𝔍𝔫 𝔗𝔥𝔢

# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 ℭ𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰
## 𝔉𝔬𝔯 𝔗𝔥𝔢 𝔉𝔢𝔡𝔢𝔯𝔞𝔩 ℭ𝔦𝔯𝔠𝔲𝔦𝔱

## SOVERAIN SOFTWARE LLC,

*Plaintiff–Appellee,*

*v.*

## NEWEGG INC.,

*Defendant–Appellant.*

### APPEAL FROM THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF TEXAS IN
### CASE NO. 07-CV-0511, JUDGE LEONARD DAVIS.

---

## BRIEF OF APPELLANT

---

Edward R. Reines
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, California 94065
(650) 802-3000

Kent E. Baldauf, Jr.
David C. Hanson
Daniel H. Brean
THE WEBB LAW FIRM
700 Koppers Building
436 Seventh Avenue
Pittsburgh, Pennsylvania 15219
(412) 471-8815

Claudia W. Frost
PILLSBURY WINTHROP
  SHAW PITTMAN, LLP
2 Houston Center
909 Fannin, Suite 2000
Houston, Texas 77010
(713) 276-7648

*Counsel for Appellant*

*Counsel for Appellant*

*Counsel for Appellant*

*Dated December 7, 2010*

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## Soverain Software, LLC v. Newegg Inc.
## 2011-1009

### CERTIFICATE OF INTEREST

Counsel for Newegg Inc. hereby certifies the following:

1.     The full name of every party or amicus represented by me is:

> Newegg Inc.

2.     The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

> Not Applicable

3.     All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

> None

4.     The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

> Edward R. Reines, Weil, Gotshal & Manges LLP
> Kent E. Baldauf, Jr., The Webb Law Firm
> David C. Hanson, The Webb Law Firm
> Daniel H. Brean, The Webb Law Firm
> John W. McIlvaine, III, The Webb Law Firm
> Richard Sayles, Sayles Werbner
> Mark Strachan, Sayles Werbner
> Claudia Wilson Frost, Pillsbury Winthrop Shaw Pittman LLP
> Jeremy Gaston, Pillsbury Winthrop Shaw Pittman LLP
> Trey Yarbrough, Yarbrough & Wilcox, PLLC

Eric H. Findlay, Findlay Craft
Charles E. Juister, Marshall Gerstein & Borun
Julianne Hartzell, Marshall Gerstein & Borun
Matthew C. Neilsen, Marshall Gerstein & Borun
Scott A. Sanderson, Marshall Gerstein & Borun
Thomas L. Duston, Marshall Gerstein & Borun

December 7, 2010

Edward R. Reines
Attorney for Defendant-Appellant

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. vii

STATEMENT OF RELATED CASES ................................................... xii

JURISDICTIONAL STATEMENT ........................................................1

STATEMENT OF THE ISSUES ...........................................................1

STATEMENT OF THE CASE ...............................................................3

STATEMENT OF FACTS .....................................................................4

    I.    THE PARTIES.............................................................................4

    II.   THE PATENTS-IN-SUIT ...........................................................5

         A.   THE "SHOPPING CART" CLAIMS .................................6

         B.   THE '492 PATENT'S "HYPERTEXT STATEMENT" CLAIMS ............8

         C.   THE '639 PATENT'S "SESSION ID" CLAIMS...................9

    III.  NEWEGG'S ACCUSED SYSTEMS ........................................ 10

         A.   THE SHOPPING CART COOKIE .................................... 12

         B.   THE SESSION ID COOKIE ........................................... 13

    IV.  THE ASSERTED PRIOR ART ................................................ 13

         A.   THE '314 AND '492 PATENTS AND THE COMPUSERVE MALL ........................................................ 14

         B.   THE '639 PATENT AND THE IBM PATENT TO JOHNSON ............. 14

SUMMARY OF THE ARGUMENT .................................................... 14

STANDARD OF REVIEW .................................................................... 18

ARGUMENT ........................................................................................ 19

I.   THE DISTRICT COURT ERRED BY MISAPPLYING THE ALL-
     ELEMENTS RULE TO BOTH SYSTEM AND METHOD CLAIMS ................. 19

     A.   THE DISTRICT COURT SHOULD HAVE ENTERED JUDGMENT
          AS A MATTER OF LAW OF NON-INFRINGEMENT OF THE
          ASSERTED "SHOPPING CART" AND "HYPERTEXT
          STATEMENT" SYSTEM CLAIMS BECAUSE THERE IS NO
          SINGLE "USER" OF THE ENTIRE ACCUSED SYSTEMS ................. 19

     B.   THE DISTRICT COURT IMPROPERLY DISREGARDED THE
          ALL-ELEMENTS RULE AND READ STEPS OUT OF THE
          SESSION ID METHOD CLAIM 79, TO OVERTURN THE JURY
          VERDICT AND FIND DIRECT INFRINGEMENT AS A MATTER
          OF LAW ................................................................................ 24

II.  THE DISTRICT COURT ERRED BY REFUSING TO ENTER
     JUDGMENT OF NON-INFRINGEMENT AS A MATTER OF LAW ON
     SOVERAIN'S SHOPPING CART AND HYPERTEXT STATEMENT
     CLAIMS ................................................................................... 26

     A.   SUBSTANTIAL EVIDENCE DOES NOT SUPPORT THE JURY'S
          FINDING OF INFRINGEMENT OF THE SHOPPING CART
          CLAIMS IN THE '314 AND '492 PATENTS ..................................... 26

          1.   Newegg Servers Do Not Modify a Shopping Cart
               in the Shopping Cart Database ....................................... 27

          2.   Newegg Servers Do Not Receive a Plurality of
               Requests to Add Products to the Shopping Cart ............ 31

          3.   Soverain Presented Insufficient Evidence to
               Support an Infringement Verdict Under the
               Doctrine of Equivalents ................................................. 32

B.   SUBSTANTIAL EVIDENCE DOES NOT SUPPORT THE JURY'S FINDING OF INFRINGEMENT OF THE '492 PATENT'S HYPERTEXT STATEMENT CLAIMS.............................................. 34

III.   THE JURY'S ACTIVE INDUCEMENT VERDICT MUST BE SET ASIDE BECAUSE THERE WAS NO EVIDENCE OF THE REQUISITE STATE OF MIND TO CAUSE INFRINGEMENT ..................................................... 36

IV.   THE DISTRICT COURT ERRED BY REFUSING TO SUBMIT OBVIOUSNESS TO THE JURY ................................................................. 37

V.   THE DISTRICT COURT ERRED BY REFUSING TO ENTER JUDGMENT AS A MATTER OF LAW THAT SOVERAIN'S TOTAL DAMAGES, PAST AND FUTURE, CANNOT EXCEED A $500,000 LUMP SUM, OR, IN THE ALTERNATIVE, BY REFUSING TO VACATE OR REMIT THE JURY'S LEGALLY DEFECTIVE, UNSUPPORTED, AND EXCESSIVE $2.5 MILLION DAMAGES AWARD...................................... 43

A.   SOVERAIN'S PROPOSED ROYALTY IMPROPERLY CLAIMED AN EXCESSIVE PORTION OF THE ENTIRE PROFIT OBTAINED FROM NEWEGG'S ONLINE PRODUCT SALES .............................. 46

B.   SOVERAIN'S DAMAGES EXPERT FAILED TO ACCOUNT FOR AND EXCLUDE NON-INFRINGING USES OF THE SHOPPING CART AND HYPERTEXT STATEMENT SYSTEMS.......................... 52

C.   NONE OF THE PATENT LICENSES IN EVIDENCE INCLUDED A RUNNING ROYALTY BASED ON A PERCENTAGE OF THE LICENSEE'S PROFITS ................................................................ 54

D.   NEWEGG'S PROFFER OF A $500,000 OR LESS LUMP-SUM ROYALTY FOR A PAID UP PERPETUAL LICENSE IS THE ONLY LEGALLY SUPPORTABLE FORM AND AMOUNT OF DAMAGES IN THIS CASE, AND ANY GREATER AWARD IS EXCESSIVE AS A MATTER OF LAW.............................................. 56

VI.   THE DISTRICT COURT ERRED BY ADMITTING UNFAIRLY PREJUDICIAL AND CONFUSING EVIDENCE REGARDING SOVERAIN'S LITIGATION-INDUCED LICENSES ...................................... 57

CONCLUSION ...................................................................................................... 60

ADDENDUM

CERTIFICATE OF FILING AND SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

<u>Page(s)</u>

## CASES

*ACCO Brands, Inc. v. ABA Locks Manufacturer Co.,*
    501 F.3d 1307 (Fed. Cir. 2007) ......................................................... 35, 36, 54

*Bell & Howell Document Management Products Co. v. Altek Systems,*
    132 F.3d 701 (Fed. Cir. 1997) ......................................................... 30

*Blackboard, Inc. v. Desire2Learn Inc.,*
    574 F.3d 1371 (Fed. Cir. 2009) ......................................................... 39

*BMC Res., Inc. v. Paymentech, L.P.,*
    498 F.3d 1373 (Fed. Cir. 2007) ......................................................... 23

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,*
    509 U.S. 209 (1993) ......................................................... 29-30, 46, 52

*Centillion Data Systems, LLC v. Qwest Communications International, Inc.,*
    Nos. 04-cv-0073 and 04-cv-2076 (S.D. Ind.) (Oct. 29, 2010),
    *appeal docketed*, No. 2010-1110 (Fed. Cir. Dec. 4, 2009) ......................................................... xii

*DSU Medical Corp. v. JMS Co.,*
    471 F.3d 1293 (Fed. Cir. 2006) ......................................................... 36, 37

*Eli Lilly & Co. v. Aradigm Corp.,*
    376 F.3d 1352 (Fed. Cir. 2004) ......................................................... 55

*Exergen Corp. v. Wal-Mart Stores, Inc.,*
    575 F.3d 1312 (Fed. Cir. 2009) ......................................................... 19

*Fresenius USA, Inc. v. Baxter International, Inc.,*
    582 F.3d 1288 (Fed. Cir. 2009) ......................................................... 19

*Golden Hour Data Systems v. emsCharts, Inc.,*
    614 F.3d 1367 (Fed. Cir. 2010) ......................................................... 23

*Hearing Components, Inc. v. Shure Inc.*,
    600 F.3d 1357 (Fed. Cir. 2010) ................................................. 18, 19

*Huck Manufacturing Co. v. Textron, Inc.*,
    No. 35956, 1975 U.S. Dist. LEXIS 12539 (E.D. Mich. May 2, 1975) ........ 53

*i4i Ltd. Partnership v. Microsoft Corp.*,
    598 F.3d 831(Fed. Cir. 2010), *cert. granted*,
    2010 U.S. LEXIS 9311 (Nov. 29, 2010) ................................................. xii, 19

*Iron Grip Barbell Co. v. USA Sports, Inc.*,
    392 F.3d 1317 (Fed. Cir. 2004) ................................................. 59

*KSR International Co. v. Teleflex, Inc.*,
    550 U.S. 398 (2007)................................................. 40, 41

*Lantech, Inc. v. Keip Machine Co.*,
    32 F.3d 542 (Fed. Cir. 1994) ................................................. 25

*Lucent Technologies v. Gateway, Inc.*,
    580 F.3d 1301 (Fed. Cir. 2009) ................................................. 50, 51, 52, 56

*Muniauction, Inc. v. Thomson Corp.*,
    532 F.3d 1318 (Fed. Cir. 2008) ................................................. *passim*

*NTP, Inc. v. Research in Motion, Ltd.*,
    418 F.3d 1282 (Fed. Cir. 2005) ................................................. 22

*Paice LLC v. Toyota Motor Corp.*,
    504 F.3d 1293 (Fed. Cir. 2007) ................................................. 32

*Perfect Web Technologies, Inc. v. InfoUSA, Inc.*,
    587 F.3d 1324 (Fed. Cir. 2009) ................................................. 39, 40

*Perkin-Elmer Corp. v. Westinghouse Electric Corp.*,
    822 F.2d 1528 (Fed. Cir. 1987) ................................................. 25

*Phoenix Solutions, Inc. v. DirecTV Group, Inc.*,
  2009 U.S. Dist. LEXIS 114977, No. CV 08-984 MRP
  (C.D. Cal. Nov. 23, 2009), *aff'd*, 2010 U.S. App. LEXIS 16105
  (Fed. Cir. August 4, 2010) .............................................................. 21

*Pioneer Corp. v. Samsung SDI Co.*,
  No. 2:06-CV-384, 2008 U.S. Dist. LEXIS 107079
  (E.D. Tex. Oct. 2, 2008) ................................................................... 58

*ResQNet.com, Inc. v. Lansa, Inc.*,
  594 F.3d 860 (Fed. Cir. 2010) ................................................. *passim*

*Riles v. Shell Exploration & Production Co.*,
  298 F.3d 1302 (Fed. Cir. 2002) ...................................................... 44

*Rite-Hite Corp. v. Kelley Co.*,
  56 F.3d 1538 (Fed. Cir. 1995) ................................................. 47, 52

*SEB S.A. v. Montgomery Ward & Co.*,
  594 F.3d 1360 (Fed. Cir. 2010), *cert. granted*,
  2010 U.S. LEXIS 8068 (Oct. 12, 2010) ................................... xii, 36

*Shockley v. Arcan*,
  248 F.3d 1349 (Fed. Cir. 2001) ...................................................... 46

*SiRF Technology, Inc. v. ITC*,
  601 F.3d 1319 (Fed. Cir. 2010) ...................................................... 25

*Soverain Software, LLC v. J.C. Penny Corporation, Inc., et al.*,
  Case No. 6:09-cv-00274-LED (E.D. Texas) ................................... xi

*Spreadsheet Automation Corp v. Microsoft Corp.*,
  587 F. Supp. 2d 794 (E.D. Tex. 2007)............................................ 58

*Tamraz v. Lincoln Electric Co.*,
  620 F.3d 665 (6th Cir. 2010) ......................................................... 45

*Texas Instruments, Inc. v. Cypress Semiconductor Corp.*,
  90 F.3d 1558 (Fed. Cir. 1996) ....................................................... 32

*U.S. v. Stalnaker,*
    571 F.3d 428, (5th Cir. 2009) ................................................................ 59, 60

*Vita-Mix Corp. v. Basic Holding, Inc.,*
    518 F.3d 1317 (Fed. Cir. 2009) ............................................................. 37

*Warner-Jenkinson Co. v. Hilton Davis Corp.,*
    520 U.S. 17 (1997) .......................................................... 19, 21, 33

*Wordtech Systems v. Integrated Networks Solutions, Inc.,*
    609 F.3d 1308 (Fed. Cir. 2010) .......................................................... 57

## STATUTES

28 U.S.C. § 1295(a)(1) ........................................................................... 1

28 U.S.C. § 1331 .................................................................................... 1

28 U.S.C. § 1338(a) ............................................................................... 1

28 U.S.C. § 2107(a) ............................................................................... 1

35 U.S.C. § 271 .................................................................................... 22

35 U.S.C. § 271(a) ............................................................................... 21

35 U.S.C. § 284 ............................................................................. 44, 56

## RULES

Fed. R. App. P. 4(a) .............................................................................. 1

Fed. R. Civ. P. 36 ................................................................................ 21

Fed. R. Civ. P. 50(b) ............................................................................. 4

Fed. R. Civ. P. 59 .................................................................................. 4

Fed. R. Evid. 402..............................................................................57

Fed. R. Evid. 403..............................................................................57

Fed. R. Evid. 408..............................................................................57

Fed. R. Evid. 702..............................................................................39

Fed. R. Evid. 704..............................................................................39

## OTHER AUTHORITY

ROBERT GOLDSCHEIDER, Litigation Backgrounder For Licensing,
    29 LES NOUVELLES 20 (1994)..................................................50

## STATEMENT OF RELATED CASES

No other appeal in or from this same civil action was previously before this Court or any other court of appeals.  Further, the following cases are the only ones known by counsel to be pending in this Court (or on appeal from this Court to the United States Supreme Court) that will directly affect or be directly affected by this Court's decision in the pending appeal: *Centillion Data Systems, LLC v. Qwest Communications International, Inc.*, Nos. 04-cv-0073 and 04-cv-2076 (S.D. Ind.) (Oct. 29, 2010), *appeal docketed*, No. 2010-1110 (Fed. Cir. Dec. 4, 2009), *SEB S.A. v. Montgomery Ward & Co.*, 594 F.3d 1360 (Fed. Cir. 2010), *cert. granted*, 2010 U.S. LEXIS 8068 (Oct. 12, 2010), and *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 841 (Fed. Cir. 2010), *cert. granted*, 2010 U.S. LEXIS 9311 (Nov. 29, 2010).

The following district court case potentially will be directly affected by this Court's decision in the present appeal: *Soverain Software, LLC v. J.C. Penny Corporation, Inc., et al.*, Case No. 6:09-cv-00274-LED (E.D. Texas).

## JURISDICTIONAL STATEMENT

The district court had original jurisdiction under 28 U.S.C. §§ 1331 and 1338(a). Because the judgment and order appealed from are final, this Court has appellate jurisdiction under 28 U.S.C. § 1295(a)(1). Newegg Inc. timely filed a notice of appeal under 28 U.S.C. § 2107(a) and Federal Rule of Appellate Procedure 4(a).

## STATEMENT OF THE ISSUES

(1)    Did the district court misapply the all-elements rule by (a) refusing to enter judgment as a matter of law that Newegg did not induce infringement of the system claims of the '314 and '492 patents, given that Newegg and its customers separately owned and controlled distinct components of the accused system, and (b) overturning the jury's verdict that Newegg did not directly infringe method claim 79 of the '639 patent, given that Newegg's customers separately performed claimed steps with no control or direction by Newegg?

(2)    Did the district court err in refusing to enter judgment as a matter of law that Newegg did not induce its customers to infringe (a) the asserted shopping cart claims of the '314 and '492 patents and (b) the asserted hypertext statement claims of the '492 patent, where the undisputed evidence showed that the accused system did not meet the former's limitations, and that the only use of the latter was by Soverain's expert?

1

(3)    Did the district court err in refusing to set aside the active inducement verdict, where the only evidence offered to show state of mind was Soverain's service of the complaint against Newegg, and Soverain's post-filing efforts to convince Newegg it was infringing?

(4)    Did the district court err in refusing to allow the jury to decide whether the asserted patent claims were obvious, where Newegg introduced substantial evidence of the prior art's teachings, the teachings' relation to the asserted claims, and someone skilled in the art could modify and adapt the prior art to make the claimed invention?

(5)    Did the district court err in refusing to enter judgment as a matter of law that damages, past and future, cannot exceed a $500,000 lump sum, where all the pertinent licenses in evidence were perpetual and granted in exchange for lump sums of less than $500,000?  Alternatively, did the district court err in refusing to vacate or remit the jury's unsubstantiated and excessive $2.5 million damages award, which could only possibly have been supported by Soverain's damages theory proffered at trial claiming 25-33% of Newegg's entire profit from online sales of non-infringing products, where there was no evidence as to whether or how Newegg's profit was attributable to or driven by the patented technology?

