**2011-1009**

# United States Court of Appeals

*for the*

# Federal Circuit

SOVERAIN SOFTWARE LLC,

*Plaintiff-Appellee,*

*v.*

NEWEGG INC.,

*Defendant-Appellant.*

---

*Appeal from the United States District Court for the Eastern District of Texas in Case No. 07-CV-0511, Judge Leonard Davis.*

## BRIEF OF PLAINTIFF-APPELLEE SOVERAIN SOFTWARE LLC

DAVID NELSON
ROBERT B. WILSON
NEIL CAVE
QUINN EMANUEL URQUHART &
    SULLIVAN, LLP
51 Madison Avenue
22nd Floor
New York, NY 10010
(212) 849-7000

*Attorneys for Plaintiff-Appellee*

MARCH 28, 2011

## <u>CERTIFICATE OF INTEREST</u>

Counsel for Plaintiff-Appellee Soverain Software LLC certifies the following:

1. The full name of every party or amicus represented by me is:

    Soverain Software LLC

2. The name of the real party in interest represented by me is:

    Same as above.

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

    None.

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

    David Nelson, Robert B. Wilson, and Neil Cave, Quinn Emanuel Urquhart & Sullivan, LLP.

    Paul J. Ripp, Williams Montgomery & John Ltd.

    Kenneth R. Adamo, Thomas Demitrack, Thomas L. Giannetti, Mark C. Howland, George T. Manning, Barry R. Satine, Jennifer Seraphine, Ognian V. Shentov, Andrey Belenky, Kenneth Canfield, Clark Craddock, Lynda Q. Nguyen, Debra R. Smith, and Stela C. Tipi, Jones Day.

    Carl R. Roth, Amanda Aline Abraham, and Brendan Clay Roth, The Roth Law Firm.

    Michael C. Smith, Siebman Burg Phillips & Smith, LLP.

March 28, 2011

Robert B. Wilson

# TABLE OF CONTENTS

**Page**

JURISDICTIONAL STATEMENT ................................................................1

STATEMENT OF THE ISSUES..................................................................1

STATEMENT OF THE FACTS ...................................................................3

I.     THE PARTIES ..............................................................................4

     A.    Open Market...............................................................4

     B.    Divine .........................................................................5

     C.    Soverain ......................................................................6

     D.    Newegg.......................................................................6

II.    THE PATENTS IN SUIT.............................................................7

     A.    Shopping Cart Claims ...............................................7

     B.    Hypertext Statement Claims......................................8

     C.    Session Identifier Claims ..........................................9

III.   NEWEGG'S ACCUSED WEBSITES .........................................10

IV.   THE PROCEEDINGS IN THE DISTRICT COURT ....................11

SUMMARY OF THE ARGUMENT ............................................................16

ARGUMENT .........................................................................................20

I.     THE DISTRICT COURT APPLIED THE CORRECT LEGAL STANDARD UNDER *CENTILLION* FOR INFRINGING "USE" OF THE ASSERTED SYSTEM CLAIMS .........................................20

     A.    The District Court Correctly Applied the Control/Benefit Standard from *NTP*................................................21

B.    The Infringing Use By Newegg's Customers Satisfies the All-Elements Rule.................................................................23

II.   SUBSTANTIAL EVIDENCE SUPPORTS THE JURY'S VERDICT OF INFRINGEMENT OF THE ASSERTED SHOPPING CART CLAIMS ............................................................................24

    A.    Newegg's System Modifies the Shopping Cart By First Creating an Instance of a Shopping Cart and Then Adding Items to It.....................................................................24

    A.    Newegg's System Satisfies the Plurality Element By Adding Products One-By-One to the Cookie on a Customer's Computer in Response to Each Customer Request.............................28

    B.    Newegg's System Infringes Under the Doctrine of Equivalents........32

III.   SUBSTANTIAL EVIDENCE SUPPORTS THE JURY'S VERDICT OF INFRINGEMENT OF THE ASSERTED HYPERTEXT STATEMENT CLAIMS ............................................................34

IV.   SUBSTANTIAL EVIDENCE SUPPORTS THE JURY'S VERDICT THAT NEWEGG ACTIVELY INDUCED INFRINGEMENT OF THE SHOPPING CART AND HYPERTEXT STATEMENT CLAIMS ............................................................................37

V.   THE DISTRICT COURT CORRECTLY GRANTED JMOL THAT NEWEGG INFRINGES CLAIM 79 OF THE SESSION IDENTIFIER PATENT ......................................................40

VI.   THE DISTRICT COURT CORRECTLY CONCLUDED THAT NO REASONABLE JURY COULD HAVE FOUND THE ASSERTED CLAIMS INVALID FOR OBVIOUSNESS.................................45

    A.    The Overwhelming Evidence At Trial Demonstrated That The Prior Art Lacked Numerous Limitations of the Asserted Claims.......45

    B.    The Prior Art Taught Away From Combining Prior Art References in the Way Newegg Alleged .............................48

    C.    Newegg Failed to Rebut the Substantial Evidence of Secondary Considerations ..................................................50

VII.  SUBSTANTIAL EVIDENCE SUPPORTS THE JURY'S
DAMAGES AWARD, OR IN THE ALTERNATIVE, THIS CASE
SHOULD BE REMANDED FOR A NEW TRIAL ON DAMAGES ......... 51

A.   The Jury's Damages Award Reflects the Fundamental Nature of
the Patented Technology and Newegg's Extensive Use ..................... 51

B.   Single-Item Transactions Were Properly Included in the
Royalty Base as Infringing the Asserted System Claims ................... 55

C.   The Patent Licenses in Evidence Include Running Royalty
Components Based on the Sales or Profits of the Licensee ............... 57

D.   Newegg's Proffer Of A $500,000 Lump-Sum Is Not
Reasonable Compensation for Newegg's Use of the Patented
Technology ...................................................................................... 59

E.   It Was Harmless Error For The District Court To Admit
Nawrocki's Testimony Regarding The 25% Rule .............................. 60

F.   The District Court Was Well Within Its Discretion to Admit
Evidence of Soverain's Licenses with Major Internet Retailers ......... 61

CONCLUSION ............................................................................................... 62

# **TABLE OF AUTHORITIES**

**Page**

*ACCO Brands, Inc. v. ABA Locks Mfrs. Co., Ltd.,*
501 F.3d 1307 (Fed. Cir. 2007) ........................................................37

*Abbott Labs. v. Sandoz, Inc.,*
544 F.3d 1341 (Fed. Cir. 2008) ........................................................49

*Alco Standard Corp. v. Tennessee Valley Authority,*
808 F.2d 1490 (Fed. Cir. 1986) ........................................................36

*Astrazeneca LP v. Apotex, Inc.,*
--- F.3d ---, 2010 WL 4286284 (Fed. Cir. Nov. 1, 2010) ...................39

*BMC Resources, Inc. v. Paymentech, L.P.,*
498 F.3d 1373 (Fed. Cir. 2007) ........................................................43

*Brooktree Corp. v. Advanced Micro Devices, Inc.,*
977 F.2d 1555 (Fed. Cir. 2003) ..................................................51, 60

*Centillion Data Sys., LLC v. Qwest Communications Int'l, Inc.,*
631 F.3d 1279 (Fed. Cir. 2011) ........................................ 1, 16, 20-23

*Duro-Last, Inc. v. Custom Seal, Inc.,*
321 F.3d 1098 (Fed. Cir. 2003) ........................................................38

*Fujifilm Corp. v. Benun,*
605 F.3d 1366 (Fed. Cir. 2010) ..............................................51, 54, 59

*Golden Blount, Inc. v. Robert H. Peterson Co.,*
438 F.3d 1354 (Fed. Cir. 2006) ..................................................39, 40

*Haun v. Ideal Industries, Inc.,*
81 F.3d 541 (5th Cir. 1996) .............................................................61

*Hilton Davis Chemical Co. v. Warner-Jenkinson Co., Inc.,*
114 F.3d 1161 (Fed. Cir. 1997) ........................................................61

*Immunocept, LLC v. Fulbright & Jaworski, LLP,*
504 F.3d 1281 (Fed. Cir. 2007) ........................................................38

*Lucent Technologies, Inc. v. Gateway, Inc.,*
580 F.3d 1301 (Fed. Cir. 2009) ..............................................36, 37, 55

*Moleculon Research Corp. v. CBS, Inc.*,
   793 F.2d 1261 (Fed. Cir. 1986) ...................................................36

*Monsanto Co. v. McFarling*,
   488 F.3d 973 (Fed. Cir. 2007) ....................................................51

*Muniauction, Inc. v. Thomson Corp.*,
   532 F.3d 1318 (Fed. Cir. 2008) ..................................................43

*NTP, Inc. v. Research in Motion, Ltd.*,
   418 F.3d 1282 (Fed. Cir. 2005) ....................1, 16, 20, 21, 22, 23

*Proveris Scientific Corp. v. Innovasystems, Inc.*,
   536 F.3d 1256 (Fed. Cir. 2008) ..................................................50

*ResQNet.com, Inc. v. Lansa, Inc.*,
   594 F.3d 860 (Fed. Cir. 2010) ....................................................62

*SiRF Technology, Inc. v. International Trade Com'n*,
   601 F.3d 1319 (Fed. Cir. 2010) ..................................................45

*Uniloc USA, Inc. v. Microsoft Corp.*,
   --- F.3d ---, 2011 WL 9738 (Fed. Cir. Jan. 4, 2011)..................60

*Varco, L.P. v. Pason Sys. USA Corp.*,
   436 F.3d 1368 (Fed. Cir. 2006) ..................................................34

## Rules/Statutes

28 U.S.C. § 1292(c)(2)...................................................................1

35 U.S.C. § 271(a) ...................................................................20, 23

## **STATEMENT OF RELATED CASES**

Pursuant to Federal Circuit Rule 47.5, counsel for Plaintiff-Appellee Soverain Software LLC ("Soverain") certifies that there has been no other appeal in or from the same civil action in the District Court for the Eastern District of Texas that was previously before this or any other appellate court.

The following case may be directly affected by this Court's decision in the present appeal: *Soverain Software LLC v. J.C. Penney Corporation, Inc., et al.,* Civil Action No. 6:09-CV-274-LED (E.D. Tex.).

Counsel for Soverain is also aware of the following cases currently on appeal from this Court to the United States Supreme Court that may directly affect the Court's decision in the present appeal: *SEB S.A. v. Montgomery Ward & Co.,* 594 F.3d 1360 (Fed. Cir. 2010), *cert. granted,* 2010 U.S. LEXIS 8068 (Oct. 12, 2010); *i4i Ltd. P'ship v. Microsoft Corp.,* 598 F.3d 831, 841 (Fed. Cir. 2010), *cert. granted,* 2010 U.S. LEXIS 9311 (Nov. 29, 2010).

## JURISDICTIONAL STATEMENT

Because the district court's judgment is final except for an accounting of damages with respect to the '639 patent (A1), this Court has jurisdiction over this appeal under 28 U.S.C. § 1292(c)(2).

## STATEMENT OF THE ISSUES

1. Whether there was sufficient evidence to support the jury's verdict that Newegg's customers directly infringe the asserted shopping cart and hypertext statement claims under the applicable legal standard for infringing "use" of a claimed system articulated in *NTP* and affirmed in *Centillion*, in light of the undisputed evidence that Newegg's customers put the accused website into service by controlling the system as a whole and obtaining a benefit from it.

