In The
# United States Court of Appeals
## For The Federal Circuit

## SOVERAIN SOFTWARE LLC,

*Plaintiff–Appellee,*

FILED
U.S. COURT OF APPEALS FOR
THE FEDERAL CIRCUIT

APR 1 4 2011

JAN HORBALY
CLERK

v.

## NEWEGG INC.,

*Defendant–Appellant.*

## APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF TEXAS IN CASE NO. 07-CV-0511, JUDGE LEONARD DAVIS.

———————————

## REPLY BRIEF OF APPELLANT

———————————

Edward R. Reines
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, California 94065
(650) 802-3000

Kent E. Baldauf, Jr.
David C. Hanson
Daniel H. Brean
THE WEBB LAW FIRM
700 Koppers Building
436 Seventh Avenue
Pittsburgh, Pennsylvania 15219
(412) 471-8815

Claudia W. Frost
Kevin M. Fong
PILLSBURY WINTHROP
  SHAW PITTMAN, LLP
2 Houston Center
909 Fannin, Suite 2000
Houston, Texas 77010
(713) 276-7648

*Counsel for Appellant*          *Counsel for Appellant*          *Counsel for Appellant*

*Dated April 14, 2011*

THE LEX GROUP^DC ♦ 1825 K Street, N.W. ♦ Suite 103 ♦ Washington, D.C. 20006
(202) 955-0001 ♦ (800) 815-3791 ♦ Fax: (202) 955-0022 ♦ www.thelexgroupdc.com

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................... iii

ARGUMENT IN REPLY ........................................................................1

I.     IT WAS LEGAL ERROR FOR THE DISTRICT COURT TO PREVENT THE JURY FROM EVEN CONSIDERING NEWEGG'S OBVIOUSNESS DEFENSE ............................................................................................1

     A.     There Is Substantial Evidence Showing that the Differences Between the Prior Art and the Claimed Inventions are Not Patentable Distinctions ..................................2

     B.     There is Ample Legal and Factual Support for the Jury to Have Concluded that Merely Adapting Newegg's Asserted Pre-World Wide Web Systems to the Internet was Obvious ............................................................................3

     C.     Soverain's Supposed "Secondary Considerations" Evidence Goes To The Weight Not The Sufficiency of Newegg's Obviousness Defense ..................................5

II.    NEWEGG'S CUSTOMERS DO NOT INFRINGE THE '314 AND '492 PATENTS .........................................................................................7

     A.     The Accused System Does Not Infringe the Shopping Cart Claims ......................................................................7

     B.     There Is *No* Evidence of Use of the Hypertext Statement Claims .................................................................... 10

     C.     *Centillion* Applied the Wrong Standard for "Use" of a System Claim, But Even Under its Control/Benefit Standard, Newegg's Customers Are Not "Users" of the Entire Claimed System ........................................... 12

III.   NEWEGG DID NOT ACTIVELY INDUCE INFRINGEMENT ........................ 14

IV.    THE JURY VERDICT FINDING NON-INFRINGEMENT OF CLAIM 79 OF THE '639 PATENT SHOULD STAND .................................................... 15

V.    THERE IS NO COMPETENT EVIDENCE TO SUPPORT A DAMAGES AWARD OF MORE THAN A LUMP SUM OF $500,000 ............................ 18

    A.    The Verdict In This Case Was Inflated By Grossly Flawed Evidence And Legally Discredited Theories And Must Be Rejected As A Matter Of Law .................................... 18

    B.    Because The Only Cognizable Evidence In The Record Establishes At Most A Lump Sum Damages Award of $500,000 or Less, The District Court Should Be Directed To Enter Judgment of at Most $500,000 If Liability Is Affirmed ................................................................................ 22

    C.    The Hypothetical Negotiation And Licenses in Evidence Support a Damages Award Of No Greater Than a $500,000 Lump Sum ................................................................ 25

        1.    The Divine Licenses ..................................................... 28

        2.    The Transact Licenses ................................................. 28

CONCLUSION ................................................................................ 30

CERTIFICATE OF FILING AND SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*ACCO Brands, Inc. v. ABA Locks Mfr. Co.,*
    501 F.3d 1307 (Fed. Cir. 2007) .................................................................... 11

*Centillion Data Sys., LLC v. Qwest Communications Int'l, Inc.,*
    631 F.3d 1279 (Fed. Cir. 2011) ........................................................... 12, 13

*DSU Med. Corp. v. JMS Co.,*
    471 F.3d 1293 (Fed. Cir. 2006) .................................................................... 14

*E-Pass Technologies, Inc. v. 3Com Corp.,*
    473 F.3d 1213 (Fed. Cir. 2007) .................................................................... 11

*epicRealm, Licensing, LLC v. Autoflex Leasing, Inc.,*
    492 F. Supp. 2d 608 (E.D. Tex. 2007) ......................................................... 13

*Golden Blount, Inc. v. Robert H. Peterson Co.,*
    438 F.3d 1354 (Fed. Cir. 2006) .................................................................... 15

*Hetzel v. Prince William County,*
    523 U.S. 208 (1998) ..................................................................................... 22

*i4i Ltd. P'ship v. Microsoft Corp.,*
    598 F.3d 831 (Fed. Cir. 2010) ..................................................................... 23

*Leapfrog Enters., Inc. v. Fisher-Price, Inc.,*
    485 F.3d 1157 (Fed. Cir. 2007) ......................................................................5

*Lucent Technologies v. Gateway, Inc.,*
    580 F.3d 1301 (Fed. Cir. 2009) .................................................................... 12

*Muniauction, Inc. v. Thomson Corp.,*
    532 F.3d 1318 (Fed. Cir. 2008) ......................................................................6

*NTP, Inc. v. Research in Motion, Ltd.,*
    418 F.3d 1282 (Fed. Cir. 2005) ................................................................ 13

*Nuance Communications Inc. v. Tellme Networks, Inc.,*
    707 F. Supp. 2d 472 (D. Del. 2010)........................................................ 14

*Paice LLC v. Toyota Motor Corp.,*
    504 F.3d 1293 (Fed. Cir. 2007) ............................................................... 10

