**WEST/CRS**

2011-1009
VOLUME III OF III
(Pages 3668 - 16677)

In The

# United States Court of Appeals
### For The Federal Circuit

## SOVERAIN SOFTWARE LLC,

*Plaintiff–Appellee,*

FILED
U.S. COURT OF APPEALS FOR
THE FEDERAL CIRCUIT

APR 2 1 2011

JAN HORBALY
CLERK

v.

## NEWEGG INC.,

*Defendant–Appellant.*

## APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS IN
## CASE NO. 07-CV-0511, JUDGE LEONARD DAVIS.

## JOINT APPENDIX

Edward R. Reines
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, California  94065
(650) 802-3000

*Counsel for Appellant*

Kent E. Baldauf, Jr.
David C. Hanson
Daniel H. Brean
THE WEBB LAW FIRM
700 Koppers Building
436 Seventh Avenue
Pittsburgh, Pennsylvania  15219
(412) 471-8815

*Counsel for Appellant*

Paul J. Ripp
WILLIAMS MONTGOMERY
  & JOHN LTD.
233 South Wacker Drive, Suite 6100
Chicago, Illinois  60606
(312) 443-3205

*Counsel for Appellee*

Claudia W. Frost
Kevin M. Fong
PILLSBURY WINTHROP
  SHAW PITTMAN, LLP
2 Houston Center
909 Fannin, Suite 2000
Houston, Texas  77010
(713) 276-7648

*Counsel for Appellant*

Dated:  April 21, 2011

David A. Nelson
QUINN EMANUEL
  URQUHART & SULLIVAN LLP
500 West Madison Street, Suite 2450
Chicago, Illinois  60661
(312) 705-7465

*Counsel for Appellee*

Robert B. Wilson
Neil G. Cave
QUINN EMANUEL
  URQUHART & SULLIVAN LLP
51 Madison Avenue, 22nd Floor
New York, New York  10010
(212) 849-7000

*Counsel for Appellee*

SOVERAIN SOFTWARE, LLC v. NEWEGG INC, NO. 2011-1009

TABLE OF CONTENTS FOR JOINT APPENDIX

**VOLUME I:**

**I.    MATERIAL REQUIRED BY FED. R. APP. P. 30(a) & FED. CIR. R. 30(a)**

| Description | Page No. |
|---|---|
| Final Judgment entered August 11, 2010 (Dkt. No. 435) | A1-A2 |
| Memorandum Opinion and Order entered August 11, 2010 (Dkt. No. 434) | A3-A34 |
| Verdict Form, April 30, 2010 (Dkt. No. 376) | A35-A37 |
| Court's Charge (Dkt. No. 436) | A38-A65 |
| United States Patent No. 5,715,314 | A66-A113 |
| United States Patent No. 5,909,492 | A114-A163 |
| United States Patent No. 7,272,639 | A164-A183 |
| Docket Report | A184-A236 |

**II.    TRANSCRIPTS OF PROCEEDINGS BELOW**

| Description | Page No. |
|---|---|
| Pretrial Conference, January 21, 2010 (Dkt. No. 323) | A1003-A1008 |
| Motions Hearing, April 19, 2010 (Dkt. No. 386) | A1343-A1362 |
| Trial Transcript, April 26, 2010 (Morning Session) (Dkt. No. 389) | A1388-A1456 |
| Trial Transcript, April 26, 2010 (Afternoon Session) (Dkt. No. 390) | |
|     Witness:    Jack Grimes | A1494-A1658 |
| Trial Transcript, April 27, 2010 (Morning Session) (Dkt. No. 391) | A1673 |
|     Witness:    Jack Grimes | A1677-A1732 |
|               G. Winfield Treese | A1750-A1781 |

**VOLUME II:**

Trial Transcript, April 27, 2010 (Afternoon Session) (Dkt. No. 392)
Witness:    Katharine A. Wolanyk    A1814-A1857
                James Nawrocki        A1884-A1967

Trial Transcript, April 28, 2010 (Morning Session) (Dkt. No. 393)
Witness:    Lee Cheng             A1996-A2020
                James Wu              A2050-A2104

Trial Transcript, April 28, 2010 (Afternoon Session) (Dkt. No. 396)
Witness:    G. Winfield Treese      A2121-A2132
                Alexander Trevor       A2141-A2192

Trial Transcript, April 29, 2010 (Morning Session) (Dkt. No. 394)
Witness:    Edward R. Tittel        A2267-A2377

Trial Transcript, April 29, 2010 (Afternoon Session) (Dkt. No. 397) ................A2601-2630
Witness:    Shikhar Ghosh Deposition (Video)    A2397-A2402
                Christopher Bakewell       A2409-A2528
                Michael Shamos          A2533-A2581

Trial Transcript, April 30, 2010 (Dkt. No. 395) ...................................................A2638-A2777

## III.    PERTINENT PLEADINGS AND ORDERS BELOW

| Description | Page No. |
| --- | --- |
| Complaint, November 2, 2007 (Dkt. No. 1) ....................................................... | A3000-A3131 |

**VOLUME III:**

Order granting Motion for Leave to File Amended Claim Construction,
March 24, 2009 (Dkt. No. 192)...........................................................................A3668

Claim Construction Order, May 28, 2009 (Dkt. No. 214)....................................A4381-A4383

Newegg's Daubert Motion to Exclude the Opinions of James Nawrocki,
October 1, 2009 (Dkt. No. 252) .........................................................................A6110-A6122

Joint Proposed Pretrial Order, November 25, 2009 (Dkt. No. 289) ...................A7929-A8053

Newegg's Motions in Limine, January 13, 2010 (Dkt. No. 306) ........................A8183-A8187

Soverain's Opposition to Newegg's Motions in Limine,
January 15, 2010 (Dkt. No. 309) ........................................................................A8333-A8335

Newegg's Rule 50(a) Motion for Judgment as a Matter of Law of
Noninfringement, April 29, 2010 (Dkt. No. 367) ...............................A8986-A9009

Newegg's Proposed Jury Charge Instruction, April 29, 2010
(Dkt. No. 371)......................................................................................A9041-A9042

Newegg's Renewed Motions for Judgment as a Matter of Law of
Non-Infringement and Invalidity of the Asserted Claims and Alternative
Motions for New Trial, May 24, 2010 (Dkt. No. 407) ......................A9675-A9676

Soverain's Opposition to Newegg's Renewed Motion for Judgment as a
Matter of Law of Non-Infringement and Invalidity of the Asserted Claims
and Alternative Motions For New Trial, June 7, 2010
(Dkt. No. 409)..................................................................................A9697-A10113

Soverain's Opposition to Newegg's Renewed Motion for Judgment
as a Matter of Law on Damages and Alternative Motion for New Trial
or Remittitur, June 7, 2010 (Dkt. No. 410) ........................................A10164

Newegg's Response to Soverain's Motion for Permanent Injunction or
Ongoing Royalties, June 7, 2010 (Dkt. No. 412) ...............................A10278

Newegg's Response to Soverain's Renewed Motion for Judgment as a
Matter of Law of Infringement '314, '492, and '639 Patents and for a
New Trial on '639 Patent Damages, June 7, 2010
(Dkt. No. 413)......................................................................................A10354-A10412

Newegg's Reply in Support of its Renewed Motion for Judgment as a Matter
of Law of Non-Infringement and Invalidity of the Asserted Claims and
Alternative Motions for New Trial, June 14, 2010
(Dkt. No. 419)......................................................................................A10486-A10487

Newegg Inc.'s Final Exhibit List of Exhibits Admitted During Trial,
August 3, 2010 (Dkt. No. 433) ...........................................................A10682-A10683

## IV. TRIAL EXHIBITS

| Description | Page No. |
| --- | --- |
| Parties' Stipulations of Fact (Trial Ex. D-516) .....................................…....... | A13002-A13004 |
| Summary of Deposition Testimony of James Wu (Trial Ex. P-62B)................. | A13005-A13022 |
| Newegg Website Ordering Help Page (Trial Ex. P-15).................................. | A13090-A13093 |

Patent license from Open Market to Johnson & Johnson Vision Care
(Trial Ex. D-223) ...........................................................................A13094-A13097

Patent license from divine to Emagio, Inc. (Trial Ex. D-225)...........................A13107-A13111

Patent license from divine to Natural Foods, Inc. (Trial Ex. D-226)..................A13112-A13115

Patent license from divine to Webster Orchard / The Fruit
Company, Inc. (Trial Ex. D-227).........................................................A13116-A13120

Patent license from divine to Perfumania.com (Trial Ex. D-228) .......................A13121-A13125

Patent license from divine to Game Link, Inc.  (Trial Ex. D-229) .....................A13126-A3130

Patent license from divine to Bikecology, Inc. (Trial Ex. D-230)......................A13131-A13135

Patent license from divine to Cartronix, Inc. (Trial Ex. D-231) .......................A13136-A13141

Patent license from divine to L.H. Internet (Trial Ex. D-232)...........................A13142-A13146

Patent license from divine to Katco Industries (Trial Ex. D-233) ......................A13147-A13151

Patent license from divine to Glooks.com (Trial Ex. D-234) ...............................A13152-A13156

Patent license from divine to Spun.com (Trial Ex. D-235) .................................A13157-A13161

Patent license from divine to Kreiss Enterprises, Inc. (Trial Ex. D-236) ...........A13162-A13166

Patent license from divine to Odimo, Inc. (Trial Ex. D-237) .............................A13167-A13171

Patent license from divine to Cadence 120 Bicycle Works
(Trial Ex. D-238) ...........................................................................A13172-A13176

Patent license from divine to Tryiton Eyewear, LLC (Trial Ex. D-239)............A13177-A13181

Patent license from divine to Bissenger French Confections
(Trial Ex. D-240) ...........................................................................A13182-A13186

Patent license from divine to DVDPlanet.com, Inc. (Trial Ex. D-241)..............A13187-A13191

Patent license from divine to System Optics, Inc. (Trial Ex. D-242) .................A13192-A13196

Transact software license from Open Market to McGraw-Hill
(Trial Ex. D-193) ...........................................................................A13208-A13215

Transact software license from Open Market to Clearview Technologies
(Trial Ex. D-194) ...........................................................................A13224

Transact software license from Open Market to Bureau of National
Affairs (Trial Ex. D-195) ....................................................................................A13227

Transact software license from Open Market to MIC Systems
(Trial Ex. D-196) ...............................................................................................A13242

Transact software license from Open Market to Thomson Learning
(Trial Ex. D-197) ...............................................................................................A13253

Transact software license from Open Market to Novis (Trial Ex. D-198)..........A13265

Transact software license from Open Market to Corel (Trial Ex. D-199)...........A13287

Transact software license from Open Market to Finsiel Spa
(Trial Ex. D-200) ...............................................................................................A13300

Newegg.com homepage (Trial Ex. D-071).........................................................A15039

Newegg.com website (Trial Ex. P-12)...................................................A15112-A16677

## V. ADDITIONAL MATERIAL CITED BY SOVERAIN

| Description | Page No. |
| --- | --- |

Soverain Software LLC v. Amazon.com, Inc.,
Memorandum Opinion re: Claim Construction
(Case 6:04-cv-00014-LED Document 246 filed 04/07/05) .................................A15018-A15019

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

SOVERAIN SOFTWARE LLC,       )
                                  )

    Plaintiff,                )
                                  )

    v.                     )    Case No. 6:07-CV-00511-LED
                                  )

CDW CORPORATION,          )    JURY TRIAL DEMANDED
NEWEGG INC.,              )
REDCATS USA, INC.        )
SYSTEMAX INC.,           )
ZAPPOS.COM, INC.,        )
REDCATS USA, L.P.,       )
THE SPORTSMAN'S GUIDE, INC.,  )
AND                       )
TIGERDIRECT, INC.,       )
                                  )

    Defendants.           )

## ORDER GRANTING LEAVE TO FILE AMENDED CLAIM CONSTRUCTION

Having considered the parties' Joint Motion for Leave to File Amended P.R. 4-3 Claim

Constructions and Prehearing Statement dated March 20, 2009 and attachments (collectively, the

"Amended P.R. 4-3 submissions"), the Court finds that the Motion should be GRANTED, and

orders as follows:

(1) The parties are granted leave to file the Amended P.R. 4-3 Claim Constructions and

Prehearing Statement accompanying the Motion.

(2) The Court adopts the claim constructions in *Soverain Software LLC v. Amazon.com,*

*Inc.*, 6:04-cv-14 (the "*Amazon* Markman Order") in the present case, except where expressly

disputed in the Amended P.R. 4-3 submissions. In particular, subject to the preceding condition,

claim terms for U.S. Pat. Nos. 5,715,314 and 5,909,492 asserted in the present case will have the

same meaning as construed in the *Amazon* Markman Order, and the claim terms common to U.S.

## APPENDIX A

| U.S. Patent Nos. 5,715,314 and 5,909,492 | | |
|---|---|---|
| | Claim Term, Phrase, or Clause and Patent(s) and Claim(s) in which it appears | Court's Construction |
| 1. | **Message** | [AGREED]<br>a unit of information sent electronically |
| 2. | **Shopping cart computer** | [AGREED]<br>a computer processing data associated with one or more shopping carts |
| 3. | **Shopping cart database** | [AGREED]<br>a database of stored representations of collections of products<br><br>where "database" means a collection of logically related data stored together in one or more computerized files |
| 4. | **Shopping cart message** | [AGREED]<br>a message concerning a shopping cart |
| 5. | **Shopping cart** | [AGREED]<br>a stored representation of a collection of products |
| 6. | **Plurality of products added to . . . shopping cart / [Add a] plurality of respective products to a shopping cart / [add] . . . plurality of products to . . . shopping cart** | [AGREED]<br>product identifiers which are added to an instance of a shopping cart in the shopping cart database / [add] identifiers of respective products to an instance of a shopping cart / [add] identifiers of products to an instance of a shopping cart |

2

| | U.S. Patent No. 7,272,639 | |
|---|---|---|
| | Claim Term, Phrase, or Clause and Patent(s) and Claim(s) in which it appears | Court's Construction |
| 12. | **Service request** | [AGREED]<br>a solicitation of services from a client to a server. A service request may entail the exchange of any number of messages between the client and the server. |
| 13. | **Session identifier** | [AGREED]<br>a text string that identifies a session |
| 14. | **Session** | [AGREED]<br>a series of requests and responses to perform a complete task or set of tasks between a client and a server system |
| 15. | **the stored session identifier** | [AGREED]<br>Plain meaning applies; this term does not require construction |
| 16. | **subsequent distinct requests** | [AGREED]<br>Plain meaning applies; this term does not require construction |
| 17. | **Validating, at the server system, the appended session identifier / validating the session identifier appended to the service request** | [AGREED]<br>at the server system, determining the validity of the appended session identifier |
| 18. | **user identifier** | [AGREED]<br>a text string that identifies a user |
| 19. | **A purchase request / a request to purchase** | [AGREED]<br>One or more messages requesting a purchase |

4

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| SOVERAIN SOFTWARE LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| CDW CORPORATION, NEWEGG | ) | Civil Action No. 6:07-CV-00511-LED |
| INC., REDCATS USA, INC., | ) | |
| SYSTEMAX INC., ZAPPOS.COM, | ) | ***FILED UNDER SEAL*** |
| INC., REDCATS USA, L.P., THE | ) | |
| SPORTSMAN'S GUIDE, INC., and | ) | |
| TIGERDIRECT, INC., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DEFENDANT NEWEGG'S DAUBERT MOTION AND SUPPORTING BRIEF
TO EXCLUDE THE OPINIONS OF JAMES NAWROCKI**

Defendant Newegg, Inc. ("Newegg") hereby moves this Court to exclude the opinions of Plaintiff Soverain Software, LLC's ("Soverain") damages expert James J. Nawrocki. Mr. Nawrocki's analysis is based on insufficient facts and data, is performed using unreliable principles and methods, and involves a fundamentally incorrect application of such unreliable principles and methods to the facts relied upon. Fed. R. Evid. 702. The overwhelming weight of legal authority holds that the fundamental errors in Mr. Nawrocki's methodology must result in his exclusion as a matter of law, as it would constitute reversible error to permit him to testify as to an opinion based on such legally impermissible premises.

## I.    The Legal Standard for Reliability of Expert Testimony

With regard to expert testimony, this Court is responsible for "ensur[ing] that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993). Accordingly, "[p]roposed testimony must be supported by appropriate validation – i.e., 'good grounds,' based on what is known." *Daubert*, 509 U.S. at 590. "The focus . . . must be solely on principles and methodology." *Id.* at 595. When evaluating damages for patent infringement, the Federal Circuit has been clear that expert testimony "requires sound economic proof of the nature of the market and likely outcomes with infringement factored out of the economic picture." *Grain Processing Corp. v. American Maize-Products Co.*, 185 F.3d 1341, 1350 (Fed. Cir. 1999).

Soverain seeks only "reasonable royalty" damages from Newegg in this case, pursuant to 35 U.S.C. § 284. Expert Report of James Nawrocki, attached hereto as Exhibit A, at ¶ 2. Analysis of a reasonable royalty centers around a hypothetical negotiation between the patentee and the accused infringer at or about the time of first accused infringement. *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116, 1120-22 (1970), aff'd, 446 F.2d 205 (1971); *Parental Guide of Texas v. Thomson, Inc.*, 446 F.3d 1265 (Fed Cir. 2006) (explaining

that "a 'reasonable royalty' rate under section 284 is calculated with reference to the long list of factors outlined in *Georgia-Pacific*"). While a certain amount of postulating is required by any damages expert to properly opine on what might have taken place in such a hypothetical negotiation, the Federal Circuit has insisted that the courts "prevent the hypothetical from lapsing into pure speculation." *Grain Processing Corp.*, 185 F.3d at 1350. As will be demonstrated in detail below, Mr. Nawrocki's opinion must be excluded because his analysis is legally invalid and based on "pure speculation" in several material respects.

## II.   Mr. Nawrocki Improperly and Unjustifiably Invoked the Entire Market Value Rule

Mr. Nawrocki improperly and unjustifiably invoked the entire market value rule by valuing the wrong thing for his royalty base. He never even attempted to properly apportion the value of the patented technology in the grand scheme of Newegg's business, nor did he analyze to what extent, if any, the patented invention impacts demand for Newegg's products and services. Mr. Nawrocki assumed, with no explanation or justification whatsoever, that the proper royalty base is 100% of the value of Newegg's online sales transactions, which is mostly attributable to cost of the products themselves—products bearing no logical or functional relation to the patented technology. Ex. A, at pp. 22-23. Despite the enormous scope and magnitude of products, functionality, and services offered via Newegg's websites, Mr. Nawrocki is ostensibly under the impression the entire value of Newegg's business is attributable solely to the technology in Soverain's patents.

Mr. Nawrocki used the total online sales revenues earned by Newegg as his royalty base, thereby invoking what is known as the "entire market value rule." The entire market value rule is traditionally put in issue where an accused product is comprised of both patented and unpatented components which are integrated into and sold as a single product. *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1549 (Fed. Cir. 1995). While damages for patent infringement are

generally limited to those necessary to redress the harm traceable to the patented subject matter, the entire market value rule allows in certain circumstances for the patentee to collect damages on (i.e., include in the royalty base) the value of the entire product. *Id.* The rule may be properly invoked only if the patented component is "of such paramount importance that it substantially created the value of the component parts," or constitutes "the basis for customer demand." *Id.*

It is important to distinguish the above-described situation where a single product comprises both patented and unpatented components from a situation where one patented product is sold along with another distinct, but complementary, product. In the latter instance, damages liability for patent infringement does not extend to "items that have essentially no functional relationship to the patented invention and that may have been sold with an infringing device only as a matter of convenience or business advantage . . . ." *Id.* at 1550. This is because "there is no basis for extending that recovery to include damages for items that are neither competitive with nor function with the patented invention." *Id.* at 1551.

Newegg's business involves operating websites that re-sell products such as computers and information technology accessories. Newegg is not a competitor of Soverain, which represents itself as a software company. When a consumer purchases a product online via www.Newegg.com, the consumer is essentially buying two distinct "products," or is paying for two entirely separate things: (1) the product itself, and (2) the overall shopping experience provided by www.Newegg.com. The subject matter of the patents in suit simply provides functionality by which certain particular aspects of the overall shopping experience may be effectuated. Specifically, the patents encompass technology including shopping cart functionality (i.e., generally allowing users to select and gather various different items while shopping, to later be purchased all as a single transaction) and session identification (i.e., generally storing personal and shopping-related information so that the website can identify,

group, and organize records of the user's activity on the website). It is critical to understand that Newegg, not being a software company or competitor of Soverain's, does not sell the software technology covered by the patents-in-suit. Rather, Newegg at most allegedly uses the patented software technology as one small part of its overall websites.

### A.    The Products Sold By Newegg

There can be no reasonable dispute over the fact that there is a fundamental difference between the products sold via www.Newegg.com and the software running the website itself which, among many other things, effectuates the sales. *See* Deposition of Shikhar Ghosh, attached as Exhibit B, at p. 39, line 10 – p. 40, line 4. All things being equal, a product purchased via www.Newegg.com is the same if it is purchased via www.Amazon.com, and is also same if it is purchased at a brick and mortar store location such as Best Buy. The end product is completely unaffected by the manner in which or vendor from which it is purchased. *Id.* Newegg's use or non-use of the patented technology has no impact on the value of the products it sells. The products sold by Newegg therefore "have essentially no functional relationship to the patented invention," nor is the patented invention "the basis for customer demand" of the products, and as such, the portion of Newegg's sales attributed to the value of the products sold may not be included in the royalty base. *Rite-Hite*, 56 F.3d at 1549.

Mr. Nawrocki admitted in his deposition that the products sold via Newegg's websites are not accused of infringement of the patents-in-suit, and that they have no functional relationship to the patented technology other than the fact that the patented technology is allegedly used as part of the sales process for the products. *See* Deposition of James Nawrocki of September 24, 2009, attached hereto as Exhibit I, at 9 ("I'm not aware of [Newegg] selling a product that incorporates [the patented technology]."); *id.* at 47-49 (emphasizing that it is the sales process, not the products sold, that is accused of infringement); *id.* at 74 (explaining that

the only "functional relationship" between the patented technology and the products sold is that the technology is part of the "sales process."). At most, the patented technology is used by Newegg "only as a matter of convenience or business advantage" when selling products online. *Rite-Hite*, 56 F.3d at 1550. In view of these facts, it would constitute reversible error to allow the fact finder to hear any testimony concerning a royalty base which includes revenues attributable to the products sold by Newegg.

As an online re-seller operating at thin profit margins, the gross revenues from Newegg's sales primarily reflect the value of the products sold. *See* Expert Rebuttal Report of W. Christopher Bakewell, attached hereto as Exhibit C, at page 53, ¶ 160. Nevertheless, Mr. Nawrocki includes the entire value of all product sales via Newegg's websites in his royalty base. Ex. A, at ¶¶ 100, 112, 113. He provides no justification for this royalty base whatsoever, but *merely states that "[his] opinion is that the appropriate royalty base in this case is the number of sales orders placed on a Newegg website." Id.* at p. 22. It is important to note that even though Mr. Nawrocki couches his royalty base in terms of the "number of sales orders," in effect his royalty base equates to the revenues derived from those sales because he explicitly correlates his royalty rate for each sales order to the average revenues from Newegg's total sales. *Id.* at ¶¶ 100, 112, 113 (performing his damages analysis by applying a royalty rate to the "average product revenue" from Newegg's total product sales). Mr. Nawrocki's methodology is legally erroneous under *Rite-Hite*.

The Federal Circuit very recently affirmed a district court's exclusion of expert testimony in similar circumstances. In *Lucent Technologies, Inc. v. Gateway, Inc.*, 2009 WL 2902044, at *2 (Fed. Cir. 2009), the patent in suit was directed to software which enabled a user to enter certain information into a system without the use of a keyboard, e.g., via clicking on a number pad display. The accused software included Microsoft's Outlook email program, which had an

allegedly infringing "date-picker" feature by which users could select and schedule dates for events by clicking on graphical calendar representations. *Id.* at \*10. The patentee's damages expert attempted to include the total value of the computers sold, onto which the allegedly infringing software had been loaded, in the royalty base. *Id.* at \*32. Because the patented software feature constituted only a very small part of the value of the entire computer and was sold along with the computer merely for business convenience, the Federal Circuit rejected any damages calculation based on the value of the entire computer as being "excessive." *Id.*

The facts in the present case are similar to those in *Lucent Technologies*. Here, the products Newegg sells bear no functional relationship to the patented software methods. At most, the patented software contributes some minimal value to a customer's experience during the website-based sales transaction. When a Newegg customer buys a computer from www.Newegg.com, even if the software methods utilized to effectuate the online purchase infringed the patents in suit, it would still be improper and "excessive" as a matter of law to include the entire value of the computer in a royalty base.

B.    *The Overall Shopping Experience Provided by Newegg*

Newegg's average gross profit margins are around 10%, meaning that approximately 90% of the gross revenues Newegg receives are attributable solely to the cost of the products sold. Exhibit C, at page 53, ¶ 160; Ex. I, at 64. The remaining 10% of Newegg's sales revenues therefore reflect the value that Newegg adds and contributes to the sale of that product, i.e., the overall shopping experience. *Id.* Thus, at a minimum, Mr. Nawrocki's overall damages calculation must be reduced by a factor of ten. As discussed above, the 10% of revenues attributable to Newegg's shopping experience may be considered a distinct "product" purchased by Newegg's customers, and generally represents all of the value that Newegg itself adds to the

transaction. However, Mr. Nawrocki's analysis cannot even support the application of the entire market value rule to this "product" of Newegg.

Mr. Nawrocki makes no attempt to demonstrate why he believes the patented technology drives the demand for Newegg's websites, which is required to be demonstrated by him under *Rite-Hite*, 56 F.3d at 1549. Mr. Nawrocki could never make such a showing because the patented technology does not drive demand for Newegg's websites. Indeed, the patented technology does not even drive demand for Transact, the software product alleged to embody the patents in suit. When asked what drove the demand for Transact, Shikhar Ghosh, founder and CEO of Open Market, Inc. (the creator of Transact), did not even mention the patented shopping cart and session ID technology. Ex. B, at page 37, line 24 – page 39, line 9.

The evidence shows that customers choose Newegg for a variety of reasons entirely unrelated to Soverain's patented technology, including Newegg's reputation, pricing, selection, reviews, traffic generation, customer service, etc. Ex. B, at page 42, line 21 – page 43, line 15; Ex. C, at pages 54-55, ¶ 162. Newegg has frequently been honored among other internet retailers for its outstanding customer service and customer satisfaction. Ex. C, at pages 21-22, ¶ 54. W. Christopher Bakewell, Newegg's damages expert, identified 21 distinct aspects of Newegg's online retail business and website functionality that each contribute to the success of and demand for Newegg's websites. Ex. C, at pages 54-55, ¶ 162. Accordingly, Mr. Bakewell carefully and meticulously apportioned the value of the patented technology in the grand scheme of the overall shopping experience via Newegg's websites. Ex. C, at pages 53-60.

In *Lucent Technologies*, discussed *supra*, the Federal Circuit observed that the patented software was "but a tiny feature of one part of a much larger software program." 2009 WL 2902044, at *25. The court explained that "Outlook is an enormously complex software program comprising hundreds, if not thousands or even more, features. We find it inconceivable

to conclude, based on the present record, that the use of one small feature, the date-picker, constitutes a substantial portion of the value of Outlook." *Id.*; *see also id.* at *26 (noting that Outlook contains millions of lines of code, "only a tiny fraction of which encodes the date-picker feature"). Accordingly, the court concluded the patented software was a "minor aspect of a much larger software program," which had a negligible effect on the demand for Outlook, and any profit attributable to the patented software was deemed to be "exceedingly small." *Id.* at *26. *In short, "there was no 'evidence that anybody anywhere at any time ever bought Outlook . . . because it had a date picker.'" Id.* at *31. It was therefore erroneous for any infringement damages calculation to have been based on the entire market value of the software. *Id.*

Here, Newegg's website comprises numerous substantial features providing extensive functionality above and beyond the narrow functions encompassed by the patents in suit. The patented software methods can likewise be considered only a "minor aspect of a much larger software program," and which do not drive demand for Newegg's website. As in *Lucent Technologies*, the coding corresponding to the patented software functionality constitutes "only a tiny fraction" of the software code. Ex. C, at ¶ 164 (noting that "the patented features comprise only 3,833 (or 0.6%) of 636,808 lines of code" in Newegg's website). Most importantly, Mr. Nawrocki cites "no evidence that anybody anywhere at any time ever" shops on Newegg's websites "because" it allegedly uses the particularly claimed methods of the patents-in-suit. *Lucent Technologies,* 2009 WL 2902044, at *31. In such circumstances, under *Rite-Hite* and *Lucent Technologies,* Mr. Nawrocki's invoking the entire market value rule is clearly erroneous.

While Mr. Nawrocki claims to have "consider[ed] the contributions made by Newegg apart from the patented technology in providing its e-commerce technology platform," his analysis and explanation is to the contrary. Ex. A, at ¶ 104. Mr. Nawrocki includes no specific mention or discussion of Newegg's various and substantial contributions to its website and

online business discussed above, and stands in stark contrast to the detailed apportionment performed by Mr. Bakewell. Rather than even attempt to apportion the value of the patented technology, Mr. Nawrocki simply assumes that the patented technology must drive all of the demand for consumers to shop on Newegg's website. While Mr. Nawrocki supposedly factored Newegg's contributions into his "analysis," he admitted in his deposition that he made no attempts whatsoever to quantify the value of Newegg's contributions when arriving at his particular royalty rate of $1.20 per transaction:

> A.    I also took into consideration contributions made by Newegg, including the overall platform they have. The fact that they have, as I understand it, more than 40,000 products. They have distribution system and things such as that. So that's an important part of the process as well.
> Q    What value did you assign to that?
> A    I assigned, you know, the – considerable value to the fact that they have a structure that they have a network of providing products on. And on a specific cents-per-unit basis, I didn't have anything that identified that.
>
> . . .
>
> Q    Just so I'm clear, referencing Paragraph 104, you did not assign any specific value to these other benefits provided by Newegg?
> A.    I didn't assign a cents-per-transaction value, that's correct. But I realize there was a value to what they contributed.
> Q.    Where is that shown in the report?
> A.    The dollar amount is not. I was aware of the fact that they have contributed, through their own operations, to the value of the overall profitability.
>
> . . .
>
> Q.    Did you consider any of the other functionality provided by the Newegg site, and assign a value to that per transaction?
> A    Well, that's what we were -- I didn't assign a value, but that's what we were talking about in my prior answer.

Ex. I, at 82-85. Because Mr. Nawrocki made no attempt to quantify and apportion the value of the patented technology in light of Newegg's overall website, his opinion of an appropriate royalty rate goes far beyond the hypothetical and amounts to nothing more than "pure speculation." *Grain Processing Corp.*, 185 F.3d at 1350. Essentially, he appears to have arbitrarily picked a number somewhere between 25% and 33% of Newegg's total sales profits

per order. *See* Ex. A, at ¶ 100; Ex. I, at 153. As a matter of law, because he has not demonstrated via "sound economic proof" "supported by appropriate validation" that the patented technology drives demand for Newegg's website, nor has he sufficiently supported his supposed apportionment analysis, Mr. Nawrocki must not be permitted to testify as to his opinion of a royalty which invokes the entire market value rule. *Grain Processing Corp.*, 185 F.3d at 1350; *Rite-Hite*, 56 F.3d at 1549; *Daubert*, 509 U.S. at 590.

C.    *Summary and Effect of Entire Market Value Rule Errors*

Mr. Nawrocki first included in his royalty base the value of the products re-sold via Newegg's websites. As these products are not covered by the patents in suit, nor do they compete with or have any functional relationship to the patented technology, they may not be included in the royalty base as a matter of law. *Rite-Hite Corp.*, 56 F.3d at 1551. Mr. Nawrocki then also included in his royalty base the entire value of the online shopping experience provided by Newegg, and thus made "no allowance for the contributions made by Newegg." Ex. C, at page 75, ¶ 212. Because he did not provide any sound economic reasons to support his assertion that Soverain's patented technology drives demand for Newegg's websites, he may not include the entire value of the shopping experience in his royalty base either. *Rite-Hite Corp.*, 56 F.3d at 1549. Accordingly, Mr. Nawrocki's opinion must be excluded as a matter of law because is it founded on unreliable and legally impermissible grounds.

The practical effects of Mr. Nawrocki's errors highlight just how egregious his errors are, as his damages calculation would grossly overcompensate Soverain for the alleged infringement by Newegg. In general, Mr. Nawrocki's error stems from his failure to consider the fact that "there is no reason to believe that the parties to the hypothetical negotiation would have agreed upon a framework that permitted the licensor to benefit from economic activities that cannot be linked to the technology of the patents-in-suit." Ex. C, at page 75, ¶ 213. Mr. Nawrocki

calculates the amount of damages to be in excess of $32 Million, while even a generous apportionment of the benefits of the patented technology in suit demonstrates that Mr. Nawrocki's damages amount is <u>64 times larger</u> than a properly apportioned calculation. Ex. C, at page 66, ¶ 193. Mr. Nawrocki admitted that his $1.20 royalty amounts to nearly half of all of Newegg's operating profits. Ex. I, at 70-73 (noting that Newegg's average operating profits, which exclude its operating costs, are only about $2.93 per sales order).

Although Mr. Nawrocki apparently does not believe that he has invoked the entire market value rule in this case (*See* Ex. I, at 94-95), the facts as described above clearly indicate that he has indeed included the entire market value of Newegg's online sales in his royalty calculation.[1] In any event, Mr. Nawrocki testified that the substance of his analysis was to include the profits derived from all of Newegg's online sales of products in his calculations:

> **Q.   Do you agree that then 25 percent rule is to be used against profits attributable to the invention?**
> A.      Should be profits that are derived from use of the invention, yes.
> **Q.   But in this instance, you took 25 percent of Newegg's profits from its entire business, correct?**
> A.      From their sales of the products that were made using the infringing -- from the infringing transactions.

Ex. I, at 153-54. Whether he acknowledges it or not, Mr. Nawrocki has thus invoked the entire market value rule, and the controlling law requires that his analysis be reliable and substantiated by "sound economic proof," which is wholly absent from his report.

In situations such as this where an invocation of the entire market value rule is not based on "sound economic proof," *Grain Processing Corp.*, 185 F.3d at 1350, courts including this one have not hesitated to exclude an expert's testimony. *See, e.g., Lucent Technologies, Inc. v. Gateway, Inc.*, 2009 WL 2902044 (Fed. Cir. 2009), discussed *supra*; *Opti, Inc. v. Apple, Inc.*,

---

[1] Mr. Nawrocki testified that he did not read or consider leading authorities on the entire market value rule such as the *Rite-Hite* case or *Cornell University v. Hewlett-Packard Co.*, 2008 WL 2222189 (N.D.N.Y. 2008) (Rader, J., sitting by designation) in connection with rendering his present opinion. Ex. I, at 97-98.

No. 2:07-CV-21, slip op. at 3 (E.D. Tex. April 3, 2009) (holding that "[t]he facts of this case do not support application of the entire market value rule, as the evidence is insufficient to show that the patented invention is the basis for customer demand for the entire accused products"); *Cornell University v. Hewlett-Packard Co.*, No. 01-CV-1974, 2008 WL 2222189, at *4 (N.D.N.Y. May 27, 2008) (Rader, J., sitting by designation) ("Dr. Stewart's inability to link his opinion to the realities of this case is a prime example of "the hypothetical [ ] lapsing into pure speculation," that Federal Circuit law prohibits. *Grain Processing*, 185 F.3d at 1350. Accordingly, this court must exclude Dr. Stewart's testimony that the entire market value of Hewlett-Packard's servers and workstations should be used as the royalty base . . . .")

### III.    Mr. Nawrocki Did Not Consider the Existence of Acceptable, Non-Infringing Alternatives

A critical part of any patent infringement damages analysis must include full consideration of the existence of acceptable, non-infringing alternatives. This is because "a rational would-be infringer is likely to offer an acceptable noninfringing alternative, if available, to compete with the patent owner rather than leave the market altogether." *Grain Processing Corp. v. American Maize-Products Co.*, 185 F.3d 1341, 1351 (Fed. Cir. 1999). "The economic relationship between the patented method and non-infringing alternative methods, of necessity, would limit the hypothetical negotiation" by effectively suggesting an upper bound on the reasonable royalty amount. *Riles v. Shell Exploration and Production Co.*, 298 F.3d 1302, 1312 (Fed. Cir. 2002). From an economic perspective, if it is more cost effective for a would-be infringer to design around the patent claims or utilize an existing non-infringing alternative technology, where such alternatives are in not significantly inferior to the patented technology, then the rational thing to do would be to utilize the alternative. Ex. C, page 76, ¶ 213. Because consideration of the economic effects of such alternatives is a "necessity," it constitutes reversible error for the fact finder to hear testimony that is based on premises that did not include

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### TYLER DIVISION

| | |
|---|---|
| SOVERAIN SOFTWARE LLC, )<br><br>Plaintiff, )<br><br>v. )<br><br>CDW CORPORATION, )<br>NEWEGG INC., )<br>REDCATS USA, INC. )<br>SYSTEMAX INC., )<br>ZAPPOS.COM, INC., )<br>REDCATS USA, L.P., )<br>THE SPORTSMAN'S GUIDE, INC., )<br>AND )<br>TIGERDIRECT, INC., )<br><br>Defendants. ) | Case No. 6:07-CV-00511-LED |

### JOINT PROPOSED PRETRIAL ORDER

This cause came before the Court for a Pretrial Conference on January 21, 2010, pursuant

to the Court's First Amended Docket Control Order (Docket No. 124), Local Rule CV-16, and

Rule 16 of the Federal Rules of Civil Procedure.  Subject to the other rulings made at the Pretrial

Conference, the Court enters this Order.

## A.    COUNSEL FOR THE PARTIES

### Plaintiff:

Kenneth R. Adamo
TX State Bar No. 00846960
Lead Attorney
Email: kradamo@jonesday.com
JONES DAY
2727 North Harwood Street
Dallas, Texas 75201-1515
Telephone: 214-220-3939
Facsimile: 214-969-5100

Thomas L. Giannetti
NY Attorney Reg. No. 1632819
Email: tlgiannetti@jonesday.com
Ognian V. Shentov
NY Attorney Reg. No. 2867737
Email: ovshentov@jonesday.com
Barry R. Satine
NY Attorney Reg. No. 1450220
Email: barryrsatine@jonesday.com
JONES DAY
222 East 41st Street
New York, New York 10017-6702
Telephone: 212-326-3939
Facsimile: 212-755-7306

Jennifer Seraphine
CA Attorney Reg. No. 245463
Email: jseraphine@jonesday.com
JONES DAY
555 California Street, 26th Floor
San Francisco, CA 94104

Carl R. Roth
TX State Bar No. 17312000
Email: cr@rothfirm.com
THE ROTH LAW FIRM, P.C.
115 North Wellington, Suite 200
Marshall, Texas 75671
Telephone: 903-935-1665
Facsimile: 903-935-1797

Michael Smith
TX State Bar No. 18650410
Email: michaelsmith@siebman.com
SIEBMAN, BURG, PHILLIPS & SMITH, LLP
713 South Washington Avenue
Marshall, Texas 75670
Telephone: 903-938-8900
Facsimile: 972-767-4670

**Defendant:**

Kent E. Baldauf, Jr.
Lead Attorney
Email: kbaldaufjr@webblaw.com
David C. Hanson
Email: dhanson@webblaw.com
John W. McIlvaine
Email: jmcilvaine@webblaw.com
Daniel H. Brean
Email: dbrean@webblaw.com
THE WEBB LAW FIRM
700 Koppers Building
436 Seventh Avenue
Pittsburgh, PA 15219
Telephone: 412-471-8815
Facsimile: 412-471-4094

Richard A. Sayles
TX State Bar No. 17697500
Email: dsayles@swtriallaw.com
Mark D. Strachan
TX State Bar No. 19351500
Email: mstrachan@swtriallaw.com
SAYLES | WERBNER PC
1201 Elm Street
4400 Renaissance Tower
Dallas, Texas 75270
Telephone: 214- 939-8700
Facsimile: 214-939-8787

Trey Yarbrough
TX State Bar No. 22133500
Email: trey@yw-lawfirm.com
YARBROUGH♦WILCOX, PLLC
100 E. Ferguson St., Ste. 1015
Tyler, Texas 75702
Telephone: 903-595-3111
Facsimile: 903-595-0191

## B.    STATEMENT OF JURISDICTION

This Court has jurisdiction over the subject matter of this action because the action arises

under the patent laws of the United States of America and jurisdiction is founded on Title 28

United States Code §§ 1331 and 1388(a).  Venue is proper in this district under Title 28 United

States Code §§ 1391(c) and 1400(b).  Jurisdiction is not disputed.

## C.    NATURE OF ACTION

This is a patent infringement action in which Plaintiff Soverain Software, LLC

("Plaintiff" or "Soverain") alleges that Defendant Newegg, Inc. ("Defendant" or "Newegg")

infringes United States Patent Nos. 5,715,314 (the "'314 patent"), 5,909,492 (the "'492 patent"),

and 7,272,639 (the "'639 patent") (collectively, the "*patents-in-suit*").  Plaintiff *seeks reasonable*

royalty damages and a permanent injunction against the Defendant.  Defendant denies

infringement, and alleges that the patents-in-suit are invalid for failure to comply with one or

more of the requirements for patentability set forth in the Patent Act, 35 U.S.C. §§ 102, 103, and

112.  Defendant also contends that Plaintiff is not entitled to money damages or injunctive relief.

### D.     CONTENTIONS OF THE PARTIES

#### Plaintiff:

Plaintiff contends that Defendant directly infringes one or more claims of the '314 patent,

either literally or by the doctrine of equivalents; one or more claims of the '492 patent, either

literally or by the doctrine of equivalents; and one or more claims of the '639 patent, either

literally or by the doctrine of equivalents.

Plaintiff contends that Defendant actively induces infringement of one or more claims of

the '314 patent and one or more claims of the '492 patent.

Plaintiff contends that the patents-in-suit are valid and enforceable.

Plaintiff contends that pursuant to 35 U.S.C. § 287 Defendant was provided with actual

notice of its infringement of one or more claims of the '314 patent; one or more claims of the

'492 patent; and one or more claims of the '639 patent by the filing of this lawsuit and continued

to infringe thereafter.

Plaintiff contends that it is entitled to damages adequate to compensate for the

infringement of the '314 patent, the '492 patent, and the '639 patent, but in no event less than a

reasonable royalty for the use made of the inventions by the Defendant.

Plaintiff contends that unless enjoined, the Defendant will continue to infringe the patents-in-suit, and an injunction to prevent the Defendant's continued infringement is warranted.[1]

**Defendant:**

Defendant contends that it has not infringed any of the asserted claims of the '314, '492, or '639 patents, whether literally or under the doctrine of equivalents. Specifically, Defendant contends that its Internet sales process does not meet various limitations of the asserted claims. Additionally, it is Defendant's position that it cannot infringe the asserted patents because it does not itself satisfy each claim element, as it is the customer and not Defendant that satisfies certain claim elements.

Defendant further contends that each of the asserted claims is invalid under 35 U.S.C. § 102 as anticipated by, or under 35 U.S.C. § 103 as obvious in view of the prior art. It is Defendant's position that the patents-in-suit are directed to simply taking well known methods of selling products over prior art dial-up systems such as CompuServe and applying them to the Internet. Defendant also contends that the '639 patent is invalid over prior art patents, publications, and prior sales activity, and that the '639 patent is not entitled to the filing date of the parent '780 patent because the '780 patent fails to satisfy the written description, best mode, and enablement requirements of 35 U.S.C. § 112 to support the claims of the '639 patent.

Defendant denies that Plaintiff is entitled to money damages. To the extent that damages are awarded, Defendant submits that they cannot be based upon its total sales of products not covered by the patents-in-suit. Defendant is not a competitor of Plaintiff and Defendant is not

---

[1] Soverain reserves its right to file a post-trial brief regarding whether Soverain is entitled to a permanent injunction and with respect to post-judgment interest if Newegg is found to have infringed any of the patents-in-suit. Soverain further reserves the right to seek post-judgment royalties or other compensation for continued use of the patents by Newegg.

accused of selling infringing software. As such, Defendant contends that it would be improper to base a damage award on its sales of televisions, computers and other products not covered by the patents-in-suit. Rather, Defendant contends that any reasonable royalty damages should be based on the financial harm allegedly incurred by Plaintiff, such as the cost to license its Transact software, or based on other indications of the value of the technology at issue.

Defendant further denies that Plaintiff is entitled to injunctive relief. Defendant does not compete with Plaintiff and its alleged use of the claimed subject matter causes no harm to Defendant, financial or otherwise. Plaintiff is not irreparably harmed by Defendant's alleged infringement, and it is not in the public interest to issue an injunction.

E.    **STIPULATIONS AND UNCONTESTED FACTS**

1.    Soverain is a Delaware limited liability company with its principal place of business at 233 South Wacker Drive, Chicago, Illinois.

2.    Newegg is a Delaware corporation with its principal place of business at 16839 E. Gale Avenue, City of Industry, California.

3.    The '314 patent, entitled "Network Sales System," was issued by the United States Patent and Trademark Office on February 3, 1998.

4.    The '492 patent, entitled "Network Sales System," was issued by the United States Patent and Trademark Office on June 1, 1999.

5.    The '780 patent, entitled "Internet Server Access Control and Monitoring Systems," was issued by the United States Patent and Trademark Office on January 13, 1998.

6.   The '639 patent, entitled "Internet Server Access Control and Monitoring Systems," was issued by the United States Patent and Trademark Office on September 18, 2007.

7.   Andrew C. Payne, Lawrence C. Stewart, and G. Winfield Treese are the named inventors of the '314 patent.

8.   Andrew C. Payne, Lawrence C. Stewart, and G. Winfield Treese are the named inventors of the '492 patent.

9.   Thomas M. Levergood, Lawrence C. Stewart, Stephen J. Morris, Andrew C. Payne, and G. Winfield Treese are the named inventors of the '780 patent.

10.  Thomas M. Levergood, Lawrence C. Stewart, Stephen J. Morris, Andrew C. Payne, and G. Winfield Treese are the named inventors of the '639 patent.

11.  The asserted claims of the '314 patent are claims 35, 49, and 51.

12.  The asserted claims of the '492 patent are claims 17, 41, and 61.

13.  The asserted claims of the '639 patent are claims 60, 66, 68, and 79.

14.  Claims 35, 49, and 51 are dependent claims of claim 34 of the '314 patent.

15.  Claim 17 is an independent claim of the '492 patent.

16.  Claim 41 is a dependent claim of claim 15 of the '492 patent.

17.  Claim 61 is a dependent claim of claim 15 and claim 60 of the '492 patent.

18.  Claim 60 is a dependent claim of claim 1 of the '639 patent.

19.    Claims 66 and 68 are dependent claim of claim 1 and claim 60 of the '639 patent.

20.    Claim 79 is a dependent claim of claim 78 of the '639 patent.

21.    The damages period, if any of the claims of the patents-in-suit are found to be valid and infringed by Newegg, is from the date of the filing of this suit, November 2, 2007, to the date of trial.

22.    Newegg presently provides Internet websites accessible through the domain names newegg.com (the "Newegg Website") and newegg.ca through which it sells products to customers. Newegg also operates an Internet website accessible through the domain name neweggmall.com, whereby Newegg hosts stores of third party merchants to facilitate sales between those merchants and their third party customers.

23.    The Newegg Server System has multiple SSL servers and each SSL server processes payment information.

24.    A potential Newegg customer communicates with the Newegg Server System by using a computer with a Web browser. The customer's computer and the Newegg Server System are interconnected by the Internet.

25.    The patents-in-suit were originally assigned from the inventors to Open Market, Inc.

26.    Open Market began selling a software product named Transact in 1996.

27.    The Transact product incorporates or reflects each asserted claim of the patents-in-suit as well as additional functionality.

28.    Open Market's assets were purchased by Divine Inc. in 2001.

29.    Divine declared bankruptcy in 2003.

30.    Soverain has not licensed the Transact product to any licensees that were not first licensed by Open Market.

Stipulation Nos. 31-35 apply to what the parties call the "ASP Version" of the Newegg Website (in use until about October 2008):

31.    When a Newegg customer clicks on the "Order Status" hypertext link on the Newegg Website, the customer's computer sends an HTTP message to one of the SSL servers. This HTTP message comprises a URL.

32.    Each Newegg SSL server has been programmed to transmit an "Order Status" page in response to that HTTP message.

33.    The "Order Status" page on the Newegg Website is coded using HTML and JavaScript. The "Order Status" page includes "View" hypertext links that correspond to particular transactions. When the customer clicks such a link, the customer's computer sends an HTTP message requesting a "View Order" page identified by the link.

34.    Each of the Newegg SSL servers is programmed to respond to that HTTP message by transmitting the "View Order" page to the customer's computer over the network.

35.     Transaction information in the "View Order" page on the Newegg
Website includes a currency type used (the "$" symbol near the prices), a
transaction date, a product description, and a transaction amount.

Stipulation Nos. 36-40 apply to what the parties call the "ASPX Version" of the Newegg
Website (in use after about October 2008):

36.     When a Newegg customer clicks on the "Order History/Print Invoice"
hypertext link, the customer's computer sends an HTTP message to one of
the Newegg SSL servers. This HTTP message comprises a URL.

37.     Each Newegg SSL server has been programmed to transmit an "Order
History" page in response to this HTTP message.

38.     The "Order History" page on the Newegg Website is coded using HTML
and JavaScript. A Newegg customer can choose a range of the customer's
transactions dates displayed on the "Order History" page. The customer
can choose to display the customer's transactions for a given month on the
"Order History" page.

39.     The "Order History" page on the Newegg Website includes hypertext
links that correspond to particular transactions. When the customer clicks
such a link, the customer's computer sends an HTTP message requesting a
"Invoice Details" page identified by the link.

40.     Each of the Newegg SSL servers is programmed to respond to that HTTP
message by transmitting the "Invoice Details" page to the customer's
computer over the network. Transaction information in the "Invoice

Details" page includes a currency type used (the "$" symbol near the prices), a transaction date, a product description, and a transaction amount.

41.    Newegg advertises its newegg.com website by Sponsored Advertisements on Google and Gizmodo.

42.    Newegg advertises its neweggmall.com website.

43.    Newegg provides help files on its newegg.com website that instruct its customers how to use the website.

44.    Newegg provides help files on its neweggmall.com website that instruct its customers how to use the website.

## F.    CONTESTED ISSUES OF FACT AND LAW

**Plaintiff**:

1.    Whether Newegg infringes one or more claims of the '314 patent.

2.    Whether Newegg infringes one or more claims of the '492 patent.

3.    Whether Newegg infringes one or more claims of the '639 patent.

4.    Whether Newegg infringes a process patent if it does not perform every step of the claimed method, but it does provide direction and control of the process through software.

5.    Whether Newegg infringes a system patent if Newegg does not own or operate each component of the claimed system.

6.    Whether the effective dates of the alleged prior art relied on by Newegg are prior to the invention dates of the patent claims against which they are asserted.

7.    Whether the alleged prior inventions relied upon by Newegg as prior art are adequately corroborated.

8.    Whether Soverain is entitled to damages for Newegg's alleged infringement, and if so, how much.

9.    Whether Soverain is entitled to attorney fees under 35 U.S.C. § 285 because this is an "exceptional case."

10.    Whether Soverain is entitled to an injunction should Newegg be found to have infringed a valid and enforceable patent.

**Defendant:**

1.    Whether Newegg infringes claims 35, 49, and 51 of the '314 patent.

2.    Whether Newegg infringes claims 17, 41, and 61 of the '492 patent.

3.    Whether Newegg infringes claims 60, 66, 68, and 79 of the '639 patent.

4.    Whether Newegg itself satisfies each element of the asserted claims, or certain elements are satisfied by its customers, so that infringement would not be possible for failure to satisfy the all elements rule.

5.    Whether the all elements rule applies to system claims.

6.    Whether Newegg directs or controls its customers so that it is responsible for the customer's satisfaction of certain claim limitations.

7.    Whether claims 35, 49, and/or 51 of the '314 patent are invalid under 35 U.S.C. § 102 as being anticipated by the prior art and/or under 35 U.S.C. § 103 as being obvious over the prior art.

8.    Whether claims 17, 41, and/or 61 of the '492 patent are invalid under 35 U.S.C. § 102 as being anticipated by the prior art and/or under 35 U.S.C. § 103 as being obvious over the prior art.

9.    Whether claims 60, 66, 68, and/or 79 of the '639 patent are invalid under 35 U.S.C. § 102 as being anticipated by the prior art and/or under 35 U.S.C. § 103 as being obvious over the prior art.

10.   Whether the '639 patent is not entitled to the filing date of the '780 patent because the '780 patent fails to support the claims of the '639 patent under 35 U.S.C. § 112 for lack of written description, lack of enablement, and/or failure to set forth the best mode of practicing the invention.

11.   If patent infringement is found, the amount of money, which would be in the form of a reasonable royalty, that Plaintiff should receive from Defendant for the infringement of the '314, '492, or '639 patents.

12.   Whether Plaintiff's damage claim can be based upon Newegg's total sales of products not covered by the patents-in-suit, or based on total number of

customer transactions, where Newegg does not sell a product accused of infringement.

13.     Whether Plaintiff can establish that the patented subject matter drives the demand for the sale of Newegg's products.

14.     Whether Plaintiff is entitled to injunctive relief when Newegg is not a competitor, does not sell an infringing product, and Plaintiff has not suffered irreparable harm.

## G.   LIST OF WITNESSES

Plaintiff's Trial Witness List is attached hereto as Attachment 1. Plaintiff's Deposition Designations are due on December 11, 2009, pursuant to the Court's First Amended Docket Control Order.

Defendant's Trial Witness List is attached hereto as Attachment 2. Defendant's Deposition Designations are due on December 11, 2009, pursuant to the Court's First Amended Docket Control Order.

## H.   LIST OF EXHIBITS

The Plaintiff's and Defendant's Exhibit Lists are due on December 11, 2009, pursuant to the Court's Order Granting Joint Motion for Extension of Time for Parties to Exchange Trial Exhibits (Docket No. 285).

I.    **JOINT PROPOSED JURY INSTRUCTIONS AND VERDICT FORM**

The parties are continuing their negotiations of the Joint Proposed Jury Instructions and Verdict Form. Plaintiff's Joint Proposed Jury Instructions is attached hereto as Attachment 3. Defendant's "blackline" of Plaintiff's Joint Proposed Jury Instructions, which shows sections and text still subject to negotiation between the parties, is attached hereto as Attachment 4. Plaintiff's Verdict Form is attached hereto as Attachment 5. Defendant's "blackline" of Plaintiff's Verdict Form, which shows sections and text still subject to negotiation between the parties, is attached hereto as Attachment 6.

J.    **LIST OF ANY PENDING MOTIONS**

**Plaintiff's Motions:**

Docket No. 230: Motion for Partial Summary Judgment of Infringement of U.S. Patent No. 5,909,492

Docket No. 242: Motion To Preclude Expert Trial Testimony by Alexander Trevor, Preclude Edward Tittel from Offering Testimony Based on the Trevor Report, and Exclude the Trevor Report from Evidence

Docket No. 243: Motion To Strike Portions of Newegg's Damages Expert Report Relying on the "Design-Around" Memo, Preclude Testimony on Those Portions, and Preclude Newegg from Offering the Memo as Evidence

Docket No. 253: Daubert Motion To Exclude Expert Testimony of Edward R. Tittel

Docket No. 254: Daubert Motion To Exclude Certain Opinions of W. Christopher Bakewell

Docket No. 287: Motion in Limine to Preclude the Testimony of Alexander Trevor at

Trial

**Defendant's Motions:**

Docket No. 221: Motion for Summary Judgment That the '639 Patent Is Not Entitled To

Claim the Benefit of the Filing Date of Its Parent Application, and That the Asserted Claims of

the '639 Patent Are Therefore Invalid

Docket No. 247: Motion for Partial Summary Judgment of Invalidity of the "Shopping

Cart Claims" in U.S. Patent No. 5,715,314 and No. 5,909,492

Docket No. 248: Motion for Summary Judgment of Non-Infringement of U.S. Patent

Nos. 7,272,639, 5,715,314, and 5,909,492

Docket No. 252: Motion To Exclude the Expert Report and Testimony of James

Nawrocki

K.    **PROBABLE LENGTH OF TRIAL**

The probable length of trial is 5 days.

L.    **MANAGEMENT CONFERENCE LIMITATIONS**

Each party is limited to three (3) testifying expert witnesses.

M.    **JURY QUESTIONNAIRE**

The parties are working together to reach agreement on a Joint Proposed Jury

Questionnaire form to be submitted later to the Court.

N.    **CERTIFICATIONS**

The undersigned counsel for each of the parties in this action do hereby certify and acknowledge the following:

1. Full and complete disclosure has been made in accordance with the Federal Rules of Civil Procedure and the Court's orders;

2. Discovery limitations set forth in the Federal Rules of Civil Procedure, the Local Rules, and the Court's orders have been complied with and not altered by agreement or otherwise;

Approved as to form and substance:

/s/ Kenneth R. Adamo (by Michael C. Smith with permission)
Kenneth R. Adamo, Attorney-in-Charge for Plaintiff

/s/ Kent E. Baldauf, Jr.
Kent E. Baldauf, Jr., Attorney-in-Charge for Defendant

This Joint Pre-Trial Order is hereby approved.

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3) this the 24th day of November, 2009. Any other counsel of record will be served by facsimile transmission and/or first class mail.

/s/ *Michael C. Smith*
Michael C. Smith

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | |
|---|---|
| SOVERAIN SOFTWARE LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Case No. 6:07-CV-00511-LED |
| | ) |
| CDW CORPORATION, | ) |
| NEWEGG INC., | ) |
| REDCATS USA, INC. | ) |
| SYSTEMAX INC., | ) |
| ZAPPOS.COM, INC., | ) |
| REDCATS USA, L.P., | ) |
| THE SPORTSMAN'S GUIDE, INC., | ) |
| AND | ) |
| TIGERDIRECT, INC., | ) |
| | ) |
| Defendants. | ) |

PLAINTIFF'S TRIAL WITNESS LIST

Plaintiff, Soverain Software, LLC, pursuant to the Court's Docket Control Order entered

in this case, files this Trial Witness List for identification and categorization of trial witnesses.

At this time, Plaintiff identifies the following witnesses for trial:

| | WITNESS | (A) WILL CALL | (B) MAY CALL | (C) MAY, BUT PROBABLY WILL NOT CALL |
|---|---|---|---|---|
| 1. | Lee Cheng | | | ✓ |
| 2. | Shikhar Ghosh | | | ✓ |
| 3. | Jack Grimes | ✓ | | |
| 4. | Lucy Huo | | | ✓ |
| 5. | Thomas Levergood | | | ✓ |
| 6. | James Nawrocki | ✓ | | |
| 7. | Andrew Payne | | ✓ | |
| 8. | Richard Quiroga | | | ✓ |
| 9. | Michael Shamos | ✓ | | |
| 10. | Lawrence Stewart | | ✓ | |

| 11. | G. Winfield Treese | ✓ | | |
| 12. | Katharine Wolanyk | ✓ | | |
| 13. | James Wu | | ✓ | |

A7948

## ATTACHMENT 2

Defendant's Witness List

Defendant expects the following witnesses to testify at trial.

1.   Lee Cheng
     General Counsel
     Newegg Inc.
     c/o Defendant's Counsel

2.   Rick Quiroga
     Chief Financial Officer
     Newegg Inc.
     c/o Defendant's Counsel

3.   James Wu
     Newegg Inc.
     c/o Defendant's Counsel

4.   Alexander Trevor
     President
     Nuvocom Inc.
     c/o Defendant's Counsel

5.   Edward Tittel
     c/o Defendant's Counsel

6.   Chris Bakewell
     Duff and Phelps
     c/o Defendant's Counsel

Defendant may call the following witnesses to testify at trial, either live or via deposition.

7.   Lawrence Stewart

8.   Andrew Payne

9.   Thomas Levergood

10.  G. Winfield Treese

11.  Katharine Wolanyk

Defendant may enter into evidence the testimony of the following witnesses via deposition.

12.    Shikhar Ghosh

13.    Eric Pyenson

14.    Paul Esdale

## ATTACHMENT 3—PLAINTIFF'S SUBMISSION

### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF TEXAS
### TYLER DIVISION

| | | |
|---|---|---|
| SOVERAIN SOFTWARE LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 6:07-CV-00511-LED |
| | ) | |
| CDW CORPORATION, | ) | |
| NEWEGG INC., | ) | |
| REDCATS USA, INC. | ) | |
| SYSTEMAX INC., | ) | |
| ZAPPOS.COM, INC., | ) | |
| REDCATS USA, L.P., | ) | |
| THE SPORTSMAN'S GUIDE, INC., | ) | |
| AND | ) | |
| TIGERDIRECT, INC., | ) | |
| | ) | |
| Defendants. | ) | |

### PLAINTIFF'S SUBMISSION OF JOINT PROPOSED CHARGE OF THE COURT[1]

MEMBERS OF THE JURY:

You have heard the evidence in this case. I will now instruct you on the law that you must apply. It is your duty to follow the law as I give it to you. On the other hand, you the jury are the judges of the facts. Do not consider any statement that I have made during the trial or make in these instructions as an indication that I have any opinion about the facts of this case.

After I instruct you on the law, the attorneys will have an opportunity to make their closing arguments. Statements and arguments of the attorneys are not evidence and are not

---

[1] Sources: Court's Charge in *i4i Ltd. P'ship v. Microsoft Corp.*, No. 6:07-CV-113, at 1 (E.D. Tex. 2009); Final Jury Instructions in *Mass Engineered Design, Inc. v. Ergotron, Inc.*, No. 2:06-CV-272, at 1 (E.D. Tex. 2009); Court's Charge in *Orion IP, LLC v. Hyundai Motor Am.*, No. 6:05-CV-322, at 1 (E.D. Tex. 2008); Court's Charge in *Forgent Networks, Inc. v. EchoStar Techs. Corp.*, No. 6:06-CV-208, at 1 (E.D. Tex. 2006); Court's Charge in *z4 Techs., Inc. v. Microsoft Corp.*, No. 6:06-CV-142, at 1 (E.D. Tex. 2006); J. Davis Model Instructions, at 1.

instructions on the law. They are intended only to assist the jury in understanding the evidence and the parties' contentions.

## 1. GENERAL INSTRUCTIONS[2]

A verdict form has been prepared for you. You will take this form to the jury room and when you have reached unanimous agreement as to your verdict, you will have your foreperson fill in, date and sign the form. Answer each question on the verdict form from the facts as you find them. Do not decide who you think should win and then answer the questions accordingly. Your answers and your verdict must be unanimous.

In determining whether any fact has been proved in this case, you may, unless otherwise instructed, consider the testimony of all witnesses, regardless of who may have called them, and all exhibits received in evidence, regardless of who may have produced them.

### 1.1    Considering Witness Testimony[3]

By the Court allowing testimony or other evidence to be introduced over the objection of an attorney, the Court did not indicate any opinion as to the weight or effect of such evidence. As stated before, you the jurors are the sole judges of the credibility of all witnesses and the weight and effect of all evidence.

When the Court sustained an objection to a question addressed to a witness, the jury must disregard the question entirely, and may draw no inference from the wording of it or speculate as to what the witness would have testified to, if he or she had been permitted to answer the question.

---

[2] Sources: Court's Charge in *i4i*, at 1-2; Court's Charge in *z4 Techs.*, at 1-2; Final Jury Instructions in *Mass Engineered*, at 1-2; Court's Charge in *Orion*, at 1-2; Court's Charge in *Forgent*, at 1-2; J. Davis Model Instructions, at 1; Uniform Jury Instructions for Patent Cases in the United States District Court for the District of Delaware, March 1993.

[3] Sources: Court's Charge in *i4i*, at 2-3; Final Jury Instructions in *Mass Engineered*, at 2-3; Court's Charge in *Orion*, at 2-3; Court's Charge in *Forgent*, at 2-3; Court's Charge in *z4 Techs.*, at 2-3; J. Davis Model Instructions, at 1-2.

At times during the trial it was necessary for the Court to talk with the lawyers here at the

bench out of your hearing, or by calling a recess. We met because often during a trial something

comes up that does not involve the jury. You should not speculate on what was discussed during

such times.

In determining the weight to give to the testimony of a witness, you should ask yourself

whether there was evidence tending to prove that the witness testified falsely concerning some

important fact, or whether there was evidence that at some other time the witness said or did

something, or failed to say or do something, that was different from the testimony the witness

gave before you during the trial.

You should keep in mind, of course, that a simple mistake by a witness does not

necessarily mean that the witness was not telling the truth as he or she remembers it, because

people may forget some things or remember other things inaccurately. So, if a witness has made

a misstatement, you need to consider whether that misstatement was an intentional falsehood or

simply an innocent lapse of memory; and the significance of that may depend on whether it has

to do with an important fact or with only an unimportant detail.

## 1.2     How to Examine the Evidence[4]

Certain testimony in this case has been presented to you through a deposition. A

deposition is the sworn, recorded answers to questions asked a witness in advance of the trial.

Under some circumstances, if a witness cannot be present to testify from the witness stand, the

witness's testimony may be presented, under oath, in the form of a deposition. Some time before

this trial, attorneys representing the parties in this case questioned this witness under oath. A

---

[4] Sources: Court's Charge in *i4i*, at 3-4; Final Jury Instructions in *Mass Engineered*, at 3-4; Court's Charge in *Orion*, at 3-4; Court's Charge in *Forgent*, at 3-4; Court's Charge in *z4 Techs*, at 3-4; J. Davis Model Instructions, at 2-3.

court reporter was present and recorded the testimony. This deposition testimony is entitled to the same consideration and is to be judged by you as to credibility and weighed and otherwise considered by you insofar as possible, the same as if the witness had been present and had testified from the witness stand in court.

While you should consider only the evidence in this case, you are permitted to draw such reasonable inferences from the testimony and exhibits as you feel are justified in the light of common experience. In other words, you may make deductions and reach conclusions that reason and common sense lead you to draw from the facts that have been established by the testimony and evidence in the case.

The testimony of a single witness may be sufficient to prove any fact, even if a greater number of witnesses may have testified to the contrary, if after considering all the other evidence you believe that single witness.

There are two types of evidence that you may consider in properly finding the truth as to the facts in the case. One is direct evidence – such as testimony of an eyewitness. The other is indirect or circumstantial evidence – the proof of a chain of circumstances that indicates the existence or nonexistence of certain other facts. As a general rule, the law makes no distinction between direct and circumstantial evidence, but simply requires that you find the facts from a preponderance of all the evidence, both direct and circumstantial.

## 1.3    Expert Witnesses[5]

When knowledge of a technical subject matter may be helpful to the jury, a person who has special training or experience in that technical field – called an expert witness – is permitted

---

[5] Sources: Court's Charge in *i4i*, at 4 ; Final Jury Instructions in *Mass Engineered,* at 4-5; Court's Charge in *Orion*, at 4; Court's Charge in *Forgent*, at 4; Court's Charge in *z4 Techs*, at 4; J. Davis Model Instructions, at 3-4.

to state his or her opinion on those technical matters. However, you are not required to accept

that opinion. As with any other witness, it is up to you to decide whether to rely upon it.

In deciding whether to accept or rely upon the opinion of an expert witness, you may

consider any bias of the witness, including any bias you may infer from evidence that the expert

witness has been or will be paid for reviewing the case and testifying, or from evidence that he or

she testifies regularly as an expert witness and that income from such testimony represents a

significant portion of the expert's income.

## 2. STIPULATIONS

The parties have agreed, or stipulated to the following facts. This means that both sides

agree that these are facts. You must therefore treat these facts as having been proved.[6]

**[INSERTION OF JPTO STIPULATED FACTS]**

## 3. SUMMARY OF CONTENTIONS

I will first give you a summary of each side's contentions in this case. I will then tell you

what each side must prove to win on these issues.[7]

### 3.1    Soverain's Contentions:

In this case, the plaintiff, Soverain, contends that the defendant, Newegg, uses technology

for its websites that infringes claims 35, 49, and 51 of the '314 patent; claims 17, 41, and 61 of

the '492 patent; and claims 60, 66, 68, and 79 of the '639 patent. Soverain asks you to award

damages for the infringement.

---

[6] Sources: Court's Charge in *Orion*, at 4; Court's Charge in *Forgent*, at 4; Court's Charge in *z4 Techs.*, at 4; J. Davis Model Instructions, at 4.

[7] Sources: Court's Charge in *i4i*, at 4; Final Jury Instructions in *Mass Engineered*, at 5; Court's Charge in *Orion*, at 5; Court's Charge in *z4 Techs.*, at 5; J. Davis Model Instructions, at 5.

**3.2     Newegg's Contentions:**

Newegg contends that it does not infringe Soverain's patents and that Soverain's patents are invalid.

**3.3     Burdens of Proof[8]**

Soverain has the burden of proving infringement by a preponderance of the evidence. "Preponderance of the evidence" means evidence that persuades you that a claim is more likely true than not true. In determining whether any fact has been proved by a preponderance of the evidence, you may, unless otherwise instructed, consider the stipulations, the testimony of all witnesses regardless of who may have called them, and all exhibits received in evidence regardless of who may have produced them. It will be your job to determine whether Soverain has met its burden of proving that infringement of the asserted patent claims is more likely true than not true.

Newegg bears the burden of proving invalidity by clear and convincing evidence. Clear and convincing evidence is evidence that produces an abiding conviction that the truth of a factual contention is highly probable.[9] Proof by clear and convincing evidence is a greater burden of proof than proof by a preponderance of the evidence. In determining whether any fact has been shown by clear and convincing evidence, you may, unless otherwise instructed, consider the stipulations, the testimony of all witnesses regardless of who may have called them, and all exhibits received in evidence regardless of who may have produced them. It will be your

---

[8] Sources: Court's Charge in *i4i*, at 5-6; Final Jury Instructions in *Mass Engineered*, at 5-6; Court's Charge in *z4 Techs.*, at 5-6; J. Davis Model Instructions, at 5-6.

[9] Sources: *Buildex Inc. v. Kason Indus., Inc.*, 849 F.2d 1461, 1463 (Fed. Cir. 1988) (explaining that clear and convincing evidence is evidence that gives the trier of fact "an abiding conviction that the truth of [the] factual contentions [is] 'highly probably'") (quoting *Colorado v. New Mexico*, 467 U.S. 310, 316 (1984)); *see also Neutrino Dev. Corp. v. Sonosite, Inc.*, 337 F. Supp. 2d 942, 946 (S.D. Tex. 2004) (applying clear and convincing standard from *Colorado v. New Mexico* in context of invalidity).

job to determine whether Newegg has met its burden of proving the invalidity of the '314, '492, and '639 patent claims.

## 3.4    Glossary of Patent Terms[10]

The following are definitions for patent terms that you should use in this case.

Application – The initial papers filed by the applicant in the United States Patent and Trademark Office (also called the "Patent Office" or "PTO").

Claims – Claims are the numbered sentences appearing at the end of the patent and define the invention. The words of the claims define the scope of the patent owner's exclusive rights during the life of the patent.

Comprising – The beginning, or preamble, portion of each of the asserted independent claims uses the word "comprising." "Comprising" means "including" or "containing." A claim that uses the word "comprising" is not limited to systems or methods having only the elements that are recited in the claim elements, but also covers systems or methods that have all of the elements and add additional elements without changing the required elements. Take as an example a claim that covers a table. If the claim recites a table "comprising" a tabletop, legs and glue, the claim will cover any table that contains these structures, even if the table also contains other structures, such as a leaf or wheels on the legs. However, if a table contains a tabletop, legs, but no glue, then the claim does not cover the table.

Continuation – A continuation application is a second application for the same invention claimed in a prior patent application and filed before the first application becomes patented.[11]

File Wrapper – See "Prosecution History" below.

---

[10] Sources: *i4i*, Appendix B at 34-35; Final Jury Instructions in *Mass Engineered*, at 6-9; Court's Charge in *Orion*, at 6-8; Court's Charge in *Forgent*, at 7-9; Court's Charge in *z4 Techs.*, at 6-8; J. Davis Model Instructions, at 6-8.

[11] Source: U.S. Patent and Trademark Office, *Glossary*, http://www.uspto.gov/main/glossary. (modified)

License – Permission to use the patented invention, which may be granted by a patent owner (or a prior licensee) in exchange for a fee called a "royalty" or other consideration.

Office Action – Communication from the patent examiner regarding the specification of the patent application and/or the claims pending in the patent application.

Ordinary Skill in the Art – From time to time in these instructions I will refer to a hypothetical person of "ordinary skill in the art" or a "person of ordinary skill in the field." This hypothetical person is presumed to be aware of all of the prior art and knowledge that existed in the field during the relevant time period. The skill of the actual inventor and experts is irrelevant, because they may possess something that distinguishes them from workers of ordinary skill in the art. Factors to consider in determining the level of ordinary skill in the art include the educational level and experience of people working in the art, the types of problems faced by workers in the art and the solutions found to those problems, and the sophistication of the technology in the field.

Parent Application – The term "parent" is applied to an earlier application of the inventor disclosing an invention.[12]

Patent Examiners – Personnel employed by the Patent Office who review (or examine) patent applications, each in a specific technical area, to determine whether the claims of a patent application are patentable and whether the disclosure adequately describes the invention.

Prior Art – Knowledge that is available to the public either prior to the invention by applicant or more than a year prior to the effective filing date of his/her patent application.

Prosecution History – The written record of proceedings in the Patent Office between the applicant and the Patent Office. It includes the original patent application and later

---

[12] Id.

communications between the Patent Office and the applicant. The prosecution history may also be referred to as the "File wrapper" of the patent during the course of this trial.

Reexamination – At any time during the enforceability of a patent any person may file a request for the Patent Office to conduct a second examination (the reexamination) of any claim of the patent on the basis of prior art patents or printed publications which that person states to be pertinent and applicable to the patent.[13]

References – Any item of prior art used to determine patentability.

Said – The patent claims use the word "said" instead of "the." Use of the word "said" in the beginning of a phrase indicates that it is referring to a previous use of the same or a similar phrase.

Specification – The specification is the information that appears in the patent and concludes with one or more claims. The specification includes the written text, the claims, and the drawings. In the specification, the inventor sets forth a description telling what the invention is, how it works, and how to make and use it so as to enable others skilled in the art to do so.

## 4. CLAIMS OF THE PATENTS IN SUIT[14]

As I told you at the beginning of the trial, the claims of a patent are the numbered sentences at the end of the patent. The claims describe the invention made by the inventor and describe what the patent owner owns and what the patent owner may prevent others from doing. Claims may describe products, such as machines or chemical compounds, or processes for making or using a product. Claims are usually divided into parts or steps, called "elements" or "limitations." For example, a claim that covers the invention of a table may recite the tabletop,

---

[13] *Id.* (modified)

[14] Sources: Court's Charge in *i4i*, at 6; Final Jury Instructions in *Mass Engineered*, at 9; Court's Charge in *Orion*, at 8-9; Court's Charge in *z4 Techs.*, at 8-9; J. Davis Model Instructions, at 8.

four legs and the glue that secures the legs on the tabletop. The tabletop, legs and glue are each a separate element of the claim.

## 4.1    Construction of the Claims[15]

In deciding whether or not the accused technology infringes a patent, the first step is to understand the meaning of the words used in the patent claims. It is my job as Judge to determine what the patent claims mean and to instruct you about that meaning. You must accept the meanings I give you and use those meanings when you decide whether or not the patent claims are infringed, and whether or not it is invalid.

Before I instruct you about the meaning of the words of the claims, I will explain to you the different types of claims that are at issue in this case. It may be helpful to refer to the copies of the '314, '492 and '639 patents that you have been given as I discuss the claims at issue here.

## 4.2    *Independent and Dependent Claims*[16]

Patent claims may exist in two forms, referred to as independent claims and dependent claims. An independent claim does not refer to any other claim of the patent. Thus, it is not necessary to look at any other claim to determine what an independent claim covers. Claim 17 of the '492 patent is an independent claim.

A dependent claim refers to at least one other claim in the patent. A dependent claim includes each of the elements of the other claim to which it refers, as well as the additional elements recited in the dependent claim itself. In this way, the claim "depends" on another claim.

---

[15] Sources: Court's Charge in *i4i*, at 7; Final Jury Instructions in *Mass Engineered*, at 9-10; Court's Charge in *Orion*, at 9-10; Court's Charge in *Forgent*, at 9-10; Court's Charge in *z4 Techs*, at 9; J. Davis Model Instructions, at 8.

[16] Sources: Court's Charge in *i4i*, at 6-7; Court's Charge in *Forgent*, at 10; J. Davis Model Instructions, at 8-9.

Therefore, to determine what a dependent claim covers, it is necessary to look both at the dependent claim and the other claim or claims to which it refers.

Claims 35, 49, and 51 of the '314 patent are dependent claims of independent claim 34. For example, if claim 34 of the '314 patent is not infringed, then claim 35 of the '314 patent cannot be infringed. Similarly, if claim 34 of the '314 patent is not anticipated or obvious, then claim 35 of the '314 patent cannot be anticipated or obvious.

## 4.3    Interpretation of Claims[17]

In deciding whether or not the accused technology infringes a patent, the first step is to understand the meaning of the words used in the patent claims.

As I stated earlier, it is my job as Judge to determine what the patent claims mean and to instruct you about that meaning. In accordance with that duty, I have interpreted the meaning of some of the language in the patent claims involved in this case. My interpretation of those claims appears in Section 4.4. Within the text of the claims of each patent-in-suit, I have bolded and underlined the terms which I have defined for you. You must accept the interpretations contained in Section 4.4 as correct. The claim language I have not interpreted for you in Section 4.4 is to be given its ordinary and accustomed meaning as understood by one of ordinary skill in the field of technology.

## 4.4    Court's Construction of Claim Terms[18]

The meaning of some of the words used in the patent claims at issue which the Court interpreted are as follows:

---

[17] Sources: Court's Charge in *i4i*, at 7; Final Jury Instructions in *Mass Engineered*, at 9-10; Court's Charge in *Orion*, at 10; Court's Charge in *Forgent*, at 9-10; Court's Charge in *z4 Techs.*, at 9-10; J. Davis Model Instructions, at 9-10.

[18] Sources: Court's Charge in *Orion*, at 10-11; Court's Charge in *z4 Techs.*, at 10-11.

### 4.4.1   The '314 Patent and the '492 Patent Claim Terms

[A] Shopping Cart URL – A URL concerning a shopping cart.

A statement URL – A URL concerning a statement.

[Add a] plurality of respective products to a shopping cart – [Add] identifiers of respective products to an instance of a shopping cart.

[Add] . . . plurality of products to . . . shopping cart – [Add] identifiers of products to an instance of a shopping cart.

Hypertext link – A non-sequential web association which the user can use to navigate through related topics.

Message – A unit of information sent electronically.

Payment message – A message relating to a payment for one or more products.

Plurality of products added to . . . shopping cart – Product identifiers which are added to an instance of a shopping cart in the shopping cart database.

Shopping cart – A stored representation of a collection of products.

Shopping cart computer – A computer processing data associated with one or more shopping carts.

Shopping cart database – A database of stored representations of collections of products, where "database" means a collection of logically related data stored together in one or more computerized files.

Shopping cart message – A message concerning a shopping cart.

To cause said[/the/a] payment message to be activated to initiate a payment transaction – To cause an action associated with said[/the/a] payment message to initiate a payment transaction.

### 4.4.2   The '639 Patent Claim Terms

A purchase request / a request to purchase – One or more messages requesting a purchase.

An identifier of a purchaser – A text string that identifies a purchaser.

Charging the user . . . according to the user information – Charging an account associated with the user according to the user information.

Controlled document – A document that can be accessed when one or more conditions are met.

Creating, responsive to the initial service request, the session identifier – Producing, in response to the initial service request, the session identifier.

Durable product – Physical product.

Forwarding . . . from the client to the server system – Sending . . . from the client to the server system.

Fulfilling the purchase request based on the user information – Carrying out the purchase request based on the user information.

Hyperlink – A non-sequential web association which the user can use to navigate through related topics.

Initial service request – The first service request in a session.

Returning – Sending back.

Service request – A solicitation of services from a client to a server.  A service request may entail the exchange of any number of messages between the client and the server.

Session – A series of requests and responses to perform a complete task or set of tasks between a client and a server system.

Session identifier – A text string that identifies a session.

User identifier – A text string that identifies a user.

Validating, at the server system, the appended session identifier / validating the session identifier appended to the service request – At the server system, determining the validity of the appended session identifier."

## 5. INFRINGEMENT[19]

In this case, Soverain asserts that Newegg has infringed the patents-in-suit. Any person or business entity that, without the patent owner's permission, makes, uses, offers for sale, or sells within the United States any product, system, or method that is covered by at least one claim of a patent, before the patent expires, infringes the patent. Soverain has the burden of proving infringement by a preponderance of the evidence.

A person can infringe a patent without knowing that what it is doing is an infringement of the patent. It may also infringe even though in good faith it believes that what it is doing is not an infringement of any patent.

A patent owner has the right to stop others from using the invention covered by the patent claims during the life of the patent. If any person makes, use, sells or offers to sell what is covered by the patent claims without the patent owner's permission, that person is said to infringe the patent. This type of infringement is called "direct infringement."

Only the claims of a patent can be infringed. You must compare each of the asserted patent claims, as I have defined them, to the accused technology used by Newegg's websites, and determine whether or not there is infringement. You should not compare the accused technology used by Newegg's websites with any specific example set out in the patents. The only correct comparison is with the language of the claim itself, with the meanings I have given you.

---

[19] Sources: Court's Charge in *i4i,* at 8-9; Final Jury Instructions in *Mass Engineered,* at 11-13; Court's Charge in *Orion,* at 11-12; Court's Charge in *z4 Techs.,* at 11-12; J. Davis Model Instructions, at 10.

In this case, there are two possible ways that a claim may be infringed. I will explain the requirements for each of these two types of infringement to you. The two types of infringement are called: (1) direct infringement, and (2) active inducement.

In this case, Soverain has alleged that Newegg directly infringes the '314, '492, and '639 patents. In addition, Soverain has alleged that customers of Newegg directly infringe the patents, and that Newegg is liable for actively inducing that direct infringement by those customers.

In order to prove infringement, Soverain must prove that the requirements for one or more of these types of infringement are met by a preponderance of the evidence, i.e., that it is more likely than not that all of the requirements of one or more of each of these types of infringement have been proved.

You must consider each claim individually and must reach your decision as to each assertion of infringement based on my instructions about the meaning and scope of the claims, the legal requirements for infringement, and the evidence present to you by the parties.

Whether or not Newegg knew that what it was doing was an infringement does not matter. A person may be found to be a direct infringer of a patent even if he or she believed in good faith that what he or she was doing was not an infringement of any patent, and even if he or she was not even aware of the patent's existence. Infringement does not require proof that the person copied the patent.

I will now explain each of the types of infringement in more detail.

## 5.1    Direct Infringement[20]

In order to prove direct infringement, a claim element may be met in one of two ways: either literally or under the doctrine of equivalents.

---

[20] Sources: Court's Charge in *i4i*, at 10-11; Final Jury Instructions in *Mass Engineered*, at 13-14.

To determine direct infringement, you must compare Newegg's accused technology with each of the claims of the patents-in-suit, using my instructions as to the meaning of the patent claims.

Direct infringement of a method claim requires a party to perform or use each and every step of a claimed method, literally or under the doctrine of equivalents. Where no one party performs all of the steps of a claimed method but multiple parties combine to perform every step of the method, that claim will nevertheless be directly infringed if one party exercises control or direction over the entire method so that every step is attributable to the controlling party. Mere arms-length cooperation between the parties is not enough to establish direct infringement. Soverain must prove that it is more likely true than not that Newegg directly infringed the patent claim.[21]

### 5.1.1   Literal Infringement[22]

To determine literal infringement, you must compare the technology of the accused websites with each claim that Soverain asserts is infringed, using my instructions as to the meaning of the patent claims.

A patent claim is literally infringed only if Newegg's technology includes each and every element or limitation in that patent claim. If Newegg's technology does not contain one or more of the elements recited in a claim, Newegg does not literally infringe that claim. If you find that Newegg's technology includes each element or limitation of the claim, then Newegg infringes the claim even if the product contains additional elements or limitations that are not recited in the claim.

---

[21] Sources: The National Jury Instruction Project's Model Patent Jury Instructions, at 3.13 (2009) (citing *Muniauction Inc. v. Thomson Corp.*, 532 F.3d 1318, 1329-30 (Fed. Cir. 2008); *BMC Resources Inc. v. Paymentech LP*, 498 F.3d 1373, 1378-81 (Fed. Cir. 2007)).

[22] Sources: Court's Charge in *Orion*, at 12-13; J. Davis Model Instructions, at 10-11.

You must consider each of the asserted claims of the patents-in-suit individually, and decide whether Newegg's technology infringes that claim. You must be certain to compare Newegg's accused technology with each claim that it is alleged to infringe. It should be compared to the elements recited in the patent claim, not to Soverain's preferred or commercial embodiment of the claimed invention.

Taking each claim of the patents separately, if you find that Soverain has proved by a preponderance of the evidence that each and every element of that claim is met by Newegg's technology, then you must find that Newegg literally infringes that claim.

### 5.1.2   Doctrine of Equivalents[23]

If Newegg uses a technology that does not meet all the elements of the claim, there can still be direct infringement if the technology satisfies the claim "under the doctrine of equivalents."

A claim element is present in the use of the accused technology under the doctrine of equivalents if the differences between the claim element and a comparable element of the accused technology are insubstantial.

One way to determine this is to look at whether the use of the accused product performs substantially the same function in substantially the same way to achieve substantially the same result as the claimed invention.

You may also consider whether, at the time of the alleged infringement, a person having ordinary skill in the field of the technology of the patent would have known of the interchangeability of the alternative feature and the unmet element of the claim.

---

[23] Source: Court's Charge in *i4i,* at 9-10.

Interchangeability at the present time is not sufficient in order for the structures to be considered to be interchangeable; rather, the interchangeability of the two structures must have been known to person of ordinary skill in the field of technology at the time the infringement began.

Thus, the inventor need not have foreseen and the patent need not describe all potential equivalents to the invention covered by the claims. Also, slight changes in technique or improvements made possible by technology developed after the patent application is filed may still be considered equivalent for the purposes of the doctrine of equivalents.

## 5.2    Active Inducement of Infringement[24]

Soverain alleges that Newegg is also liable for infringement by actively inducing others to directly infringe claims 35, 49, and 51 of the '314 patent and claims 17, 41, and 61 of the '492 patent. As with direct infringement, you must determine whether there has been active inducement on a claim-by-claim basis.

A person is liable for active inducement of a claim only if:

(1)    the person takes action during the time the patent is in force which encourages acts by someone else; and

(2)    the encouraged acts constitute direct infringement of that claim; and

(3)    the person is aware of the patent, and know or should have known that the encouraged acts constitute infringement of that patent; and

(4)    the person has an intent to cause the encouraged acts; and

(5)    the encouraged acts are actually carried out by someone else.

In order to prove active inducement, Soverain must prove that each of these requirements is met. Proof of each requirement must be by a preponderance of the evidence, i.e., that it is more likely than not that each of the above requirements has been met.

---

[24] Sources: Court's Charge in *i4i,* at 11-12; Final Jury Instructions in *Mass Engineered,* at 16-17 .

In considering whether Newegg has induced infringement by others, you may consider all the circumstances, including whether or not Newegg obtained the advice of a competent lawyer. You may not assume that merely because Newegg did not obtain an opinion of counsel, the opinion would have been unfavorable.

Intent to cause the acts that constitute direct infringement may be demonstrated by evidence of active steps taken to encourage direct infringement, such as advertising an infringing use or instructing how to engage in an infringing use. In order to establish active inducement of infringement, it is not sufficient that Newegg was aware of the act(s) that allegedly constitute the direct infringement. Rather, you must find specifically that Newegg intended to cause the acts that constitute the direct infringement and must have known or should have known that its action would cause the direct infringement. If you do not find that Newegg specifically meets these intent requirements, then you must find that Newegg has not actively induced the alleged infringement.

## 6. INVALIDITY[25]

For a patent to be valid, the invention claimed in the patent must be new, useful, and non-obvious. The terms "new," "useful," and "non-obvious" have special meanings under the patent laws. I will explain these terms to you as we discuss Newegg's grounds for asserting invalidity.

The invention claimed in a patent must also be adequately described. In return for the right to exclude others from making, using, selling or offering for sale the claimed invention, the

---

[25] Sources: Court's Charge *i4i*, at 15; Final Jury Instructions in *Mass Engineered*, at 21; Court's Charge in *Orion*, at 14-15; Court's Charge in *Forgent*, at 12; Court's Charge in *z4 Techs.*, at 15; J. Davis Model Instructions, at 13.

patent owner must provide the public with a complete description in the patent of the invention and how to make and use it.

Newegg has challenged the validity of the '314, '492, and '639 patent claims on a number of grounds. Newegg must prove that a patent claim is invalid by clear and convincing evidence. An issued patent is accorded a presumption of validity based on the presumption that the United States Patent and Trademark Office acted correctly in issuing a patent.

I will now explain to you each of Newegg's grounds for invalidity in detail. In making your determination as to invalidity, you should consider each claim separately.

**6.1     Section 112  [To be added as necessary]**

**6.2     Anticipation for Lack of Novelty[26]**

A patent claim is invalid if the claimed invention is not new. For a claimed invention to be invalid on the basis of anticipation because it is not new, all of its elements must be in a single previous device or method, or described in a single previous publication or patent. We call those things "prior art references." Newegg must prove by clear and convincing evidence that these items are prior art. The description in a reference does not have to be in the same words as the claim, but all the elements of the claim must be there, either stated expressly or necessarily implied or inherent in the level of ordinary skill in the field of technology of the patent at the time of the invention, so that someone of ordinary skill in the field of technology of the patent looking at that one reference would be able to make and use the claimed invention. Something is inherent in an item of prior art if it is always present in the prior art or always results from the practice of the prior art, and if a skilled person would understand that to be the case. Inherency

---

[26] Sources: 35 U.S.C. § 102; Court's Charge *i4i*, at 15-18; Final Jury Instructions in *Mass Engineered*, at 22; Court's Charge in *Orion*, at 18-21; Court's Charge in *Forgent*, at 16-17; J. Davis Model Instructions, at 13-15.

may not be established by probabilities or possibilities. The mere fact that a certain thing may coincidentally result from a given set of circumstances is not sufficient. A party claiming anticipation by inherency must show that the elements of the claim are always present in the prior art or always result from the practice of the prior art. You may not combine two or more items of prior art to prove anticipation.

Before explaining the different ways in which Newegg can show that the inventions are not new, there are two basic concepts that underlie your decision on this question.

First I will address the concept of conception. Conception is the mental part of a inventive act, i.e., the formation in the mind of the inventor of a definite and permanent idea of the complete and operative invention as it is thereafter to be applied in practice. Conception of an invention is complete when the idea is so clearly defined in the inventor's mind that a person of ordinary skill in the field of technology would be able to reduce the invention to practice without extensive research or experimentation. Conception may be proven when the invention is shown in its complete form by drawings, disclosure to another person, or other forms of evidence presented at trial.

Second, a claimed invention is reduced to practice when it has been tested sufficiently to show that it will work for its intended purpose. An invention may be reduced to practice even if the inventor has not made or tested a prototype of the invention. The invention may be reduced to practice by being fully described in a filed patent application.

Here is a list of ways Newegg can show that a claim of the patents-in-suit was not new:

(1)    If the claimed invention was patented or described in a printed publication, anywhere in the world, before the invention was made by the inventors; or

(2)    If the claimed invention was known or used by others in the United States before the invention was made by the inventors.

A printed publication or patent will not be an anticipating prior art reference unless it contains a description of the invention covered by the patent claims that is sufficiently detailed to teach a skilled person how to make and use the invention without undue experimentation. Factors to be considered in determining whether a disclosure would require undue experimentation include:

(1)    the quantity of experimentation necessary;

(2)    the amount of direction or guidance disclosed in the patent or publication;

(3)    the presence or absence of working examples in the patent or publication;

(4)    the nature of the invention;

(5)    the state of the prior art;

(6)    the relative skill of those in the field of the technology;

(7)    the predictability of the art; and

(8)    the breadth of the claims.

A prior public use by another may anticipate a patent claim, even if the use was accidental or was not appreciated by the other person. Thus, a prior public use may anticipate an invention even if the user did not intend to use the invention, or even realize he or she had done so. Newegg must prove anticipation for lack of novelty by clear and convincing evidence.

### 6.2.2  Anticipation by a Printed Publication[27]

Newegg contends that various claims of the patents-in-suit are invalid because they were anticipated by a printed publication. A patent claim is invalid if the invention defined by that claim was described in a printed publication before it was invented by the patent applicant, or

---

[27] Sources: Court's Charge in *i4i*, at 18-19; Court's Charge in *Orion*, at 18; J. Davis Model Instructions, at 15.

more than one year prior to the filing date of the United States patent application. Printed publications may include issued patents.

The disclosure must be complete enough to enable one of ordinary skill in the field of the technology to practice the invention without undue experimentation (you may refer back to the instructions on Anticipation for Lack of Novelty for the eight factors to consider when determining undue experimentation). A printed publication must be reasonably accessible to those members of the public who would be interested in its contents. It is not necessary that the printed publication be available to every member of the public.

So long as the printed publication was available to the public, the form in which the information was recorded is unimportant. The information must, however, have been maintained in some permanent form, such as printed or typewritten pages, magnetic tape, microfilm, photographs, or photocopies.

Newegg must prove anticipation by a printed publication by clear and convincing evidence.

### 6.2.3   Anticipation by Prior Patent[28]

Newegg contends that various claims of the patents-in-suit are invalid because they were anticipated by a prior patent. A claim in a patent is invalid if the invention defined by that claim was patented in the United States or a foreign country before it was invented by the inventor of the patent-in-suit or more than one year before the inventor patentee filed his United States patent application.

To show anticipation of the patented invention, Newegg must show by clear and convincing evidence that the prior patent disclosed all of the elements of each claim of the patent

---

[28] Sources: 35 U.S.C. § 102; Court's Charge *i4i,* at 19; Court's Charge in *Forgent,* at 17; J. Davis Model Instructions, at 16.

that Newegg contends is invalid. As with a printed publication, the disclosure must be complete

enough to enable one of ordinary skill in the field of technology to practice the invention without

undue experimentation (you may refer back to the instructions on Anticipation for Lack of

Novelty for the eight factors to consider when determining undue experimentation).

To show anticipation of the patented invention, Newegg must show by clear and

convincing evidence that the prior patent disclosed all of the elements of each claim of the patent

that Newegg contends is invalid.

### 6.2.4   Anticipation by Public Knowledge or Use by Another[29]

Newegg contends that various claims of the patents-in-suit are invalid because they were

anticipated by public knowledge or use by another. A patent claim is invalid if the invention

recited in that claim was publicly known or used in the United States by someone other than the

inventor before the patent applicant invented it, or more than one year before the United States

patent application was filed. Private or secret knowledge, such as knowledge confidentially

disclosed within a small group, is not enough to invalidate a patent claim. Similarly, if

something is only publicly known outside of the United States, then the claim is not invalid.

Newegg must prove anticipation by public knowledge or use by clear and convincing evidence.

### 6.2.5   Anticipation by Prior Invention[30]

Newegg contends that various claims of the patents-in-suit are invalid because they were

anticipated by a prior invention. A patent claim is invalid if the invention defined by that claim

was invented by another person in the United States before it was invented by the patentee, and

that other person did not abandon, suppress or conceal the invention.

---

[29] Sources: 35 U.S.C. § 102; J. Davis Model Instructions, at 15.

[30] Sources: 35 U.S.C. § 102; Court's Charge in *z4 Techs.*, at 18-19; J. Davis Model Instructions, at 15-16.

As a general rule, the first person to reduce an invention to practice is said to be the first inventor. An invention is reduced to practice either when a patent application is filed or when the invention is made and shown to work for its intended purpose. Thus, if another person reduces to practice an invention before the inventor on the patent, then the reduction to practice by the other person will be prior art to the patent claims.

A patentee who is not the first to reduce to practice can still be the first to invent if he can show two things:

(1)    that he conceived of the invention before the other party conceived of his invention; and

(2)    that he exercised reasonable diligence in reducing his invention to practice, from the time just before the other party conceived, to the time he reduced to practice.

Reasonable diligence means that the inventor worked continuously in the United States on reducing the invention to practice. Interruptions necessitated by the everyday problems and obligations of the inventor or those working with him or her do not prevent a finding of diligence.

To show anticipation of the patented invention, Newegg must show by clear and convincing evidence that the prior invention disclosed all of the elements of each claim of the patent that Newegg contends is invalid.

## 6.3    Obviousness[31]

Newegg contends that various claims of the patents-in-suit are invalid because the claimed invention was obvious to one of ordinary skill in the field of technology at the time the invention was made. To be patentable, an invention must not have been obvious to a person of ordinary skill in the pertinent field of technology at the time the invention was made. The issue is not whether the claimed invention would have been obvious to you as a layman, to me as a

---

[31] Sources: 35 U.S.C. § 103; Court's Charge *i4i,* at 21-22; J. Davis Model Instructions, at 16-18.

Judge, or to a genius in the art, but whether it would have been obvious to one of ordinary skill in the field of technology at the time it was made. Newegg bears the burden of proving this defense by clear and convincing evidence.

*You must not use hindsight when comparing the prior art to the invention for obviousness.* In making a determination of obviousness or non-obviousness, you must consider only what was known before the invention was made. You may not judge the invention in light of present day knowledge or by what you learned from or about the patents during trial.

If the prior art merely discloses numerous possible combinations but gives no direction as to which of those main choices is likely to be successful, this does not constitute a prior teaching or suggestion of the claim combination. Similarly, if the prior art merely discloses that it would be obvious to explore a new technology or general approach that seemed to be a promising field of experimentation, this would not constitute a teaching or suggestion of the claimed combination.

In determining whether or not Newegg has established obviousness of a claim of the patents-in-suit patent by clear and convincing evidence, you must consider the following:

(1)    The scope and content of the prior art put into evidence in this case;

(2)    The differences, if any, between each claim of the patent and that prior art; and

(3)    The level of ordinary skill in the field of technology at the time the invention was made.

(4)    Any additional considerations relating to obviousness or non-obviousness of the invention.

I will now describe in more detail the specific determinations you must make in deciding *whether or not the claimed invention would have been obvious.*

### 6.3.2    Scope and Content of the Prior Art[32]

The first question you must answer in determining whether or not the invention was obvious is the scope and content of the prior art at the time the invention was made. You must decide whether the specific references relied upon by Newegg in this case are prior art to the invention described in the asserted claims of the patents-in-suit.

Prior art includes previous devices, articles and methods that were publicly used or offered for sale; and printed publications or patents that disclose the invention or elements of the invention. Once you decide whether or not specific references are prior art, you must also decide what those references would have disclosed or taught to one having ordinary skill in the field of technology of the patent at the time the invention was made.

In order for a reference to be relevant for you to consider in deciding whether or not the claims of the patents-in-suit would have been obvious, the reference must be within the field of the inventors' endeavor, or if it is from another field of endeavor, the reference must be reasonably related to the particular problem or issue the inventors faced or addressed when making the inventions described in the claims of the patents-in-suit. A reference from a field of endeavor other than the inventors' is reasonably related to the problem or issues the inventors faced if the reference is one which, because of the matter with which the reference deals, logically would have commended itself to the attention of the inventors when considering the problems or issues they faced. It is for you to decide what the problems or issues were that the inventors faced at the time the inventions in the claims of the patents-in-suit.

---

[32] Source: Court's Charge in *i4i*, at 22-23.

### 6.3.3   Differences Over the Prior Art[33]

The second question you must answer in determining whether or not the invention was

obvious at the time it was made is what differences there are, if any, between the prior art and the

patented invention.  In analyzing this issue, do not focus solely on the differences between the

prior art and the invention because the test is not whether there are differences.  Rather, the test is

whether or not the invention, as a whole, would have been obvious to one having ordinary skill

in view of all the prior art at the time the invention was made.

If you conclude that the prior art discloses all the elements of the claimed invention, but

those elements are in separate items, you must then consider whether or not it would have been

obvious to combine those items.  A claim is not obvious merely because all of the elements of

that claim already existed.  One way to decide whether one of ordinary skill in the field of

technology would combine what is described in various items of prior art, is whether there is

some teaching, suggestion, or motivation in the prior art for a skilled person to make the

combination covered by the patent claims.  Motivation can be implicit.  In other words,

motivation need not be explicit.

It is common sense that familiar items may have obvious uses beyond their primary

purposes, and a person of ordinary skill often will be able to fit the teachings of multiple patents

together like pieces of a puzzle.  Multiple references in the prior art can be combined to show

that a claim is obvious.  Any need or problem known in the field and addressed by the patent can

provide a reason for combining the elements in the manner claimed.  To determine whether there

was an apparent reason to combine the known elements in the way a patent claims, you can look

to interrelated teachings of multiple patents, to the effects of demands known to the design

---

[33] *Id.,* at 23-25; The National Jury Instruction Project, at 5.9; Fifth Circuit Pattern Jury Instructions – Civil (2006), at 9.5.

community or present in the marketplace, and to the background knowledge possessed by a

person of ordinary skill in the field of technology. Neither the particular motivation nor the

alleged purpose of the patentee controls. One of ordinary skill in the field of technology is not

confined only to prior art that attempts to solve the same problem as the patent claim. Teachings,

suggestions, and motivations may also be found within the knowledge of a person with ordinary

skill in the field including inferences and creative steps that a person of ordinary skill in the field

would employ. Additionally, teachings, suggestions, and motivations may be found in the nature

of the problem solved by the claimed invention.

You may also consider whether the claimed invention would have been obvious to try,

meaning that the claimed innovation was one of a relatively small number of possible approaches

to the problem with a reasonable expectation of success by those skilled in the art. To find

obviousness, you must find not only that prior art would teach one of ordinary skill to try the

combination of known elements, but also that prior art would sufficiently direct such a person

*how to obtain the desired result. You may not use hindsight to assemble the invention from prior*

art elements.

### 6.3.4   Level of Ordinary Skill in the Field[34]

For obviousness, you must consider the level of ordinary skill in the field. The ordinary

skilled person is a person of average education and training in the field of the invention and is

presumed to be aware of all relevant prior art. The actual inventor's skill is irrelevant to this

inquiry.

You are instructed that a person of ordinary skill in the field of technology would have a

Bachelor of Science degree in computer engineering or computer science, or equivalent

---

[34] *Id.*, at 25.

education, with two to three years of practical experience developing or operating software and systems that relate to commerce on the Internet.

### 6.3.5   Additional Considerations[35]

The next question you must answer, in determining whether or not the invention was obvious at the time it was made is what evidence there is, if any, of additional considerations relating to the obviousness or non-obviousness of the invention.  You may consider in your analysis any evidence that was presented to you in this case regarding the presence or absence of the following factors in deciding whether or not the invention would have been obvious at the time it was made:

(1)   Whether or not the invention proceeded in a direction contrary to accepted wisdom in the field;

(2)   Whether or not there was long felt but unresolved need in the field of technology that was satisfied by the invention;

(3)   Whether or not others had tried but failed to make the invention;

(4)   Whether or not others copied the invention;

(5)   Whether or not the invention achieved any unexpected results;

(6)   Whether or not the invention was praised by others;

(7)   Whether or not others have taken licenses to use the invention;

(8)   Whether or not experts or those skilled in the field at the making of the invention expressed surprise or disbelief regarding the invention;

(9)   Whether or not products incorporating the invention have achieved commercial success; and

(10)   Whether or not others having ordinary skill in the field of the invention independently made the claimed invention at about the same time the inventor made the invention.

---

[35] *Id.,* at 25-26.

## 6.4    Corroboration of Oral Testimony[36]

Oral testimony of a single witness alone is insufficient to prove prior invention or that something is prior art. A party seeking to prove prior invention or prior art also must provide evidence that corroborates any oral testimony, especially where the oral testimony comes from an interested witness, or a witness testifying on behalf of an interested party. This includes any individual or company testifying that his invention or its invention predates the patents-in-suit. Documentary or physical evidence that is made contemporaneously with the inventive process provides the most reliable proof that the alleged prior art inventor's testimony has been corroborated. For any oral testimony that a party has put forth alleging that a particular event or reference occurred before the filing date of the patents-in-suit, that party must also have provided some sort of corroborating evidence that agrees with that oral testimony. If you find the party has not corroborated the oral testimony with other evidence, you are not permitted to find that the subject of that oral testimony qualifies as prior art or supports a prior date of invention.

If evidence is presented for purposes of attempting to corroborate oral testimony, then you must determine whether this evidence does, in fact, properly corroborate the oral testimony. In making this determination, you should consider the following factors:

(1)     The relationship between the corroborating witness and the alleged prior user;

(2)     The time period between the event and this trial;

(3)     The interest of the corroborating witness in the subject matter of this suit;

(4)     Contradiction or impeachment of the witness's testimony;

(5)     Extent and detail of the corroborating witness's testimony;

(6)     The witness's familiarity with the subject matter of the patented invention and the alleged prior use;

---

[36] Source: Court's Charge *i4i*, at 20-21.

(7)     Probability that a prior use could occur considering the state of the art at the time; and

(8)     Impact of the invention on the industry, and the commercial value of its practice.

## 7. DAMAGES[37]

I have now instructed you as to the law governing Soverain's claims of patent infringement and Newegg's claims of invalidity.  If you find that Newegg has infringed a valid claim of the '314, '492, or '639 patent, then you must determine what damages Newegg must pay to Soverain for that infringement.  If, on the other hand, you find that Newegg has not infringed a valid claim of the '314, '492, or '639 patent, then Soverain is not entitled to any damages, and you should not make any findings about damages for that claim.

The fact that I am instructing you about damages does not mean that Soverain is or is not entitled to recover damages.  You should not interpret the fact that I have given instructions about Soverain's damages as an indication any way that I believe that Soverain should, or should not, win this case.  I am instructing you on damages only so that you will have guidance in the event you decide that Newegg is liable and that Soverain is entitled to recover money from Newegg.

### 7.1    Date Damages Begin[38]

Under the Patent Laws, Soverain can recover damages for infringement that occurred only after Soverain gave "notice" of its patent rights.  Here Soverain gave Newegg notice by filing this lawsuit against Newegg on November 2, 2007.  In considering damages, the time period is November 2, 2007, to the present.  It is undisputed that Soverain cannot recover any damages for any infringement of the patents-in-suit before November 2, 2007.

---

[37] Sources: Court's Charge in *Orion*, at 26; Court's Charge in *Forgent*, at 22-23; Court's Charge in *z4 Techs.*, at 26; J. Davis Model Instructions, at 19-20.

[38] Source: J. Davis Model Instructions, at 26.

**7.2    Reasonable Royalty – Entitlement** [39]

The patent laws specifically provide that the amount of damages that Newegg must pay

Soverain for infringing Soverain's patents may not be less than a reasonable royalty for the use

that Newegg made of Soverain's inventions.

**7.3    Reasonable Royalty – Definition** [40]

A royalty is a payment made to the owner of a patent by a non-owner in exchange for

rights to use the claimed invention. A reasonable royalty is the royalty that would have resulted

from a hypothetical arms-length negotiation between Soverain, or its predecessor Open Market,

and a company in the position of Newegg on the eve of infringement, with both sides to this

negotiation willing to enter into a license and both sides to this negotiation operating under the

assumptions that the patents are valid, the patents are infringed, and the licensee would respect

the patents.

You are to decide what a reasonable royalty would be, based on circumstances as of the

time just before Newegg began selling or using the patented inventions. You may consider any

actual profits made by Newegg and any commercial success of the patented inventions, but the

amount of those profits is not determinative on the issue of what is a reasonable royalty.

**7.4    Reasonable Royalty – Timing** [41]

Although the relevant date for the hypothetical reasonable royalty negotiation is the date

that the infringement began – you may consider in your determination of reasonable royalty

damages any evidence with respect to the expectations for the future that the negotiators had as

---

[39] Sources: 35 U.S.C. § 284 (2009); Final Jury Instructions in *Mass Engineered,* at 38; The National Jury Instruction Project, at 6.6.

[40] Sources: Court's Charge in *i4i,* at 27; Final Jury Instructions in *Mass Engineered,* at 38-39; Court's Charge in *z4 Techs.,* at 27-28; J. Davis Model Instructions, at 24.

[41] Source: AIPLA Model Instructions, Patent Damages No. 22 (same, except for inclusion of the 2001 date and language regarding expectations future negotiators would have in 2001).

of the eve of infringement and any actual profits by Newegg after that time, and any commercial

success of the patented invention in the form of sales after that time of the patents or infringing

product after that time. You may only consider this information, however, if it was foreseeable

at the time the infringement began.

### 7.5    Reasonable Royalty – Factors[42]

In deciding what is a reasonable royalty, you may consider the factors that Soverain and

Newegg would consider in setting the amount Newegg should pay. I will list for you a number

of factors you may consider. This is not every possible factor, but it will give you an idea of the

kinds of things to consider in setting a reasonable royalty.

(1)    Any royalties received by Soverain or its predecessors for the licensing of the patents-in-suit, proving or tending to prove an established royalty.

(2)    Any rates paid by Newegg for the use of other patents comparable to the patents-in-suit.

(3)    The nature and scope of the license, as exclusive or nonexclusive; or as restricted or unrestricted in terms of territory, or with respect to the parties to whom the product may be sold.

(4)    Whether or not Soverain or any of its predecessors had an established policy and marketing program to maintain its patent exclusivity by not licensing others to use the inventions or by granting licenses under special conditions designed to preserve that exclusivity.

(5)    The commercial relationship between the licensor and licensee, such as whether they are competitors in the same territory and the same line of business.

(6)    Whether being able to use the patented inventions helps in making sales of other products or services. The effect of selling the patented inventions in promoting sales of other products or inventions of Newegg; the existing value of the inventions to Soverain as a generator of sales of its non-patented items; and the extent of such derivative or convoyed sales.

---

[42] Source: Court's Charge in *i4i*, at 28-29; Final Jury Instructions in *Mass Engineered*, at 39-40; Court's Charge in *Orion*, a 28-29; Court's Charge in *Forgent*, at 24-25; Court's Charge in *z4 Techs.*, at 28-29; *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970), *modified and aff'd sub nom. Georgia-Pacific Corp. v. United States Plywood Champion Papers, Inc.*, 446 F.2d 295 (2d Cir.), *cert denied*, 404 U.S. 870 (1971); J. Davis Model Instructions, at 24-26.

(7)     The duration of the patent and the term of the hypothetical license.

(8)     The established profitability of the inventions; their commercial success; and their current popularity.

(9)     The utility and advantages of the patented inventions over the old modes or devices, if any, that had been used for achieving similar results.

(10)    The nature of the patented inventions, the character of the commercial embodiment of the inventions as owned and produced by Soverain, and the benefits to those who have used the inventions.

(11)    The extent to which Newegg has made use of the patented inventions and any evidence that shows the value of that use.

(12)    The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the inventions or analogous inventions.

(13)    The portion of the profits that is due to the patented inventions, as compared to the portion of the profit due to other factors, such as unpatented elements or unpatented manufacturing processes, or features or improvements developed by Newegg.

(14)    Expert opinions as to what a reasonable royalty would be.

(15)    The amount that a licensor such as Soverain and a licensee such as Newegg would have agreed upon if both parties had been reasonably and voluntarily trying to reach an agreement.

In addition, it is proper for you to consider any economic or business factors that normally prudent business people would, under similar circumstances, reasonably take into consideration in negotiating the hypothetical license.

## 7.6    Non-Infringing Alternatives[43]

In determining a reasonable royalty, you may consider whether or not Newegg had commercially acceptable non-infringing alternatives to taking a license from Soverain or Open

---

[43] Sources: 3A *Federal Jury Practice and Instructions* § 71.01 (5th ed. 2001); *Tate Access Floors, Inc. v. Maxcess Techs., Inc.*, 222 F. 3d 958, 971 (Fed. Cir. 2000); *Fonar Corp. v. General Elec. Co.*, 107 F. 3d 1543, 1553 (Fed. Cir. 1997), *cert. denied*, 522 U.S. 908 (1997).

Market that were available at the time of the hypothetical negotiation and whether that would have affected the reasonable royalty the parties would have agreed upon.

## 8. INSTRUCTIONS FOR DELIBERATIONS[44]

You must perform your duties as jurors without bias or prejudice as to any party. The law does not permit you to be controlled by sympathy, prejudice, or public opinion. All parties expect that you will carefully and impartially consider all the evidence, follow the law as it is now being given to you, and reach a just verdict, regardless of the consequences.

It is your sworn duty as jurors to discuss the case with one another in an effort to reach agreement if you can do so. Each of you must decide the case for yourself, but only after full consideration of the evidence with the other members of the jury. While you are discussing the case, do not hesitate to re-examine your own opinion and change your mind if you become convinced that you are wrong. However, do not give up your honest beliefs solely because the others think differently, or merely to finish the case.

Remember that in a very real way you are the judges – judges of the facts. Your only interest is to seek the truth from the evidence in the case.

You should consider and decide this case as a dispute between persons of equal standing in the community, of equal worth, and holding the same or similar stations in life. A limited liability corporation is entitled to the same fair trial as a private individual. All persons, including limited liability corporations, and other organizations stand equal before the law and are to be treated as equals. A patent owner is entitled to protect its patent rights under the United States Constitution. This includes bringing suit in a United States District Court for money

---

[44] Sources: Court's Charge in *i4i*, at 30-31; Final Jury Instructions in *Mass Engineered*, at 41-42; Court's Charge in *Orion*, at 29-31; Court's Charge in *Forgent*, at 26-27; Court's Charge in *z4 Techs.*, at 29-31; J. Davis Model Instructions, at 28-29.

damages for infringement. This may be done regardless of whether the owner of the patent is an

individual, a partnership, a bank, a small company with only a few investors, or a large company

made up of many investors. The law recognizes no distinction among types of patent owners. A

patent owner may be a competitor of an accused infringer, but it does not have to be. The

characterization of a patent lawsuit as good or bad or as misuse of the patent laws based upon the

status of the patent owner is inappropriate and should not play any part in your deliberations. All

corporations, partnerships and other organizations stand equal before the law, regardless of size

or who owns them, and are to be treated as equals.

When you retire to the jury room to deliberate on your verdict, you may take this charge

with you as well as exhibits which the Court has admitted into evidence. Select your Foreperson

and conduct your deliberations. If you recess during your deliberations, follow all of the

instructions that the Court has given you about/on your conduct during the trial. After you have

reached your verdict, your Foreperson is to fill in on the form your answers to the questions. Do

not reveal your answers until such time as you are discharged, unless otherwise directed by me.

You must never disclose to anyone, not even to me, your numerical division on any question.

Any notes that you have taken during this trial are only aids to memory. If your memory

should differ from your notes, then you should rely on your memory and not on the notes. The

notes are not evidence. A juror who has not taken notes should rely on his or her independent

recollection of the evidence and should not be unduly influenced by the notes of other jurors.

Notes are not entitled to any greater weight than the recollection or impression of each juror

about the testimony.

If you want to communicate with me at any time, please give a written message or

question to the bailiff, who will bring it to me. I will then respond as promptly as possible either

in writing or by having you brought into the courtroom so that I can address you orally.  I will always first disclose to the attorneys your question and my response before I answer your question.

After you have reached a verdict, you are not required to talk with anyone about the case unless the Court orders otherwise.  You may now retire to the jury room to deliberate.

ATTACHMENT 4--DEFENDANT'S SUBMISSION

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

| | | |
|---|---|---|
| SOVERAIN SOFTWARE LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Case No. 6:07-CV-00511-LED** |
| | ) | |
| CDW CORPORATION, | ) | |
| NEWEGG INC., | ) | |
| REDCATS USA, INC. | ) | |
| SYSTEMAX INC., | ) | |
| ZAPPOS.COM, INC., | ) | |
| REDCATS USA, L.P., | ) | |
| THE SPORTSMAN'S GUIDE, INC., | ) | |
| AND | ) | |
| TIGERDIRECT, INC., | ) | |
| | ) | |
| Defendants. | ) | |

### DEFENDANT'S SUBMISSON OF

### JOINT PROPOSED CHARGE OF THE COURT[1]

MEMBERS OF THE JURY:

After I instruct you on the law that you
must apply. It is your duty to follow the law as I give it to you. On the other hand, you the jury
are the judges of the facts. Do not consider any statement that I have made during the trial or
make in these instructions as an indication that I have any opinion about the facts of this case.

After I instruct you on the law, the attorneys will have an opportunity to make their
closing arguments. Statements and arguments of the attorneys are not evidence and are not

---

[1] Sources: Court's Charge in *i4i Ltd. P'ship v. Microsoft Corp.*, No. 6:07-CV-113, at 1 (E.D. Tex. 2009);
Final Jury Instructions in *Mass Engineered Design, Inc. v. Ergotron, Inc.*, No. 2:06-CV-272, at 1 (E.D. Tex. 2009);
Court's Charge in *Orion IP, LLC v. Hyundai Motor Am.*, No. 6:05-CV-322, at 1 (E.D. Tex. 2008); Court's Charge in
*Forgent Networks, Inc. v. EchoStar Techs. Corp.*, No. 6:06-CV-208, at 1 (E.D. Tex. 2006); Court's Charge in *z4
Techs., Inc. v. Microsoft Corp.*, No. 6:06-CV-142, at 1 (E.D. Tex. 2006); J. Davis Model Instructions, at 1.

Defendant's Submission of NYI-4229755v1

instructions on the law. They are intended only to assist the jury in understanding the evidence and the parties' contentions.

## 1. GENERAL INSTRUCTIONS[2]

A verdict form has been prepared for you. You will take this form to the jury room and when you have reached unanimous agreement as to your verdict, you will have your foreperson fill in, date and sign the form. Answer each question on the verdict form from the facts as you find them. Do not decide who you think should win and then answer the questions accordingly. Your answers and your verdict must be unanimous.

In determining whether any fact has been proved in this case, you may, unless otherwise instructed, consider the testimony of all witnesses, regardless of who may have called them, and all exhibits received in evidence, regardless of who may have produced them.

### 1.1    Considering Witness Testimony[3]

By the Court allowing testimony or other evidence to be introduced over the objection of an attorney, the Court did not indicate any opinion as to the weight or effect of such evidence. As stated before, you the jurors are the sole judges of the credibility of all witnesses and the weight and effect of all evidence.

When the Court sustained an objection to a question addressed to a witness, the jury must disregard the question entirely, and may draw no inference from the wording of it or speculate as to what the witness would have testified to, if he or she had been permitted to answer the question.

---

[2] Sources: Court's Charge in *i4i*, at 1-2; Court's Charge in *z4 Techs.*, at 1-2; Final Jury Instructions in *Mass Engineered*, at 1-2; Court's Charge in *Orion*, at 1-2; Court's Charge in *Forgent*, at 1-2; J. Davis Model Instructions, at 1; Uniform Jury Instructions for Patent Cases in the United States District Court for the District of Delaware, March 1993.

[3] Sources: Court's Charge in *i4i*, at 2-3; Final Jury Instructions in *Mass Engineered*, at 2-3; Court's Charge in *Orion*, at 2-3; Court's Charge in *Forgent*, at 2-3; Court's Charge in *z4 Techs.*, at 2-3; J. Davis Model Instructions, at 1-2.

|  Defendant's Submission of  NYI-4229755v1     2

At times during the trial it was necessary for the Court to talk with the lawyers here at the bench out of your hearing, or by calling a recess. We met because often during a trial something comes up that does not involve the jury. You should not speculate on what was discussed during such times.

In determining the weight to give to the testimony of a witness, you should ask yourself whether there was evidence tending to prove that the witness testified falsely concerning some important fact, or whether there was evidence that at some other time the witness said or did something, or failed to say or do something, that was different from the testimony the witness gave before you during the trial.

You should keep in mind, of course, that a simple mistake by a witness does not necessarily mean that the witness was not telling the truth as he or she remembers it, because people may forget some things or remember other things inaccurately. So, if a witness has made a misstatement, you need to consider whether that misstatement was an intentional falsehood or simply an innocent lapse of memory; and the significance of that may depend on whether it has to do with an important fact or with only an unimportant detail.

## 1.2    How to Examine the Evidence[4]

Certain testimony in this case has been presented to you through a deposition. A deposition is the sworn, recorded answers to questions asked a witness in advance of the trial. Under some circumstances, if a witness cannot be present to testify from the witness stand, the witness's testimony may be presented, under oath, in the form of a deposition. Some time before this trial, attorneys representing the parties in this case questioned this witness under oath. A

---

[4] Sources: Court's Charge in *i4i*, at 3-4; Final Jury Instructions in *Mass Engineered*, at 3-4; Court's Charge in *Orion*, at 3-4; Court's Charge in *Forgent*, at 3-4; Court's Charge in *z4 Techs*, at 3-4; J. Davis Model Instructions, at 2-3.

| Defendant's Submission of NYI-4229755v1    3

court reporter was present and recorded the testimony. This deposition testimony is entitled to the same consideration and is to be judged by you as to credibility and weighed and otherwise considered by you insofar as possible, the same as if the witness had been present and had testified from the witness stand in court.

While you should consider only the evidence in this case, you are permitted to draw such reasonable inferences from the testimony and exhibits as you feel are justified in the light of common experience. In other words, you may make deductions and reach conclusions that reason and common sense lead you to draw from the facts that have been established by the testimony and evidence in the case.

The testimony of a single witness may be sufficient to prove any fact, even if a greater number of witnesses may have testified to the contrary, if after considering all the other evidence you believe that single witness.

There are two types of evidence that you may consider in properly finding the truth as to the facts in the case. One is direct evidence – such as testimony of an eyewitness. The other is indirect or circumstantial evidence – the proof of a chain of circumstances that indicates the existence or nonexistence of certain other facts. As a general rule, the law makes no distinction between direct and circumstantial evidence, but simply requires that you find the facts from a preponderance of all the evidence, both direct and circumstantial.

### 1.3    Expert Witnesses[5]

When knowledge of a technical subject matter may be helpful to the jury, a person who has special training or experience in that technical field – called an expert witness – is permitted

---

[5] Sources: Court's Charge in *i4i*, at 4 ; Final Jury Instructions in *Mass Engineered,* at 4-5; Court's Charge in *Orion,* at 4; Court's Charge in *Forgent,* at 4; Court's Charge in *z4 Techs,* at 4; J. Davis Model Instructions, at 3-4.

Defendant's Submission of  NYI-4229755v1    4

to state his or her opinion on those technical matters. However, you are not required to accept that opinion. As with any other witness, it is up to you to decide whether to rely upon it.

In deciding whether to accept or rely upon the opinion of an expert witness, you may consider any bias of the witness, including any bias you may infer from evidence that the expert witness has been or will be paid for reviewing the case and testifying, or from evidence that he or she testifies regularly as an expert witness and that income from such testimony represents a significant portion of the expert's income.

## 2. STIPULATIONS

The parties have agreed, or stipulated to the following facts. This means that both sides agree that these are facts. You must therefore treat these facts as having been proved.[6]

[INSERTION OF JPTO STIPULATED FACTS]

### 3. SUMMARY OF CONTENTIONS

I will first give you a summary of each side's contentions in this case. I will then tell you what each side must prove to win on these issues.[7]

### 3.1    Soverain's Contentions:

In this case, the plaintiff, Soverain, contends that the defendant, Newegg, uses technology for its websites that infringes claims 35, 49, and 51 of the '314 patent; claims 17, 41, and 61 of the '492 patent; and claims 60, 66, 68, and 79 of the '639 patent. Soverain asks you to award damages for the infringement.

---

[6] Sources: Court's Charge in *Orion*, at 4; Court's Charge in *Forgent*, at 4; Court's Charge in *z4 Techs.*, at 4; J. Davis Model Instructions, at 4.

[7] Sources: Court's Charge in *i4i*, at 4; Final Jury Instructions in *Mass Engineered*, at 5; Court's Charge in *Orion*, at 5; Court's Charge in *z4 Techs.*, at 5; J. Davis Model Instructions, at 5.

| Defendant's Submission of  NYI-4229755v1    5

### 3.2    Newegg's Contentions:

Newegg contends that it does not infringe Soverain's patents and that Soverain's patents are invalid. Newegg asks that you deny Soverain any damages.

### 3.3    Burdens of Proof[8]

Soverain has the burden of proving infringement by a preponderance of the evidence. "Preponderance of the evidence" means evidence that persuades you that a claim is more likely true than not true. In determining whether any fact has been proved by a preponderance of the evidence, you may, unless otherwise instructed, consider the stipulations, the testimony of all witnesses regardless of who may have called them, and all exhibits received in evidence regardless of who may have produced them. It will be your job to determine whether Soverain has met its burden of proving that infringement of the asserted patent claims is more likely true than not true.

Newegg bears the burden of proving invalidity by clear and convincing evidence. Proof by clear and convincing evidence is a greater burden of proof than proof by a preponderance of the evidence, but less than the burden of proof beyond a reasonable doubt. Clear and convincing evidence is evidence that produces an abiding conviction that the truth of a factual contention is highly probable.[9] In determining whether any fact has been shown by clear and convincing evidence, you may, unless otherwise instructed, consider the stipulations, the testimony of all witnesses regardless of who may have called them, and all exhibits received in evidence

> **Deleted:**

> **Deleted:** Proof by clear and convincing evidence is a greater burden of proof than proof by a preponderance of the evidence.

---

[8] Sources: Court's Charge in *i4i*, at 5-6; Final Jury Instructions in *Mass Engineered*, at 5-6; Court's Charge in *z4 Techs.*, at 5-6; J. Davis Model Instructions, at 5-6. *Pfizer, inc. v. Apotex, Inc.*, 480 F.3d 1348, 1360 (Fed. Cir. 2007).

[9] Sources: *Buildex Inc. v. Kason Indus., Inc.*, 849 F.2d 1461, 1463 (Fed. Cir. 1988) (explaining that clear and convincing evidence is evidence that gives the trier of fact "an abiding conviction that the truth of [the] factual contentions [is] 'highly probably'" (quoting *Colorado v. New Mexico*, 467 U.S. 310, 316 (1984)); *see also Neutrino Dev. Corp. v. Sonosite, Inc.*, 337 F. Supp. 2d 942, 946 (S.D. Tex. 2004) (applying clear and convincing standard from *Colorado v. New Mexico* in context of invalidity).

Defendant's Submission of NYI-4229755v1     6

regardless of who may have produced them. It will be your job to determine whether Newegg

has met its burden of proving the invalidity of the '314, '492, and '639 patent claims.

### 3.4    Glossary of Patent Terms[10]

The following are definitions for patent terms that you should use in this case.

Application – The initial papers filed by the applicant in the United States Patent and

Trademark Office (also called the "Patent Office" or "PTO").

Claims – Claims are the numbered sentences appearing at the end of the patent and define

the invention. The words of the claims define the scope of the patent owner's exclusive rights

during the life of the patent.

Comprising – The beginning, or preamble, portion of each of the asserted independent

claims uses the word "comprising." "Comprising" means "including" or "containing." A claim

that uses the word "comprising" is not limited to systems or methods having only the elements

that are recited in the claim elements, but also covers systems or methods that have all of the

elements and add additional elements without changing the required elements. Take as an

example a claim that covers a table. If the claim recites a table "comprising" a tabletop, legs and

glue, the claim will cover any table that contains these structures, even if the table also contains

other structures, such as a leaf or wheels on the legs. However, if a table contains a tabletop,

legs, but no glue, then the claim does not cover the table.

Continuation – A continuation application is a second application for the same invention

claimed in a prior patent application and filed before the first application becomes patented. The

---

[10] Sources: *i4i*, Appendix B at 34-35; Final Jury Instructions in *Mass Engineered*, at 6-9; Court's Charge in *Orion*, at 6-8; Court's Charge in *Forgent*, at 7-9; Court's Charge in *z4 Techs.*, at 6-8; J. Davis Model Instructions, at 6-8.

Defendant's Submission of NYI-4229755v1    7

disclosure in the continuation application must be the same as in the prior patent application, and must not include any new matter that was not disclosed in the prior application.[11]

File Wrapper – See "Prosecution History" below.

License – Permission to use the patented invention, which may be granted by a patent owner (or a prior licensee) in exchange for a fee called a "royalty" or other consideration.

Office Action – Communication from the patent examiner regarding the specification of the patent application and/or the claims pending in the patent application.

Ordinary Skill in the Art – From time to time in these instructions I will refer to a hypothetical person of "ordinary skill in the art" or a "person of ordinary skill in the field." This hypothetical person is presumed to be aware of all of the prior art and knowledge that existed in the field during the relevant time period. The skill of the actual inventor and experts is irrelevant, because they may possess something that distinguishes them from workers of ordinary skill in the art. Factors to consider in determining the level of ordinary skill in the art include the educational level and experience of people working in the art, the types of problems faced by workers in the art and the solutions found to those problems, and the sophistication of the technology in the field.

Parent Application – The term "parent" is applied to an earlier application of the inventor disclosing an invention. A later application filed by the inventor may claim priority and relate back to the parent application with respect to an invention that was sufficiently disclosed in the parent application.[12]

---

[11] Source: U.S. Patent and Trademark Office, *Glossary*, http://www.uspto.gov/main/glossary. (modified); Manual of Patent Examining Procedure, § 201.07, *available at* http://www.uspto.gov/web/offices/pac/mpep/index.htm.

[12] *Id.* Manual of Patent Examining Procedure, § 201.04, *available at* http://www.uspto.gov/web/offices/pac/mpep/index.htm; 35 U.S.C. § 120.     Field Code Changed

Defendant's Submission of  NYI-4229755v1     8

Patent Examiners – Personnel employed by the Patent Office who review (or examine) patent applications, each in a specific technical area, to determine whether the claims of a patent application are patentable and whether the disclosure adequately describes the invention.

Prior Art – Knowledge that is available to the public either prior to the invention by applicant or more than a year prior to the effective filing date of his/her patent application.

Prosecution History – The written record of proceedings in the Patent Office between the applicant and the Patent Office. It includes the original patent application and later communications between the Patent Office and the applicant. The prosecution history may also be referred to as the "File wrapper" of the patent during the course of this trial.

References – Any item of prior art used to determine patentability.

Said – The patent claims use the word "said" instead of "the." Use of the word "said" in the beginning of a phrase indicates that it is referring to a previous use of the same or a similar phrase.

**Deleted:** Reexamination – At any time during the enforceability of a patent any person may file a request for the Patent Office to conduct a second examination (the reexamination) of any claim of the patent on the basis of prior art patents or printed publications which that person states to be pertinent and applicable to the patent.

Specification – The specification is the information that appears in the patent and concludes with one or more claims. The specification includes the written text, the claims, and the drawings. In the specification, the inventor sets forth a description telling what the invention is, how it works, and how to make and use it so as to enable others skilled in the art to do so.

### 4. CLAIMS OF THE PATENTS IN SUIT[14]

As I told you at the beginning of the trial, the claims of a patent are the numbered sentences at the end of the patent. The claims describe the invention made by the inventor and describe what the patent owner owns and what the patent owner may prevent others from doing.

---

[14] Sources: Court's Charge in *i4i*, at 6; Final Jury Instructions in *Mass Engineered*, at 9; Court's Charge in *Orion*, at 8-9; Court's Charge in *z4 Techs.*, at 8-9; J. Davis Model Instructions, at 8.

Claims may describe products, such as machines or chemical compounds, or processes for making or using a product. Claims are usually divided into parts or steps, called "elements" or "limitations." For example, a claim that covers the invention of a table may recite the tabletop, four legs and the glue that secures the legs on the tabletop. The tabletop, legs and glue are each a separate element of the claim.

### 4.1    Construction of the Claims[15]

In deciding whether or not the accused technology infringes a patent, the first step is to understand the meaning of the words used in the patent claims. It is my job as Judge to determine what the patent claims mean and to instruct you about that meaning. You must accept the meanings I give you and use those meanings when you decide whether or not the patent claims are infringed, and whether or not it is invalid.

Before I instruct you about the meaning of the words of the claims, I will explain to you the different types of claims that are at issue in this case. It may be helpful to refer to the copies of the '314, '492 and '639 patents that you have been given as I discuss the claims at issue here.

### 4.2    Independent and Dependent Claims[16]

Patent claims may exist in two forms, referred to as independent claims and dependent claims. An independent claim does not refer to any other claim of the patent. Thus, it is not necessary to look at any other claim to determine what an independent claim covers. Claim 17 of the '492 patent is an independent claim.

---

[15] Sources: Court's Charge in *i4i*, at 7; Final Jury Instructions in *Mass Engineered*, at 9-10; Court's Charge in *Orion*, at 9-10; Court's Charge in *Forgent*, at 9-10; Court's Charge in *z4 Techs*, at 9; J. Davis Model Instructions, at 8.

[16] Sources: Court's Charge in *i4i*, at 6-7; Court's Charge in *Forgent*, at 10; J. Davis Model Instructions, at 8-9.

| Defendant's Submission of NYI-4229755v1    10

A dependent claim refers to at least one other claim in the patent. A dependent claim includes each of the elements of the other claim to which it refers, as well as the additional elements recited in the dependent claim itself. In this way, the claim "depends" on another claim. Therefore, to determine what a dependent claim covers, it is necessary to look both at the dependent claim and the other claim or claims to which it refers.

When analyzing the validity and alleged infringement of any dependent claim asserted by Soverain, you must consider all limitations of both the dependent claim and the independent claim from which it depends. For example, claims 35, 49, and 51 of the '314 patent are dependent claims of independent claim 34. Because dependent claim 35 includes all of the limitations of claim 34, if claim 34 of the '314 patent is not infringed, then claim 35 of the '314 patent cannot be infringed. Similarly, if claim 34 of the '314 patent is not anticipated or obvious, then claim 35 of the '314 patent cannot be anticipated or obvious.

| Deleted: C |
| Deleted: For example |

## 4.3    Interpretation of Claims[17]

In deciding whether or not the accused technology infringes a patent, the first step is to understand the meaning of the words used in the patent claims.

As I stated earlier, it is my job as Judge to determine what the patent claims mean and to instruct you about that meaning. In accordance with that duty, I have interpreted the meaning of some of the language in the patent claims involved in this case. My interpretation of those claims appears in Section 4.4. Within the text of the claims of each patent-in-suit, I have bolded and underlined the terms which I have defined for you. You must accept the interpretations contained in Section 4.4 as correct. The claim language I have not interpreted for you in Section

---

[17] Sources: Court's Charge in i4i, at 7; Final Jury Instructions in *Mass Engineered*, at 9-10; Court's Charge in *Orion*, at 10; Court's Charge in *Forgent*, at 9-10; Court's Charge in *z4 Techs.*, at 9-10; J. Davis Model Instructions, at 9-10.

4.4 is to be given its ordinary and accustomed meaning as understood by one of ordinary skill in the field of technology.

### 4.4    Court's Construction of Claim Terms[18]

The meaning of some of the words used in the patent claims at issue which the Court interpreted are as follows:

#### 4.4.1    The '314 Patent and the '492 Patent Claim Terms

[A] Shopping Cart URL – A URL concerning a shopping cart.

A statement URL – A URL concerning a statement.

Hypertext link – A non-sequential web association which the user can use to navigate through related topics.

Message – A unit of information sent electronically.

Modif[y] [the shopping cart in the shopping cart database] – To change [an instance of a shopping cart in a shopping cart database].

Payment message – A message relating to a payment for one or more products.

Plurality of products added to . . . shopping cart / [Add a] plurality of respective products to a shopping cart / [Add] . . . plurality of products to . . . shopping cart – Product identifiers which are added to an instance of a shopping cart in the shopping cart database / [Add] identifiers of respective products to an instance of a shopping cart / [Add] identifiers of products to an instance of a shopping cart.

Public packet switched computer network – A packet switched computer network, accessible by the public through communication common carriers to provide data transmission services. "Packet switching" means a message-delivery technique in which small units of

---

[18] Sources: Court's Charge in *Orion*, at 10-11; Court's Charge in *z4 Techs.*, at 10-11.

information (packets) are relayed through stations in a computer network preferably along the
best route available between the source and the destination. "Public data network" is a network
established and operated by common carriers for the specific purpose of providing low error-rate
data transmission services to the public.

Record[] . . . in a database – Store[] in a database.

Shopping cart – A stored representation of a collection of products.

Shopping cart computer – A computer processing data associated with one or more
shopping carts.

Shopping cart database – A database of stored representations of collections of products,
where "database" means a collection of logically related data stored together in one or more
computerized files.

Shopping cart message – A message concerning a shopping cart.

To cause said[/the/a] payment message to be activated to initiate a payment transaction –
To cause an action associated with said[/the/a] payment message to initiate a payment
transaction.

**4.4.2   The '639 Patent Claim Terms**

A purchase request / a request to purchase – One or more messages requesting a
purchase.

An identifier of a purchaser – A text string that identifies a purchaser.

Charging the user . . . according to the user information – Charging an account associated
with the user according to the user information.

Controlled document – A document that can be accessed when one or more conditions
are met.

Creating, responsive to the initial service request, the session identifier – Producing, in response to the initial service request, the session identifier.

Durable product – Physical product.

Forwarding . . . from the client to the server system – Sending . . . from the client to the server system.

Fulfilling the purchase request based on the user information – Carrying out the purchase request based on the user information.

Hyperlink – A non-sequential web association which the user can use to navigate through related topics.

Initial service request – The first service request in a session.

Returning – Sending back.

Service request – A solicitation of services from a client to a server. A service request may entail the exchange of any number of messages between the client and the server.

Session – A series of requests and responses to perform a complete task or set of tasks between a client and a server system.

Session identifier – A text string that identifies a session.

User identifier – A text string that identifies a user.

Validating, at the server system, the appended session identifier / validating the session identifier appended to the service request – At the server system, determining the validity of the appended session identifier."

## 5. INFRINGEMENT[19]

In this case, Soverain asserts that Newegg has infringed the patents-in-suit. Any person

or business entity that, without the patent owner's permission, makes, uses, offers for sale, or

sells within the United States any product, system, or method that is covered by at least one

claim of a patent, before the patent expires, infringes the patent. Soverain has the burden of

proving infringement by a preponderance of the evidence.

If any person makes, use, sells or offers to sell what is covered by the patent claims

without the patent owner's permission, that person is said to infringe the patent. This type of

infringement is called "direct infringement."

> **Deleted:** A person can infringe a patent without knowing that what it is doing is an infringement of the patent. It may also infringe even though in good faith it believes that what it is doing is not an infringement of any patent.¶
> A patent owner has the right to stop others from using the invention covered by the patent claims during the life of the patent.

Only the claims of a patent can be infringed. You must compare each of the asserted

patent claims, as I have defined them, to the accused technology used by Newegg's websites, and

determine whether or not there is infringement. You should not compare the accused technology

used by Newegg's websites with any specific example set out in the patents. The only correct

comparison is with the language of the claim itself, with the meanings I have given you.

In this case, Soverain has alleged that Newegg directly infringes the '314, '492, and '639

patents.

> **Deleted:** In this case, there are two possible ways that a claim may be infringed. I will explain the requirements for each of these two types of infringement to you. The two types of infringement are called: (1) direct infringement, and (2) active inducement.¶

In order to prove infringement, Soverain must prove that the requirements for direct

infringement are met by a preponderance of the evidence, i.e., that it is more likely than not that

all of the requirements of direct infringement have been proved.

> **Deleted:** In addition, Soverain has alleged that customers of Newegg directly infringe the patents, and that Newegg is liable for actively inducing that direct infringement by those customers.

> **Deleted:** one or more of these types of

> **Deleted:** one or more of each of these types of

You must consider each claim individually and must reach your decision as to each

assertion of infringement based on my instructions about the meaning and scope of the claims,

the legal requirements for infringement, and the evidence present to you by the parties.

---

[19] Sources: Court's Charge in *i4i*, at 8-9; Final Jury Instructions in *Mass Engineered*, at 11-13; Court's Charge in *Orion*, at 11-12; Court's Charge in *z4 Techs.*, at 11-12; J. Davis Model Instructions, at 10.

A person may be found to be a direct infringer of a patent even if he or she believed in

good faith that what he or she was doing was not an infringement of any patent, and even if he or

she was not aware of the patent's existence. Infringement does not require proof that the person

copied the patent.

I will now explain direct infringement in more detail.

**5.1     Direct Infringement[20]**

In order to prove direct infringement, a claim element may be met in one of two ways:

either literally or under the doctrine of equivalents.

To determine direct infringement, you must compare Newegg's accused systems and

functionality with each of the claims of the patents-in-suit, using my instructions as to the

meaning of the patent claims.

A patent claim is directly infringed by Newegg only if Newegg itself uses or practices

each and every element of the claim. If Newegg itself does not practice one or more steps

recited in a method claim, Newegg does not literally infringe that method claim. If Newegg

itself does not provide or use one or more components recited in a system claim, Newegg does

not literally infringe that system claim. If there are others apart from Newegg that practice

certain elements of the method or system claims, there can be no infringement unless Soverain

has proven that Newegg controlled or directed the activity of the others, such that Newegg would

be legally responsible for the others' actions.

---

[20] Sources: Court's Charge in *i4i*, at 10-11; Final Jury Instructions in *Mass Engineered*, at 13-14. *Warner-Jenkinson Co., Inc. v. Hilton Davis Corp.*, 520 U.S. 17, 40 (1997); *MuniAuction, Inc. v. Thomson Corporation*, 532 F.3d 1318 (Fed. Cir 2008); *BMC Resources v. Paymentech, L.P.*, 498 F.3d 1373, 1381-82 (Fed. Cir. 2007); *Golden HourData Systems, Inc. v. Emscharts, Inc.*, No. 2:06-cv-381, 2009 WL 943273 (E.D. Tex. April 3, 2009); *Global Patent Holdings, LLC v. Panthers BRHC LLC*, 586 F.Supp.2d 1331 (S.D. Fla. 2008); *DeMarini Sports, Inc. v. Worth, Inc.*, 239 F.3d 1314, 1330-31 (Fed. Cir. 2001); *Gen. Mills, Inc. v. Hunt-Wesson, Inc.*, 103 F.3d 978, 981 (Fed. Cir. 1997); *Martin v. Barber*, 755 F.2d 1564, 1567 (Fed. Cir. 1985); *Amstar Corp. v. Envirotech Corp.*, 730 F.2d 1476, 1481-82 (Fed. Cir. 1984); *Emtel, Inc. v. Lipidlabs, Inc.*, 583 F.Supp.2d 811, 830-31 (S.D. Tex. 2008); *Centillion Data Sys., LLC v. Qwest Communications Int'l, Inc.*, No. 1:04-cv-0073-LJM-DML (S.D. Ind. October 29, 2009)

Margin comments:
- Deleted: Whether or not Newegg knew that what it was doing was an infringement does not matter.
- Deleted: even
- Deleted: each of the types of
- Deleted: technology
- Formatted: Normal, Indent: First line: 0.5", Line spacing: Double

### 5.1.1  Literal Infringement[22]

To determine literal infringement, you must compare the systems and functionality of the accused websites with each claim that Soverain asserts is infringed, using my instructions as to the meaning of the patent claims.

A patent claim is literally infringed only if Newegg's systems and functionality satisfy each and every element or limitation in that patent claim.  If Newegg does not satisfy one or more of the elements recited in a claim, Newegg does not literally infringe that claim.  If you find that Newegg's systems and functionality satisfy each element or limitation of the claim, then Newegg infringes the claim even if the systems and functionality include additional elements or limitations that are not recited in the claim.

You must consider each of the asserted claims of the patents-in-suit individually, and decide whether Newegg's systems and functionality infringe that claim.  You must be certain to compare Newegg's accused systems and functionality with each claim that it is alleged to infringe.  They should be compared to the elements recited in the patent claim, not to Soverain's preferred or commercial embodiment of the claimed invention.

Taking each claim of the patents separately, if you find that Soverain has proved by a preponderance of the evidence that each and every element of that claim is met by Newegg's systems and functionality, then you must find that Newegg literally infringes that claim.

---

[22] Sources: Court's Charge in *Orion*, at 12-13; J. Davis Model Instructions, at 10-11.

**Deleted:** Direct infringement of a method claim requires a party to perform or use each and every step of a claimed method, literally or under the doctrine of equivalents. Where no one party performs all of the steps of a claimed method but multiple parties combine to perform every step of the method, that claim will nevertheless be directly infringed if one party exercises control or direction over the entire method so that every step is attributable to the controlling party. Mere arms-length cooperation between the parties is not enough to establish direct infringement.  Soverain must prove that it is more likely true than not that Newegg directly infringed the patent claim.[21]¶

**Formatted:** Bullets and Numbering

**Deleted:** technology

**Deleted:** technology

**Deleted:** includes

**Deleted:** 's technology

**Deleted:** contain

**Deleted:** technology

**Deleted:** include

**Deleted:** product contains

**Deleted:** technology infringes

**Deleted:** technology

**Deleted:** It

**Deleted:** echnology

A8005

### 5.1.2    Doctrine of Equivalents[23]

If Newegg uses systems and functionality that do not literally meet all the elements of the

claim, there can still be direct infringement if the systems and functionality satisfy the claim

"under the doctrine of equivalents."

A claim element is present in the use of the accused systems and functionality under the

doctrine of equivalents if the differences between the claim element and a comparable element of

the accused systems and functionality are insubstantial.

One way to determine this is to look at whether the use of the accused systems and

functionality perform substantially the same function in substantially the same way to achieve

substantially the same result as the claimed invention.

You may also consider whether, at the time of the alleged infringement, a person having

ordinary skill in the field of the technology of the patent would have known of the

interchangeability of the alternative feature and the unmet element of the claim.

Interchangeability at the present time is not sufficient in order for the structures to be

considered to be interchangeable; rather, the interchangeability of the two structures must have

been known to person of ordinary skill in the field of technology at the time the infringement

began.

Thus, the inventor need not have foreseen and the patent need not describe all potential

equivalents to the invention covered by the claims.  Also, slight changes in technique or

improvements made possible by technology developed after the patent application is filed may

still be considered equivalent for the purposes of the doctrine of equivalents.

---

[23] Source: Court's Charge in *i4i*, at 9-10.

Deleted: a technology
Deleted: es
Deleted: technology
Deleted: satisfies
Deleted: technology
Deleted: technology
Deleted: product performs

# 6. INVALIDITY[25]

For a patent to be valid, the invention claimed in the patent must be new, useful, and non-obvious. The terms "new," "useful," and "non-obvious" have special meanings under the patent laws. I will explain these terms to you as we discuss Newegg's grounds for asserting invalidity.

The invention claimed in a patent must also be adequately described. In return for the right to exclude others from making, using, selling or offering for sale the claimed invention, the patent owner must provide the public with a complete description in the patent of the invention and how to make and use it.

Newegg has challenged the validity of the '314, '492, and '639 patent claims on a number of grounds. Newegg must prove that a patent claim is invalid by clear and convincing evidence. An issued patent is afforded a presumption of validity based on the presumption that the United States Patent and Trademark Office acted correctly in issuing a patent.

I will now explain to you each of Newegg's grounds for invalidity in detail. In making your determination as to invalidity, you should consider each claim separately.

## 6.1 Section 112 and the Effective Filing Date of the '639 Patent.

All patent claims must satisfy certain requirements for disclosure in the patent specifications called the written description, enablement, and best mode requirements. Essentially, these requirements require that the specifications include particular and sufficient details to disclose the claimed invention. If the patent specification does not include sufficient

---

[25] Sources: Court's Charge in *i4i*, at 15; Final Jury Instructions in *Mass Engineered*, at 21; Court's Charge in *Orion*, at 14-15; Court's Charge in *Forgent*, at 12; Court's Charge in *z4 Techs.*, at 15; J. Davis Model Instructions, at 13.

**Deleted:** <#>Active Inducement of Infringement"¶
Soverain alleges that Newegg is also liable for infringement by actively inducing others to directly infringe claims 35, 49, and 51 of the '314 patent and claims 17, 41, and 61 of the '492 patent. ¶
As with direct infringement, you must determine whether there has been active inducement on a claim-by-claim basis.¶
A person is liable for active inducement of a claim only if:¶
<#>the person takes action during the time the patent is in force which encourages acts by someone else; and¶
<#>the encouraged acts constitute direct infringement of that claim; and¶
<#>the person is aware of the patent, and know or should have known that the encouraged acts constitute infringement of that patent; and¶
<#>the person has an intent to cause the encouraged acts; and¶
<#>the encouraged acts are actually carried out by someone else.¶
In order to prove active inducement, Soverain must prove that each of these requirements is met. Proof of each requirement must be by a preponderance of the evidence, i.e., that it is more likely than not that each of the above requirements has been met.¶
In considering whether Newegg has induced infringement by others, you may consider all the circumstances, including whether or not Newegg obtained the advice of a competent lawyer. You may not assume that merely because Newegg did not obtain an opinion of counsel, the opinion would have been unfavorable.¶
Intent to cause the acts that constitute direct infringement may be demonstrated by evidence of active steps taken to encourage direct infringement, such as advertising an infringing use or instructing how to engage in an infringing use. In order to establish active inducement of infringement, it is not sufficient that Newegg was aware of the act(s) that allegedly constitute the direct infringement. Rather, you must find specifically that Newegg intended to cause the acts that constitute the direct infringement and must have known or should have known that its action would cause the direct infringement. If you do not find that Newegg specifically meets these intent requirements, then you must find that Newegg has not actively [ ... [1] ]

**Formatted:** Bullets and Numbering

**Deleted:** cc

**Formatted:** Space After: 0 pt

**Deleted:** [To be added as necessary]

**Formatted:** Justified, Indent: First line: 0.5", Space After: 0 pt, Line spacing: Double

disclosure, it is said that the claims are not "supported" by the specification. Where one application is filed as a purported continuation of another, the disclosure in the parent application may or may not adequately support the claims of the later filed application. Here, Newegg contends that the '639 patent is not adequately supported by the parent '780 patent.

Newegg bears the burden of showing the failure to satisfy these disclosure requirements by clear and convincing evidence. I will now explain each of these disclosure requirements for you in further detail.

## 6.1.1. WRITTEN DESCRIPTION[26]

The written description requirement is satisfied if a person of ordinary skill in the field, reading the patent application as originally filed, would recognize that the patent application described the invention of the claims, even though the description might not use the exact words found in each claim. The written description must show that the inventor was in possession of each claim of the invention at the time the application for the patent was originally filed, even though the claim may have been changed or new claims added during the prosecution of the parent application, or after the filing of later applications based on the parent application. It is not necessary that each and every aspect of the claim be explicitly discussed, as long as a person of ordinary skill would understand that any aspect not expressly discussed is implicit in the patent application as originally filed.

Formatted: Space After: 0 pt

---

[26] Model Patent Jury Instructions, National Jury Instruction Project, 5.2; Univ. of Rochester v. G.D. Searle & Co., 358 F.3d 916 (Fed. Cir. 2004); Turbocare Div. of Demag Delaval Turbomach. Corp., v. Gen. Elec. Co., 264 F.3d 1111, 1118 (Fed. Cir. 2002); Enzo Biochem, Inc. v. Gen-Probe Inc., 323 F.3d 956 (Fed. Cir. 2002) (en banc); Purdue Pharma L.P. v. Faulding Inc., 230 F.3d 1320 (Fed. Cir. 2000); Union Oil Co. of Cal. v. Atl. Richfield Co., 208 F.3d 989, 996-1001 (Fed. Cir. 2000); Gentry Gallery, Inc. v. Berkline Corp., 134 F.3d 1473, 1478-90 (Fed. Cir. 1998); Vas-Cath, Inc. v. Mahurkar, 935 F.2d 1555 (Fed. Cir. 1991).

Defendant's Submission of NYI-4229755v1    20

6.1.2.  ENABLEMENT[27]

A patent specification must disclose sufficient information to enable one skilled in the field of the invention, at the time the application was filed (or its effective filing date), to make and use the claimed invention.  This requirement is known as the enablement requirement.

In considering whether a patent claim satisfies the enablement requirement, you must keep in mind that patents are written for persons of skill in the field of the invention.  Thus, a patent need not expressly state information that skilled persons would be likely to know or be able to obtain.  Newegg bears the burden of establishing lack of enablement by showing that it is *highly probable that a person skilled in the art, upon reading the patent document, would not be able to make the invention work without undue experimentation.*  The fact that some experimentation may be required for a skilled person to make or use the claimed invention does not mean that a patent's written description fails to meet the enablement requirement.  Factors you may consider in determining whether making the invention would require undue experimentation include:

1. the quantity of experimentation necessary;
2. the amount of direction or guidance disclosed in the patent;
3. the presence or absence of working examples in the patent;
4. the nature of the invention;
5. the state of the prior art;
6. the relative skill of those in the art;
7. the predictability of the art; and
8. the breadth of the claims.

**Formatted:** Indent: First line: 0",
Space After: 0 pt

---

[27] Model Patent Jury Instructions, National Jury Instruction Project, 5.3. AK Steel Corp. v. Sollac & Ugine, 344 F.3d 1234, 1244 (Fed. Cir. 2003); Durel Corp. v. Osram Sylvania Inc., 256 F.3d 1298, 1306 (Fed. Cir. 2001); Union Pac. Res. Co. v. Chesapeake Energy Corp., 236 F.3d 684, 690-92 (Fed. Cir. 2001); Ajinomoto Co. v. Archer-Daniels-Midland Co., 228 F.3d 1338, 1345-46 (Fed. Cir. 2000); Nat'l Recovery Techs., Inc. v. Magnetic Separation Sys., Inc., 166 F.3d 1190, 1195-98 (Fed. Cir. 1999); Enzo Biochem, Inc. v. Calgene, Inc., 188 F.3d 1362, 1371 (Fed. Cir. 1999); In re Wands, 858 F.2d 731, 737 (Fed. Cir. 1988); Spectra-Physics, Inc. v. Coherent, Inc., 827 F.2d 1524, 1533 (Fed. Cir. 1987); White Consol. Indus., Inc. v. Vega Servo Control, Inc., 713 F.2d 788, 791 (Fed. Cir. 1983).

Defendant's Submission of NYI-4229755v1    21

### 6.1.3. BEST MODE[28]

The purpose of the best mode requirement is to ensure that the public obtains a full disclosure on how to practice the invention claimed in the patent. The inventor must disclose the best mode he or she knew at the time of original filing for carrying out the invention as described in the claims. An inventor need not set forth "routine details" that would be apparent to one skilled in the art. However, if an inventor knows of a best way or mode of making and using the claimed invention at the time the patent application was originally filed, then the original written description must contain a description of that mode or the claim is invalid.

To determine whether the inventor complied with the best mode requirements, two questions must be answered:

1. At the time the original patent application was filed, did the inventors consider a particular mode for practicing his invention superior to all other modes?

2. If so, did the inventors adequately disclose the superior mode in the patent?

The first prong of the best mode inquiry focuses on the state of mind of the particular inventor and the knowledge he possessed at the time the original application was filed. The first question is subjective.

---

[28] AIPLA Model Instructions, 35 U.S.C. § 112, ¶1; *Liquid Dynamics Corp. v. Vaughan Co., Inc.*, 449 F.3d 1209, 1223 (Fed. Cir. 2006); *Bayer AG v. Schein Pharms., Inc.*, 301 F.3d 1306, 1314-1319 (Fed. Cir. 2002); *Mentor H/S, Inc., v. Med. Device Alliance, Inc.*, 244 F.3d 1365, 1375 (Fed. Cir. 2001); *Eli Lilly and Co. v. Barr Labs., Inc.*, 251 F.3d 955, 963 (Fed. Cir. 2001); *N. Telecom Ltd. v. Samsung Elecs. Co., Ltd.*, 215 F.3d 1281, 1286 (Fed. Cir. 2000); *Applied Materials, Inc. v. Advanced Semiconductor Materials Am., Inc.*, 98 F.3d 1563, 1581 (Fed. Cir. 1996); *U.S. Gypsum Co. v. Nat'l Gypsum Co.*, 74 F.3d 1209, 1212 (Fed. Cir. 1996); *Transco Prods. Inc. v. Performance Contracting, Inc.*, 38 F.3d 551, 558 (Fed. Cir. 1994); *Shearing v. Iolab Corp.*, 975 F.2d 1541, 1545-46 (Fed. Cir. 1992); *Wahl Instruments, Inc. v. Acvious, Inc.*, 950 F.2d 1575, 1581 (Fed. Cir. 1991); *Amgen, Inc. v. Chugai Pharm. Co., Ltd.*, 927 F.2d 1200, 1209-10 (Fed. Cir. 1991); *Chemcast Corp. v. Arco Indus. Corp.*, 913 F.2d 923, 927-28 (Fed. Cir. 1990); *Spectra-Physics, Inc. v. Coherent, Inc.*, 827 F.2d 1524, 1535-36 (Fed. Cir. 1987); *DeGeorge v. Bernier*, 768 F.2d 1318, 1324-25 (Fed. Cir. 1985); *Application of Gay*, 309 F.2d 769, 772 (C.C.P.A. 1962).

For instance, a selection made for commercial expediency (such as the availability of certain components, prior relationships with certain suppliers, and other routine manufacturing choices) may be the "best" decision in a manufacturing circumstance but may have been chosen by someone other than the inventor or may not be considered by the inventor to be the best mode of carrying out the invention. If the inventor contemplated a best mode before he filed the original patent application and left it out of the application, an amendment after the filing will not cure an original omission of the best mode disclosure.

If the answer to the first question is "yes," the second question of the analysis should be addressed. The second question, an objective inquiry, focuses on the scope of the patented invention and the level of skill in the field of the invention. The disclosure in the original specification must be adequate to allow one of ordinary skill in the art to make and use the best mode of the invention. Those skilled in the field of the invention should not have to look to the commercial embodiment in order to practice the best mode.

### 6.1.4. THE "EFFECTIVE FILING DATE" - DISCLOSURE REQUIREMENTS FOR PRIORITY CLAIMS IN CONTINUATION APPLICATIONS[29]

The "effective filing date" of an application is generally the date that the application was actually filed at the U.S. Patent Office, but in instances with continuation applications, the effective filing date can be earlier. A continuation application is an application filed during the pendency of a parent application, has the same disclosure as the parent application, and which claims priority to the parent application. A claim of priority means that the continuation application is claiming entitlement to the same filing date as the parent application, such that the continuation is treated as if it were filed on the same day as the parent application. Thus, the

---

[29] 35 U.S.C. § 120. *University Of Rochester v. G.D. Searle & Co., Inc.* 358 F.3d 916, 921 (Fed. Cir. 2004). *Bayer AG v. Schein Pharms., Inc.,* 301 F.3d 1306, 1313 (Fed. Cir. 2002); *In re Hafner,* 410 F.2d 1403, 1406 (C.C.P.A. 1969)

date that the parent application was filed can become the "effective filing date" even though the application may have been filed months or years later. The effective filing date determines whether certain items constitute prior art that can be used to invalidate a patent. I will explain prior art and invalidity to you in detail shortly.

Here, the '639 patent was filed as a purported continuation of the '780 patent, claiming priority to the '780 patent. However, the priority claim is not valid unless the invention claimed in the '639 continuation application was disclosed in the '780 parent application in a manner which satisfies all three of the written description, enablement, and best mode requirements I just explained to you.

If the invention claimed in the '639 application is not disclosed in the '780 parent application in a manner such that a person of ordinary skill in the pertinent technical field would believe that the inventors were in possession of it, then the '639 continuation application is not entitled to the earlier filing date of the parent application, and you should not treat the '639 continuation application as if it were filed on the date the '780 parent application was filed, June 7, 1995. Instead, the effective filing date of the '639 patent would be the date the '639 application was actually filed with the Patent Office, January 12, 1998.

Likewise, if the invention claimed in the '639 application is not disclosed in the '780 parent application in a manner which enables a person of ordinary skill in the pertinent technical field to practice the claimed invention without undue experimentation, then the '639 continuation application is not entitled to the earlier filing date of the parent application, and you should not treat the '639 continuation application as if it were filed on the date the '780 parent application was filed, June 7, 1995. Instead, the effective filing date of the '639 patent would be the date the '639 application was actually filed, January 12, 1998.

Defendant's Submission of NYI-4229755v1    24

Finally, if the best more for practicing the invention claimed in the '639 application is not set forth in the '780 parent application, then the '639 continuation application is not entitled to the earlier filing date of the parent application, and you should not treat the '639 continuation application as if it were filed on the date the '780 parent application was filed, June 7, 1995. Instead, the effective filing date of the '639 patent would be the date the '639 application was actually filed, January 12, 1998.

You must undertake the above analysis with respect to each asserted claim of the '639 patent individually.

6.1.5    Indefiniteness[30]

A patent claim must particularly point out and distinctly claim an invention. The claim language must be sufficiently clear that a person of ordinary skill in the pertinent technical field is able to read them, in light of the specification, and determine what they cover, and what they do not cover. If a claim does not satisfy this requirement, the claim is invalid. Newegg bears the burden of showing that the claims are indefinite by clear and convincing evidence.

**6.2    Anticipation for Lack of Novelty[31]**

A patent claim is invalid if the claimed invention is not new. For a claimed invention to be invalid on the basis of anticipation because it is not new, all of its elements must be in a single previous device or method, or described in a single previous publication or patent. We call those things "prior art references." Newegg must prove by clear and convincing evidence that these items are prior art. The description in a reference does not have to be in the same words as the claim, but all the elements of the claim must be there, either stated expressly or necessarily

---

[30] 35 U.S.C. § 112; *LNPEng'g Plastics, Inc. v. Miller Waste Mills, Inc.*, 275 F.3d 1347, 1357 (Fed. Cir. 2001).

[31] Sources: 35 U.S.C. § 102; Court's Charge *i4i*, at 15-18; Final Jury Instructions in *Mass Engineered*, at 22; Court's Charge in *Orion*, at 18-21; Court's Charge in *Forgent*, at 16-17; J. Davis Model Instructions, at 13-15.

Defendant's Submission of NYI-4229755v1     25

implied or inherent in the level of ordinary skill in the field of technology of the patent at the time of the invention, so that someone of ordinary skill in the field of technology of the patent looking at that one reference would be able to make and use the claimed invention. Something is inherent in an item of prior art if it is always present in the prior art or always results from the practice of the prior art, and if a skilled person would understand that to be the case. Inherency may not be established by probabilities or possibilities. The mere fact that a certain thing may coincidentally result from a given set of circumstances is not sufficient. A party claiming anticipation by inherency must show that the elements of the claim are always present in the prior art or always result from the practice of the prior art. You may not combine two or more items of prior art to prove anticipation.

Before explaining the different ways in which Newegg can show that the inventions are not new, there are two basic concepts that underlie your decision on this question.

First I will address the concept of conception. Conception is the mental part of a inventive act, i.e., the formation in the mind of the inventor of a definite and permanent idea of the complete and operative invention as it is thereafter to be applied in practice. Conception of an invention is complete when the idea is so clearly defined in the inventor's mind that a person of ordinary skill in the field of technology would be able to reduce the invention to practice without extensive research or experimentation. Conception may be proven when the invention is shown in its complete form by drawings, disclosure to another person, or other forms of evidence presented at trial.

Second, a claimed invention is reduced to practice when it has been tested sufficiently to show that it will work for its intended purpose. An invention may be reduced to practice even if

the inventor has not made or tested a prototype of the invention. The invention may be reduced

to practice by being fully described in a filed patent application.

Here is a list of ways Newegg can show that a claim of the patents-in-suit was not new:

(1)    If the claimed invention was patented or described in a printed publication,
        anywhere in the world, before the invention was made by the inventors; or

(2)    If the claimed invention was known or used by others in the United States before
        the invention was made by the inventors.

A printed publication or patent will not be an anticipating prior art reference unless it

contains a description of the invention covered by the patent claims that is sufficiently detailed to

teach a skilled person how to make and use the invention without undue experimentation.

Factors to be considered in determining whether a disclosure would require undue

experimentation include:

(1)    the quantity of experimentation necessary;

(2)    the amount of direction or guidance disclosed in the patent or publication;

(3)    the presence or absence of working examples in the patent or publication;

(4)    the nature of the invention;

(5)    the state of the prior art;

(6)    the relative skill of those in the field of the technology;

(7)    the predictability of the art; and

(8)    the breadth of the claims.

A prior public use by another may anticipate a patent claim, even if the use was

accidental or was not appreciated by the other person. Thus, a prior public use may anticipate an

invention even if the user did not intend to use the invention, or even realize he or she had done

so. Newegg must prove anticipation for lack of novelty by clear and convincing evidence.

### 6.2.2   Anticipation by a Printed Publication[32]

Newegg contends that various claims of the patents-in-suit are invalid because they were anticipated by a printed publication. A patent claim is invalid if the invention defined by that claim was described in a printed publication before it was invented by the patent applicant, or more than one year prior to the effective filing date of the United States patent application (as described previously in section 6.1.4). Printed publications may include issued patents.

The disclosure must be complete enough to enable one of ordinary skill in the field of the technology to practice the invention without undue experimentation (you may refer back to the instructions on Anticipation for Lack of Novelty for the eight factors to consider when determining undue experimentation). A printed publication must be reasonably accessible to those members of the public who would be interested in its contents. It is not necessary that the printed publication be available to every member of the public.

So long as the printed publication was available to the public, the form in which the information was recorded is unimportant. The information must, however, have been maintained in some permanent form, such as printed or typewritten pages, magnetic tape, microfilm, photographs, or photocopies.

Newegg must prove anticipation by a printed publication by clear and convincing evidence.

### 6.2.3   Anticipation by Prior Patent[33]

Newegg contends that various claims of the patents-in-suit are invalid because they were anticipated by a prior patent. A claim in a patent is invalid if the invention defined by that claim

---

[32] Sources: Court's Charge in *i4i*, at 18-19; Court's Charge in *Orion*, at 18; J. Davis Model Instructions, at 15.

[33] Sources: 35 U.S.C. § 102; Court's Charge *i4i*, at 19; Court's Charge in *Forgent*, at 17; J. Davis Model Instructions, at 16.

was patented in the United States or a foreign country before it was invented by the inventor of

the patent-in-suit or more than one year before the effective filing date of the inventor's United

States patent application (as described previously in section 6.1.4).

| Deleted: inventor patentee filed his |

A United States patent that was filed before the inventors of the patents-in-suit invented

one of their claimed inventions is prior art with respect to those claimed inventions as of the date

the United States patent was filed. In other words, a U.S. Patent can be prior art as of its filing

date if it was filed before the inventors of the patents-in-suit invented their inventions, even if the

patent did not actually publish or issue until after the inventors invented their inventions.

To show anticipation of the patented invention, Newegg must show by clear and

convincing evidence that the prior patent disclosed all of the elements of each claim of the patent

that Newegg contends is invalid. As with a printed publication, the disclosure must be complete

enough to enable one of ordinary skill in the field of technology to practice the invention without

undue experimentation (you may refer back to the instructions on Anticipation for Lack of

Novelty for the eight factors to consider when determining undue experimentation).

To show anticipation of the patented invention, Newegg must show by clear and

convincing evidence that the prior patent disclosed all of the elements of each claim of the patent

that Newegg contends is invalid.

### 6.2.4    Anticipation by Public Knowledge or Use by Another[34]

Newegg contends that various claims of the patents-in-suit are invalid because they were

anticipated by public knowledge or use by another. A patent claim is invalid if the invention

recited in that claim was publicly known or used in the United States by someone other than the

inventor before the patent applicant invented it, or more than one year before the effective filing

---

[34] Sources: 35 U.S.C. § 102; J. Davis Model Instructions, at 15.

Defendant's Submission of NYI-4229755v1    29

date of the United States patent application (as described previously in section 6.1.4).  Private or

secret knowledge, such as knowledge confidentially disclosed within a small group, is not

enough to invalidate a patent claim.  Newegg must prove anticipation by public knowledge or

use by clear and convincing evidence.

> **Deleted:** was filed

> **Deleted:** Similarly, if something is only publicly known outside of the United States, then the claim is not invalid.

### 6.2.5    Anticipation by Prior Invention[35]

Newegg contends that various claims of the patents-in-suit are invalid because they were

anticipated by a prior invention.  A patent claim is invalid if the invention defined by that claim

was invented by another person in the United States before it was invented by the patentee, and

that other person did not abandon, suppress or conceal the invention.

As a general rule, the first person to reduce an invention to practice is said to be the first

inventor.  An invention is reduced to practice either when a patent application is filed or when

the invention is made and shown to work for its intended purpose.  Thus, if another person

reduces to practice an invention before the inventor on the patent, then the reduction to practice

by the other person will be prior art to the patent claims.

A patentee who is not the first to reduce to practice can still be the first to invent if he can

show two things:

(1)    that he conceived of the invention before the other party conceived of his
          invention; and

(2)    that he exercised reasonable diligence in reducing his invention to practice, from
          the time just before the other party conceived, to the time he reduced to practice.

Reasonable diligence means that the inventor worked continuously in the United States

on reducing the invention to practice.  Interruptions necessitated by the everyday problems and

obligations of the inventor or those working with him or her do not prevent a finding of diligence.

---

[35] Sources: 35 U.S.C. § 102; Court's Charge in *z4 Techs.*, at 18-19; J. Davis Model Instructions, at 15-16.

Defendant's Submission of  NYI-4229755v1  .  30

To show anticipation of the patented invention, Newegg must show by clear and convincing evidence that the prior invention disclosed all of the elements of each claim of the patent that Newegg contends is invalid.

### 6.3    Obviousness[36]

Newegg contends that various claims of the patents-in-suit are invalid because the claimed invention was obvious to one of ordinary skill in the field of technology at the time the invention was made.  To be patentable, an invention must not have been obvious to a person of ordinary skill in the pertinent field of technology at the time the invention was made.  The issue is not whether the claimed invention would have been obvious to you as a layman, to me as a Judge, or to a genius in the art, but whether it would have been obvious to one of ordinary skill in the field of technology at the time it was made.  Newegg bears the burden of proving this defense by clear and convincing evidence.

You must not use hindsight when comparing the prior art to the invention for obviousness.  In making a determination of obviousness or non-obviousness, you must consider only what was known before the invention was made.  You may not judge the invention in light of present day knowledge or by what you learned from or about the patents during trial.

If the prior art merely discloses numerous possible combinations but gives no direction as to which of those main choices is likely to be successful, this does not constitute a prior teaching or suggestion of the claim combination.  Similarly, if the prior art merely discloses that it would be obvious to explore a new technology or general approach that seemed to be a promising field of experimentation, this would not constitute a teaching or suggestion of the claimed combination.

---

[36] Sources: 35 U.S.C. § 103; Court's Charge *i4i,* at 21-22; J. Davis Model Instructions, at 16-18.

In determining whether or not Newegg has established obviousness of a claim of the

patents-in-suit patent by clear and convincing evidence, you must consider the following:

(1)    The scope and content of the prior art put into evidence in this case;

(2)    The differences, if any, between each claim of the patent and that prior art; and

(3)    The level of ordinary skill in the field of technology at the time the invention was
       made.

(4)    Any secondary considerations relating to obviousness or non-obviousness of the
       invention.

| Deleted: additional |

I will now describe in more detail the specific determinations you must make in deciding

whether or not the claimed invention would have been obvious.

### 6.3.2   Scope and Content of the Prior Art[37]

The first question you must answer in determining whether or not the invention was

obvious is the scope and content of the prior art at the time the invention was made.  You must

decide whether the specific references relied upon by Newegg in this case are prior art to the

invention described in the asserted claims of the patents-in-suit.

Prior art includes previous devices, articles and methods that were publicly used or

offered for sale; and printed publications or patents that disclose the invention or elements of the

invention.  Once you decide whether or not specific references are prior art, you must also decide

what those references would have disclosed or taught to one having ordinary skill in the field of

technology of the patent at the time the invention was made.

In order for a reference to be relevant for you to consider in deciding whether or not the

claims of the patents-in-suit would have been obvious, the reference must be within the field of

the inventors' endeavor, or if it is from another field of endeavor, the reference must be

reasonably related to the particular problem or issue the inventors faced or addressed when

---

[37] Source: Court's Charge in *i4i,* at 22-23.

making the inventions described in the claims of the patents-in-suit. A reference from a field of endeavor other than the inventors' is reasonably related to the problem or issues the inventors faced if the reference is one which, because of the matter with which the reference deals, logically would have commended itself to the attention of the inventors when considering the problems or issues they faced. It is for you to decide what the problems or issues were that the inventors faced at the time the inventions in the claims of the patents-in-suit.

### 6.3.3   Differences Over the Prior Art[38]

The second question you must answer in determining whether or not the invention was obvious at the time it was made is what differences there are, if any, between the prior art and the patented invention. In analyzing this issue, do not focus solely on the differences between the prior art and the invention because the test is not whether there are differences. Rather, the test is whether or not the invention, as a whole, would have been obvious to one having ordinary skill in view of all the prior art at the time the invention was made.

If you conclude that the prior art discloses all the elements of the claimed invention, but those elements are in separate items, you must then consider whether or not it would have been obvious to combine those items. A claim is not obvious merely because all of the elements of that claim already existed. One way to decide whether one of ordinary skill in the field of technology would combine what is described in various items of prior art, is whether there is some teaching, suggestion, or motivation in the prior art for a skilled person to make the combination covered by the patent claims. Motivation can be implicit. In other words, motivation need not be explicit.

---

[38] *Id.,* at 23-25; The National Jury Instruction Project, at 5.9; Fifth Circuit Pattern Jury Instructions – Civil (2006), at 9.5. *KSR International Co. v. Teleflex Inc.,* 550 U.S. 398 (2007); Manual of Patent Examining Procedure, § 2143.

Defendant's Submission of  NYI-4229755v1    33

A8021

It is common sense that familiar items may have obvious uses beyond their primary purposes, and a person of ordinary skill often will be able to fit the teachings of multiple patents together like pieces of a puzzle. Multiple references in the prior art can be combined to show that a claim is obvious. Any need or problem known in the field and addressed by the patent can provide a reason for combining the elements in the manner claimed. To determine whether there was an apparent reason to combine the known elements in the way a patent claims, you can look to interrelated teachings of multiple patents, to the effects of demands known to the design community or present in the marketplace, and to the background knowledge possessed by a person of ordinary skill in the field of technology. Neither the particular motivation nor the alleged purpose of the patentee controls. One of ordinary skill in the field of technology is not confined only to prior art that attempts to solve the same problem as the patent claim. Teachings, suggestions, and motivations may also be found within the knowledge of a person with ordinary skill in the field including inferences and creative steps that a person of ordinary skill in the field would employ. Additionally, teachings, suggestions, and motivations may be found in the nature of the problem solved by the claimed invention.

The combination of familiar elements according to known methods is likely to be obvious when it does no more than to yield predictable results. Likewise, simple substitution of one known element for another to yield predictable results may be obvious.

You may also consider whether the claimed invention would have been obvious to try, meaning that the claimed innovation was one of a relatively small number of possible approaches to the problem with a reasonable expectation of success by those skilled in the art. When there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, a person of ordinary skill has good reason to pursue the known options

within his or her technical grasp. If this leads to the anticipated success, it is likely the product

not of innovation but of ordinary skill and common sense. In that instance the fact that a

combination was obvious to try might show that it was obvious.

To find obviousness, you must find not only that prior art would teach one of ordinary

skill to try the combination of known elements, but also that prior art would sufficiently direct

such a person how to obtain the desired result. You may not use hindsight to assemble the

invention from prior art elements.

### 6.3.4   Level of Ordinary Skill in the Field[39]

For obviousness, you must consider the level of ordinary skill in the field. The ordinary

skilled person is a person of average education and training in the field of the invention and is

presumed to be aware of all relevant prior art. The actual inventor's skill is irrelevant to this

inquiry.

You are instructed that a person of ordinary skill in the field of technology would have a

Bachelor of Science degree in computer engineering or computer science, or equivalent

education, with two to three years of practical experience developing or operating software and

systems that relate to commerce on the Internet.

### 6.3.5   Secondary Considerations[40]

| Deleted: Additional |

The next question you must answer, in determining whether or not the invention was

obvious at the time it was made is what evidence there is, if any, of secondary considerations

| Deleted: additional |

relating to the obviousness or non-obviousness of the invention. You may consider in your

analysis any evidence that was presented to you in this case regarding the presence or absence of

---

[39] *Id.*, at 25.

[40] *Id.*, at 25-26; *Leapfrog Enters., Inc. v. Fisher-Price, Inc.*, 485 F.3d 1157, 1162 (Fed. Cir. 2007).

Defendant's Submission of  NYI-4229755v1    35

the following factors in deciding whether or not the invention would have been obvious at the

time it was made:

(1)    Whether or not the invention proceeded in a direction contrary to accepted
wisdom in the field;

(2)    Whether or not there was long felt but unresolved need in the field of technology
that was satisfied by the invention;

(3)    Whether or not others had tried but failed to make the invention;

(4)    Whether or not others copied the invention;

(5)    Whether or not the invention achieved any unexpected results;

(6)    Whether or not the invention was praised by others;

(7)    Whether or not others have taken licenses to use the invention based on the merits
of the invention;

(8)    Whether or not experts or those skilled in the field at the making of the invention
expressed surprise or disbelief regarding the invention;

(9)    Whether or not products incorporating the invention have achieved commercial
success because of the merits of the invention; and

(10)    Whether or not others having ordinary skill in the field of the invention
independently made the claimed invention at about the same time the inventor
made the invention.

The presence of any of the above factors may suggest that the claimed invention was not

obvious. However, such secondary considerations may or may not support an overall conclusion

of nonobviousness in view of an otherwise strong showing of obviousness.

### 6.4    Corroboration of Oral Testimony[41]

Oral testimony of a single witness alone is insufficient to prove prior invention or that

something is prior art. A party seeking to prove prior invention or prior art also must provide

evidence that corroborates any oral testimony, especially where the oral testimony comes from

---

[41] Source: Court's Charge *i4i*, at 20-21.

an interested witness, or a witness testifying on behalf of an interested party. This includes any

individual or company testifying that his invention or its invention predates the patents-in-suit.

Documentary or physical evidence that is made contemporaneously with the inventive process

provides the most reliable proof that the alleged prior art inventor's testimony has been

corroborated. For any oral testimony that a party has put forth alleging that a particular event or

reference occurred before the filing date of the patents-in-suit, that party must also have provided

some sort of corroborating evidence that agrees with that oral testimony. If you find the party

has not corroborated the oral testimony with other evidence, you are not permitted to find that

the subject of that oral testimony qualifies as prior art or supports a prior date of invention.

     If evidence is presented for purposes of attempting to corroborate oral testimony, then

you must determine whether this evidence does, in fact, properly corroborate the oral testimony.

In making this determination, you should consider the following factors:

(1)    The relationship between the corroborating witness and the alleged prior user;

(2)    The time period between the event and this trial;

(3)    The interest of the corroborating witness in the subject matter of this suit;

(4)    Contradiction or impeachment of the witness's testimony;

(5)    Extent and detail of the corroborating witness's testimony;

(6)    The witness's familiarity with the subject matter of the patented invention and the alleged prior use;

(7)    Probability that a prior use could occur considering the state of the art at the time; and

(8)    Impact of the invention on the industry, and the commercial value of its practice.

## 7. DAMAGES[42]

I have now instructed you as to the law governing Soverain's claims of patent infringement and Newegg's claims of invalidity. If you find that Newegg has infringed a valid claim of the '314, '492, or '639 patent, then you must determine what damages Newegg must pay to Soverain for that infringement. If, on the other hand, you find that Newegg has not infringed a valid claim of the '314, '492, or '639 patent, then Soverain is not entitled to any damages, and you should not make any findings about damages for that claim. In other words, you should only undertake the following damages analysis if you find that (a) Newegg has infringed a claim of the '314, 492, or '639 patent, and (b) that claim is valid. If you find that Newegg has infringed any valid claim(s), then you are to undertake the following analysis with respect to that/those claim(s) only.

The fact that I am instructing you about damages does not mean that Soverain is or is not entitled to recover damages. You should not interpret the fact that I have given instructions about Soverain's damages as an indication any way that I believe that Soverain should, or should not, win this case. I am instructing you on damages only so that you will have guidance in the event you decide that Newegg is liable and that Soverain is entitled to recover money from Newegg.

### 7.1    Date Damages Begin[43]

Under the Patent Laws, Soverain can recover damages for infringement that occurred only after Soverain gave "notice" of its patent rights. Here Soverain gave Newegg notice by filing this lawsuit against Newegg on November 2, 2007. In considering damages, the time

---

[42] Sources: Court's Charge in *Orion*, at 26; Court's Charge in *Forgent*, at 22-23; Court's Charge in *z4 Techs.*, at 26; J. Davis Model Instructions, at 19-20.

[43] Source: J. Davis Model Instructions, at 26.

period is November 2, 2007, to the present. It is undisputed that Soverain cannot recover any

damages for any infringement of the patents-in-suit before November 2, 2007.

**7.2    Reasonable Royalty – Entitlement** [44]

The patent laws specifically provide that the amount of damages that Newegg must pay

Soverain for infringing Soverain's patents may not be less than a reasonable royalty for the use

that Newegg made of Soverain's inventions.

**7.3    Reasonable Royalty – Definition** [45]

A royalty is a payment made to the owner of a patent by a non-owner in exchange for

rights to use the claimed invention. The royalty payment generally reflects the value of the use

of the claimed invention. A reasonable royalty is the royalty that would have resulted from a

hypothetical arms-length negotiation between Soverain's predecessor Open Market, and a

company in the position of Newegg on the eve of infringement, with both sides to this

negotiation willing to enter into a license and both sides to this negotiation operating under the

assumptions that the patents are valid, the patents are infringed, and the licensee would respect

the patents.

> Deleted: , or its

You are to decide what a reasonable royalty would be, based on circumstances as of the

time just before Newegg began selling or using the patented inventions. You may consider any

actual profits made by Newegg and any commercial success of the patented inventions, but the

amount of those profits is not determinative on the issue of what is a reasonable royalty.

---

[44] Sources: 35 U.S.C. § 284 (2009); Final Jury Instructions in *Mass Engineered,* at 38; The National Jury Instruction Project, at 6.6.

[45] Sources: Court's Charge in *i4i,* at 27; Final Jury Instructions in *Mass Engineered,* at 38-39; Court's Charge in *z4 Techs.,* at 27-28; J. Davis Model Instructions, at 24.

Defendant's Submission of NYI-4229755v1    39

### 7.4   Reasonable Royalty – Timing[46]

Although the relevant date for the hypothetical reasonable royalty negotiation is the date that the infringement began – you may consider in your determination of reasonable royalty damages any evidence with respect to the expectations for the future that the negotiators had as of the eve of infringement and any actual profits by Newegg after that time, and any commercial success of the patented invention in the form of sales after that time of the patents or infringing product after that time. You may only consider this information, however, if it was foreseeable at the time the infringement began.

### 7.5   Entire Market Value Rule[47]

Where a patented invention is used or sold along with other products not covered by the patent, the patent owner may not collect damages based the value of the other products unless the patent owner can demonstrate that the patented invention is of such paramount importance that it substantially created the value of the other products. In other words, it must be shown that the patented invention is the basis for customer demand of the other products.

Also, if the other products have essentially no functional relationship to the patented invention, but instead the patented invention is used only for convenience or business advantage when selling the other products, damages may not be based on the sales revenues of the other products. Other products may have a functional relationship to the patented invention if the product and patented invention are together analogous to components of a single assembly or parts of a complete machine.

---

[46] Source: AIPLA Model Instructions, Patent Damages No. 22 (same, except for inclusion of the 2001 date and language regarding expectations future negotiators would have in 2001).

[47] Sources: *Lucent Technologies, Inc. v. Gateway, Inc.*, 2009 WL 2902044 (Fed. Cir. 2009); *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1549-51 (Fed. Cir. 1995); *Cornell University v. Hewlett-Packard Co.*, No. 01-CV-1974, 2008 WL 2222189, at *4 (N.D.N.Y. May 27, 2008) (Rader, J., sitting by designation); *Opti, Inc. v. Apple, Inc.*, No. 2:07-CV-21, slip op. at 3 (E.D. Tex. April 3, 2009)

For purposes of your damages calculation, you are to assume that the patented invention is used by Newegg when it sells other products, such as computers and other consumer products, that are not covered by the patents-in-suit. You may not include the entire value of Newegg's product sales revenues in your royalty base unless you believe that the use of the patented shopping cart and session ID inventions create the demand for the products sold by Newegg, and that those inventions have a functional relationship with those products that are not covered by the patents-in-suit. If you do not believe that the patented inventions create the demand for the products sold by Newegg and are functionally related to those products, Soverain may still be able to recover damages, but those damages may not be based on the entire value of the products sold on Newegg's websites, and must instead be based on an amount attributable only to the use of the patented invention.

## 7.6    Burden of Proof [48]

Soverain has the burden to persuade you by a preponderance of the evidence that it suffered the damages it seeks. While Soverain is not required to prove damages with mathematical precision, it must prove its damages with reasonable certainty. Soverain is not entitled to damages that are remote or speculative. Soverain's proof of damages must have a sound economic basis.

---

[48] *Lucent Technologies, Inc. v. Gateway, Inc.*, 2009 WL 2902044 (Fed. Cir. 2009); *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1549-51 (Fed. Cir. 1995); *Cornell University v. Hewlett-Packard Co.*, No. 01-CV-1974, 2008 WL 2222189, at *4 (N.D.N.Y. May 27, 2008) (Rader, J., sitting by designation); *Opti, Inc. v. Apple, Inc.*, No. 2:07-CV-21, slip op. at 3 (E.D. Tex. April 3, 2009); *Grain Processing Corp. v. American Maize-Products Co.*, 185 F.3d 1341, 1350 (Fed. Cir. 1999).

Defendant's Submission of NYI-4229755v1    41

**7.7     Reasonable Royalty – Factors**[49]     <span style="border:1px solid;">Formatted: Bullets and Numbering</span>

In deciding what is a reasonable royalty, you may consider the factors that Soverain and

Newegg would consider in setting the amount Newegg should pay. I will list for you a number

of factors you may consider. This is not every possible factor, but it will give you an idea of the

kinds of things to consider in setting a reasonable royalty.

(1)     Any royalties received by Soverain or its predecessors for the licensing of the patents-in-suit, proving or tending to prove an established royalty.

(2)     Any rates paid by Newegg for the use of other patents comparable to the patents-in-suit.

(3)     The nature and scope of the license, as exclusive or nonexclusive; or as restricted or unrestricted in terms of territory, or with respect to the parties to whom the product may be sold.

(4)     Whether or not Soverain or any of its predecessors had an established policy and marketing program to maintain its patent exclusivity by not licensing others to use the inventions or by granting licenses under special conditions designed to preserve that exclusivity.

(5)     The commercial relationship between the licensor and licensee, such as whether they are competitors in the same territory and the same line of business.

(6)     The effect of selling the patented inventions in promoting sales of other products or inventions of Newegg; the existing value of the inventions to Soverain as a generator of sales of its non-patented items; and the extent of such derivative or convoyed sales.     <span style="border:1px solid;">Deleted: Whether being able to use the patented inventions helps in making sales of other products or services.</span>

(7)     The duration of the patent and the term of the hypothetical license.

(8)     The established profitability of the inventions; their commercial success; and their current popularity.

(9)     The utility and advantages of the patented inventions over the old modes or devices, if any, that had been used for achieving similar results.

---

[49] Source: Court's Charge in *i4i*, at 28-29; Final Jury Instructions in *Mass Engineered*, at 39-40; Court's Charge in *Orion*, a 28-29; Court's Charge in *Forgent*, at 24-25; Court's Charge in *z4 Techs.*, at 28-29; *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970), *modified and aff'd sub nom. Georgia-Pacific Corp. v. United States Plywood Champion Papers, Inc.*, 446 F.2d 295 (2d Cir.), *cert. denied*, 404 U.S. 870 (1971); J. Davis Model Instructions, at 24-26.

(10)  The nature of the patented inventions, the character of the commercial embodiment of the inventions as owned and produced by Soverain, and the benefits to those who have used the inventions.

(11)  The extent to which Newegg has made use of the patented inventions and any evidence that shows the value of that use.

(12)  The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the inventions or analogous inventions.

(13)  The portion of the profits that is due to the patented inventions, as compared to the portion of the profit due to other factors, such as unpatented elements or unpatented manufacturing processes, or features or improvements developed by Newegg.

(14)  Expert opinions as to what a reasonable royalty would be.

(15)  The amount that a licensor such as Open Market and a licensee such as Newegg would have agreed upon if both parties had been reasonably and voluntarily trying to reach an agreement.

> **Deleted:** Soverain

In addition, it is proper for you to consider any economic or business factors that normally prudent business people would, under similar circumstances, reasonably take into consideration in negotiating the hypothetical license.

## 7.8    Non-Infringing Alternatives[50]

> **Formatted:** Indent: Left: 0", Hanging: 0.5"
>
> **Formatted:** Bullets and Numbering

In determining a reasonable royalty, you may consider whether or not Newegg had commercially acceptable non-infringing alternatives to taking a license from Open Market that

> **Deleted:** Soverain or

were available at the time of the hypothetical negotiation and whether that would have affected the reasonable royalty the parties would have agreed upon.

---

[50] Sources: 3A *Federal Jury Practice and Instructions* § 71.01 (5th ed. 2001); *Tate Access Floors, Inc. v. Maxcess Techs., Inc.*, 222 F. 3d 958, 971 (Fed. Cir. 2000); *Fonar Corp. v. General Elec. Co.*, 107 F. 3d 1543, 1553 (Fed. Cir. 1997), *cert. denied,* 522 U.S. 908 (1997).

## 8. INSTRUCTIONS FOR DELIBERATIONS[51]

You must perform your duties as jurors without bias or prejudice as to any party. The law does not permit you to be controlled by sympathy, prejudice, or public opinion. All parties expect that you will carefully and impartially consider all the evidence, follow the law as it is now being given to you, and reach a just verdict, regardless of the consequences.

It is your sworn duty as jurors to discuss the case with one another in an effort to reach agreement if you can do so. Each of you must decide the case for yourself, but only after full consideration of the evidence with the other members of the jury. While you are discussing the case, do not hesitate to re-examine your own opinion and change your mind if you become convinced that you are wrong. However, do not give up your honest beliefs solely because the others think differently, or merely to finish the case.

Remember that in a very real way you are the judges – judges of the facts. Your only interest is to seek the truth from the evidence in the case.

You should consider and decide this case as a dispute between persons of equal standing in the community, of equal worth, and holding the same or similar stations in life. A limited liability corporation is entitled to the same fair trial as a private individual. All persons, including limited liability corporations, and other organizations stand equal before the law and are to be treated as equals. A patent owner is entitled to protect its patent rights under the United States Constitution. This includes bringing suit in a United States District Court for money damages for infringement. This may be done regardless of whether the owner of the patent is an individual, a partnership, a bank, a small company with only a few investors, or a large company

---

[51] Sources: Court's Charge in *i4i*, at 30-31; Final Jury Instructions in *Mass Engineered*, at 41-42; Court's Charge in *Orion*, at 29-31; Court's Charge in *Forgent*, at 26-27; Court's Charge in *z4 Techs.*, at 29-31; J. Davis Model Instructions, at 28-29.

made up of many investors. The law recognizes no distinction among types of patent owners. A patent owner may be a competitor of an accused infringer, but it does not have to be. The characterization of a patent lawsuit as good or bad or as misuse of the patent laws based upon the status of the patent owner is inappropriate and should not play any part in your deliberations. All corporations, partnerships and other organizations stand equal before the law, regardless of size or who owns them, and are to be treated as equals.

When you retire to the jury room to deliberate on your verdict, you may take this charge with you as well as exhibits which the Court has admitted into evidence. Select your Foreperson and conduct your deliberations. If you recess during your deliberations, follow all of the instructions that the Court has given you about/on your conduct during the trial. After you have reached your verdict, your Foreperson is to fill in on the form your answers to the questions. Do not reveal your answers until such time as you are discharged, unless otherwise directed by me. You must never disclose to anyone, not even to me, your numerical division on any question.

Any notes that you have taken during this trial are only aids to memory. If your memory should differ from your notes, then you should rely on your memory and not on the notes. The notes are not evidence. A juror who has not taken notes should rely on his or her independent recollection of the evidence and should not be unduly influenced by the notes of other jurors. Notes are not entitled to any greater weight than the recollection or impression of each juror about the testimony.

If you want to communicate with me at any time, please give a written message or question to the bailiff, who will bring it to me. I will then respond as promptly as possible either in writing or by having you brought into the courtroom so that I can address you orally. I will

always first disclose to the attorneys your question and my response before I answer your question.

After you have reached a verdict, you are not required to talk with anyone about the case unless the Court orders otherwise. You may now retire to the jury room to deliberate.

| Defendant's Submission of NYI-4229755v1   46

Page 19: [1] Deleted ...................... Author ....................................

### Active Inducement of Infringement[1]

Soverain alleges that Newegg is also liable for infringement by actively inducing others to directly infringe claims 35, 49, and 51 of the '314 patent and claims 17, 41, and 61 of the '492 patent.

As with direct infringement, you must determine whether there has been active inducement on a claim-by-claim basis.

A person is liable for active inducement of a claim only if:

the person takes action during the time the patent is in force which encourages acts by someone else; and

the encouraged acts constitute direct infringement of that claim; and

the person is aware of the patent, and know or should have known that the encouraged acts constitute infringement of that patent; and

the person has an intent to cause the encouraged acts; and

the encouraged acts are actually carried out by someone else.

In order to prove active inducement, Soverain must prove that each of these requirements is met. Proof of each requirement must be by a preponderance of the evidence, i.e., that it is more likely than not that each of the above requirements has been met.

In considering whether Newegg has induced infringement by others, you may consider all the circumstances, including whether or not Newegg obtained the advice of a competent lawyer. You may not assume that merely because Newegg did not obtain an opinion of counsel, the opinion would have been unfavorable.

---

[1] Sources: Court's Charge in *i4i*, at 11-12; Final Jury Instructions in *Mass Engineered*, at 16-17 .

Intent to cause the acts that constitute direct infringement may be demonstrated by evidence of active steps taken to encourage direct infringement, such as advertising an infringing use or instructing how to engage in an infringing use. In order to establish active inducement of infringement, it is not sufficient that Newegg was aware of the act(s) that allegedly constitute the direct infringement. Rather, you must find specifically that Newegg intended to cause the acts that constitute the direct infringement and must have known or should have known that its action would cause the direct infringement. If you do not find that Newegg specifically meets these intent requirements, then you must find that Newegg has not actively induced the alleged infringement.

ATTACHMENT 5—PLAINTIFF'S SUBMISSION

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

| | | |
|---|---|---|
| SOVERAIN SOFTWARE LLC, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:07-CV-00511-LED** |
| | ) | |
| CDW CORPORATION, | ) | |
| NEWEGG INC., | ) | |
| REDCATS USA, INC. | ) | |
| SYSTEMAX INC., | ) | |
| ZAPPOS.COM, INC., | ) | |
| REDCATS USA, L.P., | ) | |
| THE SPORTSMAN'S GUIDE, INC., | ) | |
| AND | ) | |
| TIGERDIRECT, INC., | ) | |
| | ) | |
| **Defendants.** | ) | |

### PLAINTIFF'S SUBMISSION OF JOINT PROPOSED VERDICT FORM

In answering these questions, you are to follow all of the instructions I have given you in the Charge of the Court.

## QUESTION NO. 1

A.    Did Soverain prove, by a preponderance of the evidence, that Newegg directly infringed the patent claims of the '314 Patent and the '492 Patent?

B.    Did Soverain prove, by a preponderance of the evidence, that Newegg induced infringement of the patent claims of the '314 Patent and the '492 Patent?

**For each claim, answer "Yes" or "No" in column 1A. If for any claim your answer in column 1A is "No," then for that claim you must answer "Yes" or "No" in column 1B. If for any claim your answer in column 1A is "Yes," then do not answer column 1B for that claim.**

**'314 Patent:**

|  | 1A (Direct Infringement) | 1B (Inducement of Infringement) |
|---|---|---|
| Claim 35: | _____ | _____ |
| Claim 49: | _____ | _____ |
| Claim 51: | _____ | _____ |

**'492 Patent:**

|  | 1A (Direct Infringement) | 1B (Inducement of Infringement) |
|---|---|---|
| Claim 17: | _____ | _____ |
| Claim 41: | _____ | _____ |
| Claim 61: | _____ | _____ |

NYI-4232317v1

## QUESTION NO. 2

Did Soverain prove, by a preponderance of the evidence, that Newegg directly infringed the patent claims of the '639 Patent?

**For each claim, answer "Yes" or "No."**

**'639 Patent:**

Claim 60: _____

Claim 66: _____

Claim 68: _____

Claim 79: _____

NYI-4232317v1

## QUESTION NO. 3

3.     Did Newegg prove, by clear and convincing evidence, that the patent claims of the '314 Patent, the '492 Patent, and the '639 Patent are invalid as anticipated by the prior art?

**For each claim, answer "Yes" or "No."**

**'314 Patent:**

Claim 49:            _____

**'492 Patent:**

Claim 17:            _____

**'639 Patent:**

Claim 60:            _____

Claim 68:            _____

NYI-4232317v1

## QUESTION NO. 4

4.    Did Newegg prove, by clear and convincing evidence, that the patent claims of the '314 Patent, the '492 Patent, and the '639 Patent are invalid as obvious to a person of ordinary skill in the field of technology at the time the invention of that claim was made?

**For each claim, answer "Yes" or "No."**

**'314 Patent:**

Claim 34: _____

Claim 51: _____


**'492 Patent:**

Claim 17: _____

Claim 41: _____


**'639 Patent:**

Claim 60: _____

Claim 66: _____

Claim 68: _____

Claim 79: _____

NYI-4232317v1

**Answer Question No. 5 for any patent for which you answered "Yes" for one or more of the claims in Question No. 1, and for which you also answered "No" for the same claim in both Questions Nos. 3 and 4.**

## QUESTION N0. 5

5.      What sum of money, if paid now in cash, do you find should be awarded to Soverain as adequate to compensate it for the patent claims you have found to have been infringed?

'314 Patent and/or '492 Patent      $_____

**Answer Question No. 6, if you answered "Yes" for one or more of the claims in Question No. 2, and for which you also answered "No" for the same claim in both Questions Nos. 3 and 4.**

### QUESTION N0. 6

6.      What sum of money, if paid now in cash, do you find should be awarded to Soverain as adequate to compensate it for the patent claims you have found to have been infringed?

       **'639 Patent**        $ _____

**SIGNED** this _____ day of February, 2010.

_____
            JURY FOREPERSON

NYI-4232317v1

ATTACHMENT 6—DEFENDANT'S SUBMISSION          Deleted: DISCUSSION DRAFT

## IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF TEXAS
### TYLER DIVISION

| | | |
|---|---|---|
| SOVERAIN SOFTWARE LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 6:07-CV-00511-LED |
| | ) | |
| CDW CORPORATION, | ) | |
| NEWEGG INC., | ) | |
| REDCATS USA, INC. | ) | |
| SYSTEMAX INC., | ) | |
| ZAPPOS.COM, INC., | ) | |
| REDCATS USA, L.P., | ) | |
| THE SPORTSMAN'S GUIDE, INC., | ) | |
| AND | ) | |
| TIGERDIRECT, INC., | ) | |
| | ) | |
| Defendants. | ) | |

### DEFENDANT'S SUBMISSON OF

### JOINT PROPOSED VERDICT FORM

In answering these questions, you are to follow all of the instructions I have given you in the Charge of the Court.

| Defendant's Submission of NY1-4232317v1

## QUESTION NO. 1

Did Soverain prove, by a preponderance of the evidence, that Newegg directly infringed the patent claims of the '314 Patent and the '492 Patent?

For each claim, answer "Yes" or "No".

**'314 Patent:**

(Direct Infringement)

Claim 35: _____

Claim 49: _____

Claim 51: _____

**'492 Patent:**

(Direct Infringement)

Claim 17: _____

Claim 41: _____

Claim 61: _____

| Deleted: A. |
| Deleted: B.  Did Soverain prove, by a preponderance of the evidence, that Newegg induced infringement of the patent claims of the '314 Patent and the '492 Patent?¶ |
| Deleted:  in column 1A |
| Deleted: If for any claim your answer in column 1A is "No," then for that claim you must answer "Yes" or "No" in column 1B.  If for any claim your answer in column 1A is "Yes," then do not answer column 1B for that claim. |
| Deleted: 1A |
| Deleted: 1A |

Defendant's Submission of                    - 2 -
NYI-4232317v1

## QUESTION NO. 2

Did Soverain prove, by a preponderance of the evidence, that Newegg directly infringed the patent claims of the '639 Patent?

**For each claim, answer "Yes" or "No."**

**'639 Patent:**

Claim 60:    _____

Claim 66:    _____

Claim 68:    _____

Claim 79:    _____

A8046

## QUESTION NO. 3

3.   Did Newegg prove, by clear and convincing evidence, that the patent claims of the '314
     Patent, the '492 Patent, and the '639 Patent are invalid as anticipated by the prior art?

     **For each claim, answer "Yes" or "No."**

**'314 Patent:**

| Deleted: '314 Patent:¶ |
| Claim 49:            ... [1] |

     Claim 35:      _____

     Claim 49:      _____

     Claim 51:      _____

**'492 Patent:**

     Claim 17:      _____

     Claim 41:      _____

     Claim 61:      _____

**'639 Patent:**

     Claim 60:      _____

     Claim 66:      _____

     Claim 68:      _____

     Claim 79:      _____

Defendant's Submission of                    - 4 -
NYI-4232317v1

## QUESTION NO. 4

4.     Did Newegg prove, by clear and convincing evidence, that the patent claims of the '314 Patent, the '492 Patent, and the '639 Patent are invalid as obvious to a person of ordinary skill in the field of technology at the time the invention of that claim was made?

**For each claim, answer "Yes" or "No."**

**'314 Patent:**

<div>

Claim 35: _____

Claim 49: _____   _____

Claim 51: _____   _____

</div>

**'492 Patent:**

<div>

Claim 17: _____   _____

Claim 41: _____   _____

Claim 61: _____   _____

</div>

**'639 Patent:**

<div>

Claim 60: _____   _____

Claim 66: _____   _____

Claim 68: _____   _____

Claim 79: _____   _____

</div>

**Deleted: '314 Patent:¶**
Claim 34: _____ _____ ... [2]

Defendant's Submission of                    - 5 -
NYI-4232317v1

**QUESTION NO. 5**

5.     Did Newegg prove, by clear and convincing evidence, that the '780 patent fails to support       Deleted: 4
the claims of the '639 patent for lack of written description, lack of enablement, and/or
failure to set for the best mode of practicing the invention?

**Answer "Yes" or "No."**

**Answer:** _____

Answer Question No. 6 for any patent for which you answered "Yes" for one or more of the claims in Question No. 1, and for which you also answered "No" for the same claim in both Questions Nos. 3 and 4.

<div style="text-align:center">

**QUESTION NO. 6**

</div>

6.    What sum of money, if paid now in cash, do you find should be awarded to Soverain as adequate to compensate it for the patent claims you have found to have been infringed?

'314 Patent and/or '492 Patent    $ _____

<div style="text-align:right">

| Deleted: 5 |
| Deleted: 5 |
| Deleted: 5 |

</div>

Defendant's Submission of                    - 7 -
NYI-4232317v1

Answer Question No. 7, if you answered "Yes" for one or more of the claims in
Question No. 2, and for which you also answered "No" for the same claim in Questions Nos.
3 and 4.

| | Deleted: 6 |
| Deleted: both |
| Deleted: , |
| Deleted: , or 5. and 4. |
| Deleted: 6 |

QUESTION N0. 7

7.    What sum of money, if paid now in cash, do you find should be awarded to Soverain as
adequate to compensate it for the patent claims you have found to have been infringed?

| | Deleted: 6 |

'639 Patent          $_____

SIGNED this _____ day of February, 2010.

_____
JURY FOREPERSON

**Page 4: [1] Deleted**     **Author**

**'314 Patent:**

        Claim 49:       _____

**'492 Patent:**

        Claim 17:       _____

**'639 Patent:**

        Claim 60:       _____

        Claim 68:       _____

**Page 5: [2] Deleted**     **Author**

**'314 Patent:**

        Claim 34:       _____

        Claim 51:       _____

**'492 Patent:**

        Claim 17:       _____

        Claim 41:       _____

**'639 Patent:**

        Claim 60:       _____

        Claim 66:       _____

        Claim 68:       _____

        Claim 79:       _____

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| SOVERAIN SOFTWARE LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | Civil Action No. 6:07-CV-00511-LED |
| CDW CORPORATION, NEWEGG | ) | |
| INC., REDCATS USA, INC., | ) | ***Filed Under Seal*** |
| SYSTEMAX INC., ZAPPOS.COM, | ) | |
| INC., REDCATS USA, L.P., THE | ) | |
| SPORTSMAN'S GUIDE, INC., and | ) | |
| TIGERDIRECT, INC., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DEFENDANT NEWEGG'S MOTION IN LIMINE

Defendant Newegg, Inc. ("Newegg") hereby respectfully moves that before commencement of the voir dire examination of the jury panel, any and all of the witnesses and attorneys of Soverain Software, LLC ("Soverain") be instructed to refrain from making any statement, argument, mention or interrogation, directly or indirectly, in any manner whatsoever, concerning any of the matters set forth below, without counsel first approaching the bench and obtaining a ruling from the Court, outside the presence and outside the hearing of all prospective jurors and jurors ultimately selected in this cause, regarding any alleged theory of admissibility of such matters:

    I.      Preclusion of Evidence, Statements, and Arguments Relating to Newegg's Total Sales Revenues and Profits

   II.     Preclusion of Evidence, Statements, and Arguments Referring or Relating to Licenses or Licensees of the Patents-in-suit, where such Licenses were Entered into in Settlement of Litigation

III.    Preclusion of Testimony by Michael Shamos which Purports to Explain Legal Principles or Provide Legal Instruction for Analyzing the Validity of the Asserted Claims

IV.    Preclusion of Soverain from Offering Arguments and Witness Statements Related to the Reexaminations of the '314 and '492 Patents, Wherein such Arguments or Statements Suggest that the Patents are Somehow Entitled to a Heightened or Strengthened Presumption of Validity by Virtue of having undergone Reexamination

Each of these issues will now be addressed in further detail below.

## ARGUMENT

## I. PRECLUSION OF EVIDENCE, STATEMENTS, AND ARGUMENTS RELATING TO NEWEGG'S TOTAL SALES REVENUES AND PROFITS

For the reasons set forth below, Newegg hereby moves this Court to exclude at trial evidence, statements, or arguments offered by Soverain which demonstrate, refer to, or relate to Newegg's total sales revenues and/or profits.  Such evidence, statements, and arguments are irrelevant and unfairly prejudicial under Federal Rules of Evidence 402 and 403.

Soverain's position regarding damages in this case has been explained by Mr. James Nawrocki, Soverain's damages expert, in his report and deposition.  In addition to Mr. Nawrocki's expected testimony relating to Newegg's total sales, Soverain has also on its Exhibit List that it "will use" at trial 15 documents which include Newegg's totals sales revenues and related financial information. *See* Soverain Exhibit List, Exhibits 162-176, attached hereto as Exhibit A.  Mr. Nawrocki based his reasonable royalty on the total online sales revenues earned by Newegg, thereby invoking what is known as the "entire market value rule." *See* Dkt. Nos. 252 and 267.[1]  Where a patented product is sold or used along with another distinct product,

---

[1] Although Soverain contends that Mr. Nawrocki has not invoked the entire market value rule, Soverain's arguments exalt form over substance, and impermissibly attempt to "backdoor" an entire market value opinion by engaging in semantics. *See* Dkt. Nos. 264 and 267; *see also Lucent Technologies, Inc. v. Gateway, Inc.*, 2009 WL 2902044, at

damages liability for patent infringement does not extend to "items that have essentially no functional relationship to the patented invention and that may have been sold with an infringing device only as a matter of convenience or business advantage . . . ." *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1550 (Fed. Cir. 1995). This is because "there is no basis for extending that recovery to include damages for items that are neither competitive with nor function with the patented invention." *Id.* at 1551.

Damages for patent infringement are limited to those that can be tied to the patented subject matter. *Id.* at 1549. It is only in specific circumstances that the entire market rule may be properly invoked, namely, only if the patented component is "of such paramount importance that it substantially created the value of the [other product(s)]," or constitutes "the basis for customer demand" of those products. *Id.*

The total revenues and profits earned by Newegg bear no relevance to Soverain's damages model outside of an invocation of the entire market value rule. Newegg's business involves operating websites that re-sell products such as computers and other electronics. The subject matter of the patents-in-suit simply provides functionality by which certain particular aspects of the overall shopping experience on Newegg's website may be effectuated. Specifically, the patents encompass technology including shopping cart functionality (i.e., generally allowing users to select and gather various different items while shopping, to later be purchased all as a single transaction) and session identification (i.e., generally storing personal and shopping-related information so that the website can identify, group, and organize records of the user's activity on the website). Newegg, not being a software company or competitor of

---

*32 (Fed. Cir. 2009) (rejecting expert's attempt to manipulate royalty base and royalty rate to achieve an entire market value measure of damages under the guise of simply proffering a heightened royalty rate).

Soverain's, does not sell the software technology covered by the patents-in-suit. Rather, Newegg at most allegedly uses the patented software technology as one small part of its overall websites.

As explained in Newegg's *Daubert* motion (Dkt. No. 252, at 4-6), all the evidence in this case shows that Newegg's products bear no functional relationship to the patented inventions. All things being equal, a product purchased via www.Newegg.com is the same if it is purchased via www.Amazon.com, and is also same if it is purchased at a brick and mortar store location such as Best Buy. The end product is completely unaffected by the manner in which or vendor from which it is purchased. *Id.* Newegg's use or non-use of the patented technology has no impact on the products it sells. The products sold by Newegg therefore "have essentially no functional relationship to the patented invention," and cannot be used as a basis for damages. *Rite-Hite*, 56 F.3d at 1549. At most, the patented technology is used by Newegg "only as a matter of convenience or business advantage" when selling products online. *Rite-Hite*, 56 F.3d at 1550. The total value of Newegg's sales is therefore irrelevant to a proper damages analysis in this case because, as a matter of law, Soverain cannot base its reasonable royalty on the products sold by Newegg.

Further, Soverain has identified no documents in its trial exhibits list, deposition testimony in its designations, or witnesses capable of providing testimony tending to show that the patented technology drives demand for the products Newegg sells on its website. Nothing in Mr. Nawrocki's reports sets forth any facts or opinions that would support such a showing. Indeed, Soverain has taken the position that it need not provide <u>any</u> evidence that the patented technology drives demand for Newegg's products. Dkt. No. 264, at p. 4, FN 3. In *Lucent Technologies, Inc. v. Gateway, Inc.,* , the Federal Circuit rejected an expert's basing damages on the sale of Microsoft Outlook as a whole because "there was no 'evidence that anybody

anywhere at any time ever bought Outlook . . . because it had [the patented] date picker.'" 2009 WL 2902044, at *31 (Fed. Cir. 2009). Likewise, here Soverain has neither the intention nor the ability to provide evidence that "anybody anywhere at any time ever [shopped on Newegg's websites] . . . because it [has a shopping cart and method for tracking sessions]." Accordingly, Soverain cannot as a matter of law introduce evidence of Newegg's total sales or profits, because such evidence is only relevant is Soverain can demonstrate that the patented technology drives demand for Newegg's products.

Even if this Court finds that Newegg's total sales revenues and profits may be deemed relevant to this litigation, such evidence must still be excluded as being unfairly prejudicial, confusing the issues, and misleading the jury. Fed. R. Evid. 403. Newegg's total sales revenues and profits have no logical connection to Soverain's damages model outside of an entire market value analysis. Introduction of evidence or testimony relating to such financial information would seriously confuse and mislead the jury into a legally erroneous damages calculation, wherein the damages awarded are based on the value of the products sold on Newegg's website. Further, Newegg is a successful company, selling more than a billion dollars worth of merchandise annually in recent years. Such facts have no proper influence on the damages calculation in this case, and the introduction of such large sales numbers would unfairly prejudice Newegg.

## II. PRECLUDE EVIDENCE, STATEMENTS, AND ARGUMENTS REFERRING OR RELATING TO LICENSES OR LICENSEES OF THE PATENTS-IN-SUIT, WHERE SUCH LICENSES WERE ENTERED INTO IN SETTLEMENT OF LITIGATION

For the reasons set forth below, Newegg hereby moves this Court to exclude at trial evidence, statements, or arguments offered by Soverain which refer or relate to any licenses or licensees of the patents-in-suit, where such licenses were entered into in settlement of litigation.

Because evidence or statements regarding Newegg's gross sales revenue are

appropriately considered and relevant to a *Georgia-Pacific* damages analysis, and because

Newegg cites no authority to the contrary, Newegg's first motion *in limine* should be denied.

**II.    The Court should deny Newegg's motion to preclude evidence, statements, and arguments referring or relating to licenses or licensees of the patents-in-suit, where such licenses were entered into in settlement of litigation**

Newegg's second motion *in limine* seeks to preclude under Federal Rules of Evidence

403 and 408 all evidence related to any litigation-related settlement agreement entered into by

Soverain. It takes Newegg until the second page of its argument to come clean that Soverain

does not, in fact, intend to introduce into evidence litigation-related settlement agreements

(which Newegg acknowledges do not appear on Soverain's exhibit list). Nor does Soverain seek

to introduce the negotiated amounts of those settlement agreements. All that Soverain seeks to

introduce at trial is the fact of the settlement agreements, and the names of the licensees.

Newegg's motion is properly denied because the evidence that Soverain intends to

introduce at trial does not fall within exclusionary Fed. R. Evid. 408. Rule 408 is specific that it

is invoked only when evidence is "offered to prove liability for, invalidity of, or amount of a

claim that was disputed as to validity or amount." Fed. R. Evid. 408 (a). "This Rule does *not*

require exclusion if the evidence is offered for purposes not prohibited by subdivision (a)." Fed.

R. Evid. 408 (b) (emphasis added).

Newegg reads Rule 408 far too broadly in an attempt to prevent the jury from hearing not

only the amounts of the litigation-related settlement agreements, but the names of Soverain's

licensees. Newegg's position finds no support in Rule 408 or federal case law. In fact,

Newegg's own cases explain this limitation on the Rule. For example, in *Pioneer Corp. v.*

*Samsung SDI Co.*, LTD, 2008 U.S. Dist. LEXIS 107079, at *14 (E.D. Tex. Oct. 2, 2008), this

Court explained that Rule 408 "by its terms does not operate to exclude evidence unless it is

offered to prove liability for or invalidity of the claim or its amount." *Id.* (citations omitted). To

the contrary, "[e]vidence of agreements in general . . . may be relevant and not prohibited by

Rule 408 as long as it 'does not extend to the terms of those licenses granted in settlement of

litigation.'" *Inline Connection Corp. v. AOL Time Warner, Inc.*, 470 F. Supp. 2d 435, 440 (D.

Del. 2007) (citations omitted).

Newegg is forced to misstate the underlying issue to find case law to support its

argument. The cases cited by Newegg all address whether litigation-related settlement

agreements, including evidence as to the negotiated amounts, should be admitted at trial. *See*

*Pioneer Corp.,* 2008 U.S. Dist. LEXIS 107079, at \*5 (excluding testimony regarding

"*negotiations, offers and agreements* entered into under the threat of litigation"); *Spreadsheet*

*Automation Corp. v. Microsoft Corp.*, 587 F. Supp. 2d 794, 800 (E.D. Tex. 2007) ("*A payment* of

any sum in settlement of a claim for alleged infringement" is not admissible) (emphasis added).

Newegg's cases do not address the current issue, whether the existence of the licenses or the

identity of the licensees fall within the Rule.

Soverain seeks to introduce evidence only as to the existence of the licenses, and the

identities of the licensees. This evidence is permissible within the bounds of Rule 408, and

therefore properly admitted at trial.

Newegg's next argument, that Fed. R. Evid. 403 mandates exclusion of the names of

Soverain's licensees, also fails. This motion is not about precluding Soverain from offering the

litigation-related agreements into evidence; the parties agree that such evidence cannot be

offered. Similarly, this motion is not about excluding the amounts paid by licensees to settle

litigation; again, the parties agree also that such evidence is not to be offered. The only issue is

whether the jury can hear the names of any of those licensees. Newegg seeks to use Rule 403 to

exclude mention of any of those names so as to mislead the jury into believing that a reputable company involved in ecommerce has never taken a license to the patents-in-suit, thereby implying that the patents must be of limited value.

This prejudice is compounded by the fact that Newegg intends to offer into evidence license agreements entered into under threat of litigation by Soverain's predecessor. (Newegg's damages expert Christopher Bakewell relies on these licenses in his expert report, and Newegg identifies these licenses on its exhibit list as likely to be used at trial.) The simple fact is that a number of online retailers, including Amazon.com, the Gap, Zappos, and TigerDirect are licensed under the patents-in-suit. Any danger of prejudice to Newegg if the names of Soverain's licensees are allowed is greatly outweighed by the prejudice to Soverain if the names of its licensees are precluded. Newegg's attempt to preclude Soverain from identifying its licensees – while simultaneously introducing evidence of little known companies who licensed the patents years and years ago from Soverain's predecessor – is itself unfairly prejudicial and would mislead the jury.

Because Soverain does not seek to admit litigation-related license agreements into evidence, or offer evidence relating to the specific terms of the license agreements, Newegg's second motion *in limine* should be denied.

**III.** **The Court should deny Newegg's motion to preclude testimony by Michael Shamos which purports to explain legal principles or provide legal instruction for analyzing the validity of the asserted claims**

Dr. Shamos will not "provide legal instruction" to the jury as Newegg charges. He should, however, be permitted to present the bases for his expert testimony concerning validity of the patents in suit. This testimony will necessarily include the legal standards for validity as he understands them that he applied in forming his opinions. Newegg seeks to preclude such testimony by Shamos and, therefore, Soverain opposes Newegg's motion.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

| | | |
|---|---|---|
| SOVERAIN SOFTWARE LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | Civil Action No. 6:07-CV-00511-LED |
| CDW CORPORATION, NEWEGG | ) | |
| INC., REDCATS USA, INC., | ) | |
| SYSTEMAX INC., ZAPPOS.COM, | ) | |
| INC., REDCATS USA, L.P., THE | ) | |
| SPORTSMAN'S GUIDE, INC., and | ) | |
| TIGERDIRECT, INC., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**Newegg's Rule 50(a) Motion for Judgment as a Matter of Law of Non-Infringement**

TABLE OF CONTENTS

I.  The JMOL Standard ................................................................................. 1

II.  Standards for Infringement ...................................................................... 2

    A.  Direct Infringement ........................................................................ 2

        1.  All-Elements Rule .............................................................. 2

        2.  Doctrine of Equivalents ...................................................... 3

        3.  Divided Infringement of Method Claims ............................ 3

        4.  No Divided Infringement of System Claims ...................... 4

    B.  Indirect Infringement ...................................................................... 6

III.  Soverain's Infringement Claims .............................................................. 6

IV.  Argument – No Literal Infringement ....................................................... 7

    A.  No Literal Infringement: Buyer Computer and Client Computer
        Limitations ...................................................................................... 7

    B.  No Literal Infringement – Programming Limitations .................... 15

    C.  No Literal infringement – Modification Limitations ..................... 15

    D.  No Literal Infringement – "plurality of requests . . . to add a plurality of
        respective products to a shopping cart in . . . [said or the] shopping cart
        database" ......................................................................................... 16

V.  Argument – No Infringement under Doctrine of Equivalents ................. 17

VI.  Argument – No Indirect Infringement ..................................................... 18

VII.  Conclusion ............................................................................................... 19

Defendant, Newegg, Inc. moves for judgment as a matter of law (JMOL) of Non-Infringement under Fed. R. Civ. P. Rule 50(a).[1] Soverain Software LLC ("Soverain" or "Plaintiff") has failed to present any evidence that could support a jury's finding that Newegg infringes the asserted claims of the three patents in suit. Soverain's infringement claims are premised on misapplied or erroneous legal theories and do not conform to the Federal Circuit's legal proof requirements. Accordingly, a jury finding of infringement would be legally infirm, and based on improper and irrelevant evidence. Therefore, the Court should rule that Newegg does not infringe the asserted claims of the patents in suit as a matter of law.[2]

## I.    The JMOL Standard

Rule 50(a)(1) of the Federal Rules of Civil Procedure provides:

> If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may determine the issue against that party; and may grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

Judgment as a matter of law is appropriate when "there is no legally sufficient evidentiary basis for a reasonable jury to find for [the non-moving] party on that issue." FED. R. CIV. P. 50(a); *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 149-50 (2000); *Adams v. Groesbeck I.S.D.*, 475 F.3d 688 (5th Cir. 2007); *Bryant v. Compass Group USA Inc.*, 413 F.3d 471 (5th Cir. 2005).[3]

---

[1] The testimony cited or described herein is exemplary only since the majority was unavailable by transcript for preparing this motion given the Court's schedule, which had the parties close evidence, rest, and argue the charge on April 29, 2010 before submitting the case to the jury April 30, 2010. When Newegg files any Rule 50(b) motions, it will supplement the cited/described testimony herein, as appropriate, and correct any inadvertent citation or other errors that may have arisen.

[2] Newegg renews its previously filed Motion for Judgment of Non-Infringement of the '639, '314 and '492 patents (Docket No. 248), which the Court has carried with the case.

[3] Rule 50 motions are governed by "the law of the regional circuit where the appeal from the district court normally would lie." *Z4 Techs., Inc. v. Microsoft Corp.*, 507 F.3d 1340, 1346 (Fed. Cir. 2007). Accordingly, the law of the Fifth Circuit applies to the "evidentiary" principles governing judgment as a

1

Under the law of the Fifth Circuit, entry of a judgment as a matter of law is appropriate if evidence supporting the movant is "uncontradicted and unimpeached [or] if the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that [a] reasonable [jury] could not arrive at a contrary verdict." *Med. Care Am., Inc. v. Nat'l Union Fire Ins. Co.*, 341 F.3d 415, 420 (5th Cir. 2003). In resolving a JMOL motion, the court "must first excise inadmissible evidence." *Hodges v. Mack Trucks, Inc.*, 474 F.3d 188, 193 (5th Cir. 2006). Inferences that are "mere speculation and conjecture" are "not sufficient to support a jury's verdict." *Guile v. United States*, 422 F.3d 221, 225 (5th Cir. 2005) (internal quotation marks omitted). Conclusory expert testimony does not qualify as substantial evidence. *Iovate Health Sciences, Inc. v. Vio-Engineered Supplements & Nutrition, Inc.*, 586 F.3d 1376, 1381-82 (Fed. Cir. 2009) (applying Fifth Circuit law). Similarly, "when an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict." *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993); *accord, Guile*, 422 F.3d at 227 ("contradictions" in expert's testimony "coupled with the lack of support for the statements take them out of the realm of substantive evidence"); *Smith v. Louisville Ladder Co.*, 237 F.3d 515, 519-21 (5th Cir. 2001) (failure of expert witness to support proof of necessary case elements warrants judgment as a matter of law).

## II.   Standards for Infringement

### A.   *Direct Infringement*

#### 1.   *All-Elements Rule*

"The determination of infringement is a two-step process." *Roche Palo Alto LLC v. Apotex, Inc.*, 531 F.3d 1372, 1377 (Fed. Cir. 2008). The "court first construes the claims and then determines whether every claim limitation, or its equivalent, is found in the accused device." *Id.*;

---

matter of law under Rule 50. *Id.*

2

*accord, Cyber Corp. v. FAS Tech. Inc.*, 138 F.3d 1448, 1454 (Fed. Cir. 1998) (en banc). "Under the all-elements rule, 'an accused product or process is not infringing unless it contains each limitation of the claim, either literally or by an equivalent.' " *PSN Illinois LLC v. Ivoclar Vivadent, Inc.*, 525 F.3d 1159, 1167-68 (Fed. Cir. 2008). A failure to satisfy the all-elements rule requires judgment as a matter of law. *See Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1321 (Fed. Cir. 2009); *Muniauction, Inc. v. Thomson Corp.*, 532 F.3d 1318, 1330 (Fed. Cir. 2008).

### 2.    Doctrine of Equivalents

"An accused device that does not literally infringe a claim may still infringe under the doctrine of equivalents if each limitation of the claim is met in the accused device either literally or equivalently." *Amgen Inc. v. F. Hoffmann-La Roche, Ltd.*, 580 F.3d 1340, 1382 (Fed. Cir. 2009) (internal quotation marks omitted). An element in the accused product is equivalent to a claim limitation if the differences between the two are "insubstantial" to one of ordinary skill in the art. *Id.* Insubstantiality may be determined by whether the accused device performs substantially the same function in substantially the same way to obtain the same result as the claim limitation. *Id.*

### 3.    Divided Infringement of Method Claims

All of the asserted claims of the '639 patent are method claims. To establish direct infringement of a method or process claim, a plaintiff must prove that a <u>single</u> actor either (1) performs every step of the claimed method or (2) exercises the requisite "control or direction" over any steps performed by other actors. *See BMC Res., Inc. v. Paymentech, L.P.*, 498 F.3d 1373, 1380-82 (Fed. Cir. 2007); *Muniauction, Inc. v. Thomson Corp.*, 532 F.3d 1318, 1329 (Fed. Cir. 2008).[4]

As explained by the Federal Circuit, "the control or direction standard is satisfied in situations where the law would traditionally hold the accused direct infringer vicariously liable for

---

[4] *See also Golden Hour Data Sys., Inc. v. Emscharts, Inc.*, No. 2:06-CV-381, 2009 U.S. Dist. LEXIS 30108, at *8 (E.D. Tex. Apr. 3, 2009) ("[T]he patent holder must prove that 'one party exercises "control or direction" over the entire process such that every step is attributable to the controlling party, *i.e.* "the mastermind." ' " (quoting *Muniauction*, 532 F.3d at 1329)).

the acts committed by another party that are required to complete performance of a claimed method." *Muniauction*, 532 F.3d at 1330; *see also Emtel, Inc. v. LipidLabs, Inc.*, 583 F. Supp. 2d 811, 839 (S.D. Tex. 2008) ("[F]or liability to attach, the 'mastermind' must so control the third party in its performance of the infringing steps that the third party does so as the defendant's agent. The degree of control must be such that the defendant could be vicariously liable for the third party's performance.") (Rosenthal, J.); *Global Patent Holdings, LLC v. Panthers BRHC LLC*, 586 F. Supp. 2d 1331, 1335 (S.D. Fla. 2008) (to satisfy the control or direction standard, "the third party must perform the steps of the patented process by virtue of a contractual obligation or other relationship that gives rise to vicarious liability"), *aff'd*, 318 Fed. Appx. 908, 909 (Fed. Cir. 2009).

### 4.    No Divided Infringement of System Claims

All of the asserted claims of the '314 and '492 patents are system claims. The Federal Circuit has never recognized that any divided infringement exception to the all-elements rule applies to apparatus or system claims.

As to system claims, some district court cases have suggested or concluded that the exception does apply. *See Golden Hour Data Systems, Inc. v. Emscharts, Inc.*, No. 2:06-cv-381, 2009 WL 943273 (E.D. Tex. April 3, 2009) (analyzing claims that included system claims under the "control or direction" standard of *BMC* and *MuniAuction*); *Phoenix Solutions, Inc. v. DirecTV Group, Inc.*, 2009 U.S. Dist. LEXIS 114977, No. CV 08-984 MRP, at *28-29 (C.D. Cal. Nov. 23, 2009) ("*BMC Resources* analyzed divided infringement under § 271(a) with respect to process claims, but not apparatus claims. However, the Federal Circuit did not limit its statutory analysis to method claims, and its general holding applies to apparatus claims as well."); *Centillion Data Sys. ,LLC v. Qwest Communications Int'l, Inc.*, No. 1:04-cv-0073-LJM-DML, at *23 (S.D. Ind. October 29, 2009) (holding that "to the extent that Centillion suggests that under *NTP* the use of some, but not all, of the elements of a system claim is sufficient to find direct infringement if the use is 'beneficial,' the Court disagrees. 'Infringement requires, as it always has, a showing that a

4

defendant has practices [sic] each and every element of the claimed invention.'" (quoting and citing *BMC* and *Warner-Jenkinson*), *appeal docketed*, No. 2010-1110 (Fed. Cir. December 4, 2009)).

However, divided infringement is premised upon agency principles. Agency is a fiduciary relationship that arises when one party (the principal) assents to another party (the agent) to act on behalf of the principal subject to the principal's overriding control. *See* RESTATEMENT (THIRD) OF AGENCY § 1.01 (2006). Agency principles apply where method claims are involved because method claims can only be infringed by the actions of the alleged infringer. *NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1322 (Fed. Cir. 2005) ("The invention recited in a method claim is the performance of the recited steps."). Apparatus claims, however, are not about acts. Rather, apparatus claims are about structure. *See Creative Internet Advertising Corp. v. Yahoo! Inc.*, No. 6:07cv354, 2008 WL 5061625 at *16 (E.D. Tex. Nov. 24, 2008) ("[A]pparatus claims recite structure — not steps or processes."). "Not only will the [infringement] analysis differ for different types of infringing acts, it will also differ as the result of differences between different types of claims." *NTP*, 418 F.3d at 1317 (internal citations omitted).

Thus, the principles underlying divided infringement break down when applied to apparatus claims because the predicate act is missing; there is only structure. Without an act, there is no basis to hold a principle vicariously liable. Applying agency principles to apparatus claims impermissibly redrafts apparatus claims into method form. *BMC*, 498 F.3d at 1381 ("BMC correctly notes the difficulty of proving infringement of this claim format. Nonetheless, this court will not unilaterally restructure the claim or the standards for joint infringement to remedy these ill-conceived claims.").

Accordingly, Newegg submits that the divided-infringement exception to the all-elements rule should not apply to system claims. Alternatively, however, and at a minimum, a plaintiff asserting a system claim that is susceptible to a divided infringement challenge (because the

5

alleged infringer does not own or possess all elements of the system) must at least satisfy the "control or direction" standard for the divided infringement of method claims. *Cf. Golden Hour Data Sys., Inc. v. Emscharts, Inc.*, No. 2:06-CV-381, 2009 U.S. Dist. LEXIS 30108, at *8 (E.D. Tex. Apr. 3, 2009). (Indeed, no court has held that the all-elements rule can be avoided for any type of claim absent at least a showing of "control or direction" sufficient to give rise to vicarious liability as explained above.)

### B.    Indirect Infringement

Liability for indirect infringement can exist only where there is direct infringement. *See BMC Resources Inc.*, 498 F.3d at 1379 ("Indirect infringement requires, as a predicate, a finding that some party amongst the accused actors has committed the entire act of direct infringement.").

## III.   Soverain's Infringement Claims

The following table lists the claims Soverain has asserted against Newegg. For any dependent claims, the underlying independent base claim is also shown.

| Patent | Asserted Claims | Independent Base Claim |
|--------|-----------------|------------------------|
| 5,715,314 | 35 | 34 |
|  | 49 | 34 |
|  | 51 | 34 |
| 5,909,492 | 17 | N/A |
|  | 41 | 15 |
|  | 61 | 15 |
| 7,272,639 | 60 | 1 |
|  | 66 | 1 |
|  | 68 | 1 |
|  | 79 | 78 |

Because a dependent claim can only be infringed if the claim from which it depends is infringed, *Wahpeton Canvas Co. v. Frontier Inc.*, 870 F.2d 1546 (Fed. Cir. 1989), Newegg need only establish that the following claims are not infringed to demonstrate its non-infringement of all asserted claims:

| Patent | Claim(s) |
|--------|----------|
| 5,715,314 | 34 |
| 5,909,492 | 15 |
|  | 17 |

6

| 7,272,639 | 1 |
|-----------|----|
|           | 78 |

Specifically, Soverain contends that newegg.com and newegg.ca infringe claims 35 and 51 of the '314 patent; claims 17, 41, and 61 of the '492 patent; and claims 60 and 79 of the '639 patent. Soverain also contends that neweggmall.com infringes claim 34 of the '314 patent; claim 15 of the '492 patent; and claims 1 and 78 of the '639 patent.

## IV.     Argument – No Literal Infringement

Newegg is entitled to judgment that it does not infringe any of the asserted claims of the patents in suit for the following reasons:

### A.     No Literal Infringement: Buyer Computer and Client Computer Limitations

For the asserted system claims requiring a buyer or client computer, there is no legally sufficient evidence and no evidence from which a reasonable juror could find that Newegg satisfies this limitation. In particular, there is no such evidence that (1) Newegg owns, possesses, or supplies customers with, a buyer or client computer or that (2) buyers/clients are controlled or directed by Newegg such that Newegg could be vicariously liable for their actions. Accordingly, infringement cannot exist as a matter of law.

Thus, the Court should grant judgment as a matter of law of no literal infringement of the asserted system claims requiring a buyer or client computer: namely, claim 34 of the '314 patent (limitation 34[b] requires "one buyer computer"); claim 15 of the '492 patent (limitation 15[b] requires "a client computer"); and claim 17 of the '492 patent (requiring "at least one buyer computer").[5]

---

[5] Dr. Grimes testified that claim 17 of the '492 patent is substantively identical to claim 34 of the '314 patent with the addition of a few new limitations. Tr. 4/27/10 AM at 42-43. With respect to the common limitations, his testimony relied on his testimony regarding claim 34 of the '314 patent. Thus, the following elements of claim 17 of the '492 patent would likewise be met by the user/customer, as opposed to Newegg:

> 17[b] "at least one buyer computer for operation by a user desiring to buy products"

7

In particular, claim 34 the '314 patent could not be infringed without the participation of the Newegg buyer/customer. *See Global Patent Holdings*, 586 F.Supp.2d at 1335 ("If no person ever visited Defendant's website, then Plaintiff's patent would never be infringed."). Claim 34[b] includes the limitation of "at least one buyer computer for operation by a user desiring to buy products." As to that limitation, Dr. Grimes testified that the customer's computer becomes a buyer computer when it is connected to the Newegg system over the internet. Tr. 4/27/10 AM at 19.

Similarly as to Claim 15, limitation 15[b] requires "a client computer for operation by a client user." Dr. Grimes testified that this element is met by the computers of Newegg's customers. Tr. 4/26/10 PM at 115; *see also* Grimes Demo. Ex. at 61 (identifying the client computer as a "customer" computer). As above, this element is unquestionably satisfied by the customer, not Newegg. Indeed, it cannot reasonably be argued that Newegg itself satisfies the limitation of a "buyer computer for operation by a user desiring to buy products." Newegg does not provide computers to the buyers. Since Newegg does not practice this element, infringement cannot be found as a matter of law under the all-elements rule. *Warner-Jenkinson*, 520 U.S. at 40; *BMC*, 498 F.3d at 1380.

---

17[f] "the buyer computer being programmed"

17[f] "a plurality of requests from a user to add a plurality of respective products to a shopping cart"

17[j] "the buyer computer being programmed to receive a request from the user to purchase the plurality of products added to the shopping cart"

Consequently, because this system claim requires the participation of two parties, it cannot be infringed by Newegg as described herein in the discussion of claim 34 of the '314 patent.

As to the additional limitations of claim 17, one has been designated as 17[g] and includes the limitation "to send a plurality of respective shopping cart messages over the network to the shopping cart computer." Dr. Grimes testified that this limitation is met when the buyer requests to add products to a shopping cart and the buyer's computer sends a shopping cart message to Newegg. But that is just another example of a limitation is met by the buyer and the buyer computer. Infringement cannot exist because this additional limitation is likewise not performed by Newegg.

Dr. Grimes testified that Newegg "uses" a system that includes the client computer when Newegg's server system and a customer computer are interconnected by the Internet. Dr. Grimes has similarly testified that customers "use" that system as well. As a matter of law, however, the interconnection across the Internet of two systems – each of which is wholly-owned, possessed, and operated by legally distinct entities – does not create a new "system" (such that either entity can be said to have "used" the entirety of the system for purposes of imposing infringement liability) *merely because the two systems can communicate back and forth subject to an industry-standard protocol (here, http)*. The Federal Circuit has never endorsed such a far-reaching and incredible proposition of infringement liability, and such a theory is invalid as a matter of law because it violates the all-elements rule and because such networked communications between distinct entities does not by itself create any basis for imposing vicarious liability, even assuming any such an exception to the all-elements rule could be applied to system claims.

*        *        *

Although the "buyer computer" limitation is alone sufficient to preclude a finding of infringement, Newegg also does not practice additional elements of this claim. Specifically, for the asserted system or method claims requiring some action by the client or buyer computer, there is no legally sufficient evidence and no evidence from which a reasonable juror could find that Newegg controls that action of the client or buyer computer in a manner sufficient to meet the Federal Circuit's "control or direction" standard. For this reason, the Court should grant judgment as a matter of law of no literal infringement as to claim 34 (limitation 34[f]), which further requires "a plurality of requests from a user to add a plurality of respective products." Dr. Grimes testified that this is met when the user requests to add products to the shopping cart by clicking an "ADD TO CART" button. But this "clicking" is again an action of the user, not Newegg. Tr. 4/27/10 AM at 23-25.

9

A8996

Claim 34 (limitation 34[g]) of the '314 patent also includes the limitation "to send a plurality of respective shopping cart messages to said shopping cart computer." Dr. Grimes testified that Newegg satisfies this claim element when a customer clicks an "ADD TO CART" or "DOWNLOAD" button and the buyer computer sends a message to one of Newegg's SSL servers. Tr. 4/26/10 at 86-87; *see also id.* at 76 (explaining that "ADD TO CART" and "DOWNLOAD" buttons are functionally identical). But it cannot reasonably be disputed that it is the Newegg customer (via his or her "clicks"), not Newegg, that "sends a plurality of respective shopping cart messages" to the shopping cart computer. Again, because the Newegg buyer/customer satisfies this claim limitation, infringement cannot exist.

Claim 34 (limitation 34[j]) requires the "buyer computer being programmed to receive a request from said user to purchase said plurality of products added to said shopping cart." Again, the claim requires the buyer/user to send a request to purchase the plurality of products to his or her computer. But Newegg does not program the user's computer to receive requests from the user because that functionality is part of the pre-installed browser, as Ed Tittel testified.

The Court should grant judgment as a matter of law of no literal infringement of claim 41 of the '492 patent, which requires "a statement URL sent by the client computer" for the same reasons: namely, the buyer/customer computer satisfies this requirement, not Newegg.

Likewise, the Court should grant judgment as a matter of law of no literal infringement of claim 1 of the '639 patent, which requires "communications between the client and server system are according to [http]" (in 1[b]); "client storing the session identifier" (in 1[c]); and the client computer "appending the stored session identifier" (in 1[d]).[6] Claim 1 cannot be infringed by Newegg because Newegg does not perform every step in the claimed method. *BMC*, 498 F.3d at 1378-79. In particular, limitation 1[a] of this claim requires "processing service requests from a

---

[6] For the same reason, the Court should grant judgment as a matter of law of no literal infringement of claim 60 of the '639 patent, which requires "a purchase request" from the client computer (in 60[a]).

10

client to a server system." As to that, Dr. Grimes testified that client computers send service requests to Newegg over the Internet. Tr. 4/26/10 PM at 142-43. But that is a step performed by the client, not Newegg.

Limitation 1[c] of this claim includes "the client storing the session identifier for use in subsequent distinct requests to the server system." Dr. Grimes claims this limitation is satisfied because the client computer stores the cookie. Tr. 4/26/10 PM at 147-48. This element is thus satisfied by the "client computer," not Newegg. Tr. 4/27/10 AM at 58-59

For the same reason, the Court should grant judgment as a matter of law of no literal infringement of claim 78 of the '639 patent, which requires (1) a "session identifier stored at the client" (78[b]) and that the session identifier "has been appended by the client" (78[b]); (2) that the client use http to communicate with the server system; and (3) "storage by the client." In each case, claim 78 requires action by the client computer. Claim 78 (limitation 78[a]) requires "processing...service requests from a client to the server system through a network." As with claim 1, this claim requires the participation of a client (buyer/customer) and server system (Newegg). In particular, as Dr. Grimes testified, there must be a service request from a client. Tr. 4/27/10 AM at 61.

Claim 78 (limitation 78[b]) requires "a service request to which a session identifier stored at the client has been appended by the client." This likewise requires an action by the client via the "client computer," as Dr. Grimes testified. Tr. 4/27/10 AM at 61-62.

As in *Global Patent Holdings*, claims 1 and 78 of the '639 patent require an action by the remote computer user or client. If no user/client visited the Newegg website, these claim limitations cannot be satisfied. *Global Patent Holdings*, 586 F.Supp. at 1335. Moreover, as in *MuniAuction*, various portions of the claims are performed by the client (*e.g.*, storing the session identifier at the client). Under *Global Patent Holdings*, even if such actions were based on html or http code from Newegg, the mere provision of such code or other instructions does not obviate

11

the fact that the actions themselves are ultimately performed by the customer and/or customer computer. *Id.* As since, since Newegg does not perform every element of claims 1 and 78, it cannot be held to infringe under the all-elements rule absent proof that Newegg "controls or directs" the actions of its customers under the standard described above. *MuniAuction*, 532 F.3d at 1329. But as to that, Newegg's customers are not required to visit Newegg's website, they are not Newegg's agents, and Newegg could not be vicariously liable for their actions, let alone by the mere provision (at most) of any instructions.

In particular, there is no record evidence that customers are agents of Newegg – or vice versa – with respect to either the operation of the Newegg website or of any customer computer. Nor is there any record evidence that Newegg has entered any contractual relationship with any customer concerning the operation of the Newegg website or of any customer computer. As such, and as a matter of law, there is no record basis to find that Newegg satisfies the Federal Circuit's control or direction standard with respect to any limitation performed by a customer or customer computer. For these reasons, infringement of claims 1 and 78 of the '639 patent cannot exist as a matter of law. *Id.* at 1330; *Global Patent Holdings*, 586 F.Supp.2d at 1331.

The Court should also grant judgment as a matter of law of no literal infringement of claim 60 of the '639 patent, which requires "fulfilling the purchase request based on the user information" (60[d]). At trial, the only evidence introduced on this point was by Dr. Grimes, to the effect that this limitation is met by a third-party delivery service like DHL, but there was no legally sufficient evidence or evidence from which a reasonable person could conclude that Newegg meets this limitation or otherwise controls a third-party so as to meet the Federal Circuit's "control or direction" standard.

For claim 60 of the '492 patent, the Court should grant judgment as a matter of law of no literal infringement. This claim requires that "the statement document includes information on transactions by the user that took place in a given month." At trial, however, the only evidence

12

introduced was from Dr. Grimes that a customer would have to set a particular month in order to produce such a statement document. *See* Tr. 4/26/10 PM at 124. There was no legally sufficient evidence and no evidence from which a reasonable juror could conclude that Newegg defines that time period for the customer or otherwise controls any customer in doing so, as to meet the Federal Circuit's "control or direction" standard described above.

As discussed in the next section regarding programming, Newegg does not "program" the client computer as required by Claim 34 (limitation 34[f]) of the '314 patent: "said buyer computer being programmed to receive a plurality of requests from a user to add a plurality of respective products to a shopping cart." More fundamentally, even if Newegg's server system were erroneously said to "program" a customer computer through the provision of software programming, that still would be legally insufficient to establish infringement because the mere provision of instructions to a separate legal entity does not satisfy the "control or direction" standard. *See, e.g., Global Patent Holdings*, 586 F.Supp.2d at 1335 (providing software with which a customer can practice the claim limitation does not constitute direction or control).

Similarly, Claim 15 (limitation 15[f]) of the '492 patent requires "the client computer being programmed to display the statement document." As explained above, Newegg does not program the user's computer. *See Global Patent Holdings*, 586 F.Supp.2d at 1335. This limitation further requires "a request from the client user to display transaction details corresponding to a portion of the statement document displayed by the client computer." Dr. Grimes testified that this limitation is satisfied by a customer or customer computer when the customer clicks on certain links. Tr. 4/26/10 PM at 118-20. As such, this claim is like the system claim analyzed by Judge Ward in *Golden Hour* in that the claim requires instrumentalities of two separate entities. Here, the claim requires "a client computer for operation by a client user." As Newegg does not supply the client computer or control the client, Newegg cannot infringe this claim. As in *Global Patent Holdings*, the present claim requires a remote computer user and

13

A9000

cannot be infringed unless this third party visits the Newegg website. Indeed, the accused system *does not even exist* without the initial participation of the third party customer, which Dr. Grimes admitted is the result not of Newegg but of a customer's own free will. Tr. 4/27/10 AM at 14-15. For these reasons, infringement cannot exist. *Global Patent Holdings*, 586 F.Supp.2d at 1335.

Claim 15 of the '492 patent also requires the "client computer being programmed" and "a request from the client user to display transaction detail." For the same reasons given above, Newegg likewise does not satisfy these elements, and infringement cannot exist. *MuniAuction*, 532 F.3d at 1329; *Emtel*, 583 F.Supp.2d at 830-31.

<p style="text-align:center">*        *        *</p>

In summary, under *MuniAuction, Inc. v. Thomson Corporation*, 532 F.3d 1318 (Fed. Cir 2008), and the cases cited in the Standards for Infringement (Divided Infringement) section of this motion, infringement of a method or process claim requires that a single defendant practice each and every element of a claimed invention, or that the defendant control or direct the entire process or method such that every step is attributed to the defendant. Here, each of the asserted method claims includes elements that must be satisfied by multiple parties, including at least a customer and a merchant. The arms length purchase transactions between Newegg and its customers and/or third parties like DHL (which do not even concern the operation of Newegg's website) simply cannot be found to satisfy the Federal Circuit's "control or direction" standard in *MuniAuction* either for the asserted method claims or even for the asserted system claims (assuming for the sake of argument only that the "control or direction" standard can be used as an exception to the all-elements rule for system claims). For these reasons, Newegg cannot infringe the asserted claims of the patents-in-suit as a matter of law.[7]

---

[7] *See also Desenberg v. Google, Inc.*, No. 09-cv-10121, 2009 WL 2337211(S.D.N.Y. July 30, 2009) (under *MuniAuction*, Internet transaction claims could not be infringed by Google where elements were satisfied by users); *Akamai Technologies, Inc. v. Limelight Networks, Inc.*, 614 F.Supp.2d 90 (D. Mass. 2009) (under *MuniAuction*, Internet transactions claims could not be infringed where defendant's customers modify

### B.    No Literal Infringement – Programming Limitations

As Ed Tittel testified, to satisfy the limitation of the buyer computer "being programmed," the buyer computer must have an acceptable browser program installed thereon. There is no evidence that Newegg installs browsers on its customers' computers. Moreover, as Ed Tittel testified, the provision of a web page or html to a buyer computer by Newegg cannot constitute programming the buyer computer. As such, the Court should grant judgment as a matter of law of no literal infringement for asserted claims requiring the buyer or client computer to be "programmed" in some fashion, as there was no legally sufficient evidence and no evidence from which a reasonable person could conclude that Newegg programs those computers. Thus, the Court should grant judgment as a matter of law of no literal infringement of claim 34 of the '314 patent, which requires "said buyer computer being programmed" (34[f]); claim 15 of the '492 patent, which requires "the client computer being programmed" (15[f]); and claim 17 of the '492 patent, which twice requires "the buyer computer being programmed."

### C.    No Literal infringement – Modification Limitations

The Court should grant judgment as a matter of law of no literal infringement for asserted claims requiring a shopping cart computer to modify "said stored representations of collections of products in said database" or to modify "the shopping cart in the shopping cart database," as there was no legally sufficient evidence and no evidence from which a reasonable person could conclude that any shopping cart computer performs such a modification in accordance with the Court's claim construction. Rather, as shown by the testimony of James Wu and Ed Tittel, the database operations of the Newegg server system never modify or change any stored representation of any collection of products and never modify or change any shopping cart in any shopping cart database.

---

embedded objects of their web pages pursuant to defendant's instructions).

Likewise, when customers add an item to a shopping cart, this generates no request to put any item in any shopping cart in a shopping cart database. Rather, product information concerning the item is put in a cookie, which is not a shopping cart database. Conversely, when customer chooses to checkout (and product information for the entire shopping cart is inserted into the database), there is at that time no request to put any item in a shopping cart, as Dr. Grimes acknowledged. Tr. 4/27/10 AM at 28-30. This is because no additional item is being added to any shopping cart (or cookie) by the checkout process itself.

More generally speaking, and as confirmed by the testimony of James Wu and Ed Tittel, although Newegg's system inserts and/or deletes records in the relevant database, it does not modify or change individual records.[8]

Thus, the Court should grant judgment as a matter of law of no literal infringement for (1) claim 34 of the '314 patent, which requires "said shopping cart computer [to be] a computer that modifies said stored representations of collections of products in said database" (34[m]) and (2) claim 17 of the '492 patent, which requires the accused system "to modify the shopping cart in the shopping cart database to reflect the plurality of requests to add the plurality of products to the shopping cart" and also requires "the shopping cart computer [to be] a computer that modifies the stored representations of collections of products in the database."

### D.    No Literal Infringement – "plurality of requests . . . to add a plurality of respective products to a shopping cart in . . . [said or the] shopping cart database"

The Court should grant judgment as a matter of law of no literal infringement for asserted claims requiring the accused system to "receive a plurality of requests from a user to add a plurality of respective products to a shopping cart in said shopping cart database" (claim 34[f] of the '314 patent) or "to receive a plurality of requests from a user to add a plurality of respective

---

[8] Indeed, as explained by James Wu and Ed Tittel, the Newegg server system cannot reasonably be said to modify or change the shopping cart database when it inserts or deletes a record in that database because such operations are not properly understood as changes.

16

products to a shopping cart in the shopping cart database" (claim 17 of the '492 patent). In each case, there was no legally sufficient evidence and no evidence from which a reasonable person could conclude that Newegg satisfies these limitations. In particular, the evidence from Dr. Grimes was that Newegg's system puts product information into a Newegg database only when a customer chooses the checkout option. However, Dr. Grimes also testified the checkout option is not a request to add any product to any shopping cart. Tr. 4/27/10 AM at 28-30. In addition, the uncontroverted evidence was that the Newegg system does not add product information to any shopping cart database in response to any customer request to add any product to any shopping cart. Rather, product information for a customer shopping cart is solely stored in a cookie in response to such requests.

Separately, and as a matter of law, Soverain's theory that Newegg's server system satisfies this limitation by moving all shopping cart product information "en masse" from a cookie to a shopping cart database is infirm because it reads the "respective" limitations out of these claims. Put another way, the repeated use of the word "respective" in these claims requires an infringing system to add products *one at a time* to a shopping cart in a shopping cart database and thus cannot be satisfied by Newegg's substantially and undeniably different method of operation, which works "en masse" as described above.

For these reasons, the Court should grant judgment as a matter of law of no literal infringement of claim 34 of the '314 patent and claim 17 of the '492 patent.

## V.     Argument – No Infringement under Doctrine of Equivalents

The Court should grant judgment as a matter of law of no infringement by equivalents for asserted claims requiring the accused system to "receive a plurality of requests from a user to add a plurality of respective products to a shopping cart in said shopping cart database" (claim 34[f] of the '314 patent) or "to receive a plurality of requests from a user to add a plurality of respective products to a shopping cart in the shopping cart database" (claim 17 of the '492 patent). In each

case, there was no legally sufficient evidence and no evidence from which a reasonable person could conclude that Newegg satisfies these limitations under the doctrine of equivalents. Although Dr. Grimes testified that the Newegg system satisfies the "plurality of requests . . ." limitations in these claims under the doctrine of equivalents, no reasonable juror could accept that opinion because other uncontroverted testimony demonstrated that the Newegg way of adding the entire contents of the cookie to the database in one action is substantially different than the way required by these patent limitations.  In particular, as Dr. Grimes admitted and testimony by James Wu and/or Ed Tittel confirmed, Newegg's way has both substantial benefits (using less database space and less time) and costs (inability of customers to continue a shopping session at a different computer) compared to the way required by the patent limitations. Tr. 4/27/10 at 39-42.

Likewise, although Soverain has argued that Newegg's system satisfies the "modification" limitations under the doctrine of equivalents, such a position is unreasonable for the same reasons: by putting shopping cart product information into a database once a cart is "full" (rather than by modifying a cart in a database on an item-by-item basis), Newegg gains the aforementioned and substantial efficiency benefits not otherwise possible by the technology claimed in the shopping cart patents.

For these reasons, the Court should grant judgment as a matter of law of no infringement by equivalents of claim 34 of the '314 patent and claim 17 of the '492 patent.

## VI.    Argument – No Indirect Infringement

Soverain contends that Newegg encourages its customers to infringe, but there is no legally sufficient and no evidence from which a reasonable person could conclude that any customer satisfies all limitations of any asserted claim.

In particular, for the asserted system claims requiring a buyer or client computer (claim 34 of the '314 patent and claims 15 and 17 of the '492 patent), there is no such evidence that any customer owns or supplies any structure to the accused system other than the buyer or client

18

computer.

Likewise, for the asserted claims requiring action to be taken by the client or buyer computer (discussed in Part IV.A above), there is no such evidence that any customer controls any actions in any accused method or system other than actions taken by the client or buyer computer.

And for the same reasons provided above in Part IV.A, there is no cognizable legal basis to hold that customers or customer computers "use" any accused system simply because their computers may interconnect with the Newegg server system through the Internet.

For these reasons, the Court should grant judgment as a matter of law of no direct infringement by Newegg customers of claim 34 of the '314 patent; claims 15, 17, 41, and 60 of the '492 patent; and claims 1, 60, and 78 of the '639 patent. In turn, the Court should grant judgment as a matter of law of no indirect infringement by Newegg of any of these asserted claims. *See BMC Resources Inc.*, 498 F.3d at 1379.

## VII.    Conclusion

For the foregoing reasons, Newegg asks the Court to render judgment as a matter of law in its favor of non-infringement.

Respectfully submitted,

Dated: April 29, 2010          By:    /s/Mark D. Strachan
                                      Mark D. Strachan
                                      Texas State Bar No. 19351500
                                      Richard A. Sayles
                                      Texas State Bar No. 17697500
                                      SAYLES | WERBNER
                                      1201 Elm Street
                                      4400 Renaissance Tower
                                      Dallas, Texas 75270
                                      Telephone: (214) 939-8700
                                      Facsimile: (214) 939-8787

                                      David C. Hanson
                                      Kent E. Baldauf, Jr.
                                      Daniel H. Brean
                                      THE WEBB LAW FIRM
                                      700 Koppers Building

19

436 Seventh Avenue
Pittsburgh, PA 15219
T:  (412) 471-8815
F:  (412) 471-4094

Trey Yarbrough
Texas Bar No. 22133500
YARBROUGH ♦ WILCOX, PLLC
100 E. Ferguson St., Ste. 1015
Tyler, Texas 75702
Tel: (903) 595-3111
Fax: (903) 595-0191
trey@yw-lawfirm.com

Attorneys for Defendant Newegg Inc.

A9007

**Certificate of Service**

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being hereby served with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3) on April 29, 2010, or will be served via electronic mail. All other counsel of record will be served via facsimile or first class mail.

_____/s/ Mark Strachan_____
Mark Strachan

A9008

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

| | | |
|---|---|---|
| SOVERAIN SOFTWARE LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| CDW CORPORATION, NEWEGG | ) | Civil Action No. 6:07-CV-00511-LED |
| INC., REDCATS USA, INC., | ) | |
| SYSTEMAX INC., ZAPPOS.COM, | ) | |
| INC., REDCATS USA, L.P., THE | ) | |
| SPORTSMAN'S GUIDE, INC., and | ) | |
| TIGERDIRECT, INC., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

### Order Granting Newegg's Motion for
### Judgment as a Matter of Law of No Infringement

Before the Court is Defendant Newegg's Motion for Judgment as a Matter of Law of No

Infringement Invalidity. Having considered the motion, response, pertinent pleadings, evidence,

and applicable law, the Court finds that the motion is well-taken and should be granted.

The Court therefore GRANTS the motion and renders judgment in favor of Newegg Inc.

of no infringement of the asserted claims.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

| | | |
|---|---|---|
| SOVERAIN SOFTWARE LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| CDW CORPORATION, NEWEGG | ) | Civil Action No. 6:07-CV-00511-LED |
| INC., REDCATS USA, INC., | ) | |
| SYSTEMAX INC., ZAPPOS.COM, | ) | |
| INC., REDCATS USA, L.P., THE | ) | |
| SPORTSMAN'S GUIDE, INC., and | ) | |
| TIGERDIRECT, INC., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

### *Newegg's Proposed Jury Charge Instruction*

With respect to plaintiff Soverain's damages theory that a reasonable royalty in this case may be based in whole or part on defendant Newegg's profits or revenues from sales of products not covered by the asserted patent claims, Newegg requests the following jury charge instruction:

### 7.5    Royalties Based on Profits or Revenues from Other Product Sales

For purposes of your damages calculation, you are to assume that the technology of the asserted patent claims is used by Newegg when it sells other products that are not covered by the patents-in-suit, such as computers and other consumer products.

Where a patented invention is used for convenience or business advantage in selling other products not covered by the patent, royalty damages may not be based on the profits or revenues of those product sales unless the patent owner can demonstrate that the patented invention is of such importance that it created substantial customer demand for those other products.

In other words, unless you find that Newegg's use of the patented shopping cart and session ID technology created substantial demand for the products sold by Newegg, you may not

use Newegg's product sales revenues or profits in determining a reasonable royalty.

Respectfully submitted,

Dated: April 29, 2010              By:    /s/ Mark D. Strachan
                                          Mark D. Strachan
                                          Texas State Bar No. 19351500
                                          Richard A. Sayles
                                          Texas State Bar No. 17697500
                                          SAYLES | WERBNER
                                          1201 Elm Street
                                          4400 Renaissance Tower
                                          Dallas, Texas 75270
                                          Telephone: (214) 939-8700
                                          Facsimile: (214) 939-8787


                                          David C. Hanson
                                          Kent E. Baldauf, Jr.
                                          Daniel H. Brean
                                          THE WEBB LAW FIRM
                                          700 Koppers Building
                                          436 Seventh Avenue
                                          Pittsburgh, PA 15219
                                          T: (412) 471-8815
                                          F: (412) 471-4094


                                          Trey Yarbrough
                                          Texas Bar No. 22133500
                                          YARBROUGH ◆ WILCOX, PLLC
                                          100 E. Ferguson St., Ste. 1015
                                          Tyler, Texas 75702
                                          Tel: (903) 595-3111
                                          Fax: (903) 595-0191
                                          trey@yw-lawfirm.com

                                          Attorneys for Defendant Newegg Inc.

I don't have any idea."). Thus, even if such access could be characterized as a "use" of the claimed hypertext statement system, *but see supra* Part IV.D.2, there was no infringement of these claims by any Newegg customer because there was no evidence of any such "use." *See ACCO Brands, Inc. v. ABA Locks Mfr. Co.*, 501 F.3d 1307, 133 (Fed. Cir. 2007) (induced infringement finding reversed absent evidence that anyone but plaintiff's expert ever used product in infringing mode of operation).

<div align="center">*    *    *</div>

For these reasons, the Court should grant judgment as a matter of law of no direct infringement of any relevant claim by Newegg customers. In turn, the Court should grant judgment of no indirect infringement by Newegg. *See BMC Resources Inc.*, 498 F.3d at 1379.

### E.    Alternative Motion for New Trial

If the Court determines that judgment as a matter of law is not warranted on any of the foregoing issues, the Court should grant a new trial on those issues as the jury's verdict of indirect infringement was against the great weight and preponderance of the evidence. (Newegg conditionally moves for a new trial on any issue where the Court grants judgment as a matter of law, in the event that grant were reversed on appeal.)[21]

In particular, the jury's implicit finding of the necessary element of intent to induce infringement was against the great weight and preponderance of the evidence. Indeed, Newegg's non-infringement and invalidity arguments confirm that it had a reasonable basis to believe that the accused system did not infringe any valid asserted claim, as further confirmed by the jury's finding that Newegg did not directly infringe any claim. *See* Dkt. 376; *cf. DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1306 (Fed. Cir. 2006) (approving jury finding of lack of intent to cause

---

[21] As stated in Newegg's objection prior to commencement of trial, the trial of this case with Jones Day as counsel for Soverain was inherently unfair to Newegg and in violation of its constitutional rights because of Jones Day's disqualifying conflict of interest. Tr. 04/19/10 at 43:4-14. Thus, Newegg submits that any new trial of this case (granted for whatever reason) should be conducted with counsel for Soverain other than Jones Day.

infringement where the alleged infringer "did not believe" that the accused product infringed, despite knowing of patentee's infringement allegations).

In addition, the jury's finding of indirect infringement was infected by error in the admission of prejudicial evidence, including the existence of settlement licenses, such as the Amazon license,[22] as well as related questioning and argument.[23] The admission of such evidence was erroneous for the reasons previously given (*see* Dkt. 306 at 5-9) and incorporated herein by reference. In particular, such evidence, questioning, and argument was inadmissible under Federal Rules of Evidence 408[24] and 403[25] and harmful because it wrongly suggested to the jury that websites and businesses arguably similar to Newegg's should be viewed as infringing and that the asserted patent claims must be valid, otherwise companies like Amazon would not have paid a license to use technology allegedly covered by them.

The jury's finding of indirect infringement was also infected by charge error, including the Court's failure to instruct the jury that a party does not infringe a system claim unless it owns or possesses all elements or, in the alternative, exercises sufficient control or direction over the elements it does not own or posses under the Federal Circuit standard (*i.e.*, so as to be vicariously liable for them). Tr. 04/29/10 (pm) at 226:3-230:5 (charge objections). This was harmful error because it enabled the jury to conclude that a Newegg customer could infringe even though the customer did not own or possess, or at least control or direct, all elements of the accused system,

---

[22] *See* Dkt. 306; Tr. 04/19/10 at 30:18-36:20; Tr. 04/26/10 (am) at 6:17-9:17; Tr. 04/26/10 (am) at 48:9-52:12 (objections and rulings on settlement licenses).

[23] *See, e.g.*, Tr. 04/26/10 (am) at 69:02-04 (Adamo) (opening statement regarding licensees, including Amazon); Tr. 04/27/10 (pm) (Wolanyk) at 47:13-21 (recitation of settlement licenses, including Amazon); Tr. 04/27/10 (pm) (Nawrocki) at 105-17-24 (same); Tr. 04/29/10 (pm) (Bakewell) at 103:25-105:05 (same).

[24] *See Pioneer Corp. v. Samsung SDI Co.*, No. 2:06-CV-384, 2008 U.S. Dist. LEXIS 107079, at *18-19 (E.D. Tex. Oct. 2, 2008); *Spreadsheet Automation Corp v. Microsoft Corp.*, 587 F. Supp. 2d 794, 801 (E.D. Tex. 2007).

[25] *See Spreadsheet Automation Corp.*, 587 F.Supp.2d at 801; *Samsung Electronics Co. v. Quanta Computer, Inc.*, No. C-00-4524 VRW, 2006 U.S. Dist. LEXIS 75987, at *5 (N.D. Cal. Oct. 4, 2006); *Honeywell Int'l, Inc. v. Nikon Corp.*, No. 04-1337-JJF, 2009 WL 577274, at *1 (D. Del. March 4, 2009).

## I.    INTRODUCTION

Newegg challenges the jury's finding of induced infringement of the asserted sales and hypertext-statement system claims of Soverain's '314 and '492 patents.[1]  Based on the substantial evidence presented at trial, the jury correctly returned a verdict that Newegg induces its customers to infringe those claims.

Having failed on the facts, Newegg attempts to impose legal requirements that do not exist.  Newegg argues, first, that the "all-elements rule" requires that to infringe, a system must not only contain each limitation of the asserted patent claim, but that each system component must also be "owned," "possessed," or "operated" by the same party.  This theory has been rejected by both the Federal Circuit (in *NTP*) and this Court (in *Renhcol*).[2]  If this were the law – which, decidedly, it is not – it would guarantee that all system claims directed to ecommerce and other telecommunications technologies could never be infringed, for such complex systems inevitably have components owned by different entities.  Newegg next argues that Soverain cannot meet a purported "divided-infringement" exception to the all-elements rule.  But Soverain seeks no such exception to the rule because the proofs at trial established that, under the properly applied law, the all-elements test was met by Newegg's accused systems.  The jury's infringement verdict is supported by substantial evidence, and the Court should deny Newegg's motion for judgment as a matter of law.  The Court should also deny Newegg's motion for a new trial on infringement.

The Court should also deny Newegg's motion for judgment as a matter of law or a new trial on invalidity.  Newegg failed to show each element of any claim in any prior art reference,

---

[1] U.S. Patents 3,715,314 ("'314 patent") and 5,909,492 ("'492 patent").

[2] *NTP, Inc. v. Research in Motion*, 418 F.3d 1282 (Fed. Cir. 2005); *Renhcol, Inc. v. Don Best Sports*, 548 F. Supp. 2d 356 (E.D. Tex. 2008).

the shopping cart database. (Exh. 1, Tr. 30:15-31:2, 4/27/10 AM.) This element does not require products to be placed in the database after each request (*id.*, Tr. 84:21-86:3, 4/26/10 PM), and a finding by the jury that Newegg's system literally meets this element is supported by substantial evidence.

### 2.    Newegg's Cart Is Modified in the Shopping Cart Database

Newegg next argues it does not infringe the sales system claims because its system allegedly does not "modify" a shopping cart in its shopping cart database. There is also, however, sufficient evidence to support the finding that claim element 34[h] of the '314 patent (and corresponding claim element 17[h] of the '492 patent) is present in Newegg's system. This element recites "said shopping cart computer being programmed . . . to modify said shopping cart in said shopping cart database to reflect said plurality of requests to add said plurality of products to said shopping cart."[11]  Newegg admits that certain database tables are "modified" in the database SSLQuery as a result of a "Checkout"-button click. (Exh. 12, P-027A at Interrogatory 9.)

Applying the Court's claim construction for "to modify . . .,"[12] Dr. Grimes testified that the way Newegg goes from zero to a plurality of products is indeed a modification of a shopping cart in the shopping cart database, because an instance of a shopping cart is changed. (Exh. 1, Tr. 92:9-22, 4/26/10 PM)  He based his testimony on the Court's claim construction and the deposition testimony of Newegg's chief technical officer, James Wu, admitted into evidence at trial, that Newegg uses a two step process, whereby it creates an instance of a shopping cart

---

[11] Again, claim 17 of the '492 patent has this element but uses "the" instead of "said." The same analysis applies.

[12] The Court construed "to modif[y] [the shopping cart in the shopping cart database]" as "To change [an instance of a shopping cart in a shopping cart database]." (Exh. 17, *Amazon* Claim Construction Order, at 26.)

before populating it.[13] When it is populated, it is modified. (*Id.*) This testimony was sufficient to support the jury's verdict.

Newegg also seeks to avoid infringement by impermissibly adding a "one element at a time" restriction to this claim. (Newegg Br. 9.) But this claim element does not require products to be added to the shopping cart in the database one at a time; rather, modifying the cart to add all the products at once upon checkout is sufficient. (Exh. 1, Tr. Grimes 90:2-91:12, 4/26/10 PM.) The jury had ample evidence to conclude that Newegg's shopping cart computer modifies shopping carts in the shopping cart database at checkout, and, therefore, meets this claim element. The other element pointed to by Newegg, "[said/the] shopping cart computer being a computer that modifies said stored representations of collections of products in said database" (34[m] of the '314 and 17[m] of the '492), is met for the same reasons.

### 3. Newegg's System At Least Meets the Disputed Elements under the Doctrine of Equivalents

Even if Newegg were correct that (1) the claims require the shopping cart to be modified in the database when each individual product is added and (2) Newegg does not create an instance of a shopping cart in the database before modifying it, substantial evidence supports a finding that Newegg still infringes under the doctrine of equivalents. Dr. Grimes testified that Newegg's method of adding products one at a time to a cookie and then all at once to a shopping cart in the database is equivalent to adding the products one at a time to a shopping cart in the database. (Exh. 1, 93:13-97:17, 4/26/10 PM.) He explained that Newegg performs the same function (modifying) in substantially the same way (Newegg's cookie-method vs. modifying the

---

[13] Exh. 15, P-062B, at 18, Wu 30(b)(1) Dep. Tr. 19:2-10, July 9, 2009 ("Q. Is there a point when the shopping cart ID is generated, but there is no corresponding entry in the table, this temporary table which stores shopping carts? A. You're right. The timing to – because shopping cart ID is shopping cart ID table. Shopping cart line item table is different. So we generate ID that time, that moment, nothing in shopping cart item – line item table. Then we go to second step with this ID. You can say second box. This time different, yes.").

puzzle based on circumstantial evidence of sales of accused puzzle and availability of instructions and solutions).

Like the inducer in *Lucent* (and unlike the defendant in *ACCO*), Newegg instructs its customers to use its system in a way that infringes. Newegg instructs its customers to visit its order-status page to check on their orders (Exh. 10, P-015 at 1) and then provides links on its statement documents for customers to click for transaction details. By their very nature, these links are instructions saying "click here" if you want more.[14] (Exh. 1, Tr. Grimes 19:8-20:7, 4/26/10 PM.) Based on Dr. Grimes's testimony, viewing a statement document and clicking a transaction detail link would be an infringing use. (*Id.* 113:18-127:19.)

As the Court instructed the jury, "An accused system infringes the claim if it is reasonably capable of satisfying the claim elements, even though it may also be capable of non-infringing modes of operation." (Exh 7, Tr. 26:11-14, 4/30/10.[15]) As Newegg itself has put it, "system/apparatus claims do not claim action. Instead, they claim structure." (Newegg Br. 4.) "'[T]o infringe an apparatus claim, it is not necessary for an accused device actually to be performing the functions specified by the claim. All that is required is that the device have the claimed structure, and that this structure in the device have the capability of functioning as described by the claim.'" *Mass Eng'd*, 633 F. Supp. 2d at 378. Here, "[c]ertainly the *capability* of infringement [of the hypertext-statement system claims] was available at any time." *Id.*

In sum, the jury had sufficient evidence to support its verdict of infringement.

**B.    Newegg's Customers Directly Infringe the Asserted Patent Claims by Their Use of Newegg's System**

There was also sufficient evidence presented at trial to support the jury's finding of

---

[14] In Newegg's "old" system, its statement document contained an explicit instruction other than the presence of the links: "Expanded order details . . . are accessible by clicking the 'View' link." (Exh. 18, P-010, SVN2-0072530.)

[15] Portions of the trial transcript from April 30, 2010 cited herein are attached as Exhibit 7.

context of analyzing infringement under 35 U.S.C. § 271(a), courts interpret the term "use" broadly to determine if behavior constitutes an infringing "use," and the focus for infringement of a system claim is "on the whole operable assembly." *Id.* at 1316-18.

This Court's decision in *Renhcol*, which like the present case dealt with computer systems, exemplifies the proper infringement analysis for use of such systems. *Renhcol*, 548 F. Supp. 2d at 358, 360-64 & n.3. The Court rejected the necessity of an element-by-element approach, explaining that even though the computer code was located on remote third-party servers, the visitors exercised control and derived beneficial use from the code. *Id.* at 360-64 & n.3. To the same effect are *Inline Connection Corp. v. AOL Time Warner Inc.*, 472 F. Supp. 2d 598, 600 (D. Del. 2007), wherein the court granted summary judgment that the defendant internet service providers could not "avoid liability for infringement on the basis that they do not use the patented inventions," finding that "[t]he fact that [defendants] do not own all the component parts of the system [e.g., the telephone network, telephone exchange, and telephone devices] does not matter;" and also, *Nuance Commc'ns v. Tellme Networks*, 2010 WL 1609883, at *7-8 (D. Del. 2010), wherein the Court applied *NTP*'s analysis and denied summary judgment of noninfringement, finding that: "[Defendant's] arguments . . ., which employ a limitation-by-limitation analysis, are inconsistent with the Federal Circuit's emphasis that an infringing use must engage the system as a whole." *See also Civix-DDI, LLC v. Cellco P'ship*, 387 F. Supp. 2d 869, 883, 886 (N.D. Ill. 2005).

Soverain does not seek an "exception" to the all-elements rule, because it does not have to. Rather, because the asserted claims are system claims, and because Newegg's customers use the systems as a whole, the proofs at trial established that the all-elements test was met by Newegg's accused systems, and no exception is required. Newegg's discussion of what it calls

the "'divided infringement' exception to the all-elements rule is nothing more than a red-herring, and is appropriately ignored in its entirety.[16]

### C.    Newegg Induces Its Customers' Infringement

Finally, the evidence also supports the jury's finding that Newegg induces its customers to infringe. Newegg, having specifically designed its websites to sell products, advertises its websites and instructs its customers how to use them – and has done so continuously since this suit was filed in November 2007 to the present day. Newegg advertises by paying for sponsored links on Google and Gizmodo. (Exh. 19, P-016; Exh. 20, P-017; Exh. 2, Tr. Cheng 39:15-44:25, 4/28/10 AM.) Dr. Grimes's testimony and other evidence establish that Newegg instructs its customers how to use its online shopping cart to purchase products, and to enable their browsers to accept cookies, which are required to shop on Newegg's websites. (Exh. 1, Tr. Grimes 129:5-133:21, 135:15-136:4, 4/26/10 PM; Exh. 10, P-015; Exh. 13, P-038 at RFA 42; Exh. 21, P-033.)

Newegg possesses the requisite intent to induce infringement. "[T]his intent may be established through circumstantial evidence . . . . and where an alleged infringer who *'knew or should have known* his actions would induce actual infringements[]' is shown to have induced infringing acts through his actions." *Broadcom Corp. v. Qualcomm*, 543 F.3d 683, 699 (Fed. Cir. 2008) (quoting *DSU Med. Corp. v. JMS Co., Ltd.*, 471 F.3d 1293, 1306 (Fed. Cir. 2006)). Soverain only seeks damages beginning with the filing of this case. Newegg was on notice of Soverain's patents as of the filing of this case and, at minimum, should have known from the complaint and Soverain's infringement contentions that its sales and hypertext-statement systems

---

[16] Indeed, "divided infringement" is not an "exception" to the all-elements rule at all. The all-elements rule for method claims simply requires that all steps be performed. "Divided-infringement" case law, applicable *only* to method claims, addresses what happens when all of the steps of a method claim are performed, but by different parties. Throughout the summary judgment briefing, Newegg contended that method-claim divided-actor principles *did* apply to system claims. (Dkt. 248, 2-4; Dkt. 265, 1-2.) Newegg now concedes that system and method claims are different. (Newegg Br. 4.) But Newegg ignores that *NTP* and its progeny provide the proper rule for system claims. *E.g.*, *NTP*, 418 F.3d at 1316-18.





⁂ Home > Help & Info > Ordering

Search FAQs [_____] GO

## Ordering

**Does Newegg.com accept phone, fax, email or snail mail orders?**

All ordering, price quotes, stock status, and shipping quotes are provided online -- no exceptions. We do not accept phone, fax or e-mail orders or quotes. All pricing quotes on products and shipping are available on the website only.

**I didn't see an order confirmation page. Was my order submitted successfully?**

If you didn't see an order confirmation page even though you clicked this last submit button, our server probably still received your order. This happens when communication back to your PC is interrupted following your order submission. Contact our Customer Service Department at 1-800-390-1119 to make sure your order was received.

**I think I may have inadvertently placed a duplicate order. What should I do now?**

Call Newegg.com customer service at 1-800-390-1119. We will void the order for you as long as it has not yet been invoiced or shipped. If duplicate orders have been shipped, obtain the tracking number(s) for the order(s) you do not want and call shipping carrier to refuse those shipments. You will be refunded in full when those items are returned to Newegg.com.

**After I submit an order with Newegg.com, how will I be advised of the order's progress?**

Newegg.com will keep you informed of your order via e-mail. Your tracking number will be emailed to you once the item is shipped. You may also check our online order status page for live updates.

**How can I check my Newegg.com order status online?**
Go to the order status page.

**I checked my order status online and was advised that my order has been voided. Why?**

If an order is placed but the credit card is declined or the shipping address cannot be verified within three business days, the order is voided. There is no way to regenerate a void order; you'll have to re-order online. Please call Newegg.com customer service at 1-800-390-1119 if you believe there's been an error.

**Can I add, change or remove items from my order after it has been submitted?**

No.

Once an order is submitted it can only be amended or edited by calling Newegg.com customer service at 1-800-390-1119. Once our warehouses have scanned an order, items cannot be added or deleted. Once any box from an order is shipped, the order cannot be voided.

**How long does it generally take to process an order?**

It takes one to two business days for us to process an order (prior to shipping it). Once the order has shipped, your estimated time of arrival will be determined by your selected shipping method and your local FedEx guidelines for delivery.

Newegg.com offers Rush Processing for orders placed before 12PM PST for a small additional fee. Newegg.com will put forth its best efforts. We cannot however, guarantee that your order will ship the same day. If we fail to ship your order on the same day, we will refund the Rush Processing fee.

**May I combine two separate orders to save on shipping costs?**

We do not combine orders for you over the phone. However, if you call us before your orders are processed, we can cancel your orders so you can place a single order for all the items you want. Please understand that we cannot cancel an order once it has been scanned by our warehouse.

**Can I reactivate an order that has been voided/cancelled?**

No, you'll have to re-order online.

**May I take advantage of a manufacturer mail-in rebate through Newegg.com?**

For your convenience, Newegg.com advertises current Manufacturer rebates on our website.

Manufacturer mail-in rebate offers are fulfilled by the manufacturer exclusively. The prices on our website do not include rebate savings. Use of these rebates is limited to any terms or conditions provided by the manufacturer. If you have any questions regarding a rebate's terms & conditions and/or how to redeem the rebate, please contact the manufacturer directly.

**How do I change my Newegg.com login ID?**
1. Click the My Account button located at the top right of the Newegg webpage
2. Click Account Settings under the Options menu to your left. You must be logged in.
3. Change your Newegg com login ID by updating your email address accordingly

**I am getting a message, "SORRY YOU HAVE FAILED TO LOGIN TOO MANY TIMES. PLEASE TRY AGAIN LATER." Have I been locked out?**
The server allows 5 login attempts every 5 minutes. Beyond that, it will "time out" the account, and login

### Sidebar Navigation

**Help**
· Overview

**FAQs**
· Contact
· Credit
· Extended Warranty
· Ordering
· Payment
· Products
· Returns(RMA)
· Shipping

**Knowledge Base**
· Address Verification
· Search
· Expert Opinions
· External Links
· Product Tour

**Policies**
· Policy & Agreement
· Privacy Policy
· Return Policy
· Extended Warranty

**Gift Certificates**
· Buy A Gift Certificate
· Your Gift Certificates

**Contact**
· Customer Service
· Manufacturers



Plaintiff's Exhibit

Exhibit No: P-15

Case No. 6:07-cv-00511

will be forbidden for several minutes. If this "time out" occurs 20 times within the span of 3 days, the IP address used for these attempts will be locked, and login from that IP will no longer work. If this has occurred, please try logging in from a different location and contact customer service for assistance.

**Where is the Newegg Classic link? Can you bring back the old site?**
Newegg classic is no longer online, however we are constantly improving our site and would love to hear your suggestions.

**Is the Newegg.com website secure? What security features are in place to safeguard my information?**
Security is a top priority at Newegg.com. When you submit sensitive information via the website, your information is protected both online and offline.

When our registration/order form asks you to enter sensitive information (such as your credit card number), that information is encrypted and is protected with the best encryption software currently available in the industry - SSL. Newegg.com uses the most advanced form of SSL software available: 128-bit encryption by Verisign. To learn more about SSL, follow this link www.verisign.com..

Access to all of our users' information is restricted. Newegg.com operates in a secured and locked facility that requires all employees to check in and wear valid ID badges. Security cameras are positioned throughout the building in conjunction with multiple alarm systems. Only employees who need the information to perform a specific job are granted access to personally identifiable information. If you wish to have your financial information removed at the time of your order, you may opt to have your financial information deleted from our records upon completion of your order. Otherwise, you may contact us at service@newegg.com or call our toll free number (800) 390-1119 to request that your information be deleted from our database. For future transactions, you will be required to re-enter your information.

All Newegg.com servers, including web servers and database servers, are housed and maintained in secure locations. Access to the database is strictly monitored and protected from outside access. Internet access is restricted and protected by multiple Checkpoint and Cisco firewalls and password protection. The servers on which we store personally identifiable information are kept in a secured environment, inside a secured and locked room. All backups are stored and locked in a high-level security room. Only personnel with proper security clearance have access to these restricted areas. Tape backups are not permitted to leave the premises without prior authorization.

All employees are updated with the latest information on our security and privacy practices. Every quarter, as well as any time new policies are added, our employees are notified and/or reminded about the importance we place on privacy and of what they can do to ensure that our customers' information remains protected.

**Does Newegg.com sell or release my personal information?**
Newegg.com respects your privacy. We will not under any circumstances sell or release your information to anyone without your consent. Please see our Privacy Policy for additional details.

**I am experiencing trouble with my shopping cart. What can I do?**
Shopping cart problems usually occur for one or more of the following reasons:
1. Cookies are not enabled, or your browser is configured to block newegg.com and/or secure.newegg.com cookies.

NOTE: In some cases, the cookies on your computer may become corrupted. If you've verified that newegg.com and secure.newegg.com cookies are being accepted and you're still experiencing problems with the shopping cart, please clear your cookies and cache, close your browser and try again.
2. The master clock on the computer is not set correctly.
3. The computer you're using is behind a firewall.
4. The item you are trying to purchase is sold out, or there is a lesser quantity than you wish to purchase.
5. You are using a browser released prior to Internet Explorer 5.1.
If all else fails, try closing all open programs and restart your computer, or try from a different computer.

**Does Newegg.com offer a paper catalog?**
No. Our online catalog at www.newegg.com is our only catalog.

**I can't view or login to the Newegg website. What can I do?**
If you are entering the correct email address and password, and your account has not been suspended due to fraud or chargeback, please try the following:
1. Enable Cookies.
2. Enable Javascript.
3. Clear existing cookies and cache.
4. Make sure the date/time on your computer is correct for your time zone.
5. Make sure you do not block our site or our image cache server (AKAMAI).
6. If you are using Internet Explorer, set your security profile to Medium and enable "Override automatic cookie handling" (Tools > Internet Options > Privacy tab > Advanced)
7. If you are using Firefox, type "about:config" in the address bar. Set the "network.http.sendRefererHeader" value to 1.

If problems or issues continue, add the Newegg host record into your computer:
*Go to "C:\WINDOWS\system32\drivers\etc" and open the "hosts" file with Notepad. Add the following rows:
216.52.208.185 www.newegg.com
216.52.208.188 secure.newegg.com

For further assistance, try the following links:
http://www.newegg.com/test.aspx
http://secure.newegg.com/test.aspx
Then click Email WebMaster to email our Webmaster and tell us what you see.

**What happens if an item is backordered?**
If an item is found to be out of stock after your order has been placed, then it will automatically be removed from your order. We will not hold an order because an item is backordered. You will not be charged for the backordered item or for the shipping cost of the item (if you were already charged, you will be refunded). The item that was backordered will have to be re-ordered online when it becomes available again.

**What happens when an item is out-of-stock?**

We do not sell merchandise that we don't have in-stock, which is why we provide a convenient Auto-Notify feature. Simply click the Auto-Notify button and fill in your email address, and you'll receive an e-mail notification as soon as the product becomes available for purchase.

**What should I do if an item is missing from my order?**

First, verify that you've received a box for each tracking number associated with your order. If all boxes have been delivered but you're still missing an item, check the packing material for small items. Please call Newegg.com Customer Service at 1-800-390-1119 if you're unable to locate an item.

**Can I pre-order a product that is not yet in stock?**

Yes, but pre-orders are only offered for certain items. At this time, most of our products are not eligible for pre-order. Please note that we will not charge or ship a pre-order until all items on the pre-order are in stock. An item's ETA is subject to change without notice.

**Can I back order an item that is out-of-stock?**

Yes, you can back order certain items even when they are sold out or out-of-stock. However, most of our items are not eligible for backorder.

A backorder will not be charged or shipped until all items on the order are in stock. A backordered item may have an ETA, although it is subject to change without notice.

**How do I redeem my Newegg.com Gift Certificate?**

Simply enter your Claim Code and Security Code in the "Redeem Gift Certificates" area on the shopping cart page. Newegg.com Gift Certificates must be redeemed through the Newegg.com website, www.newegg.com, toward the purchase of any product(s) listed in Newegg.com's online catalog. Gift Certificates can neither be refunded nor used to purchase Gift Certificates.

**Can Newegg.com use registered mail for my APO/FPO order?**

Presently we do not offer a registered mail option for APO/FPO orders. We currently utilize only the standard service offered by the United States Postal Service to keep rates as low as possible.

**How long after buying a Gift Certificate does it take for a Gift Certificate to be sent out?**

Immediately after your order is processed (typically 24-48 hours), a gift certificate is automatically sent to the recipient's email address.

**Do Newegg.com Gift Certificates expire?**

No, they do not expire. However, they are non-transferrable from the original user to another user. The original user is the only one that can redeem the balance on a gift certificate.

**Can I redeem a Gift Certificate toward a purchase that exceeds my Gift Certificate amount?**

Yes, and you'll have to pay the remaining balance using a credit card or other payment method.

**The Bill Me Later payment option is not being displayed in the shopping cart. What gives?**

If you entered the wrong date of birth, home address, home telephone number or made a mistake typing the last four digits of your social security number (or a combination of each) three times, Bill Me Later will be deactivated as a payment option for the current order. It is important to note that the deactivation is only temporary and conducted as a precautionary measure to prevent fraudulent activity.

If your shopping cart contains pre/back-ordered merchandise and/or downloadable software, the Bill Me Later payment option is not displayed because these product types are not available for purchase using Bill Me Later.

**In what denominations can Newegg.com Gift Certificates be purchased?**

Newegg.com Gift Certificates can be purchased in any dollar denomination from $5 to $5,000.

**The product I'm interested in "Must be Purchased With Hardware." Which items qualify as "hardware"?**

Certain items may not be purchased without the purchase of a separate non-software item from our online store. There are no minimum dollar requirements or specific hardware requirements.

**I lost my Gift Certificate Claim Code. What should I do?**

Your claim codes are displayed on the Gift Certificate Balance page once you log in.

**Can Newegg.com Customer Support agents physically obtain a product and describe it to me?**

Because our inventory is stored in our warehouses, our agents cannot physically get a hold of any product to describe it for you. All product information we have is displayed on our website. Please use the "MORE INFO" and "DETAILED SPECIFICATIONS" links to learn about products you're interested in.

**Can I purchase downloadable software using Bill Me Later?**

Downloadable Software cannot be purchased using a Bill Me Later account. Please visit Newegg.com's Software Store to check if a standard version of the title you are interested in is available.

**I received an Auto-Notify email indicating that a product is now in stock. But when I check the website, the product is out-of-stock. Why?**

It's likely that the product you're interested in sold out soon after it became available for purchase. To give yourself the best chance of getting an item you're interested in, place an order immediately after receiving an auto-notify email.

---

**How do I use Newegg.com's shopping cart?**

Search for the items you want to buy. Click "Add To Cart" for each item you want. If you want to buy more than one unit of an item, input the desired quantity in the "Qty Product" field, and click "Update". If you need to shop for more items, click "continue shopping". After you've added all items you want to purchase to your shopping cart, select a shipping method and your ship-to state. Click on the shipping calculator button to view the total charges. If everything meets your satisfaction, click "Check Out" and log in following the onscreen instructions. If you're a new customer, click "GO" next to "New Customer" to create an account. The contents of your shopping cart will be held for you during this process. After creating an account, you should proceed to check out as normal.

**Why am I unable to order a Newegg.com gift certificate?**

Please make sure the credit card that is being used to order the gift certificate is a "Verified by Visa" enabled card. This helps cut down fraud and protects your online purchase. Only a Verified by Visa credit card can be used for gift certificate purchases. Regular purchases do not have this requirement. Please refer to your issuing bank to see if they participate in the Verified by Visa program. If your card is already Verified by Visa enabled, then a failed transaction may be due to an error with the banks verification server, and we would suggest that you try again later when the bank's servers are experiencing less traffic. If your Verified by Visa card fails to authenticate then you may have entered the wrong info or your card has not yet registered for the Verified by Visa program.

**Why does Newegg place Quantity limit restrictions on some items?**

In the efforts to best distribute our more popular products evenly to our vast customer base, you may find that a quantity purchase limit has been placed on select items restricting the quantity amount that can be purchased in a 'cool down' period of 48 hours.

**I've previously ordered an item(s) that had a Quantity Limit restriction. When can I order more?**

After a 'cool down' period of 48 hours has expired from a previous purchase for an item(s) with a Quantity Limit restriction, you may place a new order for that item(s) keeping in mind the Quantity Limit, if still applicable.

**My order was adjusted due to 'Quantity Limit Exceedance'. What does that mean?**

If you receive a 'Quantity Limit Exceedance' notification and was informed that your order was adjusted, that means our records indicate that the listed item(s) was either previously purchased under the same Customer account or using the same credit account and, with that purchase, the quantity limit for the listed item(s) has now been exceeded.Because of that, the listed item(s) indicated as exceeding its quantity limit would be removed from the order, and the remaining portion of the order would continue to process and ship.

**My order was cancelled due to 'Quantity Limit Exceedance'. What does that mean?**

If you receive a 'Quantity Limit Exceedance' notification and was informed that your order was cancelled, that means our records indicate that the listed item(s) was either previously purchased under the same Customer account or using the same credit account and, with that purchase, the quantity limit for the listed item(s) has now been exceeded. If the listed item(s) in this notification was indicated as exceeding its quantity limit and was the only item(s) on the order, the order cannot continue processing, and would then be cancelled.

**Do open box items qualify for rebate offers?**

No, we do not offer (or honor) rebates for open box items. A rebate offer for a new product will not be honored for a open box unit of the same product.



| CUSTOMER SERVICE | SHOPPING HELP | MY ACCOUNT | COMPANY INFO | TOOLS & RESOURCES |
|---|---|---|---|---|
| • Contact Us | • Buy Gift Certificate | • Login/Register | • About Us | • RSS Feeds |
| • Search Tips | • Return Policy Information | • My Account | • Office Hours and Location | • Site Map |
| • Frequently Asked Questions | • Knowledge Base | • Order Status | • Careers | • Knowledge Base |
| • Address Verification | • Lite Version | • Order History/Print Invoice | • Newsroom | • Rebate Center |
|  | • Icon Glossary | • Wish Lists | • Awards/Rankings | • Affiliates |
|  | • Video Center | • RMA Request | • Events | • Newegg Information Center |
|  |  | • Track My Order | | • Newsletter Subscriptions |
|  |  | Tracking Number | | |

    

Policy & Agreement | Privacy Policy | NeweggBusiness | © 2000-2009 Newegg Inc. All rights reserved.

# A1

Plaintiff's Exhibit
Exhibit No. P-10
Case No. 6:07-cv-00511

# A21



Home -> My Account > Order Info > Order Status

**SHOPPING INFO** | **ORDER INFO** | **ACCOUNT SETTINGS** | **SUBSCRIPTIONS**

**ORDER STATUS**

If your new order is not in the list, enter the sales order number in the text box and click GO: SO#

The listing below is an assemblage of all orders placed on this account in the last 15 days. Expanded order details and relevant shipping information are accessible by clicking the "View" link. To assess the status of an order, match the current step number with its corresponding definition in the Order Status Legend near the bottom of this page.

| Time | Order # | Amount | Status | | |
|------|---------|--------|--------|------|--------|
| 1/12/2008 11:14:53 AM | 74847332 | $10.98 | Step 1 | View | Cancel |
| 1/12/2008 11:14:53 AM | 74847352 | $6.99 | Step 1 | View | Cancel |

**View Complete Order History**

**Status Legend:**

**Step 1:** Your order has been successfully submitted. Your credit/debit card has not yet been charged. Please allow 1-2 business days for your order to process and ship.

**Step 2:** Verification and fraud prevention measures are complete. Your credit/debit card has not yet been charged.

**Step 3:** Your credit/debit card has been successfully charged. Please note that you may no longer make changes to your order.

**Step 4:** Your order contents will soon be packaged and sealed.

**Step 5:** Your order has shipped. You may view your tracking information by clicking the applicable "View" link above. However, your tracking number may not appear immediately as the shipping couriers update only periodically. Your tracking number(s) will also be sent via email to your Newegg.com login.

**Void:** Your order is cancelled. Void orders are null and cannot be re-processed. If you need to re-order as a result, please do so on our website. If you have any questions or concerns, please contact us for help.

Policy & Agreement | Privacy Policy | © 2000-2008 Newegg Inc. All rights reserved.

A10113

Charge at p. 18 (The jury may properly "consider any actual profits made by Newegg and any commercial success of the patented inventions"). Newegg's own damages expert testified that "the book of wisdom refers to case law which permits an analyst ..., somebody who's evaluating the hypothetical negotiation, to consider data that is subsequent to the hypothetical negotiation as part of their royalty information." (Ex. 6, 128:11-15.)

Mr. Nawrocki's consideration of Newegg's gross sales and profits during the infringement period was proper under *Georgia-Pacific*.

### E.     There Is Ample Support in the Record for a Use-Based Running Royalty

Newegg claims that "Soverain had no evidentiary support for a use-based running royalty" and that "Soverain introduced no evidence that it or its predecessors Open Market or Divine ever licensed this technology for a use-based running royalty." Newegg Mot., at 13. In doing so, Newegg ignores the record exhibits and testimony. Newegg's own damages expert testified regarding eighteen license agreements entered into by Soverain's predecessor, Divine. Each of those license agreements contained a lump-sum payment that was based on a running component that "represent[ed] a percentage of gross sales or net sales or gross profit [or] a fee per transaction." (Ex. 6, 116:10-117:9; *see also* Ex. 4, 100:8-105:9.[5])

In addition to Divine's license agreements, Newegg's damages expert testified about

---

[5] *See also* P-186 (Bikecology's license fee represented 2% of licensee's projected gross profit), P-187 (Bissinger French Confections' license fee represented 1% of licensee's gross sales in 2001), P-188 (Cadence 120 Bicycle Works's license fee represented 1% of licensee's gross sales in 2001), P-189 (Cartronix's license fee represented 1% of licensee's gross sales in 2001), P-190 (DVDPlanet.com's license fee represented 2.5% of licensee's net sales in 2001), P-191 (Emagio's license fee represented 1% of licensee's gross sales in 2001), P-192 (Game Link's license fee represented 8.33% of licensee's net sales in 2001), P-193 (Glooks.com's license fee represented 10% of licensee's gross sales in 2001), P-194 (Katco's license fee represented 10% of licensee's gross profit), P-195 (Kreiss' license fee represented 5% of licensee's gross sales in 2001), P-196 (L.H. Internet's license fee represented 2% of licensee's gross sales in 2001), P-197 (Natural Food's license fee represented 1% of licensee's gross sales), P-198 (Perfumania's license fee represented 0.5% of licensee's gross sales in 2001), P-199 (Odimo's license fee represented $0.85 per shopping cart transaction for one year), P-200 (Spun.com's license fee represented 1% of licensee's projected gross cash sales for one year), P-201 (System Optic's license fee represented 10% of licensee's gross sales for 2000-20002), P-202 (Webster Orchard's license fee represented 2% of licensee's gross sales in 2001), P-203 (Tryiton Eyewear's license fee represented 1% of licensee's gross sales in 2001).

*CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER*

47. A license with lump-sum, fully paid-up form is also supported by real-world patent licenses executed by Soverain and its predecessors-in-interest in this matter, which are all lump-sum in nature. A table summarizing these licenses is provided as Exhibit 6.

48. Often, smaller and unprofitable companies are inclined to accept lump-sum amounts, preferring certainty of cash flow over uncertain payments in the future subject to risk their technology is not used.[62] Larger companies, particularly software companies, frequently prefer to pay lump-sums for financial planning purposes. Both large and small companies recognize that lump-sums make audits unnecessary, particularly when the patented claims functionally relate to only a portion of a revenue stream that can be challenging to measure or that many change over time.[63] This indicates that the original hypothetical negotiation would have resulted in a license with a one-time payment that would have granted Newegg rights to practice the patented claims with no need to re-open the negotiation at a later date.

49. Moreover, the jury entered a round amount of $2.5 million in the verdict form. This is consistent with Soverain's licenses, all of which were of a lump-sum form.

50. The jury award of $2.5 million yields an effective royalty rate consistent with royalty rates indicated in the text of the Divine patent licenses (if the rates are evaluated as percentages of single-year sales during start-up years).

51. This is demonstrated in the following table (also see Exhibit 6):

---

[62] Frank, Peter B., Wagner, Michael J., and Weil, Roman L. "Litigation Services Handbook: The Role of the Financial Expert." Third Edition, John Wiley & Sons:2001, pg. 23-10.

[63] Frank, Peter B., Wagner, Michael J., and Weil, Roman L. "Litigation Services Handbook: The Role of the Financial Expert." Third Edition, John Wiley & Sons:2001, pg. 23-10.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### TYLER DIVISION

| | | |
|---|---|---|
| SOVERAIN SOFTWARE LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | Civil Action No. 6:07-CV-00511-LED |
| CDW CORPORATION, NEWEGG | ) | |
| INC., REDCATS USA, INC., | ) | ***FILED UNDER SEAL*** |
| SYSTEMAX INC., ZAPPOS.COM, | ) | |
| INC., REDCATS USA, L.P., THE | ) | |
| SPORTSMAN'S GUIDE, INC., and | ) | |
| TIGERDIRECT, INC., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**Newegg's Response to Soverain's Renewed Motion for Judgment as a Matter of Law of Infringement and for a New Trial on '639 Patent Damages**

TABLE OF CONTENTS

I.      Newegg does not infringe claim 79 of the '639 patent. ..................................... 1

        A.      Divided Infringement Standard ............................................................ 1

        B.      Newegg does not infringe claim 79 of the '639 patent as a matter of law ............. 3

II.     Newegg does not directly infringe the '314 and '492 patents. ........................................ 7

        A.      *The jury's inducement finding is legally insufficient because no party was shown to satisfy each and every limitation of the asserted claims of the 314 and '492 patents.* ........................................................................ 7

        B.      Even if a single party were deemed to own, operate, control, direct, or "use" the combination of a customer's computer, the Internet, and Newegg's server systems, Soverain still failed to prove infringement of each and every asserted claim element. .................................................... 9

III.    Conclusion ...................................................................................................... 12

I.    **Newegg does not infringe claim 79 of the '639 patent.**

Under *MuniAuction, Inc. v. Thomson Corporation*, 532 F.3d 1318 (Fed. Cir 2008), Newegg does not infringe claim 79 of the '639 patent as a matter of law. In particular, claim 79 includes elements that must be satisfied by multiple parties, namely a customer and a merchant. Under *MuniAuction*, infringement requires that a single defendant practice each and every element of a claimed invention, or that the defendant control or direct the entire process such that every step is attributed to the defendant. Here, however, the arms-length purchase transactions between Newegg and its customers (whose terms do not concern the operation of Newegg's websites) cannot satisfy this standard. Thus, infringement cannot exist as a matter of law.

Against this, Soverain argues that claim 79 does not present a "distributed actor issue" and asks the Court to disregard express claim limitations that require actions by multiple parties. In particular, without offering any legal support for its position, Soverain urges the Court to ignore all but the first word in each clause of claim 78 (from which claim 79 depends). Soverain's arguments are directly contrary to the law as well as the facts established at trial.

A.    **Divided Infringement Standard**

Infringement requires a showing that a defendant has practiced each and every element of the claimed invention. *Warner-Jenkinson Co., Inc. v. Hilton Davis Corp.*, 520 U.S. 17, 40 (1997). In *BMC Resources, Inc. v. Paymentech, LP*, 498 F.3d 1373 (Fed. Cir. 2007), the Federal Circuit addressed this issue in the context of a claim directed to the processing of debit transactions that required the participation of third party debit networks and financial institutions. *Id.* at 1375. The court confirmed that the infringement standard requires a single party to practice each and every element. *Id.* at 1380. The court noted, however, that infringement could be found where one party "controls or directs" the entire practice of the claim such that every element is attributable to the controlling party. *Id.* at 1380-81. Although the court did not clarify

1

the "control or direct" standard, it held that such standard was not satisfied by the mere "arms-length cooperation." *Id.* at 1371. As such, the court concluded that the defendant was not responsible for the actions of the debit networks and financial institutions and that "[w]ithout this direction or control of both of the debit networks and the financial institutions, [the defendant] did not perform or cause to be performed each and every element of the claims." *Id.* at 1382.

The Federal circuit subsequently clarified this standard in *MuniAuction*. The claims at issue there were directed to a computer system by which bond issuers could initiate and monitor bond auctions and bidders could submit bids on one central server. *MuniAuction*, 532 F.3d at 1322. The patent required a bidder and a computer system. The accused infringer, Thomson, ran the server that enabled the auction activities claimed. *Id.* at 1323. The plaintiff argued that the direction or control standard was satisfied because Thomson controlled access to its system and instructed bidders on its use. *Id.* at 1330.

The Federal Circuit confirmed that infringement requires that a single party practice each and every element. *Id.* at 1328. The court then turned to the question of whether the defendant "controlled or directed" the actions of the bidders so that their actions were attributable to the defendant. *Id.* at 1329. The court held that the "controlled or directed" standard is satisfied in situations where the law traditionally would hold the accused direct infringer vicariously liable for the acts committed by another party that are necessary to satisfy the elements of the claim. *Id.* at 1330. Since the defendant in *MuniAuction* did not itself satisfy each claim element and could not be vicariously liable for the actions of its bidders, infringement could not exist as a matter of law. *Id.*

Subsequently, the Southern District of Florida applied *BMC* and *MuniAuction* to patent claims very similar to those at issue here. In *Global Patent Holdings, LLC v. Panthers BRHC LLC*, 586 F.Supp.2d 1331 (S.D. Fla. 2008), one claim element had to be satisfied by a remote

2

computer user. The plaintiff alleged that the defendant's placement of Javascript programs on a user's computer allowed the process to function. As here, however, the asserted claims could not be practiced unless a computer user visited the defendant's website: "[i]f no person ever visited Defendant's website, then Plaintiff's patent would never be infringed." *Id.* at 1335. The court concluded that infringement could not exist because the user was in no way obligated to visit defendant's web site and the defendant could not be vicariously liable for the acts of the user. *Id.* at 1335.

Under *BMC* and *MuniAuction*, claim 78 (and thus dependent claim 79) cannot be infringed because, as confirmed by the relevant testimony, the claim requires the participation of multiple parties to satisfy the claim limitations. And because there was no evidence that customers were controlled or directed by Newegg such that Newegg could be vicariously liable for their actions, infringement cannot exist as a matter of law.

**B.    Newegg does not infringe claim 79 of the '639 patent as a matter of law**

Claim 79 of the '639 depends on claim 78. Claim 78 reads as follows, including the letter designations from Dr. Grimes:

> 78[a]. A method of processing, in a server system, service requests from a client to the server system through a network, said method comprising the steps of:
>
> [78b] receiving, from the client, a service request to which a session identifier stored at the client has been appended by the client, wherein communications between the client and server system are according to hypertext transfer protocol;
>
> [78c] validating the session identifier appended to the service request; and servicing the service request if the appended session identifier is valid.

Notably, certain limitations of claim 78 are also present in claim 1, and were discussed by both Dr. Jack Grimes and Ed Tittel at trial. Element 78[a] includes the limitation of "processing . . . service requests from a client to the server system through a network." This claim limitation

requires the participation of a client (buyer/customer) and server system (Newegg). As confirmed by Dr. Grimes, there must be a service request *from* a client to satisfy this limitation:

> "But . . . that's a description of the client server model. Clients request service; servers provide[]service." Tr. 4/27/2010 (am) (Grimes) at 55:2-17 (Ex. A).

And with respect to claim 78, Dr. Grimes specifically confirmed that "[t]he service requests are from a client, meaning – meaning a client computer or the buyer computer or the customer computer. Yes, those service requests come from the client." Tr. 4/27/2010 (am) (Grimes) at 61:4-16 (Ex. A).

In addition, the claim language itself expressly includes the processing of "service requests from a client to the server system," which unquestionably requires the action of the client (customer) *sending* a service request. Dr. Grimes and the jury agreed. This was further confirmed by the testimony of Mr. Tittel. Tr. 4/29/2010 (am) (Tittel) at 41:12 – 43:12 (Ex. C).

Element [78b] includes the limitation of "a service request to which a session identifier stored at the client has been appended by the client." This also requires an action by the client via the "client computer." Indeed, as Dr. Grimes testified, "the identifier stored at the client has been appended by the client. That's the way the [customer's] browser works." Tr. 4/27/2010 (am) (Grimes) at 61:17-62:3 (Ex. A). In addition, Mr. Tittel explained in detail the mechanisms by which the client computer stores the session identifier and appends it to subsequent requests. Tr. 4/29/2010 (am) (Tittel) at 43:13-45:18 (Ex. C). Mr. Tittel also confirmed that the "customer computer stores the session identifier and then uses it in subsequent communications." Tr. 4/29/2010 (am) (Tittel) at 44:20-24 (Ex. C). He continued by testifying that this action is not controlled by Newegg. Tr. 4/29/2010 (am) (Tittel) at 44:25-45:3 (Ex. C). Mr. Tittel further testified that the client computer appends the stored session identifier to each of the subsequent distinct requests. Tr. 4/29/2010 (am) (Tittel) at 45:4-18 (Ex. C).

Soverain cites dicta from *BMC* to the effect that a patentee can usually structure a claim to capture infringement by a single party. That might be true in some cases, but claim 78 was not so written; rather, Soverain simply ignores the very first portion of that claim, which requires the sending of service requests from the client to the server system. As in *Global Patent Holdings*, claim 78 requires an action by the remote computer user or client. If no user/client visited the Newegg website, the limitations of claim 78 could not be satisfied. *See Global Patent Holdings*, 586 F.Supp. at 1335.

In sum, Soverain asks this Court to focus exclusively on the word "receiving" in clause [78b] while ignoring the fact that subsequent limitations in the clause require affirmative action by a third party client: namely, the storage of a session identifier and the appending of that identifier to a service request.

Under Soverain's flawed logic, one could draft a method claim with an unlimited number of limitations that must be satisfied by different actors – yet avoid any issue of divided infringement – simply by making sure that the *first* verb in each clause was satisfied by one specific party. Such a theory is absurd, and Soverain – who bears the burden of proving infringement – has offered absolutely no support for it.

Moreover, Soverain's position is contrary to basic claim construction principles, which do not permit limitations to be "read out" of a claim. *See Callicrate v. Wadsworth Mfg.*, 427 F.3d 1361, 1369-1370 (Fed. Cir. 2005).[1] Here, the limitations of the "service request from the client" and "session identifier stored at the client has been appended by the client" are present in the claim. The testimony is uncontradicted that these limitations plainly exist in the patent

---

[1] *See also Lewmar Marine, Inc. v. Barient, Inc.*, 827 F.2d 744, 749 (Fed. Cir. 1987) ("The claim limitation could possibly read on the [accused device] if the word 'only' did not appear in that clause. The word 'only,' however, is there and may not be read out of the claim."); *Lantech, Inc. v. Keip Mach. Co.*, 32 F.3d 542, 546 (Fed. Cir. 1994) ("All limitations in a claim must be considered meaningful."); *Exxon Chem. Patents, Inc. v. Lubrizol Corp.*, 64 F.3d 1553, 1557 (Fed. Cir. 1995) (a court "must give meaning to all words in [the] claims").

claims, as discussed above, and would only be satisfied by the client/customer. Unlike the cases cited by Soverain, these limitations are not being read into the claim by Newegg; rather, it is Soverain who is trying to read them out.

Soverain's position is also contrary to basic patent validity principles. First, if Soverain could prove infringement by ignoring certain claim limitations, then those limitations must likewise be ignored when determining invalidity, which would make invalidity far easier to prove. For example, in rebutting Newegg's invalidity case for the asserted claims of the '639 patent, Soverain submitted testimony from its technical expert Dr. Michael Shamos, which distinguished certain prior art on the basis that it did not disclose appending a session identifier to service requests. *See* Tr. 04/29/10 (pm) at 183:5-7 (testifying that, with U.S. Patent No. 5,560,008 to Johnson, "[y]ou don't get appending the identifier, which doesn't exist, to each of the subsequent requests") (Ex. D); *see also id.* at 180:2 – 181:6. But Soverain cannot have it both ways—if the "appending" limitation distinguishes the '639 claims over the prior art, then it is likewise a limitation which must be satisfied by an accused infringer.[2]

Second, under Soverain's theory, certain phrases within the actual claims do not actually represent limitations that must be satisfied by an accused infringer. In other words, those claim phrases are somehow "unclaimed steps" of the claimed method. Yet apart from there being no such doctrine of unclaimed steps, even if there were, such claims would be invalid as indefinite under 35 U.S.C. § 112 ¶ 6. *See IPXL Holdings, L.L.C. v. Amazon.com, Inc.*, 430 F.3d 1377, 1383-84 (Fed. Cir. 2005) ("A claim is considered indefinite if it does not reasonably apprise those skilled in the art of its scope."). Here, as discussed above, both parties' experts understood these ostensibly "unclaimed" steps to be actual claim limitations. Thus, if Soverain's

---

[2] Put another way, if Soverain were correct that appending a session identifier to a service request is not a claim limitation, then it cannot be used as a basis for distinguishing prior art. *See Marrin v. Griffin*, 599 F.3d 1290, 1294 (Fed. Cir. 2010) (holding that patentees could not distinguish prior art on the basis of language that was not a claim limitation).

infringement theory were somehow correct, these claims must be found invalid as indefinite.

For these reasons, Newegg does not infringe claims 78 or 79 as a matter of law, and Soverain's motion should be denied. In turn, because Newegg does not infringe claims 78 or 79, as explained above, no new trial on damages for the '639 patent is appropriate, and Soverain's motion should be denied in this respect as well.

## II.    Newegg does not directly infringe the '314 and '492 patents.

As set forth in Newegg's Renewed Motions for Judgment as a Matter of Law of Non-Infringement and Invalidity of the Asserted Claims and Alternative Motions for New Trial (Dkt. #407), which are hereby incorporated by reference, the evidence at trial established that Newegg does not satisfy each and every limitation of the asserted claims of the '314 and '492 patents.

### A.    The jury's inducement finding is legally insufficient because no party was shown to satisfy each and every limitation of the asserted claims of the 314 and '492 patents.

Direct infringement requires a showing that a defendant has practiced each and every element of the claimed invention. *Warner-Jenkinson Co., Inc. v. Hilton Davis Corp.*, 520 U.S. 17, 40 (1997). Although Soverain argues that the jury's finding of inducement requires that direct infringement be found as a matter of law, it is well established that liability for indirect infringement can exist only where there is direct infringement. *See BMC Resources Inc.*, 498 F.3d at 1379. Here, the jury found no direct infringement by Newegg, and there was no evidence to suggest that Newegg's customers (ostensibly, the party "induced" to infringe) satisfied each and every limitation of the asserted claims. Soverain's argument that direct infringement exists via Newegg's and its customers' "using" the entire system "as a whole" fails because neither party can be said to own or operate (or even control or direct) the elements of the system owned and operated by the other party. *See* Dkt. #407 at 9-11.

Soverain's only alleged support for its novel legal theory is *NTP, Inc. v. Research in*

*Motion, Ltd.*, 418 F.3d 1282, 1317-18 (Fed. Cir. 2005), and its progeny, which are inapposite and do not help Soverain because neither *NTP* nor *Renhcol Inc. v. Don Best Sports*, 548 F. Supp. 2d 356 (E.D. Tex. 2008), addresses the issue of divided infringement. Instead, they address the question of the geographic location of an infringement to determine whether it occurred in the United States. In footnote 13, however, the *NTP* court specifically noted that the issue of direct infringement by the customers was not appealed. *NTP* did not hold that "the infringement analysis for use of claimed systems is 'fundamentally different'" such that one party does not have to satisfy every claim limitation. Instead, the court merely held that "the concept of 'use' of a patented method or process is fundamentally different from the use of a patented system or device." 418 F.3d at 1317. The court nowhere suggested, let alone held, that infringement of a system claim does not require that the accused infringer satisfy each claim limitation. *NTP* held that because "customers send and receive messages by manipulating the handheld devices in their possession in the United States, the location of the use of the communication system as a whole occurs in the United States." *Id.* (emphasis added). This cannot be taken to mean that infringement could exist if the accused did not satisfy each claim limitation (*i.e.*, the system "as a whole").

Subsequently, two district courts have interpreted *NTP* in precisely the limited fashion described above. *See Phoenix Solutions, Inc. v. DirecTV Group, Inc.*, 2009 U.S. Dist. LEXIS 114977, No. CV 08-984 MRP, at *28-29 (C.D. Cal. Nov. 23, 2009) ("*NTP* did not analyze 'joint' infringement, rather, *NTP's* holding was limited to the issue of whether a party 'uses' a claimed system or method within the United States when one element of the claimed system or method is abroad."); *Centillion Data Sys., LLC v. Qwest Communications Int'l, Inc.*, No. 1:04-cv-0073 LJMDML, at *23 (S.D. Ind. Oct. 29, 2009) (unpublished) ("However, to the extent Centillion suggests that under *NTP* the use of some, but not all, of the elements of a system claim is

sufficient to find direct infringement if the use is 'beneficial,' the Court disagrees. Infringement requires, as it always has, a showing that a defendant has practices each and every element of the claimed invention." (internal quotation marks omitted)).

Based on the evidence at trial, the only reasonable inference to be drawn from the jury's finding of inducement but not direct infringement is that the jury concluded that all claim elements were not present in the accused system, yet failed to understand that direct infringement by Newegg customers must be found in order for indirect infringement to possibly exist. Indeed, because the record was devoid of evidence to support a finding of direct infringement – let alone active inducement of infringement – the active inducement instruction in the charge was improper, and its inclusion constitutes legal error. *See* Tr. 04/29/10 (pm) at 233:5-9 (Ex. E).

Absent a legally or factually sufficient basis to establish that Newegg, or any of its customers, individually satisfied each and every limitation of the asserted claims of the '314 and '492 patents, Soverain's motion must be denied.

> **B.** **Even if a single party were deemed to own, operate, control, direct, or "use" the combination of a customer's computer, the Internet, and Newegg's server systems, Soverain still failed to prove infringement of each and every asserted claim element.**

Regarding the shopping cart claims (claims 35 and 51 of the '314 patent and claim 17 of the '492 patent), Soverain failed to prove at trial that Newegg's server system satisfies, either literally or equivalently, at least the limitations of "said buyer computer being programmed to receive a plurality of requests from a user to add a plurality of respective products to a shopping cart in said shopping cart database" and "to modify said shopping cart in said shopping cart database to reflect said plurality of request to add said plurality of products to said shopping cart." *See* Dkt. #407 at 5-9. With respect to the limitation of adding a plurality of respective products to a shopping cart in said shopping cart database, Dr. Grimes testified as follows:

> Q.     [W]hile the customer is adding products to a shopping cart,

> pressing add-to-cart, pressing add-to-cart, but prior to the time they hit checkout, that shopping cart is not in the shopping cart database while the products are being added?

A. That is correct. The add-to-cart button causes the cookie to be updated with one item or two items or however many times they press it. That cookie representing the shopping cart contents is stored by the browser on the client's computer.

Q. So it's never in the shopping cart database while the customer is adding products?

A. Yes. There are other shopping carts in the shopping cart database but . . . not the one that's currently being used by the customer to collect his products, that's right.

Q. Okay. And then I believe, based upon your chart that you put together, that the Newegg cookie shopping cart, that . . . the contents only go to the shopping cart database once the customer hits checkout; is that correct?

A. Yes.

<p style="text-align:center;">*    *    *</p>

Q. Would you agree with me that a request to check out is not a request to add a product to the shopping cart?

A. That's correct. It's a request to check out.

Tr. 4/27/2010 (am) (Grimes) at 28:16-30:13 (Ex. A). Dr. Grimes thus unequivocally confirmed that the Newegg system does not satisfy the limitation of a "plurality of requests from a user to add a plurality of respective products to a shopping cart in said shopping cart database." Rather, as he explained, when the customer adds products to the shopping cart, the shopping cart is not in the shopping cart database. The contents of the shopping cart only go to the shopping cart database when checkout is requested, and "checkout" is not a request to add products.

Dr. Grimes confirmed that this cookie method is significantly different than the server side shopping cart disclosed in the '314 patent. Tr. 4/27/2010 (am) (Grimes) at 39:24-42:22 (explaining that the Newegg cookie method efficiently conserves Newegg's database resources,

but that it also prevents customers from accessing an existing shopping cart cookie from a different computer or browser) (Ex. A). In addition,Dr. Grimes conceded that in the Newegg system, the shopping cart is not modified while it is in the shopping cart database. Tr. 4/27/2010 (am) (Grimes) at 33:6-38:6 (Ex. A).

Dr. Grimes attempted to argue that the assignment of a shopping cart identifier is an "instance of a shopping cart in the shopping cart database" that is modified when it is combined with the contents of the shopping cart. Tr. 4/27/2010 (am) (Grimes) at 33:9-23 (Ex. A). However, Dr. Grimes later acknowledged that this shopping cart identifier contains no empty fields that can be populated with information and that it is not a stored representation of products. Tr. 4/27/2010 (am) (Grimes) at 35:7-20 (Ex. A). As such, the shopping cart identifier is not a "shopping cart" within the Court's claim constructions (*i.e.*, "a stored representation of a collection of products") as it contains no fields that can be modified to store such information.

Finally, there is no evidence that the shopping cart identifier enters the shopping cart database *before* the contents of the shopping cart. To the contrary, the evidence confirmed that the shopping cart identifier and the contents of the shopping cart are combined together and dropped into the shopping cart database at the same time, with one command. Tr. 4/29/2010 (am) (Tittel) at 34:8-36:8 (Ex. A); Tr. 4/28/2010 (am) (Wu) at 98:15-100:6, 111:24-112: 21 (Ex. B). No evidence was presented to the jury that the Newegg system modifies a shopping cart in the shopping cart database.

With respect to the hypertext statement claims of the '492 patent (claims 41 and 61), Soverain presented no evidence that any customer of Newegg's had ever accessed the claimed links to view their order histories. Tr. 4/27/10 (am) (Grimes) at 46:4-8 ("Q. . . . Do you know if, in fact, Newegg customers select or choose the transaction details and, if so, how frequently? . . . A. I – actually I don't have any idea.") (Ex. A). Here, Soverain's theory that infringement exists

only via Newegg or its customers allegedly *using* the claimed hypertext statement system is dispositive.[3]  Because there is no evidence of use of the claimed hypertext statement system, there has been *no proof of infringement of the claimed hypertext statement system*. *See* 35 U.S.C. § 271(a) (defining infringement of a patent as the making, use, sale, offer for sale, or importation of the patented invention).

## III.    Conclusion

For the foregoing reasons, Soverain's Renewed Motion for Judgment as a Matter of Law of Infringement of the '314, '492, and '639 Patents and for a New Trial on '639 Patent Damages should be denied.

---

[3] *See* Dkt. #402 at 9 (arguing that "Soverain alleges that Newegg infringes by *using* its e-commerce system, not by making it") (emphasis in original).

Respectfully submitted,

Dated: June 7, 2010      By:    /s/ Kent Baldauf, Jr. with permission by Trey Yarbrough

David C. Hanson
Kent E. Baldauf, Jr.
Daniel H. Brean
THE WEBB LAW FIRM
700 Koppers Building
436 Seventh Avenue
Pittsburgh, PA 15219
T: (412) 471-8815
F: (412) 471-4094

Trey Yarbrough
Bar No. 22133500
YARBROUGH ◆ WILCOX, PLLC
100 E. Ferguson St., Ste. 1015
Tyler, Texas 75702
Tel: (903) 595-3111
Fax: (903) 595-0191
trey@yw-lawfirm.com

Attorneys for Defendant Newegg Inc.

### Certificate of Service

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being hereby served with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3) on June 7, 2010, or will be served via electronic mail. All other counsel of record will be served via facsimile or first class mail.

/s/   Trey Yarbrough
Trey Yarbrough

### Certificate of Authority to File Documents under Seal

This is to certify that on January 13, 2009 this Court entered Protective Order (Dkt. No. 171) in this case, which requires filing of the attached documents under seal.

/s/   Trey Yarbrough
Trey Yarbrough

# Exhibit
# A

1

<pre>
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE EASTERN DISTRICT OF TEXAS
 2                        TYLER DIVISION

 3   SOVERAIN SOFTWARE           )
                                 )    DOCKET NO. 6:07cv511
 4       -vs-                    )
                                 )    Tyler, Texas
 5                               )    9:00 a.m.
     NEWEGG, INC.                )    April 27, 2010
 6
                        TRANSCRIPT OF TRIAL
 7                       MORNING SESSION
                 BEFORE THE HONORABLE LEONARD DAVIS,
 8        UNITED STATES DISTRICT JUDGE, AND A JURY

 9                   A P P E A R A N C E S

10   FOR THE PLAINTIFFS:    MR. KENNETH R. ADAMO
                            JONES DAY
11                          2727 N. Harwood St.
                            Dallas, Texas  75201-1515
12
                            MR. THOMAS L. GIANNETTI
13                          MR. BARRY R. SATINE
                            MS. CLARK CRADDOCK
14                          JONES DAY
                            222 East 41st St.
15                          New York, New York  10017-6702

16                          MR. CARL ROTH
                            ROTH LAW FIRM
17                          115 N. Wellington, Ste. 200
                            P.O. Box 876
18                          Marshall, Texas  75670

19                          MR. MICHAEL C. SMITH
                            SIEBMAN, REYNOLDS, BURG,
20                          PHILLIPS & SMITH
                            713 S. Washington Ave.
21                          Marshall, Texas  75670

22
     COURT REPORTER:        MS. JUDITH WERLINGER
23
     Proceedings taken by Machine Stenotype; transcript was
24   produced by a Computer.

25
</pre>

1   this content, this product identifier, back to the

2   client computer where it is stored by the browser in the

3   cookie file.

4      Q    Okay.  So while that's going on, those

5   requests are going back and forth, at no time are they

6   yet going to the shopping cart database, correct?

7      A    Not yet, no.  That's not the way the Newegg

8   system works.

9      Q    Now, the claim itself reads:  A plurality of

10   requests from a user to add a plurality of respective

11   products to a shopping cart in a shopping cart database.

12           Would you agree with me that while the

13   customer is adding products --

14           MR. BALDAUF:  Can you keep that up,

15   please?

16      Q    (By Mr. Baldauf) -- while the product -- while

17   the customer is adding products to a shopping cart,

18   pressing add-to-cart, pressing add-to-cart, but prior to

19   the time they hit checkout, that shopping cart is not in

20   the shopping cart database while the products are being

21   added?

22      A    That is correct.  The add-to-cart button

23   causes the cookie to be updated with one item or two

24   items or however many times they press it.  That cookie

25   representing the shopping cart contents is stored by the

1  browser on the client's computer.

2      Q    So it's never in the shopping cart database

3  while the customer is adding the products?

4      A    Yes.   There are other shopping carts in the

5  shopping cart database but not -- not the one that's

6  currently being used by the customer to collect his

7  products, that's right.

8      Q    Okay.   And then I believe, based upon your

9  chart that you put together, that the Newegg cookie

10  shopping cart, that only -- the contents only go to the

11  shopping cart database once the customer hits checkout;

12  is that correct?

13      A    Yes.   That -- clicking checkout, as I

14  testified yesterday, sends -- the browser is programmed

15  to send another message when the button is clicked.

16          So that checkout message goes along with the

17  cookie, and it's received by the server.   At that point,

18  the server then takes the information from the cookie

19  and inserts it into -- into the shopping cart database.

20  So that's -- our picture is gone, but that's -- that's

21  the time at which the shopping cart database is, if you

22  will, loaded with the information from the customer's --

23  from the customer's cookie.

24      Q    I know --

25      A    The cookie that is stored on the customer's

30

 1  website.

 2      Q    I'm sorry.  Were you finished?  I'm sorry.

 3           And would you agree with me that that happens

 4  only once, that all of those contents are sent to the

 5  shopping cart database only once when checkout is hit?

 6      A    Well, it happens every time the checkout

 7  button is selected.  But if the customer is through

 8  shopping, does one checkout operation, then it's -- the

 9  database is updated only once.

10      Q    Would you agree with me that a request to

11  check out is not a request to add a product to the

12  shopping cart?

13      A    That's correct.  It's a request to check out.

14  I mean...

15      Q    During your testimony yesterday, you talked at

16  length about these claims and the various limitations.

17  I don't recall a discussion, though, about one word in

18  Claim 34(f), and that's respective.  I don't believe you

19  talked about that yesterday.

20           That's a word we hear a lot, respective,

21  respectively.  Do you agree with me respective means

22  something relating to two or more things, but they're

23  regarded individually?

24      A    I have thought about what respective means in

25  this claim -- this claim element, and I believe it

A10373

33

1  corresponds to the cookie, which is what the customer is

2  attempting to do.

3         Q    And that was my question.

4         A    Okay.

5         Q    I'm talking about that specific customer.

6         A    Yes.  For that specific customer, that's

7  correct.  There's no shopping cart in the database until

8  after the checkout button is pressed or clicked.

9         Q    Now, with the Court's claim construction,

10  modify the shopping cart means to change, correct?

11         A    Yes.  Specifically to change an instance of a

12  shopping cart in the shopping cart database.

13         Q    To change, to change it.

14         A    Modify.  To change, I would say, is a fair

15  interpretation of modify.

16         Q    So is it your testimony that placing the

17  contents of the shopping cart cookie into the shopping

18  cart for the first time -- into the shopping cart

19  database -- I'm sorry -- for the first time constitutes

20  modifying the shopping cart in the shopping cart

21  database?

22         A    It constitutes modifying an instance of the

23  shopping cart in the shopping cart database.

24         Q    What do you mean by an instance?

25         A    Well, this is based on Mr. Wu's testimony.  He

1    described it as a two-step process.

2          First, there's an instance created, which

3    means there has to be some identification of some space

4    in the shopping cart computer database, and that's step

5    one.

6          Step two involves moving the contents of the

7    cookie into that space, which is the shopping cart in

8    the database.

9          So it's a two-step process.

10   Q    I believe that first step, from your report,

11   you refer to that as the assigning of the shopping cart

12   ID.

13   A    That's the way -- that's the way Mr. Wu

14   described it as step one, yes.

15   Q    What is the shopping cart ID?

16   A    Well, the shopping cart ID, as best as I

17   understand it, is an identification of some space in the

18   shopping cart database.

19   Q    Is the shopping --

20   A    It's assigned and allocated to the shopping

21   cart ID.

22   Q    In fact, it's a number, is it not?  It's a

23   counter.  It's a simple number.

24   A    Well, it's a -- in computer science terms, we

25   call it an identifier.  It's a -- it's a pointer.  It's

1  a -- it's a reference to space in the shopping cart

2  database.

3        And you can think of it as a number, but that

4  doesn't give you any idea of the -- of the meaning of

5  the number.  The number is an address or a reference

6  into the database.

7     Q    Are there any empty fields in this shopping

8  cart identifier that can be populated with information?

9     A    No.  The identifier is a reference to the

10  space in the database.

11     Q    So the shopping cart identifier itself

12  contains no fields that can be changed or modified?

13     A    Well, the identifier is a number, which is a

14  reference to the space.

15     Q    Is the shopping cart ID a stored

16  representation of a collection of products?

17     A    No.  That's the construction for a shopping

18  cart --

19     Q    Right.  So how --

20     A    -- not a shopping cart instance.

21     Q    So you're saying, to be an instance of a

22  shopping cart, that does not have to conform to the

23  definition the Court gave us for a shopping cart?

24     A    The Court gave us a definition of a shopping

25  cart, which I used, which is a...

1    Q    Which you used for shopping cart.

2    A    Yes.

3    Q    And now you're saying that an instance of a

4    shopping cart doesn't have to satisfy the definition of

5    a shopping cart?

6    A    Well, an instance is -- refers to the space in

7    the database where the shopping cart contents will go.

8    Q    But an instance of a shopping cart.  That's

9    what you said.

10    A    Yes.

11    Q    An instance of a shopping cart.

12    A    Yes.

13    Q    So --

14    A    That's an instance of a shopping cart.

15    Q    So the definition of a shopping cart, though,

16    is a stored representation of a collection of products,

17    agreed?

18    A    Yes.

19    Q    And the shopping cart ID is not a stored

20    representation of a collection of products.

21    A    Well, there's a difference between an instance

22    of a shopping cart and a shopping cart.  The Court

23    didn't construe an instance of a shopping cart.  It used

24    that as a part of the construction for the word modify.

25    So --

1    Q    So is it your testimony --

2              MR. ADAMO:  Let him finish.

3              MR. BALDAUF:  Sorry.

4              MR. ADAMO:  Thank you.

5    A    So I used the Court's construction of a

6    shopping cart, and then I said, okay, what does modify

7    mean?

8              And the Court said, well, modify means to

9    change an instance of a shopping cart in the shopping

10   cart database.

11   Q    (By Mr. Baldauf) So just so I'm clear, in

12   connection with your definition of instance of a

13   shopping cart, you did not use the Court's definition of

14   shopping cart?

15   A    I did, because the shopping cart is the

16   destination for where the information goes -- the

17   product information goes, and it's actually not a

18   shopping cart until the information is there, because

19   the shopping cart is a stored representation of

20   products.

21             So it doesn't make any sense to have a

22   shopping cart if it doesn't contain these items, because

23   it doesn't contain a stored representation of products.

24   Q    I'll agree with you that I don't think this

25   makes sense, but the definition is very clear.  An

38

1    instance of a shopping cart.

2               MR. ADAMO:  Your Honor, objection at this

3    point.  They've been through this four times.  This is

4    starting to get argumentative.

5               MR. BALDAUF:  That's fine.  All right.

6    We can move on.

7               THE COURT:  All right.  Restate your

8    question.

9               MR. BALDAUF:  I think I made my point.

10              MR. ADAMO:  Thank you.

11              MR. BALDAUF:  Thank you.  I apologize.  I

12   carrying that too far.

13              THE COURT:  All right.  Question and

14   answer, Counsel.

15       Q    (By Mr. Baldauf) Sir, with respect to this

16   functionality in the Newegg website, you know, this idea

17   of modifying the shopping cart in the shopping cart

18   database, have you reviewed the Newegg computer code

19   relating to this functionality?

20       A    No, I have not.  I relied on Mr. Wu's

21   testimony.

22       Q    Have you examined any of the Newegg -- Newegg

23   source code?

24       A    Not directly, no.

25       Q    Just to step back one second, do you agree

1  with me that the -- while the customer is shopping,

2  it -- the cookie for the shopping cart is being updated

3  in the customer's browser as he's hitting the

4  add-to-cart button, as opposed to in the shopping cart

5  database?

6      A    Yes.  When a customer clicks the add-to -- I

7  testified about this yesterday.  When a customer clicks

8  the add-to-cart button, the html in the buyer computer

9  is programmed to send a message to the server computer.

10  The server computer then returns the -- a cookie --

11  either it's the first edition or second edition, but in

12  either event, it returns a cookie that contains the

13  results of that.

14          And the server computer, you know, knows that

15  cookies are enabled; otherwise, this operation won't

16  succeed.  And so it's automatic that the browser stores

17  this -- stores this representation of the shopping cart.

18          MR. BALDAUF:  If we could please pull up

19  Page 14 of Exhibit C?

20          And if we could pull up the first two

21  sentences of the first paragraph.  Keep going down.  The

22  first -- keep going down.  Right.  Up a little bit.

23          Yeah.  That's good right there.

24      Q    (By Mr. Baldauf) This comes from your report

25  where you wrote in your report that Newegg's system of

40

1  modifying the shopping cart in the cookie has the

2  advantage of simplifying database management.

3         What do you mean by that?

4     A    Well, there's a -- an operation -- the process

5  of purchasing items and putting them in a shopping cart,

6  the shopping cart information has to be stored

7  somewhere.

8         So the design -- this is under the Doctrine of

9  Equivalents now --

10    Q    Right.

11    A    -- since we're looking at it here, yeah.

12        So the design alternative that the implementer

13  of an E-commerce system considers is, well, where am I

14  going to store that information?  Am I going to store it

15  on the server side --

16    Q    Which is what's disclosed in the '314 patent,

17  correct?

18    A    That's correct.

19    Q    Okay.

20    A    And then -- or I'm going to -- am I going to

21  store in it a cookie, which is --

22    Q    Which -- which is what Newegg does.

23    A    -- which is what the Newegg system does,

24  right.

25        And so -- so this is a design choice.

41

1     Q    Okay.

2     A    And if you're going to store it in a cookie,

3  then that's a -- doesn't require any additional

4  resources to hold the contents of the shopping cart on

5  the server side.

6     Q    So you're --

7     A    So that simplifies -- so if you -- if you

8  reduce the amount of things that the database management

9  system has to do, then that simplifies it.

10    Q    Does that save space on Newegg servers?

11    A    It would save space on Newegg servers, yes.

12         And it would take -- I mean, the space has to

13  be taken somewhere, so the space is taken up by sending

14  the information to the customer's computer to be stored

15  there.

16    Q    Right.  So in the Newegg system, space isn't

17  taken up by storing shopping carts during the selection

18  process, correct?

19    A    Yeah.  Those are the -- those are the

20  tradeoffs of the two design alternatives, yes.

21    Q    Is there something that Newegg is sacrificing

22  by choosing this method instead of the server-side

23  method?

24    A    Yes, as a matter of fact.

25    Q    What is that, sir?

42

1    A    Well, if you -- if you purchase -- you go

2    shopping at the office, and you want to buy two or three

3    things, then they're saved as a cookie on your office

4    computer, because that's the computer you're using at

5    the time, and that's the way -- it's programmed to do

6    that.

7              Then if you go home at night and say, well,

8    gee, you know, I want to add some more things to this,

9    and maybe then buy the items in my shopping cart, the

10   shopping cart isn't there.  It's on your computer at the

11   office.

12             So this is -- this is one of the things that's

13   considered, and that's what makes it a design

14   alternative.  There are characteristics of each way of

15   implementing the E-commerce system, and this affects the

16   decision on how to implement it.

17   Q    So if a designer would select the server-side

18   option disclosed in the '314 patent, would a customer be

19   able to continue shopping from multiple computers?

20   A    Yes, they would.  That's one of the

21   consequences of -- of having the information on the

22   server.

23   Q    I'd like to now turn our attention to the '492

24   patent.

25             I believe you testified yesterday, with

46

1          MR. BALDAUF:  Excuse me, Your Honor.  I

2  didn't hear.

3          THE COURT:  Restate the question.

4     Q    (By Mr. Baldauf)  The question was simply:  Do

5  you know if, in fact, Newegg customers select or choose

6  the transaction details and, if so, how frequently?

7          THE COURT:  Overruled.

8     A    I -- actually I don't have any idea.  It's the

9  capability of the website -- it's actually a very

10 powerful website; it has lots of capabilities.  And all

11 I have direct experience with are the ones I used which

12 were -- I described in my purchase example.

13        So, I mean, I used it, but I really don't have

14 any idea of what frequency it's used.

15    Q    (By Mr. Baldauf)  Again, this claim, like what

16 we discussed -- discussed previously, requires a client

17 computer for operation by a client user.  Again, would

18 you agree with me that it is the customer that supplies

19 the client computer?

20    A    Yes.  A customer supplies the client computer.

21 As I described yesterday, it is used by the Newegg

22 order -- order history system.

23    Q    And with respect to for operation by a client

24 user, again, that's the customer?

25    A    Yes, that customer is the one that uses it.

55

1  first paragraph on the right-hand side, please.

2      Q    (By Mr. Baldauf)   The second sentence you

3  wrote in the client server model:  Client sends service

4  request over communications link to a server.

5          So would you agree with me that it's the

6  client or customer who is sending the requests?

7      A    Yes.  The html code behind a button, the

8  programming behind a button like we've been talking

9  about -- add-to-cart is a perfectly good example to

10  use -- that code, when it's executed by the browser, is

11  what sends the service request to the server for some

12  action.  In this case, you have the cart action.  But

13  that's -- that's a description of the client server

14  model.  Clients request service; servers provides

15  service.

16      Q    And it's the client that requests service?

17      A    Yes.  Yes.

18      Q    If we could move on to what you have marked as

19  1(b), forwarding a service request from the client to

20  the server system.

21          Who forwards the service request from the

22  client to the server system?

23      A    Well, there's a -- which claim element is

24  this?

25      Q    What you have marked as 1(b).

61

1    Q    Was this invented by Open Market?

2    A    No.  I think it was invented by Netscape,

3  probably around 1992, as I recall.

4    Q    If we could switch gears briefly.  Claim 78.

5  Again, this claim, as you testified yesterday, is very

6  similar to Claim 1 that we just discussed, correct?

7    A    Yes, that's correct, uh-huh.

8    Q    Part A:  A method of processing, in a server

9  system, service requests from a client to the server

10  system.

11         Again, are these service requests that are

12  sent by the client or customer to the server system?

13    A    Yes.  The service requests are from a client,

14  meaning -- meaning a client computer or the buyer

15  computer or the customer computer.  Yes, those service

16  requests come from the client.

17    Q    And in 78(b):  Receiving, from the client, a

18  service request to which a session identifier stored at

19  the client has been appended by the client.

20         Do you agree that it is the client that -- or

21  the client's computer that has appended the stored

22  session identifier?

23    A    Yes.  The claim requires that they be received

24  from the client.  So this is an operation that's done on

25  the server, they receive the messages from the client.

1           And, in fact, yes, that is correct.  The

2    identifier stored at the client has been appended by the

3    client.  That's the way the browser works.

4         Q    We talked a bit -- not we, but one of my

5    associates and you talked a bit at your deposition about

6    sessions, correct?

7         A    Undoubtedly, I don't remember.  It was most of

8    a year ago.  But I'm sure you will remind me of what I

9    said.

10        Q    That's why I'm here, right?

11        A    That's right.

12             MR. ADAMO:  You can bet on it.

13        Q    (By Mr. Baldauf)  The Court has defined

14   session as a series of requests and responses to perform

15   a complete task or set of tasks between a client and a

16   server system, correct?

17        A    In the context of the '639 patent, that is

18   correct, yes.

19        Q    And I believe you testified that a task

20   depends upon the request that the server receives and

21   the responses that it provides to the client.  Does that

22   sound accurate to you?

23        A    Yes.  A task is represented by the series of

24   requests and responses.

25        Q    Could a session be the sending back of an ID

# Exhibit B

`1`

```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE EASTERN DISTRICT OF TEXAS
 2                        TYLER DIVISION

 3  SOVERAIN SOFTWARE           )
                                )   DOCKET NO. 6:07cv511
 4      -vs-                    )
                                )   Tyler, Texas
 5                              )   9:05 a.m.
    NEWEGG, INC.                )   April 28, 2010
 6
                    TRANSCRIPT OF TRIAL
 7                    MORNING SESSION
            BEFORE THE HONORABLE LEONARD DAVIS,
 8       UNITED STATES DISTRICT JUDGE, AND A JURY

 9                  A P P E A R A N C E S

10  FOR THE PLAINTIFFS:     MR. KENNETH R. ADAMO
                            JONES DAY
11                          2727 N. Harwood St.
                            Dallas, Texas  75201-1515
12
                            MR. THOMAS L. GIANNETTI
13                          MR. BARRY R. SATINE
                            MS. CLARK CRADDOCK
14                          JONES DAY
                            222 East 41st St.
15                          New York, New York  10017-6702

16                          MR. CARL ROTH
                            ROTH LAW FIRM
17                          115 N. Wellington, Ste. 200
                            P.O. Box 876
18                          Marshall, Texas  75670

19                          MR. MICHAEL C. SMITH
                            SIEBMAN, REYNOLDS, BURG,
20                          PHILLIPS & SMITH
                            713 S. Washington Ave.
21                          Marshall, Texas  75670

22
    COURT REPORTER:         MS. JUDITH WERLINGER
23
    Proceedings taken by Machine Stenotype; transcript was
24  produced by a Computer.

25
```

1    Q    Less than 4,000?

2    A    Yes.

3    Q    So what percentage of the source code that you

4    developed for the Newegg shopping center is related to

5    the shopping cart ID and session tracking function?

6    A    If the number just you want together, we just

7    get is 0.66 percent related to the session and the

8    shopping cart.  Point 66.

9    Q    Point 66 percent?

10    A    Yes.

11    Q    Less than 1 percent --

12    A    Yes.

13    Q    -- of the total source code?

14    A    Less than 1 percent.

15    Q    All right.  Besides the Newegg shopping

16    cookie, what other cookies does Newegg use to handle

17    shopping?

18    A    Well, we use another one called the cart ID,

19    which is to facilitate three steps of the checkout

20    process.

21    Q    And how are the shopping cart ID cookies

22    created?

23    A    Oh, like I say, this cookie ID, because we

24    have this three-step with customer hitting the checkout,

25    we needed the one cookie to facilitate transaction in

1  case, prevent all the information lost.  You hitting --

2  customer hitting the checkout button, the server just

3  makes the function call to number generate a table to,

4  just to say, give me the new number.

5      Q    Okay.  And have we prepared a graph for you to

6  explain how the Newegg system works in this regard?

7      A    Yes.

8      Q    And can you explain this very slowly?

9      A    Yes.

10          This chart is -- just demonstrate how the

11  Newegg -- the checkout button in the several step, the

12  procedure.

13          If customer hitting the checkout button on the

14  shopping cart page, the web server going to the first

15  action, say take the number.

16      Q    All right.  Then what happens?

17      A    Then second step, this number going to be

18  placed on the cookie.

19          The third step, the web server going to read

20  line item information of the shopping cookie, marry with

21  shopping cart ID together.

22      Q    Marry it together?

23      A    Marry shopping cart ID with cookie value,

24  which the item identification, along with quantity

25  together, insert into shopping cart temporary table is

1  one time.

2      Q    All right.  So whatever is on this cookie is

3  dropped into this temporary table that has taken a

4  number?

5      A    Yes.  It just takes number that we upload one

6  time.

7      Q    All right.  And then when the submit-order

8  button has happened, is clicked, what happens?

9      A    If customer clicks submit-order button, the

10  web server just pull all the temporary information from

11  the server and combine with the payment, billing,

12  shipping information together, web server using this

13  information to create one XML, the document, and is

14  sending it to messaging system, such as MSQ, they wrote

15  it into the Newegg in-house data center for processing.

16      Q    And that's what happens when you hit the

17  checkout button?

18      A    That's what happen when you hitting on the

19  submit-order button.

20      Q    All right.  Why does Newegg need a shopping

21  cart ID to identify this shopping cart data?

22      A    Because we have this three steps in the

23  checkout process.  We needed one number to prevent that

24  information to loss.  So this number just can be

25  arbitrary number to protect the data loss for the

1          All right.  Now, you said in designing the

2   system, that one of the reasons you chose to use the

3   storage of your customers' computers was because you

4   knew that a lot of people will take a shopping cart but

5   wouldn't go all the way through checkout?

6        A    Correct.

7        Q    You learned that from somebody else's website

8   that you had studied to determine the functionality,

9   right?

10       A    This is nature assumption.  This assumption is

11  not a study.  Like I go to the shopping -- most of the

12  time during the year 2000 I go to the eBay or to

13  somewhere, just -- all the HP or Dell, because the

14  Newegg during time only big target competitor is Dell

15  and HP.  We go to the website to take look to building

16  the system, to building the shopping cart, but I never

17  checkout.

18       Q    Mr. Wu, you admit that you looked at other

19  websites to determine functionality.  That's the answer

20  you changed.  Remember that?

21       A    I did search the website to look at

22  functionality to generate a use case.

23       Q    Right.  And you looked at the functionality of

24  other online shopping websites, correct?

25       A    Yes, I did.

112

1     Q     And, in fact, the one you undoubtedly looked

2  at was Amazon.com, right?

3     A     Well, Amazon.com during time is not our

4  competitor --

5     Q     That's not what I asked you.  Try to answer

6  the questions, and we will get done with this much more

7  quickly.

8          What I asked you was -- not who your

9  competitors were -- I asked you which other websites you

10  looked at.

11    A     Well, I remember looking at HP and Dell

12  because we are assembling the computer.  We are the

13  main -- same business with them.

14          If you -- possibly I'm looking at Amazon,

15  possibly not, because we are only want to do same

16  business with Dell because they are taking market share

17  from us.

18    Q     In 2000 when you designed the system, you --

19  the company was still trying to transition from

20  assembling computers into the new business, correct?

21    A     Right.

22    Q     So at the time you designed the system, you

23  didn't have a system, you didn't have anything to

24  compete with HP and Dell at that point, right?  You were

25  trying to design it?

# Exhibit C

001

```
1
                    IN THE UNITED STATES DISTRICT COURT
2                    FOR THE EASTERN DISTRICT OF TEXAS
                               TYLER DIVISION
3
    SOVERAIN SOFTWARE            )
4                               )    DOCKET NO. 6:07cv511
        -vs-                    )
5                               )    Tyler, Texas
                                )    8:42 a.m.
6   NEWEGG, INC.                )    April 29, 2010
7                      TRANSCRIPT OF TRIAL
                         MORNING SESSION
8            BEFORE THE HONORABLE LEONARD DAVIS,
         UNITED STATES DISTRICT JUDGE, AND A JURY
9
                    A P P E A R A N C E S
10
    FOR THE PLAINTIFFS:     MR. KENNETH R. ADAMO
11                          JONES DAY
                            2727 N. Harwood St.
12                          Dallas, Texas  75201-1515
13                          MR. THOMAS L. GIANNETTI
                            MR. BARRY R. SATINE
14                          MS. CLARK CRADDOCK
                            JONES DAY
15                          222 East 41st St.
                            New York, New York  10017-6702
16
                            MR. CARL ROTH
17                          ROTH LAW FIRM
                            115 N. Wellington, Ste. 200
18                          P.O. Box 876
                            Marshall, Texas  75670
19
                            MR. MICHAEL C. SMITH
20                          SIEBMAN, REYNOLDS, BURG,
                            PHILLIPS & SMITH
21                          713 S. Washington Ave.
                            Marshall, Texas  75670
22
23  COURT REPORTER:         MS. JUDITH WERLINGER
24  Proceedings taken by Machine Stenotype; transcript was
    produced by a Computer.
25
```

1   shopping cart computer being programmed to receive said

2   plurality of shopping cart messages to modify shopping

3   cart in said shopping cart database?

4        A    No, it does not.

5                MR. BALDAUF:  I'm afraid to touch this

6   thing now.

7                MR. SATINE:  Mr. Sayles will fix it.

8        Q    (By Mr. Baldauf) Were you here for Mr. Grimes'

9   testimony?

10       A    Yes.

11       Q    Did you hear when he testified that the

12  assignment of a shopping cart ID creates an instance of

13  a shopping cart in the Newegg shopping cart database

14  that is then modified?

15       A    Yes, I did.

16       Q    Have you also heard the assertions from

17  Soverain that going from no record to a record in a

18  database constitutes modification of the shopping cart

19  in the shopping cart database?

20       A    Yes, I have.

21       Q    Do you agree with either of these assertions?

22       A    No, I don't, and I'll tell you why.

23       Q    Please look at the demonstrative and explain

24  why.

25       A    Okay.  Let's take a look at the demonstrative

1    that's up on the screen.  When we get to that point in

2    the checkout process -- if you'll remember, when we go

3    from the web server up to the database server at the

4    very end, what happens in the code is that an integer

5    counter or just a number gets read from a variable, and

6    that number is the shopping cart ID.

7        Q    Okay.  Stop there.

8        A    I'm sorry?

9        Q    Stop right there.

10            Is there any empty field, anything associated

11   with that number that can be changed, modified, or

12   otherwise?

13       A    No.  It's just a counter, and it has nothing

14   to do with the database either.

15            On the other side of the diagram, going to the

16   right, we see the contents of the cookie moving into a

17   variable so that all the data can be combined.

18            So what happens is, we get a number on the

19   left, which is our shopping cart ID, and we get data on

20   the right, which is our shopping contents, and all of

21   that information, in a single SQL command, gets dropped

22   into the database in one fail swoop.

23            In database terminology, modify means to

24   change an existing record.  And, in fact, if you look at

25   the claim construction, the definition of modify, as

1    applied to the shopping cart in the shopping cart

2    database, reads:  To change an instance of a shopping

3    cart in a shopping cart database.

4           Creation in database terms is not change.

5    It's what's called instantiation, because you go from

6    something -- I'm sorry -- from nothing to something.

7           So it's not a modification.  Modification

8    means changing something that's already there.

9       Q    Does Newegg satisfy each and every element of

10   the asserted claims of this patent?

11      A    No, it does not.

12      Q    Okay.  I'd now like to turn to the '492,

13   specifically Claim 17, briefly.

14           MR. BALDAUF:  Be careful with that, Dan.

15   No.  I'm sorry, Dan.  Claim 17 first.  Yes.

16           Oh, well, that's all right, because we

17   weren't going to say much about it anyway.

18      Q    (By Mr. Baldauf) As Dr. Grimes testified, do

19   you agree that Claim 17 is virtually identical to

20   Claim 34 that we just discussed?

21      A    With a few minor differences, yes.

22      Q    I'd like to just talk about this very, very

23   quickly.

24           With respect to a couple of the limitations

25   that we just discussed in Claim 34, at least one buyer

1    the client computer and display the statement document

2    to receive a request from the client user to display

3    transaction details corresponding to a portion of the

4    statement document displayed by the client computer and

5    to cause a transaction detail hypertext link

6    corresponding to the portion of the statement document

7    to be activated?

8        A    No.

9        Q    So does Newegg satisfy all the limitations of

10   the asserted claims of this patent?

11       A    No, it does not.

12       Q    I'd now like to turn to the '639 patent.

13       A    Okay.

14       Q    Do you understand that this is referred to as

15   the session ID patent?

16       A    Yes, I do.

17       Q    In general, how does the basic inherent

18   function of the internet relate to session IDs?

19       A    If by the internet, you mean the worldwide

20   web --

21       Q    Sorry.  I did.

22       A    -- session mechanisms are necessary to

23   establish ongoing communications between a pair of

24   communicators, usually, a client and a server.

25       Q    Let's take a look at this.  You see the ball

1   going back and forth.

2        A    Yes.

3        Q    Is this necessary for this type of system to

4   work?

5        A    The only way that you can use the worldwide

6   web is for a client to communicate with a server.  It's

7   inherent in the way that the worldwide web works.

8        Q    Does it necessarily require the participation

9   of two separate parties?

10       A    Yes, it does.

11       Q    Let's first take a look -- this one is on your

12  screen -- the limitation of forwarding a service request

13  from the client to the server system.

14            What does this mean?

15       A    Well, if you look at the picture on the

16  screen, you see the red rubber ball goes through a cloud

17  labeled worldwide web.

18            If you actually look at what happens to a

19  packet or a piece of information when it goes from a

20  client -- a web client to a web server, you'll see that

21  in between where it starts out at the client and where

22  it ends up at the server, there's a lot of places where

23  it stops in between.

24            Each one of those stops usually occurs at a

25  router or a firewall somewhere, and when it arrives

1  there, the device checks the address and looks at it and

2  says, hey, I can't do this here locally; I got to pass

3  it on to somebody else who can -- who might be able to

4  handle it himself.

5        And so there's a whole bunch of intermediate

6  steps called forwards involved between getting from the

7  client to the server.

8    Q    Does Newegg forward the service request from

9  the client to the server system?

10   A    No.  Newegg does not forward that information.

11        And that's, again, inherent to the way that

12 the internet works.

13   Q    The claim then requires the client storing the

14 session identifier for use in subsequent distinct

15 requests to the server system.

16        Now, this limitation is also in Claim 78.

17 What does it mean for the client to store the session

18 identifier?

19   A    When you set up a session or you log on to a

20 server what usually happens is, you're going to give it

21 an account and a password or some other kind of

22 credentials to prove who you are, and then if the server

23 likes what it sees, it's going to say, okay, you can do

24 something with me.

25        And part of the message that it sends back

1   that tells you it's okay for you to do something with it

2   is a special identifier that's built so that it's hard

3   to fake out and hard to forge, and it becomes a part of

4   what the client uses afterwards to communicate back with

5   the server.

6           The reason why this happens is because it

7   takes some time to look up a password and to check an

8   account name and to figure out what that account is

9   allowed to do and so on and so forth.

10          And if you had to do it every time you sent a

11  message between a client and a server, it would put lots

12  of unnecessary overhead on that communication.

13          So the shortcut that gets used in a lot of

14  different systems is that once you establish your

15  credentials, which is called authentication, then you

16  get some kind of token or identifier back from the

17  server that you can use to communicate so that you don't

18  have to go through all that hoopla every time you go

19  back and forth.

20      Q    Who performs this step of storing the session

21  identifier?

22      A    The customer computer stores the session

23  identifier and then uses it in subsequent

24  communications.

25      Q    Does Newegg control or direct the customer and

1  his or her computer to store the session identifier?

2      A    No.  That's a basic behavior of how the web

3  works.

4      Q    Moving on.  Appending the stored session

5  identifier to each of the subsequent distinct requests

6  from the client server system.

7           What does this mean?

8      A    This is what I referred to earlier as the

9  shortcut that the client uses to say, hey, you know me;

10  I'm okay, and to be able to gain access not just to the

11  server but also to whatever kind of ongoing interaction

12  it has with the server.

13      Q    Who performs this step?

14      A    The client does.

15      Q    And does Newegg control or direct the client

16  to do so?

17      A    No.  Again, it's inherent to the way that the

18  web works.

19      Q    Does Newegg satisfy every limitation of the

20  asserted claims in the '639 patent?

21      A    No, it does not.

22      Q    Now, next we're going to move on to start

23  talking about invalidity, but I want to ask you one last

24  thing.

25           Now, we've been talking about cookies all

# Exhibit D

```
 1              IN THE UNITED STATES DISTRICT COURT
 2             FOR THE EASTERN DISTRICT OF TEXAS
                        TYLER DIVISION
 3
    SOVERAIN SOFTWARE            )
 4                              )    DOCKET NO. 6:07cv511
         -vs-                    )
 5                              )    Tyler, Texas
                                )    1:00 p.m.
 6  NEWEGG, INC.                 )    April 29, 2010

 7                   TRANSCRIPT OF TRIAL
                      AFTERNOON SESSION
 8         BEFORE THE HONORABLE LEONARD DAVIS,
         UNITED STATES DISTRICT JUDGE, AND A JURY
 9
                     A P P E A R A N C E S
10
    FOR THE PLAINTIFFS:     MR. KENNETH R. ADAMO
11                          JONES DAY
                            2727 N. Harwood St.
12                          Dallas, Texas  75201-1515

13                          MR. THOMAS L. GIANNETTI
                            MR. BARRY R. SATINE
14                          MS. CLARK CRADDOCK
                            JONES DAY
15                          222 East 41st St.
                            New York, New York  10017-6702
16
                            MR. CARL ROTH
17                          ROTH LAW FIRM
                            115 N. Wellington, Ste. 200
18                          P.O. Box 876
                            Marshall, Texas  75670
19
                            MR. MICHAEL C. SMITH
20                          SIEBMAN, REYNOLDS, BURG,
                            PHILLIPS & SMITH
21                          713 S. Washington Ave.
                            Marshall, Texas  75670
22

23  COURT REPORTER:     MS. JUDITH WERLINGER

24  Proceedings taken by Machine Stenotype; transcript was
    produced by a Computer.
25
```

1  maintenance at all.

2      Q    Mr. Tittel pointed to a Johnson reference.   Do

3  you recall that?

4      A    Yes.

5      Q    Now, was that a state -- did that reference

6  have a session identifier?

7      A    No.  I'm spacing forward.

8      Q    What did Johnson have?

9      A    First we have to understand what a session

10  identifier is.

11      Q    Yes.

12      A    The Court's construction -- or the agreed

13  construction, I forget -- is a text string that

14  identifies a session.

15      Q    Would that apply to Johnson?

16      A    So it has to be a text string and it has to

17  identify a section.  It doesn't apply to Johnson because

18  Johnson's credential identifier could either extend over

19  many, many different sessions, or it could stop being

20  effective in the middle of a session.  It didn't

21  identify a session.

22          Likewise, user identifiers, like user names,

23  don't identify a session; they identify a user.  A

24  credential identifier doesn't identify a session; it

25  just says this person is allowed to access these certain

1  pieces of information.

2          So something that changes during a session

3  clearly doesn't identify the session.  And something

4  that can expire or go out of business during the session

5  doesn't identify it.  And something that extends over

6  many sessions doesn't identify a session.

7     Q    Mr. Tittel also referred to a Gifford patent

8  in connection with his discussion of session IDs.  Does

9  that patent disclose a session ID?

10    A    I think that the use of the Gifford reference

11  was to add the internet and hypertext to the Johnson

12  reference, which I think he acknowledged does not

13  disclose the internet or hyperlinks.  So the idea is --

14  I think he combined Gifford with Johnson to get this

15  over to the internet.

16         But what you're getting over to the internet

17  didn't have session identifiers in the first place.  So

18  you don't get session identifiers just by adding the

19  internet into things.  In fact, it makes it worse.

20  Because the Johnson reference was in closed systems

21  where the server knew who you were.

22         When you all of a sudden go to the open system

23  of the internet, you can't just take Johnson and put it

24  on the internet.  In fact, to my knowledge, Johnson has

25  never been put on the internet.

1    A    There's one slide, yes.

2         So Claim 60 has all four of these limitations.

3    Even taking Johnson, which is this credential identifier

4    patent, and somehow adding the internet into it, you

5    still don't get a session identifier.  You don't get

6    appending the identifier, which doesn't exist, to each

7    of the subsequent requests.

8         The purchase request is no disclosure of any

9    purchase request having any user identifier.  And since

10   there's no user identifier, you can't access -- on

11   receipt of the purchase request, you can't go and access

12   the user information.

13        So none of those -- none of those elements are

14   even in the combination of the Johnson and Gifford.

15   Q    Okay.  Now, there has been some discussion in

16   the testimony in the case of basic authentication.  I

17   believe it came up with Mr. Treese and maybe others.

18   A    Yes.  I think I had a slide earlier on that.

19   Q    Does that have any relationship to this

20   discussion of identifying sessions?  In other words, can

21   basic authentication identify sessions?

22   A    No.  It was recognized that authentication was

23   needed, because a lot of worldwide websites wanted to

24   sell content to people.

25        The New York Times, for example, didn't give

# Exhibit

# E

```
 1
                    IN THE UNITED STATES DISTRICT COURT
 2                  FOR THE EASTERN DISTRICT OF TEXAS
                              TYLER DIVISION
 3
    SOVERAIN SOFTWARE              )
 4                                )   DOCKET NO. 6:07cv511
        -vs-                      )
 5                                )   Tyler, Texas
                                  )   1:00 p.m.
 6  NEWEGG, INC.                  )   April 29, 2010

 7                      TRANSCRIPT OF TRIAL
                         AFTERNOON SESSION
 8           BEFORE THE HONORABLE LEONARD DAVIS,
          UNITED STATES DISTRICT JUDGE, AND A JURY
 9
                        A P P E A R A N C E S
10
    FOR THE PLAINTIFFS:     MR. KENNETH R. ADAMO
11                          JONES DAY
                            2727 N. Harwood St.
12                          Dallas, Texas  75201-1515

13                          MR. THOMAS L. GIANNETTI
                            MR. BARRY R. SATINE
14                          MS. CLARK CRADDOCK
                            JONES DAY
15                          222 East 41st St.
                            New York, New York  10017-6702
16
                            MR. CARL ROTH
17                          ROTH LAW FIRM
                            115 N. Wellington, Ste. 200
18                          P.O. Box 876
                            Marshall, Texas  75670
19
                            MR. MICHAEL C. SMITH
20                          SIEBMAN, REYNOLDS, BURG,
                            PHILLIPS & SMITH
21                          713 S. Washington Ave.
                            Marshall, Texas  75670
22

23  COURT REPORTER:         MS. JUDITH WERLINGER

24  Proceedings taken by Machine Stenotype; transcript was
    produced by a Computer.
25
```

1                    THE COURT:  I think Page 15 is already

2    gone by agreement.

3                    MS. FROST:  Right.

4                    THE COURT:  That's best mode.

5                    MS. FROST:  And it's just been called to

6    my attention that on active inducement, again, we are --

7    have made a JMOL on that basis, that there's no evidence

8    of active inducement.

9                    THE COURT:  I've ruled on that.

10                   MS. FROST:  On Page 16, for participation

11   for lack of novelty, this is a suggestion to the second

12   full paragraph on that page, the disclosure in a prior

13   art reference.

14                   It seems to me that it would be clearer

15   for the jury if we use the same language from

16   Paragraph 1 and Paragraph 2.

17                   In the first paragraph, we talk about all

18   elements must be in a single previous device or method

19   or described in a single previous publication.  I don't

20   know that the jury knows what disclosures are, but it

21   seems to me that the description in a prior art

22   reference would be clear.  It's just a suggestion.

23                   THE COURT:  All right.  The Court

24   appreciates the suggestion, but I think we'll just leave

25   it like it is.

in the United States." *Id.* This cannot mean that infringement could exist if the accused infringer did

not satisfy each claim limitation (*i.e.*, the system "as a whole").[10]

Soverain's argument that under Newegg's rationale there can be no infringement of any claim

directed to complex systems involving multiple components and parties is a red herring. "A patentee

can usually structure a claim to capture infringement by a single party," but Soverain's asserted claims

are not so written. *BMC Res., Inc. v. Paymentech, L.P.* 498 F.3d 1373, 1381 (Fed. Cir. 2007). The

claim drafters in this instance simply chose to include claim elements directed to both the client and

server side computers. Even such complex claims can be infringed, however, if a single party owns or

operates all components of the system, or at least exercises the control or direction of all elements

sufficient to impose vicarious liability. *See MuniAuction, Inc. v. Thomson Corp.*, 532 F.3d 1318, 1329-

30 (Fed. Cir 2008); Dkt. # 407 at 3-5.

Bedrock legal principles provide that there can be no liability for inducement of infringement

without a finding of direct infringement. *BMC,* 498 F.3d at 1379. Because Soverain's use-based

theory of direct infringement by Newegg's customers has no legal basis, and since Newegg's

customers do not own or operate (or at least control or direct) Newegg's servers Tr. 04/27/10 (am) at

64:1-3 (Grimes),[11] Soverain's inducement claim fails. As to the intent requirement for inducement,

Soverain has identified no evidence that Newegg knew or should have known that its or its customers'

---

[10] Subsequently, two district courts have interpreted *NTP* in precisely the limited fashion described above. *See Phoenix Solutions, Inc. v. DirecTV Group, Inc.*, No. CV 08-984 MRP 2009, U.S. Dist. LEXIS 114977, at *28-29 (C.D. Cal. Nov. 23, 2009) ("*NTP* did not analyze 'joint' infringement, rather, *NTP's* holding was limited to the issue of whether a party 'uses' a claimed system or method within the United States *when one element of the claimed system or method is abroad.*"); *Centillion Data Sys., LLC v. Qwest Commc'ns Int'l, Inc.*, No. 1:04-cv-0073 LJMDML, at *23 (S.D. Ind. Oct. 29, 2009) (unpublished) ("However, to the extent Centillion suggests that under *NTP* the use of some, but not all, of the elements of a system claim is sufficient to find direct infringement if the use is 'beneficial,' the Court disagrees. Infringement requires, as it always has, a showing that a defendant has practiced each and every element of the claimed invention." (quotations omitted)).

[11] Soverain argues that Newegg's customers somehow control and direct Newegg's servers by sending HTTP requests to the servers, which in turn generates HTML documents which, when downloaded by the customer, enable the customers to add items to their carts, view web pages, etc. Dkt. # 409 at 9. However, Soverain has not shown that sending HTTP requests constitutes control or direction sufficient to establish the customers' vicarious liability for Newegg's actions, which is required under *MuniAuction*. Indeed, the control or direction standard is not satisfied by mere arms length cooperation such as this client-server exchange. *Id.* at 1329.

actions infringe the asserted claims. Newegg has maintained that neither it nor its customers infringe any of the asserted claims, and Newegg's infringement defenses and positions all have considerable factual and legal support, negating any culpable intent on the part of Newegg. *See, e.g.*, Dkt. # 407 at 2-13.

## II.    NEWEGG PROVED INVALIDITY BY CLEAR AND CONVINCING EVIDENCE

As detailed in its opening brief, Newegg presented clear and convincing evidence of the invalidity of all the asserted patent claims. Specifically, Messrs. Treese and Trevor testified that all of the tools necessary to create the claimed methods and systems were in the prior art. Tr. 04/28/10 (pm) at 11:24–19:14, 32:7–50:11. This testimony was undisputed. Mr. Trevor further testified about the CompuServe Mall ("Mall"), a pre-World Wide Web ("Web") retail e-commerce system, with reference to the specific teachings of Exhibit D-002 (How to Get the Most Out of CompuServe) and Exhibit D-004 (Using CompuServe). *Id.* He explained how the Mall allowed customers to: connect to the CompuServe servers (shopping cart computer), browse merchants' online stores, select several products prior to check-out, add the products one-at-a-time to a personal holding file (shopping cart), and make arrangement for payment and final approval of the order. Tr. 04/28/10 (pm) at 32:7-39:21.

Mr. Tittel applied the evidence of the Mall (via Alexander Trevor's testimony and Exhibits D-002 and D-004) to the language of Claims 35 and 51 of the '314 Patent. Tr. 4/29/10 (am) at 47:21-52:3, 53:13-61:21, 63:1-67:21, 69:11-71:6. He testified that the functional disclosure of the operation of the Mall set forth in the evidence would have enabled programmers of ordinary skill in the art to implement a Web based retail ecommerce system patterned after the Mall. Tr. 04/29/10 (am) at 52:4-53:5; Tr. 4/28/10 (pm) (Trevor) at 78:15-18 ("[The CompuServe books provide a] description from the user's point of view. But software engineers have reversed engineered applications on less than this."). He further testified about Exhibit D-012 (U.S. Patent No. 5,724,424 to Gifford) and its disclosure of a

| 175 | Building Web Commerce Sites, Tittel et al.(Exh F to Docket #257) | Tittel Depo. Ex 11 |
|---|---|---|
| 177 | Server Diagram(Exh 3 to Docket # 262) | NEW0000234 |
| 192 | Transact software license from Open Market to Bureau of National Affairs | SOV0158819-29 |
| 193 | Transact software license from Open Market to McGraw-Hill | SOV0159085-92 |
| 194 | Transact software license from Open Market to Clearview Technologies | SOV0085865-73 |
| 195 | Transact software license from Open Market to Bureau of National Affairs | SOV0158830-43 |
| 196 | Transact software license from Open Market to MIC Systems | SOV0160541-53 |
| 197 | Transact software license from Open Market to Thomson Learning | SOV0159498 - 508 |
| 198 | Transact software license from Open Market to Novis | SOV0160562-83 |
| 199 | Transact software license from Open Market to Corel | SOV0158664-77 |
| 200 | Transact software license from Open Market to Finsiel Spa | SOV0160415-26SOV0160449-59 |
| 201 | Transact CSP software license from Open Market to AT&T Corp. | SOV0093315-57 |
| 202 | Transact CSP software license from Open Market to Blue Window | SOV0160638-66 |
| 203 | Transact CSP software license from Open Market to MTS Advanced | SOV0159257-91 (Ghosh Depo. Ex. 4) |
| 204 | Transact CSP software license from Open Market to Nippon Telegraph | SOV0159801-34 |
| 205 | Transact CSP software license from Open Market to Cable and Wireless PLC | SOV0160127-202;(Ghosh Depo Ex. 7) |
| 206 | Transact CSP software license from Open Market to Demon Internet, Ltd. | SOV0159768-92 |
| 207 | Transact CSP software license from Open Market to Telia Electronic Commerce AB | SOV0160701-50 |
| 208 | Transact CSP software license from Open Market to Marand d.o.o. | SOV0159523-40 (Ghosh Depo Ex. 5)SOV0159567-84 |
| 209 | Transact CSP software license from Open Market to Demon Internet, Ltd. | SOV0159751-66 |
| 210 | Transact CSP software license from Open Market to Canal | SOV0160219-34 |
| 211 | Transact CSP software license from Open Market to Terranet, Ltd. | SOV0160803-22 |

| 212 | Transact CSP software license from Open Market to Reuters Limited | SOV0159320-53 |
| 213 | Transact CSP software license from Open Market to Kocsistem-Bilgi Ve Iletisim Hizmetleri As | SOV0160481-97 |
| 214 | Transact CSP software license from Open Market to Lynk Systems | SOV0159615-66 (Ghosh Depo Ex. 6) |
| 215 | Transact CSP software license from Open Market to NTT PC Communications | SOV0159864-71 |
| 216 | Transact CSP software license from Open Market to Wind Telecommunicaczioni Spa | SOV0160852-66 |
| 217 | Transact software license from divine to Houghton Mifflin | SOV0158721-33 |
| 218 | Transact CSP software license from Open Market to Swisscom AG, BusinessCom Eleconic Commerce Solutions | SOV0160619-23 |
| 220 | Internal Open Market Documents | SVN2-0079969 – 0080059 |
| 221 | History of Intershop Efinity product, Attachment B to Supplemental expert report of W. Christopher Bakewell (9/22/2009) | |
| 222 | Overview of Intershop Efinity functionality, Attachment C to Supplemental expert report of W. Christopher Bakewell (9/22/2009) | |
| 223 | Patent license from Open Market to Johnson & Johnson Vision Care | SVN2-0040620-23 (Ghosh Depo. Ex. 13) |
| 224 | Patent license from Open Market to Internet Number Corp. | SVN2-0040611-19 (Ghosh Depo. Ex. 12) |
| 225 | Patent license from divine to Emagio, Inc. | SVN2-0040585-89 |
| 226 | Patent license from divine to Natural Foods, Inc. | SVN2-0040639-42 |
| 227 | Patent license from divine to Webster Orchard / The Fruit Company, Inc. | SVN2-0040673-77 |
| 228 | Patent license from divine to Perfumania.com | SVN2-0040648-52 |
| 229 | Patent license from divine to Game Link, Inc. | SVN2-0040601-05 |
| 230 | Patent license from divine to Bikecology, Inc. | SVN2-0040559-63 |
| 231 | Patent license from divine to Cartronix, Inc. | SVN2-0040569-74 |

by using a computer with a Web browser. The customer's computer and the Newegg Server System are interconnected by the Internet.

25. The patents-in-suit were originally assigned from the inventors to Open Market, Inc.

26. Open Market began selling a software product named Transact in 1996.

27. The Transact product incorporates or reflects each asserted claim of the patents-in-suit as well as additional functionality.

28. Open Market's assets were purchased by Divine Inc. in 2001.

29. Divine declared bankruptcy in 2003.

30. Soverain has not licensed the Transact product to any licensees that were not first licensed by Open Market.

Stipulation Nos. 31-35 apply to what the parties call the "ASP Version" of the Newegg Website (in use until about October 2008):

31. When a Newegg customer clicks on the "Order Status" hypertext link on the Newegg Website, the customer's computer sends an HTTP message to one of the SSL servers. This HTTP message comprises a URL.

32. Each Newegg SSL server has been programmed to transmit an "Order Status" page in response to that HTTP message.

33. The "Order Status" page on the Newegg Website is coded using HTML and JavaScript. The "Order Status" page includes "View" hypertext links that correspond to particular transactions. When the customer clicks such a link, the customer's computer sends an HTTP message requesting a "View Order" page identified by the link.

3

near the prices), a transaction date, a product description, and a transaction amount.

41.    Newegg advertises its newegg.com website by Sponsored Advertisements on Google and Gizmodo.

42.    Newegg advertises its neweggmall.com website.

43.    Newegg provides help files on its newegg.com website that instruct its customers how to use the website.

44.    Newegg provides help files on its neweggmall.com website that instruct its customers how to use the website.

5

# NEWEGG.COM

## SUMMARY OF DEPOSITION TESTIMONY OF JAMES WU RELATED TO CLAIMS OF U.S. PATENT NO. 5,715,314


Plaintiff's Exhibit
Exhibit No. P-62B
Case No. 6:07-cv-00511

| '314 PATENT | Relevant Portions of Wu Testimony |
|---|---|
| 34[a]. A network-based sales system, comprising: | Wu 30(b)(6) Tr. at 11:7-20, July 8, 2009<br><br>Q. Mr. Wu, let me hand you what's been marked as Plaintiff's Exhibit Wu 2. The document bears production numbers at the bottom of the page, the right-hand corner, it says NEW0000232, and the last page of the document is NEW0000236. Could you please take a look at this document and tell me if you have seen it before?<br><br>A. Yes.<br><br>Q. Could you tell me what the document represents, please?<br><br>A. Rephrase.<br><br>Q. What is depicted on the -- on Exhibit 2?<br><br>A. Exhibit 2 actually is the Newegg e-commerce infrastructure diagram. |
| [34b] at least one buyer computer for operation by a user desiring to buy products; | Wu 30(b)(6) Tr. at 40:24-41:17, July 8, 2009<br><br>Q. Let's just look a little bit outside the bigger box, the dotted box, which is labeled "Newegg E-Commerce." We have -- on the left upper-hand corner, we have computer icon with the label "Customer." Do you see that? Is that representative of Newegg's customers? |

Summary of Wu Testimony Related to the '314 Patent (newegg.com)
CONFIDENTIAL - RESTRICTED

1

| | |
|---|---|
| | A. Right.<br><br>(Wu 30(b)(6) Tr. at 19:20-25, July 8, 2009.)<br><br>2.<br><br>Q. Okay. And the Web server, I take it, it solely represents the SSL because we have a shopping flow, not the catalog; correct?<br><br>A. You're right. This Web server refers to the SSL server.<br><br>(Wu 30(b)(6) Tr. at 77:22-78:2, July 8, 2009.)<br><br>3.<br><br>Q. New item page. The -- and so what we see depicted in Exhibit 5 is that once the customer clicks that Add To Cart button, it is taken to the Web server, and in this case we established that it is the SSL server illustrated in Figure 3; right?<br><br>A. Right. This chart Web server refers to SSL server, yes.<br><br>Q. So that's the SSL server. And at the SSL server, and we have a box which is called "Add Item to Shopping Cart." Do you see that?<br><br>A. Add to shopping cart, which is sell item, you refer to -- oh, Add Item to Shopping Cart, yes, first box. Yes.<br><br>(Wu 30(b)(6) Tr. at 84:3-16, July 8, 2009.) |
| [34d] a shopping cart database connected to | Wu 30(b)(6) Tr. at 49:20-50:13, 52:19-53:7, 54:12-55:16, 60:20-62:6, July 8, 2009 |

Summary of Wu Testimony Related to the '314 Patent (newegg.com)
CONFIDENTIAL - RESTRICTED

3

| | |
|---|---|
| said shopping cart computer; | 1. |
| | Q. Let's get back for a moment to what is labeled on Page 2 of Exhibit 3 the "Shopping Cart DB." |
| | A. You talk about Exhibit 2? |
| | Q. Exhibit 3. I'm sorry. |
| | A. Three. Okay. Shopping cart DB. Okay. |
| | Q. On Page 2, we see a label that – |
| | Q. E3SHP01/2/3/4. Do you see those? |
| | A. Yeah. |
| | Q. Are these database servers? |
| | A. Yes. |
| | Q. Where are they physically located? |
| | A. E3 colo is Los Angeles, so... |
| | Q. And conversely, E4 means New Jersey or the East Coast, in the lower bottom? |
| | A. Yes. |
| | Q. Okay. What type of information is stored in the shopping cart database? |

CONFIDENTIAL - RESTRICTED

4

A13008

A. Temporary shopping cart-related information.

(Wu 30(b)(6) Tr. at 49:20-50:13, July 8, 2009.)

2.

Q. I see. So the information about the user's shopping cart is temporarily stored into the shopping cart database from the moment that the customer hits the Checkout button until sometime after he hits a Submit Order?

A. Yeah. You can say that.

Q. Okay.

A. So that's why we say temporary.

Q. I see. And the temporary storage of the customer's shopping cart includes information. What type of information does that include?

A. A SKU number, how many pieces you want to order. This kind of information.

(Wu 30(b)(6) Tr. at 52:19-53:7, July 8, 2009.)

3.

Q. On any single day, do you have a ballpark idea as to how many people may access the Newegg Web site?

A. You refer the unique customer on a daily basis?

Q. Yes. Let's say through the example, unique customer --

A. I don't have exact number.

Q. Ballpark?

A. Ballpark. 100,000. That's just -- I don't have exact number. I just give you about 100,000.

Q. Of those -- of those people, approximately how many would you say end up clicking the Checkout button?

A. How many customers hitting the Checkout button?  Well, how many customers hitting the Checkout button. I don't have exactly number. In general, in the industry standard, possible I say 3 percent or 4 percent average conversion rate. The industry number.

Q. So it's still thousands of people at any given time probably have clicked the Checkout button; correct?

A. Yeah. If you use the industry standard, because I don't have exact number. 100,000 customers is the ballpark times 3 percent, 4 percent is conversion rate, so...

Q. And so the information about the shopping carts for those customers who clicked the Checkout button is stored in the shopping cart database?

A. Yes. The 3 percent, 4 percent of the customer hitting the Checkout, all the cart list will be upload and installed as temporary. And those customers – most of customer completed the order, purged right away.

(Wu 30(b)(6) Tr. at 54:12-55:16, July 8, 2009.)

Summary of Wu Testimony Related to the '314 Patent (newegg.com)
CONFIDENTIAL - RESTRICTED

6

4.

Q. Okay. Just one thing that I wanted to verify. The -- when you look at the block diagram in Exhibit 3, there are lines, solid lines, between different blocks. Do you see them?

A. Which one? Which line are you referring to?

Q. Well, for example, there is a line from the customer to the public Internet, from the public Internet to the firewall, from the firewall to netscaler?

A. Right.

Q. Netscaler, then it has lines to the catalog server and to the SSL server, transaction server?

A. Right.

Q. These lines depict connections between different components; correct?

A. Can you rephrase?

Q. These lines depict connections between individual components?

A. Well, depend on what kind of customer request to. If customer request access catalog, then go to the catalog box. If a customer request go to the transactional or shopping cart page or check out, it go to SSL.

Q. I appreciate it. Actually, let me clarify the question. What I had in mind is that basically netscaler can communicate both with the catalog server on

A13011

| | |
|---|---|
| | the upper arrow and with the SSL server? |
| | A. Right. |
| | Q. That's a connection, which may be physical wires or it may be wireless? |
| | A. Right. |
| | Q. But essentially it enables data to move from one block to the other? |
| | A. Yeah. |
| | (Wu 30(b)(6) Tr. at 60:20-62:6, July 8, 2009.) |
| [34e] said buyer computer and said shopping cart computer being interconnected by a computer network; | Wu 30(b)(6) Tr. at 15:10-18, 19:22-20:5, 43:21-25, July 8, 2009 |
| | 1. |
| | Q. So could you tell us what the first page of Exhibit 3 represents? |
| | A. Actually, the first page of Exhibit 3, the -- is the -- represents the high level, the logic architecture of the Newegg e-commerce operation data center. Actually, you can see the three box over there, E3 and E4, that's Newegg e-commerce operation data center reach the facing customer. Another one called warehouse. |
| | (Wu 30(b)(6) Tr. at 15:10-18, July 8, 2009.) |
| | 2. |
| | Q. Yes. Seems to have a somewhat more detailed representation of certain boxes which are depicted on Page 1. |

Summary of Wu Testimony Related to the '314 Patent (newegg.com)
CONFIDENTIAL - RESTRICTED

8

| | |
|---|---|
| [34j] to cause a payment message associated with said shopping cart to be created; and | Q. Do you know when that change occurred?<br><br>A. I remember I answered this question to you earlier this morning. I just possible remember the Q2, Q4. I don't know exactly date. Second half of the 2008.<br><br>(Wu 30(b)(6) Tr. at 236:16-237:7, July 8, 2009.)<br><br>4.<br><br>Q. Is there a point when the shopping cart ID is generated, but there is no corresponding entry in the table, this temporary table which stores shopping carts?<br><br>A. You're right. The timing to -- because shopping cart ID is shopping cart ID table. Shopping cart line item table is different. So we generate ID that time, that moment, nothing in shopping cart item --line item table. Then we go to second step with this ID. You can say second box. This time different, yes.<br><br>(Wu 30(b)(1) Tr. at 19:2-10, July 9, 2009.) |
| | Wu 30(b)(6) Tr. at 101:24-102:22, July 8, 2009<br><br>Q. So now, the next box is "Display Confirm Order Page"; right?<br><br>A. Right.<br><br>Q. What is -- the confirm order page, what type of information does it contain?<br><br>A. Well, just list the one page, it say -- one area say billing and shipping and |

Summary of Wu Testimony Related to the '314 Patent (newegg.com)
CONFIDENTIAL - RESTRICTED

18



Home > Help & Info > Ordering

Search FAQs _____ **GO**

**Help**
- Overview

**FAQs**
- Contact
- Credit
- Extended Warranty
- Ordering
- Payment
- Products
- Returns(RMA)
- Shipping

**Knowledge Base**
- Address Verification
- Search
- Expert Opinions
- External Links
- Product Tour

**Policies**
- Policy & Agreement
- Privacy Policy
- Return Policy
- Extended Warranty

**Gift Certificates**
- Buy A Gift Certificate
- Your Gift Certificates

**Contact**
- Customer Service
- Manufacturers

## Ordering

**Does Newegg.com accept phone, fax, email or snail mail orders?**
All ordering, price quotes, stock status, and shipping quotes are provided online -- no exceptions. We do not accept phone, fax or e-mail orders or quotes. All pricing quotes on products and shipping are available on the website only.

**I didn't see an order confirmation page. Was my order submitted successfully?**
If you didn't see an order confirmation page even though you clicked the last submit button, our server probably still received your order. This happens when communication back to your PC is interrupted following your order submission. Contact our Customer Service Department at 1-800-390-1119 to make sure your order was received.

**I think I may have inadvertently placed a duplicate order. What should I do now?**
Call Newegg.com customer service at 1-800-390-1119. We will void the order for you as long as it has not yet been invoiced or shipped. If duplicate orders have been shipped, obtain the tracking number(s) for the order(s) you do not want and call shipping carrier to refuse those shipments. You will be refunded in full when those items are returned to Newegg.com

**After I submit an order with Newegg.com, how will I be advised of the order's progress?**
Newegg.com will keep you informed of your order via e-mail. Your tracking number will be emailed to you once the item is shipped. You may also check our online order status page for live updates.

**How can I check my Newegg.com order status online?**
Go to the order status page.

**I checked my order status online and was advised that my order has been voided. Why?**
If an order is placed but the credit card is declined or the shipping address cannot be verified within three business days, the order is voided. There is no way to regenerate a void order; you'll have to re-order online. Please call Newegg.com customer service at 1-800-390-1119 if you believe there's been an error.

**Can I add, change or remove items from my order after it has been submitted?**
No.

Once an order is submitted it can only be amended or edited by calling Newegg.com customer service at 1-800-390-1119. Once our warehouses have scanned an order, items cannot be added or deleted. Once any box from an order is shipped, the order cannot be voided.

**How long does it generally take to process an order?**
It takes one to two business days for us to process an order (prior to shipping it). Once the order has shipped, your estimated time of arrival will be determined by your selected shipping method and your local FedEx guidelines for delivery.

Newegg.com offers Rush Processing for orders placed before 12PM PST for a small additional fee. Newegg.com will put forth its best efforts. We cannot however, guarantee that your order will ship the same day. If we fail to ship your order on the same day, we will refund the Rush Processing fee.

**May I combine two separate orders to save on shipping costs?**
We do not combine orders for you over the phone. However, if you call us before your orders are processed, we can cancel your orders so you can place a single order for all the items you want. Please understand that we cannot cancel an order once it has been scanned by our warehouse.

**Can I reactivate an order that has been voided/cancelled?**
No, you'll have to re-order online.

**May I take advantage of a manufacturer mail-in rebate through Newegg.com?**
For your convenience, Newegg.com advertises current Manufacturer rebates on our website.

Manufacturer mail-in rebate offers are fulfilled by the manufacturer exclusively. The prices on our website do not include rebate savings. Use of these rebates is limited to any terms or conditions provided by the manufacturer. If you have any questions regarding a rebate's terms & conditions and/or how to redeem the rebate, please contact the manufacturer directly.

**How do I change my Newegg.com login ID?**
1. Click the My Account button located at the top right of the Newegg webpage
2. Click Account Settings under the Options menu to your left. You must be logged in.
3. Change your Newegg.com login ID by updating your email address accordingly

**I am getting a message, "SORRY YOU HAVE FAILED TO LOGIN TOO MANY TIMES. PLEASE TRY AGAIN LATER." Have I been locked out?**
The server allows 5 login attempts every 5 minutes. Beyond that, it will "time out" the account, and login


Plaintiff's Exhibit
Exhibit No. P-15
Case No. 6:07-cv-00511

A13090

will be forbidden for several minutes. If this "time out" occurs 20 times within the span of 3 days, the IP address used for these attempts will be locked, and login from that IP will no longer work. If this has occurred, please try logging in from a different location and contact customer service for assistance.

**Where is the Newegg Classic link? Can you bring back the old site?**

Newegg classic is no longer online, however we are constantly improving our site and would love to hear your suggestions.

**Is the Newegg.com website secure? What security features are in place to safeguard my information?**

Security is a top priority at Newegg.com. When you submit sensitive information via the website, your information is protected both online and offline.

When our registration/order form asks you to enter sensitive information (such as your credit card number), that information is encrypted and is protected with the best encryption software currently available in the industry - SSL. Newegg.com uses the most advanced form of SSL software available: 128-bit encryption by Verisign. To learn more about SSL, follow this link www.verisign.com.

Access to all of our users' information is restricted. Newegg.com operates in a secured and locked facility that requires all employees to check in and wear valid ID badges. Security cameras are positioned throughout the building in conjunction with multiple alarm systems. Only employees who need the information to perform a specific job are granted access to personally identifiable information. If you wish to have your financial information removed at the time of your order, you may opt to have your financial information deleted from our records upon completion of your order. Otherwise, you may contact us at service@newegg.com or call our toll free number (800) 390-1119 to request that your information be deleted from our database. For future transactions, you will be required to re-enter your information.

All Newegg.com servers, including web servers and database servers, are housed and maintained in secure locations. Access to the database is strictly monitored and protected from outside access. Internet access is restricted and protected by multiple Checkpoint and Cisco firewalls and password protection. The servers on which we store personally identifiable information are kept in a secured environment, inside a secured and locked room. All backups are stored and locked in a high-level security room. Only personnel with proper security clearance have access to these restricted areas. Tape backups are not permitted to leave the premises without prior authorization.

All employees are updated with the latest information on our security and privacy practices. Every quarter, as well as any time new policies are added, our employees are notified and/or reminded about the importance we place on privacy and of what they can do to ensure that our customers' information remains protected.

**Does Newegg.com sell or release my personal information?**

Newegg.com respects your privacy. We will not under any circumstances sell or release your information to anyone without your consent. Please see our Privacy Policy for additional details.

**I am experiencing trouble with my shopping cart. What can I do?**

Shopping cart problems usually occur for one or more of the following reasons:
1. Cookies are not enabled, or your browser is configured to block newegg.com and/or secure.newegg.com cookies.

NOTE: In some cases, the cookies on your computer may become corrupted. If you've verified that newegg.com and secure.newegg.com cookies are being accepted and you're still experiencing problems with the shopping cart, please clear your cookies and cache, close your browser and try again.
2. The master clock on the computer is not set correctly.
3. The computer you're using is behind a firewall.
4. The item you are trying to purchase is sold out, or there is a lesser quantity than you wish to purchase.
5. You are using a browser released prior to Internet Explorer 5.1.
If all else fails, try closing all open programs and restart your computer, or try from a different computer.

**Does Newegg.com offer a paper catalog?**

No. Our online catalog at www.newegg.com is our only catalog.

**I can't view or login to the Newegg website. What can I do?**

If you are entering the correct email address and password, and your account has not been suspended due to fraud or chargeback, please try the following:
1. Enable Cookies.
2. Enable Javascript.
3. Clear existing cookies and cache.
4. Make sure the date/time on your computer is correct for your time zone.
5. Make sure you do not block our site or our image cache server (AKAMAI).
6. If you are using Internet Explorer, set your security profile to Medium and enable "Override automatic cookie handling". (Tools > Internet Options > Privacy tab > Advanced)
7. If you are using Firefox, type "about:config" in the address bar. Set the "network.http.sendRefererHeader" value to 1.

If problems or issues continue, add the Newegg host record into your computer:
*Go to "C:\WINDOWS\system32\drivers\etc" and open the "hosts" file with Notepad. Add the following rows:
216.52.208.185 www.newegg.com
216.52.208.188 secure.newegg.com

For further assistance, try the following links:
http://www.newegg.com/test.aspx
http://secure.newegg.com/test.aspx
Then click Email WebMaster to email our Webmaster and tell us what you see.

**What happens if an item is backordered?**

If an item is found to be out of stock after your order has been placed, then it will automatically be removed from your order. We will not hold an order because an item is backordered. You will not be charged for the backordered item or for the shipping cost of the item (if you were already charged, you will be refunded). The item that was backordered will have to be re-ordered online when it becomes available again.



**What happens when an item is out-of-stock?**

We do not sell merchandise that we don't have in-stock, which is why we provide a convenient Auto-Notify feature. Simply click the Auto-Notify button and fill in your email address, and you'll receive an e-mail notification as soon as the product becomes available for purchase.

**What should I do if an item is missing from my order?**

First, verify that you've received a box for each tracking number associated with your order. If all boxes have been delivered but you're still missing an item, check the packing material for small items. Please call Newegg.com Customer Service at 1-800-390-1119 if you're unable to locate an item.

**Can I pre-order a product that is not yet in stock?**

Yes, but pre-orders are only offered for certain items. At this time, most of our products are not eligible for pre-order. Please note that we will not charge or ship a pre-order until all items on the pre-order are in stock. An item's ETA is subject to change without notice.

**Can I back order an item that is out-of-stock?**

Yes, you can back order certain items even when they are sold out or out-of-stock. However, most of our items are not eligible for backorder.

A backorder will not be charged or shipped until all items on the order are in stock. A backordered item may have an ETA, although it is subject to change without notice.

**How do I redeem my Newegg.com Gift Certificate?**

Simply enter your Claim Code and Security Code in the "Redeem Gift Certificates" area on the shopping cart page. Newegg.com Gift Certificates must be redeemed through the Newegg.com website, www.newegg.com, toward the purchase of any product(s) listed in Newegg.com's online catalog. Gift Certificates can neither be refunded nor used to purchase Gift Certificates.

**Can Newegg.com use registered mail for my APO/FPO order?**

Presently we do not offer a registered mail option for APO/FPO orders. We currently utilize only the standard service offered by the United States Postal Service to keep rates as low as possible.

**How long after buying a Gift Certificate does it take for a Gift Certificate to be sent out?**

Immediately after your order is processed (typically 24-48 hours), a gift certificate is automatically sent to the recipient's email address.

**Do Newegg.com Gift Certificates expire?**

No, they do not expire. However, they are non-transferrable from the original user to another user. The original user is the only one that can redeem the balance on a gift certificate.

**Can I redeem a Gift Certificate toward a purchase that exceeds my Gift Certificate amount?**

Yes, and you'll have to pay the remaining balance using a credit card or other payment method.

**The Bill Me Later payment option is not being displayed in the shopping cart. What gives?**

If you entered the wrong date of birth, home address, home telephone number or made a mistake typing the last four digits of your social security number (or a combination of each) three times, Bill Me Later will be deactivated as a payment option for the current order. It is important to note that the deactivation is only temporary and conducted as a precautionary measure to prevent fraudulent activity.

If your shopping cart contains pre/back-ordered merchandise and/or downloadable software, the Bill Me Later payment option is not displayed because these product types are not available for purchase using Bill Me Later.

**In what denominations can Newegg.com Gift Certificates be purchased?**

Newegg.com Gift Certificates can be purchased in any dollar denomination from $5 to $5,000.

**The product I'm interested in "Must be Purchased With Hardware." Which items qualify as "hardware"?**

Certain items may not be purchased without the purchase of a separate non-software item from our online store. There are no minimum dollar requirements or specific hardware requirements.

**I lost my Gift Certificate Claim Code. What should I do?**

Your claim codes are displayed on the Gift Certificate Balance page once you log in.

**Can Newegg.com Customer Support agents physically obtain a product and describe it to me?**

Because our inventory is stored in our warehouses, our agents cannot physically get a hold of any product to describe it for you. All product information we have is displayed on our website. Please use the "MORE INFO" and "DETAILED SPECIFICATIONS" links to learn about products you're interested in.

**Can I purchase downloadable software using Bill Me Later?**

Downloadable Software cannot be purchased using a Bill Me Later account. Please visit Newegg.com's Software Store to check if a standard version of the title you are interested in is available.

**I received an Auto-Notify email indicating that a product is now in stock. But when I check the website, the product is out-of-stock. Why?**

It's likely that the product you're interested in sold out soon after it became available for purchase. To *give yourself the best chance of getting an item you're interested in, place an order immediately after receiving an auto-notify email.*

**How do I use Newegg.com's shopping cart?**

Search for the items you want to buy. Click "Add To Cart" for each item you want. If you want to buy more than one unit of an item, input the desired quantity in the "Qty Product" field, and click "Update". If you need to shop for more items, click "continue shopping". After you've added all items you want to purchase to your shopping cart, select a shipping method and your ship-to state. Click on the shipping calculator button to view the total charges. If everything meets your satisfaction, click "Check Out" and log in following the onscreen instructions. If you're a new customer, click "GO" next to "New Customer" to create an account. The contents of your shopping cart will be held for you during this process. After creating an account, you should proceed to check out as normal.

**Why am I unable to order a Newegg.com gift certificate?**

Please make sure the credit card that is being used to order the gift certificate is a "Verified by Visa" enabled card. This helps cut down fraud and protects your online purchase. Only a Verified by Visa credit card can be used for gift certificate purchases. Regular purchases do not have this requirement. Please refer to your issuing bank to see if they participate in the Verified by Visa program. If your card is already Verified by Visa enabled, then a failed transaction may be due to an error with the banks verification server, and we would suggest that you try again later when the bank's servers are experiencing less traffic. If your Verified by Visa card fails to authenticate then you may have entered the wrong info or your card has not yet registered for the Verified by Visa program.

**Why does Newegg place Quantity limit restrictions on same items?**

In the efforts to best distribute our more popular products evenly to our vast customer base, you may find that a quantity purchase limit has been placed on select items restricting the quantity amount that can be purchased in a 'cool down' period of 48 hours.

**I've previously ordered an item(s) that had a Quantity Limit restriction. When can I order more?**

After a 'cool down' period of 48 hours has expired from a previous purchase for an item(s) with a Quantity Limit restriction, you may place a new order for that item(s) keeping in mind the Quantity Limit, if still applicable.

**My order was adjusted due to 'Quantity Limit Exceedance'. What does that mean?**

If you receive a 'Quantity Limit Exceedance' notification and was informed that your order was adjusted, that means our records indicate that the listed item(s) was either previously purchased under the same Customer account or using the same credit account and, with that purchase, the quantity limit for the listed item(s) has now been exceeded.Because of that, the listed item(s) indicated as exceeding its quantity limit would be removed from the order, and the remaining portion of the order would continue to process and ship.

**My order was cancelled due to 'Quantity Limit Exceedance'. What does that mean?**

If you receive a 'Quantity Limit Exceedance' notification and was informed that your order was cancelled, that means our records indicate that the listed item(s) was either previously purchased under the same Customer account or using the same credit account and, with that purchase, the quantity limit for the listed item(s) has now been exceeded. If the listed item(s) in this notification was indicated as exceeding its quantity limit and was the only item(s) on the order, the order cannot continue processing, and would then be cancelled.

**Do open box items qualify for rebate offers?**

No, we do not offer (or honor) rebates for open box items. A rebate offer for a new product will not be honored for a open box unit of the same product.









Policy & Agreement | Privacy Policy | NeweggBusiness | © 2000-2009 Newegg Inc. All rights reserved.

<u>SESSION MANAGEMENT PATENT LICENSE AGREEMENT</u>

THIS IS AN AGREEMENT, dated June 5 , 2000, by and between Open Market, Inc., a Delaware corporation having a mailing address of One Wayside Road, Burlington, Massachusetts, 01803 ("Open Market"), and Johnson & Johnson Vision Care, Inc., a Florida corporation having a mailing address of 7500 Centurion Parkway, Suite 100, Jacksonville, Florida 32256("Licensee").

# BACKGROUND

Open Market owns and has the right to grant licenses under the Licensed Patents (defined below), which patents cover, among other things, aspects of session management on HTTP based telecommunications systems. Licensee is a worldwide company that operates various intranet and Internet sites for its internal business purposes. Accordingly, Licensee desires a license under the Licensed Patents (defined below) in and for the Field Of Use (defined below).

NOW, THEREFORE, in consideration of the premises contained herein, and intending to be legally bound, the parties agree as follows:

# TERMS AND CONDITIONS

1    <u>Definitions</u>. As used herein, the following terms will have the meanings set forth below:

  (a)    "Effective Date" means the date on which this Agreement is executed by the last to sign of Licensee and Open Market.

  (b)    "Field of Use" means the development and operation of intranet and Internet web sites by Licensee, solely for Licensee's internal business purposes (which may include dissemination of information related to Licensee's products and services and the sale, use, manufacture, or distribution of Licensee's products and services), and for no other purpose. In no event will an internal business purpose include the distribution of software to third parties, or the operation of a business to provide Internet access, Internet session management, or related services to third parties. For clarification purposes, the parties agree that the preceding clause is not intended to preclude Licensee's web sites from containing links to third party web sites, however, no third party shall obtain any rights under the Licensed Patents through the inclusion of such a link in a Licensee web site.

  (c)    "Licensed Patents" means U.S. Patent Number 5,708,780 including, divisionals, continuations, and reissues, and all foreign counterparts.

CONFIDENTIAL
-1-

CONFIDENTIAL-OUTSIDE ATTORNEYS EYES ONLY

A13094

SVN2-0040620

**Defendant's Exhibit
Exhibit No. D-223
Case No. 6:07-cv-00511**

(d)  "Licensed Products" means intranet and Internet web sites.

(e)  "Licensee" means Licensee, Inc. and its Related Companies.

(f)  "Open Market" means Open Market, Inc. and its Related Companies.

(g)  "Related Company" means Licensee's parent company, and any other legal entity, more then fifty percent (50%) of whose outstanding shares or securities representing the right to vote for the election of directors or other managing authority are, or more than fifty percent (50%) of whose equity interest or capital is owned or controlled, directly or indirectly, by Licensee or Licensee's parent company, but only so long as such ownership or control or equity interest or capital position exists.

2    License Grant to Licensee

(a)  Open Market hereby grants to Licensee a non-exclusive, worldwide, paid-up license under the Licensed Patents to make, have made and use Licensed Products in and for the Field of Use.

(b)  Licensee shall have no rights under this Agreement to sublicense the Licensed Patents either directly or indirectly.

3    Licensee Fee.  In full and complete consideration of the license grant to Licensee hereunder, Licensee agrees to pay Open Market a one time non-refundable license fee of One Hundred Thousand Dollars ($100,000).  Such payment shall be made by check or wire transfer within thirty (30) days of the Effective Date.

4    Assignment.  This Agreement may not be assigned, or transferred by operation of law or otherwise, by Licensee without the prior written consent of Open Market, such consent not to be unreasonably withheld.

5    License Term.  The term of this Agreement shall commence on the Effective Date and terminate on the last to expire of the Licensed Patents.

6    Notices.  All notices or other communications required or permitted under this Agreement shall be in writing and shall be delivered by personal delivery, registered mail return receipt requested, a "Next Day Air" delivery service or by wire communications (i.e., telex, fax, etc.), addressed as indicated on the first page of this Agreement or as otherwise duly notified.  Such notices shall be effective upon receipt.

7    Confidentiality.  No party shall disclose the existence or terms of this Agreement to a third party without the prior written consent of the other party to the Agreement;

CONFIDENTIAL
-2-

CONFIDENTIAL-OUTSIDE ATTORNEYS EYES ONLY

provided, however, Open Market may disclose the Agreement pursuant to a non-disclosure agreement, or as required by law, court order, or government regulation.

8.  <u>Dispute Resolution</u>. Any disputes arising under or related to this Agreement, including without limitation any dispute as to the validity, enforceability or applicability of any of the Licensed Patents, shall be submitted to an arbitration proceeding in Boston, Massachusetts. The proceeding shall be conducted under the then prevailing rules for commercial arbitration (or, if the matter involves issues of patent validity, infringement or enforceability, the patent arbitration rules) of the American Arbitration Association, by a single arbitrator reasonably acceptable to both of the parties. The arbitrator shall have the authority to permit limited discovery to the extent required by a party in order to establish its case. The decision of the arbitrator shall be final and binding and may be entered and enforced in any court of competent jurisdiction. Any monetary award shall be payable in U.S. dollars, free of any tax, offset or other deduction. Any determination of the arbitration shall be confidential to the parties hereto and binding solely on the parties hereto. The arbitration shall be governed by the United States Arbitration Act, 9 U.S.C. Section 116.

8   <u>Miscellaneous</u>.

(a)  Open Market warrants that it (i) has the right to enter into this Agreement, (ii) owns the Licensed Patents, and (iii) has the right to grant the license provided hereunder.

(b)  Licensee warrants that it has the right to enter into this Agreement.

(c)  Nothing in this Agreement shall be construed as:

   (i)    Requiring the maintenance of the Licensed Patents;

   (ii)   Requiring the prosecution of any of the pending Licensed Patents;

   (iii)  A warranty as to the validity or scope of the Licensed Patents;

   (iv)   A warranty or representation that any product will be free from infringement of patents of third parties;

   (v)    An agreement to bring or prosecute actions against infringers of the Licensed Patents;

   (vi)   Conferring any license or right under any patent other than the Licensed Patents;

   (vii)  Conferring any right under the Licensed Patents outside the Field of Use.

CONFIDENTIAL
-3-

A13096

CONFIDENTIAL-OUTSIDE ATTORNEYS EYES ONLY

SVN2-0040622

(e)    Licensee agrees to include in the legal notices section of any web site that uses technology covered by the Licensed Patents, and can be accessed by third parties to this Agreement, a patent notice identifying U.S. Patent Number 5,708,780.  Open Market may, from time to time, provide Licensee with written notice of additional U.S. patents that are within the definition of Licensed Patents, and Licensee shall revise the patent notice as soon thereafter as reasonably practicable.

(f)    The validity and interpretation of this Agreement shall be governed by Massachusetts law, without regard to conflict of laws principles.  The parties further consent to jurisdiction of the Federal courts sitting in the Commonwealth of Massachusetts solely for the purpose of enforcement of paragraph 7 of this Agreement, including, without limitation, any judgment of the arbitrator.  Process may be served on either party by U.S. Mail, postage prepaid, certified or registered, return receipt requested, and addressed as indicated on the first page of this Agreement.

(g)    The paragraph headings in this Agreement are for convenience only and shall have no effect on the meaning or interpretation of this Agreement.

(h)    This Agreement contains the complete and final agreement between the parties, and supersedes all previous understandings relating to the subject matter hereof, whether oral or written.  This Agreement may only be modified by a written agreement signed by duly authorized representatives of the parties.

Open Market, Inc.                                    Johnson and Johnson Vision Care, Inc.

By: _____          By _____

Betty J. Savage                                      C. F. Wyckoff
Printed Name                                        Printed Name

Title: VP & CFO                                     Title: VP, CO

Date: 5·30·00                                        Date: 6/5/2000

CONFIDENTIAL
-4-

A13097

CONFIDENTIAL-OUTSIDE ATTORNEYS EYES ONLY                        SVN2-0040623

## LICENSE AGREEMENT

This License Agreement ("Agreement") is effective this 20th day of September 2002 ("Effective Date") and is by and between divine technology ventures, an Illinois general partnership having a place of business at 1301 North Elston Avenue, Chicago, Illinois ("divine") and Emagio Inc., a California corporation having a principal place of business at 617 S. Olive St., Suite 511, Los Angeles, CA 90014 ("Licensee").

### RECITALS

WHEREAS, divine is the owner of patents set forth more fully below;

WHEREAS, Licensee operates the emagio.com website; and

WHEREAS, Licensee desires to license the patents.

NOW, THEREFORE, in consideration of the above recitals, the mutual covenants set forth below, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. Definitions. As used in this Agreement, the following term shall have the following meaning:

   a. "Licensed divine Patents" means U.S. Patent Nos. 5,715,314 and 5,909,492 and any patent issuing from a continuation, continuation-in-part, divisional, reissue or foreign counterpart application of any of the foregoing, to the extent such patent claims in whole or in part the benefit of the filing date of any one of the patents.

2. License. During the term of this Agreement, and subject to the payment specified in Paragraph 7 below, divine hereby grants to Licensee a paid-up, non-transferable, non-exclusive license, with no right to sub-license, under the Licensed divine Patents to use the systems and apparatuses or to practice methods embodying any of the inventions claimed in the Licensed divine Patents throughout the world.

3. Validity of the Licensed divine Patents. Licensee acknowledges the validity of the claims of the Licensed divine Patents.

4. Covenant Not to Sue Licensee. Subject to Licensee abiding by the terms of this Agreement and for the duration of this Agreement, divine covenants not to sue Licensee, its officers, employees, and customers for infringement of the Licensed divine Patents based on the emagio.com website if Licensee does not substantially modify the functionality of the emagio.com website.

5. Covenant Not to Sue divine. Licensee covenants not to sue divine, its parent, subsidiaries, affiliates or successors for any claims or counterclaims that were or could have been brought against any of them as of the date of this Agreement in any lawsuit involving the divine Patents.

471856/D/1 XCPG01_



CONFIDENTIAL-OUTSIDE ATTORNEYS EYES ONLY                    SVN2-0040585

6.   _Mutual Release._ Each party hereto releases, acquits, and forever discharges the other party and its respective parent companies, subsidiaries, affiliates, officers, directors, employees, agents, shareholders, advisors, representatives, assigns, predecessors-in-interest and successors-in-interest from all claims, causes of action, suits, debts, liens, obligations, liabilities, demands, losses, costs and expenses (including attorneys' fees and costs) of any kind, character or nature whatsoever, known or unknown, fixed or contingent, (collectively "Claim") that the releasing party has or may have or claim to have now or that may hereafter arise out of, relate to, or be connected with the Licensed divine Patents. The releases set forth in this Section shall be effective upon execution of this Agreement by the parties.

7.   _Payment by Licensee._ In consideration of the licenses, releases, waivers and covenants against suit contained in this Agreement, Licensee shall pay to divine a one-time payment equal to one percent (1%) of gross sales of product over the Internet in 2001 or projected sales for 2002, whichever is greater. Such payment shall be made within five (5) business days after the Effective Date of this Agreement.

8.   _Limitations._ EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, NONE OF THE PARTIES (i) MAKES ANY WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED, INCLUDING WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, AND (ii) WILL BE LIABLE TO ANOTHER PARTY UNDER ANY CONTRACT, STRICT LIABILITY, NEGLIGENCE OR OTHER LEGAL OR EQUITABLE THEORY, FOR ANY INCIDENTAL OR CONSEQUENTIAL DAMAGES OR LOST PROFITS IN CONNECTION WITH THE SUBJECT MATTER OF THIS AGREEMENT.

9.   _Confidentiality._ The parties hereto acknowledge that the terms of this Agreement are confidential, except that each party may disclose that Licensee has a license under the Licensed divine Patents. Neither the parties nor their counsel may convey to third parties the terms of this Agreement, except that the terms of this Agreement may be disclosed to tax preparers and insurers as reasonably necessary, or as may be ordered by law.

10.   _Warranty of Authority._ Each person signing this Agreement on behalf of a party warrants that he or she has authority to bind said entity. divine further warrants and represents that its rights include the right to sue for alleged past infringement and that it has not entered into and shall not enter into any agreement which would interfere with or otherwise encumber any of the releases, covenants not to sue, or licenses granted by this Agreement.

11.   _Amendment to Agreement._ This Agreement may not be altered, amended, modified or otherwise changed in any respect or manner, except by a writing executed by an authorized representative of each party.



CONFIDENTIAL-OUTSIDE ATTORNEYS EYES ONLY                              SVN2-0040586

09/20/02  15:06 FAX          BELL BOYD & LOYD LLC

12.    Nontransferability of Agreement to Third Parties. This Agreement may not be assigned or transferred by Licensee to a third party without the prior written consent of divine.

13.    Notices. All notices, requests, demands, directions and other communications provided for hereunder shall be in writing and mailed or faxed or delivered to the applicable party at the address of such party set forth below (or such other address duly provided in writing to the other side). Each such notice, request, demand, direction or other communication shall be effective upon delivery.

    If to divine:

        Richard Nawracaj, Esq.
        Assistant General Counsel
        divine, Inc.
        1301 North Elston Avenue
        Chicago, Illinois 60622
        Fax: 312-394-6601

    With a copy to:

        Robert M. Barrett, Esq.
        Bell, Boyd & Lloyd LLC
        Three First National Plaza
        70 West Madison Street
        Suite 3300
        Chicago, Illinois 60602-4207


    If to Licensee:

        John Lee
        Emagio Inc.
        617 S. Olive St., Suite 511
        Los Angeles, California 90014


    14.    Fees and Costs. Each party shall bear its own costs and expenses, including attorneys' fees.

    15.    Governing Law. This Agreement shall be interpreted, enforced and governed according to the laws of the State of Illinois, without regard to conflict of law provisions.

    16.    Venue. The United States District Court for the Northern District of Illinois, or if that Court does not have subject matter jurisdiction then the state courts of Illinois, shall be the exclusive jurisdiction to enforce the terms of this Agreement. The parties hereto agree and consent to jurisdiction in these courts solely for purposes of enforcing the terms of this Agreement.

471856/D/1 XCPG01_                              3

A13109

CONFIDENTIAL-OUTSIDE ATTORNEYS EYES ONLY                    SVN2-0040587

17.   Counterparts.   This Agreement may be signed in one or more counterparts, each of which shall be deemed an original and all of which shall constitute one and the same instrument. Copies of signed counterparts transmitted by telecopy, facsimile, or other electronic transmission shall be considered original executed counterparts for purposes of this Paragraph, provided receipt of said copies of counterparts is confirmed. This Agreement shall not be effective unless and until signed by all parties hereto.

18.   Severability.   If any provision of this Agreement shall be held void or unenforceable by a court, such provision shall be severable and shall not affect the validity or enforceability of any other provisions of this Agreement.

19.   No Waivers.   The waiver by either party of a breach of any provision of this Agreement or the failure by any of the parties to exercise any right hereunder shall not operate or be construed as a waiver of any subsequent breach of that right or a waiver of any other right. It is further expressly agreed that the waiver of any right of either party hereunder or under the law shall be effective only if in writing and executed by an authorized officer of the affected party.

20.   Headings.   All section headings are stated for convenience only and shall not be considered in construing this Agreement.

21.   Preparation of Agreement; Construction.   This Agreement shall be construed without regard to the party or parties responsible for the preparation of the same and shall be deemed as prepared jointly by the parties hereto. Any ambiguity or uncertainty existing herein shall not be interpreted or construed against any party hereto on the basis that such party may have drafted such provision.

22.   Term of Agreement.   This Agreement shall be in effect until the term granted under each of the Licensed divine Patents has expired.

23.   Entire Agreement.   This Agreement (together with the exhibit hereto) represents and contains the entire agreement and understanding between the parties with respect to the subject matter of this Agreement, and supersedes any and all prior or contemporaneous negotiations, agreements and understandings, whether written or oral, between the parties with respect to the subject matter of this Agreement.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date set forth above.

DIVINE TECHNOLOGY VENTURES

By:      _____

Name:   _____

Title:   _____

Date:   _____

471856/0/1 XCPG01_                          4

CONFIDENTIAL-OUTSIDE ATTORNEYS EYES ONLY

SVN2-0040588

09/20/02  15:07 FAX                    BELL BOYD & LLOYD LLC

EMAGIO INC

By:
Name:    Shu Lee
Title:    owner
Date:    9/25/02

471856/D/t XCPG01_                              5

A13111

CONFIDENTIAL-OUTSIDE ATTORNEYS EYES ONLY

SVN2-0040589

# LICENSE AGREEMENT

This License Agreement ("Agreement") is effective this 24th day of September 2002 ("Effective Date") and is by and between divine technology ventures, an Illinois general partnership having a place of business at 1301 North Elston Avenue, Chicago, Illinois ("divine") and Natural Foods, Inc., an Ohio corporation having a principal place of business at 3040 Hill Avenue, Toledo, Ohio 43607 ("Licensee").

## RECITALS

WHEREAS, divine is the owner of patents set forth more fully below;

WHEREAS, Licensee operates the bulkfoods.com website; and

WHEREAS, Licensee desires to license the patents.

NOW, THEREFORE, in consideration of the above recitals, the mutual covenants set forth below, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.    Definitions.   As used in this Agreement, the following term shall have the following meaning:

      a.    "Licensed divine Patents" means U.S. Patent Nos. 5,724,424, 5,715,314 and 5,909,492 and any patent issuing from a continuation, continuation-in-part, divisional, reissue or foreign counterpart application of any of the foregoing, to the extent such patent claims in whole or in part the benefit of the filing date of any one of the patents.

2.    License.  During the term of this Agreement, and subject to the one-time payment equal to two thousand five hundred dollars ($2500) as specified in Paragraph 7 below, divine hereby grants to Licensee a paid-up, non-transferable, non-exclusive license, with no right to sub-license, under the Licensed divine Patents to use the systems and apparatuses or to practice methods embodying any of the inventions claimed in the Licensed divine Patents throughout the world.

3.    Validity of the Licensed divine Patents.  Licensee acknowledges the validity of the claims of the Licensed divine Patents.

4.    Covenant Not to Sue Licensee.  Subject to Licensee abiding by the terms of this Agreement and for the duration of this Agreement, divine covenants not to sue Licensee, its officers, employees, and customers for infringement of the Licensed divine Patents.

5.    Covenant Not to Sue divine.  Licensee covenants not to sue divine, its parent, subsidiaries, affiliates or successors for any claims or counterclaims that were or could have been brought against any of them as of the date of this Agreement in any lawsuit involving the divine Patents.

472413/0/2  XDWT02

CONFIDENTIAL-OUTSIDE ATTORNEYS EYES ONLY

SVN2-0040639

6.    <u>Mutual Release.</u>  Each party hereto releases, acquits, and forever discharges the other party and its respective parent companies, subsidiaries, affiliates, officers, directors, employees, agents, shareholders, advisors, representatives, assigns, predecessors-in-interest and successors-in-interest from all claims, causes of action, suits, debts, liens, obligations, liabilities, demands, losses, costs and expenses (including attorneys' fees and costs) of any kind, character or nature whatsoever, known or unknown, fixed or contingent, (collectively "Claim") that the releasing party has or may have or claim to have now or that may hereafter arise out of, relate to, or be connected with the Licensed divine Patents.  The releases set forth in this Section shall be effective upon execution of this Agreement by the parties.

7.    <u>Payment by Licensee.</u>  In consideration of the licenses, releases, waivers and covenants against suit contained in this Agreement, Licensee shall pay to divine a one-time payment equal to two thousand five hundred dollars ($2,500) which Licensee represents is more than one percent (1%) of gross sales of product over the Internet.  Such payment shall be made on the following dates: one thousand two hundred fifty dollars ($1,250) within five (5) business days after the Effective Date of this Agreement and one thousand two hundred fifty dollars ($1,250) sixty (60) days thereafter.

8.    <u>Limitations.</u>  EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, NONE OF THE PARTIES (i) MAKES ANY WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED, INCLUDING WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, AND (ii) WILL BE LIABLE TO ANOTHER PARTY UNDER ANY CONTRACT, STRICT LIABILITY, NEGLIGENCE OR OTHER LEGAL OR EQUITABLE THEORY, FOR ANY INCIDENTAL OR CONSEQUENTIAL DAMAGES OR LOST PROFITS IN CONNECTION WITH THE SUBJECT MATTER OF THIS AGREEMENT.

9.    <u>Confidentiality.</u>  The parties hereto acknowledge that the terms of this Agreement are confidential, except that each party may disclose that Licensee has a license under the Licensed divine Patents.  Neither the parties nor their counsel may convey to third parties the terms of this Agreement, except that the terms of this Agreement may be disclosed to tax preparers and insurers as reasonably necessary, or as may be ordered by law.

10.    <u>Warranty of Authority.</u>  Each person signing this Agreement on behalf of a party warrants that he or she has authority to bind said entity.

11.    <u>Amendment to Agreement.</u>  This Agreement may not be altered, amended, modified or otherwise changed in any respect or manner, except by a writing executed by an authorized representative of each party.

472413/D/2  XDWT02_                                   2

A13113

CONFIDENTIAL-OUTSIDE ATTORNEYS EYES ONLY                                   SVN2-0040640

12.    Nontransferability of Agreement to Third Parties. This Agreement may not be assigned or transferred by Licensee to a third party without the prior written consent of divine.

13.    Notices.  All notices, requests, demands, directions and other communications provided for hereunder shall be in writing and mailed or faxed or delivered to the applicable party at the address of such party set forth below (or such other address duly provided in writing to the other side). Each such notice, request, demand, direction or other communication shall be effective upon delivery.

　　　　　If to divine:

　　　　　　　　Richard Nawracaj, Esq.
　　　　　　　　Assistant General Counsel
　　　　　　　　divine, Inc.
　　　　　　　　1301 North Elston Avenue
　　　　　　　　Chicago, Illinois 60622
　　　　　　　　Fax: 312-394-6601

　　　　　With a copy to:

　　　　　　　　Robert M. Barrett, Esq.
　　　　　　　　Bell, Boyd & Lloyd LLC
　　　　　　　　Three First National Plaza
　　　　　　　　70 West Madison Street
　　　　　　　　Suite 3300
　　　　　　　　Chicago, Illinois 60602-4207

　　　　　If to Licensee:

　　　　　　　　Frank Dietrich, President
　　　　　　　　Natural Foods, Inc.
　　　　　　　　3040 Hill Avenue
　　　　　　　　Toledo, OH  43607

14.    Fees and Costs. Each party shall bear its own costs and expenses, including attorneys' fees.

15.    Governing Law. This Agreement shall be interpreted, enforced and governed according to the laws of the State of Illinois, without regard to conflict of law provisions.

16.    Counterparts. This Agreement may be signed in one or more counterparts, each of which shall be deemed an original and all of which shall constitute one and the same instrument. Copies of signed counterparts transmitted by telecopy, facsimile, or other electronic transmission shall be considered original executed counterparts for purposes of this Paragraph, provided receipt of said copies of counterparts is confirmed. This Agreement shall not be effective unless and until signed by all parties hereto.

472413/D/2 XDWT02_                          3

A13114

CONFIDENTIAL-OUTSIDE ATTORNEYS EYES ONLY                          SVN2-0040641

17.   Severability.   If any provision of this Agreement shall be held void or unenforceable by a court, such provision shall be severable and shall not affect the validity or enforceability of any other provisions of this Agreement.

18.   No Waivers.   The waiver by either party of a breach of any provision of this Agreement or the failure by any of the parties to exercise any right hereunder shall not operate or be construed as a waiver of any subsequent breach of that right or a waiver of any other right. It is further expressly agreed that the waiver of any right of either party hereunder or under the law shall be effective only if in writing and executed by an authorized officer of the affected party.

19.   Headings.   All section headings are stated for convenience only and shall not be considered in construing this Agreement.

20.   Preparation of Agreement; Construction.   This Agreement shall be construed without regard to the party or parties responsible for the preparation of the same and shall be deemed as prepared jointly by the parties hereto. Any ambiguity or uncertainty existing herein shall not be interpreted or construed against any party hereto on the basis that such party may have drafted such provision.

21.   Term of Agreement.   This Agreement shall be in effect until the term granted under each of the Licensed divine Patents has expired.

22.   Entire Agreement.   This Agreement (together with the exhibit hereto) represents and contains the entire agreement and understanding between the parties with respect to the subject matter of this Agreement, and supersedes any and all prior or contemporaneous negotiations, agreements and understandings, whether written or oral, between the parties with respect to the subject matter of this Agreement.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date set forth above.

DIVINE TECHNOLOGY VENTURES

By: _____
Name: _____JUDE  M.  SULLIVAN_____
Title: _____SVP_____
Date: _____10/3/02_____

NATURAL FOODS, INC.

By: _____
Name: Frank Dietrich
President
Date:   Sept 30, 2002

CONFIDENTIAL-OUTSIDE ATTORNEYS EYES ONLY                          SVN2-0040642

## LICENSE AGREEMENT

This License Agreement ("Agreement") is effective this 24th day of September 2002 ("Effective Date") and is by and between divine technology ventures, an Illinois general partnership having a place of business at 1301 North Elston Avenue, Chicago, Illinois ("divine") and Webster Orchard, Inc., an Oregon corporation having a principal place of business at 2670 Webster Road, Hood River, Oregon 97031 ("Licensee").

### RECITALS

WHEREAS, divine is the owner of patents set forth more fully below;

WHEREAS, Licensee operates the thefruitcompany.com website; and

WHEREAS, Licensee desires to license the patents.

NOW, THEREFORE, in consideration of the above recitals, the mutual covenants set forth below, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.    Definitions.  As used in this Agreement, the following term shall have the following meaning:

a.    "Licensed divine Patents" means U.S. Patent Nos. 5,715,314 and 5,724,424 and any patent issuing from a continuation, continuation-in-part, divisional, reissue or foreign counterpart application of any of the foregoing, to the extent such patent claims in whole or in part the benefit of the filing date of any one of the patents.

2.    License.  During the term of this Agreement, and subject to the payment specified in Paragraph 7 below, divine hereby grants to Licensee a paid-up, non-transferable, non-exclusive license, with no right to sub-license, under the Licensed divine Patents to use the systems and apparatuses or to practice methods embodying any of the inventions claimed in the Licensed divine Patents throughout the world.

3.    Validity of the Licensed divine Patents.  Licensee acknowledges the validity of the claims of the Licensed divine Patents.

4.    Covenant Not to Sue Licensee.  Subject to Licensee abiding by the terms of this Agreement and for the duration of this Agreement, divine covenants not to sue Licensee, its officers, employees, and customers for infringement of the Licensed divine Patents based on the thefruitcompany.com website if Licensee does not substantially modify the functionality of the thefruitcompany.com website.

5.    Covenant Not to Sue divine.  Licensee covenants not to sue divine, its parent, subsidiaries, affiliates or successors for any claims or counterclaims that were or could have been brought against any of them as of the date of this Agreement in any lawsuit involving the divine Patents.

471979/D/1 XCTB01_

CONFIDENTIAL-OUTSIDE ATTORNEYS EYES ONLY

A13116

SVN2-0040673

**Defendant's Exhibit
Exhibit No. D-227
Case No. 6:07-cv-00511**

6.   Mutual Release.  Each party hereto releases, acquits, and forever discharges the other party and its respective parent companies, subsidiaries, affiliates, officers, directors, employees, agents, shareholders, advisors, representatives, assigns, predecessors-in-interest and successors-in-interest from all claims, causes of action, suits, debts, liens, obligations, liabilities, demands, losses, costs and expenses (including attorneys' fees and costs) of any kind, character or nature whatsoever, known or unknown, fixed or contingent, (collectively "Claim") that the releasing party has or may have or claim to have now or that may hereafter arise out of, relate to, or be connected with the Licensed divine Patents.  The releases set forth in this Section shall be effective upon execution of this Agreement by the parties.

7.   Payment by Licensee.  In consideration of the licenses, releases, waivers and covenants against suit contained in this Agreement, Licensee shall pay to divine a one-time payment equal to two percent (2%) of Licensee's $100,000 gross sales of product over the Internet in 2001.  Such payment shall be made within five (5) business days after the Effective Date of this Agreement.

8.   Limitations.  EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, NONE OF THE PARTIES (i) MAKES ANY WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED, INCLUDING WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, AND (ii) WILL BE LIABLE TO ANOTHER PARTY UNDER ANY CONTRACT, STRICT LIABILITY, NEGLIGENCE OR OTHER LEGAL OR EQUITABLE THEORY, FOR ANY INCIDENTAL OR CONSEQUENTIAL DAMAGES OR LOST PROFITS IN CONNECTION WITH THE SUBJECT MATTER OF THIS AGREEMENT.

9.   Confidentiality.  The parties hereto acknowledge that the terms of this Agreement are confidential, except that each party may disclose that Licensee has a license under the Licensed divine Patents.  Neither the parties nor their counsel may convey to third parties the terms of this Agreement, except that the terms of this Agreement may be disclosed to tax preparers and insurers as reasonably necessary, or as may be ordered by law.

10.   Warranty of Authority.  Each person signing this Agreement on behalf of a party warrants that he or she has authority to bind said entity.  divine further warrants and represents that its rights include the right to sue for alleged past infringement and that it has not entered into and shall not enter into any agreement which would interfere with or otherwise encumber any of the releases, covenants not to sue, or licenses granted by this Agreement.

11.   Amendment to Agreement.  This Agreement may not be altered, amended, modified or otherwise changed in any respect or manner, except by a writing executed by an authorized representative of each party.

CONFIDENTIAL-OUTSIDE ATTORNEYS EYES ONLY                    SVN2-0040674

12.    <u>Nontransferability of Agreement to Third Parties.</u>  This Agreement may not be assigned or transferred by Licensee to a third party without the prior written consent of divine.

13.    <u>Notices.</u>  All notices, requests, demands, directions and other communications provided for hereunder shall be in writing and mailed or faxed or delivered to the applicable party at the address of such party set forth below (or such other address duly provided in writing to the other side). Each such notice, request, demand, direction or other communication shall be effective upon delivery.

If to divine:

> Richard Nawracaj, Esq.
> Assistant General Counsel
> divine, Inc.
> 1301 North Elston Avenue
> Chicago, Illinois 60622
> Fax: 312-394-6601

With a copy to:

> Robert M. Barrett, Esq.
> Bell, Boyd & Lloyd LLC
> Three First National Plaza
> 70 West Madison Street
> Suite 3300
> Chicago, Illinois  60602-4207

If to Licensee:

> Webster Orchard, Inc.
> 2670 Webster Road
> Hood River, Oregon  97031

471979/D/1  XCTB01_                              3

CONFIDENTIAL-OUTSIDE ATTORNEYS EYES ONLY                          SVN2-0040675

14.    Fees and Costs.  Each party shall bear its own costs and expenses, including attorneys' fees.

15.    Governing Law.  This Agreement shall be interpreted, enforced and governed according to the laws of the State of Illinois, without regard to conflict of law provisions.

16.    Venue.  The United States District Court for the Northern District of Illinois, or if that Court does not have subject matter jurisdiction then the state courts of Illinois, shall be the exclusive jurisdiction to enforce the terms of this Agreement.  The parties hereto agree and consent to jurisdiction in these courts solely for purposes of enforcing the terms of this Agreement.

17.    Counterparts.  This Agreement may be signed in one or more counterparts, each of which shall be deemed an original and all of which shall constitute one and the same instrument.  Copies of signed counterparts transmitted by telecopy, facsimile, or other electronic transmission shall be considered original executed counterparts for purposes of this Paragraph, provided receipt of said copies of counterparts is confirmed.  This Agreement shall not be effective unless and until signed by all parties hereto.

18.    Severability.  If any provision of this Agreement shall be held void or unenforceable by a court, such provision shall be severable and shall not affect the validity or enforceability of any other provisions of this Agreement.

19.    No Waivers.  The waiver by either party of a breach of any provision of this Agreement or the failure by any of the parties to exercise any right hereunder shall not operate or be construed as a waiver of any subsequent breach of that right or a waiver of any other right. It is further expressly agreed that the waiver of any right of either party hereunder or under the law shall be effective only if in writing and executed by an authorized officer of the affected party.

20.    Headings.  All section headings are stated for convenience only and shall not be considered in construing this Agreement.

21.    Preparation of Agreement; Construction.  This Agreement shall be construed without regard to the party or parties responsible for the preparation of the same and shall be deemed as prepared jointly by the parties hereto. Any ambiguity or uncertainty existing herein shall not be interpreted or construed against any party hereto on the basis that such party may have drafted such provision.

22.    Term of Agreement.  This Agreement shall be in effect until the term granted under each of the Licensed divine Patents has expired.

23.    Entire Agreement.  This Agreement (together with the exhibit hereto) represents and contains the entire agreement and understanding between the parties with respect to the subject matter of this Agreement, and supersedes any and all prior or contemporaneous negotiations, agreements and understandings, whether written or oral, between the parties with respect to the subject matter of this Agreement.

A13119

CONFIDENTIAL-OUTSIDE ATTORNEYS EYES ONLY                                   SVN2-0040676

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date set forth above.

DIVINE TECHNOLOGY VENTURES

By: *Jude M. Sullivan* (signature)
Name: JUDE M. SULLIVAN
Title: SVP
Date: 10/4/02

The Fruit Company, Inc.
~~WEBSTER ORCHARD, INC.~~

By: (signature)
Name: L. SCOTT WEBSTER
Title: President
Date: 7-30-02

CONFIDENTIAL-OUTSIDE ATTORNEYS EYES ONLY

SVN2-0040677

## LICENSE AGREEMENT

This License Agreement ("Agreement") is effective this 3rd day of October, 2002 ("Effective Date) between divine technology ventures, an Illinois general partnership having a place of business at 1301 North Elston Avenue, Chicago, Illinois ("divine") and Perfumania.com, a Florida corporation having a principal place of business at 5555 Anglers Ave., Suite 16, Fort Lauderdale, Florida 33312 ("Licensee").

### RECITALS

WHEREAS, divine is the owner of patents set forth more fully below;

WHEREAS, Licensee operates the Perfumania.com website; and

WHEREAS, Licensee desires to license the patents.

NOW, THEREFORE, in consideration of the above recitals, the mutual covenants set forth below, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.    Definitions.  As used in this Agreement, the following term shall have the following meaning:

    a.    "Licensed divine Patents" means U.S. Patent Nos. 5,715,314, 5,708,780 and 5,909,492 and any patent issuing from a continuation, continuation-in-part, divisional, reissue or foreign counterpart application of any of the foregoing, to the extent such patent claims in whole or in part the benefit of the filing date of any one of the patents.

2.    License.  During the term of this Agreement, and subject to the payment specified in Paragraph 7 below, divine hereby grants to Licensee a paid-up, non-transferable, non-exclusive license, with no right to sub-license, under the Licensed divine Patents to use the systems and apparatuses or to practice methods embodying any of the inventions claimed in the Licensed divine Patents throughout the world.

3.    Validity of the Licensed divine Patents.  Licensee acknowledges the validity of the claims of the Licensed divine Patents.

4.    Covenant Not to Sue Licensee.  Subject to Licensee abiding by the terms of this Agreement and for the duration of this Agreement, divine covenants not to sue Licensee, its officers, employees, and customers for infringement of any divine patents including the Licensed divine Patents based on the Perfumania.com website.

5.    Covenant Not to Sue divine.  Licensee covenants not to sue divine, its parent, subsidiaries, affiliates or successors for any claims or counterclaims that were or could have been brought against any of them as of the date of this Agreement in any lawsuit involving the divine Patents.

474332/D/1 XF6S01_

CONFIDENTIAL-OUTSIDE ATTORNEYS EYES ONLY

A13121

SVN2-0040648

**Defendant's Exhibit
Exhibit No. D-228
Case No. 6:07-cv-00511**

10/04/02  15:22 FAX                    BELL BOYD & LOYD LLC                        ☑004

Sent By: TTA;                    954 987 5540;          Oct-4-02  1:59PM;         Page 3

6.     Mutual Release.  Each party hereto releases, acquits, and forever discharges the other party and its respective parent companies, subsidiaries, affiliates, officers, directors, employees, agents, shareholders, advisors, representatives, assigns, predecessors-in-interest and successors-in-interest from all claims, causes of action, suits, debts, liens, obligations, liabilities, demands, losses, costs and expenses (including attorneys' fees and costs) of any kind, character or nature whatsoever, known or unknown, fixed or contingent, (collectively "Claim") that the releasing party has or may have or claim to have now or that may hereafter arise out of, relate to, or be connected with the Licensed divine Patents.  The releases set forth in this Section shall be effective upon execution of this Agreement by the parties.

7.     Payment by Licensee.  In consideration of the licenses, releases, waivers and covenants against suit contained in this Agreement, Licensee shall pay to divine a one-half percent (1/2%) royalty of the gross sales made by Licensee in 2001 over the Internet.  Such payment shall be made within twenty-one (21) business days after the Effective Date of this Agreement.

8.     Limitations.  EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, NONE OF THE PARTIES (i) MAKES ANY WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED, INCLUDING WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, AND (ii) WILL BE LIABLE TO ANOTHER PARTY UNDER ANY CONTRACT, STRICT LIABILITY, NEGLIGENCE OR OTHER LEGAL OR EQUITABLE THEORY, FOR ANY INCIDENTAL OR CONSEQUENTIAL DAMAGES OR LOST PROFITS IN CONNECTION WITH THE SUBJECT MATTER OF THIS AGREEMENT.

9.     Confidentiality.  The parties hereto acknowledge that the terms of this Agreement are confidential, except that each party may disclose that Licensee has a license under the Licensed divine Patents.  Neither the parties nor their counsel may convey to third parties the terms of this Agreement, except that the terms of this Agreement may be disclosed to tax preparers and insurers as reasonably necessary, or as may be ordered by law.

10.     Warranty of Authority.  Each person signing this Agreement on behalf of a party warrants that he or she has authority to bind said entity.  divine further warrants and represents that its rights include the right to sue for alleged past infringement and that it has not entered into and shall not enter into any agreement which would interfere with or otherwise encumber any of the releases, covenants not to sue, or licenses granted by this Agreement.

11.     Amendment to Agreement.  This Agreement may not be altered, amended, modified or otherwise changed in any respect or manner, except by a writing executed by an authorized representative of each party.

474332/D/1  XF6801_                                2

A13122

CONFIDENTIAL-OUTSIDE ATTORNEYS EYES ONLY                              SVN2-0040649

12.    Nontransferability of Agreement to Third Parties.  This Agreement may not be assigned or transferred by Licensee to a third party without the prior written consent of divine, except that the Agreement can be transferred to a party acquiring the entire business of Licensee to which the Perfumania.com website relates but it is understood that the licenses granted hereunder are limited to the Perfumania.com website and cannot be expanded by any such transfer.

13.    Notices.  All notices, requests, demands, directions and other communications provided for hereunder shall be in writing and mailed or faxed or delivered to the applicable party at the address of such party set forth below (or such other address duly provided in writing to the other side). Each such notice, request, demand, direction or other communication shall be effective upon delivery.

If to divine:

Richard Nawracaj, Esq.
Assistant General Counsel
divine, Inc.
1301 North Elston Avenue
Chicago, Illinois 60622
Fax: 312-394-6601

With a copy to:

Robert M. Barrett, Esq.
Bell, Boyd & Lloyd LLC
Three First National Plaza
70 West Madison Street
Suite 3300
Chicago, Illinois 60602-4207

If to Licensee:

Mitchell Morgan
Perfumania.com
5555 Anglers Ave.
Suite 16
Fort Lauderdale, Florida 33312

14.    Fees and Costs.  Each party shall bear its own costs and expenses, including attorneys' fees.

15.    Governing Law.  This Agreement shall be interpreted, enforced and governed according to the laws of the State of Illinois, without regard to conflict of law provisions.

474332/LV1  XP6S01_                    3

A13123

CONFIDENTIAL-OUTSIDE ATTORNEYS EYES ONLY

16.    Venue.  The United States District Court for the Northern District of Illinois, or if that Court does not have subject matter jurisdiction then the state courts of Illinois, shall be the exclusive jurisdiction to enforce the terms of this Agreement.  The parties hereto agree and consent to jurisdiction in these courts solely for purposes of enforcing the terms of this Agreement.

17.    Counterparts.  This Agreement may be signed in one or more counterparts, each of which shall be deemed an original and all of which shall constitute one and the same Instrument.  Copies of signed counterparts transmitted by telecopy, facsimile, or other electronic transmission shall be considered original executed counterparts for purposes of this Paragraph, provided receipt of said copies of counterparts is confirmed.  This Agreement shall not be effective unless and until signed by all parties hereto.

18.    Severability.  If any provision of this Agreement shall be held void or unenforceable by a court, such provision shall be severable and shall not affect the validity or enforceability of any other provisions of this Agreement.

19.    No Waivers.  The waiver by either party of a breach of any provision of this Agreement or the failure by any of the parties to exercise any right hereunder shall not operate or be construed as a waiver of any subsequent breach of that right or a waiver of any other right. It is further expressly agreed that the waiver of any right of either party hereunder or under the law shall be effective only if in writing and executed by an authorized officer of the affected party.

20.    Headings.  All section headings are stated for convenience only and shall not be considered in construing this Agreement.

21.    Preparation of Agreement; Construction.  This Agreement shall be construed without regard to the party or parties responsible for the preparation of the same and shall be deemed as prepared jointly by the parties hereto.  Any ambiguity or uncertainty existing herein shall not be interpreted or construed against any party hereto on the basis that such party may have drafted such provision.

22.    Term of Agreement.  This Agreement shall be in effect until the term granted under each of the Licensed divine Patents has expired.

23.    Entire Agreement.  This Agreement (together with the exhibit hereto) represents and contains the entire agreement and understanding between the parties with respect to the subject matter of this Agreement, and supersedes any and all prior or contemporaneous negotiations, agreements and understandings, whether written or oral, between the parties with respect to the subject matter of this Agreement.

474332/D/1  XF6501_                              4

A13124

CONFIDENTIAL-OUTSIDE ATTORNEYS EYES ONLY                                        SVN2-0040651

Sent By: TTA;                          854 887 5540;        Oct-4-02  2:01PM;        Page 6/6

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date set forth above.

DIVINE TECHNOLOGY VENTURES

By: _____
Name: _JUDE M. SULLIVAN_____
Title: _SVP_____
Date: _10/4/02_____

PERFUMANIA.COM

By: _____
Name: _Mitchell Kargon_____
Title: _CFO_____
Date: _10/4/02_____

474332/D/1  XM6S01_                        5

CONFIDENTIAL-OUTSIDE ATTORNEYS EYES ONLY                    SVN2-0040652

## LICENSE AGREEMENT

This License Agreement ("Agreement") is effective this _4_ day of _October_ 2002 and is by and between divine technology ventures, an Illinois general partnership having a place of business at 1301 North Elston Avenue, Chicago, Illinois ("divine") and Game Link, Inc., a California corporation having a principal place of business at 537 Stevenson St., Suite 100, San Francisco, California 94103 ("Licensee").

## RECITALS

WHEREAS, divine is the owner of patents set forth more fully below; and

WHEREAS, Licensee desires to license the patents.

NOW, THEREFORE, in consideration of the above recitals, the mutual covenants set forth below, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.    Definitions.    As used in this Agreement, the following term shall have the following meaning:

        a.    "Licensed divine Patents" means U.S. Patent Nos. 5,715,314, 5,708,780 and 5,909,492 and any patent issuing from a continuation, continuation-in-part, divisional, reissue or foreign counterpart application of any of the foregoing, to the extent such patent claims in whole or in part the benefit of the filing date of any one of the patents.

2.    License.    During the term of this Agreement, and subject to the payment specified in Paragraph 7 below, divine hereby grants to Licensee a paid-up, non-transferable except as provided at Paragraph 12, non-exclusive license, with no right to sub-license, under the Licensed divine Patents to use the systems and apparatuses or to practice methods embodying any of the inventions claimed in the Licensed divine Patents throughout the world.

3.    Validity of the Licensed divine Patents.    Licensee acknowledges the validity under the law of the claims of the Licensed divine Patents.

4.    Covenant Not to Sue Licensee.    Subject to Licensee abiding by the terms of this Agreement and for the duration of this Agreement, divine covenants not to sue Licensee for infringement of any divine patents including the Licensed divine Patents based on Licensee's web site.

5.    Covenant Not to Sue divine.    Licensee covenants not to sue divine, its parent, subsidiaries, affiliates or successors for any claims or counterclaims that were or could have been brought against any of them as of the date of this Agreement in any lawsuit involving the divine Patents.

CONFIDENTIAL-OUTSIDE ATTORNEYS EYES ONLY

6.    <u>Mutual Release</u>. Each party hereto releases, acquits, and forever discharges the other party and its respective parent companies, subsidiaries, affiliates, officers, directors, employees, agents, shareholders, advisors, representatives, assigns, predecessors-in-interest and successors-in-interest from all claims, causes of action, suits, debts, liens, obligations, liabilities, demands, losses, costs and expenses (including attorneys' fees and costs) of any kind, character or nature whatsoever, known or unknown, fixed or contingent, (collectively "Claim") that the releasing party has or may have or claim to have now or that may hereafter arise out of, relate to, or be connected with the divine Patents. The releases set forth in this Section shall be effective upon execution of this Agreement by the parties. There is no action pending in any court. Neither party admits any liability whatsoever to the other and that his release and License is being executed solely to avoid the expense of litigation. The parties further agree that this general release extends to claims which divine does not know or suspect to exist in its favor at the time of executing this release, which if known by it must have materially affected its settlement with Game Link, Inc. The parties understand and acknowledge the significance and consequences of this specific waiver of rights not known or suspected to exist in their favor at the time of executing this release and hereby assume full responsibility for any damage, loss, or liability which any of them may hereafter incur by reason of such waiver.

7.    <u>Payment by Licensee</u>. In consideration of the licenses, releases, waivers and covenants against suit contained in this Agreement, Licensee shall pay to divine eight and one-third percent (8.33%) royalty of the net sales made by Licensee in 2001 over the Internet, calculated to be $5,000. The License fee is payable $2,000 in the first payment and then $1,000 per month on the 15th day of the month in three (3) equal monthly installments The first such payment shall be made by October 15, 2002.

8.    <u>Limitations</u>. EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, NONE OF THE PARTIES (i) MAKES ANY WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED, INCLUDING WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, AND (ii) WILL BE LIABLE TO ANOTHER PARTY UNDER ANY CONTRACT, STRICT LIABILITY, NEGLIGENCE OR OTHER LEGAL OR EQUITABLE THEORY, FOR ANY INCIDENTAL OR CONSEQUENTIAL DAMAGES OR LOST PROFITS IN CONNECTION WITH THE SUBJECT MATTER OF THIS AGREEMENT.

9.    <u>Confidentiality.</u> The parties hereto acknowledge that the terms of this Agreement are confidential, except that each party may disclose that Licensee has a license under the divine Patents. Neither the parties nor their counsel may convey to third parties the terms of this Agreement, and Divine may not disclose the name of Licensee except that the terms of this Agreement may be disclosed to tax preparers and insurers as reasonably necessary, or as may be ordered by law.

A13127

CONFIDENTIAL-OUTSIDE ATTORNEYS EYES ONLY

10.  <u>Warranty of Authority.</u>  Each person signing this Agreement on behalf of a party warrants that he or she has authority to bind said entity.  divine further warrants and represents that its rights include the right to sue for alleged past infringement and that it has not entered into and shall not enter into any agreement which would interfere with or otherwise encumber any of the releases, covenants not to sue, or licenses granted by this Agreement.

11.  <u>Amendment to Agreement.</u>  This Agreement may not be altered, amended, modified or otherwise changed in any respect or manner, except by a writing executed by an authorized representative of each party.

12.  <u>Nontransferability of Agreement to Third Parties.</u>  This Agreement may not be assigned or transferred by Licensee to a third party except as follows: This License may be assigned or transferred to Licensee's successor company or to an assignee of more than 50% of the equity ownership in the stock of Licensee, if such an assignee or successor company is in the same industry and has gross income equal to or less than that of Licensee. Any other assignment or transfer needs prior written consent of divine, and such consent is not to be unreasonably withheld.

13.  <u>Notices.</u>  All notices, requests, demands, directions and other communications provided for hereunder shall be in writing and mailed or faxed or delivered to the applicable party at the address of such party set forth below (or such other address duly provided in writing to the other side). Each such notice, request, demand, direction or other communication shall be effective upon delivery.

If to divine:

Richard Nawracaj, Esq.
Assistant General Counsel
divine, Inc.
1301 North Elston Avenue
Chicago, Illinois 60622
Fax: 312-394-6601

If to Licensee:

Game Link, Inc.
537 Stevenson St.
Suite 100
San Francisco, California 94103

With fax and mailed copy to:

Philip Green Esq.
Law Offices of Green & Green
1000 Fourth Street, Suite 595  San Rafael, CA 94901
Fax: (415) 457-8757

CONFIDENTIAL-OUTSIDE ATTORNEYS EYES ONLY

SVN2-0040603

14.     Fees and Costs.   Each party shall bear its own costs and expenses, including attorneys' fees.

15.     Governing Law.   This Agreement shall be interpreted, enforced and governed according to the laws of the State of Illinois, without regard to conflict of law provisions.

16.     Venue.   The United States District Court for the Northern District of Illinois, or if that Court does not have subject matter jurisdiction then the state courts of Illinois, shall be the exclusive jurisdiction to enforce the terms of this Agreement.   The parties hereto agree and consent to jurisdiction in these courts solely for purposes of enforcing the terms of this Agreement.

17.     Counterparts.   This Agreement may be signed in one or more counterparts, each of which shall be deemed an original and all of which shall constitute one and the same instrument.   Copies of signed counterparts transmitted by telecopy, facsimile, or other electronic transmission shall be considered original executed counterparts for purposes of this Paragraph, provided receipt of said copies of counterparts is confirmed.   This Agreement shall not be effective unless and until signed by all parties hereto.

18.     Severability.   If any provision of this Agreement shall be held void or unenforceable by a court, such provision shall be severable and shall not affect the validity or enforceability of any other provisions of this Agreement.

19.     No Waivers.   The waiver by either party of a breach of any provision of this Agreement or the failure by any of the parties to exercise any right hereunder shall not operate or be construed as a waiver of any subsequent breach of that right or a waiver of any other right. It is further expressly agreed that the waiver of any right of either party hereunder or under the law shall be effective only if in writing and executed by an authorized officer of the affected party.

20.     Headings.   All section headings are stated for convenience only and shall not be considered in construing this Agreement.

21.     Preparation of Agreement; Construction.   This Agreement shall be construed without regard to the party or parties responsible for the preparation of the same and shall be deemed as prepared jointly by the parties hereto. Any ambiguity or uncertainty existing herein shall not be interpreted or construed against any party hereto on the basis that such party may have drafted such provision.

22.     Term of Agreement.   This Agreement shall be in effect until the term granted under each of the Licensed divine Patents has expired.

23.     Entire Agreement.   This Agreement (together with the exhibit hereto) represents and contains the entire agreement and understanding between the parties with respect to the subject matter of this Agreement, and supersedes any and all prior or contemporaneous negotiations, agreements and understandings, whether written or oral, between the parties with respect to the subject matter of this Agreement.

CONFIDENTIAL-OUTSIDE ATTORNEYS EYES ONLY                    SVN2-0040604

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date set forth above.

DIVINE TECHNOLOGY VENTURES

By: _____
Name: _____
Title: _____
Date: _____

GAME LINK, INC.

By: _____
Name: _Ivan Bunimovitz_
Title: _President_
Date: _1/4/02_

CONFIDENTIAL-OUTSIDE ATTORNEYS EYES ONLY

SVN2-0040605

## LICENSE AGREEMENT

This License Agreement ("Agreement") is effective this 9th day of October, 2002 ("Effective Date) and is by and between divine technology ventures, an Illinois general partnership having a place of business at 1301 North Elston Avenue, Chicago, Illinois ("divine") and Bikecology, Inc., a California corporation ("Bikecology") having a principal place of business at 501 Broadway, Santa Monica, California 90401 (Bikecology, together with its subsidiaries, Supergo Corp. and MOAG LLC, are collectively referred to herein as "Licensee").

### RECITALS

WHEREAS, divine is the owner of patents set forth more fully below;

WHEREAS, Licensee operates the supergo.com website; and

WHEREAS, Licensee desires to license the patents.

NOW, THEREFORE, in consideration of the above recitals, the mutual covenants set forth below, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.    Definitions.    As used in this Agreement, the following term shall have the following meaning:

    a.    "Licensed divine Patents" means U.S. Patent Nos. 5,715,314 and 5,909,492 and any patent issuing from a continuation, continuation-in-part, divisional, reissue or foreign counterpart application of any of the foregoing, to the extent such patent claims in whole or in part the benefit of the filing date of any one of the patents.

2.    License.    During the term of this Agreement, and subject to the payment specified in Paragraph 7 below, divine hereby grants to Licensee a paid-up, non-transferable, non-exclusive license, with no right to sub-license, under the Licensed divine Patents to use the systems and apparatuses or to practice methods embodying any of the inventions claimed in the Licensed divine Patents throughout the world.

3.    Validity of the Licensed divine Patents.    Licensee acknowledges the validity of the claims of the Licensed divine Patents.

4.    Covenant Not to Sue Licensee.    Subject to Licensee abiding by the terms of this Agreement and for the duration of this Agreement, divine covenants not to sue Licensee, its officers, employees, and customers for infringement of any divine patents including the Licensed divine Patents based on the supergo.com website if Licensee does not substantially modify the functionality of the supergo.com website.

5.    Covenant Not to Sue divine.    Licensee covenants not to sue divine, its parent, subsidiaries, affiliates or successors for any claims or counterclaims that were or could have been

CONFIDENTIAL-OUTSIDE ATTORNEYS EYES ONLY

SVN2-0040559

**Defendant's Exhibit
Exhibit No. D-230
Case No. 6:07-cv-00511**

brought against any of them as of the date of this Agreement in any lawsuit involving the divine Patents.

6.    <u>Mutual Release.</u>  Each party hereto releases, acquits, and forever discharges the other party and its respective parent companies, subsidiaries, affiliates, officers, directors, employees, agents, shareholders, advisors, representatives, assigns, predecessors-in-interest and successors-in-interest from all claims, causes of action, suits, debts, liens, obligations, liabilities, demands, losses, costs and expenses (including attorneys' fees and costs) of any kind, character or nature whatsoever, known or unknown, fixed or contingent, (collectively "Claim") that the releasing party has or may have or claim to have now or that may hereafter arise out of, relate to, or be connected with the Licensed divine Patents.  The releases set forth in this Section shall be effective upon execution of this Agreement by the parties.

7.    <u>Payment by Licensee.</u>  In consideration of the licenses, releases, waivers and covenants against suit contained in this Agreement, Licensee shall pay to divine a one-time payment of four thousand dollars ($4000.00), which represents two percent (2%) of projected gross profit by Licensee over the Internet for the fiscal year beginning on July 1, 2002 and ending on June 30, 2003 (represented to be two hundred thousand dollars ($200,000.00) by Licensee).  In addition, Licensee shall pay a royalty of one-fifth of one percent ( 0.2%) of the gross sales in any fiscal year beginning with the fiscal year 2003 (where the fiscal year begins on July 1st and ends on June 30th of the following year) in which Licensee utilizes the Licensed divine Patents in its operation of the supergo.com website.  The one-time payment shall be made within five (5) business days after the Effective Date of this Agreement and the royalty payment shall be made no later than ninety (90) days after the end of each applicable fiscal year.

8.    <u>Limitations.</u>  EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, NONE OF THE PARTIES (i) MAKES ANY WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED, INCLUDING WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, AND (ii) WILL BE LIABLE TO ANOTHER PARTY UNDER ANY CONTRACT, STRICT LIABILITY, NEGLIGENCE OR OTHER LEGAL OR EQUITABLE THEORY, FOR ANY INCIDENTAL OR CONSEQUENTIAL DAMAGES OR LOST PROFITS IN CONNECTION WITH THE SUBJECT MATTER OF THIS AGREEMENT.

9.    <u>Confidentiality.</u>  The parties hereto acknowledge that the terms of this Agreement are confidential, except that each party may disclose that Licensee has a license under the Licensed divine Patents.  Neither the parties nor their counsel may convey to third parties the terms of this Agreement, except that the terms of this Agreement may be disclosed to tax preparers and insurers as reasonably necessary, or as may be ordered by law.

2

CONFIDENTIAL-OUTSIDE ATTORNEYS EYES ONLY

SVN2-0040560

10.    Warranty of Authority.  Each person signing this Agreement on behalf of a party warrants that he or she has authority to bind said entity.  divine further warrants and represents that its rights include the right to sue for alleged past infringement and that it has not entered into and shall not enter into any agreement which would interfere with or otherwise encumber any of the releases, covenants not to sue, or licenses granted by this Agreement.

11.    Amendment to Agreement.   This Agreement may not be altered, amended, modified or otherwise changed in any respect or manner, except by a writing executed by an authorized representative of each party.

12.    Nontransferability of Agreement to Third Parties.  This Agreement may not be assigned or transferred by Licensee to a third party without the prior written consent of divine, except that the Agreement can be transferred to a party acquiring the entire business of Licensee to which the supergo.com website relates but it is understood that the licenses granted hereunder are limited to the supergo.com website and cannot be expanded by any such transfer.

13.    Notices.  All notices, requests, demands, directions and other communications provided for hereunder shall be in writing and mailed or faxed or delivered to the applicable party at the address of such party set forth below (or such other address duly provided in writing to the other side).  Each such notice, request, demand, direction or other communication shall be effective upon delivery.

If to divine:

> Richard Nawracaj, Esq.
> Assistant General Counsel
> divine, Inc.
> 1301 North Elston Avenue
> Chicago, Illinois 60622
> Fax: 312-394-6601

With a copy to:

> Robert M. Barrett, Esq.
> Bell, Boyd & Lloyd LLC
> Three First National Plaza
> 70 West Madison Street
> Suite 3300
> Chicago, Illinois  60602-4207

If to Licensee:

> Supergo Inc.
> 501 Broadway
> Santa Monica, California  90401

With a copy to:

3

A13133

CONFIDENTIAL-OUTSIDE ATTORNEYS EYES ONLY

SVN2-0040561

10/21/2002 10:27 FAX 1 773 394 8601        DIVINE, INC.                    ☑015

Mel Ziontz, Esq.
Bryan Cave LLP
120 Broadway, Suite 300
Santa Monica, California 90401

14.    Fees and Costs.  Each party shall bear its own costs and expenses, including attorneys' fees.

15.    Governing Law.  This Agreement shall be interpreted, enforced and governed according to the laws of the State of Illinois, without regard to conflict of law provisions.

16.    Venue.  The United States District Court for the Northern District of Illinois, or if that Court does not have subject matter jurisdiction then the state courts of Illinois, shall be the exclusive jurisdiction for Licensor to enforce the terms of this Agreement.  The parties hereto agree and consent to jurisdiction in these courts solely for purposes of actions by Licensor to enforce the terms of this Agreement. Any action by Licensee to enforce this Agreement may be brought in any competent court in any suitable jurisdiction, within or outside of California.

17.    Counterparts.  This Agreement may be signed in one or more counterparts, each of which shall be deemed an original and all of which shall constitute one and the same instrument.  Copies of signed counterparts transmitted by telecopy, facsimile, or other electronic transmission shall be considered original executed counterparts for purposes of this Paragraph, provided receipt of said copies of counterparts is confirmed.  This Agreement shall not be effective unless and until signed by all parties hereto.

18.    Severability.  If any provision of this Agreement shall be held void or unenforceable by a court, such provision shall be severable and shall not affect the validity or enforceability of any other provisions of this Agreement.

19.    No Waivers.  The waiver by either party of a breach of any provision of this Agreement or the failure by any of the parties to exercise any right hereunder shall not operate or be construed as a waiver of any subsequent breach of that right or a waiver of any other right. It is further expressly agreed that the waiver of any right of either party hereunder or under the law shall be effective only if in writing and executed by an authorized officer of the affected party.

20.    Headings.  All section headings are stated for convenience only and shall not be considered in construing this Agreement.

21.    Preparation of Agreement; Construction.  This Agreement shall be construed without regard to the party or parties responsible for the preparation of the same and shall be deemed as prepared jointly by the parties hereto. Any ambiguity or uncertainty existing herein shall not be interpreted or construed against any party hereto on the basis that such party may have drafted such provision.

22.    Term of Agreement.  This Agreement shall be in effect until the term granted under each of the Licensed divine Patents has expired.

4

A13134

CONFIDENTIAL-OUTSIDE ATTORNEYS EYES ONLY                    SVN2-0040562

23.  <u>Entire Agreement.</u>  This Agreement (together with the exhibit hereto) represents and contains the entire agreement and understanding between the parties with respect to the subject matter of this Agreement, and supersedes any and all prior or contemporaneous negotiations, agreements and understandings, whether written or oral, between the parties with respect to the subject matter of this Agreement.

24.  <u>Enforcement of Agreement.</u>  If it is necessary for either party to bring a lawsuit under this Agreement to enforce the Agreement or any provision thereof, the prevailing party to any such litigation shall be entitled to recover its reasonable attorneys' fees from the other party.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date set forth above.

DIVINE TECHNOLOGY VENTURES

By:
Name:  JUDE M. SULLIVAN
Title:  SVP & GENERAL COUNSEL
Date:  10/17/02

BIKECOLOGY, INC.

By:
Name: Alan Goldsmith
Title:  President
Date:  Oct 9, 2002

5

A13135

SVN2-0040563

## LICENSE AGREEMENT

This License Agreement ("Agreement") is effective this 15th day of October, 2002 ("Effective Date) and is by and between divine technology ventures, an Illinois general partnership having a place of business at 1301 North Elston Avenue, Chicago, Illinois ("divine") and Cartronix, Inc. (including Cartronix, Inc.'s subsidiaries, affiliates, related entities and dba's), an Indiana corporation, having a principal place of business at 3000 N. Calumet Ave., Valparaiso, Indiana 46383 ("Licensee").

### RECITALS

WHEREAS, divine is the owner of patents set forth more fully below;

WHEREAS, Licensee currently operates a website entitled "AVSmarts.com"; and

WHEREAS, Licensee desires to license the patents.

NOW, THEREFORE, in consideration of the above recitals, the mutual covenants set forth below, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.    Definitions.  As used in this Agreement, the following term shall have the following meaning:

    a.    "Licensed divine Patents" means U.S. Patent Nos. 5,715,314 and 5,909,492 and any patent issuing from a continuation, continuation-in-part, divisional, reissue or foreign counterpart application of any of the foregoing, to the extent such patent claims in whole or in part the benefit of the filing date of any one of the patents.

    b.    "Websites" of Licensee include all of the domain names owned by Cartronix, Inc., including AVSmarts.com.

2.    License. During the term of this Agreement, and subject to the payment specified in Paragraph 7 below, divine hereby grants to Licensee and Licensee's related entities, subsidiaries, affiliates, and dba's, a paid-up, non-transferable, non-exclusive license, with no right to sub-license, under the Licensed divine Patents to use the systems and apparatuses or to practice methods embodying any of the inventions claimed in the Licensed divine Patents throughout the world.

3.    Validity of the Licensed divine Patents.  Licensee acknowledges the validity of the claims of the Licensed divine Patents.

4.    Covenant Not to Sue Licensee. Subject to Licensee abiding by the terms of this Agreement and for the duration of this Agreement, divine covenants not to sue Licensee, its officers, employees, and customers, subsidiaries, affiliates, related entities or dba's, for infringement of any divine patents including the Licensed divine Patents based on the websites

473821/D/1 XXMT01_

CONFIDENTIAL-OUTSIDE ATTORNEYS EYES ONLY

SVN2-0040569

**Defendant's Exhibit
Exhibit No. D-231
Case No. 6:07-cv-00511**

BELL BOYD & LOYD    Fax:3128278000    Oct.21 2002  11:49    P.04

of Licensee, including the AVSmarts.com website, if Licensee does not substantially modify the functionality of its websites, including the AVSmarts.com website.

5.    _Covenant Not to Sue divine._    Licensee and Licensee's subsidiaries, related entitles, affiliates or dba's covenant not to sue divine, its parent, subsidiaries, affiliates or successors for any claims or counterclaims that were or could have been brought against any of them as of the date of this Agreement in any lawsuit involving the divine Patents.

A13137

CONFIDENTIAL-OUTSIDE ATTORNEYS EYES ONLY

SVN2-0040570

6.    Mutual Release.  Each party hereto releases, acquits, and forever discharges the other party and its respective parent companies, subsidiaries, affiliates, officers, directors, employees, agents, shareholders, advisors, representatives, assigns, predecessors-in-interest and successors-in-interest from all claims, causes of action, suits, debts, liens, obligations, liabilities, demands, losses, costs and expenses (including attorneys' fees and costs) of any kind, character or nature whatsoever, known or unknown, fixed or contingent, (collectively "Claim") that the releasing party has or may have or claim to have now or that may hereafter arise out of, relate to, or be connected with the Licensed divine Patents.  The releases set forth in this Section shall be effective upon execution of this Agreement by the parties.

7.    Payment by Licensee.  In consideration of the licenses, releases, waivers and covenants against suit contained in this Agreement, Licensee shall pay to divine a one-time payment equal to one percent (1%) of gross sales of product over the Internet in 2001 (represented to be $396,000.00 by Licensee).  Such payment shall be made as follows: within five (5) business days after the Effective Date of this Agreement, $2,000.00; and on or before December 1, 2002, the remaining $1,960.00 shall be paid.

8.    Limitations.  EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, NONE OF THE PARTIES (i) MAKES ANY WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED, INCLUDING WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, AND (ii) WILL BE LIABLE TO ANOTHER PARTY UNDER ANY CONTRACT, STRICT LIABILITY, NEGLIGENCE OR OTHER LEGAL OR EQUITABLE THEORY, FOR ANY INCIDENTAL OR CONSEQUENTIAL DAMAGES OR LOST PROFITS IN CONNECTION WITH THE SUBJECT MATTER OF THIS AGREEMENT.

9.    Confidentiality.  The parties hereto acknowledge that the terms of this Agreement are confidential, except that each party may disclose that Licensee has a license under the Licensed divine Patents.  Neither the parties nor their counsel may convey to third parties the terms of this Agreement, except that the terms of this Agreement may be disclosed to tax preparers and insurers as reasonably necessary, or as may be ordered by law.

10.    Warranty of Authority.  Each person signing this Agreement on behalf of a party warrants that he or she has authority to bind said entity.  divine further warrants and represents that its rights include the right to sue for alleged past infringement and that it has not entered into and shall not enter into any agreement which would interfere with or otherwise encumber any of the releases, covenants not to sue, or licenses granted by this Agreement.

473821/D/1  XXXMT01_                    3

A13138

CONFIDENTIAL-OUTSIDE ATTORNEYS EYES ONLY

SVN2-0040571

11.    Amendment to Agreement.    This Agreement may not be altered, amended, modified or otherwise changed in any respect or manner, except by a writing executed by an authorized representative of each party.

12.    Nontransferability of Agreement to Third Parties.    This Agreement may not be assigned or transferred by Licensee to a third party without the prior written consent of divine, except that the Agreement can be transferred to a party acquiring the entire business of Licensee to which the AVSmarts.com website relates but it is understood that the licenses granted hereunder are limited to the Licensee's websites, including the AVSmarts.com website, and cannot be expanded by any such transfer.

13.    Notices.    All notices, requests, demands, directions and other communications provided for hereunder shall be in writing and mailed or faxed or delivered to the applicable party at the address of such party set forth below (or such other address duly provided in writing to the other side). Each such notice, request, demand, direction or other communication shall be effective upon delivery.

> If to divine:
>
> > Richard Nawracaj, Esq.
> > Assistant General Counsel
> > divine, Inc.
> > 1301 North Elston Avenue
> > Chicago, Illinois 60622
> > Fax: 312-394-6601
>
> With a copy to:
>
> > Robert M. Barrett, Esq.
> > Bell, Boyd & Lloyd LLC
> > Three First National Plaza
> > 70 West Madison Street
> > Suite 3300
> > Chicago, Illinois 60602-4207
>
> If to Licensee:
>
> > Cartronix
> > c/o George Carter
> > 3000 N. Calumet Ave.
> > Valparaiso, Indiana 46383

14.    Fees and Costs.    Each party shall bear its own costs and expenses, including attorneys' fees.

473821/D/1 XXMT01_                                    4

A13139

CONFIDENTIAL-OUTSIDE ATTORNEYS EYES ONLY

SVN2-0040572

15.   Governing Law.  This Agreement shall be interpreted, enforced and governed according to the laws of the State of Illinois, without regard to conflict of law provisions.

16.   Venue.  The United States District Court for the Northern District of Illinois, or if that Court does not have subject matter jurisdiction then the state courts of Illinois, shall be the exclusive jurisdiction to enforce the terms of this Agreement.  The parties hereto agree and consent to jurisdiction in these courts solely for purposes of enforcing the terms of this Agreement.

17.   Counterparts.  This Agreement may be signed in one or more counterparts, each of which shall be deemed an original and all of which shall constitute one and the same instrument.  Copies of signed counterparts transmitted by telecopy, facsimile, or other electronic transmission shall be considered original executed counterparts for purposes of this Paragraph, provided receipt of said copies of counterparts is confirmed.  This Agreement shall not be effective unless and until signed by all parties hereto.

18.   Severability.  If any provision of this Agreement shall be held void or unenforceable by a court, such provision shall be severable and shall not affect the validity or enforceability of any other provisions of this Agreement.

19.   No Waivers.  The waiver by either party of a breach of any provision of this Agreement or the failure by any of the parties to exercise any right hereunder shall not operate or be construed as a waiver of any subsequent breach of that right or a waiver of any other right. It is further expressly agreed that the waiver of any right of either party hereunder or under the law shall be effective only if in writing and executed by an authorized officer of the affected party.

20.   Headings.  All section headings are stated for convenience only and shall not be considered in construing this Agreement.

21.   Preparation of Agreement; Construction.  This Agreement shall be construed without regard to the party or parties responsible for the preparation of the same and shall be deemed as prepared jointly by the parties hereto. Any ambiguity or uncertainty existing herein shall not be interpreted or construed against any party hereto on the basis that such party may have drafted such provision.

22.   Term of Agreement.  This Agreement shall be in effect until the term granted under each of the Licensed divine Patents has expired.

23.   Entire Agreement.  This Agreement (together with the exhibit hereto) represents and contains the entire agreement and understanding between the parties with respect to the subject matter of this Agreement, and supersedes any and all prior or contemporaneous negotiations, agreements and understandings, whether written or oral, between the parties with respect to the subject matter of this Agreement.

473821/D/1  XXMT01_                    5

A13140

CONFIDENTIAL-OUTSIDE ATTORNEYS EYES ONLY                    SVN2-0040573

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date set forth above.

DIVINE TECHNOLOGY VENTURES

By: _Jude M. Sullivan_
Name: JUDE M. SULLIVAN
Title: SVP & GENERAL COUNSEL
Date: 10/21/02

CARTRONIX, INC.

By: _George P. Carter_
Name: GEORGE P. CARTER
Title: President
Date: 10/15/02

473821/D/1  XXXMT01_                    6

CONFIDENTIAL-OUTSIDE ATTORNEYS EYES ONLY

SVN2-0040574

## LICENSE AGREEMENT

This License Agreement ("Agreement") is effective this 17th day of October, 2002 ("Effective Date) and is by and between divine technology ventures, an Illinois general partnership having a place of business at 1301 North Elston Avenue, Chicago, Illinois ("divine") and L.H. Internet, a California corporation having a principal place of business at 1230 N. Sweetzer Ave. #214, West Hollywood, California 90069 ("Licensee").

### RECITALS

WHEREAS, divine is the owner of patents set forth more fully below;

WHEREAS, Licensee operates the adultbiggest.com website; and

WHEREAS, Licensee desires to license the patents.

NOW, THEREFORE, in consideration of the above recitals, the mutual covenants set forth below, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.  Definitions.  As used in this Agreement, the following term shall have the following meaning:

    a.  "Licensed divine Patents" means U.S. Patent Nos. 5,715,314, 5,708,780 and 5,909,492 and any patent issuing from a continuation, continuation-in-part, divisional, reissue or foreign counterpart application of any of the foregoing, to the extent such patent claims in whole or in part the benefit of the filing date of any one of the patents.

2.  License. During the term of this Agreement, and subject to the payment specified in Paragraph 7 below, divine hereby grants to Licensee a paid-up, non-transferable, non-exclusive license, with no right to sub-license, under the Licensed divine Patents to use the systems and apparatuses or to practice methods embodying any of the inventions claimed in the Licensed divine Patents throughout the world.

3.  Validity of the Licensed divine Patents.  Licensee acknowledges the validity of the claims of the Licensed divine Patents.

4.  Covenant Not to Sue Licensee.  Subject to Licensee abiding by the terms of this Agreement and for the duration of this Agreement, divine covenants not to sue Licensee, its officers, employees, and customers for infringement of any divine patents including the Licensed divine Patents based on the adultbiggest.com website if Licensee does not substantially modify the functionality of the adultbiggest.com website.

5.  Covenant Not to Sue divine.  Licensee covenants not to sue divine, its parent, subsidiaries, affiliates or successors for any claims or counterclaims that were or could have been brought against any of them as of the date of this Agreement in any lawsuit involving the divine Patents.

CONFIDENTIAL-OUTSIDE ATTORNEYS EYES ONLY

SVN2-0040634

6.    Mutual Release.  Each party hereto releases, acquits, and forever discharges the other party and its respective parent companies, subsidiaries, affiliates, officers, directors, employees, agents, shareholders, advisors, representatives, assigns, predecessors-in-interest and successors-in-interest from all claims, causes of action, suits, debts, liens, obligations, liabilities, demands, losses, costs and expenses (including attorneys' fees and costs) of any kind, character or nature whatsoever, known or unknown, fixed or contingent, (collectively "Claim") that the releasing party has or may have or claim to have now or that may hereafter arise out of, relate to, or be connected with the Licensed divine Patents.  The releases set forth in this Section shall be effective upon execution of this Agreement by the parties.

7.    Payment by Licensee.  In consideration of the licenses, releases, waivers and covenants against suit contained in this Agreement, Licensee shall pay to divine a one-time payment of four hundred dollars ($400.00), which represents two percent (2%) of gross sales by Licensee over the Internet in 2001 (represented to be twenty thousand dollars ($20,000.00) by Licensee).  The one-time payment shall be made within five (5) business days after the Effective Date of this Agreement.

8.    Limitations.  EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, NONE OF THE PARTIES (i) MAKES ANY WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED, INCLUDING WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, AND (ii) WILL BE LIABLE TO ANOTHER PARTY UNDER ANY CONTRACT, STRICT LIABILITY, NEGLIGENCE OR OTHER LEGAL OR EQUITABLE THEORY, FOR ANY INCIDENTAL OR CONSEQUENTIAL DAMAGES OR LOST PROFITS IN CONNECTION WITH THE SUBJECT MATTER OF THIS AGREEMENT.

9.    Confidentiality.  The parties hereto acknowledge that the terms of this Agreement are confidential, except that each party may disclose that Licensee has a license under the Licensed divine Patents.  Neither the parties nor their counsel may convey to third parties the terms of this Agreement, except that the terms of this Agreement may be disclosed to tax preparers and insurers as reasonably necessary, or as may be ordered by law.

10.    Warranty of Authority.  Each person signing this Agreement on behalf of a party warrants that he or she has authority to bind said entity.  divine further warrants and represents that its rights include the right to sue for alleged past infringement and that it has not entered into and shall not enter into any agreement which would interfere with or otherwise encumber any of the releases, covenants not to sue, or licenses granted by this Agreement.

2

CONFIDENTIAL-OUTSIDE ATTORNEYS EYES ONLY

SVN2-0040635

11.   Amendment to Agreement.  This Agreement may not be altered, amended, modified or otherwise changed in any respect or manner, except by a writing executed by an authorized representative of each party.

12.   Nontransferability of Agreement to Third Parties.  This Agreement may not be assigned or transferred by Licensee to a third party without the prior written consent of divine, except that the Agreement can be transferred to a party acquiring the entire business of Licensee to which the adultbiggest.com website relates but it is understood that the licenses granted hereunder are limited to the adultbiggest.com website and cannot be expanded by any such transfer.

13.   Notices.  All notices, requests, demands, directions and other communications provided for hereunder shall be in writing and mailed or faxed or delivered to the applicable party at the address of such party set forth below (or such other address duly provided in writing to the other side). Each such notice, request, demand, direction or other communication shall be effective upon delivery.

        If to divine:

                Richard Nawracaj, Esq.
                Assistant General Counsel
                divine, Inc.
                1301 North Elston Avenue
                Chicago, Illinois 60622
                Fax: 312-394-6601

        With a copy to:

                Robert M. Barrett, Esq.
                Bell, Boyd & Lloyd LLC
                Three First National Plaza
                70 West Madison Street
                Suite 3300
                Chicago, Illinois 60602-4207

        If to Licensee:

                L.H. Internet
                1230 N. Sweetzer Ave. #214
                West Hollywood, California 90069

14.   Fees and Costs.  Each party shall bear its own costs and expenses, including attorneys' fees.

15.   Governing Law.  This Agreement shall be interpreted, enforced and governed according to the laws of the State of Illinois, without regard to conflict of law provisions.

3

A13144

CONFIDENTIAL-OUTSIDE ATTORNEYS EYES ONLY

SVN2-0040636

16.    Venue. The United States District Court for the Northern District of Illinois, or if that Court does not have subject matter jurisdiction then the state courts of Illinois, shall be the exclusive jurisdiction to enforce the terms of this Agreement. The parties hereto agree and consent to jurisdiction in these courts solely for purposes of enforcing the terms of this Agreement.

17.    Counterparts. This Agreement may be signed in one or more counterparts, each of which shall be deemed an original and all of which shall constitute one and the same instrument. Copies of signed counterparts transmitted by telecopy, facsimile, or other electronic transmission shall be considered original executed counterparts for purposes of this Paragraph, provided receipt of said copies of counterparts is confirmed. This Agreement shall not be effective unless and until signed by all parties hereto.

18.    Severability. If any provision of this Agreement shall be held void or unenforceable by a court, such provision shall be severable and shall not affect the validity or enforceability of any other provisions of this Agreement.

19.    No Waivers. The waiver by either party of a breach of any provision of this Agreement or the failure by any of the parties to exercise any right hereunder shall not operate or be construed as a waiver of any subsequent breach of that right or a waiver of any other right. It is further expressly agreed that the waiver of any right of either party hereunder or under the law shall be effective only if in writing and executed by an authorized officer of the affected party.

20.    Headings. All section headings are stated for convenience only and shall not be considered in construing this Agreement.

21.    Preparation of Agreement; Construction. This Agreement shall be construed without regard to the party or parties responsible for the preparation of the same and shall be deemed as prepared jointly by the parties hereto. Any ambiguity or uncertainty existing herein shall not be interpreted or construed against any party hereto on the basis that such party may have drafted such provision.

22.    Term of Agreement. This Agreement shall be in effect until the term granted under each of the Licensed divine Patents has expired.

23.    Entire Agreement. This Agreement (together with the exhibit hereto) represents and contains the entire agreement and understanding between the parties with respect to the subject matter of this Agreement, and supersedes any and all prior or contemporaneous negotiations, agreements and understandings, whether written or oral, between the parties with respect to the subject matter of this Agreement.

24.    Enforcement of Agreement. If it is necessary for either party to bring a lawsuit under this Agreement to enforce the Agreement or any provision thereof, the prevailing party to any such litigation shall be entitled to recover its reasonable attorneys' fees from the other party.

4

CONFIDENTIAL-OUTSIDE ATTORNEYS EYES ONLY                    SVN2-0040637

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date set forth above.

DIVINE TECHNOLOGY VENTURES

By: _____

Name: JUDE M. SULLIVAN

Title: SVP & GENERAL COUNSEL

Date: 10/31/02

L.H. INTERNET

By: _____

Name: Lori Dimbert

Title: buyer

Date: 10-20-02

5

CONFIDENTIAL-OUTSIDE ATTORNEYS EYES ONLY

SVN2-0040638

## LICENSE AGREEMENT

This License Agreement ("Agreement") is effective this 24th day of October, 2002 ("Effective Date) and is by and between divine technology ventures, an Illinois general partnership having a place of business at 1301 North Elston Avenue, Chicago, Illinois ("divine") and Katco Industries Inc., a New York corporation having a principal place of business at 10 Bonnie Drive, Northport, New York 11768 ("Licensee").

### RECITALS

WHEREAS, divine is the owner of patents set forth more fully below;

WHEREAS, Licensee operates the cosmeticmall.com website; and

WHEREAS, Licensee desires to license the patents.

NOW, THEREFORE, in consideration of the above recitals, the mutual covenants set forth below, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.  Definitions. As used in this Agreement, the following term shall have the following meaning:

    a.  "Licensed divine Patents" means U.S. Patent Nos. 5,708,780; 5,715,314 and 5,909,492 and any patent issuing from a continuation, continuation-in-part, divisional, reissue or foreign counterpart application of any of the foregoing, to the extent such patent claims in whole or in part the benefit of the filing date of any one of the patents.

2.  License. During the term of this Agreement, and subject to the payment specified in Paragraph 7 below, divine hereby grants to Licensee a paid-up, non-transferable, non-exclusive license, with no right to sub-license, under the Licensed divine Patents to use the systems and apparatuses or to practice methods embodying any of the inventions claimed in the Licensed divine Patents throughout the world.

3.  Validity of the Licensed divine Patents. Licensee acknowledges the validity of the claims of the Licensed divine Patents.

4.  Covenant Not to Sue Licensee. Subject to Licensee abiding by the terms of this Agreement and for the duration of this Agreement, divine covenants not to sue Licensee, its officers, employees, and customers for infringement of any divine patents including the Licensed divine Patents based on the cosmeticmall.com website if Licensee does not substantially modify the functionality of the cosmeticmall.com website.

5.  Covenant Not to Sue divine. Licensee covenants not to sue divine, its parent, subsidiaries, affiliates or successors for any claims or counterclaims that were or could have been brought against any of them as of the date of this Agreement in any lawsuit involving the divine Patents.

CONFIDENTIAL-OUTSIDE ATTORNEYS EYES ONLY

SVN2-0040624

Defendant's Exhibit
Exhibit No. D-233
Case No. 6:07-cv-00511

6.   Mutual Release.  Each party hereto releases, acquits, and forever discharges the other party and its respective parent companies, subsidiaries, affiliates, officers, directors, employees, agents, shareholders, advisors, representatives, assigns, predecessors-in-interest and successors-in-interest from all claims, causes of action, suits, debts, liens, obligations, liabilities, demands, losses, costs and expenses (including attorneys' fees and costs) of any kind, character or nature whatsoever, known or unknown, fixed or contingent, (collectively "Claim") that the releasing party has or may have or claim to have now or that may hereafter arise out of, relate to, or be connected with the Licensed divine Patents.  The releases set forth in this Section shall be effective upon execution of this Agreement by the parties.

7.   Payment by Licensee.  In consideration of the licenses, releases, waivers and covenants against suit contained in this Agreement, Licensee shall pay to divine a one-time payment of one thousand dollars ($1000.00), which Licensee represents is at least ten percent (10%) of gross profit of sales of product over the Internet.  The one-time payment shall be made within five (5) business days after the Effective Date of this Agreement.

8.   Limitations.  EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, NONE OF THE PARTIES (i) MAKES ANY WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED, INCLUDING WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, AND (ii) WILL BE LIABLE TO ANOTHER PARTY UNDER ANY CONTRACT, STRICT LIABILITY, NEGLIGENCE OR OTHER LEGAL OR EQUITABLE THEORY, FOR ANY INCIDENTAL OR CONSEQUENTIAL DAMAGES OR LOST PROFITS IN CONNECTION WITH THE SUBJECT MATTER OF THIS AGREEMENT.

9.   Confidentiality.  The parties hereto acknowledge that the terms of this Agreement are confidential, except that each party may disclose that Licensee has a license under the Licensed divine Patents.  Neither the parties nor their counsel may convey to third parties the terms of this Agreement, except that the terms of this Agreement may be disclosed to tax preparers and insurers as reasonably necessary, or as may be ordered by law.

10.   Warranty of Authority.  Each person signing this Agreement on behalf of a party warrants that he or she has authority to bind said entity.  divine further warrants and represents that its rights include the right to sue for alleged past infringement and that it has not entered into and shall not enter into any agreement which would interfere with or otherwise encumber any of the releases, covenants not to sue, or licenses granted by this Agreement.

11.   Amendment to Agreement.  This Agreement may not be altered, amended, modified or otherwise changed in any respect or manner, except by a writing executed by an authorized representative of each party.

2

CONFIDENTIAL-OUTSIDE ATTORNEYS EYES ONLY

SVN2-0040625

12.     Nontransferability of Agreement to Third Parties.  This Agreement may not be assigned or transferred by Licensee to a third party without the prior written consent of divine, except that the Agreement can be transferred to a party acquiring the entire business of Licensee to which the cosmeticmall.com website relates but it is understood that the licenses granted hereunder are limited to the cosmeticmall.com website and cannot be expanded by any such transfer.

13.     Notices.  All notices, requests, demands, directions and other communications provided for hereunder shall be in writing and mailed or faxed or delivered to the applicable party at the address of such party set forth below (or such other address duly provided in writing to the other side). Each such notice, request, demand, direction or other communication shall be effective upon delivery.

        If to divine:

                Richard Nawracaj, Esq.
                Assistant General Counsel
                divine, Inc.
                1301 North Elston Avenue
                Chicago, Illinois 60622
                Fax: 312-394-6601

        With a copy to:

                Robert M. Barrett, Esq.
                Bell, Boyd & Lloyd LLC
                Three First National Plaza
                70 West Madison Street
                Suite 3300
                Chicago, Illinois 60602-4207

        If to Licensee:

                Katco Industries Inc.
                10 Bonnie Drive
                Northport, New York 11768

14.     Fees and Costs.  Each party shall bear its own costs and expenses, including attorneys' fees.

15.     Governing Law.  This Agreement shall be interpreted, enforced and governed according to the laws of the State of Illinois, without regard to conflict of law provisions.

16.     Venue.  The United States District Court for the Northern District of Illinois, or if that Court does not have subject matter jurisdiction then the state courts of Illinois, shall be the exclusive jurisdiction to enforce the terms of this Agreement.  The parties hereto agree and

3

CONFIDENTIAL-OUTSIDE ATTORNEYS EYES ONLY

SVN2-0040626

consent to jurisdiction in these courts solely for purposes of enforcing the terms of this Agreement.

17.    Counterparts.  This Agreement may be signed in one or more counterparts, each of which shall be deemed an original and all of which shall constitute one and the same instrument.  Copies of signed counterparts transmitted by telecopy, facsimile, or other electronic transmission shall be considered original executed counterparts for purposes of this Paragraph, provided receipt of said copies of counterparts is confirmed.  This Agreement shall not be effective unless and until signed by all parties hereto.

18.    Severability.  If any provision of this Agreement shall be held void or unenforceable by a court, such provision shall be severable and shall not affect the validity or enforceability of any other provisions of this Agreement.

19.    No Waivers.  The waiver by either party of a breach of any provision of this Agreement or the failure by any of the parties to exercise any right hereunder shall not operate or be construed as a waiver of any subsequent breach of that right or a waiver of any other right.  It is further expressly agreed that the waiver of any right of either party hereunder or under the law shall be effective only if in writing and executed by an authorized officer of the affected party.

20.    Headings.  All section headings are stated for convenience only and shall not be considered in construing this Agreement.

21.    Preparation of Agreement; Construction.  This Agreement shall be construed without regard to the party or parties responsible for the preparation of the same and shall be deemed as prepared jointly by the parties hereto.  Any ambiguity or uncertainty existing herein shall not be interpreted or construed against any party hereto on the basis that such party may have drafted such provision.

22.    Term of Agreement.  This Agreement shall be in effect until the term granted under each of the Licensed divine Patents has expired.

23.    Entire Agreement.  This Agreement (together with the exhibit hereto) represents and contains the entire agreement and understanding between the parties with respect to the subject matter of this Agreement, and supersedes any and all prior or contemporaneous negotiations, agreements and understandings, whether written or oral, between the parties with respect to the subject matter of this Agreement.

24.    Enforcement of Agreement.  If it is necessary for either party to bring a lawsuit under this Agreement to enforce the Agreement or any provision thereof, the prevailing party to any such litigation shall be entitled to recover its reasonable attorneys' fees from the other party.

4

CONFIDENTIAL-OUTSIDE ATTORNEYS EYES ONLY

SVN2-0040627

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date set forth above.

DIVINE TECHNOLOGY VENTURES

By: _~Jude M. Sullivan~_
Name: _JUDE M. SULLIVAN_
Title: _SVP_
Date: _11/25/02_

KATCO INDUSTRIES INC.

By: _____
Name: _Sanjay Katu_
Title: _CEO_
Date: _10/31/02_

5

A13151

CONFIDENTIAL-OUTSIDE ATTORNEYS EYES ONLY

SVN2-0040628

Bell, Boyd & Lloyd    11/4/2002 11:06    PAGE 2/6    RightFax

FROM :                    FAX NO. :                Apr. 23 2002 06:29PM P1

# LICENSE AGREEMENT

This License Agreement ("Agreement") is effective this 1st day of November, 2002 ("Effective Date) and is by and between divine technology ventures, an Illinois general partnership having a place of business at 1301 North Elston Avenue, Chicago, Illinois ("divine") and GLOOKS.COM, a California company having a principal place of business at 1543 West Olympic Boulevard Suite 575, Los Angeles, California 90015 ("Licensee").

## RECITALS

WHEREAS, divine is the owner of patents set forth more fully below;

WHEREAS, Licensee operates the GLOOKS.COM website; and

WHEREAS, Licensee desires to license the patents.

NOW, THEREFORE, in consideration of the above recitals, the mutual covenants set forth below, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.    Definitions.    As used in this Agreement, the following term shall have the following meaning:

     a.    "Licensed divine Patents" means U.S. Patent Nos. 5,715,314 and 5,909,492 and any patent issuing from a continuation, continuation-in-part, divisional, reissue or foreign counterpart application of any of the foregoing, to the extent such patent claims in whole or in part the benefit of the filing date of any one of the patents.

2.    License.    During the term of this Agreement, and subject to the payment specified in Paragraph 7 below, divine hereby grants to Licensee a paid-up, non-transferable, non-exclusive license, with no right to sub-license, under the Licensed divine Patents to use the systems and apparatuses or to practice methods embodying any of the inventions claimed in the Licensed divine Patents throughout the world.

3.    Validity of the Licensed divine Patents.    Licensee acknowledges the validity of the claims of the Licensed divine Patents.

4.    Covenant Not to Sue Licensee.    Subject to Licensee abiding by the terms of this Agreement and for the duration of this Agreement, divine covenants not to sue Licensee, its officers, employees, and customers for infringement of any divine patents including the Licensed divine Patents based on the GLOOKS.COM website if Licensee does not substantially modify the functionality of the GLOOKS.COM website.

5.    Covenant Not to Sue divine.    Licensee covenants not to sue divine, its parent, subsidiaries, affiliates or successors for any claims or counterclaims that were or could have been brought against any of them as of the date of this Agreement in any lawsuit involving the divine Patents.

CONFIDENTIAL-OUTSIDE ATTORNEYS EYES ONLY                    SVN2-0040606

**Defendant's Exhibit**
**Exhibit No. D-234**
**Case No. 6:07-cv-00511**

6.    <u>Mutual Release.</u> Each party hereto releases, acquits, and forever discharges the other party and its respective parent companies, subsidiaries, affiliates, officers, directors, employees, agents, shareholders, advisors, representatives, assigns, predecessors-in-interest and successors-in-interest from all claims, causes of action, suits, debts, liens, obligations, liabilities, demands, losses, costs and expenses (including attorneys' fees and costs) of any kind, character or nature whatsoever, known or unknown, fixed or contingent, (collectively "Claim") that the releasing party has or may have or claim to have now or that may hereafter arise out of, relate to, or be connected with the Licensed divine Patents. The releases set forth in this Section shall be effective upon execution of this Agreement by the parties.

7.    <u>Payment by Licensee.</u> In consideration of the licenses, releases, waivers and covenants against suit contained in this Agreement, Licensee shall pay to divine a one-time payment of one thousand dollars ($1000.00), which represents ten percent (10%) of gross sales by Licensee over the Internet in 2001 (represented to be ten thousand dollars ($10,000.00) by Licensee). Such payment shall be made on the following dates: two hundred dollars ($200) within five (5) business days after the Effective Date of this Agreement and two hundred dollars ($200) every thirty (30) days thereafter for four (4) consecutive months.

8.    <u>Limitations.</u> EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, NONE OF THE PARTIES (i) MAKES ANY WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED, INCLUDING WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, AND (ii) WILL BE LIABLE TO ANOTHER PARTY UNDER ANY CONTRACT, STRICT LIABILITY, NEGLIGENCE OR OTHER LEGAL OR EQUITABLE THEORY, FOR ANY INCIDENTAL OR CONSEQUENTIAL DAMAGES OR LOST PROFITS IN CONNECTION WITH THE SUBJECT MATTER OF THIS AGREEMENT.

9.    <u>Confidentiality.</u> The parties hereto acknowledge that the terms of this Agreement are confidential, except that each party may disclose that Licensee has a license under the Licensed divine Patents. Neither the parties nor their counsel may convey to third parties the terms of this Agreement, except that the terms of this Agreement may be disclosed to tax preparers and insurers as reasonably necessary, or as may be ordered by law.

10.    <u>Warranty of Authority.</u> Each person signing this Agreement on behalf of a party warrants that he or she has authority to bind said entity. divine further warrants and represents that its rights include the right to sue for alleged past infringement and that it has not entered into and shall not enter into any agreement which would interfere with or otherwise encumber any of the releases, covenants not to sue, or licenses granted by this Agreement.

2

A13153

CONFIDENTIAL-OUTSIDE ATTORNEYS EYES ONLY

SVN2-0040607

11.    Amendment to Agreement.  This Agreement may not be altered, amended, modified or otherwise changed in any respect or manner, except by a writing executed by an authorized representative of each party.

12.    Nontransferability of Agreement to Third Parties.  This Agreement may not be assigned or transferred by Licensee to a third party without the prior written consent of divine, except that the Agreement can be transferred to a party acquiring the entire business of Licensee to which the GLOOKS.COM website relates but it is understood that the licenses granted hereunder are limited to the GLOOKS.COM website and cannot be expanded by any such transfer.

13.    Notices.  All notices, requests, demands, directions and other communications provided for hereunder shall be in writing and mailed or faxed or delivered to the applicable party at the address of such party set forth below (or such other address duly provided in writing to the other side). Each such notice, request, demand, direction or other communication shall be effective upon delivery.

    If to divine:

        Richard Nawracaj, Esq.
        Assistant General Counsel
        divine, Inc.
        1301 North Elston Avenue
        Chicago, Illinois 60622
        Fax: 312-394-6601

    With a copy to:

        Robert M. Barrett, Esq.
        Bell, Boyd & Lloyd LLC
        Three First National Plaza
        70 West Madison Street
        Suite 3300
        Chicago, Illinois 60602-4207

    If to Licensee:

        GLOOKS.COM
        1543 West Olympic Boulevard Suite 575
        Los Angeles, California 90015

14.    Fees and Costs.  Each party shall bear its own costs and expenses, including attorneys' fees.

15.    Governing Law.  This Agreement shall be interpreted, enforced and governed according to the laws of the State of Illinois, without regard to conflict of law provisions.

3

A13154

CONFIDENTIAL-OUTSIDE ATTORNEYS EYES ONLY

16.    Venue. The United States District Court for the Northern District of Illinois, or if that Court does not have subject matter jurisdiction then the state courts of Illinois, shall be the exclusive jurisdiction to enforce the terms of this Agreement. The parties hereto agree and consent to jurisdiction in these courts solely for purposes of enforcing the terms of this Agreement.

17.    Counterparts. This Agreement may be signed in one or more counterparts, each of which shall be deemed an original and all of which shall constitute one and the same instrument. Copies of signed counterparts transmitted by telecopy, facsimile, or other electronic transmission shall be considered original executed counterparts for purposes of this Paragraph, provided receipt of said copies of counterparts is confirmed. This Agreement shall not be effective unless and until signed by all parties hereto.

18.    Severability. If any provision of this Agreement shall be held void or unenforceable by a court, such provision shall be severable and shall not affect the validity or enforceability of any other provisions of this Agreement.

19.    No Waivers. The waiver by either party of a breach of any provision of this Agreement or the failure by any of the parties to exercise any right hereunder shall not operate or be construed as a waiver of any subsequent breach of that right or a waiver of any other right. It is further expressly agreed that the waiver of any right of either party hereunder or under the law shall be effective only if in writing and executed by an authorized officer of the affected party.

20.    Headings. All section headings are stated for convenience only and shall not be considered in construing this Agreement.

21.    Preparation of Agreement; Construction. This Agreement shall be construed without regard to the party or parties responsible for the preparation of the same and shall be deemed as prepared jointly by the parties hereto. Any ambiguity or uncertainty existing herein shall not be interpreted or construed against any party hereto on the basis that such party may have drafted such provision.

22.    Term of Agreement. This Agreement shall be in effect until the term granted under each of the Licensed divine Patents has expired.

23.    Entire Agreement. This Agreement (together with the exhibit hereto) represents and contains the entire agreement and understanding between the parties with respect to the subject matter of this Agreement, and supersedes any and all prior or contemporaneous negotiations, agreements and understandings, whether written or oral, between the parties with respect to the subject matter of this Agreement.

24.    Enforcement of Agreement. If it is necessary for either party to bring a lawsuit under this Agreement to enforce the Agreement or any provision thereof, the prevailing party to any such litigation shall be entitled to recover its reasonable attorneys' fees from the other party.

4

CONFIDENTIAL-OUTSIDE ATTORNEYS EYES ONLY    SVN2-0040609

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date set forth above.

DIVINE TECHNOLOGY VENTURES

By: _____
Name: JUDE M. SULLIVAN
Title: PRESIDENT
Date: 11/4/02

GLOOKS.COM

By: _____
Name: Young Jin
Title: Owner
Date: 11/01/02

5

A13156

CONFIDENTIAL-OUTSIDE ATTORNEYS EYES ONLY                    SVN2-0040610

11/21/2002 12:32 FAX 1 773 394 6601      DIVINE, INC.                    ☒002
  Bell, Boyd & Lloyd    11-∞2/2002 3:29   PAGE  3/7    RightFax
Sent by:SPUN            h  -11-90 01:22Pn      from 847272756.                page  2

## LICENSE AGREEMENT

This License Agreement ("Agreement") is effective this 1st day of November, 2002 ("Effective Date) and is by and between divine technology ventures, an Illinois general partnership having a place of business at 1301 North Elston Avenue, Chicago, Illinois ("divine") and Spun.com, Inc., a Delaware corporation having a principal place of business at 556 South Fair Oaks Avenue, Suite 301, Pasadena, California 91105 ("Licensee").

## RECITALS

WHEREAS, divine is the owner of patents set forth more fully below;

WHEREAS, Licensee operates the spun.com website; and

WHEREAS, Licensee desires to license the patents.

NOW, THEREFORE, in consideration of the above recitals, the mutual covenants set forth below, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.    **Definitions**.  As used in this Agreement, the following term shall have the following meaning:

     a.    "Licensed divine Patents" means U.S. Patent Nos. 5,715,314 and 5,909,492 and any patent issuing from a continuation, continuation-in-part, divisional, reissue or foreign counterpart application of any of the foregoing, to the extent such patent claims in whole or in part the benefit of the filing date of any one of the patents.

2.    **License**.  During the term of this Agreement, and subject to the payment specified in Paragraph 7 below, divine hereby grants to Licensee a paid-up, non-transferable, non-exclusive license, with no right to sub-license, under the Licensed divine Patents to use the systems and apparatuses or to practice methods embodying any of the inventions claimed in the Licensed divine Patents throughout the world.

3.    **Validity of the Licensed divine Patents**.  Licensee acknowledges the validity of the claims of the Licensed divine Patents.

4.    **Covenant Not to Sue Licensee**.  Subject to Licensee abiding by the terms of this Agreement and for the duration of this Agreement, divine covenants not to sue Licensee, its officers, employees, and customers for infringement of any divine patents including the Licensed divine Patents based on the spun.com website if Licensee does not substantially modify the functionality of the spun.com website.

5.    **Covenant Not to Sue divine**.  Licensee covenants not to sue divine, its parent, subsidiaries, affiliates or successors for any claims or counterclaims that were or could have been brought against any of them as of the date of this Agreement in any lawsuit involving the divine Patents.

*CONFIDENTIAL-OUTSIDE ATTORNEYS EYES ONLY*

SVN2-0040653

**Defendant's Exhibit
Exhibit No. D-235
Case No. 6:07-cv-00511**

6.    Mutual Release.  Each party hereto releases, acquits, and forever discharges the other party and its respective parent companies, subsidiaries, affiliates, officers, directors, employees, agents, shareholders, advisors, representatives, assigns, predecessors-in-interest and successors-in-interest from all claims, causes of action, suits, debts, liens, obligations, liabilities, demands, losses, costs and expenses (including attorneys' fees and costs) of any kind, character or nature whatsoever, known or unknown, fixed or contingent, (collectively "Claim") that the releasing party has or may have or claim to have now or that may hereafter arise out of, relate to, or be connected with the Licensed divine Patents.  The releases set forth in this Section shall be effective upon execution of this Agreement by the parties.

7.    Payment by Licensee.  In consideration of the licenses, releases, waivers and covenants against suit contained in this Agreement, Licensee shall pay to divine a one-time payment of one thousand three hundred dollars ($1300.00), which represents one percent (1%) of the projected gross cash sales of new product by Licensee over the Internet for one year beginning October 1, 2002 (represented to be one hundred thirty thousand dollars ($130,000.00) by Licensee).  Such payment shall be made within five (5) business days after the Effective Date of this Agreement.

8    Limitations.  EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, NONE OF THE PARTIES (i) MAKES ANY WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED, INCLUDING WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, AND (ii) WILL BE LIABLE TO ANOTHER PARTY UNDER ANY CONTRACT, STRICT LIABILITY, NEGLIGENCE OR OTHER LEGAL OR EQUITABLE THEORY, FOR ANY INCIDENTAL OR CONSEQUENTIAL DAMAGES OR LOST PROFITS IN CONNECTION WITH THE SUBJECT MATTER OF THIS AGREEMENT.

9.    Confidentiality.  The parties hereto acknowledge that the terms of this Agreement are confidential, except that each party may disclose that Licensee has a license under the Licensor divine Patents.  Neither the parties nor their counsel may convey to third parties the terms of this Agreement, except that the terms of this Agreement may be disclosed to tax preparers and insurers as reasonably necessary, or as may be ordered by law.

10.    Warranty of Authority.  Each person signing this Agreement on behalf of a party warrants that he or she has authority to bind said entity. divine further warrants and represents that its rights include the right to sue for alleged past infringement and that it has not entered into and shall not enter into any agreement which would interfere with or otherwise encumber any of the releases, covenants not to sue, or licenses granted by this Agreement.

2

A13158

CONFIDENTIAL-OUTSIDE ATTORNEYS EYES ONLY                    SVN2-0040654

11).    Amendment to Agreement.  This Agreement may not be altered, amended, modified or otherwise changed in any respect or manner, except by a writing executed by an authorized representative of each party.

12.    Nontransferability of Agreement to Third Parties.  This Agreement may not be assigned or transferred by Licensee to a third party without the prior written consent of divine, except that the Agreement can be transferred to a party acquiring more than 50% of the equity ownership in the stock of Licensee, but it is understood that the licenses granted hereunder are limited to the spun.com website and cannot be expanded by any such transfer.

13.    Notices.  All notices, requests, demands, directions and other communications provided for hereunder shall be in writing and mailed or faxed or delivered to the applicable party at the address of such party set forth below (or such other address duly provided in writing to the other side). Each such notice, request, demand, direction or other communication shall be effective upon delivery.

If to divine:

> Richard Nawracaj, Esq.
> Assistant General Counsel
> divine, Inc.
> 1301 North Elston Avenue
> Chicago, Illinois 60622
> Fax: 312-394-6601

With a copy to:

> Robert M. Barrett, Esq.
> Bell, Boyd & Lloyd LLC
> Three First National Plaza
> 70 West Madison Street
> Suite 3300
> Chicago, Illinois 60602-4207

If to Licensee:

> Spun.com, Inc.
> 556 South Fair Oaks Avenue, Suite 301
> Pasadena, California 91105

14.    Fees and Costs.  Each party shall bear its own costs and expenses, including attorneys' fees.

15.    Governing Law.  This Agreement shall be interpreted, enforced and governed according to the laws of the State of Illinois, without regard to conflict of law provisions.

3

A13159

CONFIDENTIAL-OUTSIDE ATTORNEYS EYES ONLY

16.    Venue. The United States District Court for the Northern District of Illinois, or if that Court does not have subject matter jurisdiction then the state courts of Illinois, shall be the exclusive jurisdiction to enforce the terms of this Agreement. The parties hereto agree and consent to jurisdiction in these courts solely for purposes of enforcing the terms of this Agreement.

17.    Counterparts. This Agreement may be signed in one or more counterparts, each of which shall be deemed an original and all of which shall constitute one and the same instrument. Copies of signed counterparts transmitted by telecopy, facsimile, or other electronic transmission shall be considered original executed counterparts for purposes of this Paragraph, provided receipt of said copies of counterparts is confirmed. This Agreement shall not be effective unless and until signed by all parties hereto.

18.    Severability. If any provision of this Agreement shall be held void or unenforceable by a court, such provision shall be severable and shall not affect the validity or enforceability of any other provisions of this Agreement.

19.    No Waivers. The waiver by either party of a breach of any provision of this Agreement or the failure by any of the parties to exercise any right hereunder shall not operate or be construed as a waiver of any subsequent breach of that right or a waiver of any other right. It is further expressly agreed that the waiver of any right of either party hereunder or under the law shall be effective only if in writing and executed by an authorized officer of the affected party.

20.    Headings. All section headings are stated for convenience only and shall not be considered in construing this Agreement.

21.    Preparation of Agreement; Construction. This Agreement shall be construed without regard to the party or parties responsible for the preparation of the same and shall be deemed as prepared jointly by the parties hereto. Any ambiguity or uncertainty existing herein shall not be interpreted or construed against any party hereto on the basis that such party may have drafted such provision.

22.    Term of Agreement. This Agreement shall be in effect until the term granted under each of the Licensed divine Patents has expired.

23.    Entire Agreement. This Agreement (together with the exhibit hereto) represents and contains the entire agreement and understanding between the parties with respect to the subject matter of this Agreement, and supersedes any and all prior or contemporaneous negotiations, agreements and understandings, whether written or oral, between the parties with respect to the subject matter of this Agreement.

24.    Enforcement of Agreement. If it is necessary for either party to bring a lawsuit under this Agreement to enforce the Agreement or any provision thereof, the prevailing party to any such litigation shall be entitled to recover its reasonable attorneys' fees from the other party.

4

A13160

CONFIDENTIAL-OUTSIDE ATTORNEYS EYES ONLY                        SVN2-0040656

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date set forth above.

DIVINE TECHNOLOGY VENTURES

By:
Name:    JUDE M. SULLIVAN
Title:    SVP
Date:    11/21/02

SPUN.COM, INC.

By:
Name:    ANDY GRUNDY
Title:    PRESIDENT
Date:    11/11/02

5

A13161

CONFIDENTIAL-OUTSIDE ATTORNEYS EYES ONLY

SVN2-0040657

# LICENSE AGREEMENT

This License Agreement ("Agreement") is effective this 4th day of November, 2002 ("Effective Date") and is by and between divine technology ventures, an Illinois general partnership having a place of business at 1301 North Elston Avenue, Chicago, Illinois ("divine") and Kreiss Enterprises, Inc., a California corporation having a principal place of business at 8525 Camino Santa Fe, San Diego, California 92121 ("Licensee").

## RECITALS

WHEREAS, divine is the owner of patents set forth more fully below;

WHEREAS, Licensee operates the kreiss.com website; and

WHEREAS, Licensee desires to license the patents.

NOW, THEREFORE, in consideration of the above recitals, the mutual covenants set forth below, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.    Definitions.  As used in this Agreement, the following term shall have the following meaning:

      a.    "Licensed divine Patents" means U.S. Patent Nos. 5,715,314 and 5,909,492 and any patent issuing from a continuation, continuation-in-part, divisional, reissue or foreign counterpart application of any of the foregoing, to the extent such patent claims in whole or in part the benefit of the filing date of any one of the patents.

2.    License.  During the term of this Agreement, and subject to the payment specified in Paragraph 7 below, divine hereby grants to Licensee a paid-up, non-transferable, non-exclusive license, with no right to sub-license, under the Licensed divine Patents to use the systems and apparatuses or to practice methods embodying any of the inventions claimed in the Licensed divine Patents throughout the world.

3.    Validity of the Licensed divine Patents.  Licensee acknowledges the validity of the claims of the Licensed divine Patents.

4.    Covenant Not to Sue Licensee.  Subject to Licensee abiding by the terms of this Agreement and for the duration of this Agreement, divine covenants not to sue Licensee, its officers, employees, and customers for infringement of any divine patents including the Licensed divine Patents based on the kreiss.com website if Licensee does not substantially modify the functionality of the kreiss.com website.

5.    Covenant Not to Sue divine.  Licensee covenants not to sue divine, its parent, subsidiaries, affiliates or successors for any claims or counterclaims that were or could have been brought against any of them as of the date of this Agreement in any lawsuit involving the divine Patents.

476961/D/1 XBP101

CONFIDENTIAL-OUTSIDE ATTORNEYS EYES ONLY

SVN2-0040629

**Defendant's Exhibit
Exhibit No. D-236
Case No. 6:07-cv-00511**

6.     Mutual Release. Each party hereto releases, acquits, and forever discharges the other party and its respective parent companies, subsidiaries, affiliates, officers, directors, employees, agents, shareholders, advisors, representatives, assigns, predecessors-in-interest and successors-in-interest from all claims, causes of action, suits, debts, liens, obligations, liabilities, demands, losses, costs and expenses (including attorneys' fees and costs) of any kind, character or nature whatsoever, known or unknown, fixed or contingent, (collectively "Claim") that the releasing party has or may have or claim to have now or that may hereafter arise out of, relate to, or be connected with the Licensed divine Patents. The releases set forth in this Section shall be effective upon execution of this Agreement by the parties.

7.     Payment by Licensee. In consideration of the licenses, releases, waivers and covenants against suit contained in this Agreement, Licensee shall pay to divine a one-time fee of five thousand dollars ($5,000.00) which represents five percent (5%) of the gross sales made by Licensee over the Internet in 2001. Such payment shall be made within five (5) business days after the Effective Date of this Agreement.

8.     Limitations. EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, NONE OF THE PARTIES (i) MAKES ANY WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED, INCLUDING WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, AND (ii) WILL BE LIABLE TO ANOTHER PARTY UNDER ANY CONTRACT, STRICT LIABILITY, NEGLIGENCE OR OTHER LEGAL OR EQUITABLE THEORY, FOR ANY INCIDENTAL OR CONSEQUENTIAL DAMAGES OR LOST PROFITS IN CONNECTION WITH THE SUBJECT MATTER OF THIS AGREEMENT.

9.     Confidentiality. The parties hereto acknowledge that the terms of this Agreement are confidential, except that each party may disclose that Licensee has a license under the Licensed divine Patents. Neither the parties nor their counsel may convey to third parties the terms of this Agreement, except that the terms of this Agreement may be disclosed to tax preparers and insurers as reasonably necessary, or as may be ordered by law.

10.     Warranty of Authority. Each person signing this Agreement on behalf of a party warrants that he or she has authority to bind said entity. divine further warrants and represents that its rights include the right to sue for alleged past infringement and that it has not entered into and shall not enter into any agreement which would interfere with or otherwise encumber any of the releases, covenants not to sue, or licenses granted by this Agreement.

11.     Amendment to Agreement. This Agreement may not be altered, amended, modified or otherwise changed in any respect or manner, except by a writing executed by an authorized representative of each party.

476961/D/1  XH#101_

2

CONFIDENTIAL-OUTSIDE ATTORNEYS EYES ONLY

SVN2-0040630

12. <u>Nontransferability of Agreement to Third Parties.</u> This Agreement may not be assigned or transferred by Licensee to a third party without the prior written consent of divine, except that the Agreement can be transferred to a party acquiring the entire business of Licensee to which the kreiss.com website relates but it is understood that the licenses granted hereunder are limited to the kreiss.com website and cannot be expanded by any such transfer.

13. <u>Notices.</u> All notices, requests, demands, directions and other communications provided for hereunder shall be in writing and mailed or faxed or delivered to the applicable party at the address of such party set forth below (or such other address duly provided in writing to the other side). Each such notice, request, demand, direction or other communication shall be effective upon delivery.

If to divine:

> Richard Nawracaj, Esq.
> Assistant General Counsel
> divine, Inc.
> 1301 North Elston Avenue
> Chicago, Illinois 60622
> Fax: 312-394-6601

With a copy to:

> Robert M. Barrett, Esq.
> Bell, Boyd & Lloyd LLC
> Three First National Plaza
> 70 West Madison Street
> Suite 3300
> Chicago, Illinois 60602-4207

If to Licensee:

> Kreiss Enterprises, Inc.
> 8525 Camino Santa Fe
> San Diego, California 92121

With a copy to:

> Marvin H. Kleinberg, Esq.
> Kleinberg & Lerner, LLP
> 2049 Century Park East
> Suite 1080
> Los Angeles, California 90067-3112

14. <u>Fees and Costs.</u> Each party shall bear its own costs and expenses, including attorneys' fees.

476961/D/1  XHP101_                                    3

CONFIDENTIAL-OUTSIDE ATTORNEYS EYES ONLY                    SVN2-0040631

15.    Governing Law.  This Agreement shall be interpreted, enforced and governed according to the laws of the State of Illinois, without regard to conflict of law provisions.

16.    Venue.  The United States District Court for the Northern District of Illinois, or if that Court does not have subject matter jurisdiction then the state courts of Illinois, shall be the exclusive jurisdiction to enforce the terms of this Agreement.  The parties hereto agree and consent to jurisdiction in these courts solely for purposes of enforcing the terms of this Agreement.

17.    Counterparts.  This Agreement may be signed in one or more counterparts, each of which shall be deemed an original and all of which shall constitute one and the same instrument.  Copies of signed counterparts transmitted by telecopy, facsimile, or other electronic transmission shall be considered original executed counterparts for purposes of this Paragraph, provided receipt of said copies of counterparts is confirmed.  This Agreement shall not be effective unless and until signed by all parties hereto.

18.    Severability.  If any provision of this Agreement shall be held void or unenforceable by a court, such provision shall be severable and shall not affect the validity or enforceability of any other provisions of this Agreement.

19.    No Waivers.  The waiver by either party of a breach of any provision of this Agreement or the failure by any of the parties to exercise any right hereunder shall not operate or be construed as a waiver of any subsequent breach of that right or a waiver of any other right.  It is further expressly agreed that the waiver of any right of either party hereunder or under the law shall be effective only if in writing and executed by an authorized officer of the affected party.

20.    Headings.  All section headings are stated for convenience only and shall not be considered in construing this Agreement.

21.    Preparation of Agreement; Construction.  This Agreement shall be construed without regard to the party or parties responsible for the preparation of the same and shall be deemed as prepared jointly by the parties hereto.  Any ambiguity or uncertainty existing herein shall not be interpreted or construed against any party hereto on the basis that such party may have drafted such provision.

22.    Term of Agreement.  This Agreement shall be in effect until the term granted under each of the Licensed divine Patents has expired.

23.    Entire Agreement.  This Agreement represents and contains the entire agreement and understanding between the parties with respect to the subject matter of this Agreement, and supersedes any and all prior or contemporaneous negotiations, agreements and understandings, whether written or oral, between the parties with respect to the subject matter of this Agreement.

24.    Enforcement of Agreement.  If it is necessary for either party to bring a lawsuit under this Agreement to enforce the Agreement or any provision thereof, the prevailing party to any such litigation shall be entitled to recover its reasonable attorneys' fees from the other party.

CONFIDENTIAL-OUTSIDE ATTORNEYS EYES ONLY

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date set forth above.

DIVINE TECHNOLOGY VENTURES

By: _____
Name: _JUDE M. SULLIVAN_
Title: _SVP_
Date: _11/22/02_

KREISS ENTERPRISES, INC.

By: _____
Name: _MICHAEL KREISS_
Title: _CEO_
Date: _11-22-02_

5

CONFIDENTIAL-OUTSIDE ATTORNEYS EYES ONLY                    SVN2-0040633

11/07/2002 09:25 FAX 1 773 394 6802    DIVINE, INC.    ☒002

Received at: 16h 47m, 11/6/2002

Nov 06 02 04:44p    Grace Arrasceta    954-835-2152    p.2

## LICENSE AGREEMENT

This License Agreement ("Agreement") is effective as of this 5th day of November, 2002 ("Effective Date") and is by and between divine technology ventures, an Illinois general partnership having a place of business at 1301 North Elston Avenue, Chicago, Illinois, and its subsidiaries, affiliates or successors ("divine") and Odimo Incorporated, a Delaware corporation having a principal place of business at 14001 NW 4th Street, Sunrise, Florida 33325, and all of Odimo Incorporated's subsidiaries, affiliates or successors (collectively referred to hereinafter as "Licensee").

### RECITALS

WHEREAS, divine is the owner of patents set forth more fully below;

WHEREAS, Licensee operates retail websites limited to the sale of luxury personal accessories, e.g., loose diamonds, fine jewelry, and brand-name watches, including the diamond.com website, (collectively the "Licensee Websites") that only use the Licensee Websites for shopping cart checkout (the "Licensee Checkout"); and

WHEREAS, Licensee desires to license the patents.

NOW, THEREFORE, in consideration of the above recitals, the mutual covenants set forth below, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. **Definitions.** As used in this Agreement, the following term shall have the following meaning:

    a. "Licensed divine Patents" means U.S. Patent Nos. 5,715,314, 5,708,780, 5,724,424, and 5,909,492 and any patent issuing from a continuation, continuation-in-part, divisional, reissue or foreign counterpart application of any of the foregoing, to the extent such patent claims in whole or in part the benefit of the filing date of an application for any one of the patents.

2. **License.** During the term of this Agreement, and subject to the payment specified in Paragraph 7 below, divine hereby grants to Licensee a paid-up, non-transferable, non-exclusive license, with no right to sub-license, under the Licensed divine Patents to use the systems and apparatuses or to practice methods embodying any of the inventions claimed in the Licensed divine Patents throughout the world limited to the Licensee Websites.

3. **Validity of the Licensed divine Patents.** Licensee acknowledges the validity of the claims of the Licensed divine Patents.

cwsrrion xxxioi_

CONFIDENTIAL-OUTSIDE ATTORNEYS EYES ONLY

SVN2-0040643

Defendant's Exhibit
Exhibit No. D-237
Case No. 6:07-cv-00511

4.    Covenant Not to Sue Licensee. Subject to Licensee abiding by the terms of this Agreement and for the duration of this Agreement, divine covenants not to sue Licensee, its officers, employees, and customers for infringement, past, present or future, of any divine patents including the Licensed divine Patents based on the use of the Licensee Checkout by any of the Licensee Websites that are wholly owned and operated by Licensee, but excludes any website that is only partially owned by Licensee or owned by a third party.

5.    Covenant Not to Sue divine. Licensee covenants not to sue divine, its parent, subsidiaries, affiliates or successors for any claims or counterclaims that were or could have been brought against any of them as of the date of this Agreement in any lawsuit involving the divine Patents.

6.    Mutual Release. Each party hereto releases, acquits, and forever discharges the other party and its respective parent companies, subsidiaries, affiliates, officers, directors, employees, agents, shareholders, advisors, representatives, assigns, predecessors-in-interest and successors-in-interest from all claims, causes of action, suits, debts, liens, obligations, liabilities, demands, losses, costs and expenses (including attorneys' fees and costs) of any kind, character or nature whatsoever, known or unknown, fixed or contingent, (collectively "Claim") that the releasing party has or may have or claim to have now or that may hereafter arise out of, relate to, or be connected with the Licensed divine Patents. The releases set forth in this Section shall be effective upon execution of this Agreement by the parties.

7.    Payment by Licensee. In consideration of the licenses, releases, waivers and covenants against suit contained in this Agreement, Licensee shall pay to divine the sum of thirty thousand dollars ($30,000.00) which represents a royalty of approximately $.85 per shopping cart transaction made last year on the Licensees Websites through the Licensee Checkout (represented by Licensee to be approximately 35,000). Such payment shall be made in two installments of $15,000 each and payable to Bell, Boyd & Lloyd Client Funds Account. The first installment shall be due in the offices of Bell, Boyd & Lloyd by no later than November 8, 2002 and the second installment shall be due in the offices of Bell, Boyd & Lloyd by no later than December 20, 2002.

8.    Limitations. EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, NONE OF THE PARTIES (i) MAKES ANY WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED, INCLUDING WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, AND (ii) WILL BE LIABLE TO ANOTHER PARTY UNDER ANY CONTRACT, STRICT LIABILITY, NEGLIGENCE OR OTHER LEGAL OR EQUITABLE THEORY, FOR ANY INCIDENTAL OR CONSEQUENTIAL DAMAGES OR LOST PROFITS IN CONNECTION WITH THE SUBJECT MATTER OF THIS AGREEMENT.

479587/D/1 XXR301

CONFIDENTIAL-OUTSIDE ATTORNEYS EYES ONLY                                    SVN2-0040644

11/07/2002 09:28 FAX 1 773 394 6602    DIVINE, INC.    @004

Received at: 16h 47m, 11/6/2002

Nov 06 02 04:44p    Grace Arracaeta    954-835-2152    p.4

9.    Confidentiality. The parties hereto acknowledge that the terms of this Agreement are confidential, except that each party may disclose that Licensee has a license under the Licensed divine Patents. Neither the parties nor their counsel may convey to third parties the terms of this Agreement, except that the terms of this Agreement may be disclosed to tax preparers and insurers as reasonably necessary, or as may be ordered by law.

10.    Warranty of Authority. Each person signing this Agreement on behalf of a party warrants that he or she has authority to bind said entity. divine further warrants and represents that its rights include the right to sue for alleged past infringement and that it has not entered into and shall not enter into any agreement which would interfere with or otherwise encumber any of the releases, covenants not to sue, or licenses granted by this Agreement.

11.    Amendment to Agreement. This Agreement may not be altered, amended, modified or otherwise changed in any respect or manner, except by a writing executed by an authorized representative of each party.

12.    Nontransferability of Agreement to Third Parties. This Agreement may not be assigned or transferred by Licensee to a third party without the prior written consent of divine, except that the Agreement can be transferred to a party acquiring substantially the entire business of Licensee to which the Licensee Checkout relates but it is understood that the licenses granted hereunder are limited to the Licensee Websites that use the Licensee Checkout and cannot be expanded by any such transfer.

13.    Notices. All notices, requests, demands, directions and other communications provided for hereunder shall be in writing and mailed or faxed or delivered to the applicable party at the address of such party set forth below (or such other address duly provided in writing to the other side). Each such notice, request, demand, direction or other communication shall be effective upon delivery.

If to divine:

> Richard Nawracaj, Esq.
> Assistant General Counsel
> divine, Inc.
> 1301 North Elston Avenue
> Chicago, Illinois 60622
> Fax: 312-394-6601

With a copy to:

> Robert M. Barrett, Esq.
> Bell, Boyd & Lloyd LLC
> Three First National Plaza
> 70 West Madison Street
> Suite 3300
> Chicago, Illinois 60602-4207

4TECHNOLOGY XXXXXL    3

CONFIDENTIAL-OUTSIDE ATTORNEYS EYES ONLY    SVN2-0040645

11/07/2002 09:26 FAX 1 773 394 8602　　　DIVINE, INC.　　　@005

Received at: 16h 47m, 11/6/2002

Nov 06 02 04:44p　　　Grace Arrascaeta　　　954-635-2152　　　p.5

If to Licensee:

Odimo Incorporated
14001 NW 4th Street
Sunrise, Florida 33325
Att: Grace Arrascaeta, VP-Business Compliance

With a copy to:

Bradley Lytle, Esq.
Oblon, Spivak, McClelland, Maier & Neustadt, P.C.
1755 Jefferson Davis Highway
4th Floor
Arlington, Virginia 22202

14.　**Fees and Costs.** Each party shall bear its own costs and expenses, including attorneys' fees.

15.　**Governing Law.** This Agreement shall be interpreted, enforced and governed according to the laws of the State of Illinois, without regard to conflict of law provisions.

16.　**Venue.** The United States District Court for the Northern District of Illinois, or if that Court does not have subject matter jurisdiction then the state courts of Illinois, shall be the exclusive jurisdiction to enforce the terms of this Agreement. The parties hereto agree and consent to jurisdiction in these courts solely for purposes of enforcing the terms of this Agreement.

17.　**Counterparts.** This Agreement may be signed in one or more counterparts, each of which shall be deemed an original and all of which shall constitute one and the same instrument. Copies of signed counterparts transmitted by telecopy, facsimile, or other electronic transmission shall be considered original executed counterparts for purposes of this Paragraph, provided receipt of said copies of counterparts is confirmed. This Agreement shall not be effective unless and until signed by all parties hereto.

18.　**Severability.** If any provision of this Agreement shall be held void or unenforceable by a court, such provision shall be severable and shall not affect the validity or enforceability of any other provisions of this Agreement.

19.　**No Waiver.** The waiver by either party of a breach of any provision of this Agreement or the failure by any of the parties to exercise any right hereunder shall not operate or be construed as a waiver of any subsequent breach of that right or a waiver of any other right. It is further expressly agreed that the waiver of any right of either party hereunder or under the law shall be effective only if in writing and executed by an authorized officer of the affected party.

20.　**Headings.** All section headings are stated for convenience only and shall not be considered in construing this Agreement.

479387/D/1 XXR301

4

CONFIDENTIAL-OUTSIDE ATTORNEYS EYES ONLY

SVN2-0040646

21.    Preparation of Agreement; Construction.  This Agreement shall be construed without regard to the party or parties responsible for the preparation of the same and shall be deemed as prepared jointly by the parties hereto. Any ambiguity or uncertainty existing herein shall not be interpreted or construed against any party hereto on the basis that such party may have drafted such provision.

22.    Term of Agreement.  This Agreement shall be in effect until the term granted under each of the Licensed divine Patents has expired.

23.    Entire Agreement.  This Agreement represents and contains the entire agreement and understanding between the parties with respect to the subject matter of this Agreement, and supersedes any and all prior or contemporaneous negotiations, agreements and understandings, whether written or oral, between the parties with respect to the subject matter of this Agreement.

24.    Enforcement of Agreement.  If it is necessary for either party to bring a lawsuit under this Agreement to enforce this Agreement or any provision thereof, the prevailing party to any such litigation shall be entitled to recover its reasonable attorneys' fees from the other party.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date set forth above.

DIVINE TECHNOLOGY VENTURES

By: _____
Name: JUDE M. SULLIVAN
Title: PRESIDENT
Date: 11/7/02

ODIMO INCORPORATED

By: _____
Name: Jeffrey Kornblum
Title: Chief Operating Officer
Date: November 5, 2002

5

CONFIDENTIAL-OUTSIDE ATTORNEYS EYES ONLY    SVN2-0040647

## LICENSE AGREEMENT

This License Agreement ("Agreement") is effective this 14th day of November, 2002 ("Effective Date") and is by and between divine technology ventures, an Illinois general partnership having a place of business at 1301 North Elston Avenue, Chicago, Illinois ("divine") and Cadence 120 Bicycle Works, Inc., an Alabama corporation having a principal place of business at 5558 Old Shell Road, Mobile, Alabama 36608 ("Licensee").

### RECITALS

WHEREAS, divine is the owner of patents set forth more fully below;

WHEREAS, Licensee operates the cadence120.com website; and

WHEREAS, Licensee desires to license the patents.

NOW, THEREFORE, in consideration of the above recitals, the mutual covenants set forth below, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. <u>Definitions</u>. As used in this Agreement, the following term shall have the following meaning:

   a. "Licensed divine Patents" means U.S. Patent Nos. 5,715,314 and 5,909,492 and any patent issuing from a continuation, continuation-in-part, divisional, reissue or foreign counterpart application of any of the foregoing, to the extent such patent claims in whole or in part the benefit of the filing date of any one of the patents.

2. <u>License</u>. During the term of this Agreement, and subject to the payment specified in Paragraph 7 below, divine hereby grants to Licensee a paid-up, non-transferable, non-exclusive license, with no right to sub-license, under the Licensed divine Patents to use the systems and apparatuses or to practice methods embodying any of the inventions claimed in the Licensed divine Patents throughout the world.

3. <u>Validity of the Licensed divine Patents</u>. Licensee acknowledges the validity of the claims of the Licensed divine Patents.

4. <u>Covenant Not to Sue Licensee</u>. Subject to Licensee abiding by the terms of this Agreement and for the duration of this Agreement, divine covenants not to sue Licensee, its officers, employees, and customers for infringement of any divine patents including the Licensed divine Patents based on the cadence120.com website if Licensee does not substantially modify the functionality of the cadence120.com website.

5. <u>Covenant Not to Sue divine</u>. Licensee covenants not to sue divine, its parent, subsidiaries, affiliates or successors for any claims or counterclaims that were or could have been brought against any of them as of the date of this Agreement in any lawsuit involving the divine Patents.

CONFIDENTIAL-OUTSIDE ATTORNEYS EYES ONLY

SVN2-0040564

Defendant's Exhibit
Exhibit No. D-238
Case No. 6:07-cv-00511

6.    Mutual Release.  Each party hereto releases, acquits, and forever discharges the other party and its respective parent companies, subsidiaries, affiliates, officers, directors, employees, agents, shareholders, advisors, representatives, assigns, predecessors-in-interest and successors-in-interest from all claims, causes of action, suits, debts, liens, obligations, liabilities, demands, losses, costs and expenses (including attorneys' fees and costs) of any kind, character or nature whatsoever, known or unknown, fixed or contingent, (collectively "Claim") that the releasing party has or may have or claim to have now or that may hereafter arise out of, relate to, or be connected with the Licensed divine Patents.  The releases set forth in this Section shall be effective upon execution of this Agreement by the parties.

7.    Payment by Licensee.  In consideration of the licenses, releases, waivers and covenants against suit contained in this Agreement, Licensee shall pay to divine a one percent (1%) royalty of the gross sales made by Licensee in 2001 over the Internet or one thousand dollars ($1000), whichever sum is greater.  The one-time payment shall be made within five (5) business days after the Effective Date of this Agreement.

8.    Limitations.  EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, NONE OF THE PARTIES (i) MAKES ANY WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED, INCLUDING WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, AND (ii) WILL BE LIABLE TO ANOTHER PARTY UNDER ANY CONTRACT, STRICT LIABILITY, NEGLIGENCE OR OTHER LEGAL OR EQUITABLE THEORY, FOR ANY INCIDENTAL OR CONSEQUENTIAL DAMAGES OR LOST PROFITS IN CONNECTION WITH THE SUBJECT MATTER OF THIS AGREEMENT.

9.    Confidentiality.  The parties hereto acknowledge that the terms of this Agreement are confidential, except that each party may disclose that Licensee has a license under the Licensed divine Patents.  Neither the parties nor their counsel may convey to third parties the terms of this Agreement, except that the terms of this Agreement may be disclosed to tax preparers and insurers as reasonably necessary, or as may be ordered by law.

10.    Warranty of Authority.  Each person signing this Agreement on behalf of a party warrants that he or she has authority to bind said entity.  divine further warrants and represents that its rights include the right to sue for alleged past infringement and that it has not entered into and shall not enter into any agreement which would interfere with or otherwise encumber any of the releases, covenants not to sue, or licenses granted by this Agreement.

11.    Amendment to Agreement.  This Agreement may not be altered, amended, modified or otherwise changed in any respect or manner, except by a writing executed by an authorized representative of each party.

2

A13173

CONFIDENTIAL-OUTSIDE ATTORNEYS EYES ONLY

SVN2-0040565

12.   Nontransferability of Agreement to Third Parties.  This Agreement may not be assigned or transferred by Licensee to a third party without the prior written consent of divine, except that the Agreement can be transferred to a party acquiring the entire business of Licensee to which the cadence120.com website relates but it is understood that the licenses granted hereunder are limited to the cadence120.com website and cannot be expanded by any such transfer.

13.   Notices.  All notices, requests, demands, directions and other communications provided for hereunder shall be in writing and mailed or faxed or delivered to the applicable party at the address of such party set forth below (or such other address duly provided in writing to the other side). Each such notice, request, demand, direction or other communication shall be effective upon delivery.

If to divine:

Richard Nawracaj, Esq.
Assistant General Counsel
divine, Inc.
1301 North Elston Avenue
Chicago, Illinois 60622
Fax: 312-394-6601

With a copy to:

Robert M. Barrett, Esq.
Bell, Boyd & Lloyd LLC
Three First National Plaza
70 West Madison Street
Suite 3300
Chicago, Illinois  60602-4207

If to Licensee:

Cadence 120 Bicycle Works, Inc.
5558 Old Shell Road
Mobile, Alabama  36608

14.   Fees and Costs.  Each party shall bear its own costs and expenses, including attorneys' fees.

15.   Governing Law.  This Agreement shall be interpreted, enforced and governed according to the laws of the State of Illinois, without regard to conflict of law provisions.

16.   Venue.  The United States District Court for the Northern District of Illinois, or if that Court does not have subject matter jurisdiction then the state courts of Illinois, shall be the exclusive jurisdiction to enforce the terms of this Agreement.  The parties hereto agree and

3

CONFIDENTIAL-OUTSIDE ATTORNEYS EYES ONLY

consent to jurisdiction in these courts solely for purposes of enforcing the terms of this Agreement.

17.    <u>Counterparts.</u>  This Agreement may be signed in one or more counterparts, each of which shall be deemed an original and *all of which shall constitute one and the same instrument.*  Copies of signed counterparts transmitted by telecopy, facsimile, or other electronic transmission shall be considered original executed counterparts for purposes of this Paragraph, provided receipt of said copies of counterparts is confirmed.  This Agreement shall not be effective unless and until signed by all parties hereto.

18.    <u>Severability.</u>  If any provision of this Agreement shall be held void or unenforceable by a court, such provision shall be severable and shall not affect the validity or enforceability of any other provisions of this Agreement.

19.    <u>No Waivers.</u>  The waiver by either party of a breach of any provision of this Agreement or the failure by any of the parties to exercise any right hereunder shall not operate or be construed as a waiver of any subsequent breach of that right or a waiver of any other right.  It is further expressly agreed that the waiver of any right of either party hereunder or under the law shall be effective only if in writing and executed by an authorized officer of the affected party.

20.    <u>Headings.</u>  All section headings are stated for convenience only and shall not be considered in construing this Agreement.

21.    <u>Preparation of Agreement; Construction.</u>  This Agreement shall be construed without regard to the party or parties responsible for the preparation of the same and shall be deemed as prepared jointly by the parties hereto.  Any ambiguity or uncertainty existing herein shall not be interpreted or construed against any party hereto on the basis that such party may have drafted such provision.

22.    <u>Term of Agreement.</u>  This Agreement shall be in effect until the term granted under each of the Licensed divine Patents has expired.

23.    <u>Entire Agreement.</u>  This Agreement (together with the exhibit hereto) represents and contains the entire agreement and understanding between the parties with respect to the subject matter of this Agreement, and supersedes any and all prior or contemporaneous negotiations, agreements and understandings, whether written or oral, between the parties with respect to the subject matter of this Agreement.

24.    <u>Enforcement of Agreement.</u>  If it is necessary for either party to bring a lawsuit under this Agreement to enforce the Agreement or any provision thereof, the prevailing party to any such litigation shall be entitled to recover its reasonable attorneys' fees from the other party.

<center>4</center>

CONFIDENTIAL-OUTSIDE ATTORNEYS EYES ONLY

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date set forth above.

DIVINE TECHNOLOGY VENTURES

By: _Jude M. Sullivan_
Name: _JUDE M. SULLIVAN_
Title: _SVP_
Date: _12/16/02_

CADENCE 120 BICYCLE WORKS, INC.

By: _____
Name: _BRAD BURTON_
Title: _PRESIDENT_
Date: _12/3/02_

5

CONFIDENTIAL-OUTSIDE ATTORNEYS EYES ONLY

## LICENSE AGREEMENT

This License Agreement ("Agreement") is effective this 25th day of November, 2002 ("Effective Date") and is by and between divine technology ventures, an Illinois general partnership having a place of business at 1301 North Elston Avenue, Chicago, Illinois ("divine") and Tryiton Eyewear, LLC, a Delaware corporation having a principal place of business at 17 Washington Street, Norwalk, Connecticut 06854 ("Licensee").

### RECITALS

WHEREAS, divine is the owner of patents set forth more fully below;

WHEREAS, Licensee operates eyewear industry related websites including the eyeglasses.com website; and

WHEREAS, Licensee desires to license the patents.

NOW, THEREFORE, in consideration of the above recitals, the mutual covenants set forth below, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.  Definitions. As used in this Agreement, the following term shall have the following meaning:

    a.  "Licensed divine Patents" means U.S. Patent Nos. 5,715,314 and 5,909,492 and any patent issuing from a continuation, continuation-in-part, divisional, reissue or foreign counterpart application of any of the foregoing, to the extent such patent claims in whole or in part the benefit of the filing date of any one of the patents.

2.  License. During the term of this Agreement, and subject to the payment specified in Paragraph 7 below, divine hereby grants to Licensee a paid-up, non-transferable, non-exclusive license, with no right to sub-license, under the Licensed divine Patents to use the systems and apparatuses or to practice methods embodying any of the inventions claimed in the Licensed divine Patents throughout the world.

3.  Validity of the Licensed divine Patents. Licensee acknowledges the validity of the claims of the Licensed divine Patents.

4.  Covenant Not to Sue Licensee. Subject to Licensee abiding by the terms of this Agreement and for the duration of this Agreement, divine covenants not to sue Licensee, its officers, employees, and customers for infringement of any divine patents including the Licensed divine Patents based on eyewear industry related websites owned by Licensee including the eyeglasses.com website.

CONFIDENTIAL-OUTSIDE ATTORNEYS EYES ONLY

SVN2-0040668

Defendant's Exhibit
Exhibit No. D-239
Case No. 6:07-cv-00511

5.   <u>Covenant Not to Sue divine.</u>  Licensee covenants not to sue divine, its parent, subsidiaries, affiliates or successors for any claims or counterclaims that were or could have been brought against any of them as of the date of this Agreement in any lawsuit involving the divine Patents.

6.   <u>Mutual Release.</u>  Each party hereto releases, acquits, and forever discharges the other party and its respective parent companies, subsidiaries, affiliates, officers, directors, employees, agents, shareholders, advisors, representatives, assigns, predecessors-in-interest and successors-in-interest from all claims, causes of action, suits, debts, liens, obligations, liabilities, demands, losses, costs and expenses (including attorneys' fees and costs) of any kind, character or nature whatsoever, known or unknown, fixed or contingent, (collectively "Claim") that the releasing party has or may have or claim to have now or that may hereafter arise out of, relate to, or be connected with the Licensed divine Patents. The releases set forth in this Section shall be effective upon execution of this Agreement by the parties.

7.   <u>Payment by Licensee.</u>  In consideration of the licenses, releases, waivers and covenants against suit contained in this Agreement, Licensee shall pay to divine a shall pay to divine a one-time royalty payment of five thousand dollars ($5000.00), which Licensee represents is at least one percent (1%) of gross sales by Licensee over the Internet in 2001 through eyewear industry related websites owned by Licensee including the eyeglasses.com website. Such payment shall be made on the following dates: twenty five hundred dollars ($2500.00) within five days of the effective date of this agreement; and twenty five hundred dollars ($2500.00) within one hundred twenty (120) days thereafter.

8.   <u>Limitations.</u>  EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, NONE OF THE PARTIES (i) MAKES ANY WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED, INCLUDING WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, AND (ii) WILL BE LIABLE TO ANOTHER PARTY UNDER ANY CONTRACT, STRICT LIABILITY, NEGLIGENCE OR OTHER LEGAL OR EQUITABLE THEORY, FOR ANY INCIDENTAL OR CONSEQUENTIAL DAMAGES OR LOST PROFITS IN CONNECTION WITH THE SUBJECT MATTER OF THIS AGREEMENT.

9.   <u>Confidentiality.</u>  The parties hereto acknowledge that the terms of this Agreement are confidential, except that each party may disclose that Licensee has a license under the Licensed divine Patents. Neither the parties nor their counsel may convey to third parties the terms of this Agreement, except that the terms of this Agreement may be disclosed to tax preparers and insurers as reasonably necessary, or as may be ordered by law.

2

CONFIDENTIAL-OUTSIDE ATTORNEYS EYES ONLY                                    SVN2-0040669

10.    <u>Warranty of Authority.</u> Each person signing this Agreement on behalf of a party warrants that he or she has authority to bind said entity.

11.    <u>Amendment to Agreement.</u> This Agreement may not be altered, amended, modified or otherwise changed in any respect or manner, except by a writing executed by an authorized representative of each party.

12.    <u>Nontransferability of Agreement to Third Parties.</u> This Agreement may not be assigned or transferred by Licensee to a third party without the prior written consent of divine, except that the Agreement can be transferred to a party acquiring at least fifty-one percent (51%) of the business of Licensee to which eyewear industry related websites owned by Licensee including the eyeglasses.com website relate, but it is understood that the licenses granted hereunder are limited to the eyewear industry related websites owned by Licensee including the eyeglasses.com website and cannot be expanded by any such transfer.

13.    <u>Notices.</u> All notices, requests, demands, directions and other communications provided for hereunder shall be in writing and mailed or faxed or delivered to the applicable party at the address of such party set forth below (or such other address duly provided in writing to the other side). Each such notice, request, demand, direction or other communication shall be effective upon delivery.

If to divine:

　　　　Richard Nawracaj, Esq.
　　　　Assistant General Counsel
　　　　divine, Inc.
　　　　1301 North Elston Avenue
　　　　Chicago, Illinois 60622
　　　　Fax: 312-394-6601

With a copy to:

　　　　Robert M. Barrett, Esq.
　　　　Bell, Boyd & Lloyd LLC
　　　　Three First National Plaza
　　　　70 West Madison Street
　　　　Suite 3300
　　　　Chicago, Illinois 60602-4207

If to Licensee:

　　　　Tryiton Eyewear, LLC
　　　　17 Washington Street
　　　　Norwalk, Connecticut 06854

14.    <u>Fees and Costs.</u> Each party shall bear its own costs and expenses, including attorneys' fees.

3

A13179

CONFIDENTIAL-OUTSIDE ATTORNEYS EYES ONLY

SVN2-0040670

15.    Governing Law.  This Agreement shall be interpreted, enforced and governed according to the laws of the State of Illinois, without regard to conflict of law provisions.

16.    Venue.  The United States District Court for the Northern District of Illinois, or if that Court does not have subject matter jurisdiction then the state courts of Illinois, shall be the exclusive jurisdiction to enforce the terms of this Agreement.  The parties hereto agree and consent to jurisdiction in these courts solely for purposes of enforcing the terms of this Agreement.

17.    Counterparts.  This Agreement may be signed in one or more counterparts, each of which shall be deemed an original and all of which shall constitute one and the same instrument.  Copies of signed counterparts transmitted by telecopy, facsimile, or other electronic transmission shall be considered original executed counterparts for purposes of this Paragraph, provided receipt of said copies of counterparts is confirmed.  This Agreement shall not be effective unless and until signed by all parties hereto.

18.    Severability.  If any provision of this Agreement shall be held void or unenforceable by a court, such provision shall be severable and shall not affect the validity or enforceability of any other provisions of this Agreement.

19.    No Waivers.  The waiver by either party of a breach of any provision of this Agreement or the failure by any of the parties to exercise any right hereunder shall not operate or be construed as a waiver of any subsequent breach of that right or a waiver of any other right. It is further expressly agreed that the waiver of any right of either party hereunder or under the law shall be effective only if in writing and executed by an authorized officer of the affected party.

20.    Headings.  All section headings are stated for convenience only and shall not be considered in construing this Agreement.

21.    Preparation of Agreement; Construction.  This Agreement shall be construed without regard to the party or parties responsible for the preparation of the same and shall be deemed as prepared jointly by the parties hereto. Any ambiguity or uncertainty existing herein shall not be interpreted or construed against any party hereto on the basis that such party may have drafted such provision.

22.    Term of Agreement.  This Agreement shall be in effect until the term granted under each of the Licensed divine Patents has expired.

23.    Entire Agreement.  This Agreement represents and contains the entire agreement and understanding between the parties with respect to the subject matter of this Agreement, and supersedes any and all prior or contemporaneous negotiations, agreements and understandings, whether written or oral, between the parties with respect to the subject matter of this Agreement.

24.    Enforcement of Agreement.  If it is necessary for either party to bring a lawsuit under this Agreement to enforce the Agreement or any provision thereof, the prevailing party to any such litigation shall be entitled to recover its reasonable attorneys' fees from the other party.

4

CONFIDENTIAL-OUTSIDE ATTORNEYS EYES ONLY

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date set forth above.

DIVINE TECHNOLOGY VENTURES

By:
Name: JUDE M. SULLIVAN
Title: SVP
Date: 12/16/02

TRYITON EYEWEAR, LLC

By:
Name: Mark S. Agred
Title: Manager
Date: 11/28/04

5

A13181

CONFIDENTIAL-OUTSIDE ATTORNEYS EYES ONLY

SVN2-0040672

# LICENSE AGREEMENT

This License Agreement ("Agreement") is effective this 27th day of November, 2002 ("Effective Date") and is by and between divine technology ventures, an Illinois general partnership having a place of business at 1301 North Elston Avenue, Chicago, Illinois ("divine") and Bissinger French Confections, a Missouri corporation having a principal place of business at 3983 Gratiot Street, St. Louis, Missouri 63110 ("Licensee").

## RECITALS

WHEREAS, divine is the owner of patents set forth more fully below;

WHEREAS, Licensee operates the bissingers.com website; and

WHEREAS, Licensee desires to license the patents.

NOW, THEREFORE, in consideration of the above recitals, the mutual covenants set forth below, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. **Definitions.** As used in this Agreement, the following term shall have the following meaning:

   a. "Licensed divine Patents" means U.S. Patent Nos. 5,715,314 and 5,909,492 and any patent issuing from a continuation, continuation-in-part, divisional, reissue or foreign counterpart application of any of the foregoing, to the extent such patent claims in whole or in part the benefit of the filing date of any one of the patents.

2. **License.** During the term of this Agreement, and subject to the payment specified in Paragraph 7 below, divine hereby grants to Licensee a paid-up, non-transferable, non-exclusive license, with no right to sub-license, under the Licensed divine Patents to use the systems and apparatuses or to practice methods embodying any of the inventions claimed in the Licensed divine Patents throughout the world.

3. **Validity of the Licensed divine Patents.** Licensee is not aware of any information adversely affecting the validity of the claims of the Licensed divine Patents.

4. **Covenant Not to Sue Licensee.** Subject to Licensee abiding by the terms of this Agreement and for the duration of this Agreement, divine covenants not to sue Licensee, its officers, employees, and customers for infringement of any divine patents including the Licensed divine Patents based on the bissingers.com website.

5. **Covenant Not to Sue divine.** Subject to divine abiding by the terms of this Agreement, and for the duration of this Agreement, Licensee covenants not to sue divine, its parent, subsidiaries, affiliates or successors for any claims or counterclaims that were or could have been brought against any of them as of the date of this Agreement in any lawsuit involving the divine Patents.

CONFIDENTIAL-OUTSIDE ATTORNEYS EYES ONLY

SVN2-0040554

A13182

**Defendant's Exhibit**
**Exhibit No. D-240**
**Case No. 6:07-cv-00511**

6.    Mutual Release.  Each party hereto releases, acquits, and forever discharges the other party and its respective parent companies, subsidiaries, affiliates, officers, directors, employees, agents, shareholders, advisors, representatives, assigns, predecessors-in-interest and successors-in-interest from all claims, causes of action, suits, debts, liens, obligations, liabilities, demands, losses, costs and expenses (including attorneys' fees and costs) of any kind, character or nature whatsoever, known or unknown, fixed or contingent, (collectively "Claim") that the releasing party has or may have or claim to have now or that may hereafter arise out of, relate to, or be connected with the Licensed divine Patents.  The releases set forth in this Section shall be effective upon execution of this Agreement by the parties.

7.    Payment by Licensee.  In consideration of the licenses, releases, waivers and covenants against suit contained in this Agreement, Licensee shall pay to divine a one percent (1%) royalty of the gross sales made by Licensee in 2001 over the Internet or ten thousand dollars ($10,000), whichever sum is greater.  Such payment shall be made within five (5) business days after the Effective Date of this Agreement.

8.    Limitations.  EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, NONE OF THE PARTIES (i) MAKES ANY WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED, INCLUDING WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, AND (ii) WILL BE LIABLE TO ANOTHER PARTY UNDER ANY CONTRACT, STRICT LIABILITY, NEGLIGENCE OR OTHER LEGAL OR EQUITABLE THEORY, FOR ANY INCIDENTAL OR CONSEQUENTIAL DAMAGES OR LOST PROFITS IN CONNECTION WITH THE SUBJECT MATTER OF THIS AGREEMENT.

9.    Confidentiality.  The parties hereto acknowledge that the terms of this Agreement are confidential, except that each party may disclose that Licensee has a license under the Licensed divine Patents.  Neither the parties nor their counsel may convey to third parties the terms of this Agreement, except that the terms of this Agreement may be disclosed to tax preparers and insurers as reasonably necessary, or as may be ordered by law.

10.    Warranty of Authority.  Each person signing this Agreement on behalf of a party warrants that he or she has authority to bind said entity.  divine further warrants and represents that its rights include the right to sue for alleged past infringement and that it has not entered into and shall not enter into any agreement which would interfere with or otherwise encumber any of the releases, covenants not to sue, or licenses granted by this Agreement.

11.    Amendment to Agreement.  This Agreement may not be altered, amended, modified or otherwise changed in any respect or manner, except by a writing executed by an authorized representative of each party.

2

A13183

CONFIDENTIAL-OUTSIDE ATTORNEYS EYES ONLY

SVN2-0040555

12.   _Nontransferability of Agreement to Third Parties._  This Agreement may not be assigned or transferred by Licensee to a third party without the prior written consent of divine, except that the Agreement can be transferred to a party acquiring the entire business of Licensee to which the bissingers.com website relates but it is understood that the licenses granted hereunder are limited to the bissingers.com website and cannot be expanded by any such transfer.

13.   _Notices._  All notices, requests, demands, directions and other communications provided for hereunder shall be in writing and mailed or faxed or delivered to the applicable party at the address of such party set forth below (or such other address duly provided in writing to the other side). Each such notice, request, demand, direction or other communication shall be effective upon delivery.

If to divine:

Richard Nawracaj, Esq.
Assistant General Counsel
divine, Inc.
1301 North Elston Avenue
Chicago, Illinois 60622
Fax: 312-394-6601

With a copy to:

Robert M. Barrett, Esq.
Bell, Boyd & Lloyd LLC
Three First National Plaza
70 West Madison Street
Suite 3300
Chicago, Illinois 60602-4207

If to Licensee:

Chief Executive Officer
Bissingers French Confections
3983 Gratiot Street
St. Louis, Missouri 63110

14.   _Fees and Costs._  Each party shall bear its own costs and expenses, including attorneys' fees.

15.   _Governing Law._  This Agreement shall be interpreted, enforced and governed according to the laws of the State of Illinois, without regard to conflict of law provisions.

16.   _Venue._  The United States District Court for the Northern District of Illinois, or if that Court does not have subject matter jurisdiction then the state courts of Illinois, shall be the

3

A13184

CONFIDENTIAL-OUTSIDE ATTORNEYS EYES ONLY

SVN2-0040556

exclusive jurisdiction to enforce the terms of this Agreement. The parties hereto agree and consent to jurisdiction in these courts solely for purposes of enforcing the terms of this Agreement.

17.    Counterparts. This Agreement may be signed in one or more counterparts, each of which shall be deemed an original and all of which shall constitute one and the same instrument. Copies of signed counterparts transmitted by telecopy, facsimile, or other electronic transmission shall be considered original executed counterparts for purposes of this Paragraph, provided receipt of said copies of counterparts is confirmed. This Agreement shall not be effective unless and until signed by all parties hereto.

18.    Severability. If any provision of this Agreement shall be held void or unenforceable by a court, such provision shall be severable and shall not affect the validity or enforceability of any other provisions of this Agreement.

19.    No Waivers. The waiver by either party of a breach of any provision of this Agreement or the failure by any of the parties to exercise any right hereunder shall not operate or be construed as a waiver of any subsequent breach of that right or a waiver of any other right. It is further expressly agreed that the waiver of any right of either party hereunder or under the law shall be effective only if in writing and executed by an authorized officer of the affected party.

20.    Headings. All section headings are stated for convenience only and shall not be considered in construing this Agreement.

21.    Preparation of Agreement; Construction. This Agreement shall be construed without regard to the party or parties responsible for the preparation of the same and shall be deemed as prepared jointly by the parties hereto. Any ambiguity or uncertainty existing herein shall not be interpreted or construed against any party hereto on the basis that such party may have drafted such provision.

22.    Term of Agreement. This Agreement shall be in effect until the term granted under each of the Licensed divine Patents has expired.

23.    Entire Agreement. This Agreement represents and contains the entire agreement and understanding between the parties with respect to the subject matter of this Agreement, and supersedes any and all prior or contemporaneous negotiations, agreements and understandings, whether written or oral, between the parties with respect to the subject matter of this Agreement.

24.    Enforcement of Agreement. If it is necessary for either party to bring a lawsuit under this Agreement to enforce the Agreement or any provision thereof, the prevailing party to any such litigation shall be entitled to recover its reasonable attorneys' fees from the other party.

4

A13185

CONFIDENTIAL-OUTSIDE ATTORNEYS EYES ONLY                    SVN2-0040557

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date set forth above.

DIVINE TECHNOLOGY VENTURES

By: _____
Name: _____
Title: _____
Date: _____

BISSINGERS FRENCH CONFECTIONS

By: _____
Name: _Kenneth C. Kellerhals_____
Title: _President_____
Date: _12/17/02_____

5

CONFIDENTIAL-OUTSIDE ATTORNEYS EYES ONLY

SVN2-0040558

## LICENSE AGREEMENT

This License Agreement ("Agreement") is effective this 6th day of January, 2003 ("Effective Date") and is by and between divine technology ventures, an Illinois general partnership having a place of business at 1301 North Elston Avenue, Chicago, Illinois ("divine") and DVD Planet.com Inc., a California corporation having a principal place of business at 15251 Beach Blvd., Westminster, California 92683-6205 ("Licensee").

### RECITALS

WHEREAS, divine is the owner of patents set forth more fully below;

WHEREAS, Licensee operates the dvdplanet.com website; and

WHEREAS, Licensee desires to license the patents.

NOW, THEREFORE, in consideration of the above recitals, the mutual covenants set forth below, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. <u>Definitions</u>. As used in this Agreement, the following term shall have the following meaning:

   a. "Licensed divine Patents" means U.S. Patent Nos. 5,715,314 and 5,909,492 and any patent issuing from a continuation, continuation-in-part, divisional, reissue or foreign counterpart application of any of the foregoing, to the extent such patent claims in whole or in part the benefit of the filing date of any one of the patents.

2. <u>License.</u> During the term of this Agreement, and subject to the payment specified in Paragraph 7 below, divine hereby grants to Licensee a paid-up, non-transferable, non-exclusive license, with no right to sub-license, under the Licensed divine Patents to use the systems and apparatuses or to practice methods embodying any of the inventions claimed in the Licensed divine Patents throughout the world.

3. <u>Validity of the Licensed divine Patents.</u> Licensee acknowledges the validity of the claims of the Licensed divine Patents.

4. <u>Covenant Not to Sue Licensee.</u> Subject to Licensee abiding by the terms of this Agreement and for the duration of this Agreement, divine covenants not to sue Licensee, its officers, employees, and customers for infringement of any divine patents including the Licensed divine Patents based on the dvdplanet.com website if Licensee does not substantially modify the functionality of the dvdplanet.com website.

5. <u>Covenant Not to Sue divine.</u> Licensee covenants not to sue divine, its parent, subsidiaries, affiliates or successors for any claims or counterclaims that were or could have been brought against any of them as of the date of this Agreement in any lawsuit involving the divine Patents.

479475/D/1  XK7J01_

CONFIDENTIAL-OUTSIDE ATTORNEYS EYES ONLY

A13187

SVN2-0040580

**Defendant's Exhibit
Exhibit No. D-241
Case No. 6:07-cv-00511**

6.    Mutual Release. Each party hereto releases, acquits, and forever discharges the other party and its respective parent companies, subsidiaries, affiliates, officers, directors, employees, agents, shareholders, advisors, representatives, assigns, predecessors-in-interest and successors-in-interest from all claims, causes of action, suits, debts, liens, obligations, liabilities, demands, losses, costs and expenses (including attorneys' fees and costs) of any kind, character or nature whatsoever, known or unknown, fixed or contingent, (collectively "Claim") that the releasing party has or may have or claim to have now or that may hereafter arise out of, relate to, or be connected with the Licensed divine Patents. The releases set forth in this Section shall be effective upon execution of this Agreement by the parties.

7.    Payment by Licensee. In consideration of the licenses, releases, waivers and covenants against suit contained in this Agreement, Licensee shall pay to divine a two and one-half percent (2 1/2%) royalty of the net sales (gross sales minus the cost of goods) made by Licensee in 2001 over the Internet, represented to be four hundred ninety-two thousand dollars ($492,000). Such payment shall be made within five (5) business days after the Effective Date of this Agreement.

8.    Limitations. EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, NONE OF THE PARTIES (i) MAKES ANY WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED, INCLUDING WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, AND (ii) WILL BE LIABLE TO ANOTHER PARTY UNDER ANY CONTRACT, STRICT LIABILITY, NEGLIGENCE OR OTHER LEGAL OR EQUITABLE THEORY, FOR ANY INCIDENTAL OR CONSEQUENTIAL DAMAGES OR LOST PROFITS IN CONNECTION WITH THE SUBJECT MATTER OF THIS AGREEMENT.

9.    Confidentiality. The parties hereto acknowledge that the terms of this Agreement are confidential. Neither the parties nor their counsel may convey to third parties the terms of this Agreement, except that the terms of this Agreement may be disclosed to tax preparers and insurers as reasonably necessary, or as may be ordered by law.

10.    Warranty of Authority. Each person signing this Agreement on behalf of a party warrants that he or she has authority to bind said entity. divine further warrants and represents that its rights include the right to sue for alleged past infringement and that it has not entered into and shall not enter into any agreement which would interfere with or otherwise encumber any of the releases, covenants not to sue, or licenses granted by this Agreement. divine therefore agrees to indemnify Licensee for any damage Licensee incurs as a result of a third party asserting Licensee infringes the Licensed divine Patents. This indemnification is limited to third party actions asserting some right in the Licensed divine Patents and does not cover any actions or assertions based on any other patents.

479475/D/1 XK7J01_                              2

CONFIDENTIAL-OUTSIDE ATTORNEYS EYES ONLY                              SVN2-0040581

11.    _Amendment to Agreement._ This Agreement may not be altered, amended, modified or otherwise changed in any respect or manner, except by a writing executed by an authorized representative of each party.

12.    _Nontransferability of Agreement to Third Parties._ This Agreement may not be assigned or transferred by Licensee to a third party without the prior written consent of divine, except that the Agreement can be transferred to a party acquiring the entire business of Licensee to which the dvdplanet.com website relates but it is understood that the licenses granted hereunder are limited to the dvdplanet.com website and cannot be expanded by any such transfer.

13.    _Notices._ All notices, requests, demands, directions and other communications provided for hereunder shall be in writing and mailed or faxed or delivered to the applicable party at the address of such party set forth below (or such other address duly provided in writing to the other side). Each such notice, request, demand, direction or other communication shall be effective upon delivery.

If to divine:

       Jude Sullivan, Esq.
       General Counsel
       divine, Inc.
       1301 North Elston Avenue
       Chicago, Illinois 60622
       Fax: 312-394-6601

With a copy to:

       Robert M. Barrett, Esq.
       Bell, Boyd & Lloyd LLC
       Three First National Plaza
       70 West Madison Street
       Suite 3300
       Chicago, Illinois 60602-4207

If to Licensee:

       DVD Planet.com Inc.
       15251 Beach Blvd.
       Westminster, California 92683-6205

A13189

CONFIDENTIAL-OUTSIDE ATTORNEYS EYES ONLY                    SVN2-0040582

With a copy to:

    Karin E. Peterka, Esq.
    Buchalter Nemer Fields & Younger
    601 South Figueroa Street
    Suite 2400
    Los Angeles, California 90017-5704

14.    Fees and Costs. Each party shall bear its own costs and expenses, including attorneys' fees.

15.    Governing Law. This Agreement shall be interpreted, enforced and governed according to the laws of the State of Illinois, without regard to conflict of law provisions.

16.    Venue. The United States District Court for the Northern District of Illinois, or if that Court does not have subject matter jurisdiction then the state courts of Illinois, shall be the exclusive jurisdiction to enforce the terms of this Agreement. The parties hereto agree and consent to jurisdiction in these courts solely for purposes of enforcing the terms of this Agreement.

17.    Counterparts. This Agreement may be signed in one or more counterparts, each of which shall be deemed an original and all of which shall constitute one and the same instrument. Copies of signed counterparts transmitted by telecopy, facsimile, or other electronic transmission shall be considered original executed counterparts for purposes of this Paragraph, provided receipt of said copies of counterparts is confirmed. This Agreement shall not be effective unless and until signed by all parties hereto.

18.    Severability. If any provision of this Agreement shall be held void or unenforceable by a court, such provision shall be severable and shall not affect the validity or enforceability of any other provisions of this Agreement.

19.    No Waivers. The waiver by either party of a breach of any provision of this Agreement or the failure by any of the parties to exercise any right hereunder shall not operate or be construed as a waiver of any subsequent breach of that right or a waiver of any other right. It is further expressly agreed that the waiver of any right of either party hereunder or under the law shall be effective only if in writing and executed by an authorized officer of the affected party.

20.    Headings. All section headings are stated for convenience only and shall not be considered in construing this Agreement.

21.    Preparation of Agreement; Construction. This Agreement shall be construed without regard to the party or parties responsible for the preparation of the same and shall be deemed as prepared jointly by the parties hereto. Any ambiguity or uncertainty existing herein shall not be interpreted or construed against any party hereto on the basis that such party may have drafted such provision.

479475/D:1  XK7J01_                        4

A13190

CONFIDENTIAL-OUTSIDE ATTORNEYS EYES ONLY                        SVN2-0040583

22.    <u>Term of Agreement.</u>   This Agreement shall be in effect until the term granted under each of the Licensed divine Patents has expired.   However, Licensee has the right to terminate this Agreement should Licensee stop using the systems and apparatuses or practice methods embodying any of the inventions claimed in the Licensed divine Patents.

23.    <u>Entire Agreement.</u>   This Agreement represents and contains the entire agreement and understanding between the parties with respect to the subject matter of this Agreement, and supersedes any and all prior or contemporaneous negotiations, agreements and understandings, whether written or oral, between the parties with respect to the subject matter of this Agreement.

24.    <u>Enforcement of Agreement.</u>   If it is necessary for either party to bring a lawsuit under this Agreement to enforce the Agreement or any provision thereof, the prevailing party to any such litigation shall be entitled to recover its reasonable attorneys' fees from the other party.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date set forth above.

DIVINE TECHNOLOGY VENTURES

By:     _Judi Sulliva_____
Name:   _____
Title:    _VP_____
Date:    _1-20-03_____

DVD PLANET.COM INC

By:     _____
Name:   _Jeff M. Framor____
Title:    _CEU_____
Date:    _1-9-03_____

A13191

CONFIDENTIAL-OUTSIDE ATTORNEYS EYES ONLY                          SVN2-0040584

## LICENSE AGREEMENT

This License Agreement ("Agreement") is effective this 16th day of January, 2003 ("Effective Date") and is by and between divine technology ventures, an Illinois general partnership having a place of business at 1301 North Elston Avenue, Chicago, Illinois ("divine") and System Optics, Inc., an Ohio corporation having a principal place of business at 518 West Avenue, Akron, Ohio 44278 ("Licensee").

### RECITALS

WHEREAS, divine is the owner of patents set forth more fully below;

WHEREAS, Licensee operates the eyelensdirect.com website; and

WHEREAS, Licensee desires to license the patents.

NOW, THEREFORE, in consideration of the above recitals, the mutual covenants set forth below, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.    <u>Definitions</u>. As used in this Agreement, the following term shall have the following meaning:

    a.    "Licensed divine Patents" means U.S. Patent Nos. 5,715,314 and 5,909,492 and any patent issuing from a continuation, continuation-in-part, divisional, reissue or foreign counterpart application of any of the foregoing, to the extent such patent claims in whole or in part the benefit of the filing date of any one of the patents, including but not limited to U.S. Patent No. 6,449,599.

2.    <u>License</u>. During the term of this Agreement, and subject to the payment specified in Paragraph 7 below, divine hereby grants to Licensee a paid-up, non-transferable, non-exclusive license, with no right to sub-license, under the Licensed divine Patents to use the systems and apparatuses or to practice methods embodying any of the inventions claimed in the Licensed divine Patents throughout the world.

3.    <u>Validity of the Licensed divine Patents.</u> Licensee acknowledges the validity of the claims of the Licensed divine Patents.

4.    <u>Covenant Not to Sue Licensee</u>. Subject to Licensee abiding by the terms of this Agreement and for the duration of this Agreement, divine, its parent, subsidiaries, affiliates or successors, including divine, Inc., covenant not to sue Licensee, its officers, employees, and customers for infringement of any divine patents including the Licensed divine Patents based on the eyelensdirect.com website if Licensee does not substantially modify the functionality of the eyelensdirect.com website.

CONFIDENTIAL-OUTSIDE ATTORNEYS EYES ONLY

SVN2-0040658

5.    Covenant Not to Sue divine.  Licensee covenants not to sue divine, its parent, subsidiaries, affiliates or successors for any claims or counterclaims that were or could have been brought against any of them as of the date of this Agreement in any lawsuit involving the divine Patents.

6.    Mutual Release.  Each party hereto releases, acquits, and forever discharges the other party and its respective parent companies, subsidiaries, affiliates, officers, directors, employees, agents, shareholders, advisors, representatives, assigns, predecessors-in-interest and successors-in-interest from all claims, causes of action, suits, debts, liens, obligations, liabilities, demands, losses, costs and expenses (including attorneys' fees and costs) of any kind, character or nature whatsoever, known or unknown, fixed or contingent, (collectively "Claim") that the releasing party has or may have or claim to have now or that may hereafter arise out of, relate to, or be connected with the Licensed divine Patents.  The releases set forth in this Section shall be effective upon execution of this Agreement by the parties.

7.    Payment by Licensee.  In consideration of the licenses, releases, waivers and covenants against suit contained in this Agreement, Licensee shall pay to divine a one-time payment of two thousand dollars ($2000.00), which Licensee represents is ten percent (10%) of gross sales of product over the Internet from 2000 through 2002.  Such payment shall be made within five (5) business days after the Effective Date of this Agreement.

8.    Limitations.  EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, NONE OF THE PARTIES (i) MAKES ANY WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED, INCLUDING WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, AND (ii) WILL BE LIABLE TO ANOTHER PARTY UNDER ANY CONTRACT, STRICT LIABILITY, NEGLIGENCE OR OTHER LEGAL OR EQUITABLE THEORY, FOR ANY INCIDENTAL OR CONSEQUENTIAL DAMAGES OR LOST PROFITS IN CONNECTION WITH THE SUBJECT MATTER OF THIS AGREEMENT.

9.    Confidentiality.  The parties hereto acknowledge that the terms of this Agreement are confidential, except that each party may disclose that Licensee has a license under the Licensed divine Patents.  Neither the parties nor their counsel may convey to third parties the terms of this Agreement, except that the terms of this Agreement may be disclosed to tax preparers and insurers as reasonably necessary, or as may be ordered by law.

2

CONFIDENTIAL-OUTSIDE ATTORNEYS EYES ONLY                                    SVN2-0040659

10. Warranty of Authority. Each person signing this Agreement on behalf of a party warrants that he or she has authority to bind said entity. divine further warrants and represents that it is the owner of all right, title and interest in and to the Licensed divine Patents including the right to sue for alleged past infringement and that it has not entered into and shall not enter into any agreement which would interfere with or otherwise encumber any of the releases, covenants not to sue, or licenses granted by this Agreement.

11. Amendment to Agreement. This Agreement may not be altered, amended, modified or otherwise changed in any respect or manner, except by a writing executed by an authorized representative of each party.

12. Nontransferability of Agreement to Third Parties. This Agreement may not be assigned or transferred by Licensee to a third party without the prior written consent of divine, except that the Agreement can be transferred to a party acquiring the entire business of Licensee to which the eyelensdirect.com website relates but it is understood that the licenses granted hereunder are limited to the eyelensdirect.com website and cannot be expanded by any such transfer.

13. Notices. All notices, requests, demands, directions and other communications provided for hereunder shall be in writing and mailed or faxed or delivered to the applicable party at the address of such party set forth below (or such other address duly provided in writing to the other side). Each such notice, request, demand, direction or other communication shall be effective upon delivery.

If to divine:

> Jude Sullivan, Esq.
> General Counsel
> divine, Inc.
> 1301 North Elston Avenue
> Chicago, Illinois 60622
> Fax: 312-394-6601

With a copy to:

> Robert M. Barrett, Esq.
> Bell, Boyd & Lloyd LLC
> Three First National Plaza
> 70 West Madison Street
> Suite 3300
> Chicago, Illinois 60602-4207

CONFIDENTIAL-OUTSIDE ATTORNEYS EYES ONLY    SVN2-0040660

If to Licensee:

> Mr. Scott Weekley
> System Optics, Inc.
> 518 West Avenue
> Akron, Ohio 44278

With a copy to:

> Ralph J. Palmisano, Esq.
> Evanchan & Palmisano
> 1225 West Market Street
> Akron, Ohio 44313

14.    _Fees and Costs._  Each party shall bear its own costs and expenses, including attorneys' fees.

15.    _Governing Law._  This Agreement shall be interpreted, enforced and governed according to the laws of the State of Illinois, without regard to conflict of law provisions.

16.    _Venue._  The United States District Court for the Northern District of Illinois, or if that Court does not have subject matter jurisdiction then the state courts of Illinois, shall be the exclusive jurisdiction to enforce the terms of this Agreement.  The parties hereto agree and consent to jurisdiction in these courts solely for purposes of enforcing the terms of this Agreement.

17.    _Counterparts._  This Agreement may be signed in one or more counterparts, each of which shall be deemed an original and all of which shall constitute one and the same instrument.  Copies of signed counterparts transmitted by telecopy, facsimile, or other electronic transmission shall be considered original executed counterparts for purposes of this Paragraph, provided receipt of said copies of counterparts is confirmed.  This Agreement shall not be effective unless and until signed by all parties hereto.

18.    _Severability._  If any provision of this Agreement shall be held void or unenforceable by a court, such provision shall be severable and shall not affect the validity or enforceability of any other provisions of this Agreement.

19.    _No Waivers._  The waiver by either party of a breach of any provision of this Agreement or the failure by any of the parties to exercise any right hereunder shall not operate or be construed as a waiver of any subsequent breach of that right or a waiver of any other right. It is further expressly agreed that the waiver of any right of either party hereunder or under the law shall be effective only if in writing and executed by an authorized officer of the affected party.

20.    _Headings._  All section headings are stated for convenience only and shall not be considered in construing this Agreement.

<div align="center">4</div>

<div align="center">A13195</div>

CONFIDENTIAL-OUTSIDE ATTORNEYS EYES ONLY                              SVN2-0040661

21.  Preparation of Agreement; Construction.  This Agreement shall be construed without regard to the party or parties responsible for the preparation of the same and shall be deemed as prepared jointly by the parties hereto. Any ambiguity or uncertainty existing herein shall not be interpreted or construed against any party hereto on the basis that such party may have drafted such provision.

22.  Term of Agreement.  This Agreement shall be in effect until the term granted under each of the Licensed divine Patents has expired.

23.  Entire Agreement.  This Agreement represents and contains the entire agreement and understanding between the parties with respect to the subject matter of this Agreement, and supersedes any and all prior or contemporaneous negotiations, agreements and understandings, whether written or oral, between the parties with respect to the subject matter of this Agreement.

24.  Enforcement of Agreement.  If it is necessary for either party to bring a lawsuit under this Agreement to enforce the Agreement or any provision thereof, the prevailing party to any such litigation shall be entitled to recover its reasonable attorneys' fees from the other party.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date set forth above.

DIVINE TECHNOLOGY VENTURES

By:       _Judd Sullivan_____
Name:  _____
Title:    _VP_____
Date:    _2-03  1-17-03_____

SYSTEM OPTICS, INC.

By:       _____
Name:  _Jerome Sude_____
Title:    _Vice President_____
Date:    _January 16, 2003_____

5

CONFIDENTIAL-OUTSIDE ATTORNEYS EYES ONLY                    SVN2-0040662

A1

December 12, 1997

Douglas G. Kubach
Senior Vice President, Technology & Multimedia
McGraw Hill Educational & Professional Publishing
1221 Avenue of the Americas, 15th floor
New York, NY 10020

Dear Doug:

This letter will confirm that The McGraw-Hill Companies, Inc. ("McGraw") agrees to acquire the Open Market products and services listed below pursuant to the terms and conditions of those certain (i) Transact Software License Agreement and (ii) Agreement for Annual Support each executed on September 29, 1997 between Open Market, Inc.("Open Market") and BusinessWeek, a division of McGraw (the "BW Agreements") which terms and conditions, except with respect to pricing, payment terms and the definition of Business Lines which are set out in this letter, are incorporated herein by reference. For purposes hereof, "Business Line", which refers to the number of Store IDs, will be defined as "the domestic divisions of McGraw's Educational and Professional Publishing Group" ("EPPG") for the one Store ID included with the Transact license; and the Additional Business Line (Store ID) purchased hereunder will be defined as "McGraw-Hill Ryerson" ("Ryerson"). ~~LiveCommerce shall be licensed under its shrinkwrap agreement.~~ The consulting services listed below are being contracted for pursuant to the Professional Services Agreement executed on September 29, 1997 between Open Market and BusinessWeek, provided that the scope of the work to be done for EPPG and Ryerson shall will be defined in a new Statement of Work to be provided by Open Market.

Fees for Products and Services.

| | |
|---|---|
| Transact | $125,000 License Fee |
| Tax Server | $ 15,000 License Fee |
| Development Server | $ 50,000 License Fee |
| Additional Business Line | $ 40,000 License Fee |
| ~~LiveCommerce Catalog~~ | ~~$ 45,000 License Fee~~  *JM* |
| | ~~$275,000~~  230,000 *JM* |
| | |
| Annual Basic Maintenance & Support | ~~$ 55,000~~  46,000 *JM* |
| | |
| Consulting: | |
| ~~Pre-paid Training Credits~~  *JM* | ~~$ 7,500~~  ✓ *JM* |
| Feasibility Study | $ 7,500 |
| ~~40 Days pre-paid Cnslng~~ | ~~$ 60,000~~  *JM* |
| Total pre-paid Consulting | 15,000  ~~$ 75,000~~ |
| | |
| Total Fees: | 291,000  ~~$405,000~~  *JM* |

The above fees shall be due upon execution of this letter by McGraw. Please acknowledge your receipt of this letter and acceptance of the terms hereof by signing a copy on the line provided below and returning it to me.

CONFIDENTIAL

SOV0159085

A13208

Sincerely,

Janine Jennings
Strategic Account Manager


Acknowledged and agreed:

The McGraw-Hill Companies, Inc.

By: _____
Name: _____
Title: _____
     (hereunto duly authorized)


OPEN MARKET, INC.

By: _____

SOV0159086

CONFIDENTIAL

Sincerely,

Janine Jennings
Strategic Account Manager

Acknowledged and agreed:

The McGraw-Hill Companies, Inc.

By: _____
Name: _____
Title: _____
(hereunto duly authorized)

OPEN MARKET, INC.

By: _____
LEGAL COUNSEL : ASSISTANT SECRETARY
12/24/97

A13210

SOV0159087

CONFIDENTIAL

## Purchase Order Form

**The McGraw-Hill Companies**
**Educational & Professional Publishing Group**
**1221 Avenue of the Americas**
**New York, NY 10020**

TODAY's DATE: __12/22/97__

PO # ASSIGNED: __129704__    Blanket PO #: _____    Release #: _____

REQUISITIONER: __Janet Nunez__    TELEPHONE: __212/512-6569__

DIVISION/DEPARTMENT: __EPPG - Technology__    LOCATION: __NY HQ 15th Floor__

DELIVER TO: __Dan Balocca__    TELEPHONE: __319/589-1347__

DIVISION/DEPARTMENT: __MH Higher Education__    LOCATION: __2460 Kerper Boulevard__
                                              Dubuque, IA 52001

15-DIGIT ACCOUNTING CODE __/    /    /    /__    REQUESTED DELIVERY DATE: __ASAP__

SUGGESTED VENDOR
Open Market (Suite #4100)
ADDRESS
1120 Ave of the Americas, NY NY 10036

VENDOR ASSIGNMENT (Corporate Purchasing Use Only)
ADDRESS

| QTY | DESCRIPTION | UNIT PRICE | EXTENDED COST |
|-----|-------------|------------|---------------|
| 1 | Transact License ($125K) plus annual support ($25K) | $150,000 | |
| 1 | Development License ($50K) plus annual support ($10K) | 60,000 | |
| 1 | Transact Sales Tax Server ($15K) plus annual supp.($3K) | 18,000 | |
| | TOTAL | 228,000 | |

**SPECIAL INSTRUCTIONS**— DEPRECIATION CODES: Attach approved Capital Expenditure forms where appropriate.

Taxable    Tax Exempt (check below) and attach appropriate certificate.
Resale/Release    Capital Improvement    Production Equipment    Other, explain:

Douglas Kubach                     15854/389
Approval Level #1-PRINT NAME    Signature    T&E Number

J C Milanif
Approval Level #2-PRINT NAME    Signature    T&E Number

Jack Witmer                      159·24-9453
Additional Approver-PRINT NAME    Signature    T&E Number

Original *MUST* be sent to Corporate Purchasing, Hightstown, N-1. Retain one copy for your records. Standing order release under $1,000 may be sent directly to the vendor with one copy to Corporate Purchasing.

FORM COPY #001
REV. 03/96

SOV0159088

CONFIDENTIAL

Purchase Order Form

**The McGraw-Hill Companies**
**Educational & Professional Publishing Group**
**1221 Avenue of the Americas**
**New York, NY 10020**

TODAY's DATE: ___12/22/97___

PO # ASSIGNED: ___129706___    Blanket PO #: _____    Release #: _____

REQUISITIONER: ___Janet Nunez___    TELEPHONE: ___212/512-6569___

DIVISION/DEPARTMENT: ___EPPG - Technology___    LOCATION: ___NY HQ 15th Floor___

DELIVER TO: ___Dan Balocca___    TELEPHONE: ___319/589-1347___

DIVISION/DEPARTMENT: ___McGraw-Hill Higher Education___    LOCATION: 2460 Kerper Boulevard
Dubuque, IA 52001

0981 7404   1 7601 4641 99    REQUESTED DELIVERY DATE: ___ASAP___
15-DIGIT ACCOUNTING CODE

| SUGGESTED VENDOR Open Market (Suite #4100) ADDRESS 1120 Ave of the Americas, NY NY 10036 | | VENDOR ASSIGNMENT (Corporate Purchasing Use Only) ADDRESS | |
|---|---|---|---|
| **QTY** | **DESCRIPTION** | **UNIT PRICE** | **EXTENDED COST** |
| | Open Market Consulting for Systems Integration 5 days analysis/design | $7,500 | |

**SPECIAL INSTRUCTIONS**— DEPRECIATION CODES: Attach approved Capital Expenditure forms where appropriate.

Taxable    Tax Exempt (check below) and attach appropriate certificate.
Resale/Release    Capital Improvement    Production Equipment    Other, explain:

___Douglas Kubach___    _Douglas Kubach_    15-5541389
Approval Level #1-PRINT NAME    Signature    T&E Number

Approval Level #2-PRINT NAME    Signature    T&E Number

Additional Approver-PRINT NAME    Signature    T&E Number

Original *MUST* be sent to Corporate Purchasing, Hightstown, N-1. Retain one copy for your records. Standing order release under $1,000 may be sent directly to the vendor with one copy to Corporate Purchasing.

FORM COPY #001
REV. 03/96

SOV0159089

CONFIDENTIAL

## Purchase Order Form

**The McGraw-Hill Companies**
**Educational & Professional Publishing Group**
**1221 Avenue of the Americas**
**New York, NY 10020**

TODAY's DATE: ___12/22/97___

PO # ASSIGNED: ___129707___    Blanket PO #: _____    Release #: _____

REQUISITIONER: ___Janet Nunez___    TELEPHONE: ___212/512-6569___

DIVISION/DEPARTMENT: ___EPPG - Technology___    LOCATION: ___NY HQ 15th Floor___

DELIVER TO: ___Dan Balocca___    TELEPHONE: ___319/589-1347___

DIVISION/DEPARTMENT: ___McGraw-Hill Higher Education___    LOCATION: ___2460 Kerper Boulevard___
                                                                         Dubuque, IA 52001

_0981  7404  1 7601 1391 21_
15-DIGIT ACCOUNTING CODE    REQUESTED DELIVERY DATE: ___ASAP___

| SUGGESTED VENDOR | VENDOR ASSIGNMENT (Corporate Purchasing Use Only) | | | |
|---|---|---|---|---|
| Open Market (Suite #4100) | | | | |
| ADDRESS | ADDRESS | | | |
| 1120 Ave of the Americas NY NY 10036 | | | | |
| QTY | DESCRIPTION | | UNIT PRICE | EXTENDED COST |
| | Open Market On-site Technical Training | | $7,500 | |
| | | | | |

**SPECIAL INSTRUCTIONS—** DEPRECIATION CODES: Attach approved Capital Expenditure forms where appropriate.

Taxable    Tax Exempt (check below) and attach appropriate certificate.
Resale/Release    Capital Improvement    Production Equipment    Other, explain:

___Douglas Kubach___    _Douglas Kubach_    _158541384_
Approval Level #1-PRINT NAME    Signature    T&E Number

_____    _____    _____
Approval Level #2-PRINT NAME    Signature    T&E Number

_____    _____    _____
Additional Approver-PRINT NAME    Signature    T&E Number

Original *MUST* be sent to Corporate Purchasing, Hightstown, N-1. Retain one copy for your records. Standing order release under $1,000 may be sent directly to the vendor with one copy to Corporate Purchasing.

FORM COPY #001
REV. 03/96

SOV0159090

CONFIDENTIAL

**Purchase Order Form**

**The McGraw-Hill Companies**
**Educational & Professional Publishing Group**
**1221 Avenue of the Americas**
**New York, NY 10020**

TODAY's DATE: __12/22/97__

PO # ASSIGNED: __129709__        Blanket PO #: _____        Release #: _____

REQUISITIONER: __Janet Nunez__        TELEPHONE: __212/512-6569__
DIVISION/DEPARTMENT: __EPPG - Technology__        LOCATION: __NY HQ 15th Floor__

DELIVER TO: __Dan Balocca__        TELEPHONE: __319/589-1347__
DIVISION/DEPARTMENT: __McGraw-Hill Higher Education__        LOCATION: __2460 Kerper Boulevard__
__Dubuque, IA 52001__

____/ _____/ ____/ ____/        REQUESTED DELIVERY DATE: __ASAP__
15-DIGIT ACCOUNTING CODE

| QTY | DESCRIPTION | UNIT PRICE | EXTENDED COST |
|---|---|---|---|
| | **SUGGESTED VENDOR** Open Market (Suite#4100) **ADDRESS** 1120 Ave of the Americas, NY NY 10036 | **VENDOR ASSIGNMENT** (Corporate Purchasing Use Only) **ADDRESS** | |
| 1 | Business Line Store ID ($40K) plus annual supp. ($8K) | $48,000 | |

*SPECIAL INSTRUCTIONS*— DEPRECIATION CODES: Attach approved Capital Expenditure forms where appropriate.

Taxable    Tax Exempt **(check below)** and attach appropriate certificate.
          Resale/Release    Capital Improvement    Production Equipment        Other, explain:

__Douglas Kubach__        _Douglas Kubach_        _158 541385_
Approval Level #1-PRINT NAME        Signature        T&E Number

_____        _____        _____
Approval Level #2-PRINT NAME        Signature        T&E Number

_____        _____        _____
Additional Approver-PRINT NAME        Signature        T&E Number

Original *MUST* be sent to Corporate Purchasing, Hightstown, N-1. Retain one copy for your records. Standing order release under $1,000 may be sent directly to the vendor with one copy to Corporate Purchasing.

FORM COPY #001
REV. 03/96

SOV0159091

A13214

CONFIDENTIAL

# Open Market, Inc.
## Quotation for Software and Support
### Order Form for Products and Support
#### U.S. Canada Pricing

**Bill-To Information**

| | |
|---|---|
| Company name: | McGraw Hill |
| Bldg/Suite No.: | 15th floor |
| Street Address: | 1221 Avenue of the Americas |
| City/state/zip: | NY, NY 10020 |
| Country: | USA |
| Contact: | Doug Kubach |
| Phone: | 212-512-6746 |
| Fax: | 212-512-6307 |
| Email: | kubachd@mcgraw-hill.com |
| Purchase order #: | 129704, 129706,129707,129709 |

**Ship-To Information**

| | |
|---|---|
| Company name: | McGraw Hill Higher Education |
| Bldg/Suite No.: | |
| Street Address: | 2460 Kerper Boulevard |
| City/state/zip: | Dubuque, IA 52001 |
| Country: | USA |
| Contact: | Dan Balocca |
| Phone: | 319-589-1347 |
| Fax: | |
| Email: | dan_balocca@mcgraw-hill.com |

**OMKT Info**

| | |
|---|---|
| OMKT rep (name & initials): | Janine Jennings    JSJ |
| Phone: | 203-978-9030 |
| Fax: | |
| Email: | jennings@openmarket.com |
| Sales Office Region: | cust |
| Sales Channel: | direct |
| Market Segment: | ic |
| Quote valid to: | |

| Item # | Product Description | Database Platform | Hardware Platform | Qty | List Price/Unit | Discount | Net Price/Unit | Extended Lic. Fees | Support Type (B or P) | Annual Support Fees |
|---|---|---|---|---|---|---|---|---|---|---|
| 15 | Corporate Transact License | Oracle | Sun Solaris | 1 | $125,000 | | $125,000 | $125,000 | b | $25,000 |
| 24 | Additional Business Line | | | 1 | $40,000 | | $40,000 | $40,000 | b | $8,000 |
| 21 | Corporate Transact Development License | | | 1 | $50,000 | | $50,000 | $50,000 | b | $10,000 |
| 18 | Corporate Transact SalesTaxServer | | | 1 | $15,000 | | $15,000 | $15,000 | | $3,000 |
| | | | | | | | | | | |
| 29 | Consulting Per Day | | | 5 | $1,500 | | $1,500 | $7,500 | | |
| | (Above consulting for analysis for integration with fulfilment centers) | | | | | | | | | |
| 29 | Consulting Per Day | | | 5 | $1,500 | | $1,500 | $7,500 | | |
| | (Above consulting for on site technical workshops) | | | | | | | | | |

| | Total Product Fees | Total Support Fees: | |
|---|---|---|---|
| | $245,000 | $46,000 | |
| | | | Total |
| | | | $291,000 |

Grand Total: $291,000

**Submission of this form:**
E-Mail to orderpro@openmarket.com -or-
Fax to 617-949-7133 Attn: Steve Boyle -or-
Mail or courier to 245 First St. Cambridge, MA 02142, USA attn Steve Boyle 617-949-7031

*MUST INVOICE ASAP. MCGRAW HILL NEEDS BEFORE (OR ON 1/5/98.)

Rev 5, 11/13/97

CONFIDENTIAL

A13215

SOV0159092

# Open Market, Inc.
## Quotation for Software and Support
### Order Form for Products and Support
### U.S. Canada Pricing

**Bill To Information**

Company Name: Clearview Technologies, Inc.
Bldg/Suite No.: One Kendall Square
Street Address: Suite 2200
City/State/Zip: Cambridge, MA 02139
Country:
Contact:
Phone:
Fax:
Email:

**Ship To Information**

Company Name:
Bldg/Suite No.:
Street Address:
City/State/Zip:
Country:
Contact:
Phone:
Fax:
Email:

**OM's Info**

OMKT rep (name & initials):

Phone:
Fax:
Email:

Quote valid to:

**Purchase order #:**

| Item # | Product Description | Software Platform | Hardware Platform | Qty | List Price/Unit | Discount | Net Price/Unit | Extended Lic. Fees | Support Type (B or P) | Annual Support Fees |
|--------|---------------------|---------|---------|-----|------------|----------|----------------|--------------------|------|------|
| 23 | Unlimited Development License | | | 2 | $50,000 | 31% | $34,500 | $69,000 | | |
| 55 | Corporate Transact Fax Module | | | 2 | $2,500 | 31% | $1,725 | $3,450 | | |
| 52 | Fulfillment SDK | | | 2 | $10,000 | 31% | $6,900 | $13,800 | | |
| 51 | Payment SDK | | | 2 | $10,000 | 31% | $6,900 | $13,800 | | |

Total Product Fees    $100,050        Total Support Fees    $100,050    $0

Grand Total:    $100,050

6/30/98

Form version 9 as of 6/9/98

Submission of this form:
E-Mail to orderpro@openmarket.com -or-
Fax to 781-359-4123 Attn: Steve Boyle -or-
Mail or courier to One Wayside Road, Burlington, MA 01803, USA attn Steve Boyle 781-359-7165

A13224

**Attachment A**

**PRODUCTS and FEES**

I.    Fees

*Please indicate currently required items only:*

| | Oracle | Sun | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Transact License* | | | 1 | $125,000 | 18% | $102,500 | $102,500 | P | $31,250 |
| Digital Goods Fulfillment Module | | | 1 | $20,000 | 18% | $16,400 | $16,400 | P | $5,000 |
| Physical Goods Fulfillment Module | | | 1 | $0 | | $0 | $0 | | |
| Credit Card Payment Module | | | 1 | $10,000 | 18% | $8,200 | $8,200 | P | $2,500 |
| Purchase Order Payment Module | | | 1 | $0 | | $0 | $0 | | |
| Payment SDK | | | 1 | $10,000 | 18% | $8,200 | $8,200 | P | $2,500 |
| Order Entry SDK | | | 1 | $10,000 | 18% | $8,200 | $8,200 | P | $2,500 |
| Limited Transact Development License | | | 1 | $35,000 | 18% | $28,700 | $28,700 | P | $8,750 |

Total Product Fees:    $172,200

Total Support Fees:    $52,500

Grand Total:    $224,700

* Base License Fee includes an aggregate of seven (7) Business Lines, one for each entity listed in Section IV below.

1

SOV0158832

CONFIDENTIAL

**Attachment A**

**PRODUCTS and FEES**

I.    **Fees**

*Please indicate currently required items only. Promptly following the Effective Date, Licensee shall issue a purchase order to OPEN MARKET for these items.*

| | | | | | | |
|---|---|---|---|---|---|---|
| Transact PSP Production license | 1 | $187,750 | 0% | $187,750 | $187,750 | B | $37,550 |
| Transact Development license | 1 | $65,000 | 81.15% | $0 | $12,250 | B | $2,450 |
| Netscape Servers | 3 | $4,860 | 100% | $0 | $0 | B | $0 |
| Digital Goods Module | 1 | $50,000 | 100% | $0 | $0 | B | $0 |
| Subscriptions Module | 1 | $50,000 | 100% | $0 | $0 | B | $0 |
| Order Entry SDK | 1 | $25,000 | 100% | $0 | $0 | B | $0 |
| Payment SDK | 1 | $25,000 | 100% | $0 | $0 | B | $0 |
| Fulfillment SDK | 1 | $25,000 | 100% | $0 | $0 | B | $0 |

Total Product Fees: $200,000

Total Support Fees: $40,000

Grand Total: $240,000

Open Market, Inc. One Wayside Road, Burlington, MA 01803 T +1(781)359 3000, +1 888 OPENMKT

P-3

CONFIDENTIAL

SOV0160544

Attachment A   6/30/99

PRODUCTS and FEES

I.   Fees

*Please indicate currently required items only. Promptly following the Effective Date, Licensee shall issue a purchase order to OPEN MARKET for these items.*

| Product Description | Vendor | Platform | Qty | List Price | | Extended | | | |
|---|---|---|---|---|---|---|---|---|---|
| Base Commerce System: Physical | Oracle | Sun | 1 | $65,000 | 25% | $48,750 | $48,750 | B | $13,000 |
| Subscriptions Module License | Oracle | Sun | 1 | $35,000 | 25% | $26,250 | $26,250 | B | $7,000 |
| US/Canada SalesTax Module (TaxWare) License* | Oracle | Sun | 1 | $15,000 | 25% | $11,250 | $11,250 | B | $3,000 |
| Digital Coupons Module License | Oracle | Sun | 1 | $10,000 | 25% | $7,500 | $7,500 | B | $2,000 |
| Fulfillment SDK | Oracle | Sun | 1 | $10,000 | 25% | $7,500 | $7,500 | B | $2,000 |
| FDC Payment Module License | Oracle | Sun | 1 | $10,000 | 25% | $7,500 | $7,500 | B | $2,000 |
| Battlestar 4.0 for Transact Production License w/startup services | Oracle | Sun | 1 | $25,000 | 25% | $18,750 | $18,750 | B | $5,000 |
| Corporate Transact Development License | Oracle | Sun | 1 | $35,000 | 25% | $26,250 | $26,250 | B | $7,000 |
| LivePublish Server (150-249 Concurrent User) | n/a | NT | 1 | $39,995 | 25% | $29,996 | $29,996 | P | $11,999 |
| LivePublish Builder | n/a | WinX | 2 | $3,995 | 25% | $2,996 | $2,996 | P | $2,397 |
| **Total Product Fees:** | | | | | | | | | |
| **Total M&S Fees:** | | | | | | | | | |
| **Grand Total:** | | | | | | | | | |

\#41K

20
4/9/1999

CONFIDENTIAL

A13253

SOV0159499

1/03 '00 17:44 FAX 441753838020     OPEN MARKET UK     @003

**Attachment A**
**Products and Fees**

**1. Fees**

Please indicate currently negotiated terms only. Promptly following the Effective Date, Licensee shall issue a purchase order to OPEN MARKET for above fees.

| | Vendor | Platform | Qty | Item Fee | M&S | Annual Fee |
|---|---|---|---|---|---|---|
| Novis Mail Transact | Oracle | Solaris | 1 | $134,000 | P | $30,150 |
| Corporate Transact Development License | Oracle | Solaris | 1 | $31,250 | P | $7,031 |
| ShopSite TX License (Manager) | Oracle | Solaris | 73 | $25,988 | P | $5,847 |
| IPS Content Served Xcelerate License | Oracle | Solaris | 1 | $0 | P | $0 |
| | | | | $191,238  Total Product Fees | | |
| | | | | Total M&S Fees | | $41,012 |
| | | | | Grand Total: | | $134,467 |

Form Version 23
Date: 11/3/99

Acknowledged and Agreed

LICENSEE
By: _____ (initials)

10

Attachment A
PRODUCTS and FEES:

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 48 | Base Commerce System: Subscriptions | 1 | $80,000 | $80,000 | 8% | $73,600 | $73,600 | p | $16,928 |
| 66 | Physical Goods Module License | 1 | $20,000 | $20,000 | 8% | $18,400 | $18,400 | p | $4,232 |
| 67 | Digital Goods Module License | 1 | $20,000 | $20,000 | 8% | $18,400 | $18,400 | p | $4,232 |
| 57 | US/Canada SalesTax Module (TaxWare) License* | 1 | $15,000 | $15,000 | 8% | $13,800 | $13,800 | p | $3,174 |
| 60 | First USA Payment Module License | 1 | $10,000 | $10,000 | 8% | $9,200 | $9,200 | p | $2,116 |
| 62 | Digital Coupons Module License | 1 | $10,000 | $10,000 | 8% | $9,200 | $9,200 | p | $2,116 |
| 63 | Advanced Customer Service Module License | 1 | $25,000 | $25,000 | 8% | $23,000 | $23,000 | p | $5,290 |
| 65 | Customer Registration Module License | 1 | $20,000 | $20,000 | 8% | $18,400 | $18,400 | p | $4,232 |
| 82 | Corporate Transact Development License | 1 | $50,000 | $50,000 | 8% | $46,000 | $46,000 | p | $10,580 |
| 90 | Implementation Services | 1 | $18,000 | $18,000 | | $18,000 | | | |
| 96 | Transact Basic Training package | 1 | $20,000 | $20,000 | | $20,000 | | | |
| 78 | Battlestar for Transact Production License | 1 | $25,000 | $25,000 | 8% | $23,000 | $23,000 | p | $5,290 |
| 86 | BattleStar 4.0 for Transact Development License | 1 | $7,000 | $7,000 | 8% | $6,440 | $6,440 | p | $1,481 |
| 76 | Netscape Enterprise Server License | 2 | $1,295 | $2,590 | 8% | $1,191 | $2,383 | p | $548 |
| 85 | Netscape Enterprise Server Development License | 1 | $1,295 | $1,295 | 8% | $1,191 | $1,191 | p | $274 |
| 113 | IPS Content Server/ Xcelerate License ( upto 4 cpu per server ) | 2 | $42,500 | $85,000 | 55% | $19,125 | $38,250 | p | $8,798 |
| 113 | IPS Content Server/ Xcelerate License ( upto 4 cpu per server ) | 2 | $42,500 | $85,000 | 55% | $19,125 | $38,250 | p | $8,798 |
| 121 | IPS Search - Altavista | 1 | $10,000 | $10,000 | 55% | $4,500 | $4,500 | p | $1,035 |
| 90 | IPS Implementation Services | 1 | $18,000 | $18,000 | | $18,000 | | | |
| 96 | IPS Basic Training Package | 1 | $20,000 | $20,000 | | $20,000 | | | |
| | | | | Total Licenses | | $344,014 | $79,123 | | |
| | | | | Total Train and Implementation | | $76,000 | | | |
| | | | | Total | $420,014 | | | | |
| | | | | | | | Grand Total: | | |

CONFIDENTIAL

SOV0158666

Attachment A

PRODUCTS and FEES

1. **Fees**

*Please indicate currently required items only. Promptly following the Effective Date, Licensee shall issue a purchase order to OPEN MARKET for these items.*

| Item # | Product Description | Database Platform | Hardware Platform | Qty | Last Price/Unit | Extended Lic. Fees | M&S Type (B or P) | Annual M&S Fees |
|---|---|---|---|---|---|---|---|---|
| | Enterprise Transact Production License - Special Grant (see Notes *) | Oracle | Sun | 1 | | $87,000 | P | $21,750 |
| | Fax Server | | | 1 | | $6,250 | P | $1,563 |
| | One SDK of choice | | | 1 | | $10,000 | P | $2,500 |
| | Netscape Enterprise Server 128bit version (3 copies) | | | 3 | | $4,860 | P | $1,215 |
| | ShopSite Pro (one copy) | | | 1 | | $1,250 | N/A | |
| | | | | | | | | |
| | IGFS by N&TS | | | 1 | | $30,000 | | $3,300 |
| | | | | | | | | |
| | **Notes *** | | | | | | | |
| | Licence is to support orders from a Single Catalogue | | | | | | | |
| | Licence is for 2,500 Store IDs, for reporting purposes | | | | | | | |
| | Licence include payment modules for Credit Card & Purchase Orders | | | | | | | |
| | Licence is for Physical Goods only | | | | | | | |
| | Licence includes 250,000 on-line transactions with direct customers per year | | | | | | | |
| | Upgrade - $40,000 US for additional 250,000 transactions (plus M&S) | | | | | | | |
| | | | | | | **$139,360** | **Total Product Fees** | |

**Total M&S Fees:** $30,328

**Grand Total:** $169,688

Form Version: 22
Date: 7/23/99

SOV0160416

CONFIDENTIAL

issue in the "payment computer" construction, where the entire term did not have a customary and ordinary meaning at the time the claim was patented. "Merchant" had an ordinary meaning at that time, and the Court has already construed "database." Like it did for "payment computer," the Court is able to infer the meaning of "merchant database" from the ordinary meaning of merchant and the construed meaning of database. *See Bancorp Servs.*, 359 F.3d at 1372. The Court rejects Amazon's proposed construction because it impermissibly limits the term and excludes one of the preferred embodiments.

*"Creat[e] [a database]"*

"Creat[e] [a database]" means "to produce a new database or update an existing database." This is consistent with the preferred embodiments and the plain and ordinary meaning of create. *See Webster's Third New Int'l Dictionary*, at 532 (1993) (defining "create" as "to bring into existence" or "to cause to be or to produce by fiat or by mental, moral, or legal action" or "to bring about by a course of action or behavior"). Amazon's proposed construction would limit the term to only when a new database structure is brought into existence for the first time. Such a construction imputes limitations from the specifications and ignores that in one embodiment the creation computer "updates a remote advertising document database on a merchant computer." '314 Patent at 4:66-5:1.

*"Shopping cart"*

The patentee acted as his own lexicographer and defined "shopping cart" to mean "a stored representation of a collection of products." '314 Patent, claims 34-39; '492 Patent, claims 17, 18, 35, & 36. Amazon argues that "collection" must mean at least two products. Soverain contends that "collection" could mean zero, one, two, or more products. Although one claim limitation requires

19

A15018

that payment be made for a "plurality of products," the claims do not require that the shopping cart always contain multiple, or any, products. *See* '314 Patent, claim 34. From this distinction the Court finds "collection" does not necessarily mean at least two, but can refer to zero, one, or more products.

*"Shopping cart database"*

"Shopping cart database" is expressly defined in the claims as "a database of stored representations of collections of products." '314 Patent, claims 34 & 39; '492 Patent, claims 17, 18, 35, & 36. Amazon's proposed construction limits the term's meaning to a single database, but this limitation is not supported by the claim language.

*"Modif[y] [the shopping cart in the shopping cart database]"* and *"Record [] . . . in a database"*

"Modif[y] [the shopping cart in the shopping cart database]" means "to change [an instance of a shopping cart in a shopping cart database]." "Record [] . . . in a database" means "store[] in a database." These constructions reflect the ordinary meanings of the terms. Amazon's constructions impose a direct-action limitation on the terms requiring the acting computer to directly perform the action rather than cause the action to occur. There is no basis for this limitation, and accordingly the Court rejects it.

*"Plurality of products added"/ "[add a] plurality of respective products to a shopping cart"*

The Court construes these terms to mean "product identifiers which are added to an instance of a shopping cart in the shopping cart database." Amazon's proposed construction would include all products previously added to the shopping cart, including those that the user has deleted. Soverain's construction, which the Court adopts, determines which products are included in the "plurality of products" as those items that are in the shopping cart when the determination is made.

20

A15019



Defendant's Exhibit
Exhibit No. D-071
Case No. 6:07-cv-00511

A15039



Gmail Calendar Documents Photos Reader Sites Web more ▾ jackdgrimes@gmail.com | New! Gmail tips | Settings | Older version | Help | Sign out

Gmail by Google BETA

Search Mail | Search the Web | Show search options | Create a filter

Compose Mail

Inbox (1)
Starred
Chats
Sent Mail
Drafts
All Mail
Spam (2)
Trash

Contacts

- Chat
Search, add, or invite
Jack Grimes
Set status here

**Talk face to face**
Try video chat

[redacted]

Options ▾ Add Contact

- Labels
Edit labels

- Invite a friend
Give Gmail to:
Send Invite 50 left
Preview Invite

Vonage - Official Site - www.Vonage.com - Same phone, better phone service. Just $24.99/mo. Sign up now! Sponsored Link

« Back to Inbox | Archive | Report spam | Delete | Move to ▾ | Labels ▾ | More actions ▾ 1 of 4 Older ›

## Newegg.com Order Confirmation Inbox | X

**info@newegg.com** to me show details 4:09 PM (3 hours ago) Reply

Dear jack d grimes

Thank you for shopping at Newegg.com.

We are dedicated to providing customers with high quality merchandise at low prices and only the finest in customer service. Your specific order details have been provided below for your convenience. Please keep this email as a reference and proof of purchase.

We recommend that customers never release personal or credit/debit card information via telephone or email to any agency unless you initiate the communication to protect yourself from fraudulent activity. Our commitment to customer satisfaction can only be matched by our devotion to safeguarding your privacy.

Below is your Order Confirmation. Please keep a copy for your records.

Your Customer Number is: 16128821
Your Sales Order Number is: 33911438
Your Sales Order Date is: 6/24/2009 12:43:14 PM

Billing Information
Name: jack d grimes
Address: 5025 wine cellar drive
City: sparks
State: NV

Shipping Information
Name: jack d grimes
Address: 5025 wine cellar drive
City: sparks
State: NV
Zip Code: 89436
Day Phone: [redacted]
Night Phone: [redacted]

Item List
Paint Shop Pro Photo X2 (Qty=1,Price=49.99)

To download your software, please follow these instructions:

Step 1: Click on the following link:
Software name: Paint Shop Pro Photo X2
Download Address 1[SerialNumber=PR12WRX-1220544-ETM,UnlockCode=No Unlock Code Needed]

Step 2: Choose "Save Target As" or "Save to Disk"

Step 3: Choose where you would like to save your download. We recommend saving it to your Desktop. Click "Save."Your Software will begin downloading at this time.

Step 4: Once your download is complete, you must install it.

Please click on the following link to view your Order Status online:
https://secure.newegg.com/app/Logon.asp?loginType=OrderStatus

If you discover that you need to update or change the Shipping Address on your order,immediately call 1-800-390-1119 for assistance.

You can not email Order cancellation requests.
You may view Newegg.com's business hours and contact information by clicking on the following link:http://www.newegg.com/app/faq_contact.asp#8

You will receive an automated email with your shipping information and tracking number(s) along with an invoice once your order has shipped in its entirety. You can check the status of your order and view tracking information online by visiting our web site and clicking My Account > Order Status.
All pricing, tax, shipping information and configurations are estimated and provided for your convenience. All pricing and shipping information are subject to change without notice.

New window
Print all
Collapse all
Forward all

Sponsored Links

Get an 800 Number Today
Multiple 800 numbers for business With call forwarding and voicemail.
www.my1voice.com/free-trial

Instant Unlock Only $2.49
Unlock Any Phone For Just $2.49 Use Any Sim In Any Phone Unlock Now
www.Cell-Unlockers.com

Cell Unlock Codes $1.99
Unlock Your Cellphone so it works on any network. Easy to use codes!
www.CellUnlockStore.com

Internet Faxing Number
Toll Free Fax Number. $7.95/month. No Setup Fee. Free 30 Day Trial!
www.RapidFAX.com

QuietComfort
Instant Service - iPhone 3G 3.0 OS Remote Servie 7Days 1-888-RXUNLOCK
www.laptopsandparts4less.com

Mobile Phones
Mobile Phone Offers From T-Mobile Verizon, AT&T, Nextel, Sprint
www.Wirefly.com

Unlimited Web Fax
PDF and TIF format, no setup, $3.95 flat, works instantly
www.packetel.com

More about...
Vantage Phone Number »
1 800 Telephone Number »
Car Radio Unlock Codes »
Snap on Tools Phone Number »

About these links

↓info@newegg.com

↓info@newegg.com

SVN2-0074357

**A24**



jack d grimes [log out] 0 Items ($ 0.00) | MY ACCOUNT

newegg.com

MY NEWEGG | REVIEWS | HELP & INFO

SEARCH GO

BROWSE | COMPUTER HARDWARE | ELECTRONICS | PCS & LAPTOPS | CELL PHONES | DIGITAL CAMERAS | NETWORKING | GAMING | SOFTWARE | HOME & GARDEN | SPECIALS

**Account Home**

- Dashboard

**Orders**

- Order Status
- Order History
- Pre-Order / Backorder Status
- Returns (RMA)
- RMA Status / History

**Options**

- Account Settings
- Address Book
- Payment Types
- Subscriptions
- Academic Info
- Newegg Preferred Account

**Shopping**

- Shopping Cart
- Wish Lists
- Write a Review
- Gift Certificates
- Auto Notifications
- Price Alerts
- View Rebate

Home > My Account > Order History

## Order History

See a listing of all completed orders placed within the last 90 days. Click Show All or select dates to see the rest of the orders.

**Invoices**

Invoice Number 03/24/2009 - 06/24/2009 Go Show All

| | | | |
|---|---|---|---|
| 6/24/2009 | Inv #49067581 | Order #33911418 | $8.98 |
| 6/24/2009 | Inv #49065698 | Order #33919738 | $7.99 |
| 6/24/2009 | Inv #49062560 | Order #33919758 | $49.99 |
| 6/24/2009 | Inv #49059486 | Order #33911438 | $49.99 |

Affiliate Sites: EggXpert.com Newegg Community NeweggMall.com Shop Multiple Retailers Shop by Region: United States | Canada | China

**CUSTOMER SERVICE**
- Contact Us
- Search Tips
- Frequently Asked Questions
- Address Verification

**SHOPPING HELP**
- Buy Gift Certificate
- Return Policy Information
- Knowledge Base
- Lite Version
- Icon Glossary
- Video Center

**MY ACCOUNT**
- Login/Register
- My Account
- Order Status
- Order History/Print Invoice
- Wish Lists
- RMA Request
- Track My Order

Tracking Number GO

**COMPANY INFO**
- About Us
- Office Hours and Location
- Careers
- Newsroom
- Awards/Rankings
- Events

**TOOLS & RESOURCES**
- RSS Feeds
- Site Map
- Knowledge Base
- Rebate Center
- Affiliates
- Newsegg Information Center
- Newsletter Subscriptions

BBB ACCREDITED BUSINESS

Policy & Agreement | Privacy Policy | Newegg Canada | © 2000-2009 Newegg Inc. All rights reserved.

# A24-1



SVN2-0074380

A15154

# A24A

► SHARING

🔍 Home > My Account > Order History

**Order History**
See a listing of all completed orders placed within the last 90 days. Click Show All or select dates to see the rest of the orders.

**Invoices**

| | | Invoice Number ▾ | 03/24/2009 | 📅 | 06/24/2009 | 📅 | Gu | Show All |

Or  03/24/2009
Or

| June, 2009 | | | | | | |
|---|---|---|---|---|---|---|
| S | M | T | W | T | F | S |
| 31 | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | 30 | 1 | 2 | 3 | 4 |

| 6/24/2009 | ⊞ | Inv #49067581 | $8.98 |
| 6/24/2009 | ⊞ | Inv #49065698 | $7.99 |
| 6/24/2009 | ⊞ | Inv #49062560 | $49.99 |
| 6/24/2009 | ⊞ | Inv #49059486 | $49.99 |

**Account Home**

• Dashboard

**Orders**

• Order Status
• Order History
• Pre-Order / Backorder Status
• Returns (RMA)
• RMA Status / History

**Options**

• Account Settings
• Address Book
• Payment Types
• Subscriptions
• Academic Info
• Newegg Preferred Account

**Shopping**

• Shopping Cart
• Wish Lists
• Write a Review
• Gift Certificates
• Auto Notifications
• Price Alerts
• View Rebate

Affiliate Sites:  EggXpert.com
Newegg Community

NeweggMall.com
Shop Multiple Retailers

Shop by Region: **United States | Canada | China**

| CUSTOMER SERVICE | SHOPPING HELP | MY ACCOUNT | COMPANY INFO | TOOLS & RESOURCES |
|---|---|---|---|---|
| • Contact Us | • Buy Gift Certificate | • Login/Register | • About Us | • RSS Feeds |
| • Search Tips | • Return Policy Information | • My Account | • Office Hours and Location | • Site Map |
| • Frequently Asked | • Knowledge Base | • Order Status | • Careers | • Knowledge Base |

# A24B

⊙ SHARING

Account Home

• Dashboard

Orders

• Order Status
• Order History
• Pre-Order / Backorder Status
• Returns (RMA)
• RMA Status / History

Options

• Account Settings
• Address Book
• Payment Types
• Subscriptions
• Academic Info
• Newegg Preferred Account

Shopping

• Shopping Cart
• Wish Lists
• Write a Review
• Gift Certificates
• Auto Notifications
• Price Alerts
• View Rebate

⊙ Home > My Account > Order History

## Order History

See a listing of all completed orders placed within the last 90 days. Click Show All or select dates to see the rest of the orders.

### Invoices

| | Invoice Number | 06/01/2009 | 06/24/2009 | Go | Show All |

| | | | |
|---|---|---|---|
| ⊞ 6/24/2009 | Inv #49067581 | Order #33911418 | $8.98 |
| ⊞ 6/24/2009 | Inv #49065698 | Order #33919738 | $7.99 |
| ⊞ 6/24/2009 | Inv #49062560 | Order #33919758 | $49.99 |
| ⊞ 6/24/2009 | Inv #49059486 | Order #33911438 | $49.99 |

Affiliate Sites:  ● EggXpert.com   ● NeweggMall.com   Shop by Region: **United States** | Canada | China
Newegg Community     Shop Multiple Retailers

| CUSTOMER SERVICE | SHOPPING HELP | MY ACCOUNT | COMPANY INFO | TOOLS & RESOURCES |
|---|---|---|---|---|
| • Contact Us | • Buy Gift Certificate | • Login/Register | • About Us | • RSS Feeds |
| • Search Tips | • Return Policy Information | • My Account | • Office Hours and Location | • Site Map |
| • Frequently Asked | • Knowledge Base | • Order Status | • Careers | • Knowledge Base |

A15158

# A24C

BROWSE | COMPUTER HARDWARE | ELECTRONICS | POS LAPTOPS | CELL PHONES | DIGITAL CAMERAS | NETWORKING | GAMING | SOFTWARE | COMPUTER PERIPHERALS | SHARING

**Account Home**

- Dashboard

**Orders**

- Order Status
- Order History
- Pre-Order / Backorder Status
- Returns (RMA)
- RMA Status / History

**Options**

- Account Settings
- Address Book
- Payment Types
- Subscriptions
- Academic Info
- Newegg Preferred Account

**Shopping**

- Shopping Cart
- Wish Lists
- Write a Review
- Gift Certificates
- Auto Notifications
- Price Alerts
- View Rebate

🔍 Home > My Account > Order History

## Order History
See a listing of all completed orders placed within the last 90 days. Click Show All or select dates to see the rest of the orders.

### Invoices

| | Invoice Number 📋 | 06/01/2009 📅 | 06/24/2009 📅 | Gu | Show All |
|---|---|---|---|---|---|

|   | | | |
|---|---|---|---|
| ⊞ 6/24/2009 | Inv #49067581 | Order #33911418 | $8.98 |
| ⊞ 6/24/2009 | Inv #49065698 | Order #33919738 | $7.99 |
| ⊞ 6/24/2009 | Inv #49062560 | Order #33919758 | $49.99 |
| ⊞ 6/24/2009 | Inv #49059486 | Order #33911438 | $49.99 |

**« ‹ Jun. 2009 › »**

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| 31 | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | 30 | 1 | 2 | 3 | 4 |

---

Affiliate Sites:   🥚 EggXpert.com   🥚 NeweggMall.com        Shop by Region: **United States | Canada | China**
Newegg Community        Shop Multiple Retailers

| CUSTOMER SERVICE | SHOPPING HELP | MY ACCOUNT | COMPANY INFO | TOOLS & RESOURCES |
|---|---|---|---|---|
| • Contact Us | • Buy Gift Certificate | • Login/Register | • About Us | • RSS Feeds |
| • Search Tips | • Return Policy Information | • My Account | • Office Hours and Location | • Site Map |
| • Frequently Asked Questions | • Knowledge Base | • Order Status | • Careers | • Knowledge Base |
| | • Site Version | • Order History/Print | | |

# A24D

BROWSE | COMPUTER HARDWARE | ELECTRONICS | PERIPHERALS | CELL PHONES | DIGITAL CAMERAS | GAMING | SYSTEMS | OFFICE SOLUTIONS | NETWORKING

↑ SHARING

**Account Home**

• Dashboard

**Orders**

• Order Status
• Order History
• Pre-Order / Backorder Status
• Returns (RMA)
• RMA Status / History

**Options**

• Account Settings
• Address Book
• Payment Types
• Subscriptions
• Academic Info
• Newegg Preferred Account

**Shopping**

• Shopping Cart
• Wish Lists
• Write a Review
• Gift Certificates
• Auto Notifications
• Price Alerts
• View Rebate

⌂ Home > My Account > Order History

## Order History

See a listing of all completed orders placed within the last 90 days. Click Show All or select dates to see the rest of the orders.

**Invoices**

| | Invoice Number ▾ | | 06/01/2009 📅 | 06/30/2009 📅 | 🖩 **Go** Show All |

| | | |
|---|---|---|
| ⊞ 6/24/2009 | Inv #49067581 | Order #33911418 | $8.98 |
| ⊞ 6/24/2009 | Inv #49065698 | Order #33919738 | $7.99 |
| ⊞ 6/24/2009 | Inv #49062560 | Order #33919758 | $49.99 |
| ⊞ 6/24/2009 | Inv #49059486 | Order #33911438 | $49.99 |

Affiliate Sites:   🥚 EggXpert.com    🥚 NewegqMall.com    Shop by Region: **United States | Canada | China**
                   Newegg Community      Shop Multiple Retailers

| CUSTOMER SERVICE | SHOPPING HELP | MY ACCOUNT | COMPANY INFO | TOOLS & RESOURCES |
|---|---|---|---|---|
| • Contact Us | • Buy Gift Certificate | • Login/Register | • About Us | • RSS Feeds |
| • Search Tips | • Return Policy Information | • My Account | • Office Hours and Location | • Site Map |
| • Frequently Asked | • Knowledge Base | • Order Status | • Careers | • Knowledge Base |
|   Questions | • Egg Machine | • Order History/Grid | • Newsroom | • Rebate Center |

A15162

# A25



jack d grimes [log out] 0 Items ($ 0.00) MY ACCOUNT

newegg.com

MY NEWEGG | REVIEWS | HELP & INFO

SEARCH GO

BROWSE | COMPUTER HARDWARE | ELECTRONICS | PCS & LAPTOPS | CELL PHONES | DIGITAL CAMERAS | NETWORKING | GAMING | SOFTWARE | HOME & GARDEN | SPECIALS

Account Home

- Dashboard

Orders

- Order Status
- Order History
- Pre-Order / Backorder Status
- Returns (RMA)
- RMA Status / History

Options

- Account Settings
- Address Book
- Payment Types
- Subscriptions
- Academic Info
- Newegg Preferred Account

Shopping

- Shopping Cart
- Wish Lists
- Write a Review
- Gift Certificates
- Auto Notifications
- Price Alerts
- View Rebate

Home > My Account > Order History

## Order History

See a listing of all completed orders placed within the last 90 days. Click Show All or select dates to see the rest of the orders.

**Invoices**

Invoice Number 06/01/2009 - 06/30/2009 Go Show All

| | | | |
|---|---|---|---|
| 6/24/2009 | Inv #49067581 | Order #33911418 | $8.98 |
| 6/24/2009 | Inv #49065698 | Order #33919738 | $7.99 |
| 6/24/2009 | Inv #49062560 | Order #33919758 | $49.99 |
| 6/24/2009 | Inv #49059486 | Order #33911438 | $49.99 |

Affiliate Sites: EggXpert.com Newegg Community NeweggMall.com Shop Multiple Retailers Shop by Region: United States | Canada | China

CUSTOMER SERVICE
- Contact Us
- Search Tips
- Frequently Asked Questions
- Address Verification

SHOPPING HELP
- Buy Gift Certificate
- Return Policy Information
- Knowledge Base
- Lite Version
- Icon Glossary
- Video Center

MY ACCOUNT
- Login/Register
- My Account
- Order Status
- Order History/Print Invoice
- Wish Lists
- RMA Request
- Track My Order

Tracking Number GO

COMPANY INFO
- About Us
- Office Hours and Location
- Careers
- Newsroom
- Awards/Rankings
- Events

TOOLS & RESOURCES
- RSS Feeds
- Site Map
- Knowledge Base
- Rebate Center
- Affiliates
- Newegg Information Center
- Newsletter Subscriptions

BBB ACCREDITED BUSINESS

Policy & Agreement | Privacy Policy | Newegg Canada | © 2000-2009 Newegg Inc. All rights reserved.

# A25-1



newegg.com®

Newegg.com - Once You Know, You Ne...

https://secure.newegg.com/NewMyAccount/OrderHistory.aspx?guid=50792838997634508aa969e741fa68d4

jack d grimes [log out]

🛒 0 items ($ 0.00)

SEARCH

GO

BROWSE | COMPUTER HARDWARE | ELECTRONICS | CPU & LAPTOPS | MY NEWEGG | REVIEWS | HELP/INFO | DIGITAL CAMERAS | NETWORKING | GAMING | SOFTWARE | HOME & AUDIO | SPECIALS

🏠 Home > My Account > Order History

**Account Home**
· Dashboard

**Orders**
· Order Status
· Order History
· Pre-Order / Backorder Status
· Returns (RMA)
· RMA Status / History

**Options**
· Account Settings
· Address Book
· Payment Types
· Subscriptions
· Academic Info
· Newegg Preferred Account

**Shopping**
· Shopping Cart
· Wish Lists
· Write a Review
· Gift Certificates
· Auto Notifications
· Price Alerts

## Order History

See a listing of all completed orders placed within the last 90 days. Click Show All or select dates to see the rest of the orders.

**Invoices**

| | Invoice Number ▾ | | 06/01/2009 🗓 - 06/30/2009 🗓 | Go | Show All |

| ☐ 6/24/2009 | Inv #49067581 | Order #33911418 | $8.98 |
| ☐ 6/24/2009 | Inv #49065698 | Order #33919738 | $7.99 |
| ☐ 6/24/2009 | Inv #49062560 | Order #33919758 | $49.99 |
| ☐ 6/24/2009 | Inv #49059486 | Order #33911438 | $49.99 |

SVN2-0074386

A15166

# E1



Jack Grimes <jackdgrimes@gmail.com>

# Newegg.com - Order Confirmation

**Newegg <info@newegg.com>**                                    **Wed, Jun 24, 2009 at 1:41 PM**
To: jackdgrimes@gmail.com







Customer ID: **jackdgrimes@gmail.com**
Account Number: **16128821**

**Dear jack d grimes,**

Thank you for shopping at Newegg.com

We're delighted we had what you were looking for!

Your order should be processed and ready for ship-out within 24-48 hours. Below is your order confirmation.
Please keep a copy for your records.

Please click here to check order status.

**Order Summary:**
**Sales Order Number:** 33919738
**Sales Order Date:**     6/24/2009 1:40:25 PM

**Billing Information**
jack d grimes
5025 wine cellar drive

sparks, NV 89436

**Shipping Information**
jack d grimes
5025 wine cellar drive

sparks, NV 89436

Egg Saver (3-7 Days)

| | |
|---|---|
| 1 x (**$7.99**) CABLE NL\|USB-15-AB R - Retail | $7.99 |

SVN2-0075774

A16667

6/29/09 11:04 AM

**Payment Term:** American Express
**Extended Warranty:** $0.00
**Subtotal:** $7.99
**Tax:** $0.00
**Shipping and Handling:** $0.00
**Total Amount:** $7.99

**Recommendations For You:** (please note that we cannot guarantee price or availability)

 $17.99     $34.99     $5.49 $3.49

Arctic Silver 5 Thermal Compound - OEM    VANTEC Nexstar 3 NST-360U2-BK 3.5" USB 2.0 External Enclosure - Retail    Rosewill RTK-002 Anti-Static Wrist Strap - Retail

To view more recommendations, please click here.

If you have any questions, please use our LiveChat function or visit our Contact Us Page.

Once You Know, You Newegg.

Your Newegg.com Customer Service Team

**CONFIDENTIALITY NOTICE:** This communication is only for the person(s) named above. Unless otherwise indicated, it contains information that is confidential, privileged or exempt from disclosure under applicable law. If you are not the person(s) named above, or responsible for delivering it to that person(s), be aware that disclosure, copying, distribution or use of this communication is strictly PROHIBITED. If you have received this communication in error, or are uncertain as to its proper handling, please immediately notify us by sending us a message here to let us know.

 **LiveChat**
**Hours of Operation:**
Mon - Fri: 5:30am - 5:30pm PT

 **EggXpert**
A community site dedicated to Newegg.com Shoppers

 **Write To Us:**
Newegg.com, 9997 E. Rose Hills Road, Whittier, CA. 90601

© 2000-2009 Newegg Inc. All rights reserved.

SVN2-0075775

A16668

# E4

 **by Google** BETA

Jack Grimes <jackdgrimes@gmail.com>

# Newegg.com Order Confirmation

**info@newegg.com <info@newegg.com>**                    **Wed, Jun 24, 2009 at 2:09 PM**
To: jackdgrimes@gmail.com

Dear jack d grimes

Thank you for shopping at Newegg.com.

We are dedicated to providing customers with high quality merchandise at low prices and only the finest in customer service. Your specific order details have been provided below for your convenience. Please keep this email as a reference and proof of purchase.

We recommend that customers never release personal or credit/debit card information via telephone or email to any agency unless you initiate the communication to protect yourself from fraudulent activity. Our commitment to customer satisfaction can only be matched by our devotion to safeguarding your privacy.

Below is your Order Confirmation. Please keep a copy for your records.

Your Customer Number is: 16128821
Your Sales Order Number is: 33919758
Your Sales Order Date is: 6/24/2009 1:40:25 PM

Billing Information
Name: jack d grimes
Address: 5025 wine cellar drive
City: sparks
State: NV
Zip Code: 89436
Payment Method: VISA
Credit Card Number: ****-****-****-****
Expiration Date: ■■■■

Shipping Information
Name: jack d grimes
Address: 5025 wine cellar drive
City: sparks
State: NV
Zip Code: 89436
Day Phone: ■■■■■
Night Phone: ■■■■■

Item List
Paint Shop Pro Photo X2 (Qty=1,Price=49.99)

To download your software, please follow these instructions:

Step 1: Click on the following link:
Software name: Paint Shop Pro Photo X2
Download Address 1[SerialNumber=PR12WRX-1220545-MVK,UnlockCode=No Unlock Code Needed]

SVN2-0075780

A16676

Step 2: Choose "Save Target As" or "Save to Disk"

Step 3: Choose where you would like to save your download. We recommend saving it to your Desktop. Click "Save."Your Software will begin downloading at this time.

Step 4: Once your download is complete, you must install it.

Please click on the following link to view your Order Status online: https://secure.newegg.com/app/Logon.asp?loginType=OrderStatus

If you discover that you need to update or change the Shipping Address on your order,immediately call 1-800-390-1119 for assistance.

If you need to update or edit the Billing Address on your order/account,

please click on the following link: https://secure.newegg.com/app/Logon.asp?loginType=CustChange&ID=jackdgrimes@gmail.com

You may cancel you order online for a limited time by checking your Order Status. If it is already beyond the online cancellation period, immediately call 1-800-390-1119 for further assistance. Due to the limitations of email and the sheer volume we receive each day, we recommend that you do not email order cancellation requests.
You may view Newegg.com's business hours and contact information by clicking on the following link:http://www.newegg.com/app/faq_contact.asp#8

You will receive an automated email with your shipping information and tracking number(s) along with an invoice once your order has shipped in its entirety. You can check the status of your order and view tracking information online by visiting our web site and clicking My Account > Order Status.
All pricing, tax, shipping information and configurations are estimated and provided for your convenience. All pricing and shipping information are subject to change without notice. Newegg.com is not responsible for typographical errors or emissions. All typographical errors are subject to correction. All sales are subject to Newegg.com's Policies & Purchasing Agreement. All warranty terms are per our website. Newegg.com does not offer any technical support or sales advice. Copyright 2006 Newegg.com,Inc.

Thank,
Newegg.com
http://www.newegg.com


HELPFUL LINKS:

Print Help And FAQs: http://www.newegg.com/app/faq.asp
Our Contact Information:http://www.newegg.com/app/faq_contact.asp
Update Account:https://secure.newegg.com/app/Logon.asp?loginType=CustChange
(please update your account address information before requesting any RMAs)

SVN2-0075781

A16677

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 21st day of April, 2011, two bound copies of the

Joint Appendix were served via UPS Next Day Air, to the following:

Paul J. Ripp
WILLIAMS MONTGOMERY & JOHN LTD.
233 South Wacker Drive, Suite 6100
Chicago, Illinois  60606
(312) 443-3205

*Counsel for Appellee*

Robert B. Wilson
Neil G. Cave
QUINN EMANUEL URQUHART & SULLIVAN LLP
51 Madison Avenue, 22nd Floor
New York, New York  10010
(212) 849-7000

*Counsel for Appellee*

David A. Nelson
QUINN EMANUEL URQUHART & SULLIVAN LLP
500 West Madison Street, Suite 2450
Chicago, Illinois  60661
(312) 705-7465

*Counsel for Appellee*

I further certify that on this 21st day of April, 2011, the required number of

copies of the Joint Appendix were hand filed at the Office of the Clerk, United

States Court of Appeals for the Federal Circuit.

The necessary filing and service were performed in accordance with the instructions given me by counsel in this case.

THE LEX GROUP<sup>DC</sup>
1825 K Street, N.W., Suite 103
Washington, D.C.  20006
(202) 955-0001