**WEST/CRS**

## 2011-1009
## VOLUME I OF III
## (Pages 1 - 1781)

### In The
# United States Court of Appeals
### For The Federal Circuit

# SOVERAIN SOFTWARE LLC,

*Plaintiff–Appellee,*

v.

FILED
U.S. COURT OF APPEALS FOR
THE FEDERAL CIRCUIT

APR 2 1 2011

JAN HORBALY
CLERK

# NEWEGG INC.,

*Defendant–Appellant.*

## APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS IN
## CASE NO. 07-CV-0511, JUDGE LEONARD DAVIS.

---

## JOINT APPENDIX

---

Edward R. Reines
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, California 94065
(650) 802-3000

*Counsel for Appellant*

Kent E. Baldauf, Jr.
David C. Hanson
Daniel H. Brean
THE WEBB LAW FIRM
700 Koppers Building
436 Seventh Avenue
Pittsburgh, Pennsylvania 15219
(412) 471-8815

*Counsel for Appellant*

Paul J. Ripp
WILLIAMS MONTGOMERY
  & JOHN LTD.
233 South Wacker Drive, Suite 6100
Chicago, Illinois 60606
(312) 443-3205

*Counsel for Appellee*

Claudia W. Frost
Kevin M. Fong
PILLSBURY WINTHROP
  SHAW PITTMAN, LLP
2 Houston Center
909 Fannin, Suite 2000
Houston, Texas 77010
(713) 276-7648

*Counsel for Appellant*

Dated: April 21, 2011

David A. Nelson
QUINN EMANUEL
  URQUHART & SULLIVAN LLP
500 West Madison Street, Suite 2450
Chicago, Illinois 60661
(312) 705-7465

*Counsel for Appellee*

Robert B. Wilson
Neil G. Cave
QUINN EMANUEL
  URQUHART & SULLIVAN LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

*Counsel for Appellee*

**SOVERAIN SOFTWARE, LLC v. NEWEGG INC, NO. 2011-1009**

TABLE OF CONTENTS FOR JOINT APPENDIX

**VOLUME I:**

## I.  MATERIAL REQUIRED BY FED. R. APP. P. 30(a) & FED. CIR. R. 30(a)

| Description | Page No. |
|---|---|
| Final Judgment entered August 11, 2010 (Dkt. No. 435) | A1-A2 |
| Memorandum Opinion and Order entered August 11, 2010 (Dkt. No. 434) | A3-A34 |
| Verdict Form, April 30, 2010 (Dkt. No. 376) | A35-A37 |
| Court's Charge (Dkt. No. 436) | A38-A65 |
| United States Patent No. 5,715,314 | A66-A113 |
| United States Patent No. 5,909,492 | A114-A163 |
| United States Patent No. 7,272,639 | A164-A183 |
| Docket Report | A184-A236 |

## II.  TRANSCRIPTS OF PROCEEDINGS BELOW

| Description | Page No. |
|---|---|
| Pretrial Conference, January 21, 2010 (Dkt. No. 323) | A1003-A1008 |
| Motions Hearing, April 19, 2010 (Dkt. No. 386) | A1343-A1362 |
| Trial Transcript, April 26, 2010 (Morning Session) (Dkt. No. 389) | A1388-A1456 |
| Trial Transcript, April 26, 2010 (Afternoon Session) (Dkt. No. 390) | |
|     Witness:    Jack Grimes | A1494-A1658 |
| Trial Transcript, April 27, 2010 (Morning Session) (Dkt. No. 391) | A1673 |
|     Witness:    Jack Grimes | A1677-A1732 |
|              G. Winfield Treese | A1750-A1781 |

**VOLUME II:**

Trial Transcript, April 27, 2010 (Afternoon Session) (Dkt. No. 392)
      Witness:     Katharine A. Wolanyk         A1814-A1857
                     James Nawrocki            A1884-A1967

Trial Transcript, April 28, 2010 (Morning Session) (Dkt. No. 393)
      Witness:     Lee Cheng                 A1996-A2020
                     James Wu                 A2050-A2104

Trial Transcript, April 28, 2010 (Afternoon Session) (Dkt. No. 396)
      Witness:     G. Winfield Treese          A2121-A2132
                     Alexander Trevor        A2141-A2192

Trial Transcript, April 29, 2010 (Morning Session) (Dkt. No. 394)
      Witness:     Edward R. Tittel          A2267-A2377

Trial Transcript, April 29, 2010 (Afternoon Session) (Dkt. No. 397) ................A2601-2630
      Witness:     Shikhar Ghosh Deposition (Video)     A2397-A2402
                     Christopher Bakewell        A2409-A2528
                     Michael Shamos           A2533-A2581

Trial Transcript, April 30, 2010 (Dkt. No. 395) ................................................A2638-A2777

**III.    PERTINENT PLEADINGS AND ORDERS BELOW**

| Description | Page No. |
| --- | --- |
| Complaint, November 2, 2007 (Dkt. No. 1) ....................................................... | A3000-A3131 |

**VOLUME III:**

Order granting Motion for Leave to File Amended Claim Construction,
March 24, 2009 (Dkt. No. 192)...........................................................................A3668

Claim Construction Order, May 28, 2009 (Dkt. No. 214)....................................A4381-A4383

Newegg's Daubert Motion to Exclude the Opinions of James Nawrocki,
October 1, 2009 (Dkt. No. 252) ........................................................................A6110-A6122

Joint Proposed Pretrial Order, November 25, 2009 (Dkt. No. 289) ..................A7929-A8053

Newegg's Motions in Limine, January 13, 2010 (Dkt. No. 306) ........................A8183-A8187

Soverain's Opposition to Newegg's Motions in Limine,
January 15, 2010 (Dkt. No. 309) .......................................................................A8333-A8335

Newegg's Rule 50(a) Motion for Judgment as a Matter of Law of
Noninfringement, April 29, 2010 (Dkt. No. 367) .............................................A8986-A9009

Newegg's Proposed Jury Charge Instruction, April 29, 2010
(Dkt. No. 371) ...........................................................................................A9041-A9042

Newegg's Renewed Motions for Judgment as a Matter of Law of
Non-Infringement and Invalidity of the Asserted Claims and Alternative
Motions for New Trial, May 24, 2010 (Dkt. No. 407) ......................................A9675-A9676

Soverain's Opposition to Newegg's Renewed Motion for Judgment as a
Matter of Law of Non-Infringement and Invalidity of the Asserted Claims
and Alternative Motions For New Trial, June 7, 2010
(Dkt. No. 409) ...........................................................................................A9697-A10113

Soverain's Opposition to Newegg's Renewed Motion for Judgment
as a Matter of Law on Damages and Alternative Motion for New Trial
or Remittitur, June 7, 2010 (Dkt. No. 410) .........................................................A10164

Newegg's Response to Soverain's Motion for Permanent Injunction or
Ongoing Royalties, June 7, 2010 (Dkt. No. 412) ................................................A10278

Newegg's Response to Soverain's Renewed Motion for Judgment as a
Matter of Law of Infringement '314, '492, and '639 Patents and for a
New Trial on '639 Patent Damages, June 7, 2010
(Dkt. No. 413) ...........................................................................................A10354-A10412

Newegg's Reply in Support of its Renewed Motion for Judgment as a Matter
of Law of Non-Infringement and Invalidity of the Asserted Claims and
Alternative Motions for New Trial, June 14, 2010
(Dkt. No. 419) ...........................................................................................A10486-A10487

Newegg Inc.'s Final Exhibit List of Exhibits Admitted During Trial,
August 3, 2010 (Dkt. No. 433) ....................................................................A10682-A10683

## IV. TRIAL EXHIBITS

| Description | Page No. |
| --- | --- |
| Parties' Stipulations of Fact (Trial Ex. D-516) ...................................…..…..A13002-A13004 | |
| Summary of Deposition Testimony of James Wu (Trial Ex. P-62B)..................A13005-A13022 | |
| Newegg Website Ordering Help Page (Trial Ex. P-15).......................................A13090-A13093 | |

Patent license from Open Market to Johnson & Johnson Vision Care
(Trial Ex. D-223) ......................................................................A13094-A13097

Patent license from divine to Emagio, Inc. (Trial Ex. D-225).............A13107-A13111

Patent license from divine to Natural Foods, Inc. (Trial Ex. D-226)..................A13112-A13115

Patent license from divine to Webster Orchard / The Fruit
Company, Inc. (Trial Ex. D-227).............................................A13116-A13120

Patent license from divine to Perfumania.com (Trial Ex. D-228)........A13121-A13125

Patent license from divine to Game Link, Inc.  (Trial Ex. D-229)......A13126-A3130

Patent license from divine to Bikecology, Inc. (Trial Ex. D-230)......A13131-A13135

Patent license from divine to Cartronix, Inc. (Trial Ex. D-231).........A13136-A13141

Patent license from divine to L.H. Internet (Trial Ex. D-232).............A13142-A13146

Patent license from divine to Katco Industries (Trial Ex. D-233) .......A13147-A13151

Patent license from divine to Glooks.com (Trial Ex. D-234)..............A13152-A13156

Patent license from divine to Spun.com (Trial Ex. D-235) ................A13157-A13161

Patent license from divine to Kreiss Enterprises, Inc. (Trial Ex. D-236) ...........A13162-A13166

Patent license from divine to Odimo, Inc. (Trial Ex. D-237) .............A13167-A13171

Patent license from divine to Cadence 120 Bicycle Works
(Trial Ex. D-238) .....................................................................A13172-A13176

Patent license from divine to Tryiton Eyewear, LLC (Trial Ex. D-239)............A13177-A13181

Patent license from divine to Bissenger French Confections
(Trial Ex. D-240) .....................................................................A13182-A13186

Patent license from divine to DVDPlanet.com, Inc. (Trial Ex. D-241)..............A13187-A13191

Patent license from divine to System Optics, Inc. (Trial Ex. D-242) .................A13192-A13196

Transact software license from Open Market to McGraw-Hill
(Trial Ex. D-193) .....................................................................A13208-A13215

Transact software license from Open Market to Clearview Technologies
(Trial Ex. D-194) .....................................................................A13224

Transact software license from Open Market to Bureau of National
Affairs (Trial Ex. D-195) .................................................................................A13227

Transact software license from Open Market to MIC Systems
(Trial Ex. D-196) .........................................................................................A13242

Transact software license from Open Market to Thomson Learning
(Trial Ex. D-197) .........................................................................................A13253

Transact software license from Open Market to Novis (Trial Ex. D-198) ..........A13265

Transact software license from Open Market to Corel (Trial Ex. D-199)...........A13287

Transact software license from Open Market to Finsiel Spa
(Trial Ex. D-200) .........................................................................................A13300

Newegg.com homepage (Trial Ex. D-071).........................................................A15039

Newegg.com website (Trial Ex. P-12)................................................A15112-A16677

## V.  ADDITIONAL MATERIAL CITED BY SOVERAIN

| Description | Page No. |
| --- | --- |

Soverain Software LLC v. Amazon.com, Inc.,
Memorandum Opinion re: Claim Construction
(Case 6:04-cv-00014-LED Document 246 filed 04/07/05) ................................A15018-A15019

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### TYLER DIVISION

| | | |
|---|---|---|
| SOVERAIN SOFTWARE LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | CASE NO. 6:07 CV 511 |
| | § | PATENT CASE |
| NEWEGG INC., | § | |
| | § | |
| Defendant. | § | |

## FINAL JUDGMENT

Pursuant to Rule 58 of the Federal Rules of Civil Procedure, consistent with the Court's contemporaneous Memorandum Opinion and Order, and in consideration of the jury verdict delivered on April 30, 2010 and the entirety of the record available to this Court, the Court **ORDERS AND ENTERS FINAL JUDGMENT** as follows:

- Defendant Newegg Inc. ("Newegg") is found to have unlawfully infringed U.S. Patent Nos. 5,715,314 (the "'314 patent"), 5,909,492 (the "'492 patent"), and 7,272,639 (the "'639 patent") (collectively, "patents-in-suit").

- The patents-in-suit are not invalid and are enforceable.

- The Court awards damages to Soverain Software LLC ("Soverain") for Newegg's infringement of the '314 and '492 patents in the amount of $2,500,000.

- Soverain is further awarded a new trial on damages for Newegg's infringement of the '639 patent, to be held after all appeals have been exhausted.

- Soverain is further awarded post-verdict damages of $2,900 per day from May 1, 2010 until the date of this Final Judgment.

- Soverain is further awarded prejudgment interest on the actual damages found by the jury calculated at the prime rate as of the date of this Final Judgment compounded monthly through July 31, 2010 and compounded daily for the month of August 2010.

- Soverain is awarded its prejudgment Costs of Court.

- Soverain is entitled to post-judgment interest as provided for by 28 U.S.C. § 1961 for any time period between the entry of this Final Judgment and the date upon which Soverain receives payment from Newegg as ordered herein.

- For the reasons stated in the Court's contemporaneous Memorandum Opinion and Order, Newegg is hereby **ORDERED**, for the remaining life of the '314 and '492 patents, to pay Soverain an ongoing royalty of $0.15 per infringing transaction.

- All relief not granted in this Final Judgment is **DENIED**.

- All pending motions not previously resolved are **DENIED**.

**So ORDERED and SIGNED this 11th day of August, 2010.**

**LEONARD DAVIS**
**UNITED STATES DISTRICT JUDGE**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| SOVERAIN SOFTWARE LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | CASE NO. 6:07 CV 511 |
| | § | PATENT CASE |
| NEWEGG INC., | § | |
| | § | |
| Defendant. | § | |

MEMORANDUM OPINION AND ORDER

Before the Court are Soverain's Renewed Motion for Judgment as a Matter of Law

("JMOL") of Infringement of the '314, '492, and '639 Patents and Motion for New Trial ("MNT")

on '639 Patent Damages (Docket No. 402); Soverain's Motion for Permanent Injunction or, in the

Alternative, Ongoing Royalties (Docket No. 403); Soverain's Motion for Prejudgment Interest and

Costs, Post-Verdict Damages to Judgment, and Post-Judgment Interest (Docket No. 404); Newegg's

Renewed Motion for JMOL on Damages and Alternative MNT or Remittitur (Docket No. 406);

Newegg's Renewed Motions for JMOL of Non-Infringement and Invalidity of the Asserted Claims

and Alternative MNT (Docket No. 407); and Newegg's Opposed Motion to Strike Certain Evidence

Submitted in Support of Soverain's Post-Trial Motions (Docket No. 411). For the reasons stated

below, the Court **GRANTS** in part Soverain's motion for JMOL on infringement and MNT on

damages (Docket No. 402), **GRANTS** in part Soverain's motion for permanent injunction or, in the

alternative, ongoing royalties (Docket No. 403), **GRANTS** in part Soverain's motion for pre-

judgment interest, post-verdict damages, and post-judgment interest (Docket No. 404), and **DENIES**

all other motions.

## BACKGROUND

Plaintiff Soverain Software LLC ("Soverain") filed suit against Newegg Inc. ("Newegg") and several other defendants in November 2007. Newegg is the only remaining defendant. Soverain asserts U.S. Patent Nos. 5,715,314 (the "'314 patent"), 5,909,492 (the "'492 patent"), and 7,272,639 (the "'639 patent") (collectively, "the patents-in-suit") against Newegg. The '314 and '492 patents, both entitled "Network Sales System," are directed to a network-based sales system including at least one buyer computer, at least one merchant computer, and at least one payment computer, all interconnected by a computer network. The asserted claims in the '314 and '492 patents are system claims. The '639 patent, entitled "Internet Server Access Control and Monitoring Systems," is directed to methods for controlling and monitoring access to network servers. The asserted claims of the '639 patent are method claims.

A jury trial began on April 26, 2010. At trial, Soverain argued that Newegg used technology for its websites that infringed claims 35 and 51 of the '314 patent; claims 17, 41, and 61 of the '492 patent; and claims 60 and 79 of the '639 patent. Newegg argued that it did not infringe Soverain's patents and that Soverain's patents were invalid. Following a five day trial, the Court submitted the following issues to the jury: (1) direct infringement and active inducement of infringement of the '314 and '492 patents, (2) direct infringement of the '639 patent, (3) invalidity of the patents-in-suit based on anticipation, and (4) damages. The jury returned a verdict finding the patents-in-suit not invalid, the '314 and '492 patents infringed, and awarding Soverain $2,500,000 in damages. Specifically, the jury found Newegg liable for induced infringement of claims 35 and 51 of the '314 patent and claims 17, 41, and 61 of the '314 patent, but found that Newegg did not directly infringe any of the asserted claims of the patents-in-suit.

2

## MOTIONS FOR JMOL & NEW TRIAL

**JMOL Standard**

"The grant or denial of a motion for judgment as a matter of law is a procedural issue not unique to patent law, reviewed under the law of the regional circuit in which the appeal from the district court would usually lie." *Summit Tech. Inc. v. Nidek Co.*, 363 F.3d 1219, 1223 (Fed. Cir. 2004). In the Fifth Circuit, JMOL may not be granted unless "there is no legally sufficient evidentiary basis for a reasonable jury to find as the jury did." *Hiltgen v. Sumrall*, 47 F.3d 695, 700 (5th Cir.1995) (internal quotation marks omitted). A court reviews all the evidence in the record and must draw all reasonable inferences in favor of the nonmoving party, however, a court may not make credibility determinations or weigh the evidence, as those are solely functions of the jury. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000).

**New Trial Standard**

Under Rule 59(a) of the Federal Rules of Civil Procedure, a new trial can be granted to any party to a jury trial on any or all issues "for any reason for which a new trial has heretofore been granted in an action at law in federal court." "A new trial may be granted, for example, if the district court finds the verdict is against the weight of the evidence, the damages awarded are excessive, the trial was unfair, or prejudicial error was committed in its course." *Smith v. Transworld Drilling Co.*, 773 F.2d 610, 612–13 (5th Cir. 1985).

## INFRINGEMENT

### *NEWEGG'S MOTION FOR JMOL & MNT - NO INDIRECT INFRINGEMENT OF '314 AND '492 PATENTS*

Newegg moves for JMOL, or alternatively for a new trial, on the issue of no indirect infringement of claims 35 and 51 of the '314 patent, claim 17 of the '492 patent, and claims 41 and 61 of the '492 patent. Claims 35 and 51 of the '314 patent and claim and claim 17 of the '492 patent

are referred to as the "shopping cart claims." Claims 41 and 61 of the '492 patent, are referred to as the "hypertext statement claims."

**Shopping Cart Claims**

Newegg first argues that there was no legally sufficient evidence from which a reasonable jury could conclude that the accused Newegg system meets all the limitations of independent claim 34 of the '314 patent[1] or independent claim 17 of the '492 patent ("shopping cart claims"), either literally or under the doctrine of equivalents.

In Newegg's accused system, when a customer adds an item to a shopping cart, product information concerning that item is held in a cookie on the customer's computer. Once the customer hits checkout, the contents of the cookie are transferred all at once to a shopping cart database. The issue is whether this transfer in the accused system satisfies two specific limitations in the shopping cart claims: (1) the "modification limitations" and (2) the "plurality limitations."

Claim 34 of the '314 patent requires "said shopping cart computer [to be] a computer that modifies said stored representations of collections of products in said database," and also requires the shopping cart computer be programmed "to modify the shopping cart in the shopping cart database to reflect the plurality of requests to add the plurality of products to the shopping cart." '314 patent, col. 14:12–15, 26–28. Claim 17 of the '492 patent similarly requires "the shopping cart computer [to be] a computer that modifies the stored representations of collections of products in the database," and that the shopping cart computer be programmed "to modify the shopping cart in the shopping cart database to reflect the plurality of requests to add the plurality of products to the shopping cart." '492 patent, col. 14:64–67; col. 15:13–15. These are referred to as the "modification limitations."

---

[1] Asserted claims 35 and 51 of the '314 patent depend from independent claim 34 of the '314 patent.

Newegg contends that its system cannot satisfy the modification limitations because there is no modification of the shopping cart database, let alone a modification of the shopping cart *in the shopping cart database*. Soverain contends that there is a modification of a shopping cart in the shopping cart database because an instance of a shopping cart in the database is changed. The Court construed the phrase "to modif[y] [the shopping cart in the shopping cart database]" to mean "to change [an instance of a shopping cart in a shopping cart database]." Docket No. 359-1, at 1. Soverain's technical expert, Dr. Grimes, basing his opinion on the Court's claim construction and other evidence presented at trial, testified that Newegg's system uses a two step process. First, when the customer clicks the check out button, a shopping cart ID is generated, which creates a holding space in the shopping cart database. Soverain contends this step creates an instance of a shopping cart in the shopping cart database. Next, the contents of the customer's shopping cart are moved to the shopping cart database in association with the shopping cart ID. Soverain contends this step represents the required modification. Dr. Grimes further testified that modifying the shopping cart to add all the products at once upon checkout is sufficient to satisfy the modification limitations.

Newegg argues that Soverain's logic is flawed because the shopping cart ID and the shopping cart are inserted into the database at the same time, and this "single instantiation" cannot be a modification of the shopping cart. Newegg also argues that a shopping cart ID cannot be a shopping cart under the Court's construction. Soverain does not allege that the shopping cart ID is a shopping cart, just that once the shopping cart ID is created, "an instance of a shopping cart" exists in the database. Once the customer's selected products are inserted into the shopping cart in the shopping cart database, that "instance of a shopping cart" is modified. Both Newegg and Soverain presented their infringement theories to the jury, and it was up to the jury to determine which infringement theory was best supported by the testimony and evidence. Accordingly, Soverain presented legally

sufficient evidence for the jury to conclude that Newegg's system satisfied the modification limitations.

Claim 34 of the '314 patent requires the buyer computer be programmed "to receive a plurality of requests from a user to add a plurality of respective products to a shopping cart in said shopping cart database," and claim 17 of the '492 patent similarly requires the buyer computer be programmed to "receive a plurality of requests from a user to add a plurality of respective products to a shopping cart in the shopping cart database." '314 patent, col. 14:3–6; '492 patent, col. 14:54–57. These are referred to as the "plurality limitations."

Newegg contends that moving the customer product information "en masse" from the cookie to the shopping cart database reads the word "respective" out of the plurality limitations. Newegg argues the word "respective" in the claim language requires the accused system to modify the shopping cart database after each product is requested by the customer. However, Dr. Jack Grimes, Soverain's expert, testified that the customer's "ADD TO CART" requests are "requests from a user to add . . . products to a shopping cart in [the] shopping cart database" because the products requested from the user ultimately end up in the shopping cart database, which is all the limitation requires. Trial Tr. 4/26/10 P.M., 81:15–86:7. Dr. Grimes further testified that the plurality limitations are satisfied because each request is associated with a respective product, and a modification of the shopping cart database after each request is not required by the claims. Trial Tr. 4/27/10 A.M. 30:15–31:2. Thus, Soverain presented legally sufficient evidence for the jury to conclude that Newegg's system satisfied the plurality limitations.

Furthermore, Dr. Grimes testified that Newegg's method of adding products one at a time to a cookie and then all at once to a shopping cart in the shopping cart database is equivalent to adding the products one at a time to a shopping cart in the shopping cart database. Trial Tr. 4/26/10

P.M., 93:13–97:17. Thus, at the very least, there was substantial evidence to support a finding that Newegg's system satisfies both the modification and plurality limitations and infringes under the doctrine of equivalents. Accordingly, Soverain presented legally sufficient evidence for the jury to conclude that Newegg's accused system satisfied all limitations of the shopping cart claims, either literally or by equivalents.

**Hypertext Statement Claims**

Claims 41 and 61 of the '492 patent, which depend from claim 15 of the '492 patent, are referred to as the "hypertext statement claims." These claims require a hypertext link that provides details about the transaction, including transaction history. Newegg argues Soverain presented no evidence that any Newegg customer ever accessed the hypertext link on Newegg's accused system and thus there is no evidence of any "use" of the hypertext statement system.[2] Newegg relies on *ACCO Brands, Inc. v. ABA Locks Manufacturer Co.*, 501 F.3d 1307 (Fed. Cir. 2007), *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, (Fed. Cir. 2009), and *E-Pass Techs., Inc. v. 3Com Corp.*, 473 F.3d 1213 (Fed. Cir. 2007), to challenge the jury's finding of infringement. In *ACCO*, the Federal Circuit found no direct infringement where the accused product could be used in both an infringing and non-infringing manner and the accused inducer only instructed customers on the non-infringing manner. *ACCO*, 501 F.3d at 1313. In *Lucent*, the Federal Circuit allowed the jury's verdict of induced infringement to stand where the accused inducer designed the accused products to be used in an infringing manner and instructed its customers to use the accused products in both an infringing

---

[2] Although Newegg also contends it does not satisfy the limitation of "the client computer being programmed to display the statement document" in Claim 15 of the '492 patent, there is legally sufficient evidence to support the jury's finding that Newegg's accused system meets this limitation of the hypertext statement claims. *See* Trial Tr. 4/26/10 P.M., 118:18–120:6.

7

and non-infringing manner. *Lucent*, 580 F.3d at 1318-19. In *E-Pass*, the only proof of direct

infringement was excerpts from product manuals for various accused devices, "show[ing], at best

that the [defendants] taught their customers each step of the claimed method in isolation." *E-Pass*,

473 F.3d at 1222.

*ACCO* and *E-Pass* are distinguishable from the instant facts and do not support overturning

the jury's verdict, while *Lucent* actually supports the jury's verdict. Although capable of non-

infringing modes of operation, Newegg's order history system is reasonably capable of infringing

the hypertext statement system claims. *See Mass Engineered Design, Inc. v. Ergotron, Inc.*, 633 F.

Supp. 2d 361, 378 ("[T]o infringe an apparatus claim, it is not necessary for an accused device

actually to be performing the functions specified by the claim. All that is required is that the device

have the claimed structure, and that this structure in the device have the capability of functioning as

described by the claim."). Soverain presented sufficient evidence showing that Newegg instructs its

customers to use its system in an infringing manner. Pl.'s Ex. 15, Docket No. 409-10. Indirect

infringement and the corresponding direct infringement may be proved by circumstantial evidence.

*See Liquid Dynamics Corp. v. Vaughan Co.*, 449 F.3d 1209, 1219 (Fed. Cir. 2006). "There is no

requirement that direct evidence be introduced, nor is a jury's preference for circumstantial evidence

over direct evidence unreasonable per se." *Id.* Accordingly, the jury was presented with legally

sufficient evidence to conclude that Newegg's customers used the order history system, and thus

infringed the hypertext statement claims.

**Newegg's Customers "Use" of the System Claims**

Newegg next argues that even if the accused systems meet all limitations of the shopping cart

and hypertext statement claims, there was no legally sufficient evidence from which a jury could

8

A10

conclude that any Newegg customer satisfies each and every limitation of any relevant claim. Induced infringement requires the plaintiff to prove a corresponding act of direct infringement. *See DSU Med. Corp.*, 471 F.3d at 1303. Newegg contends that its customers do not directly infringe any relevant claim because they do not own, possess, operate, direct, or control the accused system. Specifically, Newegg argues that because its customers only own or possess the buyer or client computer and do not "use" anything on the "Newegg side" of the system, they do not practice each and every element of the claimed invention and thus cannot directly infringe. Soverain contends Newegg's customers "use" the system "as a whole" and thus directly infringe.

The relevant claims of the '314 and '492 patents are all system claims. Although Newegg originally argued that the divided infringement standard set forth in *BMC Resources, Inc. v. Paymentech, L.P.*, 498 F.3d 1373, and *Muniauction, Inc. v. Thomson Corp.*, 532 F.3d 1318 (Fed. Cir. 2008), applied to both system and method claims, Newegg now concedes that the *BMC/Muniauction* divided infringement standard only applies to method claims and is inapplicable here. Accordingly, the Court is tasked with determining what constitutes "use" of system claims for purposes of determining infringement. "In the context of [35 U.S.C.] § 271(a), courts interpret the term 'use' broadly to determine if behavior constitutes an infringing 'use' of a patented invention." *Renhcol Inc. v. Don Best Sports*, 538 F. Supp. 2d 356, 360 (E.D. Tex. 2008) (Davis, J.) (citing *NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1316–17 (Fed. Cir. 2005)). In *NTP, Inc. v. Research in Motion, Ltd.*, the Federal Circuit addressed what constitutes "use" for purposes of determining the situs of use of a claimed system. 418 F.3d at 1313–18. "The use of a claimed system under section 271(a) is the place at which the system *as a whole* is put into service, i.e., the place where control of the system is exercised and beneficial use of the system obtained." *Id.* at 1317 (emphasis added).

9

The *NTP* court specifically emphasized the fundamental distinction between the "use" of a system and the "use" of method, noting that "use" of a method is "unlike use of a system *as a whole*, in which the components are used *collectively*, not individually." *Id.* at 1318 (emphasis added).

Numerous district courts have utilized the Federal Circuit's analysis in *NTP* to interpret "use" broadly to determine infringement. In *epicRealm, Licensing, LLC v. Autoflex Leasing, Inc.*, the claimed method and apparatus was directed to "managing dynamic web page generation requests." 492 F. Supp. 2d 608, 613 (E.D. Tex. 2007) (Folsom, J.). The court found that the customers did not "use" the software because they did not control and were not responsible for running the software that managed the incoming requests—they merely submitted requests to the web server. *Id.* at 615. The court noted that "the issue of control is central to determining whether a party is liable for 'using' a claimed invention," and that it is important that the function controlled by the user is the exact function the claimed system was directed to. *Id.* at 614 ("Importantly, the claimed system in *NTP* was directed to a system for the transmission of messages . . . and that is exactly the function that the defendant's customers controlled. Thus, the defendant's customers were users of the system.").

In *Renhcol Inc. v. Don Best Sports*, the claims were directed to an electronic marketplace for prediction information, claiming a computer storage medium comprising code to facilitate transactions in the prediction information market and a computer programmed to execute that code. 538 F. Supp. 2d at 361–62. In *Renhcol*, this Court found that "use" of the computer storage medium and programmed computer required control of the execution of the code located on the accused computer and computer storage medium, but found that certain suppliers and consumers of the marketplace controlled execution of the code by uploading and downloading prediction info to and

10

A12

from the marketplace, thus precluding summary judgment based on situs of use. *Id.* at 363–64. In *Nuance Communications Inc. v. Tellme Networks, Inc.*, the claims were direct to an "apparatus for processing verbal information for competing a task." — F. Supp. 2d —, 2010 WL 1609883, *8 (D. Del. April 20, 2010). The *Nuance* court noted that "[t]he completion of a task is the reason that a caller engages the accused services," and thus calling the accused services may constitute an infringing use if the caller exercised control over the accused services by dictating the format and manner in which the task is accomplished.

Newegg's "own, possess, operate, direct, or control" standard is in direct conflict with the analysis set forth in *NTP*. Although Soverain's "use" of a system "as a whole" standard is more in line with established law, the cases here also stress the importance of the control element. The shopping cart claims are directed to a "network-based sales system" and "hypertext statement system." The claimed systems are directed to the function of purchasing products and viewing order and transaction history, and those are the exact functions controlled by Newegg's customers. Newegg's customers control the operation of Newegg's sales system by choosing the products to purchase, when to checkout, and when to submit an order, and they control Newegg's hypertext-statement system by choosing to view their order history and transaction details. *See* Trial Tr. 4/26/10 P.M., 60:18–129:4, 135:15–137:21. In addition, Newegg's customer use and benefit from Newegg's systems when they purchase products and view their order histories. *See id.* Accordingly, the jury was presented with sufficient evidence to support the jury's verdict that Newegg's customers were "users" of the Newegg's system. Thus, the Court **DENIES** Newegg's motion for JMOL and MNT of no indirect infringement of the '314 patent and '492 patents.

11

### SOVERAIN'S MOTION FOR JMOL & MNT - DIRECT INFRINGEMENT OF '314 AND '492 PATENTS

Soverain moves for JMOL, or alternatively for a new trial, on the issue of direct infringement of claims 35 and 51 of the '314 patent, claim 17 of the '492 patent, and claims 41 and 61 of the '492 patent. Soverain contends that Newegg directly infringes the asserted claims of the '314 patent and '492 patents because Newegg "uses" its sales system just as Newegg's customers do. Soverain's post-verdict briefing does not adequately address the necessary control element that is central to determining "use" of a claimed invention. Furthermore, at the post-verdict hearing, Soverain indicated that "[t]he reason . . . [it] moved for a new trial under direct [infringement] theories [was] in case . . . [Newegg] prevail[ed] on their induced theory." Post-Verdict Hr'g Tr. 4/2/10 P.M., 16:7-10. As Newegg did not prevail on overturning the jury's verdict of induced infringement of the '314 patent and '492 patents, it is not necessary to address Soverain's motion for JMOL of direct infringement in detail. The jury was presented with sufficient evidence to support the jury's verdict that Newegg is not a "user" of its system and thus, does not infringe. Accordingly, the Court **DENIES** Soverain's motion for JMOL and MNT of direct infringement of the '314 patent and '492 patents.

### SOVERAIN'S MOTION FOR JMOL & MNT - DIRECT INFRINGEMENT OF CLAIM 79 of '639 PATENT

Soverain moves for JMOL, or alternatively for a new trial, on the issue of direct infringement of claim 79 of the '639 patent. Claim 79 is directed to a "method of processing, in a server system, service requests from a client to the server system." '639 patent, col. 14:43–44. Soverain contends that Newegg irrefutably meets every limitation of the claim, while Newegg contends that certain limitations of the claim can only be satisfied by the client or customer. If Newegg is correct that the

12

claims require action by multiple parties, then the divided infringement standard set forth in *BMC* and *Muniauction* would be applicable. Thus, the relevant inquiry is whether Newegg's customers perform any required steps of these method claims.

The parties dispute which actions are actually required by claim 79, which depends from claim 78. Claims 78 and 79 provide as follows:

> 78. A method of processing, in a server system, service requests from a client to the server system through a network, said method comprising the steps of:
> **receiving**, from the client, a service request to which a *session identifier stored at the client has been appended by the client*, wherein communications between the client and server system are according to hypertext transfer protocol;
> **validating** the session identifier appended to the service request; and
> servicing the service request if the appended session identifier is valid.

> 79. The method of claim 78, further comprising, in the server system:
> **receiving** an initial *service request from the client*;
> **creating**, responsive to the initial service request, the session identifier; and
> **returning** the session identifier to the client for storage by the client for use in subsequent distinct requests to the server system.

'639 patent, col. 14:43–60 (emphasis added). The bold portions of the claims illustrate the steps Soverain contends the claims require. Newegg, on the other hand, contends that the italicized portions of the claim represent additional claim limitations requiring action on the part of the user. Soverain contends that Newegg is attempting to create multiple-actor issues by reading additional limitations into the claims.

Both parties cite to *SiRF Technology, Inc. v. International Trade Commission* to support their reading of the claims. 601 F.3d 1319 (Fed. Cir. 2010). In *SiRF*, the Federal Circuit did not even reach the question of divided infringement because it found the claims did not require any specified actions be taken by third parties. *Id.* at 1329. The claim language at issue in *SiRF* contained similar language as the claims at issue here: "receiving satellite ephemeris at a first location" and "receiving

13

satellite signals from at least one satellite and at least one receiving station." *Id.* The court found that "[t]his [was] not a situation where a method claim specifies performance of a step by a third party, or in which a third party actually performs some of the designated steps." *Id.* As in *SiRF*, "the method claims at issue here are drawn to actions which can be performed and are performed by a single party." *Id.* Moreover, in *BMC Resources, Inc. v. Paymentech, L.P.*, the Federal Circuit observed that "[a] patentee can usually structure a claim to capture infringement by a single party." 498 F.3d at 1381. For example, a patentee might structure the claims so that the steps "feature[] references to a single party's supplying or *receiving* each element of the claimed process." *Id.* (emphasis added). Claims 78 and 79 are drafted in this manner, specifying the required action by Newegg (e.g., "receiving"), along with a limitation defining the action's object (e.g., "service request from the client").

Dr. Grimes testified that all of the steps contained in dependent claim 79 are performed by Newegg through its server system. Trial Tr. 4/26/10 P.M., 158:21–165:18. During its cross-examination of Dr. Grimes, Newegg did not question Dr. Grimes on the steps recited by claim 79, but instead focused on actions not specifically required by the claim, such as whether the customer *sends* the service request to the server and whether the session identifier stored at the client has been *appended* by the client. Trial Tr. 4/27/10 A.M., 61:8–62:3. Dr. Grimes explained during direct examination that although a client must send a request for Newegg to receive and must append the session identifier to the request, claims 78 and 79 do not recite steps of sending and appending. Trial Tr. 4/26/10 P.M., 159:11–160:9.

In addition, Newegg's own technical expert, Edward Tittel, did not testify as to any of the steps actually included in claim 79 because Mr. Tittel failed to address claim 79 in his expert reports

14

and was precluded from testifying outside the scope of his reports. To get around this, Newegg

questioned Tittel about claim 1 of the '639 patent and attempted to equate claim 1 to claims 78 and

79. Claim 1 provides as follows:

> 1. A method of processing service requests from a client to a server system through a network, said method comprising the steps of forwarding a service request from the client to the server system, wherein communications between the client and server system are according to hypertext transfer protocol;
> returning a session identifier from the server system to the client, *the client storing the session identifier* for use in subsequent distinct requests to the server system; and
> *appending the stored session identifier* to each of the subsequent distinct requests from the client to the server system.

'639 patent, col. 10:26–38 (emphasis added). When questioning Mr. Tittel about the storing action,

Newegg's counsel stated that "this limitation is also in Claim 78." Trial Tr. 4/29/10 A.M., 43:13-18.

This is likely to have misled the jury into thinking that claim 60, which depends from claim 1, and

claim 79, which depends from claim 78, were one in the same. The wording of the claims clearly

demonstrates this is not the case. Unlike claims 78 and 79, claim 1, and therefore claim 60,

expressly require the steps of "forwarding" the service request and "storing" and "appending" the

session identifier, which are all *customer actions*. Although *the phrases Newegg points to in claim*

79 (e.g., "service request to which a *session identifier stored at the client has been appended by the*

*client*") are limitations that must be satisfied, "appending" and "sending" are not separate steps

requiring action in claim 79. Because Newegg did not refute Dr. Grime's testimony that Newegg

performs each properly defined step of claim 79, and because no reasonable jury could have found

that claim 79 was not infringed, the Court **GRANTS** Soverain's motion for JMOL of direct

infringement of claim 79 of the '639 patent.

15

## DAMAGES

### *SOVERAIN'S MNT - DAMAGES FOR '639 PATENT*

Having granted Soverain's motion for JMOL on Newegg's direct infringement of claim 79

of the '639 patent, the Court **GRANTS** Soverain's motion for a new trial on damages for such

infringement, to be held after all appeals have been exhausted.

### *NEWEGG'S MOTION FOR JMOL, MNT, OR REMITTITUR - DAMAGES FOR '314 AND '492 PATENTS*

Newegg moves for JMOL that total damages in this case cannot exceed $500,000. In the

alternative, Newegg moves for a new trial on damages or a remittitur in the amount of $500,000.

In support of its motion for JMOL, Newegg argues that Soverain's damages demand was excessive,

unsupported by the facts, and inconsistent with Federal Circuit precedent. Thus, Newegg contends

it presented the only valid damages theory, which was a lump sum of $500,000, representing a paid-

up license for the life of the patent. Specifically, Newegg argues: (1) Soverain's damages expert,

James Nawrocki, violated the Entire Market Value rule and Georgia Pacific factor 13; (2) Mr.

Nawrocki failed to exclude or account for non-infringing uses; (3) Mr. Nawrocki conducted an

improper "commercial success" analysis; and (4) Soverain had no evidentiary support for a use-

based running royalty.

First, Newegg contends that Mr. Nawrocki used Newegg's entire sales as the royalty base and

a 25–33% Rule of Thumb as the royalty rate. Soverain counters that Mr. Nawrocki used the

number of infringing transactions as the royalty base, and considered Newegg's gross sales in

determining the royalty rate. Considering the foundation laid by Mr. Nawrocki's testimony, his

application of the 25% Rule of Thumb was relevant and reliable. In addition, Newegg cross-

16

examined Mr. Nawrocki on the application of the Rule of Thumb, Trial Tr. 4/27/10 P.M., 146:10-23,

and presented contrary evidence on the issue of damages. Trial Tr. 4/29/10 P.M., 11:5–65:7. As for

Newegg's entire market value rule argument, Mr. Nawrocki never relied on the entire market value

rule in his expert reports or at trial. Indeed, had Soverain been permitted to argue an "entire market

value" theory, it would have been entitled to a substantially larger portion of Newegg's operating

profit than under Mr. Nawrocki's theory of damages. *See i4i Ltd. P'ship v. Microsoft Corp.*, 670 F.

Supp. 2d 568, 592 n.8 (E.D. Tex. 2009) (Davis, J.) (citing *DePuy Spine, Inc. v. Medtronic Sofamor*

*Danek, Inc.*, 567 F.3d 1314, 1331 (Fed. Cir. 2009) (explaining that the entire market value rule

"permits a patentee to recover the entire value of an apparatus that contains both patented and

unpatented components")). Nawrocki conducted a proper *Georgia-Pacific*[3] analysis to determine

a reasonable royalty rate to apply to the number of infringing transactions royalty base, and his

testimony in this regard was appropriately considered by the jury. Trial Tr. 4/27/10 P.M.,

81:19–132:15.

Newegg next argues that Nawrocki failed to exclude single-item sales, which Newegg

contends do not infringe, from his royalty. Although Newegg represents in its briefing that Dr.

Grimes admitted that single-item sales do not infringe, Dr. Grimes admitted no such thing. Dr.

Grimes testified that "the structure has to contain the ability for the user to make multiple requests"

in order to infringe. Trial Tr. 4/26/10 P.M., 81:15–86:5. Thus, it was not improper for Nawrocki

to include single-item sales in his reasonable royalty analysis. Furthermore, Newegg's arguments

regarding Nawrocki's failure to account for transactions that do not meet the hypertext statement

limitation are misplaced. As stated above in addressing infringement, "to infringe an apparatus

---

[3] *Georgia-Pacific Corp. v. U.S. Plywood Co.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970).

17

claim, it is not necessary for an accused device actually to be performing the functions specified by the claim. All that is required is that the device have the claimed structure, and that this structure in the device have the capability of functioning as described by the claim." *Mass Engineered Design, Inc. v. Ergotron, Inc.*, 633 F. Supp. 2d 361, 378. Mr. Nawrocki properly considered the capability of infringement in his analysis of reasonable royalty for the '314 and '492 patents.

Third, Newegg argues that Nawrocki improperly focused on Newegg's commercial success, rather than the success of the patented invention. Although the Court "must carefully tie proof of damages to the claimed invention's footprint in the market place," *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010), this does not prevent the alleged infringer's profits or revenues from being a relevant consideration in a *Georgia-Pacific* analysis. Indeed, the factors for calculating a reasonable royalty under *Georgia-Pacific* make the character of the commercial embodiment of the invention, the benefits to those who have used the invention, the extent to which the infringer has made use of the invention, and any evidence probative of the value of that use specifically relevant to the "reasonable royalty" analysis. *Georgia-Pacific*, 318 F. Supp. at 1120.

Finally, Newegg contends that there was no evidentiary support for Soverain's use-based running royalty theory. Newegg's argument ignores the fact that certain fully paid-up lump-sum licenses introduced into evidence were based on running components, representing a percentage of sales, profits, or a fee per transaction. *See* Trial Tr. 4/27/10 P.M., 100:8–105:9; Trial Tr. 4/29/10 P.M., 116:10–117:9. Mr. Nawrocki's opinion that damages should be calculated on a running royalty basis is supported by sufficient evidence. Furthermore, the Court instructed the jury that the damages period ran from November 2, 2007 to the present, without any objection from either party. Thus, there is no reason to assume the jury's verdict of $2.5 million represented a paid-up license

18

for the life of the patent.

The purpose of this Court's "gatekeeper" function under *Daubert v. Merrell Dow Pharmaceuticals, Inc.* is served by "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." 509 U.S. 579 (1993). There is sufficient evidence that Mr. Nawrocki's damages opinion is both relevant and rests on a reliable foundation. Additionally, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* at 596. Newegg vigorously cross-examined Mr. Nawrocki concerning his damages opinion. Trial Tr. 4/27/10 P.M., 132:20–167:7; 171:15–21. Newegg also presented its own lump-sum damages theory, and the jury was free to weigh the parties' distinct theories and evidence. "[T]he factual determination of a reasonable royalty . . . need not be supported, and indeed, frequently is not supported by the specific figures advanced by either party." *SmithKline Diagnostics, Inc. v. Helena Labs. Corp.*, 926 F.2d 1161, 1167 (Fed. Cir. 1991). The jury's verdict of $2,500,000 is well within the amounts advocated by the parties' damages experts and is supported by sufficient evidence. Thus, the Court **DENIES** Newegg's motion for JMOL on damages.

Alternatively to JMOL, Newegg requests a new trial or remittitur. In addition to arguing that the jury's damages award was excessive and against the great weight of the evidence, Newegg sets forth a number of alleged errors that it contends infected the jury's award. However, most of these errors derive from Soverain's damages theory, which the Court has already found reliable. In addition, Newegg made a tactical decision during trial not to offer evidence of the amount Soverain paid for the patents-in-suit at a bankruptcy court auction and thus, Newegg cannot now complain that the Court excluded such evidence. *See* Trial Tr. 4/27/10 P.M., 64:9–65:16. Furthermore, remittitur

19

is within the sound discretion of the trial court and is only appropriate when the damages verdict is

"clearly excessive." *See Thompson v. Connick*, 553 F.3d 836, 865 (5th Cir. 2008). Accordingly, the

Court **DENIES** Newegg's MNT or remittitur for the same reasons outlined with regard to Newegg's

motion for JMOL on damages and for the reasons set forth above.

### NEWEGG'S MOTION FOR JMOL & MNT - INVALIDITY

Newegg moves for JMOL, or alternatively for a new trial, on the issue of invalidity of all the

asserted patent claims based on anticipation and obviousness. Specifically, Newegg asserts that (1)

claims 35 and 51 of the '314 patent were anticipated by the CompuServe Mall; (2) claims 35 and 51

of the '314 patent and claim 17 of the '492 patent were obvious based on the CompuServe Mall,

alone or in combination with Gifford; (3) claims 41 and 61 of the '492 patent were obvious based

on Gifford; and (4) claims 60 and 79 of the '639 patent were obvious based on Gifford and Johnson,

either alone or in combination. In addition, Newegg reurges each of the invalidity grounds set forth

in Newegg's Rule 50(a) motion for JMOL submitted at the close of evidence (Docket No. 368).

Newegg finally argues that if the Court concludes JMOL is not warranted based on the foregoing

grounds, the Court should grant a new trial on anticipation and obviousness based on a number of

errors regarding the admission and exclusion of evidence, charge error, and the Court's dismissal

of Newegg's obviousness claims at the close of evidence.

In order to show that it is entitled to JMOL on its affirmative defense of invalidity, Newegg

is required to prove the essential elements of that defense to a virtual certainty. *Bank of La. v. Aetna*

*U.S. Healthcare Inc.*, 468 F.3d 237, 241 (5th Cir. 2006) ("For a defendant to obtain summary

judgment on an affirmative defense, it must establish beyond dispute all of the defense's essential

elements."). As for Newegg's motion for JMOL of anticipation based on claims 35 and 51 of the

20

'314 patent, Newegg must prove that the CompuServe Mall discloses each and every limitations of

the claimed invention arranged exactly as claimed, or that any missing element is necessarily present,

or inherent, in the CompuServe Mall. *See Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1369

(Fed. Cir. 2008); *Schering Corp. v. Geneva Pharms.*, 339 F.3d 1373, 1377 (Fed. Cir. 2003). Newegg

argues that Alexandor Trevor's and Edward Tittel's testimony regarding the CompuServe Mall was

sufficient to establish anticipation. However, Mr. Tittel did not testify regarding the limitation of

"said buyer computer being programmed . . . to send . . . shopping cart messages . . . each of which

comprises a product identifier identifying one of said plurality of products," and Mr. Trevor admitted

that the CompuServe Mall was not programmed to send such messages. Trial Tr. 4/28/10 P.M.,

83:1-23. Mr. Tittel also failed to explain how the CompuServe Mall reference disclosed a "shopping

cart database," as construed by the Court. Mr. Trevor recognized that the references did not disclose

such a database. Trial Tr. 4/28/10 P.M., 79:19–80:2. Soverain's expert, Dr. Michael Shamos,

relying on Mr. Trevor's trial testimony regarding the CompuServe Mall, presented evidence that the

CompuServe Mall did not have a shopping cart message with a product identifier because there was

no need for a product identifier. Trial Tr. 4/29/10 P.M., 162:18–165:9. Dr. Shamos further testified

that CompuServe Mall did not contain a "shopping cart database" because the personal holding files

kept in the main memory failed to meet the Court's construction of "shopping cart database." Trial

Tr. 4/29/10 P.M., 165:10–168:17. The jury was free to disbelieve Mr. Tittel's expert testimony, and

the existence of contrary testimony by Dr. Shamos supports the jury's conclusion that the

CompuServe Mall does not anticipate claims 35 and 51 of the '314 patent.

With regard to obviousness, the Court granted Soverain's motion for JMOL of no

obviousness and did not send the obviousness issue to the jury. Newegg's expert, Mr. Tittel, did not

express any opinions on obviousness or conduct a proper *Graham*[4] analysis. Newegg contends that

it need not present expert testimony on the ultimate legal issue of obviousness and thus it was error

for the Court to deny Newegg the opportunity to argue obviousness to the jury and submit the issue

for a jury finding. The Federal Circuit has made clear that "[t]here must be some articulated

reasoning with some rational underpinning to support the legal conclusion of obviousness."

*Innogenetics, N.V. v. Abbott Labs.*, 512 F.3d 1363, 1373 (Fed. Cir. 2008). In *Proveris Scientific

Corp. v. Innovasystems, Inc.*, the Federal Circuit upheld the district court's decision to require

defendants to present expert testimony in order to establish anticipation and obviousness. 536 F.3d

1256, 1267–68 (Fed. Cir. 2008). As in *Proveris*, the subject matter in this case "is sufficiently

complex to fall beyond the grasp of an ordinary layperson." *Id.* Accordingly, because Newegg did

not meet its burden of establishing a prima facie case of obviousness of the asserted claims, the

Court stands by its prior decision granting Soverain's motion for JMOL on obviousness.

Lastly, Newegg asserted various grounds of alleged error in support of its MNT. First, the

Court's admission of evidence related to the existence of settlement licenses was not prejudicial to

Newegg because neither the licenses themselves nor any evidence relating to the specific terms of

the licenses were admitted. In fact, the Court only allowed Soverain to state the names of its well-

known licensees to rebut Newegg's offering of license agreements to smaller companies. Second,

while the Court's exclusion of the belatedly produced CompuServe Mall materials caused only

minor prejudice to Newegg, admitting these materials on the eve of trial would have been highly

prejudicial to Soverain. Furthermore, Newegg can hardly claim prejudice with regard to the Court's

exclusion of the belatedly produced documents given the Court's admission of the CompuServe

---

[4] *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1 (1966).

Manuals over Soverain's strenuous objections.  Third, although Newegg contends the Court failed

to instruct the jury that a witness's testimony only has to be corroborated if the witness is an

interested party, Newegg's allegation of charge error is without merit.  "[C]orroboration is required

of any witness whose testimony alone is asserted to invalidate a patent, regardless of his or her level

of interest." *Finnigan Corp. v. Int'l Trade Comm'n*, 180 F.3d 1354, 1369 (Fed. Cir. 1999); *see also*

*Adenta GMBH v. Orthoarm, Inc.*, 501 F.3d 1364 (Fed. Cir. 2007).  Lastly, as previously discussed,

the Court's dismissal of Newegg's obviousness claims at the close of evidence does not warrant a

new trial.

    In sum, the jury's verdict on invalidity was not without support and certainly not against the

great weight of the evidence.  Thus, based on the foregoing reasons, the Court **DENIES** Newegg's

motion for JMOL and MNT on invalidity of the patents-in-suit.

### SOVERAIN'S MOTION FOR PREJUDGMENT INTEREST AND COSTS, POST-VERDICT DAMAGES, AND POST-JUDGMENT INTEREST

    Soverain moves for prejudgment interest and costs, post-verdict damages until the time of

judgment, and post-judgment interest.  Soverain's request for post-judgment interest is uncontested

and is, accordingly, granted pursuant to the provisions of 28 U.S.C. § 1961.

    Soverain is also entitled to an award of prejudgment costs.  35 U.S.C. § 284 ("Upon finding

for the claimant the court shall award the claimant damages adequate to compensate for the

infringement but in no event less than a reasonable royalty for the use made of the invention by the

infringer, together with interest and costs as fixed by the court.").  Soverain shall provide the clerk

of this Court with a detailed bill of costs pursuant to Local Rule CV-54.

    With regard to prejudgment interest, Soverain calculates prejudgment interest based on the

jury's $2,500,000 award using the prime interest rate, compounded quarterly. Newegg does not

dispute that Soverain is entitled to prejudgment interest, but argues that prejudgment interest is

properly calculated using the U.S. Treasury Bill rate, not prime rate, and that $2,500,000 is not the

proper amount from which prejudgment interest should be calculated. As Newegg's arguments

regarding the proper damages award have been previously addressed and rejected, and the Court has

determined it will not alter the jury's award of $2,500,000, prejudgment interest will be calculated

on this amount.

The interest rate used to calculate prejudgment interest and the method and frequency of

compounding is left to the discretion of the district court. *See Uniroyal, Inc. V. Rudkin-Wiley Corp.*,

939 F.2d 1540, 1545 (Fed. Cir. 1991); *Studiengesellschaft Kohle, m.b.H. v. Dart Indus.*, Inc., 862

F.2d 1564, 1579–80 (Fed. Cir. 1988)(citing *Bio-Rad Labs.*, 807 F.2d at 969). Interest should be

awarded from the date of infringement to the date of final judgment. *Nickson Indus., Inc. v. Rol Mfg*,

847 F.2d 795, 800 (Fed. Cir. 1988). Accordingly, prejudgment interest shall be awarded to Soverain

on the $2,500,000 damages award at the prime rate as of August 11, 2010 compounded monthly

through July 31, 2010 and compounded daily for the month of August 2010. Interest should be

calculated from the date of infringement through the date of final judgment.

With regard to post-verdict damages, Soverain calculated a daily rate of $2,900 for post-

verdict damages by extrapolating the jury's award of $2,500,000. *See* Nawrocki's Post-Verdict

Declaration, Docket No. 403-2, at 2–3. Soverain's damages expert divided the number of Newegg

online sales transactions from January 31, 2010 to April 30, 2010 by 120 days to yield a rate of

32,844 transactions per day. *Id.* Soverain then applied a per transaction royalty of $0.088 to yield

an ongoing royalty of $2,900 per day of infringement until final judgment. *Id.* Newegg utilized

24

Soverain's per transaction rate solely for purposes of calculating post-verdict damages, but maintains that the $2,900 per day royalty must be reduced to $966.67 per day to account for Newegg's single-item sales transactions. The Court has previously addressed and rejected Newegg's argument regarding single-item sales. Accordingly, post-verdict damages shall be awarded to Soverain in the amount of $2,900 per day until final judgment.

## SOVERAIN'S MOTION FOR PERMANENT INJUNCTION OR, IN THE ALTERNATIVE, ONGOING ROYALTIES

### Permanent Injunction

Soverain requests an order permanently enjoining Newegg from using the technology claimed in Soverain's '314 and '492 patents to operate its infringing websites and any colorable variation thereof. Soverain proposes the following language:

> Newegg, its officers, agents, servants, employees and attorneys, and those persons in active concert or participation with them who receive actual notice hereof, are hereby restrained and enjoined, pursuant to 35 U.S.C. § 283 and Fed. R. Civ. P. 65(d), from:
>
> 1. infringing or inducing others to infringe U.S. Patent No. 5,715,314 (the '314 patent) through operation of the www.newegg.com, www.newegg.ca, or www.neweggmall.com websites, or any colorable variation thereof, including www.biz.newegg.com, through and including the expiration of the '314 patent, February 3, 2015; and
>
> 2. infringing or inducing others to infringe U.S. Patent No. 5,909,492 (the '492) patent through operation of the www.newegg.com, www.newegg.ca, or www.neweggmall.com websites, or any colorable variation thereof, including www.biz.newegg.com, through and including the expiration of the '492 patent, October 24, 2014.

Soverain's Proposed Order Granting Injunctive Relief, Docket No. 403-12. Importantly, Soverain is seeking to enjoin www.biz.newegg.com, a website that is not part of any of the accused systems.

The decision to grant or deny injunctive relief is within the district court's discretion, which

25

should be exercised consistent with traditional principles of equity. *eBay Inc. v. MercExchange,*

*L.L.C.,* 547 U.S. 388, 394 (2006). A party is entitled to a permanent injunction only if: "1) [the

party] has suffered an irreparable injury; 2) that remedies at law, such as monetary damages, are

inadequate to compensate for that injury; 3) that, considering the balance of hardships between the

[parties], a remedy in equity is warranted; and 4) that the public interest would not be disserved by

a permanent injunction." *Id.* at 391.

First, Soverain argues that its licensing program will be irreparably harmed if Newegg is not

enjoined from using Soverain's patented technology. Soverain contends that if Newegg is not

enjoined after having been adjudged an infringer, other infringers will be encouraged to risk

litigation, rather than take a license. Although a patent holder may in some cases establish

irreparable harm by showing that an existing infringement precludes his ability to license, it is too

speculative in this case to assume that third parties will choose to risk litigation rather than license

Soverain's technology simply because Newegg has not been enjoined. *See z4 Techs., Inc. v.*

*Microsoft Corp.,* 434 F. Supp. 2d 437, 440 (E.D. Tex. 2006) ("There is no logical reason that a

potential consumer or licensee of z4's technology would have been dissuaded from purchasing or

licensing z4's product activation technology for use in its own software due to Microsoft's

infringement."); *but see Commonwealth Scientific & Indus. Research Org. v. Buffalo Tech. (USA),*

*Inc.,* 492 F. Supp. 2d 600, 604 (E.D. Tex. 2007) ("*CSIRO*") (finding harm to a licensing program

sufficient to establish irreparable harm where the patent holder research institution relied heavily on

its ability to license to finance its research and development for frontier projects). In addition,

Soverain and its predecessors have extensively licensed the patents-in-suit, and Soverain's patent

licensing program has largely focused on obtaining monetary objectives, rather than non-monetary

26

objectives (e.g., cross licensing for resolution of litigation). Soverain's focus on monetary objectives does not favor an injunction. *Cf. CSIRO*, 492 F. Supp. 2d at 604 (finding that CSIRO's harm was "not merely financial"). Furthermore, although Soverain contends that its Transact product is a direct competitor to the www.neweggmall.com website, any possible competition between Newegg Mall and Transact is too insubstantial to support an injunction. Soverain has not established any competition with respect to www.newegg.com and www.newegg.ca. Thus, this factor weighs against enjoining Newegg.

Second, Soverain contends that monetary remedies are inadequate to compensate Soverain because the injury to Soverain and the value of its technology are not quantifiable. Soverain argues the harm that will result from an inability to license its technology to its competitors without engaging in a full-fledged trial is both incalculable and irreparable. The Court rejects these arguments as purely speculative. Moreover, "[w]hen the patented invention is but a small component of the product the companies seek to produce and the threat of an injunction is employed simply for undue leverage in negotiations, legal damages may well be sufficient to compensate for the infringement and an injunction may not serve the public interest." *eBay*, 547 U.S. at 396. Newegg argues that monetary damages would be adequate to compensate Soverain because the portions of its website relating to shopping cart functionality constitute less than 1% of the total lines of code that make up its system. While this may be true, Soverain has shown that its patented technology is "necessary" to Newegg's e-commerce system. Trial Tr. 4/28/10 A.M., 98:3-14; Trial Tr. 4/29/10 P.M., 30:20–31:4. Although this case presents a unique situation where the infringing component of Newegg's system is a small, yet necessary portion of the entire system, it is equivocal whether this is a situation where "the product is the invention." *Compare CSIRO*, 492 F. Supp. 2d

27

at 605–06 (finding monetary damages less adequate to compensate for infringement because the infringement related to "the essence of the technology"), *with z4*, 434 F. Supp. 2d at 440 (finding the infringing technology was "a small component of [Microsoft's] software" because it "in no way related to the core functionality for which the software is purchased by consumers"). However, the jury's $2.5 million damages award, which represents only a fraction of the $22.6 million advocated by Soverain, demonstrates that the infringed claims constitute a small part of the total value of Newegg's system. Accordingly, this factor also weighs against enjoining Newegg.

The balance of hardships favors Newegg. Soverain only argues its licensing program will suffer if Newegg is not enjoined. It is clear from Soverain's briefing that its licensing program has focused on obtaining purely monetary objectives. While enjoining Newegg from operating its website would have a significant effect on Newegg and its e-commerce system, the absence of an injunction would not significantly harm Soverain because monetary remedies are adequate to compensate Soverain for Newegg's continued infringement. Thus, the balance of hardships weighs against enjoining Newegg.

Because Soverain has not shown irreparable harm in the absence of a permanent injunction, any harm Soverain might suffer can be adequately remedied through the recovery of monetary damages, and the balance of hardships weighs in favor of Newegg, an injunction would not serve the public interest and is improper in this instance. Thus, the Court **DENIES** Soverain's motion for a permanent injunction.

**Ongoing Royalties**

In the absence of an injunction, Soverain requests an award of ongoing royalties for the remaining life of the '314 and '492 patents. "Under some circumstances, awarding an ongoing

28

royalty for patent infringement in lieu of an injunction may be appropriate." *Paice LLC v. Toyota Motor Corp.*, 504 F.3d 1293, 1314 (Fed. Cir. 2007) ("*Paice II*"). "Even though a permanent injunction may no longer be proper in many patent cases in light of *eBay*, an ongoing royalty rate must still adequately compensate a patentee for giving up his right under the law to exclude others from making, using, selling, offering for sale or importing his invention." *Paice LLC v. Toyota Motor Corp.*, 609 F. Supp. 2d 620, 630 (E.D. Tex. 2009) ("*Paice III*"). In addition, the Court must account for the change in the legal relationship between the parties. "Failing to consider the parties' changed legal status would create an incentive for every defendant to fight each patent infringement case to the bitter end because without consideration of the changed legal status, there is essentially no downside to losing." *Paice III*, 609 F. Supp. 2d at 628. Furthermore, an on-going post-verdict royalty is appropriately higher than the jury's pre-verdict reasonable royalty. *See Amado v. Microsoft Corp.*, 517 F.3d 1353, 1362 n.2 (Fed. Cir. 2008); *Creative Internet Adver. Corp. v. Yahoo!, Inc.*, 674 F. Supp. 2d 847, 861 (E.D. Tex. 2009).

Moreover, the Federal Circuit has encouraged parties to negotiate a license amongst themselves regarding the future use of a patented technology before imposing an ongoing royalty. *See Paice III*, 609 F. Supp. 2d at 623 (citing *Paice II*, 504 F.3d at 1315). From the parties' post-verdict briefing on the ongoing royalty issue, as well as the parties' settlement negotiation history thus far, it is clear that further license negotiation would be fruitless. Thus, the Court is faced with the task of determining an appropriate ongoing royalty arising from a post-verdict hypothetical negotiation, taking into account the changed relationship between the parties. *See Creative*, 674 F. Supp. 2d at 860.

Newegg is now an adjudged infringer and Newegg's continued infringement is both

voluntary and intentional, making Newegg's continued infringement willful. *See Paice III*, 609 F.

Supp. 2d at 628. In addition, both Newegg and Soverain's financial position has changed

dramatically since the hypothetical negotiation. Newegg is now the second largest online-only

retailer and has announced its plans for an initial public offering. Soverain's licensing program has

had recent success as Soverain has entered into seven agreements with large e-commerce retailers,

including Amazon and TigerDirect. As expected, the parties have markedly different views of how

these changes affect their respective negotiating positions. The parties' changed financial positions

appear to cancel each other out because each party is more successful today than they were at the

time of the hypothetical negotiation. However, the Court cannot ignore Newegg's adjudged infringer

status in determining an appropriate ongoing royalty.

Reducing the jury's verdict to a per-transaction rate results in an award equal to $0.088 per

Newegg transaction. Soverain contends that an appropriate ongoing royalty, taking into account the

changed legal and factual circumstances, is at least $0.20 per transaction. Newegg contends that

Soverain's proposed ongoing royalty is unreasonable because Soverain has failed to take into

account Newegg's proposed design-arounds for the shopping cart claims and hypertext statement

claims. Newegg argues that these design-arounds should lower the parties' expectations regarding

any ongoing royalty or eliminate the need for such royalty altogether. Newegg advocates for an

ongoing royalty of 1.25 cents per $100 transaction, or in the alternative, $0.088 per transaction

because the parties' various changed circumstances cancel each other out.

Newegg's 2009 profit rate of approximately 2.5% yields an operating profit of $4.68 per

transaction. *See* Nawrocki's Post-Verdict Declaration, Docket No. 403-2, at 13. Although Judge

Folsom in *Paice III* applied a 25% Rule of Thumb to the profit rate as a starting point to determine

30

an ongoing royalty, such an approach is not in line with the jury's verdict in this case because $0.088

per Newegg transaction represents only 1.88% of Newegg's profits. Accordingly, the Court uses

Soverain's proposal of $0.20 as a starting point. Even taking into account Newegg's adjudged

infringer status, the jury's award of only $0.088 per transaction (1.88% of Newegg's profits)

counsels against an ongoing royalty of $0.20 per transaction (4.27% of Newegg's profits). *See Paice*

*III*, 609 F. Supp. 2d at 630 ("[T]he jury's award for past damages . . . counsels in favor of a

reduction."). If Newegg proves successful in designing-around the shopping cart claims and

hypertext statement claims, it will be freed of the obligation to pay ongoing royalties. When the time

comes, Soverain will have the burden of proving that Newegg's design-arounds are not colorably

different and thus still infringing. *See Creative,* 674 F. Supp. 2d at 855. Although Newegg's

proposed re-designs do not preclude the post-verdict relief Soverain is entitled to given Newegg's

adjudged infringement, the Court does consider Newegg's proposed design-arounds because "the

costs of switching to an alternative design is a factor that the parties would consider in arriving at

an appropriate ongoing royalty rate." *Paice III,* 609 F. Supp. 2d at 627. Based on the foregoing

reasons, and the fact that Soverain did not account for Newegg's proposed design-arounds in its

$0.20 proposal, the Court finds it is reasonable to reduce Soverain's proposal by 25%.

Thus, taking into account the changed legal and factual circumstances occurring since the

first hypothetical negotiation, the Court **GRANTS** Soverain's motion for ongoing royalties and

concludes that $0.15 per transaction is an appropriate ongoing royalty to adequately compensate

Soverain for Newegg's continued infringement.

## NEWEGG'S MOTION TO STRIKE EVIDENCE

Newegg moves to strike Mr. Nawrocki's entire declaration and portions of Katharine

31

Wolanyk's declaration as unreliable, irrelevant, and inadmissible. Both declarations were submitted by Soverain in support of its post-verdict motions. The Court overrules Newegg's objections to these declarations and **DENIES** Newegg's motion to strike.

## CONCLUSION

For the aforementioned reasons, the Court **GRANTS** in part Soverain's motion for JMOL on infringement and MNT on damages (Docket No. 402), **GRANTS** in part Soverain's motion for permanent injunction or, in the alternative, ongoing royalties (Docket No. 403), **GRANTS** in part Soverain's motion for pre-judgment interest, post-verdict damages, and post-judgment interest (Docket No. 404), and **DENIES** all other motions.

So **ORDERED and SIGNED** this 11th day of August, 2010.

**LEONARD DAVIS**
**UNITED STATES DISTRICT JUDGE**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| SOVERAIN SOFTWARE LLC | § | |
| | § | |
| Plaintiff | § | |
| | § | |
| vs. | § | CASE NO. 6:07 CV 511 |
| | § | PATENT CASE |
| NEWEGG INC. | § | |
| | § | |
| Defendant | § | |

## VERDICT FORM

In answering these questions, you are to follow all of the instructions I have given you in the Court's Charge.

### INFRINGEMENT

1.  Did Soverain prove by a preponderance of the evidence that Newegg directly infringed or induced infringement of the asserted claims of the '314 Patent and the '492 Patent? Answer "Yes" or "No" for each Claim and each type of infringement below.

|  | Direct Infringement | Inducement |
|---|---|---|
| **'314 Patent** | | |
| Claim 35 | No | Yes |
| Claim 51 | No | Yes |
| | | |
| **'492 Patent** | | |
| Claim 17 | No | Yes |
| Claim 41 | No | Yes |
| Claim 61 | No | Yes |

2.    Did Soverain prove by a preponderance of the evidence that Newegg directly infringed the

asserted claims of the '639 Patent?

**Answer "Yes" or "No" for each Claim below.**

Claim 60        _____No_____

Claim 79        _____No_____


## INVALIDITY

3.    Did Newegg prove by clear and convincing evidence that the claims of the '314 Patent, the

'492 Patent, and the '639 Patent are invalid?

**If you find the claim invalid answer "Yes," otherwise answer "No."**

<u>'314 Patent</u>

Claim 35        _____No_____

Claim 51        _____No_____


<u>'492 Patent</u>

Claim 17        _____No_____

Claim 41        _____No_____

Claim 61        _____No_____


<u>'639 Patent</u>

Claim 60        _____No_____

Claim 79        _____No_____


2

## DAMAGES

If you have found any claim infringed, answer question 4; otherwise, do not answer question 4.

4.    What sum of money, if paid now in cash, do you find from a preponderance of the evidence would fairly and reasonably compensate Soverain for Newegg's infringement of the following patents?

Answer with the amount in dollars and cents.

'314 Patent and/or '492 Patent:    $ 2,500,000.00

'639 Patent:    $ 0.00

Signed this __30__ day of April, 2010.

_____

JURY FOREPERSON

3

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| SOVERAIN SOFTWARE LLC | § | |
| | § | |
| Plaintiff | § | |
| | § | |
| vs. | § | CASE NO. 6:07 CV 511 |
| | § | PATENT CASE |
| NEWEGG INC. | § | |
| | § | |
| Defendant | § | |

## COURT'S CHARGE

MEMBERS OF THE JURY:

You have heard the evidence in this case. I will now instruct you on the law that you must

apply. It is your duty to follow the law as I give it to you. On the other hand, you the jury are the

judges of the facts. Do not consider any statement that I have made during the trial or make in these

instructions as an indication that I have any opinion about the facts of this case. After I instruct you

on the law, the attorneys will have an opportunity to make their closing arguments. Statements and

arguments of the attorneys are not evidence and are not instructions on the law. They are intended

only to assist the jury in understanding the evidence and the parties' contentions.

1.      GENERAL INSTRUCTIONS

A verdict form has been prepared for you. You will take this form to the jury room and when

you have reached unanimous agreement as to your verdict, you will have your foreperson fill in, date

and sign the form. Answer each question on the verdict form from the facts as you find them. Do

not decide who you think should win and then answer the questions accordingly. Your answers and

your verdict must be unanimous.

In determining whether any fact has been proved in this case, you may, unless otherwise instructed, consider the testimony of all witnesses, regardless of who may have called them, and all exhibits received in evidence, regardless of who may have produced them.

## 1.1    Considering Witness Testimony

By the Court allowing testimony or other evidence to be introduced over the objection of an attorney, the Court did not indicate any opinion as to the weight or effect of such evidence. You are the sole judges of the credibility of all witnesses and the weight and effect of all evidence.

When the Court sustained an objection to a question addressed to a witness, the jury must disregard the question entirely, and may draw no inference from the wording of it or speculate as to what the witness would have testified to, if he or she had been permitted to answer the question.

At times during the trial it was necessary for the Court to talk with the lawyers here at the bench out of your hearing, or by calling a recess. We met because often during a trial something comes up that does not involve the jury. You should not speculate on what was discussed during such times.

In determining the weight to give to the testimony of a witness, you should ask yourself whether there was evidence tending to prove that the witness testified falsely concerning some important fact, or whether there was evidence that at some other time the witness said or did something, or failed to say or do something, that was different from the testimony the witness gave before you during the trial.

You should keep in mind, of course, that a simple mistake by a witness does not necessarily mean that the witness was not telling the truth as he or she remembers it, because people may forget some things or remember other things inaccurately. So, if a witness has made a misstatement, you need to consider whether that misstatement was an intentional falsehood or simply an innocent lapse

2

of memory; and the significance of that may depend on whether it has to do with an important fact or with only an unimportant detail.

## 1.2    How to Examine the Evidence

Certain testimony in this case has been presented to you through a deposition. A deposition is the sworn, recorded answers to questions asked a witness in advance of the trial. Under some circumstances, if a witness cannot be present to testify from the witness stand, the witness's testimony may be presented, under oath, in the form of a deposition. This deposition testimony is entitled to the same consideration and is to be judged by you as to credibility and weight as if the witness had testified from the witness stand in court.

While you should consider only the evidence in this case, you are permitted to draw such reasonable inferences from the testimony and exhibits as you feel are justified in the light of common experience. In other words, you may make deductions and reach conclusions that reason and common sense lead you to draw from the facts that have been established by the testimony and evidence in the case.

The testimony of a single witness may be sufficient to prove any fact, even if a greater number of witnesses may have testified to the contrary, if after considering all the other evidence you believe that single witness.

There are two types of evidence that you may consider in properly finding the truth as to the facts in the case. One is direct evidence – such as testimony of an eyewitness. The other is indirect or circumstantial evidence – the proof of a chain of circumstances that indicates the existence or nonexistence of certain other facts. As a general rule, the law makes no distinction between direct and circumstantial evidence, but simply requires that you find the facts from a preponderance of all the evidence, both direct and circumstantial.

3

### 1.3   Expert Witnesses

When knowledge of a technical subject matter may be helpful to the jury, a person who has special training or experience in that technical field – called an expert witness – is permitted to state his or her opinion on those technical matters. However, you are not required to accept that opinion. As with any other witness, it is up to you to decide whether to rely upon it.

In deciding whether to accept or rely upon the opinion of an expert witness, you may consider any bias of the witness, including any bias you may infer from evidence that the expert witness has been or will be paid for reviewing the case and testifying, or from evidence that he or she testifies regularly as an expert witness and that income from such testimony represents a significant portion of the expert's income.

## 2.   SUMMARY OF CONTENTIONS

I will first give you a summary of each side's contentions in this case. I will then tell you what each side must prove to win on these issues.

### 2.1   Soverain's Contentions

In this case, the plaintiff, Soverain, contends that the defendant, Newegg, uses technology for its websites that infringes claims 35 and 51 of the '314 patent; claims 17, 41, and 61 of the '492 patent; and claims 60 and 79 of the '639 patent. Soverain asks you to award damages for the infringement.

### 2.2   Newegg's Contentions

Newegg contends that it does not infringe Soverain's patents and that Soverain's patents are invalid. Newegg asks that you deny Soverain any damages.

4

**2.3    Burdens of Proof**

Soverain has the burden of proving infringement by a preponderance of the evidence. Preponderance of the evidence means evidence that persuades you that a claim is more likely true than not true. In determining whether any fact has been proved by a preponderance of the evidence, you may, unless otherwise instructed, consider the stipulations, the testimony of all witnesses regardless of who may have called them, and all exhibits received in evidence regardless of who may have produced them. It will be your job to determine whether Soverain has met its burden of proving that infringement of the asserted patent claims is more likely true than not true.

Newegg bears the burden of proving invalidity by clear and convincing evidence. Proof by clear and convincing evidence is a greater burden of proof than proof by a preponderance of the evidence, but less than the burden of proof beyond a reasonable doubt. Clear and convincing evidence is evidence that produces an abiding conviction that the truth of a factual contention is highly probable. In determining whether any fact has been shown by clear and convincing evidence, you may, unless otherwise instructed, consider the stipulations, the testimony of all witnesses regardless of who may have called them, and all exhibits received in evidence regardless of who may have produced them. It will be your job to determine whether Newegg has met its burden of proving the invalidity of the '314, '492, and '639 patent claims.

**3.    CLAIMS OF THE PATENTS-IN-SUIT**

As I told you at the beginning of the trial, the claims of a patent are the numbered sentences at the end of the patent. The claims describe the invention made by the inventor and describe what the patent owner owns and what the patent owner may prevent others from doing. Claims may describe products, such as machines or chemical compounds, or processes for making or using a product. Claims are usually divided into parts or steps, called "elements" or "limitations." For

5

example, a claim that covers the invention of a table may recite the tabletop, four legs and the glue that secures the legs on the tabletop. The tabletop, legs and glue are each a separate element of the claim.

## 3.1    Construction of the Claims

In deciding whether or not the accused technology infringes a patent, the first step is to understand the meaning of the words used in the patent claims. It is my job as Judge to determine what the patent claims mean and to instruct you about that meaning. You must accept the meanings I give you and use those meanings when you decide whether or not the patent claims are infringed, and whether or not it is invalid.

Before I instruct you about the meaning of the words of the claims, I will explain to you the different types of claims that are at issue in this case. It may be helpful to refer to the copies of the '314, '492 and '639 patents that you have been given as I discuss the claims at issue here.

## 3.2    Independent and Dependent Claims

Patent claims may exist in two forms, referred to as independent claims and dependent claims. An independent claim does not refer to any other claim of the patent. It is not necessary to look at any other claim to determine what an independent claim covers. Claim 17 of the '492 patent is an independent claim.

A dependent claim refers to at least one other claim in the patent. A dependent claim includes each of the elements of the other claim to which it refers, as well as the additional elements recited in the dependent claim itself. In this way, the claim "depends" on another claim. To determine what a dependent claim covers, it is necessary to look both at the dependent claim and the other claim or claims to which it refers.

6

When analyzing the validity and alleged infringement of any dependent claim asserted by Soverain, you must consider all limitations of both the dependent claim and the independent claim from which it depends. For example, claims 35 and 51 of the '314 patent are dependent claims of independent claim 34. Because dependent claim 35 includes all of the limitations of claim 34, if claim 34 of the '314 patent is not infringed, then claim 35 of the '314 patent cannot be infringed. Similarly, if claim 34 of the '314 patent is not anticipated, then claim 35 of the '314 patent cannot be anticipated.

**3.3     Interpretation of Claims**

In deciding whether or not the accused technology does or does not infringe a patent claim, or whether the asserted prior art does or does not invalidate a patent claim, the first step is to understand the meaning of the words used in the patent claims. The meaning of the words in the patent claims is the same for both the infringement and the validity determinations.

As I stated earlier, it is my job as Judge to determine what the patent claims mean and to instruct you about that meaning. In accordance with that duty, I have interpreted the meaning of some of the language in the patent claims involved in this case. My interpretation of those claims appears in Appendix A to this Charge. You must accept the interpretations contained in Appendix A as correct. The claim language I have not interpreted for you in Appendix A is to be given its ordinary and accustomed meaning as understood by one of ordinary skill in the field of technology.

**3.4     Glossary of Patent Terms**

A glossary of patent terms is contained in Appendix B to this Charge.

**4.     INFRINGEMENT**

Any person or business entity that, without the patent owner's permission, makes, uses, sells, or offers to sell a device, or practices a method, that is covered by at least one claim of a patent,

7

before the patent expires, infringes the patent. A patent owner has the right to stop others from infringing the patent claims during the life of the patent. In this case, Soverain asserts that Newegg has infringed the patents-in-suit. Soverain has the burden of proving infringement by a preponderance of the evidence.

Only the claims of a patent can be infringed. You must consider each claim individually. You must compare each of the asserted claims, as I have defined them, to the accused methods and systems used by Newegg's websites, and determine whether or not there is infringement. You must not compare the accused systems or methods with any specific example set out in the patents.

Soverain has alleged that Newegg infringes the asserted claims both directly and indirectly. I will now explain each of the types of infringement in more detail.

## 4.1    Direct Infringement

If any person makes, uses, sells, or offers to sell what is covered by the claims of a patent without the patent owner's permission, that person is said to infringe the patent. This type of infringement is called direct infringement.

A patent claim is directly infringed only if the accused system or method includes each and every element in that patent claim. If you find that the accused system or method includes each element or step of the claim, then that system or method infringes the claim even if such system or method contains additional elements or steps that are not recited in the claim. If the accused system or method does not contain one or more of the limitations recited in a claim, then that system or method does not directly infringe that claim. An accused system infringes a claim if it is reasonably capable of satisfying the claim elements, even though it may also be capable of non-infringing modes of operation.

8

Direct infringement requires a party to perform or use each and every step of a claimed method, literally or under the doctrine of equivalents. Where no one party performs all of the steps of a claimed method but multiple parties combine to perform every step of the method, that claim will nevertheless be directly infringed if one party exercises control or direction over the entire method so that every step is attributable to the controlling party. Mere arms-length cooperation between the parties is not enough to establish direct infringement.

A person can directly infringe a patent without knowing that what it is doing is an infringement of the patent. It may also directly infringe even though in good faith it believes that what it is doing is not an infringement of any patent and even if it did not know of the patent. Infringement does not require proof that the person copied a product or the patent.

A claim limitation may be directly infringed in one of two ways: either literally or under the doctrine of equivalents.

### 4.1.1    Literal Infringement

A claim limitation is literally met if it exists in the accused system or method just as it is described in the claim language, either as I have explained that language to you or, if I did not explain it, as it would be understood by one of skill in the art.

### 4.1.2    Doctrine of Equivalents

A claim limitation is present in an accused system or method under the doctrine of equivalents if the differences between the claim limitation and a comparable element of the accused system or method are insubstantial. One way to determine whether a difference is insubstantial is to look at whether the element of the accused system or method performs substantially the same function in substantially the same way to achieve substantially the same result as the element recited in the patent claim.

9

You may also consider whether, at the time of the alleged infringement, a person having ordinary skill in the field of technology of the patent would have known of the interchangeability of the alternative feature and the unmet requirement of the claim.

The interchangeability of the two features must have been known to persons of ordinary skill in the field of technology at the time the infringement began.

Thus, the inventor need not have foreseen and the patent need not describe all potential equivalents to the invention covered by the claims. Also, slight changes in technique or improvements made possible by technology developed after the patent application is filed may still be considered equivalent for the purposes of the doctrine of equivalents.

## 4.2    Active Inducement of Infringement

Soverain alleges that Newegg is also liable for infringement by actively inducing others to directly infringe claims 35 and 51 of the '314 patent and claims 17, 41, and 61 of the '492 patent.

As with direct infringement, you must determine whether there has been active inducement on a claim-by-claim basis.

A person is liable for active inducement of a claim only if:

(1)    the person takes action during the time the patent is in force which encourages acts by someone else; and

(2)    the encouraged acts constitute direct infringement of that claim; and

(3)    the person is aware of the patent, and knows or should have known that the encouraged acts constitute infringement of that patent; and

(4)    the person has an intent to cause the encouraged acts; and

(5)    the encouraged acts are actually carried out by someone else.

In order to prove active inducement, Soverain must prove that each of these requirements is met by a preponderance of the evidence.

10

Intent to cause the acts that constitute direct infringement may be demonstrated by evidence of active steps taken to encourage direct infringement, such as advertising an infringing use or instructing how to engage in an infringing use. In order to establish active inducement of infringement, it is not sufficient that Newegg was aware of the act(s) that allegedly constitute the direct infringement. Rather, you must find specifically that Newegg intended to cause the acts that constitute the direct infringement and must have known or should have known that its action would cause the direct infringement. If you do not find that Newegg specifically meets these intent requirements, then you must find that Newegg has not actively induced the alleged infringement.

## 5.    INVALIDITY

Newegg has challenged the validity of the '314, '492, and '639 patent claims. Newegg must prove that a patent claim is invalid by clear and convincing evidence. An issued patent is afforded a presumption of validity based on the presumption that the United States Patent and Trademark Office acted correctly in issuing a patent.

The "effective filing date" of an application is generally the date that the application was actually filed at the U.S. Patent Office, but in instances with continuation applications, the effective filing date can be earlier. A continuation application is an application filed during the pendency of a parent application that claims inventions that were disclosed in the parent application and claims the priority date of the parent application. A claim of priority means that the continuation application is claiming entitlement to the same filing date as the parent application, such that the continuation is treated as if it were filed on the same day as the parent application. The date that the parent application was filed is the "effective filing date" even though the application may have been filed months or years later. The effective filing date determines whether certain items constitute

11

prior art that can be used to invalidate a patent. Here, the '639 patent application was filed as a continuation of the '780 patent and claims priority to the '780 patent.

I will now explain to you Newegg's grounds for invalidity in detail. In making your determination as to invalidity, you should consider each claim separately.

## 5.1    Anticipation for Lack of Novelty

A patent claim is invalid if the claimed invention is not new. For a claimed invention to be invalid on the basis of anticipation because it is not new, all of its elements must be in a single previous device or method, or described in a single previous publication or patent. These items are called "prior art references." You may not combine two or more items of prior art to prove anticipation. Newegg must prove by clear and convincing evidence that the various claims of the patents-in-suit are anticipated by a single item of prior art.

The disclosure in a prior art reference does not have to be in the same words as the claim, but all the elements of the claim must be there, either stated expressly or necessarily implied or inherent in the level of ordinary skill in the field of technology of the patent at the time of the invention, so that someone of ordinary skill in the field of technology of the patent looking at that one prior art reference would be able to make and use the claimed invention. Something is inherent in an item of prior art if it is always present in the prior art or always results from the practice of the prior art, and if a skilled person would understand that to be the case. Inherency may not be established by probabilities or possibilities. The mere fact that a certain thing may coincidentally result from a given set of circumstances is not sufficient.

I will now explain the different ways in which Newegg can show that the various claims of the patents-in-suit are not new.

12

### 5.1.1   Anticipation by Printed Publication or Prior Patent

A patent claim is invalid if the invention defined by that claim was described in a printed publication or patented in the United States or foreign country before it was invented by the patent applicant, or more than one year prior to the effective filing date of the United States patent application. Printed publications may include issued patents.

A printed publication or patent will not be an anticipating prior art reference unless it contains a description of the invention covered by the patent claims that is sufficiently detailed to enable one of ordinary skill in the field of technology to practice the invention without undue experimentation. Factors to be considered in determining whether a disclosure would require undue experimentation include:

(1)     the quantity of experimentation necessary;

(2)     the amount of direction or guidance disclosed in the patent or publication;

(3)     the presence or absence of working examples in the patent or publication;

(4)     the nature of the invention;

(5)     the state of the prior art;

(6)     the relative skill of those in the field of the technology;

(7)     the predictability of the art; and

(8)     the breadth of the claims.

A printed publication must be reasonably accessible to those members of the public who would be interested in its contents. It is not necessary that the printed publication be available to every member of the public. So long as the printed publication was available to the public, the form in which the information was recorded is unimportant. The information must, however, have been

13

maintained in some permanent form, such as printed or typewritten pages, magnetic tape, microfilm, photographs, or photocopies.

A United States patent that was filed before the inventors of the patents-in-suit invented one of their claimed inventions is prior art with respect to those claimed inventions as of the date the United States patent was filed. In other words, a U.S. Patent can be prior art as of its filing date if it was filed before the inventors of the patents-in-suit invented their inventions, even if the patent did not actually publish or issue until after the inventors invented their inventions.

### 5.1.2   Anticipation by Public Knowledge or Use by Another

A patent claim is invalid if the invention recited in that claim was publicly known or used in the United States by someone other than the inventor before the patent applicant invented it, or more than one year before the effective filing date of the United States patent application.

Private or secret knowledge, such as knowledge confidentially disclosed within a small group, is not enough to invalidate a patent claim. A prior public use by another may anticipate a patent claim, even if the use was accidental or was not appreciated by the other person. Thus, a prior public use may anticipate an invention even if the user did not intend to use the invention, or even realize he or she had done so.

### 5.1.3   Anticipation by Prior Invention

A patent claim is invalid if the invention defined by that claim was invented by another person in the United States before it was invented by the patentee, and that other person did not abandon, suppress or conceal the invention.

As a general rule, the first person to reduce an invention to practice is said to be the first inventor. An invention is reduced to practice either when a patent application is filed or when the invention is made and shown to work for its intended purpose. Thus, if another person reduces to

14

practice an invention before the inventor on the patent, then the reduction to practice by the other person will be prior art to the patent claims.

A patentee who is not the first to reduce to practice can still be the first to invent if he can show two things:

(1)     that he conceived of the invention before the other party conceived of his invention; and

(2)     that he exercised reasonable diligence in reducing his invention to practice, from the time just before the other party conceived, to the time he reduced to practice.

Conception is the mental part of an inventive act, i.e., the formation in the mind of the inventor of a definite and permanent idea of the complete and operative invention as it is to be applied in practice.

Reasonable diligence means that the inventor worked continuously in the United States on reducing the invention to practice. Interruptions necessitated by the everyday problems and obligations of the inventor or those working with him or her do not prevent a finding of diligence.

## 5.2    Corroboration of Oral Testimony

Oral testimony alone is insufficient to prove prior invention or that something is prior art. A party seeking to prove prior invention or prior art also must provide evidence that corroborates any oral testimony, especially where the oral testimony comes from an interested witness, or a witness testifying on behalf of an interested party. This includes any individual or company testifying that his invention or its invention predates the patents-in-suit. Documentary or physical evidence that is made contemporaneously with the inventive process by someone other than the alleged prior inventor provides the most reliable proof that the alleged prior art inventor's testimony has been corroborated. For any oral testimony that a party has put forth alleging that a particular event or reference occurred before the filing date of the patents-in-suit, that party must also have provided

15

some sort of corroborating evidence that agrees with that oral testimony. If you find the party has

not corroborated the oral testimony with other evidence, you are not permitted to find that the subject

of that oral testimony qualifies as prior art or supports a prior date of invention.

If evidence is presented for purposes of attempting to corroborate oral testimony, then you

must determine whether this evidence does, in fact, properly corroborate the oral testimony. In

making this determination, you should consider the following factors:

(1)  The relationship between the corroborating witness and the alleged prior user;

(2)  The time period between the event and this trial;

(3)  The interest of the corroborating witness in the subject matter of this suit;

(4)  Contradiction or impeachment of the witness's testimony;

(5)  Extent and detail of the corroborating witness's testimony;

(6)  The witness's familiarity with the subject matter of the patented invention and the alleged prior use;

(7)  Probability that a prior use could occur considering the state of the art at the time; and

(8)  Impact of the invention on the industry, and the commercial value of its practice.

## 6.   DAMAGES

I have now instructed you as to the law governing Soverain's claims of patent infringement

and Newegg's claims of invalidity. If you find that Newegg has infringed a claim of the '314, '492,

or '639 patent, then you must determine what damages Newegg must pay to Soverain for that

infringement. If, on the other hand, you find that Newegg has not infringed a claim of the '314, '492,

or '639 patent, then Soverain is not entitled to any damages, and you should not make any findings

about damages for that claim.

16

The fact that I am instructing you about damages does not mean that Soverain is or is not entitled to recover damages. You should not interpret the fact that I have given instructions about Soverain's damages as an indication any way that I believe that Soverain should, or should not, win this case. I am instructing you on damages only so that you will have guidance in the event you decide that Newegg is liable and that Soverain is entitled to recover money from Newegg.

**6.1    Date Damages Begin**

In considering damages, the time period is November 2, 2007, to the present. It is undisputed that Soverain cannot recover any damages for any infringement of the patents-in-suit before November 2, 2007.

**6.2    Reasonable Royalty – Generally**

The patent laws specifically provide that the amount of damages that Newegg must pay Soverain for infringing Soverain's patents may not be less than a reasonable royalty for the use that Newegg made of Soverain's inventions.

A royalty is a payment made to the owner of a patent by a non-owner in exchange for rights to use the claimed invention. The royalty payment generally reflects the value of the use of the claimed invention. A reasonable royalty is the royalty that would have resulted from a hypothetical arms-length negotiation between Soverain's predecessor Open Market, and a company in the position of Newegg on the eve of infringement, with both sides to this negotiation willing to enter into a license and both sides to this negotiation operating under the assumptions that the patents are valid, the patents are infringed, and the licensee would respect the patents.

You are to decide what a reasonable royalty would be, based on circumstances as of the time just before Newegg began selling or using the patented inventions. You may consider any actual

17

profits made by Newegg and any commercial success of the patented inventions, but the amount of those profits is not determinative on the issue of what is a reasonable royalty.

Although the relevant date for the hypothetical reasonable royalty negotiation is the date that the infringement began, you may consider in your determination of reasonable royalty damages any evidence with respect to the expectations for the future that the negotiators had as of the eve of infringement and any actual profits by Newegg after that time, and any commercial success of the patented invention in the form of sales of the patents or infringing product after that time. You may only consider this information, however, if it was foreseeable at the time the infringement began.

Soverain has the burden to prove by a preponderance of the evidence that it suffered the damages it seeks. While Soverain is not required to prove damages with mathematical precision, it must prove its damages with reasonable certainty. Soverain is not entitled to damages that are speculative. Soverain's proof of damages must have a sound economic basis.

### 6.3    Reasonable Royalty – Factors

In deciding what is a reasonable royalty, you may consider the factors that Soverain and Newegg would consider in setting the amount Newegg should pay. I will list for you a number of factors you may consider. This is not every possible factor, but it will give you an idea of the kinds of things to consider in setting a reasonable royalty.

(1)    Any royalties received by Soverain or its predecessors for the licensing of the patents-in-suit, proving or tending to prove an established royalty.

(2)    Any rates paid by Newegg for the use of other patents comparable to the patents-in-suit.

(3)    The nature and scope of the license, as exclusive or nonexclusive; or as restricted or unrestricted in terms of territory, or with respect to the parties to whom the product may be sold.

18

(4)    Whether or not Soverain or any of its predecessors had an established policy and marketing program to maintain its patent exclusivity by not licensing others to use the inventions or by granting licenses under special conditions designed to preserve that exclusivity.

(5)    The commercial relationship between the licensor and licensee, such as whether they are competitors in the same territory and the same line of business.

(6)    The effect of selling the patented inventions in promoting sales of other products or inventions of Newegg; the existing value of the inventions to Soverain as a generator of sales of its non-patented items; and the extent of such derivative or convoyed sales.

(7)    The duration of the patent and the term of the hypothetical license.

(8)    The established profitability of the inventions; their commercial success; and their current popularity.

(9)    The utility and advantages of the patented inventions over the old modes or devices, if any, that had been used for achieving similar results.

(10)    The nature of the patented inventions, the character of the commercial embodiment of the inventions as owned and produced by Soverain, and the benefits to those who have used the inventions.

(11)    The extent to which Newegg has made use of the patented inventions and any evidence that shows the value of that use.

(12)    The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the inventions or analogous inventions.

(13)    The portion of the profits that is due to the patented inventions, as compared to the portion of the profit due to other factors, such as unpatented elements or unpatented manufacturing processes, or features or improvements developed by Newegg.

(14)    Expert opinions as to what a reasonable royalty would be.

(15)    The amount that a licensor such as Open Market and a licensee such as Newegg would have agreed upon if both parties had been reasonably and voluntarily trying to reach an agreement.

19

In addition, it is proper for you to consider any economic or business factors that normally prudent business people would, under similar circumstances, reasonably take into consideration in negotiating the hypothetical license.

### 6.4     Non-Infringing Alternatives

In determining a reasonable royalty, you may consider whether or not Newegg had commercially acceptable non-infringing alternatives to taking a license from Open Market that were available at the time of the hypothetical negotiation and whether that would have affected the reasonable royalty the parties would have agreed upon.

### 7.     INSTRUCTIONS FOR DELIBERATIONS

You must perform your duties as jurors without bias or prejudice as to any party. The law does not permit you to be controlled by sympathy, prejudice, or public opinion. All parties expect that you will carefully and impartially consider all the evidence, follow the law as it is now being given to you, and reach a just verdict, regardless of the consequences.

It is your sworn duty as jurors to discuss the case with one another in an effort to reach agreement if you can do so. Each of you must decide the case for yourself, but only after full consideration of the evidence with the other members of the jury. While you are discussing the case, do not hesitate to re-examine your own opinion and change your mind if you become convinced that you are wrong. However, do not give up your honest beliefs solely because the others think differently, or merely to finish the case.

Remember that in a very real way you are the judges – judges of the facts. Your only interest is to seek the truth from the evidence in the case. You should consider and decide this case as a dispute between persons of equal standing in the community, of equal worth, and holding the same or similar stations in life.

20

When you retire to the jury room to deliberate on your verdict, you may take this charge with you as well as exhibits which the Court has admitted into evidence. Select your Foreperson and conduct your deliberations. If you recess during your deliberations, follow all of the instructions that the Court has given you regarding your conduct during the trial. After you have reached your verdict, your Foreperson is to fill in on the form your answers to the questions. Do not reveal your answers until such time as you are discharged, unless otherwise directed by me. You must never disclose to anyone, not even to me, your numerical division on any question.

Any notes that you have taken during this trial are only aids to memory. If your memory should differ from your notes, then you should rely on your memory and not on the notes. The notes are not evidence. A juror who has not taken notes should rely on his or her independent recollection of the evidence and should not be unduly influenced by the notes of other jurors. Notes are not entitled to any greater weight than the recollection or impression of each juror about the testimony.

If you want to communicate with me at any time, please give a written message or question to the bailiff, who will bring it to me. I will then respond as promptly as possible either in writing or by having you brought into the courtroom so that I can address you orally. I will always first disclose to the attorneys your question and my response before I answer your question.

After you have reached a verdict, you are not required to talk with anyone about the case unless the Court orders otherwise. You may now retire to the jury room to deliberate.

21

## APPENDIX A - CLAIM CONSTRUCTION FOR PATENTS-IN-SUIT

| U.S. Patent Nos. 5,715,314 and 5,909,492 | |
|---|---|
| Claim Term, Phrase, or Clause | Court's Construction |
| A statement URL | A URL concerning a statement |
| Computer | A functional unit that can perform substantial computation, including numerous arithmetic operations, or logic operations without human intervention |
| Connected to | Having a link to . . . to send or receive data |
| Database | A collection of logically related data stored together in one or more computerized files |
| Document(s) | Any type of digital data |
| Hypertext link | A non-sequential web association which the user can use to navigate through related topics |
| Interconnected by a [computer network/public packet switched computer network] | To be connected by a [computer network/public packet switched computer network] |
| Message | A unit of information sent electronically |
| Modif[y] [the shopping cart in the shopping cart database] | To change [an instance of a shopping cart in a shopping cart database] |
| Payment message | A message relating to a payment for one or more products |
| Plurality of products added to . . . shopping cart / [Add a] plurality of respective products to a shopping cart / [add] . . . plurality of products to . . . shopping cart | Product identifiers which are added to an instance of a shopping cart in the shopping cart database / [add] identifiers of respective products to an instance of a shopping cart / [add] identifiers of products to an instance of a shopping cart |
| Product(s) | Anything that can be advertised, sold, and provided to a purchaser |

22

| U.S. Patent Nos. 5,715,314 and 5,909,492 | |
|---|---|
| Claim Term, Phrase, or Clause | Court's Construction |
| Public packet switched computer network | A packet switched computer network, accessible by the public through communication common carriers to provide data transmission services. "Packet switching" means a message-delivery technique in which small units of information (packets) are relayed through stations in a computer network preferably along the best route available between the source and the destination. "Public data network" is a network established and operated by common carriers for the specific purpose of providing low error-rate data transmission services to the public. |
| Record[] . . . in a database | Store[] in a database |
| Shopping cart | A stored representation of a collection of products |
| Shopping cart computer | A computer processing data associated with one or more shopping carts |
| Shopping cart database | A database of stored representations of collections of products, where "database" means a collection of logically related data stored together in one or more computerized files |
| Shopping cart message | A message concerning a shopping cart |
| Statement document comprising the purchase transaction records | A document that includes purchase transaction records |
| To cause said[/the/a] payment message to be activa ted to initiate a payment transaction | To cause an action associated with said[/the/a] payment message to initiate a payment transaction |
| Transaction detail hypertext link | Hypertext link to transaction detail |
| Transmit[ting/ed] | To send information over a communications channel |

23

| U.S. Patent Nos. 7,272,639 | |
|---|---|
| Claim Term, Phrase, or Clause | Court's Construction |
| A purchase request / a request to purchase | One or more messages requesting a purchase |
| Charging the user . . . according to the user information | Charging an account associated with the user according to the user information |
| Creating, responsive to the initial service request, the session identifier | Producing, in response to the initial service request, the session identifier |
| Forwarding . . . from the client to the server system | Sending . . . from the client to the server system |
| Fulfilling the purchase request based on the user information | Carrying out the purchase request based on the user information |
| Hypertext transfer protocol | Also known as HTTP, the client/server protocol used to access information on the World Wide Web |
| Initial service request | The first service request in a session |
| Returning | Sending back |
| Service request | A solicitation of services from a client to a server. A service request may entail the exchange of any number of messages between the client and the server |
| Session | A series of requests and responses to perform a complete task or set of tasks between a client and a server system |
| Session identifier | A text string that identifies a session |
| User identifier | A text string that identifies a user |

24

| U.S. Patent Nos. 7,272,639 | |
|---|---|
| Claim Term, Phrase, or Clause | Court's Construction |
| Validating, at the server system, the appended session identifier / validating the session identifier appended to the service request | At the server system, determining the validity of the appended session identifier |

25

## APPENDIX B - GLOSSARY OF PATENT TERMS

The following are definitions for patent terms that you should use in this case.

Application – The initial papers filed by the applicant in the United States Patent and Trademark Office (also called the "Patent Office" or "PTO").

Claims - Claims are the numbered sentences appearing at the end of the patent and define the invention. The words of the claims define the scope of the patent owner's exclusive rights during the life of the patent.

Comprising – The beginning, or preamble, portion of each of the asserted independent claims uses the word "comprising." "Comprising" means "including" or "containing." A claim that uses the word "comprising" is not limited to systems or methods having only the elements that are recited in the claim elements, but also covers systems or methods that have all of the elements and add additional elements without changing the required elements. Take as an example a claim that covers a table. If the claim recites a table "comprising" a tabletop, legs and glue, the claim will cover any table that contains these structures, even if the table also contains other structures, such as a leaf or wheels on the legs. However, if a table contains a tabletop, legs, but no glue, then the claim does not cover the table.

Continuation – A continuation application is a second application for the same invention disclosed in a prior patent application and filed before the first application becomes patented. The continuation should not include anything which would constitute new matter if inserted in the original application. An amendment to the specification of the continuation application that clarifies an express or inherent disclosure of the original parent application does not constitute new matter.

File Wrapper – See "Prosecution History" below.

License – Permission to use the patented invention, which may be granted by a patent owner (or a prior licensee) in exchange for a fee called a "royalty" or other consideration.

26

Office Action – Communication from the patent examiner regarding the specification of the patent application and/or the claims pending in the patent application.

Ordinary Skill in the Art – From time to time in these instructions I will refer to a hypothetical person of "ordinary skill in the art" or a "person of ordinary skill in the field." This hypothetical person is presumed to be aware of all of the prior art and knowledge that existed in the field during the relevant time period. The skill of the actual inventor and experts is irrelevant, because they may possess something that distinguishes them from workers of ordinary skill in the art. Factors to consider in determining the level of ordinary skill in the art include the educational level and experience of people working in the art, the types of problems faced by workers in the art and the solutions found to those problems, and the sophistication of the technology in the field.

Parent Application – The term "parent" is applied to an earlier application of the inventor disclosing an invention. A later application filed by the inventor may claim priority and relate back to the parent application with respect to an invention that was sufficiently disclosed in the parent application.

Patent Examiners – Personnel employed by the Patent Office who review (or examine) patent applications, each in a specific technical area, to determine whether the claims of a patent application are patentable and whether the disclosure adequately describes the invention.

Prior Art – Knowledge that is available to the public either prior to the invention by applicant or more than a year prior to the effective filing date of his/her patent application.

Prosecution History – The written record of proceedings in the Patent Office between the applicant and the Patent Office. It includes the original patent application and later communications between the Patent Office and the applicant. The prosecution history may also be referred to as the "File wrapper" of the patent during the course of this trial.

27

Reexamination – At any time during the enforceability of a patent any person may file a request for the Patent Office to conduct a second examination (the reexamination) of any claim of the patent on the basis of prior art patents or printed publications which that person states to be pertinent and applicable to the patent.

References – Any item of prior art used to determine patentability.

Said – The patent claims use the word "said" instead of "the." Use of the word "said" in the beginning of a phrase indicates that it is referring to a previous use of the same or a similar phrase.

Specification – The specification is the information that appears in the patent and concludes with one or more claims. The specification includes the written text, the claims, and the drawings. In the specification, the inventor sets forth a description telling what the invention is, how it works, and how to make and use it so as to enable others skilled in the art to do so.

US005715314A

# United States Patent [19]

## Payne et al.

[11] Patent Number: 5,715,314

[45] Date of Patent: Feb. 3, 1998

[54] NETWORK SALES SYSTEM

[75] Inventors: **Andrew C. Payne**, Lincoln; **Lawrence C. Stewart**, Burlington; **David J. Mackie**, Cambridge, all of Mass.

[73] Assignee: **Open Market, Inc.**, Cambridge, Mass.

[21] Appl. No.: **328,133**

[22] Filed: **Oct. 24, 1994**

[51] Int. Cl.⁶ ........................................ H04L 9/00

[52] U.S. Cl. .................. 380/24; 380/23; 380/25; 380/49; 380/50

[58] Field of Search ...................... 380/4, 21, 23, 380/24, 25, 49, 50; 364/401, 406, 408, 284.4; 235/379, 380; 395/200.01, 200.02, 200.09, 925

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 4,305,059 | 12/1981 | Benton ........................ 340/825.33 |
| 4,578,530 | 3/1986 | Zeidler . |
| 4,734,858 | 3/1988 | Schlafly ........................ 364/408 |
| 4,755,940 | 7/1988 | Brachtl et al. ................ 364/408 |
| 4,775,935 | 10/1988 | Yourick ........................ 364/401 |
| 4,795,890 | 1/1989 | Goldman ...................... 235/380 |
| 4,799,156 | 1/1989 | Shavit et al. ................ 364/401 |
| 4,812,628 | 3/1989 | Boston et al. ................ 235/380 |
| 4,827,508 | 5/1989 | Shear .......................... 380/4 |
| 4,922,521 | 5/1990 | Krikke et al. ................ 379/95 |
| 4,935,870 | 6/1990 | Burk, Jr. et al. . |
| 4,947,028 | 8/1990 | Gorog ........................ 235/381 |
| 4,977,595 | 12/1990 | Ohta et al. .................. 380/24 |
| 4,982,346 | 1/1991 | Girouard et al. ............ 364/550 |
| 4,992,940 | 2/1991 | Dworkin ...................... 364/401 |
| 5,025,373 | 6/1991 | Keyser, Jr. et al. .......... 364/408 |
| 5,060,153 | 10/1991 | Nakagawa .................... 364/405 |
| 5,077,607 | 12/1991 | Johnson et al. . |

(List continued on next page.)

### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 0-542-298-A2 | 5/1993 | European Pat. Off. .......... G07F 7/10 |
| 2102606 | 2/1983 | United Kingdom .............. G07F 7/10 |
| WO 91/16691 | 10/1991 | WIPO .............................. G07F 7/10 |
| WO 95/16971 | 6/1995 | WIPO . |

### OTHER PUBLICATIONS

*Rivest, R.L. et al.,* "A Method for Obtaining Digital Signatures and Public–Key Cryptosystems," Laboratory for Computer Science, Massachusetts Institute of Technology, Cambridge, Massachusetts, no date.

Bellcore Internal E–Mail, Nov. 24, 1993.

Sirbu, Marvin A.; "Internet Billing Service Design and Prototype Implementation"; *An Internet Billing Server*, pp. 1–19, no date.

*Payment Systems,* "United States"; pp. 115–135, no date.

National Westminster Bank Group Brochure; pp. 1–29, no date.

(List continued on next page.)

*Primary Examiner*—Bernarr E. Gregory
*Attorney, Agent, or Firm*—Fish & Richardson P.C.

[57] **ABSTRACT**

A network-based sales system includes at least one buyer computer for operation by a user desiring to buy a product, at least one merchant computer, and at least one payment computer. The buyer computer, the merchant computer, and the payment computer are interconnected by a computer network. The buyer computer is programmed to receive a user request for purchasing a product, and to cause a payment message to be sent to the payment computer that comprises a product identifier identifying the product. The payment computer is programmed to receive the payment message, to cause an access message to be created that comprises the product identifier and an access message authenticator based on a cryptographic key, and to cause the access message to be sent to the merchant computer. The merchant computer is programmed to receive the access message, to verify the access message authenticator to ensure that the access message authenticator was created using the cryptographic key, and to cause the product to be sent to the user desiring to buy the product.

**48 Claims, 25 Drawing Sheets**

Microfiche Appendix Included
(1 Microfiche, 34 Pages)

buyer computer 12     merchant computer 14     payment computer 16



# 5,715,314

Page 2

## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,220,501 | 6/1993 | Lawlor et al. | 364/408 |
| 5,247,575 | 9/1993 | Sprague et al. | 380/9 |
| 5,305,195 | 4/1994 | Murphy | 364/401 |
| 5,336,870 | 8/1994 | Hughes | 235/379 |
| 5,341,429 | 8/1994 | Stringer et al. | 380/23 |
| 5,347,632 | 9/1994 | Filepp et al. | 395/200.09 |
| 5,351,186 | 9/1994 | Bullock et al. | 364/401 |
| 5,351,293 | 9/1994 | Michener et al. | 380/21 |
| 5,383,113 | 1/1995 | Kight et al. | 364/401 |
| 5,414,833 | 5/1995 | Hershey et al. | 395/575 |

## OTHER PUBLICATIONS

Even et al.; "Electronic Wallet"; pp. 383–386; 1983.

Okamoto et al.; "Universal Electronic Cash"; pp. 324–337; 1991.

Pfitzmann et al.; "How to Break and Repair a 'Provably Secure' Untraceable Payment System"; pp. 338–350; 1991.

Intuit Corp Quicken User's Guide; "Paying Bills Electronically"; pp. 171–192. no date.

Compuserve International; Compuserve Information Service Users Guide; pp. 109–114; 1986.

Gifford, David; "Notes on Community Information Systems" MIT LCS TM–419; Dec., 1989.

Vittal, J. "Active Message Processing: Messages as Messengers"; pp. 175–195; 1981.

Bos et al.; "SmartCash: A Practical Electronic Payment System"; pp. 1–8; Aug. 1990.

American National Standard; "Financial Institution Retail Message Authentication"; ANSI X9.19; 1986.

American National Standard; "Interchange Message Specification for Debit and Credit Card Message Exchange Among Financial Institutions"; ANSI X9.2; 1988.

Chaum et al., "Achieving Electronic Privacy"; Scientific American; pp. 319–327; 1988.

Bürk et al.; "Value Exchange Systems Enabling Security and Unobservability"; Computers & Security, 9; pp. 715–721; 1990.

Chaum et al.; "Untraceable Electronic Cash"; Advances in Cryptology; pp. 319–327; 1988.

Schamüller–Bichl. L; "IC–Cards in High–Security Applications"; Selected Papers from the Smart Card 2000 Conference; Springer Verlag; pp. 177–199; 1991.

Newman, B.C.; "Proxy–Based Authorization and Accounting for Distributed Systems"; Proc. 13th Int. Conf. on Dist. Comp. Sys.; May, 1993.

Medvinsky et al.; "Electronic Currency for the Internet"; Electronic Markets; pp. 30–31, Sep., 1993.

Anderson, Ross J.; "UEPS—A Second Generation Electronic Wallet"; Proc. of the Second European Symposium on Research in Computer Security (ESORICS); Toulose. France; pp. 411–418. no date.

Anderson, Ross; "Why Cryptosystems Fail"; Proc. 1st Conf. Computer and Comm. Security; pp. 215–227; Nov., 1993.

Dukach, Semyon; "SNPP: A Simple Network Payment Protocol"; MIT Laboratory for Computer Science; Cambridge. Massachusetts; 1993.

Medvinsky et al.; "NetCash: A Design for Practical Electronic Currency on the Internet"; Proc. 1st ACM Conf. on Comp. and Comm. Security; Nov., 1993.

Society for Worldwide Interbank Financial Telecommunications S.C.; "A S.W.I.F.T. Overview", no date.

Case Study: The CIRRUS Banking Network; Comm. ACM 8. 28' pp. 797–8078; Aug., 1985.

Intel Corporation; Power Technology; Marketig Brochure, no date.

Bender, M.; "EFTS: Electronic Funds Transfer Systems"; Kennikat Press; Port Washington. New York; pp. 43–46; 1975.

Abadi, M. et al.; "Authentication and Delegation with Smart–Cards" Report 67; Systems Research Center; Digital Equipment Corporation; Palo Alto, California; Oct. 22, 1990, revised Jul. 30, 1992.

Information Network Institute, Carnegie Mellon University; Internet Billing Server; Prototype Scope Document; Oct. 14, 1993.

Krajewski, M.; "Concept for a Smart Card Kerberos"; 15th National Computer Security Conference; Oct., 1992.

Krajewski, M.; "Smar Card Augmentation of Kerberos"; Privacy and Security Research Group Workshop on Network and Distributed System Security; Feb., 1993.

Krajewski, M. et al.; "Applicability of Smart Cards to Network User Authentication"; Computing Systems; vol. 7, No. 1; 1994.

Harty et al.; "Case Study: The VISA Transaction Processing System"; 1988.

International Organization for Standardization; "International Standard: Bank Card Originated Messages—Interchange Message Specifications—Content for Financial Transactions"; ISO 8583; 1987.

Rivest, R.; "The MD5 Message–Digest Algorithm"; MIT Laboratory for Computer Science and RSA Data Security, Inc.; Apr., 1992.

Voydock, Victor et al.; "Security Mechanisms in High–Level Network Protocols"; Computer Surveys; vol. 15. No. 2; Jun., 1981.

Needham, Roger M., "Adding Capability Access to Conventional File Servers"; Xerox Palo Alto Research Center; Palo Alto, California; no date.

Gligor, Virgil D. et al.; "Object Migration and Authentication"; IEEE Transactions on Software Engineering; vol. SE–5. No. 6; Nov., 1979.

Chaum. D.L. et al.; "Implementing Capability–Based Protection Using Encryption"; Electronics Research Laboratory, College of Engineering. University of California. Berkeley, California; Jul. 17, 1978.

Gifford, David K.; "Cryptographic Sealing for Information Secrecy and Authentication"; Stanford University and Xerox Palo Alto Research Center; Communications of the ACM; vol. 25. No. 4; Apr., 1982.

Mosaic Communications Corp. press release; "Mosaic Communications Unveils Network Navigator and Server Software for the Internet"; Sep. 12, 1994.

Rescorla, E. and Schiffman, A.; "The Secure HyperText Transfer Protocol"; Enterprise Integration Technologies; Jun., 1994.

Tenenbaum. Jay M. and Schiffman. Allan M.; "Development of Network Infrastructure and Services for Rapid Acquisition"; adapted from a white paper submitted to DARPA by MCC in collaboration with EIT and ISI.

Cohen. Danny; "Computerized Commerce"; ISI Reprint Series IS/RS–89–243; Oct., 1989; Reprinted from Information Processing 89, Proceedings of the IFIP World Computer Congress, held Aug. 28–Sep. 1 1989.

Cohen. Danny; "Electronic Commerce"; University of Southern California Information Sciences Institute, Research Report ISI/RR–89–244; Oct., 1989.



**FIG. 1**



buyer computer 12
merchant computer 14
payment computer 16
24
user requests advertisements
26
buyer computer sends advertising document URL to merchant computer
28
merchants computer fetches advertising document from advertising document data base
30
merchant computer sends advertising document to buyer computer
32
user requests a product
34
buyer computer sends payment URL A to payment computer: payment URL A includes product identifier. domain identifier. payment amount, merchant computer identifier. merchant account identifier. duration time. expiration time, payment URL authenticator. and a buyer network address
36
payment computer verifies whether payment URL authenticator was created from contents of payment URL A using cryptographic key
38
payment computer sends document to buyer computer indicating that access the to the network sales system is denied.
End
OR
40

FIG. 2A

buyer computer 12        merchant computer 14        payment computer 16



**FIG. 2B**



buyer computer 12          merchant computer 14          payment computer 16

42

44

payment computer sends payment
confirmation document to buyer
computer; payment confirmation
document includes open link (URL C)
and continue link (URL B)

58

46

OR

60

user opens new account

User continues with payment
(user already has an account)

62

buyer computer sends payment URL B to
payment computer; payment URL B is similar to
payment URL A but also indicates that an
account does exist

buyer computer sends payment URL C to payment
computer; payment URL C is similar to payment
URL A but also indicates that an account does not
yet exist

48

50

payment computer creates
new account document

52

payment computer sends new account
document to buyer computer

54

64

**FIG. 2C**



buyer computer 12
merchant computer 14
payment computer 16
44
52
62
54
user enters new account name. account password credit card number. security information and expiration date of credit card and presses a "submit" button
56
buyer computer sends new account information to payment computer
58
payment computer enters new account
64
payment computer creates account name and password request message
66
payment computer sends account name and password request message to buyer computer
68
user enters account name and password
70
buyer computer sends account name and password to payment computer
72
payment computer verifies whether user name and password are correct
OR
payment computer sends document to buyer computer indicating that access to the networks sales system is denied
End
73

FIG. 2D



buyer computer 12
merchant computer 14
payment computer 16
72
73
payment computer determines whether additional security is warranted. based on. e.g. whether the payment amount exceeds a threshold
OR
77
75
user enters security information
if additional security is warranted. payment computer creates a challenge form document and sends it to buyer computer
buyer computer sends security information to payment computer
79
81
payment computer determines whether security information is correct
83
payment computer sends document to buyer computer indicating that access to the network sales system is denied
OR
End
82
82

**FIG. 2E**



buyer computer 12
merchant computer 14
payment computer 16
73 OR 81
82
payment computer checks settlement database to determine if user has unexpired access to the domain identifier contained in the payment URL
84
OR
payment computer sends to buyer computer option to repurchase, or to use previously purchased access
86
buyer selects to repurchase item
OR
buyer selects previously purchased access
85
87
payment computer calculates an actual payment amount that may differ from the payment amount contained in the payment URL
92
76
76

FIG. 2F



buyer computer 12
merchant computer 14
payment computer 16
82, 87
85
76
payment computer verifies whether user account has sufficient funds or credit
78
payment computer sends document to buyer computer indicating that user account does not have sufficient funds
End
OR
80
payment computer creates access URL which includes merchant computer identifier, domain identifier, product identifier, end of duration time, buyer network address, and access URL authenticator
88
payment computer records product identifier, domain, user account, merchant account, end of duration time, and actual payment amount in settlement database
90
payment computer sends redirect to access URL to buyer computer
92
92

FIG. 2G



FIG. 2H



buyer computer 12          merchant computer 14          payment computer 16

**FIG. 21**



buyer computer 12    merchant computer 14    payment computer 16

From 32    108

buyer computer sends shopping cart URL to payment computer; shopping cart URL includes product identifier, domain identifier, payment amount, merchant computer identifier, merchant account identifier, duration time, expiration time, and shopping cart URL authenticator

110

payment computer verifies whether shopping cart URL authenticator was created from contents contents of shopping cart URL using a cryptographic key

OR

112

payment computer sends document to buyer computer indicating that access to network sales system is denied

113

payment computer and buyer computer perform steps analogous to steps 40-81

114

End

FIG. 3A



buyer computer 12
merchant computer 14
payment computer 16
113
24
114
payment computer creates or updates payment URL for shopping cart
OR
OR
124
user requests display of shopping cart
116
user requests purchase of contents of shopping cart
118
buyer computer sends fetch shopping cart request to payment computer
126
buyer computer causes payment URL for shopping cart to be activated
to step 36
119
payment computer and buyer computer perform steps analogous to steps 64-81
120
payment computer returns contents of shopping cart to buyer computer
122
buyer computer displays shopping cart

FIG. 3B



buyer computer 12
merchant computer 14
payment computer 16
128
user requests smart statement
130
buyer computer sends smart statement URL to payment computer
132
payment computer verifies whether smart statement URL authenticator was created from contents of smart statement URL using cryptographic key
OR
134
payment computer sends document to buyer computer indicating that access is denied
End
136
payment computer checks to determine whether buyer network address in smart statement URL matches buyer's computer network address
End
OR
138
payment computer sends document indicating that access is denied
140
payment computer and buyer computer perform steps analogous to steps 64-81
142

FIG. 4A



buyer computer 12
merchant computer 14
payment computer 16
140
164. 170
144
142
payment computer retrieves settlement data from settlement database and creates smart statement document for buyer and sends smart statement document to buyer computer
buyer computer displays received document
OR
OR
146
User requests payment details for a particular transaction
150
buyer computer sends payment detail URL to payment computer
148
payment computer and buyer computer perform steps analogous to steps 132-140
152
payment computer retrieves from settlement database data corresponding to the payment transaction specified in the *payment detail URL*, creates detail document, and sends it to buyer computer
154. 166

FIG. 4B



buyer computer 12
merchant computer 14
payment computer 16
144
144
144
154
user requests customer service
buyer computer sends customer service URL to payment computer
156
158
payment computer creates customer service form and sends it to buyer computer
160
user types comments
buyer computer sends user's comments to payment computer
162
166
user requests display of a product
164
payment computer posts user comments and sends thank you document to buyer computer
168
buyer computer sends access URL to merchant computer
170
buyer computer and merchant computer perform steps analogous to steps 94-104

FIG. 4C

| _File_    _Options_    _Navigate_    _Annotate_ | _Help_ |

Document Title: | Mead Data Central: Internet Information |

Document URL: | http://www.openmarketcom/demo/r15/mall/me |

**Mead Data Central:  Internet Information**

November 28, 1993

LC's debut on the Internet: Library of Congress catalog On the

Text of Abstract
of Article

**VERONICA: A GOPHER NAVIGATIONAL TOOL ON THE INTERNET**

October, 1993

Data transfer complete:

Back | Forward | Home | Reload | Open... | Save As... | Clone | New Window | Close Window

**FIG. 5**

**U.S. Patent**    Feb. 3, 1998    Sheet 17 of 25    **5,715,314**

_File_    _Options_    _Navigate_    _Annotate_                                    _Help_

Document Title: | Open Market Payment

Document URL: | http://payment.openmarket.com/ben/nph-payment

**Open Market Payment**

You have selected an item that requires payment

    Merchant:Test Merchant
    Description:Mead Data Central Article
    Amount:2.85(US currency)

If you have an Open Market account click on "continue" below and you will be prompted for
your account name and password. If you do not have an account, you can establish one
on-line and return to this page to continue your purchase.

[ Open ]    an account on-line

[ Continue ]    with payment transaction.

_NOTE:_For demonstrations use the account name testuser@openmarket.com with
the password testuser.

_Open Market, Inc._

Data transfer complete:
[Back][Forward][Home][Reload][Open...][Save As...][Clone][New Window][Close Window]

**FIG. 6**

| _File_ | _Options_ | _Navigate_ | _Annotate_ | _Help_ |
|---|---|---|---|---|

Document Title: `Establish OpenMarket Account`

Document URL: `http://payment.openmarket.com/service/destabli.`

Card Number: [          ]

Expiration Date: [      ]  (format MM/YY)

Check the appropriate boxes:

☐ I am the owner of the above credit card.

☐ The above address is also the billing address for this credit card.

Your OpenMarket account statement is available on-line. At your option you may a copy of your statement automatically sent to your e-mail address at weekly or monthly intervals. Please choose a statement option.

◇ Weekly statements    ◇ Monthly statements    ◇ No e-mail statements

**Account name and password**

Please choose an account name and password for your OpenMarket account. We suggest using an account name that is unique and easy to remember such as your e-mail address. Your password should be 8 characters or longer.

Account Name [                          ]

Password [                        ]

[Back] [Forward] [Home] [Reload] [Open...] [Save As...] [Clone] [New Window] [Close Window]

**FIG. 7**



FIG. 8

| File | Options | Navigate | Annotate | Help |
|------|---------|----------|----------|------|

Document Title: `Open Market Payment`

Document URL: `http://payment.openmarket.com/ben/nph-payment`

**Open Market Payment**

You have selected an item that you have purchased recently.

    Merchant: Test Merchant
    Description: Mead Data Central Article
    Amount: 2.85(US currency)

This could happen because you would like to buy the item again or it may have happened by accident.

You can:

- Go directly to the previous item
- Go ahead and buy the item again

*Open Market, Inc.*

| Back | Forward | Home | Reload | Open... | Save As... | Clone | New Window | Close Window |

**FIG. 9**



**FIG. 10**

File    Options    Navigate    Annotate                                    Help

Document Title: | Smart Statement for Test User |

Document URL: | http://payment.openmarket.com/in/nph-stateme |

Information about the item.

**Transactions in October 1994**

Mon Oct 3 **Test Merchant** Dilbert subscription 20 seconds amount $0.10
Tue Oct 4 **Test Merchant** Mead Data Central Article amount $2.95
Tue Oct 4 **Test Merchant** Mead Data Central Article amount $2.95
Tue Oct 4 **Test Merchant** Mead Data Central Article amount $2.95
Tue Oct 4 **Test Merchant** N.Y. Times Article amount $0.50
Tue Oct 4 **Test Merchant** Mead Data Central Article amount $2.95
Wed Oct 5 **Test Merchant** Mead Data Central Article amount $2.95
Wed Oct 5 **Test Merchant** Mead Data Central Article amount $2.95
Wed Oct 5 **Test Merchant** Mead Data Central Article amount $2.95
Wed Oct 5 **Test Merchant** Mead Data Central Article amount $2.95
Wed Oct 5 **Test Merchant** Mead Data Central Article amount $2.95
Wed Oct 5 **Test Merchant** Mead Data Central Article amount $2.95
Wed Oct 5 **Test Merchant** Mead Data Central Article amount $2.95

Your total is 33.05.

**Previous Statements**

- September 1994
- August 1994

Return to your Newest Statement

**Feedback**

You can send us comments and suggestions here.

Back  Forward  Home  Reload  Open...  Save As...  Clone  New Window  Close Window

**FIG. 11**

| File | Options | Navigate | Annotate | | Help |
|---|---|---|---|---|---|

Document Title: `Smart Statement Detail`

Document URL: `http://payment.openmarket.com/@c632f154cc8021`

**Smart Statement Detail**

This is the detailed information about a particular transaction from your Smart Statement

**Transaction Information**

```
url: http://www.openmarket.com/demos/aug15/mall/mead-fingerprint/mkarticle.cgo
transaction_log_id: 50254.0
currency: US
transaction_date: 781377633
initiator: 1.0
expiration: 2592000
description: Mead Data Central Article
amount: 2.95
beneficiary: 3.0
ip_address: 199.170.183.13
transaction_type.p
domain: mead.internet-1
```

**Merchant Information**

```
telephone: 617-621-9501
address_1: Open Market, Inc.
address_2: 215 First Street
fax: 617-621-1703
address_3: Cambridge, MA
email: testmerchant@openmarket.com
principal_name: Test Merchant
```

| Back | Forward | Home | Reload | Open... | Save As... | Clone | New Window | Close Window |
|---|---|---|---|---|---|---|---|---|

**FIG. 12**

File    Options    Navigate    Annotate                                    Help

Document Title: | Smart Statement Detail |

Document URL: | http://payment.openmarket.com/@c632f154cc8021 |

```
url: http://www.openmarket.com/demos/aug15/mall/mead-fingerprint/mkarticle.cgo
transaction_log_id: 50254.0
currency: US
transaction_date: 781377633
initiator: 1.0
expiration: 2592000
description: Mead Data Central Article
amount: 2.95
beneficiary: 3.0
ip_address: 199.170.183.13
transaction_type.p
domain: mead.internet-1
```

**Merchant Information**

```
telephone: 617-621-9501
address_1: Open Market, Inc.
address_2: 215 First Street
fax: 617-621-1703
address_3: Cambridge, MA
email: testmerchant@openmarket.com
principal_name: Test Merchant
home_url:
country: US
postal_code: 02142
```

**Feedback**

You can send us comments and suggestions here.

Back  Forward  Home  Reload  Open...  Save As...  Clone  New Window  Close Window

**FIG. 13**

| File | Options | Navigate | Annotate | | Help |
|------|---------|----------|----------|--|------|

Document Title: `Open Market Feedback`

Document URL: `http://payment.openmarket.com/ben/feedback.cg`

Or if you prefer, you can send your comments via electronic mail to
feedback@openmarket.com or via FAX to +1.617.621.1703. If you would like a reply
please include your e-mail address.

Your Open Market accound name (optional):

Your E-mail address (optional):

Subject:

Your comments:

Submit Feedback

| Back | Forward | Home | Reload | Open... | Save As... | Clone | New Window | Close Window |

**FIG. 14**

5,715,314

<table>
<tr><td>1</td><td>2</td></tr>
</table>

# NETWORK SALES SYSTEM

## REFERENCES TO APPENDICES

Microfiche appendices A–G, 4 sheets of 192 images total, are being submitted with the present application.

A claim of copyright is hereby made by Open Market. Incorporated with respect to the software code contained in the microfiche appendices, as of the date of first issuance of a U.S. patent based on this application. The copyright owner has no objection to the facsimile reproduction by anyone of the microfiche appendices as they appear in the Patent and Trademark office patent file or records, but reserves all other copyright rights whatsoever.

This invention relates to user-interactive network sales systems for implementing an open marketplace for goods or services over computer networks such as the Internet.

U.S. patent application Ser. No. 08/168,519, filed Dec. 16, 1993 by David K. Gifford and entitled "Digital Active Advertising," the entire disclosure of which is hereby incorporated herein in its entirety by reference, now abandoned, describes a network sales system that includes a plurality of buyer computers, a plurality of merchant computers, and a payment computer. A user at a buyer computer asks to have advertisements displayed, as of the buyer computer requests advertisements from a merchant computer, which sends the advertisements to the buyer computer. The user then requests purchase of an advertised product, and the buyer computer sends a purchase message to the merchant computer. The merchant computer constructs a payment order that it sends to the payment computer, which authorizes the purchase and sends an authorization message to the merchant computer. When the merchant computer receives the authorization message it sends the product to the buyer computer.

The above-mentioned patent application also describes an alternative implementation of the network sales system in which, when the user requests purchase of an advertised product, the buyer computer sends a payment order directly to the payment computer, which sends an authorization message back to the buyer computer that includes an unforgeable certificate that the payment order is valid. The buyer computer then constructs a purchase message that includes the unforgeable certificate and sends it to the merchant computer. When the merchant computer receives the purchase request it sends the product to the buyer computer, based upon the pre-authorized payment order.

## SUMMARY OF THE INVENTION

In one aspect, the invention provides a network-based sales system that includes at least one buyer computer for operation by a user desiring to buy a product, at least one merchant computer, and at least one payment computer. The buyer computer, the merchant computer, and the payment computer are interconnected by a computer network. The buyer computer is programmed to receive a user request for purchasing a product, and to cause a payment message to be sent to the payment computer that comprises a product identifier identifying the product. The payment computer is programmed to receive the payment message, to cause an access message to be created that comprises the product identifier and an access message authenticator based on a cryptographic key, and to cause the access message to be sent to the merchant computer. The merchant computer is programmed to receive the access message, to verify the access message authenticator to ensure that the access message authenticator was created using the cryptographic

key, and to cause the product to be sent to the user desiring to buy the product.

The invention provides a simple design architecture for the network sales system that allows the merchant computer to respond to payment orders from the buyer computer without the merchant computer having to communicate directly with the payment computer to ensure that the user is authorized to purchase the product and without the merchant computer having to store information in a database regarding which buyers are authorized to purchase which products. Rather, when the merchant computer receives an access message from the buyer computer identifying a product to be purchased, the merchant computer need only check the access message to ensure that it was created by the payment computer (thereby establishing for the merchant computer that the buyer is authorized to purchase the product), and then the merchant computer can cause the product to be sent to the buyer computer who has been authorized to purchase the product.

In another aspect, the invention features a network-based sales system that includes at least one buyer computer for operation by a user desiring to buy products, at least one shopping cart computer, and a shopping cart database connected to the shopping cart computer. The buyer computer and the shopping cart computer are interconnected by a computer network. The buyer computer is programmed to receive a plurality of requests from a user to add a plurality of respective products to a shopping cart in the shopping cart database, and, in response to the requests to add the products, to send a plurality of respective shopping cart messages to the shopping cart computer each of which includes a product identifier identifying one of the plurality of products. The shopping cart computer is programmed to receive the plurality of shopping cart messages, to modify the shopping cart in the shopping cart database to reflect the plurality of requests to add the plurality of products to the shopping cart, and to cause a payment message associated with the shopping cart to be created. The buyer computer is programmed to receive a request from the user to purchase the plurality of products added to the shopping cart and to cause the payment message to be activated to initiate a payment transaction for the plurality of products added to the shopping cart.

In another aspect, the invention features a network-based link message system that includes at least one client computer for operation by a client user and at least one server computer for operation by a server user. The client computer and the server computer are interconnected by a computer network. The client computer is programmed to send an initial link message to the server computer. The server computer is programmed to receive the initial link message from the client computer and to create, based on information contained in the initial link message, a session link message that encodes a state of interaction between the client computer and the server computer. The session link message includes a session link authenticator, computed by a cryptographic function of the session link contents, for authenticating the session link message. The server computer is programmed to cause the session link message to be sent to the client computer. The client computer is programmed to cause the session link message to be sent to a computer in the network that is programmed to authenticate the session link message by examining the session link authenticator and that is programmed to respond to the session link message based on the state of the interaction between the client computer and the server computer.

In another aspect, the invention features a network-based sales system that includes a merchant database having a

5,715,314

3

plurality of digital advertisements and a plurality of respective product fulfillment items, at least one creation computer for creating the merchant database, and at least one merchant computer for causing the digital advertisements to be transmitted to a user and for causing advertised products to be transmitted to the user. The creation computer and the merchant computer are interconnected by a computer network. The creation computer is programmed to create the merchant database, and to transmit the digital advertisements and the product fulfillment items to the merchant computer. The merchant computer is programmed to receive the digital advertisements and product fulfillment items, to receive a request for a digital advertisement from a user, to cause the digital advertisement to be sent to the user, to receive from the user an access message identifying an advertised product, and to cause the product to be sent to the user in accordance with a product fulfillment item corresponding to the product.

In another aspect, the invention features a hypertext statement system that includes a client computer for operation by a client user and one or more server computers for operation by a server user. The client computer and the server computers are interconnected by a computer network. At least one of the server computers is programmed to record purchase transaction records in a database. Each of the purchase transaction records includes a product description. The server computer is programmed to transmit a statement document that includes the purchase transaction records to the client computer. The client computer is programmed to display the product descriptions, to receive a request from the client user to display a product corresponding to a product description displayed by the client computer, and to cause a product hypertext link derived from a purchase transaction record to be activated. At least one of the server computers is programmed to respond to activation of the product hypertext link by causing the product to be sent to the client computer.

In another aspect, the invention features a network payment system that includes at least one buyer computer for operation by a user desiring to buy a product and at least one payment computer for processing payment messages from the buyer computer. The buyer computer and the payment computer are interconnected by a computer network. The buyer computer is programmed to cause a payment message to be sent to the payment computer. The payment message includes a product identifier identifying the product that the user desires to buy. The payment computer is programmed to receive the payment message, to cause an access message to be created to enable the user to access the product, and to record a purchase transaction record in the settlement database. The buyer computer is programmed to cause a request for purchase transaction records to be sent to the payment computer. The payment computer is programmed to receive the request for purchase transaction records and to cause a document derived from the purchase transaction records to be sent to the buyer computer.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a block diagram of a network sales system in accordance with the present invention.

FIG. 2 (2-A through 2-I) is a flowchart diagram illustrating the operation of a purchase transaction in the network sales system of FIG. 1.

FIG. 3 (3-A through 3-B) is a flowchart diagram illustrating the use of a shopping cart for the purchase of products in connection with the network sales system of FIG. 1.

4

FIG. 4 (4-A through 4-C) is a flowchart diagram illustrating the operation of a smart statement in the network sales system of FIG. 1.

FIG. 5 is a screen snapshot of an advertising document that the merchant computer sends to the buyer computer in FIG. 2.

FIG. 6 is a screen snapshot of a confirmation document that the payment computer sends to the buyer computer in FIG. 2.

FIG. 7 is a screen snapshot of a new account document that the payment computer sends to the buyer computer in FIG. 2.

FIG. 8 is a screen snapshot of an account name prompt that the buyer computer creates in FIG. 2.

FIG. 9 is a screen snapshot of a document that the payment computer sends to the buyer computer in FIG. 2 and that provides an option either to repurchase or to use a previously purchased access.

FIG. 10 is a screen snapshot of a fulfillment document that the merchant computer sends to the buyer computer in FIG. 2.

FIG. 11 is a screen snapshot of a smart statement document that the payment computer sends to the buyer computer in FIG. 4.

FIGS. 12 and 13 are screen snapshots of a transaction detail document that the payment computer sends to the buyer computer in FIG. 4.

FIG. 14 is a screen snapshot of a customer service form that the payment computer sends to the buyer computer in FIG. 4.

## DETAILED DESCRIPTION

With reference to FIG. 1, a network sales system in accordance with the present invention includes a buyer computer 12 operated by a user desiring to buy a product, a merchant computer 14, which may be operated by a merchant willing to sell products to the buyer or by a manager of the network sales system, a payment computer 16 typically operated by a manager of the network sales system, and a creation computer 20 typically operated by the merchant. The buyer, merchant, payment, and creation computers are all inter-connected by a computer network 10 such as the Internet.

Creation computer 20 is programmed to build a "store" of products for the merchant. A printout of a computer program for use in creating such a "store" in accordance with the present invention is provided as Appendix F.

The products advertised by merchant computer 14 may be, for example, newspaper or newsletter articles available for purchase by buyers. Creation computer 20 creates a digital advertisement database 18 that stores advertising documents (which may for example be in the form of summaries of newspaper or newsletter articles, accompanied by prices) and product fulfillment items (which may be the products themselves if the products can be transmitted over the network, or which may be hard goods identifiers if the products are hard goods, i.e., durable products as opposed to information products). Creation computer 20 transmits contents of the advertising document database 18 to merchant computer 14 to enable the merchant computer to cause advertisements and products to be sent to buyers. Merchant computer 14 maintains advertising documents locally in advertising document database 15. In an alternative embodiment, the creation computer does not have a local digital advertisement database, but instead updates a remote

5,715,314

| 5 | 6 |

advertising document database on a merchant computer. These updates can be accomplished using HTML forms or other remote database technologies as is understood by practitioners of the art.

Payment computer 16 has access to a settlement database 22 in which payment computer 16 can record details of purchase transactions. The products may be organized into various "domains" of products, and payment computer 16 can access settlement database 22 to record and retrieve records of purchases of products falling within the various domains. Payment computer 16 also has access to a shopping cart database 21 in which a "shopping cart" of products that a user wishes to purchase can be maintained as the user shops prior to actual purchase of the contents of the shopping cart.

With reference to FIG. 2, a purchase transaction begins when a user at buyer computer 12 requests advertisements (step 24) and buyer computer 12 accordingly sends an advertising document URL (universal resource locator) to merchant computer 14 (step 26). The merchant computer fetches an advertising document from the advertising document database (step 28) and sends it to the buyer computer (step 30). An example of an advertising document is shown in FIG. 5. Details of URLs and how they are used are found in the microfiche Appendix G.

The user browses through the advertising document and eventually requests a product (step 32). This results in the buyer computer sending payment URL A to the payment computer (step 34). Payment URL A includes a product identifier that represents the product the user wishes to buy, a domain identifier that represents a domain of products to which the desired product belongs, a payment amount that represents the price of the product, a merchant computer identifier that represents merchant computer 14, a merchant account identifier that represents the particular merchant account to be credited with the payment amount, a duration time that represents the length of time for which access to the product is to be granted to the user after completion of the purchase transaction, an expiration time that represents a deadline beyond which this particular payment URL cannot be used, a buyer network address, and a payment URL authenticator that is a digital signature based on a cryptographic key. The payment URL authenticator is a hash of other information in the payment URL, the hash being defined by a key shared by the merchant and the operator of the payment computer.

In an alternative embodiment, step 34 consists of the buyer computer sending a purchase product message to the merchant computer, and the merchant computer provides payment VRL A to the buyer computer in response to the purchase product message. In this alternative embodiment, payment URL A contains the same contents as above. The buyer computer then sends the payment URL A it has received from the merchant computer to the payment computer.

When the payment computer receives the payment URL it verifies whether the payment URL authenticator was created from the contents of the payment URL using the cryptographic key (step 36). If not, the payment computer sends a document to the buyer computer indicating that access to the network sales system is denied (step 38). Otherwise, the payment computer determines whether the expiration time has past (step 40). If it has, the payment computer sends a document to the buyer computer indicating that the time has expired (step 41). Otherwise, the payment computer checks the buyer computer network

address to see if it matches the one specified in the payment URL (step 42). If it does not match, the payment computer sends a document to the buyer computer indicating that access to the network payment system is denied (step 43). Otherwise, the payment computer sends a payment confirmation document to the buyer computer, the payment confirmation document including an "open" link and a "continue" link (step 44).

An example of a confirmation document is shown in FIG. 6. The confirmation document asks the user to click on a "continue" button if the user already has an account with the payment computer, or to click on an "open" button if the user does not already have an account and wishes to open one.

If the user clicks on the "open" button (step 46), the buyer computer sends payment URL C to the payment computer (step 48), payment URL C being similar to payment URL A but also indicating that the user does not yet have an account. The payment computer creates a new account document (step 50) and sends it to the buyer computer (step 52). An example of a new account document is shown in FIG. 7. When the user receives the new account document he enters the new account name, an account password, a credit card number, the credit card expiration date, and security information such as the maiden name of the user's mother (step 54), and presses a "submit" button (not shown in FIG. 7). The buyer computer sends the new account information to the payment computer (step 56), which enters the new account in the settlement database (step 58).

If the user clicks on the "continue" button (step 60), the buyer computer sends payment URL B to the payment computer (step 62), payment URL B being similar to payment URL A but also indicating that the user already has an account. The payment computer then instructs the buyer computer to provide the account name and password (steps 64 and 66), and the buyer computer prompts the user for this information by creating an account name prompt (example shown in FIG. 8) and a similar password prompt. The user enters the information (step 68) and the buyer computer sends the account name and password to the payment computer (step 70).

The payment computer verifies whether the user name and password are correct (step 72). If they are not correct, the payment computer sends a document to the buyer computer indicating that access to the network sales system is denied (step 74). Otherwise, the payment computer determines whether additional security is warranted, based on, e.g., whether the payment amount exceeds a threshold (step 73). If additional security is warranted, the payment computer creates a challenge form document and sends it to the buyer computer (step 75). The user enters the security information (step 77), the buyer computer sends the security information to the payment computer (step 79), and the payment computer determines whether the security information is correct (step 81). If it is not correct, the payment computer sends a document to the buyer computer indicating that access to the network sales system is denied (step 83).

If the security information is correct, or if additional security was not warranted, the payment computer checks the settlement database to determine whether the user has unexpired access to the domain identifier contained in the payment URL (step 82). If so, the payment computer sends to the buyer computer a document providing an option either to repurchase or to use the previously purchased access (step 84). An example of such a document is shown in FIG. 9. The

5,715,314

| 7 | 8 |
|---|---|

user can respond to the recent purchase query document by choosing to access the previously purchased document (step 85) or to go ahead and buy the currently selected product (step 86).

If the user chooses to access the previously purchased document, the buyer computer skips to step 92 (see below). If the user chooses to buy the currently selected product, the payment computer calculates an actual payment amount that may differ from the payment amount contained in the payment URL (step 87). For example, the purchase of a product in a certain domain may entitle the user to access other products in the domain for free or for a reduced price for a given period of time.

The payment computer then verifies whether the user account has sufficient funds or credit (step 76). If not, the payment computer sends a document to the buyer computer indicating that the user account has insufficient funds (step 78). Otherwise, the payment computer creates an access URL (step 80) that includes a merchant computer identifier, a domain identifier, a product identifier, an indication of the end of the duration time for which access to the product is to be granted, the buyer network address, and an access URL authenticator that is a digital signature based on a crypto-graphic key. The access URL authenticator is a hash of other information in the access URL, the hash being defined by a key shared by the merchant and the operator of the payment computer. The payment computer then records the product identifier, the domain, the user account, the merchant account, the end of duration time, and the actual payment amount in the settlement database (step 88).

The payment computer then sends a redirect to access URL to the buyer computer (step 90), which sends the access URL to the merchant computer (step 92). The merchant computer verifies whether the access URL authenticator was created from the contents of the access URL using the cryptographic key (step 94). If not, the merchant computer sends a document to the buyer computer indicating that access to the product is denied (step 96).

Otherwise, the merchant computer verifies whether the duration time for access to the product has expired (step 98). This is done because the buyer computer can request access to a purchased product repeatedly. If the duration time has expired, the merchant computer sends a document to the buyer computer indicating that the time has expired (step 100). Otherwise the merchant computer verifies that the buyer computer network address is the same as the buyer network address in the access URL (step 101), and if so, sends a fulfillment document to the buyer computer (step 102), which is displayed by the buyer computer (step 104). An example of a fulfillment document is shown in FIG. 10. Otherwise, the merchant computer sends a document to the buyer computer indicating that access is not allowed (step 103).

With reference now to FIG. 3, when the merchant computer sends the advertising document to the buyer computer, the user may request that a product be added to a shopping cart in the shopping cart database rather than request that the product be purchased immediately. The buyer computer sends a shopping cart URL to the payment computer (step 108), the shopping cart URL including a product identifier, a domain identifier, a payment amount, a merchant account identifier, a merchant account identifier, a duration time, an expiration time, and a shopping cart URL authenticator that is a digital signature based on a cryptographic key. The shopping cart URL authenticator is a hash of other information in the shopping cart URL, the hash being defined by

a key shared by the merchant and the operator of the payment computer.

The payment computer verifies whether the shopping cart URL authenticator was created from the contents of the shopping cart URL using a cryptographic key (step 110). If not, the payment computer sends a document to the buyer computer indicating that access to the network sales system is denied (step 112). Otherwise, before any modification to a user's shopping cart is allowed, user authentication is performed (step 113) in a manner analogous to steps 40–81. Once the user is authenticated, the payment computer creates or updates a payment URL for the shopping cart (step 114).

The user then either requests more advertisements (step 24 in FIG. 2) and possibly adds another product to the shopping cart, requests display of the shopping cart (step 116), or requests purchase of the entire contents of the shopping cart (step 124). If the user requests display of the shopping cart (step 116), the buyer computer sends a fetch shopping cart request to the payment computer (step 118), and the payment computer and buyer computer (step 119) perform steps analogous to steps 64–81. The payment computer returns the contents of the shopping cart to the buyer computer (step 120), which displays the contents of the shopping cart (step 122). If the user requests that the entire contents of the shopping cart be purchased (step 124) the buyer computer causes the payment URL for the shopping cart to be activated (step 126) and the payment URL is processed in a manner analogous to the processing of payment URLs for individual products (beginning with step 36 in FIG. 2).

With reference now to FIG. 4, a user can request display of a "smart statement" that lists purchase transactions for a given month (step 128). When the buyer computer receives such a request, it sends a smart statement URL to the payment computer (step 130).

When the payment computer receives the smart statement URL, it verifies whether the smart statement URL authenticator was created from the contents of the smart statement URL using a cryptographic key (step 132). If not, the payment computer sends a document to the buyer computer indicating that access is denied (step 134). Otherwise, the payment computer checks to determine whether the buyer network address in the smart statement URL matches the buyer computer's actual network address (step 136). If not, the payment computer sends a document to the buyer computer indicating that access is denied (step 138). Otherwise (step 140), the payment computer and buyer computer perform a set of steps analogous to steps 64–81 in FIG. 2 (payment computer requests account name and password, user provides the requested information, and payment computer verifies the information).

In an alternative embodiment steps 132–138 are omitted.

After verification of account information is complete, the payment computer retrieves the requested settlement data from the settlement database, creates a smart statement document for the buyer, and sends the smart statement document to the buyer computer (step 142). An example of a smart statement document is shown in FIG. 11. Each purchase transaction record in the smart statement document includes the data of the transaction, the name of the merchant, an identification of the product, and the payment amount for the product. The smart statement document also includes a transaction detail URL for each purchase trans-action (these URLs, or hypertext links, are discussed below and are not shown in FIG. 11). The smart statement docu-

5,715,314

9

ment also identifies previous statements that the user may wish to have displayed.

The buyer computer displays the retrieved document (step 144), and the user may request transaction details for a particular transaction listed on the smart statement (step 146). If so, the buyer computer sends a transaction detail URL (or "payment detail URL") to the payment computer (step 148). The transaction detail URL includes a transaction identifier, a buyer network address, and a transaction detail URL authenticator. When the payment computer receives the transaction detail URL, it performs (step 150) a set of steps analogous to steps 132–140 (verification of URL authenticator, buyer network address, and account information). The payment computer then retrieves from the settlement database data corresponding to the payment transaction specified in the transaction detail URL, creates a transaction detail document, and sends it to the buyer computer (step 152).

An example of a transaction detail document is shown in FIGS. 12 and 13. The document displays a number of items of information about the transaction, including the transaction date, end of the duration time ("expiration"), a description of the product, the payment amount, the domain corresponding to the product, an identification of the merchant, and the merchant's address.

The smart statement document and the transaction detail document both include customer service URLs (hypertext links) that allow the user to request customer service (i.e., to send comments and suggestions to the payment computer). When the user requests customer service (step 154), the buyer computer sends the customer service URL to the payment computer (step 156), which creates a customer service form and sends it to the buyer computer (step 158). An example of a customer service form is shown in FIG. 14. The user types comments into the customer service form (step 160), and the buyer computer sends the user's comments to the payment computer (step 162). The payment computer then posts the user comments and sends a thank you document to the buyer computer (step 164).

A user may request display of a product included in the smart statement. When the user requests that the product be displayed (step 166), the buyer computer sends the access URL contained in the smart statement document to the merchant computer (step 168), and the buyer computer and merchant computer perform a set of steps analogous to steps 94–104 in FIG. 2 (authentication of access URL, verification whether duration time has expired, verification of buyer network address, and transmission of fulfillment document to buyer computer).

Whenever the present application states that one computer sends a URL to another computer, it should be understood that in preferred embodiments the URL is sent in a standard HTTP request message, unless a URL message is specified as a redirection in the present application. The request message includes components of the URL as described by the standard HTTP protocol definition. These URL components in the request message allow the server to provide a response appropriate to the URL. The term "URL" as used in the present application is an example of a "link," which is a pointer to another document or form (including multimedia documents, hypertext documents including other links, or audio/video documents).

When the present application states that one computer sends a document to another computer, it should be understood that in preferred embodiments the document is a success HTTP response message with the document in the

10

body of the message. When the present application states that a server sends an account name and password request message to the client, it should be understood that in preferred embodiments the account name and password request message is an unauthorized HTTP response. A client computer sends account name and password information to a server as part of a request message with an authorization field.

The software architecture underlying the particular preferred embodiment is based upon the hypertext conventions of the World Wide Web. Appendix A describes the Hypertext Markup Language (HTML) document format used to represent digital advertisements. Appendix B describes the HTML forms fill out support in Mosaic 2.0. Appendix C is a description of the Hypertext Transfer Protocol (HTTP) between buyer and merchant computers. Appendix D describes how documents are named with Uniform Resource Locators (URLs) in the network of computers, and Appendix E describes the authentication of URLs using digital signatures.

A printout of a computer program for use in creating and operating such a "store" in accordance with the present invention is provided as Appendix F. A printout of a computer program for use in operating other aspects of the network sales system in accordance with the present invention is provided in the microfiche appendix G.

There has been described a new and useful network-based sales system. It is apparent that those skilled in the art may make numerous modifications and departures from the specific embodiments described herein without departing from the spirit and scope of the claimed invention.

What is claimed is:

1. A network-based sales system, comprising:

at least one buyer computer for operation by a user desiring to buy a product;

at least one merchant computer; and

at least one payment computer;

said buyer computer, said merchant computer, and said payment computer being interconnected by a computer network;

said buyer computer being programmed to receive a user request for purchasing a product, and to cause a payment message to be sent to said payment computer that comprises a product identifier identifying said product;

said payment computer being programmed to receive said payment message, to cause an access message to be created that comprises said product identifier and an access message authenticator based on a cryptographic key, and to cause said access message to be sent to said merchant computer; and

said merchant computer being programmed to receive said access message, to verify said access message authenticator to ensure that said access message authenticator was created using said cryptographic key, and to cause said product to be sent to said user desiring to buy said product.

2. A network-based sales system in accordance with claim 1, wherein said payment message and said access message each comprises a universal resource locator.

3. A network-based sales system in accordance with claim 1, wherein said payment computer is programmed to identify said merchant computer upon receipt of said payment message from said buyer computer.

4. A network-based sales system in accordance with claim 1, wherein said access message comprises a buyer network address.

5,715,314

**11**

5. A network-based sales system in accordance with claim 4, wherein:

said product can be transmitted from one computer to another; and

said merchant computer causes said product to be sent to said user by transmitting said product to said buyer network address only.

6. A network-based sales system in accordance with claim 4, wherein said merchant computer is programmed to verify whether said buyer network address in said access message matches the actual network address of said buyer computer.

7. A network-based sales system in accordance with claim 1, wherein said payment message comprises a buyer network address.

8. A network-based sales system in accordance with claim 7, wherein said payment computer is programmed to verify whether said buyer network address in said payment message matches the actual network address of said buyer computer.

9. A network-based sales system in accordance with claim 1, wherein said access message authenticator comprises a cryptographic function of contents of said access message based on said cryptographic key.

10. A network-based sales system in accordance with claim 1, wherein said payment computer is programmed to verify said payment message authenticator to ensure that said payment message authenticator was created using said cryptographic key.

11. A network-based sales system in accordance with claim 10, wherein said payment message authenticator comprises a cryptographic function of contents of said payment message based on said cryptographic key.

12. A network-based sales system in accordance with claim 1, wherein said payment message comprises a payment amount.

13. A network-based sales system in accordance with claim 1, wherein said payment message comprises a merchant account identifier that identifies a merchant account.

14. A network-based sales system in accordance with claim 1, wherein said buyer computer is programmed to transmit a user account identifier to said payment computer that identifies a user account.

15. A network-based sales system in accordance with claim 14, wherein:

said payment message comprises a payment amount; and

said payment computer is programmed to ensure that said user account has sufficient funds or credit to cover said payment amount.

16. A network-based sales system in accordance with claim 14, wherein:

said payment message comprises a payment amount and a merchant account identifier that identifies a merchant account; and

said payment computer is programmed to record said payment amount, said user account, and said merchant account in a settlement database.

17. A network-based sales system in accordance with claim 16, wherein:

said payment message comprises a domain identifier; and

said payment computer is programmed to record said domain identifier and said user account in a settlement database.

18. A network-based sales system in accordance with claim 17, wherein said payment computer is programmed to check said settlement database, upon receipt of said payment message, to determine whether said user account has previously purchased a product associated with said domain identifier.

**12**

19. A network-based sales system in accordance with claim 18, wherein said payment computer is programmed to determine an actual payment amount for said product identified by said product identifier in said payment message based on whether said user account has previously purchased a product associated with said domain identifier.

20. A network-based sales system in accordance with claim 1, wherein said buyer computer is programmed to transmit a user authenticator to said payment computer and said payment computer is programmed to verify said user authenticator.

21. A network-based sales system in accordance with claim 20, wherein said user authenticator comprises a password.

22. A network-based sales system in accordance with claim 20, wherein:

said buyer computer is programmed to transmit security information to said payment computer;

said payment computer is programmed to transmit a challenge form to said buyer computer under a predetermined condition, said challenge form asking for said security information previously transmitted by said buyer computer to said payment computer;

said payment computer is programmed to respond to said challenge form by querying said user for said security information and transmitting said security information to said payment computer; and

said payment computer is programmed to verify authenticity of said security information.

23. A network-based sales system in accordance with claim 22, wherein:

said payment message comprises a payment amount; and

said predetermined condition comprises receipt of a payment amount in said payment message that exceeds a threshold.

24. A network-based sales system in accordance with claim 1, wherein said payment message comprises a merchant computer identifier that identifies said merchant computer.

25. A network-based sales system in accordance with claim 24, wherein said access message comprises said merchant computer identifier.

26. A network-based sales system in accordance with claim 1, wherein said payment message comprises a duration time that specifies a length of time for which access to said product is to be granted.

27. A network-based sales system in accordance with claim 26, wherein said payment computer is programmed to use said duration time to compute an end of duration time and to cause said end of duration time to be included in said access message.

28. A network-based sales system in accordance with claim 27, wherein said merchant computer is programmed to verify, upon receipt of said access message, that said end of duration time has not past.

29. A network-based sales system in accordance with claim 1, wherein said payment message comprises an expiration time after which said payment message can no longer be used.

30. A network-based sales system in accordance with claim 29, wherein said payment computer is programmed to verify, upon receipt of said payment message, that said expiration time has not past.

31. A network-based sales system in accordance with claim 1, wherein:

said payment computer is programmed to cause said access message to be sent to said buyer computer; and

5,715,314

| 13 | 14 |

said buyer computer is programmed to cause said access message received from said payment computer to be sent to said merchant computer.

32. A network-based sales system, comprising:

at least one buyer computer for operation by a user desiring to buy a product;

at least one merchant computer; and

at least one payment computer;

said buyer computer, said merchant computer, and said payment computer being interconnected by a computer network;

said buyer computer being programmed to receive a user request for purchasing a product, and to cause a payment URL to be sent to said payment computer that comprises a product identifier identifying said product, a payment amount, and a payment URL authenticator comprising a cryptographic function of contents of said payment URL based on a cryptographic key;

said payment computer being programmed to receive said payment URL, to verify said payment URL authenticator to ensure that said payment URL authenticator was created using said cryptographic key, to ensure that said user has sufficient funds or credit to cover said payment amount, to identify said merchant computer operated by said merchant willing to sell said product to said buyer, to cause an access URL to be created that comprises said product identifier and an access URL authenticator comprising a cryptographic function of contents of said access URL based on a cryptographic key, and to cause said access URL to be sent to said buyer computer;

said buyer computer being programmed to cause said access URL received from said payment computer to be sent to said merchant computer; and

said merchant computer being programmed to receive said access URL, to verify said access URL authenticator to ensure that said access URL authenticator was created using said cryptographic key, and to cause said product to be sent to said user desiring to buy said product.

33. A method of operating a payment computer in a computer network comprising at least one buyer computer for operation by a user desiring to buy a product, at least one merchant computer, and at least one payment computer, the method comprising the steps of:

receiving, at said payment computer, a payment message that said buyer computer has caused to be sent to said payment computer in response to a user request for purchasing a product, said payment message comprising a product identifier identifying said product;

causing an access message to be created that comprises said product identifier and an access message authenticator based on a cryptographic key; and

causing said access message to be sent to said merchant computer, said merchant computer being programmed to receive said access message, to verify said access message authenticator to ensure that said access message authenticator was created using said cryptographic key, and to cause said product to be sent to said user desiring to buy said product.

34. A network-based sales system, comprising:

at least one buyer computer for operation by a user desiring to buy products;

at least one shopping cart computer; and

a shopping cart database connected to said shopping cart computer;

said buyer computer and said shopping cart computer being interconnected by a computer network;

said buyer computer being programmed to receive a plurality of requests from a user to add a plurality of respective products to a shopping cart in said shopping cart database, and, in response to said requests to add said products, to send a plurality of respective shopping cart messages to said shopping cart computer each of which comprises a product identifier identifying one of said plurality of products;

said shopping cart computer being programmed to receive said plurality of shopping cart messages, to modify said shopping cart in said shopping cart database to reflect said plurality of requests to add said plurality of products to said shopping cart, and to cause a payment message associated with said shopping cart to be created; and

said buyer computer being programmed to receive a request from said user to purchase said plurality of products added to said shopping cart and to cause said payment message to be activated to initiate a payment transaction for said plurality of products added to said shopping cart;

said shopping cart being a stored representation of a collection of products, said shopping cart database being a database of stored representations of collections of products, and said shopping cart computer being a computer that modifies said stored representations of collections of products in said database.

35. A network-based sales system in accordance with claim 34, wherein said shopping cart computer is programmed to cause said payment message to be created before said buyer computer causes said payment message to be activated.

36. A network-based sales system in accordance with claim 34, wherein said buyer computer is programmed to receive a request from said user to display said plurality of products added to said shopping cart.

37. A network-based sales system in accordance with claim 36, wherein said buyer computer is programmed to transmit a fetch shopping cart request to said payment computer in response to receipt of said request from said user.

38. A network-based sales system in accordance with claim 37, wherein:

said payment computer is programmed to respond to said fetch shopping cart request by transmitting a message to said buyer computer indicating said plurality of products added to said shopping cart; and

said buyer computer is programmed to display said plurality of products added to said shopping cart.

39. A method of operating a shopping cart computer in a computer network comprising at least one buyer computer for operation by a user desiring to buy products, at least one shopping cart computer, and a shopping cart database connected to said shopping cart computer, said method comprising the steps of:

receiving, at said shopping cart computer, a plurality of shopping cart messages sent to said shopping cart computer by said buyer computer in response to receipt of a plurality of requests from a user to add a plurality of respective products to a shopping cart in said shopping cart database, each of said shopping cart messages comprising a product identifier identifying one of said plurality of products;

modifying said shopping cart in said shopping cart database to reflect said plurality of requests to add said plurality of products to said shopping cart; and

5,715,314

15

causing a payment message associated with said shopping cart to be created;

said buyer computer being programmed to receive a request from said user to purchase said plurality of products added to said shopping cart and to cause said payment message to be activated to initiate a payment transaction for said plurality of products added to said shopping cart;

said shopping cart being a stored representation of a collection of products, said shopping cart database being a database of stored representations of collections of products, and said shopping cart computer being a computer that modifies said stored representations of collections of products in said database.

40. A network-based link message system, comprising:

at least one client computer for operation by a client user; and

at least one server computer for operation by a server user;

said client computer and said server computer being interconnected by a computer network;

said client computer being programmed to send an initial link message to said server computer;

said server computer being programmed to receive said initial link message from said client computer, to create, based on information contained in said initial link message, a session link message that encodes a state of interaction between said client computer and said server computer, said session link message comprising a session link authenticator, computed by a cryptographic function of said session link contents, for authenticating said session link message, and to cause said session link message to be sent to said client computer;

said client computer being programmed to cause said session link message to be sent to a computer in said network that is programmed to authenticate said session link message by examining said session link authenticator and that is programmed to respond to said session link message based on said state of said interaction between said client computer and said server computer.

41. A network-based link message system in accordance with claim 40, wherein:

said client computer comprises a buyer computer for operation by a user desiring to buy a product;

said server computer comprises a payment computer for operation by a manager of said network-based link message system; and

said network-based link message system further comprises a merchant computer for operation by a merchant willing to sell said product to said buyer.

42. A network-based link message system in accordance with claim 41, wherein said computer that is programmed to

16

authenticate said session link message comprises said merchant computer.

43. A network-based link message system in accordance with claim 41, wherein said initial link message comprises a payment message to said payment computer that comprises a product identifier identifying said product.

44. A network-based link message system in accordance with claim 43, wherein said session link message comprises an access message that comprises said product identifier to be created.

45. A network-based link message system in accordance with claim 44, wherein said merchant computer is programmed to respond to said access message by causing said product to be sent to said user desiring to buy said product.

46. A network-based link message system in accordance with claim 40, wherein said initial link message and said session link message comprise universal resource locators.

47. A network-based link message system in accordance with claim 40, wherein:

said session link authenticator comprises a cryptographic function of contents of said session link message based on a cryptographic key; and

said computer to which said client computer is programmed to cause said session link message to be sent is programmed to verify that said session link authenticator was created using said cryptographic key.

48. A method of operating a server computer in a network-based link message system comprising at least one client computer for operation by a client user and at least one server computer for operation by a server user, said client computer and said server computer being interconnected by a computer network, said method comprising the steps of:

receiving, at said server computer, an initial link message sent to said server computer by said client computer;

creating, based on information contained in said initial link message, a session link message that encodes a state of interaction between said client computer and said server computer, said session link message comprising a session link authenticator, computed by a cryptographic function of said session link contents, for authenticating said session link message; and

causing said session link message to be sent to said client computer;

said client computer being programmed to cause said session link message to be sent to a computer in said network that is programmed to authenticate said session link message by examining said session link authenticator and that is programmed to respond to said session link message based on said state of said interaction between said client computer and said server computer.

*     *     *     *     *

**UNITED STATES PATENT AND TRADEMARK OFFICE**
Certificate

Patent No. 5,715,314                                                    Patented: February 3, 1998

On petition requesting issuance of a certificate for correction of inventorship pursuant to 35 U.S.C. 256, it
has been found that the above identified patent, through error and without any deceptive intent, improperly
sets forth the inventorship.

Accordingly, it is hereby certified that the correct inventorship of this patent is: Andrew C. Payne, Lincoln,
MA; Lawrence C. Stewart, Burlington, MA; and G. Winfield Treese, Wayland, MA.

Signed and Sealed this Sixth Day of April 2004.

THOMAS H. TARCZA
*Supervisory Patent Examiner*
Art Unit 3662



US005715314C1

(12) **EX PARTE REEXAMINATION CERTIFICATE** (5932nd)

# United States Patent

Payne et al.

(10) **Number:** US 5,715,314 C1

(45) **Certificate Issued:** *Oct. 9, 2007

(54) **NETWORK SALES SYSTEM**

(75) Inventors: **Andrew C. Payne**, Lincoln, MA (US); **Lawrence C. Stewart**, Burlington, MA (US); **G. Winfield Treese**, Wayland, MA (US)

(73) Assignee: **Soverain Software LLC**, Chicago, IL (US)

**Reexamination Request:**
No. 90/007,287, Nov. 3, 2004

**Reexamination Certificate for:**

| | |
|---|---|
| Patent No.: | **5,715,314** |
| Issued: | **Feb. 3, 1998** |
| Appl. No.: | **08/328,133** |
| Filed: | **Oct. 24, 1994** |

( * ) Notice: This patent is subject to a terminal disclaimer.

Certificate of Correction issued Apr. 6, 2004.

(51) **Int. Cl.**

| | |
|---|---|
| *G06Q 30/00* | (2006.01) |
| *G06Q 10/00* | (2006.01) |
| *G06Q 20/00* | (2006.01) |
| *G07F 7/00* | (2006.01) |

(52) **U.S. Cl.** ............................. 705/78; 705/26; 705/75; 713/162

(58) **Field of Classification Search** ........................ None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,484,304 A | 11/1984 | Anderson et al. | |
| 4,528,643 A | 7/1985 | Freeny, Jr. | |
| 4,529,870 A | 7/1985 | Chaum | |
| 4,566,078 A | 1/1986 | Crabtree | |
| 4,759,063 A | 7/1988 | Chaum | |
| 4,759,064 A | 7/1988 | Chaum | |

| | | | |
|---|---|---|---|
| 4,891,503 A | 1/1990 | Jewell | |
| 4,926,480 A | 5/1990 | Chaum | |
| 4,941,089 A | 7/1990 | Fischer | |
| 4,947,430 A | 8/1990 | Chaum | |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0172 670 | 2/1986 |
| EP | 0456920 | 11/1991 |
| EP | 0645688 | 3/1995 |
| JP | 3278230 | 12/1991 |
| JP | 4-10191 | 1/1992 |

(Continued)

OTHER PUBLICATIONS

Trewitt, Glenn, *Using Tcl to Process HTML Forms,* Digital Equipment Corporation Network Systems Laboratory TN–14, dated Mar. 1994.

(Continued)

*Primary Examiner*—Michael O'Neill

(57)    **ABSTRACT**

A network-based sales system includes at least one buyer computer for operation by a user desiring to buy a product, at least one merchant computer, and at least one payment computer. The buyer computer, the merchant computer, and the payment computer are interconnected by a computer network. The buyer computer is programmed to receive a user request for purchasing a product, and to cause a payment message to be sent to the payment computer that comprises a product identifier identifying the product. The payment computer is programmed to receive the payment message, to cause an access message to be created that comprises the product identifier and an access message authenticator based on a cryptographic key, and to cause the access message to be sent to the merchant computer. The merchant computer is programmed to receive the access message, to verify the access message authenticator to ensure that the access message authenticator was created using the cryptographic key, and to cause the product to be sent to the user desiring to buy the product.



# US 5,715,314 C1
Page 2

## U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 4,949,380 A | 8/1990 | Chaum |
| 4,972,318 A | 11/1990 | Brown et al. |
| 4,987,593 A | 1/1991 | Chaum |
| 4,991,210 A | 2/1991 | Chaum |
| 4,996,711 A | 2/1991 | Chaum |
| 5,035,515 A | 7/1991 | Crossman et al. |
| 5,105,184 A | 4/1992 | Pirani et al. |
| 5,204,947 A | 4/1993 | Bernstein et al. |
| 5,276,736 A | 1/1994 | Chaum |
| 5,297,249 A | 3/1994 | Bernstein et al. |
| 5,309,437 A | 5/1994 | Perlman et al. |
| 5,311,594 A | 5/1994 | Penzias |
| 5,319,542 A | 6/1994 | King, Jr. et al. |
| 5,321,751 A | 6/1994 | Ray et al. |
| 5,325,362 A | 6/1994 | Aziz |
| 5,347,632 A | 9/1994 | Filepp et al. ............... 395/200 |
| 5,353,283 A | 10/1994 | Tsuchiya |
| 5,388,257 A | 2/1995 | Bauer |
| 5,457,738 A | 10/1995 | Sylvan |
| 5,475,585 A | 12/1995 | Bush |
| 5,483,652 A | 1/1996 | Sudama et al. |
| 5,491,820 A | 2/1996 | Belove et al. |
| 5,521,631 A | 5/1996 | Budow et al. |
| 5,530,852 A | 6/1996 | Meske, Jr. et al. |
| 5,535,229 A | 7/1996 | Hain, Jr. et al. |
| 5,544,320 A | 8/1996 | Konrad |
| 5,544,322 A | 8/1996 | Cheng et al. |
| 5,550,984 A | 8/1996 | Gelb |
| 5,557,516 A | 9/1996 | Hogan |
| 5,557,518 A | 9/1996 | Rosen |
| 5,557,798 A | 9/1996 | Skeen et al. |
| 5,560,008 A | 9/1996 | Johnson et al. |
| 5,577,209 A | 11/1996 | Boyle et al. |
| 5,583,996 A | 12/1996 | Tsuchiya |
| 5,590,197 A | 12/1996 | Chen et al. |
| 5,592,378 A | 1/1997 | Cameron et al. .......... 395/227 |
| 5,594,910 A | 1/1997 | Filepp et al. |
| 5,596,642 A | 1/1997 | Davis et al. |
| 5,596,643 A | 1/1997 | Davis et al. |
| 5,604,802 A | 2/1997 | Holloway |
| 5,619,648 A | 4/1997 | Canale et al. |
| 5,621,797 A | 4/1997 | Rosen |
| 5,623,547 A | 4/1997 | Jones et al. |
| 5,623,656 A | 4/1997 | Lyons |
| 5,642,419 A | 6/1997 | Rosen |
| 5,664,110 A | 9/1997 | Green et al. |
| 5,664,111 A | 9/1997 | Nahan et al. |
| 5,675,507 A | 10/1997 | Bobo, II |
| 5,694,551 A | 12/1997 | Doyle et al. |
| 5,708,780 A | 1/1998 | Levergood et al. |
| 5,710,884 A | 1/1998 | Dedrick |
| 5,724,424 A | 3/1998 | Gifford |
| 5,724,521 A | 3/1998 | Dedrick |
| 5,727,164 A | 3/1998 | Kaye et al. |
| 5,732,219 A | 3/1998 | Blummer et al. |
| 5,734,719 A | 3/1998 | Tsevdos et al. |
| 5,761,662 A | 6/1998 | Dasan |
| 5,768,142 A | 6/1998 | Jacobs |
| 5,768,521 A | 6/1998 | Dedrick |
| 5,774,670 A | 6/1998 | Montulli |
| 5,784,565 A | 7/1998 | Lewine |
| 5,790,793 A | 8/1998 | Higley |
| 5,806,077 A | 9/1998 | Wecker |
| 5,812,776 A | 9/1998 | Gifford |
| 5,826,241 A | 10/1998 | Stein et al. |
| 5,826,242 A | 10/1998 | Montulli |
| 5,848,399 A | 12/1998 | Burke ........................ 705/27 |
| 5,848,413 A | 12/1998 | Wolff |
| 5,870,552 A | 2/1999 | Dozier et al. |
| 5,895,454 A | 4/1999 | Harrington |

| | | |
|---|---|---|
| 5,897,622 A | 4/1999 | Blinn et al. |
| 5,909,492 A * | 6/1999 | Payne et al. .................. 705/78 |
| 5,920,847 A | 7/1999 | Kolling et al. |
| 5,982,891 A | 11/1999 | Ginter et al. |
| 6,006,199 A | 12/1999 | Berlin et al. |
| 6,023,683 A | 2/2000 | Johnson et al. |
| 6,041,316 A | 3/2000 | Allen |
| 6,049,785 A | 4/2000 | Gifford |
| 6,134,592 A | 10/2000 | Montulli |
| 6,195,649 B1 | 2/2001 | Gifford |
| 6,199,051 B1 | 3/2001 | Gifford |
| 6,205,437 B1 | 3/2001 | Gifford |
| 6,449,599 B1 | 9/2002 | Payne et al. |
| 6,708,157 B2 | 3/2004 | Stefik et al. |

## FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| JP | 05-158963 | 6/1993 |
| JP | 5274275 | 10/1993 |
| JP | 6162059 | 6/1994 |
| JP | 6291776 | 10/1994 |
| WO | WO 93/10503 | 5/1993 |
| WO | WO 94/03859 | 2/1994 |

## OTHER PUBLICATIONS

Viescas, John L., The Official Guide to the Prodigy Service, Microsoft Press, 1991, ISBN 1–55615–374–0.

BizNet Technologies, Versatile Virtual Vending, published at http://www.bnt.com, Sep. 12, 1994.

Amazon "Welcome First Time Visitors" Jun. 1998 pp. 1–4.

"CompuServe Videotex Network Offers Marketing Research Service, ad Test", Marketing News, Nov. 25, 1993, p. 21.

"Electronic In–Home Shopping: 'Our Stores are Always Open'," Chain Store Age Executive, Mar. 1985, pp. 111, 116.

"Mall Offers a Holiday Treat for Hackers," Advertising Age, Nov. 13, 1985, p. 76.

"Suddenly, VideoTex is Finding an Audience", Business Week, Oct. 19, 1987, pp. 92–94.

"Redcoats Join Communications Fight", Industry Week, Feb. 22, 1982, pp. 108–109.

"Taking Advantage of the Past",Advertising Age, Apr. 11, 1983, pp. M36–37.

Beutelspacher et al., "Payment Applications with Multifunctional Smart Cards", Smart Card 2000, 1989, pp. 95–101.

Booz, Allen & Hamilton, "How to Buy Information with a First Virtual Account", Apr. 11, 1994, 63 pages.

Burk et al., "Digital Payment Systems Enabling Security and Unobservability", Computers & Security, 1989, pp. 399–415.

Computer Shopper, "Internet for Profit", Nov. 1994, pp. 180–182; 190–192; 522–528, 532, 534.

"Consumers Plugging into New Electronic Mail", Adversiting Age, Mar. 4, 1985, p. 74.

Damgard, "Payment Systems and Credential Mechanisms with Provable Security Against Abuse by Individuals", Advances in Cryptology—CRYPTO '88, 1988, pp. 328–335.

Davies et al., "Security for Computer Networks: An Introduction to Data Security In Teleprocessing and Electronic Funds Transfer", John Wiley & Sons, Dec. 5, 1985, pp. 304–336.

Ferrarini, E., "Direct Connections for Software Selections", Business Computer Systems, Feb. 1985, pp. 35–38.

**US 5,715,314 C1**

Page 3

Fujioka, et al., "ESIGN: An Efficient Digital Signature Implementation for Smart Cards," Advances in Cryptology—Eurocrypt '91, Apr. 1991, pp. 446–457.

Hakota., et al., A System for Automatic Value Exchange Exchange, Proceedings—Fall Joint Computer Conference, Nov. 1966, pp. 579–589.

Hirschfeld, "Making Electronic Refunds Safer", Laboratory for Computer Science, MIT, 1992, 4 pages.

Jansson, L., "General Electronic Payment System", 7th Proceedings of the International Conference on Computer Communication, 1985, pp. 832–835.

Kenny, "EDI Security: Risks and Solutions", SD–Scion UK Limited,1992, 12 pages.

Knapskog, "Privacy Protected Payments—Reliazation of a Protocol that Guarantees Payer Anonymity", EuroCrypt 1988, pp. 107–121.

Lai et al., "Endorsements, Licensing, and Insurance for Distributed System Services", Information Sciences Institute, U. of Southern California, undated, 6 pages.

Low et al., "Anonymous Credit Cards", undated, pp. 1–16.

Messmer, "NIST Stumbles on Proposal for Public–Key Encryption", Network World, Jul. 27, 1992, pp. 1–6.

Perry, "Electronic Banking Goes to Market", IEEE Spectrum, Feb. 1988, pp. 46–49.

Ph. van Heurck, "TRASEC: Belgian Security Systems for Electronic Funds Transfers," Computers & Security, 1987, pp. 261–268.

Pongratz, et al., "IC Cards in Videotex Systems", Smart Card 2000, 1989, pp. 179–186, 1 page.

Recommendation X.509: The Directory—Authentication Framework, Fascicle VIII.8 (Melbourne 1988) pp. 48–82.

Remery, P., et al., "Le paiement electronique", L'Echo des Recherches, No. 134, 1988, pp. 15–23.

Rescorla E., et al., "The Secure HyperText Transfer Protocol", Enterprise Integration Technologies, Dec. 1994, 35 pages.

Shain, "Security in Electronic Funds Transfer: Message Integrity in Money Transfer and Bond Settlements through GE Information Services' Global Network", Computers & Security, vol. 8, No. 3 1989, pp. 209–221.

Staskauskas, "The Formal Specification and Design of a Distributed Electronic Funds–Transfer System", *EEE, 1988, pp. 1515–1528.

Stol, "Privacy Protected Payments—A Possible Structure for a Real Implementation and Some Resource Considerations", Reproduced by U.S. Department of Commerce, 83 pages.

Strazewski, "Computerized Service Sets Shoppers Hacking", Advertising Age, Feb. 33, 1988, p. 62.

Takei, Videotex Information System and Credit System Connecting with MARS 301–of JNR, Japanese Railway Engineering, No. 95, Sep. 1985, pp. 9–11.

Tanaka et al., "Untraceable Electronic Funds Transfer Systems", Electronics and Communications in Japan, Part 3, vol. 72, No. 9, 1989, pp. 47–54.

Tunstall, "Electronic Currency", Smart Card 2000: The Future of IC Cards, Oct. 1987, pp. 47–48.

Waidner, et al., "Loss–Tolerance for Electronics Wallets", Fault–Tolerant Computing: 20th International Symposium, Jun. 26–28, 1990, pp. 140–147.

Weber, "Controls in Electronic Funds Transfer Systems: A Survey and Synthesis", Computers & Security, 1989, pp. 123–137.

Williams, "Debit Program Cuts Fraud—CompuServe Plan a Success", Pensions & Investment Age, Feb. 4, 1985, pp. 31–33.

Joint Claim Construction Chart (Patent Local Rule 4–5D)), filed Dec. 27, 2004 with Appendix A.

Order Denying Amazon's Motion to Stay Proceedings Pending Completion of the Reexamination.

Transcript of the Markman Hearing Before the Honorable Leonard David United States District Judge, Jan. 6, 2005.

Complaint for Patent Infringement filed Jan. 12, 2004.

Amazon.com's Answer, Affirmative Defenses, and Counterclaims to Soverain Software's Complaint filed Mar. 9, 2004.

Amazon.com's Response to Plaintiff's First Set of Interrogatories (Nos. 1–22) filed Jun. 11, 2004.

Soverain's Responses and Objections to Amazon.com's First Set of Interrogatories (Nos. 1–14) filed Jun. 11, 2004.

Disclosure of Preliminary Invalidity Contentions by Defendants Amazon.com and the Gap (with Exhibit A) filed Jul. 6, 2004.

Soverains'Supplemental Responses to Amazon.com's First Set of Interrogatories (Nos. 1–14) filed Aug. 13, 2004.

Soverain's Second Supplemental Response to Amazon.com's First Set of Interrogatories (Nos. 1–14) filed Sep. 21, 2004.

Soverain's Third Supplemental Response to Amazon.com's First Set of Interrogatories (Nos. 1–14).

Soverain's Preliminary Claim Construction (Patent Local Rule 4–2) filed Sep. 2, 2004.

Joint Disclosure of Prelminary Claim Construction and Extrinsic Evidence by Defendants Amazon.com and the Gap (with Exhibits A–B) filed Sep. 2, 2004.

Joint Claim Construction and Prehearing Statement (Patent Local Rule 4–3) (with Exhibits A–D) filed Oct. 4, 2004.

Amazon.com's First Amended Answer, Affirmative Defenses, and Counterclaims to Soverain's Complaint filed Oct. 6, 2004.

Declaration of Jack D. Grimes Ph.D., dated Nov. 15, 2004.

Soverain's Claim Construction Brief Pursuant to Patent Rule 4–5(a) dated Nov. 16, 2004.

Declaration of Dr. Richard N. Taylor in Support of Defendants' Markman Brief dated Nov. 29, 2004.

Joint Claim Construction Brief of Amazon.com and Gap dated Nov. 30, 2004.

Soverain's Claim Construction Reply Brief Pusuant to Patent Rule 4–5(c) dated Dec. 7, 2004.

Bina, E., et al., "Secure Access to Data Over the Internet," 1994 IEEE, pp. 99–102.

Xiuchi, T., et al., "C–HTTP—The Development of a Secure, Closed HTTP–Based Network on the Internet," 1996 IEEE, pp. 64–75.

Berners–Lee, T., et al., "Target a Common Internet Syntax Where the User Password is Appended to a Specific URL," http://www.ietf.org/rfc/rfc1738.txt?number=1738.

57 USPQ2D, "Amazon.com, Inc. v. Barnesandnoble.com, Inc." pp. 1746–1763.

Pitkow, J.E., "Webviz: A Tool for World–Wide Web Access Log Analysis." First International World Wide Web Conf., May 1994, 7 pgs.

Lim, Jong–Gyun, "Using Coollists to Index HTML Documents in the Web." http://www.ncsa.uiuc.edu/SDG/TT94/Proceedings/Searching/lim/coollist. htm, pp. 1–8.

**US 5,715,314 C1**

Page 4

Sedayao, J., "Mosiac Will Kill My Network!—Studying Network Traffic Patterns of Mosaic Use", http://www.ncsa.uiuc.edu/SDG/IT94/P...gs/DDay/sedayao/mos_traf_paper.htm.

Catledge, L.D., "Characterizing Browsing Strategies in the World–Wide Web," http:www.igd.tbg.de/archive/1995_.../UserPatterns.Paper4.formatted.htm.

Menefee, C., "New host for Internet Commercial Site Index," Newsbytes Nov. 9, 1994, p. 15.

Michalski, J., "Content in context: the Future of SGML and HTML," Release 1.0, Sep. 27, 1994, pp. 1–10.

Metcalf, R.M., "Commercialization of the Internet Opens Gateways to Interpreneurs," InfoWorld, Aug. 8, 1994, p. 44.

"MaX.500—a Macintosh X.500 Directory Client", contents of WWW website, http://www.umich.edu/~dirsvcs/ldap/max500/index.htlm as of Jul. 7, 1997.

Droms, R.E., "Access to Heterogeneous Directory Services," Proceedings IEEE INFOCOM '90, pp. 1054–1061, San Francisco, CA, Jun. 3–7, 1990.

Good, B., "Experience with Bank of America's Distributive Computing System," pp. 2–8, IEEE 1983.

Inselberg, A., "An Approach to Successful Online Transaction Processing Applications," AFIPS Conference Proceedings, 1985 National Computer Conference, pp. 419–427, Chicago, IL, Jul. 15–18, 1985.

Bowman, et al., "Univers: An Attribute–Based Name Server," Software Practice and Experience, vol. 20(4) 403–424 (Apr. 1990).

NCSA HTTPd 1.5 Beta How to Redirect, "The New Redirect Directives."

Housel, B.C., et al., "SNA Distribution Services," IBM Systems Journal, pp. 319–343, vol. 22, No. 4, 1983.

Zatti, et al., "Naming and Registration for IBM Distributed Systems," IBM Systems Journal, pp. 353–380, vol. 31, No. 2, 1992.

Welch, B., et al., "Prefix Tables: A Simple Mechanism for Locating Files in a Distributed System," pp. 184–189, 6th International Conference on Distributed Computing Systems, IEEE Computer Society, Cambridge, MA, May 1996.

Schwartz, et al., "A Name Service for Evolving, Heterogeneous Systems," Proceedings of the 11th ACM Symposium on Operating Systems Principles, vol. 21, No. 5, pp. 52–62, Austin, TX, Nov. 1987.

Hitchens, M., et al., "Bindings Between Names and Objects in a Persistent System," Proceedings of the 2nd International Workshop on Object Orientation in Operating Systems, IEEE Computer Society, pp. 26–37, Dourdan, FR, Sep. 1992.

Sheltzer, et al., "Name Service Locality and Cache Design in a Distributed Operating System," University of California, Los Angeles, 8 pgs.

Andrade, et al., "Open On–Line Transaction Processing with the Tuxedo System," pp. 368–371, Digest of Papers, IEEE Computer Society Press, Compson Spring 1992, San Francisco, California.

Terry, D.B., "Structure–free Name Management for Evolving Distributed Environments," pp. 502–508, 6th International Conference on Distributed Computing Systems, IEEE Computer Society, Cambridge, MA, May 1986.

Cheriton D.R., et al., "Uniform Access to Distributed Name Interpretation in the V–System," pp. 290–297, 4th International Conference on Distributed Computing System, IEEE Computer Society, San Francisco, CA, May 1984.

Lampson, B.W., "Designing a Global Name Service,", pp. 1–10, Proceedings of the 5th Annual ACM Symposium on Principles of Distributed Computing, ACM, Calgary, Alberta, Canada, Aug. 1986.

Curtis, R., et al., "Naming in Distributed Language Systems," pp. 298–302, 4th International Conference on Distributed Computing Systems, IEEE Computer Society, San Francisco, CA May 1984.

Squillante, M.C., et al., Integrating Heterogeneous Local Mail Systems, pp. 59–67, IEEE Software, Nov. 1989.

Schwartz, M.F., et al., Experience with a Semantically Cognizant Internet White Pages Directory Tool, Journal of Internetworking: Research and Experience, pp. 1–22 (1990).

Ordille, J.J., et al., "Nomenclater Descriptive Query Optimization for Large X.500 Environments," pp. 185–196, SIGCOM '91 Conference, Communication Architectures & Protocols, vol. 21, No. 4, Zurich, Switzerland, Sep. 1991.

Notkin, D., "Proxies: A Software Structure for Accomodating Hetergeneity," Software–Practice and Experience, vol. 20(4), 357–364, Apr. 1990.

Bjorn N. Freeman–Benson," Using the Web to Provide Private Information," First International Conference on the World Wide Web, WWW94, May 1994, 5 pages.

Rescorla, E., et al., "The Secure HyperTest Transfer Protocol," Aug. 1999.

Lou Montulli, Electronic Mail to Multiple Recipients of the www–talk list (www–talk.1995q2/0134.html on "Session Tracking" (omi.mail.www–talk, Apr. 18, 1995).

Ramanathan, Sirvivas, et al., "Architectures for Personalized Multimedia," IEEE Multimedia, vol. 1, No. 1, Computer Society, pp. 37–46, 1994.

Choudhury, Abhijit K., et al., "Copyright Protection for Electronic Publishing Over Computer Networks," IEEE Network, The Magazine of Computer Communications, vol. 9, No. 3, pp. 12–20, May 1995.

"Persistent Client State HTTP Cookies," http://search.netscape.com/newsref/std/cookie_spec.html (Jan. 9, 1998).

"HTTP State Management Mechanism," http://www.internic.net/rfc/rfc2109.txt (Jan. 9, 1998)—http://www.cse.ohio–state.edu/cgi–bin/rfc/rfc2965.html.

Pitkow, J.E., and Recker, M.M., Using the Web as a Survey Tool: Results from Second WWW User Survey,: http://www.igd.fhg.de/archive/1995_www95/papers/79/survey/survey_2_paper.html.

Peterson, Larry L., "A Yellow–Pages Service for a Local–Area Network," ACM Proceedings of the ACM SIG-COMM 87 Workshop, ACM Press, 1988, pp. 235–242.

Kahan, Jose, "A Distributed Authorization Model for WWW," http://www.isoc.org/HMP/PAPER/107/html/paper.html, pp. 1–16.

Kahan, Jose, "A capability–based authorization model for the World–Wide Web," http://www.igd.fhg.de/archive/1995_www95/proceedings/papers/86/CaMWWW.htlm, pp. 1–14.

Kahan, Jose, "A New Authorization Model for Distributed Multimedia Information Consultation Systems," English Translation, pp. 1–21.

Berners–Lee, T., et al., http://www.ietf.org/rfc/rfc1738.txt?numbers=178.

Gary Welz, "The Media Business on the WWW", Proceedings of the Second World Wide Web Conference 1994: Mosaic and the Web, Oct. 1994, 6 pages.

Clickstream, Oct. 1996, The word Spy, [http:www.wordspy.com/words/clickstream.asp], 2 pages.

## US 5,715,314 C1

Page 5

Bob Novick, (9503) Internet Marketing: The Clickstream, Mar. 1995, [http://www.i–m.com/archives/9503/0375.html] 3 pages.

Kahan, Jose, "Un nouveau modele d–autorisation pour les systemes de consultation d–information multimedia repartee," pp. 45–57.

Brian W. Kernighan and Dennis M. Ritchie, "The C Programming Language" second edition, AT&T Bell Laboratories, (N.J., Prentice Hall) pp. 17–21 (1998).

Computer and Business Equipment Manufacturers Association, "American National Standard for Information Systems–Database Language SQL" (N.Y., American National Standards Institute) pp. 27–28 (1986).

Aho, A.V., et al., "Reports and Databases." In the AWK Programming Language, M.A. Harrison, ed., (Addison–Wesley), pp. 100–101 (1988).

Kelley, A., and Pohl, I., "Arrays, Strings, and Pointers." In a Book on C, A. Apt. ed., (the Benjamin/Cummings Publishing Company, Inc.,) pp. 35–37 (1984).

WordPerfect for Macintosh, pp. 153–162 (1990).

"Here it is, World" internet postings to comp.infosystems.www.users discussion list re: Mosaic Netscape (Oct. 13, 1994–Oct. 17, 1994) available at: http://groups.google.com/group/comp.infosystems.www.users/browse_thread/thread/3666fe4e21b3a9c2/9a210e5f72278328?lnk=st&rnum=5&hl=en#9a210e5f72278328.

"Netscape 0.93 Setup Questions" internet postings to comp.infosystems.www.misc discussion list re: Mosaic Netscape (Nov. 21, 1994–Nov. 25, 1994) available at: http://groups.google.com/group/comp.infosystems.www.misc/browse_thread/thread/da4e82efc6512f67/8dabc347291409d5?lnk=st&rnum=1&hl=en#8dabc347291409d5.

"Netscape and Cookies" internet postings to comp.infosystems.www.users discussion list re: Mosaic Netscape (Dec. 11, 1994–Dec. 13, 1994) available at: http://groups.google.com/group/comp.infosystems.www.users/browse_thread/thread/5347cb89bbae572b/3583cab5e6c13e94?lnk=st&rnum=3&hl=en#3583cab5e6c13e94.

"Cookies.txt" internet postings to comp.infosystems.www.users discussion list re: Mosaic Netscape (Dec. 23, 1994–Dec. 27, 1994) available at: http://groups.google.com/group/comp.infosystems.www.users/browse_thread/thread/613e81948e9cf6e4/134ade72dfc1c58d?lnk=st&rnum=2&hl=en#134ade72dfc1c58d.

"How to get statefull HTML documents" internet postings to comp.infosystems.www.misc discussion list (Jun. 24, 1994–Jun. 25, 1994) available at: http://groups.google.com/group/comp.infosystems.www.misc/browse_thread/thread/fd304fedb645529a/b8f6dab2aa73ae71?lnk=st&rnum=7&hl=en#b8f6dab2aa73ae71.

"How to add state info to a form" internet postings to comp.infosystems.www.providers discussion list (Jun. 30, 1994–Jul. 1, 1994) available at: http://groups.google.com/group/comp.infosystems.www.providers/browse_thread/thread/2acad6cdc8ebb8a/bf368e630add2c94?lnk=st&rnum=8&hl=en#bf368e630add2c94.

"Transactional Services on WWW" internet postings to comp.infosystems.www discussion list (May 12, 1994–Jun. 1, 1994) available at: http://groups.google.com/group/comp.infosystems.www/browse_thread/thread/bf430e6df8e6e7d/8ed77a97f5d0b9d6?lnk=st&hl=en#8ed77a97f5d0b9d6.

Dan Aronson, "access and session control" posting to www–talk discussion list (Sep. 14, 1994) available at: http://1997.webhistory.org/www.lists/www–talk.1994q3/0901.html.

Rick Troth, "access and session control" (Sep. 15, 1994) available at: http://1997.webhistory.org/www.lists/www–talk.1994q3/0923.html.

alain@hyperman.co.il, "Identifying Mosaic session" posting to www–talk discussion list (Dec. 20, 1994) available at http://1997.webhistory.org/www.lists/www–talk.1994q4/1098.html.

Joe English, "Re: Identifying Mosaic session", posting to www–talk discussion list (Dec. 20, 1994 available at: http://1997.webhistory.org/www.lists/www–talk.1994q4/1109.html.

Steven Majewski, "Identifying Mosaic session" posting to www–talk discussion list (Dec. 20, 1994) available at: http://1997.webhistory.org/www.lists/www–talk.1994q4/1111.html.

Nick Arnett, "Statelessness" posting to www–talk discussion list (May 16, 1994) available at: http://1997.webhistory.org/www.lists/www–talk.1994q2/0562.html.

Jared Rhine, "Statelessness" posting to www–talk discussion list (May 16, 1994) available at: http://1997.webhistory.org/www.lists/www–talk.1994q2/0563.html.

Simon Spero, "Statelessness" posting to www–talk discussion list (May 17, 1994) available at: http://1997.webhistory.org/www.lists/www–talk.1994q2/0579.html.

Jim McBeath, "Statelessness" posting to www–talk discussion list (May 27, 1994) available at: http://1997.webhistory.org/www.lists/www–talk.1994q2/0683.html.

Phillip Hallam–Baker, "Statelessness" posting to www–talk discussion list (May 30, 1994) available at: http://1997.webhistory.org/www.lists/www–talk.1994q2/0705.html.

Gifford, Stewart, Payne, Treese, "Payment Switches for Open Networks," presented at 40th IEEE, IEEE, COMP-CON '95, Mar. 5–9, 1995, San Francisco, CA.

Defendant Amazon.com Inc.'s Unopposed Motion for Leave to Amend its Answer to Include Allegations Regarding Stuff.com.

Declaration of James E. Geringer in Support of Amazon.com, Inc's Motion for Leave to Amend its Answer and Counterclaims to Add Stuff.com.

Exhibit 1 of Geringer Declaration: Excerpts of Deposition of Michael Kuniavsky.

Exhibit 2 of Geringer Declaration: E–mail from Brooks Cutter to Mike Kuniavsky (Jun. 14, 1994).

Exhibit 3 of Geringer Declaration: Excerpts of Deposition of Richard Boake.

Exhibit 5 of Geringer Declaration: Excerpts of Deposition of Andrew Payne.

Exhibit 6 of Geringer Declaration: E–mail from Andrew Payne to Winfield Treese, et al. (Jun. 15, 1994).

Exhibit 7 of Geringer Declaration: Excerpts of Deposition of Winfield Treese.

Exhibit 8 of Geringer Declaration: Amazon.com, Inc.'s [Proposed] fourth Amended Answer, Affirmative Defenses, and Counterclaims to Soverain Software, LLC's Complaint (Redlined Version).

Amazon.com's Motion for Partial Summary Judgment that '314 claims 34–39, '492 claims 17–18 and 35–36, and '780 claims 1, 4, and 22–24 are invalid under 35 U.S.C. 102.

Amazon.com's Motion for Partial Summary Judgment that claims are indefinite under 35 U.S.C. 112.

# US 5,715,314 C1

Page 6

Berners–Lee, T., et al., http://www.ietf.org/rfc/rfc1738.txt?numbers=1738.

Changes to wwwStat at http://ftp.ics.uci.edu/pub/websoft/wwwstat/Changes.

Berners–Lee, T., RFC 1630: Universal Resource Identifiers in WWW: A Unifying Syntax for the Expression of Names and Addresses of Objects on the Network as used in the World–Wide Web.

Berners–Lee, T., et al. RFC 1738: Uniform Resource Locators.

Fielding, R., RFC 1808: Relative Uniform Resource Locators.

Berners–Lee, T., et al. RFC 1945: Hypertext Transfer Protocol—HTTP/1.0.

Fielding, R., et al. RFC 2068: Hypertext Transfer Protocol—HTTP/1.1.

Fielding, R., et al. RFC 2616: Hypertext Transfer Protocol—HTTP1/1.

Berners–Lee, T. "draft–ietf–iiir–http–00.txt" (Nov. 5, 1993).

wwwStat Readme file at http://ftp.ics.uci.edu/pub/websoft/wwwstat/README.

NCSA HTTPd release notes at http://hoohoo.ncsa.uiuc.edu/docs/Upgrade.html (last updated Aug. 1, 1995).

Crocker, Glenn, "web2mush: Serving Interactive Resources to the Web," Electronic Proc. of the 2nd World Wide Web Conf. '94: Mosaic and the Web!, Developers Days, (Oct. 20, 1994).

Dukach, Seymon; Prototype Implementation of the SNPP Protocol; allspic.lcs.mit.edu; 1992.

Batelaan; Butler; Chan; Chen; Evenchick; Hughes; Jen; Jeng; Millett; Riccio; Skoudis; Starace; Stoddard; "An Internet Billing Server Prototype Design"; Carnegie Mellon.

O'Mahony, Donal, Michael Peirce, & Hitesh Tewari, Electronic Payment Systems, Artech House, Inc., pp. 145–155, Jan. 1997.

Maren, Michael, "The Age of E–Mail," Home Office Computing, vol. 11, No. 12, p. 63(5).

Foster, David & Stuart Finn, "Insurers Can Benefit From E–Mail Networks", National Underwriter Property & Casualty–Rick & Benefits Management, No. 9, p. 46(2), Mar. 4.

Ferrarini, E., "Flight of Fancy: Goodbye Travel Agent", Business Computer Systems, vol. 2, No. 11, pp. 39–40, Nov. 1993.

Trip et al., "Cookies" (client–side persistent information) and their use, Netscape Technical Note 20019, Netscape Communications Corp., Oct. 1995.

Archive of WWWorder mailing list (Jun. 18, 1994–Jun. 13, 1994).

Leggett, John et al., "Hyperform: Using Extensibility to Develop Dynamic, Open and Distributed Hypertext Systems" (1992).

Bieber, Michael, "Issues in Modeling a 'Dynamic' Hypertest Interface for Non–Hypertext Systems" (1991).

Nielson, Jacob, Hypertext & Hypermedia (1990).

"Announcing: Internet Shopkeeper" (Aug. 21, 1994) posting on comp.infosystems.www and misc.forsale.

Eaasy Sabre User's Guide and Eaasy Sabre Reference Guide.

Compuserve Manual (undated).

The Major BBS: Collection of information and Advertisements concerning The Major BBS (Fall 1993).

Fielding, Roy, et al., "Principled Design of the Modern Web Architecture" ACM Transactions on Internet Technology 2, 2 pp. 115–150 (May 2002).

Smithson, Brian, and Singer, Barbara, An Information Clearinghouse Server for Industry Consortia, 2nd Int'l Conf. On the World Wide Web, Chicago, Ill., Oct. 1994.

Soverain's ANSWER to Counterclaim (Amazon's Third Amended Counterclaim) by Soverain Software LLC.(Seraphine, Jennifer) (Entered: Mar. 17, 2005).

NOTICE by Amazon.com re: Answer to Amended Complaint, Counterclaim Of Rejection Of Claims 1–45 Of U.S. Patent No. 5,708,780 (Entered: Mar. 25, 2005).

MOTION to Stay [Renewed] by Amazon.com. (Entered: Apr. 5, 2005).

Soverain's Opposition to Amazon's Renewed Motion to Stay.

Amazon.Com, Inc.'s Reply in Support of Renewed Motion to Stay.

Deposition of Glenn Arthur Hauman with Exhibits (Oct. 28, 2004).

Deposition of Glenn Crocker with Exhibits (Mar. 10, 2005).

Deposition of Glenn M. Trewitt with Exhibits (Jan. 25, 2005).

Deposition of Guy Henry Timothy Haskin with Exhbits (Mar. 18, 2005).

Deposition of Joshua Smith with Exhibits (Mar. 2, 2005).

Deposition of Kevin Ming–Wei Kadaja Hughes with Exhibits (Mar. 21, 2005).

Deposition of Michael Kuniavsky with Exhibits (Feb. 22, 2005).

Deposition of Michael Lazzaro with Exhibits (Mar. 9, 2005).

Deposition of Phillip Hallam–Baker with Exhibits (Mar. 11, 2005).

Deposition of Robert Allen Olson with Exhibits (Mar. 3, 2005).

Deposition of Thomas Soulanille with Exhibits (Mar. 14, 2005).

Expert Report of Alexander B. Trevor (Apr. 10, 2005).

Reply to Response to Motion re: Motion to Stay [Renewed] (Surreply in Opposition to Amazon's Renewed Motion to Stay) filed by Soverain Software LLC.

"It will happen", article excerpt from infoHighway, vol. 2–1, Jan. 1995.

Aronson, Dan, et al., Electronic Mail to multiple recipients of the www–talk list (www–talk@info.cern.ch) on "Access and session control" dated Sep. 15, 1994.

Derler, Christian, "The World–Wide Web Gateway to Hyper–G: Using a Connectionless Protocol to Access Session–Oriented Services", Institut für Informationsverarbeilung and Computergestützte neue Medien, Graz, Austria, dated Mar. 1995.

English, Joe, Electronic Mail to multiple recipients of the www–talk list (www–talk@info.cern.ch) on "Re: Identifying Mosaic session" dated Dec. 20, 1994.

Fielding, Roy, software distribution archive for the HTTP log file analysis program, wwwstat v1.01, dated Apr. 24, 1994, published at http://www.ics.uci.edu/WebSoft/wwwstat/.

Hall, Devra, et al., "Build a Web Site: The Programmer's Guide to Creating, Building, and Maintaining a Web Presence", published Apr. 1995. ISBN 0–7615–0064–2.

Hughes, Kevin, source code file for the HTTP log file analysis program, getstats v1.0, dated Feb. 1, 1994, published at http://eit.com/software/getstats/getstats.html.—Version 1, 64 pages.

US 5,715,314 C1

Page 7

Hughes, Kevin, source code file for the HTTP log file analysis program, getstats v1.0, dated Feb. 1, 1994, published at http://eit.com/software/getstats/getstats.html—Version 2, 64 pages.

McCartney, Todd, Message posted to Usenet public discussion group, rec.arts.disney, dated Nov. 21, 1994.

Pitkow, et al., "Results from the First World Wide Web Use Survey", presented at the First International Conference on the World Wide Web, Geneva, Switzerland, May 25–27, 1994, published at http://www94.web.cern.ch/WWW94/PrelimProcs.html on Jun. 2, 1994, and reprinted in the Journal of Computer Networks and ISDN Systems, vol. 27, No. 2., Nov. 1994, Elsevier Science B.V.

The NetMarket Company, NetMarket PGP Help file, from http://www.netmarket.com, dated Dec. 10, 1994.

Trewitt, Glenn, "Using Tel to Proceess HTML Forms", Digital Equipment Corporation, Network Systems Laboratory TN–14, dated Mar. 1994.

"Advanced Electronic Credit Authorization Through the Amherst Group SNET", News Release, New Haven, CT, Dec. 7, 1987, 2 pages.

Anderson, Scot et al., "Sessioneer: Flexible Session Level Authentication With Off the Shelf Servers and Clients", http//:www.igd.fhg.de/archive/1995_www95/papers/77/sessioneer2.html, pp. 1–7.

Buhle, E. Loren Jr., "Wide Area Information Servers", Digital Systems Journal, Sep./Oct. 1994, pp. 13–16.

Comer, D., et al., "The Tilde File Naming Scheme", The 6th International Conference on Distributed Computing Systems, IEEE Computer Society, Cambridge, MA., May 1996, pp. 509–514.

Comer, D.E., et al., "A Model of Name Resolution in Distributed Systems", The 6th International Conference on Distributed Computer Systems, IEEE Computer Society,, Cambridge, MA, May 1996, pp. 523–530.

Computer Fraud & Security Bulletin, "Underlying Security Mechansms", Mar. 1997, 2 pages.

Cookies and Privacy FAQ, http://search.netscape.com/assist/security/faqs/cookies.html Jan. 9, 1998 at 4:29 pm., pp. 1–3.

Crocker, Glenn, "web2mush: Serving Interactive Resources to the Web", 2nd International Conference on the WorldWide Web, Chicago, Illinois , Oct. 1994, 7 pages.

Net Market Company, "Numerous News Media Stories", New York Times, Front Page of Business Section, Aug. 12, 1994, 4 pages.

Phillips, K., "SuperHighway Access Eases Internet Entry", PC Week, Oct. 31, 1994, 3 pages.

Poler, Ariel, "Improving WWW Marketing Through User Information and Non–Intrusive Communications", Internet Profiles Corporation (I/PRO), 2nd WWW Conference, Chicago, Illinois, Oct. 1994, 4 pages.

Soverain's Disclosure of Asserted Claims and Preliminary Infringement Contentions dated Jun. 3, 2004.

Supplemental Disclosure of Preliminary Invalidity Contentions by Amazon and the Gap dated Jul. 26, 2004.

Deposition of G. Winfield Treese, dated Oct. 27, 2004.

Soverain's Reply to Amazon.Com's Amended Counterclaims, dated Jan. 14, 2005.

Third Supplement to Defendant Amazon's Initial Disclosures, dated Mar. 4, 2005.

VideoTaped Deposition of Mark Levergood dated Mar. 8, 2005 (2 parts).

VideoTaped Deposition of Andrew Payne dated Mar. 11, 2005.

VideoTaped Deposition of Stephen Morris dated Mar. 9, 2005.

VideoTaped Deposition of Glenn Trewitt dated Jan. 25, 2005 (2 parts).

Soverain's Fourth Supplemental Responses to Amazon's First Set of Interrogatores (Nos. 1–14) dated Mar. 21, 2005.

Soverain's Responses to Interrogatory Nos. 22, 23, 26 and 36 of Amazon's Third Set of Interrogatores (Nos. 17–28) dated Mar. 21, 2005.

Soverain's Responses to Amazon's First Set of Requests for Admission to Plaintiff Soverain Software (Nos. 1–100) dated Mar. 21, 2005.

Memorandum Opinion dated Apr. 7, 2005.

Soverain's Reply to Amazon's Third Amended Counterclaims, dated Mar. 17, 2005.

Amazon.com's Renewed Motion to Stay Proceedings Until the Patent and Trademark Office Completes Re–Examination of the Three Patents in Suit, dated Apr. 5, 2005.

NCSA "What's New"http://archive.ncsa.uiuc.edu/SDG/Software/Mosaic/Docs/old–whats–new/whats–new–0294.html, Feb. 28, 1994, 17 pages.

Business Wire, CommerceNet Urges Government to Ease Export Restrictions on Encryption Products; Consortium's New White Paper Articulates Position on the Export of Cryptography–Based Products, Jun. 26, 1995, 2 pages.

Motoda, Toshihiro et al., An Experimental Verification of Relational Database Access Over WWW, NTT Software Laboratories, Nippon Telegraph and Telephone Corporation, 1995, pp. 47–54 (with English Translation—8 pages).

Ohmori et al., "An On–line Shopping System Protecting User's Privacy", Information Communication Laboratory of Matsushita Electric Industrial Co., Ltd. , pp. 25–32. Note: 12 Pages of Translation Attached.

Bina et al., "Secure Access to Data Over the Internet", Natl. Center for Supercomputing Appls., Unv. Of Illinois, Champaign, Illinois, pp. 99–102.

Farber, David, "Interesting–People Message—RSA/NCSA/EIT Announcement on Secure Mosiac" Palo Alto, California, Apr. 12, 1994, 4 pages.

Kent, Stephen T., "Internet Privacy Enhanced Mail", 8070 Communications of the ACM 36, New York, Aug. 1993, pp. 48–60.

Kohn, Dan, "Prior Art on Open Market Patents", e–mail message dated Mar. 9, 1998, 1 page.

Lewis, Peter H., "Attention Shoppers: Internet is Open", 2 pages.

Medvinsky et al., NetCash: A Design for Practical Elecronic Currency on the Internet, Information Sciences Institute, University of Southern California, 1993, pp. 102–106.

Schaefer et al., "Networked Information Discovery and Retrieval Tools: Security Capabilities and Needs", The MITRE Corporation, 1994, pp. 145–153.

European Search Report dated Jun. 19, 2006.

Soverain Software LLC v. Amazon.Com, Inc. and The Gap, Inc., Form of Stipulated Request for Final Dismissals of the Actions, filed Aug. 30, 2005.

Soverain Software LLC v. Amazon.Com, Inc. and The Gap, Inc., Order of Dismissal with Prejudice filed Aug. 31, 2005.

* cited by examiner

US 5,715,314 C1

1

# EX PARTE
# REEXAMINATION CERTIFICATE
# ISSUED UNDER 35 U.S.C. 307

THE PATENT IS HEREBY AMENDED AS
INDICATED BELOW.

**Matter enclosed in heavy brackets [ ] appeared in the
patent, but has been deleted and is no longer a part of the
patent; matter printed in italics indicates additions made
to the patent.**

AS A RESULT OF REEXAMINATION, IT HAS BEEN
DETERMINED THAT:

The patentability of claims 1–48 is confirmed.

New claims 49–168 are added and determined to be
patentable.

*49. A network-based sales system in accordance with
claim 34, wherein the buyer computer activates the payment
message by transmitting a message to the shopping cart
computer that causes the payment message to be activated.*

*50. A network-based sales system in accordance with
claim 34, wherein the network is a public packet switched
network.*

*51. A network-based sales system in accordance with
claim 34, wherein the network is an Internet.*

*52. A network-based sales system in accordance with
claim 34, further comprising:*

*a merchant computer that is interconnected with the buyer
computer and shopping cart computer by the computer
network; and*

*an advertising document database;*

*wherein the merchant computer is programmed to fetch
an advertising document from the advertising docu-
ment database.*

*53. A network-based sales system in accordance with
claim 52, wherein the merchant computer is programmed to
send one or more advertising documents to the buyer
computer.*

*54. A network-based sales system in accordance with
claim 53, wherein the merchant computer is programmed to
provide a product requested by the user.*

*55. A network-based sales system in accordance with
claim 54, wherein the merchant computer is programmed to
respond to payment orders from the buyer computer without
the merchant computer having to communicate directly with
the shopping cart computer to ensure that the user is
authorized to purchase the product;*

*wherein the merchant computer is programmed to
respond to payment orders from the buyer computer
without the merchant computer having to store infor-
mation in a database regarding which buyers are
authorized to purchase which products.*

*56. A network-based sales system in accordance with
claim 53, wherein the advertisement documents are in the
form of summaries of newspaper or newsletter articles;*

*wherein prior to a user's product request, the merchant
computer sends an advertising document to the buyer
computer.*

*57. A network-based sales system in accordance with
claim 34, wherein the buyer computer transmits an initial
link that comprises information from which the shopping
cart computer can create a session link message;*

2

*wherein the session link is transmitted from the shopping
cart computer to the buyer computer;*

*wherein the session link message includes a session link
authenticator for use by a computer to authenticate the
session link message.*

*58. A network-based sales system in accordance with
claim 57, wherein the session link authenticator is a cryp-
tographic function of the session link contents.*

*59. A network-based sales system in accordance with
claim 58, wherein the buyer computer is programmed to
cause the session link message to be sent to a computer in
the network which is programmed to authenticate the ses-
sion link message by examining the session link authenti-
cator and which is programmed to respond to the session
link message based on state of the interaction between the
buyer computer and the shopping cart computer.*

*60. A network-based sales system in accordance with
claim 34, wherein at least one of the requests comprises a
shopping cart URL.*

*61. A network-based sales system in accordance with
claim 60, wherein the shopping cart URL comprises a
domain identifier.*

*62. A network-based sales system in accordance with
claim 60, wherein the shopping cart URL comprises a
merchant identifier.*

*63. A network-based sales system in accordance with
claim 60, wherein the shopping cart URL comprises a
merchant account identifier.*

*64. A network-based sales system in accordance with
claim 60, wherein the shopping cart URL comprises a
payment amount.*

*65. A network-based sales system in accordance with
claim 60, wherein the shopping cart URL comprises a
product identifier.*

*66. A network-based sales system in accordance with
claim 60, wherein the shopping cart URL comprises a
duration time.*

*67. A network-based sales system in accordance with
claim 60, wherein the shopping cart URL comprises an
expiration time.*

*68. A network-based sales system in accordance with
claim 67, wherein the shopping cart computer transmits a
document to the buyer computer indicating that the expira-
tion time has passed.*

*69. A network-based sales system in accordance with
claim 60, wherein the URL comprises a buyer network
address.*

*70. A network-based sales system in accordance with
claim 69, wherein the buyer computer network address is
verified by matching it with a network address specified in
the shopping cart URL.*

*71. A network-based sales system in accordance with
claim 70, wherein if the computer network address verifi-
cation fails, then the shopping cart computer sends a docu-
ment to the buyer computer indicating that access is not
allowed.*

*72. A network-based sales system in accordance with
claim 60, wherein the shopping cart URL comprises an
authenticator based on a cryptographic key;*

*wherein the authenticator is a function of the contents of the
shopping cart URL;*

*wherein the shopping cart computer verifies whether the
shopping cart URL authenticator was created from the
contents of the shopping cart URL using a crypto-
graphic key.*

*73. A network-based sales system in accordance with
claim 72, wherein if the verification fails, the shopping cart*

US 5,715,314 C1

3

computer transmits a document to the buyer computer indicating that access is denied.

74. A network-based sales system in accordance with claim 34, wherein the buyer computer activates the payment message by transmitting a message to the shopping cart computer that causes the payment message to be activated;

wherein the shopping cart computer transmits a payment confirmation document to the buyer computer.

75. A network-based sales system in accordance with claim 74, wherein the payment confirmation document includes an open link and a continue link.

76. A network-based sales system in accordance with claim 75, wherein the shopping cart computer opens a new account in response to the user selecting the open link.

77. A network-based sales system in accordance with claim 76, wherein the buyer computer sends a payment URL to the shopping cart computer that indicates that an account does not yet exist.

78. A network-based sales system in accordance with claim 77, wherein the shopping cart computer creates a new account document.

79. A network-based sales system in accordance with claim 78, wherein the shopping cart computer transmits the new account document to the buyer computer.

80. A network-based sales system in accordance with claim 79, wherein the new account document comprises a challenge form that requests account information to be entered by the user.

81. A network-based sales system in accordance with claim 80, wherein the account information comprises a new account name and account password.

82. A network-based sales system in accordance with claim 80, wherein the account information comprises: a new account name, an account password, a credit card number, and an expiration date of the credit card.

83. A network-based sales system in accordance with claim 80, wherein the account information comprises security information.

84. A network-based sales system in accordance with claim 34, wherein the shopping cart computer, in response to the plurality of shopping cart messages, causes an account name and password request message to be transmitted to the buyer computer.

85. A network-based sales system in accordance with claim 34, further comprising:

a merchant computer that is interconnected with the buyer and shopping cart computers by the computer network; and

an advertising document database;

wherein the merchant computer is programmed to fetch an advertising document from the advertising document database;

wherein the advertising document database is local to the merchant computer.

86. A network-based sales system in accordance with claim 85, wherein a creation computer updates the remote advertising document database on the merchant computer.

87. A network-based sales system in accordance with claim 85, wherein the buyer computer transmits a purchase product message to the merchant computer, and, in response, the merchant computer provides a payment URL to the buyer computer.

88. A network-based sales system in accordance with claim 87, wherein the buyer computer transmits the payment URL to a payment computer.

89. A network-based sales system in accordance with claim 88, wherein the payment computer is the shopping cart computer.

4

90. A network-based sales system in accordance with claim 88, wherein the payment URL comprises an authenticator based on a cryptographic key;

wherein the authenticator is a function of contents of the payment URL.

91. A network-based sales system in accordance with claim 90, wherein the payment computer verifies whether the payment URL authenticator was created from the contents of the payment URL using a cryptographic key;

if the verification fails, the payment computer transmits a document to the buyer computer indicating that access is denied.

92. A network-based sales system in accordance with claim 88, wherein the payment URL further comprises an expiration time.

93. A network-based sales system in accordance with claim 92, wherein the payment computer transmits a document to the buyer computer indicating that the expiration time has passed.

94. A network-based sales system in accordance with claim 88, wherein the payment URL comprises a buyer network address.

95. A network-based sales system in accordance with claim 94, wherein the buyer computer network address is verified by matching it with the network address specified in the payment URL;

if the verification fails, then the shopping cart computer sends a document to the buyer computer indicating that access is not allowed.

96. A network-based sales system in accordance with claim 88, wherein the payment computer transmits a payment confirmation document to the buyer computer;

wherein the payment confirmation document includes an open link and a continue link;

wherein in response to the user selecting the continue link, the payment computer instructs the buyer computer to provide an account name and password that have previously been provided by the buyer computer to the payment computer.

97. A network-based sales system in accordance with claim 96, wherein the buyer computer prompts the user for the account name and password by creating an account name prompt and a password prompt.

98. A network-based sales system in accordance with claim 97, wherein the payment computer verifies that the account name and password entered by the user match a previously provided account name and password.

99. A network-based sales system in accordance with claim 98, wherein if the verification fails, then the payment computer sends a document to the buyer computer indicating that access is not allowed.

100. A network-based sales system in accordance with claim 98, wherein if a payment amount exceeds a threshold, then the user is prompted for security information;

wherein the payment computer verifies that the security information matches a previously provided account name and password;

if the verification fails, then the payment computer sends a document to the buyer computer indicating that access is not allowed.

101. A network-based sales system in accordance with claim 98, further comprising a settlement database that is in communication with the payment computer;

wherein the settlement database is used to determine whether the user has unexpired access to a domain identified in the payment message;

US 5,715,314 C1

| 5 | 6 |

*wherein the user is presented with an option to repurchase or to use the unexpired access.*

*102. A network-based sales system in accordance with claim 101, wherein the purchase of a product in a certain domain by a user account entitles access to other products in the domain for free or at a reduced price.*

*103. A network-based sales system in accordance with claim 98, wherein the payment computer verifies whether the user account has sufficient funds or credit that satisfies a payment amount specified in the payment message,*

*if the verification fails, then the payment computer sends a document to the buyer computer indicating that the user has insufficient funds.*

*104. A network-based sales system in accordance with claim 98, wherein the payment computer records an end of duration time in a settlement database.*

*105. A network-based sales system in accordance with claim 98, wherein the payment computer creates an access URL including an access URL authenticator that is a digital signature generated based on a cryptographic key;*

*wherein the access URL authenticator is a hash of other information in the access URL;*

*wherein the payment computer sends a redirect to the access URL to the buyer computer;*

*wherein the buyer computer sends the access URL to a merchant computer.*

*106. A network-based sales system in accordance with claim 105, wherein the merchant computer verifies whether the access URL authenticator was created from said other information in the access URL using the cryptographic key;*

*if the verification fails, then the merchant computer sends a document to the buyer computer indicating that access is not allowed.*

*107. A network-based sales system in accordance with claim 105, wherein the merchant computer verifies whether a duration time for access has expired;*

*if the verification fails, then the merchant computer sends a document to the buyer computer indicating that the duration time has expired.*

*108. A network-based sales system in accordance with claim 105, wherein the merchant computer verifies that a buyer computer network address is the same as a buyer network address contained in the access URL;*

*if the verification fails, then the merchant computer sends a document to the buyer computer indicating that access is not allowed.*

*109. The method of claim 39, wherein the buyer computer activates the payment message by transmitting a message to the shopping cart computer that causes the payment message to be activated.*

*110. The method of claim 39, wherein the network is a public packet switched network.*

*111. The method of claim 39, wherein the network is an Internet.*

*112. The method of claim 39, wherein a merchant computer is interconnected with the buyer computer and shopping cart computer by the computer network;*

*wherein the merchant computer is programmed to fetch an advertising document from an advertising document database.*

*113. The method of claim 112, wherein the merchant computer is programmed to send one or more advertising documents to the buyer computer.*

*114. The method of claim 113, wherein the merchant computer is programmed to provide a product requested by the user.*

*115. The method of claim 114, wherein the merchant computer is programmed to respond to payment orders from the buyer computer without the merchant computer having to communicate directly with the shopping cart computer to ensure that the user is authorized to purchase the product;*

*wherein the merchant computer is programmed to respond to payment orders from the buyer computer without the merchant computer having to store information in a database regarding which buyers are authorized to purchase which products.*

*116. The method of claim 113, wherein the advertisement documents are in the form of summaries of newspaper or newsletter articles;*

*wherein prior to a user's product request, the merchant computer sends an advertising document to the buyer computer.*

*117. The method of claim 39, wherein the buyer computer transmits an initial link that comprises information from which the shopping cart computer can create a session link message;*

*wherein the session link is transmitted from the shopping cart computer to the buyer computer;*

*wherein the session link message includes a session link authenticator for use by a computer to authenticate the session link message.*

*118. The method of claim 117, wherein the session link authenticator is a cryptographic function of the session link contents.*

*119. The method of claim 118, wherein the buyer computer is programmed to cause the session link message to be sent to a computer in the network which is programmed to authenticate the session link message by examining the session link authenticator and which is programmed to respond to the session link message based on state of the interaction between the buyer computer and the shopping cart computer.*

*120. The method of claim 39, wherein at least one of the requests comprises a shopping cart URL.*

*121. The method of claim 120, wherein the shopping cart URL comprises a domain identifier.*

*122. The method of claim 120, wherein the shopping cart URL comprises a merchant identifier.*

*123. The method of claim 120, wherein the shopping cart URL comprises a merchant account identifier.*

*124. The method of claim 120, wherein the shopping cart URL comprises a payment amount.*

*125. The method of claim 120, wherein the shopping cart URL comprises a product identifier.*

*126. The method of claim 120, wherein the shopping cart URL comprises a duration time.*

*127. The method of claim 120, wherein the shopping cart URL comprises an expiration time.*

*128. The method of claim 127, wherein the shopping cart computer transmits a document to the buyer computer indicating that the expiration time has passed.*

*129. The method of claim 120, wherein the URL comprises a buyer network address.*

*130. The method of claim 129, wherein the buyer computer network address is verified by matching it with a network address specified in the shopping cart URL.*

*131. The method of claim 130, wherein if the computer network address verification fails, then the shopping cart computer sends a document to the buyer computer indicating that access is not allowed.*

*132. The method of claim 120, wherein the shopping cart URL comprises an authenticator based on a cryptographic key;*

US 5,715,314 C1

7

wherein the authenticator is a function of contents of the
shopping cart URL;

wherein the shopping cart computer verifies whether the
shopping cart URL authenticator was created from the
contents of the shopping cart URL using a crypto-
graphic key.

133. The method of claim 132, wherein if the verification
fails, the shopping cart computer transmits a document to
the buyer computer indicating that access is denied.

134. The method of claim 39, wherein the buyer computer
activates the payment message by transmitting a message to
the shopping cart computer that causes the payment mes-
sage to be activated;

wherein the shopping cart computer transmits a payment
confirmation document to the buyer computer.

135. The method of claim 134, wherein the payment
confirmation document includes an open link and a continue
link.

136. The method of claim 135, wherein the shopping cart
computer opens a new account in response to the user
selecting the open link.

137. The method of claim 136, wherein the buyer com-
puter sends a payment URL to the shopping cart computer
that indicates that an account does not yet exist.

138. The method of claim 137, wherein the shopping cart
computer creates a new account document.

139. The method of claim 138, wherein the shopping cart
computer transmits the new account document to the buyer
computer.

140. The method of claim 139, wherein the new account
document comprises a challenge form that requests account
information to be entered by the user.

141. The method of claim 140, wherein the account
information comprises a new account name and account
password.

142. The method of claim 140, wherein the account
information comprises: a new account name, an account
password, a credit card number, and an expiration date of
the credit card.

143. The method of claim 140, wherein the account
information comprises security information.

144. The method of claim 39, wherein the shopping cart
computer, in response to the plurality of shopping cart
messages, causes an account name and password request
message to be transmitted to the buyer computer.

145. The method of claim 39, wherein a merchant com-
puter is interconnected with the buyer and shopping cart
computers by the computer network;

wherein the merchant computer is programmed to fetch
an advertising document from an advertising document
database;

wherein the advertising document database is local to the
merchant computer.

146. The method of claim 145, wherein a creation com-
puter updates the remote advertising document database on
the merchant computer.

147. The method of claim 145, wherein the buyer com-
puter transmits a purchase product message to the merchant
computer, and, in response, the merchant computer provides
a payment URL to the buyer computer.

148. The method of claim 147, wherein the buyer com-
puter transmits the payment URL to a payment computer.

149. The method of claim 148, wherein the payment
computer is the shopping cart computer.

150. The method of claim 148, wherein the payment URL
comprises an authenticator based on a cryptographic key;

wherein the authenticator is a function of contents of the
payment URL.

8

151. The method of claim 150, wherein the payment
computer verifies whether the payment URL authenticator
was created from the contents of the payment URL using a
cryptographic key;

if the verification fails, the payment computer transmits a
document to the buyer computer indicating that access
is denied.

152. The method of claim 148, wherein the payment URL
further comprises an expiration time.

153. The method of claim 152, wherein the payment
computer transmits a document to the buyer computer
indicating that the expiration time has passed.

154. The method of claim 148, wherein the payment URL
comprises a buyer network address.

155. The method of claim 154, wherein the buyer com-
puter network address is verified by matching it with the
network address specified in the payment URL;

if the verification fails, then the shopping cart computer
sends a document to the buyer computer indicating that
access is not allowed.

156. The method of claim 148, wherein the payment
computer transmits a payment confirmation document to the
buyer computer;

wherein the payment confirmation document includes an
open link and a continue link;

wherein in response to the user selecting the continue link,
the payment computer instructs the buyer computer to
provide an account name and password that have
previously been provided by the buyer computer to the
payment computer.

157. The method of claim 156, wherein the buyer com-
puter prompts the user for the account name and password
by creating an account name prompt and a password
prompt.

158. The method of claim 157, wherein the payment
computer verifies that the account name and password
entered by the user match a previously provided account
name and password.

159. The method of claim 158, wherein if the verification
fails, then the payment computer sends a document to the
buyer computer indicating that access is not allowed.

160. The method of claim 158, wherein if a payment
amount exceeds a threshold, then the user is prompted for
security information;

wherein the payment computer verifies that the security
information matches a previously transmitted account
name and password;

if the verification fails, then the payment computer sends
a document to the buyer computer indicating that
access is not allowed.

161. The method of claim 158, wherein a settlement
database is used to determine whether the user has unex-
pired access to a domain identified in the payment message;

wherein the user is presented with an option to repurchase
or to use the unexpired access.

162. The method of claim 161, wherein the purchase of a
product in a certain domain by a user account entitles
access to other products in the domain for free or at a
reduced price.

163. The method of claim 158, wherein the payment
computer verifies whether the user account has sufficient
funds or credit that satisfies a payment amount specified in
the payment message,

if the verification fails, then the payment computer sends
a document to the buyer computer indicating that the
user has insufficient funds.

US 5,715,314 C1

<table>
<tr><td>9</td><td>10</td></tr>
</table>

164. The method of claim 158, wherein the payment computer records an end of duration time in a settlement database.

165. The method of claim 158, wherein the payment computer creates an access URL including an access URL authenticator that is a digital signature generated based on a cryptographic key;

wherein the access URL authenticator is a hash of other information in the access URL;

wherein the payment computer sends a redirect to the access URL to the buyer computer;

wherein the buyer computer sends the access URL to a merchant computer.

166. The method of claim 165, wherein the merchant computer verifies whether the access URL authenticator was created from said other information in the access URL using the cryptographic key;

if the verification fails, then the merchant computer sends a document to the buyer computer indicating that access is not allowed.

167. The method of claim 165, wherein the merchant computer verifies whether a duration time for access has expired;

if the verification fails, then the merchant computer sends a document to the buyer computer indicating that the duration time has expired.

168. The method of claim 165, wherein the merchant computer verifies that a buyer computer network address is the same as a buyer network address contained in the access URL;

if the verification fails, then the merchant computer sends a document to the buyer computer indicating that access is not allowed.

*  *  *  *  *



US005909492A

# United States Patent [19]

## Payne et al.

| [11] | Patent Number: | 5,909,492 |
|---|---|---|
| [45] | Date of Patent: | Jun. 1, 1999 |

[54] **NETWORK SALES SYSTEM**

[75] Inventors: **Andrew C. Payne**, Lincoln; **Lawrence C. Stewart**, Burlington, both of Mass.; **David J. Mackie**, Brookdale, Calif.

[73] Assignee: **Open Market, Incorporated**, Cambridge, Mass.

[21] Appl. No.: **08/878,396**

[22] Filed: **Jun. 18, 1997**

**Related U.S. Application Data**

[63] Continuation of application No. 08/328,133, Oct. 24, 1994, Pat. No. 5,715,314.

[51] Int. Cl.$^6$ ........................................ **H04L 9/00**
[52] U.S. Cl. .............................. **380/24; 380/23; 380/25; 380/49; 380/50; 705/26; 705/27; 705/39; 705/40; 705/44**
[58] Field of Search ............................... 380/4, 9, 21, 23, 380/24, 25, 49, 50; 235/379, 380; 705/26, 27, 39, 40, 41, 42, 43, 44, 14, 16

[56] **References Cited**

**U.S. PATENT DOCUMENTS**

| 4,305,059 | 12/1981 | Benton . |
|---|---|---|
| 4,528,643 | 7/1985 | Freeny, Jr. . |
| 4,529,870 | 7/1985 | Chaum ................... 235/380 |
| 4,578,530 | 3/1986 | Zeidler . |
| 4,734,858 | 3/1988 | Schlafly . |
| 4,755,940 | 7/1988 | Brachtl et al. . |
| 4,759,063 | 7/1988 | Chaum ................... 380/30 |
| 4,759,064 | 7/1988 | Chaum ................... 380/30 |
| 4,775,935 | 10/1988 | Yourick . |
| 4,795,890 | 1/1989 | Goldman ................... 235/380 |
| 4,799,156 | 1/1989 | Shavit et al. . |
| 4,812,628 | 3/1989 | Boston et al. ................... 235/380 |
| 4,827,508 | 5/1989 | Shear ................... 380/4 |
| 4,891,503 | 1/1990 | Jewel ................... 235/380 |
| 4,922,521 | 5/1990 | Krikke et al. . |
| 4,926,480 | 5/1990 | Chaum ................... 380/23 |
| 4,935,870 | 6/1990 | Burk, Jr. et al. . |
| 4,947,028 | 8/1990 | Gorog . |
| 4,947,430 | 8/1990 | Chaum ................... 380/25 |

| 4,949,380 | 8/1990 | Chaum ................... 380/30 |
|---|---|---|
| 4,972,318 | 11/1990 | Brown et al. ................... 705/26 |
| 4,977,595 | 12/1990 | Ohta et al. ................... 380/24 |
| 4,982,346 | 1/1991 | Girouard et al. . |
| 4,987,593 | 1/1991 | Chaum ................... 380/3 |
| 4,991,210 | 2/1991 | Chaum ................... 380/30 |
| 4,992,940 | 2/1991 | Dworkin . |

(List continued on next page.)

**FOREIGN PATENT DOCUMENTS**

| 0 172 670 | 2/1986 | European Pat. Off. ........ G07F 7/00 |
|---|---|---|
| 0-542-298-A2 | 5/1993 | European Pat. Off. . |
| 4-10191 | 1/1992 | Japan ................... 705/26 |
| 2102606 | 2/1983 | United Kingdom . |
| WO 91/16691 | 10/1991 | WIPO . |
| WO 93/10503 | 5/1993 | WIPO ................... G06F 15/30 |

**OTHER PUBLICATIONS**

Contents of "Welcome first–time visitors" at www.amazon-.com on the Internet as of Jun. 29, 1998.

*Primary Examiner*—Bernarr E. Gregory
*Attorney, Agent, or Firm*—Fish & Richardson P.C.

[57] **ABSTRACT**

A network-based sales system includes at least one buyer computer for operation by a user desiring to buy a product, at least one merchant computer, and at least one payment computer. The buyer computer, the merchant computer, and the payment computer are interconnected by a computer network. The buyer computer is programmed to receive a user request for purchasing a product, and to cause a payment message to be sent to the payment computer that comprises a product identifier identifying the product. The payment computer is programmed to receive the payment message, to cause an access message to be created that comprises the product identifier and an access message authenticator based on a cryptographic key, and to cause the access message to be sent to the merchant computer. The merchant computer is programmed to receive the access message, to verify the access message authenticator to ensure that the access message authenticator was created using the cryptographic key, and to cause the product to be sent to the user desiring to buy the product.

**38 Claims, 25 Drawing Sheets**



**5,909,492**
Page 2

## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,996,711 | 2/1991 | Chaum | 380/30 |
| 5,025,373 | 6/1991 | Keyser, Jr. et al. . | |
| 5,060,153 | 10/1991 | Nakagawa . | |
| 5,077,607 | 12/1991 | Johnson et al. . | |
| 5,105,184 | 4/1992 | Pirani et al. . | |
| 5,220,501 | 6/1993 | Lawlor et al. . | |
| 5,247,575 | 9/1993 | Sprague et al. | 380/9 |
| 5,276,736 | 1/1994 | Chaum | 380/24 |
| 5,305,195 | 4/1994 | Murphy . | |
| 5,311,594 | 5/1994 | Penzias | 380/24 |
| 5,319,542 | 6/1994 | King, Jr. et al. | 705/27 |
| 5,321,751 | 6/1994 | Ray et al. | 380/24 |
| 5,336,870 | 8/1994 | Hughes | 235/379 |
| 5,341,429 | 8/1994 | Stringer et al. | 380/23 |
| 5,347,632 | 9/1994 | Filepp et al. . | |
| 5,351,186 | 9/1994 | Bullock et al. . | |
| 5,351,293 | 9/1994 | Michener et al. | 380/21 |
| 5,383,113 | 1/1995 | Kight et al. . | |
| 5,414,833 | 5/1995 | Hershey et al. . | |
| 5,521,631 | 5/1996 | Budow et al. . | |
| 5,535,229 | 7/1996 | Hain, Jr. et al. . | |
| 5,557,516 | 9/1996 | Hogan | 364/406 |
| 5,557,518 | 9/1996 | Rosen | 380/24 |
| 5,557,798 | 9/1996 | Skeen et al. . | |
| 5,590,197 | 12/1996 | Chen et al. | 380/24 |
| 5,592,378 | 1/1997 | Cameron et al. | 705/27 |
| 5,594,910 | 1/1997 | Filepp et al. . | |
| 5,596,642 | 1/1997 | Davis et al. | 380/24 |
| 5,596,643 | 1/1997 | Davis et al. | 380/24 |
| 5,604,802 | 2/1997 | Holloway | 380/24 |
| 5,621,797 | 4/1997 | Rosen | 380/24 |
| 5,623,547 | 4/1997 | Jones et al. | 380/24 |
| 5,642,419 | 6/1997 | Rosen | 380/24 |
| 5,694,551 | 12/1997 | Doyle et al. | 705/26 |
| 5,715,314 | 2/1998 | Payne et al. | 380/24 |
| 5,724,424 | 3/1998 | Gifford | 380/24 |



FIG. 1



buyer computer **12**        merchant computer **14**        payment computer **16**

24

| user requests advertisements |

26

| buyer computer sends advertising document URL to merchant computer |

28

| merchants computer fetches advertising document from advertising document data base |

30

| merchant computer sends advertising document to buyer computer |

32

| user requests a product |

34

| buyer computer sends payment URL A to payment computer; payment URL A includes product identifier, domain identifier, payment amount, merchant computer identifier, merchant account identifier, duration time, expiration time, payment URL authenticator, and a buyer network address |

36

| payment computer verifies whether payment URL authenticator was created from contents of payment URL A using cryptographic key |

38

End ←

| payment computer sends document to buyer computer indicating that access the to the network sales system is denied. |

*OR*

**FIG. 2A**

40



**FIG. 2B**



buyer computer 12
merchant computer 14
payment computer 16
42
44
payment computer sends payment confirmation document to buyer computer; payment confirmation document includes open link (URL C) and continue link (URL B)
58
OR
46
user opens new account
60
User continues with payment (user already has an account)
62
buyer computer sends payment URL B to payment computer; payment URL B is similar to payment URL A but also indicates that an account does exist
buyer computer sends payment URL C to payment computer: payment URL C is similar to payment URL A but also indicates that an account does not yet exist
48
50
payment computer creates new account document
52
payment computer sends new account document to buyer computer
54
64

FIG. 2C



buyer computer 12
merchant computer 14
payment computer 16
44
52
62
54
user enters new account name, account password credit card number, security information and expiration date of credit card and presses a "submit" button
56
buyer computer sends new account information to payment computer
58
payment computer enters new account
64
payment computer creates account name and password request message
66
payment computer sends account name and password request message to buyer computer
68
user enters account name and password
70
buyer computer sends account name and password to payment computer
72
payment computer verifies whether user name and password are correct
payment computer sends document to buyer computer indicating that access to the networks sales system is denied
End
OR
73

FIG. 2D

buyer computer 12
merchant computer 14
payment computer 16
72
73
payment computer determines whether additional security is warranted, based on, e.g. whether the payment amount exceeds a threshold
OR
77
75
user enters security information
if additional security is warranted, payment computer creates a challenge form document and sends it to buyer computer
buyer computer sends security information to payment computer
79
81
payment computer determines whether security information is correct
83
payment computer sends document to buyer computer indicating that access to the network sales system is denied
End
OR
82
82

FIG. 2E



buyer computer 12      merchant computer 14      payment computer 16

73 OR 81

payment computer checks
settlement database to
determine if user has
unexpired access to the
domain identifier contained in
the payment URL

82

84

OR

payment computer sends to buyer
computer option to repurchase, or to
use previously purchased access

86

buyer selects to
repurchase item

OR

87

buyer selects previously
purchased access

85

payment computer calculates an
actual payment amount that may
differ from the payment amount
contained in the payment URL

92          76          76

**FIG. 2F**



buyer computer **12**        merchant computer **14**        payment computer **16**

82,87

76 — payment computer
verifies whether user
account has sufficient
funds or credit

78 —
payment computer sends document to
buyer computer indicating that user
account does not have sufficient funds

End ◄—

OR

80 —
payment computer creates
access URL which includes
merchant computer identifier.
domain identifier, product
identifier. end of duration
time, buyer network address,
and access URL authenticator

88 —
payment computer records product identifier , domain,
user account, merchant account, end of duration time,
and actual payment amount in settlement database

90 —
payment computer sends redirect to
access URL to buyer computer

85

92        92

**FIG. 2G**



**FIG. 2H**

buyer computer 12        merchant computer 14        payment computer 16

buyer computer sends access URL to merchant computer

merchant computer verifies whether access URL authenticator was created from contents of access URL using a cryptographic key

merchant computer sends document to buyer computer indicating that access to the product is denied

merchant computer verifies whether the duration time has expired

merchant computer sends document to buyer computer indicating that the duration time has expired



FIG. 2I



buyer computer 12          merchant computer 14          payment computer 16

From 32

108

buyer computer sends shopping cart URL to payment computer; shopping cart URL includes product identifier, domain identifier, payment amount, merchant computer identifier, merchant account identifier, duration time, expiration time, and shopping cart URL authenticator

110

payment computer verifies whether shopping cart URL authenticator was created from contents contents of shopping cart URL using a cryptographic key

OR

112

payment computer sends document to buyer computer indicating that access to network sales system is denied

113

payment computer and buyer computer perform steps analogous to steps 40-81

114

End

FIG. 3A



buyer computer 12
merchant computer 14
payment computer 16
113
24
payment computer creates or updates payment URL for shopping cart
114
OR
OR
124
user requests display of shopping cart
user requests purchase of contents of shopping cart
116
118
buyer computer sends fetch shopping cart request to payment computer
126
buyer computer causes payment URL for shopping cart to be activated
to step 36
119
payment computer and buyer computer perform steps analogous to steps 64-81
120
122
buyer computer displays shopping cart
payment computer returns contents of shopping cart to buyer computer

FIG. 3B



buyer computer 12
merchant computer 14
payment computer 16
128
user requests smart statement
130
buyer computer sends smart statement URL to payment computer
132
payment computer verifies whether smart statement URL authenticator was created from contents of smart statement URL using cryptographic key
OR
134
payment computer sends document to buyer computer indicating that access is denied
End
136
payment computer checks to determine whether buyer network address in smart statement URL matches buyer's computer network address
End
OR
138
payment computer sends document indicating that access is denied
140
payment computer and buyer computer perform steps analogous to steps 64-81
142

FIG. 4A



buyer computer 12
merchant computer 14
payment computer 16
140
164,170
142
payment computer retrieves settlement data from settlement database and creates smart statement document for buyer and sends smart statement document to buyer computer
144
buyer computer displays received document
OR
OR
146
User requests payment details for a particular transaction
150
148
buyer computer sends payment detail URL to payment computer
payment computer and buyer computer perform steps analogous to steps 132-140
152
payment computer retrieves from settlement database data corresponding to the payment transaction specified in the payment detail URL, creates detail document, and sends it to buyer computer
154, 166

FIG. 4B



buyer computer 12
merchant computer 14
payment computer 16
144
144
144
154
user requests customer service
buyer computer sends customer service URL to payment computer
156
158
payment computer creates customer service form and sends it to buyer computer
160
user types comments
buyer computer sends user's comments to payment computer
162
payment computer posts user comments and sends thank you document to buyer computer
164
166
user requests display of a product
168
buyer computer sends access URL to merchant computer
170
buyer computer and merchant computer perform steps analogous to steps 94-104

FIG. 4C

File
Options
Navigate
Annotate
Help
Document Title:
Mead Data Central: Internet Information
Document URL:
http://www.openmarketcom/demo/r15/mall/me
Mead Data Central: Internet Information
November 28, 1993
LC's debut on the Internet: Library of Congress catalog On the
Text of Abstract
of Article
VERONICA: A GOPHER NAVIGATIONAL TOOL ON THE INTERNET
October, 1993
Data transfer complete:
Back
Forward
Home
Reload
Open...
Save As...
Clone
New Window
Close Window

FIG. 5

*File*    *Options*    *Navigate*    *Annotate*                    *Help*

Document Title: | Open Market Payment

Document URL: | http://payment.openmarket.com/ben/nph-payment

**Open Market Payment**

You have selected an item that requires payment

    **Merchant:**Test Merchant
    **Description:**Mead Data Central Article
    **Amount:**2.85(US currency)

If you have an Open Market account click on "continue" below and
you will be prompted for
your account name and password.  If you do not have an account,
you can establish one
on-line and return to this page to continue your purchase.

   | Open |    an account on-line

   | Continue |   with payment transaction.

*NOTE:*For demonstrations use the account name **testuser@openmarket.com** with
the password **testuser**.

   *Open Market, Inc.*

Data transfer complete:

| Back | Forward | Home | Reload | Open... | Save As... | Clone | New Window | Close Window |

**FIG. 6**

| _File_ | _Options_ | _Navigate_ | _Annotate_ | | _Help_ |
|---|---|---|---|---|---|

Document Title: `Establish OpenMarket Account`

Document URL: `http://payment.openmarket.com/service/destabli.`

Card Number: [                    ]

Expiration Date: [          ] (format MM/YY)

Check the appropriate boxes:

☐ I am the owner of the above credit card.

☐ The above address is also the billing address for this credit card.

Your OpenMarket account statement is available on-line. At your option you may a copy of your statement automatically sent to your e-mail address at weekly or monthly intervals. Please choose a statement option.

◇ Weekly statements    ◇ Monthly statements    ◇ No e-mail statements

**Account name and password**

Please choose an account name and password for your OpenMarket account. We suggest using an account name that is unique and easy to remember such as your e-mail address. Your password should be 8 characters or longer.

Account Name [                    ]

Password [                    ]

Data transfer complete:

| Back | Forward | Home | Reload | Open... | Save As... | Clone | New Window | Close Window |

**FIG. 7**



**FIG. 8**

| _File_  _Options_  _Navigate_  _Annotate_ | _Help_ |
|---|---|

Document Title: | Open Market Payment

Document URL: | http://payment.openmarket.com/ben/nph-payment

**Open Market Payment**

You have selected an item that you have purchased recently.

    **Merchant: Test Merchant**
    **Description: Head Data Central Article**
    **Amount: 2.85(US currency)**

**This could happen because you would like to buy the item again or it may have happened by accident.**

You can:

- *Go directly to the previous item*
- *Go ahead and buy the item again*

*Open Market, Inc.*

Data transfer complete:

| Back | Forward | Home | Reload | Open... | Save As... | Clone | New Window | Close Window |

**FIG. 9**



**FIG. 10**

```
 File    Options    Navigate    Annotate                          Help
 ┌──────────────────────────────────────────────────────────────────┐
 │ Document Title: │ Smart Statement for Test User              │     │
 │                                                                    │
 │ Document URL:   │ http://payment.openmarket.com/in/nph-stateme│    │
 └──────────────────────────────────────────────────────────────────┘
```

Information about the item.

**Transactions in October 1994**

| | | |
|---|---|---|
Mon Oct 3 **Test Merchant** Dilbert subscription 20 seconds amount $0.10
Tue Oct 4 **Test Merchant** Mead Data Central Article amount $2.95
Tue Oct 4 **Test Merchant** Mead Data Central Article amount $2.95
Tue Oct 4 **Test Merchant** Mead Data Central Article amount $2.95
Tue Oct 4 **Test Merchant** N.Y. Times Article amount $0.50
Tue Oct 4 **Test Merchant** Mead Data Central Article amount $2.95
Wed Oct 5 **Test Merchant** Mead Data Central Article amount $2.95
Wed Oct 5 **Test Merchant** Mead Data Central Article amount $2.95
Wed Oct 5 **Test Merchant** Mead Data Central Article amount $2.95
Wed Oct 5 **Test Merchant** Mead Data Central Article amount $2.95
Wed Oct 5 **Test Merchant** Mead Data Central Article amount $2.95
Wed Oct 5 **Test Merchant** Mead Data Central Article amount $2.95
Wed Oct 5 **Test Merchant** Mead Data Central Article amount $2.95

Your total is 33.05.

**Previous Statements**

- September 1994
- August 1994

Return to your Newest Statement

**Feedback**

You can send us comments and suggestions here.

Data transfer complete:

Back  Forward  Home  Reload  Open..  Save As..  Clone  New Window  Close Window

**FIG. 11**

*File*    *Options*    *Navigate*    *Annotate*                    *Help*

Document Title: | Smart Statement Detail
Document URL: | http://payment.openmarket.com/@c632f154cc8021

## Smart Statement Detail

This is the detailed information about a particular transaction from your Smart Statement

### Transaction Information

```
url: http://www.openmarket.com/demos/aug15/mall/mead-fingerprint/mkarticle.cgo
transaction_log_id: 50254.0
currency: US
transaction_date: 781377633
initiator: 1.0
expiration: 2592000
description: Mead Data Central Article
amount: 2.95
beneficiary: 3.0
ip_address: 199.170.183.13
transaction_type.p
domain: mead.internet-1
```

### Merchant Information

```
telephone: 617-621-9501
address_1: Open Market, Inc.
address_2: 215 First Street
fax: 617-621-1703
address_3: Cambridge, MA
email: testmerchant@openmarket.com
principal_name: Test Merchant
```

Data transfer complete:

Back | Forward | Home | Reload | Open... | Save As... | Clone | New Window | Close Window

## FIG. 12

File
Options
Navigate
Annotate
Help
Document Title:
Smart Statement Detail
Document URL:
http://payment.openmarket.com/@c632f154cc8021
url: http://www.openmarket.com/demos/aug15/mall/mead-fingerprint/mkarticle.cgo
transaction_log_id: 50254.0
currency: US
transaction_date: 781377633
initiator: 1.0
expiration: 2592000
description: Mead Data Central Article
amount: 2.95
beneficiary: 3.0
ip_address: 199.170.183.13
transaction_type.p
domain: mead.internet-1
Merchant Information
telephone: 617-621-9501
address_1: Open Market, Inc.
address_2: 215 First Street
fax: 617-621-1703
address_3: Cambridge, MA
email: testmerchant@openmarket.com
principal_name: Test Merchant
home_url:
country: US
postal_code: 02142
Feedback
You can send us comments and suggestions here.
Data transfer complete:
Back
Forward
Home
Reload
Open...
Save As...
Clone
New Window
Close Window

FIG. 13

| File | Options | Navigate | Annotate | | Help |
|------|---------|----------|----------|--|------|

Document Title: Open Market Feedback

Document URL: http://payment.openmarket.com/ben/feedback.cg

Or if you prefer, you can send your comments via electronic mail to feedback@openmarket.com or via FAX to +1.617.621.1703. If you would like a reply please include your e-mail address.

Your Open Market accound name (optional):

Your E-mail address (optional):

Subject:

Your comments:

Submit Feedback

Data transfer complete:

Back | Forward | Home | Reload | Open... | Save As... | Clone | New Window | Close Window

**FIG. 14**

5,909,492

# 1

# NETWORK SALES SYSTEM

## CROSS REFERENCE TO RELATED APPLICATION

This is a continuation of U.S. patent application Ser. No. 08/328,133, filed Oct. 24, 1994, now U.S. Pat. No. 5,715, 314.

## REFERENCE TO MICROFICHE APPENDICES

Microfiche Appendices A–G are being submitted with the present application, being 4 sheets with 220 total pages.

## BACKGROUND OF THE INVENTION

This invention relates to user-interactive network sales systems for implementing an open marketplace for goods or services over computer networks such as the Internet.

U.S. patent application Ser. No. 08/168,519, filed Dec. 16, 1993 by David K. Gifford and entitled "Digital Active Advertising," now abandoned, the entire disclosure of which is hereby incorporated herein in its entirety by reference, describes a network sales system that includes a plurality of buyer computers, a plurality of merchant computers, and a payment computer. A user at a buyer computer asks to have advertisements displayed, and the buyer computer requests advertisements from a merchant computer, which sends the advertisements to the buyer computer. The user then requests purchase of an advertised product, and the buyer computer sends a purchase message to the merchant computer. The merchant computer constructs a payment order that it sends to the payment computer, which authorizes the purchase and sends an authorization message to the merchant computer. When the merchant computer receives the authorization message it sends the product to the buyer computer.

The above-mentioned patent application also describes an alternative implementation of the network sales system in which, when the user requests purchase of an advertised product, the buyer computer sends a payment order directly to the payment computer, which sends an authorization message back to the buyer computer that includes an unforgeable certificate that the payment order is valid. The buyer computer then constructs a purchase message that includes the unforgeable certificate and sends it to the merchant computer. When the merchant computer receives the purchase request it sends the product to the buyer computer, based upon the pre-authorized payment order.

## SUMMARY OF THE INVENTION

In one aspect, the invention provides a network-based sales system that includes at least one buyer *computer* for operation by a user desiring to buy a product, at least one merchant computer, and at least one payment computer. The buyer computer, the merchant computer, and the payment computer are interconnected by a computer network. The buyer computer is programmed to receive a user request for purchasing a product, and to cause a payment message to be sent to the payment computer that comprises a product identifier identifying the product. The payment computer is programmed to receive the payment message, to cause an access message to be created that comprises the product identifier and an access message authenticator based on a cryptographic key, and to cause the access message to be sent to the merchant computer. The merchant computer is programmed to receive the access message, to verify the access message authenticator to ensure that the access

# 2

message authenticator was created using the cryptographic key, and to cause the product to be sent to the user desiring to buy the product.

The invention provides a simple design architecture for the network sales system that allows the merchant computer to respond to payment orders from the buyer computer without the merchant computer having to communicate directly with the payment computer to ensure that the user is authorized to purchase the product and without the merchant computer having to store information in a database regarding which buyers are authorized to purchase which products. Rather, when the merchant computer receives an access message from the buyer computer identifying a product to be purchased, the merchant computer need only check the access message to ensure that it was created by the payment computer (thereby establishing for the merchant computer that the buyer is authorized to purchase the product), and then the merchant computer can cause the product to be sent to the buyer computer who has been authorized to purchase the product.

In another aspect, the invention features a network-based sales system that includes at least one buyer computer for operation by a user desiring to buy products, at least one shopping cart computer, and a shopping cart database connected to the shopping cart computer. The buyer computer and the shopping cart computer are interconnected by a computer network. The buyer computer is programmed to receive a plurality of requests from a user to add a plurality of respective products to a shopping cart in the shopping cart database, and, in response to the requests to add the products, to send a plurality of respective shopping cart messages to the shopping cart computer each of which includes a product identifier identifying one of the plurality of products. The shopping cart computer is programmed to receive the plurality of shopping cart messages, to modify the shopping cart in the shopping cart database to reflect the plurality of requests to add the plurality of products to the shopping cart, and to cause a payment message associated with the shopping cart to be created. The buyer computer is programmed to receive a request from the user to purchase the plurality of products added to the shopping cart and to cause the payment message to be activated to initiate a payment transaction for the plurality of products added to the shopping cart.

In another aspect, the invention features a network-based link message system that includes at least one client computer for operation by a client user and at least one server computer for operation by a server user. The client computer and the server computer are interconnected by a computer network. The client computer is programmed to send an initial link message to the server computer. The server computer is programmed to receive the initial link message from the client computer and to create, based on information contained in the initial link message, a session link message that encodes a state of interaction between the client computer and the server computer. The session link message includes a session link authenticator, computed by a cryptographic function of the session link contents, for authenticating the session link message. The server computer is programmed to cause the session link message to be sent to the client computer. The client computer is programmed to cause the session link message to be sent to a computer in the network that is programmed to authenticate the session link message by examining the session link authenticator and that is programmed to respond to the session link message based on the state of the interaction between the client computer and the server computer.

5,909,492

| 3 | 4 |

In another aspect, the invention features a network-based sales system that includes a merchant database having a plurality of digital advertisements and a plurality of respective product fulfillment items, at least one creation computer for creating the merchant database, and at least one merchant computer for causing the digital advertisements to be transmitted to a user and for causing advertised products to be transmitted to the user. The creation computer and the merchant computer are interconnected by a computer network. The creation computer is programmed to create the merchant database, and to transmit the digital advertisements and the product fulfillment items to the merchant computer. The merchant computer is programmed to receive the digital advertisements and product fulfillment items, to receive a request for a digital advertisement from a user, to cause the digital advertisement to be sent to the user, to receive from the user an access message identifying an advertised product, and to cause the product to be sent to the user in accordance with a product fulfillment item corresponding to the product.

In another aspect, the invention features a hypertext statement system that includes a client computer for operation by a client user and one or more server computers for operation by a server user. The client computer and the server computers are interconnected by a computer network. At least one of the server computers is programmed to record purchase transaction records in a database. Each of the purchase transaction records includes a product description. The server computer is programmed to transmit a statement document that includes the purchase transaction records to the client computer. The client computer is programmed to display the product descriptions, to receive a request from the client user to display a product corresponding to a product description displayed by the client computer, and to cause a product hypertext link derived from a purchase transaction record to be activated. At least one of the server computers is programmed to respond to activation of the product hypertext link by causing the product to be sent to the client computer.

In another aspect, the invention features a network payment system that includes at least one buyer computer for operation by a user desiring to buy a product and at least one payment computer for processing payment messages from the buyer computer. The buyer computer and the payment computer are interconnected by a computer network. The buyer computer is programmed to cause a payment message to be sent to the payment computer. The payment message includes a product identifier identifying the product that the user desires to buy. The payment computer is programmed to receive the payment message, to cause an access message to be created to enable the user to access the product, and to record a purchase transaction record in the settlement database. The buyer computer is programmed to cause a request for purchase transaction records to be sent to the payment computer. The payment computer is programmed to receive the request for purchase transaction records and to cause a document derived from the purchase transaction records to be sent to the buyer computer.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a block diagram of a network sales system in accordance with the present invention.

FIG. 2 (2-A through 2-I) is a flowchart diagram illustrating the operation of a purchase transaction in the network sales system of FIG. 1.

FIG. 3 (3-A through 3-B) is a flowchart diagram illustrating the use of a shopping cart for the purchase of products in connection with the network sales system of FIG. 1.

FIG. 4 (4-A through 4-C) is a flowchart diagram illustrating the operation of a smart statement in the network sales system of FIG. 1.

FIG. 5 is a screen snapshot of an advertising document that the merchant computer sends to the buyer computer in FIG. 2.

FIG. 6 is a screen snapshot of a confirmation document that the payment computer sends to the buyer computer in FIG. 2.

FIG. 7 is a screen snapshot of a new account document that the payment computer sends to the buyer computer in FIG. 2.

FIG. 8 is a screen snapshot of an account name prompt that the buyer computer creates in FIG. 2.

FIG. 9 is a screen snapshot of a document that the payment computer sends to the buyer computer in FIG. 2 and that provides an option either to repurchase or to use a previously purchased access.

FIG. 10 is a screen snapshot of a fulfillment document that the merchant computer sends to the buyer computer in FIG. 2.

FIG. 11 is a screen snapshot of a smart statement document that the payment computer sends to the buyer computer in FIG. 4.

FIGS. 12 and 13 are screen snapshots of a transaction detail document that the payment computer sends to the buyer computer in FIG. 4.

FIG. 14 is a screen snapshot of a customer service form that the payment computer sends to the buyer computer in FIG. 4.

## DETAILED DESCRIPTION

With reference to FIG. 1, a network sales system in accordance with the present invention includes a buyer computer 12 operated by a user desiring to buy a product, a merchant computer 14, which may be operated by a merchant willing to sell products to the buyer or by a manager of the network sales system, a payment computer 16 typically operated by a manager of the network sales system, and a creation computer 20 typically operated by the merchant. The buyer, merchant, payment, and creation computers are all inter-connected by a computer network 10 such as the Internet.

Creation computer 20 is programmed to build a "store" of products for the merchant. A printout of a computer program for use in creating such a "store" in accordance with the present invention is provided as Appendix F.

The products advertised by merchant computer 14 may be, for example, newspaper or newsletter articles available for purchase by buyers. Creation computer 20 creates a digital advertisement database 18 that stores advertising documents (which may for example be in the form of summaries of newspaper or newsletter articles, accompanied by prices) and product fulfillment items (which may be the products themselves if the products can be transmitted over the network, or which may be hard goods identifiers if the products are hard goods, i.e., durable products as opposed to information products). Creation computer 20 transmits contents of the advertising document database 18 to merchant computer 14 to enable the merchant computer to cause advertisements and products to be sent to buyers. Merchant computer 14 maintains advertising documents locally in advertising document database 15. In an alternative embodiment, the creation computer does not have a local digital advertisement database, but instead updates a remote

5,909,492

5

advertising document database on a merchant computer. These updates can be accomplished using HTML forms or other remote database technologies as is understood by practitioners of the art.

Payment computer 16 has access to a settlement database 22 in which payment computer 16 can record details of purchase transactions. The products may be organized into various "domains" of products, and payment computer 16 can access settlement database 22 to record and retrieve records of purchases of products falling within the various domains. Payment computer 16 also has access to a shopping cart database 21 in which a "shopping cart" of products that a user wishes to purchase can be maintained as the user shops prior to actual purchase of the contents of the shopping cart.

With reference to FIG. 2, a purchase transaction begins when a user at buyer computer 12 requests advertisements (step 24) and buyer computer 12 accordingly sends an advertising document URL (universal resource locator) to merchant computer 14 (step 26). The merchant computer fetches an advertising document from the advertising document database (step 28) and sends it to the buyer computer (step 30). An example of an advertising document is shown in FIG. 5. Details of URLs and how they are used are found in Appendix G.

The user browses through the advertising document and eventually requests a product (step 32). This results in the buyer computer sending payment URL A to the payment computer (step 34). Payment URL A includes a product identifier that represents the product the user wishes to buy, a domain identifier that represents a domain of products to which the desired product belongs, a payment amount that represents the price of the product, a merchant computer identifier that represents merchant computer 14, a merchant account identifier that represents the particular merchant account to be credited with the payment amount, a duration time that represents the length of time for which access to the product is to be granted to the user after completion of the purchase transaction, an expiration time that represents a deadline beyond which this particular payment URL cannot be used, a buyer network address, and a payment URL authenticator that is a digital signature based on a cryptographic key. The payment URL authenticator is a hash of other information in the payment URL, the hash being defined by a key shared by the merchant and the operator of the payment computer.

In an alternative embodiment, step 34 consists of the buyer computer sending a purchase product message to the merchant computer, and the merchant computer provides payment URL A to the buyer computer in response to the purchase product message. In this alternative embodiment, payment URL A contains the same contents as above. The buyer computer then sends the payment URL A it has received from the merchant computer to the payment computer.

When the payment computer receives the payment URL it verifies whether the payment URL authenticator was created from the contents of the payment URL using the cryptographic key (step 36). If not, the payment computer sends a document to the buyer computer indicating that access to the network sales system is denied (step 38). Otherwise, the payment computer determines whether the expiration time has past (step 40). If it has, the payment computer sends a document to the buyer computer indicating that the time has expired (step 41). Otherwise, the payment computer checks the buyer computer network

6

address to see if it matches the one specified in the payment URL (step 42). If it does not match, the payment computer sends a document to the buyer computer indicating that access to the network payment system is denied (step 43). Otherwise, the payment computer sends a payment confirmation document to the buyer computer, the payment confirmation document including an "open" link and a "continue" link (step 44).

An example of a confirmation document is shown in FIG. 6. The confirmation document asks the user to click on a "continue" button if the user already has an account with the payment computer, or to click on an "open" button if the user does not already have an account and wishes to open one.

If the user clicks on the "open" button (step 46), the buyer computer sends payment URL C to the payment computer (step 48), payment URL C being similar to payment URL A but also indicating that the user does not yet have an account. The payment computer creates a new account document (step 50) and sends it to the buyer computer (step 52). An example of a new account document is shown in FIG. 7. When the user receives the new account document he enters the new account name, an account password, a credit card number, the credit card expiration date, and security information such as the maiden name of the user's mother (step 54), and presses a "submit" button (not shown in FIG. 7). The buyer computer sends the new account information to the payment computer (step 56), which enters the new account in the settlement database (step 58).

If the user clicks on the "continue" button (step 60), the buyer computer sends payment URL B to the payment computer (step 62), payment URL B being similar to payment URL A but also indicating that the user already has an account. The payment computer then instructs the buyer computer to provide the account name and password (steps 64 and 66), and the buyer computer prompts the user for this information by creating an account name prompt (example shown in FIG. 8) and a similar password prompt. The user enters the information (step 68) and the buyer computer sends the account name and password to the payment computer (step 70).

The payment computer verifies whether the user name and password are correct (step 72). If they are not correct, the payment computer sends a document to the buyer computer indicating that access to the network sales system is denied (step 74). Otherwise, the payment computer determines whether additional security is warranted, based on, e.g., whether the payment amount exceeds a threshold (step 73). If additional security is warranted, the payment computer creates a challenge form document and sends it to the buyer computer (step 75). The user enters the security information (step 77), the buyer computer sends the security information to the payment computer (step 79), and the payment computer determines whether the security information is correct (step 81). If it is not correct, the payment computer sends a document to the buyer computer indicating that access to the network sales system is denied (step 83).

If the security information is correct, or if additional security was not warranted, the payment computer checks the settlement database to determine whether the user has unexpired access to the domain identifier contained in the payment URL (step 82). If so, the payment computer sends to the buyer computer a document providing an option either to repurchase or to use the previously purchased access (step 84). An example of such a document is shown in FIG. 9. The

5,909,492

7

user can respond to the recent purchase query document by choosing to access the previously purchased document (step 85) or to go ahead and buy the currently selected product (step 86).

If the user chooses to access the previously purchased document, the buyer computer skips to step 92 (see below). If the user chooses to buy the currently selected product, the payment computer calculates an actual payment amount that may differ from the payment amount contained in the payment URL (step 87). For example, the purchase of a product in a certain domain may entitle the user to access other products in the domain for free or for a reduced price for a given period of time.

The payment computer then verifies whether the user account has sufficient funds or credit (step 76). If not, the payment computer sends a document to the buyer computer indicating that the user account has insufficient funds (step 78). Otherwise, the payment computer creates an access URL (step 80) that includes a merchant computer identifier, a domain identifier, a product identifier, an indication of the end of the duration time for which access to the product is to be granted, the buyer network address, and an access URL authenticator that is a hash of other information in the access URL, the hash being defined by a key shared by the merchant and the operator of the payment computer. The payment computer then records the product identifier, the domain, the user account, the merchant account, the end of duration time, and the actual payment amount in the settlement database (step 88).

The payment computer then sends a redirect to access URL to the buyer computer (step 90), which sends the access URL to the merchant computer (step 92). The merchant computer verifies whether the access URL authenticator was created from the contents of the access URL using the cryptographic key (step 94). If not, the merchant computer sends a document to the buyer computer indicating that access to the product is denied (step 96).

Otherwise, the merchant computer verifies whether the duration time for access to the product has expired (step 98). This is done because the buyer computer can request access to a purchased product repeatedly. If the duration time has expired, the merchant computer sends a document to the buyer computer indicating that the time has expired (step 100). Otherwise the merchant computer verifies that the buyer computer network address is the same as the buyer network address in the access URL (step 101), and if so, sends a fulfillment document to the buyer computer (step 102), which is displayed by the buyer computer (step 104). An example of a fulfillment document is shown in FIG. 10. Otherwise, the merchant computer sends a document to the buyer computer indicating that access is not allowed (step 103).

With reference now to FIG. 3, when the merchant computer sends the advertising document to the buyer computer, the user may request that a product be added to a shopping cart in the shopping cart database rather than request that the product be purchased immediately. The buyer computer sends a shopping cart URL to the payment computer (step 108), the shopping cart URL including a product identifier, a domain identifier, a payment amount, a merchant computer identifier, a merchant account identifier, a duration time, an expiration time, and a shopping cart URL authenticator that is a digital signature based on a cryptographic key. The shopping cart URL authenticator is a hash of other information in the shopping cart URL, the hash being defined by

8

a key shared by the merchant and the operator of the payment computer.

The payment computer verifies whether the shopping cart URL authenticator was created from the contents of the shopping cart URL using a cryptographic key (step 110). If not, the payment computer sends a document to the buyer computer indicating that access to the network sales system is denied (step 112). Otherwise, before any modification to a user's shopping cart is allowed, user authentication is performed (step 113) in a manner analogous to steps 40–81. Once the user is authenticated, the payment computer creates or updates a payment URL for the shopping cart (step 114).

The user then either requests more advertisements (step 24 in FIG. 2) and possibly adds another product to the shopping cart, requests display of the shopping cart (step 116), or requests purchase of the entire contents of the shopping cart (step 124). If the user requests display of the shopping cart (step 116), the buyer computer sends a fetch shopping cart request to the payment computer (step 118), and the payment computer and buyer computer (step 119) perform steps analogous to steps 64–81. The payment computer returns the contents of the shopping cart to the buyer computer (step 120), which displays the contents of the shopping cart (step 122). If the user requests that the entire contents of the shopping cart be purchased (step 124) the buyer computer causes the payment URL for the shopping cart to be activated (step 126) and the payment URL is processed in a manner analogous to the processing of payment URLs for individual products (beginning with step 36 in FIG. 2).

With reference now to FIG. 4, a user can request display of a "smart statement" that lists purchase transactions for a given month (step 128). When the buyer computer receives such a request, it sends a smart statement URL to the payment computer (step 130).

When the payment computer receives the smart statement URL, it verifies whether the smart statement URL authenticator was created from the contents of the smart statement URL using a cryptographic key (step 132). If not, the payment computer sends a document to the buyer computer indicating that access is denied (step 134). Otherwise, the payment computer checks to determine whether the buyer network address in the smart statement URL matches the buyer computer's actual network address (step 136). If not, the payment computer sends a document to the buyer computer indicating that access is denied (step 138). Otherwise (step 140), the payment computer and buyer computer perform a set of steps analogous to steps 64–81 in FIG. 2 (payment computer requests account name and password, user provides the requested information, and payment computer verifies the information).

In an alternative embodiment steps 132–138 are omitted.

After verification of account information is complete, the payment computer retrieves the requested settlement data from the settlement database, creates a smart statement document for the buyer, and sends the smart statement document to the buyer computer (step 142). An example of a smart statement document is shown in FIG. 11. Each purchase transaction record in the smart statement document includes the data of the transaction, the name of the merchant, an identification of the product, and the payment amount for the product. The smart statement document also includes a transaction detail URL for each purchase transaction (these URLs, or hypertext links, are discussed below and are not shown in FIG. 11). The smart statement docu-

5,909,492

9

ment also identifies previous statements that the user may wish to have displayed.

The buyer computer displays the retrieved document (step 144), and the user may request transaction details for a particular transaction listed on the smart statement (step 146). If so, the buyer computer sends a transaction detail URL (or "payment detail URL") to the payment computer (step 148). The transaction detail URL includes a transaction identifier, a buyer network address, and a transaction detail URL authenticator. When the payment computer receives the transaction detail URL, it performs (step 150) a set of steps analogous to steps 132–140 (verification of URL authenticator, buyer network address, and account information). The payment computer then retrieves from the settlement database data corresponding to the payment transaction specified in the transaction detail URL, creates a transaction detail document, and sends it to the buyer computer (step 152).

An example of a transaction detail document is shown in FIGS. 12 and 13. The document displays a number of items of information about the transaction, including the transaction date, end of the duration time ("expiration"), a description of the product, the payment amount, the domain corresponding to the product, an identification of the merchant, and the merchant's address.

The smart statement document and the transaction detail document both include customer service URLs (hypertext links) that allow the user to request customer service (i.e., to send comments and suggestions to the payment computer). When the user requests customer service (step 154), the buyer computer sends the customer service URL to the payment computer (step 156), which creates a customer service form and sends it to the buyer computer (step 158). An example of a customer service form is shown in FIG. 14. The user types comments into the customer service form (step 160), and the buyer computer sends the user's comments to the payment computer (step 162). The payment computer then posts the user comments and sends a thank you document to the buyer computer (step 164).

A user may request display of a product included in the smart statement. When the user requests that the product be displayed (step 166), the buyer computer sends the access URL contained in the smart statement document to the merchant computer (step 168), and the buyer computer and merchant computer perform a set of steps analogous to steps 94–104 in FIG. 2 (authentication of access URL, verification whether duration time has expired, verification of buyer network address, and transmission of fulfillment document to buyer computer).

Whenever the present application states that one computer sends a URL to another computer, it should be understood that in preferred embodiments the URL is sent in a standard HTTP request message, unless a URL message is specified as a redirection in the present application. The request message includes components of the URL as described by the standard HTTP protocol definition. These URL components in the request message allow the server to provide a response appropriate to the URL. The term "URL" as used the present application is an example of a "link," which is a pointer to another document or form (including multimedia documents, hypertext documents including other links, or audio/video documents).

When the present application states that one computer sends a document to another computer, it should be understood that in preferred embodiments the document is a success HTTP response message with the document in the

10

body of the message. When the present application states that a server sends an account name and password request message to the client, it should be understood that in preferred embodiments the account name and password request message is an unauthorized HTTP response. A client computer sends account name and password information to a server as part of a request message with an authorization field.

The software architecture underlying the particular preferred embodiment is based upon the hypertext conventions of the World Wide Web. Appendix A describes the Hypertext Markup Language (HTML) document format used to represent digital advertisements, Appendix B describes the HTML forms fill out support in Mosaic 2.0, Appendix C is a description of the Hypertext Transfer Protocol (HTTP) between buyer and merchant computers, Appendix D describes how documents are named with Uniform Resource Locators (URLs) in the network of computers, and Appendix E describes the authentication of URLs using digital signatures.

A printout of a computer program for use in creating and operating such a "store" in accordance with the present invention is provided as Appendix F. A printout of a computer program for use in operating other aspects of the network sales system in accordance with the present invention is provided in Appendix G.

There has been described a new and useful network-based sales system. It is apparent that those skilled in the art may make numerous modifications and departures from the specific embodiments described herein without departing from the spirit and scope of the claimed invention.

What is claimed is:

1. A network-based sales system, comprising:

a merchant database comprising a plurality of digital advertisements and a plurality of respective product fulfillment items;

at least one creation computer for creating said merchant database; and

at least one merchant computer for causing said digital advertisements to be transmitted to a user and for causing advertised products to be transmitted to said user;

said creation computers, said merchant computer, and a payment computer being interconnected by a public packet switched computer network;

said creation computer being programmed to create said merchant database, and to transmit said digital advertisements and said product fulfillment items over said network to said merchant computer;

said merchant computer being programmed to receive said digital advertisements and product fulfillment items over said network, to receive over said network a request for a digital advertisement from a user, to cause said digital advertisement to be sent to said user over said network, to receive over said network from said user a product request message identifying an advertised product, to receive an access message over said network created by said payment computer, and to cause said product to be sent to said user in accordance with a product fulfillment item corresponding to said product and based upon receipt by the merchant computer of the access message.

2. A network-based sales system in accordance with claim 1, wherein each of said digital advertisements comprises an abstract of a product and a price.

3. A network-based sales system in accordance with claim 2, wherein:

5,909,492

**11**

at least one of said product fulfillment items comprises a product itself; and

said creation computer is programmed to transmit said product to said merchant computer with said digital advertisements.

4. A network-based sales system in accordance with claim 2, wherein:

at least one of said product fulfillment items comprises a hard good identifier; and

said creation computer is programmed to transmit said hard good identifier to said merchant computer with said digital advertisements.

5. A method of operating a merchant computer in a network-based sales system comprising a merchant database that comprises a plurality of digital advertisements and a plurality of respective product fulfillment items, at least one creation computer for creating said merchant database, and at least one merchant computer for causing said digital advertisements to be transmitted to a user and for causing advertised products to be transmitted to said user, and at least one payment computer, said creation computer, said merchant database, and said payment computer being interconnected by a public packet switched computer network, said method comprising the steps of:

receiving, at said merchant computer, said digital advertisements and said product fulfillment items, said digital advertisements and said product fulfillment items having been transmitted over said network to said merchant computer by said creation computer, said merchant database comprising said digital advertisements and said product fulfillment items having been created by said creation computer;

receiving over said network a request for a digital advertisement from a user;

causing said digital advertisement to be sent to said user over said network;

receiving over said network from said user a product request message identifying an advertised product;

receiving over said network an access message created by said payment computer; and

causing product to be sent to said user in accordance with a product fulfillment item corresponding to said product and based upon receipt by the merchant computer of the access message.

6. A hypertext statement system, comprising:

a client computer for operation by a client user; and

a plurality of server computers for operation by a server user;

said client computer and said server computers being interconnected by a public packet switched computer network;

at least one of said server computers being programmed to record information pertaining to purchase transaction records in a database, each of said purchase transaction records comprising a product description, and to cause a statement document comprising said purchase transaction records to be transmitted to said client computer over said network;

said client computer being programmed to display said product descriptions, to receive a request from said client user to display a product corresponding to a product description displayed by said client computer, and to cause a product hypertext link derived from a purchase transaction record to be activated;

at least one of said server computers, other than a server computer that transmitted said statement document to

**12**

said client computer, being programmed to respond to activation of said product hypertext link by causing said product to be sent to said client computer over said network.

7. A hypertext statement system in accordance with claim 6, wherein:

said client computer is programmed to receive a request from said client user to display transaction details corresponding to a product description displayed by said client computer and to cause a transaction detail hypertext link corresponding to said product description to be activated; and

at least one of said server computers is programmed to respond to activation of said transaction detail hypertext link by transmitting said transaction details to said client computer as a transaction detail document.

8. A hypertext statement system in accordance with claim 7, wherein:

said transaction detail document further comprises a customer service form hypertext link;

said client computer is programmed to receive a request from said client user to display a customer service form and to cause said customer service form hypertext link to be activated; and

at least one of said server computers is programmed to respond to activation of said customer service form hypertext link by transmitting said customer service form to said client computer.

9. A hypertext statement system in accordance with claim 6, wherein:

said statement document further comprises a customer service form hypertext link;

said client computer is programmed to receive a request from said client user to display a customer service form and to cause said customer service form hypertext link to be activated; and

at least one of said server computers is programmed to respond to activation of said customer service form hypertext link by transmitting said customer service form to said client computer.

10. A method of operating a server computer in a hypertext statement system comprising a client computer for operation by a client user, and a plurality of server computers for operation by a server user, said client computer and said server computers being interconnected by a public packet switched computer network, said method comprising the steps of:

recording, at one of said server computers, information pertaining to purchase transaction records in a database, each of said purchase transaction records comprising a product description; and

causing a statement document comprising said purchase transaction records to be transmitted to said client computer over said network;

said client computer being programmed to display said product descriptions, to receive a request from said client user to display a product corresponding to a product description displayed by said client computer, and to cause a product hypertext link derived from a purchase transaction record to be activated;

at least one of said server computers, other than a server computer that transmitted said statement document to said client computer, being programmed to respond to activation of said product hypertext link by causing said product to be sent to said client computer over said network.

5,909,492

13

11. A network payment system, comprising:

at least one buyer computer for operation by a user desiring to buy a product; and

at least one payment computer for processing payment messages from said buyer computer;

said buyer computer, said payment computer, and a merchant computer being interconnected by a public packet switched computer network;

said buyer computer being programmed to cause a payment message to be sent to said payment computer over said network;

said payment computer being programmed to receive said payment message, to cause an access message to be created for transmission over said network to said merchant computer to enable said user to access said product upon verification by said merchant computer that said access message was created by said payment computer, and to record information pertaining to a purchase transaction record in said settlement database;

said buyer computer being programmed to cause a request for a purchase transaction record to be sent to said payment computer over said network; and

said payment computer being programmed to receive said request for said purchase transaction record and to cause a document derived from said purchase transaction record to be sent to said buyer computer over said network.

12. The network payment system of claim 11 wherein the payment message comprises a product identifier identifying the product that the user desires to buy.

13. A method of operating a payment computer in a network payment system comprising at least one buyer computer for operation by a user desiring to buy a product, and at least one payment computer for processing payment messages from said buyer computer, and at least one merchant computer, said buyer computer, said payment computer, and said merchant computer being interconnected by a public packet switched computer network, said method comprising the steps of:

receiving, at said payment computer, a payment message that said buyer computer has caused to be sent to said payment computer over said network;

causing an access message to be created for transmission to a merchant computer over said network to enable said user to access said product upon verification by said merchant computer that said access message was created by said payment computer;

recording information pertaining to a purchase transaction record in said settlement database;

receiving over said network a request for a purchase transaction record that said buyer computer has caused to be sent to said payment computer; and

causing a document derived from said purchase transaction record to be sent to said buyer computer over said network.

14. The method of claim 13 wherein the payment message comprises a product identifier identifying the product that the user desires to buy.

15. A hypertext statement system, comprising:

a client computer for operation by a client user; and

one or more server computers for operation by a server user;

the client computer and the server computers being interconnected by a public packet switched computer network;

14

at least one of the server computers being programmed to record information pertaining to purchase transaction records in a database, and to transmit a statement document comprising the purchase transaction records to the client computer over the network;

the client computer being programmed to display the statement document to receive a request from the client user to display transaction details corresponding to a portion of the statement document displayed by the client computer, and to cause a transaction detail hypertext link corresponding to the portion of the statement document to be activated;

at least one of the server computers being programmed to respond to activation of the transaction detail hypertext link by transmitting the transaction details to the client computer over the network as a transaction detail document.

16. A method of operating a server computer in a hypertext statement system comprising a client computer for operation by a client user, and one or more server computers for operation by a server user, the client computer and the server computers being interconnected by a public packet switched computer network, the method comprising the steps of:

recording, at one of the server computers, information pertaining to purchase transaction records in a database; and

transmitting a statement document comprising the purchase transaction records to the client computer over the network;

the client computer being programmed to display the statement document, to receive a request from the client user to display transaction details corresponding to a portion of the statement document displayed by the client computer, and to cause a transaction detail hypertext link corresponding to the portion of the statement document to be activated;

at least one of the server computers being programmed to respond to activation of the transaction detail hypertext link by transmitting the transaction details to the client computer over the network as a transaction detail document.

17. A network-based sales system, comprising:

at least one buyer computer for operation by a user desiring to buy products;

at least one shopping cart computer; and

a shopping cart database connected to the shopping cart computer;

the buyer computer and the shopping cart computer being interconnected by a public packet switched computer network;

the buyer computer being programmed to receive a plurality of requests from a user to add a plurality of respective products to a shopping cart in the shopping cart database, and, in response to the requests to add the products, to send a plurality of respective shopping cart messages over the network to the shopping cart computer each of which comprises a product identifier identifying one of the plurality of products and at least one of which comprises a universal resource locator;

the shopping cart computer being programmed to receive the plurality of shopping cart messages, to modify the shopping cart in the shopping cart database to reflect the plurality of requests to add the plurality of products to the shopping cart, and to cause a payment message

5,909,492

| 15 | 16 |

associated with the shopping cart to be created, the payment message comprising a universal resource locator; and

the buyer computer being programmed to receive a request from the user to purchase the plurality of products added to the shopping cart and to cause the payment message to be activated to initiate a payment transaction for the plurality of products added to the shopping cart;

the *shopping cart being a stored representation of a collection of products, the shopping cart database being a database of stored representations of collections of products, and the shopping cart computer being a computer that modifies the stored representations of collections of products in the database.*

18. A method of operating a shopping cart computer in a public packet switched computer network comprising at least one buyer computer for operation by a user desiring to buy products, at least one shopping cart computer, and a shopping cart database connected to the shopping cart computer, the method comprising the steps of:

receiving, at the shopping cart computer, a plurality of shopping cart messages sent over the network to the shopping cart computer by the buyer computer in response to receipt of a plurality of requests from a user to add a plurality of respective products to a shopping cart in the shopping cart database, each of the shopping cart messages comprising a product identifier identifying one of the plurality of products and at least one of which comprises a universal resource locator;

modifying the shopping cart in the shopping cart database to reflect the plurality of requests to add the plurality of products to the shopping cart; and

causing a payment message associated with the shopping cart to be created, the payment message comprising a universal resource locator;

the buyer computer being programmed to receive a request from the user to purchase the plurality of products added to the shopping cart and to cause the payment message to be activated to initiate a payment transaction for the plurality of products added to the shopping cart;

the shopping cart being a stored representation of a collection of products, the shopping cart database being a database of stored representations of collections of products, and the shopping cart computer being a computer that modifies the stored representations of collections of products in the database.

19. *A network-based sales system, comprising:*

at least one buyer computer for operation by a user desiring to buy a product;

at least one merchant computer; and

at least one payment computer;

the buyer computer, the merchant computer, and the payment computer being interconnected by a computer network;

the buyer computer being programmed to receive a user request for purchasing a product, and to cause a payment message to be sent to the payment computer that comprises a product identifier identifying the product;·

the payment computer being programmed to receive the *payment message, to cause an access message to be created that comprises a product identifier identifying the product and an access message authenticator based on a cryptographic key, and to cause the access message to be sent to the merchant computer; and*

the merchant computer being programmed to receive the access message, to cause the access message authenticator to be verified to ensure that the access message authenticator was created using the cryptographic key, and to cause the product to be received by the user desiring to buy the product.

20. A network-based sales system in accordance with claim 19 wherein the buyer computer is programmed to cause the payment message to be sent to the payment computer by sending a purchase product message to the merchant computer, the merchant computer being programmed to receive the purchase product message, and in response thereto, to send the payment message to the payment computer.

21. A network-based sales system in accordance with claim 19 wherein the merchant computer is programmed itself to verify the access message authenticator.

22. A network-based sales system in accordance with claim 19 wherein the merchant computer is programmed to cause every access message authenticator received by the merchant computer to be verified.

23. A network-based sales system in accordance with claim 19, wherein the payment message comprises a payment amount.

24. A network-based sales system in accordance with claim 19, wherein the payment computer is programmed to record the product identifier and the payment amount.

. 25. A network-based sales system in accordance with claim 24, wherein the product identifier and the payment amount are recorded in a settlement database.

26. *A network-based sales system in accordance with* claim 19, wherein the payment message comprises a merchant computer identifier.

27. A network-based sales system in accordance with claim 19, wherein the payment message comprises a payment message authenticator based on a cryptographic key.

28. A network-based sales system in accordance with claim 27, wherein the payment computer is programmed to verify the payment message authenticator to ensure that the payment message authenticator was created using the cryptographic key.

29. *A network-based sales system in accordance with* claim 19 wherein the computer network is a public packet-switched communications network.

30. A method of operating a payment computer in a computer network comprising at least one buyer computer for operation by a user desiring to buy a product, at least one merchant computer, and at least one payment computer, the method comprising the steps of:

receiving, at the payment computer, a payment message that the buyer computer has caused to be sent to the payment computer in response to a user request for purchasing a product, the payment message comprising a product identifier identifying the product;

causing an access message to be created that comprises a product identifier identifying the product and an access message authenticator based on a cryptographic key; and

causing the access message to be sent to the merchant computer, the merchant computer being programmed to receive the access message, to cause the access message authenticator to be verified to ensure that the access message authenticator was created using the cryptographic key, and to cause the product to be received by the user desiring to buy the product.

31. A network-based sales system, comprising:

at least one buyer computer for operation by a user desiring to buy a product;

5,909,492

**17**

at least one merchant computer; and

at least one payment computer;

the buyer computer, the merchant computer, and the payment computer being interconnected by a public packet switched computer network;

the buyer computer being programmed to receive a request from a user for purchasing a product, and to cause a payment message to be sent over the network to the payment computer;

the payment computer being programmed to receive the payment message, and, if purchase of the product by the user has not been previously recorded in a settlement database, to cause the user to be charged for the product and to create a new record in the settlement database reflecting purchase of the product by the user, to cause an access message to be created, and to cause the access message to be sent over the network to the merchant computer; and

the merchant computer being programmed to receive the access message and to cause the user to receive the product.

32. The network-based sales system of claim 31 wherein:

the payment computer is programmed to cause the access message to be created using a cryptographic key; and

at least one of the computers is programmed to use the access message in a cryptographic process to ensure that the user has paid for the product.

33. A method of operating a payment computer in a public packet switched computer network comprising at least one buyer computer for operation by a user desiring to buy a product, at least one merchant computer, and at least one payment computer, the method comprising the steps of:

receiving, at the payment computer, a payment message that the buyer computer has caused to be sent over the network to the payment computer in response to a request from a user for purchasing a product, and, if purchase of the product by the user has not been previously recorded in a settlement database, causing the user to be charged for the product and creating a new record in the settlement database reflecting purchase of the product by the user;

causing an access message to be created; and

causing the access message to be sent over the network to the merchant computer, the merchant computer being programmed to receive the access message and to cause the user to receive the product.

34. The method of claim 33 wherein at least one of the computers is programmed to use the access message in a cryptographic process to ensure that the user has paid for the product.

35. A network-based sales system, comprising:

at least one buyer computer for operation by a user desiring to buy products;

at least one shopping cart computer; and

a shopping cart database connected to the shopping cart computer;

the buyer computer and the shopping cart computer being interconnected by a public packet switched computer network;

the buyer computer being programmed to receive a plurality of requests from a user to add a plurality of respective products to a shopping cart in the shopping cart database, and, in response to the requests to add the products, to send a plurality of respective shopping cart

**18**

messages over the network to the shopping cart computer each of which comprises a product identifier identifying one of the plurality of products;

the shopping cart computer being programmed to receive the plurality of shopping cart messages, and to modify the shopping cart in the shopping cart database to reflect the plurality of requests to add the plurality of products to the shopping cart; and

the buyer computer being programmed to receive a request from the user to purchase the plurality of products added to the shopping cart and to cause a payment message to be activated to initiate a payment transaction for the plurality of products added to the shopping cart;

the shopping cart being a stored representation of a collection of products, the shopping cart database being a database of stored representations of collections of products, and the shopping cart computer being a computer that modifies the stored representations of collections of products in the database.

36. A method of operating a shopping cart computer in a public packet switched computer network comprising at least one buyer computer for operation by a user desiring to buy products, at least one shopping cart computer, and a shopping cart database connected to the shopping cart computer, the method comprising the steps of:

receiving, at the shopping cart computer, a plurality of shopping cart messages sent over the network to the shopping cart computer by the buyer computer in response to receipt of a plurality of requests from a user to add a plurality of respective products to a shopping cart in the shopping cart database, each of the shopping cart messages comprising a product identifier identifying one of the plurality of products; and

modifying the shopping cart in the shopping cart database to reflect the plurality of requests to add the plurality of products to the shopping cart;

the buyer computer being programmed to receive a request from the user to purchase the plurality of products added to the shopping cart and to cause a payment message to be activated to initiate a payment transaction for the plurality of products added to the shopping cart;

the shopping cart being a stored representation of a collection of products, the shopping cart database being a database of stored representations of collections of products, and the shopping cart computer being a computer that modifies the stored representations of collections of products in the database.

37. A network-based sales system, comprising:

a merchant database comprising a plurality of digital advertisements and a plurality of respective product fulfillment items;

at least one creation computer for creating the merchant database; and

at least one merchant computer for causing the digital advertisements to be transmitted to a user and for causing advertised products to be transmitted to the user;

the creation computer and the merchant computer being interconnected by a public packet switched computer network;

the creation computer being programmed to create the merchant database, and to transmit the digital advertisements and the product fulfillment items over the network to the merchant computer;

5,909,492

**19**

the merchant computer being programmed to receive the digital advertisements and product fulfillment items over the network, to receive over the network a request for a digital advertisement from a user, to cause the digital advertisement to be sent to the user over the network, to receive over the network from the user a product request message identifying an advertised product, and to cause the product to be sent to the user in accordance with a product fulfillment item corresponding to the product;

at least a portion of the digital advertisements transmitted by the creation computer to the merchant computer over the network being authenticated by at least one digital signature.

38. A method of operating a merchant computer in a network-based sales system comprising a merchant database that comprises a plurality of digital advertisements and a plurality of respective product fulfillment items, at least one creation computer for creating the merchant database, and at least one merchant computer for causing the digital advertisements to be transmitted to a user and for causing advertised products to be transmitted to the user, the creation computer and the merchant computer being interconnected by a public packet switched computer network, the method comprising the steps of:

**20**

receiving, at the merchant computer, the digital advertisements and the product fulfillment items, the digital advertisements and the product fulfillment items having been transmitted over the network to the merchant computer by the creation computer, the merchant database comprising the digital advertisements and the product fulfillment items having been created by the creation computer;

receiving over the network a request for a digital advertisement from a user;

causing the digital advertisement to be sent to the user over the network;

receiving over the network from the user a product request message identifying an advertised product; and

causing the product to be sent to the user in accordance with a product fulfillment item corresponding to the product;

at least a portion of the digital advertisements transmitted by the creation computer to the merchant computer over the network being authenticated by at least one digital signature.

*    *    *    *    *

# UNITED STATES PATENT AND TRADEMARK OFFICE
## Certificate

Patent No. 5,909,492                                           Patented: June 1, 1999

On petition requesting issuance of a certificate for correction of inventorship pursuant to 35 U.S.C. 256, it has been found that the above identified patent, through error and without any deceptive intent, improperly sets forth the inventorship.

Accordingly, it is hereby certified that the correct inventorship of this patent is: Andrew C. Payne, Lincoln, MA (US); Lawrence C. Stewart, Wayland, MA (US); and G. Winfield Treese, Wayland, MA (US).

Signed and Sealed this Third Day of November 2009.

Thomas H. Tarcza
*Supervisory Patent Examiner*
Art Unit 3662



US005909492C1

(12) **EX PARTE REEXAMINATION CERTIFICATE** (5845th)

# United States Patent

Payne et al.

(10) **Number:**  US 5,909,492 C1

(45) **Certificate Issued:**  *Aug. 7, 2007

(54) **NETWORK SALES SYSTEM**

(75) Inventors: **Andrew C. Payne**, Lincoln, MA (US); **Lawrence C. Stewart**, Burlington, MA (US); **David J. Mackie**, Brookdale, CA (US)

(73) Assignee: **Soverain Software LLC**, Chicago, IL (US)

Reexamination Request:
No. 90/007,286, Nov. 3, 2004

Reexamination Certificate for:
Patent No.:   **5,909,492**
Issued:        **Jun. 1, 1999**
Appl. No.:    **08/878,396**
Filed:         **Jun. 18, 1997**

(*) Notice:     This patent is subject to a terminal disclaimer.

**Related U.S. Application Data**

(63) Continuation of application No. 08/328,133, filed on Oct. 24, 1994, now Pat. No. 5,715,314.

(51) **Int. Cl.**
| | |
|---|---|
| *G06Q 30/00* | (2006.01) |
| *G06Q 10/00* | (2006.01) |
| *G06Q 20/00* | (2006.01) |
| *G07F 7/00* | (2006.01) |

(52) **U.S. Cl.** ............................ **705/78**; 705/26; 705/27; 705/39; 705/40; 705/44

(58) **Field of Classification Search** ........................ None
See application file for complete search history.

(56)                **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,484,304 A | 11/1984 | Anderson et al. |
| 4,566,078 A | 1/1986 | Crabtree |
| 4,941,089 A | 7/1990 | Fischer |
| 5,035,515 A | 7/1991 | Crossman et al. |
| 5,204,947 A | 4/1993 | Bernstein et al. |

| | | | |
|---|---|---|---|
| 5,297,249 A | 3/1994 | Bernstein et al. |
| 5,309,437 A | 5/1994 | Perlman et al. |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0456920 | 1/1991 |
| EP | 0645688 | 3/1995 |
| JP | 3278230 | 12/1991 |
| JP | 05-158963 | 6/1993 |
| JP | 5274275 | 10/1993 |
| JP | 6162059 | 6/1994 |
| JP | 6291776 | 10/1994 |
| WO | WO 93/10503 | 5/1993 |
| WO | WO 94/03859 | 2/1994 |
| WO | WO 95/16971 | 6/1995 |

OTHER PUBLICATIONS

*Soverain Software LLC* v. *Amazon.Com, Inc.* and *The Gap, Inc.,* Form of Stipulated Request for Final Dismissals of the Actions, filed Aug. 30, 2005.

(Continued)

*Primary Examiner*—Michael O'Neill

(57)                **ABSTRACT**

A network-based sales system includes at least one buyer computer for operation by a user desiring to buy a product, at least one merchant computer, and at least one payment computer. The buyer computer, the merchant computer, and the payment computer are interconnected by a computer network. The buyer computer is programmed to receive a user request for purchasing a product, and to cause a payment message to be sent to the payment computer that comprises a product identifier identifying the product. The payment computer is programmed to receive the payment message, to cause an access message to be created that comprises the product identifier and an access message authenticator based on a cryptographic key, and to cause the access message to be sent to the merchant computer. The merchant computer is programmed to receive the access message, to verify the access message authenticator to ensure that the access message authenticator was created using the cryptographic key, and to cause the product to be sent to the user desiring to buy the product.



A152

# US 5,909,492 C1
Page 2

## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,325,362 A | 6/1994 | Aziz | |
| 5,347,632 A | 9/1994 | Filepp et al. | 395/200 |
| 5,353,283 A | 10/1994 | Tsuchiya | |
| 5,388,257 A | 2/1995 | Bauer | |
| 5,457,738 A | 10/1995 | Sylvan | |
| 5,475,585 A | 12/1995 | Bush | |
| 5,483,652 A | 1/1996 | Sudama et al. | |
| 5,491,820 A | 2/1996 | Belove et al. | |
| 5,530,852 A | 6/1996 | Meske, Jr. et al. | |
| 5,544,320 A | 8/1996 | Konrad | |
| 5,544,322 A | 8/1996 | Cheng et al. | |
| 5,550,984 A | 8/1996 | Gelb | |
| 5,560,008 A | 9/1996 | Johnson et al. | |
| 5,577,209 A | 11/1996 | Boyle et al. | |
| 5,583,996 A | 12/1996 | Tsuchiya | |
| 5,592,378 A | 1/1997 | Cameron et al. | 395/227 |
| 5,619,648 A | 4/1997 | Canale et al. | |
| 5,623,656 A | 4/1997 | Lyons | |
| 5,664,110 A | 9/1997 | Green et al. | |
| 5,664,111 A | 9/1997 | Nahan et al. | |
| 5,675,507 A | 10/1997 | Bobo, II | |
| 5,708,780 A | 1/1998 | Levergood et al. | |
| 5,710,884 A | 1/1998 | Dedrick | |
| 5,715,314 A * | 2/1998 | Payne et al. | 705/78 |
| 5,724,521 A | 3/1998 | Dedrick | |
| 5,727,164 A | 3/1998 | Kaye et al. | |
| 5,732,219 A | 3/1998 | Blumer et al. | |
| 5,734,719 A | 3/1998 | Tsevdos et al. | |
| 5,761,662 A | 6/1998 | Dasan | |
| 5,768,142 A | 6/1998 | Jacobs | |
| 5,768,521 A | 6/1998 | Dedrick | |
| 5,774,670 A | 6/1998 | Montulli | |
| 5,784,565 A | 7/1998 | Lewine | |
| 5,790,793 A | 8/1998 | Higley | |
| 5,806,077 A | 9/1998 | Wecker | |
| 5,812,776 A | 9/1998 | Gifford | |
| 5,826,241 A | 10/1998 | Stein et al. | |
| 5,826,242 A | 10/1998 | Montulli | |
| 5,848,399 A | 12/1998 | Burke | 705/27 |
| 5,848,413 A | 12/1998 | Wolff | |
| 5,870,552 A | 2/1999 | Dozier et al. | |
| 5,895,454 A | 4/1999 | Harrington | |
| 5,897,622 A | 4/1999 | Blinn et al. | |
| 5,920,847 A | 7/1999 | Kolling et al. | |
| 5,982,891 A | 11/1999 | Ginter et al. | |
| 6,006,199 A | 12/1999 | Berlin et al. | |
| 6,023,683 A | 2/2000 | Johnson et al. | |
| 6,041,316 A | 3/2000 | Allen | |
| 6,049,785 A | 4/2000 | Gifford | |
| 6,134,532 A | 10/2000 | Montulli | |
| 6,195,649 B1 | 2/2001 | Gifford | |
| 6,199,051 B1 | 3/2001 | Gifford | |
| 6,205,437 B1 | 3/2001 | Gifford | |
| 6,449,599 B1 | 9/2002 | Payne et al. | |
| 6,708,157 B2 | 3/2004 | Stefik et al. | |

## OTHER PUBLICATIONS

Soverain Software LLC v. Amazon.Com, Inc. and The Gap, Inc., Order of Dismissal with Prejudice filed Aug. 31, 2005.

Bina et al., "Secure Access to Data Over the Internet", Natl. Center for Supercomputing Appls., Univ. Of Illinois, Champaign, Illinois, pp. 99–102.

Farber, David, "Interesting-People Message—RSA/NCSA/ EIT Announcement on Secure Mosaic" Palo Alto, California, Apr. 12, 1994, 4 pages.

Kent, Stephen T., "Internet Privacy Enhanced Mail", 8070 Communications of the ACM 36, New York, Aug. 1993, pp. 48–60.

Kohn, Dan, "Prior Art on Open Market Patents", e–mail message dated Mar. 9, 1998, 1 page.

Lewis, Peter H., "Attention Shoppers: Internet is Open", 2 pages.

Medvinsky et al., NetCash: A Design for Practical Electronic Currency on the Internet, Information Sciences Institute. University of Southern California, 1993, pp. 102–106.

Schaefer et al., "Networked Information Discovery and Retrieval Tools: Security Capabilities and Needs", The MITRE Corporation, 1994, pp. 145–153.

European Search Report dated Jun. 19, 2006.

Ohmori et al., "An On–line Shopping System Protecting User's Privacy" Information Communication Laboratory of Matsushita Electric Industrial Co., Ltd., pp. 25–32. Note: 12 Pages of Translation Attached.

Motoda, Toshihiro et al., An Experimental Verification of Relational Database Access Over WWW, NTT Software Laboratories, Nippon Telegraph and Telephone Corporation, 1995, pp. 47–54 (with English Translation—8 pages).

Gifford, Stewart, Payne, Treese, "Payment Switches for Open Networks," presented at 40th IEEE, IEEE, COMP-CON '95, Mar. 5–9, 1995, San Francisco, CA.

Defendant Amazon.com Inc.'s Unopposed Motion for Leave to Amend its Answer to Include Allegations Regarding Stuff.com.

Declaration of James E. Geringer in Support of Amazon.com, Inc's Motion for Leave to Amend its Answer and Counterclaims to Add Stuff.com.

Exhibit 1 of Geringer Declaration: Excerpts of Deposition of Michael Kuniavsky.

Exhibit 2 of Geringer Declaration: E–mail from Brooks Cutter to Mike Kuniavsky (Jun. 14, 1994).

Exhibit 3 of Geringer Declaration: Excerpts of Deposition of Richard Boake.

Exhibit 5 of Geringer Declaration: Excerpts of Deposition of Andrew Payne.

Exhibit 6 of Geringer Declaration: E–mail from Andrew Payne to Winfield Treese, et al. (Jun. 15, 1994).

Exhibit 7 of Geringer Declaration: Excerpts of Deposition of Winfield Treese.

Exhibit 8 of Geringer Declaration: Amazon.com, Inc.'s [Proposed] fourth Amended Answer, Affirmative Defenses, and Counterlaims to Soverain Software, LLC's Complaint (Redlined Version).

Amazon.com's Motion for Partial Summary Judgment that '314 claims 34–49, '492 claims 17–18 and 36–36, and '780 claims 1, 4, and 22–24 are invalid under 35 U.S.C. 102.

Amazon.com's Motion for Partial Summary Judgment that claims are indefinite under 35 U.S.C. 112.

Berners–Lee, T., et al., http://www.ietf.org/rfc/ rfc1738.txt?numbers=1738.

Changes to wwwStat at http://ftp.ics.uci.edu/pub/websoft/ wwwstat/Changes.

Berners–Lee, T., RFC 1630: Universal Resource Identifiers in WWW: A Unifying Syntax for the Expression of Names and Addresses of Objects on the Network as used in the World–Wide Web.

Berners–Lee, T., et al. RDC 1738: Uniform Resource Locators.

Fielding, R., RFC 1808: Relative Uniform Resource Locators.

Berners–Lee, T., et al. RFC 1945: Hypertext Transfer Protocol—HTTP/1.0.

**US 5,909,492 C1**

Page 3

Fielding, R., et al. RFC 2608: Hypertext Transfer Protocol—HTTP/1.1.

Fielding, R., et al. RFC 2616: Hypertext Transfer Protocol—HTTP1/1.

Berners–Lee, T. "draft–ietf–iiir–http–00.txt" (Nov. 5, 1993). wwwStat Readme file at http://ftp.ics.uci.edu/pub/websoft/wwwstate/README.

NCSA HTTPd release notes at http://hoohoo.ncsa.uiuc.edu/docs/Upgrade.html (last updated Aug. 1, 1995).

Crocker, Glenn, "web2mush: Serving Interactive Resources to the Web," Electronic Proc. of the 2nd World Wide Web Conf. '94: Mosaic and the Web!, Developers Day, (Oct. 20, 1994).

Dukach, Seymon; Prototype Implementation of the SNPP Protocol; allspic.lcs.mit.edu; 1992.

Batelaan; Butler; Chan; Evenchick; Hughes; Jen; Jeng; Millett; Riccio; Skoudis; Starace; Stoddard; "An Internet Billing Serving Prototype Design", Carnegie Mellon.

O'Mahony, Donal, Michael Peirce, & Hitesh Tewari, Electronic Payment Systems, Artech House, Inc., pp. 145–155, Jan. 1997.

Maren, Michael, "The Age of E–Mail," Home Office Computing, vol. 11, No. 12, p. 63(5).

Foster, David & Stuart Finn, "Insurers Can Benefit From E–Mail Networks", National Underwriter Property & Casualty–Risk & Benefits Management, No. 9, p. 46(2), Mar. 4.

Ferrarini, E., "Flight of Fancy: Goodbye Travel Agent", Business Computer Systems, vol. 2, No. 11, pp. 39–40, Nov. 1993.

Trip et al., "Cookies" (client–side persistent information) and their use, Netscape Technical Note 20019, Netscape Communications Corp., Oct. 1995.

Archive of WWWorder mailing list (Jun. 18, 1994–Jun.13, 1994).

Leggett, John et al., "Hyperform: Using Extensibility to Develop Dynamic, Open and Distributed Hypertext Systems" (1992).

Bieber, Michael, "Issues in Modeling a 'Dynamic' Hypertext Interface for Non–Hypertext Systems" (1991).

Nielson, Jacob, Hypertext & Hypermedia (1990).

"Announcing: Internet Shopkeeper" (Aug. 2, 1994) posting on comp.infosystems.www and misc.forsale.

Eaasy Sabre User's Guide and Eaasy Sabre Reference Guide.

Compuserve Manual (undated).

The Major BBS: Collection of information and Advertisements concerning The Major BBS (Fall 1993).

Fielding, Roy, et al., "Principled Design of the Modern Web Architecture" ACM Transactions on Internet Technology 2, 2 pp. 115–150 (May 2002).

Smithson, Brian, and Singer, Barbara, An Information Clearinghouse Server for Industry Consortia, 2nd Int'l Conf. On the World Wide Web, Chicago, Ill., Oct. 1994.

Soverain's ANSWER to Counterclaim (Amazon's Third Amended Counterclaim) by Soverain Software LLC.(Seraphine, Jennifer) (Entered: Mar. 17, 2005).

NOTICE by Amazon.com re: Answer to Amended Complaint, Counterclaim Of Rejection Of Claims 1–45 Of U.S. Patent No. 4,708,780 (Entered: Mar. 25, 2005).

MOTION to Stay [Renewed] by Amazon.com. (Entered: Apr. 5, 2005).

Soverain's Opposition to Amazon's Renewed Motion to Stay.

Amazon.Com, Inc.'s Reply in Support of Renewed Motion to Stay.

Deposition of Glenn Arthur Hauman with Exhibits (Oct. 28, 2004).

Deposition of Glenn Crocker with Exhibits (Mar. 10, 2005).

Deposition of Glenn M. Trewitt with Exhibits (Jan. 25, 2005).

Deposition of Guy Henry Timothy Haskin with Exhibits (Mar. 18, 2005).

Deposition of Joshua Smith with Exhibits (Mar. 2, 2005).

Deposition of Kevin Ming–Wei Kadaja Hughes with Exhibits (Mar. 21, 2005).

Deposition of Michael Kuniavsky with Exhibits (Feb. 22, 2005).

Deposition of Michael Lazzaro with Exhibits (Mar. 9, 2005).

Deposition of Phillip Hallam–Baker with Exhibits (Mar. 11, 2005).

Deposition of Robert Allen Olson with Exhibits (Mar. 3, 2005).

Deposition of Thomas Soulnaille with Exhibits (Mar. 14, 2005).

Expert Report of Alexander B. Travor (Apr. 10, 2005).

Reply to Response to Motion re: Motion to Stay [Renewed] (Surreply in Opposition to Amazon's Renewed Motion to Stay) filed by Soverain Software LLC.

Soverain's Reply to Amazon's Third Amended Counterclaims, dated Mar. 17, 2005.

Amazon.com's Renewed Motion to Stay Proceedings Until the Patent and Trademark Office Completes Re–Examination of the Three Patents in Suit, dated Apr. 5, 2005.

NCSA "What's New", http://archive.ncsa.uiuc.edu/SDG/Software/Mosaic/Docs/old–whats–new/whats–new–0294.html, Feb. 28, 1994, 17 pages.

Business Wire, CommerceNet Urges Government to Ease Export Restrictions on Encryption Products: Consortium's New White Paper Articulates Position on the Export of Cryptography–Based Products, Jun. 26, 1995, 2 pages.

"Advanced Electronic Credit Authorization Through the Amherst Group SNET", New Releases, New Haven, CT, Dec. 7, 1987, 2 pages.

Anderson, Scot et al., "Sessioneer: Flexible Session Level Authentication With Off the Shelf Servers and Clients", http//www.igd.fhg.de/archive/1995_www95/papers/77/sessioneer2.html, pp. 1–7.

Buhle, E. Loren, Jr., "Wide Area Information Servers", Digital Systems Journal, Sep./Oct. 1994, pp. 13–18.

Comer, D., et al., "The Tilde File Naming Scheme", The 6th International Conference on Distributed Computer Systems, IEEE Computer Society, Cambridge, MA., May 1996, pp. 509–514.

Comer, D.E., et al. "A Model of Name Resolution in Distributed Systems", The 6th International Conference on Distributed Computer Systems, IEEE Computer Society, Cambridge, MA, May 1996, pp. 523–530.

Computer Fraud & Security Bulletin, "Underlying Security Mechansms", Mar. 1997, 2 pages.

Cookies and Privacy FAQ, http://search.netscape.com/assist/security/faqs/cookies.html Jan. 9, 1998 at 4:29 pm., pp. 1–3.

Net Market Company, "Numerous News Media Stories", New York Times, Front Page of Business Section, Aug. 12, 1994, 4 pages.

Phillips, K., "SuperHighway Access Eases Internet Entry", PC Week, Oct. 31, 1994, 3 pages.

# US 5,909,492 C1
Page 4

Poler, Ariel, "Improving WWW Marketing Through User Information and Non–Instrusive Communications", Internet Profiles Corporation (I/PRO), 2nd WWW Conference, Chicago, Illinois, Oct. 1994, 4 pages.

Soverain's Disclosure of Asserted Claims and Preliminary Infringement Contentions dated Jun. 3, 2004.

Supplemental Disclosure of Preliminary Invalidity Contentions by Amazon and the Gap dated Jul. 26, 2004.

Deposition of G. Winfield Treese, dated Oct. 27, 2004.

Soverain's Reply to Amazon.Com's Amended Counterclaims, dated Jan. 14, 2005.

Third Supplement to Defendant Amazon's Initial Disclosures, dated Mar. 4, 2005.

VideoTaped Deposition of Mark Levergood dated Mar. 8, 2005 (2 parts).

VideoTaped Deposition of Andrew Payne dated Mar. 11, 2005.

VideoTaped Deposition of Stephen Morris dated Mar. 9, 2005.

VideoTaped Deposition of Glenn Trewitt dated Jan. 25, 2005 (2 parts).

Soverain's Fourth Supplemental Responses to Amazon's First Set of Interrogatores (Nos. 1–14) dated Mar. 21, 2005.

Soverain's Responses to Interrogatory Nos. 22, 23, 26 and 36 of Amazon's Third Set of Interrogatores (Nos. 17–28) dated Mar. 21, 2005.

Soverain's Responses to Amazon's First Set of Requests for Admission to Plaintiff Soverain Software (Nos. 1–100) dated Mar. 21, 2005.

Memorandum Opinion dated Apr. 7, 2005.

"It will happen", article excerpt from infoHighway, vol. 2–1, Jan. 1995.

Aronson, Dan, et al., Electronic Mail to multiple recipients of the www–talk list (www–talk@info.cern.ch) on "Access and session control" dated Sep. 15, 1994.

Derier, Christian, "The World–Wide Web Gateway to Hyper–G: Using a Connectionless Protocol to Access Session–Oriented Services", Institut für Informationverarbeitung and Computergestützte neue Medien, Graz, Austria, dated Mar. 1995.

English, Joe, Electronic Mail to multiple recipients of the www–talk list (www–talk@info.cern.ch) on "Re: Identifying Mosaic session" dated Dec. 20, 1994.

Fielding, Roy, software distribution archive for the HTTP log file analysis program, wwwstat v101, dated Apr. 24, 1994, published at http://www.ics.uci.edu/WebSoft/www-stat/.

Hall, Devra, et al., "Build a Web Site: The Programmer's Guide to Creating, Building, and Maintaining a Web Presence", published Apr. 1995. ISBN 0–7615–0064–2.

Hughes, Kevin, source code file for the HTTP log file analysis program, getstats v1.0, dated Feb. 1, 1994, published at http://eit.com/software/getstats/getstats.html—Version 1, 64 pages.

Hughes, Kevin, source code file for the HTTP log file analysis program, getstats v1.0, dated Feb. 1, 1994, published at http://eit.com/software/getstats/getstats.html—Version 2, 64 pages.

McCartney, Todd, Message posted to Usenet public discussion group, rec.arts.disney, dated Nov. 21, 1994.

Pitkow, et al., "Results from the First World Wide Web Use Survey", presented at the First International Conference on the World Wide Web, Geneva, Switzerland, Ma 25–27, 1994, published at http://www94.web.cern.ch/WWW94/PrelimProcs.html on Jun. 2, 1994, and reprinted in the Journal of Computer Networks and ISDN Systems, vol. 27, No. 2, Nov. 1994, Elsevier Science B.V.

The NetMarket Company, NetMarket PGP Help file, from http://www.netmarket.com, dated Dec. 10, 1994.

"CompuServe Videotex Network Offers Marketing Research Service, ad Test", Marketing News, Nov. 25, 1983, p. 21.

"Electronic In–Home Shopping: 'Our Stores are Always Open'," Chain Store Age Executive, Mar. 1985, pp. 111, 116.

"Mail Offers a Holiday Treat for Hackers," Advertising Age, Nov. 13, 1985, p. 76.

"Redcoats Join Communications Fight", Industry Week, Feb. 22, 1982, pp. 108–109.

"Suddenly, VideoTex is Finding an Audience", Business Week, Oct. 19, 1987, pp. 92–94.

"Taking Advantage of the Past",Advertising Age, Apr. 11, 1983, pp. M36–37.

American National Standard: "Financial Institution Retail Message Authentication"; ANXI X9, 1986.

American National Standard: "Interchange Message Specification for Debit and Credit Card Message Exchange Among Financial Institutions"; ANXI–X9, Feb. 1988.

Anderson, Ross J.: UEPS—A Second Generation Electronic Wallet: Proc. of the Second European Symposium on Research in Computer Security (ESORICS); Touluse, France, pp. 411–418, undated.

Bellcore Internal e–mail, Nov. 24, 1993, 7 pages.

Bender, M., EFTC: Electronic Funds Transfer Systems:, Kennikat Press; Port Washington, New York, pp. 42–46, 1975.

Beutelspacher et al., "Payment Applications with Multifunctional Smart Cards", Smart Card 2000, 1989, pp. 95–101.

Booz, Allen & Hamilton, "How to Buy Information with a First Virtual Account", Apr. 11, 1994, 63 pages.

Bos et al., "SmartCast: A Practical Electronic Payment System" Centre for Mathematics and Computer Science, Aug. 1990, pp. 1–8.

Burk et al., "Digital Payment Systems Enabling Security and Unobservability", Computer & Security, 1989, pp. 399–415.

Burk et al., "Value Exchange Systems Enabling Security and Unobservability", Computer & Security, 1990, pp. 715–721.

Chaum et al., "Untraceable Electronic Cash"; Advances in Cryptology, 1988, pp. 319–327.

Chaum et al., "Implementing Capability–Based Protection Using Encryption", Electronics Research Laboratory, University of California, Berkeley, 1978, 12 pages.

Cohen, D., "Computerized Commerce", ISI Reprint Series IS/RS–89–243; Oct. 1989, Reprinted from Information Processing 89, Proceedings of the IFIP World Computer Congress, Held Aug. 28–Sep. 1, 1989, 8 pages.

Cohen, D., "Electronic Commerce", University of Southern California Information Sciences Institute, Research Report ISI/RR–89–244, Oct. 1989, 42 pages.

CompuServe International: CompuServe Information Service Users Guide, pp. 109–113; 1986.

Computer Shopper, "Internet for Profit", Nov. 1994, pp. 180–182; 190–192; 522–528, 532, 534.

"Consumers Plugging into New Electronic Mail", Advertising Age, Mar. 4, 1985, p. 74.

Damgard, "Payment Systems and Credential Mechanisms with Provable Security Against Abuse by Individuals", Advances in Cryptology–CRYPTO '88, 1988, pp. 328–335.

Davies et al., "Security for Computer Networks: An Introduction to Data Security in Teleprocessing and Electronic Funds Transfer", John Wiley & Sons, Dec. 5, 1985, pp. 304–336.

Dukach, S., "SNPP: A Simple Network Payment Protocol"; MIT Laboratory for Computer Science: Cambridge, MA, 7 pages.

Even et al., "Electronic Wallet"; Computer Science Department, Israel, pp. 383–386.

Ferranini, E., "Direct Connections for Software Selections", Business Computer Systems, Feb. 1985, pp. 35–38.

Fujioka, et al., "ESIGN: An Efficient Digital Signature Implementation for Smart Cards" Advances in Cryptology—Eurocrypt '91, Apr. 1991; pp. 446–457.

Gifford et al., "Case Study; The Cirrus Banking Network", Communications of the ACM, Aug. 1995, 2 pages.

Gifford, David K., "Notes on Community Information Systems", MIT/LCS/TM–419, Dec. 10, 1989, 7 pages.

Gifford, David K, "Cryptographic Sealing for Information Secrecy and Authenication", Stanford University and Xerox Palo Alto Research Center, Communications of the ACM, vol 25, No. 4, Apr. 1982, pp. 274–286.

Hakola., et al., A System for Automatic Value Exchange Exchange, Proceedings—Fall Joint Computer Conference, Nov. 1966, pp. 579–589.

Harty et al., "Case Study: The VISA Transaction Processing System", May 1988, pp. 1–23.

Hirschfeld, "Making Electronic Refunds Safer", Laboratory for Computer Science, MIT, 1992, 4 pages.

Information Networking Institute, Carnegie Mellon University, Prototype Scope Document, INI Technical Report 1993–1, Oct. 14, 1993, 29 pages.

International Organization for Standardization, International Standard—Bank Card Originated Messages—Interchange Message Specifications Content for Financial Transactions, ISO 8383 1987.

Intuit Corp. Quicken User's Guide, "Paying Bills Electronically", no date, pp. 171–191.

Jansson, L., "General Electronic Payment System", 7th Proceedings of the International Conference on Computer Communication, 1985, pp. 832–835.

Kenny, "EDI Security: Risks and Solutions", SD–Scion UK Limited, 1992, 12 pages.

Knapskog, "Privacy Protected Payments—Reliazation of a Protocol that Guarantees Payer Anonymity", EuroCrypt 1988, pp. 107–121.

Krajewski, M., "Concept for a Smart Card Kerberos", 15th National Computer Security Conference, Oct. 1992, 9 pages.

Krajewski, M., et al., "Applicability of Smart Cards to Network User Authentication", Computing Systems, vol. 7, No. 1, Winter 1994, pp. 75–89.

Krajewski, M., "Smart Card Augmentation of Kerberos", Privacy and Security Research Group Workshop on Network and Distributed System Security, Feb. 1993, 5 pages.

Lai et al., "Endorsements, Licensing, and Insurance for Distributed System Services", Information Sciences Institute, U. of Southern California, undated, 6 pages.

Low et al., "Anonymous Credit Cards", undated, pp. 1–16.

Medvinsky et al., "Electronic Currency for the Internet", Electronic Markets, Sep. 1993, pp. 30–31.

Messmer, "NIST Stumbles on Proposal for Public–Key Encryption", Network World, Jul. 27, 1992, pp. 1–6.

Mosaic Communications Corp. Press Release, "Mosaic Communications Unveils Network Navigator and Server Software for the Internet", Sep. 1994, 3 pages.

National Westminster Bank Group, "Clearing House Automated Payments System", undated, 31 pages.

Needham, Roger M., "Adding Capability Access to Conventional File Servers", Xerox Palo Alto Research Center, California, undated, pp. 3–4.

Okamoto et al., "University Electronic Cash", NTT Laboratories, pp. 324–337.

Payment Systems, "United States", undated, pp. 217–235.

Perry, "Electronic Banking Goes to Market", IEEE Spectrum, Feb. 1988, pp. 46–49.

Pfitzmann et al., "How to Break and Repair a Provably Secure Untraceable Payment System", pp. 338–350.

Ph, van Heurck, "TRASEC: Belgian Security Systems for Electronic Funds Transfers," Computers & Security, 1987, pp. 261–268.

Pongratz, et al., "IC Cards in Videotex Systems", Smart Card 2000, 1989, pp. 179–186, 1 page.

Recommendation X.509: The Directory—Authentication framework, Fascicle VIII.8 (Melbourne 1988) pp. 48–82.

Remery, P., et al., "Le paiement electronique", L'Echo des Recherches, No. 134, 1988, pp. 15–23.

Rescorla E., et al., "The Secure HyperText Transfer Protocol", Enterprise Integration Technologies, Dec. 1994, 35 pages.

Rescorla, E., et al., "The Secure HyperText Transfer Protocol", Enterprise Integration Technologies, Jun. 1994, 22 pages.

Rivest et al., "A Method for Obtaining Digital Signatures and Public–Key Crypotosystems", Laboratory for Computer Science, MIT, undated, pp. 1–15.

Schaumuller–Bichl, "IC Cardfs in High–Security Applications", Selected Papers from the Smart Card Conference, Springer Verlag, 1991, pp. 177–199.

Shain, "Security inElectronic Funds Transfer: Message Integrity in Money Transfer and Bond–Settlements through GE Information Services' Global Network", Computers & Security, vol. 8, No. 3 1989, pp. 209–221.

Sirbu, Marvin A., "Internet Billing Service Design and Prototype Implementation", pp. 1–19.

Society for Worldwide Interbank Financial Telecommunications S.C.; "A S.W.I.F.T. Overview" no date, 34 pages.

Staskauskas, "The Formal Specification and Design of a Distributed Electronic Funds–Transfer System", EEE, 1988, pp. 1515–1528.

Stol, "Privacy Protected Payments—A Possible Structure for a Real Implementation and Some Resource Considerations", Reproduced by U.S. Department of Commerce, 83 pages.

Strazewski, "Computerized Service Sets Shoppers Hacking", Advertising Age, Feb. 22, 1988, p. 62.

Takei, Videotex Information System and Credit System Connecting with MARS 301–of JNR, Japanese Railway Engineering, No. 95, Sep. 1985, pp. 9–11.

Tanaka et al., "Untraceable Electronic Funds Transfer Systems", Electronics and Communications in Japan, Part 3, vol. 72, No. 9, 1989, pp. 47–54.

# US 5,909,492 C1
## Page 6

Tenenbaum et al., "Development of Network Infrastructure and Services for Rapid Acquisition", Adapted from a White Paper Submitted to DARPA by MCC in Collaboratio with EIT and ISI, Jan. 1992, pp. 1–19.

Tunstall, "Electronic Currency", Smart Card 2000: The Future of IC Cards, Oct. 1987, pp. 47–48.

Vittal, "Active Message Processing: Messages as Messengers", 1981, pp. 175–195.

Waidner, et al., "Loss–Tolerance for Electronics Wallets", Fault–Tolerant Computing: 20th International Symposium, Jun. 26–28, 1990, pp. 140–147.

Weber, "Controls in Electronic Funds Transfer Systems: A Survey and Synthesis", Computers & Security, 1989, pp. 123–137.

Williams, "Debt Program Cuts Fraud—CompuServe Plan a Success", Pensions & Investment Age, Feb. 4, 1985, pp. 31–33.

Joint Claim Construction Chart (Patient Local Rule 4–5D)), filed Dec. 27, 2004 with Appendix A.

Order Denying Amazon's Motion to Stay Proceedings Pending Completion of the Reexamation.

Transcript of the Markman Hearing Before the Honorable Leonard David United States District Judge, Jan. 6, 2005.

Complaint for Patent Infringement filed Jan. 12, 2004.

Amazon.com's Answer, Affirmative Defenses, and Counterclaims to Soverain Software's Complaint filed Mar. 9, 2004.

Amazon.com's Response to Plaintiffs First Set of Interrogatories (Nos. 1–22) filed Jun. 11, 2004.

Soverain's Responses and Objections to Amazon.com's First Set of Interrogatories (Nos. 1–14) filed Jun. 11, 2004.

Disclosure of Preliminary Invalidity Contentions by Defendants Amazon.com and the Gap (with Exhibit A) filed Jul. 6, 2004.

Soverin's Supplemental Responses to Amazon.com's First Set of Interrogatories (Nos. 1–14) filed Aug. 13, 2004.

Soverin's Second—Supplemental Response to Amazon.com's First Set of Interrogatories (Nos. 1–14) filed Sep. 21, 2004.

Soverain's Third Supplemental Response to Amazon.com's First Set of Interrogatories (Nos. 1–14).

Soverin's Preliminary Claim Construction (Patent Local Rule 4–2) filed Sep. 2, 2004.

Joint Disclosure of Preliminary Claim Construction and Extrinsic Evidence by Defendants Amazon.com and the Gap (with Exhibits A–B) filed Sep. 2, 2004.

Joint Claim Construction and Prehearing Statement (Patent Local Rule 4–3) (with Exhibits A–D) filed Oct. 4, 2004.

Amazon.com's First Amended Answer, Affirmative Defenses, and Counterclaims to Soverain's Complaint filed Oct. 6, 2004.

Declaration of Jack D. Grimes Ph.D., dated Nov. 15, 2004.

Soverain's Claim Construction Brief Pursuant to Patent Rule 4–5(a) dated Nov. 16, 2004.

Declaration of Dr. Richard N. Taylor in Support of Defendants' Markman Brief dated Nov. 29, 2004.

Joint Claim Construction Brief of Amazon.com and Gap dated Nov. 30, 2004.

Soverain's Claim Construction Reply Brief Psuuant to Patent Rule 4–5(c) dated Dec. 7, 2004.

"HTTP State Management Mechanism," http://www.inter-nic.net/rfc/rfc2109.txt (Jan. 9, 1998)—http://www.cse.o-hio–state.edu/cgl–bin/rfc/rfc2965.html.

"maX.500—a Macintosh X.500 Directory Client", contents of WWW website, http://www.umich.edu/~dirsvc/ldap/max500/index.htlm as of Jul. 7, 1997.

"Mosaic Communications Unveils Network Navigator and Server Software for the Internet," Mosaic Communications Press Release, Sep. 1994.

"Persistent Client State HTTP Cookies," http://search.netscape.com/newsref/std/cookie spec.html (Jan. 9, 1998).

57 USPQ2D, "Amazon.com, Inc. v. Barnesandnoble.com, Inc." pp. 1746–1763.

Abadi M., et al., "Authentication and Delegation with Smart–Cards," Oct. 1990, Chapter 67.

Aho, A.V., et al., "Reports and Databases," in the AWK Programming Language, M.A. Harrison, ed., (Addison–Wesley), pp. 100–101 (1988).

Anderson, R., "Why Cryptosystems Fail," 1st Conf.—Computer & Comm. Security, 1993–11/93–VA, USA, pp. 215–227.

Andrade, et al., "Open On–Line Transaction Processing with the TUXEDO System," pp. 366–371, Digest of Papers, IEEE Computer Society Press, COMPSON Spring 1992, San Francisco, Calif.

Berners–Lee, T., et al., "Target a Common Internet Syntax Where the User Password is Appended to a Specific URL," http://www.ietf.org/rfc1738.txt?number–1738.

Bjorn N. Freeman–Benson, "Using the Web to Provide Private Information," First International Conference on the World Wide Web, WWW94, May 1994, 5 pages.

Bob Novick, (9503) Internet Marketing: The Clickstream, Mar. 1995, [http://www.i–m.com/archives/9503/0375.htm] 3 pages.

Bowman, et al., "Univers: An Attribute–Based Name Server," Software Practice and Experience, vol. 20(4) 403–424 (Apr. 1990).

Brian W. Kernighan and Dennis M. Ritchie, "The C Programming Language" second edition, AT&T Bell Laboratories, (N.J., Prentice Hall) pp. 17–21 (1998).

Catledge L.D., "Characterizing Browsing Strategies in the World–Wide Web," http.www.igd.thg.de/archive/1995_.../UserPatterns.Paper4.formatted.htm.

Chaum, D., "Achieving Electronic Privacy," Scientific American, Aug. 1992, pp. 96–101.

Cheriton D.R., et al., "Uniform Access to Distributed Name Interpretation in the V–System," pp. 290–297, 4th International Conference on Distributed Computing System, IEEE Computer Society, San Francisco, Calif., May, 1984.

Choudhury, Abhijit K., et al., "Copyright Protection for Electronic Publishing Over Computer Networks," IEEE Network, The Magazine of Computer Communications, vol. 9, No. 3, pp. 12–20, May 1995.

Clickstream, Oct. 1996, The word Spy, [http:www.wordspy–com/words/clickstream.asp], 2 pages.

Computer and Business Equipment Manufacturers Association, "American National Standard for Information Systems—Database Language SQL" (N.Y., American National Standards Institute) pp. 27–28 (1988).

Curtis, R., et al., "Naming in Distributed Language Systems," pp. 298–302, 4th International Conference on Distributed Computing Systems, IEEE Computer Society, San Francisco, CA May 1984.

Droms, R.E., "Access to Heterogenous Directory Services," Proceedings IEEE INFOCOM '90, pp. 1054–1061, San Francisco, Calif. Jun. 3–7, 1990.

## US 5,909,492 C1

Gary Weiz, "The Media Business on the WWW", Proceedings of the Second World Wide Web Conference 1994: Mosaic and the Web, Oct. 1994, 6 pages.

Gligor, V.D., "Object Migration and Authenication," IEEE Transactions of Software Engineering, vol. SE–5, No. 6, Nov. 1979, pp. 607–611.

Good, B., "Experience with Bank of America's Distributive Computing System," pp. 2–8, IEEE 1983.

Hitchens, M., et al., "Bindings Between Names and Objects in a Persistent System," Proceedings of the 2nd International Workshop on Object Orientation in Operating Systems, IEEE Computer Society, pp. 26–37, Dourdan, FR, Sep. 1992.

Housel, B.C., et al., "SNA Distribution Services," IBM Systems Journal, pp. 319–343, vol. 22, No. 4, 1983.

Inselberg, A., "An Approach to Successful Online Transaction Processing Applications," AFIPS Conference Proceedings, 1985 National Computer Conference, pp. 419–427, Chicago, Ill., Jul. 15–18, 1985.

Kahan, Jose, "A capability–based authorization model for the World–Wide Web," http://www.igd.fng.de/archive/1995_www95/proceedings/papers/86/CaMWWW.htlm pp. 1–14.

Kahan, Jose, "A Distributed Authorization Model for WWW," http://www.isoc.org/HMP/PAPER/107/html/paper.html. pp. 1–16.

Kahan, Jose, "A New Authorization Model for Distributed Multimedia Information Consultation Systems" English Translation, pp. 1–21.

Kahan, Jose, "Un nouveau modele d–autorisation pour les systemes de consulation d–information multimedia repartee," pp. 45–57.

Kelley, A., and Pohl, I., "Arrays, Strings, and Pointers," in a Book on C, A, Apt, ed., (the Benjamin/Cummings Publishing Company, Inc.) pp. 33–37 (1984).

Kluchi, T., et al., "C–HTTP—The Development of a Secure, Closed HTTP–Based Network on the Internet," 1996 IEEE, pp. 64–75.

Lampson, B.W., "Designing a Global Name Service," pp. 1–10, Proceedings of the 5th Annual ACM Symposium on Principles of Distribued Computing, ACM, Calgary, Alberta, Canada, Aug. 1986.

Lim, Jong–Gyun, "Using Coolists to Index HTML Documents in the Web," http://www.ncsa.uiuc.edu/SDG/TT94/Proceedings/Searching/lim/coolist. htm, pp. 1–8.

Lou Montulli, Electronic Mail to Multiple Recipients of the www–talk list (www–talk.1995a2/0134.html on "Session Tracking" (omi.mail.www–talk, Apr. 18, 1995).

Menefee, C., "New host for Internet Commercial Site Index," Newsbytes Nov. 9, 1994, p. 15.

Metcalf, R.M. "Commercialization of the Internet Opens Gateways to Interpreneurs," InfoWorld, Aug. 8, 1994, p. 44.

Michalski, J., "Content in context: the Future of SGML and HTML," Release 1.0, Sep. 27, 1994, pp. 1–10.

NCSA HTTPd 1.5 Beta How to Redirect, "The New Redirect Directives."

Neuman, B.C., "Proxy–Based Authorization and Accounting for Distributed Systems," Proceedings on the 13th International Conference on Distributed Computing Systems, Pittsburg, May 1993, pp. 283–291.

Notkin, D., "Proxies: A Software Structure for Accomodating Hetergeneity," Software–Practice and Experience, vol. 20(4), 357–364, Apr. 1990.

Ordille, J.J., et al., "Nomenclater Descriptive Query Optimization for Large X.500 Environments," pp. 185–196, SIGCOM '91 Conference, Communication Architectures & Protocols, vol. 21, No. 4, Zurich, Switzerland, Sep. 1991.

Peterson, Larry L., "A Yellow–Pages Service for a Local–Area Network," ACM Proceedings of the ACM SIG-COMM 87 Workshop, ACM Press, 1988, pp. 235–242.

Pitkow, J.E., "Webviz: A Tool for World–Wide Web Access Log Analysis," First International World Wide Web Conf., May 1994, 7 pgs.

Pitkow, J.E., and Recker, M.M., Using the Web as a Survey Tool: Results from Second WWW User Survey,: http://www.igd.fhg.de/archive/1995_www95/papers/79/survey/survey_2_paper.html.

Ramanathan, Sirvivas, et al., "Architectures for Personalized Multimedia," IEEE Multimedia, vol. 1, No. 1, Computer Society, pp. 37–46, 1994.

Rescorla, E., et al., "The Secure HyperTest Transfer Protocol," Aug. 1999.

Rivest, R., "The MD5 Message–Digest Algorithm," MIT Laboratory for Computer Science and RSA Data Security, Inc., Apr. 1992.

Schwartz, et al., "A Name Service for Evolving, Heterogeneous Systems," Proceedings of the 11th ACM Symposium on Operating Systems Principles, vol. 21, No. 5, pp. 52–62, Austin, TX, Nov. 1987.

Schwartz, M.F., et al., Experience with a Semantically Cognizant Internet White Pages Directory Tool, Journal of Internetworking: Research and Experience, pp. 1–22 (1990).

Sedayao, J., "Mosaic Will Kill My Network!—Studying Network Traffic Patterns of Mosaic Use", http://www.ncsa.uiuc.edu/SDG/TT94/P...qs/DDay/sedayao/mos_traf_paper.htm.

Sheltzer, et al., "Name Service Locality and Cache Design in a Distributed Operating System," University of California, Los Angeles, 8 pgs.

Squillante, M.C., et al, Integrating Heterogeneous Local Mail Systems, pp. 59–67, IEEE Software, Nov. 1989.

Terry, D.B., "Structure–free Name Management for Evolving Distributed Envrivonments," pp. 502–508, 6th International Conference on Distributed Computing Systems, IEEE Computer Society, Cambridge, MA, May 1986.

Voydock V., et al., "Security Mechanisms in High Level Network Protocols," Computing Surveys, vol. 15, No. 2, Jun. 1983, pp. 135–171.

Welch, B., et al., "Prefix Tables: A Simple Mechanism for Locating Films in a Distributed System," pp. 184–189, 6th International Conference on Distributed Computing Systems, IEEE Computer Society, Cambridge, MA, May 1996.

WordPerfect for Macintosh, pp. 153–162 (1990).

Zatti, et al., "Naming and Registration for IBM Distributed Systems," IBM Systems Journal, pp. 353–380, vol. 31, No. 2, 1992.

"Here it is, World" internet postings to comp.infosystems.www.users discussion list re: Mosaic Netscape (Oct. 13, 1994–Oct. 17, 1994) available at: http://groups.google.com/group/comp.infosystems. www.users/browse_thread/thread/3666fe4e21b3a9e2/9a210e5f72278328?lnk=st&mum=5&hl=en#9a210e5f72278328.

"Netscape 0.93 Setup Questions" internet postings to comp.infosystems.www.misc discussion list re: Mosaic Netscape (Nov. 21, 1994–Nov. 25, 1994) available at: http://groups.google/com/group/comp.infosystems.www.misc/browse_thread/thread/da4c82efc6512f67/8dabc347291409d5?lnk=st&rnum=1&hl=en#8dabc347291409d5.

"Netscape and Cookies" internet postings to comp.infosystems.www.users discussion list re: Mosaic Netscape (Dec. 11, 1994–Dec. 13, 1994) available at: http://groups.google.com/group/comp.infosystems.www.users/browse_thread/thread/5347cb89bbae572b/3583cab5e6c13e94?lnk=st&rnum=3&hl=en#3583cab5e6c13e94.

"Cookies.txt" internet postings to comp.infosystems.www.users discussion list re: Mosaic Netscape (Dec. 23, 1994–Dec. 27, 1994) available at: http://groups.google.com/group/comp.infosystems.www.users/browse_thread/thread/613e81948e9cf6e4/134ade72dfc1c58d?lnk=st&rnum=2&hl=en#134ade72dfc1c58d.

"How to get stateful HTML documents" internet postings to comp.infosystems.www.misc discussion list (Jun. 24, 1994–Jun. 25, 1994) available at: http://groups.google.com/group/comp.infosystems.www.misc/browse_thread/thread/fd304fedb645529a/b8f6dab2aa73ae71?lnk=st&rnum=7&hl=en#b8f6dab2aa73ae71.

"How to add state infor to a form" internet postings to comp.infosystems.www.providers discussion list (Jun. 30, 1994–Jul. 1, 1994) available at: http://groups.google.com/group/comp.infosystems.www.providers/browse_thread/thread/2acad6cdc8ebb8a/bf368e630add2c94?lnk=st&rnum=8&hl=en#bf368e630add2c94.

"Transactional Services on WWW" internet postings to comp.infosystems.www discussion list (May 21, 1994–Jun. 1, 1994) available at: http://groups.google.com/group/comp.infosystems.www/browse_thread/thread/bf430e6df8e6e7d/8ed77a97f5d0b96?lnk=st&hl=en#8ed77a97f5d0b9d6.

Dan Aronson, "access and session control" posting to www–talk discussion list (Sep. 14, 1994) available at: http://1997.webhistory.org/www.lists/www–talk.1994q3/0901.html.

Rick Troth, "access and session control" (Sep. 15, 1994) available at: http://1997.webhistory.org/www.lists/www–talk.1994q3/0923.html.

alain@hyperman.co.il, "Identifying Mosaic session" posting to www–talk discussion list (Dec. 20, 1994) available at http://1997.webhistory.org/www.lists./www–talk.1994q4/1098.html.

Joe English, "Re: Identifying Mosaic session", posting to www–talk discussion list (Dec. 20, 1994 available at: http://1997.webhistory.org/www.lists/www–talk.1994q4/1109.html.

Steven Majewski, "Identifying Mosaic session" posting to www–talk discussion list (Dec. 20, 1994) available at: http://1997.webhistory.org/www.lists/www–talk.1994q4/1111.html.

Nick Arnett, "Statelessness" posting to www–talk discussion list (May 16, 1994) available at: http://1997.webhistory.org/www.lists/www–talk.1994q2/0562.html.

Jared Rhine, "Statelessness" posting to www–talk discussion list (May 16, 1994) available at: http://1997.webhistory.org/www.lists/www–talk.1994q2/0563.html.

Simon Spero, "Statelessness" posting to www–talk discussion list (May 17, 1994) available at: http://1997.webhistory.org/www.lists/www–talk.1994q2/0579.html.

Jim McBeath, "Statelessness" posting to www–talk discussion list (May 27, 1994) available at: http://1997.webhistory.org/www.lists/www–talk.1994q2/0683.html.

Philip Hallam–Baker, "Statelessness" posting to www–talk discussion list (May 27, 1994) available at: http://1997.webhistory.org/www.lists/www–talk.1994q2/0705.html.

Trewitt, Glenn, *Using Tcl to Process HTML Forms*, Digital Equipment Corporation Network Systems Laboratory TN–14, dated Mar. 1994.

Viescas, John L., The Official Guide to the Prodigy Service, Microsoft Press, 1991, ISBN 1–55615–374–0.

BizNet Technologies, Versatile Virtual Vending, published at http://www.bnt.com, Sep. 12, 1994.

* cited by examiner

US 5,909,492 C1

| 1 | 2 |

# EX PARTE
# REEXAMINATION CERTIFICATE
# ISSUED UNDER 35 U.S.C. 307

THE PATENT IS HEREBY AMENDED AS
INDICATED BELOW.

Matter enclosed in heavy brackets [ ] appeared in the
patent, but has been deleted and is no longer a part of the
patent; matter printed in italics indicates additions made
to the patent.

AS A RESULT OF REEXAMINATION, IT HAS BEEN
DETERMINED THAT:

The patentability of claims 1–38 is confirmed.

New claims 39–108 are added and determined to be
patentable.

*39. A hypertext statement system in accordance with claim
15, wherein the network is an Internet.*

*40. A hypertext statement system in accordance with claim
15, wherein the client computer is a buyer computer, and at
least one of the server computers is a payment computer.*

*41. A hypertext statement system in accordance with claim
15, wherein the statement document is sent by at least one
of the server computers to the client computer in response to
a statement URL sent by the client computer to at least one
of the server computers.*

*42. A hypertext statement system in accordance with claim
41, wherein the statement URL includes a URL authentica-
tor that is a digital signature based on a cryptographic key;*

*wherein the URL authenticator is a hash of information
contained in the statement URL;*

*wherein at least one of the server computers verifies
whether the statement URL authenticator was created
based upon the information contained in the statement
URL using the cryptographic key.*

*43. A hypertext statement system in accordance with claim
42, wherein if verification by at least one of the server
computers fails, then at least one of the server computers
sends a document to the client computer indicating that
access is denied.*

*44. A hypertext statement system in accordance with claim
42, wherein the statement URL comprises a client computer
network address;*

*wherein the client computer network address is verified by
matching it with the network address specified in the
statement URL.*

*45. A hypertext statement system in accordance with claim
44, wherein if verification fails, then at least one of the
server computers sends a document to the client computer
indicating that access is denied.*

*46. A hypertext statement system in accordance with claim
42, wherein the client computer prompts the user for an
account name and password by creating an account name
prompt and a password prompt.*

*47. A hypertext statement system in accordance with claim
46, wherein at least one of the server computers verifies that
the account name and password provided by the user match
a previously provided account name and password.*

*48. A hypertext statement system of claim 47, wherein if
the account name and password verification fails, then at
least one of the server computers sends a document to the
client computer indicating that access to at least a portion
of a network sales system is denied.*

*49. A hypertext statement system of claim 44, wherein if
a payment amount exceeds a threshold, then the user is
prompted for security-related information;*

*wherein at least one of the server computers verifies that
the security-related information matches previously
provided security-related information.*

*50. A hypertext statement system in accordance with claim
49, wherein if the security-related verification fails, then the
payment computer sends a document to the buyer computer
indicating that access is not allowed.*

*51. A hypertext statement system in accordance with claim
49, wherein at least one of the server computers transmits
the statement document to the client computer, and the client
computer displays the statement document to the user.*

*52. A hypertext statement system in accordance with claim
51, wherein the client computer is a buyer computer;*

*wherein at least one of the server computers retrieves
settlement data from a settlement database for use in
generating the statement document.*

*53. A hypertext statement system in accordance with claim
15, wherein the transaction detail hypertext link includes a
transaction detail URL;*

*wherein the transaction detail URL includes a URL
authenticator that is a digital signature based on a
cryptographic key;*

*wherein the URL authenticator is a hash of information
contained in the transaction detail URL;*

*wherein at least one of the server computers verifies
whether the transaction detail authenticator was cre-
ated from information contained in the transaction
detail URL based upon the cryptographic key;*

*wherein the transaction detail URL comprises a client
network address;*

*wherein the client computer network address is verified by
matching it with the network address specified in the
transaction detail URL;*

*wherein the client computer prompts the user for an
account name and password by creating an account
name prompt and a password prompt;*

*wherein at least one of the server computers verifies that
the account name and password entered by the user
match a previously provided account name and pass-
word;*

*wherein if a payment amount exceeds a threshold, then the
user is prompted for security-related information;*

*wherein at least one of the server computers verifies that
the security-related information matches previously
provided security-related information.*

*54. A hypertext statement system in accordance with claim
53, wherein the client computer is a buyer computer, and at
least one of the server computers is a payment computer.*

*55. A hypertext statement system in accordance with claim
15, wherein the user requests customer service;*

*wherein in response to the user request, the client com-
puter sends a customer service URL to at least one of
the server computers, and at least one of the server
computers creates a customer service form and sends
the form to the client computer;*

*wherein the form contains an area for the user to provide
comments.*

*56. A hypertext statement system in accordance with claim
55, wherein the client computer sends the user's comments
to at least one of the server computers;*

*wherein at least one of the server computers processes the
user comments.*

3

4

57. A hypertext statement system in accordance with claim 15, wherein the user requests display of a product listed on the statement document.

58. A hypertext statement system in accordance with claim 57, wherein the client computer sends an access URL to a second server computer.

59. A hypertext statement system in accordance with claim 58, wherein the access URL comprises an authenticator based on a cryptographic key;

wherein the access URL authenticator is a hash of other information in the access URL;

wherein the second server computer verifies whether the access URL authenticator was created from information contained in the access URL using a cryptographic key;

wherein the access URL comprises a duration of time for access indicator, and the second server computer verifies whether the duration time for access has expired;

wherein the access URL comprises a buyer network address indicator, and the second server computer verifies that a buyer computer network address is the same as the buyer network address indicated in the access URL;

wherein the second server transmits a fulfillment document to the client computer.

60. A hypertext statement system in accordance with claim 15, wherein the statement document includes information on transactions by the user that took place in a given month.

61. A hypertext statement system in accordance with claim 60, wherein the information on transactions by the user includes at least one of the following types of information: a date of transaction, an identification of the product, a payment amount, and a merchant identifier.

62. A hypertext statement system in accordance with claim 60, wherein the statement document also includes one or more links to information regarding previous transactions by the user.

63. A hypertext statement system in accordance with claim 60, wherein for a transaction there is a transaction detail URL that includes a transaction identifier, a buyer network address, and a transaction detail URL authenticator.

64. A hypertext statement system in accordance with claim 63, wherein at least one of the server computers receives the transaction detail URL;

wherein the transaction detail URL includes a URL authenticator that is a digital signature based on a cryptographic key;

wherein the URL authenticator is a hash of information contained in the transaction detail URL;

wherein at least one of the server computers verifies whether the transaction detail URL authenticator was created from information contained in the transaction detail URL using the cryptographic key;

wherein the transaction detail URL comprises a client computer network address, and the client computer network address is verified by matching it with the network address specified in the transaction detail URL;

wherein the client computer prompts the user for an account name and password by creating an account name prompt and a password prompt, and at least one of the server computers verifies that the account name and password entered by the user match a previously provided account name and password;

wherein if a verification by at least one of the server computers fails, then at least one of the server com-

puters sends a document to the client computer indicating that access is denied.

65. A hypertext statement system of claim 15, wherein if a payment amount provided by the user exceeds a threshold, then the user is prompted for security-related information, and at least one of the server computers verifies that the security information matches previously provided security-related information.

66. A hypertext statement system in accordance with claim 15, wherein the transaction detail document includes transaction information and merchant information.

67. A hypertext statement system in accordance with claim 66, wherein the transaction information includes at least one of the following types of information: a URL where a product is located, a transaction log identifier, a currency type used, a transaction date, an expiration time, an initiator number, a product description, a transaction amount, a beneficiary number, an IP address, a transaction type indicator, and a domain corresponding to the product.

68. A hypertext statement system in accordance with claim 66, wherein the merchant information includes at least one of the following types of information: a merchant telephone number, a merchant address, a merchant FAX number, a merchant e-mail address, a merchant principal name, a merchant home URL, and a merchant country.

69. A hypertext statement system in accordance with claim 66, wherein the transaction detail document comprises a customer feedback form, including the following fields for data entry by the user: account name, e-mail address, subject, and comments.

70. A hypertext statement system in accordance with claim 69, wherein the customer feedback form includes a hyperlink that a user activates to send the form to at least one of the server computers.

71. A hypertext statement system in accordance with claim 66, wherein the transaction detail document comprises a message to the user inviting comments by e-mail and giving an e-mail address.

72. A hypertext statement system in accordance with claim 66, wherein the transaction detail document further comprises a message to the user inviting comments by FAX and giving a FAX number.

73. A hypertext statement system in accordance with claim 15, wherein a digital advertising document is provided to the client computer.

74. The method of claim 16, wherein the network is an Internet.

75. The method of claim 16, wherein the client computer is a buyer computer, and at least one of the server computers is a payment computer.

76. The method of claim 16, wherein the statement document is sent by at least one of the server computers to the client computer in response to a statement URL sent by the client computer to at least one of the server computers.

77. The method of claim 76, wherein the statement URL includes a URL authenticator that is a digital signature based on a cryptographic key;

wherein the URL authenticator is a hash of information contained in the statement URL;

wherein at least one of the server computers verifies whether the statement URL authenticator was created based upon the information contained in the statement URL using the cryptographic key.

78. The method of claim 77, wherein if verification by at least one of the server computers fails, then at least one of the server computers sends a document to the client computer indicating that access is denied.

US 5,909,492 C1

| 5 | 6 |

79. The method of claim 77, wherein the statement URL comprises a client computer network address;

wherein the client computer network address is verified by matching it with the network address specified in the statement URL.

80. The method of claim 79, wherein if verification fails, then at least one of the server computers sends a document to the client computer indicating that access is denied.

81. The method of claim 77, wherein the client computer prompts the user for an account name and password by creating an account name prompt and a password prompt.

82. The method of claim 81, wherein at least one of the server computers verifies that the account name and password provided by the user match a previously provided account name and password.

83. The method of claim 82, wherein if the account name and password verification fails, then at least one of the server computers sends a document to the client computer indicating that access to at least a portion of a network sales system is denied.

84. The method of claim 79, wherein if a payment amount exceeds a threshold, then the user is prompted for security-related information;

wherein at least one of the server computers verifies that the security-related information matches previously provided security-related information.

85. The method of claim 84, wherein if the security-related verification fails, then the payment computer sends a document to the buyer computer indicating that access is not allowed.

86. The method of claim 84, wherein at least one of the server computers transmits the statement document to the client computer and the client computer displays the statement document to the user.

87. The method of claim 86, wherein the client computer is a buyer computer;

wherein at least one of the server computers retrieves settlement data from a settlement database for use in generating the statement document.

88. The method of claim 16, wherein the transaction detail hypertext link includes a transaction detail URL;

wherein the transaction detail URL includes a URL authenticator that is a digital signature based on a cryptographic key;

wherein the URL authenticator is a hash of information contained in the transaction detail URL;

wherein at least one of the server computers verifies whether the transaction detail URL authenticator was created from information contained in the transaction detail URL based upon the cryptographic key;

wherein the transaction detail URL comprises a client network address;

wherein the client computer network address is verified by matching it with the network address specified in the transaction detail URL;

wherein the client computer prompts the use for an account name and password by creating an account name prompt and a password prompt;

wherein at least one of the server computers verifies that the account name and password entered by the user match a previously provided account name and password;

wherein if a payment amount exceeds a threshold, then the user is prompted for security-related information;

wherein at least one of the server computers verifies that the security-related information matches previously provided security-related information.

89. The method of claim 88, wherein the client computer is a buyer computer, and at least one of the server computers is a payment computer.

90. The method of claim 16, wherein the user requests customer service;

wherein in response to the user request, the client computer sends a customer service URL to at least one of the server computers, and at least one of the server computers creates a customer service form and sends the form to the client computer;

wherein the form contains an area for the user to provide comments.

91. The method of claim 90, wherein the client computer sends the user's comments to at least one of the server computers;

wherein at least one of the server computers processes the user comments.

92. The method of claim 16, wherein the user requests display of a product listed on the statement document.

93. The method of claim 92, wherein the client computer sends an access URL to a second server computer.

94. The method of claim 93, wherein the access URL comprises an authenticator based on a cryptographic key;

wherein the access URL authenticator is a hash of other information in the access URL;

wherein the second server computer verifies whether the access URL authenticator was created from information contained in the access URL using a cryptographic key;

wherein the access URL comprises a duration of time for access indicator, and the second server computer verifies whether the duration time for access has expired;

wherein the access URL comprises a buyer network address indicator, and the second server computer verifies that a buyer computer network address is the same as the buyer network address indicated in the access URL;

wherein the second server transmits a fulfillment document to the client computer.

95. The method of claim 16, wherein the statement document includes information on transactions by the user that took place in a given month.

96. The method of claim 95, wherein the information on transactions by the user includes at least one of the following types of information: a date of transaction, an identification of the product, a payment amount, and a merchant identifier.

97. The method of claim 95, wherein the statement document also includes one or more links to information regarding previous transactions by the user.

98. The method of claim 95, wherein for a transaction there is a transaction detail URL that includes a transaction identifier, a buyer network address, and a transaction detail URL authentictaor.

99. The method of claim 98, wherein at least one of the server computers receives the transaction detail URL;

wherein the transaction detail URL includes a URL authenticator that is a digital signature based on a cryptographic key;

wherein the URL authenticator is a hash of information contained in the transaction detail URL;

wherein at least one of the server computers verifies whether the transaction detail URL authenticator was created from information contained in the transaction detail URL using the cryptographic key;

A162

US 5,909,492 C1

7

wherein the transaction detail URL comprises a client computer network address, and the client computer network address is verified by matching it with the network address specified in the transaction detail URL;

wherein the client computer prompts the user for an account name and password by creating an account name prompt and a password prompt, and at least one of the server computers verifies that the account name and password entered by the user match a previously provided account name and password;

wherein if a verification by at least one of the server computers fails, then at least one of the server computers sends a document to the client computer indicating that access is denied.

100. The method of claim 16, wherein if a payment amount provided by the user exceeds a threshold, then the user is prompted for security-related information, and at least one of the server computers verifies that the security information matches previously provided security-related information.

101. The method of claim 16, wherein the transaction detail document includes transaction information and merchant information.

102. The method of claim 101, wherein the transaction information includes at least one of the following types of information: a URL where a product is located, a transaction log identifier, a currency type used, a transaction date,

8

an expiration time, an initiator number, a product description, a transaction amount, a beneficiary number, an IP address, a transaction type indicator, and a domain corresponding to the product.

103. The method of claim 101, wherein the merchant information includes at least one of the following types of information: a merchant telephone number, a merchant address, a merchant FAX number, a merchant e-mail address, a merchant principal name, a merchant home URL, and a merchant country.

104. The method of claim 101, wherein the transaction detail document comprises a customer feedback form, including the following fields for data entry by the user: account name, e-mail address, subject, and comments.

105. The method of claim 104, wherein the customer feedback form includes a hyperlink that a user activates to send the form to at least one of the server computers.

106. The method of claim 101, wherein the transaction detail document comprises a message to the user inviting comments by e-mail and giving an e-mail address.

107. The method of claim 101, wherein the transaction detail document further comprises a message to the user inviting comments by FAX and giving a FAX number.

108. The method of claim 16, wherein a digital advertising document is provided to the client computer.

* * * * *



US007272639B1

(12) **United States Patent**
Levergood et al.

(10) **Patent No.:**     **US 7,272,639 B1**
(45) **Date of Patent:**        *Sep. 18, 2007

(54) **INTERNET SERVER ACCESS CONTROL AND MONITORING SYSTEMS**

(75) Inventors: **Thomas Mark Levergood**, Hopkinton, MA (US); **Lawrence C. Stewart**, Burlington, MA (US); **Stephen Jeffrey Morris**, Westford, MA (US); **Andrew C. Payne**, Lincoln, MA (US); **George Winfield Treese**, Newton, MA (US)

(73) Assignee: **Soverain Software LLC**, Chicago, IL (US)

( * ) Notice:    Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **09/005,479**

(22) Filed:    **Jan. 12, 1998**

**Related U.S. Application Data**

(63) Continuation of application No. 08/474,096, filed on Jun. 7, 1995, now Pat. No. 5,708,780.

(51) **Int. Cl.**
*G06F 15/16*        (2006.01)
(52) **U.S. Cl.** ...................... 709/218; 709/203; 709/229
(58) **Field of Classification Search** ............... 709/217, 709/218, 219, 225, 229
See application file for complete search history.

(56)            **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,305,059 A | 12/1981 | Benton | |
| 4,528,643 A | 7/1985 | Freeny, Jr. | |
| 4,529,870 A | 7/1985 | Chaum | |
| 4,578,530 A | 3/1986 | Zeidler | 178/22.09 |
| 4,734,858 A | 3/1988 | Schlafly | |
| 4,755,940 A | 7/1988 | Brachtl et al. | |
| 4,759,063 A | 7/1988 | Chaum | |
| 4,759,064 A | 7/1988 | Chaum | |
| 4,775,935 A | 10/1988 | Yourick | |
| 4,795,890 A | 1/1989 | Goldman | |
| 4,799,156 A | 1/1989 | Shavit et al. | |
| 4,812,628 A | 3/1989 | Boston et al. | |
| 4,827,508 A | 5/1989 | Shear | |
| 4,891,503 A | 1/1990 | Jewell | |

(Continued)

FOREIGN PATENT DOCUMENTS

EP        0172670        2/1986

(Continued)

OTHER PUBLICATIONS

T. Berners-Lee et al., RFC 1738: Uniform Resource Locators (URLs), Network Working Group, Dec. 1994, pp. 1-25.*

(Continued)

*Primary Examiner*—Patrice Winder
(74) *Attorney, Agent, or Firm*—Jones Day

(57)            **ABSTRACT**

This invention relates to methods for controlling and monitoring access to network servers. In particular, the process described in the invention includes client-server sessions over the Internet. In this environment, when the user attempts to access an access-controlled file, the server subjects the request to a secondary server which determines whether the client has an authorization or valid account. Upon such verification, the user is provided with a session identification which allows the user to access to the requested file as well as any other files within the present protection domain.

**79 Claims, 7 Drawing Sheets**



**US 7,272,639 B1**

Page 2

## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,922,521 | A | 5/1990 | Krikke et al. |
| 4,926,480 | A | 5/1990 | Chaum |
| 4,935,870 | A | 6/1990 | Burk, Jr. et al. |
| 4,947,028 | A | 8/1990 | Gorog |
| 4,947,430 | A | 8/1990 | Chaum |
| 4,949,380 | A | 8/1990 | Chaum |
| 4,972,318 | A | 11/1990 | Brown et al. |
| 4,977,595 | A | 12/1990 | Ohta et al. ................... 380/24 |
| 4,982,346 | A | 1/1991 | Girouard et al. |
| 4,987,593 | A | 1/1991 | Chaum |
| 4,991,210 | A | 2/1991 | Chaum |
| 4,992,940 | A | 2/1991 | Dworkin |
| 4,996,711 | A | 2/1991 | Chaum |
| 5,025,373 | A | 6/1991 | Keyser, Jr. et al. |
| 5,060,153 | A | 10/1991 | Nakagawa |
| 5,077,607 | A | 12/1991 | Johnson et al. |
| 5,105,184 | A | 4/1992 | Pirani et al. |
| 5,220,501 | A | 6/1993 | Lawlor et al. |
| 5,247,575 | A | 9/1993 | Sprague et al. |
| 5,276,736 | A | 1/1994 | Chaum |
| 5,305,195 | A | 4/1994 | Murphy |
| 5,311,594 | A | 5/1994 | Penzias |
| 5,319,542 | A | 6/1994 | King, Jr. et al. |
| 5,321,751 | A | 6/1994 | Ray et al. |
| 5,336,870 | A | 8/1994 | Hughes et al. |
| 5,341,429 | A | 8/1994 | Stringer et al. |
| 5,347,632 | A * | 9/1994 | Filepp et al. ............... 709/202 |
| 5,351,186 | A | 9/1994 | Bullock et al. |
| 5,351,293 | A | 9/1994 | Michener et al. |
| 5,383,113 | A | 1/1995 | Kight et al. |
| 5,414,833 | A | 5/1995 | Hershey et al. |
| 5,475,585 | A | 12/1995 | Bush |
| 5,521,631 | A | 5/1996 | Budow et al. |
| 5,530,852 | A | 6/1996 | Meske, Jr. et al. |
| 5,535,229 | A | 7/1996 | Hain, Jr. et al. |
| 5,544,322 | A * | 8/1996 | Cheng et al. ............... 709/229 |
| 5,557,516 | A | 9/1996 | Hogan |
| 5,557,518 | A | 9/1996 | Rosen |
| 5,557,798 | A | 9/1996 | Skeen et al. |
| 5,560,008 | A * | 9/1996 | Johnson et al. ............. 709/300 |
| 5,577,209 | A | 11/1996 | Boyle et al. |
| 5,590,197 | A | 12/1996 | Chen et al. |
| 5,592,378 | A | 1/1997 | Cameron et al. |
| 5,594,910 | A | 1/1997 | Filepp et al. |
| 5,596,642 | A | 1/1997 | Davis et al. |
| 5,596,643 | A | 1/1997 | Davis et al. |
| 5,604,802 | A | 2/1997 | Holloway |
| 5,621,797 | A | 4/1997 | Rosen |
| 5,623,547 | A | 4/1997 | Jones et al. |
| 5,623,656 | A | 4/1997 | Lyons |
| 5,642,419 | A | 6/1997 | Rosen |
| 5,664,110 | A | 9/1997 | Green et al. |
| 5,664,111 | A | 9/1997 | Nahan et al. |
| 5,694,551 | A | 12/1997 | Doyle et al. |
| 5,708,780 | A | 1/1998 | Levergood et al. |
| 5,710,884 | A * | 1/1998 | Dedrick ................... 709/217 |
| 5,715,314 | A | 2/1998 | Payne et al. ............... 380/24 |
| 5,724,424 | A | 3/1998 | Gifford |
| 5,727,164 | A | 3/1998 | Kaye et al. |
| 5,734,719 | A | 3/1998 | Tsevdos et al. |
| 5,761,662 | A * | 6/1998 | Dasan ...................... 707/10 |
| 5,768,521 | A * | 6/1998 | Dedrick ................... 709/224 |
| 5,774,670 | A * | 6/1998 | Montulli ................... 709/227 |
| 5,784,565 | A | 7/1998 | Lewine |
| 5,806,077 | A | 9/1998 | Wecker |
| 5,812,776 | A | 9/1998 | Gifford |
| 5,819,092 | A | 10/1998 | Ferguson et al. |
| 5,826,241 | A | 10/1998 | Stein et al. |
| 5,826,242 | A * | 10/1998 | Montulli ................... 705/27 |
| 5,848,399 | A | 12/1998 | Burke |
| 5,895,454 | A | 4/1999 | Harrington ................ 705/26 |

| | | | |
|---|---|---|---|
| 5,897,622 | A | 4/1999 | Binn et al. |
| 5,909,492 | A | 6/1999 | Payne et al. |
| 5,920,847 | A | 7/1999 | Kolling et al. |
| 6,006,199 | A | 12/1999 | Berlin et al. |
| 6,023,683 | A | 2/2000 | Johnson et al. |
| 6,041,316 | A | 3/2000 | Allen |
| 6,049,785 | A | 4/2000 | Gifford |
| 6,134,532 | A * | 10/2000 | Montulli ..................... 709/227 |
| 6,195,649 | B1 | 2/2001 | Gifford |
| 6,199,051 | B1 | 3/2001 | Gifford |
| 6,205,437 | B1 | 3/2001 | Gifford |
| 6,449,599 | B1 | 9/2002 | Payne et al. |
| 6,708,157 | B2 | 3/2004 | Stefik et al. |

## FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0 456 920 | 11/1991 |
| EP | 0542298 B1 | 5/1993 |
| EP | 0 645 688 | 3/1995 |
| GB | 2102606 | 2/1983 |
| JP | 3278230 | 12/1991 |
| JP | 410191 | 1/1992 |
| JP | 05-158983 | 6/1993 |
| JP | 5274275 | 10/1993 |
| JP | 6162059 | 6/1994 |
| JP | 6291776 | 10/1994 |
| WO | WO 91/16691 | 10/1991 |
| WO | WO 93/10503 | 5/1993 |
| WO | WO 94/03859 | 2/1994 |

## OTHER PUBLICATIONS

Jose Kahan, A distributed Authorization Model for WWW, http://www.isoc.org/, May 1995, 16 pages.*

Jose Kahan, A capability-based authorization model for the World-Wide Web, Apr. 1995, 14 pages.*

Scott Anderson et al., Sessioneer: Flexible Session Level Authentication with Off the Shelf Servers and Clients, The Third Intern'l WWW Conf., Apr. 1995, 7 pages.*

Bjorn N. Freeman-Benson, Using the Web to Provide Private Information, First international Conference on the World Wide Web, WWW94, May 1994, 5 pages.*

Trip et al., "Cookies" (Client-side persistent information) and their use, Netscape Technical Note 20019, Netscape Communications Corp, Oct. 1995.*

Jose Kahan, A Distributed Authorization Model for WWW, May 1995, http://www.isoc.org/HMP/PAPER/107/html/paper.*

Netscape Products, "Open and Secure Internet Software" INTERNET, Sep. 18, 1995, pp. 1-2.

Merchant System: Overview, "Netscape Merchant System Data Sheet" INTERNET, Sep. 18, 1995, pp. 1-3.

Internet Applications Customer Showcase, "Customer Showcase" INTERNET, Sep. 18, 1995., pp. 1-2.

The Server-Application Function and Netscape Server API, "The Netscape Server API" Netscape Products INTERNET, Sep. 18, 1995, pp. 1-11.

The Object-Oriented Paradigm of Server Configuration, "The Object-Oriented Paradigm of Server Configuration" INTERNET, Sep. 18, 1995, pp. 102.

Verisign Redirection Information, "Important Announcement" INTERNET, Sep. 18, 1995, p. 1.

Lou Montulli, Electronic Mail to multiple recipients of the www-talk list (www-talk@www10.w3.org) on "Session Tracking" (omi.mail.www-talk, Apr. 18, 1995).

PR: Digital IDs for Open Market's Secure WebServer, "Press Release, VeriSign, Inc. to Provide Digital IDs for Open Market's Secure WebServer" INTERNET, Sep. 18, 1995, pp. 1-2.

PR: Online Security Solutions, "VeriSign, Inc. Adds the Missing Component to' Online Security Solutions" INTERNET, Sep. 18, 1995, pp. 1-2.

The SSL Protocol, INTERNET, Sep. 18, 1995, pp. 1-18.

IStore, "Netscape Istore Data Sheet" INTERNET, Sep. 18, 1995, pp. 1-2.

US 7,272,639 B1

Page 3

Ramanathan, Srinivas, et al., "Architectures for Personalized Multimedia," IEEE Multimedia, vol. 1, No. 1, Computer Society, pp. 37-46, 1994.

Choudhury, Abhijit K., et al., "Copyright Protection for Electronic Publishing Over Computer Networks," IEEE Network, The Magazine of Computer Communications, vol. 9, No. 3, pp. 12-20, May 1995.

"Cookies and Privacy FAQ," http://search.netscape.com/assist/security/faqs/cookies.html (Jan. 9, 1998 at 4:29 p.m.).

"Persistent Client State HTTP Cookies," http://search.netscape.com/newsref/std/cookie_spec.html (Jan. 9, 1998 at 4:28 p.m.).

"HTTP State Management Mechanism," http://www.internic.net/rfc/rfc2109.txt (Jan. 9, 1998 at 4:30 p.m.).

Peterson, Larry L. "A Yellow-Pages Service for a Local-Area Network", ACM Proceedings of the ACM SIGCOMM 87 Workshop, ACM Press, 1988, pp. 235-242.

"Here it is, World" internet postings to comp.infosystems.www.users discussion list re: Mosaic Netscape (Oct. 13, 1994—Oct. 17, 1995) available at: http://groups.google.com/group/comp/infosystems.www.users/browse_thread/thread/3666fe4e21b3a9e2/9a210e5f72278328?lnk=st&rnum=5&hl=en#9a210e5f72278328.

"Netscape 0.93 Setup Questions" internet postings to comp.infosystems.www.misc discussion list re: Mosaic Netscape (Nov. 21, 1994-Nov. 25, 1994) available at: http://groups.google.com/group/comp.infosystems.www.misc/browse_thread/thread/da4e82efc6512f67/8dabc347291409d5?lnk=st&rnum=1&hl=en#8dabc347291409d5.

"Netscape and Cookies" internet postings to comp.infosystems.www.users discussion list re: Mosaic Netscape (Dec. 11, 1994-Dec. 13, 1994) available at: http://groups.google.com/group/comp.infosystems.www.users/browse_thread/thread/5347cb89bbae572b/3583cab5e6c13e94?lnk=st&rnum=3&hl=en#3583cab5e6c13e94.

"Cookies.txt" internet postings to comp.infosystems.www.users discussion list re: Mosaic Netscape (Dec. 23, 1994-Dec. 27, 1994) available at: http://groups.google.com/group/comp.infosystems.www.users/browse_thread/thread/613e81948e9cf6e4/134ade72dfc1c58d?lnk=st&rnum=2&hl=en#134ade72dfc1c58d.

"How to get statefull HTML documents" internet postings to comp.infosystems.www.misc discussion list (Jun. 24, 1994-Jun. 25, 1994) available at: http://groups.google.com/group/comp.infosystems.www.misc/browse_thread/thread/fd304fedb645529a/b8f6dab2aa73ae71?lnk=st&rnum=7&hl=en#b8f6dab2aa73ae71.

"How to add state info to a form" internet postings to comp.infosystems.www.providers discussion list (Jun. 30, 1994 - Jul. 1, 1994) available at: http://groups.google.com/group/comp.infosystems.www.providers/browse_thread/thread/2acad6cdc8ebb8a/bf368e630add2c94?lnk=st&rnum=8&hl=cn#bf368e630add2c94.

"Transactional Services on WWW" internet postings to comp.infosystems.www discussion list (May 12, 1994 - Jun. 1, 1994) available at: http://groups.google.com/group/comp.infosystems.www/brows_thread/thread/bf430e6df8e6e7d/8ed77a97f5d0b9d6?lnk=st&hl=en#8ed77a97f5d0b9d6.

Dan Aronson, "access and session control" posting to www-talk discussion list (Sep. 14, 1994) available at: http://1997.webhistory.org/www.lists/www-talk.1994q3/0901.html.

Rick Troth, "access and session control" (Sep. 15, 1994) available at: http://1997.webhistory.org/www.lists/www-talk.1994q3/0923.html.

alain@hyperman.co.il, "Identifying Mosaic session" posting to www-talk discussion list (Dec. 20, 1994) available at http://1997.webhistory.org/www.lists/www-talk.1994q4/1098.html.

Joe English, "Re: Identifying Mosaic session", posting to www-talk discussion list (Dec. 20, 1994 available at: http://1997.webhistory.org/www.lists/www-talk.1994q4/1109.html.

Steven Majewski, "Identifying Mosaic session" posting to www-talk discussion list (Dec. 20, 1994) available at http://19970webhistory.org/www.lists/www-talk.1994q4/1111.html.

Nick Arnett, "Statelessness" posting to www-talk discussion list (May 16, 1994) available at: http://1997.webhistory.org/www.lists/www-talk.1994q2/0562.html.

Jared Rhine, "Statelessness" Posting to www-talk discussion list (May 16, 1994) available at: http://1997.webhistory.org/www.lists/www-talk.1994q2/0563.html.

Simon Sper, "Statelessness" posting to www-talk discussion list (May 17, 1994) available at: http://1997.webhistory.org/www.lists/www-talk.1994q2/0579.html.

Jim McBeath, "Statelessness" posting to www-talk discussion list (May 27, 1994) available at: http://1997.webhistory.org/www.lists/www-talk.1994q2/0683.html.

Phillip Hallam-Baker, "Statelessness" posting to www-talk discussion list (May 30, 1994) available at: http://1997.webhistory.org/www.lists/www-talk.1994q2/0705.html.

Pitkow, J.E., and Recker, M. M., "Using the Web as a Survey Tool: Results from the Second WWW User Survey," http://www.igd.fhg.de/www/www95/papers/79/survey/survey_2_paper.html, Apr. 1995.

Gifford, David K., "Notes on Community Information Systems," MIT/LCS/TM-419, Dec. 10, 1989, pp. 1-5.

Chaum, D., "Achieving Electronic Privacy," Scientific American, Aug. 1992, pp. 96-101.

Neuman, B. C. , "Proxy-Based Authorization and Acounting for Distributed Systems," Proceedings on the 13th International Conference on Distributed Computing Systems, Pittsburgh, May 1993.

Anderson, R., "Why Cryptosystems Fail," 1st Conf.—Computer & Comm. Security, 1993-11/93—VA, USA, pp. 215-227.

Abadi, M., et al., "Authentication and Delegation with Smartcards," Oct. 1990, 30 pgs.

Rivest, R., "The MD5 Message-Digest Algorithm," MIT Laboratory for Computer Science and RSA Data Security, Inc., Apr. 1992.

Voydock, V., et al., "Security Mechanisms in High-Level Network Protocols," Computing Surveys, vol. 15, No. 2, Jun. 1983, pp. 135-171.

Gligor, V.D., "Object Migration and Authentication," IEEE Transactions on Software Engineering, vol. SE-5, No. 6, Nov. 1979, pp. 607-611.

Chaum, D.L., et al., "Implementing Capability-Based Protection Using Encryption," Electronics Research Laboratory, Jul. 1978, pp. 1-10.

"Mosaic Communications Unveils Network Navigator and Server Software for the Internet," Mosaic Communications Press Release, Sep. 1994, 3 pgs.

Rescorla, E., et al., "The Secure Hypertext Transfer Protocol," Enterprise Integration Technologies, Jun. 1994, 22 pgs.

Bellecore Internal E-Mail, Nov. 24, 1993.

Bina, E., et al., "Secure Access to Data Over the Internet," 1994 IEEE, pp. 99-102, Sep. 1994.

Kiuchi, T., et al., "C-HTTP—The Development of a Secure, Closed HTTP-based Network on the Internet," 1996 IEEE, pp. 64-75.

Pitkow, J.E., et al., "Webviz: A Tool for World-Wide Web Access Log Analysis." May 1994, pp. 271-277.

Lim, Jong-Gyun, et al., "Using Coollists to Index HTML Documents in the Web," http://www.ncsa.uiuc.edu/SDG/Tt94/Proceedings/Searching/lim/coollist/htm, pp. 1-8, Oct. 1994.

Sedayao, J., "Mosaic Will Kill My Network!—Studying Network Traffic Patterns of Mosaic Use," http://www.ncsa.uiuc.edu/sSDG/Tt94/p...gs/dday/sedayao_trat_paper.htm, pp. 1-7, Oct. 1994.

Catledge, L.D., et al., "Characterizing Browsing Strategies in the World-Wide Web," http://igd.thg.de/archive/1995_.../Userpatterns.Paper4.formatted.htm, pp. 1-10, Apr. 1995.

57 USPQ2d, "Amazon.com, Inc. v. Barnesandnoble.com, Inc." pp. 1746-1763, Feb. 2001.

Amazon.com's Reply in Support of Renewed Motion to Stay, dated Apr. 25, 2005, pp. 1-5.

Deposition of G. Winfield Treese, dated Oct. 27, 2004.

Deposition of Glenn Arthur Hauman eith Exhibits (Oct. 28, 2004).

Jolot Claim Construction Chart (Patent Local Rue 4-50)) filed Dec. 27, 2004 with Appendix A.

Memorandum Opinion dated Apr. 7, 2005.

Motion to Stay [Renewed] by Amazon.com (Attachments: # 1 Affidavit # 2 Text of Proposed Order) (Nelson, Justin) (Entered: Apr. 5, 2005).

**US 7,272,639 B1**

Page 4

Notice by Amazon.com re Answer to Amended Complaint, Counterclaim Of Rejection Of Claims 1-45 of U.S. Patent No. 5,708,780, dated Mar. 25, 2005, pp. 1-3, with Exhibit A.

Order Denying Amazon's Motion to Stay Proceedings Pending Completion of the Reexamination, dated Apr. 20, 2005.

Soverain's Disclosure of Asserted Claims and Preliminary Infringement Contentions dated Jun. 3, 2004.

Soverain's Opposition to Amazon's Renewed Motion to Stay, dated Apr. 20, 2005, pp. 1-12.

Soverain's Reply to Amazon.Com's Amended Counterclaims, dated Jan. 14, 2005.

Soverain's Reply to Response to Motion re: Motion to Stay, dated Apr. 26, 2005.

Soverain's Answer to Counterclaim (Amazon's Third Amended Counterclaim) by Soverain Software LLC. (Seraphine, Jennifer) (Entered: Mar. 17, 2005).

Soverain's Fourth Supplemental Responses to Amazon's First Set of Interrogatores (Nos. 1-14) dated Mar. 21, 2005.

Soverain's Responses to Amazon's First Set of Requests for Admission to Plaintiff Soverain Software (Nos. 1-100) dated Mar. 21, 2005.

Soverain's Responses to Interrogatory Nos. 22, 23, 26 and 36 of Amazon's Third Set of Interrogatores (Nos. 17-368) dated Mar. 21, 2005.

Third Supplement to Defendant Amazon's Initial Disclosures, dated Mar. 4, 2005.

Transcript of the Markman Hearing Before the Honarable Leonard David United States District Judge, Jan. 6, 2005.

VideoTaped Deposition of Andrew Payne dated Mar. 11, 2005.

Videotaped Deposition of Glenn Crocker with Exhibits (Mar. 10, 2005).

VideoTaped Deposition of Glenn Trewitt dated Jan. 25, 2005 (2 parts).

Videotaped Deposition of Mark Levergood dated Mar. 8, 2005 (2 Parts).

VideoTaped Deposition of Stephen Morris dated Mar. 9, 2006.

Amazon.com Inc's Unopposed Motion for Leave to Amend Its Answer to Include Allegations Regarding Stuff.com, dated May 18, 2005, pp. 1-9.

Amazon's Motion for Partial Summary Judgment that claims are Indefinite under 35 U.S.C 112, dated Jun. 10, 2005, pp. 1-20.

Amazon.com's Motion for Partial Summary Judgment that 314 claims 34-39, '492 claims 17-18 and 35-36, and '780 claims 1, 4, and 22-24 are invalis under 35 U.S.C. 102, dated Jun. 10, 2005, pp. 1-30.

Declaration of James E. Geringer in Support of Amazon.com, Inc's Motion for Leave to Amend its Answer and Counterclaims to Add Stuff.com, dated May 18, 2005, pp. 1-3.

Deposition of Glenn M. Trewitt with Exhibits (Jan. 25, 2005).

Deposition of Joshua Smith with Exhibits (Mar. 2, 2005).

Deposition of Michael Lazzaro with Exhibits (Mar. 9, 2005).

Deposition of Thomas Soulanille with Exhibits (Mar. 14, 2005).

Exhibit 1 of Geringer Declaration: Excerpts of Deposition of Michael Kuniavsky. (Feb. 22, 2005).

Exhibit 2 of Geringer Declaration: E-mail from Brooks Cutter to Mike Kuniavsky (Jun. 14, 1994).

Exhibit 3 of Geringer Declaration: Excerpts of Deposition of Richard Boake. (Mar. 21, 2005).

Exhibit 5 of Geringer Declaration: Excerpts of Deposition of Andrew Payne, (Mar. 11, 2005).

Exhibit 6 of Geringer Declaration: E-mail from Andrew Payne to Winfield Treese et al. (Jun. 15, 1994).

Exhibit 7 of Geringer Declaration: Excerpts of Deposition of Winfield Treese (Oct. 27, 2004).

Exhibit 8 of Geringer Declaration: Amazon.com, Inc.'s [Proposed] fourth Amended Answer, Affirmative Defenses, and Counterclaims to Soverain Software LLC's Complaint (Redlined Version) (May 18, 2005).

Supplemental Disclosure of Preliminary Invalidity Contentions by Amazon and Gap dated Jul. 26, 2004.

Videotaped Deposition of Guy Henry Haskin with Exhibits (Mar. 18, 2005).

Videotaped Deposition of Kevin Ming-Wei Kadla Hughes with Exhibits (Mar. 21, 2005).

Videotaped Desposition of Michael Kuniavsky with Exhibits (Feb. 22, 2005).

Videotaped Deposition of Phillip Hallam-Baker with Exhibits (Mar. 11, 2005).

Videotaped Deposition of Robert Allen Olson with Exhibits (Mar. 3, 2005).

"Advanced Electronic Credit Authorization Through the Amherst Group SNET", News Release, pp. 1-2, Dec. 7, 1987.

"CompuServ Videotex Network Offers Marketing Research Service, Ad Test." Marketing News, Nov. 25, 1983, p.21.

Electronic In-Home Shopping: "Our Stores are Always Open", Chain Store Age Executive, Mar. 1985, pp. 111,116.

"Mall Offers Holiday Treat for Hackers," Advertising Age, Nov. 13, 1985, p. 76.

"Redcoats Join Communications Fight," Industry Week, Feb. 22, 1982, pp. 108-109.

"Suddenly, Videotex is Finding an Audience," Business Week, Oct. 19, 1987, pp. 92-94.

"Taking Advantage of the Past," Advertising Age, Apr. 11, 1983, pp. M36-37.

Allen & Hamilton, How to Buy Information with a First Virtual Account, Apr. 11, 1994, pp. 3-71.

American National Standard: "Financial Institution Retail Message Authentication"; ANSI X9, 19: 1986.

American National Standard; "Interchange Message Specification for Debit and Credit Card Message Exchange Among Financial Institutions"; ANSI X9.2; 1988.

Anderson, Ross J.; "UEPS—A Second Generation Electronic Wallet"; Proc. of the Second European Symposium on Research in Computer Security (ESORICS); Touluse, France; pp. 411-418, 1992.

Bender, M.; "EFTS: Electronic Funds Transfer Systems"; Kennikat Press: Port Washington, New York; pp. 43-46; 1975

Beutelspacher, et al, "Payment Applications with Multifunctional Smart Cards," Smart Card 2000: The Future of IC Cards, Oct. 1987, pp. 95-101.

Bos et al.; "SmartCash: A Practical Electronic Payment System"; pp. 1-8; Aug. 1990.

Burk et al.; "Value Exchange Systems Enabling Security and Unobservability"; Computers & Security, 9; pp. 715-721; 1990.

Burk, et al, "Digital Payment Systems Enabling Security and Observability," Computers & Security, 1989, pp. 399-415.

Case Study: The CIRRUS Banking Network; Comm. ACM 8, 28' pp. 797-8078; Aug. 1985.

CCITT Blue Book, vol. VIII; pp. 48-81 Nov. 14-25, 1988.

Chaum et al.; "Untraceable Electronic Cash"; Advances in Cryptology; pp. 319-327; 1988.

Cohen, Danny; "Computerized Commerce"; ISI Reprint Series IS/RS-89-243; Oct. 1989; Reprinted from Information Processing 89, Proceedings of the IFIP World Computer Congress, held Aug. 28-Sep. 1, 1989.

Cohen, Danny; "Electronic Commerce"; University of Southern California Information Sciences Institute, Research Report ISI/RR-89-244; Oct. 1989.

Compuserve International: Compuserve Information Service Users Guide: pp. 109-114; 1986.

Computer Fraud & Security Bulletin, "Underlying Security Mechanisms," Mar. 1997.

Computer Shopper: "Internet for Profit"; pp. 180-182, 190-192, 522-528, 532, 534; Nov. 1994.

Consumers Plugging into New Electronic Mall, Advertising Age, Mar. 4, 1985, p. 74.

Damgard, "Payment Systems and Credential Mechanisms with Provable Security Against Abuse by Individuals," Advances in Cryptology-CRYPTO '88, 1988, pp. 328-325.

Davies, D.W. and Price, W.L.; "Security for Computer Networks: An Introduction to Data Security in Teleprocessing and Electronic Funds Transfer"; John Wiley & Sons; 1985; pp. 304-336.

Dukach, Semyon; "SNPP: A Simple Network Payment Protocol"; MIT Laboratory for Computer Science; Cambridge, 1993.

Even et al.; "Electronic Wallet"; pp. 383-386; 1983.

Ferrarini, "Direct Connections for Software Selections," Business Computer Systems, Feb. 1984, pp. 35-38.

## US 7,272,639 B1

Page 5

Fujioka, et al, "ESIGN: An Efficient Digital Signature Implementation for Smart Cards," Advances in Cryptology-Eurocrypt '91, Apr. 1991, pp. 446-457.

Gifford, David K.; "Cryptographic Sealing for Information Secrecy and Authentication"; Stanford University and Xerox Palo Alto Research Center; Communications of the ACM; vol. 25, No. 4; Apr. 1982.

Hakola, et al, "A System for Automatic Value Exchange," Proceedings-Fall Joint Computer Conference, 1966, pp. 579-589.

Harty et al.; "Case Study; The VISA Transaction Processing System"; 1988.

Information Network Institute, Carnegie Mellon University; Internet Billing Server; Prototype Scope Document; Oct. 14, 1993.

International Organization for Standardization; "International Standard: Bank Card Originated Messages-Interchange Message Specifications-Content for Financial Transactions": ISO 8583; 1987.

Jansson, Lennart; "General Electronic Payment System"; 7th Proceedings of the International Conference on Computer Communication: pp. 832-837; 1985.

Kenny, "EDI Security: Risks and Solutions," COMPSEC 1992; The Ninth World Conference on Computer Security, Audit, and Control Nov. 1992, pp. 341-352.

Kaapskog, Privacy Protected Payments- Realization of a Protocol That Guarantees Payor Anonymity, Advances in Cryptology-Eurocrypt '88, May 1988, pp. 107-122.

Krajewski, M. et al.; "Applicability of Smart Cards to Network User Authentication"; Computing Systems; vol. 7, No. 1; 1994.

Krajewski, M.; "Concepts for a Smart Card Kerberos"; 15th National Computer Security Conference; Oct. 1992.

Krajewski, M.; "Smart Card Augmentation of Kerberos"; Privacy and Security Research Group Workshop on Network and Distributed System Security; Feb. 1993.

Lal et al., "Endorsements, Licensing, and Insurance for Distributed System Services"; Information Sciences Institute Univ. of Southern CA., Assoc. for Computing Machinery 1994.

Medvinsky et al.; "Electronic Currency for the Internet"; Electronic Markets; pp. 30-31, Sep. 1993.

Medvinsky et al.; "NetCash; A Design for Practical Electronic Currency on the Internet"; Proc. 1st ACM Conf. on Comp. and Comm. Security; Nov., 1993.

Messmer, "NIST Stumbles on Proposal for Public Key Encryption," Network World, Jul. 27, 1992, p. 1.

Needham, Roger M., "Adding Capability Access to Conventional File Servers"; Xerox Palo Alot Research Center; Palo Alot, California; Jan. 1979.

Okamoto et al.; "Universal Electronic Cash"; pp. 324-337; 1991.

P. Remeery et al., "Le Paiement electronique", pp. 15-23, 1988 L'Echo des RECHERCHES, No. 134.

Perry, "Electronic Banking Goes to Market," IEEE Spectrum, Feb. 1988, pp. 46-49.

Pfitzmann et al.; "How to Break and Repair a 'Provably Secure' Untracable Payment System"; pp. 338-350; 1991.

Ph. van Heurck, "TRASEC: Belgian Security System for Electronic Funds Transfers," Computers & Security, 1987, pp. 261-268.

Pongratz et al, "IC Cards in Videotex Systems," Smart Card 2000, 1989, pp. 179-186.

Hirschfeld, Rafael "Making Electronic Refunds Safer"; Sections 1, 2, 4 and 6, 1992.

Rivest, R.L. et al., "A Method for Obtaining Digital Signatures and Public-Key Cryptosystems," Laboratory for Computer Science, Massachusetts Institute of Technology, Cambridge, Massachusetts, date Sep. 1, 1977.

Schamuller-Bichl, I.; "IC-Cards in High-Security Applications"; Selected Papers from the Smart Card 2000 Conference; Springer Verlag; pp. 177-199; 1991.

Shain, "Security in Electronic Funds Transfer System," Computers & Security, 1989, pp. 123-137.

Sirbu, Marvin A.; "Internet Billing Service Design and Prototype Implementation"; An Internet Billing Server; pp. 1-19; 1993.

Staskauskas, "The Formal Specification and Design of a Distributed Electronic Funds Transfer System," IEEE Transactions on Computers, Dec. 1998, pp. 1515-1528.

Stol, Privacy Protected Payments-A Possible Structure for a Real Implementation and Some Resource Considerations, Feb. 1998.

Strazewski, "Computerized Service Sets Shoppers Hacking," Advertising Age, Feb. 22, 1988, p. 62.

Takei, "Videotex Information System and Credit System Connecting with MARS-301 of JNR," Japanese Railway Engineering, No. 94, Sep. 1985, pp. 9-11.

Tanaka, et al., "Untraceable Electronic Funds Transfer System," Electronics and Communications in Japan, 1989, pp. 47-57.

Tenenbaum, Jay M. and Schiffman, Allan M.; "Development of Network Infrastructure and Services for Rapid Acquisition"; adapted from a white paper submitted to DARPA by MCC in collaboration with EIT and ISI, Jan. 1992 pp. 1-19.

Tunstall, "Electronic Currency," Smart Card 2000: The future of IC Cards, Oct. 1987, pp. 47-48.

Vittal, J. "Active Message Processing: Messages as Messengers"; pp. 175-195; 1981.

Waidner, et al, "Loss-Tolerance for Electronic Wallets," Fault-Tolerant Computing: 20th International Symposium, Jun. 1990, pp. 140-147.

Weber, "Controls in Electronic Funds Transfer System," Computers & Security, 1989, pp. 209-221.

Williams, "Debit Program Cuts Fraud; CompuServe Plan a Success," Pensions & Investment Age, Feb. 4, 1985, pp. 21-32.

Viescas, "Official Guide to the Prodigy Service" 1991.

"Announcing: Internet Shopkeeper" (Aug. 2, 1994) posting on comp.infosystems.www and misc.forsale.

Net Market ("Numerous News Media Stories" (Apr. 1994)) NY Times, front page of bus.

"Welcome First Time Visitors", dated Jun. 29, 1998, pp. 1-4.

"What's New," http://archive.ncsa.uluc.edu/SDG/Software/Mosaic/Docs/old-whats-new/whats-new-0294.html, 1994.

Archive of WWWorder mailing list (Jun. 18, 1994-Jun. 13, 1994).

Ariel Poler I/PRO 2nd WWW Conference Chicago IL (Oct. 1994) (Presentation).

Aronson, Dan, et al., Electronic Mail to multiple recipients of the www-talk list (www-talk@info.cern.ch) on "Access and session control" dated Sep. 15, 1994.

Batelaan; Butler; Chan; Chen; Evenchick; Hughes; Jen; Jeng; Millett; Riccio; Skoudis; Starace; Stoddard; "An Internet Billing Server Prototype Design"; Carnegie Mellon University; 1992.

Berners-Lee, T. "draft-ietf-iiir-http-00.txt" (Nov. 5, 1993).

Berners-Lee, T., et al. RFC 1945: Hypertext Transfer Protocol-HTTP/1.0, dated May 1996, pp. 1-48.

Berners-Lee, T., et al., http://www.ieft.org/rfc/rfc1738.txt?numbers=1738, dated Dec. 1994, pp. 1-24.

Berners-Lee, T., RFC 1630: Universal Resource Identifiers in WWW: A Unifying Syntax for the Expression of Names and Addresses of Objects on the Network as used in the World-Wide Web, dated Jun. 1994, pp. 1-23.

Bieber, Michael, "Issues in Modeling a 'Dynamic' Hypertext Interface for Non-Hypertext Systems", Dec. 1991, pp. 203-217.

Biznet Technologies, Versatile Virtual Vending, published at http://www.bnt.com (Sep. 12, 1994).

Buhle, Jr., E. Loren, "Wide Area Info Services," Digital Systems J., Sep.-Oct., 1994, p. 13.

Business Wire, Jun. 26, 1995, "CommerceNet Urges Government to Ease Export Restrictions on Encryption Products; Consortium's New White Paper Articulates Position on the Export of Cryptography Based Products".

Comer, D., et al., "The Tilde File Naming Scheme," pp. 509-514, 6th International Conference on Distributed Computing Systems, IEEE Comp. Society, Cambridge NH May 1986.

Comer, D.E., et al., "A Model of Name resolution in Distributed Systems," pp. 520-530, 6th International Conference on Distributed Computing Systems IEEE Comp Society Cambridge NH May 1986.

Crocker, Glenn, "web2mush: Serving Interactive Resources to the Web," Electronic Proc. of the 2nd World Wide Web Conf. '94: Mosaic and the Web!, Developers Day, (Oct. 20, 1994).

Derler, Christian, "The World-Wide Web Gateway to Hyper-G: Using a Connectionless Protocol to Access Session-Oriented Ser-

# US 7,272,639 B1

## Page 6

vices", Institut für Informationsverarbeitung and Computergestützte neue Medien, Graz, Austria, dated Mar. 1995.

Dukach, Seymon; Prototype Implementation of the SNPP Protocol; allspic.lcs.mit.edu; 1992.

English, Joe, Electronic Mail to multiple recipients of the www-talk list (www-talk@info.cern.ch) on "Re: Identifying Mosaic session" dated Dec. 20, 1994.

Ferrarini, E., "Flight of Fancy: Goodbye Travel Agent", Business Computer Systems, vol. 2, No. 11, pp. 39-40, Nov. 1993.

Fielding, R., et al. RFC 2068: Hypertext Transfer Protocol-HTTP/1.1, Jan. 1997, pp. 1-127.

Fielding, R., et al. RFC 2616: Hypertext Transfer Protocol-HTTP1/1, Jun. 1999, pp. 1-140.

Fielding, R., RFC 1808: Relative Uniform Resource Locators, Jun. 1995, pp. 1-13.

Fielding, Roy, et al., "Principled Design of the Modern Web Architecture" ACM Transactions on Internet Technology 2, 2 pp. 115-150 (May 2002).

Fielding, Roy, software distribution archive for the HTTP log file analysis program, wwwstat v1.01, dated Apr. 24, 1994, published at http://www.ics.uci.edu/WebSoft/wwwstat/.

Foster, David & Stuart Finn, "Insurers Can Benefit From E-Mail Networks", National Underwriter Property & Casualty-Risk & Benefits Management, No. 9, p. 46(2), Mar. 4, 1991.

Gifford, Stewart, Payne, Treese, "Payment Switches for Open Networks," presented at 40th IEEE, IEEEE, '95, Mar. 5-9, 1995, San Francisco, CA.

Hall, Devra, et al., "Build a Web Site: The Programmer's Guide to Creating, Building, and Maintaining a Web Presence", published Apr. 1995. ISBN 0-7615-0064-2.

Hughes, Kevin, source code file for the HTTP log file analysis program, getstats v1.0, dated Feb. 1, 1994, published at http://eit.com/software/getstats/getstats.html—Version 1, 64 pages.

Hughes, Kevin, source code file for the HTTP log file analysis program, getstats v1.0, dated Feb. 1, 1994, published at http://eit.com/software/getstats/getstats.html-Version 2, 64 pages.

It will happen, article excerpt from infoHighway, vol. 2-1, Jan. 1995.

Leggett, John et al., "Hyperform: Using Extensibility to Develop Dynamic, Open and Distributed Hypertext Systems" (1992).

Maren, Michael, "The Age of E-Mail," Home Office Computing, vol. 11, No. 12, p. 63(5), Dec. 1993.

McCartney, Todd, Message posted to Usenet public discussion group, rec.arts.disney, dated Nov. 21, 1994.

NCSA HTTPd release notes at http://hoohoo.ncsa.uius.edu/docs/Upgrade.html (last updated Aug. 1, 1995).

Nielson, Jacob, Hypertext & Hypermedia (1990).

O'Mahony, Donald, Michael Peirce, & Hitesh Tewari, Electronic Payment Systems, Artech House, Inc., pp. 145-155, Jan. 1997.

Pitkow, et al., "Results from the First World Wide Web Use Survey", presented at the First International Conference on the World Wide Web, Geneva, Switzerland, May 25-27, 1994, published at http://www94.web.cern.ch/www94/PrelimProcs.html on Jun. 2, 1994, and reprinted in the Journal of Computer Networks and ISDN Systems, vol. 27, No. 2, Nov. 1994, Elsevier Science B.V.

Smithson, Brain, and Singer, Barbara, An Information Clearinghouse Server for Industry Consortia, 2nd Int'l Conf. On the World Wide Web, Chicago, Ill, Oct. 1994.

Stallings, William, Data & Computer Communications, MacMillan Publishing, 1985, pp. 245-252.

The Major BBS: Collection of Information and Advertisements concerning The Major BBS (Fall 1993).

The NetMarket Company, NetMarket PGP Help file, from http://www.netmarket.com, dated Dec. 10, 1994.

Trewitt, Glenn, "Using Tel to Process HTML Forms", Digital Equipment Corporation, Network Systems Laboratory TN-14, dated Mar. 1994.

Trip et al., "Cookies" (client-side pesistent information) and their use, Netscape Technical Note 20019, Netscape Communications Corp., Oct. 1995.

www talk mailing list: Troth message Sep. 15, 1994.

wwwStat Readme file at http://ftp.ics.uci.edu/pub/websoft/wwwstat/readme, dated May 18, 2005.

Ohmori et al., "An On-line Shopping System Protecting User's Privacy", Information Communication Laboratory of Matsushita Electric Industrial Co., Ltd., pp. 25-32. Note: 12 Pages of Translation Attached, Oct. 1994.

*Soverain Software LLCv. Amazon.Com, Inc. and The Gap, Inc.*, Form of Stipulated Request for Final Dismissals of the Actions, filed Aug. 30, 2005.

*Soverain Software LLC v. Amazon.Com, Inc. and The Gap, Inc.*, Order of Dismissal with Prejudice filed Aug. 31, 2005.

Bina et al., "Secure Access to Data Over the Internet", Natl. Center for Supercomputing Appls., Unv. Of Illinois, Champaign, Illinois, pp. 99-102, Sep. 1994.

Farber, David, "Interesting-People Message—RSA/NCSA/EIT Announcement on Secure Mosiac" Palo Alto, California, Apr. 12, 1994, 4 pages.

Kent, Stephen T., "Internet Privacy Enhanced Mail", 8070 Communications of the ACM 36, New York, Aug. 1993, pp. 48-60.

Kohn, Dan, "Prior Art on Open Market Patents", e-mail message dated Mar. 9, 1998, 1 page.

Lewis, Peter H., "Attention Shoppers: Internet is Open", 2 pages, Aug. 1994, New York Times.

Medvinsky et al., NetCash: A Design for Practical Electronic Currency on the Internet, Information Sciences Institute, University of Southern California, 1993, pp. 102-106, Nov. 1993.

Schaefer et al., "Networked Information Discovery and Retrieval Tools: Security Capabilities and Needs", The MITRE Corporation, 1994, pp. 145-153, Dec. 1994.

European Search Report dated Jun. 19, 2006.

Kahan, Jose "Un nouveau modele d'authorisation pour les systemes de consultation d'information multimedia repartie", pp. 45-57. Dec. 15, 1994.

Kahan, Jose, "A New Authorization Model for Distributed Multimedia Information Consultation Systems," English translation, pp. 1-21. Dec. 15, 1994.

* cited by examiner



FIG. 1



FIG. 2A



FIG. 2B



FIG. 3



FIG. 4

| Document View |
|---|

*File*   *Options*   *Navigate*   *Annotate*   *Documents*          *Help*

Title: | How to join
URL: | http: //auth. com/service/nph- createacct.cgi

I. First name _____

2. Last name _____

3. Choose a screen name (no more than 15 characters)
_____

4. Choose a password (no more than 15 characters)
   Password:
   _____

   Re-enter password:
   _____

5. E-mail address
_____

6. Your birthdate (MM/DD/ YY _____

7. U.S. zip code, or country code
   Zip /postal code:
   _____

   ISO country code
   | US |

## FIG. 5



FIG. 6

US 7,272,639 B1

## 1

# INTERNET SERVER ACCESS CONTROL AND MONITORING SYSTEMS

## RELATED APPLICATION

This application is a Continuation of U.S. Ser. No. 08/474,096, filed Jun. 7, 1995, now U.S. Pat. No. 5,708,780 the entire teachings of which are incorporated herein by reference.

## BACKGROUND TO THE INVENTION

The Internet, which started in the late 1960s, is a vast computer network consisting of many smaller networks that span the entire globe. The Internet has grown exponentially, and millions of users ranging from individuals to corporations now use permanent and dial-up connections to use the Internet on a daily basis worldwide. The computers or networks of computers connected within the Internet, known as "hosts", allow public access to databases featuring information in nearly every field of expertise and are supported by entities ranging from universities and government to many commercial organizations.

The information on the Internet is made available to the public through "servers". A server is a system running on an Internet host for making available files or documents contained within that host. Such files are typically stored on magnetic storage devices, such as tape drives or fixed disks, local to the host. An Internet server may distribute information to any computer that requests the files on a host. The computer making such a request is known as the "client", which may be an Internet-connected workstation, bulletin board system or home personal computer (PC).

TCP/IP (Transmission Control Protocol/Internet Protocol) is one networking protocol that permits full use of the Internet. All computers on a TCP/IP network need unique ID codes. Therefore, each computer or host on the Internet is identified by a unique number code, known as the IP (Internet Protocol) number or address, and corresponding network and computer names. In the past, an Internet user gained access to its resources only by identifying the host computer and a path through directories within the host's storage to locate a requested file. Although various navigating tools have helped users to search resources on the Internet without knowing specific host addresses, these tools still require a substantial technical knowledge of the Internet.

The World-Wide Web (Web) is a method of accessing information on the Internet which allows a user to navigate the Internet resources intuitively, without IP addresses or other technical knowledge. The Web dispenses with command-line utilities which typically require a user to transmit sets of commands to communicate with an Internet server. Instead, the Web is made up of hundreds of thousands of interconnected "pages", or documents, which can be displayed on a computer monitor. The Web pages are provided by hosts running special servers. Software which runs these Web servers is relatively simple and is available on a wide range of computer platforms including PC's. Equally available is a form of client software, known as a Web "browser", which is used to display Web pages as well as traditional non-Web files on the client system. Today, the Internet hosts which provide Web servers are increasing at a rate of more than 300 per month, en route to becoming the preferred method of Internet communication.

Created in 1991, the Web is based on the concept of "hypertext" and a transfer method known as "HTTP" (Hy-

## 2

pertext Transfer Protocol). HTTP is designed to run primarily over TCP/IP and uses the standard Internet setup, where a server issues the data and a client displays or processes it. One format for information transfer is to create documents using Hypertext Markup Language (HTML). HTML pages are made up of standard text as well as formatting codes which indicate how the page should be displayed. The Web client, a browser, reads these codes in order to display the page. The hypertext conventions and related functions of the world wide web are described in the appendices of U.S. patent application Ser. No. 08/328,133, filed on Oct. 24, 1994, by Payne et al. which is incorporated herein by reference.

Each Web page may contain pictures and sounds in addition to text. Hidden behind certain text, pictures or sounds are connections, known as "hypertext links" ("links"), to other pages on the same server or even on other computers within the Internet. For example, links may be visually displayed as words or phrases that may be underlined or displayed in a second color. Each link is directed to a web page by using a special name called a URL (Uniform Resource Locator). URLs enable a Web browser to go directly to any file held on any Web server. A user may also specify a known URL by writing it directly into the command line on a Web page to jump to another Web page.

The URL naming system consists of three parts: the transfer format, the host name of the machine that holds the file, and the path to the file. An example of a URL may be:

http://www.college.univ.edu/Adir/Bdir/Cdir/page.html,

where "http" represents the transfer protocol; a colon and two forward slashes (://) are used to separate the transfer format from the host name; "www.college.univ.edu" is the host name in which "www" denotes that the file being requested is a Web page; "/Adir/Bdir/Cdir" is a set of directory names in a tree structure, or a path, on the host machine; and "page.html" is the file name with an indication that the file is written in HTML.

The Internet maintains an open structure in which exchanges of information are made cost-free without restriction. The free access format inherent to the Internet, however, presents difficulties for those information providers requiring control over their Internet servers. Consider for example, a research organization that may want to make certain technical information available on its Internet server to a large group of colleagues around the globe, but the information must be kept confidential. Without means for identifying each client, the organization would not be able to provide information on the network on a confidential or preferential basis. In another situation, a company may want to provide highly specific service tips over its Internet server only to customers having service contracts or accounts.

Access control by an Internet server is difficult for at least two reasons. First, when a client sends a request for a file on a remote Internet server, that message is routed or relayed by a web of computers connected through the Internet until it reaches its destination host. The client does not necessarily know how its message reaches the server. At the same time, the server makes responses without ever knowing exactly who the client is or what its IP address is. While the server may be programmed to trace its clients, the task of tracing is often difficult, if not impossible. Secondly, to prevent unwanted intrusion into private local area networks (LAN), system administrators implement various data-flow control mechanisms, such as the Internet "firewalls", within their networks. An Internet firewall allows a user to reach the

US 7,272,639 B1

3

Internet anonymously while preventing intruders of the outside world from accessing the user's LAN.

## SUMMARY OF THE INVENTION

The present invention relates to methods of processing service requests from a client to a server through a network. In particular the present invention is applicable to processing client requests in an HTTP (Hypertext Transfer Protocol) environment, such as the World-Wide Web (Web). One aspect of the invention involves forwarding a service request from the client to the server and appending a session identification (SID) to the request and to subsequent service requests from the client to the server within a session of requests. In a preferred embodiment, the present method involves returning the SID from the server to the client upon an initial service request made by the client. A valid SID may include an authorization identifier to allow a user to access controlled files.

In a preferred embodiment, a client request is made with a Uniform Resource Locator (URL) from a Web browser. Where a client request is directed to a controlled file without an SID, the Internet server subjects the client to an authorization routine prior to issuing the SID, the SID being protected from forgery. A content server initiates the authorization routine by redirecting the client's request to an authentication server which may be at a different host. Upon receiving a redirected request, the authentication server returns a response to interrogate the client and then issues an SID to a qualified client. For a new client, the authentication server may open a new account and issue an SID thereafter. A valid SID typically comprises a user identifier, an accessible domain, a key identifier, an expiration time such as date, the IP address of the user computer, and an unforgeable digital signature such as a cryptographic hash of all of the other items in the SID encrypted with a secret key. The authentication server then forwards a new request consisting of the original URL appended by the SID to the client in a REDIRECT. The modified request formed by a new URL is automatically forwarded by the client browser to the content server.

When the content server receives a URL request accompanied by an SID, it logs the URL with the SID and the user IP address in a transaction log and proceeds to validate the SID. When the SID is so validated, the content server sends the requested document for display by the client's Web browser.

In the preferred embodiment, a valid SID allows the client to access all controlled files within a protection domain without requiring further authorization. A protection domain is defined by the service provider and is a collection of controlled files of common protection within one or more servers.

When a client accesses a controlled Web page with a valid SID, the user viewing the page may want to traverse a link to view another Web page. There are several possibilities. The user may traverse a link to another page in the same path. This is called a "relative link". A relative link may be made either within the same domain or to a different domain. The browser on the client computer executes a relative link by rewriting the current URL to replace the old controlled page name with a new one. The new URL retains all portions of the old, including the SID, except for the new page name. If the relative link points to a page in the same protection domain, the SID remains valid, and the request is honored. However, if the relative link points to a controlled page in a different protection domain, the SID is no longer valid, and

4

the client is automatically redirected to forward the rewritten URL to the authentication server to update the SID. The updated or new SID provides access to the new domain if the user is qualified.

The user may also elect to traverse a link to a document in a different path. This is called an "absolute link". In generating a new absolute link, the SID is overwritten by the browser. In the preferred embodiment, the content server, in each serving of a controlled Web page within the domain, filters the page to include the current SID in each absolute URL on the page. Hence, when the user elects to traverse an absolute link, the browser is facilitated with an authenticated URL which is directed with its SID to a page in a different path. In another embodiment, the content server may forego the filtering procedure as above-described and redirect an absolute URL to the authentication server for an update.

An absolute link may also be directed to a controlled file in a different domain. Again, such a request is redirected to the authentication server for processing of a new SID. An absolute link directed to an uncontrolled file is accorded an immediate access.

In another embodiment, a server access control may be maintained by programming the client browser to store an SID or a similar tag for use in each URL call to that particular server. This embodiment, however, requires a special browser which can handle such communications and was generally not suitable for early browser formats common to the Web. However, it may now be implemented in cookie compatible browsers.

Another aspect of the invention is to monitor the frequency and duration of access to various pages both controlled and uncontrolled. A transaction log within a content server keeps a history of each client access to a page including the link sequence through which the page was accessed. Additionally, the content server may count the client requests exclusive of repeated requests from a common client. Such records provide important marketing feedback including user demand, access pattern, and relationships between customer demographics and accessed pages and access patterns.

The above and other features of the invention including various novel details of construction and combinations of parts will now be more particularly described with reference to the accompanying drawings and pointed out in the claims. It will be understood that the particular devices and methods embodying the invention are shown by way of illustration only and not as limitations of the invention. The principles and features of this invention may be employed in varied and numerous embodiments without departing from the scope of the invention.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a diagram illustrating the Internet operation.

FIG. 2A is a flowchart describing the preferred method of Internet server access control and monitoring.

FIG. 2B is a related flowchart describing the details of the authentication process.

FIG. 3 illustrates an example of a client-server exchange session involving the access control and monitoring method of the present invention.

FIG. 4 is an example of a World Wide Web page.

FIG. 5 is an example of an authorization form page.

FIG. 6 is a diagram describing the details of the translation of telephone numbers to URLs.

US 7,272,639 B1

## DETAILED DESCRIPTION OF THE INVENTION

Referring now to the drawings, FIG. 1 is a graphical illustration of the Internet. The Internet 10 is a network of millions of interconnected computers 12 including systems owned by Internet providers 16 and information systems (BBS) 20 such as Compuserve or America Online. Individual or corporate users may establish connections to the Internet in several ways. A user on a home PC 14 may purchase an account through the Internet provider 16. Using a modem 22, the PC can dial up the Internet provider to connect to a high speed modem 24 which, in turn, provides a full service connection to the Internet. A user 18 may also make a somewhat limited connection to the Internet through a BBS 20 that provides an Internet gateway connection to its customers.

FIG. 2A is a flowchart detailing the preferred process of the present invention and FIG. 4 illustrates a sample Web page displayed at a client by a browser. The page includes text 404 which includes underlined link text 412. The title bar 408 and URL bar 402 display the title and URL of the current web page, respectively. As shown in FIG. 4, the title of the page is "Content Home Page" and the corresponding URL is "http://content.com/homepage". When a cursor 414 is positioned over link text 412b, the page which would be retrieved by clicking a mouse is typically identified in a status bar 406 which shows the URL for that link. In this example the status bar 406 shows that the URL for the pointed link 412b is directed to a page called "advertisement" in a commercial content server called "content". By clicking on the link text, the user causes the browser to generate a URL GET request at 100 in FIG. 2A. The browser forwards the request to a content server 120, which processes the request by first determining whether the requested 35 page is a controlled document 102. If the request is directed to an uncontrolled page, as in "advertisement" page in this example, the content server records the URL and the IP address, to the extent it is available, in the transaction log 114. The content server then sends the requested page to the browser 116 for display on the user computer 117.

If the request is directed to a controlled page, the content server determines whether the URL contains an SID 102. For example, a URL may be directed to a controlled page name "report", such as "http://content.com/report", that requires an SID. If no SID is present, as in this example, the content server sends a "REDIRECT" response 122 to the browser 100 to redirect the user's initial request to an authentication server 200 to obtain a valid SID. The details of the authentication process are described in FIG. 2B and will be discussed later, but the result of the process is an SID provided from the authentication server to the client. In the above example, a modified URL appended with an SID may be: "http://content.com/[SID]/report". The preferred SID is a sixteen character ASCII string that encodes 96 bits of SID data, 6 bits per character. It contains a 32-bit digital signature, a 16-bit expiration date with a granularity of one hour, a 2-bit key identifier used for key management, an 8-bit domain comprising a set of information files to which the current SID authorizes access, and a 22-bit user identifier. The remaining bits are reserved for expansion. The digital signature is a cryptographic hash of the remaining items in the SID and the authorized IP address which are encrypted with a secret key which is shared by the authentication and content servers.

If the initial GET URL contains a SID, the content server determines whether the request is directed to a page within

the current domain 106. If the request having a SID is directed to a controlled page of a different domain, the SID is no longer valid and, again, the user is redirected to an authentication server 122.

If the request is for a controlled page within the current domain, the content server proceeds to log the request URL, tagged with SID, and the user IP address in the transaction log 108. The content server then validates the SID 110. Such validation includes the following list of checks: (1) the SID's digital signature is compared against the digital signature computed from the remaining items in the SID and the user IP address using the secret key shared by the authentication and content servers; (2) the domain field of the SID is checked to verify that it is within the domain authorized; and (3) the EXP field of the SID is checked to verify that it is later than the current time.

If the validation passes, the content server searches the page to be forwarded for any absolute URL links contained therein 112, that is, any links directed to controlled documents in different content servers. The content server augments each absolute URL with the current SID to facilitate authenticated accesses across multiple content servers. The requested page as processed is then transmitted to the client browser for display 117. The user viewing the requested Web page may elect to traverse any link on that page to trigger the entire sequence again 100.

FIG. 2B describes the details of the authentication process. The content server may redirect the client to an authentication server. The REDIRECT URL might be: "http://auth.com/authenticate?domain=[domain] &URL=http://content.com/report". That URL requests authentication and specifies the domain and the initial URL. In response to the REDIRECT, the client browser automatically sends a GET request with the provided URL.

Whenever the content server redirects the client to the authentication server 200, the authentication server initiates the authorization process by validating that it is for an approved content server and determining the level of authentication required for the access requested 210. Depending on this level, the server may challenge the user 212 for credentials. If the request is for a low level document, the authentication may issue an appropriate SID immediately 228 and forego the credential check procedures. If the document requires credentials, the authentication server sends a "CHALLENGE" response which causes the client browser to prompt the user for credentials 214. A preferred credential query typically consists of a request for user name and password. If the user is unable to provide a password, the access is denied. The browser forms an authorization header 300 from the information provided, and resends a GET request to the authentication server using the last URL along with an authorization header. For example, a URL of such a GET request may be: "http://content.com/authenticate?domain=[domain]&URL=http://content.com/report and the authorization header may be: "AUTHORIZE: [authorization]".

Upon receiving the GET request, the authentication server queries an account database 216 to determine whether the user is authorized 218 to access the requested document. A preferred account database may contain a user profile which includes information for identifying purposes, such as client IP address and password, as well as user demographic information, such as user age, home address, hobby, or occupation, for later use by the content server. If the user is authorized, an SID is generated 228 as previously described. If the user is not cleared for authorization, the authentication server checks to see if the user qualifies for a new account

US 7,272,639 B1

7

220. If the user is not qualified to open a new account, a page denying access 222 is transmitted to the client browser 100. If the user is qualified, the new user is sent a form page such as illustrated in FIG. 5 to initiate a real-time on-line registration 224. The form may, for example, require personal information and credit references from the user. The browser is able to transmit the data entered by the user in the blanks 502 as a "POST" message to the authentication server. A POST message causes form contents to be sent to the server in a data body other than as part of the URL. If the registration form filled out by the new user is valid 226, an appropriate SID is generated 228. If the registration is not valid, access is again denied 222.

An SID for an authorized user is appended ("tagged") 230 to the original URL directed to a controlled page on the content server. The authentication server then transmits a REDIRECT response 232 based on the tagged URL to the client browser 100. The modified URL, such as "http://content.com/[SID]/report" is automatically forwarded to the content server 120.

FIG. 3, illustrates a typical client-server exchange involving the access control and monitoring method of the present invention. In Step 1, the client 50 running a browser transmits a GET request through a network for an uncontrolled page (UCP). For example, the user may request an advertisement page by transmitting a URL "http://content.com/advertisement", where "content.com" is the server name and "advertisement" is the uncontrolled page name. In Step 2, the content server 52 processes the GET request and transmits the requested page, "advertisement". The content server also logs the GET request in the transaction database 56 by recording the URL, the client IP address, and the current time.

In Step 3, the user on the client machine may elect to traverse a link in the advertisement page directed to a controlled page (CP). For example, the advertisement page may contain a link to a controlled page called "report". Selecting this link causes the client browser 50 to forward a GET request through a URL which is associated with the report file "http://content.com/report". The content server 52 determines that the request is to a controlled page and that the URL does not contain an SID. In Step 4, the content server transmits a REDIRECT response to the client, and, in Step 5, the browser automatically sends the REDIRECT URL to the authentication server 54. The REDIRECT URL sent to the authentication server may contain the following string:

"http://auth.com/authenticate?domain=[domain] &URL=http://content.com/report"

The authentication server processes the REDIRECT and determines whether user credentials (CRED) are needed for authorization. In Step 6, the authentication server transmits a "CHALLENGE" response to the client. As previously described, typical credentials consist of user name and password. An authorization header based on the credential information is then forwarded by the client browser to the authentication server. For example, a GET URL having such an authorization header is: "http://autho.com/authenticate?domain=[domain]&URL=http://content.com/report and the authorization header may be: "AUTHORIZE: [authorization]". The authentication server processes the GET request by checking the Account Database 58. If a valid account exists for the user, an SID is issued which authorizes access to the controlled page "report" and all the other pages within the domain.

8

As previously described, the preferred SID comprises a compact ASCII string that encodes a user identifier, the current domain, a key identifier, an expiration time, the client IP address, and an unforgeable digital signature. In Step 8, the authentication server redirects the client to the tagged URL, "http://content.com/[SID]/report", to the client. In Step 9, the tagged URL is automatically forwarded by the browser as a GET request to the content server. The content server logs the GET request in the Transaction database 56 by recording the tagged URL, the client IP address, and the current time. In Step 10, the content server, upon validating the SID, transmits the requested controlled page "report" for display on the client browser.

According to one aspect of the present invention, the content server periodically evaluates the record contained in the transaction log 56 to determine the frequency and duration of accesses to the associated content server. The server counts requests to particular pages exclusive of repeated requests from a common client in order to determine the merits of the information on different pages for ratings purposes. By excluding repeated calls, the system avoids distortions by users attempting to "stuff the ballot box."

In one embodiment, the time intervals between repeated requests by a common client are measured to exclude those requests falling within a defined period of time.

Additionally, the server may, at any given time, track access history within a client-server session. Such a history profile informs the service provider about link traversal frequencies and link paths followed by users. This profile is produced by filtering transaction logs from one or more servers to select only transactions involving a particular user ID (UID). Two subsequent entries, A and B, corresponding to requests from a given user in these logs represent a link traversal from document A to document B made by the user in question. This information may be used to identify the most popular links to a specific page and to suggest where to insert new links to provide more direct access. In another embodiment, the access history is evaluated to determine traversed links leading to a purchase of a product made within commercial pages. This information may be used, for example, to charge for advertising based on the number of link traversals from an advertising page to a product page or based on the count of purchases resulting from a path including the advertisement. In this embodiment, the server can gauge the effectiveness of advertising by measuring the number of sales that resulted from a particular page, link, or path of links. The system can be configured to charge the merchant for an advertising page based on the number of sales that resulted from that page.

According to another aspect of the present invention, a secondary server, such as the authentication server 200 in FIG. 2B, may access a prearranged user profile from the account database 216 and include information based on such a profile in the user identifier field of the SID. In a preferred embodiment, the content server may use such an SID to customize user requested pages to include personalized content based on the user identifier field of the SID.

In another aspect of the invention, the user may gain access to domain of servers containing journals or publications through a subscription. In such a situation, the user may purchase the subscription in advance to gain access to on-line documents through the Internet. The user gains access to a subscribed document over the Internet through the authorization procedure as described above where an authorization indicator is preferably embedded in a session identifier. In another embodiment, rather than relying on a

US 7,272,639 B1

9

prepaid subscription, a user may be charged and billed each time he or she accesses a particular document through the Internet. In that case, authorization may not be required so long as the user is fully identified in order to be charged for the service. The user identification is most appropriately embedded in the session identifier described above.

In another aspect of the invention, facilities are provided to allow users to utilize conventional telephone numbers or other identifiers to access merchant services. These merchant services can optionally be protected using SIDs. In a preferred embodiment, as shown in FIG. 6, a Web browser client 601 provides a "dial" command to accept a telephone number from a user, as by clicking on a "dial" icon and inputting the telephone number through the keyboard. The browser then constructs a URL of the form "http://directo-ry.net/NUMBER", where NUMBER is the telephone number or other identifier specified by the user. The browser then performs a GET of the document specified by this URL, and contacts directory server 602, sending the NUMBER requested in Message 1.

In another embodiment, implemented with a conventional browser, client 601 uses a form page provided by directory server 601 that prompts for a telephone number or other identifier in place of a "dial" command, and Message 1 is a POST message to a URL specified by this form page.

Once NUMBER is received by directory server 601, the directory server uses database 604 to translate the NUMBER to a target URL that describes the merchant server and document that implements the service corresponding to NUMBER. This translation can ignore the punctuation of the number, therefore embedded parenthesis or dashes are not significant.

In another embodiment an identifier other than a number may be provided. For example, a user may enter a company name or product name without exact spelling. In such a case a "soundex" or other phonetic mapping can be used to permit words that sound alike to map to the same target URL. Multiple identifiers can also be used, such as a telephone number in conjunction with a product name or extension.

In Message 2, Directory server 602 sends a REDIRECT to client 601, specifying the target URL for NUMBER as computed from database 604. The client browser 601 then automatically sends Message 3 to GET the contents of this URL. Merchant server 603 returns this information in Message 4. The server 602 might have returned a Web page to the client to provide an appropriate link to the required document. However, because server 602 makes a translation to a final URL and sends a REDIRECT rather than a page to client 601, the document of message 4 is obtained without any user action beyond the initial dial input.

The Target URL contained in Message 3 can be an ordinary URL to an uncontrolled page, or it can be a URL that describes a controlled page. If the Target URL describes a controlled page then authentication is performed as previously described. The Target URL can also describe a URL that includes an SID that provides a preauthorized means of accessing a controlled page.

Among benefits of the "dial" command and its implementation is an improved way of accessing the Internet that is compatible with conventional telephone numbers and other identifiers. Merchants do not need to alter their print or television advertising to provide an Internet specific form of contact information, and users do not need to learn about URLs.

In the approach a single merchant server can provide multiple services that correspond to different external "tele-

10

phone numbers" or other identifiers. For example, if users dial the "flight arrival" number they could be directed to the URL for the arrival page, while, if they dial the "reservations" number, they would be directed to the URL for the reservations page. A "priority gold" number could be directed to a controlled page URL that would first authenticate the user as belonging to the gold users group, and then would provide access to the "priority gold" page. An unpublished "ambassador" number could be directed to a tagged URL that permits access to the "priority gold" page without user authentication.

This invention has particular application to network sales systems such as presented in U.S. patent application Ser. No. 08/328,133, filed Oct. 24, 1994, by Payne et al. which is incorporated herein by reference.

## EQUIVALENTS

Those skilled in the art will know, or be able to ascertain using no more than routine experimentation, many equivalents to the specific embodiments or the invention described herein. These and all other equivalents are intended to be encompassed by the following claims.

What is claimed is:

1. A method of processing service requests from a client to a server system through a network, said method comprising the steps of forwarding a service request from the client to the server system, wherein communications between the client and server system are according to hypertext transfer protocol;

   returning a session identifier from the server system to the client, the client storing the session identifier for use in subsequent distinct requests to the server system; and

   appending the stored session identifier to each of the subsequent distinct requests from the client to the server system.

2. A method as claimed in claim 1 wherein the session identifier includes a user identifier.

3. A method as claimed in claim 1 wherein the session identifier includes an expiration time for the session.

4. A method as claimed in claim 1 wherein the server system records information from the session identifier in a transaction log in the server system.

5. A method as claimed in claim 4 wherein the server system tracks the access history of sequences of service requests within a session of requests.

6. A method as claimed in claim 5 wherein the server system tracks the access history to determine service requests leading to a purchase made within the session of requests.

7. A method as claimed in claim 4 wherein the server system counts requests to particular services exclusive of repeated requests from a common client.

8. A method as claimed in claim 4 wherein the server system maintains a data base relating customer information to access patterns.

9. A method as claimed in claim 8 wherein the information includes customer demographics.

10. A method as claimed in claim 1 wherein the server system assigns the session identifier to an initial service request to the server system.

11. A method as claimed in claim 1 wherein the server system subjects the client to an authorization routine prior to issuing the session identifier and the session identifier is protected from forgery.

US 7,272,639 B1

11

12. A method as claimed in claim 1 wherein the server system comprises plural servers including an authentication server which provides session identifiers for service requests to multiple servers.

13. A method as claimed in claim 12 wherein:

a client directs a service request to a first server which is to provide the requested service;

the first server checks the service request for a session identifier and only services a service request having a valid session identifier, and where the service request has no valid identifier;

the first server returns a response to the client, the response redirecting the service request from the client to the authentication server;

the authentication server subjects the client to an authorization routine and issues the session identifier to be appended to the service request to the first server;

the client forwards the service request appended with the session identifier to the first server; and

the first server recognizes the session identifier and services the service request to the client; and

the client appends the session identifier to subsequent service requests to the server system and is serviced without further authorization.

14. A method as claimed in claim 13 wherein the session identifier includes a user identifier.

15. A method as claimed in claim 13 wherein the session identifier includes an expiration time for the session.

16. A method as claimed in claim 13 wherein the session identifier provides access to a protected domain to which the session has access authorization.

17. A method as claimed in claim 16 wherein the session identifier is modified for access to a different protected domain.

18. A method as claimed in claim 13 wherein the session identifier provides a key identifier for key management.

19. A method as claimed in claim 13 wherein the server system records information from the session identifier in a transaction log in the server system.

20. The method of claim 1 wherein the access rights of the client are fully contained within the session identifier.

21. A method as claimed in claim 1 wherein a service request is for a document and the session identifier includes a user identification, further comprising:

returning the requested document wherein the document is customized for a particular user based on the user identification of the session identifier.

22. A method as claimed in claim 1 wherein a service request is for a document which has been purchased by a user, the session identifier comprises an authorization identifier, and further comprising:

returning the requested document if the authorization identifier indicates that the user is authorized to access the document.

23. A method as claimed in claim 1 wherein a service request is for a document wherein the session identifier comprises a user identifier, and further comprising:

returning the requested document to the client; and

charging the user identified in the identifier for access to the document.

24. The method of claim 1, wherein at least one service request comprises a request for a document which has been purchased by a user, and wherein the session identifier comprises an authorization identifier, the method further comprising:

returning the requested document if the authorization identifier indicates that the user is authorized to access the document.

25. A method as claimed in claim 24, wherein the authorization identifier is encoded within a session identifier which is appended to the request.

26. The method of claim 24 wherein the authorization identifier is provided by authentication server.

27. The method of claim 24, further comprising:

identifying the user from the authorization identifier; and

automatically charging the identified user for the document.

28. The method of claim 24, wherein the document is returned electronically.

29. The method of claim 24, wherein a physical copy of the document is sent.

30. The method of claim 24, wherein the authorization identifier in appended to uniform resource locator.

31. The method of claim 1, wherein at least one service request comprises a request for a document, wherein the session identifier is designated by the server system, said method further comprising the steps of:

returning the requested document to the client; and

charging the user identified in the session identifier for access to the document.

32. A method as claimed in claim 31, wherein a user identifier is encoded within a session identifier which is appended to the request.

33. The method of claim 1 wherein the session identifier is cryptographically generated.

34. The method of claim 1 further comprising:

returning a response to the client, the response redirecting an initial service request to an authentication server, the authentication server providing the session identifier.

35. The method of claim 1, wherein the session identifier is appended to at least one path name in a document returned by the server system.

36. The method of claim 35, wherein the at least one path name is in a link in the returned document.

37. The method of claim 36 wherein the link is an absolute link.

38. The method of claim 36 wherein the link comprises a uniform resource locator.

39. The method of claim 35 wherein the step of appending the session identifier comprises filtering the requested document.

40. The method of claim 35 wherein the session identifier is cryptographically generated.

41. The method of claim 35 wherein the session identifier is directed to an accessible domain.

42. The method of claim 35 wherein the session identifier comprises an expiration time.

43. The method of claim 35 wherein the session identifier comprises a date.

44. The method of claim 35 wherein the session identifier comprises a key identifier.

45. The method of claim 35 wherein the session identifier comprises an address of the client.

46. The method of claim 35 wherein the session identifier comprises a digital signature.

47. The method of claim 1, wherein the session identifier is designated by the server system, furthers comprising the steps of:

validating, at the server system, the appended session identifier; and

returning a controlled document if the appended session identifier is valid.

48. The method of claim 47 wherein the session identifier is cryptographically generated.

49. The method of claim 47 wherein the session identifier is directed to an accessible domain.

US 7,272,639 B1

13

50. The method of claim 47 wherein the session identifier comprises an expiration time.

51. The method of claim 47 wherein the session identifier comprises a date.

52. The method of claim 47 wherein the session identifier comprises a key identifier.

53. The method of claim 47 wherein the session identifier comprises an address of the client.

54. The method of claim 47 wherein the session identifier comprises an unforgeable digital signature.

55. The method of claim 47 wherein the session identifier facilitates authenticated accesses across multiple content servers.

56. The method of claim 47 wherein the document is customized for a particular user based on a user identification of the session identifier.

57. The method of claim 47, wherein the session identifier is appended to at least one path name in a document returned by the server system.

58. The method of claim 57 wherein the step of appending the session identifier comprises filtering the requested document.

59. The method of claim 1, further comprising:
servicing a request; and
automatically charging a user identified by the session identifier for the service provided.

60. The method of claim 1, wherein at least one service request comprises a purchase request, the purchase request including an associated user identifier, the method further comprising:
accessing, upon receipt of the purchase request at the server system, user information associated with the user identifier sufficient to charge to an account associated with the user, the purchase price of the product identified by the purchase request;
charging the user for the product identified by the purchase request according to the user information; and
fulfilling the purchase request based on the user information.

61. The method of claim 60, wherein the client includes the user identifier in a session identifier appended to the purchase request.

62. The method of claim 1, further comprising:
under control of a client system, displaying information identifying a product; and
in response to a user selection of a hyperlink associated with a product desired to be purchased, sending a request to purchase the item along with an identifier of a purchaser of the item to a server system; and
under control of the server system, upon receiving the request, retrieving additional information previously stored for the purchaser identified by the identifier in the received request;
charging the user the purchase price of the product; and
fulfilling the request for the product.

63. The method of claim 1, wherein the session identifier is appended by the client.

64. The method of claim 63, wherein the session identifier is cryptographically generated.

65. The method of claim 1, wherein a service request comprises a request to purchase a product.

66. The method of claim 65, wherein the product is transmitted over the network.

14

67. The method of claim 66, wherein the product is a newspaper/newsletter article.

68. The method of claim 65, wherein the product is a durable product.

69. An information system on a network, comprising:
means for receiving service requests from a client and for determining whether a service request includes a session identifier, wherein communications to and from the client are according to hypertext transfer protocol;
means for providing the session identifier in response to an initial service request from the client in a session of requests;
means for storing, at the client, the session identifier for use in each communication to the server system;
means for appending the stored session identifier to each of subsequent communications from the client to the server system; and
means for servicing the subsequent service requests.

70. The information system of claim 69 wherein access rights of the client are fully contained within the session identifier.

71. An information system as claimed in claim 69 wherein the means for providing the session identifier is in a server system which services the requests.

72. An information system as claimed in claim 69 further comprising an authorization routine for authorizing the client prior to issuing the session identifier and means for protecting the session identifier from forgery.

73. An information server system as claimed in claim 69 further comprising a transaction log for recording information from the session identifier.

74. An information system as claimed in claim 69 further comprising means for tracking access history of sequences of service requests within the session of requests.

75. An information system as claimed in claim 69 further comprising means for counting requests to particular services exclusive of repeated requests from a common client.

76. An information system as claimed in claim 69 further comprising a data base relating customer information to access patterns.

77. An information system as claimed in claim 76 wherein the information includes customer demographics.

78. A method of processing, in a server system, service requests from a client to the server system through a network, said method comprising the steps of:
receiving, from the client, a service request to which a session identifier stored at the client has been appended by the client, wherein communications between the client and server system are according to hypertext transfer protocol;
validating the session identifier appended to the service request; and servicing the service request if the appended session identifier is valid.

79. The method of claim 78, further comprising, in the server system:
receiving an initial service request from the client;
creating, responsive to the initial service request, the session identifier; and
returning the session identifier to the client for storage by the client for use in subsequent distinct requests to the server system.

* * * * *

APPEAL, PATENT, PATENT/TRADEMARK, PROTECTIVE–ORDER

# U.S. District Court [LIVE]
## Eastern District of TEXAS (Tyler)
## CIVIL DOCKET FOR CASE #: 6:07–cv–00511–LED

Soverain Software LLC v. CDW Corporation et al
Assigned to: Judge Leonard Davis
Cause: 35:271 Patent Infringement

Date Filed: 11/02/2007
Date Terminated: 08/11/2010
Jury Demand: Both
Nature of Suit: 830 Patent
Jurisdiction: Federal Question

**Mediator**

**Michael Philip Patterson**

represented by **Michael Philip Patterson**
Mike Patterson Mediation
515 South Vine
Tyler, TX 75702
903–592–4433
Email: mike@mikepattersonmediation.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Soverain Software LLC**

represented by **Jennifer Seraphine**
Jones Day – San Francisco
555 California Street
26th Floor
San Francisco, CA 94104
415/875–5892
Fax: 415/875–5700
Email: jseraphine@jonesday.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kenneth Robert Adamo**
Jones Day – Dallas
2727 North Harwood Street
Dallas, Tx 75201
214–969–4856
Email: kradamo@jonesday.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amanda Aline Abraham**
The Roth Law Firm
115 N. Wellington
Suite 200
P.O. Box 876
Marshall, TX 75671–0876
903–935–1665
Fax: 903–935–1797
Email: aa@rothfirm.com
*ATTORNEY TO BE NOTICED*

**Andrey Belenky**
Jones Day – NYC
222 East 41st Street
New York, NY 10017
212–326–3939
Fax: 212–755–7306
Email: abelenky@jonesday.com
*ATTORNEY TO BE NOTICED*

**Barry R Satine**
Jones Day – New York

222 E 41 Street
New York, NY 10017
212/326-3939
Fax: 12127557306
Email: barryrsatine@jonesday.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Brendan Clay Roth**
Law Office of Carl R Roth
115 N Wellington Suite 200
Marshall, Tx 75670
903/935-1665
Fax: 19039351797
Email: br@rothfirm.com
*ATTORNEY TO BE NOTICED*

**Carl R Roth**
The Roth Law Firm, P.C.
115 N Wellington Suite 200
Marshall, Tx 75670
903/935-1665
Fax: 19039351797
Email: cr@rothfirm.com
*ATTORNEY TO BE NOTICED*

**Clark Craddock**
Jones Day – New York
222 E 41 Street
New York, NY 10017
212/326-8320
Fax: 212/755-7306
Email: ccraddock@jonesday.com
*ATTORNEY TO BE NOTICED*

**Debra R Smith**
Jones Day – New York
222 E 41 Street
New York, NY 10017
212/326-3606
Fax: 212/755-7306
Email: debrarsmith@jonesday.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**George T Manning**
Jones Day – Dallas
2727 North Harwood Street
Dallas, Tx 75201
214/969-3676
Fax: 214/969-5100
Email: gtmanning@jonesday.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kenneth Canfield**
Jones Day – New York
222 E 41 Street
New York, NY 10017
212/326-3939
Fax: 212/755-7306
Email: kcanfield@jonesday.com
*ATTORNEY TO BE NOTICED*

**Lynda Q Nguyen**

Jones Day – New York
222 E 41 Street
New York, NY 10017
212/326–3939
Fax: 212/755–7306
Email: lqnguyen@jonesday.com
*ATTORNEY TO BE NOTICED*

**Mark Christopher Howland**
Jones Day – Dallas
2727 North Harwood Street
Dallas, Tx 75201
214/969–5002
Fax: 214/969–5100
Email: mchowland@jonesday.com
*ATTORNEY TO BE NOTICED*

**Michael Charles Smith**
Siebman Burg Phillips &Smith,
LLP–Marshall
P O Box 1556
Marshall, TX 75671–1556
903–938–8900
Fax: 19727674620
Email: michaelsmith@siebman.com
*ATTORNEY TO BE NOTICED*

**Ognjan V Shentov**
Jones Day – New York
222 E 41 Street
New York, NY 10017
212/326–3650
Fax: 212/755–7306
Email: ovshentov@jonesday.com
*ATTORNEY TO BE NOTICED*

**Stela Cristina Tipi**
Jones Day – New York
222 E 41 Street
New York, NY 10017
212/326–3939
Fax: 212/755–7306
Email: stipi@jonesday.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Thomas Demitrack**
Jones Day – Cleveland
North Point
901 Lakeside Ave
Cleveland, OH 44114
216/586–7141
Fax: 216/579–0212
Email: tdemitrack@jonesday.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Thomas L Giannetti**
Jones Day – New York
222 E 41 Street
New York, NY 10017
212/326–3939
Fax: 212/755–7306
Email: tlgiannetti@jonesday.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**CDW Corporation**
*TERMINATED: 03/16/2009*

represented by **Charles Edward Juister**
Marshall Gerstein &Borun
233 S Wacker Dr
6300 Sears Tower
Chicago, IL 60606−6357
312/474−6300
Fax: 312/474−0448
Email: cjuister@marshallip.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Scott A Sanderson**
Marshall Gerstein &Borun
233 S Wacker Dr
6300 Sears Tower
Chicago, IL 60606−6357
312/474−6300
Fax: 312/474−0448
Email: ssanderson@marshallip.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Thomas L Duston**
Marshall Gerstein &Borun
233 S Wacker Dr
6300 Sears Tower
Chicago, IL 60606−6357
312/474−6300
Fax: 312/474−0448
Email: tduston@marshallip.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Eric Hugh Findlay**
Findlay Craft
6760 Old Jacksonville Hwy
Suite 101
Tyler, TX 75703
903/534−1100
Fax: 903/534−1137
Email: efindlay@findlaycraft.com
*ATTORNEY TO BE NOTICED*

**Julianne Hartzell**
Marshall Gerstein &Borun
233 S Wacker Dr
6300 Sears Tower
Chicago, IL 60606−6357
312/474−6300
Fax: 312/474−0448
Email: jhartzell@marshallip.com
*ATTORNEY TO BE NOTICED*

**Matthew C Nielsen**
Marshall Gerstein &Borun
233 S Wacker Dr
6300 Sears Tower
Chicago, IL 60606−6357
312/474−6300
Fax: 312/474−0448

Email: mnielsen@marshallip.com
*ATTORNEY TO BE NOTICED*

**Defendant**

Newegg Inc.                    represented by **Eric Hugh Findlay**
(See above for address)
*TERMINATED: 09/19/2008*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Charles Edward Juister**
(See above for address)
*TERMINATED: 09/19/2008*
*ATTORNEY TO BE NOTICED*

**Claudia Wilson Frost**
Pillsbury Winthrop Shaw Pittman –
Houston
909 Fannin Street
Ste 2000
Houston, TX 77010
713/276–7648
Fax: 713/276–7673
Email: claudia.frost@pillsburylaw.com
*ATTORNEY TO BE NOTICED*

**Daniel H Brean**
The Webb Law Firm
700 Koppers Building
436 Seventh Avenue
Pittsburgh, PA 15219
412/471–8815
Fax: 412/471–4094
Email: dbrean@webblaw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**David C Hanson**
The Webb Law Firm
700 Koppers Building
436 Seventh Avenue
Pittsburgh, PA 15219
412/471–8815
Fax: 412/471–4094
Email: dhanson@webblaw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Herbert A Yarbrough , III**
Attorney at Law
100 E Ferguson
Suite 1015
Tyler, TX 75702
903/595–3111
Fax: 19035950191
Email: trey@yw–lawfirm.com
*ATTORNEY TO BE NOTICED*

**Jeremy Jason Gaston**
Pillsbury Winthrop Shaw Pittman –
Houston
909 Fannin Street
Ste 2000
Houston, TX 77010

713/276-7613
Fax: 281-582-4021
Email: jeremy.gaston@pillsburylaw.com
*ATTORNEY TO BE NOTICED*

**John W McIlvaine , III**
The Webb Law Firm
700 Koppers Building
436 Seventh Avenue
Pittsburgh, PA 15219
412/471-8815
Fax: 14124714094
Email: jmcilvaine@webblaw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Julianne Hartzell**
(See above for address)
*TERMINATED: 09/19/2008*
*ATTORNEY TO BE NOTICED*

**Kent E Baldauf , Jr**
The Webb Law Firm
700 Koppers Building
436 Seventh Avenue
Pittsburgh, PA 15219
412/471-8815
Fax: 412/471-4094
Email: kbaldaufjr@webblaw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Mark Daniel Strachan**
Sayles Webner
4400 Renaissance
1201 Elm Street
Dallas, TX 75270
214-939-8707
Fax: 214-939-8787
Email: mstrachan@swtriallaw.com
*ATTORNEY TO BE NOTICED*

**Matthew C Nielsen**
(See above for address)
*TERMINATED: 09/19/2008*
*ATTORNEY TO BE NOTICED*

**Mira S Wolff**
Newegg Inc
16839 E Gale Avenue
City of Industry, CA 91745
629/271-1420
Fax: 629/271-9483
Email: mira.s.wolff@newegg.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Richard Alan Sayles**
Sayles Werbner
1201 Elm Street
4400 Renaissance Tower
Dallas, TX 75270
214/939-8700
Fax: 12149398787
Email: dsayles@swtriallaw.com

*ATTORNEY TO BE NOTICED*

**Scott A Sanderson**
(See above for address)
*TERMINATED: 09/19/2008*
*ATTORNEY TO BE NOTICED*

**Thomas L Duston**
(See above for address)
*TERMINATED: 09/19/2008*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Redcats USA, Inc.**          represented by     **Frank W Leak , Jr**
*TERMINATED: 07/07/2008*                          Kilpatrick Stockton LLP NC
                                                  1001 W Fourth Street
                                                  Winston−Salem, NC 27101
                                                  336/607−7363
                                                  Fax: 336/607−7500
                                                  Email: fleak@kilpatrickstockton.com

                                                  **Michael E Jones**
                                                  Potter Minton PC
                                                  110 N College
                                                  Suite 500
                                                  PO Box 359
                                                  Tyler, TX 75710−0359
                                                  903−597−8311
                                                  Fax: 903−593−0846
                                                  Email: mikejones@potterminton.com

                                                  **Steven Gardner**
                                                  Kilpatrick Stockton LLP NC
                                                  1001 W Fourth Street
                                                  Winston−Salem, NC 27101
                                                  336/607−7300
                                                  Fax: 3366077500
                                                  Email: sgardner@kilpatrickstockton.com

                                                  **Tonya R Deem**
                                                  Kilpatrick Stockton LLP NC
                                                  1001 W Fourth Street
                                                  Winston−Salem, NC 27101
                                                  336−607−7485
                                                  Fax: 336−734−2653
                                                  Email: tdeem@kilpatrickstockton.com

**Defendant**

**Systemax Inc.**             represented by     **Barry J Schindler**
*TERMINATED: 05/26/2009*                          Greenberg Traurig − NJ
                                                  200 Park Ave
                                                  Florham Park, NJ 07932
                                                  973/360−7900
                                                  Fax: 973/301−8410
                                                  Email: schindlerb@gtlaw.com
                                                  *ATTORNEY TO BE NOTICED*

                                                  **Douglas Ray McSwane , Jr**
                                                  Potter Minton
                                                  P. O. Box 359
                                                  Tyler, TX 75710
                                                  903/597/8311
                                                  Fax: 9035930846
                                                  Email: dougmcswane@potterminton.com

*ATTORNEY TO BE NOTICED*

**Eric William Buether**
Buether Joe &Carpenter, LLC
1700 Pacific Avenue
Suite 2390
Dallas, TX 75201
214−466−1270
Email: eric.buether@bjciplaw.com
*TERMINATED: 01/03/2008*

**Gaston Kroub**
Greenberg Traurig − New York
Metlife Building
200 Park Avenue, 15th Floor
New York, NY 10166
212/801−9200
Fax: 212/801−6400
Email: kroubg@gtlaw.com
*ATTORNEY TO BE NOTICED*

**Mary−Olga Lovett**
Greenberg Traurig − Houston
1000 Louisiana
Suite 1700
Houston, TX 77002
713/374−3500
Fax: 7137547541
Email: lovettm@gtlaw.com
*ATTORNEY TO BE NOTICED*

**Michael A Nicodema**
Greenberg Traurig − NJ
200 Park Ave
Florham Park, NJ 07932
973/360−7900
Fax: 973/301−8410
Email: nicodemam@gtlaw.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Zappos.Com, Inc.**
*TERMINATED: 12/02/2008*

represented by **Eric Hugh Findlay**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Theodore Herhold**
Townsend &Townsend &Crew − Palo Alto
379 Lytton Ave
Palo Alto, CA 94301
650/326−2400
Fax: 650/326−2422
Email: ttherhold@townsend.com
*TERMINATED: 01/03/2008*
*LEAD ATTORNEY*

**Charles Edward Juister**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Julianne Hartzell**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Matthew C Nielsen**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Scott A Sanderson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sidney Calvin Capshaw , III**
Capshaw DeRieux, LLP
1127 Judson Road
Ste 220
Longview, TX 75601−5157
903/233−4826
Fax: 903−236−8787
Email: ccapshaw@capshawlaw.com
*TERMINATED: 01/02/2008*

**Thomas L Duston**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Tiger Direct Inc**
*TERMINATED: 05/26/2009*

represented by **Mary−Olga Lovett**
(See above for address)
*LEAD ATTORNEY*

**Douglas Ray McSwane , Jr**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**The Sportsman's Guide Inc**
*TERMINATED: 07/07/2008*

represented by **Frank W Leak , Jr**
(See above for address)

**Michael E Jones**
(See above for address)

**Steven Gardner**
(See above for address)

**Tonya R Deem**
(See above for address)

**William H Boice**
Kilpatrick Stockton LLP − Atlanta
1100 Peachtree St
Ste 2800
Atlanta, GA 30309−4530
404/815−6464
Fax: 404/54−3134
Email: bboice@kilpatrickstockton.com
*PRO HAC VICE*

**Defendant**

**Redcats USA LP**
*TERMINATED: 07/07/2008*

represented by **Frank W Leak , Jr**
(See above for address)

**Michael E Jones**
(See above for address)

**Steven Gardner**
(See above for address)

A192

**Tonya R Deem**
(See above for address)

**William H Boice**
(See above for address)
*PRO HAC VICE*

**Counter Claimant**

**Tiger Direct Inc**                    represented by  **Mary−Olga Lovett**
*TERMINATED: 05/26/2009*                               (See above for address)
                                                       *LEAD ATTORNEY*

V.

**Counter Defendant**

**Soverain Software LLC**               represented by  **Debra R Smith**
                                                       (See above for address)
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Jennifer Seraphine**
                                                       (See above for address)
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Kenneth Robert Adamo**
                                                       (See above for address)
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Amanda Aline Abraham**
                                                       (See above for address)
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Barry R Satine**
                                                       (See above for address)
                                                       *PRO HAC VICE*
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Brendan Clay Roth**
                                                       (See above for address)
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Carl R Roth**
                                                       (See above for address)
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Mark Christopher Howland**
                                                       (See above for address)
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Michael Charles Smith**
                                                       (See above for address)
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Thomas L Giannetti**
                                                       (See above for address)
                                                       *ATTORNEY TO BE NOTICED*

**Counter Claimant**

                                        represented by

A193

**Systemax Inc.**
*TERMINATED: 05/26/2009*

**Barry J Schindler**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Eric William Buether**
(See above for address)
*TERMINATED: 01/03/2008*

**Gaston Kroub**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Mary−Olga Lovett**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael A Nicodema**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Counter Defendant**

**Soverain Software LLC**          represented by **Debra R Smith**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jennifer Seraphine**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kenneth Robert Adamo**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amanda Aline Abraham**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Barry R Satine**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Brendan Clay Roth**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Carl R Roth**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Mark Christopher Howland**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Thomas L Giannetti**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**CDW Corporation**
*TERMINATED: 03/16/2009*

represented by **Charles Edward Juister**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Scott A Sanderson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Thomas L Duston**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Eric Hugh Findlay**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**Newegg Inc.**

represented by **Eric Hugh Findlay**
(See above for address)
*TERMINATED: 09/19/2008*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Daniel H Brean**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Herbert A Yarbrough , III**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**Zappos.Com, Inc.**
*TERMINATED: 12/02/2008*

represented by **Eric Hugh Findlay**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Theodore Herhold**
(See above for address)
*TERMINATED: 01/03/2008*
*LEAD ATTORNEY*

**Sidney Calvin Capshaw , III**
(See above for address)
*TERMINATED: 01/02/2008*

V.

**Counter Defendant**

**Soverain Software LLC**

represented by **Debra R Smith**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jennifer Seraphine**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kenneth Robert Adamo**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amanda Aline Abraham**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Barry R Satine**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Brendan Clay Roth**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Carl R Roth**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Mark Christopher Howland**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Thomas L Giannetti**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**The Sportsman's Guide Inc**          represented by   **Frank W Leak , Jr**
*TERMINATED: 07/07/2008*                                (See above for address)

                                                        **Michael E Jones**
                                                        (See above for address)

                                                        **Steven Gardner**
                                                        (See above for address)

                                                        **Tonya R Deem**
                                                        (See above for address)

**Counter Claimant**

**Redcats USA LP**                     represented by   **Frank W Leak , Jr**
*TERMINATED: 07/07/2008*                                (See above for address)

                                                        **Michael E Jones**
                                                        (See above for address)

                                                        **Steven Gardner**
                                                        (See above for address)

                                                        **Tonya R Deem**
                                                        (See above for address)

*V.*

**Counter Defendant**

**Soverain Software LLC**              represented by   **Debra R Smith**
                                                        (See above for address)

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jennifer Seraphine**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kenneth Robert Adamo**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amanda Aline Abraham**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Barry R Satine**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Brendan Clay Roth**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Carl R Roth**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Mark Christopher Howland**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Thomas L Giannetti**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**Zappos.Com, Inc.**                    represented by    **Eric Hugh Findlay**
*TERMINATED: 12/02/2008*                                 (See above for address)
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

                                                         **Theodore Herhold**
                                                         (See above for address)
                                                         *TERMINATED: 01/03/2008*
                                                         *LEAD ATTORNEY*

                                                         **Charles Edward Juister**
                                                         (See above for address)
                                                         *ATTORNEY TO BE NOTICED*

                                                         **Julianne Hartzell**
                                                         (See above for address)
                                                         *ATTORNEY TO BE NOTICED*

                                                         **Matthew C Nielsen**
                                                         (See above for address)
                                                         *ATTORNEY TO BE NOTICED*

                                                         **Scott A Sanderson**
                                                         (See above for address)
                                                         *ATTORNEY TO BE NOTICED*

**Sidney Calvin Capshaw , III**
(See above for address)
*TERMINATED: 01/02/2008*

**Thomas L Duston**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Counter Defendant**

Soverain Software LLC                    represented by  **Debra R Smith**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jennifer Seraphine**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kenneth Robert Adamo**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amanda Aline Abraham**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Andrey Belenky**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Barry R Satine**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Brendan Clay Roth**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Carl R Roth**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Clark Craddock**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kenneth Canfield**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lynda Q Nguyen**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Mark Christopher Howland**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael Charles Smith**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Stela Cristina Tipi**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Thomas L Giannetti**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**Tiger Direct Inc**                    represented by    **Mary-Olga Lovett**
*TERMINATED: 05/26/2009*                                  (See above for address)
                                                          *LEAD ATTORNEY*

V.

**Counter Defendant**

**Soverain Software LLC**               represented by    **Debra R Smith**
                                                          (See above for address)
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Jennifer Seraphine**
                                                          (See above for address)
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Kenneth Robert Adamo**
                                                          (See above for address)
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Amanda Aline Abraham**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Andrey Belenky**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Barry R Satine**
                                                          (See above for address)
                                                          *PRO HAC VICE*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Brendan Clay Roth**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Carl R Roth**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Clark Craddock**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Kenneth Canfield**
                                                          (See above for address)

*ATTORNEY TO BE NOTICED*

**Lynda Q Nguyen**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Mark Christopher Howland**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael Charles Smith**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Stela Cristina Tipi**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Thomas L Giannetti**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**Systemax Inc.**                        represented by    **Barry J Schindler**
*TERMINATED: 05/26/2009*                                  (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Eric William Buether**
                                                          (See above for address)
                                                          *TERMINATED: 01/03/2008*

                                                          **Gaston Kroub**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Mary−Olga Lovett**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Michael A Nicodema**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

V.

**Counter Defendant**

**Systemax Inc.**                        represented by    **Barry J Schindler**
*TERMINATED: 05/26/2009*                                  (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Eric William Buether**
                                                          (See above for address)
                                                          *TERMINATED: 01/03/2008*

                                                          **Gaston Kroub**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Mary−Olga Lovett**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Michael A Nicodema**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**CDW Corporation**
*TERMINATED: 03/16/2009*

**Counter Claimant**

**Newegg Inc.**                    represented by  **Daniel H Brean**
                                                   (See above for address)
                                                   *PRO HAC VICE*
                                                   *ATTORNEY TO BE NOTICED*

**Counter Claimant**

**Zappos.Com, Inc.**
*TERMINATED: 12/02/2008*

V.

**Counter Defendant**

**Soverain Software LLC**          represented by  **Debra R Smith**
                                                   (See above for address)
                                                   *LEAD ATTORNEY*
                                                   *ATTORNEY TO BE NOTICED*

                                                   **Jennifer Seraphine**
                                                   (See above for address)
                                                   *LEAD ATTORNEY*
                                                   *ATTORNEY TO BE NOTICED*

                                                   **Kenneth Robert Adamo**
                                                   (See above for address)
                                                   *LEAD ATTORNEY*
                                                   *ATTORNEY TO BE NOTICED*

                                                   **Amanda Aline Abraham**
                                                   (See above for address)
                                                   *ATTORNEY TO BE NOTICED*

                                                   **Barry R Satine**
                                                   (See above for address)
                                                   *PRO HAC VICE*
                                                   *ATTORNEY TO BE NOTICED*

                                                   **Brendan Clay Roth**
                                                   (See above for address)
                                                   *ATTORNEY TO BE NOTICED*

                                                   **Carl R Roth**
                                                   (See above for address)
                                                   *ATTORNEY TO BE NOTICED*

                                                   **Mark Christopher Howland**
                                                   (See above for address)
                                                   *ATTORNEY TO BE NOTICED*

                                                   **Michael Charles Smith**
                                                   (See above for address)
                                                   *ATTORNEY TO BE NOTICED*

                                                   **Thomas L Giannetti**
                                                   (See above for address)

A201

*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 11/02/2007 | 1 | COMPLAINT against CDW Corporation, Newegg Inc., Redcats USA, Inc., Systemax Inc., Zappos.Com, Inc. (Filing fee $ 350.00 pd. 6–1–11611), filed by Soverain Software LLC. (Attachments: #1 Exhibit A#2 Exhibit B#3 Exhibit C#4 Exhibit D#5 Exhibit E#6 Civil Cover Sheet)(mjc) (Entered: 11/06/2007) |
| 11/02/2007 | 2 | DEMAND for Trial by Jury by Soverain Software LLC. (mjc) (Entered: 11/06/2007) |
| 11/02/2007 | 3 | Report on the Filing or Determination of an Action Regarding A Patent or Trademark. (Copy forwarded to the Director of the U.S. Patent and Trademark Office.) (mjc) (Entered: 11/06/2007) |
| 11/02/2007 | 4 | CORPORATE DISCLOSURE STATEMENT filed by Soverain Software LLC identifying no Corporate Parent. (mjc) (Entered: 11/06/2007) |
| 11/02/2007 | 5 | E–GOV SEALED SUMMONS Issued as to CDW Corporation, Newegg Inc., Redcats USA, Inc., Systemax Inc., Zappos.Com, Inc. (Attachments: #1 CDW Corporation/Illinois Corp. Service Co. Summons #2 Newegg, Inc. Summons#3 Newegg, Inc. via Corp. Service Co. Summons#4 Zappos.com, Inc. Summons#5 Zappos.com, Inc. via Incorporating Svs., Ltd. Summons#6 Systemax, Inc. via Corp. Service Co. Summons#7 Systemax Inc., Summons#8 Redcats USA, Inc. Summons#9 Redcats USA, Inc. via The Corp. Trust Co. Summons)(mjc) (Entered: 11/06/2007) |
| 11/19/2007 | 6 | Return of Service Executed as to Zappos.Com, Inc. on 11/7/2007, answer due: 11/27/2007. (mjc) (Entered: 11/19/2007) |
| 11/19/2007 | 7 | Return of Service Executed as to Systemax Inc. on 11/6/2007, answer due: 11/26/2007. (mjc) (Entered: 11/19/2007) |
| 11/19/2007 | 8 | Return of Service Executed as to Redcats USA, Inc. on 11/6/2007, answer due: 11/26/2007. (mjc) (Entered: 11/19/2007) |
| 11/19/2007 | 9 | Return of Service Executed as to Newegg Inc. on 11/6/2007, answer due: 11/26/2007. (mjc) (Entered: 11/19/2007) |
| 11/19/2007 | 10 | Return of Service Executed as to CDW Corporation on 11/6/2007, answer due: 11/26/2007. (mjc) (Entered: 11/19/2007) |
| 11/21/2007 | 11 | MOTION for Extension of Time to File Answer re 1 Complaint, by Systemax Inc.. (Attachments: #1 Text of Proposed Order)(Buether, Eric) (Entered: 11/21/2007) |
| 11/21/2007 | 12 | MOTION for Extension of Time to File Answer re 1 Complaint, *[Unopposed]* by Redcats USA, Inc.. (Attachments: #1 Text of Proposed Order)(Jones, Michael) (Entered: 11/21/2007) |
| 11/23/2007 | 13 | AMENDED COMPLAINT *FOR PATENT INFRINGEMENT* against all defendants, filed by Soverain Software LLC. (Attachments: #1 Exhibit Exhibit A#2 Exhibit Exhibit B#3 Exhibit Exhibit C#4 Exhibit Exhibit D#5 Exhibit Exhibit E)(Adamo, Kenneth) Modified on 11/27/2007 (rvw, ). (SEE DOC #22 FOR CERT OF SVC) (Entered: 11/23/2007) |
| 11/23/2007 | 14 | NOTICE of Attorney Appearance by Mark Christopher Howland on behalf of Soverain Software LLC (Howland, Mark) (Entered: 11/23/2007) |
| 11/23/2007 | 15 | Notice of Filing of Patent/Trademark Form (AO 120). AO 120 mailed to the Director of the U.S. Patent and Trademark Office. (Howland, Mark) (Entered: 11/23/2007) |
| 11/26/2007 | 16 | NOTICE of Attorney Appearance by Thomas L Giannetti on behalf of Soverain Software LLC (Giannetti, Thomas) (Entered: 11/26/2007) |
| 11/26/2007 | 17 | E–GOV SEALED SUMMONS Issued as to Tiger Direct Inc, The Sportsman's Guide Inc, Redcats USA, Inc.. (rvw, ) (Entered: 11/26/2007) |

| | | |
|---|---|---|
| 11/26/2007 | 18 | ORDER granting 11 Motion for Extension of Time to Answer re 11 MOTION for Extension of Time to File Answer re 1 Complaint. Systemax Inc.'s answer is due by 12/31/2007. Signed by Judge Leonard Davis on 11/26/07. (mjc ) (Entered: 11/26/2007) |
| 11/26/2007 | | Set/Reset Deadlines: Systemax Inc. answer due 12/31/2007. (mjc ) (Entered: 11/26/2007) |
| 11/26/2007 | 19 | ORDER granting 12 Motion for Extension of Time to Answer re 12 MOTION for Extension of Time to File Answer re 1 Complaint, *[Unopposed]*. Redcats USA, Inc.'s answer is due by 12/31/2007. Signed by Judge Leonard Davis on 11/26/07. (mjc) (Entered: 11/26/2007) |
| 11/26/2007 | | Set/Reset Deadlines: Redcats USA, Inc. answer due 12/31/2007. (mjc ) (Entered: 11/26/2007) |
| 11/26/2007 | 20 | NOTICE of Attorney Appearance by Herbert A Yarbrough, III on behalf of Newegg Inc. (Yarbrough, Herbert) (Entered: 11/26/2007) |
| 11/26/2007 | 21 | MOTION for Extension of Time to File Answer *Defendant, Newegg Inc.'s, Unopposed Motion for Extension of Time in Which to Answer or Otherwise Respond to Plaintiff's Complaint* by Newegg Inc.. (Attachments: # 1 Text of Proposed Order)(Yarbrough, Herbert) (Entered: 11/26/2007) |
| 11/26/2007 | 22 | NOTICE by Soverain Software LLC *of Service* (Howland, Mark) (Entered: 11/26/2007) |
| 11/27/2007 | 23 | ORDER granting 21 Motion for Extension of Time to Answer re 21 MOTION for Extension of Time to File Answer *Defendant, Newegg Inc.'s, Unopposed Motion for Extension of Time in Which to Answer or Otherwise Respond to Plaintiff's Complaint*. Newegg's answer is due by 12/31/2007. Signed by Judge Leonard Davis on 11/27/07. (mjc ) (Entered: 11/27/2007) |
| 11/27/2007 | | Set/Reset Deadlines: Newegg Inc. answer due 12/31/2007. (mjc ) (Entered: 11/27/2007) |
| 11/28/2007 | 24 | APPLICATION to Appear Pro Hac Vice by Attorney Michael A Nicodema for Systemax Inc. Fee pd., 6−1−11903. Approved 11/29/07. (mjc ) (Entered: 11/29/2007) |
| 11/28/2007 | 25 | APPLICATION to Appear Pro Hac Vice by Attorney Barry J Schindler for Systemax Inc. Fee pd., 6−1−11903. Approved 11/29/07. (mjc ) (Entered: 11/29/2007) |
| 11/28/2007 | 26 | APPLICATION to Appear Pro Hac Vice by Attorney Gaston Kroub for Systemax Inc. Fee pd., 6−1−11903. Approved 11/29/07. (mjc ) (Entered: 11/29/2007) |
| 12/03/2007 | 27 | APPLICATION to Appear Pro Hac Vice by Attorney Barry R Satine for Soverain Software LLC. Fee pd., 6−1−11943. Approved 12/4/07. (mjc ) (Entered: 12/04/2007) |
| 12/06/2007 | 28 | Consent MOTION for Extension of Time to File Answer *or Otherwise Respond to Plaintiff's Complaint for Patent Infringement* by Zappos.Com, Inc.. (Attachments: # 1 Text of Proposed Order)(Herhold, Theodore) (Entered: 12/06/2007) |
| 12/07/2007 | 29 | MOTION for Extension of Time to File Answer re 13 Amended Complaint, *[Unopposed]* by Redcats USA LP, The Sportsman's Guide Inc. (Attachments: # 1 Text of Proposed Order)(Jones, Michael) (Entered: 12/07/2007) |
| 12/07/2007 | 30 | ORDER granting 28 Motion for Extension of Time to Answer re 28 Consent MOTION for Extension of Time to File Answer *or Otherwise Respond to Plaintiff's Complaint for Patent Infringement*. Defendant Zappos.com, Inc.'s answer is due by 12/31/07. Signed by Judge Leonard Davis on 12/7/07. (mjc ) (Entered: 12/07/2007) |
| 12/07/2007 | | Set/Reset Deadlines: Zappos.Com, Inc. answer due 12/31/2007. (mjc ) (Entered: 12/07/2007) |

| 12/07/2007 | 31 | MOTION for Extension of Time to File Answer re 13 Amended Complaint, *Unopposed Motion to Extend Time to Answer, Move or Otherwise Respond to the Amended Complaint of Plaintiff* by CDW Corporation. (Attachments: # 1 Text of Proposed Order)(Findlay, Eric) (Entered: 12/07/2007) |
| --- | --- | --- |
| 12/10/2007 | 32 | ORDER granting 29 Motion for Extension of Time to Answer re 29 MOTION for Extension of Time to File Answer re 13 Amended Complaint, *[Unopposed].* Defendants Redcats USA, L.P. and The Sportsman's Guide's answers are due by 12/31/07. Signed by Judge Leonard Davis on 12/10/07. (mjc ) (Entered: 12/10/2007) |
| 12/10/2007 | | Set/Reset Deadlines: The Sportsman's Guide Inc answer due 12/31/2007; Redcats USA LP answer due 12/31/2007. (mjc ) (Entered: 12/10/2007) |
| 12/10/2007 | 33 | ORDER granting 31 Motion for Extension of Time to Answer re 31 MOTION for Extension of Time to File Answer re 13 Amended Complaint, *Unopposed Motion to Extend Time to Answer, Move or Otherwise Respond to the Amended Complaint of Plaintiff* MOTION for Extension of Time to File Answer re 13 Amended Complaint, *Unopposed Motion to Extend Time to Answer, Move or Otherwise Respond to the Amended Complaint of Plaintiff.* CDW Corporation's answer is due 12/31/07. Signed by Judge Leonard Davis on 12/10/07. (mjc ) (Entered: 12/10/2007) |
| 12/10/2007 | | Set/Reset Deadlines: CDW Corporation answer due 12/31/2007. (mjc) (Entered: 12/10/2007) |
| 12/10/2007 | 34 | NOTICE of Attorney Appearance by Mary−Olga Lovett on behalf of Systemax Inc. (Lovett, Mary−Olga) (Entered: 12/10/2007) |
| 12/10/2007 | 35 | NOTICE of Attorney Appearance by Mary−Olga Lovett on behalf of Tiger Direct Inc (Lovett, Mary−Olga) (Entered: 12/10/2007) |
| 12/10/2007 | 36 | MOTION for Extension of Time to File *Unopposed Motion for Enlargement of Time in Which to Answer or Otherwise Respond* by Systemax Inc.. (Attachments: # 1 Text of Proposed Order)(Lovett, Mary−Olga) (Entered: 12/10/2007) |
| 12/10/2007 | 37 | MOTION for Extension of Time to File *Unopposed Motion for Enlargement of Tme in Which to Answer or Otherwise Respond* by Tiger Direct Inc. (Attachments: # 1 Text of Proposed Order)(Lovett, Mary−Olga) (Entered: 12/10/2007) |
| 12/10/2007 | 38 | APPLICATION to Appear Pro Hac Vice by Attorney Jennifer Seraphine for Soverain Software LLC. (mll, ) (Entered: 12/11/2007) |
| 12/10/2007 | 41 | Return of Service Executed as to Tiger Direct Inc on 11/28/2007, by personal service; answer due: 12/18/2007. (mll, ) (Entered: 12/11/2007) |
| 12/10/2007 | 42 | Return of Service Executed as to The Sportsman's Guide Inc on 11/28/2007, by personal service; answer due: 12/18/2007. (mll, ) (Entered: 12/11/2007) |
| 12/10/2007 | 43 | Return of Service Executed as to Redcats USA LP on 11/29/2007, by personal service on The Corporation Trust Company; answer due: 12/19/2007. (mll, ) (Entered: 12/11/2007) |
| 12/10/2007 | 44 | Return of Service Executed as to Redcats USA LP on 11/28/2007, by personal service on CT Corporation System, Houston, Texas; answer due: 12/18/2007. (mll, ) (Entered: 12/11/2007) |
| 12/11/2007 | 39 | ORDER granting 36 Motion for Extension of Time to File. Accordingly, IT IS ORDERED,that Systemax Inc time to answer or otherwise respond in any manner to Plaintiff's Amended Complaint is extended to December 31, 2007. Signed by Judge Leonard Davis on 12/11/07. (fnt, ) (Entered: 12/11/2007) |
| 12/11/2007 | | Answer Due Deadline Updated for Systemax Inc 12/31/2007 (fnt, ) (Entered: 12/11/2007) |
| 12/11/2007 | 40 | ORDER granting 37 Motion for Extension of Time to File. Accordingly, IT IS ORDERED, that Tiger Direct,Inc.'s time to answer or otherwise respond in any manner to Plaintiff's Amended Complaint is extended to December 31, 2007. Signed by Judge Leonard Davis on 12/11/07. (fnt, ) (Entered: 12/11/2007) |

| 12/11/2007 | 45 | APPLICATION to Appear Pro Hac Vice by Attorney Steven Gardner for The Sportsman's Guide Inc and Redcats USA, Inc. (mll, ) (Entered: 12/12/2007) |
| 12/11/2007 | 46 | APPLICATION to Appear Pro Hac Vice by Attorney Frank W Leak, Jr for The Sportsman's Guide Inc and Redcats USA, Inc. (mll, ) (Entered: 12/12/2007) |
| 12/11/2007 | 47 | APPLICATION to Appear Pro Hac Vice by Attorney Tonya R Deem for The Sportsman's Guide Inc and Redcats USA, Inc. (mll, ) (Entered: 12/12/2007) |
| 12/11/2007 | | Pro Hac Vice Filing fee paid by Steven Gardner, Frank Leak, and Tonya Deem; Fee: $75, receipt number: 6-1-12070 (mll, ) (Entered: 12/12/2007) |
| 12/12/2007 | 48 | NOTICE of Attorney Appearance by Sidney Calvin Capshaw, III on behalf of Zappos.Com, Inc. (Capshaw, Sidney) (Entered: 12/12/2007) |
| 12/12/2007 | 49 | NOTICE of Attorney Appearance by Mary-Olga Lovett on behalf of Tiger Direct Inc (Lovett, Mary-Olga) Modified on 12/13/2007 (djh, ). Modified on 12/13/2007 (djh, ). Additional attachment(s) added on 12/13/2007 (djh, ). (Entered: 12/12/2007) |
| 12/12/2007 | 50 | NOTICE of Attorney Appearance by Mary-Olga Lovett on behalf of Tiger Direct Inc (Lovett, Mary-Olga) Modified on 12/13/2007 (djh, ). Modified on 12/13/2007 (djh, ). Additional attachment(s) added on 12/13/2007 (djh, ). (Entered: 12/12/2007) |
| 12/12/2007 | 51 | NOTICE of Attorney Appearance by Mary-Olga Lovett on behalf of Tiger Direct Inc (Lovett, Mary-Olga) Modified on 12/13/2007 (djh, ). Modified on 12/13/2007 (djh, ). Additional attachment(s) added on 12/13/2007 (djh, ). (Entered: 12/12/2007) |
| 12/21/2007 | 52 | STIPULATION of Dismissal *without Prejudice as to Defendant Redcats USA, Inc.* by Soverain Software LLC. (Giannetti, Thomas) Additional attachment(s) added on 12/27/2007 (rvw, ). (Entered: 12/21/2007) |
| 12/21/2007 | 53 | APPLICATION to Appear Pro Hac Vice by Attorney Thomas L Duston for CDW Corporation. (mll, ) (Entered: 12/26/2007) |
| 12/21/2007 | 54 | APPLICATION to Appear Pro Hac Vice by Attorney Charles Edward Juister for CDW Corporation. (mll, ) (Entered: 12/26/2007) |
| 12/21/2007 | 55 | APPLICATION to Appear Pro Hac Vice by Attorney Scott A Sanderson for CDW Corporation. (mll, ) (Entered: 12/26/2007) |
| 12/28/2007 | 56 | ORDER re 52 Stipulation of Dismissal filed by Soverain Software LLC, dismissing without prejudice Defendant Redcats USA, Inc. Each party shall bear its own costs. Signed by Judge Leonard Davis on 12/28/07. (mjc ) (Entered: 12/28/2007) |
| 12/28/2007 | 57 | ANSWER to Amended Complaint, COUNTERCLAIM against Soverain Software LLC by Tiger Direct Inc.(Lovett, Mary-Olga) (Entered: 12/28/2007) |
| 12/28/2007 | 58 | ANSWER to Amended Complaint, COUNTERCLAIM against Soverain Software LLC by Systemax Inc..(Lovett, Mary-Olga) (Entered: 12/28/2007) |
| 12/28/2007 | 59 | MOTION to Withdraw as Attorney *(Defendant Zappos.com, Inc.'s Unopposed Motion for Withdrawal of S. Calvin Capshaw and the law firm of Brown McCarroll, LLP as Counsel)* by Zappos.Com, Inc.. (Attachments: # 1 Text of Proposed Order)(Capshaw, Sidney) (Entered: 12/28/2007) |
| 12/31/2007 | 60 | ANSWER to Amended Complaint , *Affirmative Defenses*, COUNTERCLAIM against Soverain Software LLC by CDW Corporation, Newegg Inc., Zappos.Com, Inc..(Findlay, Eric) (Entered: 12/31/2007) |
| 12/31/2007 | 61 | CORPORATE DISCLOSURE STATEMENT filed by Newegg Inc. identifying None as Corporate Parent. (Findlay, Eric) (Entered: 12/31/2007) |
| 12/31/2007 | 62 | CORPORATE DISCLOSURE STATEMENT filed by CDW Corporation identifying VH Holdings, Inc. as Corporate Parent. (Findlay, Eric) (Entered: 12/31/2007) |

| 12/31/2007 | 63 | CORPORATE DISCLOSURE STATEMENT filed by Zappos.Com, Inc. identifying Zappos.com, Inc. as Corporate Parent. (Findlay, Eric) (Entered: 12/31/2007) |
| 12/31/2007 | 64 | ANSWER to Amended Complaint *and*, COUNTERCLAIM against Soverain Software LLC by The Sportsman's Guide Inc, Redcats USA LP.(Jones, Michael).(Entered: 12/31/2007) |
| 01/02/2008 | 65 | MOTION to Withdraw as Attorney by Systemax Inc.. (Attachments: # 1 Text of Proposed Order)(Buether, Eric) (Entered: 01/02/2008) |
| 01/02/2008 | 66 | ORDER granting 59 Motion to Withdraw as Attorney. Attorney Sidney Calvin Capshaw, III terminated as to deft Zappos.com Inc. Signed by Judge Leonard Davis on 01/02/08. cc:attys 1–2–08 (mll, ) (Entered: 01/02/2008) |
| 01/02/2008 | 67 | MOTION to Withdraw as Attorney *(Defendant Zappos, Inc.'s Unopposed Motion for Withdrawal of Theodore T. Herhold and the law firm of Townsend and Townsend and Crew LLP as Counsel)* by Zappos.Com, Inc.. (Attachments: # 1 Text of Proposed Order)(Herhold, Theodore) (Entered: 01/02/2008) |
| 01/03/2008 | 68 | ORDER granting 65 Motion to Withdraw as Attorney. Attorney Eric William Buether terminated. Signed by Judge Leonard Davis on 1/3/08. (fnt, ) (Entered: 01/03/2008) |
| 01/03/2008 | 69 | ORDER granting 67 Motion to Withdraw as Attorney. Attorney Theodore Herhold terminated. Signed by Judge Leonard Davis on 1/3/08. (fnt, ) (Entered: 01/03/2008) |
| 01/07/2008 | 70 | CORPORATE DISCLOSURE STATEMENT filed by Redcats USA LP identifying VLP Corporation, Chadwick's of Boston, Inc., Redcats USA, Inc., Redcats USA, LLC, Redcats UK, Plc, Redcats, S.A. and PPR, S.A. as Corporate Parent. (Jones, Michael) (Entered: 01/07/2008) |
| 01/07/2008 | 71 | CORPORATE DISCLOSURE STATEMENT filed by The Sportsman's Guide Inc identifying VLP Corporation, Redcats USA, Inc., Redcats USA, LLC, Redcats UK, Plc, Redcats, S.A. and PPR, S.A. as Corporate Parent. (Jones, Michael) (Entered: 01/07/2008) |
| 01/10/2008 | 72 | ORDER – Status Conference set for 2/4/2008 01:30 PM before Judge Leonard Davis and Magistrate Judge John D. Love in Judge Davis' courtroom in Tyler to set a claim construction hearing date and a trial setting and to determine whether parties will consent to trial before Judge Love. Proposed Discovery Order is Appendix A; Proposed Docket Control Order is Appendix B. Agreed docket control and discovery orders are due 14 days after the status conference, and Plaintiff's PR 3–1 and 3–2 disclosures are due four days after the status conference. Signed by Judge Leonard Davis on 1/10/08. (mjc ) (Entered: 01/10/2008) |
| 01/17/2008 | 73 | RESPONSE to 58 Answer to Amended Complaint, Counterclaim *Soverain's Reply to Counterclaims of Systemax* by Soverain Software LLC. (Giannetti, Thomas) (Entered: 01/17/2008) |
| 01/17/2008 | 74 | RESPONSE to 57 Answer to Amended Complaint, Counterclaim *Soverain's Reply to Counterclaims of TigerDirect* by Soverain Software LLC. (Giannetti, Thomas) (Entered: 01/17/2008) |
| 01/17/2008 | 75 | RESPONSE to 60 Answer to Amended Complaint, Counterclaim *Soverain's Reply to Counterclaims of CDW, Newegg and Zappos* by Soverain Software LLC. (Giannetti, Thomas) (Entered: 01/17/2008) |
| 01/17/2008 | 76 | RESPONSE to 64 Answer to Amended Complaint, Counterclaim *Soverain's Reply to Counterclaims of Redcats and The Sportsman's Guide* by Soverain Software LLC. (Giannetti, Thomas) (Entered: 01/17/2008) |
| 01/18/2008 | 77 | APPLICATION to Appear Pro Hac Vice by Attorney Lynda Q Nguyen for Soverain Software LLC. Fee pd., 6–1–12491. Approved 1/23/08. (mjc ) (Entered: 01/23/2008) |
| 01/29/2008 | 78 | NOTICE of *Defendant Systemax Inc.'s Corporate Disclosure Statement* by Systemax Inc. (Lovett, Mary–Olga) Modified on 1/30/2008 (mjc ). (Entered: 01/29/2008) |

| | | |
|---|---|---|
| 01/29/2008 | 79 | NOTICE of *Defendant TigerDirect, Inc.'s Corporate Disclosure Statement* by Tiger Direct Inc. (Lovett, Mary–Olga) Modified on 1/30/2008 (mjc ). (Entered: 01/29/2008) |
| 02/01/2008 | 80 | APPLICATION to Appear Pro Hac Vice by Attorney William H Boice for The Sportsman's Guide Inc and Redcats USA LP. Fee pd., 6–1–12616. Approved 2/4/08. (mjc ) (Entered: 02/04/2008) |
| 02/04/2008 | 81 | Minute Entry for proceedings held before Judge Leonard Davis and Judge John Love : Status Conference held on 2/4/2008. (Court Reporter Shea Sloan.) (Attachments: # 1 Attorney Sign–In Sheet) (rlf, ) (Entered: 02/05/2008) |
| 02/04/2008 | 82 | APPLICATION to Appear Pro Hac Vice by Attorney Andrey Belenky for Soverain Software LLC. Fee pd., 6–1–12648. Approved 2/5/08. (mjc ) (Entered: 02/05/2008) |
| 02/04/2008 | | E–Minute Entry for proceedings held before Judge Leonard Davis and Judge John D. Love : Status Conference held on 2/4/2008. See Doc # 81 . (Court Reporter Shea Sloan.) (rlf, ) (Entered: 02/05/2008) |
| 02/06/2008 | 83 | ORDER re 81 Status Conference − Final Pretrial Conference set for 1/21/2010 09:00 AM before Judge Leonard Davis. Jury Selection set for 2/1/2010 09:00AM before Judge Leonard Davis. Jury Trial set for 2/8/2010 09:00 AM before Judge Leonard Davis. Markman Hearing set for 5/28/2009 09:30 AM before Judge Leonard Davis. Parties are to submit agreed Docket Control and Discovery Orders by 2/19/2008. Signed by Judge Leonard Davis on 2/5/08. (mjc ) (Entered: 02/06/2008) |
| 02/11/2008 | 84 | NOTICE of Disclosure by Soverain Software LLC *of Asserted Claims and Infringement Contentions* (Giannetti, Thomas) (Entered: 02/11/2008) |
| 02/11/2008 | 85 | APPLICATION to Appear Pro Hac Vice by Attorney Kenneth Canfield for Soverain Software LLC. Fee pd., 6–1–12724. Approved 2/12/08. (mjc ) (Entered: 02/12/2008) |
| 02/19/2008 | 86 | NOTICE by CDW Corporation *Agreed Notice of Compliance Regarding the Court's February 6, 2008 Order* (Attachments: # 1 Exhibit A# 2 Exhibit B)(Findlay, Eric) (Entered: 02/19/2008) |
| 02/25/2008 | 87 | SCHEDULING ORDER AND ORDER REFERRING CASE TO MEDIATOR: Final Pretrial Conference set for 1/21/2010 09:00 AM before Judge Leonard Davis. Discovery due by 8/31/2009. Jury Selection set for 2/1/2010 09:00AM before Judge Leonard Davis. ORDER REFERRING CASE to Mediator. Michael Philip Patterson rep by Michael Philip Patterson added as Mediator.Expert Witness List due by 7/21/2009. Identify trial witnesses by 9/14/2009. Jury instructions due by 11/24/2009. Mediation Completion due by 5/14/2008. Proposed Pretrial Order due by 11/24/2009. Jury Trial set for 2/8/2010 09:00 AM before Judge Leonard Davis. Markman Hearing set for 5/28/2009 09:30 AM before Judge Leonard Davis. Signed by Judge Leonard Davis on 2/22/08. (mjc ) (Entered: 02/25/2008) |
| 02/25/2008 | 88 | APPLICATION to Appear Pro Hac Vice by Attorney Clark Craddock for Soverain Software LLC. Fee pd., 6–1–12863. Approved 2/27/08. (mjc ) (Entered: 02/27/2008) |
| 02/25/2008 | 89 | APPLICATION to Appear Pro Hac Vice by Attorney Stela Cristina Tipi for Soverain Software LLC. Fee pd., 6–1–12861. Approved 2/27/08. (mjc ) (Entered: 02/27/2008) |
| 02/25/2008 | 90 | APPLICATION to Appear Pro Hac Vice by Attorney Matthew C Nielsen for CDW Corporation. Fee pd., 6–1–12864. Approved 2/27/08. (mjc ) (Entered: 02/27/2008) |
| 03/05/2008 | 91 | DISCOVERY ORDER entered in furtherance of the management of the Court's docket under FRCP 16. Signed by Judge Leonard Davis on 3/5/08. (mjc ) (Entered: 03/05/2008) |
| 03/11/2008 | 92 | NOTICE of Attorney Appearance by Scott A Sanderson on behalf of Newegg Inc., Zappos.Com, Inc. (Sanderson, Scott) (Entered: 03/11/2008) |

| 03/11/2008 | 93 | NOTICE of Attorney Appearance by Matthew C Nielsen on behalf of Newegg Inc., Zappos.Com, Inc. (Nielsen, Matthew) (Entered: 03/11/2008) |
|---|---|---|
| 03/11/2008 | 94 | NOTICE of Attorney Appearance by Charles Edward Juister on behalf of Newegg Inc., Zappos.Com, Inc. (Juister, Charles) (Entered: 03/11/2008) |
| 03/11/2008 | 95 | NOTICE of Attorney Appearance by Thomas L Duston on behalf of Newegg Inc., Zappos.Com, Inc. (Duston, Thomas) (Entered: 03/11/2008) |
| 03/20/2008 | 96 | NOTICE by Soverain Software LLC *of Compliance with Paragraph 1 of Discovery Order* (Giannetti, Thomas) (Entered: 03/20/2008) |
| 03/20/2008 | 97 | NOTICE of Disclosure by The Sportsman's Guide Inc, Redcats USA LP *Regarding Initial Disclosures* (Jones, Michael) (Entered: 03/20/2008) |
| 03/20/2008 | 98 | NOTICE of Disclosure by Tiger Direct Inc *DEFENDANT TIGERDIRECT, INC.'S NOTICE OF SERVICE OF INITIAL DISCLOSURES PURSUANT TO PARAGRAPH 1 OF FEBRUARY 19, 2008 DISCOVERY ORDER* (Lovett, Mary-Olga) (Entered: 03/20/2008) |
| 03/20/2008 | 99 | NOTICE of Disclosure by Systemax Inc. *DEFENDANT SYSTEMAX, INC.'S NOTICE OF SERVICE OF INITIAL DISCLOSURES PURSUANT TO PARAGRAPH 1 OF FEBRUARY 19, 2008 DISCOVERY ORDER* (Lovett, Mary-Olga) (Entered: 03/20/2008) |
| 03/20/2008 | 100 | NOTICE of Disclosure by CDW Corporation *, Newegg, Inc. and Zappos.com, Inc.* (Duston, Thomas) (Entered: 03/20/2008) |
| 03/26/2008 | 101 | NOTICE of Attorney Appearance by Carl R Roth on behalf of Soverain Software LLC (Roth, Carl) (Entered: 03/26/2008) |
| 03/26/2008 | 102 | NOTICE of Attorney Appearance by Amanda Aline Abraham on behalf of Soverain Software LLC (Abraham, Amanda) (Entered: 03/26/2008) |
| 03/26/2008 | 103 | NOTICE of Attorney Appearance by Brendan Clay Roth on behalf of Soverain Software LLC (Roth, Brendan) (Entered: 03/26/2008) |
| 03/26/2008 | 104 | NOTICE of Attorney Appearance by Michael Charles Smith on behalf of Soverain Software LLC (Smith, Michael) (Entered: 03/26/2008) |
| 04/07/2008 | 105 | NOTICE of Attorney Appearance by Douglas Ray McSwane, Jr on behalf of Tiger Direct Inc (McSwane, Douglas) (Entered: 04/07/2008) |
| 04/07/2008 | 106 | NOTICE of Attorney Appearance by Douglas Ray McSwane, Jr on behalf of Systemax Inc. (McSwane, Douglas) (Entered: 04/07/2008) |
| 04/14/2008 | 107 | Return of Service Executed as to The Sportsman's Guide Inc on 12/8/2007, answer due: 12/28/2007. (mjc ) (Entered: 04/17/2008) |
| 04/14/2008 | 108 | Return of Service Executed as to Tiger Direct Inc on 12/13/2007, answer due: 1/2/2008. (mjc ) (Entered: 04/17/2008) |
| 04/14/2008 | 109 | Return of Service Executed as to Zappos.Com, Inc. on 11/13/2007, answer due: 12/31/2007. (mjc ) (Entered: 04/17/2008) |
| 04/14/2008 | 110 | Return of Service Executed as to CDW Corporation on 11/19/2007, answer due: 12/9/2007. (mjc ) (Entered: 04/17/2008) |
| 04/14/2008 | 111 | Return of Service Executed as to Newegg Inc. on 11/19/2007, answer due: 12/31/2007. (mjc ) (Entered: 04/17/2008) |
| 04/14/2008 | 112 | Return of Service Executed as to Systemax Inc. on 11/15/2007, answer due: 12/5/2007. (mjc ) (Entered: 04/17/2008) |
| 05/08/2008 | 113 | NOTICE by Soverain Software LLC *of Compliance with Paragraphs 2(B) and 2(C) of the Discovery Order* (Tipi, Stela) (Entered: 05/08/2008) |
| 05/13/2008 | 114 | APPLICATION to Appear Pro Hac Vice by Attorney Julianne Hartzell for CDW Corporation, Zappos.com, Inc. and Newegg Inc. Fee pd., 6-1-13755. Approved 5/15/08.(mjc ) (Entered: 05/15/2008) |

| 05/21/2008 | 115 | REPORT of Mediation by Michael Philip Patterson. Mediation result: still negotiating(Patterson, Michael) (Entered: 05/21/2008) |
|---|---|---|
| 06/09/2008 | 116 | E-GOV SEALED SUMMONS Issued as to Zappos.Com, Inc.. (fnt, ) (Entered: 06/10/2008) |
| 06/17/2008 | 117 | REPORT of Mediation by Michael Philip Patterson. Mediation result: Soverain settled with RedCats(Patterson, Michael) (Entered: 06/17/2008) |
| 06/18/2008 | 118 | Consent MOTION to Amend/Correct 86 Notice (Other) *Docket Control Order* by The Sportsman's Guide Inc, Redcats USA LP. (Attachments: # 1 Text of Proposed Order)(Leak, Frank) (Entered: 06/18/2008) |
| 06/19/2008 | 119 | ORDER granting 118 Motion to Amend/Correct Docket Control Order to Extend Specific Deadlines. Signed by Judge Leonard Davis on 6/19/08. (mjc ) (Entered: 06/19/2008) |
| 06/20/2008 | 120 | MOTION for Extension of Time to Complete Discovery *Order to Extend Deadlines* by Systemax Inc.. (Attachments: # 1 ORDER)(Lovett, Mary~Olga) (Entered: 06/20/2008) |
| 06/20/2008 | 121 | RESPONSE to Motion re 120 MOTION for Extension of Time to Complete Discovery *Order to Extend Deadlines filed by Soverain Software LLC.* (Attachments: # 1 Text of Proposed Order)(Tipi, Stela) (Entered: 06/20/2008) |
| 06/21/2008 | 122 | MOTION to Amend/Correct 87 Scheduling Order,,, Order Referring Case to Mediator,,, Set Hearings,, by CDW Corporation. (Attachments: # 1 Exhibit A – Proposed Amended Docket Control Order)(Duston, Thomas) (Entered: 06/21/2008) |
| 06/25/2008 | 123 | ORDER denying as moot 120 Motion for Extension of Time to Complete Discovery; granting 122 Motion to Amend/Correct Docket Control Order.. Signed by Judge Leonard Davis on 6/25/08. (mjc ) (Entered: 06/25/2008) |
| 06/25/2008 | 124 | SCHEDULING ORDER: Discovery due by 8/31/2009. Expert Witness List due by 7/21/2009. Identify trial witnesses by 9/14/2009, Jury instructions due by 11/24/2009, Mediation Completion due by 5/14/2008. Proposed Findings of Fact due by 11/24/2009, Proposed Pretrial Order due by 11/24/2009. Jury Trial set for 2/8/2010 09:00 AM before Judge Leonard Davis. Final Pretrial Conference set for 1/21/2010 09:00 AM before Judge Leonard Davis. Jury Selection set for 2/1/2010 09:00AM before Judge Leonard Davis. Signed by Judge Leonard Davis on 6/25/08. (mjc ) (Entered: 06/25/2008) |
| 07/02/2008 | 125 | STIPULATION of Dismissal *between Plaintiff and Defendants Redcats USA, Inc., Redcats USA, L.P. and The Sportsmans Guide, Inc.* by Soverain Software LLC. (Attachments: # 1 Text of Proposed Order Proposed ORDER OF DISMISSAL WITH PREJUDICE)(Craddock, Clark) (Entered: 07/02/2008) |
| 07/03/2008 | 126 | ANSWER to 1 Complaint, *Affirmative Defenses and*, COUNTERCLAIM against Soverain Software LLC by Zappos.Com, Inc..(Findlay, Eric) (Entered: 07/03/2008) |
| 07/07/2008 | 127 | ORDER OF DISMISSAL WITH PREJUDICE re 125 Stipulation of Dismissal, filed by Soverain Software LLC, Redcats USA LP; Redcats USA, Inc.; The Sportsman's Guide Inc; The Sportsman's Guide Inc; The Sportsman's Guide Inc; The Sportsman's Guide Inc; Redcats USA LP and Redcats USA LP terminated. Plaintiff's complaint against Licensee is dismissed with prejudice. Licensee's counterclaims are dismissed with prejudice. Each party shall bear its own attorney's fees, expenses and costs. Signed by Judge Leonard Davis on 7/7/08. (mpv, ) (Entered: 07/07/2008) |
| 07/08/2008 | 128 | Return of Service Executed as to Zappos.Com, Inc. on 6/16/2007, answer due: 7/6/2007. (gsg) (Entered: 07/09/2008) |
| 07/21/2008 | 129 | *TigerDirect Inc.'s Affirmative Defenses,* ANSWER to 13 Amended Complaint, *for Patent Infringement,* COUNTERCLAIM *to Plaintiff's Amended Complaint for Patent Infringement* against Soverain Software LLC by Tiger Direct Inc.(Lovett, Mary~Olga) (Entered: 07/21/2008) |

| 07/21/2008 | 130 | *Systemax Inc.'s Affirmative Defenses* ANSWER to 1 Complaint,, COUNTERCLAIM *to Plaintiff's Amended Complaint for Patent Infringement* against Systemax Inc. by Systemax Inc..(Lovett, Mary–Olga) (Entered: 07/21/2008) |
| 07/21/2008 | 131 | NOTICE by Tiger Direct Inc *Notice of Compliance* (Lovett, Mary–Olga) (Entered: 07/21/2008) |
| 07/21/2008 | 132 | NOTICE by Systemax Inc. *Notice of Compliance* (Lovett, Mary–Olga) (Entered: 07/21/2008) |
| 07/23/2008 | 133 | ANSWER to 126 Answer to Complaint, Counterclaim by Soverain Software LLC.(Giannetti, Thomas) (Entered: 07/23/2008) |
| 07/30/2008 | 134 | MOTION for Extension of Time to File *Amended Answer, Affirmative Defenses and Counterclaims and to Exchange Proposed Terms and Claim Elements for Construction* by CDW Corporation. (Attachments: # 1 Text of Proposed Order)(Duston, Thomas) (Entered: 07/30/2008) |
| 07/31/2008 | 135 | ORDER granting 134 Motion for Extension of Time. Defts are granted an extension of time through 8–20–08 to (1) assert any counterclaims without leave of Court; and (2) add any inequitable conduct allegations to pleadings without leave of Court, and the date for the exchange of terms and claim elements for construction is extended through 9–19–08. Signed by Judge Leonard Davis on 07/31/08. cc:attys 7–31–08 (mll, ) (Entered: 07/31/2008) |
| 08/11/2008 | 136 | ANSWER to 129 Answer to Amended Complaint,, Counterclaim, by Soverain Software LLC.(Giannetti, Thomas) (Entered: 08/11/2008) |
| 08/11/2008 | 137 | ANSWER to Complaint *Answer to Counterclaims of Defendant Systemax, Docket Entry #130* by Soverain Software LLC.(Giannetti, Thomas) (Entered: 08/11/2008) |
| 08/20/2008 | 138 | AMENDED ANSWER to 13 Amended Complaint, *First*, Amended COUNTERCLAIM against Soverain Software LLC by CDW Corporation, Newegg Inc., Zappos.Com, Inc.. (Duston, Thomas) (Entered: 08/20/2008) |
| 09/02/2008 | 139 | APPLICATION to Appear Pro Hac Vice by Attorney Mira S Wolff for Newegg Inc.. (mll, ) (Entered: 09/04/2008) |
| 09/02/2008 | 140 | APPLICATION to Appear Pro Hac Vice by Attorney Kent E Baldauf, Jr for Newegg Inc.. (mll, ) (Entered: 09/04/2008) |
| 09/02/2008 | 141 | APPLICATION to Appear Pro Hac Vice by Attorney John W McIlvaine, III for Newegg Inc.. (mll, ) (Entered: 09/04/2008) |
| 09/02/2008 | 142 | APPLICATION to Appear Pro Hac Vice by Attorney David C Hanson for Newegg Inc.. (mll, ) (Entered: 09/04/2008) |
| 09/04/2008 | 143 | MOTION for Extension of Time to File Response/Reply as to 138 Amended Answer to Complaint, Counterclaim *Agreed Motion to Extend Time to Reply or Otherwise Respond to Counterclaims of Defendants* by Soverain Software LLC. (Attachments: # 1 Text of Proposed Order Granting Soverain Agreed Motion to Extend Time to Reply or Otherwise Respond to Defendants Counterclaims)(Giannetti, Thomas) (Entered: 09/04/2008) |
| 09/08/2008 | 144 | ORDER granting 143 Motion for Extension of Time to File Response/Reply re 143 MOTION for Extension of Time to File Response/Reply as to 138 Amended Answer to Complaint, Counterclaim *Agreed Motion to Extend Time to Reply or Otherwise Respond to Counterclaims of Defendants* Responses due by 10/10/2008 Replies due by 10/10/2008. Signed by Judge Leonard Davis on 9/5/2008. (gsg) (Entered: 09/08/2008) |
| 09/12/2008 | 145 | MOTION to Withdraw as Attorney *Defendant Newegg Inc.'s Unopposed Motion for Withdrawal and Substitution of Counsel* by Newegg Inc.. (Attachments: # 1 Text of Proposed Order)(Yarbrough, Herbert) (Entered: 09/12/2008) |
| 09/16/2008 | 146 | MOTION to Amend/Correct *Defendant Newegg, Inc.'s Unopposed Motion to Amend the Docket Control Order* by Newegg Inc.. (Attachments: # 1 Text of Proposed Order)(Yarbrough, Herbert) (Entered: 09/16/2008) |

| 09/17/2008 | 147 | ORDER granting 146 Motion to Amend Docket Control Order. Parties are granted an extension of time until 10−31−08 to exchange proposed terms and claim elements for construction in compliance with PR 4−1. Signed by Judge Leonard Davis on 09/17/08. cc:attys 9−17−08 (mll, ) (Entered: 09/17/2008) |
|---|---|---|
| 09/19/2008 | 148 | ORDER granting 145 Motion to Withdraw as Attorney. Added attorney Kent E Baldauf, Jr., John W McIlvaine, III, David C Hanson, and Mira S Wolff for Newegg Inc. Attorney Julianne Hartzell; Charles Edward Juister; Matthew C Nielsen; Scott A Sanderson; Thomas L Duston and Eric Hugh Findlay terminated. Signed by Judge Leonard Davis on 09/19/08. cc:attys 9−19−08 (mll, ) (Entered: 09/19/2008) |
| 09/19/2008 | 149 | ***SEE 150 FOR CERTIFICATE OF CONFERENCE*** MOTION for Protective Order by Soverain Software LLC. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Text of Proposed Order)(Giannetti, Thomas) Modified on 9/19/2008 (mjc ). (Entered: 09/19/2008) |
| 09/19/2008 | 150 | AFFIDAVIT in Support re 149 MOTION for Protective Order *Certificate of Conference filed by Soverain Software LLC.* (Giannetti, Thomas) (Entered: 09/19/2008) |
| 09/19/2008 | 151 | AFFIDAVIT in Support re 149 MOTION for Protective Order *filed by Soverain Software LLC.* (Seraphine, Jennifer) (Entered: 09/19/2008) |
| 09/19/2008 | 152 | SEALED ADDITIONAL ATTACHMENTS to Main Document: 149 MOTION for Protective Order, Exhibit G. (Giannetti, Thomas) Modified on 9/19/2008 (mjc ). (Entered: 09/19/2008) |
| 10/06/2008 | 153 | Unopposed MOTION for Extension of Time to File Response/Reply *to Plaintiff's Motion for Protective Order by TigerDirect, Inc. and* by Systemax Inc.. (Attachments: # 1 Text of Proposed Order Order Granting Defendants Systemax, Inc. and TigerDirect, Inc.'s Unopposed Motion to Enlarge Time)(Lovett, Mary−Olga) (Entered: 10/06/2008) |
| 10/06/2008 | 154 | RESPONSE to Motion re 149 MOTION for Protective Order *filed by CDW Corporation.* (Duston, Thomas) (Entered: 10/06/2008) |
| 10/07/2008 | 155 | ORDER granting 153 Motion for Extension of Time to File Response re 149 MOTION for Protective Order ; Responses due by 10/10/2008. Signed by Judge Leonard Davis on 10/07/08. cc:attys 10−07−08 (mll, ) (Entered: 10/07/2008) |
| 10/10/2008 | 156 | *Reply* ANSWER to 138 Amended Answer to Complaint, Counterclaim *of CDW, Newegg, and Zappos* by Soverain Software LLC.(Giannetti, Thomas) (Entered: 10/10/2008) |
| 10/10/2008 | 157 | SEALED RESPONSE to Motion re 149 MOTION for Protective Order filed by Tiger Direct Inc. (Attachments: # 1 Exhibit EXHIBIT A, # 2 Exhibit EXHIBIT B, # 3 Exhibit EXHIBIT C, # 4 Exhibit EXHIBIT D, # 5 Exhibit EXHIBIT E, # 6 Exhibit EXHIBIT F)(Lovett, Mary−Olga) (Entered: 10/10/2008) |
| 10/16/2008 | 158 | ***FILED IN ERROR. PLEASE DISREGARD.*** STIPULATION *TO EXTEND TIME TO FILE REPLY* by Soverain Software LLC. (Tipi, Stela) Modified on 10/17/2008 (mjc ). (Entered: 10/16/2008) |
| 10/17/2008 | 159 | Unopposed MOTION for Extension of Time to File Response/Reply by Soverain Software LLC. (Attachments: # 1 Text of Proposed Order)(Giannetti, Thomas) (Entered: 10/17/2008) |
| 10/20/2008 | 160 | ORDER granting 159 Motion for Extension of Time to File Response/Reply re 149 MOTION for Protective Order; Replies due by 10/23/2008. Signed by Judge Leonard Davis on 10/20/08. cc:attys 10−20−08 (mll, ) (Entered: 10/20/2008) |
| 10/23/2008 | 161 | REPLY to Response to Motion re 149 MOTION for Protective Order *(Reply to CDW's Response) filed by Soverain Software LLC.* (Attachments: # 1 Exhibit M)(Giannetti, Thomas) (Entered: 10/23/2008) |

| 10/23/2008 | 162 | REPLY to Response to Motion re 149 MOTION for Protective Order *(Reply to Systemax and TigerDirect's Response)* filed by Soverain Software LLC. (Attachments: # 1 Exhibit N)(Giannetti, Thomas) (Entered: 10/23/2008) |
| 10/31/2008 | 163 | NOTICE of Disclosure by Soverain Software LLC *of Proposed Terms and Claim Elements for Construction (pursuant to P.R. 4–1)* (Giannetti, Thomas) (Entered: 10/31/2008) |
| 10/31/2008 | 164 | NOTICE of Disclosure by Newegg Inc. *of Proposed Terms and Claim Elements for Construction* (Yarbrough, Herbert) (Entered: 10/31/2008) |
| 10/31/2008 | 165 | NOTICE of Disclosure by CDW Corporation, Zappos.Com, Inc. *of Proposed Terms and Claim Elements* (Hartzell, Julianne) (Entered: 10/31/2008) |
| 10/31/2008 | 166 | NOTICE of Disclosure by Tiger Direct Inc *of Proposed Terms and Claim Elements for Construction* (Lovett, Mary–Olga) (Entered: 10/31/2008) |
| 10/31/2008 | 167 | NOTICE of Disclosure by Systemax Inc. *of Proposed Terms and Claim Elements for Construction* (Lovett, Mary–Olga) (Entered: 10/31/2008) |
| 12/01/2008 | 168 | STIPULATION of Dismissal *between Plaintiff Soverain Software LLC and Defendant Zappos.com, Inc.* by Soverain Software LLC. (Attachments: # 1 Text of Proposed Order)(Giannetti, Thomas) (Entered: 12/01/2008) |
| 12/02/2008 | 169 | ORDER re 168 Stipulation of Dismissal filed by Soverain Software LLC. Pltf's complaint against Licensee is dismissed without prejudice. Licensee's counterclaims against pltf are dismissed without prejudice. Each party shall bear its own atty's fees, expenses and costs. Signed by Judge Leonard Davis on 12/02/08. cc:attys 12–03–08(mll, ) (Entered: 12/03/2008) |
| 01/13/2009 | 170 | ORDER granting 149 Motion for Protective Order. The Court further orders Soverain to direct its attorneys and experts that they shall not access Tiger Direct's and Systemax's customer information when reviewing those parties' source code. Signed by Judge Leonard Davis on 01/13/09. cc:attys 1–14–09(mll, ) (Entered: 01/14/2009) |
| 01/13/2009 | 171 | PROTECTIVE ORDER. Signed by Judge Leonard Davis on 01/13/09. cc:attys 1–14–09(mll, ) (Entered: 01/14/2009) |
| 01/20/2009 | 172 | NOTICE by CDW Corporation *Notice of Change of Contact Information* (Findlay, Eric) (Entered: 01/20/2009) |
| 02/06/2009 | 173 | Agreed MOTION for Extension of Time to Complete Discovery *Comply with P.R. 4–2 to Exchange with Plaintiff Preliminary Claim Constructions and Extrinsic Evidence and to Exchange Privilege Logs*, Agreed MOTION for Extension of Time to File *Joint Claim Construction and Prehearing Statement (P.R. 4–3)* by Tiger Direct Inc, Systemax Inc.. (Attachments: # 1 Text of Proposed Order Granting Agreed Motion For Extension of Time for Defendants to Comply with Patent Rules 4–2 and 4–3)(Lovett, Mary–Olga) (Entered: 02/06/2009) |
| 02/09/2009 | 174 | ORDER granting 173 Motion for Extension of Time to Complete Discovery; granting 173 Motion for Extension of Time. Defts are granted an extension of time through 2–20–09 to comply with PR 4–2 to exchange preliminary claim constructions and extrinsic evidence and to exchange privilege log, and the date for filing joint claim construction and prehearing statement under PR 4–3 is extended through 3–16–09. Signed by Judge Leonard Davis on 02/09/09. cc:attys 2–9–09 (mll, ) (Entered: 02/09/2009) |
| 02/10/2009 | 175 | Unopposed MOTION to Vacate *ORDER (DKT. NO. 174) AND TO ENTER A CORRECTED ORDER* by Soverain Software LLC. (Attachments: # 1 Text of Proposed Order)(Giannetti, Thomas) (Entered: 02/10/2009) |
| 02/11/2009 | 176 | ORDER granting 175 Motion to Vacate 174 Order on Motion for Extension of Time to Complete Discovery, and Order on Motion for Extension of Time to File. The deadline for complying with PR 4–2 is set to 2–20–09 for all parties. The deadline for the exchange of privilege logs is set to 2–20–09 for all parties. The deadline for complying with PR 4–3 is set to 3–16–09 for all parties. Signed by Judge Leonard Davis on 02/11/09. cc:attys 2–11–09(mll, ) (Entered: 02/11/2009) |

| 02/19/2009 | 177 | NOTICE of Attorney Appearance by Ognjan V Shentov on behalf of Soverain Software LLC (Shentov, Ognjan) (Entered: 02/19/2009) |
| 02/20/2009 | 178 | NOTICE by Soverain Software LLC *of Compliance with P.R. 4−2* (Giannetti, Thomas) (Entered: 02/20/2009) |
| 02/20/2009 | 179 | NOTICE by Systemax Inc. *of Compliance with P.R. 4−2* (Lovett, Mary−Olga) (Entered: 02/20/2009) |
| 02/20/2009 | 180 | NOTICE by Tiger Direct Inc *of Compliance with P.R. 4−2* (Lovett, Mary−Olga) (Entered: 02/20/2009) |
| 02/20/2009 | 181 | NOTICE by Systemax Inc. *regarding Privilege* (Lovett, Mary−Olga) (Entered: 02/20/2009) |
| 02/20/2009 | 182 | NOTICE by Tiger Direct Inc *regarding Privilege* (Lovett, Mary−Olga) (Entered: 02/20/2009) |
| 02/20/2009 | 183 | NOTICE by CDW Corporation *of Compliance with Docket Control Order Regarding Privilege* (Duston, Thomas) (Entered: 02/20/2009) |
| 02/20/2009 | 184 | NOTICE by CDW Corporation *of Compliance with P.R. 4−2* (Duston, Thomas) (Entered: 02/20/2009) |
| 02/20/2009 | 185 | NOTICE by Newegg Inc. *Notice of Compliance with P.R. 4−2* (Yarbrough, Herbert) (Entered: 02/20/2009) |
| 03/12/2009 | 186 | STIPULATION of Dismissal *between Plaintiff Soverain Software LLC and Defendant CDW Corporation* by Soverain Software LLC. (Attachments: # 1 Text of Proposed Order [Proposed] Order of Dismissal with Prejudice)(Giannetti, Thomas) (Entered: 03/12/2009) |
| 03/16/2009 | 187 | ORDER re 186 Stipulation of Dismissal filed by Soverain Software LLC. Pltf's complaint against deft CDW Corporation is dismissed with prejudice. CDW's counterclaims against pltf are dismissed with prejudice. Each party shall bear its own attys' fees, expenses and costs. Signed by Judge Leonard Davis on 03/16/09. cc:attys 3−16−09(mll, ) (Entered: 03/16/2009) |
| 03/16/2009 | 188 | PR 4−3 Joint Submission. (Attachments: # 1 Exhibit Claim Construction Comparison Chart, # 2 Exhibit Soverain's Claim Constructions and Support, # 3 Exhibit Defendants' Joint Claim Constructions and Support, # 4 Exhibit SM and TD's Claim Construction and Support exhibit, # 5 Exhibit Defendants' Adopted Constructions)(Shentov, Ognjan) (Entered: 03/16/2009) |
| 03/17/2009 | 189 | ORDER re 188 Claim Construction Chart, filed by Soverain Software LLC. The Court orders the parties to meet and confer and narrow the number of disputed terms to a reasonable number. The Court also reminds the parties that the page limits governing dispositive motions apply to claim construction briefing and will not be extended absent a showing of good cause. Signed by Judge Leonard Davis on 03/17/09. cc:attys 3−17−09(mll, ) (Entered: 03/17/2009) |
| 03/19/2009 | 190 | NOTICE by Soverain Software LLC *of Compliance With Docket Control Order Regarding Technical Advisors* (Giannetti, Thomas) (Entered: 03/19/2009) |
| 03/23/2009 | 191 | Joint MOTION for Leave to File *Amended P.R. 4−3 Claim Construction and Prehearing Statement* by Soverain Software LLC. (Attachments: # 1 Text of Proposed Order Order, # 2 Appendix Amazon Markman Order, # 3 Supplement Amended P.R. 4−3 Joint Claim Construction and Prehearing Statement, # 4 Exhibit Claim Construction Comparison Chart, # 5 Exhibit Soverain's Constructions and Support, # 6 Exhibit Defendants' Joint Constructions and Support, # 7 Exhibit Defendants SM and TD Constructions for a Claim term, # 8 Exhibit Defendants' adopted Amazon constructions and support)(Shentov, Ognjan) (Entered: 03/23/2009) |
| 03/24/2009 | 192 | ORDER granting 191 Motion for Leave to File Amended Claim Construction. Signed by Judge Leonard Davis on 03/24/09. cc:attys 3−24−09 (mll, ) (Entered: 03/24/2009) |

| 03/25/2009 | 193 | ***DOCUMENT FILED IN ERROR. PLEASE DISREGARD.*** JOINT AMENDED P.R. 4-3 CLAIM CONSTRUCTION AND PREHEARING STATEMENT filed by Soverain Software LLC. (Attachments: #_1 Exhibit A – Claim Construction Comparison Chart, #_2 Exhibit B – Soverain's Proposed Claim Constructions and support, #_3 Exhibit C – Defendants' Joint Proposed Claim Constructions and support, #_4 Exhibit D – SM and TD Claim Construction and support for a claim term, #_5 Exhibit E – Defendants' adopted Amazon claim constructions)(Shentov, Ognjan) Modified on 3/26/2009 (mjc, ). (Entered: 03/25/2009) |
|---|---|---|
| 03/26/2009 | | ***FILED IN ERROR. Document # 193, Amended PR 4-3 Joint Claim Construction and Prehearing Statement. PLEASE IGNORE. TO BE REFILED WITH SIGNATURES OF ATTORNEYS FOR ALL PARTIES.*** (mjc, ) (Entered: 03/26/2009) |
| 03/26/2009 | 194 | ORDER that the parties file any objections they have to the appointment of Michael T McLemore as the Court's technical advisor, by 4–3–09. Signed by Judge Leonard Davis on 03/26/09. cc:attys 3–26–09(mll, ) (Entered: 03/26/2009) |
| 03/27/2009 | 195 | JOINT AMENDED P.R. 4-3 CLAIM CONSTRUCTION AND PREHEARING STATEMENT (Attachments: #_1 Exhibit a – Claim Construction Comparison Chart, #_2 Exhibit B – Soverain's Claim Constructions and Support, #_3 Exhibit C – Defendants' Joint Claim Constructions and Support, #_4 Exhibit D – Defendants' SM and TD Claim construction for a term, #_5 Exhibit E – Defendants' adopted Amazon claim constructions)(Shentov, Ognjan) (Entered: 03/27/2009) |
| 04/02/2009 | 196 | NOTICE by Soverain Software LLC *of No Objection to Proposed Technical Advisor* (Giannetti, Thomas) (Entered: 04/02/2009) |
| 04/08/2009 | 197 | ORDER appointing Michael T McLemore to the position of technical advisor in this case, with his costs to be assessed equally between pltf and defts and timely paid as billed. Signed by Judge Leonard Davis on 04/08/09. cc:attys 4–8–09(mll, ) (Entered: 04/08/2009) |
| 04/13/2009 | 198 | NOTICE by Soverain Software LLC *OF SUBMISSION OF MARKMAN TUTORIAL* (Giannetti, Thomas) (Entered: 04/13/2009) |
| 04/15/2009 | 199 | CLAIM CONSTRUCTION BRIEF filed by Soverain Software LLC. (Attachments: #_1 Exhibit '314 Patent, #_2 Exhibit '492 Patent, #_3 Exhibit '639 Patent, #_4 Exhibit US Patent 5,708,780, #_5 Exhibit US Patent 5,724,424, #_6 Exhibit Order – Dkt 192, #_7 Exhibit Excerpt from Defendants' PR 4–3 Exhibit C, #_8 Exhibit Excerpt from Defendants PR 4–3 Exhibit D, #_9 Exhibit Excerpt from File History of '639 Patent, #_10 Exhibit Excerpt 2 from File History of '639 Patent, #_11 Exhibit Amazon Markman Order, #_12 Exhibit Appendices A–D title pages to Application 08/328,133, #_13 Exhibit Excerpt from a Soverain internal document)(Shentov, Ognjan) (Entered: 04/15/2009) |
| 04/30/2009 | 200 | NOTICE by Newegg Inc. *of Compliance* (Baldauf, Kent) (Entered: 04/30/2009) |
| 05/01/2009 | 201 | Notice of Withdrawal of Dispute as to Certian Claims filed by Systemax Inc.. (Lovett, Mary–Olga) (Entered: 05/01/2009) |
| 05/01/2009 | 202 | Supplemental Notice of Withdrawal of Dispute as to Certain Clam Terms filed by Systemax Inc.. (Lovett, Mary–Olga) (Entered: 05/01/2009) |
| 05/01/2009 | 203 | REPLY to 199 Claim Construction Brief,, *filed by Newegg Inc.*. (Attachments: #_1 Exhibit A, #_2 Exhibit B, #_3 Exhibit C)(Baldauf, Kent) (Entered: 05/01/2009) |
| 05/01/2009 | 204 | CLAIM CONSTRUCTION BRIEF filed by Tiger Direct Inc, Systemax Inc.. (Attachments: #_1 Affidavit Declaration of Mary–Olga Lovett, #_2 Exhibit Exhibit 1, #_3 Exhibit EXHIBIT 2, #_4 Exhibit Exhibit 3, #_5 Exhibit Exhibit 4, #_6 Exhibit Exhibit 5 – Part 1 of 3, #_7 Exhibit Exhibit 5 – Part 2 of 3, #_8 Exhibit Exhibit 5 – Part 3 of 3, #_9 Exhibit Exhibit 6, #_10 Exhibit Exhibit 7, #_11 Exhibit Exhibit 8, #_12 Exhibit Exhibit 9 – Part 1 of 2, #_13 Exhibit Exhibit 9 – Part 2 of 2, #_14 Exhibit Exhibit 10, #_15 Exhibit Exhibit 11, #_16 Exhibit Exhibit 12, #_17 Exhibit Exhibit 13)(Lovett, Mary–Olga) (Entered: 05/01/2009) |

| | | |
|---|---|---|
| 05/15/2009 | 205 | REPLY to 204 Systemax and TigerDirect's Responsive Claim Construction Brief, *filed by Soverain Software LLC.* (Shentov, Ognjan) (Entered: 05/15/2009) |
| 05/15/2009 | 206 | REPLY to 203 Newegg's Responsive Claim Construction Brief, *filed by Soverain Software LLC.* (Attachments: # 1 Exhibit Exh 14, Excerpts from Appendix A to the '492 Patent)(Shentov, Ognjan) (Entered: 05/15/2009) |
| 05/15/2009 | 207 | Joint Notice Regarding Estimated Time for Markman Hearing, filed by Soverain Software LLC. (Shentov, Ognjan) (Entered: 05/15/2009) |
| 05/21/2009 | 208 | NOTICE by Soverain Software LLC *Joint Notice of Compliance with PR 4−5(d)* (Smith, Michael) (Entered: 05/21/2009) |
| 05/22/2009 | 209 | STIPULATION of Dismissal *between Plaintiff Soverain Software LLC and Defendants Systemax Inc. and TigerDirect, Inc.* by Soverain Software LLC. (Attachments: # 1 Text of Proposed Order of Dismissal with Prejudice)(Giannetti, Thomas) (Entered: 05/22/2009) |
| 05/26/2009 | 210 | NOTICE by Newegg Inc. *of Withdrawal of Dispute as to Certain Claim Terms* (Baldauf, Kent) (Entered: 05/26/2009) |
| 05/26/2009 | 211 | ORDER re 209 Stipulation of Dismissal filed by Soverain Software LLC. Pltf's complaint against Systemax Inc and TigerDirect Inc is dismissed with prejudice. Systemax's counterclaims against pltf are dismissed with prejudice. Each party shall bear its own attys fees, expenses and costs. Signed by Judge Leonard Davis on 05/26/09. cc:attys 5−26−09(mll, ) (Entered: 05/26/2009) |
| 05/27/2009 | 212 | NOTICE by Soverain Software LLC, Newegg Inc. *of Joint Agreement re: Remaining Claim Terms* (Attachments: # 1 Exhibit 1 − Revised 4−5(d) submission, # 2 Text of Proposed Order − with Appendix A)(Smith, Michael) (Entered: 05/27/2009) |
| 05/27/2009 | 213 | ORDER that pltf and defts pay $12,500.00 each to Michael McLemore, the technical consultant to the Court, for services through 5−21−09, for the total amount of $25,000.00. Signed by Judge Leonard Davis on 05/27/09. cc:attys 5−27−09(mll, ) (Entered: 05/27/2009) |
| 05/28/2009 | 214 | CLAIM CONSTRUCTION ORDER. The Court having been advised that the parties have agreed on the constructions for the remaining claim terms hereby adopts the parties' agreed constructions as set out in Appendix A to this order. Signed by Judge Leonard Davis on 05/28/09. cc:attys 5−28−09(mll, ) (Entered: 05/28/2009) |
| 07/21/2009 | 215 | Unopposed MOTION for Extension of Time to Complete Discovery by Newegg Inc.. (Attachments: # 1 Text of Proposed Order)(Yarbrough, Herbert) (Entered: 07/21/2009) |
| 07/22/2009 | 216 | ORDER granting 215 Motion for Extension of Time to Complete Discovery. Signed by Judge Leonard Davis on 07/22/09. cc:attys 7−22−09 (mll, ) (Entered: 07/22/2009) |
| 07/23/2009 | 217 | Unopposed MOTION for Extension of Time Regarding Pre−Trial Deadlines by Soverain Software LLC. (Attachments: # 1 Text of Proposed Order)(Smith, Michael) (Entered: 07/23/2009) |
| 07/24/2009 | 218 | ORDER granting 217 Motion for Extension of Time regarding pre−trial deadlines. Signed by Judge Leonard Davis on 07/24/09. cc:attys 7−24−09 (mll, ) (Entered: 07/24/2009) |
| 07/31/2009 | 219 | Unopposed SEALED PATENT MOTION *to Amend and Supplement Infringement Contentions* by Soverain Software LLC. (Attachments: # 1 Exhibit Exhibit 1 to Motion to Amend and Supplement Infringement Contentions, # 2 Text of Proposed Order Proposed Order)(Shentov, Ognjan) (Entered: 07/31/2009) |
| 08/03/2009 | 220 | ORDER granting 219 Sealed Patent Motion for leave to amend/supplement its Infringement Contentions. It is Ordered that the 7−23−09 Expert Report of Jack D Grimes, Ph.D. regarding US Patent Nos 7,272,639; 5,715,314, and 5,909,492 be deemed as Soverain's amended and supplemented infringement contentions for defendant Newegg. Signed by Judge Leonard Davis on 08/03/09. cc:attys |

| | | |
|---|---|---|
| | | 8−03−09(mll, ) (Entered: 08/03/2009) |
| 08/17/2009 | 221 | MOTION for Summary Judgment by Newegg Inc.. (Attachments: #1 Statement of Undisputed Material Facts, #2 Declaration of Kent E. Baldauf, Jr., #3 Exhibit A, #4 Exhibit B−1, #5 Exhibit B−2, #6 Exhibit C, #7 Exhibit D, #8 Exhibit E, #9 Exhibit F, #10 Exhibit G, #11 Exhibit H, #12 Exhibit I, #13 Exhibit J, #14 Exhibit K, #15 Exhibit L, #16 Exhibit M, #17 Exhibit N, #18 Text of Proposed Order)(Yarbrough, Herbert) (Entered: 08/17/2009) |
| 08/24/2009 | 222 | Unopposed MOTION for Extension of Time to File *Soverain's Opposition to Newegg's Motion for Summary Judgment of Invalidity and/or Denial of Priority Claim of the '639 Patent* by Soverain Software LLC. (Attachments: #1 Text of Proposed Order Granting Soverain's Unopposed Motion for an Extension of Time)(Giannetti, Thomas) (Entered: 08/24/2009) |
| 08/24/2009 | 223 | Unopposed MOTION to Amend/Correct 216 Order on Motion for Extension of Time to Complete Discovery by Newegg Inc.. (Attachments: #1 Text of Proposed Order)(Yarbrough, Herbert) (Entered: 08/24/2009) |
| 08/25/2009 | 224 | ORDER granting 222 Motion for Extension of Time. Soverain Software LLC shall file its Opposition to Newegg Inc's Motion for Summary Judgment of Invalidity and/or Denial of Priority Claim of the '639 Patent by 9−11−2009. Signed by Judge Leonard Davis on 08/25/09. cc:attys 8−26−09 (mll, ) (Entered: 08/26/2009) |
| 08/25/2009 | 225 | ORDER granting 223 Motion to Amend/Correct and for extension of time. The discovery deadline in this action is extended through 9−10−2009. Signed by Judge Leonard Davis on 08/25/09. cc:attys 8−26−09 (mll, ) (Entered: 08/26/2009) |
| 08/26/2009 | 226 | Unopposed MOTION for Leave to File *Motion for Leave to Supplement Invalidity Contentions* by Newegg Inc.. (Attachments: #1 Text of Proposed Order)(Yarbrough, Herbert) (Entered: 08/26/2009) |
| 08/27/2009 | 227 | ORDER granting 226 Motion for Leave to File Supplement. Newegg Inc is granted leave to supplement its invalidity contentions and serve the said Second Supplemental Invalidity Contentions on the pltf. Signed by Judge Leonard Davis on 08/27/09. cc:attys 8−28−09 (mll, ) (Entered: 08/28/2009) |
| 08/28/2009 | 228 | Unopposed MOTION to Amend/Correct 221 MOTION for Summary Judgment *Newegg's Unopposed Motion to Enter Substitute Statement of Undisputed Material Facts* by Newegg Inc.. (Attachments: #1 Statement of Undisputed Material Facts, #2 Text of Proposed Order)(Yarbrough, Herbert) (Entered: 08/28/2009) |
| 08/31/2009 | 229 | ORDER granting 228 Motion to Amend and Enter Substitute Statement of Undisputed Material Facts. Signed by Judge Leonard Davis on 08/31/09. cc:attys 8−31−09(mll, ) (Entered: 08/31/2009) |
| 09/09/2009 | 230 | First SEALED PATENT MOTION *for Partial Summary Judgment of Infringement of the '492 Patent* by Soverain Software LLC. (Attachments: #1 Supplement Statement of Undisputed Material Facts, #2 Exhibit, #3 Exhibit Declaration of Jack Grimes, #4 Exhibit Amazon Markman Order, #5 Exhibit Markman Order, #6 Exhibit Excerpts from Tittle Opening Report, #7 Exhibit Excerpts from Tittle Deposition Transcript, #8 Exhibit Excerpts from Tittle Deposition Transcript of 09−02, #9 Exhibit Letter from Newegg Counsel, #10 Exhibit Transaction January 2008, #11 Exhibit Transaction June 2009, #12 Exhibit Excerpts from Wu Deposition Transcript, #13 Exhibit Excerpts from Wu Deposition Transcript 07−09, #14 Exhibit RFC 791, #15 Exhibit Newegg System Diagram 1, #16 Exhibit Newegg System Diagram 2, #17 Exhibit Newegg FAQ pages, #18 Exhibit Newegg flowchart, #19 Exhibit IEEE Dictionary, #20 Exhibit Excerpts from Tanenbaum, #21 Exhibit RFC 2616, #22 Exhibit Newegg's Responses to RFAs, #23 Exhibit Newegg Supplemental Interrogatory Responses, #24 Exhibit RFC1808, #25 Exhibit Tittel Rebuttal Report on Infringement, #26 Text of Proposed Order)(Shentov, Ognjan) (Entered: 09/09/2009) |
| 09/11/2009 | 231 | RESPONSE in Opposition re 221 MOTION for Summary Judgment *of Invalidity of the '639 Patent filed by Soverain Software LLC.* (Attachments: #1 Soverain's Statement of Genuine Issues, #2 Exhibit 1, #3 Exhibit 2, #4 Exhibit 3, #5 Exhibit 4, #6 Exhibit 5, #7 Exhibit 6, #8 Exhibit 7, #9 Exhibit 8, #10 Exhibit 9, #11 |

| | | |
|---|---|---|
| | | Exhibit 10, #_12 Exhibit 11)(Giannetti, Thomas) (Entered: 09/11/2009) |
| 09/14/2009 | 232 | Trial Witness List by Soverain Software LLC. (Giannetti, Thomas) (Entered: 09/14/2009) |
| 09/14/2009 | 233 | Trial Witness List by Newegg Inc.. (Yarbrough, Herbert) (Entered: 09/14/2009) |
| 09/16/2009 | 234 | Unopposed MOTION for Extension of Time to File *Opposition to Soverain Software LLC's Motion for Partial Summary Judgment of Infringement of U.S. Patent No. 5,909,492* by Newegg Inc.. (Attachments: #_1 Text of Proposed Order)(Yarbrough, Herbert) (Entered: 09/16/2009) |
| 09/17/2009 | 235 | ORDER granting 234 Motion for Extension of Time. Newegg Inc is granted an extension of time to file its Opposition to Soverain Software LLC's Motion for Partial Summary Judgment through 9-28-2009. Signed by Judge Leonard Davis on 09/17/09. cc:attys 9-17-09 (mll, ) (Entered: 09/17/2009) |
| 09/18/2009 | 236 | REPLY to Response to Motion re 221 MOTION for Summary Judgment *Newegg's Reply to Plaintiff Soverain's Opposition to Newegg's Motion for Summary Judgment Regarding the Improper Priority Claim and Invalidity of the '639 Patent filed by Newegg Inc.*. (Attachments: #_1 Exhibit A)(Yarbrough, Herbert) (Entered: 09/18/2009) |
| 09/18/2009 | 237 | **FILED IN ERROR. PLEASE DISREGARD. See Corrected Entry 238 . Document sealed because of of Supplemental Response**NOTICE of Attorney Appearance by Debra R Smith on behalf of Soverain Software LLC (kls, ) Modified on 9/21/2009 (gsg). (Entered: 09/18/2009) |
| 09/18/2009 | 238 | APPLICATION to Appear Pro Hac Vice by Attorney Debra R Smith for Soverain Software LLC. Receipt #6-1-19352. (Attachments: #_1 Supplement)(gsg) (Entered: 09/21/2009) |
| 09/25/2009 | 239 | Rebuttal Witness List by Soverain Software LLC. (Giannetti, Thomas) (Entered: 09/25/2009) |
| 09/25/2009 | 240 | Rebuttal Trial Witness List by Newegg Inc.. (Yarbrough, Herbert) (Entered: 09/25/2009) |
| 09/28/2009 | 241 | SUR-REPLY to Reply to Response to Motion re 221 MOTION for Summary Judgment *filed by Soverain Software LLC.* (Giannetti, Thomas) (Entered: 09/28/2009) |
| 09/28/2009 | 242 | Opposed MOTION to Strike *A. Trevor as Expert Witness, To Preclude E. Tittel's Testimony Based on Trevor Report, and To Exclude Trevor Report from Evidence* by Soverain Software LLC. (Attachments: #_1 Exhibit A, #_2 Exhibit B, #_3 Text of Proposed Order)(Giannetti, Thomas) (Entered: 09/28/2009) |
| 09/28/2009 | 243 | Opposed SEALED MOTION *To Strike Portions Of Newegg Damages Expert Report Relying On "Design Around" Memo, Preclude Testimony On Those Portions, And Preclude Newegg From Offering "Design Around" Memo As Evidence* by Soverain Software LLC. (Attachments: #_1 Exhibit A, #_2 Exhibit B, #_3 Exhibit C, #_4 Text of Proposed Order)(Giannetti, Thomas) (Entered: 09/28/2009) |
| 09/28/2009 | 244 | ***DOCUMENT FILED IN ERROR. PLEASE DISREGARD.*** SEALED MOTION *TO EXCLUDE CERTAIN OPINIONS OF W. CHRISTOPHER BAKEWELL* by Soverain Software LLC. (Attachments: #_1 Exhibit 1, #_2 Exhibit 2, #_3 Exhibit 3, #_4 Text of Proposed Order)(Tipi, Stela) Modified on 9/30/2009 (mjc, ). (Entered: 09/28/2009) |
| 09/28/2009 | 245 | ***DOCUMENT FILED IN ERROR. PLEASE DISREGARD.*** SEALED MOTION *Defendant's Motion and Supporting Brief to Exclude the Expert Report and Testimony of James Nawrocki* by Newegg Inc.. (Attachments: #_1 Exhibit A, #_2 Exhibit B, #_3 Exhibit C, #_4 Exhibit D, #_5 Exhibit E, #_6 Exhibit F, #_7 Exhibit G, #_8 Exhibit H, #_9 Exhibit I, #_10 Text of Proposed Order)(Yarbrough, Herbert) Modified on 9/30/2009 (mjc, ). (Entered: 09/28/2009) |

| 09/28/2009 | 246 | ***DOCUMENT FILED IN ERROR. PLEASE DISREGARD.*** SEALED PATENT MOTION *Soverain's Daubert Motion to Preclude Expert Testimony of Edward Tittel* by Soverain Software LLC. (Attachments: #1 Exhibit July 23 Expert Report, #2 Exhibit August 18 Rebuttal Expert Report, #3 Exhibit August 28 Supplemental Expert Report, #4 Exhibit Tittel Dep Transcript Vol 1 September 2, 2009, #5 Exhibit Tittel Dep Transcript Vol 2, September 2, 2009, #6 Exhibit Tittel Dep Transcript Vol 3, September 3, 2009, #7 Exhibit Amazon Claim Construction Order adopted by Dkt 192, #8 Exhibit Markman Order May 2009, #9 Exhibit Excerpts from Newegg's April 30 2009 Invalidity Contentions, #10 Text of Proposed Order Proposed Order)(Shentov, Ognjan) Modified on 9/30/2009 (mjc, ). (Entered: 09/28/2009) |
| 09/28/2009 | 247 | SEALED MOTION *Defendant's Motion for Partial Summary Judgment of Invalidity of the "Shopping Cart Claims" in U.S. Patents No. 5,715,314 and No. 5,909,492* by Newegg Inc.. (Attachments: #1 Statement of Undisputed Material Facts, #2 Exhibit 1, #3 Exhibit 2, #4 Exhibit 3, #5 Exhibit 4, #6 Exhibit 5, #7 Exhibit 6, #8 Exhibit 7, #9 Exhibit 8, #10 Exhibit 9, #11 Exhibit 10, #12 Exhibit 11, #13 Exhibit 12, #14 Exhibit 13, #15 Exhibit 14, #16 Exhibit 15, #17 Exhibit 16, #18 Exhibit 16A, #19 Exhibit 17, #20 Exhibit 17A, #21 Exhibit 18, #22 Exhibit 19, #23 Exhibit 20, #24 Text of Proposed Order)(Yarbrough, Herbert) (Entered: 09/28/2009) |
| 09/28/2009 | 248 | SEALED MOTION *Defendant's Motion for Summary Judgment of Non–Infringement of U.S. Patent Nos. 7,272,639, 5,715,314, and 5,909,492* by Newegg Inc.. (Attachments: #1 Statement of Undisputed Material Facts, #2 Exhibit A, #3 Exhibit B, #4 Exhibit C, #5 Text of Proposed Order)(Yarbrough, Herbert) (Entered: 09/28/2009) |
| 09/28/2009 | 249 | Agreed MOTION for Leave to File Excess Pages *With Respect to Summary Judgment Briefing* by Newegg Inc.. (Attachments: #1 Text of Proposed Order)(Yarbrough, Herbert) (Entered: 09/28/2009) |
| 09/28/2009 | 250 | SEALED RESPONSE to Motion re 230 First SEALED PATENT MOTION for Partial Summary Judgment of Infringement of the '492 Patent filed by Newegg Inc. (Attachments: #1 Response to Statement of Undisputed Material Facts, #2 Exhibit A, #3 Exhibit B, #4 Exhibit C, #5 Exhibit D, #6 Exhibit E, #7 Exhibit F, #8 Exhibit G, #9 Exhibit H, #10 Exhibit I, #11 Exhibit J)(Yarbrough, Herbert) (Entered: 09/28/2009) |
| 09/29/2009 | 251 | ORDER granting 249 Motion for Leave to File Excess Pages With Respect to Summary Judgment Briefing. Signed by Judge Leonard Davis on 09/29/09. cc:attys 9–30–09(mll, ) (Entered: 09/30/2009) |
| 09/30/2009 | | NOTICE of Deficiency regarding the 244 ,245 ,246 Sealed Motions submitted by Soverain Software LLC, Newegg Inc. The motions do not contain a certificate of conference as required per Local Rule CV–7, and document 245 exceeds the page limit. Correction should be made by one business day. (mjc, ) (Entered: 09/30/2009) |
| 10/01/2009 | 252 | SEALED MOTION *Defendant's Daubert Motion and Supporting Brief to Exclude the Opinions of James Nawrocki* by Newegg Inc.. (Attachments: #1 Exhibit A, #2 Exhibit B, #3 Exhibit C, #4 Exhibit D, #5 Exhibit E, #6 Exhibit F, #7 Exhibit G, #8 Exhibit H, #9 Exhibit I, #10 Text of Proposed Order)(Yarbrough, Herbert) (Entered: 10/01/2009) |
| 10/01/2009 | 253 | Opposed SEALED PATENT MOTION *TO EXCLUDE EXPERT TESTIMONY OF EDWARD R. TITTEL* by Soverain Software LLC. (Attachments: #1 Exhibit, #2 Exhibit, #3 Exhibit, #4 Exhibit, #5 Exhibit, #6 Exhibit, #7 Exhibit, #8 Exhibit, #9 Exhibit, #10 Text of Proposed Order)(Tipi, Stela) (Entered: 10/01/2009) |
| 10/01/2009 | 254 | Opposed SEALED PATENT MOTION *TO EXCLUDE CERTAIN OPINIONS OF W. CHRISTOPHER BAKEWELL* by Soverain Software LLC. (Attachments: #1 Exhibit, #2 Exhibit, #3 Exhibit, #4 Text of Proposed Order)(Tipi, Stela) (Entered: 10/01/2009) |
| 10/05/2009 | 255 | Unopposed MOTION for Extension of Time to File Response/Reply *to Defendant Newegg Inc.'s Opposition to Soverain's Motion for Partial Summary Judgment of Infringement of US Pat 5,909,492 (Dkt. 250)* by Soverain Software LLC. |

| | | |
|---|---|---|
| | | (Attachments: #1 Text of Proposed Order Proposed Order)(Shentov, Ognjan) (Entered: 10/05/2009) |
| 10/06/2009 | 256 | ORDER granting 255 Motion for Extension of Time to File Response/Reply re 230 First SEALED PATENT MOTION *for Partial Summary Judgment of Infringement of the '492 Patent*; Replies due by 10/13/2009. Signed by Judge Leonard Davis on 10/06/09. cc:attys 10−06−09 (mll, ) (Entered: 10/06/2009) |
| 10/13/2009 | 257 | RESPONSE in Opposition re 247 SEALED PATENT MOTION *Defendant's Motion for Partial Summary Judgment of Invalidity of the "Shopping Cart Claims" in U.S. Patents No. 5,715,314 and No. 5,909,492* filed by Soverain Software LLC. (Attachments: #1 Soverain's Statement of Genuine Issues, #2 Exhibit A, #3 Exhibit B, #4 Exhibit C, #5 Exhibit D, #6 Exhibit E, #7 Exhibit F, #8 Exhibit G, #9 Exhibit H)(Giannetti, Thomas) (Entered: 10/13/2009) |
| 10/13/2009 | 258 | SEALED PATENT REPLY to Newegg's Opposition to PATENT Motion re 230 First SEALED PATENT MOTION *for Partial Summary Judgment of Infringement of the '492 Patent* filed by Soverain Software LLC. (Attachments: #1 Exhibit 25− '492 patent, #2 Exhibit 26 − Appendix G to the '492 patent, #3 Exhibit 27 − Excerpts from the Deposition Transctipt of Edward Tittel)(Shentov, Ognjan) (Entered: 10/13/2009) |
| 10/13/2009 | 259 | RESPONSE in Opposition re 253 Opposed SEALED PATENT MOTION *TO EXCLUDE EXPERT TESTIMONY OF EDWARD R. TITTEL* filed by Newegg Inc.. (Yarbrough, Herbert) (Entered: 10/13/2009) |
| 10/13/2009 | 260 | RESPONSE in Opposition re 242 Opposed MOTION to Strike *A. Trevor as Expert Witness, To Preclude E. Tittel's Testimony Based on Trevor Report, and To Exclude Trevor Report from Evidence* filed by Newegg Inc.. (Yarbrough, Herbert) (Entered: 10/13/2009) |
| 10/13/2009 | 261 | SEALED RESPONSE to Motion re 243 Opposed SEALED MOTION *To Strike Portions Of Newegg Damages Expert Report Relying On "Design Around" Memo, Preclude Testimony On Those Portions, And Exclude Newegg From Offering "Design Around" Memo As Evidence* filed by Newegg Inc.. (Yarbrough, Herbert) (Entered: 10/13/2009) |
| 10/13/2009 | 262 | SEALED PATENT Sovrean's Opposition to SEALED PATENT MOTION re 248 SEALED MOTION *Defendant's Motion for Summary Judgment of Non−Infringement of U.S. Patent Nos. 7,272,639, 5,715,314, and 5,909,492* filed by Soverain Software LLC. (Attachments: #1 Supplement Soverain's Response to Statement of Facts, #2 Exhibit Declaration of Jack Grimes, Ph.D. and supporting documents, #3 Exhibit Excerpts from Deposition Transcript of Edward Tittel, #4 Exhibit System Diagram, #5 Exhibit Excerpts from Deposition Transcript Wu, #6 Exhibit Sponsored Links, #7 Exhibit Newegg email 1, #8 Exhibit Newegg email 2, #9 Exhibit Response to RFA, #10 Exhibit FAQ page)(Shentov, Ognjan) (Entered: 10/13/2009) |
| 10/13/2009 | 263 | SEALED RESPONSE to Motion re 254 Opposed SEALED PATENT MOTION *TO EXCLUDE CERTAIN OPINIONS OF W. CHRISTOPHER BAKEWELL* filed by Newegg Inc.. (Attachments: #1 Exhibit A, #2 Exhibit B, #3 Exhibit C, #4 Exhibit D, #5 Exhibit E, #6 Exhibit F)(Yarbrough, Herbert) (Entered: 10/13/2009) |
| 10/13/2009 | 264 | SEALED RESPONSE to Motion re 252 SEALED MOTION *Defendant's Daubert Motion and Supporting Brief to Exclude the Opinions of James Nawrocki* filed by Soverain Software LLC. (Attachments: #1 Exhibit, #2 Exhibit)(Tipi, Stela) (Entered: 10/13/2009) |
| 10/21/2009 | 265 | REPLY to Response to Motion re 248 SEALED MOTION *Defendant's Motion for Summary Judgment of Non−Infringement of U.S. Patent Nos. 7,272,639, 5,715,314, and 5,909,492* filed by Newegg Inc.. (Yarbrough, Herbert) (Entered: 10/21/2009) |
| 10/21/2009 | 266 | REPLY to Response to Motion re 247 SEALED MOTION *Defendant's Motion for Partial Summary Judgment of Invalidity of the "Shopping Cart Claims" in U.S. Patents No. 5,715,314 and No. 5,909,492* filed by Newegg Inc.. (Yarbrough, Herbert) (Entered: 10/21/2009) |

| | | |
|---|---|---|
| 10/21/2009 | 267 | SEALED REPLY to Response to Motion re 252 SEALED MOTION Defendant's Daubert Motion and Supporting Brief to Exclude the Opinions of James Nawrocki filed by Newegg Inc. Attachments: #(1) Exhibit M (Yarbrough, Herbert) (Entered: 10/21/2009) |
| 10/21/2009 | 268 | SUR–REPLY to Reply to Response to Motion re 230 First SEALED PATENT MOTION *for Partial Summary Judgment of Infringement of the '492 Patent filed by Newegg Inc.*. (Yarbrough, Herbert) (Entered: 10/21/2009) |
| 10/23/2009 | 269 | SEALED PATENT REPLY to Response to PATENT Motion re 254 Opposed SEALED PATENT MOTION *TO EXCLUDE CERTAIN OPINIONS OF W. CHRISTOPHER BAKEWELL filed by Soverain Software LLC*. (Smith, Debra) (Entered: 10/23/2009) |
| 10/23/2009 | 270 | SEALED REPLY to Response to Motion re 243 Opposed SEALED MOTION *To Strike Portions Of Newegg Damages Expert Report Relying On "Design Around" Memo, Preclude Testimony On Those Portions, And Preclude Newegg From Offering "Design Around" Memo As Evidence filed by Soverain Software LLC*. (Giannetti, Thomas) (Entered: 10/23/2009) |
| 10/23/2009 | 271 | REPLY to Response to Motion re 242 Opposed MOTION to Strike *A. Trevor as Expert Witness, To Preclude E. Tittel's Testimony Based on Trevor Report, and To Exclude Trevor Report from Evidence filed by Soverain Software LLC*. (Giannetti, Thomas) (Entered: 10/23/2009) |
| 10/23/2009 | 272 | REPLY to Response to Motion re 253 Opposed SEALED PATENT MOTION *TO EXCLUDE EXPERT TESTIMONY OF EDWARD R. TITTEL filed by Soverain Software LLC*. (Shentov, Ognjan) (Entered: 10/23/2009) |
| 10/29/2009 | 273 | SUR–REPLY to Reply to Response to Motion re 247 SEALED MOTION *Defendant's Motion for Partial Summary Judgment of Invalidity of the "Shopping Cart Claims" in U.S. Patents No. 5,715,314 and No. 5,909,492 filed by Soverain Software LLC*. (Giannetti, Thomas) (Entered: 10/29/2009) |
| 10/29/2009 | 274 | **FILED IN ERROR. PLEASE DISREGARD. ATTORNEY TO REFILE.** SEALED PATENT SUR–REPLY to Reply to Response to PATENT Motion re 252 SEALED MOTION *Defendant's Daubert Motion and Supporting Brief to Exclude the Opinions of James Nawrocki filed by Soverain Software LLC*. (Tipi, Stela) Modified on 10/30/2009 (gsg). (Entered: 10/29/2009) |
| 10/30/2009 | 275 | SUR–REPLY to Reply to Response to Motion re 248 SEALED MOTION *Defendant's Motion for Summary Judgment of Non–Infringement of U.S. Patent Nos. 7,272,639, 5,715,314, and 5,909,492 filed by Soverain Software LLC*. (Attachments: # 1 Exhibit Golden Hour JMOL Brief, # 2 Exhibit Golden Hour Opposition, # 3 Exhibit GOlden Hour Final Judgment)(Shentov, Ognjan) (Entered: 10/30/2009) |
| 10/30/2009 | 276 | SEALED PATENT SUR–REPLY to Reply to Response to PATENT Motion re 252 SEALED MOTION *Defendant's Daubert Motion and Supporting Brief to Exclude the Opinions of James Nawrocki filed by Soverain Software LLC*. (Smith, Debra) (Entered: 10/30/2009) |
| 11/02/2009 | 277 | SEALED PATENT SUR–REPLY to Reply to Response to PATENT Motion re 254 Opposed SEALED PATENT MOTION TO EXCLUDE CERTAIN OPINIONS OF W. CHRISTOPHER BAKEWELL filed by Newegg Inc. (Attachments: #(1) Exhibit K)(Yarbrough, Herbert) (Entered: 11/02/2009) |
| 11/02/2009 | 278 | SEALED PATENT SUR–REPLY to Reply to Response to PATENT Motion re 243 Opposed SEALED MOTION To Strike Portions Of Newegg Damages Expert Report Relying On "Design Around" Memo, Preclude Testimony On Those Portions, And Preclude Newegg From Offering "Design Around" Memo As Evidence filed by Newegg Inc. Attachments: #(1)Exhibit 1, #(2) Exhibit 2)(Yarbrough, Herbert) (Entered: 11/02/2009) |
| 11/03/2009 | 279 | NOTICE of Attorney Appearance by Richard Alan Sayles on behalf of Newegg Inc. (Sayles, Richard) (Entered: 11/03/2009) |

| 11/03/2009 | 280 | NOTICE of Attorney Appearance by Mark Daniel Strachan on behalf of Newegg Inc. (Strachan, Mark) (Entered: 11/03/2009) |
| 11/09/2009 | 281 | ORDER that the parties substantively meet and confer on all limine issues before filing any motions in limine. Motions in limine shall be filed by 1−13−2010 and responses are due by 1−15−2010. The Court also withdraws its general request for any pending motion notebooks or courtesy copies. Signed by Judge Leonard Davis on 11/09/09. cc:attys 11−09−09(mll, ) (Entered: 11/09/2009) |
| 11/12/2009 | 282 | Unopposed MOTION for Leave to File *Supplemental Brief in Support of Its Motion for Summary Judgment of Noninfringement (Dkt. No. 248)* by Newegg Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Text of Proposed Order)(Yarbrough, Herbert) (Entered: 11/12/2009) |
| 11/17/2009 | 283 | ORDER granting 282 Motion for Leave to File Supplemental Brief. Signed by Judge Leonard Davis on 11/17/09. cc:attys 11−17−09 (mll, ) (Entered: 11/17/2009) |
| 11/17/2009 | 284 | Joint MOTION for Extension of Time for Parties to Exchange Trial Exhibits by Soverain Software LLC. (Attachments: # 1 Text of Proposed Order)(Smith, Michael) (Entered: 11/17/2009) |
| 11/18/2009 | 285 | ORDER granting 284 Motion for Extension of Time. The deadline for parties to exchange their trial exhibits is extended to 12−11−2009. Signed by Judge Leonard Davis on 11/18/09. cc:attys 11−18−09 (mll, ) (Entered: 11/18/2009) |
| 11/18/2009 | 286 | APPLICATION to Appear Pro Hac Vice by Attorney Daniel H Brean for Newegg Inc. (mll, ) (Entered: 11/18/2009) |
| 11/20/2009 | 287 | MOTION in Limine *to Preclude the Testimony of Alexander Trevor at Trial* by Soverain Software LLC. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4)(Giannetti, Thomas) (Entered: 11/20/2009) |
| 11/24/2009 | 288 | **Filed in Error. Please Disregard. To be Refiled by Attorney.** Proposed Pretrial Order *(Joint)* by Soverain Software LLC, Newegg Inc.. (Attachments: # 1 Exhibit 1 − Plaintiff's Witness List, # 2 Exhibit 2 − Defendant's Witness List, # 3 Exhibit 3 − Plaintiff's Proposed Jury Instructions, # 4 Exhibit 4 − Defendant's Proposed Jury Instructions, # 5 Exhibit 5 − Plaintiff's Proposed Verdict Form, # 6 Exhibit 6 − Defendant's Proposed Verdict Form)(Smith, Michael) Changed one word for Exhibit 2 from exhibit to witness. Modified on 11/25/2009 (mjc, ). Modified on 11/25/2009 (gsg). (Entered: 11/24/2009) |
| 11/25/2009 | 289 | **Corrects Entry** 288 Proposed Pretrial Order *(Joint)* by Soverain Software LLC, Newegg Inc.. (Attachments: # 1 Exhibit 1 − Plaintiff's Witness List, # 2 Exhibit 2 − Defendant's Witness List, # 3 Exhibit 3 − Plaintiff's Proposed Jury Instructions, # 4 Exhibit 4 − Defendant's Proposed Jury Instructions, # 5 Exhibit 5 − Plaintiff's Proposed Verdict Form, # 6 Exhibit 6 − Defendant's Proposed Verdict Form)(Smith, Michael) Modified on 11/25/2009 (gsg). (Entered: 11/25/2009) |
| 11/27/2009 | 290 | RESPONSE in Opposition re 282 Unopposed MOTION for Leave to File *Supplemental Brief in Support of Its Motion for Summary Judgment of Noninfringement (Dkt. No. 248)*Unopposed MOTION for Leave to File *Supplemental Brief in Support of Its Motion for Summary Judgment of Noninfringement (Dkt. No. 248) Soverain's Response to Newegg's Supplemental Brief filed by* Soverain Software LLC. (Shentov, Ognjan) (Entered: 11/27/2009) |
| 12/03/2009 | 291 | RESPONSE in Opposition re 287 MOTION in Limine *to Preclude the Testimony of Alexander Trevor at Trial filed by* Newegg Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E)(Yarbrough, Herbert) (Entered: 12/03/2009) |
| 12/14/2009 | 292 | REPLY to Response to Motion re 287 MOTION in Limine *to Preclude the Testimony of Alexander Trevor at Trial filed by* Soverain Software LLC. (Giannetti, Thomas) (Entered: 12/14/2009) |
| 12/14/2009 | 293 | NOTICE by Soverain Software LLC *of Compliance with Paragraphs 6(B) and 6(C) of the Discovery Order* (Giannetti, Thomas) (Entered: 12/14/2009) |

| 12/14/2009 | 294 | NOTICE by Soverain Software LLC *of Request for Daily Transcripts and Real Time Reporting of Trial Proceedings* (Giannetti, Thomas) (Entered: 12/14/2009) |
| 12/15/2009 | 295 | NOTICE of Disclosure by Newegg Inc. (Sayles, Richard) (Entered: 12/15/2009) |
| 12/21/2009 | 296 | SUR–REPLY to Reply to Response to Motion re 287 MOTION in Limine *to Preclude the Testimony of Alexander Trevor at Trial filed by Newegg Inc..* (Yarbrough, Herbert) (Entered: 12/21/2009) |
| 12/23/2009 | 297 | NOTICE of Disclosure by Soverain Software LLC *of Compliance with Paragraph 2(A) of the Discovery Order* (Giannetti, Thomas) (Entered: 12/23/2009) |
| 12/29/2009 | 298 | NOTICE of Disclosure by Newegg Inc. *re: Rebuttal Deposition Designation* (Sayles, Richard) (Entered: 12/29/2009) |
| 01/04/2010 | 299 | NOTICE of Disclosure by Soverain Software LLC *of Compliance with Paragraph 2(A) of the Discovery Order* (Giannetti, Thomas) (Entered: 01/04/2010) |
| 01/05/2010 | 300 | NOTICE of Disclosure by Newegg Inc. *Re: Objections to Rebuttal Deposition Designations* (Sayles, Richard) (Entered: 01/05/2010) |
| 01/09/2010 | 301 | NOTICE of Disclosure by Soverain Software LLC *Notice of Compliance* (Giannetti, Thomas) (Entered: 01/09/2010) |
| 01/11/2010 | 302 | NOTICE of Disclosure by Newegg Inc. *Re: Objections to Plaintiff's Exhibits* (Sayles, Richard) (Entered: 01/11/2010) |
| 01/11/2010 | 303 | Agreed MOTION for Leave to File Excess Pages *for Motion in Limine Briefing* by Soverain Software LLC. (Attachments: # 1 Text of Proposed Order)(Giannetti, Thomas) (Entered: 01/11/2010) |
| 01/13/2010 | 304 | ORDER granting 303 Motion for Leave to File Excess Pages with Respect to Motion in Limine Briefing. Signed by Judge Leonard Davis on 01/13/10. cc:attys 1–13–10(mll, ) (Entered: 01/13/2010) |
| 01/13/2010 | 305 | MOTION in Limine *Soverain's Motions in Limine Nos. 1 − 29* by Soverain Software LLC. (Attachments: # 1 Attachment 1: Brief in Support of Soverain's Motion in Limine No. 20, # 2 Attachment 2: Brief in Support of Soverain's Motion in Limine No. 22, # 3 Attachment 3: Brief in Support of Soverain's Motion in Limine No. 23, # 4 Text of Proposed Order)(Giannetti, Thomas) (Entered: 01/13/2010) |
| 01/13/2010 | 306 | Opposed SEALED PATENT MOTION *In Limine* by Newegg Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit 1, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Text of Proposed Order)(Sayles, Richard) (Entered: 01/13/2010) |
| 01/14/2010 | 307 | NOTICE of Attorney Appearance by Claudia Wilson Frost on behalf of Newegg Inc. (Frost, Claudia) (Entered: 01/14/2010) |
| 01/15/2010 | 308 | NOTICE of Attorney Appearance by Jeremy Jason Gaston on behalf of Newegg Inc. (Gaston, Jeremy) (Entered: 01/15/2010) |
| 01/15/2010 | 309 | RESPONSE in Opposition re 306 Opposed SEALED PATENT MOTION *In Limine filed by Soverain Software LLC.* (Giannetti, Thomas) (Entered: 01/15/2010) |
| 01/15/2010 | 310 | SEALED PATENT RESPONSE to SEALED PATENT MOTION re 305 MOTION in Limine *Soverain's Motions in Limine Nos. 1 − 29 filed by Newegg Inc..* (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Text of Proposed Order)(Sayles, Richard) (Entered: 01/15/2010) |
| 01/19/2010 | 311 | NOTICE by Soverain Software LLC *Plaintiff Soverain Software LLC's Trial Time Requests* (Giannetti, Thomas) (Entered: 01/19/2010) |
| 01/19/2010 | 312 | Joint MOTION Submission of Juror Questionnaire by Soverain Software LLC. (Attachments: # 1 [Proposed] Joint Juror Questionnaire, # 2 Text of Proposed Order [Proposed] Order for Joint Juror Questionnaire)(Giannetti, Thomas) (Entered: 01/19/2010) |

| | | |
|---|---|---|
| 01/19/2010 | 313 | NOTICE by Newegg Inc. *Defendant Newegg Inc.'s Estimate of Time* (Sayles, Richard) (Entered: 01/19/2010) |
| 01/21/2010 | 322 | **1.21.2010 Minute Entry (Pretrial):** for proceedings held before Judge Leonard Davis: Final Pretrial Conference held on 1/21/2010. (Court Reporter Shea Sloan.) (rlf, ) (Entered: 02/05/2010) |
| 01/23/2010 | 314 | NOTICE by Newegg Inc. *of Compliance with 35 USC 282* (Yarbrough, Herbert) (Entered: 01/23/2010) |
| 01/25/2010 | 315 | ORDER denying 221 Motion for Summary Judgment; denying as moot 242 Motion to Strike and Preclude Expert Trial Testimony and Evidence; denying 243 Sealed Motion to Strike Portions of Newegg's Damages Expert Report; denying 247 Sealed Motion for Partial Summary Judgment; denying 252 Sealed Motion to Exclude the Opinions of James Nawrocki; denying 253 Sealed Patent Motion to Exclude Expert Testimony of Edward R Tittel; denying 254 Sealed Patent Motion to Exclude Certain Opinions of W Christopher Bakewell; denying 287 Motion in Limine; granting 312 Motion Requesting Submission of a Juror Questionnaire: The first page of instructions will be read aloud to the potential jurors and the second page of questions will be handed to and filled out by the potential jurors prior to voir dire. The Court CARRIES 230 Motion for Partial Summary Judgment; and CARRIES 248 Motion for Summary Judgment. The Court GRANTS in part, DENIES in part and CARRIES in part 305 Motion in Limine; and CARRIES 306 Motion in Limine. The parties shall meet and confer on all motions in limine not ruled on and notify the Court of any issues that need to be resolved by 1-28-2010. If parties cannot resolve all the issues, the Court will hear them before jury selection on 2-01-2010. Parties shall meet and confer on the Court's Charge and submit a proposed Charge to the Court by 2-03-2010. The Court will allow the parties 30 minutes for voir dire, 30 minutes for opening statements, 12 hours for direct and cross examinations, and 60 minutes for closing arguments. Signed by Judge Leonard Davis on 01/25/10. cc:attys 1-25-10 (mll, ) (Entered: 01/25/2010) |
| 01/26/2010 | 316 | ORDER that this case is set for jury trial on February 1-2, 2010; February 8-9, 2010; and February 16-17, 2010. Trial will commence immediately following jury selection on 2-01-2010. Signed by Judge Leonard Davis on 01/26/10. cc:attys 1-26-10(mll, ) (Entered: 01/26/2010) |
| 01/27/2010 | 317 | Joint MOTION to Continue *the Trial Date* by Soverain Software LLC. (Attachments: # 1 Text of Proposed Order Proposed Order, # 2 Supplement Declaration of Michael Ian Shamos)(Adamo, Kenneth) (Entered: 01/27/2010) |
| 01/27/2010 | 318 | ORDER granting 317 Motion to Continue Trial Date. The Court sets this case for jury selection on 4-19-2010 at 9:00 a.m., with trial to commence on 4-26-2010 at 9:00 a.m. Signed by Judge Leonard Davis on 01/27/10. cc:attys 1-28-10 (mll, ) (Entered: 01/28/2010) |
| 01/27/2010 | | Jury Selection reset for 4/19/2010 09:00AM before Judge Leonard Davis. Jury Trial reset for 4/26/2010 09:00 AM before Judge Leonard Davis. (per 318 Order) (mll, ) (Entered: 01/28/2010) |
| 01/28/2010 | 319 | Agreed MOTION To Substitute Prior Order of Dismissal Without Prejudice with Order of Dismissal With Prejudice by Soverain Software LLC. (Attachments: # 1 Text of Proposed Order Order of Dismissal with Prejudice)(Giannetti, Thomas) (Entered: 01/28/2010) |
| 01/28/2010 | 320 | NOTICE by Soverain Software LLC *of Joint Certificate of Conference in Compliance with the Court's Order to Meet and Confer on the Parties' Motions in Limine* (Satine, Barry) (Entered: 01/28/2010) |
| 01/29/2010 | 321 | ORDER granting 319 Motion to Dismiss with Prejudice. Pltf's complaint against Zappos is now dismissed with prejudice. Zappos's counterclaims against pltf are now dismissed with prejudice. Each party shall bear its own attys' fees, expenses and costs. Signed by Judge Leonard Davis on 01/29/10. cc:attys 1-29-10 (mll, ) (Entered: 01/29/2010) |
| 02/15/2010 | 323 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Pretrial Conference held on 1/21/10 before Judge Leonard Davis. Court Reporter: Shea Sloan, shea_sloan@txed.uscourts.gov. 90 pages. |

| | | |
|---|---|---|
| | | **NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have seven (7) business days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.txed.uscourts.gov<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.. Redaction Request due 3/11/2010. Redacted Transcript Deadline set for 3/22/2010. Release of Transcript Restriction set for 5/19/2010. (sms, ) (Entered: 02/15/2010) |
| 03/01/2010 | 324 | Emergency SEALED MOTION *Emergency Opposed Motion to Disqualify Jones Day* by Newegg Inc.. (Attachments: #_1 Exhibit A − Declaration of Lee Cheng, #_2 Exhibit B − Declaration of Mira Wolff, #_3 Text of Proposed Order)(Yarbrough, Herbert) (Entered: 03/01/2010) |
| 03/02/2010 | 325 | ORDER re 324 Emergency SEALED MOTION *Emergency Opposed Motion to Disqualify Jones Day* filed by Newegg Inc. Response to Motion is due 3−05−2010 at 12:00 p.m. Reply is due 3−08−2010 at 12:00 p.m. Surreply is due 3−09−2010 at 8:00 a.m. Signed by Judge Leonard Davis on 03/02/10. cc:attys 3−02−10(mll, ) (Entered: 03/02/2010) |
| 03/04/2010 | 326 | Opposed MOTION to Strike *The Belatedly−Produced CompuServe Documents, The CompuServe Manuals As Corroborating Evidence, And Trevor's Uncorroborated Testimony* by Soverain Software LLC. (Attachments: #_1 Text of Proposed Order)(Giannetti, Thomas) (Entered: 03/04/2010) |
| 03/05/2010 | 327 | SEALED RESPONSE to Motion re 324 Emergency SEALED MOTION *Emergency Opposed Motion to Disqualify Jones Day* filed by Soverain Software LLC. (Attachments: #_1 Exhibit A Declaration of Mark A. Finkelstein, #_2 Exhibit 1 to the Declaration of Mark A. Finkelstein, #_3 Exhibit 2 to the Declaration of Mark A. Finkelstein, #_4 Exhibit 3 to the Declaration of Mark A. Finkelstein, #_5 Exhibit 4 to the Declaration of Mark A. Finkelstein, #_6 Exhibit 5 to the Declaration of Mark A. Finkelstein, #_7 Exhibit 6 to the Declaration of Mark A. Finkelstein, # 8 Exhibit 7 to the Declaration of Mark A. Finkelstein, # 9 Exhibit 8 to the Declaration of Mark A. Finkelstein (See #_27**Replacement Exhibit**), #_10 Exhibit B Declaration of Marc K. Callahan, #_11 Exhibit 1 to the Declaration of Marc K. Callahan, #_12 Exhibit 2 to the Declaration of Marc K. Callahan, #_13 Exhibit 3 to the Declaration of Marc K. Callahan, #_14 Exhibit 4 to the Declaration of Marc K. Callahan, #_15 Exhibit 5 to the Declaration of Marc K. Callahan, #_16 Exhibit 6 to the Declaration of Marc K. Callahan, #_17 Exhibit 7 to the Declaration of Marc K. Callahan, #_18 Exhibit 8 to the Declaration of Marc K. Callahan, #_19 Exhibit 9 to the Declaration of Marc K. Callahan, #_20 Exhibit 10 to the Declaration of Marc K. Callahan, #_21 Exhibit C Katharine A. Wolanyk Declaration, #_22 Exhibit D Kenneth R. Adamo Declaration, #_23 Exhibit E Thomas L. Giannetti Declaration, #_24 Exhibit F Barry R. Satine Declaration, #_25 Exhibit G Jennifer Seraphine Declaration, #_26 Exhibit H Ognjan V. Shentov Declaration)(Adamo, Kenneth) (Additional attachment(s) added on 3/9/2010: #_27 Exhibit 8 to the Declaration of Mark A. Finkelstein) (mll, ). Modified on 3/9/2010 per 336 Order (mll, ). (Entered: 03/05/2010) |
| 03/05/2010 | 328 | Unopposed MOTION for Leave to File Excess Pages by Soverain Software LLC. (Attachments: #_1 Text of Proposed Order)(Smith, Michael) (Entered: 03/05/2010) |
| 03/05/2010 | 329 | Unopposed SEALED MOTION *To Enter Substitute Exhibit 8 to Declaration of Mark A. Finkelstein* by Soverain Software LLC. (Attachments: #_1 Exhibit 8 to the Declaration of Mark A. Finkelstein, #_2 Text of Proposed Order)(Satine, Barry) (Entered: 03/05/2010) |
| 03/08/2010 | 330 | SEALED REPLY to Response to Motion re 324 Emergency SEALED MOTION Emergency Opposed Motion to Disqualify Jones Day filed by Newegg Inc.. (Yarbrough, Herbert) (Entered: 03/08/2010) |
| 03/08/2010 | 331 | ORDER granting 328 Motion for Leave to File Excess Pages. Signed by Judge Leonard Davis on 03/08/10. cc:attys 3−08−10 (mll, ) (Entered: 03/08/2010) |

| | | |
|---|---|---|
| 03/08/2010 | 332 | Unopposed MOTION for Leave to File Excess Pages *on Newegg's Reply in Support of Motion to Disqualify Jones Day* by Newegg Inc.. (Attachments: #1 Text of Proposed Order)(Yarbrough, Herbert) (Entered: 03/08/2010) |
| 03/08/2010 | 333 | Unopposed MOTION for Leave to File Excess Pages *for Soverain's surreply to Newegg's Emergency Opposed Motion to Disqualify Jones Day* by Soverain Software LLC. (Attachments: #1 Text of Proposed Order)(Giannetti, Thomas) (Entered: 03/08/2010) |
| 03/09/2010 | 334 | SEALED SURREPLY in Support of Soverain's RESPONSE to Motion re 324 Emergency SEALED MOTION *Emergency Opposed Motion to Disqualify Jones Day* filed by Soverain Software LLC. (Attachments: #1 Exhibit I)(Adamo, Kenneth) (Entered: 03/09/2010) |
| 03/09/2010 | 335 | ORDER Setting Hearing on Motion 324 Emergency SEALED MOTION *Emergency Opposed Motion to Disqualify Jones Day* : Motion Hearing set for 3/17/2010 01:30 PM before Judge Leonard Davis. Signed by Judge Leonard Davis on 03/09/10. cc:attys 3−09−10(mll, ) (Entered: 03/09/2010) |
| 03/09/2010 | 336 | ORDER granting 329 Sealed Motion to Substitute Exhibit. Signed by Judge Leonard Davis on 03/08/10. cc:attys 3−09−10 (mll, ) Modified on 3/9/2010 (mll, ). (Entered: 03/09/2010) |
| 03/09/2010 | 337 | ORDER granting 332 Motion for Leave to File Excess Pages. Signed by Judge Leonard Davis on 03/08/10. cc:attys 3−09−10 (mll, ) (Entered: 03/09/2010) |
| 03/09/2010 | 338 | ORDER granting 333 Motion for Leave to File Excess Pages. Signed by Judge Leonard Davis on 03/09/10. cc:attys 3−09−10 (mll, ) (Entered: 03/09/2010) |
| 03/10/2010 | 339 | ORDER re 335 Order Setting Hearing on Motion. The Court expects the principal declarants to be present and available for direct and cross examination regarding their declarations. Parties are directed to meet and confer in person or telephone to determine if either party expects any other declarants to be present and available to testify at the evidentiary hearing. Should any disputes arise, parties shall notify the Court by 3−12−2010 at 12:00 p.m. Signed by Judge Leonard Davis on 03/10/10. cc:attys 3−10−10(mll, ) (Entered: 03/10/2010) |
| 03/11/2010 | 340 | APPLICATION to Appear Pro Hac Vice by Attorney Thomas Demitrack for Soverain Software LLC. (mll, ) (Entered: 03/11/2010) |
| 03/12/2010 | 341 | APPLICATION to Appear Pro Hac Vice by Attorney George T Manning for Soverain Software LLC. (mll, ) (Entered: 03/12/2010) |
| 03/15/2010 | 342 | Sealed Document − Joint Stipulation Regarding Evidentiary Hearing on Attorney Disqualification Issue. (Frost, Claudia) (Entered: 03/15/2010) |
| 03/16/2010 | 343 | NOTICE by Soverain Software LLC *of Compliance with Plaintiff's Objections to Newegg's Supplemental and Second Supplemental Exhibit Lists* (Giannetti, Thomas) (Entered: 03/16/2010) |
| 03/17/2010 | 349 | **3.17.10 Minute Entry(Evidentiary Hrg):** for proceedings held before Judge Leonard Davis: Motion Hearing held on 3/17/2010 re 324 Emergency SEALED MOTION *Emergency Opposed Motion to Disqualify Jones Day* filed by Newegg Inc.. (Court Reporter Shea Sloan.) (rlf, ) (Entered: 03/24/2010) |
| 03/18/2010 | 344 | ORDER REGARDING EXHIBITS. Signed by Judge Leonard Davis on 03/17/10. cc:attys 3−18−10(mll, ) (Entered: 03/18/2010) |
| 03/18/2010 | 345 | MEMORANDUM OPINION AND ORDER denying re 324 Emergency SEALED MOTION *Emergency Opposed Motion to Disqualify Jones Day* filed by Newegg Inc. Signed by Judge Leonard Davis on 3/18/2010. (kls, ) (Entered: 03/19/2010) |
| 03/19/2010 | 346 | SEALED RESPONSE to Motion re 326 Opposed MOTION to Strike The Belatedly−Produced CompuServe Documents, The CompuServe Manuals As Corroborating Evidence, And Trevor's Uncorroborated Testimony filed by Newegg Inc.(Attachments: #(1) Exhibit A, #2) Exhibit B, #(3) Exhibit C, #(4) Exhibit D, #(5) Exhibit E)(Yarbrough, Herbert) (Entered: 03/19/2010) |

| 03/24/2010 | 347 | Exhibit List: Plaintiff's Exhibits Admitted During 3.17.10 Hearing. (rlf, ) (Entered: 03/24/2010) |
|---|---|---|
| 03/24/2010 | 348 | Exhibit List: Defendant Newegg's Exhhibits Admitted During 3.17.10 Hearing. (rlf, ) (Entered: 03/24/2010) |
| 03/26/2010 | 350 | SEALED REPLY to Opposition 346 to Opposed Motion 326 to Strike *The Belatedly−Produced CompuServe Documents, The CompuServe Manuals As Corroborating Evidence, And Trevor's Uncorroborated Testimony* filed by Soverain Software LLC. (Attachments: # 1 Exhibit 1 − Shamos Tr., # 2 Exhibit 2 − Trevor Tr.)(Giannetti, Thomas) (Entered: 03/26/2010) |
| 04/05/2010 | 351 | SEALED PATENT SUR−REPLY to Reply to Response to PATENT Motion re 326 Opposed MOTION to Strike The Belatedly−Produced CompuServe Documents, The CompuServe Manuals As Corroborating Evidence, And Trevor's Uncorroborated Testimony filed by Newegg Inc. (Attachments: #(1) Exhibit A, #(2) Exhibit B)(Yarbrough, Herbert) (Entered: 04/05/2010) |
| 04/14/2010 | | E−NOTICE of Hearing on Motion 306 Opposed SEALED PATENT MOTION *In Limine,* 326 Opposed MOTION to Strike *The Belatedly−Produced CompuServe Documents, The CompuServe Manuals As Corroborating Evidence, And Trevor's Uncorroborated Testimony,* 305 MOTION in Limine *Soverain's Motions in Limine Nos. 1 − 29* : **Motion Hearing set for 4/19/2010 immediately after Jury Selection before Judge Leonard Davis.** (rlf, ) (Entered: 04/14/2010) |
| 04/14/2010 | 352 | ORDER for the parties to meet, confer and submit a proposed Charge to the Court by 4/21/2010. Signed by Judge Leonard Davis on 4/14/10. (mjc, ) (Entered: 04/14/2010) |
| 04/16/2010 | 353 | ORDER that parties meet and confer on a claim construction chart to be submitted to the jurors for use at trial containing the Court's constructions of the terms in the 314, 492, and 639 patents. Signed by Judge Leonard Davis on 04/16/10. cc:attys 4−16−10(mll, ) (Entered: 04/16/2010) |
| 04/16/2010 | 354 | Proposed Jury Instructions by Soverain Software LLC. (Attachments: # 1 Exhibit A Joint Proposed Charge of the Court)(Giannetti, Thomas) (Entered: 04/16/2010) |
| 04/19/2010 | 355 | **4.19.10 Minute Entry (Jury Selection):** for proceedings held before Judge Leonard Davis: Jury Selection held on 4/19/2010. (Court Reporter Shea Sloan.) (rlf, ) (Entered: 04/19/2010) |
| 04/19/2010 | 356 | Sealed Document. Jury Questionnaires (Pages 1−8) (Attachments: # 1 − Questionnaires (Pages 8−17), # 2 − Questionnaires (Pages 18−25))(rlf, ) (Entered: 04/19/2010) |
| 04/19/2010 | 357 | **4.19.10 Minute Entry (Motion Hearing):** for proceedings held before Judge Leonard Davis: Motion Hearing held on 4/19/2010 re 306 Opposed SEALED PATENT MOTION *In Limine* filed by Newegg Inc., 305 MOTION in Limine *Soverain's Motions in Limine Nos. 1 − 29* filed by Soverain Software LLC, 326 Opposed MOTION to Strike *The Belatedly−Produced CompuServe Documents, The CompuServe Manuals As Corroborating Evidence, And Trevor's Uncorroborated Testimony* filed by Soverain Software LLC. (Court Reporter Shea Sloan.) (rlf, ) (Entered: 04/19/2010) |
| 04/20/2010 | 358 | ORDER granting in part and denying in part 326 Motion to Exclude the Belatedly−Produced CompuServe Documents, the CompuServe Manuals as Corroborating Evidence, and Trevor's Uncorroborated Testimony ; granting in part and denying in part 305 Motion in Limine −− GRANTED as to matters 1,9, 14, and 15; DENIED as to matters 8, 12, and 13; denying 306 Sealed Patent Motion in Limine as to matter 2. Signed by Judge Leonard Davis on 04/20/10. cc:attys 4−20−10 (mll, ) (Entered: 04/20/2010) |
| 04/21/2010 | 359 | JOINT SUBMISSION OF CLAIM CONSTRUCTION CHART filed by Soverain Software LLC. (Attachments: Exhibit A: Claim Construction Chart)(Giannetti, Thomas) (Entered: 04/21/2010) |
| 04/21/2010 | 360 | Proposed Jury Instructions by Soverain Software LLC. (Attachments: # 1 Exhibit A: REVISED JOINT PROPOSED CHARGE OF THE COURT)(Giannetti, |

|  |  | Thomas) (Entered: 04/21/2010) |
|------------|------|---|
| 04/26/2010 | 361 | **4.26.10 Minute Entry (Jury Trial – Day 1):** for proceedings held before Judge Leonard Davis: Jury Trial held on 4/26/2010. (Court Reporter Judy Werlinger.) (rlf, ) (Entered: 04/26/2010) |
| 04/27/2010 | 362 | **4.27.10 Minute Entry (Jury Trial – Day 2):** for proceedings held before Judge Leonard Davis: Jury Trial held on 4/27/2010. (Court Reporter Judy Werlinger.) (rlf, ) (Entered: 04/27/2010) |
| 04/28/2010 | 363 | TRIAL BRIEF *Soverain's Memorandum in Support of Admitting Summary Charts and Slides Prepared by Soverain's Expert Jack Grimes* by Soverain Software LLC. (Adamo, Kenneth) (Entered: 04/28/2010) |
| 04/28/2010 | 372 | **4.28.10 Minute Entry (Jury Trial – Day 3):** for proceedings held before Judge Leonard Davis: Jury Trial held on 4/28/2010. (Court Reporter Judy Werlinger.) (rlf, ) (Entered: 04/30/2010) |
| 04/29/2010 | 364 | MOTION to Strike *The Trevor Trial Testimony* by Soverain Software LLC. (Adamo, Kenneth) (Additional attachment(s) added on 5/5/2010: #1 Text of Proposed Order) (mjc, ). (Entered: 04/29/2010) |
| 04/29/2010 | 365 | TRIAL BRIEF *Regarding Noninfringing Alternatives* by Newegg Inc.. (Strachan, Mark) (Entered: 04/29/2010) |
| 04/29/2010 | 366 | MOTION for Judgment as a Matter of Law by Soverain Software LLC. (Adamo, Kenneth) (Additional attachment(s) added on 5/5/2010: #1 Text of Proposed Order) (kls, ). (Entered: 04/29/2010) |
| 04/29/2010 | 367 | MOTION for Judgment as a Matter of Law *on Non–Infringement* by Newegg Inc.. (Attachments: #1 Text of Proposed Order)(Strachan, Mark) (Entered: 04/29/2010) |
| 04/29/2010 | 368 | MOTION for Judgment as a Matter of Law *on Invalidity* by Newegg Inc.. (Attachments: #1 Text of Proposed Order)(Strachan, Mark) (Entered: 04/29/2010) |
| 04/29/2010 | 369 | MOTION for Judgment as a Matter of Law *on Damages* by Newegg Inc.. (Attachments: #1 Text of Proposed Order)(Strachan, Mark) (Entered: 04/29/2010) |
| 04/29/2010 | 370 | **\*\*\*DISREGARD ENTRY – FILED IN ERROR – TO BE REFILED\*\*\***<br><br>MOTION for Judgment as a Matter of Law *, Supplemental Brief in Suport of,* by Soverain Software LLC. (Adamo, Kenneth) Modified on 4/30/2010 (kls, ). (Entered: 04/29/2010) |
| 04/29/2010 | 371 | Proposed Jury Instructions by Newegg Inc.. (Strachan, Mark) (Entered: 04/29/2010) |
| 04/29/2010 | 373 | **4.29.10 Minute Entry (Jury Trial – Day 4):** for proceedings held before Judge Leonard Davis: Jury Trial held on 4/29/2010. (Court Reporter Judy Werlinger.) (rlf, ) (Entered: 04/30/2010) |
| 04/30/2010 |  | **\*\*\*FILED IN ERROR. Document #370 Brief filed as Motion PLEASE IGNORE.\*\*\***<br><br>(kls, ) (Entered: 04/30/2010) |
| 04/30/2010 | 374 | **4.30.2010 Minute Entry (Jury Trial – Day 5):** for proceedings held before Judge Leonard Davis: Jury Trial completed on 4/30/2010. (Court Reporter Judy Werlinger.) (rlf, ) (Entered: 04/30/2010) |
| 04/30/2010 | 375 | SEALED Jury Notes. (rlf, ) (Entered: 04/30/2010) |
| 04/30/2010 | 376 | JURY VERDICT. (rlf, ) (Entered: 04/30/2010) |
| 04/30/2010 | 377 | Sealed Document. JURY VERDICT IN ITS ENTIRETY. (rlf, ) (Entered: 04/30/2010) |
| 04/30/2010 | 378 | ORDER denying 364 Motion to Strike 364 MOTION to Strike *The Trevor Trial Testimony*. Signed by Judge Leonard Davis on 4/30/2010. (gsg) (Entered: 04/30/2010) |

| | | |
|---|---|---|
| 04/30/2010 | 379 | BRIEF filed *Supplemental Brief in Support of Motion for Judgment as a Matter of Law* by Soverain Software LLC. (Adamo, Kenneth) Modified on 5/5/2010 (kls, ).***(Corrects Entry #370)<br><br>(Entered: 04/30/2010) |
| 04/30/2010 | 436 | Jury Instructions. (rlf, ) (Entered: 08/24/2010) |
| 05/06/2010 | 380 | Exhibit Lists Filed by Soverain Software LLC during Jury Trial (4.26.2010 − 4.30.2010):<br>Main Document: Plaintiff's Exhibit List 1A<br>Attachments: #_1_ − Plaintiff's Exhibit List 1B;<br>#_2_ − Plaintiff's Exhibit List 2;<br>#_3_ − Plaintiff's Exhibit List 3;<br>#_4_ − Plaintiff's Exhibit List − Final(rlf, ) (Entered: 05/06/2010) |
| 05/06/2010 | 381 | Exhibit List Filed by Newegg Inc. during Trial (4.26.2010 − 4.30.2010):<br>Main Document: Defendant's Exhibit List 1<br>Attachments: #_1_ − Defendant's Exhibit List 2;<br>#_2_ − Defendant's Exhibit List 3;<br>#_3_ − Defendant's Exhibit List − Final(rlf, ) (Entered: 05/06/2010) |
| 05/06/2010 | 382 | ORDER that all post−verdict motions be filed by 5−24−2010; responses by 6−07−2010; replies by 6−14−2010; and surreplies by 6−21−2010. The Court sets all post verdict motions for hearing on 6−29−2010 at 9:00 a.m. Signed by Judge Leonard Davis on 05/06/10. cc:attys 5−07−10(mll, ) (Entered: 05/07/2010) |
| 05/06/2010 | | Post−Verdict Motion Hearing set for 6/29/2010 09:00 AM before Judge Leonard Davis. (mll, ) (Entered: 05/07/2010) |
| 05/06/2010 | 383 | ORDER appointing Mike Patterson as Mediator in this case. The mediation session should be conducted before 5−24−2010. Signed by Judge Leonard Davis on 05/06/10. cc:attys 5−07−10(mll, ) (Entered: 05/07/2010) |
| 05/06/2010 | 384 | ORDER granting in part and denying in part 366 Motion for Judgment as a Matter of Law; denying 367 Motion for Judgment as a Matter of Law; denying 368 Motion for Judgment as a Matter of Law; denying 369 Motion for Judgment as a Matter of Law. Signed by Judge Leonard Davis on 05/06/10. cc:attys 5−07−10(mll, ) (Entered: 05/07/2010) |
| 05/07/2010 | 385 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Voir Dire Proceedings held on 4/19/10 before Judge Leonard Davis. Court Reporter: Shea Sloan, shea_sloan@txed.uscourts.gov. 73 pages.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: The parties have seven (7) business days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.txed.uscourts.gov**<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.. Redaction Request due 6/1/2010. Redacted Transcript Deadline set for 6/10/2010. Release of Transcript Restriction set for 8/9/2010. (sms, ) (Entered: 05/07/2010) |
| 05/07/2010 | 386 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Motion Hearing Proceedings held on 4/19/10 before Judge Leonard Davis. 58 pages. Court Reporter: Shea Sloan, shea_sloan@txed.uscourts.gov.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: The parties have seven (7) business days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.txed.uscourts.gov** |

|  |  | Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.. Redaction Request due 6/1/2010. Redacted Transcript Deadline set for 6/10/2010. Release of Transcript Restriction set for 8/9/2010. (sms, ) (Entered: 05/07/2010) |
|---|---|---|
| 05/07/2010 | 387 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Evidentiary Hearing Proceedings held on 3/17/10 before Judge Leonard Davis. Court Reporter: Shea Sloan, shea_sloan@txed.uscourts.gov. 39 pages. **NOTICE RE REDACTION OF TRANSCRIPTS: The parties have seven (7) business days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.txed.uscourts.gov** Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.. Redaction Request due 6/1/2010. Redacted Transcript Deadline set for 6/10/2010. Release of Transcript Restriction set for 8/9/2010. (sms, ) (Entered: 05/07/2010) |
| 05/07/2010 | 388 | Proceedings held on 3/17/10 before Leonard Davis − Sealed Portion of the Transcript. (sms, ) (Entered: 05/07/2010) |
| 05/13/2010 | 389 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings held on 4/26/10 Morning Session before Judge Leonard Davis. Court Reporter/Transcriber: Shea Sloan/J Werlinger,Telephone number: 903/590−1171. <P>**NOTICE RE REDACTION OF TRANSCRIPTS: The parties have seven (7) business days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.txed.uscourts.gov**<P> Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.. Redaction Request due 6/7/2010. Redacted Transcript Deadline set for 6/16/2010. Release of Transcript Restriction set for 8/16/2010. (lss, ) (Entered: 05/13/2010) |
| 05/13/2010 | 390 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings held on 4/26/10 Afternoon Session before Judge Leonard Davis. Court Reporter/Transcriber: S. Sloan/J. Werlinger,Telephone number: 903/590−1171. <P>**NOTICE RE REDACTION OF TRANSCRIPTS: The parties have seven (7) business days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.txed.uscourts.gov**<P> Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.. Redaction Request due 6/7/2010. Redacted Transcript Deadline set for 6/16/2010. Release of Transcript Restriction set for 8/16/2010. (lss, ) (Entered: 05/13/2010) |
| 05/13/2010 | 391 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings held on 4/27/10 Morning Session before Judge Leonard Davis. Court Reporter/Transcriber: Shea Sloan/J. Werlinger,Telephone number: 903/590−1171. <P>**NOTICE RE REDACTION OF TRANSCRIPTS: The parties have seven (7) business days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.txed.uscourts.gov**<P> Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.. Redaction Request due 6/7/2010. Redacted Transcript Deadline set for 6/16/2010. Release of Transcript |

| | | |
|---|---|---|
| | | Restriction set for 8/16/2010. (lss, ) (Entered: 05/13/2010) |
| 05/13/2010 | 392 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings held on 4/27/10 Afternoon Session before Judge Leonard Davis. Court Reporter/Transcriber: Shea Sloan/J. Werlinger,Telephone number: 903/590−1171. <P>NOTICE RE REDACTION OF TRANSCRIPTS: The parties have seven (7) business days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.txed.uscourts.gov<P> Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.. Redaction Request due 6/7/2010. Redacted Transcript Deadline set for 6/16/2010. Release of Transcript Restriction set for 8/16/2010. (lss, ) (Entered: 05/13/2010) |
| 05/13/2010 | 393 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings held on 4/28/10 Morning Session before Judge Leonard Davis. Court Reporter/Transcriber: Shea Sloan/J. Werlinger,Telephone number: 903/590−1171. <P>NOTICE RE REDACTION OF TRANSCRIPTS: The parties have seven (7) business days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.txed.uscourts.gov<P> Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.. Redaction Request due 6/7/2010. Redacted Transcript Deadline set for 6/16/2010. Release of Transcript Restriction set for 8/16/2010. (lss, ) (Entered: 05/13/2010) |
| 05/13/2010 | 394 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings held on 4/29/10 Morning Session before Judge Leonard Davis. Court Reporter/Transcriber: Shea Sloan/J. Werlinger,Telephone number: 903/590−1171.<br><br>NOTICE RE REDACTION OF TRANSCRIPTS: The parties have seven (7) business days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.txed.uscourts.gov<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.. Redaction Request due 6/7/2010. Redacted Transcript Deadline set for 6/16/2010. Release of Transcript Restriction set for 8/16/2010. (lss, ) (Entered: 05/13/2010) |
| 05/13/2010 | 395 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings held on 4/30/10 before Judge Leonard Davis. Court Reporter/Transcriber: Shea Sloan/J. Werlinger,Telephone number: 903/590−1171.<br><br>NOTICE RE REDACTION OF TRANSCRIPTS: The parties have seven (7) business days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.txed.uscourts.gov<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.. Redaction Request due 6/7/2010. Redacted Transcript Deadline set for 6/16/2010. Release of Transcript Restriction set for 8/16/2010. (lss, ) (Entered: 05/13/2010) |
| 05/13/2010 | 396 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Trial Proceedings held on 4/28/10 − Afternoon Session before Judge Leonard Davis. Court Reporter: Shea Sloan/Judy Werlinger, Telephone number: 903−590−1171. |

| | | |
|---|---|---|
| | | **NOTICE RE REDACTION OF TRANSCRIPTS: The parties have seven (7) business days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.txed.uscourts.gov**<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 6/16/2010. Redacted Transcript Deadline set for 8/16/2010. Release of Transcript Restriction set for 8/16/2010. (sms, ) (Entered: 05/13/2010) |
| 05/13/2010 | 397 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Trial Proceedings held on 4/29/10– Afternoon Session before Judge Leonard Davis. Court Reporter: Shea Sloan/Judy Werlinger,Telephone number: 903–590–1171.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: The parties have seven (7) business days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.txed.uscourts.gov**<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.. Redaction Request due 6/7/2010. Redacted Transcript Deadline set for 6/16/2010. Release of Transcript Restriction set for 8/16/2010. (sms, ) (Entered: 05/13/2010) |
| 05/19/2010 | 398 | REPORT of Mediation by Michael Philip Patterson. Mediation result: not settled(Patterson, Michael) (Entered: 05/19/2010) |
| 05/20/2010 | 399 | NOTICE by Newegg Inc. *Notice of Intent to Request Redaction* (Yarbrough, Herbert) (Entered: 05/20/2010) |
| 05/20/2010 | 400 | MOTION for Leave to File Excess Pages by Soverain Software LLC. (Attachments: # 1 Text of Proposed Order)(Smith, Debra) (Entered: 05/20/2010) |
| 05/21/2010 | 401 | ORDER denying 400 Motion for Leave to File Excess Pages. Signed by Judge Leonard Davis on 05/21/10. cc:attys 5–21–10 (mll, ) (Entered: 05/21/2010) |
| 05/24/2010 | 402 | Opposed SEALED MOTION *for Judgment as a Matter of Law of Infringement of the 314, 492, and 639 Patents and for a New Trial on 639 Patent Damages* by Soverain Software LLC. (Attachments: # 1 Exhibit 1 – Grimes testimony, # 2 Exhibit 2 – P–008, # 3 Exhibit 3 – P–027A, # 4 Exhibit 4 – P–038, # 5 Exhibit 5 – P–062A, # 6 Exhibit 6 – P–062B, # 7 Exhibit 7 – Grimes demonstratives, # 8 Exhibit 8 – Pretrial hearing transcript, # 9 Exhibit 9 – Tittel testimony, # 10 Exhibit 10 – P–014, # 11 Exhibit 11 – P–015, # 12 Exhibit 12 – P–018, # 13 Text of Proposed Order Proposed Order)(Adamo, Kenneth) (Entered: 05/24/2010) |
| 05/24/2010 | 403 | SEALED MOTION *For an Injunction or, in the Alternative, Ongoing Royalties* by Soverain Software LLC. (Attachments: # 1 Exhibit Exhibit 1, Declaration of K. Wolanyk, # 2 Exhibit Exhibit 2, Declaration of J. Nawrocki, # 3 Exhibit Exhibit 3, Trial Testimony of K. Wolanyk, # 4 Exhibit Exhibit 4, Trial Testimony of C. Bakewell, # 5 Exhibit Exhibit 5, Trial Testimony of J. Nawrocki, # 6 Exhibit Exhibit 6, Ex. P–149, # 7 Exhibit Exhibit 7, Ex. P–245, # 8 Exhibit Exhibit 8, Ex. P–162, # 9 Exhibit Exhibit 9, Trial Testimony of S. Ghosh, # 10 Exhibit Exhibit 10, Trial Testimony of J. Wu, # 11 Exhibit Exhibit 11, Trial Testimony of L. Cheng, # 12 Text of Proposed Order)(Adamo, Kenneth) (Entered: 05/24/2010) |
| 05/24/2010 | 404 | SEALED MOTION *For Prejudgment Interest and Costs, Post–Verdict Damages to Judgment, and Post–Judgment Interest* by Soverain Software LLC. (Attachments: # 1 Exhibit Grantley v. Clear Channel, Slip Op., # 2 Text of Proposed Order)(Adamo, Kenneth) (Entered: 05/24/2010) |
| 05/24/2010 | 405 | Agreed MOTION to Redact 389 Transcript,,, by Newegg Inc.. (Attachments: # 1 Exhibit A, # 2 Text of Proposed Order)(Yarbrough, Herbert) (Entered: 05/24/2010) |

| | | |
|---|---|---|
| 05/24/2010 | 406 | SEALED MOTION *Renewed Motion for Judgment as a Matter of Law on Damages and Alternative Motion for New Trial or Remittitur* by Newegg Inc.. (Attachments: #1 Text of Proposed Order)(Yarbrough, Herbert) (Entered: 05/24/2010) |
| 05/24/2010 | 407 | SEALED MOTION *Renewed Motions for Judgment as a Matter of Law of Non−Infringement and Invalidity of the Asserted Claims and Alternative Motions for New Trial* by Newegg Inc.. (Attachments: #1 Text of Proposed Order)(Yarbrough, Herbert) (Entered: 05/24/2010) |
| 05/25/2010 | 408 | ORDER granting 405 Motion to Redact re 389 Transcript. The original page 50 the the transcript of the morning session of the proceedings held before Judge Davis on 4−26−2010 is ordered sealed and that the court reporter shall redact all publicly available versions of the transcript of those proceedings. Signed by Judge Leonard Davis on 05/25/10. cc:attys 5−26−10 (mll, ) (Entered: 05/26/2010) |
| 06/07/2010 | 409 | SEALED RESPONSE to Motion re 407 SEALED MOTION *Renewed Motions for Judgment as a Matter of Law of Non−Infringement and Invalidity of the Asserted Claims and Alternative Motions for New Trial* filed by Soverain Software LLC. (Attachments: #1 Exhibit 1 − Grimes testimony, #2 Exhibit 2 − Cheng testimony, #3 Exhibit 3 − Trevor testimony, #4 Exhibit 4 − Tittel testimony, #5 Exhibit 5 − Shamos testimony, #6 Exhibit 6 − 42610 AM transcript, #7 Exhibit 7 − 43010 transcript, #8 Exhibit 8 − P−008, #9 Exhibit 9 − P−014, #10 Exhibit 10 − P−015, #11 Exhibit 11 − P−018, #12 Exhibit 12 − P−027A, #13 Exhibit 13 − P−038, #14 Exhibit 14 − P−062A, #15 Exhibit 15 − P−062B, #16 Exhibit 16 − Grimes trial demonstratives, #17 Exhibit 17 − Amazon claim construction order, #18 Exhibit 18 − P−016, #19 Exhibit 19 − P−016, #20 Exhibit 20 − P−017, #21 Exhibit 21 − P−033, #22 Exhibit 22 − Golden Hour final judgment, #23 Exhibit 23 − 41910 PM pretrial hearing transcript)(Adamo, Kenneth) (Entered: 06/07/2010) |
| 06/07/2010 | 410 | SEALED RESPONSE to Motion re 406 SEALED MOTION *Renewed Motion for Judgment as a Matter of Law on Damages and Alternative Motion for New Trial or Remittitur* filed by Soverain Software LLC. (Attachments: #1 Exhibit 4/26/10 AM Tr., #2 Exhibit 4/26/10 PM Tr., #3 Exhibit 4/27/10 AM Tr., #4 Exhibit 4/27/10 PM Tr., #5 Exhibit 4/28/10 AM Tr., #6 Exhibit 4/29/10 PM Tr., #7 Exhibit 4/30/10 Tr., #8 Exhibit Nawrocki Dep. Tr.)(Adamo, Kenneth) (Entered: 06/07/2010) |
| 06/07/2010 | 411 | Opposed SEALED MOTION *To Strike Certain Evidence Submitted in Support of Soverain's Post−Trial Motions* by Newegg Inc.. (Attachments: #1 Text of Proposed Order)(Yarbrough, Herbert) (Entered: 06/07/2010) |
| 06/07/2010 | 412 | SEALED RESPONSE to Motion re 403 SEALED MOTION For an Injunction or, in the Alternative, Ongoing Royalties filed by Newegg Inc. (Attachments: #(1) Exhibit 1, #(2) Exhibit 2, #(3) Exhibit 3, #(4) Exhibit 4)(Yarbrough, Herbert) (Entered: 06/07/2010) |
| 06/07/2010 | 413 | SEALED RESPONSE to Motion re 402 Opposed SEALED MOTION for Judgment as a Matter of Law of Infringement of the 314, 492, and 639 Patents and for a New Trial on 639 Patent Damages filed by Newegg Inc. (Attachments: #(1) Exhibit A, #(2) Exhibit B, #(3) Exhibit C, #(4) Exhibit D, #(5) Exhibit E) (Yarbrough, Herbert) (Entered: 06/07/2010) |
| 06/07/2010 | 414 | SEALED RESPONSE to Motion re 404 SEALED MOTION For Prejudgment Interest and Costs, Post−Verdict Damages to Judgment, and Post−Judgment Interest filed by Newegg Inc. (Yarbrough, Herbert) (Entered: 06/07/2010) |
| 06/14/2010 | 415 | Soverain's SEALED RESPONSE to Newegg's Opposed SEALED MOTION (Dkt. 411) *To Strike Certain Evidence Submitted in Support of Soverain's Post−Trial Motions* filed by Soverain Software LLC. (Adamo, Kenneth) (Additional attachment(s) added on 6/15/2010: #1 Text of Proposed Order) (kls, ). (Entered: 06/14/2010) |
| 06/14/2010 | 416 | Soverain's SEALED REPLY to Newegg's Response 413 to Soverain's Opposed SEALED MOTION 402 *for Judgment as a Matter of Law of Infringement of the 314, 492, and 639 Patents and for a New Trial on 639 Patent Damages* filed by Soverain Software LLC. (Attachments: (1) Exhibit 13 − Grimes testimony; (2) Exhibit 14 − Shamos testimony; (3) Exhibit 15 − 4−30−10 trial transcript)(Adamo, |

| | | Kenneth) (Entered: 06/14/2010) |
|---|---|---|
| 06/14/2010 | 417 | REPLY to Response to Motion re 404 SEALED MOTION *For Prejudgment Interest and Costs, Post-Judgment Damages to Judgment, and Post-Judgment Interest filed by Soverain Software LLC.* (Adamo, Kenneth) (Entered: 06/14/2010) |
| 06/14/2010 | 418 | SEALED REPLY to Response to Motion re 403 SEALED MOTION *For an Injunction or, in the Alternative, Ongoing Royalties filed by Soverain Software LLC.* (Attachments: # 1 Declaration of Dr. Jack Grimes, # 2 Declaration of Dr. Michael Shamos)(Adamo, Kenneth) (Entered: 06/14/2010) |
| 06/14/2010 | 419 | SEALED REPLY In Support of Motion re 407 SEALED MOTION Renewed Motions for Judgment as a Matter of Law of Non-Infringement and Invalidity of the Asserted Claims and Alternative Motions for New Trial filed by Newegg Inc.(Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D)(Yarbrough, Herbert) (Entered: 06/14/2010) |
| 06/14/2010 | 420 | SEALED REPLY In Support of Motion re 406 SEALED MOTION Renewed Motion for Judgment as a Matter of Law on Damages and Alternative Motion for New Trial or Remittitur filed by Newegg Inc. (Yarbrough, Herbert) (Entered: 06/14/2010) |
| 06/21/2010 | 421 | SEALED SUR-REPLY in Opposition to Renewed Motion re 402 Opposed SEALED MOTION *for Judgment as a Matter of Law of Infringement of the 314, 492, and 639 Patents and for a New Trial on 639 Patent Damages filed by Newegg Inc.* (Yarbrough, Herbert) (Entered: 06/21/2010) |
| 06/21/2010 | 422 | Plaintiff Soverain's SEALED SURREPLY in Opposition to Defendant Newegg's Sealed Motion 407 *Renewed Motions for Judgment as a Matter of Law of Non-Infringement and Invalidity of the Asserted Claims and Alternative Motions for New Trial filed by Soverain Software LLC.* (Attachments: # 1 Exhibit 24 – Grimes testimony, # 2 Exhibit 25 – Tittel testimony, # 3 Exhibit 26 – 4–29–10 PM trial transcript)(Adamo, Kenneth) (Entered: 06/21/2010) |
| 06/21/2010 | 423 | SUR-REPLY to Reply to Response to Motion re 406 SEALED MOTION *Renewed Motion for Judgment as a Matter of Law on Damages and Alternative Motion for New Trial or Remittitur filed by Soverain Software LLC.* (Adamo, Kenneth) (Additional attachment(s) added on 6/21/2010: # 1 Signature Page of Reply) (gsg, ). (Entered: 06/21/2010) |
| 06/21/2010 | 424 | SEALED SUR-REPLY to Motion re 403 SEALED MOTION *For an Injunction or, in the Alternative, Ongoing Royalties filed by Newegg Inc.* (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Yarbrough, Herbert) (Entered: 06/21/2010) |
| 06/29/2010 | 429 | **6.29.10 Minute Entry (Post-Verdict Motion Hrg):** for proceedings held before Judge Leonard Davis: Post Verdict Motion Hearing held on 6/29/2010. (Court Reporter Shea Sloan.) (rlf, ) (Entered: 07/02/2010) |
| 06/30/2010 | 425 | ***STRIKEN PER 428 ORDER*** Sealed Document – Dft Supplemental Submission of Evidence by Newegg. (Attachments: # 1 Exhibit A)(Baldauf, Kent) Modified on 7/1/2010 (sm, ). Modified on 7/2/2010 (mll, ). (Entered: 06/30/2010) |
| 07/01/2010 | 426 | Emergency MOTION to Strike 425 Sealed Document by Soverain Software LLC. (Attachments: # 1 Text of Proposed Order Proposed Order)(Adamo, Kenneth) (Entered: 07/01/2010) |
| 07/02/2010 | 427 | RESPONSE in Opposition re 426 Emergency MOTION to Strike 425 Sealed Document *filed by Newegg Inc..* (Baldauf, Kent) (Entered: 07/02/2010) |
| 07/02/2010 | 428 | ORDER granting 426 Emergency Motion to Strike 425 Sealed Document. Signed by Judge Leonard Davis on 07/02/10. cc:attys 7–02–10 (mll, ) (Entered: 07/02/2010) |
| 07/28/2010 | 430 | ***DOCUMENT FILED IN ERROR. PLEASE DISREGARD.*** NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Post-Verdict Hearing Proceedings held on 7/22/10 before Judge Leonard Davis. Court Reporter Shea |

| | | |
|---|---|---|
| | | Sloan, shea_sloan@txed.uscourts.gov. 62 pages.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: The parties have seven (7) business days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.txed.uscourts.gov**<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.. Redaction Request due 8/23/2010. Redacted Transcript Deadline set for 9/2/2010. Release of Transcript Restriction set for 10/29/2010. (sms, ) (Transcript sealed by the Court.) Modified on 7/28/2010 (mjc, ). (Additional attachment(s) added on 7/28/2010: # 1 Notice) (mjc, ). (Entered: 07/28/2010) |
| 07/29/2010 | 431 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Post–Verdict Motion Hearing held on 6/29/10 before Judge Leonard Davis. Court Reporter: Shea Sloan, shea_sloan@txed.uscourts.gov. 82 pages.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: The parties have seven (7) business days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.txed.uscourts.gov**<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.. Redaction Request due 8/23/2010. Redacted Transcript Deadline set for 9/2/2010. Release of Transcript Restriction set for 11/1/2010. (sms, ) (Entered: 07/29/2010) |
| 08/03/2010 | 432 | Exhibit List: Soverain Software LLC's FINAL EXHIBIT LIST OF EXHIBITS ADMITTED DURING TRIAL (4.26.10 – 4.30.10) (rlf, ) (Entered: 08/03/2010) |
| 08/03/2010 | 433 | Exhibit List: Newegg Inc'S FINAL EXHIBIT LIST OF EXHIBITS ADMITTED DURING TRIAL (4.26.10 – 4.30.10) (rlf, ) (Entered: 08/03/2010) |
| 08/03/2010 | | TRIAL EXHIBITS PLACED AND STORED IN CLERK'S OFFICE. (rlf, ) (Entered: 08/03/2010) |
| 08/11/2010 | 434 | MEMORANDUM OPINION AND ORDER granting in part 402 Sealed Motion for Judgment as a Matter of Law; granting in part 403 Sealed Motion for Permanent Injunction or in the alternative Ongoing Royalties; granting in part 404 Sealed Motion for prejudgment interest, post–verdict damages, and post–judgment interest. All other motions are DENIED. Signed by Judge Leonard Davis on 08/11/10. cc:attys 8–11–10 (mll, ) (Entered: 08/11/2010) |
| 08/11/2010 | 435 | FINAL JUDGMENT. Deft Newegg Inc is found to have unlawfully infringed US Patent Nos 5,715,314; 5,909,492; and 7,272,639. The patents–in–suit are not invalid and are enforceable. The Court awards damages to Soverain Software LLC for Newegg's infringement of the '314 and '492 patents in the amount of $2,500,000. Soverain is further awarded a new trial on damages for Newegg's infringement of the '639 patent, to be held after all appeals have been exhausted. Soverain is further awarded post–verdict damages of $2,900 per day from 5–01–2010 until the date of this Final Judgment. Soverain is further awarded prejudgment interest on the actual damages found by the jury calculated at the prime rate as of the date of this Final Judgment compounded monthly through 7–31–2010 and compounded daily for the month of August, 2010. Soverain is awarded its prejudgment Costs of Court. Soverain is entitled to post–judgment interest for any time period between the entry of this Final Judgment and the date upon which Soverain receives payment from Newegg as ordered herein. For reasons stated in the Court's contemporaneouos Memorandum Opinion and Order, Newegg is ordered for the remaining life of the '314 and '492 patents to pay Soverain an ongoing royalty of $0.15 per infringing transaction. All relief not granted in this Final Judgment is DENIED. All pending motions not previously |

| | | |
|---|---|---|
| | | resolved are DENIED. Signed by Judge Leonard Davis on 08/11/10. cc:attys 8–11–10(mll, ) (Entered: 08/11/2010) |
| 08/25/2010 | 437 | MOTION for Bill of Costs *(AGREED)* by Soverain Software LLC. (Attachments: # 1 Appendix, #2 Affidavit, #3 Exhibit, #4 Exhibit, #5 Exhibit, #6 Exhibit, #7 Exhibit, #8 Exhibit)(Smith, Debra) (Entered: 08/25/2010) |
| 08/25/2010 | | ***FILED IN ERROR. Document # 437, Bill of Costs. PLEASE IGNORE. To be refiled by Attorney*** <br><br> (gsg) (Entered: 08/25/2010) |
| 08/25/2010 | 438 | MOTION for Bill of Costs *(AGREED)* by Soverain Software LLC. (Attachments: # 1 Appendix, #2 Affidavit, #3 Exhibit, #4 Exhibit, #5 Exhibit, #6 Exhibit, #7 Exhibit, #8 Exhibit)(Smith, Debra) (Entered: 08/25/2010) |
| 08/30/2010 | 439 | BILL OF COSTS by Soverain Software LLC. Costs Taxed in the amount of $66,246.87. (Attachments: #1 Affidavit)(mll, ) (Entered: 08/30/2010) |
| 09/01/2010 | 440 | Unopposed MOTION for Bond *Newegg Inc.'s Unopposed Motion to Approve Supersedeas Bond for Purpose of Obtaining A Stay Pending Appeal* by Newegg Inc.. (Attachments: #1 Supersedeas Bond, #2 Power of Attorney of James E. Bass, #3 Text of Proposed Order)(Yarbrough, Herbert) (Entered: 09/01/2010) |
| 09/02/2010 | 441 | ORDER granting 440 Motion for Approval of Supersedeas Bond. Signed by Judge Leonard Davis on 09/02/10. cc:attys 9–02–10 (mll, ) (Entered: 09/02/2010) |
| 09/07/2010 | 442 | SEALED MOTION *Newegg's Renewed Post–Judgment Motions for Judgment as a Matter of Law of Non–Infringement and Invalidity of the Asserted Claims and Alternative Motions for New Trial* by Newegg Inc.. (Attachments: #1 Text of Proposed Order)(Yarbrough, Herbert) (Entered: 09/07/2010) |
| 09/07/2010 | 443 | SEALED MOTION *Newegg's Renewed Post–Judgment Motion for Judgment as a Matter of Law on Damages and Alternative Motion for New Trial or Remittitur* by Newegg Inc.. (Attachments: #1 Text of Proposed Order)(Yarbrough, Herbert) (Entered: 09/07/2010) |
| 09/09/2010 | 444 | RESPONSE in Opposition re 443 SEALED MOTION *Newegg's Renewed Post–Judgment Motion for Judgment as a Matter of Law on Damages and Alternative Motion for New Trial or Remittitur,* 442 SEALED MOTION *Newegg's Renewed Post–Judgment Motions for Judgment as a Matter of Law of Non–Infringement and Invalidity of the Asserted Claims and Alternative Motions for New Trial* filed by Soverain Software LLC. (Attachments: #1 Exhibit 1, #2 Text of Proposed Order)(Giannetti, Thomas) (Entered: 09/09/2010) |
| 09/10/2010 | 445 | NOTICE OF APPEAL – PATENT CASE as to 435 Judgment,,,,,, by Newegg Inc.. Filing fee $ 455, receipt number 0540-2663849. (Baldauf, Kent) (Entered: 09/10/2010) |
| 09/22/2010 | 446 | TRANSCRIPT REQUEST by Newegg Inc. (mll, ) (Entered: 09/22/2010) |
| 09/28/2010 | 447 | TRANSCRIPT REQUEST by Newegg Inc. (mll, ) (Entered: 09/29/2010) |
| 10/01/2010 | | Transmission of Notice of Appeal and Docket Sheet to US Court of Appeals for the Federal Circuit re 445 Notice of Appeal – PATENT CASE (mll, ) Modified on 10/1/2010 (mll, ). (Entered: 10/01/2010) |
| 10/01/2010 | 448 | ORDER denying 442 Sealed Motion; denying 443 Sealed Motion. Signed by Judge Leonard Davis on 10/01/10. cc:attys 10–01–10 (mll, ) (Entered: 10/01/2010) |
| 10/05/2010 | 449 | AMENDED NOTICE OF APPEAL as to 435 Judgment,,,,,,, 448 Order on Sealed Motion, by Newegg Inc.. (Yarbrough, Herbert) Modified on 10/6/2010 (mjc, ). (Edited text to add Amended.) (Entered: 10/05/2010) |
| 10/15/2010 | 450 | Appeal Remark re 445 Notice of Appeal – PATENT CASE, 449 Notice of Appeal : Received by USCA Federal Circuit on 10–08–10. (mll, ) (Entered: 10/20/2010) |
| 10/15/2010 | 451 | NOTICE of Docketing Record on Appeal from USCA Federal Circuit re 445 Notice of Appeal – PATENT CASE filed by Newegg Inc., 449 Notice of Appeal |

| | | filed by Newegg Inc.. USCA Case Number 2011−1009 (mll, ) (Entered: 10/20/2010) |

4

1   and, of course, Trey Yarbrough in Tyler.

2          THE COURT:  Mr. Yarbrough.

3          MR. SAYLES:  From the Webb Law Firm, this is Dan

4   Brean, Dave Hanson, and this is Ken Baldauf.  And with the

5   Court's permission we have in the courtroom Claudia Frost of

6   the Pillsbury Firm who will assist us on legal matters during

7   the trial.  And our client representatives and in-house

8   counsel Mr. Lee Cheng and Mira Wolff.

9          THE COURT:  Very good.

10         I must tell you I found out not too long ago who

11  Newegg was through a -- full disclosure -- a purchase I made

12  through Newegg, and it a very neat concept that you have

13  there.  All right.  Well, let's get down to this case -- and

14  if anyone wishes for me to recuse on that basis, I will be

15  glad to, and let this pass to someone else.

16         MR. ADAMO:  It depends on what you bought.  No, Your

17  Honor, obviously not.

18         THE COURT:  Thank you.  All right.  Well, we have

19  got a lot to do here today.  Let's get down to business.  I

20  think what I will do is start with the Daubert motions and

21  other expert-related motions.  So first let's hear Newegg's

22  motion with regard to -- Nawrocki?

23         MR. SATINE:  Nawrocki (different pronunciation.)

24         THE COURT:  Nawrocki.

25         Okay.  Mr. Brean.

5

1           MR. BREAN:  Good morning, Your Honor.  Newegg's

2    position with respect to its Daubert challenge to Mr. Nawrocki

3    is centered around his invocation of the entire market value

4    rule.  Essentially the rule exists as it is explained in the

5    Rite-Hite case and in Lucent v. Gateway.  The purpose of this

6    rule is to avoid overreaching by a patentee where they are

7    trying to encompass damages that extend beyond what is

8    traceable to the patented invention.

9           In this instance Mr. Nawrocki has taken the total

10   profit of newegg.com's online sales, the total value of each

11   sale and essentially applied the 25 percent rule, or as he

12   uses it, the 25 to 33 percent rule, to that entire profit.

13   Now, Newegg's profit is traceable to a multitude of sources

14   including the pricing variable to offer the quality of the

15   products, Newegg's award winning customer service, among many

16   other features of its website, its search functionality, and

17   the allegedly infringing shopping cart and session ID

18   functionality.

19          With respect to Mr. Nawrocki's methodology,

20   essentially, it is set forth in his report in Paragraph 100

21   where he takes Newegg's profit margins and applies those

22   margins to the average value of each sale to arrive at the

23   average profit, and then he explains that applying a 25 to 33

24   percent apportionment to these figures results in a royalty

25   range that equates to .75 dollars to $2.20 per order and his

6

1    $1.20 falls precisely in the middle of that range.

2              Now, the cases that we cited in our report, such as

3    the Cornell case, the Grain Processing case, it is clear that

4    some sound economic proof is required in order to invoke this

5    rule and take a percentage of profits that are attributable to

6    things other than the patented invention; and as set forth in

7    the Rite-Hite case, two of the things that have to be shown

8    would be (1) that the patented invention shares a functional

9    relationship with the -- what is included in the royalty base;

10   and (2) that the patented invention drives the demand for

11   everything that is included in the royalty base.  And, again,

12   as set forth in his report on Paragraph 100, the entire value

13   of each sale, the entire profit has been included in his

14   calculation.

15             Now, with respect to Mr. Nawrocki's methodology --

16             THE COURT:  Are you talking about the total value of

17   each sale or the profit from each sale?

18             MR. BREAN:  The total profit from each sale is what

19   he uses --

20             THE COURT:  The total profit.  So not gross revenue

21   but net profit basically -- or gross profit, I guess?

22             MR. BREAN:  Yes, Your Honor.

23             THE COURT:  What does the plaintiff have to say in

24   response to that?

25             MR. SATINE:  Good morning, Your Honor.  This

7

 1    argument is really a strawman.

 2          THE COURT:  Really a what?

 3          MR. SATINE:  A strawman.  There is no use of the

 4    entire market value rule by Mr. Nawrocki.  He has made that

 5    clear at his deposition and in his report.  What has happened

 6    here is in determining a royalty, there is the royalty base

 7    and the royalty rate.  The entire market value rule applies to

 8    the royalty base.  Mr. Nawrocki's royalty base is the number

 9    of transactions which infringe the patents.

10          Mr. Nawrocki uses that as his royalty base.  He then

11    determines a royalty rate and in calculating a royalty rate,

12    multiplied against the royalty base.  One of the things that

13    he looks at is the average revenue per infringing transaction

14    and he calculates what is a rate with respect to that average

15    sales revenue from the infringing transaction.

16          It is not -- yes, when you multiply all of the

17    numbers it is going to be there somewhere in the equation what

18    their revenue is because their revenues are using -- engaging

19    in a transaction.  The transaction is the infringement.  So in

20    calculating a rate, one of the things an expert has to look at

21    is how much is the transaction worth to the infringer?  But

22    then when Mr. Nawrocki looks at the base, the only thing he is

23    looking at --

24          THE COURT:  Is the number of transactions?

25          MR. SATINE:  Is the number of transactions which --

8

1    of the infringement.  That is not a violation of the entire

2    market value.

3             THE COURT:  What is your response to that?

4             MR. BREAN:  Newegg's response is that this is a red

5    herring; that Mr. Nawrocki doesn't say he invokes the entire

6    market value rule.  He says that he is basing his royalty on

7    the number of transactions; but, in fact, a reading of his

8    report reveals the only substantive calculation that Mr.

9    Nawrocki makes in his report that touches on where that $1.20

10   per transaction comes from is by taking Newegg's total profit

11   and applying the 25 percent rule.

12            This sort of, as we explain in our reply brief -- or

13   our surreply brief, Mr. Nawrocki's methodology, the

14   mathematics, has been manipulated in a way to appear as if he

15   is using the number of transactions; but, in fact, the

16   mathematics works out the same whether he had explicitly used

17   the entire market value rule or not.  Essentially, what he has

18   done is taken the average sale and taken 25 percent of the

19   profit from that sale and then multiplied by the number of

20   transactions.  Whereas, under a more direct approach under the

21   entire market value rule, he would simply take the royalty per

22   transaction and then multiply for each transaction -- I'm

23   sorry.  I think I got that backwards.

24            Under the entire market value rule, he would find

25   out the royalty base of the total revenues; and then instead

9

1    of taking it as an average, he would then already include the

2    number of transactions.

3             THE COURT:  All right.  The Court is going to deny

4    the Daubert motion, Docket No. 252.

5             All right.  Soverain's Daubert motion regarding

6    Tittel, Docket No. 253.  Who is going to be heard from

7    Soverain on that?

8             MR. ADAMO:  Dr. Shentov.  We have it split up,

9    hopefully, for efficiency.

10            THE COURT:  Okay.

11            MR. SHENTOV:  Your Honor, for your permission can I

12   stand here, because I have a PowerPoint presentation?

13            THE COURT:  As long as the Court Reporter can hear

14   you.

15            Can he plug in up there with his computer?  Well,

16   however you want.  However would be the fastest, you can go

17   ahead.

18            MR. SHENTOV:  Let me see if it works out.

19            Your Honor, the defendant to this case is one

20   technical expert for issues of infringement and validity, and

21   it is a very charming gentleman who has written books and is

22   quite knowledgeable.  However, it turns out that when the time

23   came for him to present expert reports and to help the jury,

24   allegedly at some point with scientific or technical or other

25   specialized knowledge, he really didn't do it.

1    the value of a license.

2          The defendant in this case points to a product, the

3    Transact product that Soverain offers, as a non-infringing

4    alternative, which would have been on the table at this

5    hypothetical negotiation.  Their position is that it is an

6    acceptable non-infringing alternative that can be part of

7    their expert's damage analysis in connection with the

8    determination of reasonable royalty.

9          In fact, they go so far as to say the price of a

10   Transact license should be pointed to -- would have been

11   pointed to by the hypothetical negotiator as a cap on what

12   they would have paid for a license under the patents-in-suit.

13         Well, there are a couple of problems with that, Your

14   Honor.  The first is that Transact is really not -- the

15   Transact license is not a patent license.  It is a software

16   license.  And that is not just a semantic difference.  As I am

17   sure you appreciate, a patent license allows you to design a

18   custom product, whatever you want, that is within the scope of

19   the patent.  Whereas, a software license allows you to use the

20   software.  It doesn't allow you to change the software.  It

21   doesn't allow you to make modifications to the software.

22         So this is an apples-to-oranges comparison.  It is

23   plainly not something that is contemplated by the hypothetical

24   negotiation.  They are negotiating for a patent license and

25   not for a software license, so we think it is irrelevant.

30

```
 1    other products that are out there, and they are all offered

 2    for various price points, and that is the reason for this.  We

 3    are by no means going to suggest that they are non-infringing

 4    alternatives.

 5           MR. GIANNETTI:  I don't see the relevance of these

 6    data points.  I don't see why the jury -- these should be

 7    presented to the jury.  There is a risk of confusion here.  I

 8    believe that this should be excluded.

 9           THE COURT:  I'm not real sure what they are, but I'm

10    going to grant the motion in limine at this time, but that is

11    not without prejudice to approaching the Bench first when we

12    get further into the testimony and explaining it to me a

13    little bit better, and maybe I will feel otherwise at that

14    time.

15           All right.  Is that all of Soverain's motions in

16    limine?

17           MR. GIANNETTI:  Yes, Your Honor.

18           THE COURT:  All right.  Newegg's motion in limine

19    No. 306, No. 2; preclusion of evidence relating to licenses of

20    the patents-in-suit where such licenses were entered into in

21    settlement of litigation.

22           MR. BALDAUF:  Yes, Your Honor.  This motion deals

23    specifically with the issue of the settlement agreements with

24    Amazon and the Gap and with the other defendants in this

25    case.
```

1          The plaintiff has agreed that they have no intention

2    of offering the amount at which these licenses were entered

3    into, but they still want to be able to get up there and say

4    that all these people are licensees of theirs.

5          For the life of me I cannot understand nor even

6    suggest how this is relevant.  It is not relevant to damages.

7    I have the recent decision by Magistrate Judge Everingham in

8    Data Treasury where he has specifically held that these types

9    of lump sum agreements are completely irrelevant when the

10   plaintiff is seeking a royalty under a running royalty theory.

11         These were all lump sum payments, have no bearing on

12   their damage case whatsoever, and they haven't been relied

13   upon by their expert.

14         Now, to the extent that the other reason they want

15   to be able to say this is that perhaps it lends some credence

16   to the validity of their patents by saying, well, Amazon is a

17   licensee, that is incredibly prejudicial.  Those settlement

18   agreements were all entered into under actual litigation.

19         Now, I submit probably the likely reason that Amazon

20   settled was that the MercExchange/eBay case had not been

21   decided yet and the threat of an injunction was still out

22   there.  Beyond that, their experts have not submitted any

23   opinion that they are going to be relying upon that as

24   secondary indicia of non-obviousness.  There is just

25   absolutely no basis that they should be able to back-door

32

1    these settlement agreements in such a way that would

2    incredibly prejudice the jury.

3            Besides the fact that we have these very high

4    settlement amounts out there, specifically Amazon's, if they

5    want to get out there and wave around the fact that Amazon is

6    a licensee, it prejudices the jury because they will sit back

7    and think, well, here is a sophisticated big company we have

8    all heard of, they have taken a license, that must mean there

9    is something to these patents.  While we all know that was

10   entered into to avoid litigation, there is no reasonable basis

11   for allowing that into evidence.

12           MR. GIANNETTI:  Your Honor, if this is a relevancy

13   issue, I would point to the Inline case in the District of

14   Delaware where it was clearly said that evidence of agreements

15   in general or policy of making a particular type of agreement

16   may be relevant as long as it does not extend to the terms of

17   the licenses granted the settlement of litigation.  This is

18   relevant to the issue of the strength of the patents and

19   commercial success, and our expert I believe did refer to this

20   in his report.

21           THE COURT:  You are not going into the amount --

22           MR. GIANNETTI:  No.  Neither side has listed the

23   license agreements, per se.  We are not going to tell the jury

24   the amounts.  We are not going to tell the jury the terms,

25   simply that these licenses have been entered into.  We want to

1    be able to identify the parties, and we want to be able to say

2    that the licenses have been entered into following litigation.

3           THE COURT:  You want to say they have been entered

4    into following litigation?

5           MR. GIANNETTI:  That would be the plan, Your Honor,

6    yes.

7           THE COURT:  And they are offering a number of

8    license agreements which they are going to say these are

9    companies people you have never heard of.  There are a slew of

10    licensing agreements that the prior owner of the patent

11    licensed.  They are going to be offering those, and we have

12    got to be able to respond to that, so they have really opened

13    the door to that kind of testimony.

14           I think what we are asking for here, I don't think

15    it really falls under the Data Treasury rule that Counsel was

16    talking about or the ResQNet case and its progeny.  That is

17    really not what we are talking about here.  We just want to

18    tell the jury that these patents have been licensed, to whom

19    they have been licensed, and what the circumstances were.  And

20    that's it.  We are not trying to confuse the jury.

21           THE COURT:  What is the relevance of that?

22           MR. GIANNETTI:  Well, the relevance of the licenses

23    and the fact that there have been licenses and the

24    individuals, first of all, it is relevant because we need to

25    answer their charge that we have licensed these patents but to

1    a bunch of no-name companies.

2            Secondly, it is relevant to the issue of commercial

3    success of the patents. I mean the fact that some major

4    companies have taken licenses I think it is something that the

5    jury should hear about the strength of our patents.

6            MR. BALDAUF: Your Honor, if I may?

7            THE COURT: Yes, go ahead.

8            MR. BALDAUF: I didn't mean to interrupt. I would

9    like to address two points. First of all, this issue with the

10    Divine licenses. We went -- in our expert's deposition we had

11    listed a number of these licenses that their predecessor had

12    entered into, Divine. During the deposition they made a point

13    that some of these were entered into in settlement of

14    litigation. I personally went through all of the hundreds of

15    thousands of documents that they produced and determined which

16    ones were entered into under settlement of litigation, and we

17    took those off the list. We are not going to mention them.

18    We are not going to talk about them.

19            There is absolutely no reason these should come in.

20    I could be wrong. I've been wrong many times before. But I

21    don't believe there is any reference to any of these

22    agreements in any of their expert reports as a secondary

23    indicia of non-obviousness.

24            But beyond that, you just heard him say it, they

25    want to be able to get up here and say that Amazon took a

35

1    license, Amazon is a licensee of this.

2            Well, what is anybody going to think?  Anyone is

3    going to think that, wow, that is an arm's length deal.

4    Amazon wanted that technology.  Amazon saw something there.

5    They took a license.  But that case was in this very

6    courtroom.  Amazon certainly didn't do that willingly.  Amazon

7    certainly didn't seek out this technology.

8            It is so incredibly prejudicial and will

9    unquestionably leave the jury with the thought in their mind

10   that there was some sort of willing component to this.  It is

11   probative of nothing.  Amazon tried to avoid spending money in

12   the threat of an injunction.  I think we all know that.

13           MR. GIANNETTI:  How am I going to answer when he

14   puts in all these Divine licenses and says, look at all these

15   licenses?  These are to companies that you have never heard of

16   before.  We have to be able to tell this story to the jury,

17   Your Honor.  It is not fair to have him do that and not allow

18   us to put in -- we are not putting in the terms --

19           THE COURT:  What is he going to be putting in?

20           MR. GIANNETTI:  We are just putting in the names of

21   the licensees, the fact that they took licenses.  And we also

22   would like to be able to mention that these resulted from

23   litigation, but certainly --

24           THE COURT:  No.  I am saying what are you seeking to

25   rebut that he is putting in?

1          MR. GIANNETTI:  He is putting in all of these Divine

2     licenses.  I don't know how many they are putting in --

3          THE COURT:  What kind of licenses?

4          MR. GIANNETTI:  Divine was a company.

5          THE COURT:  Okay.

6          MR. GIANNETTI:  After Open Market there was Divine,

7     and Divine licensed the patents widely, and there were a

8     number of companies that they gave licenses to.  Divine is the

9     name of the company, the licensor.

10          And these licenses are going to come into evidence

11     and many of them are to small companies, very small companies

12     that probably nobody has ever heard of.  They weren't for a

13     lot of money.  These licenses were for -- you know, the

14     company was in dire straits.  So they put out these licenses.

15     That is all going to come in.  But we think we should be able

16     to tell the other side of the story, which is that there were

17     some substantial companies that took in licenses.  We are not

18     going to put in the amounts, we are not going to put in the

19     terms of the license, but we need to tell that to the jury.

20          THE COURT:  I'm going to deny the motion in limine.

21          All right.  What else?  Is there anything further

22     from Newegg?

23          MR. BALDAUF:  That's it, Your Honor -- excuse me,

24     I'm sorry.  There is one other issue that Ms. Frost would like

25     to --

1              MR. SAYLES:  First of all, may I address something

2      else?

3              THE COURT:  Yes.

4              MR. SAYLES:  In the event that they offer these

5      settlement licenses and we object and it is overruled,

6      consistent with your denial of the motion in limine, would we

7      then have the ability, if we want to, to put in the fact that

8      these are lump sum agreements because we have the competition

9      in this case of them seeking a running royalty and us putting

10.     forth a lump sum?

11             It seems to me that they shouldn't have the cake and

12      eat it too to put in settlement licenses and say they are not

13      going into amounts but leave us with the inability to point

14      out that these were lump sum settlements?  So I inquire

15      because I want to --

16             THE COURT:  If you put in they were lump sum

17      settlements, would you let them put in the amounts that were

18      paid?  Would you object to that?

19             MR. SAYLES:  Well, we don't think the amounts should

20      come in.  If that was the option we were faced with, we would

21      have to decide whether it was worth it or not.  But the Amazon

22      settlement was $40 million, and that sounds like a lot of

23      money over there in the jury box.  So my inclination is, right

24      now, that we wouldn't want that amount in but these settlement

25      licenses were indeed lump sums.

1          MR. GIANNETTI:  We are not putting the amounts in,

2    Your Honor.  I don't think there is any need to tell them what

3    the terms were.

4          THE COURT:  What is your response to his request to

5    put in that they were lump sum settlements instead of running

6    royalties?

7          MR. GIANNETTI:  Well, not if we are not going to

8    tell them what the amounts are.  If the terms aren't coming

9    in, they shouldn't come in for either party.  We are not going

10   to tell the jury that Amazon paid $40 million.

11         THE COURT:  I think that they are entitled to put in

12   the fact that this technology was licensed to Amazon and

13   others, to rebut what you are putting in regarding the Divine

14   licenses.  But how much further you go -- this becomes a very

15   slippery slope -- if you then want to put in that they were

16   lump sum instead of paid-up royalty, then I'm going to let

17   them put in the amounts of the settlement.

18         You know, y'all need to think that through, and I

19   wish y'all could discuss it and decide before we get in the

20   middle of trial to do that --

21         MR. GIANNETTI:  I can say that we don't intend to

22   put in the amounts right now, Your Honor.

23         THE COURT:  I know you don't, but if they want to

24   put in that they were lump sum, then I would allow you to put

25   in the amounts is what I am saying.

1              MR. GIANNETTI:  In other words, if they want to put

2      in the lump sum, then we get to put in the amounts?

3              THE COURT:  That's right.

4              MR. GIANNETTI:  We would prefer no terms at all.

5              THE COURT:  I think that would be simpler because

6      you get on this slippery slope of retrying -- it just starts

7      going into a whole other case, so I am inclined at this time

8      with stopping it, with letting them just put in it was

9      licensed.  You think about it, if you want to really urge, I

10     will consider that later -- I'm not going to rule on it right

11     now, but I will look at it.  But I will give you a heads-up

12     that if you pursue that course and I did go that far, then I

13     would let them put the amounts in.

14             MR. SAYLES:  I understand.

15             MR. GIANNETTI:  Thank you, Your Honor.

16             MR. SAYLES:  Can I mention something to Mr. Baldauf

17     that I want him clarify?

18             THE COURT:  Okay.

19        (Pause in proceedings.)

20             MR. BALDAUF:  Your Honor --

21             THE COURT:  Let me say this further about that last

22     issue we were talking about:  I think really what is at issue

23     or what has been put in issue is the fact of licensing.  Once

24     we get beyond that and start getting into the terms of the

25     license, neither one of you have relied upon those for your

40

1   damage experts, so I would really rather probably not get into

2   all that area.  Okay.

3          MR. SAYLES:  I think I would probably not, but if I

4   can take the Court up on thinking about it.

5          THE COURT:  Think about it.  But -- how long do you

6   need to think about it?

7          MR. SAYLES:  Well, I can let you know before we

8   start on Monday morning.

9          THE COURT:  Why don't you let Mr. Giannetti know of

10  your position by, say, Thursday at noon.

11         MR. SAYLES:  I can do that.

12         MR. GIANNETTI:  It is a problem, Your Honor, because

13  this was not something factored into the expert reports.

14         THE COURT:  I think it would be a problem for both

15  sides the further we go down that road.  So I would rather

16  just stay in the shallow water.

17         Go ahead.

18         MR. BALDAUF:  Mr. Sayles reminded me of two other

19  things.  When we were discussing the issue of the expert

20  report, we spoke just about the '639 patent, and you had also

21  mentioned Claim 61 of the '492 patent, which is a dependent

22  claim.  We have no intention of having our expert address that

23  claim in the context of infringement.  We will just focus upon

24  the underlying independent claim that was addressed.

25         With respect to invalidity, this claim offers

1  in the time period before the license.

2              And here that's not an issue, because the

3  entire damage period here is after, well after --

4              THE COURT:  All right.  How -- how

5  important is it for you to mention this in your opening

6  statements?

7              MR. BALDAUF:  It's extremely important to

8  us, Your Honor, because this is another software product

9  that was out there that was licensed with this

10  technology, and we believe it's a non-infringing

11  alternative that was available to Newegg.

12              THE COURT:  All right.  I'm going to

13  grant the motion in limine at this time.  Don't mention

14  it in opening statement, and I'll give you a ruling on

15  the admissibility when it comes up during the course of

16  the trial.

17              MR. BALDAUF:  Real briefly, Your Honor,

18  with respect to one of the slides that has been proposed

19  by the Plaintiff, it appears that they're going to

20  reference the Amazon license, as well as the other

21  settlement licenses with the Defendants in this case, as

22  evidence of commercial success.

23              I'd like to bring your attention to the

24  decision in DataTreasury versus Wells Fargo from Judge

25  Folsom from a few months ago, directly on point of how

1  that these types of settlement agreements are not

2  evidence of commercial success.

3          Number one, there has to be expert

4  testimony from the Plaintiffs.  There has to be some

5  established nexus between those settlement agreements

6  and the recognized commercial success or value of the

7  patents as opposed to just the design to avoid for

8  litigation, and that has not been done.  In fact, it's

9  nowhere in the any of their expert reports.

10          MR. ADAMO:  Very brief response, Your

11  Honor.

12          Mr. Sayles is going to use this slide in

13  his opening, which he's removed the names of the various

14  licensees, which was on the version that I was given

15  last night; but he has informed me in good candor that

16  the names are going to be mentioned during trial.

17          About five minutes.  These are agreed

18  exhibits.  This stuff is all going to be in evidence.

19  There's no requirement under law that evidence of

20  secondary considerations, including commercial success,

21  has got to be in an expert report.  It is, by the way,

22  in Professor Shamos' expert report.  So it is there and

23  certainly in his slides, which come directly from his

24  report.

25          Two things that Mr. Giannetti mentioned

8

1    when you ruled in our favor last Monday to allow us to

2    name the licensees -- and I didn't put the -- the

3    numbers are not down here.  I even changed the heading

4    to take off any reference to commercial success -- and

5    we told them this last night -- to make this more

6    neutral.

7                   This is exactly what Mr. Giannetti argued

8    to Your Honor a week ago today that you allowed us to

9    do.  The Plaintiffs -- well, his position is, no small

10   licensees, and that's not going to be the situation for

11   more than about probably 10 minutes.

12                  And I think the position is, you've got

13   to have experts discuss commercial success, which is not

14   the law, but in any event, Dr. Shamos has it, and we

15   should be allowed to use this, Your Honor.

16                  THE COURT:  Response?

17                  MR. BALDAUF:  Your Honor, we -- with

18   respect to the point of mentioning that there are larger

19   licenses, that's not what we're talking about here.

20                  We're talking about the issue of

21   commercial success in that reference.  And there's been

22   no established link between these settlement licenses

23   and commercial success.

24                  THE COURT:  Now, are y'all going to

25   mention the licenses?

9

1            MR. BALDAUF:  We have no interest in

2    mentioning the Amazon license whatsoever, as we put in

3    our motion in limine to begin with.

4            MR. ADAMO:  Your Honor, they've moved

5    into evidence and we've agreed, we're about to read the

6    list into the record, all the small licenses, exactly

7    the issue Mr. Giannetti argued to Your Honor last week

8    when you allowed us to do what's in my -- in my slide.

9            MR. BALDAUF:  Which were not in

10   settlement litigation.

11           MR. ADAMO:  Your Honor, that -- this has

12   all been argued last week.  Nothing has changed.  This

13   is exactly what you allowed us to do.

14           THE COURT:  All right.  I'm going to --

15   I'm going to grant their objection.  Don't go into that

16   in opening statement, and I'll take it up when we get

17   into the evidence.

18           Bring the jury in.

19           COURT SECURITY OFFICER:  All rise for the

20   jury.

21           (Jury in.)

22           THE COURT:  All right.  Each member of

23   the jury, come back down to these four seats on the

24   front row down on this end, please.

25           Thank you.  I think it will be easier for

48

1  opening statements, which will take about an hour.

2                So be in recess until 10:25.

3                COURT SECURITY OFFICER:  All rise.

4                THE COURT:  You may follow the Court

5  Security Officer to the jury room.

6                (Jury out.)

7                COURT SECURITY OFFICER:  All rise.

8                THE COURT:  Please be seated.

9                All right.  Let me revisit this license

10  issue.  I need to know -- what I want to know from

11  Newegg is, are you going, in opening statement, to go

12  into your argument that Soverain has only listed --

13  licensed these patents to these small no-name companies?

14                MR. SAYLES:  Yes, we are.

15                THE COURT:  Okay.  If you're going to go

16  down that road --

17                MR. SAYLES:  I'm sorry, sir.

18                THE COURT:  Excuse me.  Go ahead.

19                MR. SAYLES:  Not by name, but I would say

20  we're definitely going to make reference to that.

21                THE COURT:  Okay.  Well --

22                MR. SAYLES:  The names are not --

23                THE COURT:  You know, my mind -- I've had

24  two or three cases going here.  I'm getting this one

25  squared back in.

49

1              And I believe Mr. Adamo was correct, that

2    in the prior pretrial, I said that if you went into

3    that, they would be able to go into the fact that they

4    had licensed to significant companies, but they would

5    not go into the amounts, and we would not get into all

6    that settlement stuff.

7              I think both sides agreed they did not

8    want to get into that mess; is that right?

9              MR. SAYLES:  That's right.

10             THE COURT:  Okay.

11             MR. ADAMO:  That's correct, Your Honor.

12             THE COURT:  Okay.  So that's all you're

13   going to say?

14             MR. ADAMO:  You saw the slide.  All I'm

15   going to do --

16             THE COURT:  No, I didn't see it.

17             MR. ADAMO:  Oh, I'm sorry.

18             THE COURT:  You held it up, but I

19   couldn't read it.

20             MR. ADAMO:  My apologies, Your Honor.

21             THE COURT:  Okay.  All right.

22             MR. ADAMO:  That's -- that's all the

23   slides.  That's all I will --

24             THE COURT:  Do you have any objection

25   with that?

1          MR. SAYLES:  That slide would be

2  consistent with your ruling in the pretrial.

3          THE COURT:  Okay.  So what was your

4  objection this morning about then?

5          MR. BALDAUF:  Your Honor, it was the

6  reference to these licenses with the entities that have

7  been previously sued as evidence of commercial success

8  as a secondary consideration.

9          Amazon,  ███, all of these entities that

10  settled --

11          THE COURT:  Isn't that what I just talked

12  about that we decided at the pretrial?

13          MR. BALDAUF:  Well, it's how they're

14  referenced, Your Honor, the idea of whether they can be

15  referenced, the fact that they exist or whether he's

16  going to go into the fact --

17          THE COURT:  Okay.

18          MR. BALDAUF:  -- that these are evidence

19  of secondary consideration on obviousness.

20          THE COURT:  All right.  How are you going

21  to reference them, Mr. Adamo?

22          MR. ADAMO:  Your Honor, all I was going

23  to do was -- and I apologize.

24          Casey, can you put 22 up?  There's the

25  slide, Your Honor, if you can see it on the monitor.

```
1                THE COURT:  Right.  Okay.

2                MR. ADAMO:  And I was simply going to put

3   that up, and this has in a series -- short series of

4   slides where I talk about contemporaneous recognition of

5   the inventions.

6                I was going to simply put the slide up

7   and say Soverain Software has also licensed the patented

8   technology, and this is a list of the licensees.  That

9   was it.

10                THE COURT:  Okay.  All right.  Is there

11   any objection to that, if that's as far as he goes?

12                MR. BALDAUF:  We don't maintain the

13   objection in that -- in view of the fact that these are

14   in settlement of litigation, we don't believe they're

15   proper to put up.

16                THE COURT:  Well, I'm not sure I want to

17   get into settlement litigations, but if y'all are going

18   to take the position that it's only been licensed to a

19   bunch of no-name companies, I think they're entitled at

20   least to show that it has been licensed to big-named

21   companies.

22                But I don't think y'all want to get into

23   the amount.  I don't want to get into the amount.  I

24   don't think the others do.  But if -- if -- you know,

25   this is a tricky slope, once we start getting into them.
```

 1              But you're teeing it up by arguing that

 2    they have not licensed it.

 3              MR. BALDAUF:  Well, Your Honor, I think

 4    there's a significant difference in that in the first

 5    instance, the agreements that we're relying on have not

 6    been entered into in settlement of litigation, and these

 7    have been.

 8              THE COURT:  Okay.  But I'm -- I'm not

 9    going to let the jury just see half the picture.  So

10    even though these were entered into in settlement of

11    litigation, they were significant licenses, so...

12              All right.  You may go into that,

13    Mr. Adamo.

14              Bring the jury in, please.

15              MR. ADAMO:  Can I restore the slide?

16              THE COURT:  Yes, you may.

17              MR. ADAMO:  Thank you, Your Honor.

18              (Jury in.)

19              THE COURT:  All right.  Please be seated.

20              All right, Ladies and Gentlemen of the

21    Jury.  We're now going to hear the opening statements.

22    The Court will recognize Mr. Adamo, who I don't believe

23    you met last week.  I think he was stranded in Europe

24    somewhere due to the volcano going off, but he's --

25              MR. ADAMO:  I was being held captive by a

54

1   technical problems that had severely restricted online

2   shopping development when the internet first became

3   available for public use, which was in 1991, and the

4   worldwide web was developed in 1991 and 1992.

5              They created solutions that the industry

6   and even Newegg's technical expert recognized were

7   technically innovative.  These solutions strongly

8   influence right to this day online shopping, what

9   sometimes is referred to as E-commerce.

10             Soverain Software is the successor in

11  ownership, the later owner of the patents-in-suit that

12  resulted from those inventions.  We're here because we

13  seek payment, as provided by the law, for Newegg's use

14  of these inventions in a very successful business that

15  has turnover of over $2 billion a year in online

16  shopping.

17             I want to spend just a little bit of time

18  talking about technology.  Dr. Grimes, our first

19  witness, is going to get into this with y'all in a

20  little more detail.

21             The technology involved in this case, as

22  Mr. Roth told you last Monday, is the internet and a

23  part of the internet that's called the worldwide web.

24             Sixteen years ago, when this work was

25  first done, online shopping -- to the extent anything

69

1  at that time.

2              And licenses continue, now that Soverain

3  owns the patents, to companies such as amazon.com,

4  TigerDirect, Zappos.

5              All right.  Who's Newegg, right?  Why are

6  we chasing Newegg around?  Are we picking on some poor

7  person here that's inappropriate?  Hardly.  Newegg is

8  the second largest online shopping company in the United

9  States.  Only amazon.com is bigger.

10             THE COURT:  Mr. Adamo, you have ten

11  minutes left.

12             MR. ADAMO:  Ten, Your Honor?

13             THE COURT:  Ten.

14             MR. ADAMO:  Thank you, sir.

15             Newegg was founded in 2001, okay?  They

16  own and run the website www.newegg.com.  And since the

17  lawsuit started -- this lawsuit started in 2007 --

18  they've actually launched two new websites,

19  neweggmall.com and newegg.ca, which is a website based

20  in Canada.

21             Newegg has been in the process of making

22  a number of filings with the Securities and Exchange

23  Commission relating to something they're doing with

24  their business.

25             And in those filings, they're describing

1           He is going to give you his opinion on

2    what the reasonable royalty per order or transaction

3    should be, and he will explain this in detail.  It's 80

4    cents for the '314 patent or the '492 patent together;

5    40 cents for the '639 patent; all in a dollar twenty.

6           Now, you're going to hear from Newegg

7    that we're ripping them off; that this is just an

8    unconscionable amount of money, because when you take

9    the dollar twenty, and you multiply it by the

10   two-and-a-half approximate years that we say they owe us

11   royalty for, last year, 12 million transactions, when

12   you add that all up, you come up with a big number.

13           I'm not denying $34 million is a big

14   number.  But why is it a big number?  Not because we're

15   doing anything improper or overreaching; it's a big

16   number simply because the extent, the breadth of

17   Newegg's use of the technology, 2-plus billion dollars a

18   year, that's the reason the number is so big.

19           Last point.  As His Honor told you, we

20   don't have to prove the patent valid; they've got to

21   prove it's invalid.  They have all sorts of different

22   arguments that you heard His Honor mention that they may

23   bring up.  Whatever they bring up that they previously

24   told us about, we will respond.

25           The gentleman on the screen right now,

3

```
 1              P R O C E E D I N G S
 2              COURT SECURITY OFFICER:  All rise.
 3              (Jury in.)
 4              THE COURT:  Please be seated.
 5              All right.  Mr. Adamo, you may begin.
 6              MR. ADAMO:  Thank you.
 7              Your Honor, Soverain Software calls as
 8  its first witness Dr. Jack Grimes.
 9              THE COURT:  All right.
10              MR. ADAMO:  Your Honor had swore
11  Mr. Grimes earlier, and I hope I wasn't being
12  presumptuous; but in the interest of saving some time, I
13  had asked him to come up and be seated in the witness
14  box.
15              THE COURT:  That's an excellent idea.  I
16  appreciate you doing that.
17              MR. ADAMO:  All right.  May we proceed,
18  Your Honor?
19              THE COURT:  Yes, you may.
20              MR. ADAMO:  Ladies and Gentlemen,
21  Dr. Grimes; Dr. Grimes, Members of the Jury.
22              MR. GRIMES:  Good afternoon.
23         JACK GRIMES, PLAINTIFF'S WITNESS, SWORN
24                  DIRECT EXAMINATION
25  BY MR. ADAMO:
```

4

1     Q     Where do you live?

2     A     I live in Sparks, Nevada.

3     Q     And what have you been asked to testify about

4  today as you understand it, Dr. Grimes?

5     A     I'm giving some material -- I've prepared a

6  tutorial and some background information, but the main

7  purpose is to -- is to present a comparison of the

8  claims of the three patents-in-suit and the way the

9  Newegg system works.

10     Q     Do you feel you're qualified to give an

11  opinion to the jury in this case, Dr. Grimes?

12     A     Yes, I do.

13     Q     Why?

14     A     Well, I have had quite a bit of industry

15  experience, working in the industry, regarding payments.

16               MR. ADAMO:  Ms. Ferguson, is the

17  microphone on, or Dr. Grimes just needs to get a little

18  closer?

19               All right.  Doctor, if you can lean in a

20  bit.

21               THE WITNESS:  Okay.

22               MR. ADAMO:  And, Ms. Ferguson, can we ask

23  for the lights, please, ma'am?

24               Thank you very much.

25     Q     (By Mr. Adamo) Dr. Grimes, I'm going to put up

5

 1   on the display system, but you should have a copy of it

 2   in your binder there as well, a copy of a document that

 3   is in evidence, Exhibit 7.

 4           Do you recognize that?

 5       A   Yes, I do.  This is my resume, or sometimes we

 6   call it a CV for curriculum vitae.

 7       Q   Is it pretty much up to date?

 8       A   Yes, it is.  The date on this is last year,

 9   and it's substantially the same as it was then.

10       Q   If you would, could you summarize your

11   educational background for us, please.

12       A   Yes.  I received three degrees in electrical

13   engineering; a BS, an MS, and a Ph.D., from Iowa State

14   University.  And when I got my Ph.D., my minor was in

15   computer science.

16       Q   Any other education, formal education, Doctor?

17       A   Yes.  About 10 years later, I received a

18   second master's degree in experimental psychology that

19   dealt with design of computer and user interfaces.

20       Q   What is your recent work focused on?

21       A   The -- well, in terms of work experience?

22       Q   Well, what -- let's just say since the

23   mid-1990s, what have you -- what have you been working

24   on?

25       A   Oh.  I was -- I've been involved in working in

6

1    the industry for, you know, 30-some years.  And in the

2    mid-1990s, I worked for two payments companies, a small

3    company called IC Verify and a -- one of the most

4    well-known companies in the world, Visa International,

5    Visa, the credit card company.

6        Q    All right.  Let's jump by IC Verify then and

7    talk about Visa International.  What position did you

8    hold with Visa?

9        A    When I was with Visa, I was a senior vice

10   president, and I was responsible for several areas,

11   including architecture of the back-office systems, as

12   well as the Smart Card Program.

13            And I had a development group developing

14   software for Smart Cards and had a small group dealing

15   with internet transactions for internet commerce.  It

16   was called Secure Electronic Transactions.  It was a

17   very high-security payments system designed for use on

18   open networks, such as the internet.

19       Q    Did you leave Visa and then go the work for a

20   company called ServiceHub, Doctor?

21       A    Yes, I did.  ServiceHub was a startup, and

22   their -- they had a combination of a web system, and

23   they used web browsers, which at the time were very new

24   and were on the cell phones.

25            So it was a communication between the

7

 1   service -- the web service on the internet and the

 2   browser on the cell phone.  The company dealt with

 3   dispatching, like courier services.

 4       Q    And what position did you hold there?

 5       A    I was the chief technical officer at

 6   ServiceHub.

 7       Q    All right.  Currently, what do you do for a

 8   living?

 9       A    Well, currently, I'm semi-retired, so I'm -- I

10   do some litigation consulting support, which is why I'm

11   here today, and I also am on the board of a startup

12   company, and I do some other minor consulting.

13           And then I do the things -- semi, I do the

14   things retired people do.  I play racquet ball in the

15   mornings and go hunting in the hills of northern Nevada

16   and so on.

17       Q    Would you care to adopt me, Doctor?

18           MR. ADAMO:  All right.  Sorry, Your

19   Honor.

20       Q    (By Mr. Adamo) What types of -- you said you

21   did legal consulting services.  Tell the Ladies and

22   Gentlemen of the Jury, if you would, what type of

23   services that involves.

24       A    That involves -- I have an office at home, and

25   that involves primarily doing analysis work.  I do lots

8

1   of reading of documents that are produced in patent

2   litigation, such as this one; and then I form opinions

3   about, much like this case, do the claims of the

4   patent -- given the Court's construction for what the

5   terms mean in the claims, does that match up or does it

6   not match up with the -- with the way that the accused

7   systems operate.

8        Q    Before you started your work on this lawsuit,

9   did you ever consult on projects involving internet

10  commerce or what I was calling earlier online shopping?

11       A    The primary work I did prior to this case was

12  when I was at Visa, and we dealt with the transaction,

13  the payment portion, of internet -- internet commerce

14  systems.

15       Q    Have you made presentations at scientific

16  meetings during your career relating to internet

17  commerce?

18       A    Yes, I have.  When I was with Visa, I made

19  presentations internationally, but the one I remember

20  most was a particular meeting in Southern California

21  where I talked about the electronic transaction effort

22  that Visa was doing.

23            The project at Visa was a joint effort between

24  Visa, MasterCard, Microsoft, and Netscape.

25       Q    Professional societies or organizations,

9

1  Dr. Grimes, what involvement with those types of groups

2  have you had, briefly?

3      A    For decades now, I've been a member of the

4  IEEE, which is Institute of Electrical and Electronics

5  Engineers, which is primarily a professional association

6  of primarily hardware people, really electrical

7  engineers.

8          And I also belong to ACM, which is sort of the

9  software counterpart, if you will.  And both

10  organizations deal with all aspects of computers, but

11  the ACM is primarily concerned with programming

12  computers and computer software issues.

13      Q    Does your previous experience, in your view,

14  relate to the issues that we've asked you to testify

15  about in this case?

16      A    Yes, it does.

17      Q    In what fashion?

18      A    Well, I've dealt with the -- with the issues

19  about internet commerce, in particular, how the payments

20  are done.

21          And Visa, for example, is the -- is just

22  paranoid about security.  They -- they're very concerned

23  with the security of transactions, because they're owned

24  by banks.  Banks are very conservative organizations.

25          And so I became -- very, very heightened

1  awareness of the issues associated with doing proper

2  transactions and making sure that the transactions were

3  handled in a secure manner so that someone eavesdropping

4  on the communication would not be able to intercept any

5  of the information.

6      Q    Have you ever testified as an expert in a

7  lawsuit before as you're doing right now?

8      A    Yes, I have.  I've been involved in testifying

9  in two previous jury trials and at four ITC hearings,

10  which are what you guys refer to as trials, but

11  they're -- they have all the characteristics of a trial.

12  There's just no jury involved.

13          So those six locations, there was testimony

14  much like I'm giving here today in terms of the format.

15      Q    I think earlier counsel for Newegg

16  characterized you as a professional expert.  Do you

17  typically get paid to testify, Doctor?

18      A    No, I do not get paid to testify.  I'm paid

19  for my time, basically.  It's a -- I work by the hour

20  essentially.  And I provide my opinions about the

21  results of my analysis, and I get paid for the time I

22  spend doing that analysis, basically, and here today

23  describing the results of them.

24      Q    Are you getting paid to appear today in this

25  case?

1      A    Only in terms of the -- my hourly -- hourly

2  pay.

3      Q    Does your -- as you understand things, does

4  your compensation depend on what conclusions you reach

5  or whether Soverain wins this case?

6      A    No, it does not.  Does not depend on that at

7  all.

8      Q    All right.  Let me the turn your -- thank you,

9  Doctor.  Let me turn your attention now to the specifics

10  of the subjects that we're involved with here today.

11  I understand you've prepared a slide as part of your

12  PowerPoint presentation where you're going to describe

13  what you're here to testify about.

14          Am I recalling that correctly?

15      A    Yes.

16          MR. ADAMO:  Would you bring that slide up

17  on the system.

18      Q    (By Mr. Adamo) And then explain to the Ladies

19  and Gentlemen of the Jury what topics you're going to

20  cover in your testimony.

21      A    I have these four topic areas.

22  First of all, I'll try and supplement some of the

23  tutorial information that you've already heard from

24  Judge Davis.  And I have one slide, which is a brief

25  background of the Newegg system.

12

1    Then I thought it would be helpful to go through a

2    purchase example.  I made several purchases on the

3    Newegg website, and this is one of them that I took

4    great detailed records of, and I want to give you

5    some -- I won't go through all the slides of that, but I

6    want to give you a sample of what it's like, in case you

7    haven't yet purchased things from Newegg.

8              But the bulk of my material for today is in

9    Section 4.  In other words, the main reason for me being

10   here really is to give you the results of my analysis

11   where I took the claims, the Court's definition of what

12   the terms mean, the description we got from Newegg about

13   how their system works, and I made a comparison to see

14   if they matched.

15             And I'm here to present the results of that.

16   That's probably -- oh, probably three-quarters of the

17   time that I'll be presenting today will be just on Topic

18   No. 4.

19        Q    In your -- in your book --

20             MR. ADAMO:  And I'm going to ask to have

21   this put up on the presentation system.

22        Q    (By Mr. Adamo) Do you have a copy of

23   Exhibit 2, which should be a copy of the '314 patent?

24        A    Yes, I do.

25        Q    All right.  Is Exhibit 2, in fact, a copy of

13

1   the '314 patent?

2       A    Yes, it is.  This is the -- Exhibit 2 is the

3   '492 patent.

4       Q    Oh, I'm sorry.  All right.  '492.  Look at

5   Exhibit 1 then.  Hopefully, that's -- there.  That's the

6   '314 patent.

7       A    Yes.  Exhibit 2 is the '314 patent.

8       Q    All right.  I think we're talking sideways

9   here.  Let me -- I've confused things.

10           Exhibit 1 is the '314 patent, Doctor?

11      A    Yes, that is correct.

12      Q    And Exhibit 2 is the '492 patent?

13      A    Yes, that is correct.

14      Q    All right.  Now, were you in the courtroom

15  earlier where there was some discussion about

16  reexaminations for both of these patents?

17      A    Yes, I was.

18      Q    All right.  Would you look at -- well, let's

19  try Exhibit 4 first and see if that's one of the two

20  reexamination certificates.

21      A    Yes.  Exhibit 4 is the reexamination

22  certificate for the '314 patent.

23      Q    Do you have an understanding of what a

24  reexamination is?

25      A    Yes.  Well, as was described earlier,

14

1  basically, the Patent Office took a second look at the

2  validity of the '314 patent.  And this is the results of

3  their effort, which is that the claims of the '314

4  patent were -- were, again, confirmed as being valid.

5          And in addition, there were other claims that

6  were also allowed.

7      Q    All right.  Would you look in your binder at

8  Exhibit 5, which, hopefully, is the reexamination

9  certificate for the '492 patent; is that correct?

10     A    Yes.  The story is the same here.  This is --

11  again, there were questions about the validity of the

12  '492 patent, and the Patent Office issued this

13  certificate which confirmed the earlier claims of the

14  '492 patent and then also granted some additional

15  claims.

16     Q    All right.  And would you look in your binder

17  and tell me which exhibit the '639 patent is, if you

18  don't mind, Dr. Grimes?  I know it seems to be a little

19  less than clear.

20     A    Yes.  That is Exhibit 3.

21     Q    3.  All right.

22          And you've also studied the '639 patent,

23  correct?

24     A    Yes, the patent.

25     Q    Is there a reexamination certificate for the

15

1  '639 patent?

2      A    No, there's not.  The '639 was issued very

3  recently, in 2007, and so there have been no requests

4  that I know of before the Patent Office to re-examine

5  the '639.

6      Q    In the '639 patent, are there pages where the

7  art that was looked at by the Patent Examiner appear?

8      A    Yes.  There's a few on the cover page or the

9  first page, but the second page is -- and the third page

10  and the fourth page are completely devoted to -- five,

11  six, seven pages are completely devoted to other patents

12  and publications that were considered before the

13  granting of the '639 patent.

14      Q    Can you generally describe for us, in your

15  view, what the subject matter of the inventions of the

16  three Soverain patents is?

17      A    Yes.  The '314 and the '492 patent deal with

18  the -- a network-based sales system.  The sales system

19  includes both the ability to purchase products and pay

20  for them -- select them and pay for them, as well as the

21  ability to find out about history of the products that

22  you've purchased in the past.

23      Q    And what does the '639 patent deal with, to

24  your understanding, Dr. Grimes?

25      A    The '639 patent is called the session ID

1  patent, and it deals essentially with underlying

2  mechanisms that allow the communication to occur in an

3  effective manner between the client computer, which is

4  the -- let's say in your home -- home family room, and

5  the server computer, which is located in -- someplace in

6  cyberspace.

7      Q   I used the term session during my opening

8  statement for the jury.  Does the '639 patent have

9  anything to do with session management?

10     A   Yes.  The -- as was described earlier, there

11 was a basic problem in the way that the internet

12 operated if you wanted to try and do something like a

13 sales system.

14         If all you wanted to do was to retrieve

15 documents, then the internet worked just great.  And

16 that was the primary use of it for a long time.

17         And then when they wanted to build an internet

18 sales system, then they ran into this characteristic of

19 the internet that -- that it didn't really keep track of

20 where the previous request came from.

21         So when it got a second request, it didn't

22 realize it was from the same -- the same computer

23 system.

24     Q   Thank you, Doctor.

25         I'd like now for you to focus on what you said

1   you were going to help us all out with, the tutorial on

2   the subject matter that the patents deal with.

3           Why don't you start, if you would, by

4   explaining in non-Ph.D. terms, if you can, what the

5   internet is.

6       A   Certainly.

7           The internet is a network that just

8   interconnects computers and other networks.  So it's --

9   it's -- that's why it's the internet rather than just

10  network.  The internet accomplishes both things.

11          Here's a structural diagram that describes the

12  kinds of connections that can occur.  There are clients,

13  which represent computers that you or I may use that are

14  either in our office or at home.

15          And the internet is the -- you know, the

16  wiring in our house that connects us to this cloud

17  diagram here called the internet.  The internet

18  basically connects all computers together, okay, and

19  allows communication to occur among any -- any of them,

20  between any client and any server.

21          The servers here represent resources on the

22  network.  For example, the first -- the one on the left

23  here could represent -- I don't know -- the Weather

24  Channel and weather.com.

25          And you might go there to find out if we're

18

1    really going to have a thunderstorm this afternoon or

2    not.  It might show the radar, for example, for the

3    Weather Channel.

4           The other application server next to it has

5    another server attached to it, database server.  This

6    might represent, for example, the Patent & Trademark

7    Office.  It turns out, if you go to uspto.gov, the

8    Patent Office website, and put in a patent number, you

9    can actually obtain a patent.

10          So there have been millions and millions of

11   patents granted, and so those are all stored in this

12   database, which is attached to a database server.

13          So that's an example of a pretty powerful

14   application server.

15   Q    Just so I'm clear on this and I've confirmed

16   this for the Ladies and Gentlemen of the Jury, a client,

17   as you're showing on your slide right at the moment, is

18   a computer?

19   A    Yes.  These are actually all computers.  The

20   client is a computer which is -- has software on it that

21   allows it to send requests to --

22   Q    Is the internet open to the public?

23   A    Yes.  The internet is, in fact, a public

24   resource.  You can obtain free access to the internet by

25   going to certain places.  Like, you know, the downtown

19

1  of some cities have free internet access.  Some

2  restaurants have it.

3           Or if you want your service at home, you can

4  even pay for a higher speed service and have it -- have

5  it at your home.

6           But the internet per se, the internet itself,

7  is, in fact, free.

8      Q    The worldwide web, would you tell us what you

9  understand that to be?

10     A    Well, the worldwide web is often used

11  synonymously with the internet, just because the web is

12  such a popular use of the internet.

13          But the worldwide web is technically an

14  application that uses the internet.  Sometimes people

15  refer to the use -- refer to the web as the internet and

16  the internet as the web.  And that's a perfectly

17  reasonable thing to do, because the web is such a

18  popular way of using the internet.

19          Webs have -- they're worldwide literally, and

20  they contain a browser on your computer, as was

21  mentioned earlier today, and when you send the browser

22  to a particular location or the particular website, the

23  website returns a page, such as we have shown here.

24          These pages are pretty nice-looking.  In other

25  words, they're not just text, like they used to be.

1   They contain pictures, images or photographs and icons,

2   as well as text, as well as sounds sometimes.

3          You can -- you know, you can go to -- the

4   other night I went to a web location that was

5   broadcasting a hockey game.  So sometimes it's the sound

6   that's the most important.

7          But these web pages also, importantly, contain

8   this complicated term called a hypertext link, as you

9   just wanted to just call it a link this morning.  Links

10  are really connections to other web pages.

11         So, for example, I went to the hockey website,

12  and on that website was a link that said, you know, some

13  radio station, so -- and it was underlined.  And so I

14  clicked on it, and sure enough, I started hearing the

15  announcers broadcasting the hockey game.

16         You can tell -- sometimes it's a little hard,

17  by looking the page, to tell what are links and what are

18  just text, but when you move your mouse over the

19  particular regions of the page, it will change from a

20  pointer into a hand, and that tells you -- that tells

21  the user that it's a link.

22         And so then if you click the mouse at that

23  point, you will be taken to a web page.  What happens

24  underneath the -- underneath the cover, so to speak,

25  is -- is that the click generates a request; the request

1    goes out over the internet to the location that it's

2    sent to; and then the request returns a response, which

3    is probably another web page, which would then be

4    displayed on your screen.

5            So there's lots of ability to find out

6    information on the internet by using these web pages

7    with these links on them.

8        Q    Now, let's just briefly go back to web

9    browsers.  I don't want to beat this to death, but

10   just -- could you generally tell us what a browser does?

11       A    Yes.  A browser is an application that you

12   would load on your computer and run, and then the

13   browser allows you to receive and display web pages.

14           And the web pages take these actions when you

15   click on various links on the web page.

16           There's a second important thing for us today

17   that web browsers do that a lot of people are just not

18   aware of, and that is, is that automatically, if the

19   browser has been set up to operate this way, and

20   typically they are, the browser automatically receives

21   information from the website that you connect to, and it

22   stores this information.

23           It's called a cookie.  I have no idea why this

24   is called a cookie, by the way.  It seems to me like a

25   pretty odd term.  But it's called a cookie.  And the

1   cookie is stored by the browser on the client computer.

2          And the next time that you make a request to

3   the same website, the cookies that the browser stored

4   locally are, in fact, sent back with your request to the

5   server.

6          And each time that you are seeing displayed

7   new web pages under the covers, so to speak, these

8   cookies are traveling back and forth and are -- when

9   they're received by the client computer, they're being

10  stored on the -- on your local hard drive.

11     Q    All right.  Mr. Sayles made a big point in his

12  opening statement about cookies and how they're going to

13  demonstrate why Newegg doesn't infringe, so I'd like to

14  spend a little more time with you about cookies.

15         Mr. Sayles characterized a cookie as a flat

16  file.  Is that accurate?

17     A    Yes.  A cookie is just a string of characters.

18     Q    So XYZGQ1 could be a cookie?

19     A    Yes.  And the cookie has a name.  And so the

20  name, plus the information related with that name, are

21  stored in a file called the cookie file on the client's

22  computer.

23     Q    And the -- okay.  So the client computer --

24  I'm sitting at home.  I'm talking to a -- to a website.

25  Let's just -- for the sake of argument, amazon.com.

1  Where does the cookie come from in the first place?

2      A    The cookie comes from amazon.com servers.

3      Q    And then it gets sent into my computer?

4      A    Right.  It comes along with the web page,

5  basically.  So if you click on a product -- this is true

6  for Newegg.  It's true for really any web server.

7  When you click on a link that causes a web page to come

8  up, the web page comes to your computer, obviously, so

9  it can be displayed, but it comes along with cookies

10  almost always, and those cookies are stored locally.

11      Q    So the -- the computer that I'm trying to talk

12  to, to buy something from, puts this thing together and

13  shoves it into my computer?

14      A    Yes.  I have a diagram here that's probably a

15  little more --

16      Q    Okay.  Hopefully, better than talking about

17  shoving things into computers.

18      A    A little more clear.

19      Q    All right.  Could you explain to us what this

20  diagram shows with regard to the operation of the

21  cookies, please?

22      A    Yes.  This -- this deals with the --

23  essentially, the network communications.

24           So you're at the client and you click on link.

25  Okay.  The link then causes a service request to be

1 generated by the client, which goes over the internet to

2 the server.  The server then -- that's what servers do,

3 is they respond and provide service for requests.

4          So the server sends back a web page, let's

5 say, and along with the web page, it returns cookies

6 associated with your request to the server.  And those

7 cookies then are stored in this file, cookie file, what

8 was called a flat file earlier.  It's a cookie file on

9 the client's side.

10          Then with additional requests -- you might

11 click on more links, for example.  Every time you send

12 another request and another request and another request,

13 every request, the browser automatically attaches the

14 cookies that it has stored that it received from that

15 server to that request and sends those cookies back to

16 the server.

17    Q    All right.  Later on today, hopefully not too

18 much later on, when we get into the details of the

19 Newegg system, have you got some animations and some

20 other things that you've prepared so the jury can

21 actually see this whole thing work more or less in real

22 time?

23    A    Yes, I do.  The details of how the cookies

24 work are going to turn out to be very important in this

25 case, so I'll spend more time on that later.

25

1     Q    All right.  This point about how cookies work

2  in the Newegg system, that's what I mentioned, if you

3  recall, during my opening, was going to be one of their

4  arguments about why we're not responsible for

5  infringing -- or I'm sorry -- we don't infringe at all,

6  is that how you understood it?

7     A    Yes.

8     Q    And you've looked at this issue?

9     A    Yes, I have.

10     Q    All right.  Well, give us a little bit of a

11  preview.  In your view, do the cookies, as they function

12  in the Newegg system, mean that Newegg doesn't literally

13  infringe the claims in these patents?

14     A    No.  The cookies that -- the way Newegg

15  operates with them, in fact, meet the requirements of

16  the claims -- certain of the claim elements of the '639

17  patent.

18     Q    You heard mentioned earlier today about

19  literal infringement and Doctrine of Equivalents

20  infringement.  In your view, Dr. Grimes, does the

21  presence of the cookies block literal infringement here?

22     A    No.  The use of the cookies in the particular

23  way that they're used at the Newegg website matches

24  literally the requirements of the claim, based on the

25  Court's construction for how those -- what those terms

1  mean.

2      Q    All right.  As a -- as a belt and suspenders,

3  if I can put it that way, did you also do a Doctrine of

4  Equivalents analysis about the cookies?

5      A    Yes, I did.  With respect to a particular

6  claim that -- that was in dispute, I did.

7      Q    And where did that come out?

8      A    Well, it turns out that they also match under

9  the Doctrine of Equivalents.

10      Q    All right.  Let's get now down to the -- to

11  what really counts here, where the rubber meets the

12  road.  Let's talk about the Newegg's system.  I think

13  that was one of the items on your -- on your list.

14      A    Well, I had a few --

15      Q    What do you mean by Newegg system?

16      A    Well, I had few more tutorial elements here --

17      Q    Oh, I'm sorry.  Then let's go back to the

18  tutorial.

19      A    -- which I may have already covered.

20          I talked about web browsers and servers

21  communicating.  One of the important things that will

22  come up later is the -- is how do they communicate; in

23  other words, what language do they use, so to speak?

24      Q    Okay.

25      A    And the answer to that is, is that they use a

1    protocol called the hypertext transfer protocol.  This

2    is more alphabet soup here.  This is -- it's called

3    http, and that's what it stands for.  And this is the

4    format for the messages.

5          In other words, you can send a string of

6    characters to a server, but the server has to be able to

7    understand what the string of characters mean that are

8    in your request.

9          And so the http protocol defines what these --

10   what these commands and requests are.

11     Q    Is protocol, in this instance, just a fancy

12   word for rules or sort of a dictionary of meanings of

13   terms?

14     A    Yes.  Rules of communication is a good way to

15   think of what http is.

16          And then I mentioned earlier -- or maybe it

17   was mentioned earlier as well in the -- in your opening

18   that the problem solved by the '639 patent is really

19   that the characteristic of the internet, that the

20   request and response is fine; but then a new request

21   comes, and the server can't actually realize -- doesn't

22   actually realize that it came from the same place that

23   the request right before it came.

24          And if you have -- if the role of the internet

25   is just to provide documents, then a request and a

1  response is just fine.  But if you're going to try and

2  do something involving a sustained interaction, then

3  there's a technical problem that if you address it, is

4  going to make life much simpler for doing things like

5  internet commerce.

6      Q    I think I mentioned during my opening

7  statement the concept of state and whether the

8  web/internet combination was stateless.

9          Does that have anything to do with what you're

10  talking about?

11     A    Yes.  That's -- that's the way -- that's the

12  way the technical people talk about what the problem is.

13  The shorthand for it is, the internet is stateless.  And

14  that doesn't have much meaning for a lot of folks, and

15  so that's why I described it as being executed

16  independently.

17         And when you get multiple requests, it's

18  important in an internet commerce setting to know that

19  you're getting multiple requests from the same client

20  computer.

21     Q    The last subject that I inadvertently jumped

22  over that you wanted to talk to us about was issuing a

23  request, and then what a URL was.

24         And I see you put that slide up.  Would you

25  explain that to the Ladies and Gentlemen of the Jury for

29

1   me, please?

2       A    Yes.   The -- the browser has to have a

3   destination in mind.   In this case, the example is the

4   person here is in the midst of typing www.usa.gov, which

5   is -- which is the location of a website.

6            So as soon as the O and the V show up, then

7   the person hits -- they may hit the return key.   They

8   may click on a button.   But this is known as the

9   beginning of the http request.

10           And so what happens is, is the request is sent

11  to this website address for a -- basically, a default

12  page.   If no other information is sent, it returns

13  whatever is the default page for this particular

14  website.

15           And you can do this by typing in the address,

16  or sometimes you have a web page that already has a link

17  on it.   That accomplishes the same thing, when you click

18  on the link or click on a picture.

19           For example, you might have a weather map of

20  the United States, and you click on Louisiana, and so it

21  then brings up the weather for Louisiana.   When you

22  click on Louisiana, that actually is a link that brings

23  back the next web page.

24      Q    All right.   Now are we ready to talk about

25  Newegg's system, Dr. Grimes?

1       A      I think I've just -- just gave -- here's some

2  more examples of URLs, but we've already --

3       Q      Okay.  I guess not.

4       A      I think this the last --

5       Q      This is your last one; then we've got to keep

6  going here.  Come on.

7       A      I think the horse is dead.

8       Q      All right.  Well, now can we talk about

9  Newegg's system?  Thank you.

10             Would you describe what you mean by the term

11 Newegg system, please?

12      A      Yes.  I have a picture here.  In fact, we're

13 going to be using this so much, that if I could have --

14 I had a -- sort of a larger version of this made up.

15 And I'll be talking about it and pointing at it, and

16 we'll see it show up over and over again.  So I had a

17 big board made of it.

18             This is -- this is a description of the Newegg

19 system.  One of the reasons it's so complicated is

20 because Newegg has a great, powerful system.  I mean,

21 I've bought things on the Newegg system, and in fact,

22 it's a very powerful system.

23             So in the -- in the -- there's several things

24 I wanted to point out in particular.

25             For example, in the upper left-hand corner

1  here, is an icon that we've seen before.  This is the

2  customer computer.  So this is also called the client,

3  the client computer.  It's also called the buyer

4  computer.

5         And those basically all refer to the same

6  thing.  It's a computer, like a personal computer you

7  would have in your office or in your home, and it's the

8  particular machine that runs the browser.

9         This is connected over the public internet,

10 and then it connects to the green area here, which

11 represents the -- basically, the data centers that

12 Newegg operates.

13        In particular, one of the data centers is this

14 blue area right here (indicates), and you can see in the

15 lower right-hand corner, it says data center.  And this

16 is the E3 Colo data center.

17        So this describes symbolically or structurally

18 what are the computers that are contained in the Newegg

19 data center.

20    Q    Does the diagram depict a server, Dr. Grimes,

21 the one we're looking at right now?

22    A    It's really a server system that contains many

23 servers.

24        These -- for example, this area right here

25 (indicates), we'll be spending quite a bit of time with.

1  This highlighted area is the collection of servers that

2  perform the shopping cart function, shopping cart

3  computer.

4          And then on the right-hand side is the

5  shopping cart database, which is where the shopping

6  carts are stored eventually or where the payment occurs.

7  So we'll be dealing with these, and these are -- all

8  contain many, many, many, many computers.

9      Q    Are the customer computers and the Newegg

10  server system connected?  Is that done by the internet?

11      A    Yes, that is done by the internet, and that's

12  represented by this black line on the left and across

13  the top and this same cloud here called public internet.

14          This -- this, by the way, is -- this is a

15  Newegg diagram.  In other words, Newegg provided this to

16  us as part of the lawsuit.  So this is their description

17  of what the Newegg system -- system is.

18      Q    All right.  There's a box in there that looks

19  like it says netscaler or -- it's vertically above the

20  firewall.

21          Do you see that?

22      A    Yes.

23      Q    Could you tell us briefly what that is?

24      A    Yes.  The netscaler is in this connection, the

25  network connection that comes from the computer into the

1  servers.  And the netscaler essentially routes the

2  incoming messages.

3         Newegg has a number of servers, and you can

4  address them.  For example, the one at the top labeled

5  www here stands for worldwide web, and this is where you

6  access all of the product information.

7         When you decide to do a purchase and put

8  things in a shopping cart, then the requests that come

9  in are routed by the netscaler into this block, which is

10  labeled SSL, and that provides the shopping cart

11  functionality.

12     Q    And you said a few minutes ago, there's a

13  shopping cart database also shown on this diagram?

14     A    Yes, that's correct.  DB is just a shorthand

15  notation for database.

16         So the shopping cart computer -- this arrow

17  right here between the two is the network connection

18  (indicates), so the shopping cart computer is connected

19  directly to the shopping cart database.

20     Q    There's some round symbols on the -- almost

21  look like a sowing thimble to the right of the boxes

22  that represent, I guess, computers and the bigger box

23  that says shopping cart database.

24         What do those little round

25  cylindrical-looking things represent?  I don't know if

34

1    you can actually see these or not.  These are really

2    tiny.  Maybe we can blow them --

3              There we go.  There we go.

4              MR. ADAMO:  Thank you, Mr. Gooden.

5      A    These little cylinders are intended to

6    represent computer center hard disk drives.  It's kind

7    of a traditional notation that's used to represent -- in

8    a diagram like this, to represent a very large storage

9    capability.

10              And so they draw them as cylinders, because at

11    one point in time, they literally were cylinders.  They

12    were, you know, perhaps a couple of feet in diameter and

13    maybe 3 or 4 feet high, and that's literally what they

14    looked like back a long time ago.

15              So this same kind of an icon has been used

16    ever since then to represent mass -- large amounts of

17    storage.

18      Q    (By Mr. Adamo) I think on your list of

19    subjects that you wanted to talk about today, you had a

20    purchase example.

21              Do you recall that?

22      A    Yes, I do.

23      Q    All right.  Now, let's talk about the purchase

24    example now.

25              The material you've got up on the stand with

1  you, there should be an Exhibit 12, which should be

2  materials relating to a purchase that was done sometime

3  in June of 2009.

4          Is that stuff handy?

5    A    Yes, it is.

6          You'll be happy to know we're not going to go

7  through every page of this.  The -- the top two

8  volumes -- binders here represent the -- all the details

9  of the purchase example.

10         It includes all the web pages that I looked

11  at, and it includes all of the traffic that occurs when

12  you click on links to navigate the website or to add

13  items to your shopping cart, and it includes other

14  information, such as the cookie file that's been

15  mentioned a couple of times.  It includes e-mails that I

16  received and confirmations.

17         In short, this is a complete record, with all

18  the detail that I knew of that exists of a purchase

19  example.

20    Q    All right.  Now, in view of the fact that

21  you've just promised the jury that we're not going

22  through all of that paper, is it a safe bet that you've

23  got some slides that summarize this, and you can talk

24  about this shopping example that you did?

25    A    Yes.  The shopping example that I did had a

1   total of, like, 35 web pages, and I've selected maybe

2   half a dozen of them to kind of give you a flavor for

3   what the key things were that I did when I bought a

4   couple of items on the Newegg website.

5        Q    All right.  Just so we're all clear on this,

6   in June of 2009, you yourself got on a computer and

7   logged on to Newegg's website and bought some stuff, and

8   that's what is recorded in all of these two huge binders

9   that you're about to explain to us, hopefully, with some

10  simpler slides, right?

11       A    Yes, indeed.

12       Q    Okay.  Why don't you walk us through the

13  slides then, Dr. Grimes, I guess starting from the

14  beginning and going through until you're completed with

15  the purchase example.

16       A    So this is the -- sort of the beginning point.

17  I don't know if you can see it at the top or not, but at

18  the top, it says http://www.newegg.com.

19            And so that was typed in; and when I hit

20  enter, this is the page that showed up.  So this is the

21  result of going to the Newegg website.  So this is the

22  first page that you see.

23       Q    All right.  What happened next?

24       A    Well, then I navigated around using some of

25  the -- clicking on some of these buttons, and I decided

37

1   I wanted to buy a cable, a cable and some software.

2           So this is the cable page that contained the

3   cable that I was looking for.  It was a USB cable.  And

4   right at the bottom of the page -- of -- right below the

5   cables I was interested in is this button called

6   add-to-cart.

7           And so I clicked on the add-to-cart button.

8       Q   Okay.  Then what happened?

9       A   Okay.  Then it gave me this page that said

10  this is the item that's been added to your cart, and

11  then it waited for me to, you know, take some further

12  action.

13          So I navigated to another portion of the

14  website that contained software, and I looked for -- I

15  was interested in a painting program, so I navigated to

16  this website that has -- a portion of the website that

17  has the Corel software on it.

18          And so this says Corel Paint Shop Photo Pro,

19  and it turns out this is downloadable software, so to

20  add this to cart -- my cart, I click on this button that

21  says download.

22          So that tells me that not only is it going to

23  add to the my cart, but also it's not going to come in

24  the mail.  I'm going to, in fact, download the software.

25      Q   And so what happened when you clicked that

1  button?

2    A    So I clicked that button, and then it gave me

3  that other same message:  It's been added to your cart.

4            A little bit later, I said, okay -- I'm

5  skipping a few pages here now.  I said, okay, now its

6  it's time to, you know, buy it.  I've selected the two

7  products.  I found them.  They're in my shopping cart.

8  And so I looked at my shopping cart and -- to see what

9  was there, and this is the page that shows up.

10           So this is the page that corresponds to the

11 shopping cart.  And most importantly -- I mean, besides

12 listing the two products that I've just selected, most

13 importantly, at the bottom, it contains another button

14 called checkout.

15   Q    All right.  Did you click the checkout button?

16   A    I clicked the checkout button.

17   Q    And?

18   A    And it said you have to log in.

19           So it turns out I'm an existing customer, so I

20 typed in my Newegg identification, which is my e-mail

21 address, my password, and then clicked submit, and that

22 allowed me to log in.

23   Q    All right.  And what happened when you clicked

24 the submit button?

25   A    Well, the system, of course, knew that I was

1   checking out, and I can't just check out without the

2   system knowing who I am, so it asked me who I was.

3           Then it says, okay, if you want to check out,

4   well, here's all the payment information that we have

5   for you.  This is the shipping address we have.  This is

6   the credit card information we have to -- to finish the

7   payment.

8           And it asks me basically if this is all

9   correct, and if it is, then I click the continue button.

10      Q    All right.  So you clicked the continue

11  button?

12      A    I clicked the continue button, and then it

13  gives me essentially information about the order.  This

14  is going to be -- this is my last chance, basically, to

15  change anything.

16          It says here's the shipping information we

17  have.  Here's the billing information we have.  Here's

18  the products that are going to get shipped to you.  Is

19  this okay?

20          And if it is okay, then at the bottom of this

21  page is a button called submit order.

22      Q    And I assume that you clicked the submit order

23  button?

24      A    Indeed, I did.

25      Q    And what happened next?

1    A    Okay.  The next thing that happened was, I got

2  this thank you page.  And it says:  Thank you for

3  ordering from newegg.com.

4         And one of the options on this page is a

5  button in the lower right-hand corner to log out, and so

6  I logged out.

7    Q    Okay.

8    A    And then it gave me another page.  There's

9  a -- there's a real pattern here of clicking buttons and

10  getting new pages and clicking buttons, getting new

11  pages.  These are the requests and the responses between

12  my computer and the servers at the Newegg -- Newegg

13  service system.

14         So I clicked -- I logged out, and then it gave

15  me a message that says:  Thank you.  You are

16  successfully logged out.

17    Q    Okay.

18    A    So that really concluded the purchase example

19  that I wanted to -- to show to the jury.

20    Q    Did you try to find out whether the Newegg

21  website would give you order history information?

22    A    Yes, I did.

23         The other thing that's important to the case

24  is, in fact, the -- it's called statement -- hypertext

25  statement documents, which are documents that describe

1    the purchase transactions that have taken place before.

2              And Newegg has a facility to do that.  To

3    access it, there's a -- now, this is at the bottom of

4    one of the pages.  There's a number of things that you

5    can do, shopping help and things to do with your

6    account, and one of those is order history.

7              So that's underlined, and therefore, it's a

8    link.  So I clinked on that link.

9        Q    And what happened?

10       A    Well, not surprisingly, I got my order

11   history.

12             So this is a display of the last four

13   invoices -- or the last four payments that were made --

14   payment transactions made on the Newegg website.  And

15   each one of those invoice numbers here is underlined.

16             And as we now know, that means that that's a

17   link.  And so one of the things that I could do is I

18   could get more details about that.

19             For example, I mean, this is the number, but I

20   might not -- maybe a month has gone by, let's say, and I

21   don't quite remember what the number was, but I want to

22   know what was in this invoice.  So I click on this link,

23   and it provides me with more details.

24             And it turns out, yep, this was the -- it

25   wasn't the cable.  This was the software that I

42

1   purchased.  And so this gives me the order detail

2   associated with -- with that invoice.

3       Q    All right, Doctor.  Does this combination of

4   things that you've just shown us, does this complete

5   your purchase example that you had mentioned earlier on

6   the -- what you've now got up?

7       A    Yes, it does.

8       Q    All right.  Let's get to the meat of it now

9   that we've got the background and you've demonstrated to

10  us that you've personally gone through the system and

11  run it yourself to see what you could see.  Let's turn

12  to your main reason for being here today.

13          Have you reached any opinions regarding

14  whether Newegg meets the claims of the Soverain patents,

15  the three different patents-in-suit here?

16      A    Yes, I have.  I reached these opinions by

17  going through a particular process and --

18      Q    Would you tell us what the process was?

19  You've got a slide up here, but would you tell us,

20  please?

21      A    Yes.  And the conclusion, not surprisingly, is

22  that yes, they meet the claims.  But this is the process

23  that I went through, because you can't just, you know,

24  make assertions.  You have to say, okay, what's the

25  evidence that you have?

43

1          And the evidence that I looked at has to match

2   the claims.  So -- but that happens later.

3          The first process that I did was I started out

4   by reading the patent, not surprisingly.  And the

5   associated prosecution history or file history, as the

6   Judge told us this morning mean the same thing.

7          That's all -- it's all the dialogue between

8   the patentee and the Patent Office during the generation

9   of the patent, and it results in the patent.

10          So I spent time studying both the patent --

11   like I read the patent so many times -- I've lost track

12   how many times -- but the patents and the prosecution

13   histories are an important part of the background and

14   kind of a starting point.

15          The next thing I did was reviewed -- I think

16   of this as the Court's dictionary, okay?  It's called a

17   claim construction order, but I think of it as

18   dictionary.  It says there's lots of terms in dispute,

19   and as a matter of law, these are the definitions I'm

20   supposed to use.

21          So it doesn't matter what I think they mean;

22   this is what the Court says they mean.  So these are the

23   definitions that I applied in my analysis.

24          Another large component of my time was spent

25   reviewing Newegg documents.  I mean, this, after all,

44

 1    forms a large portion of the evidence that I need to

 2    rely on to show the matching with the claims.  And so I

 3    spent a lot of time reviewing that.

 4            Other things I can rely on turns out to be

 5    statements made under oath by corporate representatives

 6    of Newegg.

 7            We met Mr. Wu this morning, and he was the

 8    main corporate representative whose testimony I also

 9    relied on in terms of understanding how the Newegg

10    system operated.

11            And I actually physically attended his

12    deposition and, of course, received a transcript --

13    transcript of it later, which I studied, and I reviewed

14    other Newegg deposition testimony.  But Mr. Wu's was

15    really the most -- the most significant one.

16            And then as we talked about these two

17    binders -- and in fact, I've got four more binders that

18    describe two other purchase transactions, which we also

19    will not go through.

20            I studied the operation of newegg.com and

21    neweggmall.com.  One pair of these binders is a purchase

22    transaction I did at neweggmall.com.

23            And then with all of this information and a

24    very messy office with paper piled all over, I was able

25    to then form the analysis that I did, comparing the

45

1  claims under the Court's construction with the

2  documentation and other evidence that I have from Newegg

3  and form my opinions about whether or not they match.

4      Q    All right.  Let's cut to the chase.  Tell the

5  Ladies and Gentlemen of the Jury, if you would, please,

6  what the opinions were that you reached, Doctor.

7      A    There are two websites, newegg.com and a more

8  recent one newegg.ca is Canadian.  And those two

9  websites -- based on the testimony of Mr. Wu, is that

10 those two websites basically operate the same.

11         And they do operate the same for purposes of

12 my analysis and that those, therefore, meet all of the

13 elements of these two claims of the '314, these three

14 claims of the '492, and two claims of the '639 patent.

15     Q    Was it your understanding from what you

16 reviewed, Dr. Grimes, that the Canadian website was, in

17 fact, hosted on the same servers here in the United

18 States that the newegg.com was hosted?

19     A    Yes, it is.  The -- this notion -- it's real

20 strange -- interesting, actually, the dot-com, you think

21 of, well, that's the United States.  Well, no.  It turns

22 out I know several websites in England that are dot-com

23 websites.

24         And here's an example of a dot-ca website that

25 you would think of would be in Canada which is not in

1  Canada.  It's, in fact, in the United States.

2        One of the -- one of the sort of humorous

3  questions, trivia questions, is, what are the three most

4  important things to know about the internet?  And the

5  answer is no location, no location, no location.

6        So you really have no idea physically where

7  these websites are when you attach to them.  And here is

8  just an interesting example of that at Newegg.

9        You can address -- as long as the -- as long

10  as you type in newegg.ca, it takes you to a particular

11  server, and that server -- in this case, actually, I

12  couldn't buy anything there, because I do not have a

13  Canadian address.

14        So it really is -- looks like it's in Canada,

15  but, in fact, it's not.

16    Q    What time period does your analysis apply for

17  with respect to the newegg.ca site?

18    A    The newegg.ca website is relatively recent, I

19  think in the last year or two.  I don't remember

20  specifically the dates of it, but it -- but the 2001 is

21  when the newegg.com website was initially brought

22  forward as we heard this morning.

23    Q    In your summary of opinion slide that you have

24  up on the projection system right now, you also talk

25  about neweggmall.com.  What's neweggmall.com, as you

47

1   understand it?

2       A    Well, Newegg Mall is meant to refer to like a

3   shopping mall where you might go, and there might be a

4   huge store, which might be, you know, Macy's.  But then

5   in the mall, there are all kinds of other stores of

6   other merchants selling other merchandise.

7           Well, Newegg Mall sets up to be the same

8   thing, so it's kind of a company operative arrangement

9   Newegg provides.  Other merchants also sell merchandise

10  in the Newegg Mall.

11      Q    Well, what time periods do you understand

12  it -- does your analysis of neweggmall.com cover?

13      A    That's also relatively recent.  I think within

14  the last year or two.

15      Q    Have you prepared a summary of your newegg.com

16  system to each of Soverain's patents?

17      A    Yes, I have.

18      Q    Exhibit 21, would you take a look at that for

19  us and see if you can identify it?

20      A    (Witness reviews exhibit.)

21      Q    Would you tell us what Exhibit 21 is, Doctor?

22      A    Yes.  Exhibit 21 is a portion of the expert

23  report that I did, which provides detailed results of my

24  analysis of the comparison between the way the Newegg

25  system operates and the structures it has and the --

48

1   each one of the elements of the claims that are involved

2   in this lawsuit.

3       Q    From which patent?

4       A    This is -- Appendix C is for the '314 patent.

5   And there are two other appendices for the other two

6   patents.

7       Q    Is Exhibit 22 the Appendix C that relates to

8   the '429 -- your analysis of the '492 patent?

9       A    Yes, that's correct.

10      Q    And is Exhibit 23 the Appendix C of your

11  expert report that relates to your analysis of the '639

12  patent?

13      A    Yes, that's correct.

14      Q    Did you prepare a summary for neweggmall.com

15  website?

16      A    Yes, I did.

17      Q    And you might look at Exhibit 31 in your book;

18  is that the summary?

19      A    Yes.  This -- this appendix here essentially

20  includes all three patents.  I didn't do a separate

21  appendix for each patent, so this one has all three of

22  them.

23      Q    Do you have Exhibit 29 handy in the binders

24  that you have there, Doctor?

25      A    Yes, I do.

1     Q     Could you identify that for us and explain

2  briefly what it is?

3     A     It says separately bound, which means, to me,

4  get out of my chair.

5     Q     Okay.

6     A     So these are two of the other four binders I

7  mentioned.  These binders correspond to the same thing,

8  all the detail, web pages, HTML traffic, everything

9  associated with my Newegg Mall purchase.

10    Q     So you did an actual hands-on purchase

11 experiment, so to speak, with regard to the Newegg Mall

12 site?

13    A     Yes, neweggmall.com, right.

14    Q     Doctor, is it your opinion -- and I think you

15 had this on your summary slide we just had up there --

16 that newegg.com and newegg.ca, the Canadian site, meet

17 all the elements of the asserted claims?  Is that, in

18 fact, your opinion?

19    A     Yes, I didn't do the -- all of the claims for

20 the Newegg Mall.  I did the ones that are listed here.

21    Q     Claim 34 of the '314, Claim 15 of '492, and

22 Claims 8 and 78 of the '639?

23    A     Yes, that's correct.

24    Q     Judge Davis, a little earlier today, told us

25 about the claims and what their function was.  Just to

50

1    make sure that you understand this the same way as the
2    Court did, what do you understand the function of the
3    claims in the patent to be?
4        A    Well, here's an example of one of the claims
5    from the '314 patent.  This is Claim 34 highlighted in
6    the background here.  And I've taken the first portion
7    of Claim 34 so that we can see the text a little easier.
8            The claims are made up of a sequence of
9    limitations.  The first one here about a buyer computer,
10   the second one about a shopping cart computer, and the
11   third one about a computer network.  So I have to take
12   the full text of each claim element one at a time --
13   just because it makes it easier to follow -- I took them
14   one at a time.  And I said, okay, does the Newegg system
15   provide all of the requirements of this claim
16   limitation?  And if so, how can I show that, and what's
17   the evidence that I have that makes me come to that
18   conclusion?
19           So this was the -- the claims, essentially,
20   it's like a -- I like the example of a trespassing that
21   was used earlier.
22           The claims really define what the boundaries
23   are.  In other words, one of the things that's required
24   of the patent is that it tell people:  If you go within
25   these boundaries, then you're going to practice the

1   claim, and that's not allowed without some kind of a

2   license; or, you're outside the boundary, so everything

3   is fine.

4          So the claims have this role of identifying

5   what the boundaries are for the intellectual property

6   that is in the patent claims.

7      Q    Doctor, do you understand what it means for a

8   claim to be infringed literally as compared to what it

9   means for a claim to be infringed under the Doctrine of

10  Equivalents?

11     A    Yes, I do.

12     Q    Tell us what you understand literal

13  infringement to mean.

14     A    Well, literal infringement means that it's

15  very clear, and there really isn't much doubt, that the

16  way that the particular system works, in this case the

17  Newegg system, matches literally or precisely or exactly

18  the way the claim is written.  And there's -- it's

19  really not open to much interpretation about what the

20  claim means; and given that interpretation, this is

21  what -- how the Newegg system matches that requirement.

22     Q    Now, when you say matches, you told us a

23  minute or two ago about claim elements when you were

24  describing Claim 34 of the '314 patent.  Is that what

25  has to be matched by the system that you're trying to

52

1    decide whether or not it infringes?

2        A    Yes, that's correct.  That's correct.

3        Q    To your understanding, now, what does it mean

4    to infringe under the Doctrine of Equivalents?

5        A    The patent system, if you will, basically had

6    decided that, as I understand it, that if you make

7    some -- some minor variation to the way the patent

8    describes it, that that's still within the boundaries

9    identified by the -- by the claim.

10           And so there's a separate analysis that one

11   goes through called the Doctrine of Equivalents to find

12   out if this variation, if you will, if it's a variation

13   in interpretation of what the claim means, if it still

14   falls within the boundaries of the claim.  And that is

15   called a Doctrine of Equivalents analysis.

16           So you look at the two alternatives, and you

17   say:  Okay, I understand there are differences, but

18   would these -- are these differences significant to a

19   person of ordinary skill in the art or is this just a

20   minor change?

21           And so the analysis that I did was to

22   determine whether or not there was any substantial

23   differences between the two -- between the two

24   alternatives that I evaluated.

25       Q    When you did the analysis that we're going to

53

1   look at in a few minutes, with respect to the Doctrine

2   of Equivalents, did you understand that you had to

3   either literally or by equivalence still have to have

4   every element that the claim called out?

5        A    Yes.  It was mentioned earlier that, you know,

6   if you have ten claims, it's not enough to just practice

7   nine of them, you have to do -- or claim limitations;

8   you have to do all ten.  And that is exactly the

9   methodology I applied.  And that's why I took them one

10  at a time.

11            And then when I reached the end of the claim,

12  if everything was met, then my conclusion was that, yes,

13  this claim is matched, and, therefore, Newegg infringes

14  this claim.

15       Q    And in the instance that we discussed a few

16  minutes ago where you did the alternative Doctrine of

17  Equivalents' analysis, how did you do that?  Did you --

18  well, you tell us.

19       A    Well, there's a three-part test that's done.

20  The claims have some kind of a function, some particular

21  way that it's done, and some particular result that

22  comes from the claim limitation.  So you have to analyze

23  all three of those:  The function, the way, and the

24  result.

25            And in the particular analysis that I did, the

54

1  function and the result were actually the same among

2  these two alternatives.  The difference was in the way.

3          So I looked at the way that it's -- I think

4  it's done literally and the correct way to interpret the

5  claim, and I looked at the way that Newegg says, well,

6  no, you should look at it this way.

7          So I did okay.  I did an analysis of the way

8  that they think it should be done.  And I determined

9  that the way that I think the claim properly is

10  interpreted and the way the Newegg thinks it's

11  interpreted were -- the differences were insubstantial.

12          So there's essentially -- we will get into

13  more details later, but it's basically a design

14  alternative.  The designers could do it this way or they

15  can do it that way.

16          And when you have a situation like that,

17  that's further evidence that the differences are

18  insubstantial.  And if the differences are

19  insubstantial, then it still meets the requirement of

20  the claim under the Doctrine of Equivalents.

21      Q    You're not a patent lawyer, are you?

22      A    No.  No, I'm not.

23      Q    How did you word --

24      A    It would interfere with my hunting in the

25  hills of northern Nevada.

55

1    Q    I'm sorry?

2    A    It would interfere with my hunting in the
3  hills of northern Nevada.

4    Q    I'm sure that's not turning into a hunting
5  lawyer's bad joke.

6    A    I'm sorry.  This is serious business; I
7  shouldn't make light of that.

8    Q    It is that, Doctor.

9         How did you learn about these patent law
10  concepts then that you were just talking about that you
11  apparently applied in doing your analysis to reach your
12  opinions?

13    A    In all cases, they come from discussions with
14  the attorneys in the case.  I've actually done the
15  Doctrine of Equivalent analysis several times before, so
16  I had some familiarity with it.

17         But again, on this case, I was again taught,
18  if you will, by the attorneys:  This is what you should
19  do, this is the analysis you should perform, and then --
20  and then you tell us what the results are, which I did.

21    Q    Over what chronologic time period, calendar
22  time period, did you analyze the Newegg system, or the
23  state of the Newegg system, I guess is what I'm trying
24  to ask you?

25    A    Oh, golly, it was the better part of a year.

56

1   The documents were produced -- started being produced

2   quite some time ago.  I don't even remember exactly

3   when.  And that's when I really started my analysis.

4           Before that, I spent time understanding the

5   patent and the prosecution history and so forth.

6       Q    Do you recall those various examples that --

7   the purchase examples that you told us about so far,

8   some of the purchase examples that you studied were done

9   by yourself, correct?

10      A    Yes.

11      Q    And were there any available for you to study

12  that had been done by somebody else at an earlier time?

13      A    Yes.  There was -- the other two binders the

14  remaining two of the six, which are also an exhibit

15  here -- were -- represented a purchase transaction that

16  was done by the attorneys perhaps, I think like a year

17  earlier, in 2008.

18      Q    And your recent transaction was June of 2009?

19      A    Yes.

20      Q    Okay.

21      A    Then I did a later one with the Newegg Mall.

22  It may have been around throughout the same time.  But I

23  did basically two full purchase transactions.

24      Q    It's April 2010.  What information, if any, do

25  you have that the system, at least as of, let's say, as

1  of last month, March, was the same as what you analyzed

2  in the documents you looked at and the study you did in

3  2009?

4      A    It's my understanding that the system operates

5  the same today as it -- as it did when I did my purchase

6  example in 2009.  Actually, I did -- I did another

7  purchase later to buy some more cables.  I mean, the

8  prices are very good on the Newegg website, I have to

9  tell you.  So I went back and I bought some HDMI cables

10 for my television.  So I did an additional transaction

11 in November -- I think it was November -- personally.

12 And it's my understanding it still operates the same way

13 today.

14              MR. ADAMO:  Your Honor, at this point

15 we're going to now start going through in detail, claim

16 element by claim element, the various seven claims in

17 the three patents.  Would you like to consider taking a

18 break at this point or should we just power on?

19              THE COURT:  I think we're all right.  Is

20 the jury okay?  Anybody need a break?

21              All right.  We will go ahead and see if

22 we can get through it.

23              MR. ADAMO:  Just the anticipation is just

24 electric in the room for this next stage, Your Honor.

25              THE COURT:  Everyone is waiting.

58

```
1                MR. ADAMO:  We're just sort of like, yes,
2    let's go.
3                Sorry.  It was the volcanic dust, Your
4    Honor.  It obviously got to me.
5                THE COURT:  You had that before you went.
6                MR. ADAMO:  That's one.  One of these
7    days I've got to learn, Your Honor, to not lead with my
8    chin in this courtroom.
9                THE COURT:  All right.
10               MR. ADAMO:  Thank you.
11       Q    (By Mr. Adamo)  All right, Doctor.  Maybe we
12   should take -- I am in fear that we're going to knock
13   some of these --
14       A    No, let's leave this one up.
15       Q    Can I take the binders?
16       A    Yes.
17       Q    I am in fear you will knock those down?
18       A    And I would like -- while we're moving here,
19   I'd like to have another chart -- chart put up.
20               THE WITNESS:  Thank you, gentlemen.
21       Q    (By Mr. Adamo) All right.  I believe we've got
22   this set up, so we're going to do it in patent number
23   order from the last three digits.  So let's start with
24   '314.
25               Briefly, I mean briefly, refresh us as to what
```

59

1   the '314 patent is about, as you understand it?

2       A    The '314 patent is a network-based sales

3   system that essentially provides a complete shopping

4   experience.  It allows you to go to a website, find the

5   products you want, purchase the products you want, pay

6   for them with a credit card or whatever, and then they

7   are delivered to your door.

8       Q    Is this patent, as you understand it, just for

9   the idea of using a shopping cart on line?

10      A    No.  Shopping carts, I mean, are not a new

11  idea.  We all use the metaphor of a shopping cart.

12           But the key thing about the '314 patent is

13  the -- is the ability to complete the transaction

14  online.

15           I mean, before, you would have to, you know,

16  you could go to Macy's website and find products you

17  wanted, then you would have to call Macy's and give them

18  your credit card over the phone; you'd have to fax them

19  information or something.

20           But this -- the '314 patent allowed you to

21  complete the transaction online without making a phone

22  call.

23      Q    I used the phrase earlier "soup to nuts."  Is

24  that apropos with regard to the '314 patent in your

25  view?

1    A    It -- that's what I meant by complete --

2    complete shopping experience, yes. From beginning to

3    end, you don't need to leave your computer basically.

4        Q    The claims of the '314 patent that Newegg is

5    accused of infringing, the ones you've studied, are

6    those system claims, method claims, or both?

7        A    The '314 -- the first two patents essentially

8    have system claims. A system claim is basically

9    structural, and it deals with the capability of the

10   system. A method claim, which is in the last patent,

11   the '639 patent, deals with the operation of the system.

12        So the way I think of it is, if you have a

13   system claim, then the system has to have the capability

14   to do the operations that are described; and for a

15   method claim you have to actually show that it doesn't.

16   So the method claims deal with the process or the

17   operation -- actual operation of the system.

18        Q    All right. Claim 35 is the first of the two

19   claims in the '314 patent. That's the one that's in the

20   original patents; and the later claim is the one that's

21   in the reexam, which I think we managed to figure out

22   earlier this morning.

23        Do you have a slide showing your analysis of

24   Claim 35?

25        A    Yes. It starts here. This is Claim 35, and

61

1   you notice it's very short.  Well, the reason it's short

2   is because of the first sentence.  It says:   In

3   accordance with Claim 34.  So this is what's known as a

4   dependent claim.

5            In other words, to show that the Claim 34

6   matches between the requirements and the -- and the way

7   the Newegg system is built, you also have to show that

8   Claim 34 also matches, because Claim 35 really depends

9   upon Claim 34.

10           So, on the right side over here I have put

11  a -- I had this board constructed for us.  And this is

12  Claim 34, all of these elements.  And then down at the

13  bottom here we have Claim 35.

14           So Claim 35, in order to be -- to show that it

15  infringes, I have to first really do the analysis of

16  Claim 34.  So the starting point here is Claim 34.  When

17  I finish it, then we will return basically to Claim 35.

18      Q    All right.  The letters 34(a) and (b), (c),

19  (d), (e), et cetera, et cetera, were they in the

20  original claim, or did you add those on yourself just to

21  have a way to keep track of where you are?

22      A    I added those.  In fact, the convention here

23  is that the brackets are things that I've added.  The

24  Number 34 starts out that's part of the claim, and the

25  (a) is what I added.  Then I called 34(b) the second

62

1    one, and 34(c), and so on.

2            This is just a way of -- it's a notation for

3    me to keep track of which claim element that I'm working

4    on. And I did that the same for all of the -- for all

5    the claims.

6       Q    All right. Let's start to step through it as

7    expediently as we are able to and be correct, Doctor.

8    Let's start with element 34(a). Is that the first

9    element that you considered?

10      A    Yes. I started with -- I started at the top

11   basically and went in alphabetical order.

12      Q    All right. Would you explain your analysis of

13   34(a), and we have -- I guess you have actually because

14   you're controlling the slides -- you've got a slide up,

15   '314 patent claim element 34. Is this the system that

16   you used in doing the analysis of these claims?

17      A    Yes. This -- you can see that this claim

18   really just includes -- the evidence is just the upper

19   portion of this larger diagram that we spent some time

20   on this morning. So -- I mean earlier.

21           This particular diagram that I've shown here

22   is a -- it's kind of a simplified version of this one

23   that we have on the -- on the -- on the posters. Okay?

24           The two were on two different pages of the

25   same document that were produced by -- by Newegg. So

1   that's the reason they look -- they look so similar.

2          So this is a network-based sales system.  I

3   mean, it has the network, the public internet.  It has a

4   customer computer and server computers.  And so that's

5   what we mean by network.  And since it's oriented

6   towards sales, it's a sales system.

7          And this word comprising means that we need to

8   look at all the rest of the elements, (b), (c), (d),

9   (e), all the way down to the last one.  And the network

10  sales system, comprising means that it includes those.

11         So there can be other things that the Newegg

12  system does; but in order to practice this Claim 34, it

13  has to do every one of these.  It can't do just most of

14  them; it has to do every one of them.

15     Q    All right.  All the way down at the bottom of

16  the slide you have up on the presentation system at the

17  moment, which is your No. 34, there is a parenthetical.

18         And it says:  Sources, Newegg documents

19  (P008P018), and then Wu 30(b)(6) TR11:7-20.  What's all

20  that mean?

21     A    You probably can't read that.  I mean, I can't

22  even read it and I'm right next to it.  But this across

23  the bottom -- I have done this routinely on all of the

24  slides that I've prepared here.

25         And this came from those other exhibits where

64

1    I have all the detailed information.  This -- this is

2    the reference to the Newegg evidence.  Okay?

3            In all cases, this is either testimony or

4    documents produced by Newegg about how their system

5    works.  So this is how I know that and what I relied on

6    for the fact that the system works the way I'm

7    describing to you this afternoon.

8        Q    This whole mechanism that you came up with

9    with the slides and breaking the claim elements down and

10   all, are the slides intended to be summaries of this

11   additional documentation, such as, the exhibits,

12   transcript pages, things of that nature?

13       A    Yes, that is exactly right.

14       Q    And when you prepared these slides, to the

15   best of your ability, I mean, did you accurately

16   summarize what's in the source material that you've

17   cited on them?

18       A    Yes.  That was the way that we decided what

19   should go on the slides was I looked at the evidence,

20   and people who were assisting me to make these -- looked

21   at the evidence, and we made sure that this was an

22   accurate summary.

23       Q    I don't know if you have Exhibit 62(a) and (b)

24   available to you?

25       A    I do.

1    Q    Would you tell us what you understand those

2  exhibits to be?

3    A    I had mentioned earlier that one of the most

4  important depositions was the chief technical person,

5  Mr. Wu, the corporate -- corporate spokesman for Newegg.

6         And Exhibit 62(a) is essentially all of his

7  testimony, or excerpts of his testimony, that he gave at

8  his deposition.

9    Q    All right.  Is that the testimony from

10  Mr. Wu's deposition that you relied on in doing your

11  analyses for the seven claims of the three patents?

12    A    Yes, that is correct.

13         And Exhibit B that you asked me about, I took

14  his testimony, and essentially I matched it up with

15  the -- each claim term.

16         So for example, here is his testimony about

17  how the network sales system operates at Newegg and what

18  the structure is.  And one of the diagrams he used in

19  his description is, in fact, the one that we have up

20  here.  So this all essentially -- that's how I know how

21  to describe to the jury how the system operates is

22  because Mr. Wu told us in his deposition.

23    Q    What did you conclude about whether Newegg

24  meets Element 34(a)?

25    A    Based on the analysis I did, the Newegg sales

1  system, in fact, meets Element 34(a).

2      Q    All right.  We've put up your Slide 35.  This

3  is headed Claim 35 elements shown in Newegg system.

4           What are you going to do with this document?

5      A    This is -- this is just a way for me to sort

6  of -- and people on the jury to figure out where we are.

7           So every time I finish an analysis, I sort of

8  go back to this and put a check mark in so that you have

9  some notion of where we are in going through all of

10  these elements of 34 -- the elements of Claim 34.  Then

11  we will do Claim 35.

12      Q    Is the check mark supposed to symbolize that

13  we just did the analysis or is it supposed to symbolize

14  that your opinion is the element is there?

15      A    No.  The check mark is a symbol that, in fact,

16  the analysis shows that the Newegg system meets the

17  requirements of this particular claim limitation 34(a).

18      Q    All right.  Did you next analyze Elements

19  34(b) through (d)?

20      A    Yes.

21           Next -- I did the next three together, (b),

22  (c), and (d) because they're very straightforward and

23  they're easy to -- easy to understand once you know how

24  the Newegg system works.

25           So 34(b) is a client computer, a buyer

1   computer it's called here, for operation by the user who

2   wants to buy products; and that is the customer

3   computer, which is part of the Newegg system.

4       Q    So is that first piece, 34(b), in the Newegg

5   system, in your opinion?

6       A    Yes.  And that's, again, based on this same

7   diagram here.  This is the customer computer located in

8   the upper left-hand corner; and this is part of the

9   Newegg system, the network sales system really

10  represented by this entire picture.

11      Q    What about the next item in 34(c), the

12  shopping cart computer?

13      A    34(c) is the shopping cart computer as you

14  mentioned, is represented by this sequence of servers.

15  And so you might say, well, how do you know that?  And

16  the answer is at bottom of the slide here, it's from

17  Mr. Wu's testimony.

18           So Mr. Wu described the operation of the SSL

19  computer as the -- performing the functions of the

20  shopping cart computer.  And I used as the definition of

21  the shopping cart computer the Court's construction for

22  what the shopping cart computer was.

23      Q    All right.  34(d) is a shopping cart database.

24           Did you find that in the Newegg system?

25      A    Yes.  We referred to this earlier, and, in

68

1  fact, it describes it as a shopping cart database.  So

2  there was very little question as to what the shopping

3  cart database corresponded to in the Newegg system.

4  But that was confirmed by Mr. Wu in his testimony.

5      Q     Did the structure that was labeled shopping

6  cart database on the big exhibit that you're using,

7  which apparently is our Exhibit 8, did it match the

8  Judge's definition, or the Court's definition, of what a

9  database had to be?

10     A     Yes, it did.

11     Q     Is the shopping cart database connected to the

12 shopping cart computer in the Newegg system as 34(d)

13 requires it to be?

14     A     It definitely is.

15           Here's the -- these two elements, the shopping

16 cart computer and the shopping cart database, in this

17 diagram, they're connected by this arrow.  And that

18 arrow is understood to be and described as a network

19 connection.  So, in fact, the shopping cart computer, as

20 operation is described by Mr. Wu, and the shopping cart

21 database, are, in fact, connected to each other.

22     Q     In analyzing 34(b) through (d), how did you

23 determine what meanings to give to the claim terms?

24     A     As always, the case -- I mean, whether I

25 explicitly remember to say it or not, I always used the

69

1    Court's construction.  And here are a few of the terms

2    that were important in the last couple of minutes of

3    analysis that provide the definitions that I used for

4    computer, shopping cart, shopping cart computer and,

5    shopping cart database.

6         Q    To the best of your understanding, did these

7    come from the Markman construction that originated with

8    Judge Davis?

9         A    Not to the best of my understanding; in fact,

10   they did come -- literally these were copied directly

11   from the Court's dictionary of the claim construction

12   order provided by Judge Davis.

13        Q    Do you have a definition from the Court of the

14   term computer?  Did the Court say anything about whether

15   or not the claim computer had to be just one physical

16   device?

17        A    Well, I mean, the definition is here.  It had

18   to be a functional unit to perform substantial

19   computation.  And that, in fact, could be represented by

20   a single box, if you will, or a collection of boxes.

21             Each box may, in fact, contain multiple

22   processing units.

23             So all of those fulfill the definition of a

24   computer, based on the Court's construction.

25        Q    Okay.  There is reference to a database in the

1   shopping cart database definition.  Do you see that?

2        A    Yes.

3        Q    Can you explain why, in your view, Newegg has

4   a database, according to the Court's construction?

5        A    First of all, based on the -- well, I mean, it

6   says database on the diagram, but that's actually not

7   sufficient.

8             But when Mr. Wu was asked about this, what

9   does this functionality correspond to, he characterized

10   it in a way that met the definition, which is a

11   collection of logically related data stored together in

12   one or more computer files.  And a person of ordinary

13   skill in the art would understand that that is right;

14   that's what a database is.  And it meets the Court's

15   construction as described by Mr. Wu in his testimony.

16       Q    As you understand the function of Newegg's

17   system that we're discussing here, if more than one

18   customer clicks checkout, is more than one customer's

19   selections then stored together in the shopping cart

20   database in the Newegg system?

21       A    Yes.  The way the operation of the database

22   was described is that all of the shopping carts -- when

23   checkout occurs, all the shopping carts that are

24   currently involved in checkout -- I mean, Newegg is very

25   successful.  They have, you know, millions of customers.

1        So there's certainly tens or hundreds or

2   thousands checking out at any one time, more than

3   likely.  And all of those shopping cart computers are,

4   in fact -- shopping carts are, in fact, stored in the

5   same shopping cart database, which is this collection

6   of -- collection of servers shown right here.

7       Q    Are the shopping carts for the various

8   customers, in your view, logically related?

9       A    Yes, they are.  They're all shopping carts,

10  and they're all contained in the shopping cart database.

11       So they are logically related by virtue of

12  being in the same database.

13      Q    Did the Court say anything about how long the

14  information has to be stored?

15      A    No.  For the '314 and the '492 patent, those

16  are system claims, and they don't -- they don't say

17  anything -- they just mean that the functionality to

18  store the data has to be present.

19      Q    Did the Court say anything --

20      A    There's no additional requirement for anything

21  else, including how long they are in the database.

22      Q    All right.  Did the Court say anything about

23  whether a database has to be backed up to satisfy the

24  definition of database?

25      A    Well, I mean, most databases are backed up;

72

1    some of them aren't.  But that's not a requirement of
2    the claim language.
3            As I stated earlier, this comprising word here
4    means that the Newegg system, or the accused system, has
5    to perform all of these actions and contain all of these
6    structures in this case.  It can also do other things.
7            In the case of database, it could provide
8    backup; could not provide backup.  But that's not
9    required by the claim.
10    Q    All right.  Have you completed your
11    explanation of your analysis of elements 34(b) through
12    (d), Dr. Grimes?
13    A    Yes, I have.
14            So I went back to my favorite chart here, and
15    I added the check marks for these three, because the
16    Newegg system practices the requirements for these three
17    claims based on that -- claim elements based on the
18    evidence that we just looked at.
19    Q    All right.  Let's go to claim element 34(e).
20            What does that claim element require, as you
21    understand it?
22    A    Well, this element requires that the buyer
23    computer and shopping cart computer, which we've already
24    looked at, be interconnected by a computer network.
25    Q    In the Newegg system, are they?

1      A     Yes, they are.  This is represented by this

2   black line.

3            I've added the red line here, by the way.

4   That's not part of the Newegg document that was

5   produced.  But I added the red line to show the

6   connection between the buyer computer and the shopping

7   cart computer.  For example, when you're adding items to

8   the shopping cart, this is the path that the request

9   takes from the client computer to the shopping cart

10  computer; and also the response going back to the client

11  computer travels over the same network.

12     Q     And the public internet that appears on this

13  slide that you have up on the display system at the

14  moment, is that an indication of the buyer computer and

15  the shopping cart computer being interconnected by a

16  computer network?

17     A     Yes, it is.  Precisely, that's what this black

18  line in the Newegg *diagram represents; it represents*

19  that connection, interconnection.

20     Q     So what did you conclude about whether Newegg

21  meets element 34(a)?

22     A     This one is pretty straightforward.  Based on

23  the evidence that we just looked at, in fact, I gave

24  34(e) a check mark as being met by the Newegg system.

25     Q     I want to turn now to elements 34(f), (g), and

1   (h), but focusing on (f) first.

2           And here I want to focus on the way that the

3   Newegg system, when used, adds items to the shopping

4   cart.  So I want to focus you back on your actual

5   purchase examples, sir.  Are you with me, Dr. Grimes?

6       A   Yes.

7       Q   Can you explain in a little more detail how

8   Newegg does that in the system?

9       A   I described it in words before, but sometimes

10  it's nicer to have some diagrams and animations to show

11  this, because this is going to turn out to be an

12  important aspect of the -- of the case.

13          The buyer computer, or the client computer, is

14  executing the browser.  The browser has your product

15  element that you're looking at, like your cable.  And

16  then we have this button called add-to-cart.

17          So when you click the add-to-cart button,

18  let's suppose that this is the first product that you

19  have found on the website -- you're going to buy several

20  things, but this is the first one.  So this is the first

21  time in this interaction that you clicked the

22  add-to-cart button.

23          What happens is, for all button clicks,

24  actually almost all button clicks, the browser sends a

25  message to the Newegg server system over this network

75

1   that we just looked at, and it sends the message to the

2   server.

3          Now, the server gets this request for service,

4   and the service is add-to-cart.  So what the Newegg

5   server does is it adds this product to a cookie --

6   actually, the first time it happens it generates the

7   cookie because there wasn't a cookie before.  So it adds

8   this product a cookie.

9          And then when it sends the page back saying

10  you just purchased this item, it also sends the cookie

11  back to the client's computer.  The client's computer

12  automatically, whenever it sees the cookie, stores it in

13  the cookie file.  So it stores this cookie.

14     Q    Is the information about the product stored

15  after the buyer clicks add-to-cart?

16     A    Yes.

17     Q    Where?

18     A    The information as to what the product is is

19  sent in the message to the server computer.  The server

20  computer takes that information -- the product ID,

21  actually, the product number, and puts that in the

22  cookie, and then sends this cookie back to the server

23  computer -- back to the client computer to be stored.

24     Q    Can the buyer add a second product?

25     A    Yes.  In my example, I wanted to buy some

1  software.  So I clicked -- it was actually called the

2  download button, but the function was the same as if I

3  had purchased a different cable.  It was -- I clicked

4  the add-to-cart button for the second time.

5      Q    And what happened?

6      A    Okay.  A message was sent.  Every time

7  messages are sent, all of the cookies from this server

8  that is being addressed are sent with the message.

9          Now, before there were cookies sent as well,

10  but they weren't important to us because this was --

11  there wasn't any shopping cart cookie, if you will.

12          So the second time, it takes all the cookies,

13  now which includes the shopping cart cookie, and sends

14  that to the server.  The server gets this message -- the

15  action is to add an item to the shopping cart -- and it

16  has the cookie from before.

17          So it adds the second product information in

18  this cookie.  It actually modifies the cookie to add the

19  second item.  Then it sends the cookie, with the page

20  saying you just purchased this item, back to the client

21  computer.

22          And the client computer does the same thing.

23  It takes this cookie that it got, which now has two

24  products in it, and stores that in this cookie file.

25      Q    Okay.  What happens when the buyer is

1  satisfied with what they've selected and wants to check

2  out?

3    A    Well, they are perhaps looking at their

4  shopping cart to see what it is they purchased.  But the

5  important thing is that there is a checkout button.  And

6  they click the checkout button when they are through

7  shopping and through putting items in their cart.

8         So they click the checkout button.  When you

9  click this button, not surprisingly, another message is

10  sent along with all of the cookies, which includes the

11  shopping cart cookie, to the Newegg server.  And the

12  Newegg server now, instead of having an add-to-cart

13  action, it wants to do a checkout action.

14         So the check-out action involves some

15  different things.  In particular, it looks at this

16  cookie, gets the data out of it for what the products

17  are that correspond to items in the shopping cart, and

18  it stores those in this shopping cart database.  And

19  then basically that concludes the checkout action that

20  the server takes.

21         Then it sends a message back with more cookies

22  and says, you know, proceeds with the next stage in the

23  checkout process.

24         But this is that same shopping cart database

25  that we looked at earlier on this diagram.  This is the

1   shopping cart computer which is performing these

2   actions, these requests, add-to-cart as well as

3   checkout.  And this is the shopping cart database, which

4   is where the product information is stored after the

5   checkout button has been clicked.

6       Q    I think earlier, a few minutes ago, we

7   promised the jury a little more real-time demonstration

8   of how all this works.

9            Did you prepare or ask us to prepare an

10  animation along those lines?

11      A    Yes.  I asked that we make a short movie

12  that -- that describes how this system actually works.

13      Q    All right.  I think Mr. Gooden has now put up

14  on the monitor the beginning of the short movie.  Would

15  you, working with Mr. Gooden, try and step us through

16  this, please, Dr. Grimes?

17      A    Yes.  It begins by looking at the web page

18  that has the cable on it.  And so you're looking at this

19  web page, and then you decide that that's correct.  And

20  so you find the cable that you want, and you go down

21  and, sure enough, there's an add-to-cart button under

22  it.  We've seen this before.

23            You click on the button.  The browser creates

24  a message.  The message is add-to-cart item.  It sends

25  the product information for the cable to the shopping

 1  cart computer.  The shopping cart computer then says,

 2  okay, this is the first one, so I need to generate a

 3  cookie with this shopping cart information in it for the

 4  cable.

 5          Then I'm going to send that back to the

 6  customer computer, or the buyer computer, and that's

 7  going to store it in this -- the cookie file.  The idea

 8  was to have a cookie jar there, which I thought was kind

 9  of humorous.

10          So then we go and make the second purchase,

11  which is the software.  I click on the download button,

12  which generates an add-to-cart message.  And it sends --

13  now it sends this additional cookie that it has with the

14  first item in it to the shopping cart computer.  The

15  shopping cart computer now takes the first cookie and

16  modifies it and makes the -- change it to have both

17  items in it, and sends it back to the customer's -- the

18  buyer computer, also the client -- same as the client

19  computer, and it stores it in the cookie file.

20          Okay.  Now, when the shopping is concluded,

21  and you have this shopping cart page you're looking at

22  that has this button on it called checkout, you click

23  the checkout button.  It, just like before, generates

24  another message to checkout, sends along all the cookies

25  that go to this server, which includes the cookie with

80

1   the shopping cart information in it.

2           That information goes to the server computer.

3   This time, though, the message is checkout, the action

4   to take place.  So in this case, it takes the

5   information from the cookie and puts it in the shopping

6   cart in the shopping cart database.

7           So now we're ready to proceed with the next

8   stage of the checkout, which depends upon having the

9   information in the shopping cart database.

10      Q    Did you confirm with any sort of Newegg

11  documentation or Mr. Wu's testimony that the Newegg

12  system actually works as you've testified and just shown

13  us with the animation as well as your Slide 42?

14      A    Yes, I did.  These animations, of course, were

15  done -- I had them done in preparation for the trial.

16  These are not Newegg movies.  These are movies that I

17  had created.

18      Q    Do you have a --

19      A    But they are completely consistent with

20  Mr. Wu's testimony.  That's the important thing is that

21  they are illustrative and demonstrative of how the

22  Newegg system works.

23      Q    Do you have a copy of Exhibit 14 in your

24  binder, Dr. Grimes?

25      A    Yes, I do.

1      Q     Would you tell us what that is and what, if

2    anything, that's got to do with what we just spent the

3    last 15 or 20 minutes focusing on, this cookie,

4    add-to-cart, checkout, database, storage issue?

5      A     This is a two-page diagram.  It's entitled

6    Newegg Shopping Flow.

7           This is -- this is a page that we got from

8    Newegg that describes how the shopping flow works.  And

9    this, in fact, is also -- I believe Mr. Wu was actually

10   asked about this diagram, and that's how we were able to

11   understand in great detail what all of the different

12   actions are taken by the Newegg system.  So it works --

13   this is additional supporting evidence for it working

14   the way that I just described.

15           MR. ADAMO:  Turn to Element 34(f) of

16   Claim 34 of the '314 patent, please.

17     Q     (By Mr. Adamo) What does that claim element

18   require?

19     A     This is a different kind of claim.  This claim

20   is about how the buyer computer is programmed.  So the

21   language starts out the buyer computer being programmed

22   to do several things.

23           First, it has to receive a plurality of

24   requests from a user.  These requests from the user are

25   to add products to a shopping cart.  And then the

1  request from the user and the products need to end up in

2  the shopping cart database.

3         So since this is a system claim, that means

4  that the Newegg system must contain the structures that

5  allow this to occur.

6    Q    Does the Newegg system meet element 34(a) in

7  your opinion?

8    A    Yes, it does.  It, in fact, contains the

9  structures shown on this diagram and is consistent with

10  this diagram on the screen now, as well as Mr. Wu's

11  testimony of how the system works.

12   Q    Can you show us --

13         MR. ADAMO:  Just back up a second here.

14   Q    (By Mr. Adamo)  Can you show us again an

15  example of the add-to-cart button in the Newegg system?

16         I guess you've got one right here.

17   A    Yes.  This is the -- each time there is a

18  product on the web page that the user desires to

19  purchase, or download if it's -- if it's downloadable

20  software, there's a button that has this little icon

21  picture of a shopping cart on it.  And when you click

22  that, that sends a message to the Newegg server system

23  to add this item to your shopping cart.

24   Q    The add-to-cart button is on the Newegg web

25  page, apparently, but how is Newegg programming the

1  buyer computer?

2      A    The Newegg programs the buyer computer because

3  when it sends -- the server computer sends the

4  information back to the buyer computer in a message,

5  that message contains programming.  It's programmed in a

6  language called html.  It stands for hypertext markup

7  language.  And it's a language that the browser uses to

8  display the page and to program the actions of the

9  buttons, for example, the add-to-cart button.

10          So the programming of the buyer computer is

11  done by Newegg by virtue of sending this html code in a

12  message to the browser, and the browser executes that

13  code, generates the display, and provides the actions

14  available to the customer, for example, the add-to-cart

15  action.

16      Q    Do you have on one of your slides, say Slide

17  44, some of this html code, Doctor?

18      A    Yes, I do.

19      Q    Would you show it to us, please?

20      A    This is the code -- actually, the code for

21  this page displayed is probably 30 or 40 pages long.  In

22  other words, that's one of the reasons these binders are

23  so thick is because I captured all of that code and

24  looked at it for this entire page.

25          But the important thing was now going to be:

1  What is the action that takes place that it's programmed

2  to do to generate the request?

3          Well, the requests are generated by virtue of

4  the user, the buyer clicking on the button.  And the

5  computer has been programmed by Newegg, because this

6  example, the code that we see here, causes the action

7  when you click on the button.

8          In addition to providing the action, it also

9  does more code here that tells you what the display is

10 supposed to look like; in other words, what this little

11 button is supposed to look like.  It's supposed to say

12 add-to-cart and have this icon and so on.

13         But the important thing is, is that not only

14 does the code describe how to display the button, but it

15 describes the action to be taken if the button is

16 clicked by the user.  And that's how the user sends a

17 request.

18         It says:  *Program to receive a plurality of*

19 *requests from the user.*  These requests are generated by

20 clicking on add-to-cart button.

21    Q    Are these -- in view of the explanation you

22 have just given us about the request to add products to

23 a shopping cart, are those requests, in your opinion,

24 Doctor, requests to add products to a shopping cart in

25 the shopping cart database?

85

1    A    They are.

2    Q    Why?

3    A    Because the requests, as I just showed in the

4 animation and the description of how the system works,

5 the items that are added end up in the shopping cart

6 database.  Therefore, the request from the user to add

7 the product ends up in the shopping cart database.  And

8 that meets the requirement of this claim.

9    Q    Does Element 34 specify in any way when or how

10 products are added to the database?

11    A    It specifies the how because they are a result

12 of a request from the user to add products.  But it

13 doesn't say anything about when.  I mean, this is

14 characteristic of system claims.  The system has to be

15 capable of making -- at some point, the request from the

16 user to add product must be represented in the shopping

17 cart database, which is the case --

18    Q    And --

19    A    -- as I described how that worked.

20    Q    And in view of that description, because the

21 information of what was in the shopping cart eventually

22 ends up, or ultimately ends up in the shopping cart

23 database, in your opinion, is that enough to satisfy,

24 literally, element 34(f)?

25    A    Well, that's what's required by a proper

1  reading of Claim 34(f).  And the answer is yes, that's

2  the way the Newegg system operates.

3      Q    In your opinion, then, does the Newegg system

4  literally meet element 34(f)?

5      A    Yes, it does.

6           And back to my chart here, I gave 34(f) a

7  check mark.

8      Q    All right.

9           With regard to element 34(g), what does that

10  element require?

11     A    34(g) is an additional thing that the buyer

12  computer must be programmed to do to meet this claim

13  element.  And this one says, in response to these

14  requests to add the shopping cart messages to the

15  shopping cart computer, it's important that -- another

16  requirement is that each of these requests contains or

17  comprises, includes, a product identifier identifying

18  the plurality of products.

19           Now, I mentioned that when you click the

20  add-to-cart button, the message contains a product

21  identifier.  This is the actual html code, and it's a

22  get request from the client to the web server.

23           And a get request gives the URL, and then

24  there's an item number here that's in bold -- I don't

25  know if you can read it or not.  It says N82E1 and then

87

1   a bunch more digits.  That is the product identifier for

2   the cable that I purchased.

3       Q    Does the message then include a product

4   identifier for the product being added to the Newegg

5   shopping cart as element 34(g) requires?

6       A    Yes, it does.  This message goes -- when you

7   click the add-to-cart button, the message goes from the

8   client computer to the web server.  And I have a

9   little -- cute little animation here that shows the

10  message going from the client to the shopping cart

11  computer labeled here as a web server.

12      Q    For the reasons you've just described to us,

13  did the Newegg -- I'm sorry -- does Newegg program the

14  buyer computer to do this?

15      A    Yes.  By virtue of sending the html code to

16  the buyer computer, Newegg -- what it's doing is

17  controlling the buyer computer and what actions can be

18  taking place -- can take place on the buyer computer.

19           And so one of those actions is add-to-cart.

20  And so when the -- when that action is -- the request is

21  made by clicking the button, in fact, the shopping cart

22  computer, because of its programming, sends the message,

23  which includes the product identifier.

24      Q    What do you conclude about element 34(g) as to

25  whether Newegg meets that, Doctor?

88

1    A    Well, for all these reasons and the evidence

2  shown here and that I summarized, it meets 34(g).

3    Q    All right.  34(h), what are the requirements

4  of element 34(h)?

5    A    Okay.  34(h), we just talked about the

6  programming of the shopping -- of the client computer.

7          Now we are going to switch and talk about the

8  programming of the shopping cart computer.  We just

9  talked about the client being programmed, and now we

10  have to show that the shopping cart computer is

11  programmed.

12    Q    Is it?

13    A    Yes, it is.

14    Q    How?

15    A    That's what the web server does; it receives

16  messages and takes actions.  And computers just don't do

17  anything unless they are programmed to do them.

18  Otherwise, they just sit there and consume power.

19          In this case, the server computer, here called

20  the web server.  In fact, its sole purpose in life is to

21  receive requests and to take action based on those.  So,

22  in fact, it does receive this plurality or the several

23  shopping cart messages as required and takes action.

24    Q    All right.  Does 34(h), the element of the

25  claim that we're looking at, have any other

 1  requirements?

 2      A    Yes, it does.  There's basically two parts.

 3  It has to be programmed to do two things.

 4           Receiving the plurality of messages is -- is

 5  really not in much dispute because that's what web

 6  servers do.

 7           The second part, though, is -- is more

 8  problematic and is one of the issues in the suit, as we

 9  heard this morning.

10           And here this shopping cart computer has to be

11  programmed to modify the shopping cart in the shopping

12  cart database, and the modification in the database has

13  to reflect these plurality of requests to add products

14  to the shopping cart.

15      Q    All right.  Is the Newegg shopping cart

16  computer programmed in that fashion?

17      A    Yes, it does.  It is programmed to do that.

18  It's shown in this diagram here, along with the

19  supporting testimony from Mr. Wu.  And the Court's

20  construction about modify I wrote here because it's very

21  important to this, showing that the Newegg system meets

22  this claim element.  Modify means to change an instance

23  of a shopping cart in a shopping cart database.

24      Q    Let me -- let me ask you -- I think this is

25  essentially the same question, but let me phrase it in

90

1  slightly a different way.

2          Does the claim require the shopping cart

3  computer being programmed to modify the shopping cart in

4  the shopping cart database after each shopping cart

5  message?

6      A    No.  The claim, as we can see by reading the

7  text here, it says you have to modify the shopping cart

8  to reflect the plurality of requests.  It doesn't say

9  follow one -- it doesn't say one at a time.  It just

10  says that -- that the result has to be that the shopping

11  cart database reflects these results.  And it has to

12  modify the shopping cart in the database to do that.

13   As you understand this claim and how -- at the moment,

14  focus on your understanding of the claim -- is it

15  correct that the modification could happen after each

16  individual message?

17      A    Yes.  That would be -- if it happened after

18  each individual message, that would also meet this

19  requirement, because the claim doesn't say whether it

20  has to be done one at a time or all at once.  It simply

21  says that the shopping cart database has to be modified

22  to reflect this -- these three requests.  You make three

23  requests for products, the shopping cart database has to

24  reflect that.  It doesn't say one at a time or all at

25  once or some other way.

1      Q    As you understand the claim element, it could

2  work either way; is that fair?

3      A    Yes.  In fact, in my experience in online

4  shopping, systems do work both ways.  So the answer is

5  yes.

6      Q    And which way does Newegg do it?

7      A    Newegg does it all at once, as I described

8  earlier.  They -- they wait until you do the checkout

9  operation.  In other words, you can add-to-cart,

10  add-to-cart, add-to-cart, the information shows up in

11  the cookie.  It's only when you do checkout that it's

12  stored in the shopping cart database.

13      Q    All right.  In earlier submissions in the case

14  which haven't been in front of the Court so far, but I'm

15  just going to say this, Newegg has said that, going from

16  an empty cart to a full cart is not a modification but

17  an insertion.

18          What's your reaction to that and your

19  response, Dr. Grimes?

20      A    Well, I mean, you can -- you can characterize

21  it as an insertion, I suppose.  But I'm not sure what

22  they mean by that.

23          The thing that I did was I went back to the

24  Court's construction, which is to change an instance of

25  a shopping cart in the shopping cart database.  I mean,

1   the Court said this is what it means to modify it.  So

2   that's -- that's the definition I used.

3          I don't know -- you could call it an

4   insertion, I suppose, if it, in fact, changes an

5   instance of a shopping cart in the shopping cart

6   database.  Then it would match.  But, otherwise, I am

7   not sure what they meant -- Newegg meant when they said,

8   no, no, it does an insertion in the file.

9      Q    In your understanding, is going from zero

10  items to multiple items a change as the Court used that

11  phrase in the definition we're looking at on your

12  Slide 49?

13     A    The answer is yes.  And the reason is because

14  that's what Mr. Wu testified was the way that the

15  shopping cart database -- insertion, if you want to use

16  that word -- occurred.

17         In other words, there was an instance of a

18  shopping cart, and that instance was modified.  And

19  that's the way the system works.  And, therefore, based

20  on his description in his deposition, it meets the

21  modify requirement for the -- based on the Court's

22  construction.

23         THE COURT:  Mr. Adamo, we've been going

24  for about two hours.  Whenever you get to a good

25  stopping place, unless you're about to finish up with

1  this witness.  How much longer do you anticipate?

2                    MR. ADAMO:  On this point, we're exactly

3  at the place we were going to talk about the Doctrine of

4  Equivalents.  Maybe five more minutes --

5                    THE COURT:  Go ahead and finish that.

6                    MR. ADAMO:  -- and then this would be a

7  good place to break, if I can ask everybody to hang in

8  for five more.

9                    THE COURT:  As soon as you get to a

10 stopping place, we'll take a break.

11                    MR. ADAMO:  Absolutely, Your Honor.

12 Appreciate the courtesy.

13     Q    (By Mr. Adamo) Dr. Grimes, I just promise

14 we're going to do this accurately but quickly.

15     A    All right.

16     Q    The slide says literal analysis -- this is

17 your Slide 49.  Why are we specifying literal analysis

18 on this slide?

19     A    Well, this is a -- it's to remind all of us,

20 and me in particular, that, in fact, I did another

21 analysis, which is the Doctrine of Equivalents.

22          So I just described to you my literal

23 analysis.  This is the way I believe the claim should

24 operate, should mean, and this is the way the Newegg

25 system works, and it meets the literal description in

1    the claim.

2        Q    Okay.  Now, you did this alternative analysis

3    because you're not sure of your analysis, or you did it

4    just to see what would happen if you had bought into

5    Newegg's argument?

6        A    No.  I didn't do it because of any question of

7    my own analysis because of the reasons I said, the

8    testimony of Mr. Wu and so forth; but just sort of to

9    make sure, I did an analysis of this claim limitation

10   based on what Newegg interpreted it to mean.  And I did

11   that analysis under the Doctrine of Equivalents.

12       Q    And your understanding of what Newegg

13   interpreted this to mean was an addition every time

14   there's a message?

15       A    Yes.  They interpreted this language, which to

16   me it doesn't say that, but they said:  When you reflect

17   the plurality -- let me see if I can restate the

18   language as they mean it.

19            They said, to reflect a plurality of requests

20   to add products to the shopping cart each time a request

21   is sent by the client.  I have made this up.  But they

22   think that this other language, each time a request is

23   made by the client is actually there.

24            And so I said, well, let's -- let's make the

25   assumption, under the Doctrine of Equivalents, that it

95

1    is there, and then do they still match this claim

2    requirement under the Doctrine of Equivalents.  So

3    that's the analysis I did.

4        Q    All right.  Under what you understand to be

5    Newegg's belief position, whatever, do you believe that

6    Newegg meets the modify element under the Doctrine of

7    Equivalents?

8        A    It does.  I did the three-part analysis I

9    described before.  I won't go back through all of that.

10   But the function performed, which is to modify, is the

11   same under the way Newegg thinks it should be

12   interpreted versus what I think is the correct literal

13   interpretation, the result is the same, I mean, you end

14   up with items stored in Newegg's shopping cart database.

15   The discrepancy is the way Newegg does it and the way

16   Newegg thinks it needs to be done, which is one at a

17   time.

18           So I looked at the way Newegg does it, which I

19   already described it adds items to the cookie, and then

20   at checkout it dumps all of the items into the shopping

21   cart, versus doing it every time you do an add-to-cart.

22   I actually prepared a little animation to show this

23   difference.

24       Q    Okay.  Another animation.  A quick one, I

25   hope?

1      A     A quick one.

2      Q     All right.

3      A     So the claim, according to Newegg, is that,

4   every time you click an add-to-cart button, they

5   maintain that that has to cause it to show up in the

6   shopping cart database.  That's the essence of the way

7   they think that the claim should operate.  And I said

8   all the systems do it that way, so that is a perfectly

9   reasonable -- if they did it that way, that would, in

10   fact, practice the claim element.

11          But the way they actually do it is different.

12   I did this before so you will recognize it.  Every time

13   you add an item to the shopping cart, it actually gets

14   added to the cookie, which you can think of as like a

15   shopping basket or something.  Then once you do the

16   checkout operation, not the add-to-cart but the checkout

17   operation, that causes all of the product identifiers in

18   the cookie to be put into the shopping cart database.

19          So the question is, okay, these two ways of

20   interpreting the claim are different, but are -- are the

21   differences between these two ways substantial?  And, in

22   fact, I looked at them and they are not substantial.

23   The differences are insubstantial.

24          One of the reasons I came to that conclusion

25   is, these, in fact, are design alternatives.  A designer

1  implementing a shopping cart and putting items from a

2  shopping cart into a database could do it either way.

3  In fact, systems do do it either way.

4         So these two, the differences between the way

5  Newegg does it, on the bottom, and the way they believe

6  that it is required to be done, on the top, are, in

7  fact, equivalent under the Doctrine of Equivalents.

8     Q    And that's with respect specifically to

9  elements 34(h), correct?

10    A    Yes.  I can -- we're going to back up.  Here

11  it is.  This is 34(h).  So this is the claim element

12  that I analyzed under the Doctrine of Equivalents.

13    Q    All right.  So what's the conclusion that you

14  reached, Dr. Grimes, as to whether Newegg meets element

15  34(h) under the Doctrine of Equivalents?

16    A    It meets this under the Doctrine of

17  Equivalents, so I gave it a check mark.

18    Q    Okay.

19         MR. ADAMO:  This would be a good point,

20  Your Honor, with the Court's permission.

21         THE COURT:  All right.  Very well.

22         Ladies and Gentlemen of the Jury, we will be

23  in recess until 3:10.  So enjoy your break.  Remember my

24  instructions.  Don't discuss the case among yourselves.

25         Be in recess.

98

1              (Jury out.)

2              (Recess.)

3              (Jury in.)

4              THE COURT:  Please be seated.

5              You may proceed, Mr. Adamo.

6              MR. ADAMO:  Thank you, Your Honor.

7              Thank you, Ms. Ferguson.

8    Q    (By Mr. Adamo) All right.  Dr. Grimes, let's

9  see if we can finish out.  I think we were on -- I

10  should just check 34(h), I think that's where we stopped

11  before the break.  Let's move on to element 34(i), and

12  let's see if we can pick up the pace a bit if you don't

13  mind, Doctor.

14             What does element 34(i) require?

15   A    This is a third aspect of how the shopping

16  cart computer needs to be programmed.  And this caused

17  the shopping cart message -- payment message to be

18  created.

19   Q    What's a payment message?

20   A    Well, the Court's construction is here.

21             Payment message is a message relating to the

22  payment for one or more products.

23   Q    Does Newegg meet this element?

24   A    Yes.  This page shown here has the billing

25  information and the total, which is -- in fact, meets

1  the Court's construction.

2      Q    And what is Newegg's payment message?  Is it

3  this confirm order page?

4      A    Yes, it's this confirm order page that's shown

5  here.

6      Q    And why is that a payment message?

7      A    Because it's a message because of the

8  information that's received from the server, that

9  relates to the payment for one or more products.  And we

10  know that because we can see the information on the

11  page.

12     Q    Is the shopping cart computer programmed to

13  cause this to be created?

14     A    Yes.  We know it is because we received this

15  web page from the shopping cart computer.

16     Q    And does that then go back to your point

17  earlier about html code generating the page and that

18  being programming?

19     A    Yes.  That code is, in fact, generated by the

20  shopping cart computer sending a message to the client

21  and displayed.

22     Q    What did you conclude about element 34(h) --

23  excuse me, 34(i) then?

24     A    It's met by the evidence that we've summarized

25  here, and I gave it a check mark.

```
1    Q    34(j), what does element 34(j) require?

2    A    34(j) is a programming about the -- effected

3    on the buyer computer, and it has to be programmed to do

4    these two things, receive a request and to cause a

5    payment message to be activated to initiate the

6    transaction.

7    Q    Is Newegg's buyer computer programmed to

8    perform the first task of element 34(j)?

9    A    It is programmed to receive a request because

10   when you click on buttons, the submit-order button in

11   particular, that generates the request which is received

12   from the user.

13   Q    All right.  What about the second task?  Is

14   the buyer computer programmed to cause said payment

15   message to be activated to initiate a payment

16   transaction for said plurality of products added to said

17   shopping cart?

18   A    Yes.  The Court's construction is listed here,

19   and when the submit-order button is clicked, that, in

20   fact, causes a payment message to be activated to

21   initiate the transaction.

22   Q    And how is that done?

23   A    The action is caused by the message that's

24   sent in response to clicking the submit-order button.

25   That's what causes the activation of the initiation of
```

1   the payment transaction.

2       Q    And is the message that's sent to the Newegg

3   shopping cart computer, does that tell the computer that

4   the buyer made the requested purchase?

5       A    Yes, it does.  That's the action that's to be

6   taken place by the buyer -- by the server computer when

7   it receives this message.  It initiates the transaction.

8       Q    And is the sending of the message an action

9   associated with the payment message so the Court's

10  construction is satisfied?

11      A    Yes, that is correct.

12      Q    Is the payment transaction initiated?

13      A    Precisely.  The -- the clicking of this button

14  and the sending of the message to the server computer is

15  what initiates the transaction.

16      Q    So the buyer computer does the recited actions

17  then?

18      A    Yes.  The buyer computer is programmed to

19  cause the message to be activated, and then that message

20  is received by the server computer.

21      Q    And programmed how, again?

22      A    Programmed using html that's been sent from

23  the server computer.

24      Q    Do you have any further evidence that a

25  payment transaction was initiated, more than what we've

1  look at so far?

2      A    Well, we can tell it's been initiated because,

3  in fact, we get a thank-you message from the website in

4  response to the server computer initiating payment

5  thanking -- thanking me for ordering it.

6          And further, sometime later, I get an e-mail.

7  This came to my e-mail for my purchases telling me that

8  my order was successfully charged.  So I know that, in

9  fact, the payment transaction had to have been

10  initiated; otherwise, I wouldn't get this message.

11      Q    Dr. Grimes, does Newegg meet claim element

12  34(j) then?

13      A    Yes, it does for the reasons I summarized

14  here, so I gave it a check mark.

15      Q    Let's move on to claim elements 34(k, (l), and

16  (m).  Do these elements add new structures to the claim?

17      A    No.  These are really definitions.  In fact,

18  they're definitions consistent with the Court's

19  construction.  So these were the definitions I've

20  already used in the analysis that I performed thus far.

21      Q    All right.  Let's just step through them

22  briefly for completeness.

23          34(k), does the Newegg system have that claim

24  shopping cart?

25      A    Yes, it does.  It has this stored

1  representation of a collection of products.

2      Q    34(l), does the Newegg system have the claim

3  shopping cart database?

4      A    Yes, it does.  The Newegg database does meet

5  this claim element.

6      Q    And 34(m), does the Newegg system have the

7  claim shopping cart computer?

8      A    Yes.  The shopping cart computer, as we've

9  talked about earlier, is the computer that modifies the

10  stored representations in the database.

11      Q    And in the way you've discussed before the

12  break with respect to element 34(h), is the shopping

13  cart computer modified -- programmed to modify the

14  shopping cart and the database, et cetera, et cetera?

15      A    Yes, it is.  It uses this network connection

16  in this diagram -- this large diagram that I showed

17  earlier.

18      Q    Does Newegg meet elements 34(k) through (m),

19  then, in your opinion?

20      A    Yes, it does.  And these are the three

21  remaining elements of 34, so I gave each of those a

22  check mark.

23      Q    All right.  We've been through elements (a)

24  through (m) of Claim 34.  That's all of them?

25      A    That is all of them.

104

1    Q    All right.  In your opinion, then, does the

2    newegg.com website meet all the elements of Claim 34?

3    A    It does.  It does.

4    Q    Before we go to Claim 35, let me ask you about

5    the neweggmall.com.  Does that meet all the elements of

6    Claim 34?

7    A    It does.  The transaction that I did verified

8    that the Newegg Mall also meets element -- all the

9    elements of Claim 34.

10    Q    So if we went through all of the detail we

11    just went through with this Newegg website, we'd end up

12    with boxes checked for all of 34(a) through 34(m)?

13    A    Yes, we would.  The transactions operate

14    really substantially the same way on newegg.mall as they

15    do on newegg.com, based on Mr. Wu's description of

16    Newegg Mall.

17    Q    So, literally, would all of elements 34(a)

18    through (m), in your opinion, be satisfied by

19    neweggmall.com?

20    A    Yes, they would.

21    Q    All right.  Now, let's turn to Claim 35.

22         Please tell us what you understand Claim 35

23    requires.

24    A    We saw this at the beginning of the '314.

25    This is the one that depends upon 34.  So 35 then

1    includes everything included in 34, and then adds some

2    additional limitations.

3            In this particular case, the shopping cart

4    computer I have to show is programmed to cause the

5    payment message to be created before the buyer computer

6    causes the payment message to be activated.

7        Q    And why do you say that the payment message

8    was created before?  What is it that you see that

9    evidences that?

10       A    Well, the payment message is really the

11   message that creates this web page that's displayed to

12   the user that comes from the -- from the web server, the

13   shopping cart computer.  And it contains this button.

14   And it's the button that activates the initiation of the

15   message.

16           So the payment message is created because we

17   can see it, and then the button is clicked.  And so the

18   message is created before the payment message is

19   activated.

20       Q    If it wasn't done in that sequence, would

21   there be a button to click?

22       A    No, there would not be a button to click.

23   Just by nature of the way that the system operates, the

24   message occurs, then the button is there, and you click

25   on the button, and that activates the payment.

1    Q    With regard to Claim 35, then, Dr. Grimes, is

2  it your view that Newegg meets that claim?

3    A    Yes, it does.  It is my opinion, so I gave 35

4  a check mark.

5    Q    All right.  Now, looking at Claim 35 as a

6  whole, what's your opinion?

7    A    Well, Claim 35, which includes Claim 34, has

8  all the elements that we've just analyzed.  And I

9  presented summaries of my detailed analysis so I gave 35

10  a check -- 35 is one of the claims in the suit.

11    Q    And is it your view that Claim 35 is literally

12  infringed?

13    A    Yes, it is literally infringed.

14    Q    All right.  Let's turn to Claim 51.  What does

15  Claim 51 require, Doctor?

16    A    51 is a similar structure to 34 because it

17  also depends on 34.  So all of the analysis that we just

18  completed for 34 applies also to 51.

19         So 51 adds an additional requirement where the

20  network that's in Claim 34 is an internet.

21    Q    Can you explain -- oh, I see.  So what you

22  called earlier is the cloud, the public internet, that

23  is the element that you say responds to Claim 51?

24    A    Yes, that's correct.

25         Based on the system diagram that we have here,

1  you can see that the internet is the network that

2  connects the customer computer with the server

3  computers.

4      Q    All right.  And a number of the slides that

5  we've looked at have had the source information in the

6  lower right-hand corner that we discussed earlier.  This

7  slide does.  Same reason, the source information is

8  there for the same purpose, Doctor?

9      A    Yes.  That's the case for all of the slides

10  that I've summarized.  I made sure that each one of them

11  has the source from my detailed analysis.

12      Q    So what's your ultimate conclusion about Claim

13  51?

14      A    Well, for -- because of the rationale for --

15  and the evidence for Claim 34, Claim -- and the way

16  Claim 51 is evidenced, then I gave 51 a check mark as

17  well.

18      Q    Is Claim 51 literally infringed, in your

19  opinion, Dr. Grimes?

20      A    Yes, it is.

21      Q    All right.  Why don't we now turn our

22  attention to the '492 patent.

23          And I think in your overall topics we are

24  right in the middle of the three patents.  We have done

25  '314 patent; we are now at '492.

1            What relation, again, does the '492 patent

2   have to the '314 patent?

3      A     The '492 patent, turns out, it also has a

4   claim that's very much like the '314 patent; but the

5   main feature of the '492 patent is that it adds a

6   different functionality, namely checking past

7   transactions.

8      Q     All right.  Let's -- excuse me just for one

9   moment.

10         Okay.  Claim 15 of the '492 patent, that claim is

11  directed to what?

12     A     Yes.  Claim 17, which is -- which is -- let's

13  see, Claim 41, let me say --

14     Q     Okay.

15     A     -- is the one that's asserted in this matter,

16  the first one to be dealt with.  And 41 depends upon --

17  depends upon Claim 15.

18         But I think there's another patent -- another

19  claim that we were going to deal with first.

20     Q     Yeah.

21     A     Claim 17, which is actually not listed here.

22     Q     We don't have that one on the chart?

23     A     That's a little bit confusing.  I don't think

24  I have a chart with Claim 17 on it.

25     Q     All right.  Let's -- so we have to work

1   without the chart on Claim 17.  But let's do Claim 17

2   first anyway.

3          Can you tell us what the differences are

4   between Claim 17 and Claim 34 of the '314 patent?

5      A   Yes.  This is relatively straightforward to

6   deal with because we just spent all this time on

7   Claim 34 of the '314.  And it turns out that Claim 17 of

8   the '492 is almost identical.  I mean, if you compare

9   the text side by side, which I have done, there's

10  actually very little difference.  What the differences

11  are I've got on this slide and the next one.

12     Q   All right.  So this is your Slide 67.  You've

13  got a first difference here that you identified between

14  Claim 17 of the '492 patent and Claim 34 of the '314

15  patent?

16     A   That is correct.

17     Q   All right.  Could you briefly explain the

18  first difference?

19     A   Well, the first difference is that the

20  computer network in the Claim 34 has an additional

21  requirement in that it has to be a public packet

22  switched computer network.  So, it's more specific than

23  Claim 34.

24     Q   Does Newegg's system use a public packet

25  switched computer network?

110

1    A    It does indeed.  The Court construed the term

2  packet switching in analyzing the -- because of the fact

3  that it uses the internet, it's really well-known that

4  the internet is, in fact, an example of a packet

5  switched system that meets the Court's definition.  It's

6  a packet switched computer network.

7    Q    How do you know the internet is a packet

8  switched network, Dr. Grimes?

9    A    Well, not only did Mr. Wu confirm that, but

10  the other documents that I have listed here provide

11  additional confirmation.  The RFC listed here and

12  Tanenbaum, which is a very well-known book on computer

13  networks.

14    Q    And a packet switched network -- I think you

15  might have seen during my opening, I put a slide up

16  there quickly -- is a packet switched situation where

17  messages are split up into pieces, the packets are sent,

18  and then the packets can go in a variety of different

19  paths, but they eventually arrive at their destination,

20  and then they are reassembled?

21    A    That's correct.  The message is far too long

22  to be contained in a single packet, so it's broken up

23  into multiple packets.  That's just the way the internet

24  works.

25    Q    You made reference to something called RFC

1  '791. Would you look at your binders and hopefully

2  you're going to find Exhibit 24, which should be that

3  internet protocol?

4      A    Yes.  This is a document from the Internet

5  Engineering Task Force, which is a group of -- loosely

6  coupled group of people who, in fact, worry about what

7  kind of standards should be used by the internet.  And

8  this RFC is an example of one of the documents that

9  describes the IP or the internet protocol.

10     Q    In your experience and in your view,

11  Dr. Grimes, is an RFC such as this a reliable reference

12  and, in fact, a reference that people in your line of

13  work and your experience rely upon with regard to the

14  internet protocol?

15     A    It is.  The Internet Engineering Task Force is

16  a group of people who are all cooperating.  And so when

17  a document like this shows up, the other people say,

18  okay, well, this is the way we should do it.  It doesn't

19  have force of standards body or something.  But, in

20  fact, it works very well over many, many years as a way

21  to get uniformity in the operation of the internet.

22     Q    And you also talked about Tanenbaum 3D edition

23  on Slide 67.  What is that?

24     A    Tanenbaum is probably one of the most

25  well-recognized computer science books that deals with

1  computer networks.  And he has many editions going back

2  many years, and the 3d edition is an example.

3      Q    Is Tanenbaum, to your understanding, a

4  reliable reference, essentially a standard reference in

5  the computer network field that people such as yourself

6  rely upon?

7      A    Yes.  Tanenbaum is what I would call an

8  authoritative source of information about all aspects of

9  computer networks.

10     Q    All right.  We've got on the system the front

11 page of Tanenbaum's book, part of which is in -- should

12 be in your binder as Exhibit 25.  Would you find that

13 for us and confirm that Exhibit 25 is, in fact, part of

14 the Tanenbaum book?

15     A    Yes, it is.  I have provided specific

16 citations for that which are listed across the bottom of

17 the slide here to specific pages in this reference to

18 confirm that the internet uses this packet switched

19 protocol, the packet switched computer network.

20     Q    All right.  What about the other differences

21 you identified between Claim 34 of the '314 patent and

22 Claim 17 of the '492 patent?

23     A    This difference relates to the messages that

24 are sent back and forth between the client and the

25 server and the server and the client.  In this case, the

1  shopping cart message, which goes from the client to the

2  server, has additional requirements.  In particular, it

3  has to contain a universal resource locator or a URL.

4  And the payment message is another example of a message

5  that must contain a URL.

6          And here is the http traffic that I recorded

7  during my purchase example.  And, in fact, it shows that

8  the http shopping cart message contains a URL and shows

9  that the payment message also contains a URL.

10     Q    What conclusion did you reach then, Doctor,

11  with respect to Claim 17 of the '492 patent and whether

12  the Newegg system satisfies it?

13     A    Because of these differences and additional

14  requirements are met, I concluded that Claim 17 is

15  practiced by the Newegg system.

16     Q    Literally?

17     A    Literally.

18     Q    All right.  Let's move on to other claims in

19  the '492 patent.

20          Does the '492 patent have other claims that,

21  in your opinion, are met by Newegg?

22     A    Yes.  This is the second, in some sense the

23  major feature of the '492, which is the hypertext

24  statement system.

25          Here we have Claim 15 and Claim 41 on the

114

1  board.  And as we can see from the board and from the

2  slide, we first need to analyze Claim 15.

3      Q    All right.  Is that because Claim 41 is

4  dependent; it cites back to Claim 15?

5      A    Yes, exactly.  It's a dependent claim, and

6  it's dependent upon Claim 15.  So we have to revisit

7  Claim 41 after we have looked at the evidence for

8  Claim 15.

9      Q    All right.  We've got your -- now we've got

10 your poster that matches the questions I should be

11 asking you.  Got Claim 15, Claim 41, and hopefully it's

12 also going to work for Claim 61, which it looks like it

13 does.

14          Let's start with Claim 15, please.  You used

15 the same system of breaking it down into subparts with

16 brackets to show what you did yourself?

17     A    Yes, that's correct.

18     Q    Let's turn to 15(a) first.  What does that

19 element recite?

20     A    This is a -- recites a hypertext statement

21 system comprising, which means it includes the items

22 listed below.

23     Q    Does Newegg have a hypertext statement system?

24     A    Yes, they do.  They call it the order history

25 system, order history pages, but it is a hypertext

115

1   statement system.

2       Q    Look now at elements 15(b) through 15(d).

3   What did your analysis of those elements show?

4       A    These three elements, looking at (b) first,

5   requires a client computer, which is the same computer

6   we were used to pointing out in the upper left-hand

7   corner of the diagram.  And it's for operation by a user

8   of the claim.

9       Q    And what about element 15(c)?

10      A    Element 15(c) is -- requires one or more

11  server computers for operation by server users.  And

12  we've seen this before, as I circled it in red here with

13  the oval.  Previously we called it the shopping cart

14  computer, and it also performs the hypertext statement

15  functions.

16      Q    And now element 15(d), what did your analysis

17  show there?

18      A    The client computer and the server computers

19  are interconnected.  And we already dealt with this

20  question before.  It's interconnected with a public

21  packet switched computer network, which is the internet.

22      Q    What is your opinion, then, Dr. Grimes, as to

23  whether Newegg meets Claim elements 15(a) through (d)?

24      A    Based on the evidence we've summarized here,

25  in fact, the Newegg system meets these four claim

1  elements listed here.

2      Q    All right.  Let's continue with your analysis

3  of Claim 15.  Looks like we're up to element 15(e).

4  What did your analysis with respect to that element

5  show?

6      A    This is a requirement for the programming of

7  the server computer, and it has to do a couple of

8  things.  One of them is to record information pertaining

9  to the transactions in a database.  And the database is

10  shown on the right here with the little yellow square,

11  and that's where the order information -- the order

12  history information for the transactions is stored.

13      Q    Does the Newegg server computer record the

14  information, then, about the purchase transactions in

15  the database?

16      A    Yes, it does.  We can see this because the web

17  server column, if you will, is the transaction server

18  for hypertext statement documents.  And the thing at the

19  bottom says send message.  So the web server sends the

20  message, and it goes through the MSNQ server into the

21  data center and stored in the order database.  So it

22  meets this claim element.

23      Q    Is the little gold square in there in the

24  original document or is it there --

25      A    No, I added that.  That is to represent the

117

1   order history and the result of the recording that

2   information in the order history database.  That is the

3   database that is required.

4       Q    All right.  You've just explained how the data

5   is recorded.  How is it programmed to do that, or at

6   what point is it programmed to do that?

7       A    Yes.  We know that it's programmed to do that

8   because of this diagram, number one; and, number two,

9   because when Mr. Wu was asked about where the

10  information is recorded, he said it's recorded in the

11  order database.

12      Q    What's the second function that the server

13  computer must be programmed to do?

14      A    Okay.  The second thing is that the same

15  server computer must also be programmed to transmit a

16  statement document that contains the transaction records

17  to the client computer over the network.

18      Q    Are new -- excuse me -- Newegg server

19  computers programmed in that way, Dr. Grimes?

20      A    Yes, they are.

21          This is an example of the html code on the

22  client.  And when you click the link that requests the

23  order history, shown here in the red, from the

24  newegg.com secure server, which is the server we've been

25  focusing on, the server says, okay.  That means that it

118

1   received the request and is going to supply the

2   requested information.

3       Q     And how does that -- how do you know that the

4   computer's -- excuse me, the server computer was

5   programmed in the required way then?

6       A     Well, I mean, that's what server computers do.

7   They are all programmed -- the only thing the server

8   computer really does is it receives requests and takes

9   action based on those.  And the way we know that it is

10  programmed to do this particular operation is because we

11  receive an order history page as a result of the

12  request.

13      Q     What did you conclude about whether the Newegg

14  system meets element 15(e)?

15      A     For the reasons I've stated here, and the

16  other reasons, including Mr. Wu's testimony, it meets

17  this element.

18      Q     All right.  Let's turn our attention to 15(f).

19            Would you please explain your analysis for

20  that claim element?

21      A     This is a requirement on how the client

22  computer is programmed.  And we know from earlier it's

23  programmed by sending an html code from the server to

24  the client.  That program -- the client controls what

25  the client computer does.

119

1          And it does these three things.  It displays
2   the statement document, it's called an order history.
3   It receives a request from the client to display
4   details.  That's done with a mouse click.  And it causes
5   the transaction detail link corresponding to that
6   portion of the document to be activated when you click
7   on the request.
8       Q    Does the statement document have invoice
9   number hypertext links in it?
10      A    Yes.  Here's the portion of the web page that
11  comes back when you -- when you do this.  So we know
12  that the -- the request was successful.
13          This particular -- this represents multiple
14  purchases that I've made.  One of them is this dash 5 --
15  ends in 560.  It's underlined, so I know it's a link.
16      Q    Okay.  And the element also requires that the
17  client computer is programmed to cause a transaction
18  detail hypertext link corresponding to part of the
19  statement document to be activated, right?
20      A    Yes.
21      Q    I did --
22      A    And clicking on this link not only sends the
23  request but causes the detailed document to be
24  activated.
25      Q    And you know that how?

120

1    A    Well, I know that because when I click on it,

2   I end up seeing the detail document.

3    Q    What did you conclude about whether the Newegg

4   system meets element 15(f)?

5    A    The Newegg system does, in fact, practice

6   element 15(f).

7    Q    Let's turn to element 15(g), please.

8        What does your analysis of the newegg.com

9   system show with respect to this element of the '492

10  patent?

11   A    Okay.  Well, this is the other side of the

12  request.  In other words, we just talked about the buyer

13  computer clicking the link, sends the request.  This

14  says that the server computer needs to be programmed to

15  respond to the activation of the link.  And it responds

16  by transmitting the details to the client computer over

17  the network as a detail document.

18   Q    Does the Newegg system meet this element?

19   A    It does.  And here is the document that

20  actually shows up on the client computer.  So the only

21  place it can come from is from the -- from the server

22  computer based on the request for this document.

23  And here it is.  And it, in fact, shows the detail for

24  this particular invoice.  In fact, this is the software.

25  So this is not the cable, but this is the software that

121

1    I ordered.  So this is the details behind that link that
2    I clicked on.
3        Q    And this is your Slide 77 that you're
4    describing?
5        A    Yes, that's correct.
6        Q    Does that conclude your explanation of how
7    element 15(g) is met?
8        A    Yes.  15(g) is the last element of 15 that we
9    needed to analyze before dealing with 41.  And so all
10   the elements of 15 have been met, so I gave them all the
11   check marks all at once.
12       Q    In your view, Doctor, were they all met
13   literally by the Newegg system?
14       A    Yes, they were.  They are all met literally by
15   the Newegg system.
16       Q    Okay.  Let us then look at Claim 41.  We
17   already looked at 15, which 41 is dependent from, and
18   you have concluded that 15 is literally infringed?
19       A    Yes.
20       Q    All right.  Now, let's turn to 41.  What did
21   your analysis of Claim 41 show?
22       A    Well, this is an additional requirement in
23   addition to all the requirements of Claim 15.  And this
24   requirement is -- is that at least one of the server
25   computers in the client -- one of the server computers

1  to the client computer in response to a statement URL

2  sent by the client computer to one of the server

3  computers.

4          So we need to look at the -- at the

5  information, the message that came from the client

6  computer and determine whether or not it contained this

7  statement URL.

8      Q    Does Newegg meet this claim element -- I'm

9  sorry, this claim, excuse me?

10     A    It does.  This claim is -- by clicking the

11  order history, sends this following request.  And the

12  request, in fact, includes the URL as required by this

13  claim.  And it meets the Court's construction, as I

14  showed at the bottom here.

15     Q    All right.  What was the definition you

16  applied in that analysis for a statement URL?

17     A    The statement URL, which is the claim term,

18  the Court said is a URL that concerns a statement.  And

19  this concerns the order history, which is, in fact, a

20  statement.

21     Q    Does that satisfy the Court's definition, sir?

22     A    It does.

23     Q    All right.  Does the newegg.com system meet

24  the additional element of Claim 41 as to Claim 15?

25     A    It does.  So I gave Claim 41 a check mark.

1    Q    Is it your belief and conclusion and opinion,

2    Doctor, that Claim 41 is literally infringed by the

3    newegg.com system?

4    A    Not only Claim 17, but Claim 41, are literally

5    infringed.

6    Q    Before we turn to Claim 61, did you do an

7    analysis of Claim 15 and Claim 41 for the Newegg Mall

8    that we were discussing earlier?

9    A    Yes, I did.  Claim 15, Claim -- and Claim 41

10   were met by the Newegg Mall as I detailed in one of the

11   appendices that we looked at earlier.

12   Q    Was that also literal, in your view?

13   A    Yes, it was literally infringed.

14   Q    Let's turn to Claim 61 now, the last claim of

15   the '492 patent that we're going to look at.  That's at

16   the bottom of your chart.  Is that a dependent or

17   independent claim?

18   A    It's dependent.  But instead of being

19   dependent on 15, it's dependent on 60, which is

20   dependent on 15.  So there's another link in the chain

21   here.

22   Q    Okay.  So 61 depends on 60; 60 depends back to

23   15?

24   A    Correct.

25   Q    What does Claim 65 require then?

124

1    A    Before we look at 61, we have to look at 60.

2  And 60 requires a statement system according to

3  Claim 15, but the statement system needs to include

4  information on the transactions by the user that took

5  place during a given month.  So this is an additional

6  restriction on Claim 15.

7    Q    What's your conclusion after analysis

8  regarding Claim 60?

9    A    Well, we can see from the exhibit here, which

10  was the order history document that I received and

11  looked at on my computer, that, in fact, it allows you

12  to set one month and it will provide you with the

13  details about the transaction for that month.

14       Notice I have at the top new version only.

15    Q    Yes.

16    A    In looking at the -- I did three different

17  transactions -- or looked at three different

18  transactions; two of them I did.

19       The earlier one, which was done in 2008, did

20  not have this capability.  So this capability represents

21  something that Newegg added to their system sometime

22  between the middle of 2008 and the middle of 2009 when

23  these two transactions were done.  So this is relatively

24  recent.

25       The rest of everything I've talked about goes

125

1   all the way back to 2001.  This is the first example we

2   have of a claim that doesn't go all the way back to

3   2001.

4           This claim has really only been infringed

5   since, for sure that we know, since sometime in 2009.

6   So, it's relatively recent.

7       Q   Up to this particular point, the limitation

8   that appears, the dependent limitation that added to

9   Claim 15, everything you've been testifying about

10  earlier must apply equally to what you're calling both

11  versions?

12      A   Yes, that's correct.

13      Q   Okay.  Does that complete your analysis of

14  Claim 60?

15      A   Yes, it does.  And now we can move to 61,

16  which is dependent on 60, which was dependent on 15.

17      Q   All right.  To meet claim -- first, what does

18  Claim 61 require?

19      A   61 requires further information on the

20  transactions by the user in a hypertext statement

21  system.  In fact, it requires four items, but really

22  only needs to include one of them, so date of

23  transaction, product ID, payment amount, merchant

24  identifier.

25          So we look at the order history information

126

1   and we say:  Does this include at least one of these

2   four elements?  And the answer is yes, because it

3   includes two of the four elements.  It includes the date

4   and the payment amount.

5        Q    All right.  I just want to clarify; you might

6   have misspoke yourself.

7             Does Claim 61 require all four of -- the date

8   of transaction and identification of the product,

9   payment method, and a merchant identifier, or just any

10  one or more of the four?

11       A    All you have to do, if you match this claim

12  requirement, is just one of these four.

13       Q    All right.  Now --

14       A    There's two of them, which is, of course, at

15  least one.

16       Q    Agreed.

17            We're looking at your Slide 84.  You've got

18  new version only on this slide as well.  Why?

19       A    Well, 61 is dependent upon 60, and 60 is only

20  the new version.  So, therefore, Claim 61 also is

21  restricted to just the new version because of Claim 60.

22       Q    Does that finish your analysis with regard to

23  Claim 61?

24       A    It does.  And this time I gave it a qualified

25  check mark.  I said 61 is met only by the new system.

1 And by new system I mean since sometime in 2009.

2      Q    And in your view, is the infringement by the

3 new system only of Claim 61, literal?

4      A    Yes, it is.

5      Q    All right.  Doctor, that's all that we needed

6 to address on the '492 patent.  But before we turn to

7 the remaining patent, the '639 patent, I want to ask you

8 a few more questions about the system claims, the ones

9 we've been discussing in the '314 patent and '492

10 patents.

11           Now, I hopefully was careful to ask you in

12 each instance about your ultimate opinion and

13 conclusion.

14           Am I correct that you testified that, and

15 explained how the Newegg system met all of the elements

16 of the claims that we've reviewed so far out of the '314

17 and the '492 patents?

18      A    Yes, that's correct.  The Newegg system is

19 this large diagram beside me here.

20      Q    Okay.  Who uses the Newegg system?

21      A    Well, in the first instance, Newegg, the

22 company, uses the entire system.  In other words,

23 everything on this diagram here is used.  And used means

24 essentially the operation of it is controlled by Newegg.

25 That includes the servers, databases, the network links,

128

1   the buyer computers as well.

2       Q    And this is your Slide 86 where you have

3   summarized your views on this subject, sir?

4       A    That is correct.

5       Q    Now, you say that Newegg also uses the buyer

6   or client computer as part of the system, I see.

7       A    Yes, that is correct.

8       Q    All right.  How do you reach that conclusion?

9   I mean, whoever is sitting in their home is the one

10  who's punching the buttons on their client computer;

11  isn't it?

12      A    That's also true.  In other words, the client

13  computer is used both by Newegg and by, you know, you or

14  I if we're buying products.

15      Q    All right.  Let's stick to the use by Newegg

16  before we talk about the customer use.

17           Why do you say that Newegg is using the buyer

18  or client computers?

19      A    Well, Newegg -- Newegg uses the client

20  computer because it controls the client computer.  In

21  other words, if a person is buying products and paying

22  for them on the Newegg website, all of the operations or

23  all of the options that are available to the user on the

24  client computer are controlled by Newegg.

25           And it's controlled because Newegg sends the

129

1   programming that the browser uses to display the pages,

2   and the pages contain buttons that Newegg puts on the

3   page, and those are the only options that the user has

4   for what kind of operations to do on the Newegg website.

5       Q    Now, you note here on your Slide 86 under

6   buyer -- Newegg uses buyer computers client computers,

7   you note providing cookies and storing shopping cart and

8   other information and cookies on those computers.  Then

9   you've got a sub-note:  Newegg requires customers to

10  have cookies enabled.

11          Can you explain all that to us a little more,

12  please, Dr. Grimes --

13      A    Yes.

14      Q    -- why that supports your view that Newegg

15  uses the claim systems that you've been discussing?

16      A    Certainly.

17          If -- if you go to buy something on the Newegg

18  website, and you put items in the shopping cart, and you

19  click checkout, if for some reason cookies are not

20  enabled in your browser, the system will give you an

21  error message basically.  It says, I'm sorry, but you

22  have to enable cookies on your browser if you're

23  actually going to purchase these products.

24          The same thing happens if you try and log in

25  and you don't have cookies enabled.  The system -- the

130

1  Newegg system does not allow you to actually purchase

2  anything, or log in for that matter to check your

3  statement document, unless you have cookies enabled.

4         So there's no option for the user here.  The

5  user has to have cookies enabled or they simply can't

6  purchase things on the website.  So in that sense, the

7  client computer operates automatically once the user

8  enables cookies.

9         So there isn't any election or option

10  available to the user.  The user gets a web page to be

11  displayed; and if cookies are enabled, then when these

12  web pages come from the server computer, the browser

13  automatically stores the cookies and Newegg realizes

14  that because you can't buy things without having cookies

15  enabled.

16         So this is the automatic operation of the

17  user.  There is no option for the user.  They have to

18  enable cookies or they simply can't buy products.

19     Q    As best as you can tell from your review of

20  all of this Newegg system information, was this some

21  accident or was the system designed to operate exactly

22  the way you just described it?

23     A    No, it must operate the way I was describing.

24  In fact, that's conventional in many websites on the

25  internet.  And when you first install a browser, in

1   fact, that's the default, that cookies are enabled.  So,

2   many times the users install a browser, they go to

3   newegg.com, and they don't even realize this is an issue

4   because, in fact, cookies are enabled.

5          Newegg's website was designed specifically to

6   operate only with cookies enabled if you wanted to

7   purchase products.  You can shop, you know, but you

8   can't buy anything.

9      Q    All right.  You don't get $2 billion from

10  transactions if people shop and don't buy, right?

11     A    Yes, that's correct.  That's correct.

12     Q    Let me just make sure that -- because you've

13  used some terms here several times now and we didn't

14  cover them in your tutorial.  And I want to make sure

15  that you explain the terms to the jury, because computer

16  people don't speak English.

17         And cookies enabled, in plain English does

18  that mean they're turned on?

19     A    Yes.  That means they're turned on.  If you go

20  into the preferences capability of the browser and

21  search around, probably listed under cookies, you have

22  the ability to turn them off.  And if you do that, you

23  can't buy products on the Newegg website.

24     Q    You said something about cookies enabled being

25  a default condition, am I remembering what you said

132

 1  correctly?

 2       A    Yes.  When you first install browsers, that's

 3  the default.  In other words, the user doesn't actually

 4  have to do anything.  That's sort of the way they

 5  operate, sort of out-of-the-box, if you will.

 6       Q    So when you say default, let me see if I can

 7  get that back in English.  Enable means turned on,

 8  right?

 9       A    Turned on.

10       Q    And default means it comes on and stays on

11  unless you do something to shut it off?

12       A    That is correct, yes.

13       Q    Okay.

14            All right.  Would you look at Exhibit 15 in

15  your binder, please?

16       A    Yes.

17       Q    What is that?

18       A    This is the help page from the Newegg website,

19  and it is very well done actually.  It's four pages

20  long.  It basically provides help for people that are

21  having difficulty or have some questions about some

22  things, or maybe they're having trouble logging in or

23  whatever.  So this is a help page that is organized in

24  several categories.  It talks about ordering products

25  and so on.

133

1    Q    Is there a discussion about cookies in that
2 help page somewhere?

3    A    Yes, there is.

4    Q    Where is it approximately, so Mr. Gooden can
5 blow it up so the ladies and gentlemen of the jury can
6 see it.

7    A    I'm looking for the -- yeah, here it is.  It's
8 on -- it says:  I am experiencing trouble with my
9 shopping cart.  What can I do?

10          So this person has tried to check out, and it
11 didn't allow them to check out.  So they're having
12 trouble with their shopping cart.

13          And it says here:  Usually occur for one or
14 more of the following reasons:

15          Number one, cookies are not enabled, and then
16 it gives another reason, too, or your browser is
17 configured to block cookies from newegg.com.

18          So for whatever reason, cookies are not
19 automatically stored when they come back from the
20 server.  Either they're not enabled, or for some reason,
21 the website is blocked.

22    Q    So either they're not turned on or the client
23 computer, the people who are sitting in their homes, are
24 keeping other computers from shoving cookies into their
25 computer by blocking it, correct?

134

1    A    Yes.  Some browsers have the capability,

2  according to this, to block specific websites.  I don't

3  know why you would block a website you're trying to buy

4  products at, but that's the second reason.

5         Typically, the reason is the first one, the

6  cookies are not enabled.  So some -- you know, maybe

7  your son or daughter has come in and, you know, changed

8  the preferences or something to block cookies.

9    Q    Is there an analogy of any sort that you feel

10  is appropriate, Dr. Grimes, that would describe Newegg's

11  use of its customer computers?

12    A    Yes.  The key is, is that Newegg controls the

13  operation of the client computer when it's connected to

14  the Newegg website.

15         Example of that might be maybe the mother is

16  preparing dinner or the father is preparing dinner, and

17  the daughter comes up and says, can I go out and play,

18  11-year-old daughter, and the parent says, You can clean

19  your room, or you can do your homework.

20         In other words, there's only two options

21  available for the daughter.  Playing is not one of them.

22         So this is -- this is the same kind of analogy

23  for the way Newegg controls the operation of the client

24  computer.  The client may want to do something, but the

25  only thing that they can do are the options that are

1  available based on the html that programs the browser.

2      Q    Would it be appropriate, in your view, to say

3  that Newegg is acting like a puppeteer?

4      A    Puppeteer.  I haven't -- I haven't thought

5  about that.  They are in the sense that they're

6  controlling the available options on the client

7  computer.  So in that sense, it's like a puppeteer, yes.

8      Q    All right.  And Newegg uses the entire system

9  for what purpose, Dr. Grimes?

10     A    Well, the purpose is to -- you know, to make

11  money.  I mean, that's why really any company is

12  probably in business.  And they use the computer system

13  to that end.  I mean, they may have other purposes, but

14  that's the one that comes to mind.

15     Q    All right.  You mentioned a few minutes ago

16  that Newegg's customers also use the system.  Does

17  Newegg instruct the customers how to use the website and

18  the system?

19     A    It does through the help menu that I just

20  described.

21         And in addition, the technical officer,

22  Mr. Wu, said that yes, cookies are required in order to

23  shop.  That's the help page I mentioned.

24         If you try and log in and cookies aren't

25  enabled, the log-in page itself tells you, you know, you

1    have to enable cookies in order to log in.

2            So if you -- if you use the website at all and

3    cookies aren't enabled, there's all kinds of messages

4    that tell you that that's likely the problem.

5        Q    Would you look at Exhibit 18 in your binder,

6    please?

7        A    Yes.  This is a corporate summary from the

8    website.

9        Q    All right.  In the second -- please look at

10   the portion where there's a discussion of -- about

11   newegg.com.

12           Do you see that?

13       A    Yes.  Near the bottom?

14       Q    Yes.

15           And the first line, let me read it out loud.

16           Quote, Newegg.com, Inc., is the second largest

17   online-only retailer in the United States, period, close

18   quote.

19           Do you see that?

20       A    Yes.

21       Q    You understand what that means?

22       A    Yes.  That means that there is no physical

23   Newegg store.  It means that the only way to buy

24   products from Newegg is to type in, you know, or

25   otherwise go to newegg.com or one of their other

137

1    websites and navigate the site and so forth, like I did

2    in my purchase example.  You can't go to a physical

3    store and buy products.

4        Q    Dr. Grimes, in your opinion, in view of

5    everything that you've seen with regard to the Newegg

6    systems, does Newegg encourage, coax, lead its customers

7    to use Newegg's sales and hypertext statement systems?

8        A    It certainly does.  When you go to the home

9    page, for example, it tells you what the specials are.

10   I mean, it advertises on the website to say, you know,

11   this is -- these are the specials that we're running.

12   I mean, they have good prices everywhere, but the

13   specials are things that -- products that they're

14   featuring.

15       Q    Would you agree, sir, that Newegg needs

16   customers to use its website because that's the only

17   kind of business it's able to do?

18       A    Well, not having any physical stores, I mean,

19   if you're a merchant, then you have to have a mechanism

20   to sell products, and the newegg.com website is the main

21   mechanism that they use to sell products.

22       Q    Let's turn to the '639 -- thank you, Doctor.

23            Let's turn to the '639 patent now and see if

24   we can keep up the focus here.

25            The '639 patent, again, just so we've got it,

138

1   because we've been talking about a bunch of other

2   things.  Very briefly, what does the '639 patent relate

3   to, as you understand it?

4        A    This is this -- has been described earlier as

5   the session ID patent.  And we'll be looking at -- at

6   some claims, so if I could have the board changed to the

7   next -- the next one.

8             The -- basically, the '639 patent provides the

9   underlying technology to manage sessions using this

10  technique called -- the invention called a session ID or

11  session identifier.

12       Q    All right.  The session identifier that you

13  just mentioned, did you give a particular meaning to

14  session in the context of the '639 patent?

15       A    Well, the cart construed it, and it's at the

16  bottom of the slide here.  It identified -- it construed

17  both session and session identifier.

18            A session is a series of requests and

19  responses to perform a complete task or a set of tasks

20  between a client and a server system.  We've seen client

21  computers and server computers.  Those make up a client

22  and server system.

23            And then a session identifier is a string of

24  characters, a text string, that identifies a particular

25  session.

1      Q    Does Newegg have a session identifier using

2    the definitions that His Honor gave?

3      A    It does.  It actually has two different

4    sessions:  A checkout session and a log-in session.

5      Q    Can you explain the first session, please?

6      A    Well, sessions -- sessions have to have a

7    beginning and an end, and there has to be one or more

8    tasks associated with that.  And then there has to be a

9    session ID that corresponds to that session.

10           In the case of the Newegg system, the checkout

11   session is initiated by clicking on the checkout button,

12   and it ends when you click the submit order button.

13           The task, as you would expect, is paying for

14   the products in the shopping cart.  And the SID is a

15   particular cookie.  It's the value associated with the

16   shopping cart ID cookie that's stored on the client

17   browser and is updated by the server.

18      Q    Okay.  So what is the session -- excuse me.

19   What is the Newegg session identifier for the checkout

20   session then?

21      A    It's the cookie called shopping cart ID, and

22   the identifier is the value contained in that cookie,

23   and it's showing here in red.

24           This box, by the way, is a fragment of the

25   message sent back by the server to the client and

1  instructs the client to set this cookie, and it gives it

2  the name and the value for the cookie.

3      Q    Now, on this slide that's here, No. 90, you've

4  got some dates and use information.  What are those

5  dates, and why did you put that information on this

6  slide?

7      A    I could not confirm that the shopping cart

8  ID -- how far back it went.  So I was able to confirm

9  that it was used between August 10, 2007, and at least

10  as late as October 29, 2008.

11          And I confirmed that because I had a colleague

12  of mine look at the code and also -- because it says at

13  the bottom here -- it's in response to an interrogatory,

14  which is a correspondence that came from Newegg, and

15  according to Mr. Wu's testimony.

16      Q    What's the second session that you mentioned a

17  minute or two ago?  What is that session?  When does it

18  begin, and when does it end?

19      A    This I call the log-in session, because it

20  corresponds to logging in to use facilities in the

21  computer.  It has a beginning and an end, logging in and

22  logging out.

23          The task is -- could be several things.  The

24  Court didn't say what the task needed to be, just there

25  needed to be one or a set of tasks, one task or a set of

1  tasks.

2           And so it depends what the user does.  For

3  example, if he logs on for the purpose of checking the

4  order history, then checking the order history turns out

5  to be a task.

6           There's a different cookie, the customer

7  log-in cookie, which stores the information -- stores

8  the session ID for the log-in session.

9      Q    And is some of the http traffic shown on your

10 Slide 91, the one that's on the system now?

11     A    Yes.  It's been used at least as early -- as

12 far back as August of 2007, and it's currently being

13 used today.

14     Q    And does the slide show some of the http

15 traffic?

16     A    Yes.  This is the http message that comes back

17 to the client to set this cookie up.  And in this

18 particular -- it's like the previous one, but this time

19 it sets a different cookie, and it sets this value,

20 this -- it's written in red here.  And that is the text

21 string that corresponds to the value of the session ID.

22     Q    All right.  Let's turn to the claims, if we

23 can, starting with Claim 60.

24           It looks as if we've got a dependent situation

25 here again, Dr. Grimes; is that correct?

1    A    Yes.  This -- we need to go through Claim 1

2    first and then return to Claim 60.

3        Q    Okay.  Let's start with Claim 1.

4            Is Claim 1 a system claim or a method claim?

5        A    This is a method claim.  So it means that we

6    have to show that the -- the Newegg system actually does

7    what the method says.

8        Q    And how did you begin your analysis of

9    Claim 1?

10        A    Well, I looked at the structure and looked at

11    the definition for the terms, and it needs to show that

12    Newegg has a method for processing these requests over a

13    network, and then the method actually has several steps.

14    But the -- based on the documents that I've seen and the

15    purchase example exhibits, Newegg does, in fact, process

16    these service requests through a server system.  So they

17    meet this claim element.

18        Q    So what is it that does the processing?

19        A    The processing is done by the Newegg system,

20    and the service requests come from the client to the

21    server through the network.

22        Q    The preamble that we're looking at, 1(a), uses

23    the term service request.  Did the Court define that

24    term, and is that the definition that you used?

25        A    Both of those are true.  Service request is

1  listed at the bottom.  And as is always the case, I used

2  the Court's construction for the term.

3      Q    When we were looking earlier at the '314 and

4  the '492 patents, the term request was involved with

5  those patents.

6           Does the term service request, with regard to

7  the '639 patent, have the same meaning as the word

8  request did when we looked at them earlier -- looked at

9  it earlier in the '314 and the '492 patents?

10     A    They use similar words, but, in fact, they

11  have quite different meanings.

12          The -- in the -- in the '314 and the '492

13  patent, the request was a result of clicking a button,

14  for example.  Add-to-cart is an example of a request.

15  So the button click generated the request.

16          Here a service request is an http message --

17  http message that occurs under the covers, so to speak.

18  It goes between the client and the server.

19          So a service request is this collection of

20  messages from the client through a server to a

21  accomplish some task.  And a service request is the

22  request part of that.

23     Q    What did you conclude about element 1(a) in

24  your analysis?

25     A    Element 1(a) is practiced by the Newegg

1  system.

2      Q    All right.  Element 1(b), what does element

3  1(b) require?

4      A    Element 1(b) requires forwarding -- forwarding

5  a service request from the client to the server, and the

6  communications between the two need to correspond to the

7  hypertext transfer protocol, which is http.

8      Q    In Newegg's system, is a server request, in

9  fact, forwarded from the client to the Newegg server

10  system?

11      A    Yes, it is.  The service request is forwarded.

12  For example, on the way, it's forwarded from the

13  netscaler block that we looked at earlier to the SSL

14  server block.  And, in fact, the Newegg technical expert

15  said that the step, in fact, was performed by the server

16  system.

17      Q    Who actually does the forwarding step?

18      A    The forwarding step is done by each of the

19  elements along the way.  In other words, it goes from

20  the customer to the firewall.  It's forwarded by the

21  firewall to the netscaler.  It's forwarded by the

22  netscaler to the SSL system.  So it's forwarded really

23  many times.

24      Q    Are the communications between the client and

25  the server system, as you analyzed it, according to the

1  hypertext transfer protocol?

2      A    Yes, it is.  In fact, it says in this line

3  right here, between the customer computer and the public

4  internet, it identifies http as the protocol.  There's

5  actually a slight variation of it called https, which is

6  also an http protocol.

7      Q    What did you conclude about element 1(b)?

8      A    Element 1(b) is met by the Newegg system.

9      Q    And who meets it?

10     A    The server system -- well, the Newegg system

11 as a whole meets this claim element.

12     Q    Go to 1(c).  What does step 1(c) require?

13     A    1(c) requires a returning of the session ID

14 from the server to the client, and then the client

15 stores the session ID for use in subsequent requests to

16 the server system.

17     Q    Does the Newegg server system return a session

18 identifier to the client?

19     A    It does.  In fact, that's shown here by --

20 we've seen this before, too -- by the set cookie

21 commands.

22          In this particular case, the set cookie

23 command involves customer log-in, which is the session

24 ID for the logged-in session.

25     Q    Is there a standard cookie protocol now,

1    Doctor, somewhere?

2        A    Yes.  That's probably the result of another

3    RFC -- in fact, I have it listed at the bottom here.

4    It's one of the exhibits -- RFC 2109 that describes how

5    client computers store cookies.

6        Q    Would you look at Exhibit 26 in your binder

7    for me, please?

8        A    Yes.

9        Q    Is that, in fact, the RFC 2109?

10       A    It is.  It's entitled:  Http State Management

11   Mechanism.  We've come across this term state before.

12   And the use of the cookies is a mechanism to allow state

13   to be managed, according to this description.

14       Q    And the RFCs that you've looking -- the RFCs

15   that you're looking at here, 2109, is that relied upon

16   and treated by you and your peers in the way that the

17   earlier ones were that we discussed today?

18       A    Yes.  This amounts to a de facto standard

19   that's used by the industry, yes.

20       Q    All right.

21            MR. ADAMO:  Go back to Slide 95.

22       Q    (By Mr. Adamo) In the messages on your slide,

23   the cookie names have a percent sign, 5F, in them.  What

24   does that mean?  At the beginning.

25       A    The -- there's actually -- it looks like

1  there's a carriage return there, but there's not.  The

2  sequence is NV%5FCUS and so on.

3          The percent sign means that the following two

4  characters are to be interpreted as -- all three of

5  those are to be interpreted as a character.  And, in

6  fact, it means underlining.

7      Q    Okay.  Who performs the step of returning?

8      A    The returning of the session identifier comes

9  from the client -- or from the server computer to the

10  client.  So it's generated by the client -- I'm sorry.

11  It must be getting late in the day.

12     Q    It is.  Keep going.

13     A    The session identifier comes from the server

14  system.  So it's created by the server system and sent

15  to the client.

16     Q    All right.  What about the second aspect of

17  second element 1(c).  Does the client in Newegg's system

18  store the session ID for use in subsequent distinct

19  requests to the server?

20     A    Yes.  As we described earlier through the

21  other patents, this is a cookie, and the cookie that

22  comes from the server to the client is automatically

23  stored, and it's always sent with all following requests

24  to that -- to that same web server.

25          So, yes, it's stored and is sent with

1  subsequent requests, as required by this claim.

2      Q    Who performs the step of storing?

3      A    The storing is done by the client, the

4  server -- the client computer.  It's also called a buyer

5  computer.

6      Q    Does Newegg direct, instruct, or control the

7  client computer to store the session identifier?

8      A    This fragment -- yes.  The fragment we're

9  looking at here is part of the html code that is sent

10  from the server to the client.  The client browser

11  executes this code and then performs the storing

12  operation for all of the cookies that are contained in

13  the message.

14      Q    Is this essentially the situation with cookies

15  that you described to us earlier?

16      A    Yes.  It's precisely the situation I described

17  earlier.

18      Q    What did you conclude about whether the Newegg

19  system meets element 1(c)?

20      A    For the reasons that I've described here in

21  detail in my report and summarized it, it meets this

22  claim element.

23      Q    Element 1(d), let's move on to the final step,

24  actually.  What does that require?

25      A    Well, this requires that the system operate

149

1  the way I just described it does.

2           In other words, this requires that it actually

3  be appended -- the stored session identifier be appended

4  to each of the subsequent requests from the client to

5  the server.  And that's the way the browsers work.

6      Q    Did this, in fact, occur in the Newegg's

7  system?

8      A    Yes, it does.  This cookie is the cookie that

9  is stored on the client, and all the cookies that come

10  from that server go back to that server with every

11  subsequent request.

12      Q    Did the Court provide a definition for

13  appending, Dr. Grimes?

14      A    It provided it -- as I recall, this -- this

15  term for appending was actually in a different term, but

16  at least indirectly, it defined what appending means,

17  yes.  And it was tagging, affixing, or supplementing.

18      Q    Is what you just described, this cookie line

19  that we're looking at in your Slide 96, does that come

20  within the Court's definition of appending?

21      A    It does.  It does.  The cookie is added to --

22  all the cookies for that server are added to the http

23  message when it is sent back to the server.

24      Q    Who performs the step of appending?

25      A    Appending is done by the client, by the

150

1  browser, basically, on the client computer.

2      Q    All right.  Again, does Newegg direct,

3  instruct, or in some manner, control the client to

4  perform the step of appending?

5      A    It does.  The way that the browsers work, they

6  receive the html code from the server, and when they

7  send the next request, they automatically perform this

8  appending based on the -- the operation of the -- the

9  only operation of the browser.

10      Q    What did you conclude about whether the Newegg

11  system meets element 1(d)?

12      A    It meets element 1(d).

13      Q    All right.  I think we've gone through all

14  four elements of Claim 1 of the '639 patent.  Would you

15  tell the ladies and gentlemen of the jury what your

16  opinion is about whether the newegg.com system meets

17  that claim?

18      A    For the reasons that I've recited and

19  summarized today, it meets all the elements of Claim 1.

20      Q    Did you also consider whether neweggmall.com

21  meets all the elements of Claim 1?

22      A    I did.  And based on my analysis, Newegg Mall

23  also meets all of the elements of Claim 1 for all the

24  same reasons that newegg.com meets it.

25      Q    Let's turn to Claim 60 now in the '639 patent.

1  Sixty depends on Claim 1, Doctor; is that correct?

2      A     That is correct.  And Claim 60 has four parts

3  to it.

4      Q     All right.  What's the first -- let's look at

5  60(a).  What's the first requirement of Claim 60 then?

6      A     This is everything from Claim 1, plus at least

7  one service request includes a purchase request.  And

8  the purchase request in turn has to include an

9  associated user identifier.

10         And so the html that's shown here, which

11  occurs when you click the submit order button, in fact,

12  generates a service request, and it does, in fact,

13  include an associated user identifier, which turns out

14  to be my g-mail or e-mail address.

15      Q     Did you conclude that at least one service

16  request in the Newegg's system comprises a purchase

17  request?

18      A     Yes, I did.

19      Q     Did the Court provide a definition for a

20  purchase request?

21      A     It did.

22         It's one or more messages requesting a

23  purchase.  And in fact, that's part of the shopping

24  analysis that I did.

25      Q     Why then did you conclude that Newegg's system

1  has a purchase request, briefly?

2      A    Because of the -- this is part of the http

3  traffic that results from clicking the submit order

4  button.

5      Q    Did you conclude that the purchase request

6  also includes a user identifier?

7      A    It does, because the -- my name here and

8  e-mail address is what I used as the user identifier on

9  the Newegg website.

10     Q    What did you conclude about whether the Newegg

11 system then meets element 60(a)?

12     A    I concluded that it does meet all the

13 requirements for element 60(a).

14     Q    All right.  60(b).  What does element 60(b)

15 require?

16     A    60(b) says that upon receipt of the purchase

17 request at the server, the server needs to access user

18 information associated with this identifier that it got

19 in the message, and the information has to be sufficient

20 to charge an account associated with the user and the

21 purchase price of the product identified by the purchase

22 request.

23     Q    Does Newegg meet this step?

24     A    It does.  This page that we've seen before,

25 which occurs as part of the checkout process, includes,

153

1  you know, my name, my credit card number, expiration

2  date, as well as the total purchase price for the

3  product identified in the request.

4      Q    Having had identity fraud problems for years,

5  Doctor, I congratulate you that you took care on these

6  slides to knock out your credit card information.

7      A    Yes, I did.

8      Q    All right.  Is the information accessed when a

9  user makes a purchase request?

10     A    Yes, it is.  When the request is made, the

11 server accesses the user information.

12     Q    Does the purchase request identify the

13 purchase price?

14     A    It does.  That's actually shown in the next

15 slide where I have another part of the http traffic from

16 the same action, submitting the submit order button.

17 And this fragment of it shows the -- both the product

18 identifier -- actually both product identifiers, as well

19 as the total amount, the $57 for the two -- for the two

20 products.

21     Q    Does it also identify the product or the

22 products to be purchased?

23     A    Yes.  In blue here is the identifiers,

24 these -- the 160 number and the 12-8 number are the two

25 product identifiers for the two products, the cable and

154

1  the software.

2      Q    Who does the accessing?

3      A    The accessing is done by the server system.

4      Q    And what did you conclude about whether the

5  Newegg system meets element 60(b)?

6      A    My conclusion, in looking at the http traffic,

7  is that it's met by the Newegg system.

8      Q    All right.  Element 60(c), what does that

9  require?

10     A    Well, this is sort of the next step that

11 requires also that the user be charged for the product

12 identified by the purchase request based on the user

13 information.

14     Q    All right.  And does Newegg charge the user

15 for the product identified by the purchase request?

16     A    It does.  We've seen this confirmation e-mail

17 before, but in addition, this is a fragment of my

18 American Express card showing the -- showing the

19 transactions -- transaction for the $57.

20     Q    Okay.  Now, was the charge, quote, according

21 to the user information, close quote, as the claim

22 element recites?

23     A    The user information -- well, the system,

24 based on Mr. Wu's testimony of how it works, uses the

25 user information that it has stored on the server system

155

1   to actually complete the charge to my credit card

2   account, because it showed me what the account number

3   was going to be, and then it got the information from

4   the server to cause the charge to occur.

5       Q    Who does the charging?

6       A    The charging is done -- well, it's initiated

7   by the Newegg server system.  I mean, in the end, the

8   charging is actually done by American Express.

9       Q    But the starting of the charging operation is

10  by the system?

11      A    The initiation of it is done by the Newegg

12  system.

13      Q    What did you conclude about whether the Newegg

14  system meets element 60(c)?

15      A    It -- for the reasons we've just discussed, it

16  does, in fact, meet and practices claim element 60(c).

17      Q    All right.  60(d).  What does the last step of

18  Claim 60, element 60(d) require?

19      A    Well, 60(d) is satisfied, you know, when your

20  door bell rings, and the guy from DHL says:  Here's a

21  package for you.  And you look at it, and you see that

22  it's from Newegg and open it up, and it contains the

23  cable that you ordered.

24          So this is evidence that, in fact, the

25  purchase request for the cable has been fulfilled.  And

1   since it came to me with the correct address, it was

2   fulfilled based on the user information.

3      Q    Is what we're looking at in your Slide 102

4   here, is this a photograph of what actually showed up at

5   your house?

6      A    Yes. I took this photograph and provided it

7   so that we could make a slide out of it.

8      Q    With respect to the last element of this

9   claim, element 60(d), does the Newegg system meet this

10   element?

11      A    Yes, it does. It meets element (d) as is

12   shown here.

13      Q    And who does the fulfilling: Newegg or the

14   customer?

15      A    Well, the fulfilling is done by Newegg. I

16   mean, this comes out of their warehouse -- one of these

17   three warehouses as you described earlier. I'm not sure

18   where it came from, but, obviously, it came from Newegg.

19   It showed up on my door with a Newegg return address.

20      Q    All right. With respect to Claim 60, then,

21   overall, Dr. Grimes, what is your opinion with regard to

22   whether it, in fact, infringes?

23      A    Claim 60 is met, so I gave all four elements

24   that we just analyzed a checkmark.

25      Q    All right. I misspoke myself. I meant to say

157

 1  whether the Newegg system infringes.  Does the Newegg
 2  system infringe Claim 60?
 3      A    Yes.  For all the reasons I gave you, the
 4  Newegg system really meets all of the elements of
 5  Claim 60.
 6      Q    Literally?
 7      A    Literally.
 8      Q    And is that true for both the log-in session
 9  and the checkout session?
10      A    Yes, it is.
11           I looked at -- both for the time periods that
12  I indicated when I described it earlier, Claim 60 is met
13  by both the checkout session and by the log-in session.
14      Q    All right.  Let us look at the last claim of
15  the '639 patent --
16           MR. ADAMO:  -- which, Your Honor, I am
17  happy to report is the last claim we are going to do
18  today.
19           THE COURT:  Very well.
20           MR. ADAMO:  Let's get the poster up.
21  Claim 79.  Excuse me.
22      Q    (By Mr. Adamo) All right.  Is Claim 79
23  dependent or independent, Doctor?
24      A    Claim 79 is dependent on Claim 78, which we --
25  which we haven't looked at yet.

```
 1      Q    All right.  And we've got your poster up, so
 2  we've got both 78 and 79 available to you.  Let's start
 3  with 78(a).
 4           What does claim element 78(a) require?
 5      A    We can look at 78(a) and (b) together,
 6  actually.  They're very much like Claim 1.  In fact, the
 7  wording is slightly different but almost identical.
 8           And Claim 78(a) adds an additional requirement
 9  for the processing in a server system.  I already
10  described, when I did Claim 1, that it occurred in a
11  server system, but that wasn't a requirement for Claim
12  1.  But it is a requirement for Claim 78.
13      Q    So your conclusion about this element, then,
14  is what?
15      A    My conclusion is that 78 is met and really for
16  the same reasons that I described for Claim 1(a).
17      Q    Who does the processing:  Newegg or the
18  customer?
19      A    Newegg.  It's done by the Newegg -- actually,
20  by the Newegg server system.
21      Q    And let's look at element 78(b) on this board.
22           What is your conclusion with respect to that
23  element?
24      A    78(b) is slightly different.  It says:
25  Receiving from the client a service request to which an
```

159

1   identifier stored at the client has been appended by the

2   client.

3        So this really refers to an operation at the

4   Newegg server system side, which is what's doing the

5   receiving, and then receiving comes from the client.

6       Q    And is it your conclusion that Newegg meets

7   element 78(b)?

8       A    Yes.  Communication is also done by the http,

9   the hypertext transfer protocol, which is also required

10  for 78(b).

11      Q    And so who does the receiving:  The customer

12  or Newegg?

13      A    Newegg.  Newegg does the receiving.

14      Q    But doesn't the client have to send a request

15  in order for Newegg to receive it?

16      A    Yes, that's true.  But that's not required by

17  the claim.  What's required by the claim is that it be

18  received from the client, the service request.  And that

19  operation is done by the server.

20      Q    Is it your understanding that the way the

21  claim is structured, it's not necessary to get into the

22  sending because the claim doesn't talk about the

23  sending?

24      A    That's correct.  That's correct.  The only

25  thing that's necessary here is that the server system

1  receives from a client the service request.

2     Q   Does Claim 78(b) have a step of appending or

3  storing a session identifier when it says, quote, a

4  service request to which a session identifier is stored

5  at the client has been appended by the client, close

6  quote?

7     A   No.  Only that the request that's received

8  contain a session identifier that has been appended by

9  the client.

10     Q   Let's look at element 78(c).  What do you

11  understand that to require, Dr. Grimes?

12     A   This is a further step actually not contained

13  in Claim 1, so it's -- I don't have anything to compare

14  it with in Claim 1.  It's by itself.  This is a

15  validation step.  And then once it's been validated,

16  servicing the service request.

17     Q   Does Newegg meet this?

18     A   Yes, it does.  We have deposition testimony

19  from Mr. Wu that described the validation, and we know

20  that the service request is -- it's serviced because we

21  actually see the results of that.

22        So, in fact, the validation has been

23  identified by Mr. Wu, and the servicing of the service

24  request, if it's valid, can be seen by the http traffic

25  I looked at, plus Mr. Wu's testimony.

1    Q    Is the log-in session ID what you were looking

2    at both in your personal work, as well as looking at

3    Mr. Wu's testimony?

4    A    Yes.  Yes.  The topic under discussion was the

5    log-in session ID.

6    Q    Who performs the steps of validating and

7    servicing?

8    A    Those are done by the server, the server

9    system, the Newegg server system.

10    Q    What is your opinion about element 78(c),

11    Doctor?

12    A    78(c) is also met by the Newegg system.

13    Q    All right.  And let's look now at Claim 78 in

14    its entirety.

15        Do you have an opinion as to whether Claim 78

16    is met in its entirety?

17    A    Yes.  All three elements are met for the

18    reasons that I just described, and so I gave all three

19    of them a checkmark.

20    Q    Are the elements, in your view, all met

21    literally?

22    A    Yes, they're all met literally.

23    Q    And who is the actor who's meeting all these

24    elements, as you understand it?

25    A    All three of these elements are performed by

162

1  the Newegg service system.

2      Q    All right.  Does your analysis that we've just

3  discussed apply not only to the log-in session ID but

4  also to the checkout session ID situation?

5      A    I don't recall.  I'd have to look at my -- at

6  my notes.  I believe so.  I believe it also applies to

7  the checkout -- checkout session.

8      Q    All right.  Did you form an opinion about

9  Claim 78 for the Newegg Mall?

10     A    Yes.  Claim 78 is met by the Newegg Mall.

11     Q    Does the Newegg Mall have the equivalent of

12 the checkout session ID?

13     A    I believe so, yes.

14     Q    Does that help you refresh your recollection

15 as to whether you -- the analysis would be the same for

16 both the log-in session ID and the checkout session ID?

17     A    Yes, it does.

18          The one that doesn't have the checkout session

19 was one of the earlier claims that we looked at, earlier

20 examples that we looked at.

21          In this case, both the log-in session and the

22 checkout session are performed by both the Newegg Mall

23 and by the newegg.com website.

24     Q    All right.  Let's turn to Claim 79.  First

25 element is 79(a), what does that require?

163

1       A       79(a) requires everything from 78, plus

2   requires that the server system receive an initial

3   request from the client or a first request from the

4   client.

5       Q       Did the Court construe that claim term,

6   Doctor?

7       A       It did.  It said that first -- initial service

8   request means the first one in a session.

9       Q       And does Newegg meet that element, according

10  to your analysis?

11      A       Yes, it does.  I looked at the http traffic,

12  and there's a cookie that's generated by the server when

13  it receives the request to log in.

14      Q       Who does the step of receiving?

15      A       Receiving is done by the server system.

16      Q       So that's Newegg?

17      A       That's Newegg service system, yes.

18      Q       All right.  Element 79(b).  What does claim

19  element 79 (b) require?

20      A       That requires that in response to this

21  request, the server system -- actually is what does

22  it -- creates a session identifier, and that's done by

23  the Newegg server system.

24      Q       So Newegg does meet this element; is that

25  correct?

1    A    Yes, it does.

2         We also have a response to an interrogatory --

3    a response to a question here that says that the

4    customer log-in, which is the log-in session identifier,

5    is created by the Newegg system.

6    Q    All right.  Would you look quickly in your

7    binder at Exhibit 27 and tell me if that is the

8    interrogatory response that you quote on your Slide 110?

9    A    Yes, it is.

10   Q    And who does the step of creating?

11   A    The creation is done by the Newegg service

12   system.

13   Q    79(c), what does that claim element require?

14   A    79(c) is almost identical to 1(c) and requires

15   this returning of the session identifier to the

16   client -- it turns out it's returned in this customer

17   log-in cookie -- for storage by the client for use in

18   subsequent requests.

19        So I already described earlier how that

20   happens.  It happens the same way as it did for element

21   1(c).

22   Q    All right.  Does Newegg meet this element?

23   A    Yes, it does.  It meets element 79(c).

24   Q    Who does the step of returning?

25   A    The step of returning is done by the Newegg

165

 1  service system.

 2      Q    I think we've now been through all of the

 3  elements of Claim 79.  Did you form an opinion regarding

 4  the infringement or lack thereof of this claim, Doctor?

 5      A    I did.  I concluded that element -- all the

 6  elements in Claim 79 were met, so I gave them all a

 7  checkmark.

 8      Q    And now the same question I asked you a few

 9  seconds ago, a few minutes ago.  The logged-in session

10  seemed to be the focus of what we were just discussing.

11           Does the analysis also apply to the checkout

12  session?

13      A    Yes, it does.  It applies to both the checkout

14  session and the log-in session for both of these claims.

15      Q    All right.  Is it your view, Doctor, then,

16  with respect to both of the asserted '639 patent claims,

17  that they are infringed by Newegg?

18      A    Yes.

19           So just to summarize, both newegg.com and

20  newegg.ca, the Canadian website, meet all elements of

21  the asserted claims that are listed here, which is the

22  ones we went through this afternoon.

23      Q    All right.  We got a tad ahead of ourselves.

24  We'll get to your last slide.

25           Can you give me a best estimate of how many

1  hundreds of hours of your work it has taken for you to

2  generate everything that we've spent the last almost

3  four hours going through?  Can you give us an estimate?

4      A    Wow.  Several hundred, 200, 300, something in

5  that -- 400, something in that range.  It was -- it was

6  a lot of work.

7      Q    And as we have been asking you questions and

8  you've been providing the information to the ladies and

9  gentlemen of the jury this afternoon, were you going at

10 a pace that you felt was appropriate due to the

11 seriousness of this nature and the complexity of the

12 subject matter?

13     A    Yes, indeed.  I maybe should apologize for

14 giving some long answers, but I really want to make sure

15 that my answers are understood.  So I may have been able

16 to make it shorter, but I guess I erred on the side of

17 trying to make sure that the answers were clear.

18     Q    All right.  So let's look at your summary, and

19 then I'm going to sit down.

20     A    Okay.

21     Q    Would you as succinctly, as briefly as you

22 can, tell us what the overall summary of your opinions

23 are with respect -- or is with respect to the seven

24 claims of the three patents that are at issue here

25 regarding Newegg?

1    A    Yes.  As I stated very briefly before,

2    newegg.com, newegg.ca websites meet all of the elements

3    of this list of asserted claims.

4    Q    Literally?

5    A    Literally.

6    Q    All right.  With respect to the

7    neweggmall.com.

8    A    I did a subset analysis of a subset of the

9    claims, and these are the claims you asked me about as

10    we went through this afternoon.

11        So in summary, there are these four claims

12    that I analyzed, and the neweggmall.com website meets

13    all the elements of these four claims.

14    Q    Thank you, Dr. Grimes.

15        MR. ADAMO:  Your Honor, I pass the

16    witness.

17        THE COURT:  All right.  Very well.  Thank

18    you.

19        All right, Ladies and Gentlemen of the Jury, I

20    think this would be a good stopping place for today.

21    We'll come back in the morning and begin with the

22    cross-examination of Dr. Grimes.

23        You've paid very good attention today.  Thank

24    you very much for that.  Please go home and get a good

25    night's sleep tonight.

8

1            Then Slide 13 is founded on Exhibit --

2    Plaintiff's Exhibit 245, to which we object, and it

3    mentions net sales of $2.1 billion, and we object to

4    that as irrelevant and unfairly prejudicial.

5            Slide 15 is founded upon Plaintiff's

6    Exhibit 174, which is objected to, and here again, this

7    is a bar graph showing Newegg's extent-of-use, and it

8    goes back to 2001, and we object to anything prior to

9    2007 as irrelevant, misleading, and potentially

10   prejudicial.

11           Slides 16, 17, 18, and 19 are all of the

12   same nature.  They are all founded on the documents that

13   I objected to specifically.  They state the net sales

14   numbers and gross profits, as I've argued earlier, and

15   we submit that a calculation, based on that, and a

16   showing of that is irrelevant and prejudicial.

17           And so, Your Honor, those are the

18   Defendant's objections to the underlying exhibits, 162

19   through 176 and 245, and the slides that are based upon

20   them.

21           THE COURT:  Okay.  Thank you.

22           Let me ask you this, Mr. Sayles:

23   Obviously, you have known what their damage expert's

24   approach was since you had his report and deposed him, I

25   take it.

12

```
 1  preserved.

 2                  MR. SAYLES:  All right.  If my objections

 3  are preserved and they're offered in evidence, that's

 4  all I can do.

 5                  THE COURT:  That's right.  Okay.

 6                  MR. ADAMO:  Okay.

 7                  THE COURT:  Thank you.

 8                  MR. ADAMO:  Thank you.

 9                  THE COURT:  Bring the jury in, please.

10                  COURT SECURITY OFFICER:  All rise for the

11  jury.

12                  (Jury in.)

13                  THE COURT:  Please be seated.

14                  All right, Ladies and Gentlemen of the

15  Jury.  Welcome back.  I hope you had a good night's

16  sleep, and you're ready to put in a full day today,

17  so -- you did a very good job yesterday paying close

18  attention.  I saw you taking notes and listening to the

19  witness.

20                  So we'll continue now with the

21  cross-examination of Mr. Grimes.

22      JACK GRIMES, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

23                      CROSS-EXAMINATION

24  BY MR. BALDAUF:

25      Q   Good morning, Dr. Grimes.
```

13

1       A       Good morning.

2       Q       Just wanted to touch a few points about your

3   background.

4               If I understood your testimony yesterday, when

5   you're not enjoying your semi-retirement, you work as an

6   expert witness, correct?

7       A       I work as an expert witness, and I also am on

8   the Board of Directors of a startup company.

9       Q       And you've been doing litigation expert

10  witness work since the 1990s?

11      A       Yes.  It started out part-time and have really

12  remained part-time all during that time.  There was

13  some -- a year or two where I did it pretty much

14  full-time, but it sort of started part-time and now is

15  part-time.

16      Q       And you work with an expert broker firm?

17      A       Yes, I do.

18      Q       So for the hourly fee that you're paid, some

19  of that goes to the broker firm; you keep the rest?

20      A       Yes.  That's the way it works, uh-huh.

21      Q       And you've worked with the -- with counsel for

22  Soverain in a number of cases before this, correct?

23      A       Yes.  I've worked with them on several cases.

24      Q       Is it true that you personally have never

25  designed an E-commerce system?

1     A    No, I have not been involved in the design of

2  an E-commerce system, only the security aspects of

3  E-commerce, which I talked about yesterday.

4     Q    Now, you took us through the claims yesterday,

5  and I certainly don't want to repeat all of that.  I

6  commend you.  That was a test of endurance.

7          But in all of those claims, in every one of

8  the claims, you talked about this limitation of a

9  customer computer or a buyer computer, correct?

10    A    Yes, that's correct.

11    Q    You were --

12    A    Not all -- not all of the claims, but many of

13  the claims dealt with that, yes.

14    Q    And those claims that had that limitation, do

15  you agree that the customer computers is supplied by the

16  customer?

17    A    Yes, it is, with the exception of the testing

18  that Newegg does.  But in almost all cases, it's

19  supplied by the customer.  It's the customer's computer.

20    Q    And would you agree with me that Newegg does

21  not somehow force its customers to connect to its

22  website?

23    A    No.  The customer decides they want to

24  purchase something, and they have to type in the Newegg

25  URL or otherwise connect to the website.

1    Q    And they do so of their own free will.

2    A    Certainly, just like you would, you know, pick

3  *Home Depot* of your own free will.  It's very much the

4  same, yes.

5    Q    And if no customer ever connected to the

6  Newegg website, would you agree that there would not be

7  a customer computer for the purposes of the claims?

8    A    Well, the -- I mean, this is the -- Newegg's

9  description of their system.

10    Q    Correct.  But I'm asking you this:  If no

11  customer connects, is there a customer computer present?

12    A    The Newegg system would still represent a

13  customer computer; but if a customer doesn't connect,

14  then there would be no usage of the customer computer,

15  if that's -- if that's your question.

16    Q    It is.  Thank you.

17    A    Okay.

18    Q    You also testified that Newegg instructs its

19  customers how to use its website on its help page,

20  correct?

21    A    Yes, among other things.  But the help page is

22  quite extensive.

23    Q    Can a customer choose not to follow these

24  instructions?

25    A    The customer, you know, may not even be aware

16

1    of the web page; but if they are, then it provides

2    instructions.

3         Q    But the customer can decide not to follow them

4    of their own free will?

5         A    Certainly.  I don't know why a customer would

6    go to a help page and then ignore the instructions, but

7    that's possible, certainly, yeah.

8         Q    And based upon your testimony yesterday, I

9    take it that you agree that a customer cannot shop on

10   the Newegg website unless he or she has turned on

11   cookies on their computer?

12        A    The browser -- the browser on their computer

13   must have cookies enabled in order to actually purchase

14   products.

15        Q    Do you agree with me that it's up to the

16   customer whether or not they enable cookies?

17        A    As I said yesterday, the default is that

18   they're enabled, but the customer could disable cookies

19   for some reason.

20        Q    If the customer disables cookies for some

21   reason, can Newegg somehow go into that customer

22   computer and turn them on?

23        A    No.  The customer computer -- the customer has

24   to set the -- has to enable cookies; otherwise, they

25   can't purchase products.

1    Q    Now, once the customer checks out at the

2  Newegg website, who's responsible for paying for the

3  selection?

4    A    Well, the customer's credit card is charged,

5  so, ultimately, the customer, of course, pays his credit

6  card bill.  I mean, he's purchasing the product, so the

7  customer pays for them in the end.

8    Q    So do you agree with me that Newegg is not

9  responsible for paying for these products if the

10  customers do not do so?

11    A    Actually, I haven't thought about that.  I

12  don't know what happens.  I mean, customer -- Newegg

13  certainly pays for the inventory, so they have purchased

14  the inventory.  If the customer doesn't pay, I don't

15  know what happens, actually.

16    Q    I'd like to talk about the '314 patent.

17        From your testimony yesterday, you told us

18  that Soverain is asserting the infringement of only

19  Claims 35 and 51, correct?

20    A    Yes, that is correct.

21    Q    And these claims depend upon Claim 34.

22    A    Right.  Exactly right, uh-huh.

23    Q    So if Newegg does not infringe Claim 34, would

24  you agree with me that it cannot infringe 35 or 51?

25    A    Yes.  That's the way it works.  You have to

1  have all of the -- for 35, you have to have 35 and then

2  all of the elements of 34.

3      Q    And just to be clear, with respect to the

4  elements, the portion in brackets, I believe you

5  testified yesterday that those are not actually in the

6  claim, that you put those in for our ease of reference,

7  correct?

8      A    Yes, that's correct.  Anything in brackets

9  like that are text that I've added.

10     Q    I'd like to look at 34(b), at least one buyer

11 computer for operation by a user desiring to buy

12 products.

13              MR. BALDAUF:  If you could please pull up

14 Appendix B, Page 2, please, Ms. Johnston.

15              If you could please highlight -- or

16 enlarge the very first paragraph on the right side.

17     Q    (By Mr. Baldauf) And, Dr. Grimes, we're taking

18 a look at your expert report that you prepared in this

19 case, correct?

20     A    Yes, that's correct.  This is my -- this is

21 Appendix C from my expert report.

22     Q    And this is the portion of your report where

23 you compare the claim elements of Claim 34 of the '314

24 patent to that functionality of the Newegg website that

25 you believe satisfies those limitations, correct?

19

```
 1     A    Yes, that's correct.

 2     Q    Okay.  With respect to the limitation in

 3  34(b), at least one buyer computer for operation by a

 4  user desiring to buy products, you wrote that a Newegg

 5  customer computer, when connected to the Newegg server

 6  system, through Newegg's website via the internet

 7  becomes a buy computer.

 8          So is it your testimony that the customer's

 9  computer is the buyer computer?

10     A    Yes.  It becomes the buyer computer after it

11  connects to the Newegg server system.

12     Q    And, again, this computer is supplied by the

13  customer.

14     A    Yes.  It's the customer's computer, and it

15  becomes a buyer computer, matching this claim

16  limitation, when it connects to the Newegg server

17  system.  Then it becomes part of the Newegg server

18  system.

19     Q    Now, Claim 34(b) also requires a user desiring

20  to buy products.  Is the user in this claim element the

21  customer?

22     A    Yes.  The claim requires the buyer computer

23  for operation by the user.  So the focus of the claim is

24  the buyer computer, and it is the -- the user is the --

25  is the customer, with the exception of the testing
```

1   situations that I mentioned.

2       Q    Does Newegg supply the customer or user?

3       A    No.  The customer is, you know, people like

4   you, and I who want to buy products.

5       Q    And we talked about this before.  Newegg does

6   not somehow control the customer and force them to log

7   on to their website.

8       A    No.  No.  That's -- that's also not required

9   by the claim.

10      Q    But you agree that the customer decides to

11  access the Newegg website by their own free will.

12      A    Certainly.  Certainly.

13      Q    So do you agree with me that it's the customer

14  that satisfies the limitation of a user?

15      A    Well, the limitation is for a buyer computer

16  for operation by a user.  So the limitation of a buyer

17  computer, the buyer computer is the customer's computer;

18  and when it's connected to the Newegg server, it becomes

19  a buyer computer.

20      Q    Right.  But I'm asking you about the latter

21  portion of that claim, for operation by a user.  Who

22  satisfies that portion?  The user?

23      A    Well, the buyer can --

24      Q    Is that the customer, or is that Newegg?

25      A    With the exception of the testing activities,

1  it's the customer that actually does operate the

2  computer.

3      Q    Thank you.

4          If I could turn your attention to what you

5  have designated as 34(f).  Said buyer computer being

6  programmed to receive a plurality of requests from a

7  user to add a plurality of respective products to a

8  shopping cart in said shopping cart database.

9          Is the cookie stored in the user's computer

10 browser of the Newegg shopping cart?

11     A    The cookies stored in the browser contains the

12 contents of the shopping cart, yes.  You can think of it

13 as a shopping cart, but it contains the contents of the

14 user shopping cart.  It's the products he wants to

15 purchase.

16     Q    So is that the shopping cart?

17     A    You can think of it that way.  I think of it

18 as a cookie representing the contents of the shopping

19 cart.

20     Q    Now, I just want to be very clear on this

21 point, because we did talk about this in your

22 deposition.  And I'm not sure we're saying something

23 different, but I just want to make sure we're on the

24 same page.

25          If you could please turn to Page 131 of your

1    deposition transcript.

2          Do you have that in front of you, sir?

3    A    Yes, I do.

4    Q    If you look to Line 11:

5          QUESTION:  So you've interpreted a

6    shopping cart to include cookies?

7          ANSWER:  The contents of the shopping

8    cart for multiple clicks are stored in a cookie called

9    the Newegg cookie.

10         QUESTION:  A moment ago, you referred to

11   that as the shopping cart.

12         ANSWER:  Yes, that's the shopping cart.

13   The contents of the shopping cart are stored in the

14   cookie called the Newegg cookie.

15   Q    (By Mr. Baldauf) So is it fair to say that

16   you're referring to that cookie as the shopping cart?

17   A    Yes, you could say that.

18   Q    Okay.

19   A    That would be a good way to say it.

20   Q    Is there any portion of the '314 patent that

21   describes the shopping cart as being a cookie?

22   A    I don't -- I don't recall specifically.  I

23   think not.  Yeah.

24   Q    Would you agree with me that only a

25   server-side shopping cart is disclosed in the '314

1  patent?

2      A    Server-side shopping cart.  A server-side

3  shopping cart is disclosed.

4      Q    Would you agree with me that that's the only

5  type of shopping cart that's disclosed in the '314

6  patent?

7      A    I don't recall if it is the only thing, but it

8  could be the only thing.  It certainly is disclosed.  I

9  recall that, yes.

10             MR. BALDAUF:  If we could turn to Page 4

11  of the appendices of Dr. Grimes's report.

12      Q    (By Mr. Baldauf) And we're still talking about

13  limitation 34(f).

14             MR. BALDAUF:  If you could move it to the

15  other side of the page and the paragraph beginning by

16  selecting.  That one.  Thank you.

17      Q    (By Mr. Baldauf) Sir, you wrote:  By

18  selecting, clicking on an ad to cart or download button,

19  a user is requesting to add a selected product to the

20  shopping cart.

21             So this is the request to add the product to

22  the shopping cart?

23      A    That is correct.  That's what I testified to

24  yesterday.

25      Q    Okay.  And this is an action taken by the

1  user, correct, the customer?

2      A     Yeah.  The -- the claim requires that the

3  buyer computer be programmed to receive the request.

4  The request is a mouse click by the user, uh-huh.

5              MR. BALDAUF:  If we could please move to

6  the next page.

7              If you could blow up the sentence that

8  says:  A user may request to add.

9      Q    (By Mr. Baldauf) Okay.  Now, here you write:

10             A user may request to add multiple items to

11  the shopping cart by clicking multiple add-to-cart or

12  download buttons.

13             So is it your contention that when the

14  customer clicks the add-to-cart button multiple times,

15  that this is the plurality of requests from the user to

16  add the plurality of products to the shopping cart?

17      A     Almost.  The -- the requests are generated by

18  the multiple clicks, and those clicks, of course, are

19  performed by the user.  And the buyer's computer is

20  programmed to operate on those clicks, basically,

21  receive those requests.

22      Q     So the claim requires a plurality of requests

23  from a user to add a plurality of respective products to

24  a shopping cart, correct?

25      A     That's how the buyer computer must be

25

1   programmed to do that, yes.

2        Q    Do you agree that a plurality means more than

3   one?

4        A    It means two or more, that's correct, yes.

5        Q    So is this limitation satisfied if the

6   customer only puts a single item in the shopping cart

7   and then checks out?

8        A    No.  The claim language is very clear.  It has

9   to be programmed to receive a plurality of requests from

10  the user.

11       Q    So to --

12       A    So there has to be -- the structure has to

13  contain the ability for the user to make multiple

14  requests.

15       Q    So to satisfy the system in this claim, the

16  user has to put multiple items in the shopping cart?

17       A    That's what I -- that's the evidence I put

18  forward, yes.

19       Q    Okay.  So let's talk about that instance when

20  the customer puts multiple items in the shopping cart.

21            I believe it was your testimony yesterday that

22  these servers here on the Newegg system constitute the

23  shopping cart database, correct?

24       A    No.

25       Q    No?  I'm sorry.  The shopping cart computer.

26

```
 1      A    Yes.  The shopping cart database --
 2  fortunately, we have different colors, I guess.
 3      Q    Yeah.  It looks like Star Wars.
 4      A    The shopping cart database is represented by
 5  this block here that has --
 6      Q    Okay.
 7      A    -- shopping cart DB written underneath it.
 8      Q    Okay.  And both of those are server-side,
 9  correct?
10      A    Yes, they are.  They're both part of the
11  Newegg server system.
12                MR. BALDAUF:  So if we could refer to
13  Slide 42 from Dr. Grimes' presentation yesterday.
14      Q    (By Mr. Baldauf) So just to -- it should be on
15  the screen in front of you, sir.  This is a slide that
16  you had prepared in connection with your direct
17  yesterday, correct?
18      A    Yes, that's correct.
19      Q    Okay.  So if you could walk us through this,
20  please.  Can you explain this to us once again?  What's
21  happening here?
22      A    Certainly.  And this relates to 34(f), which
23  we've been --
24      Q    Right.
25      A    -- which we've been talking about.
```

1    Q    That's what we're discussing.

2    A    Right.  So 34(f) requires the buyer computer

3  to be programmed to receive requests.

4        So this shows that the buyer computer is

5  programmed.  It's the -- the add-to-cart button is what

6  has the html code behind it, if you will, that it's

7  executed when the button is clicked, so the buyer's

8  computer is programmed.

9        When the add-to-cart button is clicked -- in

10  this case, let's assume it's for the first time -- in

11  response to the click, the program -- the buyer computer

12  program running on the browser takes the add-to-cart

13  button, creates a message -- in fact, this is an

14  add-to-cart message, and it contains the product

15  identifier associated with the product right next to the

16  add-to-cart button, the cable, okay?

17        Then it goes to -- that message then goes to

18  the Newegg server system, which is -- which is this

19  server block here (indicates), and then the server

20  system generates a new cookie representing the shopping

21  cart contents or, if you will, the shopping cart --

22    Q    Uh-huh.

23    A    You can call it that, if you like.

24    Q    Well, or like you have.

25    A    Yeah.  And then sends this cookie containing

1  this content, this product identifier, back to the

2  client computer where it is stored by the browser in the

3  cookie file.

4       Q    Okay.  So while that's going on, those

5  requests are going back and forth, at no time are they

6  yet going to the shopping cart database, correct?

7       A    Not yet, no.  That's not the way the Newegg

8  system works.

9       Q    Now, the claim itself reads:  A plurality of

10  requests from a user to add a plurality of respective

11  products to a shopping cart in a shopping cart database.

12            Would you agree with me that while the

13  customer is adding products --

14                 MR. BALDAUF:  Can you keep that up,

15  please?

16       Q    (By Mr. Baldauf) -- while the product -- while

17  the customer is adding products to a shopping cart,

18  pressing add-to-cart, pressing add-to-cart, but prior to

19  the time they hit checkout, that shopping cart is not in

20  the shopping cart database while the products are being

21  added?

22       A    That is correct.  The add-to-cart button

23  causes the cookie to be updated with one item or two

24  items or however many times they press it.  That cookie

25  representing the shopping cart contents is stored by the

1  browser on the client's computer.

2      Q    So it's never in the shopping cart database

3  while the customer is adding the products?

4      A    Yes.  There are other shopping carts in the

5  shopping cart database but not -- not the one that's

6  currently being used by the customer to collect his

7  products, that's right.

8      Q    Okay.  And then I believe, based upon your

9  chart that you put together, that the Newegg cookie

10 shopping cart, that only -- the contents only go to the

11 shopping cart database once the customer hits checkout;

12 is that correct?

13     A    Yes.  That -- clicking checkout, as I

14 testified yesterday, sends -- the browser is programmed

15 to send another message when the button is clicked.

16          So that checkout message goes along with the

17 cookie, and it's received by the server.  At that point,

18 the server then takes the information from the cookie

19 and inserts it into -- into the shopping cart database.

20 So that's -- our picture is gone, but that's -- that's

21 the time at which the shopping cart database is, if you

22 will, loaded with the information from the customer's --

23 from the customer's cookie.

24     Q    I know --

25     A    The cookie that is stored on the customer's

 1  website.

 2      Q    I'm sorry.  Were you finished?  I'm sorry.

 3           And would you agree with me that that happens

 4  only once, that all of those contents are sent to the

 5  shopping cart database only once when checkout is hit?

 6      A    Well, it happens every time the checkout

 7  button is selected.  But if the customer is through

 8  shopping, does one checkout operation, then it's -- the

 9  database is updated only once.

10      Q    Would you agree with me that a request to

11  check out is not a request to add a product to the

12  shopping cart?

13      A    That's correct.  It's a request to check out.

14  I mean...

15      Q    During your testimony yesterday, you talked at

16  length about these claims and the various limitations.

17  I don't recall a discussion, though, about one word in

18  Claim 34(f), and that's respective.  I don't believe you

19  talked about that yesterday.

20           That's a word we hear a lot, respective,

21  respectively.  Do you agree with me respective means

22  something relating to two or more things, but they're

23  regarded individually?

24      A    I have thought about what respective means in

25  this claim -- this claim element, and I believe it

1  represents the relationship between the request and the

2  products.

3      Q    My question is just what respectively means.

4      A    Respectively?

5      Q    Yes.

6      A    You know, I haven't really thought about it

7  other than in the context of the claim.

8      Q    Okay.  Is that not a word you're familiar

9  with?

10     A    It's not a word I use, no.

11     Q    Okay.

12     A    And the important thing is what it means

13 relative to the claim, and that's really all I focused

14 on.

15     Q    Okay.

16     A    I didn't actually think about what it may mean

17 independent of that, yes.

18     Q    Okay.  I'd like to now turn to what you have

19 marked as element 34(h).

20          The language to modify said shopping cart in

21 said shopping cart database to reflect said plurality of

22 requests to add said plurality of products to said

23 shopping cart, would you agree with me that plurality

24 means more than one?

25     A    Yes.  Two or more.  We've -- we've already

1  talked about that, uh-huh.

2      Q    And as you stated previously, the contents of

3  the shopping cart are only sent bundled together when

4  the checkout button is hit to the database.

5      A    Yes, that's correct.  The cookie is sent,

6  which contains multiple items.

7      Q    Prior to this transfer to the shopping cart

8  database, there is no shopping cart -- filled shopping

9  cart in the shopping cart database, correct?

10      A    Nothing that corresponds to the customer's

11  purchase.  I mean, the database contains -- I mean,

12  there are other customers, and so it contains their

13  shopping carts, but nothing -- there's no shopping cart

14  in the database that relates to the purchase items that

15  are in the customer's cookie.

16      Q    Right.  And that's what we're talking about.

17      A    Yeah.  That's correct, yes, uh-huh.

18      Q    So you'll agree that with respect to this

19  customer, prior to the time that they hit checkout, the

20  shopping cart database is empty.

21      A    No.  It contains the elements from the other

22  customers who are doing checkout.

23      Q    Right.

24      A    So the database is not empty.  There's just no

25  shopping cart in the shopping cart database that

```
 1   corresponds to the cookie, which is what the customer is

 2   attempting to do.

 3       Q    And that was my question.

 4       A    Okay.

 5       Q    I'm talking about that specific customer.

 6       A    Yes.  For that specific customer, that's

 7   correct.  There's no shopping cart in the database until

 8   after the checkout button is pressed or clicked.

 9       Q    Now, with the Court's claim construction,

10   modify the shopping cart means to change, correct?

11       A    Yes.  Specifically to change an instance of a

12   shopping cart in the shopping cart database.

13       Q    To change, to change it.

14       A    Modify.  To change, I would say, is a fair

15   interpretation of modify.

16       Q    So is it your testimony that placing the

17   contents of the shopping cart cookie into the shopping

18   cart for the first time -- into the shopping cart

19   database -- I'm sorry -- for the first time constitutes

20   modifying the shopping cart in the shopping cart

21   database?

22       A    It constitutes modifying an instance of the

23   shopping cart in the shopping cart database.

24       Q    What do you mean by an instance?

25       A    Well, this is based on Mr. Wu's testimony.  He
```

34

1  described it as a two-step process.

2          First, there's an instance created, which

3  means there has to be some identification of some space

4  in the shopping cart computer database, and that's step

5  one.

6          Step two involves moving the contents of the

7  cookie into that space, which is the shopping cart in

8  the database.

9          So it's a two-step process.

10    Q    I believe that first step, from your report,

11  you refer to that as the assigning of the shopping cart

12  ID.

13    A    That's the way -- that's the way Mr. Wu

14  described it as step one, yes.

15    Q    What is the shopping cart ID?

16    A    Well, the shopping cart ID, as best as I

17  understand it, is an identification of some space in the

18  shopping cart database.

19    Q    Is the shopping --

20    A    It's assigned and allocated to the shopping

21  cart ID.

22    Q    In fact, it's a number, is it not?  It's a

23  counter.  It's a simple number.

24    A    Well, it's a -- in computer science terms, we

25  call it an identifier.  It's a -- it's a pointer.  It's

35

```
 1  a -- it's a reference to space in the shopping cart

 2  database.

 3          And you can think of it as a number, but that

 4  doesn't give you any idea of the -- of the meaning of

 5  the number.  The number is an address or a reference

 6  into the database.

 7      Q    Are there any empty fields in this shopping

 8  cart identifier that can be populated with information?

 9      A    No.  The identifier is a reference to the

10  space in the database.

11      Q    So the shopping cart identifier itself

12  contains no fields that can be changed or modified?

13      A    Well, the identifier is a number, which is a

14  reference to the space.

15      Q    Is the shopping cart ID a stored

16  representation of a collection of products?

17      A    No.  That's the construction for a shopping

18  cart --

19      Q    Right.  So how --

20      A    -- not a shopping cart instance.

21      Q    So you're saying, to be an instance of a

22  shopping cart, that does not have to conform to the

23  definition the Court gave us for a shopping cart?

24      A    The Court gave us a definition of a shopping

25  cart, which I used, which is a...
```

1      Q      Which you used for shopping cart.

2      A      Yes.

3      Q      And now you're saying that an instance of a

4   shopping cart doesn't have to satisfy the definition of

5   a shopping cart?

6      A      Well, an instance *is* -- *refers to the space in*

7   *the database where the shopping cart contents will go.*

8      Q      But an instance of a shopping cart.  That's

9   what you said.

10     A      Yes.

11     Q      An instance of a shopping cart.

12     A      Yes.

13     Q      So --

14     A      That's an instance of a shopping cart.

15     Q      So the definition of a shopping cart, though,

16   is a stored representation of a collection of products,

17   agreed?

18     A      Yes.

19     Q      And the shopping cart ID is not a stored

20   *representation of a collection of products.*

21     A      Well, there's a difference between an instance

22   of a shopping cart and a shopping cart.  The Court

23   didn't construe an instance of a shopping cart.  It used

24   that as a part of the construction for the word modify.

25   So --

37

1    Q    So is it your testimony --

2                MR. ADAMO:  Let him finish.

3                MR. BALDAUF:  Sorry.

4                MR. ADAMO:  Thank you.

5    A    So I used the Court's construction of a

6  shopping cart, and then I said, okay, what does modify

7  mean?

8                And the Court said, well, modify means to

9  change an instance of a shopping cart in the shopping

10  cart database.

11    Q    (By Mr. Baldauf) So just so I'm clear, in

12  connection with your definition of instance of a

13  shopping cart, you did not use the Court's definition of

14  shopping cart?

15    A    I did, because the shopping cart is the

16  destination for where the information goes -- the

17  product information goes, and it's actually not a

18  shopping cart until the information is there, because

19  the shopping cart is a stored representation of

20  products.

21                So it doesn't make any sense to have a

22  shopping cart if it doesn't contain these items, because

23  it doesn't contain a stored representation of products.

24    Q    I'll agree with you that I don't think this

25  makes sense, but the definition is very clear.  An

38

1    instance of a shopping cart.

2              MR. ADAMO:  Your Honor, objection at this

3    point.  They've been through this four times.  This is

4    starting to get argumentative.

5              MR. BALDAUF:  That's fine.  All right.

6    We can move on.

7              THE COURT:  All right.  Restate your

8    question.

9              MR. BALDAUF:  I think I made my point.

10             MR. ADAMO:  Thank you.

11             MR. BALDAUF:  Thank you.  I apologize.  I

12   carrying that too far.

13             THE COURT:  All right.  Question and

14   answer, Counsel.

15    Q    (By Mr. Baldauf) Sir, with respect to this

16   functionality in the Newegg website, you know, this idea

17   of modifying the shopping cart in the shopping cart

18   database, have you reviewed the Newegg computer code

19   relating to this functionality?

20    A    No, I have not.  I relied on Mr. Wu's

21   testimony.

22    Q    Have you examined any of the Newegg -- Newegg

23   source code?

24    A    Not directly, no.

25    Q    Just to step back one second, do you agree

1   with me that the -- while the customer is shopping,

2   it -- the cookie for the shopping cart is being updated

3   in the customer's browser as he's hitting the

4   add-to-cart button, as opposed to in the shopping cart

5   database?

6       A    Yes.  When a customer clicks the add-to -- I

7   testified about this yesterday.  When a customer clicks

8   the add-to-cart button, the html in the buyer computer

9   is programmed to send a message to the server computer.

10  The server computer then returns the -- a cookie --

11  either it's the first edition or second edition, but in

12  either event, it returns a cookie that contains the

13  results of that.

14           And the server computer, you know, knows that

15  cookies are enabled; otherwise, this operation won't

16  succeed.  And so it's automatic that the browser stores

17  this -- stores this representation of the shopping cart.

18           MR. BALDAUF:  If we could please pull up

19  Page 14 of Exhibit C?

20           And if we could pull up the first two

21  sentences of the first paragraph.  Keep going down.  The

22  first -- keep going down.  Right.  Up a little bit.

23           Yeah.  That's good right there.

24      Q    (By Mr. Baldauf) This comes from your report

25  where you wrote in your report that Newegg's system of

40

1  modifying the shopping cart in the cookie has the

2  advantage of simplifying database management.

3        What do you mean by that?

4     A    Well, there's a -- an operation -- the process

5  of purchasing items and putting them in a shopping cart,

6  the shopping cart information has to be stored

7  somewhere.

8        So the design -- this is under the Doctrine of

9  Equivalents now --

10    Q    Right.

11    A    -- since we're looking at it here, yeah.

12        So the design alternative that the implementer

13 of an E-commerce system considers is, well, where am I

14 going to store that information?  Am I going to store it

15 on the server side --

16    Q    Which is what's disclosed in the '314 patent,

17 correct?

18    A    That's correct.

19    Q    Okay.

20    A    And then -- or I'm going to -- am I going to

21 store in it a cookie, which is --

22    Q    Which -- which is what Newegg does.

23    A    -- which is what the Newegg system does,

24 right.

25        And so -- so this is a design choice.

41

1    Q    Okay.

2    A    And if you're going to store it in a cookie,

3 then that's a -- doesn't require any additional

4 resources to hold the contents of the shopping cart on

5 the server side.

6    Q    So you're --

7    A    So that simplifies -- so if you -- if you

8 reduce the amount of things that the database management

9 system has to do, then that simplifies it.

10    Q    Does that save space on Newegg servers?

11    A    It would save space on Newegg servers, yes.

12    And it would take -- I mean, the space has to

13 be taken somewhere, so the space is taken up by sending

14 the information to the customer's computer to be stored

15 there.

16    Q    Right.  So in the Newegg system, space isn't

17 taken up by storing shopping carts during the selection

18 process, correct?

19    A    Yeah.  Those are the -- those are the

20 tradeoffs of the two design alternatives, yes.

21    Q    Is there something that Newegg is sacrificing

22 by choosing this method instead of the server-side

23 method?

24    A    Yes, as a matter of fact.

25    Q    What is that, sir?

42

1    A    Well, if you -- if you purchase -- you go

2  shopping at the office, and you want to buy two or three

3  things, then they're saved as a cookie on your office

4  computer, because that's the computer you're using at

5  the time, and that's the way -- it's programmed to do

6  that.

7         Then if you go home at night and say, well,

8  gee, you know, I want to add some more things to this,

9  and maybe then buy the items in my shopping cart, the

10  shopping cart isn't there.  It's on your computer at the

11  office.

12         So this is -- this is one of the things that's

13  considered, and that's what makes it a design

14  alternative.  There are characteristics of each way of

15  implementing the E-commerce system, and this affects the

16  decision on how to implement it.

17    Q    So if a designer would select the server-side

18  option disclosed in the '314 patent, would a customer be

19  able to continue shopping from multiple computers?

20    A    Yes, they would.  That's one of the

21  consequences of -- of having the information on the

22  server.

23    Q    I'd like to now turn our attention to the '492

24  patent.

25         I believe you testified yesterday, with

1  respect to Claim 17 of the '492 patent, that it's

2  virtually identical to Claim 34 of the '314 patent that

3  we've just discussed; is that correct?

4      A    Yes, that's right.  I talked about -- rather

5  than go through all of the elements of the claim, I

6  talked about the differences, yes, that's right.

7      Q    And since we just talked about a lot of the

8  things that are in both claims, I'm not going to belabor

9  that point here either.

10         However, with respect to Claim 15, a hypertext

11  statement system, so, again, Claims 41 and 61, these are

12  the asserted claim, they depend upon Claim 15.

13      A    Yes, that's correct.

14      Q    And if Claim 15 is not infringed, Claims 41

15  and 51 cannot be infringed; is that right?

16      A    That's right.  Claim 41, of course, includes

17  the text here; but because of this phrase, in accordance

18  with Claim 15, that means it has to also satisfy all of

19  these limitations for Claim 15.

20         That's -- I believe that's what you said, yes.

21      Q    Yes.  Right.

22         This claim talks about -- it's a hypertext

23  statement system.  What is a hypertext link?

24      A    Pardon me?

25      Q    What is a hypertext link?

44

1      A    A hypertext link is a region on the web page

2  displayed by the browser from the code that comes from

3  the server.  And the link refers to an area of the

4  screen that you can click on -- the user can click on.

5          And the computer is programmed to respond to

6  that link and take some action.

7          Typically, it brings up another web page,

8  but -- but that's -- that's a -- an example.  Really,

9  it's programmed to take some action.

10     Q    Is the use of hypertext a basic function of

11  the worldwide web?

12     A    Yes.  I have a hard time imagining the

13  worldwide web without hyperlinks.

14     Q    Did Open Market invent the use of hypertext

15  links on the web?

16     A    No.  Those were -- well, actually, the -- the

17  notion of a hyperlink is very early.  Comes from a

18  fellow named Ted Nelson, who wrote -- wrote a book about

19  hyperlinks called Computer Literacy or -- I forget

20  exactly the name of it, but -- but it was, you know,

21  decades, decades before Open Market's system.  So 10 or

22  20 -- 10 or 20 years.

23     Q    This claim also talks about a transaction

24  detail, transaction statement.  What is that?  What is

25  the transaction detail within 15(f)?  Display

45

1   transaction details, what are those, sir?

2       A    Well, they're -- I think, as you -- as you

3   might just take from reading this, they're details about

4   the transaction.  The statement document consists of a

5   transaction history, and transaction details would be

6   further information about a transaction.

7       Q    What type of information would you expect to

8   be in a transaction detail?

9       A    Well, the claim tells us actually what

10  needs -- what, to satisfy the claim, needs to be there.

11  That's the context I used in analyzing this in the

12  claim.

13          But I would expect, you know, additional

14  information, I mean, you know, details or somehow

15  further information.  It's not presented by the

16  statement without the detail.

17      Q    And these relate to the past transactions what

18  you have previously purchased, how much it costs, that

19  sort of thing?

20      A    Yes.  Purchase transactions, right.

21      Q    Can you tell me how often this hypertext

22  function is used by customers on Newegg's website?

23              MR. ADAMO:  Objection.  It's outside the

24  of the scope of the direct.

25              THE COURT:  Restate the question.

1                    MR. BALDAUF:  Excuse me, Your Honor.  I

2    didn't hear.

3                    THE COURT:  Restate the question.

4        Q    (By Mr. Baldauf)  The question was simply:  Do

5    you know if, in fact, Newegg customers select or choose

6    the transaction details and, if so, how frequently?

7                    THE COURT:  Overruled.

8        A    I -- actually I don't have any idea.  It's the

9    capability of the website -- it's actually a very

10   powerful website; it has lots of capabilities.  And all

11   I have direct experience with are the ones I used which

12   were -- I described in my purchase example.

13                   So, I mean, I used it, but I really don't have

14   any idea of what frequency it's used.

15       Q    (By Mr. Baldauf)  Again, this claim, like what

16   we discussed -- discussed previously, requires a client

17   computer for operation by a client user.  Again, would

18   you agree with me that it is the customer that supplies

19   the client computer?

20       A    Yes.  A customer supplies the client computer.

21   As I described yesterday, it is used by the Newegg

22   order -- order history system.

23       Q    And with respect to for operation by a client

24   user, again, that's the customer?

25       A    Yes, that customer is the one that uses it.

1  The requirement under the claim is for a client

2  computer.

3      Q    My focus though --

4      A    And it's for operation by the user, but the

5  requirement to satisfy the claim is that there be a

6  client computer, which is part of the Newegg system.

7  It's called the customer in the Newegg diagram.

8      Q    Right.  I was just reading the entirety of the

9  passage.

10     A    Yes.

11     Q    For operation by a client user.

12     A    That's correct.

13          Let me add one thing.

14     Q    Sure.

15     A    It's actually used by -- it could be a Newegg

16  computer if they're providing testing of the system.

17     Q    Okay.  Thank you.

18     A    That's really true for all of the claims.  I

19  keep forgetting to mention that.

20     Q    With respect to testing, do you know how

21  frequently Newegg tests its systems?

22     A    Well, not specifically, but in the normal

23  course of doing business and adding features to

24  websites, which I am familiar with, you would really

25  test features before they were launched for customer

48

 1  use.  And I have seen some documents produced by Newegg

 2  about some of their testing that they have done.

 3      Q    Uh-huh.

 4      A    And that's the normal case.  You test to make

 5  sure that you're not going to end up with lots of, you

 6  know, upset customers because something doesn't work

 7  quite right the way it was designed.

 8          So the purpose of the testing is to ensure

 9  that you're going to have smooth, trouble-free operation

10  when people come to use these facilities that you're

11  adding to the website.

12      Q    So you believe this is internal Newegg testing

13  that they're operating, if you will, as the customer?

14      A    Yes.  That's a good way to characterize it.

15  It's Newegg employees with Newegg computers, obviously,

16  acting as customers for purposes of testing.

17      Q    So these are not revenue-generating sales;

18  this is all internal to Newegg?

19      A    No, they would not generate -- the purpose

20  isn't to generate revenue.  The purpose is to make sure

21  the facilities work that are being launched on the

22  website.

23      Q    15(f) there, the client computer being

24  programmed to display the statement document to receive

25  a request from the client user to display transaction

A1713

49

1  details, and so on.

2         Who requests the display of transaction

3  details?

4      A    Well, this claim requires that -- a client

5  computer to be programmed.  And it has to be programmed

6  to do these things.  And once it's been programmed to do

7  that, then it meets this claim requirement.  The actual

8  requests, of course, are done by the user clicking --

9  clicking buttons.

10     Q    That was my question.

11         I believe you testified yesterday that the

12  client computer runs a browser that is programmed by

13  Newegg.  Is that a fair summary of your testimony?

14     A    Yes.  Generally, claims require two things:

15  Client computer programmed by Newegg and server

16  computers programmed by Newegg.  So the client computers

17  are programmed by Newegg, as I testified yesterday.

18     Q    And you believe that is satisfied by Newegg

19  sending html pages to the browser of the customer's

20  computer, correct?

21     A    Yes.  That's the mechanism that the Newegg

22  system uses to control the operation of the -- of the

23  customer computer.

24     Q    Okay.  In fact, the way this works, is it not

25  the customer computer that pulls or extracts the web

50

1  page from the Newegg server?

2       A    No.  The messages go back and forth between

3  the client and the -- and the server computer.

4  The only thing that the customer does, which is not

5  covered by the claims, is to actually connect to the

6  Newegg website.  Once they connect to the Newegg

7  website, they get the initial homepage that has the

8  specials and things on it; and, at that point, all of

9  the operation of the browser is controlled by the

10  programming that comes from Newegg.

11       Q    And this is subsequent to the customer

12  initially logging -- taking the action of logging onto

13  the Newegg website?

14       A    Yes.  It's like the customer, you know,

15  deciding to walk into Home Depot.  I mean, that's kind

16  of the initial decision that the customer makes.  They

17  connect to this website, and they type newegg.com, and

18  then they are connected to the website.

19       Q    So after this happens, then you believe that

20  Newegg programs the customer's browser?

21       A    Yes.  All subsequent actions that take place

22  relative to the website are controlled by the code, html

23  code, that is sent to the browser in response to a

24  request from the client computer.

25       Q    Is a browser a computer?

51

1    A    Well, it certainly depends what you think a
2  computer is.  I don't recall specifically if the Court
3  construed that.  Yes, they did, actually.

4    Q    Yes, he did.

5    A    Let me review this here.

6         Functional unit that can perform substantial
7  computation, including numerous arithmetic operations or
8  logic operations without human intervention.

9         So the computer -- I'm sorry, what was your
10  question again?

11   Q    If a browser is a computer under that
12  definition.

13   A    I would say the browser is an application that
14  runs on the computer.

15   Q    The browser itself is not a computer, correct?

16   A    Well, when someone says go to your computer
17  and buy me a cable, then the distinction between a
18  browser and a computer might get lost.  But from a
19  technical standpoint, I think of the browser as an
20  application that runs on a computer.

21   Q    Right.  And I was just focusing on the Court's
22  construction.

23   A    Yes.  But the computer is definitely a
24  functional unit that can perform substantial
25  computation, including running -- running a browser.

52

1    Q    Does the '492 patent disclose the sending of

2  instructions to a browser as constituting programming

3  the buyer computer?

4    A    Well, the -- the browser receives instructions

5  in two ways.  I mean, for example, if you're going to

6  enable cookies or disable cookies, then that's kind of

7  browser-based commands that are independent of what

8  Newegg is doing.

9         But once browsers are enabled, which means you

10 can buy products, at that point the control of the -- of

11 the browser is done, relative to the claims, is done

12 completely by a code that's sent from the Newegg server

13 system.

14   Q    My question, though, is specifically, does the

15 '492 patent disclose the sending of instructions to a

16 browser as constituting programming the buyer's

17 computer?

18   A    Oh, I'm sorry, I misunderstood your question.

19 The -- the claim language just says that the client

20 computer is programmed, right here for example.

21        So my analysis was, okay, how does the Newegg

22 system work?  Does it contain a client computer, which

23 is the second element?  And then is, in fact, it

24 programmed to do the things that the claim requires?

25        And the answer is -- was yes.  And it does

1   that by sending the html code from the server computer.

2        Q    I understand all that.  If you would please

3   answer my question.

4        A    Oh, I'm sorry.

5        Q    My question is very specific.

6             In the '492 patent itself, the specification

7   that the Judge described to us at the onset of this

8   trial where it discusses the operation of the invention,

9   anywhere in there does it disclose the sending of

10  instructions to a browser as constituting programming

11  the buyer computer?

12       A    Oh, I'm sorry.  I thought you were referring

13  to the claims.  You're actually referring to the patent

14  itself.

15       Q    Yes, I am.

16       A    I apologize.

17       Q    That's quite all right.

18       A    I misunderstood the context of your question.

19            I don't remember specifically, but a person of

20  ordinary skill in the art reading the specification

21  would understand what a browser would be or could be

22  used and how they work.

23       Q    To answer my question, you don't remember?

24       A    I don't remember specifically, no.  But I do

25  know that it would be within the knowledge of a person

54

1  of ordinary skill in the art that that's the way

2  browsers work, yeah.

3      Q    Does Newegg install browsers on customer

4  computers?

5      A    No.  I think I testified yesterday that you

6  could have any one of a number of browsers that --

7  sometimes they come as part of your system.  When you

8  install Windows, they're just there.  And sometimes

9  people say, oh, I want to use this new Firebox browser.

10 You say, oh, okay.  So you download that.  So those are

11 done by the customer.

12     Q    I think we can finally turn our attention to

13 the '639 patent.

14          I don't want to belabor this point, but,

15 again, we can just concentrate on these independent

16 claims, correct?

17     A    Certainly.  All the claim elements, whether

.18 they are in the independent claims or the dependent

19 claims, must be satisfied.

20          MR. BALDAUF:  If we can please pull up

21 Exhibit B, Page 1 of the report.

22     Q    (By Mr. Baldauf) okay.  Looking at this, it's

23 a -- part 1(a) that you've designated -- a method of

24 processing service request from a client to a server.

25          MR. BALDAUF:  If we could blow up the

1   first paragraph on the right-hand side, please.

2       Q    (By Mr. Baldauf)   The second sentence you

3   wrote in the client server model:   Client sends service

4   request over communications link to a server.

5           So would you agree with me that it's the

6   client or customer who is sending the requests?

7       A    Yes.   The html code behind a button, the

8   programming behind a button like we've been talking

9   about -- add-to-cart is a perfectly good example to

10  use -- that code, when it's executed by the browser, is

11  what sends the service request to the server for some

12  action.   In this case, you have the cart action.   But

13  that's -- that's a description of the client server

14  model.   Clients request service; servers provides

15  service.

16      Q    And it's the client that requests service?

17      A    Yes.   Yes.

18      Q    If we could move on to what you have marked as

19  1(b), forwarding a service request from the client to

20  the server system.

21          Who forwards the service request from the

22  client to the server system?

23      A    Well, there's a -- which claim element is

24  this?

25      Q    What you have marked as 1(b).

56

```
 1      A    1(b), yes.

 2           Okay.  This forwarding occurs in multiple

 3  steps.  I mean, it starts with the client; then it's

 4  received by elements along the way.  For example, it's

 5  received by the firewall at the Newegg web system, the

 6  server system, and then it's forwarded to this netscaler

 7  block that I testified about yesterday, and then it's

 8  forwarded from there to some other servers to actually

 9  perform the action requested inside the Newegg server

10  system.

11           MR. BALDAUF:  If you could please pull up

12  Page 3 to Exhibit B of Dr. Grimes' report.

13      Q    (By Mr. Baldauf)  Sir, Page 3 of Exhibit B to

14  your report is your explanation of how this claim

15  limitation is satisfied, correct?

16      A    Yes, that's correct.  This is the -- this

17  is -- what we're looking at here is my detailed

18  analysis.  I summarized it yesterday, but these are the

19  details, yes.

20           MR. BALDAUF:  Would you be kind enough to

21  blow up the first paragraph on the right side.

22

23      Q    (By Mr. Baldauf)  You wrote that to satisfy

24  this limitation:  Client computer forward send service

25  requests to the Newegg server system when, for example,
```

1  users click hyperlinks while browsing web pages.

2          Is that accurate?  Is that how that limitation

3  is satisfied?

4      A    Yes.  This is -- client computers forward --

5  that's right.  When you click on a hyperlink, the code,

6  the html code behind that link, causes a service request

7  to be sent by the browser.

8      Q    So it's the client computer that's forwarding

9  that service request?

10      A    Well, the client computer generates the

11  service request.  Forwarding sort of means that it's

12  been received somewhere, you know, like forwarding mail,

13  for example.  I get mail and I forward it.  So someone

14  else sent me the mail, but the person that receives it

15  then does the forwarding operation.

16          So client computers send a service request,

17  and then it's forwarded by other elements in the chain.

18  This is perhaps not very clearly written.  But

19  forwarding means receive something and then send it on.

20      Q    And you had mentioned the firewall and the

21  netscaler, correct?

22      A    Those are two elements.  In fact, Mr. Tittel

23  has said that the -- that this claim element is met by

24  virtue of the fact that the netscaler forwards it to the

25  server system.  And that's certainly one place that it

58

1   is forwarded, yes.

2      Q    We can let Mr. Tittel testify himself.

3           Could you show me where in your report in this

4   discussion of element 1(b) that you explain that this

5   limitation is satisfied by either forwarding from the

6   firewall or netscaler? I don't -- you can look, but I

7   don't believe it's in your report.

8      A    The use of that particular example, which I

9   agree with completely, was first -- the first time I had

10  thought about that was when I read it in Mr. Tittel's

11  report.

12     Q    Okay.  So would you agree with me that it's

13  not in your report?

14     A    I don't believe I went into that level of

15  detail on the issue, particular issue of what exactly it

16  means to forward.  I have what is written here.

17     Q    And that's it?

18     A    Yes.

19     Q    And that's that the client computers forward

20  or send service requests to the Newegg server system?

21     A    Yes.  Well, what I have written here speaks

22  for itself, of course.

23     Q    If we could take a look at what you have

24  marked as 1(c) now:  Returning a session identifier from

25  the server system to the client, the client storing the

1  session identifier for use in subsequent distinct

2  requests.

3        This includes the language client is storing

4  the *session identifier* for use in subsequent distinct

5  requests.

6        Is this satisfied by the customer's computer

7  storing the session identifier?

8    A   The claim requires that the session identifier

9  be returned from the server system to the client.  And

10 then it requires that the client store the session

11 identifier for use in subsequent requests.

12       So it's -- the storing is done by the client,

13 yes.

14   Q   And then moving on from that to 1(d):

15       Appending the storage session identifier to

16 each of the subsequent distinct requests.

17       Again, is that done by the customer computer?

18   A   Yes.  It's controlled by the Newegg system

19 because it sends the html, which causes the browser to

20 actually do that.  That's an automatic operation of the

21 browser when cookies are enabled is that the -- in this

22 case the stored session ID is stored in a cookie, and it

23 is automatically appended to requests of the browser.

24   Q   But that's done on the customer computer?

25   A   Yes.  The request is sent from the customer

60

1  computer, yes.

2           MR. BALDAUF:  If you could please pull up

3  Page 6 of Exhibit D to Dr. Grimes' report.  If you could

4  pull up the last paragraph, please.

5     Q    (By Mr. Baldauf)  Dr. Grimes, you wrote in

6  your report that the conventional operation of cookies

7  is that a server system sends a cookie value to a client

8  computer, and the client computer stores the cookie

9  value for use in subsequent requests to that server

10 system.

11          What do you mean by the conventional operation

12 of a cookie?

13    A    Well, that's the way all browsers that I know

14 of operate.  That's what I meant by conventional is that

15 it's something that is -- is done by -- it's done by all

16 browsers that I know of.  Certainly you could use for

17 doing purchases on the Newegg system.

18          MR. BALDAUF:  If you could pull up

19 Slide 6 from Dr. Grimes' presentation yesterday.

20    Q    (By Mr. Baldauf)  Dr. Grimes, this is another

21 slide from your presentation yesterday.  Is this what

22 you're referring to as the conventional operation of

23 cookies?

24    A    This is a description of the conventional

25 operation of a browser that has cookies enabled, yes.

61

```
 1     Q    Was this invented by Open Market?

 2     A    No.  I think it was invented by Netscape,

 3  probably around 1992, as I recall.

 4     Q    If we could switch gears briefly.  Claim 78.

 5  Again, this claim, as you testified yesterday, is very

 6  similar to Claim 1 that we just discussed, correct?

 7     A    Yes, that's correct, uh-huh.

 8     Q    Part A:  A method of processing, in a server

 9  system, service requests from a client to the server

10  system.

11          Again, are these service requests that are

12  sent by the client or customer to the server system?

13     A    Yes.  The service requests are from a client,

14  meaning -- meaning a client computer or the buyer

15  computer or the customer computer.  Yes, those service

16  requests come from the client.

17     Q    And in 78(b):  Receiving, from the client, a

18  service request to which a session identifier stored at

19  the client has been appended by the client.

20          Do you agree that it is the client that -- or

21  the client's computer that has appended the stored

22  session identifier?

23     A    Yes.  The claim requires that they be received

24  from the client.  So this is an operation that's done on

25  the server, they receive the messages from the client.
```

62

1              And, in fact, yes, that is correct.  The

2  identifier stored at the client has been appended by the

3  client.  That's the way the browser works.

4        Q    We talked a bit -- not we, but one of my

5  associates and you talked a bit at your deposition about

6  sessions, correct?

7        A    Undoubtedly, I don't remember.  It was most of

8  a year ago.  But I'm sure you will remind me of what I

9  said.

10       Q    That's why I'm here, right?

11       A    That's right.

12            MR. ADAMO:  You can bet on it.

13       Q    (By Mr. Baldauf)  The Court has defined

14  session as a series of requests and responses to perform

15  a complete task or set of tasks between a client and a

16  server system, correct?

17       A    In the context of the '639 patent, that is

18  correct, yes.

19       Q    And I believe you testified that a task

20  depends upon the request that the server receives and

21  the responses that it provides to the client.  Does that

22  sound accurate to you?

23       A    Yes.  A task is represented by the series of

24  requests and responses.

25       Q    Could a session be the sending back of an ID

A1727

1   from the server to the customer's computer after

2   authentication?

3        A    Well, when you do a logged-in session, which

4   involves authentication by the server, that's

5   actually -- the sending of that cookie and storing it is

6   the beginning of the session.

7        Q    Okay.

8        A    So that's -- that's -- my analysis shows that

9   that's when the session begins, the logged-in session

10  particularly begins.

11       Q    As a task?

12       A    Pardon me?

13       Q    As a task?

14       A    I wouldn't consider that a task, no.  That's

15  the beginning point.  In other words, you have to begin

16  the session, then the task consists of requests and

17  responses that occur once the session is begun.

18       Q    How many?

19       A    How many?

20       Q    Yes.

21       A    Well, at least one set of requests and

22  responses.

23       Q    You talked a bit yesterday about this concept

24  of inducement of infringement.  Just a couple final

25  questions.

64

1          Are Newegg's customers responsible for the

2    operation of Newegg servers?

3          A    I can't imagine they would be.

4          Q    Do Newegg's customers ever supply or operate

5    Newegg's shopping cart computers or shopping cart

6    databases?

7          A    The -- the shopping cart system -- the Newegg

8    system, you know, at the data center is operated by --

9    by Newegg employees for sure.  And the -- and I talked

10   about the fact that the service send htmls, so in that

11   sense they're controlling the user's computer, but they

12   don't -- the user operates the user's computer.

13        Q    Thank you.

14             MR. BALDAUF:  Thank you.  I pass the

15   witness.

16             THE COURT:  All right.  Redirect.

17             MR. ADAMO:  Redirect, Your Honor?

18             MR. BALDAUF:  Yes, redirect.

19             MR. ADAMO:  It will be brief.

20             THE COURT:  Okay.

21             MR. ADAMO:  Your Honor, it will work best

22   if I can stand here by the charts.

23             THE COURT:  That will be fine.

24             MR. ADAMO:  With my volume voice on.

25                  REDIRECT EXAMINATION

65

1  BY MR. ADAMO:

2      Q      You spent a lot of time with Mr. Baldauf on

3  the '314 patent talking about things that the customers

4  did or didn't do, or when they did them or if they did

5  them.

6          What kind of claim is the '314 patent claim,

7  Doctor?

8      A      This is called a system claim.

9      Q      Okay.

10     A      I thought for a moment you were going to

11  delete part of the claim.

12     Q      Don't worry about it.

13          Claim 35, is that a system claim?

14     A      Yes, it is.  In fact, all of the claims that

15  are asserted in this case in the '314 patent are all

16  what are known as system claims.  They are claims about

17  the structure of the Newegg system.

18     Q      All right.  And I think you were making, in

19  your back-and-forth with Mr. Baldauf, you were trying to

20  point out in various of your answers that the claims

21  require computers that are programmed in a certain way;

22  is that correct?

23     A      Yes.  That's the -- that's the language of the

24  claim, right.

25     Q      Okay.

66

1    A    For like the client computer and the server

2  computer.

3    Q    Programmed, programmed.  I think I've got them

4  all.

5         Claim 34, does any element of Claim 34 require

6  any action on behalf of a customer?

7    A    The claim language itself does not.  I mean,

8  customers, of course, are involved; but the claim

9  doesn't require the customer action.  The claim requires

10  that the computer be programmed.

11    Q    All right.  Let me be clear about this.  So

12  let me ask you again:  Do any of the elements of

13  Claims 34, 35, or 51 require any customer action?

14    A    No, they do not.

15    Q    All right.  So besides all the time you spent

16  with Mr. Baldauf talking about what customers did or

17  didn't do with respect to the system claims in the '314

18  patent, you then turned to the '492 and you spent all

19  sorts of time talking with him about what customers did

20  or didn't do with respect to this patent.

21         What kind of claim is this?

22    A    All of the asserted claims are also system

23  claims for this patent.

24    Q    Those claims, those system claims, the

25  elements in those system claims call out computers that

67

1  are programmed to do a certain thing?

2      A    That's correct, yes.

3      Q    And I didn't circle the for operation before.

4           Is for operation a function of a computer?

5      A    Yes.

6      Q    Not structural?

7      A    That's correct.

8      Q    All right.

9      A    It's what is the purpose, basically.

10     Q    Do any of the elements of any of the claims in

11 the '492 patent, Claims 15, 21, 60, 61, do any of them

12 require any action of any type on the part of a

13 customer?

14     A    No, they do not.

15              MR. ADAMO:  I have nothing further, Your

16 Honor.  Thank you.

17              THE COURT:  Thank you.  Any further

18 recross?

19              MR. BALDAUF:  Nothing further, Your

20 Honor.

21              THE COURT:  All right.  Thank you.  You

22 may step down.

23              All right, Ladies and Gentlemen of the

24 Jury, I think we will go ahead and take our morning

25 break at this time.  So we will be in recess until

85

```
 1      A     Besides being able to give us the graphical

 2 display and make it more interactive, the use of

 3 hypertext links in the worldwide web, where you can

 4 click on a link and go to the next page in a catalog,

 5 find out more information about an item for sale or even

 6 select something to buy, were a key part of what the web

 7 made it possible for us to do.

 8      Q     All right.  Let's add a few more of the dates

 9 that you just mentioned on to the -- on to the timeline.

10            When did Stewart and Payne start working at

11 Open Market again?

12      A     That was in April of 1994.

13      Q     All right.  So the dates of April and May of

14 '94 that are now on the timeline, are they accurate?

15      A     Yes, they are.

16      Q     And you started in May, so you're now on there

17 as well, correct?

18      A     Correct.

19      Q     All right.  Let's go back to the 1994 events

20 then.

21            At the time you joined Open Market, were there

22 other E-commerce companies at that time that you were

23 aware of?

24      A     There were others starting up at about the

25 same time.
```

86

1    Q    Were you familiar with some of them?

2    A    Some of them that I remember from that time

3 included Netscape, a company called First Virtual, and

4 one called CyberCash.

5    Q    What did they do?

6    A    Netscape set out building the core pieces for

7 the web in general, the web browser and the server

8 software that would be needed for people to use the web

9 for all kinds of applications.

10        First Virtual was working on a system for

11 doing -- for buying things by e-mail that you would get

12 delivered by e-mail.  Their favorite example is actually

13 a joke of the day that you could buy for a nickel.

14        And CyberCash was working on developing ways

15 of doing secure payment for credit cards over the

16 internet.

17    Q    Okay.  How is what you were thinking about or

18 trying to do at Open Market different or planning to be

19 different than what these other companies were already

20 trying to do?

21    A    What we set out to do at Open Market was to

22 build the full set of systems that you would need to do

23 business on the internet.

24        That would, of course, include payment; but it

25 would include the presentation of products, like a

1   catalog, for sale, the ability for someone to choose

2   what they wanted to buy or choose what they didn't want

3   to buy, if they changed their mind later, complete the

4   transaction, and then keep track of what they had

5   purchased after the sale.  It was really a complete set

6   of things.

7        Q    All right.  I referred to what Open Market was

8   attempting to do, as far as online shopping was

9   concerned, as a soup-to-nuts system.  Is that accurate?

10       A    I think that's a good way to describe it.

11       Q    Who were the intended buyers and sellers for

12  the system, as Open Market folks viewed it, in mid-1994?

13       A    We were building the tools that would

14  primarily be used -- our customers would be businesses.

15            But we thought a lot about all of the users of

16  the system, which would include anyone who was buying

17  something from those sellers, as well as the tools, of

18  course, that the sellers would need to do it.

19            And we wanted that capability to be available

20  to small businesses, as well as the large businesses,

21  and the network to be open to anyone with a network

22  connection to be able to buy things from these sellers.

23       Q    Was there any thought in your minds or

24  intention at the time to put the system together so that

25  the small mom-and-pop store in Connecticut on the web

88

1  would look like Nieman Marcus in Dallas?

2     A    That was absolutely something that we had in

3  mind, to enable small businesses to have the same kind

4  of presence on the net.

5          Around that time, there was a cartoon in the

6  New Yorker, two dogs sitting at a computer.  One dog

7  says to the other:  On the internet, no one knows you're

8  a dog.

9          And that really had a couple of meanings for

10 us.  One was that as a seller, you could be a small

11 business there with as big a presence on the network as

12 a large seller did.

13         But also it was true for the buyers, that any

14 buyer was the same to a seller no matter where they came

15 from, no matter what they looked like, how old or young

16 they were, how they were dressed.  All buyers looked the

17 same on the internet.

18    Q    This -- what's up on the screen right now that

19 we're showing, is this, in fact, the cartoon you were

20 referring to?

21    A    Yes, it is.

22    Q    All right.  Let me ask you now to look in your

23 binder -- and we'll put this up on the system -- at a

24 document that's in evidence as Exhibit P78.

25         Are you familiar with this document,

1    A    A session would be a series of requests in a

2  related session of what you're doing.  Browsing through

3  a catalog, choosing items, discarding items would all be

4  part of the same session.  A few days later, you might

5  have another session.

6    Q    And why was that a technical issue in

7  developing the type of system that you folks were

8  focusing on at Open Market in the mid-1994?

9    A    Those were a problem, because the worldwide

10  web, as originally designed, was intentionally designed

11  without state, which has a lot of benefits for some

12  applications, but for the business applications we had

13  in mind, state was absolutely essential.

14    Q    Did you and the other people at Open Market

15  solve these state and session problems?

16    A    Yes, we did.

17    Q    How?

18    A    We did it in a -- in a couple of pieces for

19  the state and for sessions.

20    Q    All right.  Start with the first piece.

21    A    For the state, we stored that information on a

22  web server so that there was a database keeping track of

23  the items in your shopping cart, is a good example of

24  the kind of state we needed to have.

25        And then that was actually connected to what

1  you were doing by the session so that you would have a

2  shopping cart for a session.

3          And that was done by attaching some

4  information that would go back and forth between the

5  browser and the server as you browse through -- as you

6  interacted with the shopping cart, and that's what we

7  called a session identifier.

8      Q    Now, when you say -- said browser in your last

9  answer, as far as hardware is concerned, are you

10 referring to the client computer or the customer

11 computer?

12     A    The browser is software that would be running

13 on the client computer -- that's the technical term --

14 or the customer's PC.

15     Q    Do you tend to use the terms interchangeably,

16 Mr. Treese?

17     A    Yes.

18     Q    All right.  You mentioned that you came up

19 with the idea of sending something that you just told us

20 was a session identifier back and forth between the

21 client and the server.

22         Just if you don't mind, tell us a little bit

23 more about the session identifier, please.

24     A    At that time, what we did was, every web page

25 has a name called a URL.  You can see it in the top bar

98

1    of a web browser, usually.

2            And to that, we attached an identifier that

3    would be consistent through the session even as you

4    changed pages.  And that's how we built the first

5    system.

6        Q    Best recollection of when someone at Open

7    Market came up with this solution to this state/session

8    problem?

9        A    I believe that was in May of 1994.

10       Q    Would you, in your binder, please, look at

11   Exhibit P75 that's already in evidence?

12           MR. ADAMO:  And, Mr. Gooden, I guess if

13   you would blow up about the top half of the page.  Come

14   down a little more.  Keep going.  Good.  Thank you.

15       Q    (By Mr. Adamo) Have you seen this document

16   before, Mr. Treese?

17       A    Yes, I have.

18       Q    And do you know what the date was that this

19   document was -- on which this document was created?

20       A    There's information at the top indicating it

21   was dated May 2nd, 1994.

22       Q    And who is the author?  Is there information

23   that shows you who the author of the document is?

24       A    Yes.  It was written by Andy Payne.

25       Q    Okay.  Does this document in any way show what

100

1   on the website.

2           We sometimes call this "sneaker net" because

3   it involved someone running around in sneakers to

4   actually handle the order.

5       Q    Well, were people actually dealing with the

6   problem or avoiding it?

7       A    That was pretty much working around it, just

8   avoiding the problem.

9       Q    To your knowledge, at Open Market, were there

10  other ways of maintaining state and session in May of

11  1994, other than the one you had just come up with?

12      A    Not that I'm aware of.

13      Q    All right.  I've asked that the timeline be

14  modified so that we've now added the date of the

15  document we were just looking at, May 2nd of 1994.

16          Is that accurate, Mr. Treese?

17      A    Yes, it is.

18          MR. ADAMO:  And I believe, Mr. Gooden, we

19  can add another item in, that's the date of the earlier

20  memo, P78, that we just looked at, and I've asked Mr.

21  Gooden to do that.

22      Q    (By Mr. Adamo) Is that accurate, Mr. Treese?

23      A    Yes, it is.

24      Q    All right.  How long did it take Open Market

25  to get these ideas into a real live working product?

1       A    Yes.

2       Q    And you said that Open Market later launched

3   Transact.  And Transact again was what?

4       A    Transact was the software products that came

5   out of our work on the Open Marketplace.

6       Q    And Transact was first sold when?

7       A    That was in -- around May of 1996.

8       Q    What else was happening in Open Market in

9   1996?

10      A    Around May of 1996 was also when Open Market

11  went public.

12      Q    Let's talk about licenses for a moment.

13           Did Open Market offer only one type of license

14  with respect to Transact?

15      A    There was more than one license type.

16      Q    Can you -- best recollection, can you describe

17  the types of licenses?

18      A    There were at least two.  One was for large

19  companies -- we called it the enterprise license -- who

20  would buy the software and operate it themselves.  The

21  other was a commerce service provider license for

22  companies who wanted to provide services to small and

23  medium-sized businesses, who would be operating much as

24  what we talked about the Open Marketplace.  Only those

25  companies would operate it instead of Open Market.

1     Q    Mr. Treese, I think I've just finally figured

2  out what all the popping has been.  You've got an

3  extremely powerful voice.  If you could tilt the

4  microphone a little bit off center and maybe drop your

5  voice just a tad.  Are you a little nervous?

6     A    A little bit.

7     Q    Okay.  You're among friends -- at least I'm

8  your friend.  Try not to boom it out so much, because

9  the popping is sort of making us all -- everybody's been

10 looking around the room trying the figure out where it's

11 been coming from.

12         All right.  Let's go back to talking about the

13 licenses.

14         In the customer service provider licenses, do

15 you remember any of Open Market's customers that had

16 those licenses?

17    A    Those companies included AT&T, MCI, Sprint,

18 First Union National Bank.  At the time, it was about 11

19 of the world's largest 15 phone companies.

20    Q    Did Open Market promote the fact that it had

21 customers like AT&T?

22    A    Yes, we did.

23    Q    How?

24    A    We would issue press releases and

25 announcements about them.

1      Q    Let's go back to the other style of license,

2  the corporate customer license.  Do you recall who any

3  of Open Market's corporate customers were?

4      A    Corporate customers included companies like

5  Disney; 3Com; the Tribune Company, which owns The

6  Chicago Tribune; and other media properties; Business

7  Week; Time Warner for its magazines; Mcgraw-Hill;

8  business Week; companies like that.

9      Q    Best of your recollection, do you remember

10  what a typical -- typical price for a basic corporate

11  customer license to Transact was, best recollection?

12      A    I believe that was in the range of $125,000 to

13  $250,000.

14      Q    Were there any additional costs to that

15  license that you are aware of?

16      A    Yes, there typically would be.

17      Q    And can you the tell us what they -- what the

18  nature of those costs were?

19      A    Those costs would include installation,

20  services, annual software maintenance for updates and

21  bug fixes, and things like that.  And often some

22  customization and integration that would make it work

23  with other software that the company had.

24      Q    Bug -- bug fixes.  That basically in English

25  means that there's something wrong with the program that

115

```
 1     A     It was acquired by a company called Divine in
 2  2001.
 3     Q     And it no longer exists?
 4     A     And Divine ran into trouble during the dot-com
 5  bust.
 6     Q     Transact.  What about the Transact product?
 7  Is it still around today?
 8     A     The Transact product is still around today.
 9     Q     People still using it, to the best of your
10  knowledge?
11     A     Yes, they do.
12     Q     Last few questions.
13           How do you feel about the patented inventions
14  that are represented by all those grants from the United
15  States Government?
16     A     I'm proud of it.
17     Q     Why?
18     A     First of all, as an engineer, we have a
19  technical challenge to solve those problems.  And that
20  was part of the reward for that.
21           Secondly, it was the core technology that we
22  needed to build a growing software business at that time
23  in an explosion of doing business on the network.
24           And the third, that work and the work at Open
25  Market beyond that, influenced the evolution of doing
```

1   business and the software that's used for it on the

2   internet.

3                    MR. ADAMO:  Thank you, Your Honor.  I

4   have nothing further.  I pass the witness.

5                    THE COURT:  Thank you.  Cross.

6                    CROSS-EXAMINATION

7   BY MR. HANSON:

8       Q    Good morning, Mr. Treese.  It's good to see

9   you again.  I'm sure you remember that I met you on a

10  rainy day in Boston and asked you a number of questions

11  at your deposition.

12      A    Good morning, Mr. Hanson.

13      Q    Nice to see you again.

14           And at your deposition you answered those

15  questions under oath; isn't that right?

16      A    Yes.

17      Q    And that deposition was transcribed and you

18  read it and signed it?

19      A    Yes.

20      Q    Thank you.

21           And we can rely upon that then, can't we?

22      A    Yes.

23      Q    Yes.  Mr. Treese --

24                    MR. HANSON:  I wonder if we could bring

25  up that screen that showed the pictures of the various

## <u>CERTIFICATE OF FILING AND SERVICE</u>

I hereby certify that on this 21st day of April, 2011, two bound copies of the

Joint Appendix were served via UPS Next Day Air, to the following:

Paul J. Ripp
WILLIAMS MONTGOMERY & JOHN LTD.
233 South Wacker Drive, Suite 6100
Chicago, Illinois 60606
(312) 443-3205

*Counsel for Appellee*

Robert B. Wilson
Neil G. Cave
QUINN EMANUEL URQUHART & SULLIVAN LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

*Counsel for Appellee*

David A. Nelson
QUINN EMANUEL URQUHART & SULLIVAN LLP
500 West Madison Street, Suite 2450
Chicago, Illinois 60661
(312) 705-7465

*Counsel for Appellee*

I further certify that on this 21st day of April, 2011, the required number of

copies of the Joint Appendix were hand filed at the Office of the Clerk, United

States Court of Appeals for the Federal Circuit.

The necessary filing and service were performed in accordance with the instructions given me by counsel in this case.

THE LEX GROUP DC
1825 K Street, N.W., Suite 103
Washington, D.C.  20006
(202) 955-0001