(6)    Did the district court err in permitting Soverain to introduce evidence, testimony, and argument regarding Soverain's large corporate e-commerce

2

"licensees," where such licenses were granted in settlement of litigation and were only offered to show that Soverain had succeeded in getting Newegg's large competitors to take licenses to the patents-in-suit?

## STATEMENT OF THE CASE

This case involves Soverain Software LLC's ("Soverain") claim that Newegg Inc. ("Newegg"): 1) directly infringed or actively induced its customers to infringe several claims of two patents covering certain aspects of a network-based e-commerce (*i.e.*, online shopping) system—namely U.S. Patent Nos. 5,715,314 ("the '314 patent") and 5,909,492 ("the '492 patent"); and 2) directly infringed several claims of a patent covering a method for processing service requests from a client to a server—namely U.S. Patent No. 7,272,639 ("the '639 patent").

At trial, the jury found that Newegg did not directly infringe any asserted claims of any of the patents-in-suit. But the jury awarded Soverain $2.5 million in damages based on findings that Newegg actively induced infringement of the asserted claims of both the '314 and '492 patents. (A35-A37).

Newegg and Soverain filed post-trial motions for judgment as a matter of law and alternatively for new trial on infringement. (A231-A232). Newegg also moved to vacate and remit the damages award. Soverain moved for a permanent injunction or alternatively for ongoing royalties. The district court denied all of

Newegg's motions.  (A1-A34).  The court overturned the jury's finding of no infringement of the '639 patent, entered judgment of infringement of the asserted claims of the '639 patent, and conditionally granted a new trial on damages for infringement of that patent after all appeals were concluded.  (A14-A17).  The court denied Soverain's injunction request and entered judgment for the $2.5 million found by the jury plus damages for the period from the verdict to the judgment date and ongoing royalties for the remaining life of the '314 and '492 patents in the amount of $0.15 per sales transaction.  (A2, A27-A33).

Newegg timely filed a notice of appeal from the judgment to this Court and subsequently amended the notice to include an appeal from the denial of its post-judgment motions.[1]  (A235).

## STATEMENT OF FACTS

### I.    THE PARTIES

Newegg is an online-only retailer.  (A1911-12).  Through its website www.newegg.com, Newegg primarily sells consumer electronics and information technology products.  (A1911-12, A1996-97).  Newegg does not make or sell any products accused of infringement, but is only alleged to infringe the patents-in-suit

---

[1]    Because the district court required the parties to file their post-trial motions under Rules 50(b) and 59 prior to the entry of judgment, out of an abundance of caution, Newegg renewed those motions after judgment was entered.  The district court denied the renewed motions.  (A235).

4

by using the patented systems and methods as a minute component of its overall online retail business. (A1901, A1967).

Soverain is the current owner of the patents-in-suit. Open Market, Inc. ("Open Market") employees originally developed the patented inventions in 1994. They also created a software product called Transact that embodied the patented technology. (A1853-54). In 2001, Open Market, unable to turn a profit, sold its assets to Divine, Inc. ("Divine"), which, despite its efforts to license the patents-in-suit itself, went out of business and filed for bankruptcy. (A1854-55, A13002). Soverain was then specifically created to acquire the Open Market assets from Divine in 2003, including all rights to the patents-in-suit and the Transact software product. (A1822).

Soverain generates income solely through patent litigation settlements and some residual maintenance and service fees from a few legacy Transact customers that Open Market originally licensed. (A1828-30, A1848-50, A1911-12). Soverain has not licensed a single new Transact customer. (A1853).

## II.    THE PATENTS-IN-SUIT

Computer networks such as the Internet include two types of computers: servers and clients. (A1553-54). Servers share their resources with a client and perform functions for a client only at a client's "request." (A1579, A1609). A server's resources include stored information available for download and the

5

ability to perform calculations or access data.  (A2267-68).  The '314 and '492

patents are generally directed to a network-based sales system, in which a client

computer may communicate with a server to facilitate online shopping

transactions.  (A66-A163).  The '639 patent is generally directed to a session

identification method to manage and track client/server communications.

Soverain asserted three distinct categories of claims against Newegg:

1) "shopping cart" claims—system claims 34 and 51 of '314 patent
and system claim 17 of the '492 patent;

2) "hypertext statement" claims—system claims 41 and 61 of the
'492 patent; and

3) "session identification" claims—method claims 60 and 79 of the
'639 patent.

(A4).  Each category is addressed separately below.

A.   THE "SHOPPING CART" CLAIMS

Claim 34 of the '314 patent is representative of the "shopping cart" claims:

34.  A network-based sales system, comprising:
      at least one buyer computer for operation by a user desiring to
buy products;
      at least one shopping cart computer; and
      a shopping cart database connected to said shopping cart
computer;
      said buyer computer and said shopping cart computer being
interconnected by a computer network;
      said buyer computer being programmed to receive a plurality of
requests from a user to add a plurality of respective products to a
shopping cart in said shopping cart database, and, in response to said
requests to add said products, to send a plurality of respective
shopping cart messages to said shopping cart computer each of which
comprises a product identifier identifying one of said plurality of
products;

6

said shopping cart computer being programmed to receive said plurality of shopping cart messages, to modify said shopping cart in said shopping cart database to reflect said plurality of requests to add said plurality of products to said shopping cart, and to cause a payment message associated with said shopping cart to be created; and

said buyer computer being programmed to receive a request from said user to purchase said plurality of products added to said shopping cart and to cause said payment message to be activated to initiate a payment transaction for said plurality of products added to said shopping cart;

said shopping cart being a stored representation of a collection of products, said shopping cart database being a database of stored representations of collections of products, and said shopping cart computer being a computer that modifies said stored representations of collections of products in said database.

(A99). Claim 51 depends from claim 34 and adds the limitation that "the network is an Internet." (A109). Independent claim 17 of the '492 patent is virtually identical to claim 34 of the '314 patent, except for additional limitations not at issue. (A147-48).

As the claims sound, the "shopping cart" claims reflect the simple implementation of the real-world concept of a shopping cart to an online store. The shopping cart claims require the customer to individually select a plurality of items for placement into an electronically stored "shopping cart," which already resides in a database in the shopping cart computer (*i.e.*, the server). As the customer selects each individual item, the database in the server is modified to reflect each product added to the shopping cart. The '314 and '492 patents do *not* disclose any way to store a customer's product selections other than having the

7

server manage a shopping cart database on the server side of the network. (A1687-88, A2127-28, A2131-32).

## B.    THE '492 PATENT'S "HYPERTEXT STATEMENT" CLAIMS

The "hypertext statement" claims are directed to a network-based sales system that allows a customer to access online statement documents regarding the details of a customer's past purchase(s). (A147, A160-61). The statement is essentially an electronic invoice or receipt. Claim 15, from which asserted claims 41 and 61 both depend, recites:

> 15. A hypertext statement system, comprising:
> a client computer for operation by a client user; and
> one or more server computers for operation by a server user;
> the client computer and the server computers being interconnected by a public packet switched computer network;
> at least one of the server computers being programmed to record information pertaining to purchase transaction records in a database, and to transmit a statement document comprising the purchase transaction records to the client computer over the network;
> the client computer being programmed to display the statement document to receive a request from the client user to display transaction details corresponding to a portion of the statement document displayed by the client computer, and to cause a transaction detail hypertext link corresponding to the portion of the statement document to be activated;
> at least one of the server computers being programmed to respond to activation of the transaction detail hypertext link by transmitting the transaction details to the client computer over the network as a transaction detail document.

(A147, A160-61). This claim requires that the customer activate a hypertext link corresponding to transaction record details, which enables the server to transmit a

transaction detail document for display on the customer's computer. Asserted dependent claims 41 and 61 add additional limitations to claim 15 that are not at issue. (A160-61).

## C.    THE '639 PATENT'S "SESSION ID" CLAIMS

Claim 79[2] of the '639 patent is directed to methods for processing service requests from a client to a server. (A164-83). It is analogous to assigning unique numbers or identifiers to customers in real-world stores. In a client-server computer network, every interaction between the client and the server is a distinct request or communication. (A1629-30). When these individual communications constitute a series of related transactions (all by the same user), they are considered a single "session." (A1629-30). To organize and store together the information and communications that are part of the same session, a "session identifier" or "session ID" (usually a string of numbers and letters) unique to the user may be appended to each message or request from the client. (A1629-30).

Independent claim 78 and dependent claim 79 are reproduced below:

78. A method of processing, in a server system, service requests from a client to the server system through a network, said method comprising the steps of:
    receiving, from the client, a service request to which a session identifier stored at the client has been appended by the client, wherein

---

[2] Because Soverain did not seek post-verdict relief with respect to the jury's finding that Newegg did not infringe claim 60 of the '639 patent, all of Soverain's previous positions with respect to claim 60 have been waived, and only claim 79 is at issue.

communications between the client and server system are according to hypertext transfer protocol;

     validating the session identifier appended to the service request; and

     servicing the service request if the appended session identifier is valid.

79. The method of claim 78, further comprising, in the server system:

     receiving an initial service request from the client;

     creating, responsive to the initial service request, the session identifier; and

     returning the session identifier to the client for storage by the client for use in subsequent distinct requests to the server system.

(A183).  The claims require the server receiving a client service request wherein the client (customer) computer has previously stored and appended a session identifier to the service request.

## III.    NEWEGG'S ACCUSED SYSTEMS

The interactions between Newegg's computers and its customers' computers are typical of arms-length online shopping transactions.  As an online retailer offering content and functionality to its customers via its website, Newegg's accused systems operate on the server side, not the client side, of the online shopping network.  Newegg does not own or control its customers' computers— the customers use their own computers.  (A1684-86, A2280).  Likewise, Newegg obviously does not and cannot compel its customers to visit and shop on Newegg's website at any time or in any particular manner.  (A1684-86, A2280, A2354-55).

Customers use familiar Internet browsers (*e.g.*, Internet Explorer) to access Newegg's website. (A2053). The customer's browser renders each page of Newegg's website when it downloads a document from Newegg's server that is written in HTML computer language. The customer's browser then interprets this HTML document to visually display the web page. (A2268-69, A2298-A2301). Newegg's sole role in creating the website and facilitating the interaction with the customer's computer is creating the HTML documents. (A2093). Of course, the shopping transaction cannot take place without the customer's and Internet browser's actions. Newegg does not create the browsers used by its customers, nor does Newegg program or place the browsers on the customers' computers. (A2298-A2301).

Internet browsers have the ability to store information on the customer's computer in software objects called "cookies." (A1512-14). When a customer downloads an HTML document from Newegg's servers, sometimes the HTML code causes the browser to create a cookie or place information into an existing cookie. (A2074-77). This cookie functionality is built into the browser. (A2093-94). Customers have the ability to unilaterally enable or disable the browser's cookie functionality. (A1681, A2290-91). Without cookies enabled, customers cannot shop or purchase products on the Newegg website. *Id.* Newegg cannot

force a customer's browser to perform any cookie-related functions if the customer disables cookies. *Id.*

This appeal involves two browser cookies: the shopping cart cookie and the session ID cookie.

A.    THE SHOPPING CART COOKIE

When Newegg's customers shop on Newegg's website and make their product selections, the items are placed into an electronic "shopping cart" in a cookie on the customer's computer.  Importantly, these product selections are *not* stored in a server database as required by the shopping cart claims.  At the time the '314 patent was filed, there was no way to implement a cookie-based, customer-side shopping cart, and none is described or claimed therein.  (A2127).

Like many websites, when Newegg's customers select an item for purchase, they click an "add to cart" button.  (A2074-77).  In response, the Newegg server generates an HTML document that the customer's browser downloads.  The browser then creates a shopping cart cookie to store information about the selected item on the customer's computer.  (A2074-77, A2281-85).  If a customer continues to shop and add more items to the shopping cart, the browser adds the additional product information to the cookie.  (A2074-77, A2281-85).  The customer's product selections are never stored on Newegg's servers during this shopping process.

12

After customers have filled their shopping carts, they may click the "check out" button, which transfers the contents of the shopping cart cookie en masse into a shopping cart database on Newegg's server. (A2078-79, A2285-86). No product information is modified after "check out." The cookie-based shopping cart's contents are simply inserted into the server database in a single action. (A1694-95, A2078-79, A2294-96).

### B.    THE SESSION ID COOKIE

When a customer shops on Newegg's website, Newegg's server generates HTML code that the customer's browser downloads to create a cookie containing a unique customer and shopping session identifier. (A1630-32, A2080-81, A2303-05, A2368-70). The browser stores this session ID cookie and appends it to future requests to Newegg's servers so that the servers can track the customer's shopping transaction. (A1630-32, A2080-81, A2303-05, A2368-70).

## IV.    THE ASSERTED PRIOR ART

The claimed inventions are straightforward implementations of basic, real-world shopping mechanisms including a shopping cart, a receipt, and shopping visit identifier. All of the tools necessary to implement these concepts existed in the pre-World Wide Web online prior art, and were readily adapted to Web protocols as soon as the Internet permitted online shopping to become viable. (A2121-30, A2141-53).

13

A.    THE '314 AND '492 PATENTS AND THE COMPUSERVE MALL

Alexander Trevor, CompuServe's former Chief Technology Officer, testified at trial in detail about the CompuServe Mall ("Mall"). The Mall was a pre-World Wide Web ("Web") retail e-commerce system. (A2141-53). He explained, with reference to specific teachings in prior art user manuals for the Mall, how the Mall allowed customers to connect to the CompuServe servers (shopping cart computers), browse merchants' online stores, select several products prior to check-out, add the products one-at-a-time to a personal holding file (shopping cart), arrange for payment, and approve the final order. (A2141-53).

B.    THE '639 PATENT AND THE IBM PATENT TO JOHNSON

U.S. Patent No. 5,560,008 to Johnson (and assigned to IBM) is directed to a system and method for authentication over a network by a server using a "credentials identifier," which the client stored and returned to the server with each subsequent request. (A2336-38). The Johnson patent is not limited to a particular transfer protocol, and hypertext transfer protocol was simply how clients and servers accomplished tasks on the Web at that time. (A2339-40).

## SUMMARY OF THE ARGUMENT

The proceedings in the district court suffered from numerous and intolerable legal errors. The result was an unwarranted finding that Newegg infringed Soverain's patents and a multi-million dollar verdict plus future royalties. This

appeal focuses on the most severe errors to vividly highlight the unfairness of the result.

This case is about Internet retail technology. The patents-in-suit claim particular ways to conduct shopping and sales transactions on the Internet that mirror basic sales procedures used by brick and mortar stores for centuries. These include the concepts of a shopping cart to hold products for check-out, receipts and invoices, and a customer tracking number. Although the application of such simple sales procedures to the Internet are obvious as a matter of common sense, let alone over Newegg's asserted online shopping prior art, Newegg was precluded from even submitting this issue to the jury.

The identification of legal errors in this case must quickly turn to the all-elements rule. All asserted claims of the '314 and '492 patents are system claims spanning the entire Internet sales network, including the store's servers that host the website and the customer's own computer. Consequently, these claims violate the cardinal principle that direct infringement requires one party to itself be responsible for satisfying all claim elements. The relationship between Newegg and its customers is a routine arms-length sales transaction, and there is no "user" of the entire accused system because neither party controls or operates the other's components. Customers' commercial benefit from Newegg's servers and the Internet does not make them actual operators of those system elements such that

15

they should bear responsibility for them as direct infringers, and the district court's contrary conclusion was error.

Regarding the '639 patent, the jury's non-infringement verdict was based on substantial evidence that there was a divided infringement problem with the asserted method claims. But the district court found infringement as a matter of law, concluding that the claimed "storing" and "appending" steps, which are unquestionably performed by the customers on their computers, are not limitations at all because they are recited in the passive voice. This was error. Whether in the active or passive voice, all claim limitations must be considered meaningful and must be satisfied to establish infringement.

The next error was the district court's failure to recognize the fundamental differences between Newegg's shopping cart functionality and the shopping cart claims of the '314 and '492 patents. These claims require a shopping cart located on the server, and when the customer selects and adds products one-by-one, the server's shopping cart is modified accordingly each time. Newegg's system, in sharp contrast, involves a shopping cart at the customer's computer, which at checkout is passed, one time, en masse to Newegg's server. This fundamental difference requires a conclusion of non-infringement.

With respect to the '492 patent, there was no evidence that anyone ever used the order history feature accused to infringe the hypertext statement claims except

Soverain's expert. Offering no opinion as to even the likelihood of probability of use, the expert conceded he had "no idea" if this feature was ever used. This failure of proof dooms Soverain's infringement claim.

As another legal error, the district court upheld the jury's conclusion that Newegg had a specific intent to induce infringement, finding mere service of the complaint and subsequent litigation to be substantial evidence. This is legally insufficient to establish the requisite culpable state of mind, especially in view of the strength of Newegg's litigation positions.

One evidentiary ruling below is so outside the bounds of the law and prejudicial that it warrants a new trial in its own right. Over diligent objection, the district court permitted Soverain to introduce testimony and argument that Amazon, The Gap, and other major online retailers entered into licenses (which were actually litigation settlements) for the patents. The fact of these major licenses was used to argue that Newegg was an inappropriate holdout for patents which had been licensed by large name brand companies—Newegg's competitors. Such evidence was unfairly prejudicial and confusing. It was intended to and did falsely imply that large, reputable online retailers conceded the patents' validity and infringement, acknowledging that the technology was valuable and thus Soverain was entitled to higher royalties. This clearly infected the jury's analysis

17

by causing it to find validity, infringement, and undeservedly large damages absent sufficient, or sometimes any, evidence.

Finally, the jury's damages award of $2.5 million must be vacated as unsubstantiated and excessive. The record is full of paid-up licenses for the patented technology for lump sums well below $500,000. There is no basis for an award of more than $500,000 or an ongoing royalty in the face of this real-world evidence. The $2.5 million compromise award was inflated because Soverain was permitted to present an unsubstantiated damages theory in excess of $30 million. Soverain essentially demanded nearly a third of Newegg's profits. This overreaching position was based on the so-called "rule of thumb" that purportedly entitles a patentee to 25-33% of the profits made in connection with the sale of an infringing product. Not only is that "rule" bereft of reliability, but in this case it is the sales procedures that are allegedly infringing, not the products sold, so the attempt to claim such a large portion of the profits is even more outrageous. Admission of this theory was legal error resulting in a jury award five times the maximum possible royalty supported by the record.

## STANDARD OF REVIEW

A grant or denial of a motion for judgment as a matter of law is reviewed *de novo*. *Hearing Components, Inc. v. Shure Inc.*, 600 F.3d 1357, 1369 (Fed. Cir. 2010). Judgment as a matter of law is properly entered if "the jury's verdict is

unsupported by substantial evidence or premised on incorrect legal standards." *Id.* Substantial evidence must be "such relevant evidence from the record taken as a whole as might be accepted by a reasonable mind as adequate to support the finding under review." *Fresenius USA, Inc. v. Baxter Int'l, Inc.*, 582 F.3d 1288, 1294 (Fed. Cir. 2009) (quotation omitted). This Court reviews jury instructions, evidentiary rulings, and rulings on motions for a new trial for abuse of discretion. *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 841 (Fed. Cir. 2010), *cert. granted*, 2010 U.S. LEXIS 9311 (Nov. 29, 2010).