2. Whether there was sufficient evidence to support the jury's verdict of infringement of the asserted shopping cart claims in light of the substantial evidence demonstrating that Newegg's website system satisfies the "modify" and "plurality" elements, both literally and under the doctrine of equivalents.

3. Whether there was sufficient evidence to support the jury's verdict of infringement of the hypertext statement claims in light of the undisputed evidence that Newegg prominently features its infringing order history

1

system on its website and provides detailed instructions to its customers about how to use it.

4.  Whether there was sufficient evidence to support the jury's verdict that Newegg actively induced its customers to infringe the asserted shopping cart and hypertext statement claims with full knowledge of the Soverain patents by soliciting customers to buy products on its infringing website and instructing them how to use the accused systems in an infringing manner.

5.  Whether the district court correctly determined that claim 79 of the session identifier patent does not require a divided infringement analysis, and therefore no reasonable jury could find non-infringement given the undisputed evidence that Newegg's website server performs every step of the recited method.

6.  Whether the district court correctly granted JMOL on obviousness in light of the complete failure of proof regarding several fundamental *Graham* factors, including (a) why numerous elements of the claims missing from the asserted references would have allegedly been obvious to a person of ordinary skill in the art, (b) what reason a person of ordinary skill in the art would have had to combine prior art references in the way Newegg alleged given that the alleged combinations of prior art would have been inoperable,

and (c) any rebuttal to the compelling evidence of secondary considerations of non-obviousness.

7.     Whether there was sufficient evidence to support the jury's damages award of $2.5 million in light of the utility and advantages of the patented technology as core components of e-commerce, the extensive use that Newegg has made of the inventions, and the value of that use which has directly facilitated Newegg's e-commerce sales and its overall success as an online retailer.

**STATEMENT OF THE FACTS**

This case involves technology that revolutionized e-commerce and the way in which retailers make their products available for sale online. The now-familiar functionality described and claimed in the patents in suit has become the standard for operating e-commerce websites across the Internet. The patents disclose technology that allows customers to shop using a virtual shopping cart, view their transaction history and order status, and visit almost any retail website using nothing more than a standard browser installed on almost any personal computer.

It is difficult today to recall a time before the patented technology had become part of the fundamental platform that retailers use to operate their websites. But prior to 1994-1995, when the applications leading to the patents in suit were filed, nothing like the patented functionality had been devised, let alone

3

implemented before. The simplicity and intuitive features of the patented

technology soon became apparent. Almost overnight, retailers abandoned older

technologies that often required customers to dial in directly to specific sites, shop

for products using function codes or other keypad commands, and fax or phone in

orders rather than complete transactions online. The patented functionality is now

deeply ingrained in the way in which retailers and customers do business online.

Without this technology, retailers would not be able to meet basic standards for

ease of use, convenience, and speed that any e-commerce website must have in

order to compete effectively. Indeed, the fact that customers generally take it for

granted that retail websites will incorporate the patented functionality is the

ultimate measure of its success in transforming the field of e-commerce to become

what it is today.

## I.    THE PARTIES

### A.    Open Market

Open Market was a start-up company that began developing software

products for Internet commerce in May 1994. (A1763:6-9). By October 1994,

Open Market had implemented the first commercial embodiment of the patented

technology (A1765:24-103:4), and filed the first application leading to the patents-

in-suit. (A66).

In May 1996, Open Market began commercial shipment of OM-Transact ("Transact"), its flagship Internet commerce product. (A1775:2-7). Transact was quickly embraced by the market, and its early customers included many notable companies such as AT&T, First Union National Bank, Sprint, Sony, and Disney. (A1776:12-A1777:8; A1825:5-13). By the late 1990s, Transact was established as a market leader in e-commerce technology "command[ing] over 30 percent of the E-commerce software market [and] dwarfing all other competitors, including companies like Microsoft and IBM." (A1824:4-14).

In 2001, following the bursting of the "dot-com bubble," Divine interVentures, Inc. ("Divine") purchased Open Market for approximately $70 million. (A1819:7-20). As a result of the purchase, Divine acquired Open Market's patent portfolio and its Transact software product. (*Id.*: A1827:1-12).

## B.    Divine

Divine was a venture capital investment company founded in May 1999. (A1814:15-1815:5). Divine focused on "professional services, Web-based technology, and managed services." *Id.* At its peak, Divine employed approximately 3,000 people in more than 20 locations worldwide and offered approximately 50 software products. (A1817:12-15). However, Divine "grew too big too fast" and filed for bankruptcy on February 25, 2003. (A1820:18-1823:20; A13002). Divine was eventually broken up and sold to various investors.

(A1822:17-20).  One of these investors was Soverain, an entity formed for the

purpose of purchasing certain Open Market assets, including the Transact software

business and related intellectual property.  (A1822:23-25; A1827:1-12).

## C.    Soverain

Soverain Software LLC is the current owner of the patents in suit.  Soverain

provides "e-commerce software and services for enterprises, focusing on the

publishing, news syndicate and digital content industries."  (A1828:5-A1829:12).

Soverain continues to "develop and support the e-commerce technology that was

pioneered by Open Market," including the Transact software.  (A1828:5-15).

Companies that currently use Transact include Reuters, Business Week, Thomson

Learning, Maroc Telecommerce, McGraw Hill, and BNA.  (A13208-215).

In addition to Transact, Soverain has maintained and developed the Open

Market patent portfolio, which now consists of over 50 issued and pending U.S.

and international patents covering key aspects of e-commerce technology.

(A1827:5-12; 1829:7-12).  Soverain has successfully licensed *its patents to some

of the largest e-commerce retailers today, including Amazon, The Gap, and

Zappos.*  (A1850:13-18).

## D.    Newegg

Newegg Inc. is the world's second-largest online-only retailer, second only

to Amazon.  Newegg specializes in consumer electronics and information

technology products.  (A1997:10-21).  Founded in 2001, Newegg now owns and

operates several websites, including www.newegg.com, www.newegg.ca, and

www.neweggmall.com.  In 2008, Newegg's websites accounted for an estimated

$2.1 billion in sales.  (A1911:8-21).

## II.    THE PATENTS IN SUIT

U.S. Patent Nos. 5,715,314, 5,909,492, and 7,272,639 are directed to

fundamental features of e-commerce technology.  The asserted claims can be

grouped into three categories as follows (A4):

| Shopping Cart Claims | '314 patent<br>'492 patent | claims 35 and 51<br>claim 17 |
|---|---|---|
| Hypertext Statement Claims | '492 patent | claims 41 and 61 |
| Session Identifier Claims | '639 patent | claims 60 and 79 |

### A.    Shopping Cart Claims

The shopping cart claims of the '314 and '492 patents recite network-based

sales systems that allow the user to shop over the Internet and pay electronically.

(A1506:14-22).   The patented systems include a shopping cart computer, a

shopping cart database, and a buyer computer for operation by a user desiring to

buy products online using a shopping cart feature.  (A1557:18-A1559:4).  A user

selects products for purchase by adding them to a shopping cart, and the sales

system stores representations of those products.  (A1572:15-A1573:5).  When

ready to purchase the selected products, the user can initiate a payment transaction to pay for them. (A1589:14-22).

The sales systems described and claimed in the '314 and '492 patents allow both item selection and payment to be processed over a network such as the Internet, so there is no need for alternate shopping arrangements, such as telephone calls, fax authorizations, or in-store visits. This results in efficient transaction processing, a lower cost-of-sales to the merchant, and a more convenient online shopping experience for the user.

## B.    Hypertext Statement Claims

The hypertext statement claims of the '492 patent are directed to systems that allow customers to check the status of current orders and to review their transaction history online using statement documents that can be opened by clicking on a hypertext link. (A147, A160-61). These hypertext statement documents allow customers to request and display detailed information about past purchases on their computers, reducing or even obviating the need for the system operator to provide customer support personnel or to mail account statements to its customers. (A1709:23-A1710:20). In addition, the hypertext statement system also allows customers to track the status of an order, eliminating the need for customers to keep track of their purchases. (*Id.*; A2564:2-10). Although this system may seem straightforward today in light of its widespread implementation

on e-commerce websites across the Internet, Open Market was the first to develop and implement this functionality.

## C.    Session Identifier Claims

The '639 patent teaches the use of a "session identifier" to permit web servers to recognize a series of inquiries (or "service requests") from the same client during an online session, and to control and monitor the client's access to information on a website. (A1507:7-23). This technology is essential due to the "stateless" nature of the Internet. (A177 at 2:40-3:2). The web server assigns the session identifier, which can be as simple as a string of text or numbers, in response to an initial service request from a client. (A1629:12-25). When the server receives a subsequent request with the same session identifier appended to it, the server can then associate that request with earlier requests. (A1636:12-16; A1639:23-A1640:5). The session identifier allows the web server to recognize the client during a series of requests and responses, to provide access to information resources which the user is authorized to access, and to monitor the user's access. (A1506:23-A1507:23; A1761:20-A1763:5). In practice, this technology allows e-commerce merchants, such as Newegg, to maintain an e-commerce session with a customer, to track and monitor visitors to its website, and to present personalized content to individual customers.

## III.   NEWEGG'S ACCUSED WEBSITES

Newegg conducts e-commerce via three websites that incorporate systems and methods claimed in the Soverain patents:  www.newegg.com, www.newegg.ca, and www.neweggmall.com.  (A1535:4-A1538:17).  Customers connect to Newegg's websites via the public Internet by typing the web address into a standard browser, such as Internet Explorer.  (A13005).  Customers send requests to the Newegg server for access to different pages of the website or information relating to Newegg's products.  (A1708:25-A1709:13; A13093). Through a series of requests and responses, customers are able to browse through and read about available products, add selected items to a shopping cart, and complete a transaction online at checkout.

Customers may also check the status of their completed orders and review their past transaction history.  Hyperlinks directing customers to the transaction statement system are located on a banner featured on the principal web pages of Newegg's website.  (A13093; *see also* A1612:20-A1613:14; A2052:20-A2053:6).

Newegg provides comprehensive instructions and technical support for customers using its websites.  (A1531:20-A1533:2).  These instructions direct customers about how to use the shopping cart to select products and checkout, and how to retrieve information about their order status and/or transaction history.

(A9704; A9813-9816; A13090-093; A10111-A10113; *see also* A1623:14-A1624:21).

## IV.    THE PROCEEDINGS IN THE DISTRICT COURT

Trial in this case commenced on April 26, 2010, during which the jury heard testimony regarding infringement, invalidity, and damages.

*Infringement*:  Soverain's expert, Dr. Jack Grimes – a Ph.D. in electrical engineering with 30 years of industry experience – testified regarding Newegg's infringement of the asserted claims.  (A1496:10-A1498:6).  Dr. Grimes walked the jury through the steps of a transaction on Newegg.com, and explained how the Newegg website works.  (A1525:18-A1531:19).[1]

Regarding the shopping cart claims, Dr. Grimes explained that when a customer first adds an item to the shopping cart by clicking on "ADD TO CART," Newegg's website creates a "cookie" on the customer's computer.  (A1565:7-A1566:23; A1569:6-A1570:9).  This cookie stores product information concerning the selected item.  (*Id.*).  The Newegg system is programmed so that the customer can add one, two, or more items for purchase.  (A1569:6-A1571:6; A1574).  As each item is selected, the respective product information is added to a cookie and

---

[1]    Dr. Grimes explained that Newegg's 30(b)(6) witness on technical issues had confirmed that the Neweggmall.com and Newegg.ca websites operate in the same way as Newegg.com with respect to the systems and methods that are pertinent to infringement of the Soverain patents.  (A1536:4-14).

transferred back to the customer's browser. (A1566:24-A1567:24; A1570:10-A1570:19).