*ResQNet.com v. Lansa, Inc.,*
    594 F.3d 860 (Fed. Cir. 2010) ....................................................................6

*Rite-Hite Corp. v. Kelley Co.,*
    56 F.3d 1538 (Fed. Cir. 1995) .......................................................... 19, 25

*SiRF Technology, Inc. v. ITC,*
    601 F.3d 1319 (Fed. Cir. 2010) ....................................................... 16, 17

*Structural Rubber Products Co. v. Park Rubber Co.,*
    749 F.2d 707 (Fed. Cir. 1984) ................................................................ 24

*Tanner v. Westbrook,*
    174 F.3d 542 (5th Cir. 1999) ................................................................... 21

*Tronzo v. Biomet, Inc.,*
    236 F.3d 1342 (Fed. Cir. 2001) ................................................... 22, 23, 24

*Uniloc USA, Inc. v. Microsoft Corp.,*
    No. 2010-1035,
    2011 U.S. App. LEXIS 11 (Fed. Cir. Jan. 4, 2011)............................... *passim*

*Weisgram v. Marley,*
    528 U.S. 440 (2000)................................................................................. 24

*Western Union Co. v. Moneygram Payment Sys., Inc.,*
    626 F.3d 1361 (Fed. Cir. 2010) .......................................................... 2, 3, 4

*Woods v. Sammisa Co.,*
    873 F.2d 842 (5th Cir. 1989) ................................................................... 24

## CONSTITUTIONAL PROVISION

U.S. CONST. amend. VII .......................................................................... 22

## STATUTE

35 U.S.C. § 271(a) .................................................................................. 12

## RULES

Fed. R. Civ. P. 50 ................................................................................... 21

Fed. R. Civ. P. 59 ........................................................................... 14, 21

## **ARGUMENT IN REPLY**

I.    IT WAS LEGAL ERROR FOR THE DISTRICT COURT TO PREVENT THE JURY FROM EVEN CONSIDERING NEWEGG'S OBVIOUSNESS DEFENSE

Soverain struggles to defend the district court's decision to prevent the jury from even considering Newegg's obviousness defense. Indeed, Soverain fails to identify how its patents were anything more than the routine application of century old shopping traditions to the Internet. Soverain never really denies that the patents-in-suit claim as "inventions" common tools used to conduct shopping and sales transactions that were well-known at the time: (1) a shopping cart to hold products selected by a customer for purchase; (2) receipts and invoices for sales; and (3) a customer shopping tracking number. Newegg's Brief, 5-10. Although the application of such simple sales procedures to the Internet would have been obvious as a matter of common sense—let alone over Newegg's asserted online shopping prior art—the district court erroneously precluded Newegg from even submitting this issue to the jury. (A2638); Newegg's Brief, 37-43.

All of Soverain's obviousness arguments on appeal go to the weight, not the legal adequacy, of Newegg's obviousness defense here. Soverain touts its evidence of secondary considerations, cites heavily to its own expert's opinions, and contends that there are differences between the prior art and the claimed inventions that are somehow meaningful. But, as demonstrated below, Soverain

1

never comes to grips with the extensive evidence Newegg offered to prove obviousness. Newegg's Brief, at 37-43.

> A.    There Is Substantial Evidence Showing that the Differences Between the Prior Art and the Claimed Inventions are Not Patentable Distinctions

The differences between Newegg's asserted prior art and the claimed inventions identified by Soverain "add[] only trivial improvements that would have been a matter of common sense to one of ordinary skill in the art." *Western Union Co. v. Moneygram Payment Sys., Inc.*, 626 F.3d 1361, 1372 (Fed. Cir. 2010).

The use of a "product identifier" to identify products, a "database" to store shopping cart information, a "statement document" providing the customer's order details, and a "session identifier" are, at most, "simply routine modifications that are a part of adapting a new technology to an existing system," and Newegg introduced substantial evidence to support this fact. *Id.* at 1370-71; *see* Newegg's Brief, 37-43; (A2333) ("To any competent programmer, the ability to access a record by a unique identifier means that they know how to find it, and once they've got it in their hands, they can take it and slice it and dice it any way they want to."); (A2335) ("Anyone who could get access to the text in a transaction record would understand how to use html to present that information at a variety of levels of details."); (A2376-77) (explaining "the accepted best practice in the industry since the 1970s" was to use databases to store data for multiple concurrent system

2

users, and that the CompuServe books "suggest a number of reasonable possible implementations, . . . a database among those alternatives."); (A2375) ("Simply knowing that you can do something like store information about purchases means that a competent programmer can figure out how to do it.").

Here, the combined elements of the patented inventions represented "no more than the predictable use of prior art elements according to their established functions," and Newegg should have at least had the opportunity to argue obviousness to the jury. *Western Union*, 626 F.3d at 1372 (finding the asserted claims to be obvious *as a matter of law*).

B. There is Ample Legal and Factual Support for the Jury to Have Concluded that Merely Adapting Newegg's Asserted Pre-World Wide Web Systems to the Internet was Obvious

Soverain argues that the CompuServe Mall and Johnson patent systems would be "rendered inoperable" and would "completely collapse" when combined with the World Wide Web. Soverain's Brief, 48-49. This hyperbole is squarely opposed to technological reality, and to this Court's precedent. *See, e.g., Western Union*, 626 F.3d at 1370 (Applying "previously known [electronic] methods . . . through an Internet web browser was obvious because it amounted to no more than applying the use of the Internet to existing electronic processes at a time when doing so was commonplace.").

3

The inventors of the patents-in-suit merely took existing online shopping and identification systems and applied them to the World Wide Web, at a time when such adaptation was indeed commonplace. The Internet became open for public use and commerce in 1991, and by 1994 when Open Market was working on its own e-commerce software, other competitors were engaged in the very same kind of development. *See, e.g.*, (A1436, A2689, A1750-51) ("There were other[] [e-commerce companies] starting up at about the same time . . . . First Virtual was working on a system for doing—for buying things by e-mail that you would get delivered by e-mail.").