## ARGUMENT

### I. THE DISTRICT COURT ERRED BY MISAPPLYING THE ALL-ELEMENTS RULE TO BOTH SYSTEM AND METHOD CLAIMS

Under the all-elements rule, direct infringement requires proof that a defendant practiced *every* element of the claimed invention. *Warner-Jenkinson Co. v. Hilton Davis Corp.*, 520 U.S. 17, 40 (1997). Failure to prove this requires judgment as a matter of law. *See Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1321 (Fed. Cir. 2009).

#### A. THE DISTRICT COURT SHOULD HAVE ENTERED JUDGMENT AS A MATTER OF LAW OF NON-INFRINGEMENT OF THE ASSERTED "SHOPPING CART" AND "HYPERTEXT STATEMENT" SYSTEM CLAIMS BECAUSE THERE IS NO SINGLE "USER" OF THE ENTIRE ACCUSED SYSTEMS

All of the asserted claims of the '314 and '492 patents are directed to systems. Each such claim recites key system elements including computers that

are separately used by either Newegg or its customers, connected via the Internet. *See, e.g.*, '314 Patent, Claim 34 ("at least one buyer computer for operation by a user desiring to buy products [and] at least one shopping cart computer . . . said buyer computer and said shopping cart computer being interconnected by a computer network"); '492 Patent, Claim 15 ("a client computer . . . and one or more server computers").

The evidence unequivocally proved that Newegg exclusively owns, possesses, controls, and operates its servers or shopping cart computers, and that Newegg's customers exclusively own, possess, control, and operate their client or buyer computers. (A1524, A1557-58, A1606, A1679-80, A1684-85, A2280, A2297). Newegg cannot force its customers to use its website, operate their own computers, or shop in any particular manner. (A1679-82). Likewise, Newegg's customers cannot dictate how Newegg's servers are programmed to operate. They can only make certain "requests" within the confines of the Newegg system architecture to cause particular responses by Newegg's servers. (A1575, A1579, A1609, A1720). Neither party has any obligation to participate, and either can terminate the interaction at any time. (A1679-82).

The accused systems cannot exist unless and until a customer decides to visit Newegg's website, has enabled cookies on his or her browser, connects to Newegg's server system via the Internet, and engages in an arms-length sales

transaction. (A1684-86). No single party uses all elements of the accused system. Thus there can be no direct infringement as a matter of law. *Warner-Jenkinson Co.*, 520 U.S. at 40.

Soverain's infringement theory was that Newegg's customers were *alone* the direct infringers because they "used," under 35 U.S.C. § 271(a), the whole accused Internet commerce system—including Newegg's servers and the Internet. (A10-A13). This theory is superficial and imprecise—Newegg's customers only "use" the whole system in the sense that they are *engaged* with it, as one of its many components. Newegg's customers do not control or operate Newegg's servers or the Internet. Newegg controls and operates its own servers at its facilities, and Internet service providers control and operate their own network elements. *See supra* Statement of Facts, Part II. Soverain's limitless and contorted definition of "use" suggests that a postal customer mailing a letter is "using" the planes, trains, automobiles, and warehouses that make up the postal system, even though the customer does not own them, knows no specifics about them, and certainly does not control or operate them. This cannot be right.[3]

---

[3] Indeed, this Court recently rejected essentially the same argument made by the patentee in *Phoenix Solutions, Inc. v. DirecTV Group, Inc.*, 2009 U.S. Dist. LEXIS 114977, No. CV 08-984 MRP, at *28-29 (C.D. Cal. Nov. 23, 2009), *aff'd* 2010 U.S. App. LEXIS 16105 (Fed. Cir. August 4, 2010) (affirming without opinion under Rule 36). There, Phoenix Solutions argued that summary judgment of non-infringement should be reversed because it was based on the premise that "use" of a system under section 271(a) required the direct infringer to perform every element of the claim.

21

In light of the reality that Newegg's customers are *not* operating every element of the accused system, and thus are not using all elements from a technological perspective, the district court focused instead on commercial benefit and customer user experience. (A10-A13). Ultimately, Newegg's customers were wrongly deemed to use the entire system under § 271 because they "choos[e] the products to purchase, when to checkout, and when to submit an order" and "choos[e] to view their order history and transaction details." (A13).

For this novel and unsupported approach to "use" the district court relied on *NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282 (Fed. Cir. 2005). But *NTP* addressed the very different question of identifying a particular location *where* a system is used—not whether multiple actors are involved in using it. *NTP* did not even purport to address the standard for direct or divided infringement of system claims, and it certainly did not hold that the analysis is "fundamentally different" such that one party does not have to operate all the system elements it is supposedly using. *Id.* at 1317-18. This Court expressly noted that the issue of direct infringement by end user customers was even not being considered on appeal. *Id.* at 1317 n.13. Rather, *NTP* merely held that because "customers send and receive messages by manipulating the handheld devices in their possession in the United States, the location of the use of the communication system as a whole occurs in the United States." *Id.* at 1317.

22

This Court has never recognized an exception to the all-elements rule for any type of claim absent at least a showing of "control or direction" sufficient to impose vicarious liability. *See Muniauction, Inc. v. Thomson Corp.*, 532 F.3d 1318, 1329-30 (Fed. Cir. 2008). In fact, this Court recently affirmed a grant of judgment as a matter of law of non-infringement where no one party was found to satisfy every system claim element under a divided infringement theory. *Golden Hour Data Sys. v. emsCharts, Inc.*, 614 F.3d 1367, 1381 (Fed. Cir. 2010). Thus, at a minimum, when an accused system includes components controlled by separate entities, direct infringement cannot occur unless the direct infringer "uses" the entire accused system under *Muniauction's* divided infringement standard (*i.e.*, the separate entity's actions must be legally attributable to the accused direct infringer).

Here, as in *Muniauction*, Newegg and its customers engage in "mere arms-length cooperation," which cannot "give rise to direct infringement by *any party*." *Muniauction*, 532 F.3d at 1329 (quoting *BMC*, 498 F.3d at 1381) (emphasis added). Neither party can be deemed a "mastermind" that controls or directs the entire system such that it should be vicariously liable for the others' actions. Thus,

the divided infringement exception of *Muniauction* cannot apply,[4] and there can be no infringement liability as a matter of law.

> B.  THE DISTRICT COURT IMPROPERLY DISREGARDED THE ALL-ELEMENTS RULE AND READ STEPS OUT OF THE SESSION ID METHOD CLAIM 79, TO OVERTURN THE JURY VERDICT AND FIND DIRECT INFRINGEMENT AS A MATTER OF LAW

The jury deliberated and concluded that Newegg did not directly infringe the '639 patent method claims. (A36). The district court overturned this verdict to find method claim 79 infringed as a matter of law, despite the fact that the following italicized limitations were shown at trial to be steps performed by the customer or client computer, not Newegg: "receiving, from the client, a service request to which a session identifier *stored at the client* has been *appended by the client*." (A183).

Newegg does not satisfy the all-elements rule with respect to claim 79. The customer's Internet browser unilaterally stores the session ID cookie and appends the session identifier. *See* (A16) (explaining that the trial record established "a client must send a request for Newegg to receive and must append the session identifier to the request"). Newegg does not program or install the browser. *See supra* Statement of Facts, Part III. As discussed above, Newegg and its customers

---

[4] Soverain conceded as much and, arguing that *Muniauction*'s holding was applicable to method claims only, stated that "Soverain seeks no [divided infringement] exception to the rule because the proofs at trial established that, under the properly applied law, the all-elements test was met by Newegg's accused systems." (A9697, A9706-07).

are engaged in "mere arms-length cooperation," which cannot "give rise to direct infringement by *any party*," and so the "divided infringement" exception to the all-elements rule does not apply. *Muniauction*, 532 F.3d at 1329.

The district court nevertheless overturned the jury's verdict and entered judgment as a matter of law of infringement based on the conclusion that the above limitations of claim 79 supposedly require only a single action of "receiving" an object. (A15-A17). The district court thus impermissibly read the steps of "storing" and "appending" out of the claim, but these claimed actions cannot be ignored, as "[a]ll limitations in a claim must be considered meaningful." *Lantech, Inc. v. Keip Mach. Co.*, 32 F.3d 542, 546 (Fed. Cir. 1994); *cf. Perkin-Elmer Corp. v. Westinghouse Elec. Corp.*, 822 F.2d 1528, 1532 (Fed. Cir. 1987) ("[A] court may not . . . erase a plethora of meaningful structural and functional limitations of the claim on which the public is entitled to rely in avoiding infringement.").

The district court relied on *SiRF Technology, Inc. v. ITC*, 601 F.3d 1319 (Fed. Cir. 2010) to justify its claim reading. (A15-A17). In *SiRF*, however, the defendant attempted to read additional limitations into the claims that had no textual basis whatsoever in the claims themselves. *See id.* at 1329-31. Unlike the *SiRF* defendant, Newegg does not need to "read in" any language to these claims to show that certain third-party steps are part of the claimed method. The proof is

25

in claim 79, which expressly includes steps requiring a session identifier to be "stored at the client" and "appended by the client."

Claim 79's expressly claimed steps are not directed to merely "receiving [an object]," but to receiving a specific object, sent by a specific third-party, on which certain specific actions have been taken by that third-party. Storing and appending a session identifier are *actions* the customer performs to satisfy the claim limitations, despite their being written in the passive voice. The district court should have entered judgment on the verdict of non-infringement. (A16).

## II.   THE DISTRICT COURT ERRED BY REFUSING TO ENTER JUDGMENT OF NON-INFRINGEMENT AS A MATTER OF LAW ON SOVERAIN'S SHOPPING CART AND HYPERTEXT STATEMENT CLAIMS

No reasonable jury could have found the accused system satisfied all shopping cart claim limitations, or that anyone actually used Newegg's website features accused to infringe the hypertext statement claims. Judgment as a matter of law of infringement should have been granted. In the alternative, at a minimum, a new trial should be granted because the jury's infringement verdict was against the great weight and preponderance of the evidence.

### A.   SUBSTANTIAL EVIDENCE DOES NOT SUPPORT THE JURY'S FINDING OF INFRINGEMENT OF THE SHOPPING CART CLAIMS IN THE '314 AND '492 PATENTS

The shopping cart claims include "modify" and "plurality" limitations that require the items in the customer's shopping cart to be added, stored, and

26

transmitted in very particular ways. *See* Statement of Facts, *supra* Parts II.A-B. Specifically, claim 34 of the '314 patent requires the "shopping cart computer [to be] programmed to receive said plurality of shopping cart messages, to *modify* said shopping cart *in said shopping cart database*." (A99) (emphasis added). Claim 34 also requires that the "buyer computer [be] programmed to . . . , in response to requests to add [] products, to send a *plurality* of respective shopping cart messages to said shopping cart computer." *Id.* (emphasis added). Claim 17 of the '492 patent includes the same material claim limitations. (A147).

Newegg's shopping cart functionality undisputedly works as follows: "[A]s items get added to the cart, it's the cookie on the customer computer that changes and . . . no interaction with the shopping cart database is involved." (A2293-94). After all items have been selected and added to the cookie, the customer "checks out" and the contents of the customer's shopping cart are inserted into Newegg's shopping cart database in a single action. (A2294-95, A2102-04). This "one time" insertion of a customer's shopping cart involves no change or modification to any existing shopping cart data, either in the cookie or the database. *Id.*

1.    *Newegg Servers Do Not Modify a Shopping Cart in the Shopping Cart Database*

The district court incorrectly concluded that Newegg's system could literally satisfy the shopping cart claims' "modification" limitations because Newegg's

27

server assigns a shopping cart identifier (*i.e.*, "shopping cart ID"). (A7). This assignment does not satisfy the "modification" limitations.

At checkout the Newegg server provides a numeric identifier to each shopping cart to uniquely identify each customer's cart. (A2084-87). At trial, Soverain's technical expert, Dr. Grimes, opined that "once the shopping cart ID is created, 'an instance of a shopping cart' exists in the database," and "once the customer's selected products are inserted into the shopping cart in the shopping cart database, that 'instance of a shopping cart' is modified." (A7). Essentially, Dr. Grimes assumed that creating a shopping cart ID somehow creates and references a predetermined space in the database, into which the shopping cart is placed. (A1700). But this is incorrect and inconsistent with the evidence. Even if this characterization were accurate, such a system would not satisfy the modification limitations under the district court's construction of the term "shopping cart."

James Wu, Newegg's Chief Technical Officer, unequivocally testified that the shopping cart ID is just a number generated to identify the customer, not a space in the server database. (A2084-87) (explaining that the shopping cart ID is the means by which each customer can "take a number" as they check out, to distinguish them from other shoppers). Newegg's technical expert, Edward Tittel, likewise confirmed that the shopping cart ID is merely a number with no

28

correlation to any database space. (A2295-96) ("[The shopping cart ID is] just a counter, and it has nothing to do with the database either.").

Soverain's theory of how Newegg's system works is mere unsupported conjecture by Dr. Grimes. The only factual *evidence* ever alleged to support this theory is a single excerpt from Wu's deposition, reproduced here in its entirety:

> Q.   Is there a point when the shopping cart ID is generated, but there is no corresponding entry in the table, this temporary table which stores shopping carts?
> A.   You're right. The timing to—because shopping cart ID is shopping cart ID table. Shopping cart line item table is different. So we generate ID that time, that moment, nothing in shopping cart item—line item table. Then we go to second step with this ID. You can say second box. This time different, yes.

(A13022); *see also* (A9701-02) (Soverain arguing that "this testimony was sufficient to support the jury's verdict"). Nothing in this excerpt supports Soverain's characterization of Newegg's system. Nowhere did Wu suggest that the "[shopping cart] identifier is a reference to the space in the database" into which the shopping cart is later inserted, as Dr. Grimes alleged. (A1700).

At best, Soverain's position is mere speculation that is wholly inconsistent with the evidence. At worst, Soverain is blatantly exploiting the grammatical errors and perceived ambiguity in an isolated deposition snippet of someone who speaks English as a second language. Dr. Grimes' testimony does not overcome this evidentiary deficiency because when expert testimony is clearly inconsistent with the evidence, that testimony is not entitled to any weight. *Brooke Group Ltd.*

29

*v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993) ("When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict."); *cf. Bell & Howell Document Mgmt. Prods. Co. v. Altek Sys.*, 132 F.3d 701, 706 (Fed. Cir. 1997) ("any expert testimony that is inconsistent with unambiguous intrinsic evidence should be accorded no weight" for claim construction purposes).

Even if Soverain's characterization of Newegg's system were correct, Newegg still would not satisfy the modification limitations. The shopping cart claims require the system to *"modif[y] the shopping cart* in [the] shopping cart database." The district court construed the term "shopping cart" to mean "a stored representation of a collection of products." (A60). Thus, even if the customer's shopping cart were inserted into some predefined database space created by the shopping cart ID, Soverain conceded the supposed "instance of a shopping cart" contains no product information. (A10405-06) (arguing that Newegg's system involves "creating an instance of a shopping cart before populating it" with the product information). Thus, Soverain's "instance of a shopping cart" is not a "shopping cart" under the district court's construction because it contains no product information. Any modification of the supposed "instance" does not modify a "shopping cart."

30

2.    *Newegg Servers Do Not Receive a Plurality of Requests to Add Products to the Shopping Cart*

The parties do not dispute that Newegg's website transfers all of a customer's product selections to the shopping cart database *en masse*, rather than one at a time as each product is selected. (A8, A1695-98, A2280-86, A2294-95, A2356-59). Rather, Soverain disputes whether the word "respective" in the shopping cart claims requires that the plurality of requests to add products result in an update to the shopping cart database every time a customer adds a new item. (A2356-59); *see supra* Statement of Facts, Part II.A.

The claims require a system programmed "to receive a *plurality* of requests from a user to add a *plurality of respective* products to a shopping cart in said shopping cart database, and, in response to said requests to add said products, to send a *plurality of respective* shopping cart messages to said shopping cart computer," as set forth in claim 34 of the '314 patent and claim 17 of the '492 patent. (A99, A147-48) (emphasis added). Thus, the shopping cart messages and products to which they pertain are expressly claimed as being respective, or sent individually to the database in response to each distinct request to add a product. Because shopping cart information is placed into a Newegg database only upon checkout, and a checkout request is not a request to add a product to a shopping cart, in Newegg's system there is no "*plurality of respective* shopping cart

31

messages to said shopping cart computer." There is only a single message sent at checkout. (A1695, A2285) (emphasis added).

3.    *Soverain Presented Insufficient Evidence to Support an Infringement Verdict Under the Doctrine of Equivalents*

The Federal Circuit has been clear that

"a patentee must . . . provide *particularized testimony and linking argument* . . . with respect to the function, way, result test when such evidence is presented to support a finding of infringement under the doctrine of equivalents. Generalized testimony as to the overall similarity between the claims and the accused infringer's product or process will not suffice."

*Paice LLC v. Toyota Motor Corp.*, 504 F.3d 1293, 1305 (Fed. Cir. 2007) (quoting *Tex. Instruments, Inc. v. Cypress Semiconductor Corp.*, 90 F.3d 1558, 1567 (Fed. Cir. 1996)). Here, Soverain and Dr. Grimes fell far short of satisfying this standard in an attempt to broadly cover the use of any "shopping carts" and "order statements" for online shopping.

The district court pointed to four pages of Dr. Grimes' testimony as substantial evidence of infringement under the doctrine of equivalents. (A8-A9) (citing A1584-88). In most of that testimony, Dr. Grimes simply defined the doctrine of equivalents and summarized the differences between Newegg's and Soverain's reading of the modification and plurality limitations. The entirety of the substantive "analysis" performed by Dr. Grimes in these four pages of testimony boils down to the following statements:

32

1) "[T]he function performed . . . [is the same because] you end up with items stored in Newegg's shopping cart database."

2) "[T]hese, in fact, are design alternatives. A designer implementing a shopping cart and putting items from a shopping cart into a database could do it either way."

(A1584-88). Dr. Grimes then summarily posited that "[t]he differences are insubstantial" without further explanation. (A1587).

Dr. Grimes' sparse conclusory statements completely fail to show that the modification and plurality limitations satisfy the equivalence standard. Dr. Grimes did not even separately discuss the claim limitations to which he was referring, but lumped the modification and plurality limitations together. But "the doctrine of equivalents must be applied to individual elements of the claim, not to the invention as a whole." *Warner-Jenkinson*, 520 U.S at 29, 40. Accordingly, there was insufficient evidence to support an equivalence finding, and a jury verdict premised upon such a finding cannot be sustained.