Dr. Grimes further explained that the checkout process on the Newegg website involves two steps. (A1698:9:A1699:9; *see also* A1583:13-16). First, when the customer clicks the "CHECKOUT" button, the Newegg system creates an instance of a shopping cart by generating a shopping cart ID that is associated with the transaction. (A1698:2-5). But at this point, the shopping cart ID has no products associated with it. The shopping cart is empty. Second, the contents of the cookie are transferred to the shopping cart database. (A13007-13012; A1567:25-A1569:5). The system modifies the earlier-identified shopping cart by adding the information about each of the products that the customer has selected for purchase. (A13007-13012; A1699:6:9).

Regarding the hypertext statement claims, Dr. Grimes explained how the Newegg system uses hypertext links that allow customers to select particular transaction documents from a summary page of their past transaction history. By clicking on an "Order Status" link, customers can view the progress of their pending orders. (A15112; A16666-A16668; A16675-A16677). Similarly, by clicking on an "Order History" link, customers are directed to a webpage listing their past orders and providing hypertext links to access more detailed information about individual transactions. (A15151-A15166).

Regarding the session identifier claims, Dr. Grimes explained that he had analyzed the Newegg.com system, and identified at least two session identifiers – a log-in session identifier and a checkout session identifier. (A1630:1-A1632:21). These session identifiers allow the Newegg server to recognize requests received from the customer and relate them to the log-in and checkout sessions for a particular transaction. (A1630:5-A1631:2; A1631:16-22).

*Invalidity*: Dr. Michael Shamos, an expert with a Ph.D. in computer science and extensive experience in electronic commerce (A2533:3-A2536:25), testified for Soverain in response to Newegg's contentions regarding anticipation and obviousness based on the CompuServe Mall and the Johnson patent, either alone or in combination with the Gifford patent. Dr. Shamos explained that the CompuServe Mall did not use "product identifiers" or a "shopping cart database" recited in the shopping cart claims or "hypertext links" for retrieving order history. (A2547:2-A2548:12; A2557:13-A2560:7; A2562:A2568:13). Moreover, Dr. Shamos pointed out that the CompuServe guides described different systems in operation at different times, and that Newegg's witnesses had therefore relied on impermissible hindsight to select isolated portions of these separate references to match up with the elements of the asserted claims. (A2548:13-A2550:22).

Similarly, Dr. Shamos testified that Johnson did not disclose "session identifiers" for keeping track of customer requests. (A2572:2-7). Dr. Shamos

13

explained that the customer ID disclosed in Johnson could not be a session identifier according to the Court's construction because it was used to identify a particular customer over an undefined period of time, not a session relating to a particular transaction. (A2572:2-A2573:6).

Dr. Shamos further explained how the Gifford patent describing certain Internet-based technology could not be combined with either CompuServe or Johnson because the resulting combination would render the system inoperable. (A2553:18-25; A2573:7-25).

Finally, Dr. Shamos testified regarding secondary considerations of non-obviousness. (A2577:4-A2581:10). He described the praise that the patented technology had received from others in the field, the commercial success of the Transact software which embodied the patented technology, and the failure of others to solve the problems addressed by the patents. (*Id.*) Dr. Shamos explained that this evidence further supported his opinion of non-obviousness, which Newegg's witnesses had altogether failed to address. (*Id.*)

***Damages***:  The jury heard testimony concerning the relevant *Georgia-Pacific* factors. (A1884:19-A1886:5; A1893:7-A1928:8). Dr. Grimes and Open Market's former CEO, Shikar Ghosh, testified about how the patented technology is a core functionality for processing transactions online. (A1506:14-A1507:23; A1518:11-A1519:20; A2397:3-A2399:14). Win Treese, one of the inventors of the Soverain

patents, explained how Open Market had achieved success with its commercial embodiment of the patented technology, Transact. (A1780:12-1781:2). Katharine Wolanyk, the President of Soverain, testified about the continued success of the patented technology, as reflected by Soverain's licenses with some of the largest e-commerce retailers today. (A1850:10-18). Finally, James Nawrocki, Soverain's damages expert, explained how Newegg's extensive use of the technology had enabled Newegg to complete more than 28 million online transactions during the two and a half year damages period from November 2007 to trial. (A1908:8-A1909:8; A1912:16-A1914:9; A1940:24-A1941:7).

*Judgment*: At the conclusion of the evidence, the district court granted Soverain's motion for JMOL on obviousness in light of Newegg's complete failure of proof on the required analysis under *Graham*. (A2638:5-21). The jury returned a verdict on the remaining issues, finding induced infringement of the shopping cart and hypertext statement claims, no infringement of the session identifier claims, and no anticipation. (A2775:18-A2777:12). The jury awarded $2.5 million in damages. (A2776:23-25). Following the verdict, the district court granted Soverain's motion for JMOL on infringement of claim 79 of the session identifier patent in light of the unrebutted evidence that Newegg's website system performs every step recited in that method claim. (A14-A17). The district court

upheld the jury's verdict in all other respects as supported by sufficient evidence. (A1-A34).

## SUMMARY OF THE ARGUMENT

*Infringing Use*:  Newegg argues it should not be liable for infringement of the shopping cart and hypertext system claims because its customers allegedly do not use the infringing systems on defendant's websites to purchase products. Newegg's argument is squarely at odds with the controlling legal standard for infringing "use" of system claims set forth in *NTP*, and recently affirmed in *Centillion*, which does not require Newegg's customers to own and operate all parts of the infringing system, as Newegg contends, but merely that they control the system as a whole and obtain a benefit from it.  The evidence at trial was more than sufficient to support the jury's verdict of infringement under the appropriate legal standard.

*Shopping Cart Claims*:  Newegg argues that it does not infringe certain "plurality" and "modify" elements of the shopping cart claims because its system uses a cookie stored on the buyer computer to collect information about items as the customer selects products for purchase.  The evidence at trial, however, demonstrated that Newegg's system does not avoid infringement, either literally or under the doctrine of equivalents.  In particular, Newegg attempts to brush aside damaging admissions from its own 30(b)(6) witness about how the Newegg system

16

operates that the jury almost certainly weighed when evaluating the credibility of the non-infringement opinions offered by Newegg's expert. Newegg's arguments also run afoul of the Court's construction of the claim terms "modify" and "collection," which the jury necessarily applied in reaching its verdict.

***Hypertext Statement Claims***: Newegg does not contest the fact that its website incorporates a hypertext statement system that literally infringes claims 41 and 61 of the '492 patent. Instead, Newegg contends that it should not be liable for infringement because its customers allegedly do not use its infringing system. For Newegg, as an online retailer, to argue that its customers do not track the status of their orders and review their past transaction histories stretches the bounds of everyday experience and common sense. Indeed, the unrebutted evidence at trial demonstrated that the infringing hypertext statement system is one of the most prominent features on the Newegg website, and that Newegg provides comprehensive instructions for its customers about how to use the infringing system.

***Inducement***: Newegg argues that, even if its customers used the infringing shopping cart and hypertext statement systems on its website, it should not be liable because it allegedly did not induce their infringement. The unrebutted evidence at trial, however, demonstrated that with full knowledge of the '314 and '492 patents, Newegg provided detailed instructions and support to its customers

17

explaining exactly how to use the infringing systems in an infringing manner,
which was more than sufficient evidence to support the jury's verdict of
inducement.

***Session Identifier Claims***:  The unrebutted evidence at trial demonstrated
that Newegg's server system performs each of the recited steps in claim 79 of the
'639 patent.  Thus, the district court correctly granted JMOL of infringement.
Newegg attempts to create a divided infringement issue by rewriting claim 79 to
include two additional steps allegedly performed by the client – "appending" and
"storing" – that are simply not recited in this method claim.  All of the recited steps
in claim 79 are performed by a single server-side party, and the divided
infringement standard does not apply.

***Obviousness***:  Newegg failed to offer testimony or other evidence on
multiple elements of the obviousness analysis required under *Graham*, including
why the admittedly missing elements in the prior art would have been obvious to a
person of ordinary skill in the art, and what reason a person of ordinary skill in the
art would have had to combine prior art references in the way Newegg alleged,
given that the combination would have been inoperable.  Newegg also failed to
rebut the compelling evidence of secondary considerations.  With little or no
evidence concerning several of the *Graham* factors, Newegg fell far short of
establishing a *prima facie* case of obviousness, and the district court correctly

18

concluded that the issue should not be submitted to the jury. (A2638:5-21). As the district court noted at the close of the evidence, it was not even a "close call." (A2638:9-10).

*Damages*: The evidence at trial relating to the pertinent *Georgia-Pacific* factors confirms that the jury's award of $2.5 million was well within the bounds of reason. The patented technology has become an integral part of e-commerce, as reflected in the success of Open Market's Transact product and Soverain's licenses with some of the largest internet retailers in the industry. The infringing systems and methods are not minor, add-on functionalities, as Newegg maintains, but are an integral part of the operation of Newegg's e-commerce system. Every single transaction that takes place on Newegg's website makes use of this technology, including more than 28 million transactions during the damages period alone. Without this technology, Newegg would be unable to serve its customers with state of the art technology that directly facilitates its sales and contributes to its overall success as an online retailer.

In light of the ample evidence supporting the jury's damages award, it was harmless error for the district court to admit certain testimony concerning the 25% rule, discussed by Soverain's expert James Nawrocki, because this testimony did not influence the jury's damages award. The actual award is equivalent to a royalty rate of 1.88% – more than an order of magnitude less than the now-defunct

25% rule. Because the jury rejected testimony concerning the 25% rule, and instead awarded damages consistent with Newegg's extensive use of the patented technology and its broad acceptance by other Internet retailers, admission of this testimony was harmless.

## ARGUMENT

## I.    THE DISTRICT COURT APPLIED THE CORRECT LEGAL STANDARD UNDER *CENTILLION* FOR INFRINGING "USE" OF THE ASSERTED SYSTEM CLAIMS

Newegg's argument is premised on its assumption that the standard for "use" set forth in *NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1317 (Fed. Cir. 2005), does not apply here. (Br. at 22). The Court's recent decision in *Centillion* destroys that premise. In *Centillion Data Sys., LLC v. Qwest Communications Int'l, Inc.*, 631 F.3d 1279 (Fed. Cir. 2011), the Court set forth the applicable standard for infringing use of system claims. *Id.* at 1284.

> We hold that to 'use' a system for purposes of infringement, a party must put the invention into service, *i.e.*, control the system as a whole and obtain benefit from it.

The Court relied on its earlier decision in *NTP*, where it held that "[t]he use of a claimed system under section 271(a) is the place at which the system as a whole is put into service, *i.e.*, the place where control of the system is exercised and beneficial use of the system obtained." *NTP*, 418 F.3d at 1317. In *Centillion*, the Court acknowledged that "*NTP* dealt with the situs of infringement rather than the nature of the infringing act." *Centillion*, 631 F.3d at 1284. Nevertheless, the

20

Court confirmed that the definition of infringing "use" of a system claim derived

from *NTP* "was the proper one to apply." *Id.*

## A.    The District Court Correctly Applied the Control/Benefit Standard from *NTP*

As subsequently made clear in *Centillion*, the district court correctly relied

on the analysis in *NTP*.  (A11-A13).  The district court concluded that the

control/benefit standard was the applicable standard for determining infringing use

of the asserted system claims, and expressly rejected Newegg's "own, possess,

operate, direct, or control" standard as "in direct conflict with the analysis set forth

in *NTP*."  (A13).