This Court has repeatedly recognized that one skilled in the art has the capability to perform "routine modifications that are a part of adapting a new technology to an existing system." *See, e.g., Western Union*, 626 F.3d at 1370. Newegg introduced evidence to show that such adaptations were straightforward and obvious. *See, e.g., supra* Part IV.A; (A2331) ("Anyone who wanted to move shopping to the web would know they had to use URLs to tie things together to deliver information."); (A2375) ("Simply knowing that you can do something like store information about purchases means that a competent programmer can figure out how to do it."); (A2333) ("To any competent programmer, the ability to access a record by a unique identifier means that they know how to find it, and once they've got it in their hands, they can take it and slice it and dice it any way they

4

want to."); (A2335) ("Anyone who could get access to the text in a transaction record would understand how to use html to present that information at a variety of levels of details.").

Conspicuously missing from Soverain's brief is any argument, much less evidence, to rebut the ample proof that the implementation of a shopping cart, customer number, receipt or the like on the Internet was not itself an inventive challenge.

C.    Soverain's Supposed "Secondary Considerations" Evidence Goes To The Weight Not The Sufficiency of Newegg's Obviousness Defense

Soverain's attempt to rely upon secondary considerations fails because, even if it had such evidence, that could not overcome Newegg's obviousness defense as a matter of law. *See Leapfrog Enters., Inc. v. Fisher-Price, Inc.*, 485 F.3d 1157, 1162 (Fed. Cir. 2007) ("[G]iven the strength of the prima facie obviousness showing, the evidence on secondary considerations was inadequate to overcome a final conclusion" of obviousness.); *see supra* Parts I.A – I.B.

The weight of Soverain's secondary consideration evidence is weak, at best. Soverain cites to the alleged commercial success and praise of the Transact product. Despite Soverain's allegation that Transact was "widely licensed" to "over 1000 licensees," only 27 Transact licenses were produced in discovery and introduced at trial. Soverain's Brief, 50; (A2579); (A10682-83). Soverain made no attempt at trial to prove that even the supposed short-lived success of the

5

Transact product was due to the patented features.  Shikhar Ghosh, a founder of Open Market, testified that Transact was a complete e-commerce solution software including far more functionality than that covered by the patents-in-suit. (A2398-99) ("It could do a whole range of these things . . . .  It was an end-to-end product . . . .").  Absent a nexus between the commercial success and the claimed inventions, this alleged "commercial success" and "praise by others" evidence has no bearing on obviousness, nor could it extinguish the defense altogether.  *See Muniauction, Inc. v. Thomson Corp.*, 532 F.3d 1318, 1327 (Fed. Cir. 2008).

Soverain likewise failed to show that the patent licenses were taken due to the value of the patented technology, again failing to satisfy the nexus requirement. Indeed, at trial Soverain proudly touted licenses to companies like Amazon.com, The Gap, and Zappos.com, all of whom took licenses to settle active litigation between those companies and Soverain.  Such settlement licenses were improperly admitted as explained in Newegg's Opening Brief and only indicate a desire to avoid the cost and burden of litigation, not proof of nonobviousness.  *See* Newegg's Brief, 57-59.[1]

---

[1] Soverain's citing *ResQNet.com v. Lansa, Inc.*, 594 F.3d 860, 870-72 (Fed. Cir. 2010) to defend its misuse of these licenses is meritless.  Soverain's Brief, 61-62. There, the licenses at were actually offered in support of the damage theory as the "most reliable" evidence of proper royalty.  Here, Soverain did not rely upon the settlement licenses to support a damage theory and there was no justification for their admission.  *See* Newegg's Brief, 57-60.

6

II.   NEWEGG'S CUSTOMERS DO NOT INFRINGE THE '314 AND '492 PATENTS

A.   The Accused System Does Not Infringe the Shopping Cart Claims

As confirmed by Soverain's Brief, the shopping cart claims of the '314 and '492 Patents are fundamentally different from the accused system. The patents disclose and claim only a shopping cart that is maintained at all times in the shopping cart computer, *i.e.* the server side database. (A1687-88, A2127-32). Newegg's system is cookie-based where the "shopping cart" resides on the cookie, in the browser of the customer's computer, and the selected product items are stored on the cookie until they are sent en masse by the customer to Newegg's server upon checkout. *See* Soverain's Brief, 30 ("[A] plurality of customer requests are stored on a cookie at the customer's computer before being moved to the shopping cart database . . . . [I]nformation about the selected products is sent together."). Soverain does not contest this important difference, which establishes two dispositive distinctions from the claims. *See, e.g.*, Soverain's Brief, 29.

First, the claims unquestionably require a "shopping cart computer be programmed . . . to *modify* said shopping cart *in said shopping cart database.*" (A99) (emphasis added). Thus to satisfy this limitation, the shopping cart must be modified when in the server side database. The trial testimony was undisputed that there is no interaction with Newegg's shopping cart database as a customer adds products to the shopping cart, and at checkout the contents of shopping cart cookie

are inserted into Newegg's database in a single action. (A2293-94). This single insertion involves no modification to the shopping cart, either in the cookie or in the database. *Id.*

Soverain fabricates a modification of the shopping cart in the server-side database through Dr. Grimes' strained attempt to characterize the creation of the shopping cart at checkout as a two-step process. Soverain concedes that this two-step *opinion* was based solely on a few lines of Newegg CTO James Wu's deposition testimony. Soverain's Brief, 24-26. However, this argument is an act of desperation. This testimony cannot be reasonably interpreted as a description of the creation of a shopping cart in the shopping cart database that is then modified in a second step by the insertion of the shopping cart cookie data.

Under Soverain's contention, a space in the database is created when the customer clicks the "checkout" button and a shopping cart ID is generated. Soverain's Brief, 12. Then the contents of the shopping cart cookie are inserted into this supposed "empty shopping cart" now existing in the database, thereby modifying the "empty shopping cart." *Id.* However, the shopping cart ID is just a number to identify a customer – not even Soverain argues it is alone inserted into the server-side database before or upon checkout. (A2084-87, A2102-04, A2294-96); *see* Soverain's Brief, 12. Only upon check-out is the shopping cart ID

combined with the shopping cart data from the cookie and inserted together into the database—once, in a single action. (A2294-95, A2102-04).