While Soverain completely failed to prove equivalence, Newegg clearly established *non*-equivalence. Regarding the "plurality" limitations, because all shopping cart product information is stored on a cookie on the customer's computer until checkout, Newegg's system has substantial benefits (it is considerably faster and uses 15 times less server database space)[5] and tradeoffs

---

[5] (A1705-07, A2077-78, A2288-90).

(customers cannot continue a shopping session at a different computer)[6] compared to the server-side storage system the claims require. For the same reasons, the "modification" limitations are not satisfied under the doctrine of equivalents. By placing shopping cart product information into a database only at checkout, Newegg gains the above-mentioned substantial efficiency benefits, which would not be possible using the fundamentally different claimed server-side system.

B.    SUBSTANTIAL EVIDENCE DOES NOT SUPPORT THE JURY'S FINDING OF INFRINGEMENT OF THE '492 PATENT'S HYPERTEXT STATEMENT CLAIMS

The Newegg website's order history feature enables a customer to activate certain hypertext links to view a past order's transaction details. This feature was accused of infringing the '492 patent's hypertext statement system claims. *See supra* Statement of Facts, Part II.B (discussing asserted claims 41 and 61). But at trial Soverain never introduced any evidence that Newegg's customers ever used this feature. The only person Soverain proved ever used the order history feature was Soverain's expert Dr. Grimes. (A1711). There was no evidence to suggest that customers ordinarily or necessarily use this optional function. Importantly, Dr. Grimes conceded that he did not have "any idea" whether Newegg's customers ever used this feature, and even if they did, with what frequency. *Id.*

Even assuming that the order history feature of Newegg's system would otherwise infringe, customers are not required to use this optional order history

---

[6] (A1705-07, A2290-91).

feature. (A1531-33). Soverain based its liability theory only on accused system "use" and requested damages only on a per transaction basis. (A1456). Absent evidence to show actual use by Newegg's customers, Newegg cannot be liable or subject to damages on a per use basis. *See ACCO Brands, Inc. v. ABA Locks Mfr. Co.*, 501 F.3d 1307, 1313 (Fed. Cir. 2007).

The district court found that the hypertext statement claims may nevertheless be deemed infringed because "Newegg's order history system is reasonably capable of infringing the hypertext statement system claims." (A10). *ACCO Brands*, a case with strikingly similar facts, compels the opposite result. There, this Court reversed an infringement finding because there was no evidence that the claimed locking system was actually used, other than by the patentee's expert. The expert was able to offer "no opinion" as to whether others had ever used the accused lock in an infringing manner. *ACCO Brands*, 501 F.3d at 1313. Although the accused infringer had provided instructions describing the infringing manner of use, this Court determined the evidence was insufficient. *Id.* at 1312-13. Direct infringement cannot be proven without evidence of "specific instances of direct infringement" or proof that infringement necessarily occurred. *Id.* at 1312-13. The jury's infringement finding was therefore reversed because "the record contain[ed] no evidence of actual users having operated the lock in an infringing

manner," and "hypothetical instances of direct infringement are insufficient to establish vicarious liability or indirect infringement." *Id.*

Under *ACCO Brands*, judgment of non-infringement as a matter of law is required in these circumstances and should have been granted.

## III. THE JURY'S ACTIVE INDUCEMENT VERDICT MUST BE SET ASIDE BECAUSE THERE WAS NO EVIDENCE OF THE REQUISITE STATE OF MIND TO CAUSE INFRINGEMENT

To actively induce infringement, "the inducer must have an affirmative intent to cause direct infringement . . . . [I]nducement requires that the alleged infringer knowingly induced infringement and possessed specific intent to encourage another's infringement." *DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1306 (Fed. Cir. 2006) (quotations omitted); *see also SEB S.A. v. Montgomery Ward & Co.*, 594 F.3d 1360, 1376 (Fed. Cir. 2010) ("[D]eliberate indifference of a known risk . . . is a form of actual knowledge."), *cert. granted*, 2010 U.S. LEXIS 8068 (Oct. 12, 2010). Although the Supreme Court is presently considering the precise standard for the requisite state of mind, at a minimum, the evidence here fails to meet any legitimate standard, including the "specific intent" standard submitted to the jury—in particular, that Newegg "kn[ew] or should have known that the encouraged acts constitute infringement." (A47-48).

As demonstrated herein, Newegg had a reasonable and good faith belief that the accused system did not infringe any valid asserted claim, as further confirmed

36

by the jury's finding that Newegg did not directly infringe any claim. *See DSU Med. Corp.*, 471 F.3d at 1307 (approving finding of lack of intent where alleged infringer "did not believe" the accused product infringed, despite knowing of patentee's infringement allegations); *see also* (A35-A36). There is absolutely no evidence that Newegg intended to infringe the patents, nor did it proceed with deliberate indifference, or even negligence.

Soverain's only argument in support of the scienter element of inducement was that Newegg became aware of the patents-in-suit when Soverain served its infringement complaint, and Soverain's counsel had since tried to convince Newegg that it was infringing. (A2703-04). This evidence, standing alone, is insufficient to support a finding of specific intent. *See DSU Med.*, 471 F.3d at 1035; *see also Vita-Mix Corp. v. Basic Holding, Inc.*, 518 F.3d 1317, 1328 (Fed. Cir. 2009) ("Intent can be shown by circumstantial evidence, but the mere knowledge of possible infringement will not suffice.").

## IV.   THE DISTRICT COURT ERRED BY REFUSING TO SUBMIT OBVIOUSNESS TO THE JURY

The inventions at issue in this case include an online shopping cart, an order detail statement, and a shopping session identifier. *See* Statement of Facts, at Part II, *supra*. These "inventions" are ubiquitous and familiar not only from the innumerable e-commerce websites existing today, but also from being logical extensions of longstanding staples of shopping and commerce in general. Physical

shopping carts, invoices and receipts, and customer identifiers have been used for centuries to make shopping faster, easier, and better documented. The patents claim to have "invented" the online analogue of this age-old system.

The district court precluded the jury from hearing argument and deciding whether the shopping cart and other inventions were obvious. (A2638). The district court implicitly assumed that the online shopping cart and other inventions were too technologically complex for a lay person to evaluate absent expert opinion testimony. Presumably based on that assumption, the district court granted Soverain's Rule 50(a) motion on obviousness because Newegg's expert, Edward Tittel, stopped short of expressing an opinion at trial as to the ultimate legal issue.[7] (A2602-03) (Soverain's counsel arguing that "in a case like this, you need expert opinion testimony to get to the jury, and they don't have it"); *see generally* (A2601-05). The issue was not that Newegg had failed to introduce *any* expert testimony regarding obviousness. Indeed, Tittel (and other witnesses) testified at great length about the prior art and how it related to the claimed invention. Rather, the determinative issue for the district court was that Tittel stopped short of expressing his *opinion* as to whether the claims, having been thoroughly discussed

---

[7] The district court orally granted Soverain's motion without explanation, stating only that "I don't think there's sufficient testimony to present an obviousness case to the jury." (A2638). The court ostensibly believed that Newegg's testimony failed to present clear and convincing evidence of invalidity, as was the standard for which the court instructed the jury. (A42).

in light of the prior art, were ultimately "obvious." Requiring Tittel to use specific words or phrases in giving his expert testimony exalts form over substance, and finds no support in the law.

A claim is obvious if the finder of fact, properly applying the law to the facts, concludes it to be obvious. Opinion testimony from experts is intended to "assist the trier of fact to understand the evidence or to determine a fact in issue," Fed. R. Evid. 702, but the Federal Rules plainly contemplate that expert testimony need not encompass the ultimate legal issues. *See* Fed. R. Evid. 704; *see also Perfect Web Techs., Inc. v. InfoUSA, Inc.*, 587 F.3d 1324, 1329 (Fed. Cir. 2009) ("[W]hile an analysis of obviousness always depends on evidence that supports the required Graham factual findings, it also may include recourse to logic, judgment, and common sense available to the person of ordinary skill that do not necessarily require explication in any reference or expert opinion."); *Blackboard, Inc. v. Desire2Learn Inc.*, 574 F.3d 1371, 1381-82 (Fed. Cir. 2009) ("[I]t is not necessary to rely on the testimony of Desire2Learn's [expert] witness to conclude that claims 36-38 are invalid. Instead, . . . the conclusion of anticipation is dictated by the testimony of Blackboard's own witnesses and the documentary evidence that was presented to the jury.").

There exists no requirement that an expert must say the magic words "and therefore this claim is obvious" in order for obviousness to go to the jury.

39

Obviousness is a question of law based on underlying fact findings, and here Newegg presented substantial evidence, expert testimony, and other witness testimony establishing the factual predicates for obviousness. *Perfect Web Techs.*, 587 F.3d at 1327. No expert testimony was required on the ultimate legal issue.

In *KSR International Co. v. Teleflex, Inc.*, the Supreme Court emphasized that "when a patent simply arranges old elements with each performing the same function it had been known to perform and yields no more than one would expect from such an arrangement, the combination is obvious." 550 U.S. 398, 417 (2007). The operative question is thus whether the combination or modification is merely "the predictable use of prior art elements according to their established functions" such that it is "the product not of innovation but of ordinary skill and common sense." *Id.* at 417, 421. The online shopping cart and other inventions at issue here are not so esoteric or technologically intensive that a jury would be ill-equipped to use its "common sense" to determine obviousness absent an expert telling them that that invention is obvious.

As discussed below, Newegg demonstrated that the patented technology was no more than the application of prior art systems to the Web's basic functionality, in a manner that was well within the technical grasp of those having ordinary skill in the art. Just as in *Muniauction,* where the mere adaptation of an old network-based system to utilize new Internet and Web protocols and browsers was deemed

40

obvious, 532 F.3d at 1330, here it would have been obvious to those of ordinary skill in the art to use the basic hypertext and URL functions of the Web in their intended manner to adapt these systems to the Web. *KSR*, 550 U.S. at 417.

All of the tools necessary to create the claimed methods and systems existed in the prior art. (A2121-30, A2141-53). Alexander Trevor, the former CTO of CompuServe, testified in detail about the pre-Web e-commerce system known as the CompuServe Mall. *See supra* Statement of Facts, Part IV.A. He explained how the Mall allowed customers to connect to the CompuServe servers (shopping cart computers), browse merchants' online stores, select several products prior to check-out, add the products one-at-a-time to a personal holding file (shopping cart), and make arrangement for payment and final approval of the order. (A2141-53). The Mall enabled customers to shop on CompuServe in the same manner as is disclosed and claimed in the '314 and '492 patents.

Tittel thoroughly applied the evidence concerning the CompuServe Mall (via Trevor's testimony and the prior art CompuServe books, *see supra* Statement of Facts, Part IV) to show how it satisfies the shopping cart claims (*i.e.*, claims 35 and 51 of the '314 patent and claim 17 of the '492 patent). (A2309-27, A2329-31). He testified that one of ordinary skill in the art could implement a Web-based retail e-commerce system patterned after the Mall, based on the functional disclosure of the Mall's operation set forth in the prior art. (A2312-13) ("[I]f you know how to

write software and you read about or see how a software system works, you can figure out what's going on underneath the hood. If you see menus being used— menus are things that programmers know how to create and how to manipulate. If you see data being manipulated, if you understand the kind of manipulation that's involved, you can write code to perform that manipulation."); *see also* (A2187) (Trevor confirming same).

Regarding the hypertext statement claims (claims 41 and 61 of the '492 patent), Tittel further testified about a prior art U.S. Patent to Gifford and its disclosure of a system for purchasing goods or information over a public packet switched computer network based on HTTP and HTML.  (A2331-36).  He explained that hypertext was a fundamental tool for building web pages and that hypertext statements were a trivial application of HTTP, relating the use of these fundamental web tools to claims 41 and 61. *Id.*

Regarding the '639 patent, Tittel again explained the fundamental web tools referenced in the Gifford patent.  He also discussed another patent's teachings (a U.S. Patent to Johnson, and assigned to IBM), which is directed to a system and method for authentication over a network by use of a "credentials identifier" by the server, which the client stored and returned to the server with each subsequent request.  (A2336-38).  Tittel explained that "[t]he same mechanisms that are used to set up a network log-in [as in Johnson], apply to establishing a session [as in the

'639 patent]." (A2338). He noted that Johnson is not limited to a particular transfer protocol, and that the "hypertext transfer protocol" in the claims was simply how clients and servers accomplished tasks on the Web. (A2339-40). Thus, he explicitly showed a clear association between the Johnson patent's teachings and the asserted claims. (A2338-41). *See supra* Statement of Facts, Part II.C (discussing claim 79).

Newegg offered many facts and explanations concerning the prior art and its relationship to the claims, and reasonable minds using common sense could readily accept the evidence as sufficient to show obviousness. Thus, it was error to refuse to submit the issue of obviousness to the jury, and Newegg is entitled to a new trial on obviousness.

## V.    THE DISTRICT COURT ERRED BY REFUSING TO ENTER JUDGMENT AS A MATTER OF LAW THAT SOVERAIN'S TOTAL DAMAGES, PAST AND FUTURE, CANNOT EXCEED A $500,000 LUMP SUM, OR, IN THE ALTERNATIVE, BY REFUSING TO VACATE OR REMIT THE JURY'S LEGALLY DEFECTIVE, UNSUPPORTED, AND EXCESSIVE $2.5 MILLION DAMAGES AWARD

The damages theory Soverain presented at trial, over Newegg's strenuous objections, was grossly overreaching and untethered to economic rationality. This brief explains in no uncertain terms why Soverain's theory is fundamentally unreliable and the verdict unsupported by evidence. This Court should vacate the $2,500,000 verdict that resulted from Soverain's presentation of an improper damages theory.

43

Soverain argued that it should receive almost a third of the profit of every completed Newegg sales transaction, as a purported "reasonable royalty" under 35 U.S.C. § 284. Given everything that goes into creating a first class Internet retail store such as Newegg's, and the incredibly minor software accessories that are the subject of the patents, Soverain has no right to seek such a large chunk of Newegg's profit.

By arbitrarily using the notorious "25% rule" (in the form here of the 25-33% rule) on the profit of all sales revenue for products sold through Newegg's website, Soverain failed to base its damages theory on "sound economic and factual predicates." *Riles v. Shell Exploration & Prod. Co.*, 298 F.3d 1302, 1311 (Fed. Cir. 2002). Nor did Soverain establish an economically justified nexus between the patented technology's value and the 25-33% of Newegg's profit from sales of non-infringing products to which Soverain claimed a right. *See ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010) ("[A] reasonable royalty analysis requires a court to hypothesize, not to speculate. . . . [T]he trial court must carefully tie proof of damages to the claimed invention's footprint in the market place."). This kind of damages analysis is the poster-child for damages theories that prejudicially invite inflated compromise verdicts, and which breed justifiable cynicism for the patent system.

Prior to trial, Newegg filed a *Daubert* motion to preclude Nawrocki from presenting his damages theory to the jury, for essentially the same reasons discussed herein. (A6110-22). The district court denied Newegg's motion at the pretrial hearing without explanation. (A1003-08). As shown below, Nawrocki's damages theory was legally impermissible and fundamentally unreliable, and the district court's summary denial of Newegg's *Daubert* motion was an abuse of discretion. *See Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665 (6th Cir. 2010) (reversing denial of *Daubert* challenge based upon finding that "[t]here is too great an analytical gap between the data and the opinion proffered").

There are nineteen non-settlement licenses to the patents-in-suit in the record, all paid-up lump sum perpetual licenses granted to online retailers for a total aggregate amount of about $200,000. (A1856-57, A2433-37). Additionally, there are nine single user software licenses to the Transact product, which embodied the patents-in-suit, all for one-time lump sum license fees of up to $344,000. (A1857, A2438-40). With such a wealth of evidence about the patents' value in the marketplace, reliance on the so-called "Rule of Thumb" to seek almost a third of a company's profit is not only an improper opinion, it is also a litigation abuse. The numerous and highly informative licenses showing the claimed invention's "footprint in the marketplace" cannot simply be ignored. *See ResQNet.com*, 594 F.3d at 869.

45

Because Soverain did not present a legally supportable damages theory, the only valid damages range came from Newegg's expert, W. Christopher Bakewell. Based on a detailed analysis of real world evidence, including all the licenses, Bakewell proffered a one-time lump sum of, at most, $500,000. This measure of $500,000 or less in damages should be awarded, or at least remitted on remand. *See Brooke Group Ltd*, 509 U.S. at 242 ("When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict."); *Shockley v. Arcan*, 248 F.3d 1349, 1362 (Fed. Cir. 2001).

Each of the specific legal errors is discussed in detail below.

A.    SOVERAIN'S PROPOSED ROYALTY IMPROPERLY CLAIMED AN EXCESSIVE PORTION OF THE ENTIRE PROFIT OBTAINED FROM NEWEGG'S ONLINE PRODUCT SALES

Soverain sought a running royalty of $1.20 per completed sales transaction on Newegg's website ($0.80 for the '314 and '492 patents, and $0.40 for the '639 patent), based on a "25% rule of thumb." (A1887-89). As demonstrated below, this $1.20 figure was explicitly calculated and based only on Newegg's total profits from sales of unrelated non-infringing products.

Newegg's business involves online re-sale of products such as computers and other consumer electronics. (A2050-52). The patented inventions simply effectuate a few particular aspects of the overall shopping experience on

Newegg's website. Specifically, as discussed in detail above, the patents encompass shopping cart functionality, past order statements, and session identification. Newegg is not a software company or competitor of Soverain and does not sell the technology covered by the patents-in-suit. (A1966-67, A2003, A2050-52). Indeed, none of the various electronics or computer products sold by Newegg are accused of infringing the patents-in-suit. (A1967). The products sold by Newegg therefore "have essentially no functional relationship to the patented invention," and "there is no basis for extending that recovery to include damage for items that are neither competitive with nor function with the patented invention." *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1549, 1551 (Fed. Cir. 1995). The patented technology is used, if at all, "only as a matter of convenience or business advantage" when selling products online, as one tiny part of Newegg's overall business. *Id.* at 1549-50.

Despite these facts, Soverain predicated its damages theory on all product sales on Newegg's website. As Nawrocki explained, "what I've done is I've taken Newegg's average order value [of $200 per order,] . . . I applied here an operating profit of 6 percent [,] . . . [a]nd then the next section that I did was, I apportioned it 25 to 33 percent." (A1923); *see generally* (A1922-27, A1932) (performing additional similar calculations based on alternative profit margins, ultimately arriving at $1.20 per transaction royalty).

47

The total damages amount Nawrocki proposed for infringement of the '314 and '492 patents was $22,653,203.20 (or $0.80 x 28,316,504 sales transactions) and $11,362,602.00 for the '639 patent, totaling nearly $34 million. (A1887-89). Nawrocki admitted that the *only* factor he considered in calculating damages was Newegg's overall financial success:

> Q:    We don't have a specific economic analysis analyzing each of the factors that Newegg contributes [to its success in the marketplace] here, do we?
> A:    Not other than looking at their overall financials and their profitability.

(A1960-61).