Applying the control/benefit standard, the district court correctly concluded

that substantial evidence supported the jury's verdict of infringement.  (A13;

A1551:18-A1620:4; A1626:15-A1628:21).  Specifically, "Newegg's customers

control the operation of Newegg's sales system by choosing the product to

purchase, when to checkout, and when to submit an order."  (A13).  The customer

initially puts the system as a whole into service by visiting the website.  (A1679:4-

13).  The customer controls the system by browsing for products, adding items to

the shopping cart, and purchasing them in a sales transaction.  (A1551:18-

A1620:4; A1626:15-A1628:17).  The customer requests of the website cause the

system to act for its intended purpose by performing the functions recited in the

21

asserted claims. (*Id.*). And the customer obtains the benefit of being able to shop for and order products online. (A1506:14-22).

Likewise, Newegg's customers control Newegg's hypertext-statement system by choosing to view their order history and transaction details. (A1551:18-A1620:4; A1626:15-A1628:21). Newegg's customers benefit from having ready access to their order status and transaction histories in order to keep track of their purchases. (A1531:22-A1533:2).

Newegg criticizes the district court's analysis of infringing use as focused "on commercial benefit and customer user experience." (Br. at 22). But that is exactly how this Court analyzed infringing use in *NTP* and *Centillion*. In *NTP*, the Court found that RIM's customers used the claimed email system in the United States, even though RIM maintained a relay system in Canada, because the customers "controlled the transmission of the originated information and also benefited from such an exchange of information." *NTP*, 418 F.3d at 1317. Similarly, in *Centillion*, the Court found that Qwest's customers "control[led] the system by creating a query and transmitting it to Qwest's back-end." *Centillion*, 631 F.3d at 1285. As the Court explained, "[t]his query causes the back-end processing to act for its intended purpose to run a query and return a result. If the user did not make the request, then the back-end processing would not be put into service." *Id.* at 1285. The Court concluded that "[b]y causing the system as a

whole to perform this processing and obtaining the benefit of the result, the customer has 'used' the system under § 271(a)." *Id.*

## B. The Infringing Use By Newegg's Customers Satisfies the All-Elements Rule

The Court in *Centillion* confirmed that "direct infringement by 'use' of a system claim 'requires a party ... to use each and every ... element of a claimed [system].' In order to 'put the system in to service,' the end user must be using all portions of the claimed invention." *Centillion* 631 F.3d at 1284. For example, in *NTP*, the end user was 'using' every element of the system by transmitting a message. It did not matter that the user did not have physical control over RIM's relays. The user made them work for their patented purpose, and thus 'used' every element of the system by putting every element collectively into service. *Id.* Likewise, the customers in *Centillion* initiated a request that caused Qwest's back-end system to operate for its intended purpose. *Id.* at 1285. The back-end processing is performed in response to the customer demand. *Id.* "This is 'use' because, but for the customer's actions, the entire system would never have been put into service." *Id.*

Here, the all-elements rule is satisfied because ample evidence at trial demonstrated that each and every element of the claimed shopping cart and hypertext statement systems is put into use by Newegg's customers. (A1551:18-A1620:4; A1626:15-A1628:21). Newegg's customers use every element of the

23

accused systems when they initiate requests to select and purchase products or to view their past transaction statements. (*Id.*). Those customer requests put every element collectively into service and cause the accused systems to work for their intended purpose. (*Id.*). As such, there was more than sufficient evidence for the jury to conclude that customers' use of the shopping cart and hypertext statement systems on the Newegg website directly infringed the asserted claims of the '314 and '492 patents.

## II.    SUBSTANTIAL EVIDENCE SUPPORTS THE JURY'S VERDICT OF INFRINGEMENT OF THE ASSERTED SHOPPING CART CLAIMS

### A.    Newegg's System Modifies the Shopping Cart By First Creating an Instance of a Shopping Cart and Then Adding Items to It

The parties stipulated to the phrase "to modif[y] [the shopping cart in the shopping cart database]" to mean "to change [*an instance of a shopping cart* in a shopping cart database]." (A59) (emphasis added). The Court entered a claim construction order based on the stipulated agreement. (A2430). And Newegg does not challenge that construction on appeal. At trial, substantial evidence demonstrated that Newegg's system satisfies the "to modify" limitation of the asserted shopping cart claims under the correct construction of that term. Thus, it was reasonable for the jury to conclude that Newegg's system infringed. By contrast, Newegg's theory of non-infringement ignores the stipulated construction of this element, and was correctly rejected by the jury.

24

Newegg concedes that its server assigns a shopping cart ID "to uniquely identify each customer's cart" at checkout. (Br. at 28). As Dr. Grimes explained, the assignment of a shopping cart ID is the creation of "an instance" of a shopping cart. (A1698:16-A1700:6; A1701:3-14). The shopping cart ID is a unique identifier that must be recognized by the Newegg server as associated with a specific shopping cart. (A1698:16-A1700:6; A1701:3-14). If the shopping cart ID did not relate to a specific shopping cart, the system would have no way of knowing how to assign the products that the customer has selected for purchase.

Next, the Newegg system moves the information about the items selected for purchase from the cookie stored on the customer's computer to the shopping cart database. (A1698:16-23; A1699:6-9). This step modifies the instance of the shopping cart designated by the shopping cart ID. (A1698:16-23). The first step on the Newegg system creates an instance of a shopping cart, and the second step modifies this instance of a shopping cart by moving items onto the shopping cart database. (A1698:25-A1699:9). When the shopping cart ID is first created, that instance of a shopping cart is associated with no products. (A1697:7-17). After the product information is downloaded from the customer computer, that instance of a shopping cart has been modified. (A1698:24-A1700:6). It is now associated with the products selected by the customer. (A1694:4-A1695:1). As a result,

25

Newegg's system literally infringes the "modify" element of the shopping cart claims.

Dr. Grimes' testimony about the operation of the Newegg system was confirmed by the deposition testimony of Newegg's 30(b)(6) witness, Dr. Wu:

> Q.    Is there a point when the shopping cart ID is generated, but there is no corresponding entry in the table, this temporary table which stores shopping carts?
>
> A.    You're right. The timing to—because shopping cart ID is shopping cart ID table. Shopping cart line item table is different. So we generate ID that time, that moment, nothing in shopping cart item—line item table. Then we go to second step with this ID. You can say second box. This time different, yes.

(A13022).

Dr. Wu confirmed that Newegg's system modifies an instance of a shopping cart in a two-step process. Dr. Wu acknowledged that the system first generates the shopping cart ID and "[t]hen we go to second step." (*Id.*). He explained that the shopping cart is empty when first created: at the moment the shopping cart ID is generated, "that moment, nothing in shopping cart item—line item table." (*Id.*). When the product information is downloaded to the shopping cart, the shopping cart is "different" – *i.e.*, it has been modified: "Then we go to second step with this ID. You can say second box. This time different, yes." (*Id.*). To the extent Newegg believed Dr. Wu's deposition testimony was inaccurate, Newegg had ample opportunity to correct it by asking its own questions at his deposition,

26

serving errata to his deposition testimony, or asking him about his previous testimony at trial, none of which Newegg did.

Newegg argues that no physical memory in the shopping cart database is allocated when the shopping cart ID is assigned. (Br. at 28-29). That argument ignores the Court's construction of "to modify," and therefore, the jury necessarily rejected it. (A2430). The claims do not require the modification of specifically designated memory on the shopping cart database, but rather the modification of an instance of a shopping cart, which in this case is identified by the shopping cart ID. (A1698:9-A1699:14). When the customer's selected products are moved to the shopping cart database, that "instance of a shopping cart" is modified. (*Id.*).

Finally, Newegg contends that even if its system modifies an instance of a shopping cart, it does not infringe because Newegg's shopping cart initially "contains no product information." (Br. at 30). Newegg essentially argues that there is no such thing as an empty shopping cart. Its argument turns on the construction of shopping cart to mean "a stored representation of a collection of products." (A60). This definition of "shopping cart" is set forth expressly in the language of the shopping cart claims. (A99 at 14:23-24; A147 at 15:10-11). The definition was agreed to by the parties and entered by the district court as part of its claim construction order. (A4381 at 2).

But in making its argument that a shopping cart must contain at least one product, Newegg ignores the district court's construction of the term "collection of products" as it is used in the shopping cart patents. In earlier litigation between Soverain and Amazon, the district court construed "collection" to mean "zero, one, two or more." (A15018-A15019). The district court expressly rejected the argument that Newegg makes here that "collection" must mean one or more. (*Id.* at 20). For purposes of this case, the district court adopted its earlier claim constructions from the *Amazon* case, including the construction of "collection." (A3668). And Newegg did not dispute the construction of this term. Because "a collection of products," as that term is used in the shopping cart patents, may include zero, one or more products, an empty shopping cart is therefore still a shopping cart. To the extent that Newegg's non-infringement theory rests on an incorrect construction of "collection" to mean just one or more, the jury correctly rejected that argument in reaching its verdict.

### A.    Newegg's System Satisfies the Plurality Element By Adding Products One-By-One to the Cookie on a Customer's Computer in Response to Each Customer Request

The jury heard substantial evidence establishing that Newegg's system infringes the "plurality" element of the shopping cart claims. The claims recite that the buyer computer is programmed "to receive a plurality of requests from a user to add a plurality of respective products to a shopping cart in the shopping cart

28

database," and in response to the user requests, "to send a plurality of respective shopping cart messages to said shopping cart computer each of which comprises a product identifier identifying one of said plurality of products." (A99 at 14:2-10; A147 at 14:54-62). Thus, the buyer computer is programmed to do two things: (1) receive a plurality of requests to add a plurality of respective products to the shopping cart, and (2) to send a plurality of respective messages to the shopping cart computer to add the selected products.

As Dr. Grimes explained at trial, Newegg's system infringes the plurality elements. (A1576:25-A1577:7). First, Newegg's system programs the buyer computer to receive a plurality of requests to add a plurality of respective products to the shopping cart. Each time the customer clicks "Add to Cart," information about the respective product is added to a cookie stored on the customer's computer. (A1569:13-A1570:9). That is, the customer requests the products one-by-one by clicking on the "Add to Cart" button on Newegg's website. (A1572:15-A1577:7). Each request results in information about the respective product being added to the cookie. (A1695:15-A1696:2).

Upon checkout, the accumulated information in the cookie about the plurality of products is sent to the shopping cart computer. (A1570:10-A1571:9; A1696:2-6). The shopping cart computer adds the selected item to the shopping cart database. (A1569:6-A1570:9). Thus, the cookie sent by the buyer computer

29

at checkout contains a plurality of respective messages to the shopping cart computer to add the selected products that the customer has identified while browsing the website. (A1570:10-A1571:9; A1696:2-6). In light of this evidence, it was reasonable for the jury to conclude that Newegg's website infringes the plurality element of the shopping cart claims.

Newegg argues that no reasonable jury could have found infringement because the claims use the word "respectively." (A2359:17-20). Newegg did not ask the district court to construe that term before trial. Now, on appeal, Newegg argues that this term requires that the shopping cart messages be "sent individually to the database in response to each distinct request to add a product." (Br. at 31).