Even if Soverain's "two-step" theory were arguably correct, the insertion of shopping cart information into an empty space does not "*modif[y] the shopping cart* in [the] shopping cart database" because the district court construed "shopping cart" to mean "a stored representation of a collection of products." Since an empty shopping cart (under Soverain's theory, just a customer ID number) by definition contains no product information, there is no modification of a shopping cart in the shopping cart database when shopping cart data is inserted en masse at check-out. Soverain's response is that "collection" was construed in a prior case to mean "zero, one, two or more." This counter-intuitive construction of "collection of products" which supposedly encompasses "nothing" was not provided to the jury or even mentioned at trial and thus cannot possibly support the verdict. (A59-62).

As for the "plurality" limitations, Soverain concedes that only a single shopping cart message is sent from client to server. Soverain's Brief, 29. Yet the claims require that the system be programmed to "send a *plurality* of respective shopping cart messages to said shopping cart computer." (A99). The plurality of respective messages are required because these patents disclose and claim only the server side shopping cart that permanently resides in the shopping cart database, and which undergoes modification as each product is selected by the customer.

(A1687-88, A2127-32).  By design and resultant necessity, the claimed system requires that a separate message be sent to the shopping cart computer for every item placed in the shopping cart.  Soverain seeks to ignore this limitation to encompass Newegg's cookie-based design wherein the customer sends one shopping cart message to the shopping cart computer at checkout.  (A2078-79, A2285-86).  The plurality limitations are not satisfied.

Soverain ultimately argues that the Newegg system's lack of both the "modify" and "plurality" limitations can be back-filled by the doctrine of equivalents such that its patents would cover any use of shopping carts on the Internet.  Dr. Grimes' passing references to alleged equivalence and design choice are legally insufficient. *See Paice LLC v. Toyota Motor Corp.*, 504 F.3d 1293, 1305 (Fed. Cir. 2007) (requiring "particularized testimony and linking argument" to demonstrate equivalence); Newegg's Brief, 32-34.  Newegg's cookie-based system functions in a completely different manner and eliminates these claim requirements altogether.  Newegg's Brief, 31-34.

B.    There Is *No* Evidence of Use of the Hypertext Statement Claims

Soverain concedes that it failed to present evidence of actual use of the hypertext statement claims.  Soverain's Brief, 34-37.  Instead, Soverain contends that such use should be presumed because it is an option that Newegg's website "prominently" identifies.  Soverain's Brief, 35; (A13090).  Soverain attempts to

excuse its failure of proof by declaring that this option simply must have been used.

This exact argument has been rejected by this Court. *E-Pass Technologies, Inc. v. 3Com Corp.*, 473 F.3d 1213 (Fed. Cir. 2007) dismissed the assertion that it was "unfathomable" that no one used the device in the claimed manner as a substitute for proof, reasoning that, if so, the patentee "should have had no difficulty in meeting its burden of proof and in introducing testimony of even one such user." *Id.* at 1222-23. Soverain, too, is seeking to be relieved of its duty to carry its burden by proclaiming usage to be manifest – but if so Soverain should have had no problem locating evidence. There is no meaningful distinction between this case and *E-Pass*.

*ACCO Brands, Inc. v. ABA Locks Mfr. Co.*, 501 F.3d 1307, 1313 (Fed. Cir. 2007) is no different. Soverain attempts to distinguish *ACCO* by arguing that the defendant there only provided instructions for non-infringing use of a product which was capable of both infringing and non-infringing uses, whereas Newegg's website only provides instructions for infringing use. *Id.* at 1311; Soverain's Brief, 37; (A9-A10). This assertion is wrong.

First, the hypertext statement functionality is an optional feature of the accused system (*i.e.*, Newegg's website) that does not need to be used in any—let alone every—sales transaction. (A1531-33). Newegg's website is absolutely

11

capable of non-infringing use, just as in *ACCO*—here, *non*-use—no matter what functionality Newegg offers its customers.

Second, the only instruction relied upon by Soverain is a single sentence on Newegg's website merely letting visitors know they can "[g]o to the order status page" to check the status online, should they desire to do so. (A10); (A13090). However, merely "go[ing] to the order status page" does not use the claimed system—Newegg does not instruct its customers how to navigate to or activate any particular hypertext links to view *transaction details*, as required by the claims. (A1605-11; *see* A147 (Claim 15)). *Lucent Technologies v. Gateway, Inc.* also lends no support to Soverain, because there the direct infringement finding was premised on expert testimony indicating that infringement would likely have occurred, whereas here Dr. Grimes testified to not having "any idea" whether the hypertext statement functionality was ever used. *580 F.3d 1301, 1317-19 (Fed. Cir. 2009)*; (A1711).

There is no substantial evidence to support the jury's infringement finding, and the verdict should be reversed.

C.    *Centillion* Applied the Wrong Standard for "Use" of a System Claim, But Even Under its Control/Benefit Standard, Newegg's Customers Are Not "Users" of the Entire Claimed System

Because there is no single "user" of the claimed systems of the '314 and '492 patents under Section 271(a), Soverain relies on the recently adopted "control

12

and benefit" analysis from *Centillion Data Sys., LLC v. Qwest Communications Int'l, Inc.*, 631 F.3d 1279 (Fed. Cir. 2011).  Soverain's Brief, 20-23.

Under *Centillion's* "use" analysis, "a party must put the invention into service, *i.e.*, control the system as a whole and obtain benefit from it."  631 F.3d at 1284 (adopting standard from *NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1317 (Fed. Cir. 2005)).  Newegg respectfully submits that *Centillion* applied the wrong standard for "use" of a system claim because, as illustrated by the way this test is used by Soverain, it distorts the concept of "use" into a fuzzy benefit test that disengages from identifying the true users of the different claim elements.