Nawrocki's damages theory was legally impermissible because Soverain lacked any proof that: 1) the claimed invention constituted the basis for customer demand for products sold by Newegg; or 2) Newegg's profits were otherwise solely attributable to the patented technology. *Id.* at 1549-50. While Soverain presented no evidence that the patented technology drove customer demand, Lee Cheng, Newegg's corporate representative, testified in detail about the major aspects of Newegg's business that draw customers to Newegg—great product selection, low prices, fast shipping, award winning customer service, and a corporate culture of integrity and fairness—none of which include the accused technology. (A2003-04, A2007-08, A2013-20).

Bakewell, Newegg's expert, testified regarding actual Newegg customer survey results, none of which mentioned the accused instrumentalities. (A2416-17). In addition to the surveys, Bakewell studied other evidence and found that over twenty factors contributed to Newegg's success, only one of which ("intuitive website and design") was even remotely influenced by the patented technology and, in fact, was *much* broader than that technology. (A2417-18). Moreover, it was undisputed that Newegg's website possessed many important capabilities apart from any shopping cart or session ID functionality, including "[c]omparison of products, rollover and guided navigation, reviews of products, photos, how-to videos, and things of that nature." (A2420-21); *see also* (A1521, A1711). Bakewell thoroughly analyzed these various business success factors to properly apportion the value of the patented technology in Newegg's business. He calculated that that the patented features contributed a value of $0.05 per $100 transaction. (A2417-22). Assuming that a running royalty was a proper form of damages, Bakewell calculated a benchmark value of $599,000 based on Newegg's total accused sales transactions, (A2442-43), which is consistent with the other real world evidence of the claimed invention's "footprint in the marketplace," as discussed *infra* in Part V.D. *ResQNet.com*, 594 F.3d at 869.

In contrast, Nawrocki admitted that he did not even attempt to quantify the value of the numerous contributions Newegg makes to enable and drive each sale

on its website. (A1959-62, A2416) ("I did not do a survey or an economic analysis of the specific attributions to customer service or fast shipping . . . [o]r any other aspects of Newegg's contribution to its own success"). His opinion amounted to nothing more than heavy reliance on the 25% rule. It is improper to use the "Rule of Thumb" as some kind of non-evidentiary presumption that a patentee deserves 25% of the profits made in any way related to a product sale. *See* ROBERT GOLDSCHEIDER, Litigation Backgrounder For Licensing, 29 LES NOUVELLES 20, 25 (1994) (unscientifically drawing a generalization from an analysis of Swiss mixed-IP profit licenses negotiated in the 1950s). This supposed "rule" is neither sound nor reliable, such that it could substitute for actual economic evidence. But that is exactly what Soverain did here. Further, Soverain's prime emphasis on this argument is inconsistent with the nature of modern technology, even if it were justified for Swiss licensing practices in the 1950s. Moreover, here we are not looking at 25% of the profits from the sale of an infringing product. Instead it is 25% of Newegg's total company profit. If each feature of Newegg's website required a license fee of 25% of the profit, royalty payments would swiftly consume all Newegg's profit.

In the grand scheme of Newegg's multi-faceted business and powerful website, Nawrocki grossly exaggerated the patented technology's tiny role, and did so in a manner strikingly similar to that in *Lucent Technologies v. Gateway, Inc.*,

580 F.3d 1301 (Fed. Cir. 2009). There, where the patented features were "but a tiny feature of one part of a much larger software program," this Court rejected a royalty calculated based on the value of the entire Outlook program because "there was no evidence that anybody anywhere at any time ever bought Outlook . . . *because* it had [the patented] date picker." *Id.* at 1332-33, 1337-38 (emphasis added). Furthermore, in *Lucent* it was noted that Outlook contains millions of lines of code, "only a tiny fraction of which encodes the [patented] date-picker feature." *Id.* at 1332.

Similarly, James Wu, Newegg's Chief Technology Officer, testified that the portions of Newegg's website relating to the shopping cart and session ID functionality constitute "less than 1 percent" of the computer code for Newegg's website. (A2083-84). That figure of "less than 1 percent" refers only to the portion of Newegg's *website* associated with the accused infringing features, and Newegg's website is only *one* of the many reasons for Newegg's success.

The barriers to entry as an e-commerce vendor are small. It does not take much to set up a website with a basic shopping cart and begin selling products— this is why there are a plethora of online vendors today. And yet Newegg is second only to Amazon.com in terms of online sales success in the marketplace. (A1627). It reached that point due to its great product selection, low prices, fast shipping, and award winning customer service, in addition to its multi-faceted and

51

powerful website containing numerous user features above and beyond the accused functionalities. Just as in *Lucent*, "when we consider the importance of the many features not covered by the [asserted patents] compared to the [few] infringing feature[s] in [Newegg's website], we can only arrive at the unmistakable conclusion that the invention . . . is not the reason consumers purchase [products from Newegg]." *Id.* at 1337-1338.

Because there was no evidence that the patented technology drove Newegg's sales, Nawrocki's grossly overreaching damages calculation based on Newegg's total sales was erroneous as a matter of law and cannot support the jury's verdict.[8] *See Brooke Group*, 509 U.S. at 242; *Rite-Hite*, 56 F.3d at 1549-50.

B.    SOVERAIN'S DAMAGES EXPERT FAILED TO ACCOUNT FOR AND EXCLUDE NON-INFRINGING USES OF THE SHOPPING CART AND HYPERTEXT STATEMENT SYSTEMS

Two-thirds of the sales included in Nawrocki's royalty base were single-item sales—that is, only one item was placed into the shopping cart and purchased by the customer. (A2464, A2527-28). As confirmed by Soverain's infringement expert, however, single-item orders do not infringe the shopping cart claims. (A1690) ("Q. So to satisfy the system in this claim the user has to put multiple

---

[8] The district court, over Newegg's objections, excluded Newegg's proposed charge regarding the entire market value rule, refusing to provide the jury with *any* instruction as to the applicable law. (A53-A57, A2629-30, A9041-42). Thus, should this Court decline to enter judgment as a matter of law on damages, it should remand the case for a new trial on damages, with a properly instructed jury.

items in the shopping cart? A. That's what I—that's the evidence I put forward, yes."). Nawrocki admittedly failed to exclude from his royalty (or otherwise account for) these orders. (A1956-57) ("[My analysis] includes all completed transactions."). Thus, at a minimum, Nawrocki's royalty base for damages for the shopping cart claims' infringement must be reduced by two-thirds.

Dr. Grimes also testified that the '492 patent's hypertext statement claims require a hypertext link that provides details about sales transactions, such as one's order history. (A1708-11). But, as discussed above, Soverain presented no evidence that any Newegg customer had ever used such a link or accessed their order history. *See supra* Part II.B (discussing the absence of actual or circumstantial evidence that anyone used the accused order history feature). Nevertheless, Nawrocki included *all* transactions during the damages period in his royalty, failing to exclude transactions that do not implicate the hypertext statement claims. (A1956-57).

A use-based royalty must be based on infringing uses. *See Huck Mfg. Co. v. Textron, Inc.*, No. 35956, 1975 U.S. Dist. LEXIS 12539, at *76 (E.D. Mich. May 2, 1975) ("For a person who uses a device [that is capable of a non-infringing use], infringement is determined by the use to which the invention is actually put . . . ."). Newegg cannot be liable for damages for inducing its customers to use its system

in a non-infringing manner. *See ACCO Brands*, 501 F.3d at 1313; *see also supra* Part II.B.

Because Nawrocki improperly included non-infringing uses in his damages calculation, his testimony was fundamentally unreliable and should not be a consideration when evaluating the sufficiency of the evidence supporting the jury's verdict.

C. NONE OF THE PATENT LICENSES IN EVIDENCE INCLUDED A RUNNING ROYALTY BASED ON A PERCENTAGE OF THE LICENSEE'S PROFITS

Soverain argued below that certain licenses included use-based running royalties or are based on revenues, providing evidentiary support for Soverain's damages model. (A20, A10164). The district court agreed, relying on three patent licenses entered into by Divine. (A20-21) (citing testimony relating to Divine licenses to Webster Orchard, Katco Industries, and Odimo). The first license to Webster Orchard provided that "Licensee shall pay to Divine a one-time payment equal to two percent (2%) of Licensee's $100,000 gross sales of product over the Internet in 2001." (A13117). The second license to Katco Industries provided that "Licensee shall pay to Divine a one-time payment of one thousand dollars ($1,000.00), which Licensee represents is at least ten percent (10%) of gross profit of sales of products over the Internet." (A13148). The third license to Odimo provided that "Licensee shall pay to Divine the sum of thirty thousand dollars

($30,000.00) which represents a royalty of approximately $.85 per shopping cart transaction made last year on the licensees Websites." (A13168).

Despite these recitals, both Nawrocki and Bakewell agreed that each of the licenses, in substance, provided a paid-up, perpetual license for the life of the patents in exchange for a one-time, lump-sum payment. (A1951-56, A2504-10). To suggest that because the one time lump sum payment amount was represented to constitute a particular portion of revenues, or reflect a particular number of transactions, the licenses may be deemed use-based running royalties, exalts form over substance. All of the license fees or royalties owed under these licenses were fixed or capped because they represented only the licensee's revenues or transactions during one or two startup years. (A2508-09). Further, it is undisputed that all three of these licenses Soverain relied upon were expressly granted as being "paid up" "until . . . each of the Licensed Divine Patents has expired." (A13116, A13119, A13147, A13150, A13167, A13171). Indeed, all 19 patent licenses in evidence were paid up licenses for the patents' life, granted in exchange for one time lump sums. *See* Part V.D, *infra*.

When viewed in the aggregate with all other evidence, Soverain's strained reading and cherry-picking of license terms amounts to no more than a "mere scintilla" of evidence and will not support the verdict. *See Eli Lilly & Co. v. Aradigm Corp.*, 376 F.3d 1352, 1363 (Fed. Cir. 2004) ("Substantial evidence is

more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.").

D.    NEWEGG'S PROFFER OF A $500,000 OR LESS LUMP-SUM ROYALTY FOR A PAID UP PERPETUAL LICENSE IS THE ONLY LEGALLY SUPPORTABLE FORM AND AMOUNT OF DAMAGES IN THIS CASE, AND ANY GREATER AWARD IS EXCESSIVE AS A MATTER OF LAW

The several patent licenses and software licenses for the Transact product (which embodied the patented technology) in evidence clearly demonstrate "the claimed invention's footprint in the market place." *ResQNet.com*, 594 F.3d at 869. They are analogous and comparable to the kind of license Newegg would have obtained in the hypothetical negotiation. *See Lucent Techs.*, 580 F.3d at 1317, 1324, 1329-30. This real world evidence proves that the measure of damages that is "adequate to compensate for the infringement" is a lump sum not exceeding $500,000, far less than the jury's excessive award. 35 U.S.C. § 284.

As noted above, the total aggregate amount of license fees obtained for the patents was about $200,000, all paid as lump sums, (A1856-57, A2433-37), and all Transact licenses were lump sums up to $344,000. (A1857, A2438-40). Considering these data points along with his $599,000 benchmark from his apportionment analysis (discussed *supra* in Part V.A), Bakewell correctly concluded that a reasonable royalty would be a one-time lump sum payment of, at most, $500,000 covering the patents' life. (A2442-43, A2447, A2456-57).

56

This Court should reverse the district court and enter judgment as a matter of law that the damages owed by Newegg cannot exceed $500,000 for the patents' life. If, however, this Court determines that judgment as a matter of law is not warranted, it should order a remittitur to an amount of $500,000 or less, or grant a new trial as the jury's award was against the great weight and preponderance of the evidence, and is excessive. *See Wordtech Sys. v. Integrated Networks Solutions, Inc.*, 609 F.3d 1308, 1319-22 (Fed. Cir. 2010) (reversing $250,000 verdict and remanding for a new trial on damages because "the verdict was 'clearly not supported by the [licensing] evidence' and 'based only on speculation or guesswork'").

## VI. THE DISTRICT COURT ERRED BY ADMITTING UNFAIRLY PREJUDICIAL AND CONFUSING EVIDENCE REGARDING SOVERAIN'S LITIGATION-INDUCED LICENSES

Prior to Soverain's trial with Newegg, Soverain sued various other large internet retailers such Amazon.com, The Gap, and Zappos.com. Those retailers settled with Soverain before trial, taking licenses to the patents-in-suit. Although Soverain conceded that the agreements themselves, particularly the dollar amounts paid under such agreements, are properly excluded under Federal Rules of Evidence 402, 403, and 408, Soverain nevertheless sought to introduce testimony and argument regarding the licenses' existence and the licensees' names. (A8333-35). Because the settlements' existence was irrelevant and grossly prejudicial,

57

Newegg moved *in limine* to prevent this inflammatory evidence from reaching the jury, but Newegg's motion was denied. (A1352-58, A1388-91, A1430-34).[9]

Soverain took advantage of this ruling and presented testimony and argument to the effect that Soverain had a number of big successful Internet retailer companies as "licensees" of its patents, and that Newegg was a comparable company and a glaring holdout. (A1451) ("And licenses continue, now that Soverain owns the patents, to companies such as amazon.com, TigerDirect, Zappos . . . Are we picking on some poor person here that's inappropriate? Hardly. Newegg is the second largest online shopping company in the United States. Only amazon.com is bigger."); *see also* (A1850, A1911-12, A2495-98).

"Even if negotiations, offers, and agreements reached under the threat of litigation had some probative value, such value would be too slight and clearly outweighed by the danger of unfair prejudice and confusion . . . . [Such evidence] is inadmissible under Rules 403 and 408." *Pioneer Corp. v. Samsung SDI Co.*, No. 2:06-CV-384, 2008 U.S. Dist. LEXIS 107079, at *18-19 (E.D. Tex. Oct. 2, 2008); *see Spreadsheet Automation Corp v. Microsoft Corp.*, 587 F. Supp. 2d 794, 801 (E.D. Tex. 2007). Admission of such evidence requires a new trial if there is a

---

[9] The district court essentially ruled that because Newegg was relying on various *non*-settlement licenses that happened to be for smaller companies and for lesser amounts, Soverain was "entitled at least to show that it has been licensed to big-named companies. But I don't think y'all want to get into the amount. I don't want to get into the amount . . . . I'm not going to let the jury just see half the picture." (A1433-34).

"significant possibility that the prejudicial evidence had a substantial impact on the jury verdict." *U.S. v. Stalnaker*, 571 F.3d 428, 434 n.5 (5th Cir. 2009).

Allowing such evidence, testimony, and argument wrongly suggested to the jury that websites and businesses arguably similar to Newegg's should be viewed as infringing, and that the asserted patent claims must be valid and valuable, otherwise companies like Amazon would not have paid to license them. Soverain failed to show any relevance of these litigation settlements to any material fact in dispute.[10]

The jury's finding of active inducement of infringement in the absence of sufficient evidence (*see supra* Parts I-III), and its damages award inflated well above the range supported by the evidence (*see supra* Part V), shows that this prejudicial evidence very likely impacted the jury's analysis and judgment. A new trial is therefore required because there is, at a minimum, a "significant possibility

---

[10] Soverain's expert provided cursory testimony that the licenses show commercial success supporting nonobviousenss, but no attempt was made to satisfy the nexus requirement. (A2577-80); *see Iron Grip Barbell Co. v. USA Sports, Inc.*, 392 F.3d 1317, 1324 (Fed. Cir. 2004) ("Our cases specifically require affirmative evidence of nexus where the evidence of commercial success presented is a license, because it is often 'cheaper to take licenses than to defend infringement suits.'").

Further, this Court's recent decision in *ResQNet.com, Inc. v. Lansa, Inc.* does not lend any support to Soverain. 594 F.3d 860 (Fed. Cir. 2010). There, the litigation induced-licenses were "the most reliable licenses in this record" to support the patentee's damages theory. *Id.* at 872. Here, the licenses at issue were all for lump sums, (A1353, A1359-62), and Soverain cannot prove that they are in any way supportive as to the form or amount of damages sought from Newegg at trial.

that the prejudicial evidence had a substantial impact on the jury verdict."
*Stalnaker*, 571 F.3d at 434 n.5 (5th Cir. 2009).

## CONCLUSION

For the foregoing reasons, Newegg respectfully requests that the Court reverse the district court's judgment of infringement and enter a take-nothing judgment in Newegg's favor. Alternatively, the Court should reverse and remand with instructions to enter a judgment not to exceed $500,000. At a minimum, the Court should remand for a new trial on infringement, obviousness, and damages. Newegg also requests any other and further relief to which it may be justly entitled.

Respectfully submitted,

Dated: December 7, 2010

By: *Edward R. Reines*

Edward R. Reines

WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
Telephone: (650) 802-3000

Kent E. Baldauf, Jr.
David C. Hanson
Daniel H. Brean

THE WEBB LAW FIRM
700 Koppers Building
436 Seventh Avenue
Pittsburgh, PA 15219
Telephone: (412) 471-8815

Claudia W. Frost

PILLSBURY WINTHROP SHAW
PITTMAN, LLP
2 Houston Center
909 Fannin, Suite 2000
Houston, TX 77010
Telephone: (713) 276-7648

Counsel for Appellant-Defendant
Newegg Inc.

# ADDENDUM

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

| | | |
|---|---|---|
| SOVERAIN SOFTWARE LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | **CASE NO. 6:07 CV 511** |
| | § | **PATENT CASE** |
| NEWEGG INC., | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court are Soverain's Renewed Motion for Judgment as a Matter of Law ("JMOL") of Infringement of the '314, '492, and '639 Patents and Motion for New Trial ("MNT") on '639 Patent Damages (Docket No. 402); Soverain's Motion for Permanent Injunction or, in the Alternative, Ongoing Royalties (Docket No. 403); Soverain's Motion for Prejudgment Interest and Costs, Post-Verdict Damages to Judgment, and Post-Judgment Interest (Docket No. 404); Newegg's Renewed Motion for JMOL on Damages and Alternative MNT or Remittitur (Docket No. 406); Newegg's Renewed Motions for JMOL of Non-Infringement and Invalidity of the Asserted Claims and Alternative MNT (Docket No. 407); and Newegg's Opposed Motion to Strike Certain Evidence Submitted in Support of Soverain's Post-Trial Motions (Docket No. 411). For the reasons stated below, the Court **GRANTS** in part Soverain's motion for JMOL on infringement and MNT on damages (Docket No. 402), **GRANTS** in part Soverain's motion for permanent injunction or, in the alternative, ongoing royalties (Docket No. 403), **GRANTS** in part Soverain's motion for pre-judgment interest, post-verdict damages, and post-judgment interest (Docket No. 404), and **DENIES** all other motions.

## BACKGROUND

Plaintiff Soverain Software LLC ("Soverain") filed suit against Newegg Inc. ("Newegg") and several other defendants in November 2007. Newegg is the only remaining defendant. Soverain asserts U.S. Patent Nos. 5,715,314 (the "'314 patent"), 5,909,492 (the "'492 patent"), and 7,272,639 (the "'639 patent") (collectively, "the patents-in-suit") against Newegg. The '314 and '492 patents, both entitled "Network Sales System," are directed to a network-based sales system including at least one buyer computer, at least one merchant computer, and at least one payment computer, all interconnected by a computer network. The asserted claims in the '314 and '492 patents are system claims. The '639 patent, entitled "Internet Server Access Control and Monitoring Systems," is directed to methods for controlling and monitoring access to network servers. The asserted claims of the '639 patent are method claims.