This argument is essentially a rehash of Newegg's non-infringement theory regarding the "modify" element. Newegg relies on the same feature of the accused system in which a plurality of customer requests are stored on a cookie at the customer's computer before being moved to the shopping cart database. Newegg does not dispute that its system is programmed to add a plurality of requests to the cookie one-by-one in response to each individual request from the user. (Br. at 31-32). Instead, Newegg argues that its system does not receive a plurality of shopping cart messages from the buyer computer to modify the shopping cart in the shopping cart database because information about the selected products is sent together. *Id.*

30

There is no requirement in the claims, however, that product information must be sent item-by-item to the shopping cart database. (A1580:24-A1581:12). The claims do not impose a temporal limitation on when the plurality of shopping cart messages are sent, whether they are sent one-by-one, or together. (*Id.*). The claims encompass either system.

Indeed, on cross-examination, Newegg's expert could not point to anything in the claims, specification, or prosecution history of the shopping cart patents that imposes a timing requirement. (A2356:4-A2359:20). Nor does Newegg point to anything in the claim construction or any other evidence indicating that shopping cart messages must be sent one-by-one to the shopping cart database in response to each customer request. (Br. at 31-32; A2359:13-16).

As Dr. Grimes testified, the word "respectively" is used in the claims to describe the one-to-one correspondence between each product and its respective request from the customer and message to the shopping cart computer. (A1695:15-A1696:2). It is sufficient that following each customer request, each respective product is added to the cookie on the customer's computer, where the shopping cart messages are collected before they are eventually sent to the shopping cart computer. (A1565:7-A1567:24, A1575:21-A1577:5). Thus, regardless of whether individual items are moved to the shopping cart database one-by-one or together is irrelevant for purposes of literal infringement, and the jury correctly disregarded

Newegg's attempt to impose this extra limitation on the claims. (A1580:24-1582:5).

## B.   Newegg's System Infringes Under the Doctrine of Equivalents

Even if the jury credited Newegg's interpretation of the shopping cart claims, the evidence at trial demonstrated that Newegg's system nevertheless infringes under the doctrine of equivalents. Dr. Grimes testified regarding his analysis of function-way-result with respect to the following claim element (A1588:8-12):

> said shopping cart computer being programmed to receive said plurality of shopping cart messages, to modify said shopping cart in said shopping cart database to reflect said plurality of requests to add said plurality of products to said shopping cart.

As Dr. Grimes testified, any differences between this element of the claims and Newegg's system are insubstantial. (A1544:15-A1545:20; 1585:2-1588:17).

As Dr. Grimes explained, he compared the claim language as Newegg alleged it should be construed with the features of the accused system. (A1544:15-A1545:11). He concluded that the function and the result were the same. (A1544:25-A1545:2). Both the claim element and the accused features of the Newegg system have the same function – to modify the shopping cart database. (A1586:4-17). Likewise, the claim element and the accused system achieve the same result – to end up with the plurality of selected items in the shopping cart database. (*Id.*).

Dr. Grimes then examined the way in which the two alternatives functioned. (A1586:18-A1587:18). He presented an animation illustrating for the jury the differences in the way the two alternatives work, and explained where the differences arise. (*Id.*). Dr. Grimes concluded that Newegg's system, in which products are added one at a time to a cookie and then transferred together to a shopping cart in the database, functions in substantially the same way to a system that adds the products to the shopping cart one-by-one :

> So the claim, according to Newegg, is that, every time you click an add-to-cart button, they maintain that that has to cause it to show up in the shopping cart database. That's the essence of the way they think that the claim should operate. ...So the question is, okay, these two ways of interpreting the claim are different, but are—are the differences between these two ways substantial? And, in fact, I looked at them and they are not substantial. The differences are insubstantial. (A1587:3-23).

Dr. Grimes explained that one of the reasons he arrived at that conclusion is because the two alternatives merely reflect a straightforward design choice. (A1587:24-A1588:7). As Dr. Grimes explained, "[a] designer implementing a shopping cart and putting items from a shopping cart into a database could do it either way. In fact, systems do ... it either way." (A1587:24-A1588:7). Mr. Wu confirmed that he faced this design choice when determining where to store a "shopping cart event," and elected to use a client cookie system in order to save hard disk space on the Newegg server. (A2062:18-A2064:20; A2070:20-A2071:6).

33

Newegg contends that certain benefits and tradeoffs of its system allegedly established "non-equivalence." (Br. at 33-34). But Newegg failed to explain at trial why these alleged benefits and tradeoffs are substantially different from the claimed shopping cart systems. As this Court has held, alleged improvements over the claimed system do not automatically avoid infringement under the doctrine of equivalents. *Varco, L.P. v. Pason Sys. USA Corp.,* 436 F.3d 1368, 1376 (Fed. Cir. 2006). More than that, Dr. Wu's testimony about his development of the Newegg system reinforced the conclusion that this difference was merely a design choice implemented to spare Newegg the cost of having to store customer shopping carts on its server. (A2062:18-A2064:20; A2077:10-A2078:6). Instead, Newegg opted to take advantage of the storage capacity on the customers' computers. *Id.* Thus, it was reasonable for the jury to conclude that the Newegg design differences were a straightforward design option to save money that does not reflect a substantial difference in the way the Newegg system works.

## III.   SUBSTANTIAL EVIDENCE SUPPORTS THE JURY'S VERDICT OF INFRINGEMENT OF THE ASSERTED HYPERTEXT STATEMENT CLAIMS

Newegg's website includes a system for retrieving statement information concerning past transactions. (A1615:7-13; A1616:17-A1617:15). This system is the only way for a customer to check the status of an order or their transaction history on the Newegg website. The jury found that the Newegg system infringes

every element of the asserted hypertext statement claims (A2776:16-17), and Newegg does not contest that conclusion.

Instead, Newegg contends that it is not liable for infringement because there is allegedly insufficient evidence that Newegg's customers use its infringing hypertext statement system. (Br. at 34-36). The evidence at trial demonstrated, however, that Newegg's statement system is a prominent feature of its website. On Newegg's home page, the customer is directed to check order status and transaction history with direct hyperlinks to the infringing system. (A15039). These links are repeated on page after page as the customer browses on Newegg's website. (A13093). Likewise, information about how to use the hypertext statement system is featured prominently on Newegg's Help and Info page. On the website's list of "Most Frequently Asked Questions" is "How can I check my Newegg.com order status online?" (A13090). The answer to that question provides a direct hyperlink to Newegg's infringing statement system. (*Id.*). Given the prominence of the hypertext statement system on Newegg's website, the instructions on how to use the system in an infringing way, and the large number of online transactions that Newegg processes each year, there was more than sufficient evidence for the jury to conclude that Newegg's customers directly infringe the asserted hypertext statement claims.

35

Newegg suggests that the jury necessarily required direct evidence of the specific number of individual customers who used the infringing hypertext statement system. (Br. at 34). However, the Court has made clear that infringement can be established by circumstantial evidence alone. *Moleculon Research Corp. v. CBS, Inc.*, 793 F.2d 1261, 1272 (Fed. Cir. 1986); *Alco Standard Corp. v. Tennessee Valley Authority*, 808 F.2d 1490, 1503 (Fed. Cir. 1986).

Indeed, in this instance, the jury is likely to have had firsthand experience and knowledge of how customers shop online. They may have relied on their experience and understanding in deciding whether it was reasonable to infer from the circumstantial evidence that customers on Newegg's website used the infringing hypertext statement system. *See Lucent Technologies, Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1318 (Fed. Cir. 2009).

Moreover, to the extent there was evidence tracking customers' use of the Newegg website, it would be in Newegg's possession, custody, or control. Notably, Newegg did not introduce any tracking data to rebut the evidence of use at trial. If such data had been available and supported Newegg's argument, Newegg would have presumably offered it into evidence. The fact that it did not suggests, at the very least, that no such data is available, or if it is available, it does not support Newegg's argument.

36

Finally, Newegg relies on a single case, *ACCO Brands*, for its argument that it is entitled to a judgment of non-infringement. (Br. at 35-36). However, that case is inapposite because the parties in *ACCO Brands* agreed that the accused lock could operate in two modes, and the record showed that Belkin instructed its customers to use the non-infringing mode. *ACCO Brands, Inc. v. ABA Locks Mfrs. Co., Ltd.*, 501 F.3d 1307, 1313 (Fed. Cir. 2007). The only evidence of infringement was expert testimony that the infringing mode was "the most natural and intuitive way to use the lock," and the Court held this testimony to be insufficient. *Id.* at 1312.

Indeed, the Court has already rejected a similar argument based on *ACCO*. When Microsoft attempted to rely on *ACCO* to overturn the jury verdict of infringement in *Lucent*, the Court distinguished it on the facts described above. *Lucent*, 580 F.3d at 1319. Unlike the patentee in *ACCO*, Soverain introduced ample evidence demonstrating how Newegg instructs its customers to use the infringing hypertext statement system in an infringing way. (A13090-A13093). Thus, the sole case on which Newegg relies has no application here.

## IV.   SUBSTANTIAL EVIDENCE SUPPORTS THE JURY'S VERDICT THAT NEWEGG ACTIVELY INDUCED INFRINGEMENT OF THE SHOPPING CART AND HYPERTEXT STATEMENT CLAIMS

Newegg raises the issue of intent to induce infringement for the first time on appeal. Newegg made only passing reference to this issue in its post-trial motions

for JMOL or a new trial. (A8986-A9009; A9675-A9676; A10486-A10487; *see also* A10354-A10412). And Newegg did not object after the district court made no ruling on intent in its post-trial order. Accordingly, this issue has been waived. *Immunocept, LLC v. Fulbright & Jaworski, LLP*, 504 F.3d 1281, 1287-88 (Fed. Cir. 2007); *Duro-Last, Inc. v. Custom Seal, Inc.*, 321 F.3d 1098, 1106-1109 (Fed. Cir. 2003).

Newegg's argument also fails on the merits. The evidence at trial was more than sufficient for the jury to conclude that Newegg had the requisite intent to infringe.[2] The jury heard extensive testimony describing how Newegg's entire business model is tied to the success of its online sales. It relies on the Internet as its single channel of commerce. (A1627:15-21). Newegg does not have bricks and mortar stores. (*Id.*). It does not take orders over the phone. (*Id.*). The operation of its website is essential to Newegg's business. (*Id.*). And once customers arrive, Newegg provides detailed instructions and customer support to enable them to use its website in an infringing manner to purchase products online and to track their order history. (A1626:15-A1627:4; A13090; A13004). This evidence was more than sufficient for the jury to conclude that Newegg not only had knowledge of its customers' infringing activities – it actively encouraged their infringement.

---

[2]  Newegg does not dispute that it had actual knowledge of the Soverain patents at least as of the filing of the Complaint on November 2, 2007. (A3000-A3131).

The Court has repeatedly held that evidence showing an accused infringer instructed its customers to use its product in an infringing manner is sufficient to support a finding of intent for inducement. *Golden Blount, Inc. v. Robert H. Peterson Co.*, 438 F.3d 1354, 1364 (Fed. Cir. 2006); *Astrazeneca LP v. Apotex, Inc.*, --- F.3d ---, 2010 WL 4286284, *16 (Fed. Cir. Nov. 1, 2010).