Under any reasonable application of the *Centillion* standard, Newegg's customers lack the requisite control over Newegg's servers to "use" them.  In cases applying the *NTP* analysis to analyze direct infringement based on use (versus situs of use), district courts have reasoned that that the accused direct infringer must impact the manner of operation or underlying functionality of the remote systems they are alleged to "use."  Here, the asserted claims include servers programmed to perform specific functions in specific ways, of which the customers are never aware and cannot change.  A customer's blind use of Newegg's servers is insufficient to demonstrate "control" over the servers.  *See* (A10-A13); *epicRealm, Licensing, LLC v. Autoflex Leasing, Inc.*, 492 F. Supp. 2d 608, 614-15 (E.D. Tex. 2007) (customer does not "use" the web server system under *NTP* because the

server operates in the configuration set by the web server programmer); *Nuance Communications Inc. v. Tellme Networks, Inc.*, 707 F. Supp. 2d 472, 483 (D. Del. 2010) ("use" of remote call processing system exists where "the caller exercises control over the accused services by dictating the format and manner in which the task is accomplished.").

III.    NEWEGG DID NOT ACTIVELY INDUCE INFRINGEMENT

Soverain presented no evidence of Newegg's active inducement of infringement. It relies instead on the mere fact that Newegg had knowledge of the patents-in-suit *after* it was served with the Complaint, and that Newegg's website includes instructions and answers to Frequently Asked Questions on how to use the website.[2] Soverain's Brief, 38. But the mere provision of information concerning the underlying acts of infringement without proof of a culpable state of mind is legally insufficient to support a verdict under the unchallenged jury instruction. *DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1305-06 (Fed. Cir. 2006) ("Knowledge of the acts alleged to constitute infringement is not enough . . . . [I]nducement requires that the alleged infringer knowingly induced infringement and possessed specific intent to encourage another's infringement.");

---

[2] Soverain argues that Newegg waived its right to seek a new trial based on the jury's active inducement finding. However, Newegg challenged the active inducement verdict as against the great weight of the evidence in its Rule 59 motion, arguing that there was in fact no evidence to support such a finding, and this position was properly preserved. (A14, A9675-76, A10486-87).

(A47-48) (agreed jury charge that active inducement requires that the accused infringer "kn[ew] or should have known that the encouraged acts constitute infringement.").

Adverse findings on legitimately contested issues of validity and infringement after trial cannot retroactively establish the required state of mind. Indeed, the clear strength of Newegg's positions make the required culpable state of mind finding implausible altogether. *See generally* Newegg's Brief, 20-50.

*Golden Blount, Inc. v. Robert H. Peterson Co.*, lends no support to Soverain's argument because there the patentee's belief of non-infringement was objectively unreasonable based on "incompetent" opinions of counsel. 438 F.3d 1354, 1364 (Fed. Cir. 2006).

At bottom, Soverain improperly seeks to shift the burden to Newegg to prove a *lack* of intent to induce infringement. Soverain's Brief, 39-40. The burden of proving infringement is and always has been Soverain's. Its failure to meet its burden means the active inducement finding cannot stand.

IV.    THE JURY VERDICT FINDING NON-INFRINGEMENT OF CLAIM 79 OF THE '639 PATENT SHOULD STAND

Notwithstanding the jury verdict against it, Soverain argues that it is entitled to judgment as a matter of law of infringement of claim 79 of the '639 Patent. However, the jury was entitled to find that, based on the testimony of Soverain's expert, claim 79's limitations were met only by improperly combining the actions

15

of Newegg and its customers. Newegg's Brief, 9-10, 13, 24-26. Specifically, claim 79 requires "receiving, from the client, a service request to which *a session identifier stored at the client* has been *appended by the client.*" (A183). Even under Soverain's infringement theory, it is Newegg's *customer's* computer that stores and appends the session identifier. Soverain's Brief, 43.

Soverain's expert Dr. Grimes admitted that storing the session identifier and appending it to the request are satisfied by the Newegg *customer.* (A1726-27) ("Q: Do you agree that it is the client that—or the client's computer that has appended the stored session identifier? . . . . A: [Y]es, that is correct. The identifier stored at the client has been appended by the client. That's the way the browser works."). The simple fact is that Soverain expressly relied on the actions of Newegg customers to satisfy positively recited limitations within the "receiving" portion of the claim. The jury was entitled to find a divided infringement problem with Soverain's theory.

Soverain suggests that the claimed actions by Newegg's customers should have been ignored by the jury in the divided infringement analysis because they are expressed in the passive voice—even though it sought no such jury instruction or claim construction. Soverain has identified no authority to support this argument. Soverain relies solely and erroneously on *SiRF Technology, Inc. v. ITC*, 601 F.3d 1319 (Fed. Cir. 2010). Unlike here, in *SiRF* there was no showing that the

16

opposing expert had expressly relied upon the actions of third parties for his infringement theory. This alone confirms that there is substantial evidence to support the jury's decision.

Also, the claim language in *SiRF* was very different. The claims included the steps of "communicating" and "transmitting" positioning data signals to the GPS devices. *Id.* at 1329-30. SiRF argued that it could not directly infringe because the "communication" and "transmission" to the GPS devices required actions by two third parties—the positioning data must be forwarded and downloaded to the GPS devices. The court rejected this argument because even if the communication and transmission could not otherwise take place as a practical matter, the claims did not recite the limitations of "forwarding" or "downloading" such data. *Id.* at 1330. Without such a textual basis in the claims, the court concluded that the claims did not encompass action by the end users, and that the defendants were effectively asking the court "to read such limitations into the claims." *Id.* at 1331.

Here, unlike *SiRF*, the limitations of a stored session identifier that has been appended by the client are explicitly included in claim 79. Claim 79 is not directed to merely "receiving [an object]," but to receiving a specifically claimed object, sent by a specific third-party, on which certain specifically claimed actions have been taken by that third-party. Storing and appending a session identifier are all

17

claimed *actions* that Soverain itself admits are performed by the *customer*. Soverain's Brief, 43.

In sum, in overturning the jury's verdict, the district court read the acts of "storing" and "appending" out of claim 79 even though Soverain itself insisted that it was Newegg's customers who performed these required actions.

V.   THERE IS NO COMPETENT EVIDENCE TO SUPPORT A DAMAGES AWARD OF MORE THAN A LUMP SUM OF $500,000

   A.   The Verdict In This Case Was Inflated By Grossly Flawed Evidence And Legally Discredited Theories And Must Be Rejected As A Matter Of Law

The $2,500,000 verdict cannot stand because it was infected and inflated by the presentation of grossly flawed evidence and legally discredited theories. Indeed, this trial could serve as a case study for the type of damages presentation that has tarnished the reputation of damages experts in modern patent litigation. This Court's recent precedent highlights the legal problems.