A jury trial began on April 26, 2010. At trial, Soverain argued that Newegg used technology for its websites that infringed claims 35 and 51 of the '314 patent; claims 17, 41, and 61 of the '492 patent; and claims 60 and 79 of the '639 patent. Newegg argued that it did not infringe Soverain's patents and that Soverain's patents were invalid. Following a five day trial, the Court submitted the following issues to the jury: (1) direct infringement and active inducement of infringement of the '314 and '492 patents, (2) direct infringement of the '639 patent, (3) invalidity of the patents-in-suit based on anticipation, and (4) damages. The jury returned a verdict finding the patents-in-suit not invalid, the '314 and '492 patents infringed, and awarding Soverain $2,500,000 in damages. Specifically, the jury found Newegg liable for induced infringement of claims 35 and 51 of the '314 patent and claims 17, 41, and 61 of the '314 patent, but found that Newegg did not directly infringe any of the asserted claims of the patents-in-suit.

2

## MOTIONS FOR JMOL & NEW TRIAL

**JMOL Standard**

"The grant or denial of a motion for judgment as a matter of law is a procedural issue not unique to patent law, reviewed under the law of the regional circuit in which the appeal from the district court would usually lie." *Summit Tech. Inc. v. Nidek Co.*, 363 F.3d 1219, 1223 (Fed. Cir. 2004). In the Fifth Circuit, JMOL may not be granted unless "there is no legally sufficient evidentiary basis for a reasonable jury to find as the jury did." *Hiltgen v. Sumrall*, 47 F.3d 695, 700 (5th Cir.1995) (internal quotation marks omitted). A court reviews all the evidence in the record and must draw all reasonable inferences in favor of the nonmoving party, however, a court may not make credibility determinations or weigh the evidence, as those are solely functions of the jury. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000).

**New Trial Standard**

Under Rule 59(a) of the Federal Rules of Civil Procedure, a new trial can be granted to any party to a jury trial on any or all issues "for any reason for which a new trial has heretofore been granted in an action at law in federal court." "A new trial may be granted, for example, if the district court finds the verdict is against the weight of the evidence, the damages awarded are excessive, the trial was unfair, or prejudicial error was committed in its course." *Smith v. Transworld Drilling Co.*, 773 F.2d 610, 612–13 (5th Cir. 1985).

## INFRINGEMENT

### *NEWEGG'S MOTION FOR JMOL & MNT - NO INDIRECT INFRINGEMENT OF '314 AND '492 PATENTS*

Newegg moves for JMOL, or alternatively for a new trial, on the issue of no indirect infringement of claims 35 and 51 of the '314 patent, claim 17 of the '492 patent, and claims 41 and 61 of the '492 patent. Claims 35 and 51 of the '314 patent and claim and claim 17 of the '492 patent

3

are referred to as the "shopping cart claims." Claims 41 and 61 of the '492 patent, are referred to as the "hypertext statement claims."

**Shopping Cart Claims**

Newegg first argues that there was no legally sufficient evidence from which a reasonable jury could conclude that the accused Newegg system meets all the limitations of independent claim 34 of the '314 patent[1] or independent claim 17 of the '492 patent ("shopping cart claims"), either literally or under the doctrine of equivalents.

In Newegg's accused system, when a customer adds an item to a shopping cart, product information concerning that item is held in a cookie on the customer's computer. Once the customer hits checkout, the contents of the cookie are transferred all at once to a shopping cart database. The issue is whether this transfer in the accused system satisfies two specific limitations in the shopping cart claims: (1) the "modification limitations" and (2) the "plurality limitations."

Claim 34 of the '314 patent requires "said shopping cart computer [to be] a computer that modifies said stored representations of collections of products in said database," and also requires the shopping cart computer be programmed "to modify the shopping cart in the shopping cart database to reflect the plurality of requests to add the plurality of products to the shopping cart." '314 patent, col. 14:12–15, 26–28. Claim 17 of the '492 patent similarly requires "the shopping cart computer [to be] a computer that modifies the stored representations of collections of products in the database," and that the shopping cart computer be programmed "to modify the shopping cart in the shopping cart database to reflect the plurality of requests to add the plurality of products to the shopping cart." '492 patent, col. 14:64–67; col. 15:13–15. These are referred to as the "modification limitations."

---

[1] Asserted claims 35 and 51 of the '314 patent depend from independent claim 34 of the '314 patent.

Newegg contends that its system cannot satisfy the modification limitations because there is no modification of the shopping cart database, let alone a modification of the shopping cart *in the* shopping cart database. Soverain contends that there is a modification of a shopping cart in the shopping cart database because an instance of a shopping cart in the database is changed. The Court construed the phrase "to modif[y] [the shopping cart in the shopping cart database]" to mean "to change [an instance of a shopping cart in a shopping cart database]." Docket No. 359-1, at 1. Soverain's technical expert, Dr. Grimes, basing his opinion on the Court's claim construction and other evidence presented at trial, testified that Newegg's system uses a two step process. First, when the customer clicks the check out button, a shopping cart ID is generated, which creates a holding space in the shopping cart database. Soverain contends this step creates an instance of a shopping cart in the shopping cart database. Next, the contents of the customer's shopping cart are moved to the shopping cart database in association with the shopping cart ID. Soverain contends this step represents the required modification. Dr. Grimes further testified that modifying the shopping cart to add all the products at once upon checkout is sufficient to satisfy the modification limitations.

Newegg argues that Soverain's logic is flawed because the shopping cart ID and the shopping cart are inserted into the database at the same time, and this "single instantiation" cannot be a modification of the shopping cart. Newegg also argues that a shopping cart ID cannot be a shopping cart under the Court's construction. Soverain does not allege that the shopping cart ID is a shopping cart, just that once the shopping cart ID is created, "an instance of a shopping cart" exists in the database. Once the customer's selected products are inserted into the shopping cart in the shopping cart database, that "instance of a shopping cart" is modified. Both Newegg and Soverain presented their infringement theories to the jury, and it was up to the jury to determine which infringement theory was best supported by the testimony and evidence. Accordingly, Soverain presented legally

5

sufficient evidence for the jury to conclude that Newegg's system satisfied the modification limitations.

Claim 34 of the '314 patent requires the buyer computer be programmed "to receive a plurality of requests from a user to add a plurality of respective products to a shopping cart in said shopping cart database," and claim 17 of the '492 patent similarly requires the buyer computer be programmed to "receive a plurality of requests from a user to add a plurality of respective products to a shopping cart in the shopping cart database." '314 patent, col. 14:3–6; '492 patent, col. 14:54–57. These are referred to as the "plurality limitations."

Newegg contends that moving the customer product information "en masse" from the cookie to the shopping cart database reads the word "respective" out of the plurality limitations. Newegg argues the word "respective" in the claim language requires the accused system to modify the shopping cart database after each product is requested by the customer. However, Dr. Jack Grimes, Soverain's expert, testified that the customer's "ADD TO CART" requests are "requests from a user to add . . . products to a shopping cart in [the] shopping cart database" because the products requested from the user ultimately end up in the shopping cart database, which is all the limitation requires. Trial Tr. 4/26/10 P.M., 81:15–86:7. Dr. Grimes further testified that the plurality limitations are satisfied because each request is associated with a respective product, and a modification of the shopping cart database after each request is not required by the claims. Trial Tr. 4/27/10 A.M. 30:15–31:2. Thus, Soverain presented legally sufficient evidence for the jury to conclude that Newegg's system satisfied the plurality limitations.

Furthermore, Dr. Grimes testified that Newegg's method of adding products one at a time to a cookie and then all at once to a shopping cart in the shopping cart database is equivalent to adding the products one at a time to a shopping cart in the shopping cart database. Trial Tr. 4/26/10

P.M., 93:13–97:17.  Thus, at the very least, there was substantial evidence to support a finding that Newegg's system satisfies both the modification and plurality limitations and infringes under the doctrine of equivalents.  Accordingly, Soverain presented legally sufficient evidence for the jury to conclude that Newegg's accused system satisfied all limitations of the shopping cart claims, either literally or by equivalents.

**Hypertext Statement Claims**

Claims 41 and 61 of the '492 patent, which depend from claim 15 of the '492 patent, are referred to as the "hypertext statement claims."  These claims require a hypertext link that provides details about the transaction, including transaction history.  Newegg argues Soverain presented no evidence that any Newegg customer ever accessed the hypertext link on Newegg's accused system and thus there is no evidence of any "use" of the hypertext statement system.[2]  Newegg relies on *ACCO Brands, Inc. v. ABA Locks Manufacturer Co.*, 501 F.3d 1307 (Fed. Cir. 2007), *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, (Fed. Cir. 2009), and *E-Pass Techs., Inc. v. 3Com Corp.*, 473 F.3d 1213 (Fed. Cir. 2007), to challenge the jury's finding of infringement.  In *ACCO*, the Federal Circuit found no direct infringement where the accused product could be used in both an infringing and non-infringing manner and the accused inducer only instructed customers on the non-infringing manner.  *ACCO,*  501 F.3d at 1313.  In *Lucent*, the Federal Circuit allowed the jury's verdict of induced infringement to stand where the accused inducer designed the accused products to be used in an infringing manner and instructed its customers to use the accused products in both an infringing

---

[2] Although Newegg also contends it does not satisfy the limitation of "the client computer being programmed to display the statement document" in Claim 15 of the '492 patent, there is legally sufficient evidence to support the jury's finding that Newegg's accused system meets this limitation of the hypertext statement claims.  *See* Trial Tr. 4/26/10 P.M., 118:18–120:6.

and non-infringing manner. *Lucent*, 580 F.3d at 1318–19. In *E-Pass*, the only proof of direct infringement was excerpts from product manuals for various accused devices, "show[ing], at best that the [defendants] taught their customers each step of the claimed method in isolation." *E-Pass*, 473 F.3d at 1222.

*ACCO* and *E-Pass* are distinguishable from the instant facts and do not support overturning the jury's verdict, while *Lucent* actually supports the jury's verdict. Although capable of non-infringing modes of operation, Newegg's order history system is reasonably capable of infringing the hypertext statement system claims. *See Mass Engineered Design, Inc. v. Ergotron, Inc.*, 633 F. Supp. 2d 361, 378 ("[T]o infringe an apparatus claim, it is not necessary for an accused device *actually to be performing the functions specified by the claim. All that is required is that the device have the claimed structure, and that this structure in the device have the capability of functioning as described by the claim."). Soverain presented sufficient evidence showing that Newegg instructs its customers to use its system in an infringing manner. Pl.'s Ex. 15, Docket No. 409-10. Indirect infringement and the corresponding direct infringement may be proved by circumstantial evidence. *See Liquid Dynamics Corp. v. Vaughan Co.*, 449 F.3d 1209, 1219 (Fed. Cir. 2006). "There is no requirement that direct evidence be introduced, nor is a jury's preference for circumstantial evidence over direct evidence unreasonable per se." *Id.* Accordingly, the jury was presented with legally sufficient evidence to conclude that Newegg's customers used the order history system, and thus infringed the hypertext statement claims.

**Newegg's Customers "Use" of the System Claims**

Newegg next argues that even if the accused systems meet all limitations of the shopping cart and hypertext statement claims, there was no legally sufficient evidence from which a jury could

8

conclude that any Newegg customer satisfies each and every limitation of any relevant claim. Induced infringement requires the plaintiff to prove a corresponding act of direct infringement. *See DSU Med. Corp.*, 471 F.3d at 1303. Newegg contends that its customers do not directly infringe any relevant claim because they do not own, possess, operate, direct, or control the accused system. Specifically, Newegg argues that because its customers only own or possess the buyer or client computer and do not "use" anything on the "Newegg side" of the system, they do not practice each and every element of the claimed invention and thus cannot directly infringe. Soverain contends Newegg's customers "use" the system "as a whole" and thus directly infringe.

The relevant claims of the '314 and '492 patents are all system claims. Although Newegg originally argued that the divided infringement standard set forth in *BMC Resources, Inc. v. Paymentech, L.P.*, 498 F.3d 1373, and *Muniauction, Inc. v. Thomson Corp.*, 532 F.3d 1318 (Fed. Cir. 2008), applied to both system and method claims, Newegg now concedes that the *BMC/Muniauction* divided infringement standard only applies to method claims and is inapplicable here. Accordingly, the Court is tasked with determining what constitutes "use" of system claims for purposes of determining infringement. "In the context of [35 U.S.C.] § 271(a), courts interpret the term 'use' broadly to determine if behavior constitutes an infringing 'use' of a patented invention." *Renhcol Inc. v. Don Best Sports*, 538 F. Supp. 2d 356, 360 (E.D. Tex. 2008) (Davis, J.) (citing *NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1316–17 (Fed. Cir. 2005)). In *NTP, Inc. v. Research in Motion, Ltd.*, the Federal Circuit addressed what constitutes "use" for purposes of determining the situs of use of a claimed system. 418 F.3d at 1313–18. "The use of a claimed system under section 271(a) is the place at which the system *as a whole* is put into service, i.e., the place where control of the system is exercised and beneficial use of the system obtained." *Id.* at 1317 (emphasis added).

9

The *NTP* court specifically emphasized the fundamental distinction between the "use" of a system and the "use" of method, noting that "use" of a method is "unlike use of a system *as a whole*, in which the components are used *collectively,* not individually." *Id.* at 1318 (emphasis added).

Numerous district courts have utilized the Federal Circuit's analysis in *NTP* to interpret "use" broadly to determine infringement. In *epicRealm, Licensing, LLC v. Autoflex Leasing, Inc.*, the claimed method and apparatus was directed to "managing dynamic web page generation requests." 492 F. Supp. 2d 608, 613 (E.D. Tex. 2007) (Folsom, J.). The court found that the customers did not "use" the software because they did not control and were not responsible for running the software that managed the incoming requests—they merely submitted requests to the web server. *Id.* at 615. The court noted that "the issue of control is central to determining whether a party is liable for 'using' a claimed invention," and that it is important that the function controlled by the user is the exact function the claimed system was directed to. *Id.* at 614 ("Importantly, the claimed system in *NTP* was directed to a system for the transmission of messages . . . and that is exactly the function that the defendant's customers controlled. Thus, the defendant's customers were users of the system.").

In *Renhcol Inc. v. Don Best Sports*, the claims were directed to an electronic marketplace for prediction information, claiming a computer storage medium comprising code to facilitate transactions in the prediction information market and a computer programmed to execute that code. 538 F. Supp. 2d at 361–62. In *Renhcol*, this Court found that "use" of the computer storage medium and programmed computer required control of the execution of the code located on the accused computer and computer storage medium, but found that certain suppliers and consumers of the marketplace controlled execution of the code by uploading and downloading prediction info to and

10

from the marketplace, thus precluding summary judgment based on situs of use. *Id.* at 363–64. In *Nuance Communications Inc. v. Tellme Networks, Inc.*, the claims were direct to an "apparatus for processing verbal information for competing a task." — F. Supp. 2d —, 2010 WL 1609883, *8 (D. Del. April 20, 2010). The *Nuance* court noted that "[t]he completion of a task is the reason that a caller engages the accused services," and thus calling the accused services may constitute an infringing use if the caller exercised control over the accused services by dictating the format and manner in which the task is accomplished.

Newegg's "own, possess, operate, direct, or control" standard is in direct conflict with the analysis set forth in *NTP*. Although Soverain's "use" of a system "as a whole" standard is more in line with established law, the cases here also stress the importance of the control element. The shopping cart claims are directed to a "network-based sales system" and "hypertext statement system." The claimed systems are directed to the function of purchasing products and viewing order and transaction history, and those are the exact functions controlled by Newegg's customers. Newegg's customers control the operation of Newegg's sales system by choosing the products to purchase, when to checkout, and when to submit an order, and they control Newegg's hypertext-statement system by choosing to view their order history and transaction details. *See* Trial Tr. 4/26/10 P.M., 60:18–129:4, 135:15–137:21. In addition, Newegg's customer use and benefit from Newegg's systems when they purchase products and view their order histories. *See id.* Accordingly, the jury was presented with sufficient evidence to support the jury's verdict that Newegg's customers were "users" of the Newegg's system. Thus, the Court **DENIES** Newegg's motion for JMOL and MNT of no indirect infringement of the '314 patent and '492 patents.

11

## SOVERAIN'S MOTION FOR JMOL & MNT - DIRECT INFRINGEMENT OF '314 AND '492 PATENTS

Soverain moves for JMOL, or alternatively for a new trial, on the issue of direct infringement of claims 35 and 51 of the '314 patent, claim 17 of the '492 patent, and claims 41 and 61 of the '492 patent. Soverain contends that Newegg directly infringes the asserted claims of the '314 patent and '492 patents because Newegg "uses" its sales system just as Newegg's customers do. Soverain's post-verdict briefing does not adequately address the necessary control element that is central to determining "use" of a claimed invention. Furthermore, at the post-verdict hearing, Soverain indicated that "[t]he reason . . . [it] moved for a new trial under direct [infringement] theories [was] in case . . . [Newegg] prevail[ed] on their induced theory." Post-Verdict Hr'g Tr. 4/2/10 P.M., 16:7-10. As Newegg did not prevail on overturning the jury's verdict of induced infringement of the '314 patent and '492 patents, it is not necessary to address Soverain's motion for JMOL of direct infringement in detail. The jury was presented with sufficient evidence to support the jury's verdict that Newegg is not a "user" of its system and thus, does not infringe. Accordingly, the Court **DENIES** Soverain's motion for JMOL and MNT of direct infringement of the '314 patent and '492 patents.

## SOVERAIN'S MOTION FOR JMOL & MNT - DIRECT INFRINGEMENT OF CLAIM 79 of '639 PATENT

Soverain moves for JMOL, or alternatively for a new trial, on the issue of direct infringement of claim 79 of the '639 patent. Claim 79 is directed to a "method of processing, in a server system, service requests from a client to the server system." '639 patent, col. 14:43–44. Soverain contends that Newegg irrefutably meets every limitation of the claim, while Newegg contends that certain limitations of the claim can only be satisfied by the client or customer. If Newegg is correct that the

claims require action by multiple parties, then the divided infringement standard set forth in *BMC* and *Muniauction* would be applicable. Thus, the relevant inquiry is whether Newegg's customers perform any required steps of these method claims.

The parties dispute which actions are actually required by claim 79, which depends from claim 78. Claims 78 and 79 provide as follows:

> 78. A method of processing, in a server system, service requests from a client to the server system through a network, said method comprising the steps of:
> **receiving**, from the client, a service request to which a *session identifier stored at the client has been appended by the client*, wherein communications between the client and server system are according to hypertext transfer protocol;
> **validating** the session identifier appended to the service request; and servicing the service request if the appended session identifier is valid.