Newegg contends there can be no active inducement because it allegedly "had a reasonable and good faith belief that the accused system did not infringe any valid asserted claim." (Br. at 36). However, Newegg cites no evidence to support its alleged belief. *Id.* It merely refers to the jury's verdict of no direct infringement. (Br. at 36-37). But the outcome at trial undermines, rather than supports, Newegg's argument of good faith. Its claim of obviousness was dismissed as a matter of law for failure of proof. (A2638:5-21). The jury found no anticipation. (A2776:20-22). And Newegg's contentions on non-infringement are based on a strained reading of the asserted claims that in several instances is flatly inconsistent with the Court's construction. (*See* Section II, *supra*). If anything, an objective review of Newegg's claims and the outcome at trial undermines rather than supports its alleged good faith intent.

Moreover, Newegg cannot overcome a jury verdict of inducement with an unsupported statement denying intent. If so, virtually any accused infringer would be able to avoid a finding of inducement regardless of the jury's determination.

39

The Court has dismissed similar attempts to overturn a jury's verdict of active inducement. For example, in *Golden Blount*, the accused infringer "argue[d] that it acted in good faith and cite[d] several oral opinions of counsel." *Golden Blount*, 438 F.3d at 1364. The Court rejected this argument, holding that the district court acted properly "in dismissing those opinions as incompetent and in finding that Peterson's assertions of good faith ring hollow." *Id.* at 1364-65. Here, Newegg does not proffer an opinion of counsel or any other evidence in support of its bare claim of alleged good faith.

The jury necessarily made a credibility determination based on the evidence presented at trial. Ultimately, the jury rejected Newegg's assertions that it did not have the requisite intent. Newegg's argument, without substantive support, is altogether insufficient to overturn the jury's verdict of active inducement.[3]

## V. THE DISTRICT COURT CORRECTLY GRANTED JMOL THAT NEWEGG INFRINGES CLAIM 79 OF THE SESSION IDENTIFIER PATENT

The evidence at trial regarding infringement of claim 79 of the '639 patent was wholly unrebutted. The district court correctly granted JMOL of infringement because Newegg failed to offer any evidence to rebut Dr. Grimes' testimony

---

[3]    Soverain notes that the district court denied its motion for an injunction, and instead, awarded post-trial damages. (A27-A33). If the jury's determination that Newegg's customers directly infringe the asserted system claims is upheld on appeal, Newegg will have no basis to continue to induce its customers to use its infringing websites in an infringing way.

demonstrating that Newegg's website server performs every step of the claimed

method. Claim 79 of the '639 patent, which depends from claim 78, recites:

> 78.    A method of processing, in a server system, service requests
> from a client to the server system through a network, said method
> comprising the steps of:
>
> **receiving**, from the client, a service request to which a session
> identifier *stored* at the client has been *appended* by the client, wherein
> communications between the client and server system are according to
> hypertext transfer protocol;
>
> **validating** the session identifier appended to the service
> request; and servicing the service request if the appended session
> identifier is valid.
>
> 79.    The method of claim 78, further comprising, in the server
> system:
>
> **receiving** an initial service request from the client;
>
> **creating**, responsive to the initial service request, the session
> identifier; and
>
> **returning** the session identifier to the client for storage by the
> client for use in subsequent distinct requests to the server system.

(A183 at 14:43-60) (emphasis added).

Dr. Grimes testified that Newegg's server system performs each of the steps

(highlighted in bold text above) of "receiving," "validating," "creating," and

"returning" the session identifier in claim 79. (A1649:21-A1656:18). His

testimony included a step-by-step explanation of exactly how Newegg's system

performs the claimed method. Dr. Grimes' testimony regarding infringement of

these steps was unrebutted by any testimony from Newegg's witnesses, including

41

its expert, Mr. Tittel. Accordingly, no reasonable jury could have found that claim 79 was not infringed, and the district court properly granted judgment as a matter of law.

Newegg does not contest the district court's determination that its server system infringes the recited steps of "receiving," "validating," "creating," and "returning" recited in claim 79.[4] Instead, Newegg contends that the claims require two *additional* steps of "storing" and "appending" the session identifier that are not found in the asserted claim. (Br. at 24-26). Here, Newegg focuses on the first step in claim 78 of "receiving" a service request. (Br. at 24-26). The "receiving" step includes elements describing the content of the client's service request, namely that a session identifier "stored" at the client is "appended" to it. (A183 at 14:43-60). Newegg is attempting to delete the passive modifiers "stored" and "appended" (italicized in the text above) and re-write them as the active steps "storing" and "appending." (A1650:11-A1651:9; A17). Based on this rewritten claim, Newegg then argues that there is no direct infringement because multiple actors are allegedly required to perform the newly-added steps. (Br. at 24-26).

---

[4] In particular, Newegg does not dispute that its server performs the first "receiving" step in claim 79. When a customer shops on Newegg's website, there is no dispute that server receives service requests "to which a session identifier stored at the client has been appended by the client."

The district court was correct to reject Newegg's attempt to create a divided infringement issue by rewriting the plain language of this claim.

The pertinent analysis for whether a method claim is infringed by a single actor is to determine who performs each of the recited steps. *Muniauction, Inc. v. Thomson Corp.*, 532 F.3d 1318, 1328-30 (Fed. Cir. 2008). As this Court has observed, a "patentee can usually structure a claim to capture infringement by a single party." *BMC Resources, Inc. v. Paymentech, L.P.*, 498 F.3d 1373, 1381 (Fed. Cir. 2007). That is precisely what the applicant did when drafting claim 79. The claim requires action by only a single actor – a server-side party such as Newegg. As the district court observed, claim 79 describes certain characteristics of the session identifier that is received from the client. (A16-A17). The session identifier has been "stored" at the client and has been "appended" to the service request. (A1650:11-A1651:9; *see* A17). But reciting these characteristics of the session identifier is not the same as requiring the client to perform additional steps of "storing" and "appending" as separate steps required by the claim.

The "receiving" step in claim 79 is akin to receiving a letter in the mail. The envelope will likely have a stamp that has been appended to the outside and an address that was stored somehow by the sender. But the stamp and the address are physical characteristics of the envelope. The step of receiving a letter with an envelope having those characteristics does not require the additional steps of

43

"appending" the stamp and "storing" the address. (A1650:11-A1651:9). Yet, that is how Newegg is attempting to rewrite claim 79 to insert additional steps that are simply not there.

The district court contrasted claim 79 with claim 1 of the '639 patent, which expressly recites the terms "storing" and "appending." (A181 at 10:26-38). The district court correctly distinguished the different language used in the different claims, and concluded that the use of the different words should be given meaning. (A16-A17).[5]

Contrary to Newegg's argument, the district court's reliance on *SiRF Technology, Inc. v. International Trade Com'n*, 601 F.3d 1319, (Fed. Cir. 2010) was directly on point. In *SiRF*, as here, the defendant attempted to rewrite an asserted method claim by inserting additional steps. *Id.* at 1330. Newegg attempts to distinguish this case by arguing that, unlike the defendant in *SiRF*, it is not reading in any new steps. (Br. at 25). However, as shown above, that is exactly what Newegg is doing – claim 79 does not require the steps of "storing" and "appending." Just as in *SiRF*, despite the defendant's attempt to read in additional

---

[5]    In an attempt to get around this issue, Newegg questioned Mr. Tittel at trial about claim 1 of the '639 patent, and then attempted to equate the language in claim 1 to claim 79. (A2338:19-A2341:8). Unlike claim 79, however, claim 1 expressly recites the terms "storing" and "appending," which claim 79 does not. (A16-A17; A181-A183). Thus, Mr. Tittel's testimony concerning the elements of claim 1 is not relevant to infringement of claim 79.

steps performed by a second actor, "the method claims at issue here are drawn to actions which can be performed and are performed by a single party." *SiRF*, 601 F.3d at 1329.

## VI. THE DISTRICT COURT CORRECTLY CONCLUDED THAT NO REASONABLE JURY COULD HAVE FOUND THE ASSERTED CLAIMS INVALID FOR OBVIOUSNESS

### A.     The Overwhelming Evidence At Trial Demonstrated That The Prior Art Lacked Numerous Limitations of the Asserted Claims

*Shopping Cart Claims:* The testimony of Newegg's witnesses confirmed that the CompuServe Mall – a pre-World Wide Web retail system – failed to disclose several fundamental elements of the shopping cart claims, either alone or in combination with the Internet functionality disclosed in the Gifford patent. For example, Newegg's fact witness, Mr. Trevor, testified that the CompuServe Mall did not employ "product identifiers," and was therefore not programmed to send "shopping cart messages ... each of which comprises a product identifier." (A2192:1-23). As Soverain's expert, Dr. Shamos, explained, the basic architecture of the CompuServe Mall was specifically designed so that the system would be able to ascertain what products the customer had selected for purchase without the use of a separate "product identifier." (A2545:14-A2548:12). Dr. Shamos noted that Newegg's expert, Mr. Tittel had "kind of skipped over" the product identifier element in his discussion of the CompuServe Mall. (4/29/10 P.M. Tr. at 154:18-156:6).

45

Similarly, Newegg's expert failed to explain where the CompuServe Mall and/or the Gifford patent taught a "shopping cart database." (A23). Instead, Mr. Tittel merely inferred that such a database must have existed (A2316:2-16; A2374:13-17), even though he conceded on cross-examination that a database was just one of several possible ways to implement the desired functionality. (A2376:23-A2377:15). And on cross-examination, Mr. Trevor admitted that the user guides describing the CompuServe system did not disclose a shopping cart database. (A2188:23-A2189:12).

*Hypertext Statement Claims:*  The CompuServe Mall did not have the capability for customers to review their order status or transaction history online. (A2563:18-A2565:5). Instead, customers were required to call or e-mail CompuServe directly. *Id.* Accordingly, the CompuServe Mall simply did not disclose most, if not all, of the elements recited in the hypertext statement claims, including: (1) statement document comprising purchase transaction records, (2) activation of a hypertext link on the statement document, (3) transaction detail document, (4) server computer sending the statement document in response to a statement URL (claim 41), (5) statement document including information on transactions by the user that took place in a given month (claim 61), and (6) statement document including at least one of a date of transaction, an identification

of the product, a payment amount, and a merchant identifier (claim 61). (A2567:9-2568:11).

*Session Identifier Claims:* The evidence at trial confirmed that Johnson, alone or in combination with Gifford, does not disclose a "session identifier" as that term is used in claims 60 and 79 of the '639 patent. Newegg stipulated to the construction of "session identifier" to mean "a text string that identifies a *session*" (A4383) (emphasis added), and has not challenged that construction on appeal.

Newegg's expert, Mr. Tittel, testified concerning the "credential identifier" disclosed in Johnson. (A2336:22-A2338:14). As Mr. Tittel conceded, the "credential identifier" in Johnson identifies a network *user* rather than a *session*. As a result, the "credential identifier" can cover a portion of a single session or be extended to cover multiple sessions. (A2572:15-A2573:6). Thus, by definition, the "credential identifier" of Johnson cannot be a "session identifier." (*See* A2571-2575). The addition of the Internet functionality in Gifford does not cure this deficiency. (A2573:7-25; A2574:2-14). As Dr. Shamos explained, "the Internet didn't have session identifiers in the first place. So you don't get session identifiers just by adding the [I]nternet into things." (*Id.*).

Finally, Mr. Tittel was precluded from testifying on elements specific to claim 79 because he had failed to disclose his opinions regarding that claim in his expert report. (A16-A17; A2341:5-A2343:22 ). Accordingly, Mr. Tittel gave no

47

testimony concerning the alleged disclosure in the prior art of elements such as the "validating" step in claim 79.