For starters, this Court's decision in *Uniloc USA, Inc. v. Microsoft Corp.*, No. 2010-1035, 2011 U.S. App. LEXIS 11, at *56 (Fed. Cir. Jan. 4, 2011) firmly rejected the 25% rule which was the damage theory promoted by Soverain and presented by its damages expert. This legally and logically unsupported rule was misused to present an outrageously inflated damages theory. Newegg's Brief, 46-52. Soverain does not contest this serious legal error in its case. Soverain's Brief, 60-61.

18

Second, the district court improperly allowed the jury to use as the "base" for its royalty Newegg's total sales of products on its website, even though neither those products nor any components thereof were even accused of infringement. Soverain does not deny that it based its damages theory on the revenue for products that do not infringe. This Court has long prohibited basing damages on revenues not fairly attributable to the patented invention, and has increasingly required economic proof of the proper base. *See Rite-Hite Corp. v. Kelley Co.*, *56 F.3d 1538, 1549-1551 (Fed. Cir. 1995); Uniloc*, 2011 U.S. App. LEXIS 11, at *60-63. If a share of the revenue or profit from all of a brick and mortar store's products were sought because someone had a patent on a physical shopping cart, that patentee would be laughed out of court. Modern technology does not obsolete old-fashioned common sense. Electronic shopping carts, receipts and invoices, and customer tracking numbers are simply tools used to facilitate shopping transactions—tools that are purchased for modest lump sums as part of the store's infrastructure just like their non-electronic counterparts have been for centuries. *See* Newegg's Brief, 6-10. Newegg's total revenues and profits from sales of non-accused products have no proper bearing on damages for alleged use of these patented functionalities, and no such theory should be permitted.

Third, over Newegg's objections, Soverain emphasized Newegg's achievement of annual gross revenues (not profits) of approximately $2.1 billion in

19

recent years, to try to make the $34 million in damages sought seem small and reasonable to the jury. *See, e.g.*, (A1456, A1911) ("I'm not denying $34 million is a big number. But why is it a big number? Not because we're doing anything improper or overreaching; it's a big number simply because the extent, the breadth of Newegg's use of the technology, 2-plus billion dollars a year, that's the reason the number is so big."); (A1673, A6114-22, A8183-87) (objections, *Daubert* challenge, and motion *in limine* regarding Newegg's total sales). As in *Uniloc*, this "number dropping" of Newegg's total revenues was improper and seriously "skew[ed] the damages horizon for the jury." *Uniloc*, 2011 U.S. App. LEXIS 11, at *72.

Faced with the fact that it presented at trial a resoundingly discredited approach to damages, Soverain concedes that Mr. Nawrocki's use of the 25% rule was error. But it argues that the introduction of his flawed opinion was "harmless error" because "the jury did not adopt Mr. Nawrocki's application of the 25% rule" and ultimately awarded damages equal to only 1.88% of Newegg's profits. Soverain's Brief, 60-61. Soverain's speculation as to the reasoning behind the jury's verdict is irrelevant, as is the fact that the ultimate damages award was less than the legally invalid amount proffered by Mr. Nawrocki.

"An error is harmless if the court is certain, after reviewing the record, that the error did not influence the jury or had only a slight effect on its verdict."

*Tanner v. Westbrook*, 174 F.3d 542, 549 (5th Cir. 1999). Allowing Mr. Nawrocki to testify to his legally invalid damages theories as a Court-blessed expert absolutely had more than a "slight effect" upon the damages verdict. Mr. Nawrocki used his 25-33% rule calculations to proffer a damages amount of nearly $34 million, which included his discussion of Newegg's total sales revenues in excess of $2 billion noted above. (A1887-89).

Indeed, the jury's award of $2.5 million is *five times the maximum amount of damages supported by the competent evidence* in this case. *See, e.g.*, Newegg's Brief, 43-46; *see also supra* and *infra* this Part. This cannot be "harmless error." Permitting Soverain to introduce this fundamentally flawed damages theory absolutely "taint[ed] the jury's damages calculation," which resulted in a grossly inflated damages award. *Uniloc*, 2011 U.S. App. LEXIS 11, at *65-66. For the district court to have found that "[Nawrocki's] application of the 25% Rule of Thumb was relevant and reliable," and to have based its denial of Newegg's Rule 50 and 59 motions with respect to damages on such a conclusion, is clearly erroneous and unsupportable under *Uniloc*. (A18).[3]

---

[3] Further, Mr. Nawrocki improperly included in his damages calculations the two thirds of transactions where only a single item was purchased. Newegg's Brief, 52-54. Contrary to Soverain's characterization, Dr. Grimes' testimony unambiguously confirms that using Newegg's website for single item sales is beyond the scope of the claims, and there can be no liability for noninfringing uses of that system. *Id.*; Soverain's Brief, 55-57.

Without a legally viable damages theory, and having banked on an approach replete with legal error, Soverain has nowhere to turn for support of the $2,500,000 award. The only coherent and legally viable damages theory was presented by Newegg and, as demonstrated below, it in no way supports the inflated verdict.

B. Because The Only Cognizable Evidence In The Record Establishes At Most A Lump Sum Damages Award of $500,000 or Less, The District Court Should Be Directed To Enter Judgment of at Most $500,000 If Liability Is Affirmed

This Court should reverse the district court and enter judgment that Soverain's total damages cannot exceed a $500,000 lump sum because Soverain has proffered no competent evidence to support any reasonable royalty award in excess of that amount as a matter of law. *See Tronzo v. Biomet, Inc.*, 236 F.3d 1342, 1351-52 (Fed. Cir. 2001) ("[P]resenting this issue to the jury would have been pointless because, as a matter of law, the compensatory damages could not exceed" a particular amount).