> 79. The method of claim 78, further comprising, in the server system:
> **receiving** an initial *service request from the client*;
> **creating**, responsive to the initial service request, the session identifier; and
> **returning** the session identifier to the client for storage by the client for use in subsequent distinct requests to the server system.

'639 patent, col. 14:43–60 (emphasis added). The bold portions of the claims illustrate the steps Soverain contends the claims require. Newegg, on the other hand, contends that the italicized portions of the claim represent additional claim limitations requiring action on the part of the user. Soverain contends that Newegg is attempting to create multiple-actor issues by reading additional limitations into the claims.

Both parties cite to *SiRF Technology, Inc. v. International Trade Commission* to support their reading of the claims. 601 F.3d 1319 (Fed. Cir. 2010). In *SiRF*, the Federal Circuit did not even reach the question of divided infringement because it found the claims did not require any specified actions be taken by third parties. *Id.* at 1329. The claim language at issue in *SiRF* contained similar language as the claims at issue here: "receiving satellite ephemeris at a first location" and "receiving

13

satellite signals from at least one satellite and at least one receiving station." *Id.* The court found that "[t]his [was] not a situation where a method claim specifies performance of a step by a third party, or in which a third party actually performs some of the designated steps." *Id.* As in *SiRF*, "the method claims at issue here are drawn to actions which can be performed and are performed by a single party." *Id.* Moreover, in *BMC Resources, Inc. v. Paymentech, L.P.*, the Federal Circuit observed that "[a] patentee can usually structure a claim to capture infringement by a single party." 498 F.3d at 1381. For example, a patentee might structure the claims so that the steps "feature[] references to a single party's supplying or *receiving* each element of the claimed process." *Id.* (emphasis added). Claims 78 and 79 are drafted in this manner, specifying the required action by Newegg (e.g., "receiving"), along with a limitation defining the action's object (e.g., "service request from the client").

Dr. Grimes testified that all of the steps contained in dependent claim 79 are performed by Newegg through its server system. Trial Tr. 4/26/10 P.M., 158:21–165:18. During its cross-examination of Dr. Grimes, Newegg did not question Dr. Grimes on the steps recited by claim 79, but instead focused on actions not specifically required by the claim, such as whether the customer *sends* the service request to the server and whether the session identifier stored at the client has been *appended* by the client. Trial Tr. 4/27/10 A.M., 61:8–62:3. Dr. Grimes explained during direct examination that although a client must send a request for Newegg to receive and must append the session identifier to the request, claims 78 and 79 do not recite steps of sending and appending. Trial Tr. 4/26/10 P.M., 159:11–160:9.

In addition, Newegg's own technical expert, Edward Tittel, did not testify as to any of the steps actually included in claim 79 because Mr. Tittel failed to address claim 79 in his expert reports

14

and was precluded from testifying outside the scope of his reports. To get around this, Newegg questioned Tittel about claim 1 of the '639 patent and attempted to equate claim 1 to claims 78 and 79. Claim 1 provides as follows:

> 1. A method of processing service requests from a client to a server system through a network, said method comprising the steps of forwarding a service request from the client to the server system, wherein communications between the client and server system are according to hypertext transfer protocol;
>
> returning a session identifier from the server system to the client, *the client storing the session identifier* for use in subsequent distinct requests to the server system; and
>
> *appending the stored session identifier* to each of the subsequent distinct requests from the client to the server system.

'639 patent, col. 10:26–38 (emphasis added). When questioning Mr. Tittel about the storing action, Newegg's counsel stated that "this limitation is also in Claim 78." Trial Tr. 4/29/10 A.M., 43:13-18. This is likely to have misled the jury into thinking that claim 60, which depends from claim 1, and claim 79, which depends from claim 78, were one in the same. The wording of the claims clearly demonstrates this is not the case. Unlike claims 78 and 79, claim 1, and therefore claim 60, expressly require the steps of "forwarding" the service request and "storing" and "appending" the session identifier, which are all customer actions. Although the phrases Newegg points to in claim 79 (e.g., "service request to which a *session identifier stored at the client has been appended by the client*") are limitations that must be satisfied, "appending" and "sending" are not separate steps requiring action in claim 79. Because Newegg did not refute Dr. Grime's testimony that Newegg performs each properly defined step of claim 79, and because no reasonable jury could have found that claim 79 was not infringed, the Court **GRANTS** Soverain's motion for JMOL of direct infringement of claim 79 of the '639 patent.

## DAMAGES

### *SOVERAIN'S MNT - DAMAGES FOR '639 PATENT*

Having granted Soverain's motion for JMOL on Newegg's direct infringement of claim 79 of the '639 patent, the Court **GRANTS** Soverain's motion for a new trial on damages for such infringement, to be held after all appeals have been exhausted.

### *NEWEGG'S MOTION FOR JMOL, MNT, OR REMITTITUR - DAMAGES FOR '314 AND '492 PATENTS*

Newegg moves for JMOL that total damages in this case cannot exceed $500,000. In the alternative, Newegg moves for a new trial on damages or a remittitur in the amount of $500,000. In support of its motion for JMOL, Newegg argues that Soverain's damages demand was excessive, unsupported by the facts, and inconsistent with Federal Circuit precedent. Thus, Newegg contends it presented the only valid damages theory, which was a lump sum of $500,000, representing a paid-up license for the life of the patent. Specifically, Newegg argues: (1) Soverain's damages expert, James Nawrocki, violated the Entire Market Value rule and Georgia Pacific factor 13; (2) Mr. Nawrocki failed to exclude or account for non-infringing uses; (3) Mr. Nawrocki conducted an improper "commercial success" analysis; and (4) Soverain had no evidentiary support for a use-based running royalty.

First, Newegg contends that Mr. Nawrocki used Newegg's entire sales as the royalty base and a 25–33% Rule of Thumb as the royalty rate. Soverain counters that Mr. Nawrocki used the number of infringing transactions as the royalty base, and considered Newegg's gross sales in determining the royalty rate. Considering the foundation laid by Mr. Nawrocki's testimony, his application of the 25% Rule of Thumb was relevant and reliable. In addition, Newegg cross-

16

examined Mr. Nawrocki on the application of the Rule of Thumb, Trial Tr. 4/27/10 P.M., 146:10-23, and presented contrary evidence on the issue of damages. Trial Tr. 4/29/10 P.M., 11:5–65:7. As for Newegg's entire market value rule argument, Mr. Nawrocki never relied on the entire market value rule in his expert reports or at trial. Indeed, had Soverain been permitted to argue an "entire market value" theory, it would have been entitled to a substantially larger portion of Newegg's operating profit than under Mr. Nawrocki's theory of damages. *See i4i Ltd. P'ship v. Microsoft Corp.*, 670 F. Supp. 2d 568, 592 n.8 (E.D. Tex. 2009) (Davis, J.) (citing *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1331 (Fed. Cir. 2009) (explaining that the entire market value rule "permits a patentee to recover the entire value of an apparatus that contains both patented and unpatented components")). Nawrocki conducted a proper *Georgia-Pacific*[3] analysis to determine a reasonable royalty rate to apply to the number of infringing transactions royalty base, and his testimony in this regard was appropriately considered by the jury. Trial Tr. 4/27/10 P.M., 81:19–132:15.

Newegg next argues that Nawrocki failed to exclude single-item sales, which Newegg contends do not infringe, from his royalty. Although Newegg represents in its briefing that Dr. Grimes admitted that single-item sales do not infringe, Dr. Grimes admitted no such thing. Dr. Grimes testified that "the structure has to contain the ability for the user to make multiple requests" in order to infringe. Trial Tr. 4/26/10 P.M., 81:15–86:5. Thus, it was not improper for Nawrocki to include single-item sales in his reasonable royalty analysis. Furthermore, Newegg's arguments regarding Nawrocki's failure to account for transactions that do not meet the hypertext statement limitation are misplaced. As stated above in addressing infringement, "to infringe an apparatus

---

[3] *Georgia-Pacific Corp. v. U.S. Plywood Co.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970).

17

claim, it is not necessary for an accused device actually to be performing the functions specified by the claim. All that is required is that the device have the claimed structure, and that this structure in the device have the capability of functioning as described by the claim." *Mass Engineered Design, Inc. v. Ergotron, Inc.*, 633 F. Supp. 2d 361, 378. Mr. Nawrocki properly considered the capability of infringement in his analysis of reasonable royalty for the '314 and '492 patents.

Third, Newegg argues that Nawrocki improperly focused on Newegg's commercial success, rather than the success of the patented invention. Although the Court "must carefully tie proof of damages to the claimed invention's footprint in the market place," *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010), this does not prevent the alleged infringer's profits or revenues from being a relevant consideration in a *Georgia-Pacific* analysis. Indeed, the factors for calculating a reasonable royalty under *Georgia-Pacific* make the character of the commercial embodiment of the invention, the benefits to those who have used the invention, the extent to which the infringer has made use of the invention, and any evidence probative of the value of that use specifically relevant to the "reasonable royalty" analysis. *Georgia-Pacific,* 318 F. Supp. at 1120.

Finally, Newegg contends that there was no evidentiary support for Soverain's use-based running royalty theory. Newegg's argument ignores the fact that certain fully paid-up lump-sum licenses introduced into evidence were based on running components, representing a percentage of sales, profits, or a fee per transaction. *See* Trial Tr. 4/27/10 P.M., 100:8–105:9; Trial Tr. 4/29/10 P.M., 116:10–117:9. Mr. Nawrocki's opinion that damages should be calculated on a running royalty basis is supported by sufficient evidence. Furthermore, the Court instructed the jury that the damages period ran from November 2, 2007 to the present, without any objection from either party. Thus, there is no reason to assume the jury's verdict of $2.5 million represented a paid-up license

18

for the life of the patent.

The purpose of this Court's "gatekeeper" function under *Daubert v. Merrell Dow Pharmaceuticals, Inc.* is served by "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." 509 U.S. 579 (1993). There is sufficient evidence that Mr. Nawrocki's damages opinion is both relevant and rests on a reliable foundation. Additionally, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* at 596. Newegg vigorously cross-examined Mr. Nawrocki concerning his damages opinion. Trial Tr. 4/27/10 P.M., 132:20–167:7; 171:15–21. Newegg also presented its own lump-sum damages theory, and the jury was free to weigh the parties' distinct theories and evidence. "[T]he factual determination of a reasonable royalty . . . need not be supported, and indeed, frequently is not supported by the specific figures advanced by either party." *SmithKline Diagnostics, Inc. v. Helena Labs. Corp.*, 926 F.2d 1161, 1167 (Fed. Cir. 1991). The jury's verdict of $2,500,000 is well within the amounts advocated by the parties' damages experts and is supported by sufficient evidence. Thus, the Court **DENIES** Newegg's motion for JMOL on damages.

Alternatively to JMOL, Newegg requests a new trial or remittitur. In addition to arguing that the jury's damages award was excessive and against the great weight of the evidence, Newegg sets forth a number of alleged errors that it contends infected the jury's award. However, most of these errors derive from Soverain's damages theory, which the Court has already found reliable. In addition, Newegg made a tactical decision during trial not to offer evidence of the amount Soverain paid for the patents-in-suit at a bankruptcy court auction and thus, Newegg cannot now complain that the Court excluded such evidence. *See* Trial Tr. 4/27/10 P.M., 64:9–65:16. Furthermore, remittitur

is within the sound discretion of the trial court and is only appropriate when the damages verdict is "clearly excessive." *See Thompson v. Connick*, 553 F.3d 836, 865 (5th Cir. 2008). Accordingly, the Court **DENIES** Newegg's MNT or remittitur for the same reasons outlined with regard to Newegg's motion for JMOL on damages and for the reasons set forth above.

## NEWEGG'S MOTION FOR JMOL & MNT - INVALIDITY

Newegg moves for JMOL, or alternatively for a new trial, on the issue of invalidity of all the asserted patent claims based on anticipation and obviousness. Specifically, Newegg asserts that (1) claims 35 and 51 of the '314 patent were anticipated by the CompuServe Mall; (2) claims 35 and 51 of the '314 patent and claim 17 of the '492 patent were obvious based on the CompuServe Mall, alone or in combination with Gifford; (3) claims 41 and 61 of the '492 patent were obvious based on Gifford; and (4) claims 60 and 79 of the '639 patent were obvious based on Gifford and Johnson, either alone or in combination. In addition, Newegg reurges each of the invalidity grounds set forth in Newegg's Rule 50(a) motion for JMOL submitted at the close of evidence (Docket No. 368). Newegg finally argues that if the Court concludes JMOL is not warranted based on the foregoing grounds, the Court should grant a new trial on anticipation and obviousness based on a number of errors regarding the admission and exclusion of evidence, charge error, and the Court's dismissal of Newegg's obviousness claims at the close of evidence.

In order to show that it is entitled to JMOL on its affirmative defense of invalidity, Newegg is required to prove the essential elements of that defense to a virtual certainty. *Bank of La. v. Aetna U.S. Healthcare Inc.*, 468 F.3d 237, 241 (5th Cir. 2006) ("For a defendant to obtain summary judgment on an affirmative defense, it must establish beyond dispute all of the defense's essential elements."). As for Newegg's motion for JMOL of anticipation based on claims 35 and 51 of the

20

'314 patent, Newegg must prove that the CompuServe Mall discloses each and every limitations of the claimed invention arranged exactly as claimed, or that any missing element is necessarily present, or inherent, in the CompuServe Mall. *See Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1369 (Fed. Cir. 2008); *Schering Corp. v. Geneva Pharms.*, 339 F.3d 1373, 1377 (Fed. Cir. 2003). Newegg argues that Alexandor Trevor's and Edward Tittel's testimony regarding the CompuServe Mall was sufficient to establish anticipation. However, Mr. Tittel did not testify regarding the limitation of "said buyer computer being programmed . . . to send . . . shopping cart messages . . . each of which comprises a product identifier identifying one of said plurality of products," and Mr. Trevor admitted that the CompuServe Mall was not programmed to send such messages. Trial Tr. 4/28/10 P.M., 83:1-23. Mr. Tittel also failed to explain how the CompuServe Mall reference disclosed a "shopping cart database," as construed by the Court. Mr. Trevor recognized that the references did not disclose such a database. Trial Tr. 4/28/10 P.M., 79:19–80:2. Soverain's expert, Dr. Michael Shamos, relying on Mr. Trevor's trial testimony regarding the CompuServe Mall, presented evidence that the CompuServe Mall did not have a shopping cart message with a product identifier because there was no need for a product identifier. Trial Tr. 4/29/10 P.M., 162:18–165:9. Dr. Shamos further testified that CompuServe Mall did not contain a "shopping cart database" because the personal holding files kept in the main memory failed to meet the Court's construction of "shopping cart database." Trial Tr. 4/29/10 P.M., 165:10–168:17. The jury was free to disbelieve Mr. Tittel's expert testimony, and the existence of contrary testimony by Dr. Shamos supports the jury's conclusion that the CompuServe Mall does not anticipate claims 35 and 51 of the '314 patent.

With regard to obviousness, the Court granted Soverain's motion for JMOL of no obviousness and did not send the obviousness issue to the jury. Newegg's expert, Mr. Tittel, did not

express any opinions on obviousness or conduct a proper *Graham*[4] analysis. Newegg contends that it need not present expert testimony on the ultimate legal issue of obviousness and thus it was error for the Court to deny Newegg the opportunity to argue obviousness to the jury and submit the issue for a jury finding. The Federal Circuit has made clear that "[t]here must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness." *Innogenetics, N.V. v. Abbott Labs.*, 512 F.3d 1363, 1373 (Fed. Cir. 2008). In *Proveris Scientific Corp. v. Innovasystems, Inc.*, the Federal Circuit upheld the district court's decision to require defendants to present expert testimony in order to establish anticipation and obviousness. 536 F.3d 1256, 1267–68 (Fed. Cir. 2008). As in *Proveris*, the subject matter in this case "is sufficiently complex to fall beyond the grasp of an ordinary layperson." *Id*. Accordingly, because Newegg did not meet its burden of establishing a prima facie case of obviousness of the asserted claims, the Court stands by its prior decision granting Soverain's motion for JMOL on obviousness.

Lastly, Newegg asserted various grounds of alleged error in support of its MNT. First, the Court's admission of evidence related to the existence of settlement licenses was not prejudicial to Newegg because neither the licenses themselves nor any evidence relating to the specific terms of the licenses were admitted. In fact, the Court only allowed Soverain to state the names of its well-known licensees to rebut Newegg's offering of license agreements to smaller companies. Second, while the Court's exclusion of the belatedly produced CompuServe Mall materials caused only minor prejudice to Newegg, admitting these materials on the eve of trial would have been highly prejudicial to Soverain. Furthermore, Newegg can hardly claim prejudice with regard to the Court's exclusion of the belatedly produced documents given the Court's admission of the CompuServe

---

[4] *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1 (1966).

Manuals over Soverain's strenuous objections. Third, although Newegg contends the Court failed to instruct the jury that a witness's testimony only has to be corroborated if the witness is an interested party, Newegg's allegation of charge error is without merit. "[C]orroboration is required of any witness whose testimony alone is asserted to invalidate a patent, regardless of his or her level of interest." *Finnigan Corp. v. Int'l Trade Comm'n*, 180 F.3d 1354, 1369 (Fed. Cir. 1999); *see also Adenta GMBH v. Orthoarm, Inc.*, 501 F.3d 1364 (Fed. Cir. 2007). Lastly, as previously discussed, the Court's dismissal of Newegg's obviousness claims at the close of evidence does not warrant a new trial.

In sum, the jury's verdict on invalidity was not without support and certainly not against the great weight of the evidence. Thus, based on the foregoing reasons, the Court **DENIES** Newegg's motion for JMOL and MNT on invalidity of the patents-in-suit.

### SOVERAIN'S MOTION FOR PREJUDGMENT INTEREST AND COSTS, POST-VERDICT DAMAGES, AND POST-JUDGMENT INTEREST

Soverain moves for prejudgment interest and costs, post-verdict damages until the time of judgment, and post-judgment interest. Soverain's request for post-judgment interest is uncontested and is, accordingly, granted pursuant to the provisions of 28 U.S.C. § 1961.

Soverain is also entitled to an award of prejudgment costs. 35 U.S.C. § 284 ("Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court."). Soverain shall provide the clerk of this Court with a detailed bill of costs pursuant to Local Rule CV-54.

With regard to prejudgment interest, Soverain calculates prejudgment interest based on the

23

jury's $2,500,000 award using the prime interest rate, compounded quarterly. Newegg does not dispute that Soverain is entitled to prejudgment interest, but argues that prejudgment interest is properly calculated using the U.S. Treasury Bill rate, not prime rate, and that $2,500,000 is not the proper amount from which prejudgment interest should be calculated. As Newegg's arguments regarding the proper damages award have been previously addressed and rejected, and the Court has determined it will not alter the jury's award of $2,500,000, prejudgment interest will be calculated on this amount.