**B.     The Prior Art Taught Away From Combining Prior Art References in the Way Newegg Alleged**

Newegg failed to offer any evidence explaining why a person of ordinary skill in the art would choose, let alone combine, the particular prior art references that Newegg identified to arrive at the claimed combinations.  Instead, Newegg's witnesses attempted to cobble together disparate teachings from multiple references without offering any rationale why a person of ordinary skill in the art would have made its proffered combinations.  As Dr. Shamos testified, the testimony of Newegg's witnesses concerning the CompuServe Mall involved the "pick[ing] and choos[ing] of several different references which focused on different iterations of the CompuServe Mall system, each iteration employing different features and functionalities."  (A2548:13-A2550:6).  But Newegg may not use the asserted claims as a roadmap to pick and chose elements from the prior art.  That is the essence of impermissible hindsight.  *See Abbott Labs. v. Sandoz, Inc.,* 544 F.3d 1341, 1348 (Fed. Cir. 2008).

Moreover, Soverain introduced uncontroverted evidence demonstrating that the prior art actually taught away from Newegg's proposed combinations because both the CompuServe Mall and Johnson reference would have been rendered inoperable when combined with the Internet functionality disclosed in Gifford.  As

48

Dr. Shamos explained, the CompuServe Mall architecture was not designed to handle multiple requests originating from multiple users on an open system such as the Internet. (A2551:3-A2552:6). This inherent design feature would cause the CompuServe Mall to "completely collapse" if a person of ordinary skill in the art attempted to combine the CompuServe Mall system and Gifford. (A2553:18-25). Likewise, a person of ordinary skill in the art would understand that because Johnson was designed for use in closed systems, Johnson would also not function if it were combined with an open system, such as the Internet, disclosed in Gifford. (A2573:7-25). Thus, not only did Newegg fail to explain why a person of ordinary skill in the art would make its alleged combinations, it failed to rebut the overwhelming evidence that the prior art taught away from such combinations.

Newegg argues that expert opinion was unnecessary in this case. (Br. at 43). However, in cases involving complex technology such as this one, expert testimony is required to establish the necessary factual predicate to demonstrate that a patent is obvious by clear and convincing evidence. *Proveris Scientific Corp. v. Innovasystems, Inc.*, 536 F.3d 1256, 1267–68 (Fed. Cir. 2008). Here, the patents in suit relate to network-based sales systems and methods for accessing network servers. The district court correctly determined that the technology at issue "is sufficiently complex to fall beyond the grasp of an ordinary layperson."

49

(A24).[6] Without expert testimony, the lay jury would have had no way to evaluate the scope and content of the prior art, to compare the prior art to the elements of the asserted claims, or to understand whether it would have been within the capabilities of a person of ordinary skill in the art to combine the teachings of the prior art to arrive at the claimed combinations.

### C.    Newegg Failed to Rebut the Substantial Evidence of Secondary Considerations

Soverain introduced substantial evidence of secondary considerations, confirming the non-obviousness of the patented technology. Open Market's Transact product received widespread recognition in the general media. (A2578:12-17). It received an excellence award from the industry. (A2578:9-23). And it was widely licensed, confirming its commercial success. (A2579:17-A2580:9). Indeed, the session identifier patent was the first solution addressing the long felt need of adding "state to http" despite numerous failed attempts of others. (A2580:10-A2581:10).

Newegg's expert did not even attempt to rebut this testimony, but instead completely ignored secondary considerations of non-obviousness. (A2577:4-6). Indeed, in his book on e-commerce programming, Newegg's expert praised Open

---

[6] Indeed, the parties stipulated that a person of ordinary skill in the art is a person having "a Bachelor of Science degree in computer engineering or computer science, or equivalent education, with two to three years of practical experience developing or operating software and systems that relate to commerce on the Internet." (A7929-A8053 at § 6.3.4).

Market for its accomplishments. (A2578:24-A2579:16). Thus, even Mr. Tittel

recognized the significant achievement marked by the patented technology.

## VII.   SUBSTANTIAL EVIDENCE SUPPORTS THE JURY'S DAMAGES AWARD, OR IN THE ALTERNATIVE, THIS CASE SHOULD BE REMANDED FOR A NEW TRIAL ON DAMAGES

A jury's damages award in a patent infringement case is to be given broad

deference. *Monsanto Co. v. McFarling*, 488 F.3d 973, 981 (Fed. Cir. 2007). The

jury's verdict "should stand unless it is grossly excessive, not supported by the

evidence, or based on only speculation or guesswork." *Fujifilm Corp. v. Benun*,

605 F.3d 1366, 1372 (Fed. Cir. 2010) (citation omitted). "To the extent there [are]

conflicts in the [damages] evidence," a trial court may not "substitute its choice of

result for that of the jury." *Brooktree Corp. v. Advanced Micro Devices, Inc.*, 977

F.2d 1555, 1580 (Fed. Cir. 2003).

### A.   The Jury's Damages Award Reflects the Fundamental Nature of the Patented Technology and Newegg's Extensive Use

In this case, there was more than sufficient evidence to support the jury's

damages award, and Newegg has no grounds to argue that these damages are

grossly excessive. The evidence at trial demonstrated that Soverain's patents are

directed to fundamental features of Newegg's website. (A1780:12-A1781:2;

A1908:8-A1909:8; A1912:16-A1914:9; A1940:24-A1941:7; A2397:3-A2399:14).

For example, the jury heard the testimony of Shikar Ghosh, former CEO of

Soverain's predecessor Open Market, about the patented technology embodied in

51

the Transact product. As Mr. Ghosh testified, "[i]t's hard to imagine someone doing shopping without some functionality like [the shopping cart]; otherwise, every transaction would be unique and different." (A2397:9-12). Likewise, Mr. Ghosh confirmed the value of the methods for maintaining state claimed in the session identifier patent:

> It's critical. So without state, it's really hard to imagine how you could conduct commerce, or for that matter, anything of any value.

(A2397:25-A2398:2).

Likewise, Win Treese, one of the named inventors of the patents in suit, explained that the patented functionality was "the core technology that we needed to build a growing software business at that time in an explosion of doing business on the network." (A1780:21-23). Over the long-term, Mr. Treese explained that it "influenced the evolution of doing business and the software that's used for it on the Internet." (A1780:25-A1781:2).

Newegg's attempts to downplay the patented technology as "incredibly minor software accessories" that are "used, if at all ... as one tiny part of Newegg's overall business" are flatly contradicted by the extensive testimony concerning the fundamental nature of the patented inventions and Newegg's implementation of that technology as an integral part of its website. (A1780:21-23). The testimony of Mssrs. Ghosh and Treese also disposes of Newegg's argument that the district court should have vacated the jury's damages award because there was allegedly

no evidence showing that Newegg's profits are driven by the patented technology. (Br. at 46-47).

The record further demonstrates that Internet retailers have embraced the patented technology. By the late 1990s, Open Market had established itself as a market leader. (A1824:10-13). Following its acquisition of Open Market, Divine extensively licensed the patented technology. (A13147-A13151; A13167-A13171). Royalties for these licenses ranged from payments equivalent to 2%-10% of gross profit, 0.5%-10% of gross sales, 2.5%-8.33% of net sales, and $0.85 per transaction. (A13107-A13196). Soverain continues to license this technology to leading Internet retailers today. (A1850:13-18). The widespread adoption of the patented technology is further evidence supporting the jury's damages award.

Newegg has not advanced a single compelling argument that the jury's verdict of $2.5 million for over 28 million infringing transactions spanning two and a half years is "grossly excessive" as a matter of law. *See Fujifilm*, 605 F.3d at 1372. While the Divine licenses admitted into evidence were for amounts less than $500,000, this does not reflect the intrinsic value of the patents, as Newegg contends. (Br. at 56). Rather, the evidence at trial placed these amounts in context both in terms of the unique economic circumstances after the dot.com bubble burst and the nature and size of the licensees compared to Newegg. (A1903:8-A1908:9). Thus, Newegg has no grounds to request a new trial or remittitur on this basis.

53

Newegg's customer surveys, by which it seeks to downplay the importance of the patented technology, are beside the point. (Br. at 49). As Newegg's witnesses admitted at trial, those surveys did not attempt to quantify the contribution of the patented technology, but rather took that technology for granted. (A2512:2-15). No customer was asked, for example, whether they would continue to shop on Newegg's website if they were unable to checkout using a shopping cart, were unable to access information about pending and past transactions, or unable to submit multiple requests that would be recognized as part of the same transaction – all core features covered by the Soverain patents. (*Id.*). Newegg's customer surveys are akin to asking which factors drive customers to buy a particular car, without asking if they would prefer to buy a car with wheels.

Newegg's reliance on *Lucent* highlights this point. (Br. at 50-51). In *Lucent*, the claimed "date picker" was merely a small feature of the overall Outlook program. *Lucent Technologies, Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1332 (Fed. Cir. 2009). By contrast, the technology at issue here is integral to Newegg's website and its ability to compete.

Finally, Newegg emphasizes the small number of lines of code associated with the patented technology. (Br. at 51). But, although the number of lines may be relatively small, the infringing systems are fundamental to the operation of Newegg's website. Accordingly, the contribution of the patented technology in

this case "cannot be reduced to a mere counting of lines of code." *Lucent*, 580

F.3d at 1332-33.

### B.    Single-Item Transactions Were Properly Included in the Royalty Base as Infringing the Asserted System Claims

Newegg argues that the royalty base should exclude transactions involving

single items. (Br. at 52-53). The claims, however, recite only that the shopping

cart computer is *programmed* to handle more than one item. (A99) (emphasis

added). As the district court found, this language means that an infringing system

must have the *capability* to handle transactions with two or more items, not that

transactions involving only a single item fall outside the claims. (A19-20). Single

item transactions are still infringing uses of the claimed system.

Newegg misrepresents the testimony of Soverain's technical expert as

allegedly "admitting" that single item sales are purportedly outside the scope of the

asserted claims. As the district court confirmed, however, Soverain's expert

admitted no such thing. (A19). On the contrary, Dr. Grimes made it abundantly

clear throughout his testimony that Newegg's sales system is capable of

performing the recited functions, including adding a plurality of items to a

shopping cart. (A1579:3-A1580:23).

Newegg relies exclusively on one question and answer from Dr. Grimes

which, when taken out of context, misrepresents the substance of Dr. Grimes'

testimony. (Br. at 52-53). When read in context, however, Dr. Grimes' testimony

55

confirms that single item transactions infringe if the sales system, such as

Newegg's website, has the capability of adding a plurality of items to the shopping

cart:

> Q.   So the claim requires a plurality of requests from a user to add a plurality of respective products to a shopping cart, correct?

> A.   That's how the buyer computer must be programmed to do that, yes.

> Q.   Do you agree that a plurality means more than one?

> A.   It means two or more, that's correct, yes.

> Q.   So is this limitation satisfied if the customer only puts a single item in the shopping cart and then checks out?

> A.   No.  The claim language is very clear.  It has to be programmed to receive a plurality of requests from the user. ... So there has to be—the structure has to contain the ability for the user to make multiple requests.

> Q.   So to satisfy the system in this claim, the user has to put multiple items in the shopping cart?

> A.   That's what I—that's the evidence I put forward, yes.

(A1689:22-A1690:18).

In his final question and answer above (the only portion quoted by Newegg), Dr.

Grimes did not, as Newegg incorrectly suggests, agree that single-item sales do not

infringe.  Instead, he agreed only that in the evidence he presented as examples of

purchases, multiple items were included – thereby demonstrating that Newegg's

system is indeed capable of multiple item transactions.