While a reduction of damages can sometimes involve a reweighing of the evidence, Soverain is incorrect that Newegg requests any improper re-weighing of evidence by this Court, or that this Court simply substitute its judgment for that of the jury. Soverain's Brief, 59. When damages awards are reduced due to a grant of a new trial motion, the Seventh Amendment may require a new jury trial, *Hetzel v. Prince William County*, 523 U.S. 208, 211-12 (1998), but a new jury trial is not necessary when the reduction is based solely on legal grounds and can be

performed without re-weighing the evidence and exercising discretion. *See, e.g.,* *Tronzo*, 236 F.3d at 1351-52 (affirming district court's re-computation of damages without a new trial where "the court did not reweigh any evidence, nor did it exercise its discretion in computing the damages award. Instead, the court awarded the maximum damages possible" that were supported by competent evidence in the record, and excluded additional sums that were unsupported by legally competent evidence).

This important distinction between a request for a new trial and a request for judgment as a matter of law was center stage in *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 857 (Fed. Cir. 2010). There, this Court stated clearly that the standards of review and relief requested for those two types of motions are different. *Id.* Here, it is beyond dispute that Newegg properly and timely sought a judgment as a matter of law regarding the damages in this case, and this Court can properly direct the district court to enter judgment accordingly.

All the evidence shows that the amount of damages adequate to compensate Soverain for infringement would be a one time, lump sum payment of $500,000 <u>at a maximum</u>. Newegg's Brief, 43-56; *see also infra* this Part. The only supposedly countervailing evidence or testimony was Nawrocki's legally invalid theory. Because Mr. Nawrocki used his 25-33% rule calculations to proffer a damages amount of nearly $34 million, the jury had to rely on his testimony to reach its

23

damages verdict of $2.5 million. (A1887-89). As explained below, there is no other evidence to support a damage award larger than a $500,000 lump sum.

In the event that this Court declines to enter judgment as a matter of law and orders a new trial on damages, Newegg respectfully requests that the Court give appropriate guidance to the district court on the damage issues. *See, e.g., Structural Rubber Products Co. v. Park Rubber Co.*, 749 F.2d 707, 718 (Fed. Cir. 1984); *Woods v. Sammisa Co.*, 873 F.2d 842, 854 (5th Cir. 1989). In particular, Newegg respectfully requests that this Court instruct the district court to hold proceedings wherein:

> (1) Soverain may introduce no evidence of Newegg's total online sales or profits because Newegg sells no products accused of infringement;

> (2) Soverain is precluded from presenting any new damages theory to the jury, or submitting a new expert report, since the sole theory that it chose to present was based on the 25% rule; and

> (3) the maximum amount of damages that can be awarded is a $500,000 lump sum.

*See Weisgram v. Marley*, 528 U.S. 440, 455-56 (2000) ("'[A] litigant's failure to buttress its position because of confidence in the strength of that position is always indulged in at the litigant's own risk.'"); *Tronzo*, 236 F.3d at 1347 (introduction of

new damage theory precluded where the plaintiff made "strategic decisions" as to what evidence and argument to advance); *Rite-Hite*, 56 F.3d at 1549-1551; *Uniloc*, 2011 U.S. App. LEXIS 11, at *72.

      C.    The Hypothetical Negotiation And Licenses in Evidence Support a Damages Award Of No Greater Than a $500,000 Lump Sum

Soverain's Brief inaccurately characterizes Newegg' damages theory and the licenses in evidence as failing to reflect the "unique economic circumstances after the dot.com bubble burst and the nature and size of the licensees compared to Newegg." Soverain's Brief, 53. Soverain argues that the amounts paid for the licenses to the patented technology "demonstrates that the licensees' businesses were orders of magnitude smaller than Newegg, and thus not comparable." *Id.* at 58. The evidence regarding the particular circumstances of the hypothetical negotiation showed that Newegg was similarly situated to all the licensees of the patented technology in evidence, however, and that Newegg would therefore pay a similar price for a license to the patented technology.

This Court has increasingly required damages to be based on the technical and economic realities of the case, not abstract speculation. *See Uniloc*, 2011 U.S. App. LEXIS 11, at *60-63. Further, "a patentee [can] not rely on license agreements that were 'radically different from the hypothetical agreement under consideration' to determine a reasonable royalty." *Id.* at *62-63.

At the time of the hypothetical negotiation in this case (January 2001, when Newegg's website went online), the original developer and owner of the patented technology, Open Market, Inc., would have been the licensor.  (A54, A2409, A2427, A2444).  Open Market's business plans indicate that it wanted to broadly license the patents to online retailers, and to provide its e-commerce technology to small companies so that they could more effectively compete with larger stores.  (A2449, A1752-53).  In 2001, Open Market was in "pretty bad shape.  The company was losing money and did not have a huge cash balance, and the public markets were not available to raise additional capital."  (A2399, A2525-28).  Newegg, by contrast was just opening for business as an online retailer in 2001—it had high hopes to grow its business over time, but limited financial resources to do so.  (A1998, A2444).  There was certainly no reason to believe at that time that nearly ten years later, during the damages period in this case, Newegg would have achieved the success that it has.

"A company in the situation that Open Market was in [in 2001] that needed cash would be more inclined to accept or negotiate for an upfront payment in order to continue to fund its business."  (A2474).  Likewise, smaller startup companies like Newegg was in 2001 would find lump sum payments appealing due to the certainty of a single payment rather than uncertain future payment, and because

running royalties require detailed audits and reports to be generated, which can involve considerable time and expense. (A10278).

Soverain's theory at trial, suggesting that Newegg and Open Market would have negotiated for Newegg to pay nearly a third of Newegg's profits in the form of a running royalty per transaction, was absurd. Suppose that the shopping cart claims encompassed a physical shopping cart. It strains the imagination to suggest that grocery stores would ever agree to pay the shopping cart manufacturers per use made of the shopping carts by its customers, or based on the value of the products placed into the cart. Shopping carts are simply tools purchased for a modest lump sum payment, after which they are made available to customers for their use—for free—regardless of the number or value of products placed into the carts. (A2411). Likewise, here the accused functionalities are simply tools provided on Newegg's website, and it defies logic and common sense to suggest that Newegg would agree to pay a royalty per use or based on revenues or profits from product sales. As discussed above, in the hypothetical negotiation Newegg would have paid a modest lump sum fair market price for the right to use such tools, and there are no facts or circumstances of the hypothetical negotiation in evidence that would suggest otherwise.