The interest rate used to calculate prejudgment interest and the method and frequency of compounding is left to the discretion of the district court. *See Uniroyal, Inc. V. Rudkin-Wiley Corp.*, 939 F.2d 1540, 1545 (Fed. Cir. 1991); *Studiengesellschaft Kohle, m.b.H. v. Dart Indus.*, Inc., 862 F.2d 1564, 1579–80 (Fed. Cir. 1988)(citing *Bio-Rad Labs.*, 807 F.2d at 969). Interest should be awarded from the date of infringement to the date of final judgment. *Nickson Indus., Inc. v. Rol Mfg*, 847 F.2d 795, 800 (Fed. Cir. 1988). Accordingly, prejudgment interest shall be awarded to Soverain on the $2,500,000 damages award at the prime rate as of August 11, 2010 compounded monthly through July 31, 2010 and compounded daily for the month of August 2010. Interest should be calculated from the date of infringement through the date of final judgment.

With regard to post-verdict damages, Soverain calculated a daily rate of $2,900 for post-verdict damages by extrapolating the jury's award of $2,500,000. *See* Nawrocki's Post-Verdict Declaration, Docket No. 403-2, at 2–3. Soverain's damages expert divided the number of Newegg online sales transactions from January 31, 2010 to April 30, 2010 by 120 days to yield a rate of 32,844 transactions per day. *Id.* Soverain then applied a per transaction royalty of $0.088 to yield an ongoing royalty of $2,900 per day of infringement until final judgment. *Id.* Newegg utilized

24

Soverain's per transaction rate solely for purposes of calculating post-verdict damages, but maintains

that the $2,900 per day royalty must be reduced to $966.67 per day to account for Newegg's single-

item sales transactions. The Court has previously addressed and rejected Newegg's argument

regarding single-item sales. Accordingly, post-verdict damages shall be awarded to Soverain in the

amount of $2,900 per day until final judgment.

## SOVERAIN'S MOTION FOR PERMANENT INJUNCTION
## OR, IN THE ALTERNATIVE, ONGOING ROYALTIES

**Permanent Injunction**

Soverain requests an order permanently enjoining Newegg from using the technology claimed

in Soverain's '314 and '492 patents to operate its infringing websites and any colorable variation

thereof. Soverain proposes the following language:

> Newegg, its officers, agents, servants, employees and attorneys, and those persons
> in active concert or participation with them who receive actual notice hereof, are
> hereby restrained and enjoined, pursuant to 35 U.S.C. § 283 and Fed. R. Civ. P.
> 65(d), from:
>
> 1. infringing or inducing others to infringe U.S. Patent No. 5,715,314 (the '314
> patent) through operation of the www.newegg.com, www.newegg.ca, or
> www.neweggmall.com websites, or any colorable variation thereof, including
> www.biz.newegg.com, through and including the expiration of the '314 patent,
> February 3, 2015; and
>
> 2. infringing or inducing others to infringe U.S. Patent No. 5,909,492 (the '492)
> patent through operation of the www.newegg.com, www.newegg.ca, or
> www.neweggmall.com websites, or any colorable variation thereof, including
> www.biz.newegg.com, through and including the expiration of the '492 patent,
> October 24, 2014.

Soverain's Proposed Order Granting Injunctive Relief, Docket No. 403-12. Importantly, Soverain

is seeking to enjoin www.biz.newegg.com, a website that is not part of any of the accused systems.

The decision to grant or deny injunctive relief is within the district court's discretion, which

25

should be exercised consistent with traditional principles of equity. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 394 (2006). A party is entitled to a permanent injunction only if: "1) [the party] has suffered an irreparable injury; 2) that remedies at law, such as monetary damages, are inadequate to compensate for that injury; 3) that, considering the balance of hardships between the [parties], a remedy in equity is warranted; and 4) that the public interest would not be disserved by a permanent injunction." *Id.* at 391.

First, Soverain argues that its licensing program will be irreparably harmed if Newegg is not enjoined from using Soverain's patented technology. Soverain contends that if Newegg is not enjoined after having been adjudged an infringer, other infringers will be encouraged to risk litigation, rather than take a license. Although a patent holder may in some cases establish irreparable harm by showing that an existing infringement precludes his ability to license, it is too speculative in this case to assume that third parties will choose to risk litigation rather than license Soverain's technology simply because Newegg has not been enjoined. *See z4 Techs., Inc. v. Microsoft Corp.*, 434 F. Supp. 2d 437, 440 (E.D. Tex. 2006) ("There is no logical reason that a potential consumer or licensee of z4's technology would have been dissuaded from purchasing or licensing z4's product activation technology for use in its own software due to Microsoft's infringement."); *but see Commonwealth Scientific & Indus. Research Org. v. Buffalo Tech. (USA), Inc.*, 492 F. Supp. 2d 600, 604 (E.D. Tex. 2007) ("*CSIRO*") (finding harm to a licensing program sufficient to establish irreparable harm where the patent holder research institution relied heavily on its ability to license to finance its research and development for frontier projects). In addition, Soverain and its predecessors have extensively licensed the patents-in-suit, and Soverain's patent licensing program has largely focused on obtaining monetary objectives, rather than non-monetary

26

objectives (e.g., cross licensing for resolution of litigation). Soverain's focus on monetary objectives does not favor an injunction. *Cf. CSIRO*, 492 F. Supp. 2d at 604 (finding that CSIRO's harm was "not merely financial"). Furthermore, although Soverain contends that its Transact product is a direct competitor to the www.neweggmall.com website, any possible competition between Newegg Mall and Transact is too insubstantial to support an injunction. Soverain has not established any competition with respect to www.newegg.com and www.newegg.ca. Thus, this factor weighs against enjoining Newegg.

Second, Soverain contends that monetary remedies are inadequate to compensate Soverain because the injury to Soverain and the value of its technology are not quantifiable. Soverain argues the harm that will result from an inability to license its technology to its competitors without engaging in a full-fledged trial is both incalculable and irreparable. The Court rejects these arguments as purely speculative. Moreover, "[w]hen the patented invention is but a small component of the product the companies seek to produce and the threat of an injunction is employed simply for undue leverage in negotiations, legal damages may well be sufficient to compensate for the infringement and an injunction may not serve the public interest." *eBay*, 547 U.S. at 396. Newegg argues that monetary damages would be adequate to compensate Soverain because the portions of its website relating to shopping cart functionality constitute less than 1% of the total lines of code that make up its system. While this may be true, Soverain has shown that its patented technology is "necessary" to Newegg's e-commerce system. Trial Tr. 4/28/10 A.M., 98:3-14; Trial Tr. 4/29/10 P.M., 30:20–31:4. Although this case presents a unique situation where the infringing component of Newegg's system is a small, yet necessary portion of the entire system, it is equivocal whether this is a situation where "the product is the invention." *Compare CSIRO*, 492 F. Supp. 2d

27

at 605–06 (finding monetary damages less adequate to compensate for infringement because the infringement related to "the essence of the technology"), *with z4*, 434 F. Supp. 2d at 440 (finding the infringing technology was "a small component of [Microsoft's] software" because it "in no way related to the core functionality for which the software is purchased by consumers"). However, the jury's $2.5 million damages award, which represents only a fraction of the $22.6 million advocated by Soverain, demonstrates that the infringed claims constitute a small part of the total value of Newegg's system. Accordingly, this factor also weighs against enjoining Newegg.

The balance of hardships favors Newegg. Soverain only argues its licensing program will suffer if Newegg is not enjoined. It is clear from Soverain's briefing that its licensing program has focused on obtaining purely monetary objectives. While enjoining Newegg from operating its website would have a significant effect on Newegg and its e-commerce system, the absence of an injunction would not significantly harm Soverain because monetary remedies are adequate to compensate Soverain for Newegg's continued infringement. Thus, the balance of hardships weighs against enjoining Newegg.

Because Soverain has not shown irreparable harm in the absence of a permanent injunction, any harm Soverain might suffer can be adequately remedied through the recovery of monetary damages, and the balance of hardships weighs in favor of Newegg, an injunction would not serve the public interest and is improper in this instance. Thus, the Court **DENIES** Soverain's motion for a permanent injunction.

**Ongoing Royalties**

In the absence of an injunction, Soverain requests an award of ongoing royalties for the remaining life of the '314 and '492 patents. "Under some circumstances, awarding an ongoing

28

royalty for patent infringement in lieu of an injunction may be appropriate." *Paice LLC v. Toyota Motor Corp.*, 504 F.3d 1293, 1314 (Fed. Cir. 2007) ("*Paice II*"). "Even though a permanent injunction may no longer be proper in many patent cases in light of *eBay*, an ongoing royalty rate must still adequately compensate a patentee for giving up his right under the law to exclude others from making, using, selling, offering for sale or importing his invention." *Paice LLC v. Toyota Motor Corp.*, 609 F. Supp. 2d 620, 630 (E.D. Tex. 2009) ("*Paice III*"). In addition, the Court must account for the change in the legal relationship between the parties. "Failing to consider the parties' changed legal status would create an incentive for every defendant to fight each patent infringement case to the bitter end because without consideration of the changed legal status, there is essentially no downside to losing." *Paice III*, 609 F. Supp. 2d at 628. Furthermore, an on-going post-verdict royalty is appropriately higher than the jury's pre-verdict reasonable royalty. *See Amado v. Microsoft Corp.*, 517 F.3d 1353, 1362 n.2 (Fed. Cir. 2008); *Creative Internet Adver. Corp. v. Yahoo!, Inc.*, 674 F. Supp. 2d 847, 861 (E.D. Tex. 2009).

Moreover, the Federal Circuit has encouraged parties to negotiate a license amongst themselves regarding the future use of a patented technology before imposing an ongoing royalty. *See Paice III*, 609 F. Supp. 2d at 623 (citing *Paice II*, 504 F.3d at 1315). From the parties' post-verdict briefing on the ongoing royalty issue, as well as the parties' settlement negotiation history thus far, it is clear that further license negotiation would be fruitless. Thus, the Court is faced with the task of determining an appropriate ongoing royalty arising from a post-verdict hypothetical negotiation, taking into account the changed relationship between the parties. *See Creative*, 674 F. Supp. 2d at 860.

Newegg is now an adjudged infringer and Newegg's continued infringement is both

29

voluntary and intentional, making Newegg's continued infringement willful. *See Paice III*, 609 F.

Supp. 2d at 628. In addition, both Newegg and Soverain's financial position has changed

dramatically since the hypothetical negotiation. Newegg is now the second largest online-only

retailer and has announced its plans for an initial public offering. Soverain's licensing program has

had recent success as Soverain has entered into seven agreements with large e-commerce retailers,

including Amazon and TigerDirect. As expected, the parties have markedly different views of how

these changes affect their respective negotiating positions. The parties' changed financial positions

appear to cancel each other out because each party is more successful today than they were at the

time of the hypothetical negotiation. However, the Court cannot ignore Newegg's adjudged infringer

status in determining an appropriate ongoing royalty.

Reducing the jury's verdict to a per-transaction rate results in an award equal to $0.088 per

Newegg transaction. Soverain contends that an appropriate ongoing royalty, taking into account the

changed legal and factual circumstances, is at least $0.20 per transaction. Newegg contends that

Soverain's proposed ongoing royalty is unreasonable because Soverain has failed to take into

account Newegg's proposed design-arounds for the shopping cart claims and hypertext statement

claims. Newegg argues that these design-arounds should lower the parties' expectations regarding

any ongoing royalty or eliminate the need for such royalty altogether. Newegg advocates for an

ongoing royalty of 1.25 cents per $100 transaction, or in the alternative, $0.088 per transaction

because the parties' various changed circumstances cancel each other out.

Newegg's 2009 profit rate of approximately 2.5% yields an operating profit of $4.68 per

transaction. *See* Nawrocki's Post-Verdict Declaration, Docket No. 403-2, at 13. Although Judge

Folsom in *Paice III* applied a 25% Rule of Thumb to the profit rate as a starting point to determine

an ongoing royalty, such an approach is not in line with the jury's verdict in this case because $0.088 per Newegg transaction represents only 1.88% of Newegg's profits. Accordingly, the Court uses Soverain's proposal of $0.20 as a starting point. Even taking into account Newegg's adjudged infringer status, the jury's award of only $0.088 per transaction (1.88% of Newegg's profits) counsels against an ongoing royalty of $0.20 per transaction (4.27% of Newegg's profits). *See Paice III*, 609 F. Supp. 2d at 630 ("[T]he jury's award for past damages . . . counsels in favor of a reduction."). If Newegg proves successful in designing-around the shopping cart claims and hypertext statement claims, it will be freed of the obligation to pay ongoing royalties. When the time comes, Soverain will have the burden of proving that Newegg's design-arounds are not colorably different and thus still infringing. *See Creative*, 674 F. Supp. 2d at 855. Although Newegg's proposed re-designs do not preclude the post-verdict relief Soverain is entitled to given Newegg's adjudged infringement, the Court does consider Newegg's proposed design-arounds because "the costs of switching to an alternative design is a factor that the parties would consider in arriving at an appropriate ongoing royalty rate." *Paice III*, 609 F. Supp. 2d at 627. Based on the foregoing reasons, and the fact that Soverain did not account for Newegg's proposed design-arounds in its $0.20 proposal, the Court finds it is reasonable to reduce Soverain's proposal by 25%.

Thus, taking into account the changed legal and factual circumstances occurring since the first hypothetical negotiation, the Court **GRANTS** Soverain's motion for ongoing royalties and concludes that $0.15 per transaction is an appropriate ongoing royalty to adequately compensate Soverain for Newegg's continued infringement.

## NEWEGG'S MOTION TO STRIKE EVIDENCE

Newegg moves to strike Mr. Nawrocki's entire declaration and portions of Katharine

31

Wolanyk's declaration as unreliable, irrelevant, and inadmissible. Both declarations were submitted by Soverain in support of its post-verdict motions. The Court overrules Newegg's objections to these declarations and **DENIES** Newegg's motion to strike.

## CONCLUSION

For the aforementioned reasons, the Court **GRANTS** in part Soverain's motion for JMOL on infringement and MNT on damages (Docket No. 402), **GRANTS** in part Soverain's motion for permanent injunction or, in the alternative, ongoing royalties (Docket No. 403), **GRANTS** in part Soverain's motion for pre-judgment interest, post-verdict damages, and post-judgment interest (Docket No. 404), and **DENIES** all other motions.

**So ORDERED and SIGNED this 11th day of August, 2010.**

**LEONARD DAVIS**
**UNITED STATES DISTRICT JUDGE**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

| | | |
|---|---|---|
| SOVERAIN SOFTWARE LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | CASE NO. 6:07 CV 511 |
| | § | PATENT CASE |
| NEWEGG INC., | § | |
| | § | |
| Defendant. | § | |

## FINAL JUDGMENT

Pursuant to Rule 58 of the Federal Rules of Civil Procedure, consistent with the Court's contemporaneous Memorandum Opinion and Order, and in consideration of the jury verdict delivered on April 30, 2010 and the entirety of the record available to this Court, the Court **ORDERS AND ENTERS FINAL JUDGMENT** as follows:

- Defendant Newegg Inc. ("Newegg") is found to have unlawfully infringed U.S. Patent Nos. 5,715,314 (the "'314 patent"), 5,909,492 (the "'492 patent"), and 7,272,639 (the "'639 patent") (collectively, "patents-in-suit").

- The patents-in-suit are not invalid and are enforceable.

- The Court awards damages to Soverain Software LLC ("Soverain") for Newegg's infringement of the '314 and '492 patents in the amount of $2,500,000.

- Soverain is further awarded a new trial on damages for Newegg's infringement of the '639 patent, to be held after all appeals have been exhausted.

- Soverain is further awarded post-verdict damages of $2,900 per day from May 1, 2010 until the date of this Final Judgment.

- Soverain is further awarded prejudgment interest on the actual damages found by the jury calculated at the prime rate as of the date of this Final Judgment compounded monthly through July 31, 2010 and compounded daily for the month of August 2010.

- Soverain is awarded its prejudgment Costs of Court.

- Soverain is entitled to post-judgment interest as provided for by 28 U.S.C. § 1961 for any time period between the entry of this Final Judgment and the date upon which Soverain receives payment from Newegg as ordered herein.

- For the reasons stated in the Court's contemporaneous Memorandum Opinion and Order, Newegg is hereby **ORDERED**, for the remaining life of the '314 and '492 patents, to pay Soverain an ongoing royalty of $0.15 per infringing transaction.

- All relief not granted in this Final Judgment is **DENIED**.

- All pending motions not previously resolved are **DENIED**.

**So ORDERED and SIGNED this 11th day of August, 2010.**

**LEONARD DAVIS**
**UNITED STATES DISTRICT JUDGE**

2

## <u>CERTIFICATE OF FILING AND SERVICE</u>

I hereby certify that on this 7th day of December, 2010, two bound copies of

the Brief of Appellant were served via UPS Next Day Air, to the following:

      Kenneth R. Adamo
      JONES DAY
      2727 North Harwood Street
      Dallas, Texas  75201
      (214) 969-4856

      *Counsel for Appellee*

      Thomas L. Giannetti
      JONES DAY
      222 East 41st Street
      New York, New York  10017
      (212) 326-3939

      *Counsel for Appellee*

      Paul J. Ripp
      WILLIAMS MONTGOMERY & JOHN LTD.
      233 South Wacker Drive, Suite 6100
      Chicago, Illinois  60606
      (312) 443-3205

      *Counsel for Appellee*

I further certify that on this 7th day of December, 2010, the required number

of copies of the Brief of Appellant were hand filed at the Office of the Clerk,

United States Court of Appeals for the Federal Circuit.

The necessary filing and service were performed in accordance with the instructions given me by counsel in this case.

THE LEX GROUP DC
1825 K Street, NW, Suite 103
Washington, DC  20006
(202) 955-0001

## CERTIFICATE OF COMPLIANCE

1.  This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) or Federal Rule of Appellate Procedure 28.1(e):

    [ X ] this brief contains [*13,992*] words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii), or

    [    ] this brief uses a monospaced typeface and contains [*state the number of*] lines of text, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii)

2.  This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) or Federal Rule of Appellate Procedure 28.1(e) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6):

    [ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 2007*] in [*14pt Times New Roman*]; *or*

    [    ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

Dated: <u>December 7, 2010</u>                    *Edward R. Reines*
                                                                    Edward R. Reines
                                                                    *Counsel for Appellant*

## DECLARATION OF AUTHORITY
## PURSUANT TO FED. CIR. R. 47.3(d)

I, Deborah D. Sweigart, hereby declare under penalty of perjury that I am

duly authorized to sign on behalf of Counsel for Appellant, Edward R. Reines, as

he is unavailable to do so himself.

Executed:  December 7, 2010

THE LEX GROUP DC
1825 K STREET, NW, SUITE 103
WASHINGTON, DC  20006
(202) 955-0001

To Be Filed For:

Edward R. Reines
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
Telephone: (650) 802-3000

*Counsel for Appellant*

Respectfully Submitted,

Edward R. Reines
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
Telephone: (650) 802-3000

*Counsel for Appellant*