At no point during his testimony did Dr. Grimes testify that single item sales do not infringe the '314 patent. Indeed, in response to the question just before the one cited in Newegg's brief, Dr. Grimes made clear that "the structure has to contain *the ability* for the user to make multiple requests," which Newegg's system unquestionably does. (A1572:15-A1577:5) (emphasis added). The evaluation of Dr. Grimes' testimony is a quintessential function that the jury performed at trial. Newegg has no basis to reargue the weight of that evidence here.

## C.    The Patent Licenses in Evidence Include Running Royalty Components Based on the Sales or Profits of the Licensee

Newegg argues that a running royalty damages award was unsupported by the evidence at trial because the Divine licenses "in substance" involved lump sum payments. (Br. at 54-56). But Newegg's characterization of the Divine licenses is an oversimplification. They do not readily fit either category of a lump sum or running royalty agreement, but instead incorporate elements of both. For eighteen of the nineteen licenses in evidence, the payment is based on a percentage of sales, profits, or transactions made over the course of one or two years.[7] At the same time, the Divine licenses typically provide for a single royalty payment based on

---

[7] Thirteen licenses were based on a percentage of gross sales. (A13136-A13146; A13172-A13186; A13107-A13125; A13152-A13161; A13192-A13196). Two licenses were based on a percentage of net sales. (A13187-A13191; A13126-A13130). Two licenses were based on a percentage of gross profit. (A13131-A13135 and A13147-A13151). And one license was based on a per transaction royalty. (A13167-A13171).

57

one or two years revenue, rather than a series of payments over the life of the licensed patents.[8]

Taken together, there is no established form for the Divine licenses to the patents in suit. The licensing terms are highly specific, reflecting the varied nature of the licensees, their size, and their businesses. (A1903:8-A1908:8). The jury was not bound to adopt Newegg's unequivocal categorization of them as lump sum. Moreover, the jury was presented with ample evidence explaining that these early licenses were granted in 2000-2001 in the wake of the dot.com bust, and therefore, reflect unique economic circumstances that would have artificially depressed the amounts of these licenses regardless of the inherent value of the patented technology. (A1819:21-A1820:17; A1820:21-A1822:20; *see also* A1826:7-25; A1830:12-25). Likewise, the amounts paid for these licenses demonstrate that the licensees' businesses were orders of magnitude smaller than Newegg, and thus not comparable. (A13107-A13135; A13136-A13161; A13167-A13196).

---

[8]    Only one of the licenses in evidence required a single payment to be made without describing how the amount was calculated. (A13094-A13097). This license was for a single patent to develop websites "solely for . . . internal business purposes," rather than a publicly-accessible website for e-commerce. (*Id.* at 13094).

**D.    Newegg's Proffer Of A $500,000 Lump-Sum Is Not Reasonable Compensation for Newegg's Use of the Patented Technology**

Newegg contends that it is entitled to either a new trial or remittitur because its "proffer of a $500,000 or less lump-sum royalty for a paid up perpetual license is the only legally supportable form and amount of damages in this case." (Br. at 56).  Newegg's argument ignores the evidence as well as the legal standard for a new trial or remittitur.  As described above, a jury's damages award in a patent infringement case is entitled to broad deference and "should stand unless it is grossly excessive, not supported by the evidence, or based on only speculation or guesswork." *Fujifilm Corp.*, 605 F.3d at 1372.  Newegg fails to address this standard and argues instead that any award greater than the $500,000 lump sum that its expert, Christopher Bakewell, proffered on damages is "excessive as a matter of law." (Br. at 56).  Instead of addressing the sufficiency of the evidence supporting the jury's damages award, Newegg in effect asks the Court to re-weigh the evidence and assign greater weight to Newegg's evidence.  However this approach is directly contrary to law – Newegg cannot ask the Court to re-weigh conflicting evidence and "substitute its choice of result for that of the jury." *Brooktree Corp.*, 977 F.2d at 1580.  Thus, Newegg's argument fails at the outset because it ignores the applicable standard for appealing a jury's award of damages.

Moreover, the jury's damages award was supported by substantial evidence. (A1494-A1658; A1677-A1732; A1894-A1927).  The jury heard extensive

59

testimony rebutting Mr. Bakewell's oversimplified analysis of prior Divine

licenses to the patents in suit, his failure to consider the lack of comparability

between the Divine licensees and Newegg with respect to both the size and nature

of their businesses, and his attempt to exclude single item sales based on flawed

conclusions concerning infringement of the asserted shopping cart claims.

(A1903:8-A1908:9; A1956:1-3).  As such, there was more than sufficient evidence

for the jury to conclude that Mr. Bakewell's proffered $500,000 lump sum

payment was wholly inadequate.

### E.    It Was Harmless Error For The District Court To Admit Nawrocki's Testimony Regarding The 25% Rule

On January 4, 2011, this Court held that evidence relying on the 25% rule is

inadmissible at trial.  *Uniloc USA, Inc. v. Microsoft Corp.*, --- F.3d ---, 2011 WL

9738, *19 (Fed. Cir. Jan. 4, 2011).  The Court rendered this decision after

judgment had been entered in this case.

Here, Soverain's damages expert, James Nawrocki, applied the 25% rule as

part of his analysis of the *Georgia-Pacific* factors.  (A1921:23-A1922:6).  The

jury's verdict makes plain, however, that admission of this testimony was harmless

because the jury did not adopt Mr. Nawrocki's application of the 25% rule.  The

jury's damages award of $2.5 million was approximately one tenth of the $22.6

million amount that Mr. Nawrocki calculated as a reasonable royalty for Newegg's

infringement of the '314 and '492 patents.  The district court determined that the

jury's award "represents only 1.88% of Newegg's profits." (A33). As a result, it was harmless error to admit the portion of Mr. Nawrocki's testimony addressing the 25% rule because the jury's actual damages award shows this testimony had little, if any, effect on the award. *Haun v. Ideal Industries, Inc.*, 81 F.3d 541, 547 (5th Cir. 1996).

Newegg bears the burden of showing how the admission of Mr. Nawrocki's testimony regarding the 25% rule affected its substantial rights. *Haun*, 81 F.3d at 547. Because this testimony had no demonstrable effect on the jury's damages award, which was amply supported by other evidence, Newegg cannot meet this burden, and the verdict should be affirmed.[9]

### F.     The District Court Was Well Within Its Discretion to Admit Evidence of Soverain's Licenses with Major Internet Retailers

Newegg argues the district court abused its discretion by admitting evidence of Soverain's recent licenses with major Internet retailers because they were executed in settlement of litigation. (Br. at 57). This Court has observed that a settlement agreement may, in some cases, be "the most reliable license in [the] record." *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 870, 872 (Fed. Cir.

---

[9]    In the alternative, if the Court determines that Mr. Nawrocki's testimony on the 25% rule had more than a slight effect on the verdict, Soverain respectfully requests that the Court vacate the jury's damages award and remand for a new trial on damages arising from Newegg's infringement of the '314 and '492 patents. *Hilton Davis Chemical Co. v. Warner-Jenkinson Co., Inc.*, 114 F.3d 1161, 1164 (Fed. Cir. 1997).

2010). The probative value of such agreements must be weighed against the risk of prejudice, which is exactly what the district court did here. *Id.* at 869.

The district court struck a careful balance in admitting limited evidence concerning the identities of the licensees, while excluding the actual license agreements themselves and the amounts of the royalties paid. Indeed, the district court was concerned that Newegg's arguments regarding the Divine licenses were only painting "half the picture," and were therefore unfairly prejudicial to Soverain. (A1343:8-13). Newegg's attempt to characterize the limited evidence of the Soverain licenses as "irrelevant and grossly prejudicial" as well as "inflammatory" is nothing more than overheated rhetoric. (Br. at 57-58). The district court's carefully balanced decision was well within its discretion.

## CONCLUSION

For the foregoing reasons, Soverain respectfully requests that the Court affirm the judgment in its entirety.

Respectfully submitted,

Dated: March 28, 2011          By: _____

David Nelson
Robert B. Wilson
Neil Cave
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000

Attorneys for Plaintiff-Appellee
Soverain Software LLC

## CERTIFICATE OF SERVICE

**United States Court of Appeals
for the Federal Circuit**
No. 2011-1009
------------------------------------------------------------)
SOVERAIN SOFTWARE LLC,
                    Plaintiff-Appellee,
      v.
NEWEGG INC.,
                    Defendant-Appellant.
------------------------------------------------------------)

        I, Elissa Matias, being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

Counsel Press was retained by QUINN EMANUEL URQUHART & SULLIVAN, LLP, Attorneys for Plaintiff-Appellee to print this document.  I am an employee of Counsel Press.

On the **28th Day of March, 2011,** I served the within **Brief of Plaintiff-Appellee Soverain Software LLC** upon:

| | |
|---|---|
| Edward R. Reines | Kent E. Baldauf, Jr. |
| edward.reines@weil.com | kbaldaufjr@webblaw.com |
| 201 Redwood Shores Parkway | Daniel Harris Brean |
| Redwood Shores, CA 94065-1175 | dbrean@webblaw.com |
| (650) 802-3022 | David C. Hanson |
| | dhanson@webblaw.com |
| Claudia Wilson Frost | The Webb Law Firm |
| claudia.frost@pillsburylaw.com | 700 Koppers Building |
| Pillsbury Wintrop Shaw Pittman LLP | 436 Seventh Avenue |
| 909 Fannin Street | Pittsburgh, PA 15219 |
| Suite 2000 | (412) 471-8815 |
| Houston, TX 77010 | |

*Attorneys for Defendant-Appellant*

**via Federal Express,** by causing 2 true copies of each to be deposited, enclosed in a properly addressed wrapper, in an official depository of the U.S. Postal Service.

Unless otherwise noted, 12 copies have been filed with the Court on the same date and in the same manner as above.

March 28, 2011

United States Court of Appeals
for the Federal Circuit
No. 2011-1009

-------------------------------------------------------------)

SOVERAIN SOFTWARE LLC,
                    Plaintiff-Appellee,
        v.
NEWEGG INC.,
                    Defendant-Appellant.

-------------------------------------------------------------)

### DECLARATION OF AUTHORITY PURSUANT TO
### 28 U.S.C. § 1746 AND FEDERAL CIRCUIT RULE 47.3(d)

I, Elissa Matias, being duly sworn according to law and being over the age

of 18, upon my oath depose and say that:

I am an employee of Counsel Press.  Counsel Press was retained by QUINN

EMANUEL URQUHART & SULLIVAN, LLP, Attorneys for Plaintiff-Appellee,

to print this document.

The attached brief has been submitted to Counsel Press, by the above

attorneys, electronically and/or has been reprinted to comply with the Court's

rules.  Because of time constraints and the distance between counsel of record and

Counsel Press, counsel is unavailable to provide an original signature, in ink, to be

bound in one of the documents.  Pursuant to 28 U.S.C. §1746 and Federal Circuit

Rule 47.3(d), I have signed the documents for Robert B. Wilson, with actual

authority on his behalf as an attorney appearing for the party.

March 28, 2011

Elissa Matias
Counsel Press

## CERTIFICATE OF COMPLIANCE

In accordance with Federal Rule of Appellate Procedure 32(a)(7)(C), I hereby state that the accompanying Brief of Plaintiff-Appellee Soverain Software LLC is in compliance with the Court's type-volume limitations. The brief was prepared using the Microsoft Office Word 2003 SP2 word processing system, which reports a word count of 13,854 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b).

Dated:  March 28, 2011

Robert B. Wilson