1.    *The Divine Licenses*

In 2001, Divine granted many licenses to the patents-in-suit to online retailers, all during startup years for those licensees. (A1358, A1903, A2509); (A13107-193). Thus, the Divine licensees were all similarly situated to Newegg at the time of the hypothetical negotiation in 2001, and Newegg would be licensed on comparable terms.

It cannot be disputed that the Divine licenses were all granted in substance as paid-up perpetual licenses for lump sum amounts *totaling* about $200,000. Newegg's Brief, 54-57.  Soverain concedes that the licenses "provide for a single royalty payment . . . rather than a series of payments over the life of the licensed patents.  Soverain's Brief, 57-58.  The Divine licenses provide no evidentiary support for a damages award of even $500,000, let alone any kind of running royalty.

2.    *The Transact Licenses*

The Transact software product developed and licensed by Open Market "incorporates or reflects each asserted claim of the patents-in-suit as well as additional functionality." (A13002, A2398-99).  These licenses provide for access and permission to use the patented technology, which is informative as to the business considerations that might have affected the hypothetical negotiation. (A2438-39).  Essentially, if Open Market licensed Transact for license fees of

$344,000 or less, and Transact includes functionality above and beyond the patents-in-suit, the value of having permission to use the patented technology by itself must be less than $344,000. *Id.* It was undisputed at trial that the only payments under the Transact licenses that corresponded to the *right to use* the software technology (*i.e.*, the only payments analogous to the rights granted under a patent license) were the lump sum license fees. (A1836-37, A2438-39). Further, being the results of arms-length negotiations, these licenses provide insight into what the fair market value of the patented technology would have been at the time, and as to the reasonableness of Bakewell's proffered royalty. *Id.*

The former Chairman of Open Market testified that if Newegg had approached Open Market in 2001 seeking to license Transact, "[w]e'd have licensed it." (A2400). He explained that Newegg would have been licensed for "standard terms . . . similar to those of other merchants or single user licenses." (A2401-02). Again, for all single users of the Transact product in evidence, the license fees were lump sums of $344,000 or less. (A13208, A13224, A13227, A13242, A13253, A13265, A13287, A13300). The Transact licenses provide no evidentiary support for a damages award over a $500,000 lump sum.

## **CONCLUSION**

For the foregoing reasons, Newegg respectfully requests that the Court reverse the district court's judgment of infringement and enter a take-nothing judgment in Newegg's favor. Alternatively, the Court should reverse and remand with instructions to enter a judgment of a lump sum payment of, at most, $500,000. At a minimum, the Court should remand for a new trial on infringement, obviousness, and damages, providing guidance to the court as to the issues on remand, as appropriate. Newegg also requests any other and further relief to which it may be justly entitled.

Respectfully submitted,

Dated:  April 14, 2011

By: _Edward R. Reines_

Edward R. Reines

WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
Telephone: (650) 802-3000

Kent E. Baldauf, Jr.
David C. Hanson
Daniel H. Brean

THE WEBB LAW FIRM
700 Koppers Building
436 Seventh Avenue
Pittsburgh, PA 15219
Telephone:  (412) 471-8815

Claudia W. Frost
Kevin M. Fong

PILLSBURY WINTHROP SHAW
PITTMAN, LLP
2 Houston Center
909 Fannin, Suite 2000
Houston, TX 77010
Telephone: (713) 276-7648

Counsel for Appellant-Defendant
Newegg Inc.

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 14th day of April, 2011, two bound copies of the

Reply Brief of Appellant were served via UPS Next Day Air, to the following:

Paul J. Ripp
WILLIAMS MONTGOMERY & JOHN LTD.
233 South Wacker Drive, Suite 6100
Chicago, Illinois  60606
(312) 443-3205

*Counsel for Appellee*

Robert B. Wilson
Neil G. Cave
QUINN EMANUEL URQUHART & SULLIVAN LLP
51 Madison Avenue, 22nd Floor
New York, New York  10010
(212) 849-7000

*Counsel for Appellee*

David A. Nelson
QUINN EMANUEL URQUHART & SULLIVAN LLP
500 West Madison Street, Suite 2450
Chicago, Illinois  60661
(312) 705-7465

*Counsel for Appellee*

I further certify that on this 14th day of April, 2011, the required number of

copies of the Reply Brief of Appellant were hand filed at the Office of the Clerk,

United States Court of Appeals for the Federal Circuit.

The necessary filing and service were performed in accordance with the instructions given me by counsel in this case.

*Danielle M. Still*

THE LEX GROUP DC
1825 K Street, NW, Suite 103
Washington, DC 20006
(202) 955-0001

## **CERTIFICATE OF COMPLIANCE**

1.   This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) or Federal Rule of Appellate Procedure 28.1(e):

  [ X ] this brief contains [*6,992*] words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii), or

  [    ] this brief uses a monospaced typeface and contains [*state the number of*] lines of text, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii)

2.   This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) or Federal Rule of Appellate Procedure 28.1(e) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6):

  [ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 2007*] in [*14pt Times New Roman*]; *or*

  [    ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

Dated: April 14, 2011                                  *Edward R. Reines*
                                                                          Edward R. Reines
                                                                          *Counsel for Appellant*

## <u>DECLARATION OF AUTHORITY</u>
## <u>PURSUANT TO FED. CIR. R. 47.3(d)</u>

I, Danielle M. Staley, hereby declare under penalty of perjury that I am duly

authorized to sign on behalf of Counsel for Appellant, Edward R. Reines, as he is

unavailable to do so himself.

Executed: April 14, 2011

THE LEX GROUP DC
1825 K STREET, NW, SUITE 103
WASHINGTON, DC 20006
(202) 955-0001

To Be Filed For:

Edward R. Reines
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
Telephone: (650) 802-3000

*Counsel for Appellant*

Respectfully Submitted,

Edward R. Reines
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
Telephone: (650) 802-3000

*Counsel for Appellant*